**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, | |
| Plaintiff, | |
| v. | Case No. 14-cv-04361 |
| PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS, INC.; AND ACTAVIS PLC, | Honorable Elaine E. Bucklo |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
PLAINTIFF'S COMPLAINT UNDER THE PRIMARY JURISDICTION DOCTRINE
AND UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................. 1

II.     THE COURT SHOULD DISMISS OR STAY THIS ACTION UNDER THE DOCTRINE OF PRIMARY JURISDICTION ................................. 5

III.     THE COURT SHOULD DISMISS THE ACTION UNDER RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM ............................................ 12

     A.     All Claims Fail Because the City Engages in Improper Group Pleading ........... 13

     B.     All Claims Fail Because the City Has Not Pleaded Fraud with Particularity ...... 15

     C.     All Claims Fail Because the City Has Not Alleged Any Actionable Misrepresentations or Omissions ................................................. 17

     D.     All Claims Fail Because the City Has Not Adequately Alleged Causation ........ 23

         1.     There Are No Factual Allegations That Defendants' Purported Misconduct Caused the City to Pay for Opioid Prescriptions or Caused Other Harm .................................................... 24

         2.     The Relationship Between the Alleged Misrepresentations and the Alleged Harm Is Too Attenuated to Support the City's Claims As a Matter of Law ...................................................... 26

     E.     All Claims Fail Because the City Has Not Adequately Alleged Injury ............. 30

     F.     The Complaint Is Deficient on Multiple Additional Grounds ........................ 34

         1.     The Claim Under Chicago Municipal Code § 2-25-090 (Count I) Must Be Dismissed ................................................... 34

             a.     The City Has Not Adequately Pleaded Standing ........................ 34

             b.     Defendants Cannot Be Held Liable for Consumer Fraud Based on Materials That Complied with FDA Regulations ........ 34

             c.     The City Cannot Obtain Relief for Consumer Fraud Prior to November 19, 2008 ................................................... 35

         2.     The Municipal False Statement (Count III), FCA (Counts IV and V) and Insurance Fraud (Count VII) Claims Must Be Dismissed for Inadequate Pleading of Presentment, Knowledge, and Conspiracy ................................................. 36

         3.     The Municipal Services Claim (Count VI) Must Be Dismissed ............. 38

         4.     The Common Law Civil Conspiracy Claim (Count VIII) Must Be Dismissed ................................................... 39

         5.     The Unjust Enrichment Claim (Count X) Must Be Dismissed ............... 40

IV.     CONCLUSION ............................................................... 40

i

## TABLE OF AUTHORITIES

Page

<u>**CASES**</u>

*Aaronson v. Vital Pharm., Inc.*,
  2010 U.S. Dist. LEXIS 14160 (S.D. Cal. Feb. 17, 2010) ...................................................... 12

*Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*,
  499 F.3d 663 (7th Cir. 2007) ............................................................................................. 13

*Allegis Realty Investors v. Novak*,
  223 Ill. 2d 318 (2006) ....................................................................................................... 35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................... 13

*Bank One, Okla., N.A. v. Trammell Crow Servs., Inc.*,
  2003 WL 23019173 (N.D. Ill. Dec. 23, 2003) .................................................................... 14

*Bankers Trust Co. v. Old Republic Ins. Co.*,
  959 F.2d 677 (7th Cir. 1992) ............................................................................................. 17

*Beaman v. Souk*,
  2011 WL 832506 (C.D. Ill. Mar. 3, 2011) ................................................................... 14, 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................... 12, 13, 39

*Bober v. Glaxo Wellcome, PLC*,
  246 F.3d 934 (7th Cir. 2011) ....................................................................................... 21, 35

*Borsellino v. Goldman Sachs Grp., Inc.*,
  477 F.3d 502 (7th Cir. 2007) ....................................................................................... 13, 39

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) ........................................................................................................... 19

*Buckner v. Atl. Plant Maint., Inc.*,
  182 Ill. 2d 12 (1998) ......................................................................................................... 39

*Cain v. Osman*,
  286 F. App'x 934 (7th Cir. 2008) ...................................................................................... 14

*Cent. Reg'l Emps. Benefit Fund v. Cephalon, Inc.*,
  2009 WL 3245485 (D.N.J. Oct. 7, 2009) ........................................................................... 19

**TABLE OF AUTHORITIES**
(continued)

Page

*Cent. Reg'l Emps. Benefit Fund v. Cephalon, Inc.*,
   2010 WL 1257790 (D.N.J. Mar. 29, 2010) ........................................................ 24, 31

*Cincinnati Life Ins. Co. v. Beyrer*,
   722 F.3d 939 (7th Cir. 2013) ................................................................. 14, 16, 17

*City of Chicago v. Beretta U.S.A. Corp.*,
   213 Ill. 2d 351 (2004) ........................................................................... 38

*Cleary v. Philip Morris Inc.*,
   656 F.3d 511 (7th Cir. 2011) .................................................................... 40

*Cnty. of Cook v. Philip Morris, Inc.*,
   353 Ill. App. 3d 55 (2004) ................................................................. 23, 26, 39

*Coehlo v. Park Ridge Oldsmobile, Inc.*,
   2001 U.S. Dist. LEXIS 14652 (N.D. Ill. Sept. 19, 2001) ...................................... 22

*Connick v. Suzuki Motor Co.*,
   174 Ill. 2d 482 (1996) ........................................................................... 22

*Cont'l Cas. Co. v. Mohatare*,
   2012 WL 4830419 (N.D. Ill. Oct. 10, 2012) ...................................................... 14

*Cytyc Corp. v. Neuromedical Sys., Inc.*,
   12 F. Supp. 2d 296 (S.D.N.Y. 1998) .......................................................... 18, 35

*Design Time, Inc. v. Synthetic Diamond Tech., Inc.*,
   674 F. Supp. 1564 (N.D. Ind. 1987) ............................................................. 14

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) ................................................................... 13

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
   2008 WL 5413105 (D.N.J. Dec. 23, 2008) ....................................................... 32

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
   784 F. Supp. 2d 508 (D.N.J. 2011) ............................................................. 29

*Emp'r Teamsters-Local Nos. 175/505 v. Bristol Myers Squibb Co.*,
   969 F. Supp. 2d 463 (S.D. W. Va. 2013) ...................................................... 25, 27

*Endo Pharm., Inc. v. Actavis, Inc.*,
   2013 WL 4774494 (D.N.J. Sept. 3, 2013) ........................................................ 12

iii

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Fowler v. Caremark Rx, Inc.*,
  2006 WL 2425331 (N.D. Ill. Aug. 21, 2006) ........................................................ 23

*Gordon v. Church & Dwight Co.*,
  2010 U.S. Dist. LEXIS 32777 (N.D. Cal. Apr. 2, 2010) ....................................... 11

*Gredell v. Wyeth Labs.*,
  367 Ill. App. 3d 287 (2006) ................................................................................... 20

*Greifenstein v. Estee Lauder Corp., Inc.*,
  2013 WL 3874073 (N.D. Ill. July 26, 2013) ......................................................... 21

*H.C. Duke & Son v. Prism Mktg. Corp.*,
  2013 U.S. Dist. LEXIS 140254 (C.D. Ill. Sept. 30, 2013) .................................... 14

*Health Care Serv. Corp. v. Olivares*,
  2011 WL 4591913 (E.D. Tex. Sept. 2), *adopted by* 2011 WL 4591915 (E.D.
  Tex. Sept. 30, 2011) ............................................................................................... 26

*Henson v. CSC Credit Serv.*,
  29 F.3d 280 (7th Cir. 1994) ..................................................................................... 6

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992) ............................................................................................... 26

*Ill. Non-Profit Risk Mgmt. Ass'n v. Human Serv. Ctr. of S. Metro-E.*,
  378 Ill. App. 3d 713 (2008) ................................................................................... 39

*Imagenetix, Inc. v. Frutarom USA, Inc.*,
  2013 WL 6419674 (S.D. Cal. Dec. 9, 2013) ......................................................... 12

*In re Actimmune Mktg. Litig.*,
  2010 WL 3463491 (N.D. Cal. Sept. 1, 2010), *aff'd, In re Actimmune Mktg.
  Litig.*, 464 F. App'x 651 (9th Cir. 2011) ............................................................... 24

*In re Actimmune Mktg. Litig.*,
  464 F. App'x 651 (9th Cir. 2011) ........................................................................... 24

*In re Actimmune Mktg. Litig.*,
  614 F. Supp. 2d 1037 (N.D. Cal. 2009) ................................................................. 19

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
  2012 WL 3154957 (N.D. Cal. Aug. 2, 2012) ......................................................... 24

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*,
2009 WL 1703285 (C.D. Cal. June 17, 2009) ........................................................ 19

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
2009 WL 2043604 (D.N.J. July 10, 2009) ....................................................... 19, 27

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
2010 WL 2346624 (D.N.J. June 9, 2010) ........................................................ 20, 31

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
678 F.3d 235 (3d Cir. 2012) ................................................................................ 25

*In re Towers*,
162 F.3d 952 (7th Cir. Ill. 1998) ......................................................................... 30

*In re Vioxx Prods. Liab. Litig.*,
2010 U.S. Dist. Lexis 142767 (E.D. La. Mar. 31, 2010) ..................................... 28

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*,
2010 WL 3119499 (S.D. Ill. Aug. 5, 2010) ..................................................... 27, 32

*In re Zyprexa Prods. Liab. Litig.*,
671 F. Supp. 2d 397 (E.D.N.Y. 2009) ............................................................. 28, 32

*Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*,
2014 WL 2115498 (E.D. Pa. May 21, 2014) ................................................... 20, 21

*Indeck N. Am. Power Fund, L.P. v. Norweb PLC*,
316 Ill. App. 3d 416 (2000) ................................................................................ 39

*Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*,
585 F. Supp. 2d 1339 (M.D. Fla. 2008) ..................................................... 27, 28, 30

*Kennedy v. Medtronic, Inc.*,
366 Ill. App. 3d 298 (2006) ................................................................................ 21

*Kirk v. Michael Reese Hosp. & Med. Ctr.*,
117 Ill. 2d 507 (1987) ........................................................................................ 29

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ............................................................................................ 35

*Lewis v. Lead Indus. Ass'n, Inc.*,
342 Ill. App. 3d 95 (2003) .................................................................................. 40

v

**TABLE OF AUTHORITIES**
(continued)

Page

*Martin ex rel. Martin v. Ortho Pharms. Corp.*,
169 Ill. 2d 234 (1996) ................................................................................ 29

*Martis v. Grinnell Mut. Reinsurance Co.*,
388 Ill. App. 3d 1017 (2009) ...................................................................... 40

*McCauley v. City of Chicago*,
671 F.3d 611 (7th Cir. 2011) ...................................................................... 13

*McClure v. Owens Corning Fiberglas Corp.*,
188 Ill. 2d 102 (1999) ................................................................................ 39

*Monster Beverage Corp. v. Herrera*,
2013 U.S. Dist. LEXIS 125001 (C.D. Cal. Aug. 22, 2013) ....................... 11

*Moore v. Boating Indus. Ass'n*,
819 F.2d 693 (7th Cir. 1987) ...................................................................... 39

*Morgan v. SmithKline Beecham Corp.*,
2013 U.S. Dist. LEXIS 96869 (E.D. Pa. July 10, 2013) ...................... 27, 29

*Moyer v. Michaels Stores, Inc.*,
2014 WL 3511500 (N.D. Ill. July 14, 2014) .............................................. 32

*Mut. Pharm. Co. v. Bartlett*,
133 S. Ct. 2466 (2013) ................................................................................ 11

*Newman v. McNeil Consumer Healthcare*,
2013 U.S. Dist. LEXIS 113440 (N.D. Ill. Mar. 29, 2013) .................... 18, 35

*Opoka v. INS*,
94 F.3d 392 (7th Cir. 1996) .......................................................................... 6

*Pa. Emps. Benefit Trust, Fund (PEBTF) v. Ortho-McNeil-Janssen Pharm., Inc.*,
2010 WL 3613056 (Ct. Comm. Pl. July 7, 2010) ...................................... 32

*People ex rel. Hartigan v. E & E Hauling, Inc.*,
153 Ill. 2d 473 (1992) ............................................................................ 24, 40

*People ex rel. Madigan v. United Constr. of Am.*,
2012 IL App. (1st) 120308........................................................................... 24

*Peterson v. Cmty. Gen. Hosp.*,
2003 WL 262515 (N.D. Ill. Feb. 7, 2003) .................................................. 23

vi

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) ................................................... 13

*Prohias v. Pfizer, Inc.*,
    490 F. Supp. 2d 1228 (S.D. Fla. 2007) .......................................... 18, 35

*Reuter v. MasterCard Int'l, Inc.*,
    397 Ill. App. 3d 915 (2010) ................................................... 30

*Roberts v. Chemlawn Corp.*,
    716 F. Supp. 364 (N.D. Ill. 1989) .............................................. 5, 10

