**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, | |
| Plaintiff, | |
| v. | Case No. 14-cv-04361 |
| PURDUE PHARMA L.P.; PURDUE PHAR-MA INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTI-CAL INDUSTRIES, LTD.; TEVA PHAR-MACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS INC.; AC-TAVIS PLC; ACTAVIS, INC.; WATSON, PHARMACEUTICALS, INC. n/k/a AC-TAVIS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., | Honorable Elaine E. Bucklo |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFF'S
FIRST AMENDED COMPLAINT UNDER THE PRIMARY JURISDICTION
DOCTRINE AND UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. THE COURT SHOULD DISMISS OR STAY THIS ACTION IN DEFERENCE
TO THE PRIMARY JURISDICTION OF THE FDA .................................................... 4

    A. Background of the FDA's Oversight and Pending Investigation of Opioids ........ 5

    B. The Doctrine of Primary Jurisdiction .................................................... 9

    C. The Primary Jurisdiction Doctrine Applies Here.................................................. 11

III. THE COURT SHOULD DISMISS THE ACTION UNDER RULE 12(B)(6) FOR
FAILURE TO STATE A CLAIM .................................................................... 13

    A. All Claims Fail Because the FAC Fails to Allege Fraud with Particularity ........ 13

        1. The FAC Engages in Improper Group Pleading..................................... 15

        2. The FAC Fails to Plead Each Defendant's Alleged Fraud with
Sufficient Particularity .............................................................. 17

    B. All Claims Fail Because the FAC Fails to Allege Actionable
Misrepresentations or Omissions...................................................... 20

    C. All Claims Fail Because the FAC Does Not Adequately Allege Causation........ 26

        1. The FAC Fails to Allege That Defendants' Purported Misconduct
Caused the City to Pay for Opioid Prescriptions or Caused Other
Harm .................................................................................. 26

        2. The FAC's Allegations Fail for Lack of Proximate Cause..................... 31

    D. All Claims Fail Because the City Has Not Adequately Alleged Injury.............. 35

    E. The FAC Is Deficient on Multiple Additional Grounds ..................................... 38

        1. The Claim Under Chicago Municipal Code § 2-25-090 (Count I)
Must Be Dismissed .................................................................. 38

            a. Defendants Cannot Be Held Liable for Consumer Fraud
Based on Materials That Complied with FDA Regulations ........ 38

            b. Defendants Cannot Be Held Liable for Statements Not
Made in Connection with Advertising or Offers for Sale............ 39

            c. The FAC Fails to Adequately Plead a Violation of the
DTPA and Fails to Plead Its Unfairness Claim with
Particularity.................................................................. 39

            d. The City Cannot Obtain Relief for Consumer Fraud Prior to
November 19, 2008.................................................... 40

        2. The Claim Under Chicago Municipal Code § 4-276-470 (Count II)
Must Be Dismissed .................................................................. 41

i

**TABLE OF CONTENTS**
**(continued)**

Page

3.    The Municipal False Statement (Count III), Chicago Municipal False Claims Statute ("CFCA") (Counts IV and V), and Insurance Fraud (Count VII) Claims Must Be Dismissed ...................................... 42

    a.    The FAC Fails to Plead a False Claim .......................................... 42

    b.    The FAC Does Not Adequately Plead Presentment, Causation, or Conspiracy ........................................................... 45

4.    The Municipal Services Claim (Count VI) Must Be Dismissed.............. 46

5.    The Civil Conspiracy Claim (Count VIII) Must Be Dismissed............... 47

    a.    The FAC Fails to Allege an Agreement ..................................... 47

    b.    The FAC Fails to Plead a Conspiracy with Particularity............ 49

6.    The Unjust Enrichment Claim (Count X) Must Be Dismissed............... 50

7.    The Subrogation Claim (Count XI) Must Be Dismissed ........................ 51

IV.    CONCLUSION................................................................................................. 52

## TABLE OF AUTHORITIES

Page

## <u>CASES</u>

*Aaronson v. Vital Pharm., Inc.*,
2010 WL 625337 (S.D. Cal. Feb. 17, 2010) ........................................................ 11

*Alexander v. Cont'l Motor Werks, Inc.*,
1996 WL 79403 (N.D. Ill. Feb. 16, 1996) ........................................................... 15

*Allegis Realty Investors v. Novak*,
223 Ill. 2d 318 (2006) ......................................................................................... 41

*Anthony v. Country Life Mfg., L.L.C.*,
2002 WL 31269621 (N.D. Ill. Oct. 9, 2002) ....................................................... 44

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 14, 20

*Bank One, Okla., N.A. v. Trammell Crow Servs., Inc.*,
2003 WL 23019173 (N.D. Ill. Dec. 23, 2003) .................................................... 15

*Bankers Trust Co. v. Old Republic Ins. Co.*,
959 F.2d 677 (7th Cir. 1992) ............................................................................... 19

*Bausch v. Stryker Corp.*,
630 F.3d 546 (7th Cir. 2010) ............................................................................... 44

*Beaman v. Souk*,
2011 WL 832506 (C.D. Ill. Mar. 3, 2011) .......................................................... 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................... 13, 14, 20, 48

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
344 F.3d 211 (2d Cir. 2003) ................................................................................ 52

*Bober v. Glaxo Wellcome, PLC*,
1999 WL 759364 (N.D. Ill. Aug. 31, 1999) ....................................................... 45

*Bober v. Glaxo Wellcome, PLC*,
246 F.3d 934 (7th Cir. 2001) .............................................................. 22, 38, 40, 42

*Borsellino v. Goldman Sachs Grp., Inc.*,
477 F.3d 502 (7th Cir. 2007) .............................................................. 14, 49, 50

**TABLE OF AUTHORITIES**
(continued)

Page

*Bradford Sch. Bus Transit, Inc. v. Chi. Transit Auth.*,
537 F.2d 943 (7th Cir. 1976) ................................................................... 10

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)................................................................... 21, 44

*Cain v. Osman*,
286 F. App'x 934 (7th Cir. 2008) ........................................................ 14

*Cent. Reg'l Emps. Benefit Fund v. Cephalon, Inc.*,
2010 WL 1257790 (D.N.J. Mar. 29, 2010)................................. 36

*Cincinnati Life Ins. Co. v. Beyrer*,
722 F.3d 939 (7th Cir. 2013) ................................................. 14, 18, 49

*City of Chi. v. Beretta U.S.A. Corp.*,
213 Ill. 2d 351 (2004) ................................................... 31, 34, 35, 47

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) ................................................... 50

*CNA Ins. Co. v. DiPaulo*,
342 Ill. App. 3d 440 (2003) ................................................... 51

*Cnty. of Cook v. Philip Morris, Inc.*,
353 Ill. App. 3d 55 (2004) ......................................... 26, 31, 47

*Coelho v. Park Ridge Oldsmobile, Inc.*,
2001 U.S. Dist. LEXIS 14652 (N.D. Ill. Sept. 19, 2001) ................... 25

*Connick v. Suzuki Motor Co.*,
174 Ill. 2d 482 (1996) ................................................... 25

*Cont'l Cas. Co. v. Mohatare*,
2012 WL 4830419 (N.D. Ill. Oct. 10, 2012)................................. 14

*Cont'l Cas. Co. v. Polk Bros.*,
120 Ill. App. 3d 395 (1983) ................................................... 51

*Credit Ins. Consultants, Inc. v. Gerling Global Reinsurance Corp. of Am.*,
210 F. Supp. 2d 980 (N.D. Ill. 2002) ................................................... 47

*Cytyc Corp. v. Neuromedical Sys., Inc.*,
12 F. Supp. 2d 296 (S.D.N.Y. 1998)................................................ 21, 38

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*D & G Enters. v. Cont'l Ill. Nat'l Bank & Trust Co.*,
　574 F. Supp. 263 (N.D. Ill. 1983) ........................................................................ 16

*DiLeo v. Ernst & Young*,
　901 F.2d 624 (7th Cir. 1990) ............................................................................... 14

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
　2008 WL 5413105 (D.N.J. Dec. 23, 2008) .......................................................... 36

*Duke Energy Carolinas, LLC v. Frontier Cmmc'ns of the Carolina's LLC*,
　2014 WL 3854146 (W.D.N.C. Aug. 6, 2014) ....................................................... 13

*Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol
　Myers Squibb Co.*,
　969 F. Supp. 2d 463 (S.D. W. Va. 2013) ....................................................... 27, 31

*Endo Pharm., Inc. v. Actavis, Inc.*,
　2013 WL 4774494 (D.N.J. Sept. 3, 2013), *vacated as moot*, 2014 WL
　6844812 (3d Cir. Nov. 21, 2014) ......................................................................... 11

*Estate of Sims ex rel. Sims v. Cnty. of Bureau*,
　506 F.3d 509 (7th Cir. 2007) ............................................................................... 48

*Far E. Conference v. United States*,
　342 U.S. 570 (1952) ............................................................................................... 9

*Fid. Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*,
　161 F. Supp. 2d 876 (N.D. Ill. 2001) .................................................................. 50

*Fontes v. Time Warner Cable, Inc.*,
　2014 WL 2153919 (C.D. Cal. May 19, 2014) ..................................................... 13

*Gaudie v. Countrywide Home Loans, Inc.*,
　683 F. Supp. 2d 750 (N.D. Ill. 2010) .................................................................. 47

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
　458 U.S. 375 (1982) ............................................................................................. 26

*Germain v. Teva Pharm., USA, Inc.*,
　756 F.3d 917 (6th Cir. 2014) ............................................................................... 45

*Gisvold v. Merck & Co.*,
　__ F. Supp. 3d __, 2014 WL 6765718 (C.D. Cal. Nov. 25, 2014) ....................... 10

**TABLE OF AUTHORITIES**
(continued)

Page

*Gordon v. Church & Dwight Co.*,
2010 WL 1341184 (N.D. Cal. Apr. 2, 2010) .................................................... 10, 11

*Gredell v. Wyeth Labs. Inc.*,
367 Ill. App. 3d 287 (2006) ........................................................................ 21

*Greenberg v. United Airlines*,
206 Ill. App. 3d 40 (1990) ......................................................................... 40

*Greifenstein v. Estee Lauder Corp.*,
2013 WL 3874073 (N.D. Ill. July 26, 2013) ............................................... 22

*Grenadyor v. Ukrainian Vill. Pharm., Inc.*,
__ F.3d at __, 2014 WL 6783033 (7th Cir. Dec. 3, 2014) ................... 19, 42, 43, 46

*Grenadyor v. Ukrainian Vill. Pharm., Inc.*,
895 F. Supp. 3d 872 (N.D. Ill. 2012), *aff'd*, 2014 WL 6783033 (7th Cir.
Dec. 3, 2014) .......................................................................................... 50

*Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*,
1989 WL 152670 (N.D. Ill. Nov. 27, 1989) ............................................... 44

*Gupta v. St. Margaret Mercy Healthcare Ctrs., Inc.*,
1998 WL 34360626 (N.D. Ind. Apr. 22, 1998) ........................................... 50

*H.C. Duke & Son v. Prism Mktg. Corp.*,
2013 WL 5460209 (C.D. Ill. Sept. 30, 2013) ............................................. 14, 40

*Hagood v. Sonoma County Water Agency*,
81 F.3d 1465 (9th Cir. 1996) ..................................................................... 22

*Hansen v. Norfolk & W. Ry. Co.*,
689 F.2d 707 (7th Cir. 1982) ..................................................................... 9

*Hard Drive Prods., Inc. v. Does 1-55*,
2011 WL 4889094 (N.D. Ill. Oct. 12, 2011) .............................................. 48

*Health Care Serv. Corp. v. Brown & Williamson Tobacco Corp.*,
208 F.3d 579 (7th Cir. 2000) ..................................................................... 52

*Health Care Serv. Corp. v. Olivares*,
2011 WL 4591915 (E.D. Tex. Sept. 30, 2011) ........................................... 31

**TABLE OF AUTHORITIES**
(continued)

Page

*Henson v. CSC Credit Servs.*,
29 F.3d 280 (7th Cir. 1994) ............................................................................... 4

*Holmes v. Sec. Investor Prot. Corp.*,
503 U.S. 258 (1992) ........................................................................................... 31

*Hooker v. Columbia Pictures Indus., Inc.*,
551 F. Supp. 1060 (N.D. Ill. 1982) ................................................................... 39

*Imagenetix, Inc. v. Frutarom USA, Inc.*,
2013 WL 6419674 (S.D. Cal. Dec. 9, 2013) .................................................... 11

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
2012 WL 3154957 (N.D. Cal. Aug. 2, 2012) ........................................ 27, 28, 38

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
2009 WL 2043604 (D.N.J. July 10, 2009) .................................................. 28, 32

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
2010 WL 2346624 (D.N.J. June 9, 2010) .................................................... 22, 36

*In re StarNet, Inc.*,
355 F.3d 634 (7th Cir. 2004) ............................................................................... 9

*In re Text Messaging Litig.*,
2009 WL 5066652 (N.D. Ill. Dec. 10, 2009) .................................................... 49

*In re Towers*,
162 F.3d 952 (7th Cir. 1998) ............................................................................. 35

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*,
2010 WL 3119499 (S.D. Ill. Aug. 5, 2010) ............................................... passim

*In re Zyprexa Prods. Liab. Litig.*,
671 F. Supp. 2d 397 (E.D.N.Y. 2009) ............................................................... 37

*Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*,
2014 WL 2115498 (E.D. Pa. May 21, 2014) ..................................................... 23

*Indeck N. Am. Power Fund, L.P. v. Norweb PLC*,
316 Ill. App. 3d 416 (1st Dist. 2000) ................................................................ 47

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*,
665 F.3d 930 (7th Cir. 2012) ............................................................................. 49

# TABLE OF AUTHORITIES
## (continued)

Page

*Int'l Bhd. of Teamsters Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*,
34 F. Supp. 2d 656 (N.D. Ill. 1998) ....................................................... 34

*Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*,
585 F. Supp. 2d 1339 (M.D. Fla. 2008) ................................. 30, 32, 33, 34

*Jepson, Inc. v. Makita Corp.*,
34 F.3d 1321 (7th Cir. 1994) ...................................................... 15, 16

*Kennedy v. Medtronic, Inc.*,
366 Ill. App. 3d 298 (2006) ................................................................ 23

*Kirk v. Michael Reese Hosp. & Med. Ctr.*,
117 Ill. 2d 507 (1987) ....................................................................... 32

*Landis v. North Am. Co.*,
299 U.S. 248 (1936) ........................................................................... 13

*Lewis v. Lead Indus. Ass'n, Inc.*,
342 Ill. App. 3d 95 (2003) ................................................................ 51

*Luckey v. Baxter Healthcare Corp.*,
183 F.3d 730 (7th Cir. 1999) ............................................................. 22

*Lynch Ford, Inc. v. Ford Motor Co.*,
957 F. Supp. 142 (N.D. Ill. 1997) ..................................................... 39

*Martin ex rel. Martin v. Ortho Pharms. Corp.*,
169 Ill. 2d 234 (1996) ......................................................... 24, 32, 33

*Martis v. Grinnell Mut. Reinsurance Co.*,
388 Ill. App. 3d 1017 (2009) ............................................................. 51

*Mass Laborers' Health & Welfare v. Philip Morris*,
62 F. Supp. 2d 236 (D. Mass 1999) .................................................... 52

*McCauley v. City of Chi.*,
671 F.3d 611 (7th Cir. 2011) ............................................................. 14

*McClure v. Owens Corning Fiberglass Corp.*,
720 N.E.2d 242 (Ill. 1999) ........................................................... 48, 49

**TABLE OF AUTHORITIES**
(continued)

Page

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
532 F.2d 412 (5th Cir. 1976) ................................................................................. 10

*Monster Beverage Corp. v. Herrera*,
2013 WL 4573959 (C.D. Cal. Aug. 22, 2013) ....................................................... 10

*Moore v. Boating Indus. Ass'n*,
819 F.2d 693 (7th Cir. 1987) ................................................................................. 49

*Morgan v. SmithKline Beecham Corp.*,
2013 WL 3486907 (E.D. Pa. July 10, 2013) .......................................................... 32

*Morton Grove Pharm., Inc. v. Nat'l Pediculosis Ass'n*,
494 F. Supp. 2d 934 (N.D. Ill. 2007) .................................................................... 40

*Nat'l Commc'ns Ass'n, Inc. v. AT&T Co.*,
46 F.3d 220 (2d Cir.1995) ....................................................................................... 9

*Newman v. McNeil Consumer Healthcare*,
2013 WL 7217197 (N.D. Ill. Mar. 29, 2013) ................................................... 21, 38

*Oliveira v. Amoco Oil Co.*,
201 Ill. 2d 134 (Ill. 2002) ..................................................................................... 28

*Opoka v. INS*,
94 F.3d 392 (7th Cir. 1996) ..................................................................................... 4

*Otto v. Variable Annuity Life Ins. Co.*,
814 F.2d 1127 (7th Cir. 1986) ............................................................................... 50

*Pa. Emps. Benefit Trust, Fund (PEBTF) v. Ortho-McNeil-Janssen Pharm., Inc.*,
2010 WL 3613056 (Ct. Comm. Pl. July 7, 2010) .................................................. 37

*Pac. Trading Co. v. Wilson & Co.*,
547 F.2d 367 (7th Cir. 1976) ................................................................................. 44

*People ex rel. Hartigan v. E & E Hauling, Inc.*,
153 Ill. 2d 473 (1992) ...................................................................................... 26, 51

*People ex rel. Madigan v. United Constr. of Am.*,
981 N.E.2d 404 (Ill. App. 2012) ............................................................................ 26

*People of the State of Cal. v. Purdue Pharma L.P., et al.*,
Case No. 30-2014-00725287 (Orange Cty. Sup. Ct., May 21, 2014).................... 13

ix

## TABLE OF AUTHORITIES
### (continued)

Page

*People v. Parks*,
403 Ill. App. 3d 451 (2010) ............................................................... 35

