**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, | |
| Plaintiff, | |
| v. | Case No. 14-cv-04361 |
| PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMA-CEUTICALS INC.; ACTAVIS PLC; ACTAVIS, INC.; WATSON, PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; WATSON LABORATO-RIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., | Honorable Elaine E. Bucklo |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS JOHNSON & JOHNSON AND
JANSSEN PHARMACEUTICALS, INC.'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT UNDER
RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    ARGUMENT ...................................................................................................... 3

    A.     Product Labels .......................................................................................... 3

        1.    Duragesic ......................................................................................... 4

        2.    Nucynta and Nucynta ER.................................................................. 5

    B.     "Unbranded" Information ........................................................................... 6

        1.    AGS Clinical Practice Guideline ..................................................... 10

        2.    *Finding Relief* Brochure................................................................. 11

        3.    *Let's Talk Pain* Website ................................................................ 13

        4.    *Exit Wounds* ................................................................................. 15

    C.     Conspiracy .............................................................................................. 15

III.   CONCLUSION.................................................................................................. 16

# TABLE OF AUTHORITIES

**Page**

<u>**CASES**</u>

*Adcock v. Brakegate, Ltd.*,
   645 N.E.2d 888 (Ill. 1994) ................................................................................................ 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................... 2, 6

*Coehlo v. Park Ridge Oldsmobile, Inc.*,
   2001 U.S. Dist. LEXIS 14652 (N.D. Ill. 2001) ............................................................... 7

*Connick v. Suzuki Motor Co.*,
   174 Ill. 2d 482 (1996) ...................................................................................................... 7

*Davis v. G.N. Mortg. Corp.*,
   396 F.3d 869 (7th Cir. 2005) ........................................................................................ 3, 4

*Dillman v. Nadlehofer*,
   119 Ill. 567 (1886) ........................................................................................................... 3

*Gredell v. Wyeth Labs., Inc.*,
   367 Ill. App. 3d 287 (2006) .............................................................................................. 8

*Greifenstein v. Estee Lauder Corp., Inc.*,
   2013 WL 3874073 (N.D. Ill. July 26, 2013) ............................................................... 8, 12

*Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*,
   2014 WL 2115498 (E.D. Pa. May 21, 2014) .................................................................... 3

*Knapp v. Hill*,
   276 Ill. App. 3d 376 (1995) .............................................................................................. 7

*Mack v. Plaza Dewitt Ltd. P'ship*,
   137 Ill. App. 3d 343 (1985) .............................................................................................. 4

*Martin ex rel. Martin v. Ortho Pharm. Corp.*,
   169 Ill. 2d 234 (Ill. 1996) ................................................................................................. 9

*McClure v. Owens Corning Fiberglas Corp.*,
   720 N.E.2d 242 (Ill. 1999) .............................................................................................. 15

*Muir v. Playtex Prods., LLC*,
   983 F. Supp. 2d 980 (N.D. Ill. 2013) ........................................................................ 10, 15

## TABLE OF AUTHORITIES
### (continued)

**Page**

*NPF WL, Inc. v. Sotka,*
2000 WL 574527 (N.D. Ill. May 10, 2000) ............................................................... 1

*Owens v. Mitsubishi Motors Sales of Am., Inc.,*
2004 U.S. Dist. LEXIS 21764 (N.D. Ill. Oct. 28, 2004) ........................................... 7

*Prohias v. Pfizer, Inc.,*
490 F. Supp. 2d 1228 (S.D. Fla. 2007) ...................................................................... 6

*Robacki v. Allstate Ins. Co.,*
127 Ill. App. 3d 294 (1984) ............................................................................... 10, 15

*Ryan v. Wersi Elec. GmbH,*
59 F.3d 52 (7th Cir. Ill. 1995) .................................................................................. 4

*Schmidt v. Landfield,*
20 Ill. 2d 89 (1960) ............................................................................................. 3, 4

*Wright v. Associated Ins. Cos.,*
29 F.3d 1244 (7th Cir. 1994) .................................................................................... 2

*YCB Int'l, Inc. v. UCF Trading Co.,*
904 F. Supp. 2d 870 (N.D. Ill. 2012) ........................................................................ 1

## STATUTES

21 U.S.C. § 829(a) ...................................................................................................... 4

## REGULATIONS

21 C.F.R. § 1306.11 .................................................................................................... 3

## I.     INTRODUCTION

Defendant Janssen Pharmaceuticals, Inc., its predecessors Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, Inc. (jointly, "Janssen"), and its parent company Johnson & Johnson ("J&J") join in the Memorandum of Points and Authorities filed in support of all Defendants' Joint Motion to Dismiss the First Amended Complaint ("FAC"). Janssen and J&J write separately to highlight the deficiencies of the FAC's allegations as to them.

