## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **CITY OF CHICAGO, a municipal corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PURDUE PHARMA L.P., PURDUE** | ) | **No. 14 C 4361** |
| **PHARMA INC., THE PURDUE** | ) | |
| **FREDERICK COMPANY, INC., TEVA** | ) | |
| **PHARMACEUTICAL INDUSTRIES,** | ) | **Judge Jorge L. Alonso** |
| **LTD., TEVA PHARMACEUTICALS** | ) | |
| **USA, INC., CEPHALON, INC.,** | ) | |
| **JOHNSON & JOHNSON, JANSSEN** | ) | |
| **PHARMACEUTICALS, INC., ORTHO-** | ) | |
| **MCNEIL-JANSSEN** | ) | |
| **PHARMACEUTICALS, INC. n/k/a** | ) | |
| **JANSSEN PHARMACEUTICALS, INC.,** | ) | |
| **JANSSEN PHARMACEUTICA, INC.** | ) | |
| **n/k/a JANSSEN PHARMACEUTICALS,** | ) | |
| **INC., ENDO HEALTH SOLUTIONS,** | ) | |
| **INC., ENDO PHARMACEUTICALS,** | ) | |
| **INC., ACTAVIS PLC, ACTAVIS, INC.,** | ) | |
| **WATSON PHARMACEUTICALS, INC.** | ) | |
| **n/k/a ACTAVIS, INC., WATSON** | ) | |
| **LABORATORIES, INC., ACTAVIS LLC,** | ) | |
| **and ACTAVIS PHARMA, INC. f/k/a** | ) | |
| **WATSON PHARMA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The City sues defendants Purdue Pharma L.P., Purdue Pharma Inc., The Purdue Frederick

Company, Inc., (collectively, "the Purdue defendants"), Teva Pharmaceutical Industries, Ltd., Teva

Pharmaceuticals USA, Inc., Cephalon, Inc. (collectively, the "Teva defendants"), Johnson &

Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc. now known

as Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. now known as Janssen

Pharmaceuticals, Inc. (collectively, "the Janssen defendants"), Endo Health Solutions, Inc., Endo Pharmaceuticals, Inc. (collectively, "the Endo defendants"), Actavis plc, Actavis Inc./Watson Laboratories, Inc.[1], Actavis LLC, and Actavis Pharma, Inc. (collectively, "the Actavis defendants") for their alleged violations of the Chicago Municipal Code and state law in connection with their marketing of certain drugs. The case is before the Court on defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12. For the reasons set forth below, the Court grants in part and denies in part defendants' joint motion to dismiss and grants the other motions.

## Facts

The Purdue defendants manufacture, promote, and sell in Chicago, among other places, opium-like painkillers ("opioids"), including OxyContin and Dilaudid. (1st Am. Compl. ("FAC") ¶¶ 3, 27, 28.) The Teva defendants manufacture, promote, and sell in Chicago, among other places, opioids including, Actiq and Fentora. (*Id.* ¶¶ 32-34.) The Janssen defendants manufacture, promote, and sell in Chicago, among other places, opioids including Duragesic and Nucynta. (*Id.* ¶¶ 37-38.) The Endo defendants manufacture, promote, and sell in Chicago, among other places, opioids, including Opana, Percodan, and Percocet. (*Id.* ¶¶ 40-41.) The Actavis defendants manufacture, promote, and sell in Chicago, among other places, opioids, including Kadian and generic versions of Duragesic and Opana. (*Id.* ¶¶ 43-44.)

Opioids have been regulated as controlled substances by the U.S. Drug Enforcement Administration since 1970. (*Id.* ¶ 53.) "The labels for scheduled opioid drugs carry black box

---

[1]The City sues Watson Pharmaceuticals, Inc., but the record shows that Watson Pharmaceuticals, Inc. is now Actavis, Inc., having changed its name after acquiring Actavis Group in 2012. (*See* Mem. Supp. Actavis' Defs.' Mot. Dismiss, Ex. 2, 2d Hirt Decl. ¶¶ 2-5, ECF No. 221-2.)

warnings of potential addiction and '[s]erious, life-threatening, or fatal respiratory depression,' the result of an excessive dose, which may slow breathing to fatal levels." (*Id.*) As a result, in the 1970s and 1980s, "generally accepted standards of medical practice dictated that opioids should only be used short-term, for instance, for acute pain, pain relating to recovery from surgery, or for cancer or palliative care." (*Id.* ¶ 73.)

By the 1990s, defendants had the ability to produce massive quantities of opioids cheaply, but the market for them was small. (*Id.* ¶ 3.) Consequently, they developed a common marketing plan designed to persuade patients to request, doctors to write, and healthcare payors like the City to pay for more opioid prescriptions. (*Id.* ¶¶ 80-83, 89.) With the help of consultants, defendants set out to create the perception of a scientific exchange in medical literature by commissioning studies that discussed and cited other studies they had commissioned, all of which concluded that long-term use of opioids for chronic pain was appropriate. (*Id.* ¶¶ 84-89.)

Though the Food and Drug Administration ("FDA") requires drug companies to obtain approval of drug labels, which includes promotional materials disseminated about the drug, *see* 21 U.S.C. § 321(k), (m), the FDA generally does not review "unbranded" promotional materials, *i.e.*, materials that promote the use of a type of drug but do not identify any particular drug by name. (*Id.* ¶¶ 98, 100-03.) Accordingly, "to avoid regulatory scrutiny and gain legitimacy, Defendants created, supported, and directed a network of Front Groups to collectively promote the treatment of chronic pain using opioid products over other alternatives." (*Id.* ¶ 104.)

Defendants also disseminated their message through ostensibly neutral publications. (*Id.* ¶ 108.) For example, the Janssen and Teva entities contracted with a medical publishing firm, Conrad & Associates, LLC to produce unbranded materials on opioids that listed professional groups, such as the American College of Physicians, as partners, though the content of the materials was drafted

3

by a medical writer hired by the consultants and paid by defendants. (*Id.*) The materials were also reviewed, edited and approved by defendants' compliance staff. (*Id.*)

Another facet of defendants' marketing campaign was promoting a small circle of doctors who favored treating chronic pain with opioids as experts on opioid use. (*Id.* ¶ 115.) These doctors, referred to as key opinion leaders ("KOLs"), "have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs [continuing medical education programs] supportive of chronic opioid therapy." (*Id.* ¶ 116.) They have also served on committees that developed treatment guidelines encouraging the use of opioids for chronic pain and on the boards of pro-opioid advocacy groups and societies that develop, select, and present continuing medical education programs. (*Id.* ¶¶ 116-131.) In return for their support of defendants' pro-opioid message, the KOLs received money, prestige, recognition, research funding, and publishing opportunities, which allowed them to exert even more influence in the medical community. (*Id.*)

Defendants also "commissioned, edited and arranged for the placement of favorable articles in academic journals." (*Id.* ¶ 134.) They "coordinated the timing and publication of manuscripts, abstracts, posters/oral presentations, and educational materials in peer-reviewed journals and other publications to support the launch and sales of their drugs." (*Id.* ¶¶ 135-43.) Defendants also worked "to discredit or bury negative information" by publishing negative review articles, letters to the editor, commentaries, case-study reports, and newsletters. (*Id.* ¶¶ 144-46.)