*Ryan v. Chemlawn Corp.*,
    935 F.2d 129 (7th Cir. 1991) ................................................... 5, 9

*S.E. Laborers Health & Welfare Fund v. Bayer Corp.*,
    2011 WL 5061645 (11th Cir. Oct. 24, 2011) ..................................... 25

*Scachitti v. UBS Fin. Servs.*,
    215 Ill. 2d 484 (2005) ........................................................ 36

*Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharm., Inc.*,
    586 F.3d 500 (7th Cir. 2009) ................................................... 11

*Season Comfort Corp. v. Ben A. Borenstein Co.*,
    281 Ill. App. 3d 648 (1995) ................................................... 40

*Steadfast Ins. Co. v. Auto Mktg. Network*,
    2 F. Supp. 2d 1058 (N.D. Ill. 1998) ........................................... 31

*Steadfast Ins. Co., Inc. v. Auto Mktg. Network, Inc.*,
    1997 WL 1106276 (N.D. Ill. Aug. 12, 1997) ..................................... 30

*Suburban Buick, Inc. v. Gargo*,
    2009 WL 1543709 (N.D. Ill. May 29, 2009) ...................................... 15

*Swearingen v. Late July Snacks LLC*,
    2014 U.S. Dist. LEXIS 74114 (N.D. Cal. May 29, 2014) .......................... 11

*Taradejna v. Gen. Mills, Inc.*,
    909 F. Supp. 2d 1128 (D. Minn. 2012) .......................................... 11

*Tierney v. Vahle*,
    304 F.3d 734 (7th Cir. 2002) .................................................. 3

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Travelers Indem. Co. v. Cephalon, Inc.*,
    2014 WL 3408550 (E.D. Pa. July 14, 2014) .............................................. 19, 20, 21

*TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*,
    153 F.3d 822 (7th Cir. 1998) ............................................................... 31

*Tutoki v. Celebrezze*,
    375 F.2d 105 (7th Cir. 1967) ............................................................... 12

*United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund
    v. Amgen, Inc.*,
    400 F. App'x 255 (9th Cir. 2010) ......................................................... 19, 27

*United States ex rel. Dolan v. Long Grove Manor, Inc.*,
    2014 WL 3583980 (N.D. Ill. July 18, 2014) ................................................ 36

*United States ex rel. Drescher v. Highmark, Inc.*,
    305 F. Supp. 2d 451 (E.D. Pa. 2004) ...................................................... 37

*United States ex rel. Fowler v. Caremark Rx, LLC*,
    496 F.3d 730 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound
    Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009) ...................................... 36

*United States ex rel. Garst v. Lockheed-Martin Corp.*,
    328 F.3d 374 (7th Cir. 2003) ............................................................... 16, 17

*United States ex rel. Geschrey v. Generations Healthcare, LLC*,
    922 F. Supp. 2d 695 (N.D. Ill. 2012) ...................................................... 36

*United States ex rel. Gross v. AIDS Research Alliance-Chi.*,
    415 F.3d 601 (7th Cir. 2006) ............................................................... 13, 37

*United States ex rel. Kennedy v. Aventis Pharm., Inc.*,
    2008 WL 5211021 (N.D. Ill. Dec. 10, 2008) ............................................... 33

*United States ex rel. Obert-Hong v. Advocate Health Ctr.*,
    2001 WL 303692 (N.D. Ill. Mar. 28, 2001) ................................................ 17

*United States ex rel. Walner v. NorthShore Univ. Healthsystem*,
    660 F. Supp. 3d 891 (N.D. Ill. 2009) ...................................................... 38

*United States ex rel. West v. Ortho-McNeil Pharm., Inc.*,
    2007 WL 2091185 (N.D. Ill. July 20, 2007) ................................................ 16, 19

**TABLE OF AUTHORITIES**
**(continued)**

Page

*United States ex rel. Zemplenyi v. Grp. Health Coop.*,
 2011 WL 814261 (W.D. Wash. Mar. 3, 2011) ...................................................... 33

*United States v. Caputo*,
 288 F. Supp. 2d 912 (N.D. Ill. 2003) .................................................................. 21

*United States v. Krizek*,
 111 F.3d 934 (D.C. Cir. 1997) ............................................................................ 37

*United States v. Mackby*,
 261 F.3d 821 (9th Cir. 2001) .............................................................................. 37

*United States v. President & Fellows of Harvard Coll.*,
 323 F. Supp. 2d 151 (D. Mass. 2004) ................................................................ 37

*United States v. W. Pac. R.R. Co.*,
 352 U.S. 59 (1956) ................................................................................................ 5

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
 20 F.3d 771 (7th Cir. 1994) ......................................................................... 13, 14

*Vodak v. City of Chicago*,
 2006 WL 2524141 (N.D. Ill. Aug. 20, 2006) ..................................................... 30

*Watt v. City of Highland Park*,
 2001 WL 1090152 (N.D. Ill. Sept. 13, 2001) ............................................... 14, 15

*Weinberger v. Bentex Pharm., Inc.*,
 412 U.S. 645 (1973) ............................................................................................ 12

*Williams v. Purdue Pharma Co.*,
 297 F. Supp. 2d 171 (D.D.C. 2003) .................................................................... 32

*Wright v. Associated Ins. Cos.*,
 29 F.3d 1244 (7th Cir. 1994) ................................................................................ 3

## STATUTES

21 U.S.C § 355-1 .................................................................................................. 10

21 U.S.C. § 352(n) ............................................................................................... 10

21 U.S.C. § 355(d) ............................................................................................... 11

ix

**TABLE OF AUTHORITIES**
**(continued)**

Page

21 U.S.C. § 355(o) .......................................................................................... 8

31 U.S.C.A. § 3729 *et seq.* .......................................................................... 36

720 ILCS 5/17-10.5 ...................................................................................... 38

740 ILCS § 175 *et seq.* ................................................................................ 36

815 ILCS 505/10(b)(1) ................................................................................ 34

Chi. Mun. Code § 1-20-020 ......................................................................... 38

Chi. Mun. Code § 1-21-010(a) ............................................................... 30, 38

Chi. Mun. Code § 1-22-020(2) ..................................................................... 37

Chi. Mun. Code § 1-22-20(1) ....................................................................... 36

Chi. Mun. Code § 2-25-090 ..................................................................... 34, 35

Chi. Mun. Code § 2-25-090(a) ..................................................................... 34

Chi. Mun. Code § 2-25-090(b) ..................................................................... 34

Chi. Mun. Code § 2-25-090(c) ..................................................................... 34

## OTHER AUTHORITIES

36 Fed. Reg. 18539 (Sept. 16, 1971) ........................................................... 10

*FDA Blueprint for Prescriber Education for Extended-Release and Long-Acting*
*Opioid Analgesics*,
http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/U
CM277916.pdf ............................................................................................. 10

Institute of Medicine, "Relieving Pain in America: A Blueprint for Transforming
Prevention, Care, Education, and Research, available at www.nap.edu/
catelogue.php?record_id=13172 (National Institutes 2011) ........................ 7

*Questions and Answers: FDA Approves a Risk Evaluation and Mitigation*
*Strategy (REMS) for Extended-Release and Long-Acting (ER/LA) Opioid*
*Analgesics*,
http://www.fda.gov/drugs/drugsafety/informationbydrugclass/ucm309742.htm .................. 10

x

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Use of Approved Drugs for Unlabeled Indications*, FDA Drug Bull., Vol. 12, No.
   1 (Apr. 1982)...................................................................................................... 19

**REGULATIONS**

21 C.F.R. § 1308.12 .............................................................................................. 14

21 C.F.R. § 1308.14 .............................................................................................. 14

21 C.F.R. § 202.1 .................................................................................................. 10

21 C.F.R. § 314.80 ................................................................................................ 10

21 C.F.R. § 314.81 ................................................................................................ 10

21 C.F.R. § 314.81(b)(2)(i) ................................................................................... 10

21 C.F.R. § 314.81(b)(2)(v) .................................................................................. 10

21 C.F.R. § 314.81(b)(2)(vi) ................................................................................. 10

## I. INTRODUCTION

Defendants Purdue Pharma L.P., Purdue Pharma, Inc., and The Purdue Frederick Company, Inc. ("Purdue"), Teva Pharmaceutical Industries, Ltd. ("Teva") and Cephalon Inc. ("Cephalon"), Johnson & Johnson and Janssen Pharmaceuticals, Inc. ("Janssen"), Endo Health Solutions Inc. ("Endo"), and Actavis, plc ("Actavis") move to dismiss or stay Plaintiff City of Chicago's Complaint (Docket No. 81-1, filed July 22, 2014).

Defendants are competing manufacturers of opioid analgesics—FDA-approved prescription drugs used for management of pain (or in some cases their parent companies).[1] Defendants manufacture a range of such drugs in a variety of formulations and potencies which the FDA has approved for a variety of indications, including for some of the drugs at issue, "the management of pain severe enough to require daily, around the clock, long-term opioid treatment and for which alternative treatment options are inadequate." As their FDA-approved labeling makes clear, all of the drugs are opioids that carry serious health risks, and are regulated under the federal Controlled Substances Act—in most cases, as Schedule II controlled substances. All are closely and continuously monitored by the FDA, which regulates their approved indications, warnings, and promotion.

The City's Complaint is nothing if not broad. Over the course of 121 pages and 376

---

[1] As set forth in Actavis Individual Motion to Dismiss Plaintiff's Complaint (the "Actavis Motion"), filed concurrently herewith, Actavis does not manufacture, market, distribute, or sell any pharmaceutical products. Actavis Motion at p. 3. Likewise, as set forth in its separate Motion to Dismiss, Teva Pharmaceutical Industries Ltd. ("Teva") does not manufacture, market, distribute, or sell opioids in the United States. To the extent that this Joint Memorandum of Points and Authorities describes the conduct of individual defendants collectively using the term "Defendants," it should not be construed to be an admission that Actavis or Teva engages in that conduct. Moreover, as set forth in the Actavis Motion and Teva's separate motion to dismiss, this Court lacks personal jurisdiction over Actavis and Teva and the Complaint should be dismissed as to Actavis and Teva pursuant to Federal Rule of Civil Procedure 12(b)(2). *Id.* For simplicity, in this Memorandum the individual defendants are from time to time referred to collectively as "Defendants." Such reference is not intended to represent that Actavis or Teva at any time engaged in any manufacturing, marketing or sales activities of pharmaceutical products.

paragraphs, the City sweepingly accuses Defendants of conducting a 20-year-long fraudulent scheme to promote opioids for what the City claims is a novel, unsafe, and ineffective use—namely, the long-term treatment of chronic non-cancer pain. Complt. ¶¶ 5-8, 35, 42-46, 239. The City alleges that over the course of this period, Defendants both directly and indirectly, with the assistance of key opinion leaders, pain societies, and medical groups, disseminated false and misleading information that both overstated the efficacy of such treatment and minimized its risks. Complt. ¶¶ 125-187, 188-195, 241-248. The City asserts that the allegedly fraudulent statements and omissions purportedly caused doctors to write medically inappropriate opioid prescriptions for patients in Chicago, which, in turn, caused the City to pay for these prescriptions. Complt. ¶¶ 266. The City also seeks to attribute to Defendants a host of social problems associated with unidentified prescriptions, including widespread addiction to prescription drugs and increased criminal trafficking in illicit drugs. Complt. ¶ 256-58.

The City asserts 10 claims for relief, all sounding in fraud: (1) consumer fraud under Chicago Municipal Code, (2) false advertising under the Chicago Municipal Code, (3) false statements to the City under the Chicago Municipal Code; (4) false claims under Chicago Municipal Code § 1-22-020 ("The Chicago Municipal False Claims Act" or "CFCA"); (5) false certification under the Chicago Municipal False Claims Act; (6) reimbursement of costs for provision of municipal services under the Chicago Municipal Code; (7) statutory insurance fraud (based on the City's status as a self-insured entity); (8) common law fraud; (9) civil conspiracy to defraud; and (10) unjust enrichment. The Complaint seeks for injunctive relief, civil penalties, restitution, treble damages for false claims (the City alleges that since 2007 it has spent $9.5 million to reimburse opioid prescriptions under City health plans), reimbursement of service costs, common law compensatory and punitive damages, and costs and attorney fees. Complt.

¶¶ 274-374.

Despite its prolixity, the Complaint is as notable for what it does not allege as for what it does. It acknowledges that Defendants' opioids came with FDA-mandated warnings—and thus the Court may freely consider the contents of those warnings on this motion[2]—but it wholly ignores the contents of those warnings, which extensively discuss the very risks that the City alleges Defendants suppressed. It largely ignores Defendants' actual promotion of their drugs (also highly regulated by the FDA), but instead concerns itself almost exclusively with what the City calls "unbranded" promotion—general information about benefits and risks of opioids and other pain relievers without any focus on specific drugs and divorced from the learned intermediary consultations and product-specific warning information which inform actual medical prescription decisions.