*Peterson v. Cmty. Gen. Hosp.*,
2003 WL 262515 (N.D. Ill. Feb. 7, 2003) ............................................ 46

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) .............................................................. 14

*Prohias v. Pfizer, Inc.*,
490 F. Supp. 2d 1228 (S.D. Fla. 2007) .................................... 20, 21, 38

*Reuter v. MasterCard Int'l, Inc.*,
397 Ill. App. 3d 915 (2010) ............................................................... 35

*Ries v. Hornell Brewing Co., Inc.*,
2010 WL 2943860 (N.D. Cal. July 23, 2010) ...................................... 11

*Roberts v. Chemlawn Corp.*,
716 F. Supp. 364 (N.D. Ill. 1989) ...................................................... 10

*Ryan v. Chemlawn Corp.*,
935 F.2d 129 (7th Cir. 1991) ............................................................. 10

*Ryan v. Wersi Elec. GmbH*,
59 F.3d 52 (7th Cir. 1995) ................................................................ 24

*S.E. Laborers Health & Welfare Fund v. Bayer Corp.*,
2011 WL 5061645 (11th Cir. Oct. 24, 2011) ....................................... 27

*Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharm., Inc.*,
586 F.3d 500 (7th Cir. 2009) ............................................................. 12

*Schivarelli v. CBS, Inc.*,
333 Ill. App. 3d 755 (2002) ............................................................... 40

*Scott v. GlaxoSmithKline Consumer Healthcare, L.P.*,
2006 WL 952032 (N.D. Ill. 2006) ...................................................... 28

*Season Comfort Corp. v. Ben A. Borenstein Co.*,
281 Ill. App. 3d 648 (1995) ............................................................... 51

*Segretti v. Lome*,
747 F. Supp. 484 (N.D. Ill. 1990) ...................................................... 48

x

**TABLE OF AUTHORITIES**
**(continued)**

Page

*State Farm Gen. Ins. Co. v. Stewart*,
288 Ill. App. 3d 678 (1997) ........................................................................ 35, 51

*Steadfast Ins. Co. v. Auto Mktg. Network*,
2 F. Supp. 2d 1058 (N.D. Ill. 1998) ........................................................... 35

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
171 F.3d 912 (3d Cir. 1999)........................................................................ 32

*Suburban Buick, Inc. v. Gargo*,
2009 WL 1543709 (N.D. Ill. May 29, 2009) ............................................. 16

*Swearingen v. Late July Snacks LLC*,
2014 WL 2215878 (N.D. Cal. May 29, 2014) ........................................... 10, 11

*Taradejna v. Gen. Mills, Inc.*,
909 F. Supp. 2d 1128 (D. Minn. 2012) ...................................................... 10, 11

*Tierney v. Vahle*,
304 F.3d 734 (7th Cir. 2002) ...................................................................... 2

*Travelers Indem. Co. v. Cephalon, Inc.*,
2014 WL 3408550 (E.D. Pa. July 14, 2014)............................................... 21, 23

*TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*,
153 F.3d 822 (7th Cir. 1998) ...................................................................... 35

*Tutoki v. Celebrezze*,
375 F.2d 105 (7th Cir. 1967) ...................................................................... 11

*UFCW Local 1776 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010)........................................................................ 28

*United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund
v. Amgen, Inc.*,
400 F. App'x 255 (9th Cir. 2010) ............................................................... 33

*United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*,
460 F.3d 853 (7th Cir. 2006) ...................................................................... 42

*United States ex rel. Dolan v. Long Grove Manor, Inc.*,
2014 WL 3583980 (N.D. Ill. July 18, 2014).............................................. 42, 46

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States ex rel. Drescher v. Highmark, Inc.*,
305 F. Supp. 2d 451 (E.D. Pa. 2004) ................................. 46

*United States ex rel. Fowler v. Caremark Rx, Inc.*,
2006 WL 2425331 (N.D. Ill. Aug. 21, 2006) ........................ 18, 46

*United States ex rel. Garst v. Lockheed-Martin Corp.*,
328 F.3d 374 (7th Cir. 2003) .............................. 18, 20, 45

*United States ex rel. Geschery v. Generations Healthcare, LLC*,
922 F. Supp. 2d 695 (N.D. Ill. 2012) ............................. 46

*United States ex rel. Gross v. AIDS Research Alliance-Chi.*,
415 F.3d 601 (7th Cir. 2006) ................................ 14

*United States ex rel. Kennedy v. Aventis Pharm., Inc.*,
2008 WL 5211021 (N.D. Ill. Dec. 10, 2008) ........................ 37

*United States ex rel. Lamers v. City of Green Bay*,
168 F.3d 1013 (7th Cir. 1999) ............................... 44

*United States ex rel. Lisitza v. Par Pharm. Cos.*,
2013 WL 870623 (N.D. Ill. Mar. 7, 2013) .......................... 50

*United States ex rel. Milam v. Regents of the Univ. of Cal.*,
912 F. Supp. 868 (D. Md. 1995) ............................... 23

*United States ex rel. Nguyen v. City of Cleveland*,
2005 WL 2416925 (N.D. Ohio Sept. 30, 2005) ....................... 23

*United States ex rel. Obert-Hong v. Advocate Health Ctr.*,
2001 WL 303692 (N.D. Ill. Mar. 28, 2001) ......................... 18

*United States ex rel. Walner v. NorthShore Univ. Healthsystem*,
660 F. Supp. 2d 891 (N.D. Ill. 2009) ............................. 46

*United States ex rel. West v. Ortho-McNeil Pharm., Inc.*,
2007 WL 2091185 (N.D. Ill. July 20, 2007) ...................... 18, 46

*United States ex rel. Zemplenyi v. Grp. Health Coop.*,
2011 WL 814261 (W.D. Wash. Mar. 3, 2011) ........................ 38

*United States v. Caputo*,
288 F. Supp. 2d 912 (N.D. Ill. 2003) ............................ 23

**TABLE OF AUTHORITIES**
**(continued)**

Page

*United States v. Kaadt,*
171 F.2d 600 (7th Cir. 1948) ................................................................ 45

*United States v. Krizek,*
111 F.3d 934 (D.C. Cir. 1997) ............................................................... 46

*United States v. Mackby,*
261 F.3d 821 (9th Cir. 2001) ................................................................ 46

*United States v. President & Fellows of Harvard Coll.,*
323 F. Supp. 2d 151 (D. Mass. 2004) .................................................. 46

*United States v. W. Pac. R.R. Co.,*
352 U.S. 59 (1956) ............................................................................... 9

*Vangsness v. Deutsche Bank Nat'l Trust Co.,*
2012 WL 5989354 (N.D. Ill. Nov. 29, 2012) ........................................ 14

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.,*
20 F.3d 771 (7th Cir. 1994) ............................................................ 15, 16

*Vodak v. City of Chi.,*
2006 WL 2524141 (N.D. Ill. Aug. 20, 2006) ........................................ 35

*Wang ex rel. United States v. FMC Corp.,*
975 F.2d 1412 (9th Cir. 1992) ............................................................. 23

*Watt v. City of Highland Park,*
2001 WL 1090152 (N.D. Ill. Sept. 13, 2001) ....................................... 16

*Weinberger v. Bentex Pharms., Inc.,*
412 U.S. 645 (1973) ............................................................ 9, 11, 12, 13

*Weit v. Cont'l Ill. Nat'l Bank & Trust Co.,*
641 F.2d 457 (7th Cir. 1981) ............................................................... 49

*Williams v. Purdue Pharma Co.,*
297 F. Supp. 2d 171 (D.D.C. 2003) ..................................................... 36

*Wright v. Associated Ins. Cos.,*
29 F.3d 1244 (7th Cir. 1994) ................................................................. 3

*Zic v. Italian Gov't Travel Office,*
130 F. Supp. 2d 991 (N.D. Ill. 2001) ................................................... 47

**TABLE OF AUTHORITIES**
(continued)

Page

**STATUTES**

21 U.S.C. § 331(a) ............................................................................................. 44, 47

21 U.S.C. § 337(a) .................................................................................................. 44

21 U.S.C. § 352(a) ............................................................................................. 44, 45

21 U.S.C. § 352(f) ............................................................................................. 44, 45

21 U.S.C. § 352(n) .................................................................................................. 24

720 ILCS § 5/17 ..................................................................................................... 42

815 ILCS § 505/1 ................................................................................................... 39

815 ILCS § 505/10 ................................................................................................. 38

815 ILCS § 505/2 ................................................................................................... 40

815 ILCS § 510/2 ................................................................................................... 39

815 ILCS § 510/4 ................................................................................................... 40

Chi. Mun. Code § 1-20-020 .............................................................................. 41, 46

Chi. Mun. Code § 1-21-010 .............................................................................. 35, 42

Chi. Mun. Code § 1-21-030 ................................................................................... 41

Chi. Mun. Code § 1-22-020 ................................................................................... 46

Chi. Mun. Code § 1-22-030 ................................................................................... 41

Chi. Mun. Code § 2-25-090 .......................................................................... 38, 39, 41

Chi. Mun. Code § 4-276-005 ............................................................................ 39, 41

Chi. Mun. Code § 4-276-470 ................................................................................. 41

Chi. Mun. Code § 4-276-640 ................................................................................. 41

**OTHER AUTHORITIES**

36 Fed. Reg. 18539 (Sept. 16, 1971) ..................................................................... 42

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Assessment of Analgesic Treatment of Chronic Pain: A Scientific Workshop*,
http://goo.gl/7hGEQ6 (last visited Dec. 19, 2014) ................................................... 6

*FDA Blueprint for Prescriber Education for Extended-Release and Long-Acting
Opioid Analgesics*, http://goo.gl/hgWSEv (last visited Dec. 19, 2014) ..................................... 6

FDA, *Guidance for Industry: Assessment of Abuse Potential of Drugs* (Jan. 2010) ................... 23

*Questions and Answers: FDA Approves a Risk Evaluation and Mitigation Strategy
(REMS) for Extended-Release and Long-Acting (ER/LA) Opioid Analgesics*,
http://goo.gl/jFdoFP (last visited Dec. 19, 2014) ................................................... 6

## RULES

Fed. R. Civ. P. 12(b)(2) ................................................................................. 2

Fed. R. Civ. P. 12(b)(6) ............................................................................. 2, 13

Fed. R. Civ. P. 8(a) ...................................................................................... 20

Fed. R. Civ. P. 9(b) .............................................................................. passim

## REGULATIONS

21 C.F.R. § 201.326 ..................................................................................... 25

21 C.F.R. § 202.1 ............................................................................ 24, 25, 45

## I.    INTRODUCTION

Defendants move to dismiss or stay the City of Chicago's First Amended Complaint ("FAC").[1] The FAC seeks to limit the ability of Chicago doctors to treat the chronic, non-cancer pain of patients in the manner doctors deem most appropriate. Although the Food and Drug Administration ("FDA") has approved certain opioid pain medications for the treatment of chronic non-cancer pain, the FAC seeks to deprive patients and doctors of that treatment choice by having six lay jurors determine that "the use of opioids to treat chronic pain is not 'medically necessary' or 'reasonably required' in that their risks do not exceed their benefits." FAC ¶ 354.[2]

The Court should dismiss or stay the FAC without prejudice because the issues it raises are within the FDA's primary jurisdiction. It is undisputed that the FDA has approved certain opioid pain medication at issue in the FAC for the treatment of chronic non-cancer pain. Yet the City seeks to have a Chicago jury find that the use of opioids to treat chronic non-cancer pain is medically inappropriate based on scientific evidence the FDA has already rejected, all while the FDA is further addressing the issue through authorized, currently conducted studies. The safety and efficacy of prescription medications, including opioids, are issues within the FDA's unique scientific and regulatory expertise. Under the primary jurisdiction doctrine, courts should defer

---

[1] The Defendants are Purdue Pharma L.P., Purdue Pharma, Inc., and The Purdue Frederick Company, Inc. ("Purdue"), Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. ("Teva"), Cephalon Inc. ("Cephalon"), Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica Inc. ("Janssen"), Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. ("Endo"), and Actavis plc, Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc., Actavis LLC, Actavis Pharma, Inc., f/k/a Watson Pharma, Inc., and Watson Laboratories, Inc. ("Actavis").

[2] As the City would have it, any prescription signed by a Chicago-area physician to treat his or her patient with an opioid for a form of chronic pain other than "cancer or end-of-life pain" is medically improper, and therefore, all claims submitted to a City medical insurance program for "opioids prescribed for chronic pain, as opposed to acute and cancer or end-of-life pain, were ineligible for payment." FAC ¶ 343. Each of the eleven counts in the FAC is premised on the allegation that Chicago physicians "who prescribed opioids for chronic non-cancer pain" were fraudulently deceived, *id*. ¶¶ 415, 430, 478, 484, 496, 501, 506, and that "opioids . . . are not 'medically necessary' or 'reasonably required' to treat chronic pain." *Id*. ¶¶ 437, 447, 463, 487, 511.

to the agency's expertise. Indeed, application of the primary jurisdiction doctrine is most compelling where, as here, the relevant issue is under active regulatory consideration.

Apart from the City's effort to supplant the FDA's regulatory role, the City has filed a profoundly deficient complaint. Those defects, individually and collectively, are fatal to the FAC under Rule 12(b)(6). *First*, the FAC's fraud allegations fail on two fundamental grounds: (1) although Defendants are competing manufacturers[3] of a wide range of opioid products, the FAC lumps them together for pleading purposes as if they were a single actor manufacturing an undifferentiated product; and (2) the FAC fails to allege any fraud claim as to any Defendant with the particularity required under Rule 9(b). The FAC nowhere sets forth the requisite who, what, where, when, and how of any opioid prescription the City claims it wrongly reimbursed or by which it was otherwise harmed. Despite its failure to meet the elements of Rule 9(b) as to **any** prescription, the City claims that Defendants are responsible for alleged wrongdoing as to **every** opioid prescription written in Chicago, including prescriptions for products manufactured and sold by other companies, including those not sued.

*Second*, even apart from the Rule 9(b) deficiencies described above, the FAC fails to allege any actionable misrepresentation or omission by any Defendant. Defendants' challenged statements comport with an FDA-approved use and therefore cannot form the basis of a fraud allegation.[4] *Third*, the City fails to adequately plead causation. Defendants' opioids are only

---

[3] Some Defendants are not manufacturers but rather corporate parents or predecessors of manufacturers. In addition, as set forth in Actavis's and Teva's individual motions to dismiss, Actavis plc., Actavis, Inc. and Teva Pharmaceutical Industries, Ltd. are nonresident entities that do not manufacture, market, or sell opioids. The FAC should be dismissed as to them under Rule 12(b)(2) for lack of personal jurisdiction. For convenience only, this Memorandum at times refers to the individual defendants collectively as "Defendants." Such references should not be taken as representations that the parent or predecessor companies named in the FAC manufacture, market, or sell the products in issue.

[4] Because the FAC refers to Defendants' product labels and the FDA-mandated warnings are undeniably central here, the Court may consider them in resolving the motion to dismiss. *See, e.g.*, FAC ¶¶ 21, 28, 34, 38, 41, 44; *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) ("document[s] merely … referred to in

available to patients through a doctor's prescription. Illinois law requires physicians to under-stand the FDA-approved uses and attendant risks of prescription medications. And, it is entirely lawful for physicians to prescribe medications for off-label uses. The physician's exercise of his or her independent professional judgment in prescribing opioids to a patient breaks the causal connection between any representations or omissions and the alleged harm to the City. In fact, that intervening cause is only one of many, including the patient's decisions about whether and how to use the medication and the City's prescription reimbursement decisions. The FAC does not provide any legally sufficient allegations to address the fundamental element of proximate cause.

*Fourth*, the City fails to plead a cognizable injury. The City's insurance plans obligate it to reimburse for prescription medications prescribed for FDA-approved uses. The FAC fails to allege that any opioid product failed to perform in accordance with its FDA-approval or that any physician prescribed an opioid to his or her patient in violation of the FDA-approved labelling or independent medical judgment. *Finally*, each count in the FAC suffers from additional, claim-specific deficiencies requiring dismissal.

This case is not simply a dispute between litigants. Opioid analgesics offer important, life-altering benefits to patients suffering from chronic pain—but carry serious risks. Important decisions regarding the appropriate uses of opioids, and the necessary warnings and disclosures, belong, and must belong, to the FDA and the physicians who make the decisions on individual patient care. The FDA has reaffirmed the use of opioids for treatment of chronic non-cancer pain and has procedures in process for further analysis of the issue. The City should not be per-

---

[a] complaint" can be considered for purposes of resolving a motion to dismiss where their authenticity is not disputed and they are central to the claims); *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (consideration of documents "referred to in the plaintiff's complaint and … central to [plain-tiff's] claim" does not "convert[] the motion to dismiss to a motion for summary judgment.").

mitted to undermine that regulatory determination. Even if the doctrine of primary jurisdiction did not mandate dismissal or a stay of the City's claims, they otherwise fail due to manifest pleading deficiencies. Having asserted its sweeping claims, the City must adhere to the pleading requirements that would permit Defendants to fairly defend against them.