Despite alleging a massive fraud scheme by opioid manufacturers to misrepresent opioids' safety and efficacy, the City's 190-page FAC says little about either Janssen or J&J. As to J&J, the FAC alleges a handful of generic observations about its corporate relationship with Janssen and never mentions J&J again. FAC ¶ 37. The City's failure to allege any wrongdoing by J&J or any facts sufficient to plead a claim of alter ego liability requires dismissal.[1]

As to Janssen, the City alleges that the company manufactures three Schedule II opioid pain relievers—Duragesic, Nucynta, and Nucynta ER, *id.* ¶ 38. It further alleges that since 2007 its health plans have paid $319,952.78 and since 2009 its workers compensation program has paid $136,957.18 for Janssen-made opioids. *Id.* ¶¶ 342, 357.[2] The FAC alleges almost nothing about the drugs themselves or any supposed misconduct in marketing them. The City does not challenge the adequacy of the labeling for these drugs; to the contrary, except for a passing reference it ignores the labeling. *Id.* ¶ 38; *see also id.* ¶¶ 239, 271(k). The FAC no longer challenges the drugs' branded advertising and does not allege that Janssen promoted the drugs for any "off-

---

[1] To plead alter ego liability against a corporate parent, a plaintiff must allege that (1) "there [is] such unity of interest and ownership that the separate personalities of the corporation [and the parent] ... no longer exist[]" and (2) "adherence to the fiction of a separate corporate existence would sanction fraud or promote injustice." *NPF WL, Inc. v. Sotka*, 2000 WL 574527, at *7 (N.D. Ill. May 10, 2000). Corporate separateness cannot be disregarded "merely because one owns the stock of the other." *YCB Int'l, Inc. v. UCF Trading Co.*, 904 F. Supp. 2d 870, 877 n.3 (N.D. Ill. 2012). The claims against J&J should be dismissed because the City fails to plead any facts that would support either direct or vicarious liability.

[2] These modest totals include not only Class II opioids like Duragesic and Nucynta but also Class III opioids, about which the City makes no complaint.

label" indications. The core of the FAC's allegations concern what the City calls "unbranded" promotion, meaning materials that discuss opioids in general but do not promote Janssen's branded products. In the "unbranded" category, the City alleges that Janssen "sponsored" one or more "key opinion leaders" who published and spoke about opioids. *Id.* ¶¶ 122, 125, 164. It also alleges that Janssen "funded" or otherwise influenced and promoted four publications about pain management: (1) a treatment guideline for physicians, *id.* ¶ 167; (2) a brochure for laypersons, *id.* ¶¶ 100, 185-86, 210, 232, 247(j), 252(m), 271(j); (3) a pain society website, *id.* ¶¶ 152, 186, 194, 247(k), 254, 262; and (4) an Iraq War veteran's book about his experiences with pain re-lievers, *id.* ¶¶ 238-40, 247(l), 252(o), 271(k). These allegations patently fail to support any claim against Janssen.

First, product labels are the principal means by which drug companies communicate risk information about their drugs to prescribing physicians. Janssen's product labels—which the Court may properly consider in reviewing the sufficiency of the City's pleading[3]—contained ex-tensive and detailed warnings. These warnings preclude any claim that Janssen concealed or minimized opioid-related risks. The City cannot credibly claim that Janssen engaged in a scheme to conceal opioid risks while ignoring Janssen's disclosures of the same risks. Viewed in context, the City's claim is wholly implausible and should be dismissed. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Second, the City cannot state a claim based on out-of-context snippets from a handful of "unbranded" materials. The materials consist largely of statements by third parties, not Janssen.

---

[3] "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994). The FAC refers to Janssen's product labels, *see* FAC ¶¶ 38, 239, 271(k), and Janssen's communications to physicians about the risks at issue are self-evidently central. Under the same principle, the Court may consider the referenced "unbranded" materials. Copies of the product labels, medication guides, and unbranded materials are attached as Exhibits to the accompanying Declaration of Charles C. Lifland ("Lifland Decl."), which for convenience also excerpts the relevant label warnings.

Even if these materials were attributable to Janssen, the Court must consider them in their entirety and in conjunction with the product labels. The unbranded materials do not promote Janssen pain relievers—and so are not subject to the FDA "fair balance" requirements for product-specific advertising. Nor do they promote opioids as a category of pain relievers, or misrepresent medical literature. Instead, they provide general (and balanced) information about a range of pain relievers. They admonish physicians and patients about the need for individualized medical evaluation and advice. Read as a whole and in context, they are not remotely misleading.