Defendants also used favorable professional and patient advocacy organizations as marketing tools. (*Id.* ¶¶ 148-54.) Defendants' KOLs served as board members of these organizations, which sponsored conferences and other events at which the pro-opioid message was presented. (*Id.*) In addition, organizations like the Federation of State Medical Boards, the American Academy of Pain

Medicine, the American Pain Society, the American Geriatrics Society and others, which were seeded with KOLs and funded by defendants, developed guidelines that promoted the use of opioids for treatment of chronic pain. (*Id.* ¶¶ 156-168, 188-212.)

Among the other marketing methods defendants used to promote their message were continuing medical education programs ("CMEs") and direct-to-consumer marketing. "Defendants sponsored CMEs that were delivered thousands of times, . . . . [which] focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects." (*Id.* ¶¶ 174, 178-82.) They also used third parties, like the American Pain Society, to create websites that promote opioids directly to patients. (*Id.* ¶¶ 184-87.)

In addition to targeting patients generally, defendants marketed opioids to specific patient populations, including elderly patients, those who receive worker's compensation benefits, and veterans. (*Id.* ¶¶ 225-40.) They also marketed their own specific drugs to prescribers in Chicago and elsewhere through one-on-one visits with doctors and group events with featured speakers. (*Id.* ¶¶ 273-87.)

Defendants' marketing materials: (1) incorrectly state that opioids improve function (*id.* ¶¶ 244, 246-47); (2) conceal the link between long-term opioid use and addiction (*id.* ¶¶ 244, 248-55); (3) falsely state that the risk of addiction can be managed (*id.* ¶¶ 244, 256-60); (4) falsely describe the signs of addiction as "pseudoaddiction" (*id.* ¶¶ 244, 261-62); (5) falsely state that withdrawal from opioids is easily managed (*id.* ¶¶ 244, 263-64); (6) misrepresent the dangers from higher doses of opioids (*id.* ¶¶ 244, 265-67); and (7) falsely understate the adverse effects of opioids and overstate the risks of nonsteroidal anti-inflammatory drugs ("NSAIDs") (*id.* ¶¶ 244, 268-72, 288-318).

"The City provides . . . prescription drugs coverage . . . to its employees and retirees . . . . under various health plans that the City self-insures." (*Id.* ¶ 326.) There is "a preferred provider organization ('PPO') for employees, a health maintenance organization ('HMO') for employees, a plan that covers retirees who are not yet on Medicare, and a plan that provides supplemental coverage to those retirees who are on Medicare." (*Id.* ¶ 326.) "The City's applicable health plans provide benefits for all medically necessary services associated with opioids, including treatment related to any adverse outcomes from chronic opioid therapy, such as overdose or addiction treatment." (*Id.* ¶ 330.) The plans cover "Medically Necessary" prescriptions, *i.e.*, those that are "customary for the treatment or diagnosis of an Illness or Injury, and [are] consistent with generally accepted medical standards." (*Id.* ¶ 332.) Drugs that are not medically necessary or are prescribed for a purpose not approved by the FDA are excluded from coverage under the City's plans. (*Id.*) At all times relevant to this suit, the City has paid directly for prescription drugs under the PPO, and periodically from July 2006 to the present, it has paid directly for prescription drugs under the HMO plan. (*Id.* ¶¶ 327-28.) Defendants' marketing program:

> caused doctors and pharmacies to submit, and the City to pay claims to its health plans that were false by: (a) causing doctors to write prescriptions for chronic opioid therapy based on deceptive representations regarding the risks and benefits of those drugs; (b) causing doctors to certify that these prescriptions and associated services were "medically necessary"; (c) causing claims to be submitted for drugs that were promoted for off-label uses and misbranded, and therefore not FDA-approved; and (d) distorting the standard of care for treatment of chronic pain so that doctors would feel not only that it was appropriate, but required, that they prescribe opioids long-term to treat chronic pain.

(*Id.* ¶ 331; *see id.* ¶¶ 332-38.) It also caused patients covered by the City's insurance to incur additional injuries from overdoses and addiction, which caused the City to incur additional costs. (*Id.* ¶¶ 341-44.)

The City also provides worker's compensation benefits, including prescription drug coverage, through a self-insured program. (*Id.* ¶ 345.) By law, the City is required to pay for "all the necessary first aid, medical and surgical services, and all necessary medical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of . . . accidental [work-related] injur[ies]." 820 Ill. Comp. Stat. 305/8(a). The program "covers all costs associated with opioids, including treatment related to any adverse outcomes from chronic opioid therapy, such as addiction treatment." (FAC ¶ 347; *see id.* ¶ 358.)

Defendants' marketing program:

caused doctors and pharmacies to submit, and the City to pay claims to its workers' compensation program that were false by: (a) causing doctors to write prescriptions for chronic opioid therapy based on deceptive representations regarding the risks and benefits of those drugs; (b) causing doctors to certify that these prescriptions and associated services were "[m]edically appropriate, so that expected health benefits (such as, but not limited to, increased life expectancy, improved functional capacity, prevention of complications, relief of pain) materially exceed the expected health risks" or "reasonably required to cure . . . the effects of [an] accidental injury"; and (c) distorting the standard of care for treatment of chronic pain so that doctors would feel not only that it was appropriate, but required, that they prescribe opioids long-term to treat chronic pain.

(*Id.* ¶ 348.)

**Discussion**

**I.    Primary Jurisdiction Doctrine**

Defendants first contend that this case should be stayed or dismissed pursuant to the primary jurisdiction doctrine. That doctrine "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991). The doctrine applies when: (1) "in a suit involving a regulated firm but not brought under the regulatory statute itself, an issue arises that is within the exclusive original jurisdiction of the regulatory agency to resolve"; or (2) "the court and agency have concurrent jurisdiction to decide an issue, or only the court has the power to decide it," and the court seeks the agency's advice on an issue that "extend[s] beyond the conventional experiences of judges or fall[s] within the realm of administrative discretion." *Arsberry v. Illinois*, 244 F.3d 558, 563-64 (7th Cir. 2001) (quotation omitted). "There is no fixed formula" for applying the doctrine, and "'the decision whether to [do so] depends upon a case by case determination of whether, in view of the purposes of the statute involved and the relevance of administrative expertise to the issue at hand, the court ought to defer initially to the administrative agency.'" *Bradford Sch. Bus Transit v. Chi. Transit Auth.*, 537 F.2d 943, 949 (7th Cir. 1976) (quoting *Feliciano v. Romney*, 363 F. Supp. 656, 674 (S.D.N.Y. 1973)).