The Complaint also contains only the scantest discussion of Defendants themselves, several of whom are barely mentioned in the Complaint at all. Instead, the City simply lumps all Defendants together as a group, ignoring relevant differences between the drugs they are alleged to have manufactured, the FDA-approved indications and the warnings the drugs carried, and the dates the drugs were marketed, and providing no specifics about any Defendant's alleged role in the alleged scheme. The Complaint could serve as a textbook example of improper group pleading.

Remarkably, the City simply glosses over the fact, again reflected in the FDA-approved

---

[2] Because the Complaint relies upon the labeling for Defendants' products, the labels are incorporated by reference in the Complaint, and the Court may consider them for purposes of resolving the motion to dismiss. *See, e.g.*, Complt. ¶¶ 5,14,17, 43; *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) ("document[s] merely ... referred to in [a] complaint" can be considered for purposes of resolving a motion to dismiss where their authenticity is not disputed and they are central to the claims); *Wright v. Associated Ins. Cos*., 29 F.3d 1244, 1248 (7th Cir. 1994) (consideration of documents that "are referred to in the plaintiff's complaint and are central to [plaintiff's] claim," is proper on a Rule 12(b)(6) Motion to Dismiss and does not "convert[] the motion to dismiss to a motion for summary judgment.")

labeling that the Complaint acknowledges, that the FDA has *approved* many of the drugs here in issue as safe and effective for long-term treatment of chronic non-cancer pain. And egregiously, the City ignores that just last year, the FDA *specifically addressed* a petition seeking to curtail the use of opioids for the treatment of non-cancer pain based on the same safety and efficacy arguments that the City now advances in its Complaint and seeks to persuade the Court to adopt. After a thorough review, the FDA determined that the studies cited by the petitioner (and repeated by the City here) were not scientifically valid to establish the propositions for which they were offered. In order to further examine these complex medical issues on a scientifically appropriate basis, the FDA has established a protocol for testing which it is currently overseeing. Despite neglecting to mention this FDA decision in its 121-page Complaint, the City asks this Court to supplant its judgment for that of the FDA and decide these matter of public health before the expert agency completes its active study of those same issues.

Defendants therefore move, first, to dismiss or stay the case under the doctrine of primary jurisdiction. When the FDA ruled on the petition last year permitting the continued usage of opioids to treat chronic non-cancer pain, it also ordered certain opioid manufacturers to conduct additional post-marketing studies to provide additional data on the issue. Those studies are scheduled to be completed over the next four years, and pending their completion, the underlying scientific and policy issues raised in the Complaint remain pending before the FDA and squarely within its primary jurisdiction.

Second, Defendants move to dismiss the Complaint for failure to state a claim, based on numerous and glaring deficiencies, including improper group pleading, failure to plead fraud with particularity, failure to adequately plead actionable misrepresentations or omissions, causation, and injury, and failure to adequately plead other elements of the City's claims. In

addition, Defendants Actavis, Endo, Janssen and Johnson & Johnson, and Cephalon and Teva have submitted short individual motions with supporting memoranda addressing issues specific to them.

## II. THE COURT SHOULD DISMISS OR STAY THIS ACTION UNDER THE DOCTRINE OF PRIMARY JURISDICTION

"The doctrine of primary jurisdiction is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991). This prudential doctrine applies "whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)). Although "[n]o fixed formula exists for applying" the doctrine, a court should consider whether (1) its application would "promote[ ] consistency and uniformity, particularly where the development of the law is dependent to some degree upon administrative policy," (2) "an administrative agency is uniquely qualified to resolve the complexities of [issues] which are outside the conventional experience of the courts," and (3) judicial economy would be served "because the dispute may be decided within the agency." *Id.* The "advisability of invoking primary jurisdiction is greatest where the issue is already before the agency." *Roberts v. Chemlawn Corp.*, 716 F. Supp. 364, 366 (N.D. Ill. 1989). All of these factors heavily favor invoking the doctrine here: the City's claims raise complex issues uniquely suited for the FDA, and those issues have been and are currently before the agency.

The City's central allegation is that opioids are "too addictive and too debilitating for long-term use for chronic non-cancer pain (pain lasting three months or longer), particularly because their effectiveness wane[s] with prolonged use and because of the substantial risk of

significant side effects and addiction, especially with high-dose use." Complt. ¶ 2; *see also id.* at

¶¶ 34-35. Ignoring that the FDA in fact has approved many opioids for such use, the City claims

that promoting opioids for "long-term use for chronic non-cancer pain" misrepresents both their

safety and effectiveness. *Id.* The City seeks not only damages and penalties, but also an

injunction ordering Defendants "to cease their unlawful promotion of opioids and to correct their

misrepresentations." *Id.* at ¶ 20.

But just last year, in a September 2013 response to a citizen petition filed by a group of

medical clinicians, researchers, and health officials called Physicians for Responsible Opioid

Prescribing (PROP), the FDA rejected the City's central premise.[3] Like the City, PROP

contended that the "[l]ong-term safety and effectiveness of managing [chronic non-cancer pain]

with opioids has not been established." PROP Pet. at 2. Its petition requested that the FDA

change the approved labeling (1) to specify a daily dose maximum equivalent to 100 mg

morphine (MED), (2) to specify a continuous use maximum of 90 days for non-cancer pain, and

(3) to "[s]trike the term 'moderate' from the indication for non-cancer pain." *Id.* The FDA

"carefully reviewed" the petition, received more than 2500 comments submitted to public

dockets related to these issues, conducted hearings, and applied its expertise in assessing the

"relevant literature." *Id.* at 2. After its thorough review, the FDA granted the request to adjust the

description of the severity of pain required for the controlled-release opioid indication (though

---

[3] *See* 7/25/12 Letter from PROP to FDA ("PROP Pet.") and 9/10/13 Letter from FDA to PROP ("FDA Resp."), attached as Exs. 1-2 to the accompanying Declaration of Carolyn J. Kubota. The PROP petition and the FDA's response may be considered by the Court for purposes of resolving this motion. "[I]t is a well-settled principle that the decision of another court or agency ... is a proper subject of judicial notice," *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996), and courts "may ... take judicial notice of matters of public record without converting a ... motion [to dismiss] into a motion for summary judgment." *Henson v. CSC Credit Serv.*, 29 F.3d 280, 284 (7th Cir. 1994).

not in the way PROP requested),[4] but *denied* PROP's requests to establish limits on dosages and duration of use.

At the outset, the FDA emphasized a reality that the City's Complaint here all but ignores—opioids provide important public health benefits:

> When prescribed and used properly, opioids can effectively manage pain and alleviate suffering—clearly a public health priority. Chronic pain is a serious and growing public health problem: it "affects millions of Americans; contributes greatly to national rates of morbidity, mortality, and disability; and is rising in prevalence." There is also evidence that pain is inadequately treated in many patients. [Footnotes omitted.]

FDA Resp. 2 & nn.4-6 (quoting Institute of Medicine, "Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research, available at www.nap.edu/catelogue.php?record_id=13172 (National Institutes 2011) (last visited Aug. 29, 2014)).

On the proposed duration of use restriction, the FDA stated that "[a]fter a review of the literature cited in the Petition, and an assessment of other relevant information ..., FDA has determined that limiting the duration of use for opioid therapy to 90 days is not supportable." FDA Resp. 14. The FDA likewise found that "the scientific literature does not support establishing a maximum recommended daily dose of 100 mg MED." *Id.* at 12. And the agency expressly declined to recognize "a distinction between cancer and non-cancer chronic pain in opioid labeling," stating that PROP failed to provide "scientific support for why labeling should recommend different treatment for [cancer and non-cancer] patients" and "FDA knows of no physiological or pharmacological basis upon which to differentiate the treatment of chronic pain

---

[4] Instead of replacing the terms "moderate to severe pain" with a categorical requirement of "severe pain," as PROP had requested, the FDA changed the indication to require pain "*severe enough* to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." FDA Resp. at 8-9, 11 (emphasis added). As the agency explained, it chose to discontinue the "use of terminology predicated only on a categorical 'severity scale' (e.g., mild, moderate, severe) to characterize the intensity of pain for which ER/LA opioids are indicated" in favor of a "more thoughtful determination that [a patient's pain]—however it may be defined—is severe enough —to require" the use of ER/LA opioids for indicated uses. (*Id*. at 7-8 (emphasis in original).)"

in a cancer setting or patient from the treatment of chronic pain in the absence of cancer." *Id.*
at 9. Finally, the FDA noted that its conclusions were widely shared: the "majority" of the 1,900
comments it received on PROP's Petition "opposed PROP's requests" and "[m]any professional
societies (*e.g.*, the American Academy of Pain Medicine, the American Medical Association, the
American Society of Anesthesiologists, the American Pain Society) did not support the Petition
and stated that the data cited by PROP did not support PROP's requests." *Id.* at 5.

Of course, the FDA fully recognized that opioids "also have grave risks, the most well-
known of which include addiction, overdose, and even death." *Id.* at 2. As its response to PROP
explains, these "well-known" risks are highlighted in the drug labeling, are the subject of FDA-
mandated risk evaluation and mitigation strategies (REMS) requiring additional prescriber and
patient education, and are the basis for extensive regulation under the Controlled Substances Act
aimed at curbing diversion and abuse. *Id.* at 2-5. But the agency found that, despite all the
comments and scientific literature it reviewed, before it could "determine whether additional
action needs to be taken" to address these risks, "more data are needed regarding ... the
relationship between opioid duration of use and adverse effects ... [and] the point at which the
risks of opioid use at ... longer durations of treatment may outweigh the benefits of opioid
analgesic therapy." *Id.* at 10. To that end, the FDA exercised its authority under 21 U.S.C.
§ 355(o) to require manufacturers of extended-release/long-acting opioids—who include several
Defendants here—to "conduct postapproval studies and clinical trials," *id.* at 1, to further assess
"the known serious risks of misuse, abuse, hyperalgesia, addiction, overdose and death." *Id.* at
10-11. These FDA-ordered studies are targeted for completion between 2015 and 2018. *Id.* In the
meantime, FDA continues to permit the marketing of these medications due to their known
health benefits.

The City seeks to have this Court second-guess scientific and regulatory determinations the FDA has recently made after reviewing the currently available scientific evidence, and interfere with FDA's continued and active investigation of these issues, posing an obvious risk of inconsistent and non-uniform administrative and judicial determinations of matters placed within the FDA's "special competence" and "dependent to some degree upon administrative policy." *Ryan*, 935 F.2d at 131. This is plain from the face of the Complaint, which alleges that "[c]onsistently, in their marketing, Defendants failed to disclose the lack of evidence to establish that opioids are safe and effective long-term." Complt. ¶ 60. PROP advanced exactly the same underlying contention—that "[l]ong-term safety and effectiveness of managing [chronic non-cancer pain] with opioids has not been established"—in support of its petition to restrict approved dosages and duration. Prop. Pet. 2. Here, the City relies on the ***same*** studies and literature considered and rejected by the FDA in its response to PROP. For example:

- The City cites studies by Sullivan and Eriksen for the claim that "Defendants have failed to disclose scientific evidence that establishes that many patients on chronic opioid therapy continue to experience significant pain and dysfunction." Complt. ¶ 59 & n.22. The FDA found the Sullivan and Eriksen studies flawed and inconclusive, noting that Sullivan's study did "not address the question of whether chronic non-cancer pain patients fare better or worse on chronic opioid therapy" and Eriksen's study was "insufficient to conclude that chronic opioid therapy ... is ineffective in treating chronic pain and dysfunction." FDA Resp. 15.

- The City cites studies by Braden, Dunn, and Gomes for the claim that "at higher doses, patients are much more likely to develop dependence or addiction, experience pain deterioration due to hyperalgesia, and are three to nine times more likely to die from opioid-related causes than those on low doses." Complt. ¶ 61 & n.24. The FDA found that "the point at which the risk of overdose-related death increases enough to change the benefit-risk assessment of the studied opioids cannot be determined from these studies," and concluded that they did not support establishment of dose limitations. FDA Resp. 13-14.

- The City cites a study by Saunders for the claim that "[e]lderly patients taking opioids have been found to suffer elevated fracture risks, a greater risk for hospitalizations, and increased vulnerability to adverse drug effects and interactions." Complt. ¶ 177 & n.62. The FDA noted that this study "did not take into account any co-morbidities," potentially "confound[ing] the results" and making it "premature to conclude that the

risks of high-dose opioids outweigh their benefits in this population." FDA Resp.
at 12.