## II.     THE COURT SHOULD DISMISS OR STAY THIS ACTION IN DEFERENCE TO THE PRIMARY JURISDICTION OF THE FDA

The FDA has determined that opioids serve an important public health role: "When prescribed and used properly, opioids can effectively manage pain and alleviate suffering—clearly a public health priority. Chronic pain is a serious and growing health problem: it 'affects millions of Americans; contributes greatly to national rates of morbidity, mortality, and disability; and is rising in prevalence.'"[5] At the same time, there is no dispute that opioids pose significant public health risks: "Opioids also have grave risks, the most well-known of which include addiction, overdose, even death. The labeling for these products contains prominent warnings about these risks. Moreover, the boxed warning states that all patients should be 'routinely monitor[ed] … for signs of misuse, abuse, and addiction.'"[6]

As these statements make clear, the FDA has expressly *approved* opioid drugs as safe and effective for long-term treatment of chronic non-cancer pain with prominent warnings regarding their risks. Just last year, the FDA undertook a comprehensive review of opioid drugs prompted by a citizen's petition. The FDA's review addressed the premise that serves as the

---

[5] *See* 9/10/13 Letter from FDA to Physicians for Responsible Opioid Prescribing ("PROP") ("FDA Resp.") at 2 & nn.4-6, attached as Ex. 1 to the Kubota Decl.; *see also* 7/25/12 Letter from PROP to FDA ("PROP Pet."), attached as Ex. 2 to the Kubota Decl. Because the FAC refers to the PROP Petition and the FDA's Response, *see* FAC ¶¶ 56, 62, 245, 247 & nn.27, 35, 115, 116, they are incorporated by reference in the FAC and the Court may consider them. *See* n.3; *see also Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996) ("the decision of another court or agency ... is a proper subject of judicial notice"); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (courts "may ... take judicial notice of matters of public record without converting a ... motion [to dismiss] into a motion for summary judgment.").

[6] *Id.* at 2.

cornerstone of the FAC—namely, the claim that opioids are inappropriate "for long-term use for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as 'chronic pain')." FAC ¶ 3. While the FAC acknowledges this FDA proceeding, *id.* ¶ 62, it ignores the result. After a thorough review, the FDA *rejected* the same safety and efficacy arguments the FAC advances and *declined* to restrict the use of opioids as the citizen's petition advocated. The FDA reaffirmed the public health role of opioids for the treatment of chronic non-cancer pain. It also exercised its statutory authority to direct further studies and clinical trials to gather "more data" to determine if additional measures are warranted. FDA Resp. at 10.

The City would have six Chicago jurors supplant the institutional expertise and role of the FDA with regard to this important public health question. The City would do so at the *same time* the agency is gathering additional data on the issue with scientific rigor, through approved research protocols. This is precisely the circumstance that the doctrine of primary jurisdiction was intended to address. This court should stay the FAC or dismiss it without prejudice to ensure that the FDA's institutional expertise serves its established function.[7]

### A. Background of the FDA's Oversight and Pending Investigation of Opioids

For many years, the FDA has been actively monitoring and evaluating the risks and benefits of opioid pain relievers to ensure that they are prescribed appropriately.[8] As the FDA Commissioner recently commented:

> The FDA is always working in an environment in which complex decisions must be made, balancing risks and benefits and working within a legal regulatory framework. The opiate issue is a huge area of concern in terms of the public health epidemic that we are facing with opiate addiction, abuse and misuse, overdose, and preventable death. ***At the same time, many patients need effective***

---

[7] In the event the FAC is dismissed without prejudice, Defendants would be prepared to stipulate that all statutes of limitations applicable to the claims in the FAC would be tolled during the pendency of the FDA review.

[8] *See* Timeline of Selected FDA Activities & Events Addressing Opioids, attached as Appendix 1 to this Memorandum.

5

> *pain management ... for the treatment of chronic conditions. We need to balance those issues. We need to ensure access to safe and effective pain medication but recognize that there is a broader context of abuse.*[9]

Recognizing these issues, the FDA has undertaken an evaluation of the risks and benefits of opioids for treatment of chronic non-cancer pain. In May 2012, the FDA co-hosted a scientific workshop to review available data on the efficacy of analgesics, including opioids, for treatment of chronic non-cancer pain.[10] Two months later, the FDA approved a risk evaluation and mitigation strategy ("REMS") for extended release/long acting ("ER/LA") opioid analgesics that introduced safety measures to reduce risks of their use. The REMS requires manufacturers to provide training for health care professionals on proper prescription practices. It addresses, among other things, "how to recognize evidence of and potential for opioid misuse, abuse, and addiction," and the need to distribute educational materials to prescribers and patients on the safe use of these drugs.[11]

In September 2013, the FDA ruled on a citizen's petition filed by a group of clinicians, researchers, and health officials called Physicians for Responsible Opioid Prescribing ("PROP"). Like the FAC, the Petition directly challenged the use of opioids for "chronic non-cancer pain." PROP contended that the "[l]ong-term safety and effectiveness of managing [chronic non-cancer pain] with opioids has not been established," and requested that the FDA, *inter alia*, impose a "maximum duration of 90-days for continuous (daily) use for non-cancer

---

[9] Interview by Eric J. Topol, MD, with Margaret A. Hamburg, MD, FDA Commissioner (Nov. 12, 2014), http://goo.gl/ZLlU9c (last visited Dec. 19, 2014) (emphasis added).

[10] *See Assessment of Analgesic Treatment of Chronic Pain: A Scientific Workshop*, attached as Ex. 10 to the Kubota Decl.

[11] *See Questions and Answers: FDA Approves a Risk Evaluation and Mitigation Strategy (REMS) for Extended-Release and Long-Acting (ER/LA) Opioid Analgesics*, attached as Ex. 11 to the Kubota Decl.; *see generally Extended-Release (ER) and Long-Acting (LA) Opioid Analgesics Risk Evaluation and Mitigation Strategy (REMS)*, attached as Ex. 12 to the Kubota Decl.

pain." PROP Pet. 2.[12] The FDA "carefully reviewed" the Petition and "more than 1900 [related] comments." The agency assessed the "relevant literature." It held a two-day public hearing at which it received "over 600 comments" and dozens of experts and concerned citizens testified. FDA Resp. at 1, 5-6. The FDA noted that "the majority of comments" "opposed PROP's requests" and that "[m]any professional societies," including the American Medical Association, "did not support the Petition and stated that the data cited by PROP did not support PROP's requests." *Id.* at 5. After completing a 14-month review, the FDA determined that opioids should continue to be available for the treatment of chronic pain, while also directing further study and certain labeling changes for some opioid drugs.[13] Significantly, after being presented with the same assertions as those now alleged in the Amended Complaint,[14] the FDA made two findings directly at odds with the underlying premises that form the cornerstones of the FAC.

First, the FDA rejected any distinction between the use of opioids for "cancer" versus "non-cancer" pain:

> It is FDA's view that a patient without cancer, like a patient with cancer, may suffer from chronic pain, and PROP has not provided scientific support for why labeling should recommend different treatment for such patients. In addition, **FDA knows of no physiological or pharmacological basis upon which to dif-**

---

[12] PROP contended that the "[l]ong-term safety and effectiveness of managing [chronic non-cancer pain] with opioids has not been established," and asked that the FDA (1) impose a daily dose maximum equivalent to 100 mg morphine, (2) impose a "maximum duration of 90-days for continuous (daily) use for non-cancer pain," and (3) "[s]trike the term 'moderate' from the indication for non-cancer pain." Pet. 2.

[13] Instead of replacing the terms "moderate to severe pain" with a categorical requirement of "severe pain," as PROP had requested, the FDA changed the indication in the labeling for ER/LA opioids to require pain "*severe enough* to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." FDA Resp. at 8-9, 11 (emphasis in original). As the agency explained, it chose to discontinue the "use of terminology predicated only on a categorical 'severity scale' (e.g., mild, moderate, severe) to characterize the intensity of pain for which ER/LA opioids are indicated" in favor of a "more thoughtful determination that [a patient's] pain—however it may be defined—is severe enough —to require" the use of ER/LA opioids for indicated uses. *Id.* at 7-8 (emphasis in original). The FDA "denie[d] PROP's Petition insofar as it request[ed] labeling changes for [immediate release ("IR")opioids, or opioid/non-opioid combination products." *Id.* at 6 & n.30.

[14] Appendix 2 to this Memorandum sets forth a chart comparing the salient PROP Petition "Statements of Scientific Basis" which are realleged in the FAC, along with the FDA's response.

> *ferentiate the treatment of chronic pain in a cancer setting or patient from the treatment of chronic pain in the absence of cancer*, and comments to the Petition docket reflect similar concerns. FDA therefore declines to make a distinction between cancer and non-cancer chronic pain in opioid labeling.

*Id.* at 9 (emphasis added).

Second, the FDA rejected the assertion that opioids should not be available "for long-term use" in the treatment of chronic pain. The FDA rejected the Petition's request that opioid therapy be limited to a maximum 90-day duration: "After a review of the literature cited in the Petition, and an assessment of other relevant information discussed below, FDA has determined that *limiting the duration of use for opioid therapy to 90 days is not supportable*." *Id.* at 14. (emphasis added). In rendering its decision, the FDA found the various studies and data submitted by PROP—many of which the City relies on in the FAC—to be scientifically inadequate and deficient.[15] *Id.* at 15-17.

However, exercising its continuing responsibility in this area and recognizing that "additional action" might be warranted if there were relevant supporting data, the FDA required opioid manufacturers to conduct additional studies and clinical trials to further assess the "serious risks of misuse, abuse … addiction, overdose, and death associated with the long-term use of opioid analgesics." *Id.* at 10-11. The FDA set milestones for completion of those studies: the first is scheduled for completion by late 2015 and others by 2018. *Id.* at 11.

---

[15] *See, e.g.*, FDA Resp. at 16 & n.63 (stating FDA did "not agree" that data used in the study titled *Long-Term Chronic Opioid Therapy Discontinuation Rates from the TROUP Study* cited in FAC ¶ 12 n.8 "necessarily reflect a safety concern specific to longer term use"). Appendix 3 to this memorandum charts the multiple studies cited in the FAC that the FDA found deficient. Appendix 3 also identifies multiple additional studies cited in the original complaint but omitted from the FAC after Defendants' original dismissal motion pointed out that the FDA had found them deficient. Notably, the FAC retains the discredited allegations for which those studies were previously cited, and thus the effect of the omissions is merely to mask the FAC's reliance on studies the FDA rejected. *Compare, e.g.*, Complt. ¶ 59 & n.22 (citing Sullivan and Eriksen for the claim that "scientific evidence … establishes that many patients on chronic opioid therapy continue to experience significant pain and dysfunction"), *with* FDA Resp. at 15 (finding studies flawed and inconclusive), *and* FAC ¶ 66 (omitting citation but continuing to claim that "evidence exists to show opioid drugs are not effective to treat chronic pain, and may worsen patients' health").

### B.     The Doctrine of Primary Jurisdiction

"The doctrine of primary jurisdiction ... is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956). The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 64. Given the "expert and specialized knowledge of the agencies involved," referring to the institutional expertise of "agencies that are better equipped than courts by specialization [and] insight gained through experience," serves salutary purposes and promotes "[u]niformity and consistency." *Id.* at 64-65; *In re Star-Net, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) (en banc) ("'The doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight.'" (quoting *Nat'l Commc'ns Ass'n, Inc. v. AT&T Co.*, 46 F.3d 220, 222–23 (2d Cir. 1995)).

The Supreme Court repeatedly has directed that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far E. Conference v. United States*, 342 U.S. 570, 574-75 (1952); *see also Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 654 (1973) (same); *W. Pac. R.R. Co.*, 352 U.S. at 64 (same); *see also Hansen v. Norfolk & W. Ry. Co.*, 689 F.2d 707, 710 (7th Cir. 1982) (same). "No fixed formula exists for applying the doctrine of primary jurisdiction …" *Hansen*, 689 F.2d at 710. The policies underlying its application are: "(1) the desirable uniformity which would obtain if a specialized agency initially passed on certain types of administrative questions, … and (2) the

9

expert and specialized knowledge of the agencies involved.'" *Bradford Sch. Bus Transit, Inc. v. Chi. Transit Auth.*, 537 F.2d 943, 949 (7th Cir. 1976) (citation omitted); *accord Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991).

Two lines of cases invoking the primary jurisdiction doctrine apply here. First, courts have recognized that "[i]t is axiomatic that 'the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency.'" *Roberts v. Chemlawn Corp.*, 716 F. Supp. 364, 366 (N.D. Ill. 1989) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 420 (5th Cir. 1976)). Courts routinely apply the primary jurisdiction doctrine when an issue central to the litigation is pending before the FDA. *See Gisvold v. Merck & Co.*, 2014 WL 6765718, at *4 (C.D. Cal. Nov. 25, 2014) (dismissing complaint on primary jurisdiction grounds where an issue "[u]nderlying all of Plaintiff's claims" "ha[d] been *pending* before the FDA" for over three years); *Monster Beverage Corp. v. Herrera*, 2013 WL 4573959, at *15-16 (C.D. Cal. Aug. 22, 2013) (primary jurisdiction applied where "the FDA has taken an interest in investigating and resolving" the question at issue).[16] As the *Gisvold* Court summarized:

> Through this action, Plaintiff invites the Court to weigh in, find in her favor, and take action by requiring Merck to make a disclaimer and engage in corrective advertising. Exercising such jurisdiction over Plaintiff's claims presents substantial risk of inconsistent rulings on issues presently pending before the FDA. The investigation of clinical benefits of drugs is particularly within the FDA's initial decisionmaking domain, and is therefore not appropriate for adjudication before completion of the FDA's own decisionmaking process.

2014 WL 6765718, at *4.

Second, in the particular context of evaluating drugs, the Supreme Court has emphasized:

---

[16] *See also Swearingen v. Late July Snacks LLC*, 2014 WL 2215878, at *3 (N.D. Cal. May 29, 2014) (stay proper where "FDA ha[d] the regulatory authority and [was] actively considering an issue central to the litigation"); *Taradejna v. Gen. Mills, Inc.*, 909 F. Supp. 2d 1128, 1135 (D. Minn. 2012) (same where "it would be imprudent for the Court, at this juncture, to substitute its judgment for that of the [FDA's] while revision of the standard ... is pending."); *Gordon v. Church & Dwight Co.*, 2010 WL 1341184, at *2 (N.D. Cal. Apr. 2, 2010) (same where FDA was "still considering public comments and other data in connection with warnings similar to those that plaintiffs seek to have the court impose").

> Evaluation of conflicting reports as to the reputation of drugs among experts in the field is not a matter well left to a court without chemical or medical background. The determination whether a drug is generally recognized as safe and effective ... necessarily implicates complex chemical and pharmacological considerations. Threshold questions within the peculiar expertise of an administrative agency are appropriately routed to the agency, while the court stays its hand.

*Weinberger*, 412 U.S. at 653-54 (internal quotations omitted) (deferring to primary jurisdiction of the FDA); *see also Tutoki v. Celebrezze*, 375 F.2d 105, 107 (7th Cir. 1967) ("The district court has neither the facilities nor the expertise to pass on [the drug] in the first instance. The possible conflict of a judicial determination of this question with a subsequent FDA decision ... strengthens our view that the doctrine of primary jurisdiction should be applied."); *Imagenetix, Inc. v. Frutarom USA, Inc.*, 2013 WL 6419674, at *4 (S.D. Cal. Dec. 9, 2013) (stay proper where "underlying issue" in plaintiff's claims involved "complex" considerations and "technical and scientific questions" "within the primary jurisdiction of the FDA"); *Endo Pharm., Inc. v. Actavis, Inc.*, 2013 WL 4774494, at *2 (D.N.J. Sept. 3, 2013) (dismissing claim "bound-up with determinations that can only be made by FDA"), *vacated as moot*, 2014 WL 6844812 (3d Cir. Nov. 21, 2014) (finding that abstention was no longer necessary after the FDA "issued its determination"); *Aaronson v. Vital Pharm., Inc.*, 2010 WL 625337, at *2 (S.D. Cal. Feb. 17, 2010) (dismissal proper where "the[] issues are best suited for the FDA"). Application of the doctrine of primary jurisdiction has been found particularly appropriate where, as here, the complaint concerns allegations of fraud and "an issue central to" those fraud claims falls within the authority of the FDA. *See, e.g., Swearingen*, 2014 WL 2215878, at *3; *Taradejna*, 909 F. Supp. 2d at 1135.[17]

### C. The Primary Jurisdiction Doctrine Applies Here

The FAC's central assertion is that opioids should not be prescribed for the treatment of chronic non-cancer pain, and that opioids "are not 'medically necessary' or 'reasonably re-

---

[17] *See also Ries v. Hornell Brewing Co., Inc.*, 2010 WL 2943860, at *6 (N.D. Cal. July 23, 2010); *Gordon*, 2010 WL 1341184, at *1; *Aaronson*, 2010 WL 625337, at *2-3.

quired' to treat chronic pain." FAC ¶¶ 437, 447, 463, 485. PROP advanced the same underlying contention—that "[l]ong-term safety and effectiveness of managing [chronic non-cancer pain] with opioids has not been established." PROP Pet. at 2. Indeed, the FAC's allegations closely parallel PROP's purported "Statements of Scientific Basis."[18] After a comprehensive review, the FDA found the proposed restrictions "not supportable" and ruled that the drugs should continue to be available for long-term treatment of chronic non-cancer pain. FDA Resp. at 14.

Repeating all of PROP's claims and citing many of the same studies addressed by the FDA in its 2013 ruling,[19] the City seeks to have six Chicago jurors determine the complex scientific issues that FDA has been intensively investigating. The City wishes to have a jury rely upon the very evidence the FDA found to be unscientific to effectively overrule the FDA's approval of opioids for the treatment of chronic pain and determine that each and every opioid prescription for the treatment of chronic non-cancer pain reimbursed by the City was medically improper. *See* Appendix 3; FAC ¶¶ 320, 336, 343, 354, 415, 430, 478, 484, 496, 501, 506.