## II.    ARGUMENT

### A.    Product Labels

Illinois law requires that an allegedly deceptive statement be assessed in context, meaning "in light of the totality of the information made available to the plaintiff." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005); *see also Schmidt v. Landfield*, 20 Ill. 2d 89, 94 (1960) ("[T]he representations must be viewed in the light of all the facts of which the plaintiff had actual notice, and also of such as he might have availed himself by the exercise of ordinary prudence" (quoting *Dillman v. Nadlehofer*, 119 Ill. 567, 577 (1886)). That principle defeats the City's claims against Janssen because Janssen's product labels provided prescribing physicians—a patient's only lawful source for opioids—with extensive information about the risks the City claims were concealed.

Patients can lawfully obtain opioid drugs only by prescription from a licensed physician authorized to prescribe controlled substances. *See* 21 C.F.R. §§ 1306.11; 1306.03(a)(1). Physicians are presumed by law to know the contents of the product labels for the drugs they prescribe. *Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*, 2014 WL 2115498, at *6 (E.D. Pa. May 21, 2014) ("[P]hysician-prescribers are presumed to have knowledge of a drug label's content"). Prescriptions for Schedule II controlled substances cannot

be refilled, *see* 21 U.S.C. § 829(a), requiring a patient to consult with a physician before every renewal. For extended-release/long-acting opioids like Duragesic and Nucynta ER, the FDA "strongly encourage[s]" prescribers to complete FDA-compliant training "to reduce serious adverse outcomes resulting from inappropriate prescribing, misuse, and abuse," including "addiction, unintentional overdose, and death." Lifland Decl. Ex. 21 at 2, 24, 27-28, 30, 34. Prescriptions must be filled at a pharmacy, where the consumer obtains the label and the medication guide and has an opportunity to discuss the drug with a pharmacist. Given this prescribing environment and the labels' extensive risk disclosures, none of the alleged misrepresentations is misleading as a matter of law. *See Davis*, 396 F.3d at 884; *Schmidt*, 20 Ill. 2d at 94.[4]

        **1.**       **Duragesic**

Duragesic is a highly potent opioid pain reliever administered via transdermal patch, first approved in 1990. *See* Lifland Decl. Ex. 8 at 1. Its active ingredient, fentanyl, is 100 times more potent than morphine and is listed as a Schedule II controlled substance. *See id.* Ex. 1 at 1-2; Ex. 8 at 11, 25. Under its FDA-approved labeling, Duragesic is indicated only for patients who are opioid tolerant, for pain "severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." *Id.* Ex. 8 at 1, 4.

Duragesic's labeling includes a prominent "boxed warning" highlighting its serious risks:

**Addiction, Abuse, and Misuse**
**DURAGESIC exposes patients and other users to the risks of opioid addiction, abuse, and misuse, which can lead to overdose and death. Assess each patient's risk prior to prescribing DURAGESIC, and monitor all patients**

---

[4] In light of the detailed product labels and learned intermediary requirements, alleged misstatements and omissions in unbranded information also cannot be material. *See Ryan v. Wersi Elec. GmbH*, 59 F.3d 52, 54 (7th Cir. Ill. 1995) (a "misrepresentation is 'material' and therefore actionable only if it is such that had the other party been aware of it, he would have acted differently" and holding that alleged oral misrepresentations were not material in light of "clear, written documentation" upon which a reasonable person would be expected to rely); *see also Mack v. Plaza Dewitt Ltd. P'ship*, 137 Ill. App. 3d 343, 350 (1985) (affirming dismissal for failure to plead a material misrepresentation).

regularly for the development of these behaviors or conditions *[see Warnings and Precautions (5.1)].*

**Life-threatening Respiratory Depression**
**Serious, life-threatening, or fatal respiratory depression may occur with use of DURAGESIC, even when used as recommended. Monitor for respiratory depression, especially during initiation of DURAGESIC or following a dose increase. Because of the risk of respiratory depression, DURAGESIC is contraindicated for use as an as-needed analgesic, in non-opioid tolerant patients, in acute pain, and in postoperative pain** *[see Contraindications (4) and Warnings and Precautions (5.2)].*

**Accidental Exposure**
**Deaths due to a fatal overdose of fentanyl have occurred when children and adults were accidentally exposed to DURAGESIC. Strict adherence to the recommended handling and disposal instructions is of the utmost importance to prevent accidental exposure** *[see Warnings and Precautions (5.3)]....*

*Id.* at 3, 1; Ex. 1 at 1. The body of the label provides more detailed information about these and other risks (including use in elderly patients, drug abuse, dependence, and overdose), *id.* Ex. 1 at 1-4, Ex. 8 at 11-28, and extensive warnings and instructions to be provided to the patient. *Id.* Ex. 8 at 37-39.