Defendants argue that this case falls in the second category because the central issue to be decided is whether opioids should be prescribed to treat chronic, non-cancer pain, a determination best left to the FDA. (Defs.' Jt. Mot. Dismiss at 11-12, ECF No. 229.) In reality, however, the issue is not whether opioids are prescribed appropriately but whether they are marketed truthfully; specifically, whether defendants misrepresented the risks, benefits and superiority of opioids to treat long-term, chronic pain. (FAC ¶¶ 8-9; *see, e.g., id.* ¶¶ 250, 252, 260, 262-67 (risk of addiction, overdose, death); ¶¶ 64-65, 247 (benefits of opioids); ¶¶ 270-71 (superiority of opioids).) Courts

are equipped to adjudicate such claims. *See, e.g., In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1349 (S.D. Fla. 2013) ("Plaintiffs' claims rest on the determination of whether WhiteWave's brain health representations on its products' labeling, in its advertisements, and on its website are false and/or misleading and whether customers purchased WhiteWave's products in reliance on these representations. . . . This is not a technical area in which the FDA has greater technical expertise than the courts – as every day courts decide whether conduct is misleading.") (alterations and quotations omitted); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, No. M: 05-1699 CRB, 2006 WL 2374742, at *12 (N.D. Cal. Aug. 16, 2006) ("The issue is not whether Celebrex has fewer GI complications than other over-counter NSAIDs; the FDA has already determined that it does not. The issue is whether contrary to the FDA's findings, Pfizer nonetheless falsely claimed that Celebrex was superior. Courts and juries frequently decide similar false advertising claims.").

The cases defendants cite do not dictate a different result. In *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645 (1973), drug companies sought a declaration that their drugs were not "'new drugs' within the meaning . . . of the Federal Food, Drug, and Cosmetic Act." *Id.* at 647. The Supreme Court held that the primary jurisdiction doctrine applied because determining whether a drug was "new" within the meaning of that statute was an "issue[] peculiarly suited to initial determination by the FDA." *Id.* at 653-54; *see Imagenetix, Inc. v. Frutarom USA, Inc.*, No. 12CV2823-GPC(WMC), 2013 WL 6419674, at *4 (S.D. Cal. Dec. 9, 2013) (holding that the primary jurisdiction doctrine applied because the issue underlying plaintiff's breach of warranty claims was whether a probiotic product was a drug or a dietary supplement within the meaning of the Food, Drug, and Cosmetic Act). Similarly, in *Tutoki v. Celebreeze*, 375 F.2d 105 (7th Cir.

1967), the primary jurisdiction doctrine applied because the relief plaintiffs sought, a declaration that a cancer drug had been improperly denied to out-of-state patients, assumed that the drug should be approved for shipment by the FDA, a determination "[t]he district court ha[d] neither the facilities nor the expertise" to make. *Id.* at 107. In this case, however, plaintiff's claims can be adjudicated without deciding whether opioids should be prescribed for chronic, non-cancer pain. Thus, the primary jurisdiction doctrine does not apply.[2]

## II. **Personal Jurisdiction**

Actavis plc, Actavis, Inc., and Teva Ltd. move to dismiss plaintiffs' claims against them for lack of personal jurisdiction. Federal courts sitting in diversity may exercise personal jurisdiction over nonresident defendants only if the forum-state court would have such jurisdiction. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Illinois courts can "exercise jurisdiction on any . . . basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 Ill. Comp. Stat. 5/2-209(c). Because the state and federal standards are not substantively different, *Hyatt*, 302 F.3d at 715, the Court will address only the federal.

This Court can constitutionally exercise personal jurisdiction over defendants if they have sufficient "minimum contacts" with this state "such that the maintenance of the suit does not offend

---

[2]The parties dispute whether the issue of the propriety of prescribing opioids for long-term, non-cancer pain is currently before the FDA, by virtue of its order, in response to a citizen's petition challenging the use of opioids for such pain, that opioid manufacturers conduct studies to assess "the serious risks of misuse, abuse[,] addiction, overdose, and death associated with the long-term use of opioid analgesics." (Defs.' Jt. Mot. Dismiss at 8, ECF No. 229) (quotation and alterations omitted). Even if that issue is before the FDA, however, that would not be a basis for applying the primary jurisdiction doctrine because, as discussed *supra*, that issue will not be determined in this case.

'traditional notions of fair play and substantial justice.'" *Id.* at 716 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). If a defendant has "continuous and systematic general business contacts with the forum," it is subject to that forum's general jurisdiction and can be sued there for any cause of action. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997) (quotation omitted); *see Daimler AG v. Bauman*, 134 S. Ct. 746, 750 (2014) ("[A] court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)). For a corporation, "the paradigm for[a]" for the exercise of general jurisdiction are its "place of incorporation and principal place of business." *Bauman*, 134 S. Ct. at 760 (quotation omitted). If a defendant's purposeful contacts with the forum are more limited, it is subject to the forum's specific jurisdiction and can be sued there only if the suit arises out of those specific contacts. *RAR, Inc.*, 107 F.3d at 1277.

### A. Actavis plc & Actavis, Inc.

Actavis plc is an Irish corporation with its principal place of business in Ireland. (FAC ¶ 43.) Actavis, Inc. is a Nevada corporation with its principal place of business in New Jersey. (*Id.*) Both are holding companies and neither has offices or employees in Illinois. (*See* Actavis' Mot. Dismiss, Ex. 1, 1st Hirt Decl. ¶¶ 5, 10, ECF No. 221-1; *id.*, Ex. 2, 2d Hirt Decl. ¶¶ 8-9, ECF No. 221-2.) Given these facts, neither is so "'at home'" in Illinois as to be subject to this Court's general jurisdiction. *Bauman*, 134 S. Ct. at 760 (quoting *Goodyear*, 131 S. Ct. at 2851).

The City, however, argues, that both companies are subject to the Court's specific jurisdiction because Actavis, Inc. purposefully directed its marketing activities at Illinois and its

contacts with this jurisdiction can be imputed to Actavis plc. Though Actavis, Inc. avers that it does not direct advertising for opioids to or solicit sales of opioids from Illinois (*see* Actavis' Mot. Dismiss, Ex. 2, 2d Hirt Decl. ¶ 10, ECF No. 221-2), its documents belie that contention. Specifically, the documents show that Actavis, Inc.'s predecessor, Actavis Group, tracked the number of prescriptions for Kadian, Actavis' opioid product, written by Illinois doctors and ranked the doctors by the number of prescriptions they wrote. (*See* Mem. Law Opp'n Actavis' Mot. Dismiss, Dolesh Decl. ¶¶ 9, 10, ECF No. 253-1; *id.*, Ex. 5, Prescriber Ranking, ACTAVIS065671, ECF No. 253-6; *id.*, Ex. 6, Kadian Prescribers ACTAVIS0650365, ECF No. 253-7.) They also show that Actavis kept a "target list" of Illinois doctors and marketed to them by participating in a CME at Northwestern Memorial Hospital and offering a $50.00 co-pay program to them. (*See* Mem. Law Opp'n Actavis' Mot. Dismiss, Dolesh Decl. ¶¶ 11-12, 15-16; *id.*, Ex. 7, 2011 Target List, ACTAVIS0821795, ECF No. 253-8; *id.*, Ex. 8, Ex. Request & Approval Form, ACTAVIS0005258-61, ECF No. 253-9; *id.*, Ex. 11, Kadian $50 CoPay Card 2010 Physician Ranking Report, ACTAVIS0666775, ECF No. 253-12; *id.*, Ex. 12, Target List, ACTAVIS0663383, ECF No. 253-13.) Because the claims in this suit arise from Actavis, Inc.'s marketing efforts, these contacts are sufficient to give the Court specific jurisdiction over Actavis, Inc. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (stating that the exercise of specific jurisdiction is proper when defendant "has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.") (quotations, citations and footnote omitted); *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012) (stating, in the context of a common-law fraud claim, "[w]here a plaintiff's claim is for an intentional tort, 'the inquiry focuses

on whether the conduct underlying the claim[] was purposely directed at the forum state.'") (quoting *Tamburo v. Dworkin*, 601 F.2d 693, 702 (7th Cir. 2010)).