- The City cites a study by Martin for the claim that "more than half of patients who
  continuously use opioids for more than 90 days remain on opioids after more than
  five years." Complt. ¶ 97 & n.39. The FDA "disagree[d]" that the study supported
  this claim and found that its data did not "necessarily reflect a safety concern specific
  to longer term use." FDA Resp. 16 & n.63.[5]

Just as clearly, the City seeks to embroil the Court in issues that remain under *continuing*

agency review. The FDA's extensive regulatory oversight of prescription opioids includes

continuing review of all post-marketing safety and efficacy data,[6] continuing development of

REMS requirements to mitigate risks,[7] and continuing regulation of advertising and promotion.[8]

But most notably here, the FDA has ordered manufacturers to conduct post-approval studies for

the express purpose of enabling the agency to determine whether further action on long-term risk

issues should be taken. Because this issue "is already before the agency," the "advisability of

invoking primary jurisdiction is greatest …." *Roberts*, 716 F. Supp. at 366.

In asking this Court to decide scientific and policy matters that fall squarely within the

province of, and *are currently being addressed by*, the FDA, the City has "jumped the gun by

---

[5] The City relies on other materials cited in the PROP petition, all of which the FDA evaluated along with
other "relevant literature" in rejecting PROP's requests for dosage and duration limitations. FDA Resp. 1,
6, 11-17; *compare* Complt. ¶ 65 n.26 (Boscarino studies), ¶ 97 n.39 (Martin study), ¶ 153 (American Pain
Society's Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-cancer Pain), and
¶ 191 n.71 (GAO report on OxyContin), *with* PROP Pet. 6 (citing same studies and materials).

[6] *See* 21 C.F.R. § 314.80; *id.* § 314.81. FDA regulations require, *inter alia*, the submission of annual
reports containing all significant new information that might affect the safety or efficacy of a prescription
medication, *see id.* § 314.81(b)(2)(i), as well as information regarding all relevant clinical and nonclinical
studies not previously reported. *See id.* § 314.81(b)(2)(v), (vi).

[7] *See* 21 U.S.C. § 355-1; *see also Questions and Answers: FDA Approves a Risk Evaluation and
Mitigation Strategy (REMS) for Extended-Release and Long-Acting (ER/LA) Opioid Analgesics*,
http://www.fda.gov/drugs/drugsafety/informationbydrugclass/ucm309742.htm (last visited Aug. 29,
2014): *FDA Blueprint for Prescriber Education for Extended-Release and Long-Acting Opioid
Analgesics*, http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM277916.pdf
(last visited Aug. 29, 2014).

[8] *See* 21 U.S.C. § 352(n); 21 C.F.R. § 202.1; 36 Fed. Reg. 18539 (Sept. 16, 1971) (FTC/FDA
Memorandum of Understanding assigning FDA primary responsibility for regulation of prescription drug
advertising).

suing before the FDA" has resolved those issues. *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharm., Inc.*, 586 F.3d 500, 507, 510 (7th Cir. 2009). As multiple courts have done, this Court should dismiss or stay this action to allow the FDA to first address these matters within the framework it has defined and is currently implementing. *See*, *e.g.*, *Swearingen v. Late July Snacks LLC*, 2014 U.S. Dist. LEXIS 74114, at *8-9 (N.D. Cal. May 29, 2014) (stay proper where "FDA ha[d] the regulatory authority and [was] actively considering an issue central to the litigation"); *Monster Beverage Corp. v. Herrera*, 2013 U.S. Dist. LEXIS 125001, at *39-41 (C.D. Cal. Aug. 22, 2013) (primary jurisdiction applied because question before court was "a question the FDA has taken an interest in investigating and resolving"); *Taradejna v. Gen. Mills, Inc.*, 909 F. Supp. 2d 1128, 1135 (D. Minn. 2012) (dismissal proper where "it would be imprudent for the Court, at this juncture, to substitute its judgment for that of the [FDA's] while revision of the standard ... is pending."); *Gordon v. Church & Dwight Co.*, 2010 U.S. Dist. LEXIS 32777, at *4-5 (N.D. Cal. Apr. 2, 2010) (dismissal proper where the FDA was "still considering public comments and other data in connection with warnings similar to those that plaintiffs seek to have the court impose").

Deference to the FDA's primary jurisdiction is especially warranted here, where the claims challenge the safety and efficacy of FDA-approved prescription drugs. The FDA is the specialized administrative body charged with making certain that opioids, like all prescription drugs, are "'safe for use' under 'the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof.'" *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2471 (2013) (quoting 21 U.S.C. § 355(d)). Indeed, the Supreme Court has emphasized the FDA's "peculiar expertise" and specialized superior institutional competence in this area:

> Evaluation of conflicting reports as to the reputation of drugs among experts in the field is not a matter well left to a court without chemical or medical

> background. The determination whether a drug is generally recognized as safe and effective ... necessarily implicates complex chemical and pharmacological considerations. Threshold questions within the peculiar expertise of an administrative agency are appropriately routed to the agency, while the court stays its hand.

*Weinberger v. Bentex Pharm., Inc.*, 412 U.S. 645, 653-54 (1973) (internal quotations omitted).

Again as many other courts have done in this setting, this Court should dismiss or stay this action under the primary jurisdiction doctrine. *Tutoki v. Celebrezze*, 375 F.2d 105, 107 (7th Cir. 1967) ("This determination is a matter within the primary jurisdiction of the FDA. The district court has neither the facilities nor the expertise to pass on [the drug] in the first instance. The possible conflict of a judicial determination of this question with a subsequent FDA decision ... strengthens our view that the doctrine of primary jurisdiction should be applied" (internal citation omitted)); *see also Imagenetix, Inc. v. Frutarom USA, Inc.*, 2013 WL 6419674, at *4-6 (S.D. Cal. Dec. 9, 2013) (stay proper where "underlying issue" in plaintiff's claims involved "complex" considerations and "technical and scientific questions" that fell "within the primary jurisdiction of the FDA"); *Endo Pharm., Inc. v. Actavis, Inc.*, 2013 WL 4774494, at *2 (D.N.J. Sept. 3, 2013) (unpublished) (dismissing claim "bound-up with determinations that can only be made by FDA"); *Aaronson v. Vital Pharm., Inc.*, 2010 U.S. Dist. LEXIS 14160, at *7-9 (S.D. Cal. Feb. 17, 2010) (dismissal proper where "the[] issues are best suited for the FDA").

## III.    THE COURT SHOULD DISMISS THE ACTION UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM

If the Court does not dismiss or stay under the primary jurisdiction doctrine, it should dismiss the Complaint under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." A complaint sounding in fraud, like the City's here, must meet both the plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and the particularity standard of Rule 9(b). To satisfy the *Twombly* standard, the allegations must transcend the "speculative"

and "conceivable," and must "state a claim to relief that is plausible on its face." *Id*. at 555, 570. The Court must scrutinize the well-pleaded factual allegations to ensure that they are more than "'merely consistent with' a defendant's liability," disregarding "legal conclusions" and "conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009) (quoting *Twombly*, 550 U.S. at 557); *see also McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the claim must be dismissed. *Iqbal*, 556 U.S. at 679; *see also Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).

To satisfy the Rule 9(b) standard, the Complaint must detail the "who, what, when, where, and how" of the fraudulent conduct, *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), stating with particularity "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (quotations omitted). For the reasons that follow, the City fails both tests.

### A. All Claims Fail Because the City Engages in Improper Group Pleading

All the City's claims are predicated on a central allegation that Defendants engaged in a "fraudulent marketing scheme" intended to mislead prescribing physicians and/or patients about the safety and efficacy of opioid drugs. Complt. ¶¶ 100, 278, 300, 310, 317, 332-33, 348, 356, 365, 375. Accordingly, all the claims "sound[] in fraud" and all must meet Rule 9(b)'s heightened pleading requirements. *Borsellino v. Goldman Sachs Group*, *Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).[9] For multiple reasons, the allegations here fail those requirements.

---

[9] *See also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446-47 (7th Cir. 2011) (consumer fraud claim subject to Rule 9(b)); *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005) (same for False Claims Act claim); *Borsellino*, 477 F.3d at 507-08 (same for civil conspiracy to defraud); *Cont'l Cas. Co. v. Mohatare*, 2012 WL

13

As a preliminary matter, the Complaint is filled with improper group pleading. Courts in this Circuit have repeatedly held that complaints that lump together multiple defendants without differentiation should be dismissed because a complaint must allege sufficient facts about ***each*** defendant to state a plausible claim, especially if the claim sounds in fraud. *See, e.g.*, *Vicom*, 20 F.3d at 778 ("We previously have rejected complaints that have 'lumped together' multiple defendants"); *Beaman v. Souk*, 2011 WL 832506, at \*15 (C.D. Ill. Mar. 3, 2011) (failure to give "necessary individualized attention" to each defendant violated Rule 8); *Bank One, Okla., N.A. v. Trammell Crow Servs., Inc.*, 2003 WL 23019173, at \*2 (N.D. Ill. Dec. 23, 2003) (dismissing claims against parent company lumped with subsidiary); *Watt v. City of Highland Park*, 2001 WL 1090152, at \*2-3 (N.D. Ill. Sept. 13, 2001) (dismissing several defendants from undifferentiated claim against all defendants); *Design Time, Inc. v. Synthetic Diamond Tech., Inc.*, 674 F. Supp. 1564, 1569 (N.D. Ind. 1987) ("A complaint that attributes misrepresentations to all defendants, 'lumped' together for pleading purposes, generally is insufficient.").

The City's group pleading here is especially egregious. Defendants are nine separate and distinct companies. Defendants or their affiliates manufacture and sell opioid drugs for the treatment of various conditions under different FDA-approved product labels. *See* note 1, *supra*. The drugs are not interchangeable, ranging from low potency Schedule IV opioids to Schedule II opioids 100 times more potent than morphine. *See* 21 C.F.R. §§ 1308.12; 1308.14. They include both immediate acting formulations approved for acute pain and extended release formulations

---

4830419, at \*2 (N.D. Ill. Oct. 10, 2012) (same for insurance fraud); *Cain v. Osman*, 286 F. App'x 934, 936 (7th Cir. 2008) (same for common law fraud); *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 950 (7th Cir. 2013) (same for fraud-predicated unjust enrichment). The City's consumer fraud count also alleges that Defendants committed "unfair method[s] of competition[]," *see* Complt. ¶¶ 288-96, but here the claim is based entirely on allegedly deceptive conduct and therefore is still subject to Rule 9(b). *See H.C. Duke & Son v. Prism Mktg. Corp.*, 2013 U.S. Dist. LEXIS 140254 (C.D. Ill. Sept. 30, 2013) (unfairness claim based on deceptive practice allegations was not a "claim of merely unfair practices" and therefore still subject to Rule 9(b))(internal quotations omitted).

approved for chronic pain. Some are administered orally, others by transdermal patch. Some were approved and available decades ago, others as recently as 2012.

The great bulk of the City's allegations improperly lump together all nine companies as "Defendants," failing to differentiate between either related or unrelated companies or between different drugs, labels, or relevant time periods, and, most importantly, failing to specify which company did or said what, when, or where.[10] *See* Complt. ¶¶ 1-195, 239-79, 285-376. The few paragraphs that allege conduct by a particular company, *e.g.*, *id.* ¶¶ 50-56, 196-238, 280-84, do not remotely state facts plausibly supporting the City's sweeping fraud claim. Actavis, Endo, Teva, and Janssen receive almost no mention at all, while the allegations mentioning Purdue and Cephalon largely concern off-label marketing claims that do not amount to fraud.[11]

The City's pervasive group pleading makes it impossible to tell what the City claims each Defendant did. This is by itself sufficient reason to dismiss the Complaint. *See Beaman*, 2011 WL 832506, at *15; *Watt*, 2001 WL 1090152, at *2-3 (dismissing claims where group-pled allegations, "if read literally, would absurdly charge each police officer with carrying out everything" alleged); *Suburban Buick, Inc. v. Gargo*, 2009 WL 1543709, at *4 (N.D. Ill. May 29, 2009) (complaint's "many broad references to 'Defendants'" were "wholly inadequate to put defendants on notice of the conduct alleged").

### B. All Claims Fail Because the City Has Not Pleaded Fraud with Particularity

The City fails to plead *any* of the other specifics necessary to satisfy Rule 9(b). Despite hundreds of paragraphs of broad, conclusory, and undifferentiated assertions about opioid

---

[10] For example, the City alleges that "Defendants" began their opioid marketing scheme "over 20 years ago," Complt. ¶ 5, but does not acknowledge that many Defendants were not even in the business of selling opioids at that time or, for those that were, which opioids they were selling.

[11] As noted at the outset, Actavis, Endo, Janssen, and Teva and Cephalon have filed individual motions and supporting memoranda separately addressing the insufficiency of the few allegations that mention them by name.

marketing generally, Complt. ¶¶ 1-273, the Complaint fails to allege any relevant specifics about any transactions in which the City claims it was defrauded:

- The City fails to identify **who** made or received any alleged false statements. In particular, the City fails to allege any facts about interactions between any Defendant and either the City itself or any doctor who prescribed any of the opioids at issue, including which Defendant had contact with which doctor, what was said to that doctor, who made the statements, or when and where the interaction took place.