Most notably here, the FDA has ordered manufacturers to conduct post-approval studies for the express purpose of enabling the agency to determine whether further action on long-term risk issues should be taken. By asking the Court and a local jury to interject itself into these scientific and policy matters the City has "jumped the gun by suing before the FDA" has conclusively resolved those issues. *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharm., Inc.*, 586 F.3d 500, 507, 510 (7th Cir. 2009). To allow lay jurors to address the "complex chemical and pharmacological considerations" involved in determining the conditions under which opioids are to be "generally recognized as safe and effective," *Weinberger*, 412 U.S. at 653-54, while the matter is currently being addressed by the FDA, would fail "to appropriately route[]"

---

[18] *See* Appendix 2.
[19] *See supra* n.14.

that fundamental scientific and medical determination to the agency vested with authority and expertise over the matter, and would raise the specter of conflicting determinations of this important public health question. *Id.* at 653. Such concerns are only heightened by the existence of a parallel suit in another jurisdiction being pursued by Plaintiff's outside counsel. *See People of the State of Cal. v. Purdue Pharma L.P., et al*, Case No. 30-2014-00725287 (Orange Cty. Sup. Ct., May 21, 2014).

Simply put, it is perilous and inappropriate for a jury of six lay persons in Chicago to resolve a scientific issue on the basis of "scientific evidence" already deemed insufficient by the institutional experts. A stay of this action pursuant to the primary jurisdiction doctrine will preserve the rights of all parties until such time as the scientific issues can properly be addressed by the agency actively reviewing the matter.[20]

## III. THE COURT SHOULD DISMISS THE ACTION UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM

### A. All Claims Fail Because the FAC Fails to Allege Fraud with Particularity

The Court should also dismiss the FAC under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Because all the FAC's claims sound in fraud, they must meet both the plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and the particularity standard of Rule 9(b). To satisfy *Twombly*, the allegations must transcend the

---

[20] Separate and apart from the primary jurisdiction argument, it is well-settled that federal district courts have inherent power to stay proceedings before them where, as here, it serves the interests of justice to do so. *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936); *Duke Energy Carolinas, LLC v. Frontier Cmmc'ns of the Carolina's LLC*, 2014 WL 3854146, at *5 (W.D.N.C. Aug. 6, 2014) (holding that "the Court need not determine the applicability of the primary jurisdiction doctrine" because "a stay of these proceedings is warranted" in any event under *Landis*); *Fontes v. Time Warner Cable, Inc.*, 2014 WL 2153919, at *2 (C.D. Cal. May 19, 2014) (same). As the Supreme Court directs, the exercise of such inherent power is particularly warranted "in cases of extraordinary public moment." *Landis*, 299 U.S. at 256. The availability of needed medications for the treatment of chronic pain for the residents of Chicago presents issues that are both "great in their complexity" and "great in their significance." *Id.* A stay is warranted so the FDA can first address this matter of public health importance in accordance with its institutional expertise and function.

"speculative" and "conceivable," and "state a claim to relief that is plausible on its face." *Id*. at 555, 570. Well-pleaded factual allegations must be more than "'merely consistent with' a defendant's liability," disregarding "legal conclusions" and "conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009) (quoting *Twombly*, 550 U.S. at 557); *see also McCauley v. City of Chi.*, 671 F.3d 611, 617 (7th Cir. 2011).

All of the FAC's claims proceed from the allegation that Defendants fraudulently misrepresented the safety and efficacy of opioids to Chicago physicians, causing them to write medically inappropriate prescriptions. Those prescriptions, in turn, allegedly caused the City to incur costs or damages.[21] All the claims "sound[] in fraud" and therefore all must meet Rule 9(b)'s heightened pleading requirements. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).[22] To satisfy Rule 9(b), the FAC must further detail the "who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). It must state with particularity "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771,

---

[21] FAC ¶¶ 82-83, 98, 115, 132, 188, 213-24, 242-45, 273-74, 319-25, 362-64, 385-88, 392, 405-06, 413, 415, 421-22, 426-28, 430, 432, 437-41, 445, 454, 456-57, 460-63, 470, 477-79, 483-90, 493-95, 498-503, 506, 510.

[22] *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446-47 (7th Cir. 2011) (consumer fraud claim subject to Rule 9(b)); *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2006) (same for False Claims Act claim); *Borsellino*, 477 F.3d at 507-08 (same for civil conspiracy claim); *Cont'l Cas. Co. v. Mohatare*, 2012 WL 4830419, at *2 (N.D. Ill. Oct. 10, 2012) (same for insurance fraud claim); *Cain v. Osman*, 286 F. App'x 934, 936 (7th Cir. 2008) (same for common law fraud claim); *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 950 (7th Cir. 2013) (same for unjust enrichment claim predicated on fraud). The City's consumer fraud count allegation that Defendants committed "unfair method[s] of competition[]," *see* FAC ¶¶ 416-21, is based entirely on allegedly deceptive conduct and is thus also subject to Rule 9(b). *See H.C. Duke & Son v. Prism Mktg. Corp.*, 2013 WL 5460209, at *3 (C.D. Ill. Sept. 30, 2013) (unfairness claim based on alleged deceptive practices subject to Rule 9(b)); *Vangsness v. Deutsche Bank Nat'l Trust Co.*, 2012 WL 5989354, at *5 (N.D. Ill. Nov. 29, 2012) (unfairness and fraud claims must be pleaded separately to avoid the heightened pleading requirements of rule 9(b)).

777 (7th Cir. 1994) (internal quotation marks omitted). Despite 70 new pages and one hundred new paragraphs, the City's FAC still fails to plead any alleged act of fraud by any Defendant with the specificity Rule 9(b) requires.

### 1.    The FAC Engages in Improper Group Pleading

Like the City's original Complaint, the FAC engages in rampant and impermissible group pleading. The Seventh Circuit has repeatedly held that complaints lumping all defendants together are improper and should be dismissed. To pass muster under *Iqbal*, *Twombly*, and Rule 9(b), a complaint must particularize the alleged wrongdoing of *each* defendant. *See, e.g.*, *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328-29 (7th Cir. 1994) ("when the complaint accuses multiple defendants of participating in the scheme to defraud, the plaintiffs must take care to identify which of them was responsible for the individual acts of fraud."); *Vicom*, 20 F.3d at 778 (same; listing cases where the Seventh Circuit "previously ... rejected complaints that have 'lumped together' multiple defendants"); *Bank One, Okla., N.A. v. Trammell Crow Servs., Inc.*, 2003 WL 23019173, at *2 (N.D. Ill. Dec. 23, 2003) (dismissing claims against parent company lumped together with subsidiary); *Alexander v. Cont'l Motor Werks, Inc.*, 1996 WL 79403, at *6 (N.D. Ill. Feb. 16, 1996) (dismissing ICFA claims against defendant improperly lumped with others).

Defendants are 18 separate companies. Some conduct no business in the United States, while others (or their affiliates) independently manufacture, market, and sell different opioid products approved for the treatment of different conditions under different FDA-approved labeling. The drugs in question are not interchangeable. They range from fast-acting formulations twice as potent as morphine and administered via tablet, to extended-release formulations 100 times more potent than morphine approved for chronic pain and administered via transdermal patch. Some received FDA approval decades ago, others as recently as 2012. *See* Appendix 1.

Yet in hundreds of paragraphs, the FAC fails to differentiate between Defendants, their

drugs, their drugs' labels, their promotional techniques, the relevant time periods, and most importantly, fails to detail which company did or said what, when, where, or to whom.[23] The FAC's pervasive group pleading makes it difficult to tell what the City claims each Defendant did. For this reason alone, the FAC fails under Rule 9(b). *See Jepson*, 34 F.3d at 1328-29; *Vicom*, 20 F.3d at 779; *see also Watt v. City of Highland Park*, 2001 WL 1090152, at *2-3 (N.D. Ill. Sept. 13, 2001) (dismissing group-pleaded claims and noting that the general allegations, "if read literally, would absurdly charge each police officer with carrying out everything" alleged); *Beaman v. Souk*, 2011 WL 832506, at *5, *15 (C.D. Ill. Mar. 3, 2011); *Suburban Buick, Inc. v. Gargo*, 2009 WL 1543709, at *4 (N.D. Ill. May 29, 2009).

The FAC goes so far as to attribute to Defendants the actions of all "opioid makers" and "opioid manufacturers" in an attempt to hold Defendants liable for City costs related to "opioids ... manufactured or distributed by other drug makers." *See, e.g.*, FAC ¶¶ 168, 190, 197, 207, 220, 366, 376, 422, 441, 457, 473, 490, 496, 503. But as the FAC recognizes, companies besides Defendants manufacture and market branded and generic opioids. *See id.* ¶ 100 & n.69 (discussing FDA warning letter sent to King Pharmaceuticals, Inc., the maker of branded opioid Avinza). The FAC's attempted use of group pleading to hold each Defendant liable for the alleged sins of the entire industry patently violates *Iqbal*, *Twombly*, and Rule 9(b), requiring dismissal. *See D & G Enters. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 574 F. Supp. 263, 267-68 (N.D. Ill. 1983).

---

[23] *See* FAC ¶¶ 1-5, 7-11, 13, 20-24, 26, 51, 60, 64, 73, 78-83, 86, 91-93, 98-99, 101, 103-105, 109, 111, 113-18, 126, 132-35, 144, 147-48, 156, 165, 168-69, 173, 177-78, 181, 183-84, 187, 189, 195, 197, 203, 206, 211, 213-20, 224, 229, 234-35, 237, 242-43, 245, 248-50, 256-57, 263, 265-66, 272-74, 319-22, 324-25, 328, 331, 337, 339, 341, 343, 348-49, 356-57, 359, 361, 363, 365, 373, 380, 383, 389, 393-94, 396-401, 404-07, 413-14, 416-23, 426-29, 431-32, 437-41, 445-57, 460-65, 467-70, 472-73, 476-79, 483-84, 486-90, 492-96, 498-503, 505-07, 511-12. For example, the City alleges that "Defendants" conducted a "common, sophisticated, and highly deceptive marketing campaign that began in the late 1990s, deepened around 2006, and continues to the present," *id.* ¶ 8, but does not allege which Defendants were even in the business of selling opioids during these time periods or which opioids they were selling. Even when quoting documents belonging to one Defendant, the FAC purports to identify the source as, or attribute the document to, "Defendants." *See, e.g.*, *id.* ¶¶ 133, 135.

16

### 2. The FAC Fails to Plead Each Defendant's Alleged Fraud with Sufficient Particularity

The FAC attempts to remedy the original complaint's pervasive non-compliance with Rule 9(b) by adding tables that purport to describe each Defendant's alleged wrongdoing. FAC ¶¶ 242-72. According to the FAC, the tables show that each Defendant "caused ... deceptive materials and information ... to be placed in the marketplace, including to patients and prescribers in Chicago ... [which] were intended to and did encourage patients to ask for, doctors to prescribe, and payors to pay for chronic opioid therapy." *Id.* ¶ 242. But as discussed below and in the individual motions to dismiss, these tables still fail to state the relevant particulars of any transaction that led the City to wrongly reimburse a prescription or otherwise caused it harm. Specifically:

- The City still fails to identify *who* received—and often *who* made—any alleged false statements. In particular, the City fails to allege facts about interactions between any Defendant and either the City itself or any physician who wrote prescriptions for Defendants' opioids for which the City paid.

- The City still fails to identify *what* supposedly false statements any Defendant allegedly made to the City or to physicians who wrote prescriptions for Defendants' opioids which the City paid, much less allege *why* any such statement was false.

- The City still fails to identify *where* any alleged wrongful conduct occurred, let alone where each false statement was made.

- The City still fails to identify *when* any particular false statement was made or *when* the City reimbursed for prescriptions based on any Defendant's alleged fraudulent activity.

- The City still fails to allege *how* any allegedly fraudulent acts affected any prescriptions the City paid for. It has not specified why any doctor prescribed opioids, whether the patients benefited from the prescriptions, or why any of the prescriptions were somehow inappropriate or not medically necessary or reasonably required for those patients.

Without that information, the City fails to connect any covered prescription to something a Defendant said or did.[24] That failure is fatal. Courts in this circuit routinely dismiss fraud-based

---

[24] For example, the City alleges that Defendants sponsored various continuing medical education programs ("CMEs") or third-party publications, *see, e.g.*, FAC ¶¶ 252(c), (i), 264(c); 267(h); 271(f), but fails to allege that *any* doctor who prescribed opioids attended one of those CMEs or reviewed one of the pub-

claims that rely on conclusory assertions of "misrepresentations" without identifying the com-

munications at issue or the "who, what, when, where, and how" that Rule 9(b) requires. *See*, *e.g.*,

*United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003) (Rule

9(b) not met where lengthy complaint failed to specify any relevant statement or why it was

false); *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 949 (7th Cir. 2013) (Rule 9(b) not met

where plaintiff spent "a great deal of energy insinuating that fraud occurred," but failed to allege

specifics of fraudulent activity); *United States ex rel. Obert-Hong v. Advocate Health Care*, 2001

WL 303692, at *2 (N.D. Ill. Mar. 28, 2001) (Rule 9(b) not met where complaint was "full of

conclusory allegations, but includes no details" and "outlines the general methodology of a

scheme, but offers no specific instances of fraud"); *United States ex rel. West v. Ortho-McNeil

Pharm., Inc.*, 2007 WL 2091185, at *5 (N.D. Ill. July 20, 2007) (FCA claims dismissed where

generalized allegations of off-label marketing did not identify which sales representatives made

misrepresentations, to which doctors, or what about the statements was false); *United States ex

rel. Fowler v. Caremark Rx, Inc.*, 2006 WL 2425331, at *6-7 (N.D. Ill. Aug. 21, 2006) (FCA

claims dismissed where allegations of general scheme did "not identify a single prescription

through which [Defendant] perpetrated the alleged fraud"). This Court should do the same here.

The FAC also relies extensively on fraud allegations based on "information and belief."

FAC ¶¶ 115, 121, 123, 125, 131, 149, 158, 166, 176, 199, 209-10, 221-22, 230, 262(g), 284, 307,

315, 343, 359. But the City cannot credibly contend it lacked access to the necessary facts when

it alleges misrepresentations to third parties, and it subpoenaed thousands of documents before

suing. *Beyrer*, 722 F.3d at 948 ("We frown on making allegations 'on information and belief' in

the fraud context and generally find that such claims do not meet Rule 9(b)'s particularity re-

---

lications, let alone that any Chicago-based doctor relied on that information to prescribe one of Defend-
ants' opioids to a Chicago resident covered by the City's health plan or workers' compensation program.

quirement"); *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) (same); *Grenadyor v. Ukrainian Vill. Pharm., Inc.*, 2014 WL 6783033, at *6 (7th Cir. Dec. 3, 2014) (the "familiar [on information and belief] formula won't do in a fraud case–for it can mean as little as 'on rumor.'").

The FAC's new allegations about unidentified "Chicago Doctors A, B, C, and D" do not cure these deficiencies. FAC ¶¶ 365-77. The FAC does not allege that *any* of these doctors interacted with any Defendant. The FAC alleges that Doctor A "reported that he talked with opioid makers' sales representatives," *id.* ¶ 366, and that Doctor D "recalled being visited by sales representatives promoting opioids." *Id.* ¶ 376. But it fails to allege that any of those sales representatives worked for any Defendant. Nor does it allege any of the other details Rule 9(b) requires, such as when the interaction occurred, what was said, why it was misleading, or how it affected prescriptions that the City paid for. The same is true of the conclusory allegations about Patients 1-11, where the FAC baldly asserts that "[b]ecause of Defendants' fraudulent marketing, these [patients'] claims were not—and could not have been—based on the prescribers' assessments of the risks and benefits of opioids to treat these patients' chronic pain." *Id.* ¶¶ 380-81.

Similarly, the inclusion of representative City-reimbursed prescriptions written by "Doctor A," *see* FAC Ex. C, or representative opioid claims submitted by unidentified doctors to the City's health plans and workers' compensation program, *id.* Exs. B-C, do not cure the FAC's deficiencies. The FAC says nothing about which Defendant, if any, made statements to a prescribing doctor, much less what that doctor relied on. The allegation that Actavis and Janssen identified Doctor A as a marketing "target" and tracked his prescribing habits cannot bridge these gaps. *Id.* ¶ 366. The FAC simply does not allege that any Defendant made any false statement to anyone—whether a patient, a doctor, or a prescription-benefits manager—connected

with an opioid prescription the City paid for. Prolixity is no substitute for compliance with Rule 9(b)'s particularity requirement. To the contrary, it only makes matters worse, requiring dismissal under Rule 8(a) *and* Rule 9(b). *See Garst*, 328 F.3d 378 (dismissing 400-paragraph complaint because "length and complexity may doom a complaint by obfuscating the claim's essence").

### B. All Claims Fail Because the FAC Fails to Allege Actionable Misrepresentations or Omissions

The FAC broadly asserts that Defendants misled the public about opioids' safety and efficacy for chronic non-cancer pain. FAC ¶¶ 406, 427, 437, 445, 450-51, 484, 493, 498, 506. But disregarding the FAC's repetitive and conclusory accusations of "deceptive marketing," "deceptive messages," and "false and misleading" statements,[25] as under *Iqbal* and *Twombly* the Court must do, the remaining allegations do not allege any actionable misrepresentation or omission. *Twombly*, 550 U.S. at 555, 570; *Iqbal*, 556 U.S. at 677-79.

First, the FAC's central allegation is that Defendants falsely represented that opioid products are safe and effective for long-term treatment of chronic pain. *See* FAC ¶¶ 9, 64-72. But the FDA has ***approved*** many of those drugs for long-term treatment of chronic pain.[26] It also ***rejected*** a petition to exclude long-term use for chronic non-cancer pain from the labeling. Those facts are dispositive. Statements that "generally comport with [a drug's] approved label" are "not misleading as a matter of law." *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1235 (S.D. Fla. 2007). FDA approval signifies that a medicine is safe and effective for the uses indicated; it follows that if representations substantively comport with FDA-approved labeling, they "cannot

---

[25] *See* FAC ¶¶ 8, 20, 60, 118 n.70, 206, 224, 322, 337, 339, 341, 365, 396-97 ("deceptive marketing"); *id.* ¶¶ 22, 99, 114, 217, 278, 365, 399 ("deceptive messages"); *id.* ¶¶ 10, 337, 406, 408-12, 414, 427, 429, 437, 447, 461-63, 486, 493, 499 ("false and misleading" statements or claims).