### 2.      Nucynta and Nucynta ER

Nucynta is an opioid pain reliever administered by oral tablet or solution, first approved by the FDA in 2008. *See id.* Ex. 12 at 1; Ex. 14 at 1. Its active ingredient, tapentadol, is less potent than morphine, but still listed as a Schedule II controlled substance. *See id.* Ex. 5 at 1-2; Ex. 7 at 1-2; Ex. 12 at 5, 19; Ex. 14 at 6, 20. Nucynta is approved for "moderate to severe acute pain" in adults. *See id.* Ex. 12 at 1, 3; Ex. 14 at 1, 3. Nucynta's labeling contains lengthy warnings about the potential for abuse, addiction, life-threatening respiratory depression, and death from overdose. *See id.* Ex. 5 at 1-3; Ex. 7 at 1-3; Ex. 12 at 5-7, 15-17; Ex. 14 at 6-7, 17-20. It also states that "[d]aily doses [of Nucynta] greater than 700 mg on the first day of therapy and 600 mg on subsequent days have not been studied and are not recommended." *See id.* Ex. 12 at 4. The FDA approved an extended-release oral tablet formulation, Nucynta ER, in 2011. *See id.* Ex.

11 at 1. Nucynta ER is approved for the same indication as Duragesic. *See id.* Ex. 10 at 1.[5] Nucynta ER's labeling sets the "maximum total daily dose" at 500 mg and instructs patients and physicians not to "exceed" it. *See id.* Ex. 10 at 4. Nucynta ER has a boxed warning similar to Duragesic's boxed warning (which discloses risks of addiction, abuse, misuse, life-threatening respiratory depression, and interaction with alcohol, among others) and has similarly detailed risk information in the body of the label. *See id.* Ex. 3 at 1-4; Ex. 10 at 1, 3, 8-22.

### B.    "Unbranded" Information

The City seeks to attribute to Janssen one physician-directed publication—a 2009 American Geriatrics Society Clinical Practice Guideline addressing Pharmacological Management of Persistent Pain in Older Persons ("AGS Guideline")—and three consumer-oriented publications: a brochure titled *Finding Relief: Pain Management for Older Adults* ("*Finding Relief*"), a website titled *Let's Talk Pain*, and a 200-page book authored by Derek McGinnis, a U.S. Navy veteran injured in the Iraq war, titled *Exit Wounds—A Survival Guide to Pain Management for Returning Veterans and Their Families* ("*Exit Wounds*").[6] The City's allegations about Janssen's involvement in these "unbranded" publications fail to support a plausible claim.

First, as discussed above, Illinois law requires that information in these publications be considered together with Janssen's product labels. This alone defeats any claim because the la-

---

[5] The City claims that a Janssen live speaker program "falsely promoted Nucynta ER as having 'long-term' safety and efficacy." FAC ¶ 279. This claim fails as Nucynta ER is expressly approved for treatment of pain requiring "long-term opioid treatment." *See Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1235 (S.D. Fla. 2007) (statements that "generally comport with [a drug's] approved label" are "not misleading as a matter of law").

[6] The FAC also alleges that "Janssen currently runs a website, *Prescriberesponsibly.com*, which claims that concerns about opioid addiction are 'overstated.'" FAC ¶ 252(p). In fact, as its name indicates, the website provides general information and assessment tools for responsible pain management. It does not promote Janssen's opioid drug and it includes links both to published medical literature and the FDA mandated REMS for ER/LA opioids. *See* Lifland Decl. ¶ 25, Ex. 19. Nothing in the website supports the City's fraud claim. *See Iqbal*, 556 U.S. at 678. The same is true of the FAC's allegation that an unidentified Janssen website contains a version of a five-question addiction and abuse screening tool developed by Dr. Lynn Webster. FAC ¶ 130.

beled warnings thoroughly cover the risks at issue.

Second, the City has failed to allege facts sufficient to attribute many of the allegedly misleading "unbranded" materials to Janssen. The City does not allege that the speakers or authors were Janssen's agents. *See Knapp v. Hill*, 276 Ill. App. 3d 376, 381-82 (1995) (actual agency exists only where principal has authority to control manner and method in which agent performs); *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 498-99 (1996) (dismissing common law fraud where plaintiffs failed to allege manufacturer "expressly gave authority to the [third party] to bind [manufacturer] to statements [at issue]" or that the third party had "implied authority from [manufacturer] sufficient to impose liability [on the manufacturer] for [its] fraudulent statements."); *Coelho v. Park Ridge Oldsmobile, Inc.*, 2001 U.S. Dist. LEXIS 14652, at *13-14 (N.D. Ill. Sept. 19, 2001) (claim dismissed for failure to sufficiently plead the agency relationship under Rule 9(b); plaintiff seeking to "establish actual agency ... must allege that defendants specifically authorized" a third party to make a statement or "conceal the [material] fact" at issue); *Owens v. Mitsubishi Motors Sales of Am., Inc.*, 2004 U.S. Dist. LEXIS 21764, at *6-7 (N.D. Ill. Oct. 28, 2004) (dismissing claim where plaintiff failed to "present sufficient evidence that a reasonable trier of fact could find that [defendants] gave [a party] the authority to [make the] misrepresent[ion]" in question).