The situation is different, however, for Actavis plc because there is no evidence that it marketed opioids to Illinois residents. The City nonetheless contends that the Court has personal jurisdiction over Actavis plc because the contacts of its subsidiary, Actavis, Inc., can be imputed to it. "[P]ersonal jurisdiction cannot be premised on corporate affiliation or stock ownership" unless "corporate formalities are [not] substantially observed" or "the parent . . . exercise[s] an unusually high degree of control over the subsidiary." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). The City alleges "[u]pon information and belief, [that] Actavis plc exercises control over the[] marketing and sales efforts and profits from the sale of Actavis products" by Actavis, Inc. (FAC ¶ 43.) But it offers no facts to support that allegation or to counter Actavis plc's declarations that: (1) it "owns shares of companies that manufacture prescription drugs but does not finance or control the daily affairs of those companies, including their marketing or sales operations in Illinois"; and (2) its "books, tax returns, and financial statements are kept separate from those of its subsidiaries, which operate independent of Actavis plc." (*See* Actavis' Mot. Dismiss, Ex. 1, 1st Hirt Decl. ¶¶ 7-8, ECF No. 221-1.) Thus, Actavis, Inc.'s contacts cannot be imputed to Actavis plc on a control theory.

Alternatively, the City argues that Actavis plc is the successor-in-interest to Actavis, Inc., and as such can be charged with Actavis Inc.'s contacts. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 784 (7th Cir. 2003) ("In the corporate successor context, the successor corporation has chosen to stand in the shoes of its predecessor and has chosen to accept the business expectations of those who have dealt previously with that predecessor. Therefore, it

can be expected to be haled into the same courts as its predecessor."). One company is the successor of another if, among other things, "the transaction amounts to a consolidation, merger, or similar restructuring of the two corporations" or "the purchasing corporation is a 'mere continuation' of the seller." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325-26 (7th Cir. 1990). The transaction that created Actavis plc combined Actavis, Inc. and Warner Chilcott plc and made each a subsidiary of Actavis plc. *See* Actavis plc 2013 Form 10-k at 3, *available at* http://www.sec.gov/Archives/edgar/data/1578845/000119312514066242/ d648811d10k.htm (describing the transaction). Nonetheless, the record suggests that Actavis plc simply continued the business of Actavis, Inc. The consolidation transaction, for example, converted each Actavis, Inc. common share into one Actavis plc share. *See id.* Actavis, Inc.'s U.S. headquarters were at "Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ," and its officers were Paul M. Bisaro, Sigurdur O. Olafsson, G. Frederick Wilkinson, Robert A. Stewart, R. Todd Joyce, David A. Buchen, Charles M. Mayr, and Patrick J. Eagan. *See* Actavis, Inc. 2012 Form 10-k at 3, 77, *available at* http://www.sec.gov/Archives/edgar/data/884629/000119312513082059/ d448020d10k.htm. Actavis plc's "administrative headquarters" are at "Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ," and it retained all of Actavis, Inc.'s officers in the same positions. *See* Actavis plc 2013 Form 10-k at 4, 98, *available at* http://www.sec.gov/Archives/ edgar/data/1578845/000119312514066242/d648811d10k.htm. Actavis plc has the same website as Actavis, Inc., *see id.* at 4; Actavis plc 2013 Form 10-k at 3, and the Actavis plc 2013 Form 10-k states that "[r]eferences throughout [the document] to 'we' 'our,' 'us,' the 'Company' or 'Actavis' refer to financial information and transactions of Watson Pharmaceuticals, Inc. prior to January 23,

2013, Actavis, Inc. from January 23, 2013 until October 1, 2013 and Actavis plc subsequent to October 1, 2013." Actavis plc 2013 Form 10-k at 3. Though this evidence does not definitively establish that Actavis plc is Actavis, Inc.'s successor, and thus subject to the Court's jurisdiction, it is sufficient to make a prima facie case of jurisdiction, which defeats Actavis plc's motion. *See Purdue Research Found.*, 338 F.3d at 782-83.

### B. Teva Pharmaceutical Industries, Ltd.

Teva Pharmaceuticals, Ltd. ("Teva, Ltd."), an Israeli corporation with its principal place of business in Israel, owns Cephalon and Teva Pharmaceuticals USA, Inc. ("Teva USA"), both of which are Delaware corporations with their principal places of business in Pennsylvania. (FAC ¶¶ 31-32.) Though Teva, Ltd. declares that it operates independently of its subsidiaries (*see* Mem. Law Supp. Teva's Mot. Dismiss, Ex. A, West Decl. ¶¶ 4-5, ECF No. 225-1), the City contends that the subsidiaries' only purpose is to conduct Teva, Ltd.'s business, and thus their contacts with Illinois can be imputed to Teva, Ltd. *See Cent. States*, 230 F.3d at 940. The City's evidence for that contention is that: (1) Teva, Ltd.'s CEO told investors shortly after Cephalon was acquired that the two companies had combined their sales forces; (2) a pharmaceutical industry newsletter written shortly after the acquisition states that "Teva implemented a series of unusually robust price increases [25%] for several of Cephalon's branded meds"; (3) the websites for Cephalon's Actiq and Fentora products display Teva, Ltd.'s logo (but Cephalon's copyright); (4) the Teva, Ltd. website touts its, *i.e.*, Cephalon's, opioid products; (5) and Teva, Ltd.'s SEC filings include information about Cephalon. *See* http://seekingalpha.com/article/315684-teva-pharmaceuticals-management-presents-at-nasdaq-omx-27th-investor-program-transcript?page=4; http://www.fiercepharma.com/

story/teva-jacks-prices-cephalon-legacy-brands/2011-12-07 (quotation omitted); http://www.tevapharm.com/our_products/specialty_products/pain_killers/; http://www.fentora.com/; http://www.actiq.com/; Teva Pharmaceutical Industries Ltd., Form 20-f, *available at*, http://www.sec.gov/Archives/edgar/data/818686/000119312515039151/d831284d20f.htm. These facts are not sufficient to suggest that Teva, Ltd. controls Cephalon to such a degree that Cephalon's contacts with Illinois can be imputed to Teva, Ltd. Therefore, the Court grants Teva, Ltd.'s motion to dismiss for lack of personal jurisdiction.