- The City fails to identify **what** supposedly false statements any Defendant allegedly made to the City or to physicians who wrote opioid prescriptions for which the City paid, much less allege **why** any such statement was false.

- The City fails to identify **where** any alleged wrongful conduct occurred, let alone where each false statement was made.

- The City fails to identify **when** any particular false statement was made or **when** the City reimbursed for prescriptions on the basis of any Defendant's alleged fraudulent activity.

- The City fails to allege **how** any alleged fraudulent acts by any Defendant affected any of the prescriptions that the City paid for. It has not specified why any doctor prescribed opioids, what conditions they were prescribed for, whether the patients benefited from the prescriptions, or that any of the prescriptions were inappropriate or not medically necessary for those patients.

Courts in this circuit have regularly dismissed fraud-based claims that rely on conclusory assertions of "misrepresentations" without identifying the communications at issue or the "who, what, when, where, and how" required by Rule 9(b). *See, e.g., United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378-79 (7th Cir. 2003) (lengthy complaint that failed to specify any statement or why it was false violated Rule 9(b)); *Beyrer*, 722 F.3d at 949 (Rule 9(b) unmet where plaintiff spent "a great deal of energy insinuating that fraud occurred," but failed to allege details of specific fraudulent activity); *United States ex rel. West v. Ortho-McNeil Pharm., Inc.*, 2007 WL 2091185, at *5 (N.D. Ill. July 20, 2007) (False Claims Act claims dismissed where generalized allegations of off-label marketing did not identify which sales representatives made misrepresentations, to which doctors, or what about the statements was false); *United*

*States ex rel. Obert-Hong v. Advocate Health Care Ctr.*, 2001 WL 303692, at *2 (N.D. Ill. Mar. 28, 2001) (complaint fell "far short" of satisfying Rule 9(b) where it was "full of conclusory allegations, but includes no details" and "outlines the general methodology of a scheme, but offers no specific instances of fraud").[12] This Court should do the same.

In short, despite more than 375 paragraphs and 120 pages, the City's Complaint fails to allege any of the specific facts required to state a fraud-based claim, including that any Defendant made any false statement to anyone connected with any opioid prescription the City paid for. Prolixity cannot substitute for either specificity or clarity. *See Garst*, 328 F.3d at 378-79 (dismissing 400-paragraph complaint covering 155 pages because "length and complexity may doom a complaint by obfuscating the claim's essence"). The City's Complaint fails to satisfy either Rule 8(a) or Rule 9(b) and should be dismissed.

### C. All Claims Fail Because the City Has Not Alleged Any Actionable Misrepresentations or Omissions

The City broadly asserts that Defendants made misrepresentations and omissions about the safety and efficacy of opioids for chronic non-cancer pain. Complt. ¶¶ 278, 300, 310, 317, 332-33, 348, 356, 365, 375. But when the City's endlessly repetitive and conclusory accusations of "deceptive marketing," "deceptive messages," and "false and misleading" statements[13] are disregarded, as under *Iqbal* and *Twombly* they must be, what remains does not allege any

---

[12] In addition, the bulk of the City's description of the alleged fraudulent scheme improperly relies on allegations made on "information and belief." Complt. ¶¶ 43, 115, 128, 132, 149, 151, 159 60, 163, 179, 182, 185, 191, 194, 195, 216, 233, 238, 243-45, 271. These allegations do not satisfy Rule 9(b) because, by definition, they lack the requisite particularity and embrace a "'sue first, ask questions later' philosophy." *Beyrer*, 722 F.3d at 948 ("We frown on making allegations 'on information and belief' in the fraud context and generally find that such claims do not meet Rule 9(b)'s particularity requirement"); *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) (same). Nor can the City contend that it lacked access to any necessary facts when its legal theory is based on statements made to third parties and it obtained thousands of documents via subpoena before suing.

[13] *See* Complt. ¶¶ 4, 16, 149, 233, 241, 242, 246, 250, 269, 317, 324, 340 ("deceptive marketing"); *id.* ¶¶ 18, 45, 70, 76, 128, 138, 165, 174, 188, 244, 249, 247, 249 ("deceptive messages"); *id.* ¶¶ 13, 43, 93, 124, 128, 280 ("false and misleading" statements or claims).

actionable misrepresentation or omission, for multiple reasons.

First, statements that "generally comport with [a drug's] approved label" are "not misleading as a matter of law." *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1235 (S.D. Fla. 2007). Yet, these are precisely the types of claims upon which the City largely relies. Although the labeling for Defendants' drugs establishes that the FDA has ***approved*** many of these products for long-term treatment of chronic pain,[14] and, as discussed above, FDA recently ***rejected*** a petition to exclude long term use for chronic non-cancer pain from the labeling, the City's Complaint hinges on Defendants' representations that these products are safe and effective for this FDA-approved indication. *See* Complt. ¶¶ 5, 12, 38, 42-61. Because FDA approval signifies that a medicine *is* safe and effective for the particular uses indicated, "representations ... that comport substantively with statements approved ... by the FDA cannot supply the basis for [false and misleading representation and unfair competition] claims." *Cytyc Corp. v. Neuromedical Sys., Inc*., 12 F. Supp. 2d 296, 299, 301 (S.D.N.Y. 1998). Accordingly, such representations cannot support the City's claims here. *See id.* (dismissing claims on the ground that the statements at issue were "similar enough to the [FDA] approved statements for the Court to conclude, as matter of law, that they are neither false nor misleading"); *Prohias*, 490 F. Supp. 2d at 1235 (advertising comporting with drug's approved label not misleading); *Newman v. McNeil Consumer Healthcare*, 2013 U.S. Dist. LEXIS 113440, at *19 (N.D. Ill. Mar. 29, 2013) (holding a statement not deceptive because it was "consistent with the FDA-approved" label for the product).

In addition, although the City alleges that certain Defendants promoted opioids for uses

---

[14] Kadian, Endo's Opana ER, Janssen's Duragesic and Nucynta ER, and Purdue's OxyContin—extended release-long acting opioids of different potencies—are all specifically approved for "long-term opioid treatment" or for when "opioid analgesic is needed for an extended period of time." *See* Kubota Decl. Exs. 3-7 for the FDA-approved labels for each drug.

not approved in the labeling, such allegations still do not establish an actionable false statement. As multiple courts have recognized, "off-label marketing of an approved drug is itself not inherently fraudulent." *Cent. Reg'l Emps. Benefit Fund v. Cephalon, Inc.*, 2009 WL 3245485, at *4 (D.N.J. Oct. 7, 2009) (unpublished) (quoting *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1051 n.6 (N.D. Cal. 2009) ("*Actimmune I*")).[15] Thus, off-label statements about the efficacy or safety of a medicine, on their own, do not give rise to fraud-based claims. *See, e.g.*, *United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (dismissing misrepresentation-based claims despite allegations of off-label promotion where the complaint "did not identify statements or representations ... that were literally false or misleading"); *Travelers Indem. Co. v. Cephalon, Inc.*, 2014 WL 3408550, at *10 (E.D. Pa. July 14, 2014) (same); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at *10 (D.N.J. July 10, 2009) (unpublished) ("*Schering-Plough I*") (same); *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 2009 WL 1703285, at *7 (C.D. Cal. June 17, 2009) ("*Epogen II*") (same); *see also West*, 2007 WL 2091185, at *4 (same).

For those Defendants that sell opioids not approved for long-term non-cancer pain, the City relies upon nothing more than conclusory allegations of off-label promotion, which are insufficient as a matter of law, or no allegations at all. For instance, several Defendants market opioids approved only for acute or short term pain (for example, Janssen's Ultracet),[16] but the

---

[15] Indeed, the Supreme Court and the FDA have both made clear that off-label prescriptions may form the proper standard of care for patient treatment and that doctors are free to prescribe medicines for whatever condition they see fit. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 n.5 (2001) (recognizing that off-label prescribing and use "often is essential to giving patients optimal medical care") (internal citations and quotations omitted); *Use of Approved Drugs for Unlabeled Indications*, FDA Drug Bull., Vol. 12, No. 1, at 4-5 (Apr. 1982) ("accepted medical practice often includes drug use that is not reflected in approved drug labeling").

[16] *See* Kubota Decl. Ex. 8 at p. 6.

Complaint nowhere alleges that those Defendants marketed those drugs for long-term treatment of chronic pain. Although the City alleges that Cephalon marketed Actiq and Fentora for off-label uses, the Complaint fails to state a claim because it makes only general and conclusory allegations of off-label promotion and fails to identify any specific statements made to any specific prescribers in Chicago, let alone any statement that was actually false. *See* Complt. ¶¶ 175, 196, 201, 207-08, 213, 219, 223; *Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*, 2014 WL 2115498, at *7 (E.D. Pa. May 21, 2014) (dismissing fraud-based claims where complaint "merely maintains that Cephalon undertook an off-label fraudulent marketing scheme" without pleading actionable fraud).

The City's allegations about the lack of "controlled studies of the use of opioids beyond 16 weeks" do not alter the conclusion that it has failed to plead actionable (on-label or off-label) false statements or omissions by any of the Defendants. Complt. ¶ 48, ¶¶ 47-61. "Merely because a fact is unsupported by clinical tests does not make it untrue." *Gredell v. Wyeth Labs.*, 367 Ill. App. 3d 287, 291 (2006). The City itself concedes that opioids are "potent" pain-killers, Complt. ¶ 5; *see also id.* ¶¶ 200, 227, and as already discussed, the FDA has specifically approved many of Defendants' drugs for long-term treatment. Absent other factually supported allegations that the drugs are actually ineffective, an asserted lack of evidence does not state a claim for misrepresentation. *See, e.g.*, *Travelers*, 2014 WL 3408550, at *6 ("absence of data of evidence affirmatively providing that a drug is safe and effective in treating a particular condition, without more, does not support the conclusion that the drug is actually ineffective or unsafe for that use"); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2010 WL 2346624, at *4 (D.N.J. June 9, 2010) (unpublished) ("*Schering-Plough II*") ("lack of data or evidence affirmatively proving that a Subject Drug was effective in treating a condition was not the same

20

as the actual ineffectiveness of the Subject Drug"). Moreover, under Illinois law, "[l]ack of substantiation is deceptive only when the claim at issue implies there is substantiation." *Bober v. Glaxo Wellcome, PLC*, 246 F.3d 934, 939 n.2 (7th Cir. 2011); *see also Greifenstein v. The Estee Lauder Corp., Inc.*, 2013 WL 3874073, at *4 (N.D. Ill. July 26, 2013) (an advertisement may be fraudulent for lack of substantiation only when the claim in issue falsely implies that substantiation exists). With respect to almost every Defendant, there are no allegations of particular claims which are asserted falsely to imply substantiation through testing over any specific period of time, nor has the City alleged that the drugs at issue are in fact ineffective for their FDA-approved uses.

The City's attempts to show false statements or misrepresentations through claims that Defendants downplayed the risks of using opioids to treat long-term non-cancer pain likewise fail to plead any actionable conduct. *See* Complt. ¶¶ 63-124. As a matter of law, there can be no fraud when the safety risks and approved indications at issue are clearly delineated for prescribing physicians in a product's label. *See Travelers*, 2014 WL 3408550, at *11 (dismissing fraud-based claims where warnings were prominent "in all the FDA materials and the drug labels" and prescribing physicians are "sophisticated consumers who themselves have an affirmative duty to be familiar with them"); *Carpenters*, 2014 WL 2115498, at *6 (dismissing fraud-based claims based upon allegedly false and misleading marketing of an opioid because the drug label "clearly identifies the dangers of abuse and respiratory depression").[17]

"[P]hysician-prescribers are presumed to have knowledge of a drug label's content," *Carpenters*, 2014 WL 2115498, at *6, and as the City concedes, opioids are highly regulated "controlled

---

[17] *See also United States v. Caputo*, 288 F. Supp. 2d 912, 921 (N.D. Ill. 2003) (doctors "are familiar with the FDA-approval process and able to independently evaluate the validity of [promotional] claims"); *Kennedy v. Medtronic, Inc.*, 366 Ill. App. 3d 298, 305 (2006) ("a doctor is considered in the best position to prescribe drugs and monitor their use because he is knowledgeable of the propensities of the drugs he is prescribing and the susceptibilities of his patient").

substances" and the labels for Defendants' products contain "numerous warnings" about the risks

of the treatments. Complt. ¶¶ 64, 112; *see also id.* ¶ 115. Accordingly, allegations that

Defendants "deceptively overstated the safety and minimized the adverse outcomes" for their

products, *id.* ¶ 62, do not establish any actionable falsehoods.