[26] Actavis's Kadian, Endo's Opana ER, Janssen's Duragesic and Nucynta ER, and Purdue's OxyContin, MS Contin and Butrans—ER/LA opioids of different potencies—are all specifically approved for "long-term opioid treatment" or for when "opioid analgesic is needed for an extended period of time." *See* Kubota Decl. Exs. 3-9.

supply the basis for [misrepresentation and unfair competition] claims." *Cytyc Corp. v. Neuro-medical Sys., Inc.*, 12 F. Supp. 2d 296, 299, 301 (S.D.N.Y. 1998) (dismissing claims on the grounds that the statements at issue were "similar enough to the [FDA] approved statements for the Court to conclude, as a matter of law, that they are neither false nor misleading"); *Prohias*, 490 F. Supp. 2d at 1235 (advertising comporting with drug's approved label not misleading); *Newman v. McNeil Consumer Healthcare*, 2013 WL 7217197, at \*5 (N.D. Ill. Mar. 29, 2013) (statement "consistent with the FDA-approved" product label not deceptive).[27]

Second, the FAC's repeated allegations about the lack of "*controlled* studies of the use of opioids beyond 16 weeks" also fail to plead an actionable fraud. FAC ¶ 65 (emphasis added); *see also id.* ¶¶ 5, 138, 245, 247. "Merely because a fact is unsupported by clinical tests does not make it untrue," *Gredell v. Wyeth Labs. Inc.*, 367 Ill. App. 3d 287, 291 (2006), and the City does not allege facts that show that any particular statement or omission about the long-term use of opioids was somehow false. As discussed above, the FDA has approved many of Defendants' drugs for long-term treatment of chronic pain. *See, e.g.*, FAC ¶¶ 28, 34, 38, 41, 44. Plaintiff's assertion that the FDA's approval is not based on long-term clinical trial data does not support an actionable false statement or omissions.[28] *See Travelers Indem. Co. v. Cephalon, Inc.*, 2014 WL 3408550, at \*6 (E.D. Pa. July 14, 2014) ("absence of data or evidence affirmatively providing that a drug is safe and effective in treating a particular condition, without more, does not support the conclusion that the drug is actually ineffective or unsafe for that use"); *In re Schering-Plough*

---

[27] If the FAC means to suggest that the FDA's express approval of ER/LA opioids for long-term use in the treatment of non-cancer pain was itself obtained by fraud, the claim is doubly unsustainable. First, the claim is untenable given the FDA's rigorous scrutiny of the matter and its recent ruling on the PROP Petition. Second, the claim is preempted as a matter of law under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349-50 (2001) (FDCA preempts state-law claims alleging fraud on the FDA).

[28] In its response to the Prop Petition, the FDA noted that "[t]here are numerous *uncontrolled* studies that have evaluated patients on opioids for as long as a year ... which may suggest that [patients] continue to experience benefits that would warrant the risks of opioid use." FDA Resp. at 10 n.40 (emphasis added).

*Corp. Intron/Temodar Consumer Class Action*, 2010 WL 2346624, at *4 (D.N.J. June 9, 2010) (*Schering-Plough II*) ("lack of data or evidence affirmatively proving that a Subject Drug was effective in treating a condition was not the same as the actual ineffectiveness of the Subject Drug").

Under Illinois law, "lack of substantiation [can] be deceptive only when the comparative claim at issue implies that there is substantiation for the claim." *Bober v. Glaxo Wellcome*, *PLC*, 246 F.3d 934, 939 n.2 (7th Cir. 2001); *see Greifenstein v. Estee Lauder Corp.*, 2013 WL 3874073, at *4 (N.D. Ill. July 26, 2013) (advertisement may be fraudulent for lack of substantiation only when claim at issue falsely implies that substantiation exists). The FAC does not allege that Defendants falsely claimed support from long-term controlled studies; instead, it asserts that Defendant made statements "suggest[ing]" their "claims are corroborated by scientific evidence." FAC ¶ 247; *see also id.* ¶¶ 252, 260, 262, 264, 267, 271. But the referenced statements do not claim or suggest the existence of corroborating studies but contain only general discussion about the efficacy and risks of opioids. With two exceptions, none refers to or claims support from any studies at all. *Id.* ¶¶ 247, 252, 260, 262, 264, 267, 271. For the two statements that refer to studies, the FAC fails to explain in what respect the statements were false. *Id.* ¶¶ 247(n), 252(m); *see also* Janssen Motion to Dismiss. And of course, the mere existence of scientific debate on a point does not show falsity. The Seventh Circuit and other courts have consistently found that statements subject to current scientific dispute cannot be false or fraudulent. *See Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-33 (7th Cir. 1999); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996) ("'false' does not mean 'scientifically untrue'; it means 'a lie.'"); *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1421 (9th

Cir. 1992) (same).[29]

Third, the FAC catalogs seven "primary misleading and unfounded representations" that Defendants allegedly made directly or through "key opinion leaders" ("KOLs"), professional organizations, CMEs, treatment guidelines, and articles. *See id.* ¶¶ 244-72. The City's criticism of almost all of these alleged misrepresentations is that the use of opioids to treat chronic, non-cancer pain is medically inappropriate and that potential risks of addiction and abuse were not sufficiently delineated. But such statements cannot as a matter of law constitute actionable fraud when the FDA-approved labeling *did* highlight those risks. *See Travelers*, 2014 WL 3408550, at *11 (dismissing fraud-based claims where warnings were prominent "in all the FDA materials and the drug labels" and prescribing physicians are "sophisticated consumers who themselves have an affirmative duty to be familiar with them"); *Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*, 2014 WL 2115498, at *6 (E.D. Pa. May 21, 2014) (dismissing fraud-based claims because the drug label "clearly identifies the dangers of abuse and respiratory depression"); *cf.* FDA, *Guidance for Industry: Assessment of Abuse Potential of Drugs* 19 (Jan. 2010) ("Information on the abuse potential of a drug is generally conveyed to healthcare professionals and patients through appropriate labeling.... *Labeling is the cornerstone of risk minimization efforts* for most of the drugs approved by FDA." (emphasis added)), Kubota Decl. Ex. 21.[30]

"[P]hysician-prescribers are presumed to have knowledge of a drug label's content," *Carpenters*, 2014 WL 2115498, at *6, and as the FAC concedes, opioids' labels clearly warn of the potential

---

[29] *See also United States ex rel. Nguyen v. City of Cleveland*, 2005 WL 2416925, at *12 (N.D. Ohio Sept. 30, 2005) ("Plaintiff presents a scientific dispute, not a fraud case."); *United States ex rel. Milam v. Regents of the Univ. of Cal.*, 912 F. Supp. 868, 886 (D. Md. 1995) ("At most, the Court is presented with a legitimate scientific dispute, not a fraud case.").

[30] *See also United States v. Caputo*, 288 F. Supp. 2d 912, 921 (N.D. Ill. 2003) (doctors "are familiar with the FDA-approval process and able to independently evaluate the validity of [promotional] claims"); *Kennedy v. Medtronic, Inc.*, 366 Ill. App. 3d 298, 305 (2006) ("a doctor is considered in the best position to prescribe drugs and monitor their use because he is knowledgeable of the propensities of the drugs he is prescribing and the susceptibilities of his patient").

23

for addiction and abuse. FAC ¶¶ 6, 53. Here the labeling for prescribing physicians describes the risks in question and emphasizes the need to counsel patients on proper use and monitor them to address problems that may arise. And prescribers in turn must "provide direct warnings to patients concerning the dangers associated with prescription drugs." *Martin ex rel. Martin v. Ortho Pharms. Corp.*, 169 Ill. 2d 234, 244 (1996); *accord Ryan v. Wersi Elec. GmbH*, 59 F.3d 52, 54 (7th Cir. 1995) (holding that alleged oral misrepresentations were not material to a transaction in light of "clear, written documentation" clarifying the alleged misrepresentations upon which a reasonable person would be expected to rely).[31]

The FAC's remaining examples of allegedly "misleading and unfounded representations" also fail to allege actionable claims. The FAC alleges that Defendants "misrepresented that opioids improve function" and cites a handful of purported examples. *Id.* ¶¶ 244, 247. But the FDA does not prohibit functional claims, and the FAC fails to explain how any particular claim was false or misleading. The FAC alleges that there have been no long-term controlled studies on this point, but as discussed above, that alone cannot establish that any of the statements in question were false or misleading. The FAC also asserts that Defendants misled prescribers and patients by "emphasizing or exaggerating risks of competing products" such as acetaminophen or NSAIDs. *Id.* ¶¶ 268, 270; *see also id.* ¶ 244. Again, the FAC fails to explain why the alleged

---

[31] Except for a handful of allegations concerning branded advertisements (which are addressed in the individual motions to dismiss), *see e.g., id.* ¶¶ 247(c), 247(h), 247(m), 252(f), 267(b), the allegations of "misleading and unfounded representations" all concern unbranded materials. Contrary to the FAC's assertions, *see* FAC ¶¶ 92-93, 97, unbranded materials and statements are not subject to regulatory "fair balance" requirements. By their terms, FDA "fair balance" regulations, which require inclusion of the warnings from the approved product labeling, only apply to product-specific-promotional materials and activities. *See* 21 U.S.C. § 352(n) (providing that "all advertisements and other descriptive printed matter issued or caused to be issued by the manufacturer, packer, or distributor with respect to that drug" must contain a "true statement" in "brief summary relating to side effects, contraindications, and effectiveness as shall be required in [FDA] regulations"); 21 C.F.R. § 202.1(e)(5)(ii) (an advertisement does not meet the "fair balance requirement" if it "fails to present a fair balance between information relating to side effects and contraindications and information relating to effectiveness of the drug").

comparisons were deceptive or how any statement about the risks of other classes of pain reliev-ers (which like opioid risks are fully described in the labeling)[32] was untrue. *See id.* ¶¶ 268-72.[33]

Finally, the FAC's allegations concerning allegedly misleading statements by KOLs, pain advocacy organizations, and other third parties, *see* FAC ¶¶ 98-224, do not state actionable claims. The FAC fails to allege sufficient facts to make Defendants legally responsibility for those statements. To hold Defendants responsible for third-party statements, the City must allege facts showing either a principal-agency relationship or control of such parties' statements. *See Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 498 (1996) (common law fraud claim against manufacturer failed because complaint pleaded legal conclusions of agency instead of facts); *see also Coelho v. Park Ridge Oldsmobile, Inc.*, 2001 U.S. Dist. LEXIS 14652, at *14-15 (N.D. Ill. Sept. 19, 2001) ("to establish actual agency, [plaintiff] must allege that [defendants] specifically authorized" a third party to make a statement or "conceal the [material] fact" at issue in the case; to establish apparent agency plaintiff must allege it "reasonably concluded that [the third party] was an agent of [the defendants], or that [the plaintiff] relied on [the third party's] apparent au-thority to his detriment").

The FAC does neither. It alleges in conclusory fashion that Defendants "controlled" vari-ous third parties. But it alleges no facts specifying how Defendants did so or linking their pur-ported control to specific, allegedly actionable statements. *See* FAC ¶¶ 212, 242, 462, 493. In-

---

[32] NSAIDs carry FDA-mandated black box warnings that their use can increase the risk of potentially fa-tal adverse cardiovascular events and gastrointestinal bleeding. *See* Kubota Decl. Ex. 13 at 1. Acetamino-phen products carry an FDA-mandated warning that overdose can cause "[s]evere liver damage." 21 C.F.R. § 201.326(a)(1)(iii)(A), (iv)(A)(1), (v)(A); *see also* Kubota Decl. Ex. 14 at 2-3.

[33] The City's citation to an FDA regulation restricting comparative claims about specific drugs is unavail-ing. *Id.* ¶ 94 & n.66. This regulation—like all other FDA regulations addressing prescription drug promo-tion—applies only to materials that promote specific drugs by name or necessary implication. *See* 21 C.F.R. § 202.1(e)(6)(ii). The alleged comparisons here consisted only of very general information about the benefits and risks of broad categories of drugs used to treat broad categories of pain. *See* FAC ¶ 271. Moreover, comparative claims are not inherently false and there is no private cause of action for violating FDA restrictions on such claims.

stead, the FAC relies on vague allegations that Defendants "influenced" third-party statements, FAC ¶¶ 108, 113-14, 165, 177, 187, 211, 398, or provided funding for research, educational programs, or patient advocacy organization. *See, e.g.*, *id.* ¶¶ 8, 105, 125-26, 129, 145-46, 163, 168, 174, 177, 179, 182, 186, 188, 190, 196-97, 213, 217, 220, 223, 307, 397-98, 461-62, 493. Those allegations are legally insufficient to show the requisite agency or control. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 395 (1982) (the fact that defendants "fund the activities of [an organization] does not render the [organization] [a defendant's] servant or agent any more than an independent contractor is rendered an agent simply because he is compensated by the principal for his services. [Defendant] must also enjoy a right to control the activities of the [organization]").

### C. All Claims Fail Because the FAC Does Not Adequately Allege Causation

The FAC also does not sufficiently allege how Defendants' alleged misconduct caused the City's purported injuries. Because a "causal relationship between a defendant's action and a plaintiff's injury is essential in every tort," the City's claims should be dismissed. *Cnty. of Cook v. Philip Morris, Inc.*, 353 Ill. App. 3d 55, 60 (2004) (dismissing complaint where Cook County failed to show a direct injury based on manufacturers' false advertising); *People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 491 (1992) (a connection must be shown between the misrepresentation and the injury); *People ex rel. Madigan v. United Constr. of Am.*, 981 N.E.2d 404, 408 (2012) ("a valid claim [by a public prosecutor under ICFA] must show that the consumer fraud proximately caused plaintiff's injury").

### 1. The FAC Fails to Allege That Defendants' Purported Misconduct Caused the City to Pay for Opioid Prescriptions or Caused Other Harm

The FAC is devoid of factual allegations which, if true, could plausibly establish that Defendants' alleged misrepresentations caused the City to incur costs. For example, the FAC does

not allege how Defendants' alleged misrepresentations caused opioid prescriptions to be submit-ted to or reimbursed by the City's health plans and workers' compensation program. Instead, the City alleges in conclusory fashion that "Defendants' scheme worked," that "Defendants' efforts were wildly successful," and that Defendants' conduct has had a "catastrophic" "result" and "caused grievous injury." FAC ¶¶ 11, 14, 360, 417.

Courts require allegations of false or misleading drug marketing to include factual detail that "particular doctors with a 'demonstrated connection' to the plaintiff" relied on the allegedly false marketing. *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 2012 WL 3154957, at *8-9 (N.D. Cal. Aug. 2, 2012) (dismissing Illinois statutory and common law fraud and unjust enrichment claims where the plaintiff failed to allege that purportedly false marketing claims caused harm); *see also S.E. Laborers Health & Welfare Fund v. Bayer Corp.*, 2011 WL 5061645, at *7 (11th Cir. Oct. 24, 2011) (unpublished) (affirming dismissal where complaint was "devoid of allegations that [the third-party payor] or any other proposed class member, actu-ally relied on [defendant's] representations"). A complaint simply does not "pass muster under *Iqbal* and *Twombly*" when it fails to allege plausibly "whether any prescriptions were written based on a misunderstanding" resulting from a defendant's purported false statements. *Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 471-72 (S.D. W. Va. 2013). To avoid dismissal, a plaintiff must allege "that either the plaintiff or a third party sufficiently connected to the plaintiff relied on the defendant's mis-leading statements." *Bextra*, 2012 WL 3154957, at *8. The FAC lacks such allegations.

The FAC improperly attempts to bridge this causal gap via a "fraud-on-the-market" theo-ry—that is, by alleging a "statistical" correlation between the allegedly fraudulent marketing and increased prescription and payment rates for opioids. *See* FAC ¶¶ 322, 360-64, 382-85. For ex-

27

ample, the FAC asserts that increases in opioid prescriptions show "the impact of Defendants' deceptive marketing on doctors." *Id.* ¶¶ 322, 361. Illinois law does not allow a plaintiff to plead causation "by [showing] the effect that [defendants' allegedly fraudulent] statements had on the marketplace for the product." *Scott v. GlaxoSmithKline Consumer Healthcare, L.P.*, 2006 WL 952032, at *3 (N.D. Ill. Apr. 12, 2006); *see also Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 155 (2002) (rejecting a market theory of causation in consumer fraud cases).

Moreover, "[t]he nature of prescriptions ... means that this theory of causation is interrupted by the independent actions of prescribing physicians." The physicians' actions "thwart[] any attempt to show proximate cause through generalized proof" and make "general proof of but-for causation impossible." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 135 (2d Cir. 2010); *see also In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2010 WL 3119499, at *8 (S.D. Ill. Aug. 5, 2010). In *Bextra*, the court dismissed the plaintiffs' Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), common law fraud, and unjust enrichment claims premised on a similar attempt to "create an inference of causation" from statistical "quantity effect[s]." *Bextra*, 2012 WL 3154957, at *4. The court explained that this "was not a viable theory of causation" and "require[d] too much speculation." *Id.* at *7-9. Here too, the plaintiff's statistically based inference of cause and effect is facially speculative. Like *Bextra*, this case requires individualized allegations of causation—showing how particular doctors were influenced by a particular Defendant's statement—which the FAC does not make. *See id.*; *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at *25 (D.N.J. July 10, 2009) (*Schering-Plough I*) (rejecting plaintiffs' efforts to prove causation though "generalized allegations and aggregate proof" based on statistical analysis of defendants' sales data).