Nor does the City allege that anyone reasonably assumed that these speakers or authors were Janssen's agents, creating apparent agency. *See Coelho*, 2001 U.S. Dist. LEXIS 14652, at *15-16 (plaintiff must allege it "reasonably concluded that [the third party] was an agent of [the defendants], or that [the plaintiff] justifiably relied on [the third party's] apparent authority to his detriment").

The FAC alleges that an unnamed doctor "gave paid promotional talks"—the content of

which the City neither identifies nor challenges—for Janssen and other Defendants' opioid drugs. FAC ¶ 122. It further alleges that one "key opinion leader," who published and spoke about opioids and participated in a panel of doctors that developed professional medical societies' prescribing guidelines, "received research support, consulting fees, and honoraria" from Janssen and other Defendants. *Id.* ¶¶ 125, 164. These allegations are insufficient to show that either the doctor's or the opinion leader's publications or statements were Janssen's. The City also alleges that Janssen "publicized" and "support[ed]" the distribution of the AGS Guideline developed by a committee of physicians. *Id.* ¶¶ 167, 233. Even if true, that allegation does not transform the Guideline into Janssen's representations or recommendations. The City similarly alleges that the American Pain Foundation ("APF"), using grant money it received from Janssen or others, *id.* ¶¶ 238, 247(l), 252(o), distributed the book *Exit Wounds* authored by an Iraq War veteran about his experiences with painkillers and that Janssen "sponsored" the book and "supported the [book's] marketing effort." *Id.* ¶¶ 271(k), 239. These allegations boil down to an assertion that Janssen provided money to APF, which that organization used to market and distribute the book. Those allegations do not make the book a publication by Janssen.

Third, under Illinois law, promotional material is actionable for lack of scientific substantiation only if it falsely states or implies that scientific substantiation exists. *Greifenstein v. Estée Lauder Corp.*, 2013 WL 3874073, at *4 (N.D. Ill. July 26, 2013); *Gredell v. Wyeth Labs., Inc.*, 367 Ill. App. 3d 287, 291 (2006) ("Lack of substantiation is deceptive only when the claim at issue implies there is substantiation for that claim [where there is none].... Merely because a fact is unsupported by clinical tests does not make it untrue"). The City alleges that various generic statements in *Finding Relief*, *Let's Talk Pain*, and *Exit Wounds* "suggest [they are] corroborated by scientific evidence." FAC ¶¶ 247(j-l), 267h, 271(j-k). A review of the cited statements refutes

8

this allegation: one is a statement that "opioids *may* make it easier for people to live *normally*," *id.* ¶ 247(j) (emphasis added); another is by a patient who says opioids allowed her to "continue to function," *id.* ¶ 247(k); a third quotes a medical society's definition of a medical term, *id.* ¶ 262(e); and others are challenged solely because they "omit[] warnings" that appear in drug labels, *id.* ¶¶ 247(l), 267(h), 271(j), (k).

Fourth, the City ignores that the FDA "fair balance" requirements for product-specific advertising do not apply to "unbranded" promotion. *See* Joint Mem. at 24 n.31. Illinois law concerning consumer promotional material is satisfied if a drug manufacturer provides "adequate" warnings to physicians, a duty Janssen fulfilled through its drug labels. *Martin by Martin v. Ortho Pharm. Corp.*, 169 Ill. 2d 234, 244 (1996) (failure to provide direct-to-consumer warnings about a drug's risks was not actionable because "defendant fulfilled its duty under Illinois law at the time it provided adequate warnings to the prescribing physician"). The City's allegations that *Exit Wounds* "fails to disclose" risks included in the label, FAC ¶¶ 238-40, 247(l), 271(k), and side effects listed in guidance published by the Veterans Administration and the Department of Defense, *id.* ¶ 240, thus fail to state a claim as a matter of law. The same authority and reasoning disposes of the City's allegation that Janssen failed to disclose to physicians the FDA's conclusion that two studies of osteoarthritis pain Janssen submitted to FDA did not demonstrate efficacy.[7] *Id.* ¶ 280.