III.    **Failure to State a Claim**

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" but must contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Moreover, claims alleging fraud must be pleaded "with particularity"; that is, they must "provide the who, what, when, where, and how" of the fraud. Fed. R. Civ. P. 9(b); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (quotations omitted).

A.    **Consumer Fraud - Counts One & Two**

In Count One, the City alleges that defendants violated § 2-25-90 of the Chicago Municipal Code ("Code"), which provides that:

> No person shall engage in any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city. Any conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act . . . or any section of this Code relating to business

16

> operations or consumer protection, shall be a violation of this section.  In construing this section, consideration shall be given to court interpretations relating to the Illinois Consumer Fraud and Deceptive Business Practices Act, as amended.  In construing this section, consideration shall also be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act, 15 U.S.C.A., Section 45. . . .

The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" . . . in the conduct of any trade or commerce . . . .

815 Ill. Comp. Stat. 505/2.  "The elements of a claim under [ICFA] are:  (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during a course of conduct involving trade or commerce." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002); *see People ex rel. Madigan v. United Constr. of Am., Inc.*, 981 N.E.2d 404, 411 (Ill. App. Ct. 2012) (stating that "the Attorney General may litigate a violation [of ICFA] and seek injunctive and other relief" without showing actual damages).

Defendants contend that only misrepresentations made in advertisements are actionable under § 2-25-090.  (*See* Defs.' Jt. Mot. Dismiss at 39, ECF No. 229.)  The ICFA, which the Code section cites as an interpretative guide, defines "advertisement" as "the attempt by publication, dissemination, solicitation or circulation to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise," and "trade" and "commerce" as "the advertising, offering for sale, sale, or distribution of . . . article, commodity, or thing of value . . . includ[ing] any trade or commerce directly or indirectly affecting the people of [Illinois]."  815 Ill. Comp. Stat,

505/1(a), (f).  The City alleges that the unbranded materials are indirect attempts by defendants to persuade doctors to prescribe and consumers to purchase their opioid products.  (*See, e.g.*, FAC ¶¶ 98-108.)  That is sufficient to implicate § 2-25-090.

In Count Two, the City alleges that defendants violated § 4-276-470 of the Code, which prohibits any person from:

> [A]ct[ing], us[ing] or employ[ing] any deception, fraud, false pretense, false promise or misrepresentation, or . . . conceal[ing], suppress[ing] or omit[ting] any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, for cash or on credit, or advertisement of any merchandise, whether or not any person has in fact been misled.

Defendants contend that the Corporation Counsel lacks standing to enforce § 4-276-470 because the Code vests the Department of Business Affairs and Consumer Protection ("Department") with that power.  *See* Code § 4-276-640 (stating that the Department shall enforce the provisions of Code chapter 4).  However, the Code also expressly permits the Department to turn over the prosecution of consumer fraud to the Corporation Counsel:

> The powers and duties of the commissioner and the department shall be as follows:
>
> . . . .
>
> to investigate complaints to ascertain whether any person or business has engaged in, is engaging in, or is about to engage in, any illegal, fraudulent or other deceptive practice that violates any law or regulation in connection with the advertisement or sale for cash or on credit of any merchandise to any consumer, and to institute an action with the department of administrative hearings in order to determine liability and seek remedies authorized by this Code or to report forthwith to the corporation counsel, the state's attorney, the attorney general and such other governmental agency as may have jurisdiction over or an interest in the subject matter, the name and place of business of all persons suspected of having engaged in such fraud, false pretense, misrepresentation or any other deceptive practice.

*See* § 2-25-50(b)(15)(ii).  The Court, thus, rejects the standing argument.

Defendants also argue that prescription drugs fall outside the ambit of § 4-276-470. This argument is based on the Code's definition of "merchandise" as, among other things, "commodities," and "consumer commodity" as:

> [A] consumer item that is consumed and replaced by consumers on a regular basis, . . . includ[ing], but . . . not limited to . . .
> (1)   Food, beverages (including liquor), other items intended for consumption by humans or animals and all substances or ingredients to be added to food;
> (2)   Paper, metal, and plastic products, including but not limited to napkins, facial tissues, toilet tissues, foil wrap, plastic wrap, paper toweling, wrapping paper, cordage, disposable diapers, and disposable plates;
> (3)   Detergents, solvents, waxes, soaps and other cleansing agents, sponges and similar cleaning accessories, and lubricants;
> (4)   Non-prescription drugs, personal care items, including female hygiene products, bandages, and toiletries; and
> (5)   Household products, including light bulbs, disposable cameras, batteries, camera supplies, candles, tape, and adhesives.
> The term "consumer commodity" shall not include:
> (1)   Unpackaged fresh produce;
> (2)   Individual items under three cubic inches in size;
> (3)   Individual items weighing less than three ounces; and
> (4)   Individual items priced under fifty cents.

Code § 4-276-005. Because prescription drugs are not included in the list of commodities, defendants contend such drugs are not covered by § 4-276-470.

The Court disagrees. The Illinois courts have emphasized that "the maxim of *expressio unius est exclusio alterius*," *i.e.*, the expression of one thing excludes another, "is not a rule of law but . . . a mere rule of statutory construction which is used by the courts in arriving at the real intention of the legislature where such intention is not clearly manifest from the language itself." *Dick v. Roberts*, 133 N.E.2d 305, 308 (Ill. 1956); *see Paxson v. Bd. of Educ. of Sch. Dist. No. 87*, 658 N.E.2d 1309, 1315 (Ill. App. Ct. 1995) ("[T]he maxim Expressio unius est exclusio alterius is only a rule of construction . . . and should never be applied to defeat the purpose of a statute."). Here, it is clear from the legislature's use of the phrase "includ[ing], but . . . not limited to" in the definition of

19

"commodity" that the term includes all "item[s] that [are] consumed and replaced by consumers on regular basis," not just those enumerated in the ordinance. *See Paxson*, 658 N.E.2d at 1315 ("[I]t is generally improper to conclude that entities not specifically enumerated are excluded when the legislature uses the word 'including.'"). Because prescription drugs fall into that category, they are subject to § 4-276-470.

Defendants also argue that the ordinance does not apply to their products because opioids are sold by prescription, not "at retail." *See* § 4-276-005 (defining "advertisement" as "any offer to sell a commodity to the public at retail"). The ordinance does not define the term "retail." However, the common and ordinary understanding of the word "retail" is "to sell (something) to customers for their own use." http://www.merriam-webster.com/dictionary/retail; *see* http://dictionary.reference.

com/browse/retail?s=t (defining "retail" as "the sale of goods to ultimate consumers, usually in small quantities (opposed to wholesale ).");*see also Senese v. Vill. of Buffalo Grove*, 890 N.E.2d 628, 630 (Ill. App. Ct. 2008) ("A determination of legislative intent begins with the language of the statute, which must be given its 'plain, ordinary, and popularly understood meaning.'") (quoting *Alvarez v. Pappas*, 890 N.E.2d 434, 434 (Ill. 2008)). Given that definition, prescription drugs are sold at retail. *See id.* ("'Where the language is clear and unambiguous, the statute must be given effect as written without resort to further aids of statutory construction.'") (quoting *Alvarez*, 890 N.E.2d 434).