To the extent the City seeks to impose liability upon Defendants for statements made by

third parties, it is unsuccessful. *See, e.g., id.* ¶¶ 43-44, 52-55, 68, 70, 82-90, 111, 149-71, 188-

94.[18] The City fails to allege facts establishing a principal-agency relationship or showing that

Defendants controlled such parties' statements. *See Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482,

498 (1996) (common law fraud claim against manufacturer failed because complaint pleaded

legal conclusions of agency instead of facts); *see also Coelho v. Park Ridge Oldsmobile, Inc.*,

2001 U.S. Dist. LEXIS 14652, at *14, *7 (N.D. Ill. Sept. 19, 2001) ("to establish actual agency,

[plaintiff] must allege that [defendants] specifically authorized" a third party to make a statement

or "conceal the [material] fact" at issue in the case; to establish apparent agency plaintiff must

allege it "reasonably concluded that [the third party] was an agent of [the defendants], or that

[the plaintiff] relied on [the third party's] apparent authority to his detriment."). The City's

conclusory statements that Defendants influenced third party statements, Complt. ¶¶ 140, 160,

162-63, and these third parties were "front groups" for Defendants, *id.* ¶¶ 5, 116, 138-159, do not

establish either actual or apparent agency under these standards—much less tie any of these

statements to any of the prescriptions that the City paid for.

Finally, the only statements or omissions that matter here are those tied to a prescription

reimbursed by the City or which otherwise purportedly caused the City some alleged harm. As is

set forth more fully elsewhere, not only does the Complaint fail to identify any false or

---

[18] The City alleges that certain doctors have recently changed their opinions about prescribing opioids long-term, Complt. ¶¶ 109, 137, but that does not show that Defendants said anything false or misleading.

misleading statements, it also fails to identify any statement or omission that is relevant to its claims. The City offers only vague references to "unbranded" promotional activities, none of which is tied to any particular doctors who prescribed particular opioids or to any prescriptions the City paid for. *See* Complt. ¶¶ 85-86, 123, 135, 167, 168, 185, 193, 213-15. While the City makes conclusory assertions that various Continuing Medical Education (CME) events, brochures, and web sites purportedly conveyed incomplete or misleading information about opioid safety or efficacy and were "available" in Chicago, the City fails to allege that any physicians who wrote prescriptions the City paid for were exposed to any of these alleged false statements (much less influenced by them). For this reason alone, the City has failed to plead an actionable misrepresentation or omission and all of its claims fail as a matter of law. *See United States ex rel. Fowler v. Caremark Rx, Inc.*, 2006 WL 2425331, at *6-7 (N.D. Ill. Aug. 21, 2006) (allegations of general scheme that "do not identify a single prescription through which [Defendant] perpetrated the alleged fraud" do not satisfy Rule 9(b)); *Peterson v. Cmty. Gen. Hosp.*, 2003 WL 262515, at *1 (N.D. Ill. Feb. 7, 2003) (dismissing False Claims Act (FCA) claim that did "not identify a single Medicare patient referred to defendants pursuant to any of the allegedly unlawful self-referral arrangements"); *see also infra* Sections II(C)(1), III(E)(2).

## D. All Claims Fail Because the City Has Not Adequately Alleged Causation

The City claims it paid too much—or never should have paid—for Defendants' opioid medications. Complt. ¶¶ 271-73. But the City fails to plausibly allege that Defendants' alleged misrepresentations caused the submission of even a single prescription for which the City provided reimbursement, nor could it do so as a matter of law. The City must make plausible allegations of a causal connection between Defendants' alleged misconduct and the City's expenditures for certain opioid products. *See Cnty. of Cook v. Philip Morris, Inc.*, 353 Ill. App. 3d 55, 60 (2004) (stating that "[p]roof of a causal relationship between a defendant's action and a

23

plaintiff's injury is essential in every tort" and dismissing complaint where Cook County could not show a direct injury based on cigarette manufacturers' false advertising); *People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 491 (1992) (a connection must be shown between the misrepresentation and the resulting injury); *People ex rel. Madigan v. United Constr. of Am.*, 2012 IL App. (1st) 120308, at *8 ("a valid claim [by a public prosecutor under ICFA] must show that the consumer fraud proximately caused plaintiff's injury."). The Complaint lacks factual allegations—as opposed to conclusions—that meet this requirement.

> **1.** **There Are No Factual Allegations That Defendants' Purported Misconduct Caused the City to Pay for Opioid Prescriptions or Caused Other Harm**

Courts routinely dismiss claims that allege false or misleading marketing of pharmaceutical medications but lack any factual detail as to the reliance of "particular doctors with a 'demonstrated connection' to the plaintiff [who was] deceived." *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 2012 WL 3154957, at *8-9 (N.D. Cal. Aug. 2, 2012) (dismissing Illinois unjust enrichment and statutory and common law fraud claims where the plaintiff failed to allege that purportedly false marketing claims caused harm); *see also In re Actimmune Mktg. Litig.*, 2010 WL 3463491 (N.D. Cal. Sept. 1, 2010) ("*Actimmune II*"), *aff'd, In re Actimmune Mktg. Litig.*, 464 F. App'x 651 (9th Cir. 2011) (dismissal for failure to allege that doctors relied on misleading information when deciding to write prescriptions for third-party payor's members).

Conclusory complaints of "generalized activity" do not suffice because they fail to establish "any nexus at all" from which a court could plausibly infer "reliance by the plaintiffs or causation of the plaintiffs' alleged damages." *Cent. Reg'l Emps. Benefit Fund v. Cephalon, Inc.*, 2010 WL 1257790, at *4 (D.N.J. Mar. 29, 2010) (unpublished) (dismissing fraud claims); *see also In re Schering-Plough Corp. Intron/Temodar Consumer Class Action (Schering Plough III)*,

678 F.3d 235, 248 (3d Cir. 2012) (affirming dismissal of complaint lacking factual allegations that the drug "which [the third-party payor] paid for was prescribed to its members for ineffective off-label uses *because of* [defendant's] alleged misconduct"); *Emp'r Teamsters-Local Nos. 175/505 v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 471-72 (S.D. W. Va. 2013) (dismissal proper where "the SAC d[id] not allege, let alone plausibly, whether any prescriptions were written based on a misunderstanding of Plavix's efficacy"); *S.E. Laborers Health & Welfare Fund v. Bayer Corp.*, 2011 WL 5061645, at *7 (11th Cir. Oct. 24, 2011) (unpublished) (affirming dismissal where complaint was "devoid of allegations that [the third-party payor] or any other proposed class member, actually relied on Bayer's representations").

As in cited cases, the Complaint here is devoid of factual allegations stating a plausible claim that Defendants' alleged misrepresentations caused opioid prescriptions to be submitted to or reimbursed by the City's health plans, or caused any other related costs. The City goes on at length about the general safety and efficacy of opioids for treating chronic non-cancer pain, but fails to identify even a single doctor or patient who was exposed to and acted on any alleged misrepresentations, let alone one who caused the City to pay for an inappropriate prescription. Instead, the City's causation allegations are generalized and wholly conclusory. The City alleges that Defendants sponsored CME programs and webinars that "were available" to physicians in Chicago "during the relevant time period," that certain third parties "appeared" on television to discuss opioid use, and that purported misrepresentations were made "on a website," but identifies no physicians who actually attended any of these events or saw any of these materials. *See, e.g.*, Complt. ¶¶ 69, 82, 84, 167, 168.[19] Absent factual allegations establishing the requisite causal link, the City's assertions that "defendants' efforts were wildly successful," "paid off,"

---

[19] Often, the Complaint does not even attempt to explain how or whether the alleged misrepresentations were disseminated to any doctors or patients at all. *See, e.g.*, Complt. ¶¶ 83, 121, 173, 174.

"caused the use of opioids to explode," and "led to the total City spends on opioids," *id.* ¶¶ 6, 181, 250, 272, are mere conclusions insufficient under *Twombly* and *Iqbal* to state a claim.

Likewise, the Complaint makes no allegation that the City itself relied upon Defendants' alleged misrepresentations when deciding either to cover opioid prescriptions or to approve individual reimbursement requests. On the contrary, the City continues to reimburse opioid prescriptions today, long past when it could claim to have been unaware of Defendants' alleged misconduct. *See* Complt. ¶ 342. The City's failure to allege facts to show that any false statement from the Defendants caused the City to reimburse for the opioid prescriptions at issue—or any other harm—is fatal to all of its claims. *Health Care Serv. Corp. v. Olivares*, 2011 WL 4591913, at *7 (E.D. Tex. Sept. 2), *adopted by* 2011 WL 4591915 (E.D. Tex. Sept. 30, 2011) (dismissing Illinois fraud, unjust enrichment, conspiracy, and negligence claims when complaint "fail[ed] to allege what misrepresentations, if any, were made directly to [the third-party-payor plaintiff] and upon which it relied" and "fail[ed] to allege that any doctors or other health care professional relied on any Pfizer misrepresentation promoting an off-label use, as opposed to relying on the professional's own judgment and expertise, when prescribing the drugs.").

### 2. The Relationship Between the Alleged Misrepresentations and the Alleged Harm Is Too Attenuated to Support the City's Claims As a Matter of Law

Further, under Illinois law, the relationship between Defendants' alleged misrepresentations and the alleged harm to the City or its residents is so attenuated that it cannot support causation as a matter of law. "One way in which the concept of proximate cause operates is through the remoteness doctrine, which is sometimes called the 'direct-injury' test." *Philip Morris*, 353 Ill. App. 3d at 60. "This doctrine states that there must be 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). Too long a series of "significant independent

26

intervening events" between allegedly false statements and injury precludes liability. *Emp'r Teamsters-Local Nos. 175/505*, 969 F. Supp. 2d at 467.

The intervening events here include: (1) a prescribing doctor's exercise of independent medical judgment and assessment of the patient's individual medical condition; (2) a patient's preferences; (3) a pharmacist's counseling disclosures; (4) a patient's decision to fill a prescription; (5) the City's decision to cover the drug for the particular indication and reimburse the prescription; and (6) a patient's decision on how to use the medication.[20] *See, e.g.*, *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2010 WL 3119499, at *7-9 (S.D. Ill. Aug. 5, 2010) (listing the many intervening steps between an alleged misrepresentation and any harm); *United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010) (same). Applying these principles, courts often dismiss cases fundamentally similar to this one because, as a matter of law, this chain of causation is too attenuated.[21] In particular, these cases recognize that "generalized allegations" of deceptive marketing cannot "surmount the hurdle of the learned intermediary rule," which "interposes the prescribing physician between the patient and the pharmaceutical company." *Morgan v. SmithKline Beecham Corp.*, 2013 U.S. Dist. LEXIS 96869, at *6-7 (E.D. Pa. July 10, 2013).

For example, in *Ironworkers Local Union No. 68 v. AstraZeneca Pharmaceuticals, LP*, 585 F. Supp. 2d 1339 (M.D. Fla. 2008), a case similarly premised on alleged misrepresentations

---

[20] The City's allegations of influence over certain alleged "key opinion leaders" and pain advocacy organizations add even more links in the attenuated causation chain, implicating the independent judgment and decision making processes of those physicians and organizations before Defendants' own conduct can be linked to any alleged harm.

[21] *E.g.*, *Emp'r Teamsters-Local Nos. 175/505*, 969 F. Supp. 2d at 472-76; *In re Yasmin*, 2010 WL 3119499, at *7-9; *Schering-Plough I*, 2009 WL 2043604, at *34 ("even if Plaintiffs had sufficiently alleged injury or ascertainable loss, the injury or loss is simply too remote and attenuated to establish the causation element required to sustain Plaintiffs' claims").

about the safety and efficacy of a prescription medication, the court dismissed fraud-based state law and RICO claims because the "causal nexus between the actionable conduct and the injury sustained" by the third-party-payor plaintiff was "too remote." *Id.* at 1345. The court rejected the plaintiff's conclusory efforts at the pleading stage to tie the wrongdoing to the asserted injury— paying too much for too many prescriptions—because "the fact that consumers may only obtain [the drug] through a prescription from ... physician[s]" who "use their independent medical judgment to decide whether [a particular drug] is the best treatment for a given patient" was a "key independent factor." *Id.* at 1344. Establishing causation would have "require[d] an inquiry into the specifics of each doctor-patient relationship implicated by the lawsuit." *Id.*; *see also In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 454 (E.D.N.Y. 2009) (rejecting Mississippi's proposed aggregate proof of causation because "individualized proof is needed ... to overcome the possibility that a Mississippi patient was prescribed Zyprexa for some reason other than belief in the accuracy of Lilly's warnings or representations"); *In re Vioxx Prods. Liab. Litig.*, 2010 U.S. Dist. Lexis 142767, at *23 (E.D. La. Mar. 31, 2010) (general assertions that manufacturer's misrepresentations led to prescriptions are insufficient as "[e]ach decision by each doctor and each patient was different" and the "effect that any alleged misrepresentations had on each decision is unique.").

The reasoning of these cases applies equally here. The City's liability theory requires too many intervening events, making any connection between Defendants' alleged improper actions and the City's claimed injuries far too remote. Before any causation finding could be made, the multiple layers of decision-making would require detailed analysis of each prescription, why it was prescribed, and whether it was appropriate for each patient, as well as the City's decision to pay for it and how each patient used the medicine.