28

The FAC's new allegations about "Chicago Doctors A, B, C, and D" also do not support the required casual nexus. Only "Chicago Doctor A" is alleged to have prescribed opioids that the City reimbursed. Even then, Doctor A is *not* alleged to have prescribed opioids *because of* any of Defendants' conduct, much less any false or misleading statement. *See* FAC ¶ 366. Instead, the FAC vaguely alleges that Doctor A talked to sales representatives of unspecified opioid manufacturers, attended CMEs about unspecified opioids, and—due to his own time constraints—used information he suspected to be biased. *See id*. And the FAC does not allege that any of Doctor A's prescriptions were medically inappropriate or unnecessary.

The FAC likewise does not allege that the City (or any of its pharmacy benefit managers) relied on any of Defendants' supposed misrepresentations in deciding whether to cover opioid prescriptions or to approve individual reimbursement requests. The FAC does not allege that Defendants made misrepresentations directly to the City, its health plans, or its workers' compensation program, nor that the City or its plans relied on such statements. In the place of adequate causation and reliance allegations, the City asserts it should not have reimbursed opioid prescriptions because "opioid therapy is considered customary or consistent with generally accepted medical standards ... only because standards of practice have been tainted by Defendants' deceptive marketing." FAC ¶ 339. In other words, the City alleges that if the medical community had known the "truth" about opioids, standards of medical practice would have been different and payors like the City would have adopted different reimbursement policies. The speculation inherent in this theory is self-evident. *See Yasmin*, 2010 WL 3119499, at *8 (dismissing as "hopelessly speculative" a claim that payor "would have minimized the number of … prescriptions purchased or reimbursed" had it known of the supposed misrepresentations).

Finally, the City contradicts its own assertions that Defendants caused it injury. Accord-

ing to the FAC, there is a "well-settled historical understanding and clear evidence that opioids taken long term are addictive." FAC ¶ 249. The City allegedly believes that opioids prescribed for chronic pain are "ineligible for payment under the City's health plans and workers' compensation program." *Id*. ¶ 380. Yet it admits to continuing to reimburse such prescriptions. *See id*. ¶¶ 453, 469. If the City contends it should not be required to reimburse prescriptions written to treat chronic pain in accordance with a drug's FDA-approved indication, it should make such a position clear in its contractual relationship with its insureds and deny any such reimbursement requests. It has never done so, and despite filing this suit, continues to provide such reimbursements. *See Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1345 (M.D. Fla. 2008) (the "causal nexus between Plaintiffs' alleged harm and Defendants' alleged scheme to defraud is even further attenuated by Plaintiffs' affirmations that they continued to pay for Seroquel even after Defendants' alleged misconduct was uncovered").

Similarly, the City alleges that unidentified Chicago doctors prescribed opioids despite knowing they should not. These doctors allegedly acted for a variety of reasons, including fear that they "might lose the patients" or "face negative reviews." *Id*. ¶¶ 453, 469, 495. These allegations expressly negate a causal nexus between Defendants' alleged misrepresentations and the City's injury. If true, these allegations establish that the City reimbursed for opioid prescriptions that both it and the prescribing doctors knew were dangerous and medically improper. And not surprisingly, the City alleges no facts showing that any doctor writing the prescriptions at issue would have acted differently if not for any unbranded marketing materials linked to Defendants.

Absent factual allegations supporting the necessary causal link, the City's conclusory assertion that "Defendants caused doctors and pharmacies to submit, and the City to pay claims," *id*. ¶ 331, fails to connect any alleged false statements to any alleged harm. This defect is fatal to

the City's claims. *See, e.g.*, *Health Care Serv. Corp. v. Olivares*, 2011 WL 4591915, at *1 (E.D. Tex. Sept. 30, 2011) (dismissing Illinois fraud, unjust enrichment, conspiracy, and negligence claims where complaint failed to "identify what misrepresentations were made directly to [the plaintiff] and/or whether any health care professionals relied upon Pfizer misrepresentations when prescribing the drugs at issue for off-label uses").

### 2. The FAC's Allegations Fail for Lack of Proximate Cause

The FAC's allegations also fail because the relationship between Defendants' alleged misrepresentations and the City's alleged harm is too attenuated to establish proximate cause. Proximate cause exists "only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *City of Chi. v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395 (2004) (internal citations and quotations omitted). "One way in which the concept of proximate cause operates is through the remoteness doctrine, which is sometimes called the 'direct-injury' test." *Philip Morris*, 353 Ill. App. 3d at 60. "This doctrine states that there must be 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992)). There can be no liability if too many "significant independent intervening events" lie between the purported misconduct and harm. *Emp'r Teamsters-Local Nos. 175/505*, 969 F. Supp. 2d at 467.

Here, any connection between the alleged misconduct and the alleged injury depends on multiple significant and independent intervening events and actors. These include: (1) the prescribing doctor's exercise of independent medical judgment—itself influenced by a multitude of factors—concerning his or her assessment of and treatment for the patient's medical condition; (2) the patient's preferences; (3) the patient's decision to fill a prescription; (4) the patient's decision whether and how to use the medication; and (5) the City's decisions to cover the drug for the particular indication and to reimburse the particular prescription. *See, e.g.*, *Yasmin*, 2010 WL

3119499, at *7. The FAC's allegations that Defendants exerted influence over certain "key opin-ion leaders" and pain advocacy organizations which, in turn, allegedly influenced various publi-cations, FAC ¶¶ 115-71, add even more links to the already attenuated causation chain.

Dismissal is appropriate where the causation chain is "too speculative and attenuated to support recovery" and involves intervening events that make any connection between the sup-posed improper actions and injuries too remote. *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 928 (3d Cir. 1999) (affirming dismissal of claims "for being too remotely connected in the causal chain from any wrongdoing on defendants' part"); *see also Yasmin*, 2010 WL 3119499, at *7-9 (claims were too remote because causation involved "the decision making process of the patient, the prescribing physician, and the third party payor."); *Schering-Plough I*, 2009 WL 2043604, at *34 ("even if Plaintiffs had sufficiently alleged injury or ascertainable loss, the injury or loss is simply too remote and attenuated to establish the causa-tion element required to sustain Plaintiffs' claims"). The same is true here. For each prescription the City reimbursed, a finding of causation would depend on an analysis of multiple layers of decision-making by the doctor, the patient, and the City as payor.

In particular, the learned intermediary doctrine "interposes the prescribing physician be-tween the patient and the pharmaceutical company" and breaks the chain of causation. *Morgan v. SmithKline Beecham Corp.*, 2013 WL 3486907, at *2 (E.D. Pa. July 10, 2013). Illinois law has long recognized this doctrine. *See, e.g.*, *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 117 Ill. 2d 507, 518-19 (1987); *Martin*, 169 Ill. 2d at 244. "[T]he fact that consumers may only obtain [the drug] through a prescription from ... physician[s]" who "use their independent medical judgment to decide whether [the particular drug] is the best treatment for a given patient" is a "key inde-pendent factor" in the chain of causation. *Ironworkers*, 585 F. Supp. 2d at 1344; *see also Kirk*,

117 Ill. 2d at 518-19 (a prescribing physician must consider "the propensities of the drug as well as the susceptibilities of his patient," "weigh[] the benefits of any medication against its potential dangers[,]" and "decide[] which available drug best fits the patient's needs"); *Martin*, 169 Ill. 2d at 244 ("prescribing physicians, and not pharmaceutical manufacturers, are in the best position to provide direct warnings to patients concerning the dangers associated with prescription drugs.").

Under this doctrine, courts dismiss claims like the City's because proof of causation "would require an inquiry into the specifics of each doctor-patient relationship implicated by the lawsuit." *Ironworkers*, 585 F. Supp. 2d at 1345 (fraud-based claims dismissed because the "causal nexus between the actionable conduct and the injury sustained" was "too remote."); *see also Yasmin*, 2010 WL 3119499, at *7-9 (fraud-based claims dismissed where the court would "have to delve into the specifics of each physician patient relationship to determine what damages were caused by [drug manufacturer's] alleged fraudulent conduct, as opposed to what damages were caused by the physician's independent medical judgment"); *United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (affirming dismissal where no "cognizable theory of proximate causation link[ed manufacturer's] alleged misconduct to Appellant's alleged injury" due to intervening links including the "doctors' decisions to prescribe [the drug]").

The FAC acknowledges that a physician's prescribing decision is a crucial, independent step between Defendants' representations and a patient's use of Defendants' opioids. Contrary to its own implausible assertion that Defendants "subverted every 'input' physicians rely on," FAC ¶ 339, the FAC concedes that physicians have available many sources of information about Defendants' products—including the FDA-approved labeling, literature required under the FDA REMS program, and a large body of other medical literature. *See, e.g.*, *id.* ¶¶ 53, 55, 57, 60, 66,

70-72. This robust mix of information underscores the need to assess each prescribing decision as the product of each doctor's knowledge, experience, and judgment applied to each patient's circumstances. *See, e.g.*, *Ironworkers*, 585 F. Supp. 2d at 1341-42 (claims dismissed where independent medical judgment was key factor breaking chain of causation despite allegations that fraudulent marketing scheme spanned multiple promotional and informational channels).

The City's alleged interviews of Chicago doctors reinforce each physician's significance in the chain of causation. As the FAC alleges, those doctors made prescribing decisions, not in reliance on Defendants' alleged misrepresentations, but on their medical training, their clinical experience and observations, their patients' needs, and even their fear of "negative [patient] reviews." FAC ¶¶ 366-77. Just like the allegations in *Ironworkers*, *Yasmin*, *Schering-Plough* and many other cases, the causal connection between Defendants' alleged conduct and the City's alleged harm is too remote, and the claims should be dismissed.

The FAC includes inflammatory, irresponsible, and legally insufficient assertions that Defendants have "fuel[ed] a new heroin epidemic" and supplied a "criminal market" for illicit drugs, resulting in "concomitant crime and costs; unrealized economic productivity; and broken families and homes." *Id.* ¶ 417; *see also id.* ¶¶ 389-90. Proximate cause "will not be found where the criminal acts of third parties have broken the causal connection" and those acts and their consequences are not "so clearly foreseeable that the sales practices of [a defendant] should be deemed a legal cause [thereof]." *Beretta*, 213 Ill. 2d at 408; *see also Int'l Bhd. of Teamsters Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*, 34 F. Supp. 2d 656, 662 (N.D. Ill. 1998). Defendants sell highly regulated, FDA-approved medications that a patient can lawfully obtain only with a prescription. Defendants are "several times removed" from any criminal market or resulting heroin epidemic. *Beretta*, 213 Ill. 2d at 412 (inappropriate to subject defendants

34

who sold "highly regulated" "lawful" product to liability). Those social ills are "the aggregate result of numerous unforeseeable intervening criminal acts by third parties not under defendants' control." *Id.* at 432.

### D. All Claims Fail Because the City Has Not Adequately Alleged Injury

For each of the City's claims, it must—but fails—to plead a legally cognizable injury.[34] The City must allege not only that it paid for opioid prescriptions and associated costs, but that those prescriptions harmed patients and should not have been written.

The City's theory of injury is premised on the claim that long-term use of opioids to treat chronic non-cancer pain is never medically necessary or reasonably required. *See*, *e.g.*, FAC ¶¶ 320, 336, 348, 354, 437, 447, 463, 487. This claim flies in the face of the FDA's undisputed ***approval*** of many of the opioids at issue for relief of chronic non-cancer pain. *Id.* ¶ 21 (FDA-

---

[34] *See* FAC ¶¶ 421, 423 (Count I (consumer fraud) (alleging that the City has been "damaged" by Defendants' acts and seeking "restitution of any money acquired as a result of Defendants' consumer fraud.")), *see also In re Towers*, 162 F.3d 952, 955 (7th Cir. 1998) ("[R]estitution is 'compensation for actual pecuniary loss' from the perspective of the victim ...."); FAC ¶ 432 (Count II (misrepresentations in connection with sale or advertising of merchandise) (alleging that the City has been "damaged" by Defendants' acts)); *id.* ¶¶ 440-41 (Count III (false statements) (alleging that the City has been "damaged" by Defendants' acts and seeking "restitution of any money acquired")), *see also* Chi. Mun. Code § 1-21-010(a) (authorizing "up to three times the amount of *damages which the city sustains* because of the person's violation of this section") (emphasis added); FAC ¶¶ 454, 457 (Count IV (false claims) (same)); *id.* ¶ 470 (Count V (conspiracy to defraud) (same)); *id.* ¶ 479 (Count VI (recovery of costs) (claiming the City has incurred costs due to Defendants' acts that are recoverable under MCC § 1-20-020)), *see also Vodak v. City of Chi.*, 2006 WL 2524141, at *3 (N.D. Ill. Aug. 20, 2006) (injury is an element of a claim under Section 1-20-020); FAC ¶ 489 (Count VII (insurance fraud) (alleging that the City has been "damaged" by Defendants' acts)), *see also People v. Parks*, 403 Ill. App. 3d 451, 460 (2010) (a claim of insurance fraud requires an allegation of deprivation of property); FAC ¶ 495 (Count VIII (civil conspiracy) (alleging that the City has been "damaged" by Defendants' acts)); *see also Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915, 927 (2010) (injury is an element of a civil conspiracy); FAC ¶¶ 502-03 (Count IX (common law fraud) (alleging that the City has been "damaged" by Defendants' acts and seeking "restitution of any money acquired")), *see also Steadfast Ins. Co. v. Auto Mktg. Network*, 2 F. Supp. 2d 1058, 1059-60 (N.D. Ill. 1998) (injury is an element of a claim for common law fraud); FAC ¶ 507 (Count X (unjust enrichment) (alleging that the City has been "damaged" by Defendants' acts and seeking "disgorge[ment of all] unjust enrichment to the City")), *see also TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998) (holding that a Defendant must have been enriched at the Plaintiff's expense to support a claim for unjust enrichment); FAC ¶ 512 (Count XI (subrogation) (alleging Defendants are liable for "treatment costs caused by Defendants' conduct")), *see also State Farm Gen. Ins. Co. v. Stewart*, 288 Ill. App. 3d 678, 686-87 (1997) (the first element of subrogation is that a "third party must be primarily liable to the insured for [a] loss").

approved labels for most of the opioids "may have allowed or did not exclude the use of opioids for chronic non-cancer pain."). The FAC also concedes that the prescriptions the City reimbursed were "deemed 'medically necessary' and 'reasonably required' by doctors" at the time they were written. *Id*. ¶ 320.

A complaint insufficiently alleges injury, and dismissal is appropriate, where it fails to allege that prescriptions were actually ineffective or harmed a patient. *See Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 2008 WL 5413105, at *8 (D.N.J. Dec. 23, 2008) (dismissing fraud-based claims because Plaintiffs failed to "allege that any beneficiaries, insured, or employees … 'received [an] inadequate [or] inferior [drug] or even worse, suffered personal injuries as a result of' Defendants' alleged misrepresentations") (unpublished); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176-77 (D.D.C. 2003) ("Without alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs"); *Cent. Reg'l Emps. Benefit Fund v. Cephalon, Inc.*, 2010 WL 1257790, at *3 (D.N.J. Mar. 29, 2010) (no cognizable injury pleaded where plaintiffs failed to allege prescriptions "were ineffective even for off-label uses") (unpublished). Even in the case of an opioid prescribed for an off-label use, the cost of reimbursement is not a cognizable injury unless the prescription was actually ineffective or harmed the patient. *See, e.g.*, *Schering-Plough II*, 2010 WL 2346624, at *7-8 (dismissing fraud-based claims because third-party payor failed to allege facts showing that off-label prescriptions "were actually ineffective or unsafe").

The FAC fails to allege that Defendants' allegedly improper conduct caused doctors to write ***any*** ineffective or harmful opioid prescriptions, much less that ***every*** opioid prescription in Chicago was harmful. *See e.g.*, FAC ¶ 422. The FAC attempts to allege injury by two means: first, by attaching a sampling of opioid prescriptions paid for by the City's healthcare plan and

workers' compensation program and, second, through interviews with four unidentified doctors and eleven unidentified patients. But the FAC neither identifies the indications for which these prescriptions were written nor alleges that the prescriptions failed to alleviate the patients' pain or harmed them in any way. *See id*. ¶¶ 342, 357, Exs. A-C. It does not allege that Doctors A-D wrote any ineffective or harmful prescriptions, or that Doctors B-D wrote any prescriptions that the City reimbursed. *Id*. ¶¶ 366-77. None of the eleven patients is alleged to have received a prescription that was ineffective or caused harm. *Id*. ¶ 380-81. And the FAC does not allege that any of these prescriptions led the City to incur costs for emergency services or addiction treatment. Absent specific allegations of injury, the City's claims fail.[35]

Finally, the FAC admits that the City did not pay direct costs for prescription drugs under certain of its HMO plans for most of the time the FAC covers.[36] Instead, the City paid fixed premiums to a third party for all prescriptions. That third party, in turn, paid all prescription drug costs. Under this arrangement, the City *paid the same amount* regardless how many opioid prescriptions were reimbursed. *Id*. ¶ 328. For periods covered by this arrangement, the City cannot establish injury. *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 2008 WL 5211021, at *2-3 (N.D. Ill. Dec. 10, 2008); *United States ex rel. Zemplenyi v. Grp. Health Coop.*, 2011 WL

---

[35] In *Zyprexa*, the court held that the State of Mississippi, which sought to recover prescription costs, damages, and statutory penalties for "non-medically necessary" prescriptions allegedly caused by defendant's misconduct, was required to show individualized proof that prescribing physicians relied on the alleged misrepresentations for *each* allegedly unnecessary prescription. *In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 453, 457 (E.D.N.Y. 2009); *see also Yasmin*, 2010 WL 3119499, at *7 (dismissing plaintiff's damages claims as speculative when a court "would have to delve into the specifics of each physician patient relationship to determine what damages were caused by [defendant's] alleged fraudulent conduct, as opposed to what damages were caused by the physician's independent medical judgment."); *Pa. Emps. Benefit Trust, Fund (PEBTF) v. Ortho-McNeil-Janssen Pharm., Inc.*, 2010 WL 3613056 (Ct. Comm. Pl. July 7, 2010) (dismissing unjust enrichment claim under individualized proof rule).