Fifth, the City fails to allege that even a single Chicago doctor (or patient) was exposed to the unbranded materials the City seeks to attribute to Janssen. Nor does the City allege that any Chicago doctor relied on the supposed misrepresentations in making treatment decisions, or that

---

[7] The City's allegation that an internal marketing plan demonstrated that Janssen was "seeking to promote Nucynta ER for the treatment of osteoarthritis" despite the FDA's comments on these two studies, FAC ¶ 280, fails to state a claim on multiple other grounds, most notably the FAC's failure to allege that Janssen actually promoted Nucynta ER for osteoarthritis.

those decisions caused the City to pay for a single inappropriate prescription. The City's only relevant allegations are that doctors "may review direct-to-consumer materials sales representatives give them to distribute to patients, such as Janssen's *Finding Relief*," and that *Finding Relief* was "distributed by Janssen sales representatives, including, upon information and belief, in Chicago." *Id.* ¶¶ 185, 210. Allegation that Janssen distributed unbranded material, which a Chicago doctor might have seen, is patently insufficient to state a claim. *See* Joint Mem. Section III.

Finally, the "unbranded" materials do not misleadingly promote opioids. Rather, they contain basic and general information about a variety of pain treatments, including opioids, NSAIDs, steroids, and others. All mention the well-known risks of opioids and repeatedly emphasize that patients seeking treatment for pain relief should see a doctor for individualized medical advice. The City quotes snippets from these materials out of context. But Illinois law requires that the Court assess allegedly deceptive statements in the light of the whole publication. *See Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 988 (N.D. Ill. 2013) ("[A] statement that would have been deceptive in isolation can be non-deceptive when placed in context"); *Robacki v. Allstate Ins. Co.*, 127 Ill. App. 3d 294, 299-301 (1984) (holding that a "careful study" of the challenged materials showed the alleged misrepresentation was not deceptive). Review of the four publications at issue here makes plain that ***none*** remotely support any fraud claim, much less the massive fraud alleged in the FAC.

### 1. AGS Clinical Practice Guideline

The City challenges as misleading the 2009 AGS Guideline. This document was compiled by a committee of ten physicians and peer reviewed by over a dozen other medical societies (including the American Medical Association). It cites more than three dozen published articles. Lifland Decl. Ex. 15 at 1339-46. The Guideline includes recommendations to physicians for pharmacological management of pain for all available pain treatments and ranks both the

strength of the recommendation and the strength of the supporting evidence. *Id.* The City quotes a statement preceding the recommendations, that addiction risks are "exceedingly low in older patients with no current or past history of substance abuse"—and alleges that no studies or "other reliable scientific evidence" support the statement. FAC ¶ 167. But the Guideline itself refutes that allegation. The authors cite five studies supporting the quoted statement (one of which, in turn, relies on an analysis of dozens of other studies). *See* Lifland Decl. Ex. 15 at 1339-40 & refs. 117, 112-13, 124-25.[8] The City also argues that the Guideline's *recommendation* that "[a]ll patients with moderate to severe pain ... should be considered for opioid therapy" lacks substantiation. FAC ¶ 167. The recommendation *itself*, however, states that it is based on "low quality of evidence." The Guideline elsewhere states that the authors relied in part on "clinical experience and the consensus of panel members" because other evidence on pain treatment for older persons is "weak." *See* Lifland Decl. Ex. 15 at 1332, 1342. The Guideline also emphasizes that physicians must evaluate patients individually in deciding what treatment to recommend and devotes an entire section to both the risks and benefits of opioids. *Id.* at 1333, 1339-40. In light of the supporting citations and disclosures, the City fails to explain how the Guideline could plausibly be characterized as misleading.

### 2. *Finding Relief* Brochure

*Finding Relief* is a 36-page patient brochure sponsored by Janssen and created by the American Academy of Pain Medicine, AGS, and the AGS Foundation for Health in Aging. It provides background information on pain management, including a balanced presentation of five common types of analgesics. The discussion of each analgesic (including opioids) is confined to a single page. *See* Lifland Decl. Ex. 16 at 15-17. It repeatedly directs readers that anyone requir-

---

[8] Nor does the existence of a *subsequent* 2010 study regarding *overdose* in older patients render the Guideline's statement regarding *addiction* unsubstantiated or misleading. FAC ¶ 233.

ing medical care "should consult a medical or health care professional." *Id.* at 19, 29, 36.

The City attacks the brochure's statement that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain." FAC ¶ 252(m); *see also id.* ¶¶ 186, 232, 252(n), (o). But the AGS Guideline discussed above refers to multiple studies that support this statement. *See* Lifland Decl. Ex. 15 at 1339-40 & ref. 112-13, 117, 124-25. The Guideline also cites numerous studies supporting the brochure's statement that NSAIDs carry their own well-known risks for geriatric patients, including gastrointestinal bleeds and cardiovascular adverse events. *Id.* at 1337, refs. 48, 49, 55 & 56; *see* FAC ¶ 271(j).