Even if their products are subject to the consumer fraud ordinances, defendants contend that the Count One and Two claims fail because the misrepresentations they are alleged to have made are not actionable as a matter of law. Defendants assert, for example, that the FAC's "central allegation is that [they] falsely represented that opioid products are safe and effective for long-term

treatment of chronic pain." (Defs.' Jt. Mot. Dismiss at 20, ECF No. 229.) As discussed above, however, that is not what the City claims. Defendants also assert that any claim based on lack of clinical testing cannot survive because "'lack of substantiation [can] be deceptive only when the comparative claim at issue implies that there is substantiation for the claim.'" (*Id.* at 22) (quoting *Bober v. Glaxo Wellcome, PLC*, 246 F.3d 934, 939 n.2 (7th Cir. 2001)). Yet that is exactly what the City alleges. (*See* FAC ¶ 147 (alleging that defendants falsely implied that the representations about their products were supported by scientific evidence).) Similarly, defendants argue that any claims based on misrepresentations about the risks of abuse and addiction are foreclosed by the FDA-approved labels for their products because the labels disclose those risks. (Defs.' Jt. Mot. Dismiss at 23, 38, ECF No. 229.) But, as the cases cited by defendants illustrate, drug labels do not preclude fraud claims based on misrepresentations of the label information, which is what the City alleges. *Travelers Indemn. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 552 (E.D. Pa. 2014) (dismissing fraud claims because "no facts alleged in the Amended Complaint suggest that Cephalon concealed or misrepresented the content of the [labels]"); *Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*, No. 13-7167, 2014 WL 2115498, at *6 (E.D. Pa. May 21, 2014) ("Fentora's 'Black Box' warning label, available to potential prescribing physicians, clearly identifies the dangers of abuse and respiratory depression that form the basis of the Fund's concerns, and there is no allegation that the Defendants concealed this information."). In short, the Court rejects defendants' argument that their alleged misrepresentations cannot be the basis for any fraud-based claim.

The Court now turns to the specific allegations the City makes against each defendant.

### 1. The Actavis entities

The City alleges that each of the Actavis entities, *i.e.*, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharma, and Watson Laboratories, Inc., conducted in-person marketing with Chicago doctors, and starting in 2010 trained its sales representatives to falsely tell doctors that: (a) patients with chronic, non-cancer pain function better on opioid therapy; (b) long-acting opioids are less likely to cause addiction than short-acting opioids; (c) patients can be effectively screened for addiction risk; (d) aberrant patient behavior like drug seeking and pill hoarding are signs of pseudoaddiction, not addiction; (e) it is easy to withdraw from opioid use; (f) opioid doses should be continually increased until a patient reports "adequate analgesia"; and (g) opioids are safer than other forms of pain medication because they have no dosage ceiling. (FAC ¶¶ 43, 247, 252, 260, 262, 264, 267, 271, 275, 366.) In addition, each Actavis entity allegedly distributed an advertisement in 2010 that said non-cancer patients function better with chronic opioid therapy, and a patient education brochure in 2007 that said patients without a predisposition to addition are unlikely to become addicted to opioids and implied that addiction was unrelated to increased opioid doses. (*Id.* ¶¶ 247, 252, 267.) The City further alleges that the Actavis entities made these misrepresentations during the course of selling their opioid products to Chicago doctors and advertising them to Chicago consumers and intended for the doctors and consumers to rely on them. (*Id.* ¶¶ 44, 246, 275, 366.) What the City does not allege, however, is the name of any Chicago doctor or consumer to whom any Actavis entity made an alleged misrepresentation, when the misrepresentation was made, or how. Absent that information, the City has not stated claims against the Actavis entities for violations of Code §§ 2-25-90 and 4-276-470.

### 2. The Cephalon Entities

The City alleges that the two Cephalon entities that remain in this suit, *i.e.*, Cephalon and Teva USA, "used speaker programs" in unidentified locations to market their opioids and: (1) at an unspecified time, "sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*" that falsely says patients without a family history of addiction do not commonly become addicted to opioids; (2) in 2007, "sponsored [the American Pain Foundation's] *Treatment Options: A Guide for People Living with Pain*," which falsely says that addiction is rare, and quality of life improves with long-term opioid use; (3) "sponsored the Federation of State Medical Board's *Responsible Opioid Prescribing* (2007)" and distributed it to 10,000 doctors in unspecified locations, which falsely says that long-term use of opioids improves functioning and that behavior like pill hoarding is a sign of pseudoaddiction, not addiction; (4) "sponsored a CME [continuing medical education program]. . . , *Optimizing Opioid Treatment for Breakthrough Pain*, offered . . . from September 28, 2007 through December 15, 2008" that falsely says nonopioids are less effective than opioids because of dosing limits. (FAC ¶¶ 33-34, 247, 252, 262, 267, 271, 285.) The City also alleges that the Cephalon entities sell their opioid products and distribute savings cards for them in Chicago. (*Id.* ¶¶ 33-34.) The City does not, however, explain what editorial control, if any, is entailed in "sponsoring" or "facilitating" materials or events. Moreover, it does not allege when, how, and to whom in Chicago the Cephalon entities made any alleged misrepresentations or distributed the contested materials. Absent such allegations, the City has not stated claims against the Cephalon entities for violations of Code §§ 2-25-90 and 4-276-470.

Alternatively, the City alleges that the Cephalon entities violated these ordinances by "market[ing] [their] opioids [*i.e.*, Actiq and Fentora] for chronic non-cancer pain despite having

23

labels that specifically limited their use to cancer pain in opioid-tolerant individuals." (FAC ¶ 288.) With respect to these claims, the City alleges that: (1) the FDA has approved Actiq and Fentora **"ONLY** for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain"; (2) the drugs' labels state that "'[t]his product must not be used in opioid non-tolerant patients because life-threatening respiratory depression and death could occur at any dose in patients not on a chronic regimen of opioids. For this reason ACTIQ is contraindicated in the management of acute or postoperative pain.'"; (3) in 2007 and 2008, the Cephalon entities sponsored three CMEs, which taught that "there was no sound basis for the distinction between cancer and non-cancer 'breakthrough pain'"; (4) in 2008, the FDA rejected Cephalon's supplemental new drug application seeking approval of Fentora for the treatment of non-cancer breakthrough pain; (5) "[o]n March 26, 2009, the [FDA] issued a Warning Letter to Cephalon, telling Cephalon that its promotional materials for Fentora . . . . 'misleadingly broaden[ed] the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora therapy . . . when this is not the case.'"; (6) Cephalon markets Actiq and Fentora primarily to doctors who do not specialize in cancer. (*Id.* ¶¶ 292, 297, 303-06, 309, 311, 312-13) (emphasis in original). Again, however, the City alleges no facts that connect the alleged misrepresentations specifically to Chicago doctors or consumers. Accordingly, the off-label consumer fraud claims fail as well.