Illinois law in particular emphasizes that physicians' prescribing decisions are crucial independent steps between representations made by drug makers and decisions to purchase and use a drug. As a medical expert, the prescribing physician's task is to consider "the propensities of the drug as well as the susceptibilities of his patient," "weigh[] the benefits of any medication against its potential dangers[,]" and "decide[] which available drug best fits the patient's needs." *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 117 Ill. 2d 507, 518-19 (1987); *see also Martin ex rel. Martin v. Ortho Pharms. Corp.*, 169 Ill. 2d 234, 244 (1996) ("prescribing physicians, and not pharmaceutical manufacturers, are in the best position to provide direct warnings to patients concerning the dangers associated with prescription drugs."). The necessary involvement of prescribing physicians as learned intermediaries introduces too many variables into the causal chain between the alleged misrepresentations and any injury.

Attempting to avoid this established law, the City asserts that Defendants' "causal role" is not "broken by the involvement of doctors" because Defendants' "deceptive messages tainted virtually every source doctors could rely on for information." Complt. ¶ 18. But this facially conclusory and implausible allegation is insufficient as a matter of law. *See* ("*Schering-Plough III*"), 678 F.3d at 242 (affirming dismissal of third-party payors' claims despite conclusory allegations that "unlawful marketing practices caused physicians to prescribe the Subject Drugs for off-label uses"); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 524 (D.N.J. 2011) (plaintiffs "may not aver 'causation by way of generalized allegations and aggregate proof'"); *cf. Morgan*, 2013 U.S. Dist. LEXIS 96869, at *7-8 ("Because Plaintiff could not obtain Avandia without a physician's prescription, and the allegations with regard to the prescribing physician's exposure to, and justified reliance on, misleading information from Defendant are insufficient to state a cause of action, the learned intermediary

29

doctrine bars Plaintiff's claim.").

Indeed, the City concedes that prescribing physicians have a wide array of information about the opioid products and alternative products—including the FDA-approved labeling and a large body of published medical literature. *See, e.g.*, Complt. ¶¶ 2, 3, 9, 16-18, 58, 64-65, 70, 187. This mix of information reinforces the need to assess each prescribing decision, as the product of each individual doctor's knowledge, experience and judgment applied to each individual patient's circumstances. *See Ironworkers*, 585 F. Supp. 2d at 1341-42 (dismissal required where independent medical judgment was the key factor breaking the chain of causation despite allegations that defendants' fraudulent marketing scheme spanned a multitude of branded and unbranded promotional and informational channels). The allegations here are just like those in *Ironworkers*, *In re Yasmin*, *Janssen*, *Schering–Plough III* and many other cases; the causal connection is too remote, and the claims should be dismissed.

### E.  All Claims Fail Because the City Has Not Adequately Alleged Injury

The City also fails to adequately plead a legally cognizable injury.[22] The bare allegation

---

[22] Injury is an element of all the City's claims. *See* Complt. ¶ 295-296 (Count I (consumer fraud)) (alleging that the City has been "damaged" by Defendant's acts and seeking "restitution of any money acquired as a result of Defendants' consumer fraud."), *see also In re Towers*, 162 F.3d 952, 955 (7th Cir. Ill. 1998) ("[R]estitution is 'compensation for actual pecuniary loss' from the perspective of the victim...."); Complt. ¶ 305 (Count II (misrepresentations in connection with sale or advertising of merchandise)) (alleging that the City has been "damaged" by Defendant's acts); Complt. ¶ 313 (Count III (false statements)) (alleging that the City has been "damaged" by Defendant's acts and seeking "restitution of any money acquired"), *see also* Chi. Mun. Code § 1-21-010(a) (authorizing "up to three times the amount of *damages which the city sustains* because of the person's violation of this section") (emphasis added); Complt. ¶¶ 327, 329 (Count IV (false claims)) (same); Complt. ¶ 343 (Count V (conspiracy to defraud)) (same); Complt. ¶ 349 (Count VI (recovery of costs)) (claiming the City has incurred costs due to Defendants' acts that are recoverable under MCC § 1-20-020), *see also Vodak v. City of Chicago*, 2006 WL 2524141, at *3 (N.D. Ill. Aug. 20, 2006) (injury is an element of a claim under Section 1-20-020); Complt. ¶ 361 (Count VII (insurance fraud)) (alleging that the City has been "damaged" by Defendants' acts), *see also Steadfast Ins. Co., Inc. v. Auto Mktg. Network, Inc.*, 1997 WL 1106276, at *16 (N.D. Ill. Aug. 12, 1997) (injury is an element of a claim under 720 ILCS 5/17-10.5); Complt.¶ 366 (Count VIII (civil conspiracy)) (alleging that the City has been "damaged" by Defendants' acts), *see also Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915, 927 (2010) (injury is an element of a civil conspiracy); Complt. ¶ 372 (Count IX (common law fraud)) (alleging that the City has been

that the City paid for opioid prescriptions or allegedly associated treatment costs, without more, is not enough. Moreover, under its theories of liability, the City cannot establish injury as a matter of law because, for significant periods of the time covered by the Complaint, the City did not actually pay extra for any prescriptions, including opioid prescriptions, under its HMO healthcare plan.

The City's allegation that it paid for opioids, emergency services, addiction treatment, and other costs for opioid patients does not adequately plead a cognizable injury. The City's theory of injury depends on the claim that long-term opioid use is medically inappropriate or unnecessary for treating chronic non-cancer pain. *See*, *e.g.*, Complt. ¶¶ 42-61. But the City fails to allege that any specific patient received an inappropriate or ineffective prescription for one of the opioid medications to treat long-term non-cancer pain. On the contrary, the Complaint concedes that the FDA-approved labels for most of the opioids "did not exclude the use of opioids for chronic non-cancer pain." Complt. ¶ 17. And even if an opioid were prescribed for off-label uses, merely reimbursing for such a prescription is not a cognizable injury unless the prescription was actually ineffective or harmed the patient. *See, e.g.*, *Schering-Plough II*, 2010 WL 2346624, at *7-8 (dismissing fraud-based claims because third-party payor plaintiffs failed to allege facts showing that off-label prescriptions "were actually ineffective or unsafe").

Courts have dismissed similar complaints for failure to adequately plead injury when they do not allege that any prescriptions were actually ineffective or harmed the patient. *See id.*; *Cent. Reg'l Emps. Benefit Fund*, 2010 WL 1257790, at *3 (plaintiffs failed to plead a cognizable injury

---

"damaged" by Defendants' acts and seeking "restitution of any money acquired"), *see also Steadfast Ins. Co. v. Auto Mktg. Network*, 2 F. Supp. 2d 1058, 1059-60 (N.D. Ill. 1998) (injury is an element of a claim for common law fraud); Complt. ¶ 376 (Count X (unjust enrichment)) (alleging that the City has been "damaged" by Defendant's acts and seeking "disgorge[ment of all] unjust enrichment to the City"), *see also TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998) (holding that a Defendant must have been enriched at the Plaintiff's expense to support a claim for unjust enrichment).

because they failed to allege that prescriptions "were ineffective even for off-label uses"); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 2008 WL 5413105, at *8 (D.N.J. Dec. 23, 2008) (unpublished) (dismissing fraud-based claims because "nowhere do Plaintiffs allege that any beneficiaries, insured, or employees taking Risperdal 'received [an] inadequate [or] inferior [drug] or even worse, suffered personal injuries as a result of' Defendants' alleged misrepresentations"); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176-77 (D.D.C. 2003) ("Without alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs"); *see also Moyer v. Michaels Stores, Inc.*, 2014 WL 3511500, at *7 (N.D. Ill. July 14, 2014) (dismissing consumer fraud claims when plaintiffs failed to plead actual monetary damages).

Here, the City has failed to allege that Defendants' allegedly improper conduct caused *any* actually ineffective or harmful opioid prescriptions.[23] The City alleges no facts about any prescription for which it paid or any patient who was prescribed one of Defendants' opioid medicines, much less that any patient was harmed by one of Defendants' prescriptions or that those prescriptions did not alleviate that patient's pain. And the City certainly has not alleged that any allegedly unnecessary prescriptions led any particular patient to seek addiction counseling or treatment or need emergency services. Because the City has not alleged that any of Defendants' prescribed opioids were actually worth less than what the City paid for them, the

---

[23] In *Zyprexa*, for example, the court held that the State of Mississippi, which sought to recover prescription costs, damages, and statutory penalties for "non-medically necessary" prescriptions allegedly caused by defendant's misconduct, was required to show individualized proof that prescribing physicians relied on the alleged misrepresentations for *each* allegedly unnecessary prescription. *In re Zyprexa*, 671 F. Supp. 2d at 453, 457; *In re Yasmin*, 2010 WL 3119499, at *7 (dismissing plaintiff's damages claims as speculative when a court "would have to delve into the specifics of each physician patient relationship to determine what damages were caused by [defendant's] alleged fraudulent conduct, as opposed to what damages were caused by the physician's independent medical judgment."); *Pa. Emps. Benefit Trust, Fund (PEBTF) v. Ortho-McNeil-Janssen Pharm., Inc.*, 2010 WL 3613056 (Ct. Comm. Pl. July 7, 2010) (dismissing unjust enrichment claim under individualized proof rule).

Complaint fails to plead a cognizable injury under *Twombly* and *Iqbal*.

Finally, the City cannot prove injury for periods during which it did not pay extra amounts or pay separately for prescription drug costs. The City admits that it has not paid prescription drug costs for portions of its HMO plans for most of the time period covered in the Complaint.[24] During these times, the City paid premiums to a third party who in turn paid the costs of any prescription drugs. Complt. ¶ 262. This means that the City *paid the same amount* regardless of the number of opioid prescriptions reimbursed under its HMO plan.

Plaintiffs seeking damages based upon individual prescriptions or medical procedures do not state a cognizable injury when they pay fixed costs for prescription drugs or medical services. *See United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 2008 WL 5211021, at *2-3 (N.D. Ill. Dec. 10, 2008) (no FCA claim where government paid for prescription drugs under predetermined Medicare rates which had "nothing to do with the particular drugs prescribed or used in the patient's treatment" and off-label drug prescriptions "did not cause the government to pay any more money"); *United States ex rel. Zemplenyi v. Grp. Health Coop.*, 2011 WL 814261, at *2 (W.D. Wash. Mar. 3, 2011) (no FCA claim where "government continues to pay a flat rate ... and … is not spending additional money when an individual surgery is performed").

Like the plans in *Kennedy* and *Group Health*, the City's HMO plan only required it to pay fixed premiums and not the direct costs of prescription drugs. *See* Complt. ¶ 262. Because the City would have paid the same premiums regardless of any opioid prescriptions, under *Kennedy* and *Group Health*, the City cannot state a cognizable damage claim, and the Court should dismiss the City's damage claims for the periods in which it was not self-insured.

---

[24] *See* Complt. ¶ 262 ("Before July 2006, the City paid the premiums for the HMO plans, which in turn covered the cost of prescription drugs"); *id.* ("Between July 2006 and December 2009, the City paid the premiums for the HMO plan to Unicare, which in turn covered the cost of prescription drugs"); *id.* ("From January 2012 to December 2013 ... the City paid premiums to the HMO plan, which in turn covered the cost of prescription drugs").

**F.      The Complaint Is Deficient on Multiple Additional Grounds**

      **1.      The Claim Under Chicago Municipal Code § 2-25-090 (Count I) Must Be Dismissed**

            **a.      The City Has Not Adequately Pleaded Standing**

Preliminarily, the Complaint fails to demonstrate that the City has standing to bring a claim for violations of Chicago Municipal Code § 2-25-090. Sections 2-25-090(b) and (e) charge the commissioner of the business affairs and consumer protection department with enforcement of Section 2-25-090 and provide that the commissioner, "after completing an investigation" and "determin[ing] that a person has ... engaged in a practice prohibited [by Section 2-25-090,] ... may request the corporation counsel to bring an action for injunctive relief or such other equitable relief that the commissioner deems to be appropriate." MCC § 2-25-090(e). The Complaint fails to allege that the commissioner undertook the requisite investigation, determined that Defendants have engaged in a prohibited practice, or requested that corporation counsel file suit to obtain "the relief the commissioner deems to be appropriate." Thus, the City fails to establish that the City's Corporation Counsel has authority to bring this claim. *Id*.

            **b.      Defendants Cannot Be Held Liable for Consumer Fraud Based on Materials That Complied with FDA Regulations**

Section 2-25-090 of the MCC is modeled after the Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA") and expressly provides that "consideration shall be given to court interpretations relating to the [ICFA]" in construing the Section. MCC § 2-25-090(a). It also provides that "[c]ompliance with ... court interpretations relating to [ICFA] shall be an absolute defense to a finding of a violation of [Section 2-25-090]." MCC § 2-25-090(c). The ICFA, in turn, excludes from liability "[a]ctions ... specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 ILCS 505/10(b)(1). Actions are "specifically authorized" if they are

34

"sufficiently within what is authorized by federal law." *See Bober*, 246 F.3d at 941-42 (because ICFA "will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations," dismissal was proper where one allegedly misleading statement was "required" by FDA regulations and another was "consistent with those [] regulations").