[36] *See* FAC ¶ 328 ("Before July 2006, the City paid the premiums for the HMO plans, which in turn covered the cost of prescription drugs. Between July 2006 and December 2009, the City paid the premiums for an HMO plan to Unicare, which in turn covered the cost of prescription drugs.... From January 2012 to December 2013 ... the City paid premiums to the HMO plan, which in turn covered the cost of prescription drugs.").

814261, at *2 (W.D. Wash. Mar. 3, 2011). Any claim of injury from indirect premium increases, FAC ¶ 328, is too speculative. *See Bextra*, 2012 WL 3154957, at *8 (inflated price injuries are too speculative). The Court should dismiss the City's damage claims for the periods in which it was not self-insured.

### E. The FAC Is Deficient on Multiple Additional Grounds

#### 1. The Claim Under Chicago Municipal Code § 2-25-090 (Count I) Must Be Dismissed

##### a. Defendants Cannot Be Held Liable for Consumer Fraud Based on Materials That Complied with FDA Regulations

Section 2-25-090 of the Chicago Municipal Code ("MCC") is modeled after the ICFA and expressly provides that "consideration shall be given to court interpretations relating to the [ICFA]" in construing the Section. MCC § 2-25-090(a). It also provides that "[c]ompliance with ... court interpretations relating to [ICFA] shall be an absolute defense to a finding of a violation of [Section 2-25-090]." MCC § 2-25-090(c). The ICFA, in turn, excludes from liability "[a]ctions ... specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 ILCS § 505/10(b)(1). Actions are "specifically authorized" if they are "sufficiently within what is authorized by federal law." *Bober*, 246 F.3d at 941-42 (ICFA "will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations").

Federal law authorized Defendants to promote opioids for the indications specified in their approved labeling. *See Prohias*, 490 F. Supp. 2d at 1234; *Newman*, 2013 WL 7217197, at *5; *Cytyc*, 12 F. Supp. 2d at 301. Because most of the drugs at issue here were approved for long-term treatment of chronic non-cancer pain, claims seeking to hold Defendants liable for such promotion are not cognizable under Section 2-25-090 and must be dismissed. *See Bober*, 246 F.3d at 941.

### b. Defendants Cannot Be Held Liable for Statements Not Made in Connection with Advertising or Offers for Sale

The vast majority of the materials the FAC alleges to be deceptive—unbranded publications about opioids and other drugs, scientific articles, prescribing guidelines, and CMEs—cannot support a claim under Section 2-25-090 because they do not constitute advertising or offers for sale. Section 2-25-090 proscribes fraudulent, unfair, or deceptive practices committed "while conducting any trade or business in the city." MCC § 2-25-090(a). The MCC does not define "trade or business." The ICFA, which is instructive in interpreting the MCC, defines "trade or commerce" as "advertising, offering for sale, sale, or distribution." 815 ILCS § 505/1(f). Both statutes define "advertisements" as offers to sell or attempts to induce a sale. *See* MCC § 4-276-005; 815 ILCS § 505/1(a). The FAC acknowledges that the unbranded materials at issue are not tied to any specific opioid product, *see* FAC ¶ 98, and does not allege that they constituted offers to sell or attempts to induce a sale. Accordingly, the City's claim that this material violated Section 2-25-090 should be dismissed. *See Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147-48 (N.D. Ill. 1997) (dismissing ICFA claim because the statement "did not involve the 'advertisement,' the 'offering for sale,' the 'sale,' or the 'distribution'" of any item and thus "did not occur in the course of conduct involving trade or commerce").

### c. The FAC Fails to Adequately Plead a Violation of the DTPA and Fails to Plead Its Unfairness Claim with Particularity

The FAC fails to allege facts sufficient to state a claim under Sections 510/2(a)(2), (3), (5), (8) and (12) of the Uniform Deceptive Trade Practices Act ("DTPA"), 815 ILCS § 510/2. *See* FAC ¶ 419(a)-(c). "Essential to the maintenance of an action" under 815 ILCS § 510/2(a)(2), (3) and (12) "are well-pleaded allegations indicating the existence of a 'likelihood of confusion.'" *Hooker v. Columbia Pictures Indus., Inc.*, 551 F. Supp. 1060, 1064 (N.D. Ill. 1982). Because the FAC merely recites the language of the relevant statutory provisions, *see* FAC

¶¶ 419(a)(i)-(ii); 419(c), without elaborating "how or why a likelihood of confusion" arose from Defendants' conduct, it fails to state a claim. *Greenberg v. United Airlines*, 206 Ill. App. 3d 40, 47 (1990) (dismissing complaint for "alleg[ing] only the language of the statute itself"). The same is true for the City's claim under Section 510/2(a)(5), where the City simply quotes the statutory language prohibiting representations that goods or persons "have sponsorship, approval" or other characteristics that "they do not have." FAC ¶ 419(a)(iii).

The FAC fails to state a disparagement claim under Section 510/2(a)(8), *see id.* ¶ 419(b), because it fails to identify, as Illinois law requires, the specific competing products or manufacturers that Defendants' allegedly disparaged. *See Schivarelli v. CBS, Inc.*, 333 Ill. App. 3d 755, 766 (2002); *Morton Grove Pharm., Inc. v. Nat'l Pediculosis Ass'n*, 494 F. Supp. 2d 934, 943 (N.D. Ill. 2007). To the extent the City claims that these provisions prohibit Defendants from promoting opioids for uses the FDA has approved, its claims are not cognizable because the DTPA is not only expressly incorporated into the ICFA, *see* 815 ILCS § 505/2, and thus subject to ICFA's "safe harbor" provision, but itself contains an identical provision barring such liability. *See* 815 ILCS § 510/4(1); *Bober*, 246 F.3d at 941.

Finally, the City's claim that Defendants engaged in "unfair method[s] of competition" that resulted in a criminal opioids market must be dismissed under Rule 9(b) because it rests on the same deficient allegations as the City's fraud claims. FAC ¶ 403, 416; *see supra* Section II.A. *See H.C. Duke & Son v. Prism Mktg. Corp.*, 2013 WL 5460209, at *3 (C.D. Ill. Sept. 30, 2013) (Rule 9(b) applied to unfairness claim based on allegations of deceptive and not merely "unfair" practices). The City's conclusory unfairness allegations do not remotely satisfy Rule 9(b).

### d. The City Cannot Obtain Relief for Consumer Fraud Prior to November 19, 2008

To the extent the City seeks penalties or other remedies under Section 2-25-090 for con-

duct occurring before November 19, 2008, its claim fails because the section was first enacted on that date and is not expressly retroactive. The Court should not apply it retroactively, as such application would be inequitable and is unsupported by clear legislative intent. *See Allegis Realty Investors v. Novak*, 223 Ill. 2d 318, 330-31 (2006).

### 2. The Claim Under Chicago Municipal Code § 4-276-470 (Count II) Must Be Dismissed

Unlike every other MCC section under which the City sues,[37] Section 4-276-470 does not grant enforcement authority to corporation counsel. Instead, it provides that "the department of business affairs and consumer protection shall enforce" the section. MCC § 4-276-640. The claim must therefore be dismissed for lack of standing. The claim also must be dismissed because Section 4-276-470 has no application to this case. The section appears in the MCC chapter dealing with "Regulation of Weights and Measures" and prohibits the use deception "in connection with the sale ... or advertisement of any merchandise…." *Id*. "Merchandise" means "objects, wares, goods, [or] commodities," MCC § 4-276-005, and "consumer commodity" means "a consumer item that is consumed and replaced by consumers on a regular basis..." such as "[n]on-prescription drugs." *Id*. The definition does not include prescription drugs. "Advertisement" means "any offer to sell a commodity to the public at retail…." MCC § 4-276-005. Opioid pain relievers are not sold at retail but only by prescription. And as discussed above, the vast majority of the materials the FAC alleges to be deceptive are unbranded materials that do not constitute advertisements or statements made "in connection with" a sale. Finally, Section 4-276-470 excludes from liability conduct that "complies with the rules and regulations of ... the Federal

---

[37] *See* MCC § 2-25-090(e)(4) (Count I) (the commissioner may "request the corporation counsel to bring an action for injunctive relief or such other equitable relief that the commissioner deems to be appropriate."); MCC § 1-21-030 (Count III) (corporation counsel may bring an administrative action "[i]n addition to any other means authorized by law"); MCC § 1-22-030 (Counts IV and V) ("The corporation counsel may bring a civil action under this section ..."); MCC § 1-20-020 (Count VI) (amounts owing under the cost recovery statute "shall be collectible in the same manner as any other personal liability").

Trade Commission." For prescription drugs, the Federal Trade Commission has ceded primary jurisdiction to the FDA.[38] Thus, even if the Court were to find that Section 4-276-470 applies to prescription drugs, this provision would bar liability for promoting opioids for FDA-approved uses. *See Bober*, 246 F.3d at 941.

**3.    The Municipal False Statement (Count III), Chicago Municipal False Claims Statute ("CFCA") (Counts IV and V), and Insurance Fraud (Count VII) Claims Must Be Dismissed**

**a.    The FAC Fails to Plead a False Claim**

The City's false statement, CFCA, and insurance fraud counts all fail because the FAC does not adequately plead a false claim.[39] To plead a false claim, the City "must link specific allegations of deceit to specific claims for payment." *United States ex rel. Dolan v. Long Grove Manor, Inc.*, 2014 WL 3583980, at *3 (N.D. Ill. July 18, 2014) (Bucklo, J.). The FAC wholly fails to meet this requirement. Rather than identify specific false claims, the FAC asserts that *all* reimbursement claims for opioid prescriptions used to treat chronic non-cancer pain are false. FAC ¶¶ 343, 463. The Seventh Circuit has repeatedly rejected that mode of pleading, holding that allegations that fail to identify specific false claims are insufficient. *See United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 858 (7th Cir. 2006) (rejecting statistics-based argument that *all* claims for certain medications are false); *Grenadyor*, 2014 WL 6783033, at *4 ("[v]iolating a regulation is not synonymous with filing a false claim").

The FAC attempts to plead around this deficiency in two ways. First, the FAC relies on an implied certification theory. It alleges that the City's health plans and workers' compensation

---

[38] 36 Fed. Reg. 18539 (Sept. 16, 1971) (FTC/FDA Memorandum of Understanding assigning FDA responsibility for regulation of prescription drug advertising).

[39] MCC § 1-21-010(a) imposes liability on "any person who knowingly makes a false statement of material fact to the city…." MCC § 1-22-020 imposes liability for "false or fraudulent claim[s] paid or approved by the city." 720 ILCS § 5/17-10.5(a)(1) prohibits "the making of a false claims or [] causing a false claims to be made on any policy of insurance…"

program only cover "medically necessary" or "reasonably required" prescriptions. Accordingly, the FAC asserts, implicit in every drug reimbursement claim is the health care provider's implied certification that the prescription is "customary for the treatment or diagnosis of an Illness or Injury, and is consistent with generally accepted medical standards." FAC ¶ 332. The FAC alleges that a jury of six Chicagoans should determine that prescribing opioids to treat chronic non-cancer pain is not in accordance with generally accepted medical standards; therefore, claims submitted for such prescriptions are false. *Id.* ¶¶ 437, 447. Second, the FAC alleges that the City's health plans only cover prescriptions for "FDA-approved uses." *Id.* ¶¶ 332, 463. The City claims that "Defendants' opioids were not FDA-approved, within the meaning of the City's health plans, for the long-term treatment of chronic pain" because "Defendants' deceptive marketing" rendered them "misbranded" for such use. *Id.* ¶ 337; *see also id.* ¶¶ 93, 331, 447, 463, 486.[40]

Both theories fail. The Seventh Circuit has not approved an "implied certification" theory for false claims. *See Grenadyor*, 2014 WL 6783033, at *3 (treating issue as unsettled). No Illinois cases have even considered the issue. Even if the theory were otherwise cognizable, it fails here because the FAC fails to allege the element of falsity. The FAC admits the FDA has approved the use of opioids for long-term treatment of chronic non-cancer pain, FAC ¶ 21, and, as discussed above, the FDA recently rejected PROP's petition to restrict that indication. The FAC further admits that physicians "routinely prescribe[]" opioids to treat chronic non-cancer pain. *Id.* ¶ 64. These admissions foreclose any claim that opioids are not customary or accepted medical

---

[40] The City asserts this second theory as to the workers' compensation program as well as the health plans, FAC ¶¶ 447, 463, 486, but the FAC makes no factual allegation that the workers' compensation program only covers drugs prescribed for "FDA-approved" uses. *Compare id.* ¶ 332 ("The City's self-insured health plans only cover the cost of prescription drugs that are 'Medically Necessary' and dispensed for a FDA-approved purpose.") *with id.* ¶¶ 345-59 (no parallel allegation for workers' compensation program). The theory thus fails as to the workers' compensation program from the outset.

treatment for such pain. The City, like PROP, may contend such use should be restricted, but at best its allegations express disagreement with the FDA's views, not falsity. *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) ("imprecise statements or differences in interpretation growing out of a disputed legal question" are not false under the FCA). As discussed, issues of scientific dispute do not provide a basis for allegations of fraud.

The City's "misbranding" theory is also unavailing. The FAC cites 21 U.S.C. §§ 352(a) and 352(f), which provide that a drug is misbranded if its labeling is "false or misleading in any particular" or does not include "adequate directions for use." The FAC further cites 21 U.S.C. § 331(a), which prohibits "[t]he introduction … into interstate commerce of any … drug … that is … misbranded." *See* FAC ¶¶ 337, 476(g), 494(g). But the FDCA vests exclusive enforcement authority for these provisions in the federal government. *See* 21 U.S.C. § 337(a) (excepting suits to enforce certain food regulations, "all ... proceedings for the enforcement … of [the FDCA] shall be by and in the name of the United States"); *Buckman*, 531 U.S. at 349-50. Under the FDCA, the City has no authority to declare Defendants' drugs misbranded; any attempt to do so under other laws is preempted. *See Pac. Trading Co. v. Wilson & Co.*, 547 F.2d 367, 368 (7th Cir. 1976) (the FDCA does not "permit the prosecution of a private action for a monetary recovery thereunder or enforcement thereof by fine"); *Bausch v. Stryker Corp.*, 630 F.3d 546, 558 (7th Cir. 2010) ("[T]he plaintiff must not be suing *because* the conduct violates the [FDCA] (such a claim would be impliedly preempted under *Buckman*))" (citation omitted, emphasis in original)); *Anthony v. Country Life Mfg., L.L.C.*, 2002 WL 31269621, at *3 (N.D. Ill. Oct. 9, 2002) (holding that an ICFA claim "premised solely upon a violation of the FDCA" was preempted); *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 1989 WL 152670, at *3 (N.D. Ill. Nov. 29, 1989) (plaintiff could not "base its Lanham Act claim upon the violation of the FDCA" because "Con-

44

gress has precluded private causes of action under the FDCA").

Preemption aside, the FAC does not remotely allege sufficient facts to establish a mis-branding claim. The cited FDCA misbranding prohibitions apply only to a drug's "labeling." *See* 21 U.S.C. § 352(a) and (f). Under FDA regulations, "labeling" includes both the approved drug labeling and product-specific promotional communications, but it does not include unbranded general education material of the kind the City attacks here. *See* 21 C.F.R. § 202.1(l)(2) (defining labeling as "printed, audio, or visual matter descriptive of a drug ... containing drug information supplied by [and disseminated by or on behalf of] the manufacturer, packer, or distributor of the drug"); *United States v. Kaadt*, 171 F.2d 600, 601-03 (7th Cir. 1948) (material constituted label-ing because it "was used in the sale of the drug" and "advertised and explained the use of the drug"); *Bober v. Glaxo Wellcome, PLC*, 1999 WL 759364, at *2 (N.D. Ill. Sep. 3, 1999) ("label-ing" is "telling an individual what to do with the [drug] he or she has just bought").

Finally, as discussed above, the FDA has just reviewed the precise labeling issue underly-ing the City's misbranding assertion—whether the approved indication for treatment for chronic pain should be limited as to dose or duration or to cancer patients only—and rejected the City's position.[41] Under *Twombly* and *Iqbal*, the City cannot plausibly contend that the drugs are mis-branded on this basis, and its "misbranding" argument accordingly cannot save its claims under the CFCA or other provisions of Illinois law. *Cf. Germain v. Teva Pharm., USA, Inc.*, 756 F.3d 917, 929 (6th Cir. 2014).

### b. The FAC Does Not Adequately Plead Presentment, Causation, or Conspiracy

Counts III-V and VII must also be dismissed because the FAC does not allege "any spe-cific example of a fraudulent claim" *presented* to the City for payment. *Garst*, 328 F.3d at 376;

---

[41] *Compare, e.g.*, FAC ¶¶ 51, 265-67 (alleging that Defendants' FDA-approved labeling does not include dose or duration limits needed to ensure safe use of opioid drugs).