The City takes issue with *Finding Relief's* characterization as "Myth" that "opioid doses ***have to*** be bigger over time," and as "Fact" that "opioids ***may*** make it easier for people to live normally," FAC ¶¶ 267(h), 247(j) (emphasis added). But the FAC fails to identify *how* these statements are false or misleading. *See Greifenstein*, 2013 WL 3874073, at *4 (dismissing fraud claim for failure to plead "*how* the [] claims [at issue] ... are false"). Contrary to the City's claim, neither statement implies that it is corroborated by scientific studies. *Id.* The brochure also discusses the risk of opioid addiction, noting that "[s]ome [opioids] are less likely to be addictive," directing patients to talk to their doctor, and warning: "Don't take your medication more often—or in a larger dose—than prescribed." Lifland Decl. Ex. 16 at 17, 19.

The City again mischaracterizes *Finding Relief* by alleging it "lists examples of *expected functional improvement from opioids* like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs." FAC ¶ 247(j) (emphasis added); *see also* ¶¶ 186, 232. The text of the brochure refutes this. The section at issue addresses treatment goals for *all* pain relief methods and actually states: "Your recovery will be measured by how well you reach functional goals, such as: Sleeping without waking from pain; Sleeping in your own bed; Returning

to work; Enjoying recreational activities; Having sex; Walking without help; Climbing stairs." Lifland Decl. Ex. 16 at 13. The brochure makes no claim of "expected functional improvements" and first mentions opioids four pages later—after a discussion of aspirin, acetaminophen, NSAIDs and topical anesthetics—making plain that the identified measures of recovery are not limited to opioids. *Id*. at 14-17.

The City also seeks to compare the general measures of recovery discussed in the brochure to the functional claims in a branded advertisement for Avinza, an opioid manufactured by a company that is not part of this litigation. FAC ¶ 100 & n.69. Based on an FDA warning letter regarding Avinza concerning such functional claims, the City alleges that Defendants "were put on notice that the FDA would not allow [functional] claims in branded materials" and therefore instead "created and disseminated these same unsupported claims ... through *unbranded* marketing materials" to evade FDA review, citing *Finding Relief* as an example. FAC ¶ 100 & n.69 (emphasis in original); *see also id*. ¶ 98. Even if *Finding Relief* made functional claims—which it does not—there is simply no FDA prohibition on functional claims. The City cannot fabricate such a prohibition out of a warning letter issued to a drug company with which Janssen is not affiliated for a drug that Janssen does not manufacture. The City fails to allege that Janssen knew of the Avinza warning letter, much less that it created *Finding Relief* to avoid receiving a similar letter.[9]

### 3. *Let's Talk Pain* **Website**

*Let's Talk Pain* is a website for pain victims created by the APF, the American Academy

---

[9] The FAC alleges that an unidentified "Medical Writer X," who was "hired by Conrad & Associates," "wrote numerous ... opioid-related publications," FAC ¶ 108-09, and that *Finding Relief* was "produced by Conrad & Associates." *Id.* ¶ 186. The FAC further alleges that unidentified Defendants edited an unidentified publication authored by Medical Writer X and "exerted their widest and most insidious influence" over him through "[unidentified] doctors and [unidentified] Front Groups who guided and oversaw" his work. *Id.* ¶ 113; *see also id*. ¶¶ 110-14. These allegations facially fail to state the "who, what, when, where, and how" of any alleged fraudulent conduct as required by Rule 9(b).

of Pain Management, the American Society for Pain Management Nursing, and Janssen. *See* Lifland Decl. Ex. 17 at 2. The City alleges that *Let's Talk Pain* "taught that opioids improve function and that addiction was rare" and "presented an unbalanced treatment of opioid risk compared with alternative therapies for chronic pain." FAC ¶ 186. In fact the website provides only general information about pain management, presents information on both opioid and non-opioid treatment options, and repeatedly emphasizes the importance of effective and systematic communication between doctors and patients. It offers tools (such as pain journals, questionnaires, and scales) to foster such communication. Lifland Decl. Ex. 17 at 12-20. A statement to that effect follows the challenged language from *Let's Talk Pain*, FAC ¶ 254: "If you suffer from pain, it's natural to want to know the truth about opioid therapy. It's even more important that you talk to your healthcare professional about whether or not these pain treatment options are right for you." *See* Lifland Decl. Ex. 17 at 67. The website also discusses side effects and risks of various treatment options, including opioids, and has a page dedicated to "Understanding Addiction," which includes a discussion of signs of addiction. *Id.* at 10-11.