### 3. The Endo Entities

The City alleges that each of the Endo entities, *i.e.*, Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc., "relie[s] heavily on in-person marketing . . . to Chicago doctors" and: (1) "sponsor[ed]" two websites, painknowledge.com and PainAction.com, that falsely say opioids

improve function, people do not usually become addicted to them, doses do not have to be continually increased, and omit significant risks of opioid use; (2) at an unspecified time, distributed ads for Opana ER that falsely say chronic pain patients who take the drug are able to do physically demanding work; (3) distributed to its sales force the Federation of State Medical Boards' *Responsible Opioid Prescribing* (2007), which falsely says that opioid use improves function and that drug seeking and other aberrant patient behaviors are a sign of pseudoaddiction, not addiction; (4) falsely implied in its 2012 ads for Opana ER that the drug is more difficult to abuse than other opioids; (5) at an unspecified time, "sponsored a CME [continuing medical education program] published by [the American Pain Foundation's] National Initiative of Pain Control, of which Endo was the sole funder, entitled *Persistent Pain in the Older Adult*," which falsely says that older people are less likely to abuse opioids than younger people and withdrawal symptoms can be avoided; (6) at an unspecified time, "distributed an education pamphlet . . . entitled *Living with Someone with Chronic Pain*," which falsely says most people on opioids do not develop an addiction; (7) at an unspecified time, "distributed a patient education pamphlet . . . entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*," which falsely implies that patients who take opioids for pain will not become addicted to them and that there is no ceiling on opioid dosage; (8) "contracted with the American Geriatrics Society to produce a CME [continuing medical education program] promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*, which falsely say that the risk of addiction for older people is very low; (9) "paid for a 2007 supplement available for continuing [medical] education credit . . . . entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*," and distributed 96,000 copies of it, which falsely says that patients can be effectively screened for addiction risk and that those at high risk can still safely

receive chronic opioid therapy; and (10) distributed copies of a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), which falsely says that doctors should regard drug seeking and other aberrant patient behavior as signs of pseudoaddiction, not addiction. (FAC ¶¶ 40-41, 247, 252, 260, 262, 267, 271, 276.) Again, however, the City does not explain what editorial control, if any, the Endo entities had over materials they allegedly sponsored or funded. Further, it does not allege that the Endo entities distributed the educational materials or advertisements to Chicago doctors or consumers, that Chicago doctors attended the continuing medical education programs, that Chicago doctors or consumers visited the websites or otherwise indicate when, how, and to whom the alleged misrepresentations were made. Without such allegations, the City has not stated viable §§ 2-25-90 and 4-276-470 claims against the Endo entities.

### 4.     The Janssen Entities

The City alleges that each of the Janssen entities, *i.e.*, Janssen Pharmaceuticals, Inc. and Johnson & Johnson, sells opioids in Chicago through personal visits to doctors and through speaker programs held in the City and that they:  (1) "sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009)," which was distributed by its sales force and says that opioids are rarely addictive, make it easier for people to live normally, do not have dosage limits, and have mild side effects, particularly as compared to NSAIDs; (2) "sponsored" a website in 2009, *Let's Talk Pain,* that claims opioids allow a patient "to continue to function" and that pseudoaddiction is different from addiction; (3) "provided grants to [the American Pain Foundation] to distribute *Exit Wounds* to veterans, which teaches that opioid medications '*increase* your level of functioning'" and says that people who are not predisposed to addiction are unlikely to become addicted; (4) "contracted with the American Geriatrics Society to produce a CME [continuing medical education

program] promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*," which "falsely claim that 'the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse'"; (5) "currently runs a website, Prescriberesponsibly.com . . . , which claims that concerns about opioid addiction are "overstated.'" (FAC ¶¶ 37-38, 247, 252, 262, 267, 271, 279, 366) (emphasis in original). Again, there are no allegations about these entities' editorial control over materials they allegedly sponsored or funded or about where or when the Janssen entities made these alleged misrepresentations to Chicago doctors or consumers. Thus, the City has not stated claims against the Janssen entities for violations of Code §§ 2-25-90 and 4-276-470.

### 5. The Purdue Entities

The City alleges that each of the Purdue entities, *i.e.*, Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company, "engaged in in-person marketing to doctors in Chicago and operated speakers bureau programs that included Chicago prescribers." (FAC ¶¶ 27, 29, 281.) It also alleges that these entities: (1) ran ads in 2012 promoting OxyContin for long-term pain without saying that there was no evidence of its long-term efficacy; (2) "sponsored [the American Pain Foundation's] *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claims that 'multiple clinical studies' have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients," says that less than 1% of kids who take opioids get addicted, that pseudoaddiction can be distinguished from true addiction, and suggests that withdrawal is easy; (3) sponsored and distributed at least 17,200 copies of the American Pain Foundation's *Treatment Options: A Guide for People Living with Pain* (2007), which falsely teaches that opioids improve the quality of pain

patients' lives, have little addiction risk, and have "'no ceiling dose'" and exaggerates the overdose death rate associated with NSAIDs; (4) "sponsored *Exit Wounds* (2009), which falsely teaches veterans that opioid medications '*increase* your level of functioning'" and that addiction is unlikely in people who are not predisposed to it; (5) "sponsored the Federation of State Medical Boards' *Responsible Opioid Prescribing* (2007), which falsely describes functional improvement as the goal of a long-term opioid use and says drug-seeking behavior is a sign of pseudoaddiction, not addiction; (6) "published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*," which falsely suggests that opioids can be abused only by snorting or injecting them and attributes drug seeking behavior to pseudoaddiction; (7) at an unspecified time, "funded [a] study . . . [that falsely] claimed . . . [there is] 'evidence that the risk of psychological dependence or addiction is low in the absence of a history of substance abuse'"; (8) "contracted with the American Geriatrics Society to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*," which falsely claims that the rate of addiction in older people with no history of substance abuse is very low; (9) has a website, "*In the Face of Pain* (inthefaceofpain.com), which states that policies that 'restrict[] [opioid] access to  patients with pain who also have a history of substance abuse' and 'requir[e] special government-issued prescription forms for the only medications that are capable of relieving pain that is severe' [are] 'at odds with' best medical practices" and that a patient whose doctor will not give him enough opioids, should find another one who will; (10) "sponsored a 2012 CME [continuing education program] taught by a Chicago-based key opinion leader entitled *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*," that falsely contends addiction screening is effective; (11) "sponsored" a 2011 webinar entitled *Managing Patients' Opioid*

28

*Use: Balancing the Need and Risk*, which falsely tells prescribers that screening tools, urine tests, and patient agreements have the effect of preventing opioid abuse and overdoses; (12) in 2005, posted a pamphlet on its website, *Partners Against Pain.com*, titled *Clinical Issues in Opioid Prescribing*, which distinguished pseudoaddiction from addiction; and (13) sponsored a CME [continuing medical education program] issued by the American Medical Association in 2003, 2007, 2010, and 2013, *Overview of Management Options*, that says NSAIDs and other nonopioids are unsafe at high doses. (*Id.* ¶¶ 247, 252, 260, 262, 264, 267, 271) (emphasis in original). Though most of these allegations suffer from the same flaws as those leveled against the other entities, the allegations that, starting in 2005 and continuing to the present, the Purdue entities made misstatements about opioids on their own websites with the intention that Chicago doctors and consumers rely on those misrepresentations are sufficient to state claims against the Purdue entities for violations of Code §§ 2-25-90 and 4-276-470.