Federal law authorized Defendants to promote opioids for the indications specified in their approved labeling. *See Prohias*, 490 F. Supp. 2d at 1234 (advertisements that "marketed an approved use for the drug" were "implicitly authorized by the FDA" and thus "fall within the safe harbor provisions of the Florida and Massachusetts consumer fraud acts"); *see also Newman*, 2013 U.S. Dist. LEXIS 113440, at *19; *Cytyc*, 12 F. Supp. 2d at 301. Because most of the drugs in issue here were approved for long-term treatment of chronic non-cancer pain, claims seeking to hold Defendants liable for such promotion are not cognizable under Section 2-25-090 and must be dismissed. *See Bober*, 246 F.3d at 941.

### c. The City Cannot Obtain Relief for Consumer Fraud Prior to November 19, 2008

The City fails to state a claim under Section 2-25-090 to the extent it seeks penalties or other remedies for conduct occurring before that ordinance's adoption on November 19, 2008. Section 2-25-090 is not expressly retroactive and should not be held to apply retroactively, as such application would be inequitable and unsupported by clear legislative intent. *See Allegis Realty Investors v. Novak*, 223 Ill. 2d 318, 330-31 (2006) (where retrospective application of the new law would have inequitable consequences, courts should presume non-retroactivity absent clear contrary legislative intent) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)).

### 2. The Municipal False Statement (Count III), FCA (Counts IV and V) and Insurance Fraud (Count VII) Claims Must Be Dismissed for Inadequate Pleading of Presentment, Knowledge, and Conspiracy

The City's false statement, CFCA,[25] and insurance fraud counts all fail because the Complaint does not adequately allege presentment, knowledge, or conspiracy. The City alleges that Defendants violated CFCA subsections (1), (2), and (3). Subsection (1) imposes liability on any person who "knowingly presents, or causes to be presented" a false claim to the City for payment or approval. MCC § 1-22-20(1). On its face, this section requires presentment of a false claim for payment. *See United States ex rel. Fowler v. Caremark Rx, LLC*, 496 F.3d 730, 740 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009); *United States ex rel. Geschrey v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 705 (N.D. Ill. 2012) ("Without ... presentment ... there is simply no actionable damage to the public fisc as required" under the FCA). It is not enough for a plaintiff to describe a scheme in detail but then allege presentment in conclusory fashion; rather, the complaint "must link specific allegations of deceit to specific claims for payment." *United States ex rel. Dolan v. Long Grove Manor, Inc.*, 2014 WL 3583980, at *3 (N.D. Ill. July 18, 2014) (Bucklo, J.).

Because the Complaint fails to specifically identify any allegedly false claim for payment presented to it by anyone, the City's claim under this subsection fails. *See Fowler*, 496 F.3d at 742 (plaintiff must identify claims "*at an individualized transaction level*") (emphasis in original); *Dolan*, 2014 WL 358390, at *5 (failure to identify specific false claims or provide details of exemplary cases violates Rule 9(b)). The City's general allegation that it paid approximately $9.5 million for opioid prescriptions since 2007, Complt. ¶ 271, is not sufficient.

---

[25] The CFCA is modeled on the Illinois False Claims Act, 740 ILCS § 175 *et seq.* ("ILCA"), and the federal False Claims Act, 31 U.S.C.A. § 3729 *et seq.* ("FCA"). Because case law interpreting the CFCA is limited, cases discussing the ILCA and the FCA are instructive. *Cf. Scachitti v. UBS Fin. Servs.*, 215 Ill. 2d 484, 506 (2005) (noting that the Illinois False Claims Act "mirrors" the federal False Claims Act and looking to federal case law to aid in its interpretation).

Nor is the City's allegation that Defendants' alleged misconduct "caused" physicians to write and submit medically unnecessary prescriptions sufficient. First, the defendant must have some direct causal role in presenting the allegedly claim, which the City does not here allege.[26] Second, as discussed above, the City has not in any event alleged facts sufficient to show that any specific prescription it reimbursed was either caused by allegedly misleading conduct or medically unnecessary.

The City has similarly failed to allege sufficient facts to state a violation of CFCA subsection (2), which prohibits persons from knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid by the City. MCC § 1-22-020(2). The same lack of specificity that defeats the false presentment claim defeats the false certification claim. In addition, the *mens rea* element is an essential part of a false claims violation. *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005). The City appears to allege that Defendants violated this provision by aiding and abetting physicians who falsely certified that opioid prescriptions were "medically necessary" and submitted false claims. *See* Complt. ¶¶ 319, 321. But this would require factual allegations not only that specific prescriptions were medically unnecessary, but also that the physicians who allegedly wrote such medically unnecessary prescriptions did so knowingly—allegations that, again, the City does not make.

Likewise, the City fails to allege sufficient facts to state a violation of CFCA subsection

---

[26] *See United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (physician instructed billing service to place his identification number on claims, thus causing the submission of false claims); *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (physician delegated to wife the authority to submit claims on his behalf); *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187-89 (D. Mass. 2004) (holding a defendant signed invoices indicating that the expenses were chargeable to a federally funded entity); *United States ex rel. Drescher v. Highmark, Inc.*, 305 F. Supp. 2d 451, 459-60 (E.D. Pa. 2004) (defendant causes the submission of a false claim only when the submitting party is "merely a conduit to the transfer of government funds.").

(3), which prohibits conspiracies to submit false or fraudulent claims. MCC § 1-22-020. The claim fails, initially, from the same lack of specific allegations supporting any underlying false claims. In addition, as discussed below in connection with the City's common law conspiracy claim, the City has not alleged sufficient specific facts to support any conspiracy claim, let alone "an agreement, combination, or conspiracy to defraud the government," made "for the purpose of obtaining payment from the government." *United States ex rel. Walner v. NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 895 (N.D. Ill. 2009).

Finally, for all of the same reasons, the City has failed to allege sufficient facts to state claims under MCC § 1-21-010(a), which prohibits knowing false statements to the City in violation of law or in connection with a government submission, or 720 ILCS 5/17-10.5, which prohibits knowingly false claims against the City in its capacity as a self-insurer. Both claims fail for the same lack of particularized allegations setting forth specific knowingly false statements, or specific knowingly false insurance claims, made to the City.

### 3. The Municipal Services Claim (Count VI) Must Be Dismissed

The failure to plead a cognizable underlying claim or injury precludes the City's claim under MCC § 1-20-020, which authorizes damage claims against persons who cause the City "to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law …." In addition, the City's claim is barred under "the municipal cost recovery rule, also called the 'free public services doctrine,' [which provides that] public expenditures made in the performance of governmental functions are not recoverable in tort." *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 424 (2004) (dismissing City's claim against gun manufacturer). The heath care, addiction treatment, and emergency services costs the City seeks to recover under this claim fall squarely within the *Beretta* rule, which bars their recovery. *Id*. at 426, 430. In addition, the City's claim for such expenses is independently barred

by the doctrine of remoteness. *See Philip Morris*, 353 Ill. App. 3d at 60 (remoteness doctrine barred County claim for tobacco healthcare costs).

### 4. The Common Law Civil Conspiracy Claim (Count VIII) Must Be Dismissed

The failure to plead a cognizable underlying tort claim also dooms the City's civil conspiracy claim, which is derivative of the City's other claims. *See Ill. Non-Profit Risk Mgmt. Ass'n v. Human Serv. Ctr. of S. Metro-E.*, 378 Ill. App. 3d 713, 724 (2008); *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 432 (2000). So too does the City's failure to comply with Rule 9(b). *Borsellino*, 477 F.3d at 509 (dismissal proper where plaintiff "offered none of the critical details regarding the alleged fraud conspiracy" and failed to "state with particularity the circumstances constituting the conspiracy …").

Even apart from these deficiencies, the City's pleading is insufficient to state a conspiracy claim. The "factual" allegations offered in support of the claimed conspiracy boil down to assertions that Defendants employed similar marketing methods and "messages" and supported some of the same pain management associations. Complt. ¶¶ 188-89. But allegedly parallel conduct by competitors has never been sufficient to support an inference of conspiracy. *See McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 140 (1999) ("parallel conduct alone is insufficient to establish civil conspiracy ...."); *Twombly*, 550 U.S. at 556 ("parallel conduct and a bare assertion of conspiracy will not suffice"). Nor has common participation in industry meetings. *Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1987).

At bottom, the City's failure to allege with any meaningful specificity the time, place, and nature of Defendants' individual activities precludes any plausible inference that defendants even acted in parallel, let alone in concert. *See Buckner v. Atl. Plant Maint., Inc.*, 182 Ill. 2d 12, 23 (1998) ("The mere characterization of a combination of acts as a conspiracy is insufficient to

withstand a motion to dismiss."). Just as in *Borsellino*, the conspiracy claim must be dismissed.

### 5. The Unjust Enrichment Claim (Count X) Must Be Dismissed

The City's unjust enrichment claim is also derivative of the City's other claims and fails for the same reasons. *See Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill. App. 3d 1017, 1025 (2009) ("When an underlying claim of fraud ... is deficient, a claim for unjust enrichment should also be dismissed."); *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then ... unjust enrichment will stand or fall with the related claim."). In addition, to survive a motion to dismiss an unjust enrichment claim, the City must allege facts showing that each Defendant was under a duty to the City, *Martis*, 388 Ill. App. 3d at 1025, and that there is no adequate remedy at law. *Season Comfort Corp. v. Ben A. Borenstein Co.*, 281 Ill. App. 3d 648, 656 (1995).

The Complaint here does neither. It does not allege that Defendants filed any claims with or received payments from the City; nor does it suggest any other relationship giving rise to a duty. *See Hartigan*, 153 Ill. 2d at 497 ("The theory of unjust enrichment is based on a contract implied in law. To recover under this theory, plaintiffs must show that defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment."); *Lewis v. Lead Indus. Ass'n, Inc.*, 342 Ill. App. 3d 95, 106 (2003). And nothing suggests that the City's other statutory and common law remedies, should it succeed in pleading a claim, would be inadequate. The unjust enrichment claim should be dismissed.

## IV. CONCLUSION

For all of the reasons stated above, Defendants' motion should be granted. The Complaint should be dismissed or stayed under the doctrine of primary jurisdiction. Alternatively, the Complaint should be dismissed for failure to comply with Rule 9(b) and failure to state a claim on which relief can be granted.

Dated:   August 29, 2014

Respectfully submitted,

By: /s/ Charles C. Lifland

Charles C. Lifland
clifland@omm.com
Carolyn J. Kubota
ckubota@omm.com

O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone:   (213) 430-6000
Facsimile:   (213) 430-6407

*Attorneys for Defendants Janssen
Pharmaceuticals, Inc. and Johnson &
Johnson, Appearing Pro Hac Vice*

By:  /s/ R. Ryan Stoll

R. Ryan Stoll
Patrick Joseph Fitzgerald
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
155 N. Wacker Drive
Suite 2700
Chicago, IL 60606
(312) 407-0508
patrick.fitzgerald@skadden.com

*Attorneys for Defendants Purdue Pharma
L.P., The Purdue Frederick Company,
Inc., and Purdue Pharma, Inc.*

By:  /s/ Tinos Diamantatos

Tinos Diamantatos
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, 5th Floor
Chicago, IL 60601
(312) 324-1145
(312) 353-2067 (fax)
tdiamantatos@morganlewis.com

*Attorneys for Defendants Cephalon, Inc.
and Teva Pharmaceuticals Industries, Ltd.*


By:  /s/ Peter Vincent Baugher

Peter Vincent Baugher
Kristen Elizabeth Hudson
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago, IL 60606
(312) 701-9300
baugher@sw.com
hudson@sw.com

*Attorneys for Defendant Endo Health
Solutions, Inc.*


By:  /s/ Nicholas William Marietti

Nicholas William Marietti
K&L Gates LLP
70 W. Madison St.
Suite 3100
Chicago, IL 60602
312 807 4221
nicholas.marietti@klgates.com

*Attorneys for Defendant Actavis PLC*

## SIGNATURE ATTESTATION

Pursuant to the Northern District of Illinois' General Order on Electronic Case Filing, General Order 14-0009(IX)(C)(2), I hereby certify that authorization for the filing of this document has been obtained from each of the other signatories shown above and that all signatories concur in the filing's content.

       /s/ Charles C. Lifland
       Charles C. Lifland

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2014, I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the electronic Mail Notice List.


Executed on August 29, 2014, at Los Angeles, California.


/s/ Charles C. Lifland
Charles C. Lifland