*see also United States ex rel. Geschery v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 705 (N.D. Ill. 2012) ("Without … presentment … there is simply no actionable damage to the public fisc as required" under the FCA.); MCC § 1-22-020(1) (imposing liability on any person who "knowingly presents or causes to be presented" a false claim). FAC Appendices A-C, which purport to identify a representative sample of presented claims, do not cure this deficiency. The FAC alleges no facts showing any of the listed claims to be false, let alone linking any of them to any Defendant's alleged misconduct. *See Grenadyor*, 2014 WL 6783033, at *4; *Dolan*, 2014 WL 3583980, at *5; *West*, 2007 WL 2091185, at *4; *Fowler*, 2006 WL 2425331, at *6-7; *Peterson v. Cmty. Gen. Hosp.*, 2003 WL 262515, at *2 (N.D. Ill. Feb. 7, 2003). For the same reason, the CFCA claims fail for lack of causation. The conclusory allegation that Defendants "caused" physicians to write and submit inappropriate prescriptions, FAC ¶¶ 320, 447, is insufficient.[42]

Finally, the FAC's failure to allege any underlying false claim is also fatal to its claim under CFCA's conspiracy provision, MCC § 1-22-020(3). As discussed *infra*, the FAC fails to allege facts sufficient to state a conspiracy claim of any kind, let alone a specific agreement made "for the purpose of obtaining … payment from the government." *United States ex rel. Walner v. NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 895-96 (N.D. Ill. 2009).

### 4. The Municipal Services Claim (Count VI) Must Be Dismissed

MCC § 1-20-020 authorizes actions against persons who cause the City "to incur costs in

---

[42] To avoid dismissal, the City must allege facts showing that Defendants played a *direct* causal role in presenting an allegedly false claim. *See United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (defendant, the managing director of a physical therapy clinic, instructed billing service to place his identification number on claims, thus causing the submission of false claims); *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (physician defendant delegated to wife the authority to submit claims on his behalf); *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187-89 (D. Mass. 2004) (defendant signed invoices indicating that the expenses were chargeable to a federally funded entity); *United States ex rel. Drescher v. Highmark, Inc.*, 305 F. Supp. 2d 451, 459-60 (E.D. Pa. 2004) (defendant causes the submission of a false claim only when the submitting party is "merely a conduit to the transfer of government funds"). The FAC contains no such allegations.

order to provide services reasonably related to such person's violation of any federal, state or local law."[43] The FAC fails to plead a cognizable underlying claim or injury, which forecloses any claim under this section. The claim is also barred by "the municipal cost recovery rule, also called the 'free public services doctrine,' [which provides that] public expenditures made in the performance of governmental functions are not recoverable in tort." *Beretta*, 213 Ill. 2d at 424. The health care, addiction treatment, and emergency services costs the City seeks to recover under this claim fall squarely within the *Beretta* rule. *See id.* at 426, 430. And the claim is independently barred by the remoteness doctrine. *See Philip Morris*, 353 Ill. App. 3d at 60.

### 5. The Civil Conspiracy Claim (Count VIII) Must Be Dismissed

The failure to plead a cognizable underlying claim and injury also defeats the City's civil conspiracy claim. *See Zic v. Italian Gov't Travel Office*, 130 F. Supp. 2d 991, 997 (N.D. Ill. 2001) ("[w]ithout a fraud, there can be no conspiracy to defraud."); *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 432 (2000) (because "a conspiracy is not an independent tort," a conspiracy claim fails when the "plaintiff fails to state an independent cause of action underlying its conspiracy allegations"). The claim also fails because the FAC does not allege facts supporting an agreement among the Defendants and fails to particularize the "who, what, when, where, and how" of the conspiracy as required by Rule 9(b) for claims sounding in fraud. *See Gaudie v. Countrywide Home Loans, Inc.*, 683 F. Supp. 2d 750, 758 (N.D. Ill. 2010).

### a. The FAC Fails to Allege an Agreement

Because conspiracy is an agreement to commit an illegal act, the essence of conspiracy is agreement. *See Credit Ins. Consultants, Inc. v. Gerling Global Reinsurance Corp. of Am.*, 210 F. Supp. 2d 980, 986 (N.D. Ill. 2002); *McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d

---

[43] To the extent the FAC purports to predicate municipal services or civil conspiracy claims on allegations that Defendants unlawfully sold "misbranded" drugs in violation of 21 U.S.C. § 331(a), *see* FAC ¶¶ 476(g), 494(g), the claims fail for the reasons already discussed in Part III.E.3.a. *infra.*

242, 258 (Ill. 1999). Failure to allege agreement is fatal to a conspiracy claim. *See, e.g.*, *Segretti v. Lome*, 747 F. Supp. 484, 487 n.1 (N.D. Ill. 1990); *Hard Drive Prods., Inc. v. Does 1-55*, 2011 WL 4889094, at *5 (N.D. Ill. Oct. 12, 2011). The FAC falls short of pleading *any* agreement between *any* Defendants for *any* unlawful purpose and thus fails to state a claim. *See Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 517 (7th Cir. 2007) ("Even under notice pleading, a complaint must indicate the parties, the general purpose, and approximate date of the agreement to form a conspiracy….").

The FAC alleges no facts supporting its claim that Defendants, who are competitors, *agreed* to engage in a "common, sophisticated and highly deceptive marketing campaign." FAC ¶ 8. It gives no details about any alleged agreements between Defendants "to create or elevate favorable studies," sponsor CMEs, or develop unbranded publications. *Id.* ¶¶ 144, 174, 184. Apparently to support an alleged agreement, the FAC asserts that, at various times over a 20-year period, some Defendants used the same consultants, sponsored some of the same KOLs, referenced similar treatment guidelines, and donated to some of the same advocacy groups. *Id.* ¶¶ 89, 115, 155, 188. At best, those allegations show "parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 556-57. Parallel conduct cannot establish an agreement, even under Rule 8's relaxed pleading standard. *See id.* ("an allegation of parallel conduct and a bare assertion of conspiracy will not suffice"); *McClure*, 720 N.E.2d at 261 ("parallel conduct alone is insufficient to establish civil conspiracy …. [B]asic economic principles dictate that competitive companies will often act in a highly similar manner.").

Equally insufficient are the FAC's allegations that Defendants had "opportunities to meet and discuss common activities" at industry conferences and an industry group alleged to have developed "consensus recommendations" on REMS. FAC ¶¶ 218-21. Industry meetings and

consensus recommendations to the government are perfectly lawful. An alleged "opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." *In re Text Messaging Litig.*, 2009 WL 5066652, at *7 (N.D. Ill. Dec. 10, 2009) ("Participation in points of contact or relationships for promotion of mutual interest (like a trade organization) does not, without more, support an inference of conspiracy." (internal quotations omitted)); *Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1987); *Weit v. Cont'l Ill. Nat'l Bank & Trust Co.*, 641 F.2d 457, 462 (7th Cir. 1981).

A handful of allegations describe actual communications between Defendants. The FAC alleges that Janssen responded to an email sent to several Defendants "expressing a plan to conference with … 'partners[.]'" FAC ¶ 204. It also alleges that "one drug company" commented on the consequences of an FDA action in an email it sent Janssen, Purdue, and Endo. *Id.* ¶ 223 & n.105. Neither allegation shows an agreement at all, much less an agreement to commit marketing fraud. "The mere exchange of information by manufacturers of the same or similar products is a common practice ... and does not support an inference of an agreement." *McClure*, 720 N.E.2d at 265. Absent factual allegations supporting an inference that each Defendant "understood the general objectives of the conspiratorial scheme, accepted them, and agreed, either explicitly or implicitly to do its part to further those objectives," the claim must be dismissed. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 938-39 (7th Cir. 2012) (citation and internal alterations omitted).

### b.  The FAC Fails to Plead a Conspiracy with Particularity

The conspiracy allegations also fail under Rule 9(b)—which requires the "who, what, when, where, and how" of the alleged conspiracy to defraud. *Beyrer*, 722 F.3d at 950; *see Borsellino*, 477 F.3d at 509 ("the complaint tells us nothing about the nature of the purported agreement to defraud the plaintiff[], such as when it was made or which [Defendants] arranged

the conspiracy"); *Grenadyor v. Ukrainian Vill. Pharm., Inc.*, 895 F. Supp. 2d 872, 879 (N.D. Ill. 2012), *aff'd*, 2014 WL 6783033 (7th Cir. Dec. 3, 2014). Without the "critical details regarding the alleged fraud conspiracy," the claim cannot stand. *Borsellino*, 477 F.3d at 509.

The FAC's conspiracy allegations provide none of the details Rule 9(b) requires. The FAC summarily asserts that Defendants "acted concurrently and/or collaboratively," FAC ¶ 456, and "worked with each other and with the Front Groups and KOLs they funded and directed to carry out a common scheme," *id.* ¶ 213, but it fails to allege how the "scheme" was formed or who participated and how. This is particularly improper for an alleged conspiracy, where "a plaintiff must allege the agreement of *each defendant* to the operation of the conspiracy." *Otto v. Variable Annuity Life Ins. Co.*, 814 F.2d 1127, 1137 (7th Cir. 1986) (emphasis added); *United States ex rel. Lisitza v. Par Pharm. Cos.*, 2013 WL 870623, at *7 (N.D. Ill. Mar. 7, 2013); *Fid. Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, 161 F. Supp. 2d 876, 886 (N.D. Ill. 2001) (dismissing conspiracy claim where there was "no indication as to whether all [Defendants] participated in each alleged incident of fraud, and if not, which [Defendant] made each individual statement").[44] Absent particularized allegations explaining when, where, how and to what degree the different Defendants acted together, the conspiracy claim must be dismissed. *See Gupta v. St. Margaret Mercy Healthcare Ctrs., Inc.*, 1998 WL 34360626, at *13 (N.D. Ind. Apr. 22, 1998); *Borsellino*, 477 F.3d at 509.

### 6. The Unjust Enrichment Claim (Count X) Must Be Dismissed

The City's unjust enrichment claim is derivative of the City's other claims and fails for the same reasons. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an

---

[44] Even the FAC's allegation of the dates of the conspiracy—that it "began in the late 1990s, deepened around 2006, and continues to the present," FAC ¶ 8—is impermissibly vague and ignores that some Defendants did not manufacture opioids at all during the vast majority of this period. *See, e.g., id.* ¶ 44 (recognizing that Actavis acquired rights to Kadian in 2008 and began marketing Kadian in 2009).

50

unjust enrichment claim rests on the same improper conduct alleged in another claim, then ... unjust enrichment will stand or fall with the related claim."); *Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill. App. 3d 1017, 1025 (2009) ("When an underlying claim of fraud ... is deficient, a claim for unjust enrichment should also be dismissed.").

In addition, the unjust enrichment claim fails because the FAC does not allege facts showing that (1) Defendants owed the City a duty, *Martis*, 388 Ill. App. 3d at 1025, and (2) the City has no adequate remedy at law. *Season Comfort Corp. v. Ben A. Borenstein Co.*, 281 Ill. App. 3d 648, 656 (1995). The FAC does not allege that Defendants filed any claims with or received payments from the City; nor does it suggest any other relationship giving rise to a duty. *See Hartigan*, 153 Ill. 2d at 497 ("The theory of unjust enrichment is based on a contract implied in law."); *Lewis v. Lead Indus. Ass'n, Inc.*, 342 Ill. App. 3d 95, 106 (2003). Nothing suggests that the City's other statutory and common law remedies, should it succeed in pleading a claim, would be inadequate.

### 7.    The Subrogation Claim (Count XI) Must Be Dismissed

Subrogation is "the substitution of one individual in the place of a claimant to whose rights he succeeds in relation to the debt or claim asserted which he has paid involuntarily." *State Farm*, 288 Ill. App. 3d at 686-87 (detailing the three prerequisites for a subrogation claim). An insurer who brings a subrogation claim attempts to "'step[] into the shoes' of the person whose claim he has paid and may only enforce those rights which the [insured] could enforce." *CNA Ins. Co. v. DiPaulo*, 342 Ill. App. 3d 440, 445 (2003) (quoting *Cont'l Cas. Co. v. Polk Bros.*, 120 Ill. App. 3d 395, 397 (1983)).

The City asserts a right of subrogation in claims allegedly belonging to participants in its health plan and workers' compensation program against Defendants for costs of prescription drugs, treatment, and hospitalizations caused by Defendants' conduct. *See* FAC ¶ 511. The claim

fails because the FAC fails to (1) "identify the [insureds] to whose claims [the City is allegedly] subrogated," (2) "show that the insureds are entitled to recover," and (3) show that the City has "a contractual right to proceed on each insured's behalf with respect to each claim," all as required to plead a subrogation claim under Illinois law. *Health Care Serv. Corp. v. Brown & Williamson Tobacco Corp.*, 208 F.3d 579, 581 (7th Cir. 2000) (dismissing subrogation claim for failure to adequately plead the necessary elements); *see also Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 217-18 (2d Cir. 2003) ("[a]t the very least, a subrogation claim would require [the insurer] to identify its subrogors and those subrogors' claims so that defendants would have the opportunity to assert defenses against those claims").

The FAC's inclusion of "a representative sample" of City-reimbursed opioid prescriptions cannot cure these defects. FAC ¶¶ 380-81, Exs. A-C. The "examples" do not identify the patients in question and the FAC does not allege that any Defendant injured them or that the patients would be entitled to a recovery. Nor, except as to one unidentified health plan, does the FAC even allege a contractual right of subrogation. *See id.* ¶¶ 508-12. The FAC thus fails to allege even the most basic requirements of a subrogation claim. *Health Care Serv. Corp.*, 208 F.3d at 581; *see also Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 246 (D. Mass. 1999) (insurer cannot proceed via "a kind of subrogation-in-gross"; it must demonstrate that defendants should be legally responsible for a participant's medical expenses "one participant at a time," which "depends on many factors, including factors specific to that participant").

## IV. CONCLUSION

Defendants' motion to dismiss or stay the FAC should be granted.

Dated:   December 19, 2014

Respectfully submitted,


By:  /s/ Charles C. Lifland
       Charles C. Lifland
       Carolyn J. Kubota

       O'MELVENY & MYERS LLP
       400 S. Hope Street
       Los Angeles, CA 90071
       Telephone:  (213) 430-6000
       Facsimile:   (213) 430-6407
       clifland@omm.com
       ckubota@omm.com

       *Attorneys for Defendants Janssen Phar-*
       *maceuticals, Inc., Johnson & Johnson,*
       *Janssen Pharmaceutica, Inc. n/k/a Janssen*
       *Pharmaceuticals, Inc., and Ortho-McNeil-*
       *Janssen Pharmaceuticals, Inc. n/k/a*
       *Janssen Pharmaceuticals, Inc., Appearing*
       *Pro Hac Vice*


By:  /s/ Michael P. Doss
       Michael P. Doss
       Scott D. Stein

       SIDLEY AUSTIN LLP
       One South Dearborn
       Chicago, IL 60603
       Telephone:   (312) 853-7520
       Facsimile:    (312) 853-7036
       mdoss@sidley.com
       sstein@sidley.com

       *Attorneys for Defendants Janssen Phar-*
       *maceuticals, Inc., Johnson & Johnson,*
       *Janssen Pharmaceutica, Inc. n/k/a Janssen*
       *Pharmaceuticals, Inc., and Ortho-McNeil-*
       *Janssen Pharmaceuticals, Inc. n/k/a*
       *Janssen Pharmaceuticals, Inc.*

By: /s/ R. Ryan Stoll

    R. Ryan Stoll
    Patrick Joseph Fitzgerald

    SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
    155 N. Wacker Drive
    Suite 2700
    Chicago, IL 60606
    Telephone: (312) 407-0508
    ryan.stoll@skadden.com
    patrick.fitzgerald@skadden.com

    *Attorneys for Defendants Purdue Pharma*
    *L.P., The Purdue Frederick Company,*
    *Inc., and Purdue Pharma, Inc.*


By: /s/ Tinos Diamantatos

    Tinos Diamantatos

    MORGAN, LEWIS & BOCKIUS LLP
    77 West Wacker Drive, 5th Floor
    Chicago, IL 60601
    Telephone: (312) 324-1145
    (312) 353-2067 (fax)
    tdiamantatos@morganlewis.com

    Gordon Cooney, Jr. (pro hac vice)
    Steven A. Reed (pro hac vice)
    MORGAN, LEWIS & BOCKIUS LLP
    1701 Market Street
    Philadelphia, PA 19103-2921
    Telephone: (215) 963-5000
    jgcooney@morganlewis.com
    sreed@morganlewis.com

    *Attorneys for Defendants Cephalon, Inc.,*
    *Teva Pharmaceuticals USA, Inc., and*
    *Teva Pharmaceuticals Industries, Ltd.*

By: /s/ Steven G. Reade

Steven G. Reade (pro hac vice)
Joshua M. Davis (pro hac vice)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: (202) 942.5000
steven.reade@aporter.com
joshua.davis@aporter.com

*Attorneys for Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.*

By: /s/ Peter Vincent Baugher

Peter Vincent Baugher
Kristen Elizabeth Hudson
Nicholas A. Gowen

SCHOPF & WEISS LLP
One South Wacker Drive
28th Floor
Chicago, IL 60606
Telephone: (312) 701-9300
baugher@sw.com
hudson@sw.com
gowen@sw.com

*Attorneys for Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.*

By: /s/ James W. Matthews

James W. Matthews, *pro hac vice*
Katy E. Koski, *pro hac vice*
William G. Potter, *pro hac vice*
Jason L. Drori, *pro hac vice*
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone: (617) 261-3100
james.matthews@klgates.com
katy.koski@klgates.com
william.potter@klgates.com
jason.drori@klgates.com

Nicholas W. Marietti
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Telephone: (312) 807-4221
nicholas.marietti@klgates.com

*Attorneys for Defendants Actavis plc, Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc., Actavis LLC, Actavis Pharma, Inc., f/k/a Watson Pharma, Inc., and Watson Laboratories, Inc.*

.

## SIGNATURE ATTESTATION

Pursuant to the Northern District of Illinois' General Order on Electronic Case Filing, General Order 14-0009(IX)(C)(2), I hereby certify that authorization for the filing of this document has been obtained from each of the other signatories shown above and that all signatories concur in the filing's content.

/s/ Charles C. Lifland
Charles C. Lifland

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2014, I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the electronic Mail Notice List.

Executed on December 19, 2014, at Los Angeles, California.

/s/ Charles C. Lifland
Charles C. Lifland