The City also objects to statements discussing strict regulatory control of opioids and physicians' reluctance to prescribe opioids but fails to explain *how* these statements are false or misleading or have any possible relevance to a fraud claim. The same is true of the City's objection to the website's reference to "pseudoaddiction," FAC ¶¶ 254, 262(e), a concept the City acknowledges is recognized in medical literature. *Id.* ¶¶ 131, 162. The website itself notes that the definition of "pseudoaddition," as well as definitions of tolerance, dependence, and addiction, come from a joint publication by the Society of Addiction Medicine, the American Academy of Pain Medicine, and the American Pain Society. Nothing in the website comments on the scientific underpinnings of those definitions. *Id.* ¶¶ 262 & 262(e). *See* Lifland Decl. Ex. 17 at 10; Ex.

14

20 at 3-4.

### 4. *Exit Wounds*

*Exit Wounds* is a 200-page book by Derek McGinnis, a U.S. Navy veteran injured in the Iraq war, and distributed by APF. It presents a first-person narrative of McGinnis's pain management following his war injuries. The book provides "just an overview" of pain management "[w]ithout resorting to medical jargon or citing needless technical details," and states that it "should not be used for diagnosing or treating a health problem." *See* Lifland Decl. Ex. 18 at 3, 9, 18. The book briefly discusses opioids in a chapter titled "Your Arsenal of Treatment Options." *Id.* at 22-27. That chapter also discusses other forms of pain relief, including alternative medicine. *Id*. at 30-34. It stresses the importance of "work[ing] with your doctor" and "good communication with [a] health care provider." *Id*. at 17, 27. The author states that "[t]he most obvious way to start is by getting competent, professional, and comprehensive help for your chronic pain condition." *Id*. at 14. The book discusses the "most common side effects of opioids" without focusing on any particular drug, and discusses addiction multiple times. *Id*. at 22-27. None of the snippets quoted in the FAC are misleading in context. FAC ¶¶ 238, 247(l), 252(o). *See Muir*, 983 F. Supp. 2d at 988; *Robacki*, 127 Ill. App. 3d at 299.

### C. Conspiracy

Finally, the FAC's conspiracy allegations against Janssen are patently inadequate. To state a civil conspiracy claim, the City must allege "an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglas Corp*., 720 N.E.2d 242, 258 (Ill. 1999). "[T]he agreement is a necessary and important element ...." *Adcock v. Brakegate, Ltd*., 645 N.E.2d 888, 894 (Ill. 1994). The City alleges no such agreement involving Janssen, let alone its factual details. Instead, it vaguely alleges (1) that Janssen and other Defendants "entered into arrangements with numerous organizations to promote opioids" and drew on the organiza-

tions' publications, FAC ¶¶ 188, 205; (2) that Janssen wrote an email "expressing a plan to conference with APF 'and [unidentified] partners'" regarding APF's plan to respond to a publication, *id*. ¶ 204; and (3) that a "survey was circulated among" Endo, Janssen, and Purdue predicting rates of opioid prescribing on which one unidentified drug company commented. *Id*. ¶ 223 & n.105. These allegations do not come close to meeting the requirements of *Iqbal* or Rule 9(b).

## III.    CONCLUSION

The Court should dismiss the City's FAC in its entirety as to both J&J and Janssen.

Dated:   December 19, 2014

Respectfully submitted,

By: /s/ Charles C. Lifland
    Charles C. Lifland
    clifland@omm.com
    Carolyn J. Kubota
    ckubota@omm.com

    O'MELVENY & MYERS LLP
    400 South Hope Street
    Los Angeles, CA 90071
    Telephone:   (213) 430-6000
    Facsimile:    (213) 430-6407

    *Attorneys for Defendants Janssen Pharma-*
    *ceuticals, Inc., Johnson & Johnson, Janssen*
    *Pharmaceutica, Inc. n/k/a Janssen Pharma-*
    *ceuticals, Inc., and Ortho-McNeil-Janssen*
    *Pharmaceuticals, Inc. n/k/a Janssen Phar-*
    *maceuticals, Inc., Appearing Pro Hac Vice*


By: /s/ Michael P. Doss
    Michael P. Doss
    mdoss@sidley.com
    Scott D. Stein
    sstein@sidley.com

    SIDLEY AUSTIN LLP
    One South Dearborn
    Chicago, IL 60603
    Telephone:   (312) 853-7520
    Facsimile:    (312) 853-7036

    *Attorneys for Defendants Janssen Pharma-*
    *ceuticals, Inc., Johnson & Johnson, Janssen*
    *Pharmaceutica, Inc. n/k/a Janssen Pharma-*
    *ceuticals, Inc., and Ortho-McNeil-Janssen*
    *Pharmaceuticals, Inc. n/k/a Janssen Phar-*
    *maceuticals, Inc.*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2014, I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the electronic Mail Notice List.

Executed on December 19, 2014, at Los Angeles, California.

　　　　　　　　　　　　　　　　　　　　　 /s/ Charles C. Lifland
　　　　　　　　　　　　　　　　　　　　　 Charles C. Lifland