### B. Fraud Claims - Counts Three to Seven & Nine

In Count Three, the City alleges that defendants violated §§ 1-21-010 and 1-21-020 of the Code, which prohibit any person from aiding and abetting another to "knowingly make[] a false statement of material fact to the city in violation of any statute, ordinance or regulation, or . . . knowingly make[] a false statement of material fact to the city in connection with any application, report, affidavit, oath, or attestation." Violators are liable for penalties "plus up to three times the amount of damages which the city sustains because of the . . . violation," and "the city's litigation and collection costs and attorney's fees." § 1-21-010(a). For the purposes of these sections:

> a person knowingly makes a false statement of material fact when that person (i) makes a statement of material fact with actual knowledge that the statement was false, or (ii) makes a statement of material fact with knowledge of facts or

information that would cause a reasonable person to be aware that the statement was false when it was made, or (iii) signs, certifies, attests, submits or otherwise provides assurances, or causes any other person to sign, certify, attest, submit or otherwise provide assurances, that a statement of material fact is true or accurate in deliberate ignorance or reckless disregard of the truth or falsity of the statement. For purposes of this section, a person who fails to make a reasonable investigation to determine the accuracy, truthfulness or completeness of any material fact acts in deliberate ignorance or reckless disregard of the truth or falsity of the material fact.

§ 1-21-010(d).

In Counts Four and Five, the City alleges that defendants conspired to and violated § 1-22-020 of the Code, which imposes liability on any person who:

(1) knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city;

(3) conspires to defraud the city by getting a false or fraudulent claim allowed or paid.

*See* § 1-22-10 (defining "claim" to include "any request or demand, whether under a contract or otherwise, for money or property which is made by a city contractor, grantee, or other recipient if the city is the source of any portion of the money or property which is requested or demanded, or if the city will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.").

Count Six alleges that defendants violated § 1-20-20 of the Code, which states that:

Any person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law, or such person's failure to correct conditions which violate any federal, state or local law when such person was under a legal duty to do so, shall be liable to the city for those costs. This liability shall be collectible in the same manner as any other personal liability.

Count Seven alleges that defendants violated the Illinois Insurance Fraud Statute, which

states:

> (a)(1) A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.

> . . . .

> A person who knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of any insurance company by the making of a false claim or by causing a false claim to be made on a policy of insurance issued by an insurance company, or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property, shall be civilly liable to the insurance company or self-insured entity that paid the claim or against whom the claim was made or to the subrogee of that insurance company or self-insured entity in an amount equal to either 3 times the value of the property wrongfully obtained or, if no property was wrongfully obtained, twice the value of the property attempted to be obtained, whichever amount is greater, plus reasonable attorney's fees.

720 Ill. Comp. Stat. 5/17-10.5(a)(1), (e)(1).

Count Nine is a common-law fraud claim, which requires the City to allege that each

defendant made a false statement of material fact, knowing that it was false or with reckless

disregard for its truth or falsity, to induce the City's reliance, the City relied on the statement, and

it was injured as a result. *Small v. Sussman*, 713 N.E.2d 1216, 1221 (Ill. App. Ct. 1999).

The City alleges that the misrepresentations and omissions defendants made in marketing

their opioids caused doctors to submit to and receive payment from the City for false and fraudulent

claims because: (1) the City's health and worker's compensation plans limit prescription coverage to drugs that are "medically necessary" or "reasonably required" and are dispensed for an FDA-approved purpose; (2) but for defendants' false and misleading statements about opioids, doctors would not have deemed opioids to be "medically necessary" or "reasonably required" to treat City employees' and retirees' chronic pain, and thus would not have given them opioid prescriptions for that purpose; and (3) between January 2007 and June 2014, the City paid 22,000 claims for opioids that had been prescribed for three or more consecutive months, *i.e.*, for chronic pain rather than acute pain; and (4) if doctors had not been deceived into writing such opioid prescriptions, the City would not have had to pay for the prescriptions or for the additional costs associated with opioids, *e.g.*, treatment for addiction and overdoses. (FAC ¶¶ 320, 324, 330-38, 340-54, 358-59; *id.*, Exs. A & B, Claims Charts.) What the City does not allege, however, is the identities of doctors who, as a result of one or more of defendants' alleged misrepresentations, prescribed opioids for chronic pain to a City-insured patient or worker's compensation recipient whose claim for that prescription the City paid, or any other details about such claims. Absent such allegations, the City has not stated claims for violation of §§ 1-20-20, 1-21-010, 1-21-020, 1-22-020 of the Code or the Illinois Insurance Fraud statute against defendants.

### C.     Civil Conspiracy - Count Eight

In Count Eight, the City alleges that defendants are liable for conspiring to violate the Code sections and statutes on which its substantive claims are based.  Because the substantive claims are only viable against the Purdue entities, and the City does not allege that Purdue entities conspired with one another, the conspiracy claim also fails.  *See Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994) ("Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means."); *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000) ("[A] conspiracy is not an independent tort. Where, as here, a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails.").

### D.      Unjust Enrichment - Count Ten

In Count Ten, the City asserts a claim for unjust enrichment, which requires, among other things, an allegation that "defendant[s] ha[ve] unjustly retained a benefit to the [City's] detriment." *HPI Healthcare Servs., Inc.  v. Mt. Vernon Hosp.*, 545 N.E.2d 672, 679 (Ill. 1989).  As discussed above, the City has not alleged with particularity that it was harmed by defendants' actions because it does not identify the opioid prescriptions for which it paid that were written by doctors influenced by defendants' alleged misrepresentations.  Thus, the unjust enrichment claim fails.

### E.      Subrogation - Count Eleven

In Count Eleven, the City alleges that, under both its health and worker's compensation plans, it has "a right of reimbursement or subrogation for any payment of a medical benefit provided to a Participant arising out of any injury caused by a third party."  (FAC ¶ 510; *see id.* ¶ 512.)

Because the City has not adequately alleged that it paid medical benefits to any plan participant for any injury caused by any defendant, the subrogation claims are dismissed.

## Conclusion

For the reasons set forth above, the Court: (1) grants the Cephalon entities' motion to dismiss [224] and terminates Teva Pharmaceuticals, Ltd. as a party to this case; and (2) grants the Actavis entities' motion to dismiss [220], the Endo entities' motion to dismiss [226], and the Janssen entities' motion to dismiss [232]; and (3) grants in part and denies in part defendants' joint motion to dismiss [228], which is denied as to the claims asserted in Counts One and Two against the Purdue entities but otherwise granted. The City has thirty days from the date of this Memorandum Opinion and Order to amend the dismissed claims, if it can do so and comply with Federal Rule of Civil Procedure 11. If the City fails to do so, the Court will dismiss those claims with prejudice.

**SO ORDERED.**                                    **ENTERED: May 8, 2015**

_____
**HON. JORGE L. ALONSO**
**United States District Judge**

34