**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation,<br><br>   Plaintiff,<br><br> v.<br><br>PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; DEPOMED, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ACTAVIS, INC. f/k/a WATSON, PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.,<br><br>   Defendants. | Case No. 14-cv-04361<br><br>Honorable Jorge L. Alonso<br>U.S. District Court Judge |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS
ALL CLAIMS AGAINST DEFENDANTS CEPHALON, INC. AND
<u>TEVA PHARMACEUTICALS USA, INC.</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

I.      INTRODUCTION ............................................................................... 1

II.     BACKGROUND ................................................................................ 4

        A.    Cephalon's Opioid Medicines............................................... 4

        B.    Off-Label Prescribing Is Entirely Legal And Off-Label Promotion Is Not The Same As Fraud........................................... 5

        C.    The Court Previously Dismissed All Of The City's Claims................................. 6

        D.    The City Has Failed To Cure The Defects That The Court Identified. ................ 7

III.    LEGAL ARGUMENT ........................................................................ 7

        A.    The City's Complaint Should Be Dismissed Because It Is Improperly Prolix And Confusing. ........................................ 7

        B.    All Claims Fail Because The City Has Not Pled Any Misrepresentation Or Omission By Any Teva Defendant, Much Less Any That Satisfy Rule 9(b)......................... 9

              1.    The City's Unbranded Promotion Theory Fails As A Matter Of Law. ......................... 9

              2.    The City's Branded Promotion Theory Fails As A Matter Of Law. ....... 12

        C.    All Claims Fail Because The City Has Not Pled Any Facts To Show That Any Teva Defendant Caused The City Any Harm. ............................. 15

              D.    All Claims Against The Teva Defendants Fail for Lack of Injury. ......... 19

        E.    The Conspiracy Claims Against The Teva Defendants Are Devoid of Facts. ................ 21

        F.    The SAC Fails To Allege Any Misconduct By Teva USA. ............................. 22

IV.     CONCLUSION.................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

<small>CASES</small>

*Beaman v. Souk,*
 No. 10-cv-1019, 2011 WL 832506 (C.D. Ill. Mar. 3, 2011) ..................................................... 8

*Bell Atlantic Corp. v. Twombly,*
 550 U.S. 544 (2007).................................................................................................................. 22

*Borsellino v Goldman Sachs Grp. Inc.,*
 477 F.3d 502 (7th Cir. 2007) .......................................................................................... 9, 21, 22

*Buckman Co. v. Plaintiffs' Legal Comm.,*
 531 U.S. 341 (2001).................................................................................................................... 5

*Camasta v. Jos. A. Bank Clothiers, Inc.,*
 761 F.3d 732 (7th Cir. 2014) ..................................................................................................... 9

*Cen. Reg'l Empl. Benefit Fund v. Cephalon, Inc.* ("*CREB I*"),
 No. 09-3418, 2009 WL 3245485 (D.N.J. Oct. 7, 2009) ....................................................... 2, 13

*Cen. Reg'l Empl. Benefit Fund v. Cephalon, Inc.* ("*CREB II*"),
 No. 13-7167, 2010 WL 1257790 (D.N.J. March 29, 2010)........................................... 2, 17, 19

*Conlee v. WMS Industries, Inc.,*
 No. 11-c-3503, 2012 WL 3042498 (N.D. Ill. July 25, 2012) ..................................................... 9

*County of Cook v. Philip Morris, Inc.,*
 353 Ill. App. 3d 55, 817 N.E. 2d 1039 (1st Dist. 2006)........................................................... 16

*Design Time, Inc. v. Synthetic Diamond Tech., Inc.,*
 674 F. Supp. 1564 (N.D. Ind. 1987) .......................................................................................... 8

*District 1199P Health & Welfare Plan v. Janssen, L.P,*
 No. 06-3044, 2008 WL 5413105 (D.N.J. Dec. 23, 2008)........................................................ 19

*Flayter v. Wisconsin Dep't of Corr.,*
 16 F. App'x 507 (7th Cir. 2001) ................................................................................................ 7

*Hess v. Kanoski & Associates,*
 668 F.3d 446 (7th Cir. 2012) ................................................................................................... 16

*In re Actimmune Mktg. Litig.,*
 614 F. Supp. 2d 1037 (N.D. Cal. 2009) ..................................................................................... 6

*In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab.,*
 MDL No. 01699, 2012 WL 3154957 (N.D. Cal. Aug. 2, 2012).............................................. 17

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action,*
 No. 2:06-cv-5774, 2009 WL 2043604 (D. N.J. July 10, 2009) ..................................... 6, 12, 16

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
  No. 2:06-cv-5774, 2010 WL 2346624 (D.N.J. June 9, 2010); ................................................. 19

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
  MDL No. 1703, 2007 WL 4287511 (N.D. Ill. Dec. 4, 2007) ................................................... 16

*In re Towers*,
  162 F.3d 952 (7th Cir. 1998) ................................................................................................. 19

*In re Yasmin & Yaz Mktg., Sales Practices & Prods. Liab. Litig.*,
  MDL No. 2100, 2010 WL 3119499 (S.D. Ill. Aug. 5, 2010) .................................................. 17

*Indeck N. Am. Power Fund, L.P. v. Norweb, PLC*,
  735 N.E.2d 649 (Ill. App. Ct. 2000) ..................................................................................... 21

*Indiana/Kentucky/Ohio/Regional Council of Carpenters Welfare*
  *Fund* v. *Cephalon, Inc.* ("*Carpenters*"),
  No. 09-3418, 2014 WL 2115498 (E.D. Pa. May 21, 2014) ...................................... 2, 11, 12, 13

*Ironworkers Local Union 68 And Participating Emp' Health And Welfare*
  *Funds v. AstraZeneca Pharm. LP*,
  634 F.3d 1352 (11th Cir. 2011) ............................................................................................ 19

*Ironworkers Local Union No. 68 and Participating Emp' Health & Welfare*
  *Funds, et al.,v. Astrazeneca Pharm. LP*,
  585 F. Supp. 2d 1339 (M.D. Fla 2008) ................................................................................. 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ........................................................................................................ 16

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................................. 19

*Merrilees v. Merrilees*,
  2013 IL App (1st) 121897 ..................................................................................................... 22

*People ex rel. Hartigan v. E&E Hauling, Inc.*,
  153 Ill. 2d 473 (1992) .......................................................................................................... 16

*Reuter v. MasterCard Int'l, Inc.*,
  397 Ill. App. 3d 915 (5th Dist. 2010) .................................................................................... 19

*Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*,
  No. 97-C-5696, 1997 WL 1106276 (N.D. Ill. Aug. 12, 1997) ................................................. 19

*Suburban 1, Inc. v. GHS Mortgage*, LLC,
  358 IL. App. 3d 769, 833 N.E.2d 18 (2005) .......................................................................... 22

*Travelers Indemnity Co. v. Cephalon, Inc.*, No. 14-4261 (*"Travelers II"*),
    2015 WL 4717929 (3d Cir. Aug. 10, 2015) ...................................................... 13, 17

*Travelers Indemnity Company v. Cephalon, Inc.* (*"Travelers I"*),
    32 F. Supp. 3d 538 (E.D. Pa. 2014) ...................................................... passim

*TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*,
    153 F.3d 822 (7th Cir. 1998) ...................................................... 19

*United Food & Commercial Workers Cent. Pa. & Reg. Health & Welfare*
    *Fund v. Amgen, Inc.*,
    400 Fed. Appx. 255 (9th Cir. 2010) ...................................................... 12

*Vicom, Inc. v. Harbridge Merchant Services, Inc.*,
    20 F.3d 771 (7th Cir. 1994) ...................................................... 7, 8

*Vodak v. City of Chicago*,
    2006 WL 2524141 (N.D. Ill. Aug. 20, 2006) ...................................................... 19

*Watt v. City of Highland Park*,
    No. 98-c-8123, 2001 WL 1090152 (N.D. Ill. Sept. 13, 2001) ...................................................... 8

*Wright v. Associated Ins. Cos.*,
    29 F.3d 1244 (7th Cir. 1994) ...................................................... 5

*Wright v. Carter*,
    No. 14 C 9109, 2015 WL 4978688 (N.D. Ill. Aug. 20, 2015) ...................................................... 22

**OTHER AUTHORITIES**

Chicago Municipal Code § 1-20-020 ...................................................... 16

Chicago Municipal Code § 1-21-010(a) ...................................................... 19

Chicago Municipal Code § 2-25-090 ...................................................... 16

Fed. R. Civ. P. 8(a) ...................................................... 7

**TREATISES**

*Use of Approved Drugs for Unlabeled Indications*,
    FDA Drug Bulletin, Vol. 12, No. 1, at 4-5 (Apr. 1982) ...................................................... 5

## I.  <u>INTRODUCTION</u>

The Court previously dismissed all claims against Defendants Teva Pharmaceuticals USA, Inc. ("Teva USA") and Cephalon, Inc. ("Cephalon") (collectively, the "Teva Defendants").  The Court held that despite the length of the City's pleading, it failed to link any particular allegedly false statement by the Teva Defendants to any particular Chicago physician who wrote a medically inappropriate or harmful prescription for which the City paid.

The City's Second Amended Complaint ("SAC") fails to cure these fundamental flaws. The City again attempts to use length to camouflage the absence of particular facts of actual fraud against the City—that is, facts showing that one of the Teva Defendants made a false statement that caused a Chicago physician to write a prescription that harmed the City.  It is now abundantly clear that, after three opportunities to plead a claim, the City simply cannot do so. All claims against the Teva Defendants fail—yet again—for several independent reasons.

First, the SAC is improperly prolix, repetitive, and confusing.  It now spans 325 pages and 850 paragraphs.  It repeats conclusory allegations over and over again.  It resorts to improper group pleading in hundreds of allegations, failing to state what each Defendant allegedly did or did not do.  It certainly does not contain a short and plain statement of the City's claims against either of the Teva Defendants as required by Rule 8(a).  Under controlling Seventh Circuit precedent, the SAC should be dismissed for this reason alone.

Second, the SAC again lacks the necessary facts to plead a claim.  All of the City's claims rest upon theories of fraud, but it has failed to plead any actual misrepresentations by the Teva Defendants to Chicago prescribers, much less any specific fraud with the detail required by Rule 9(b).  The City continues to rest its fraud-based claims on two theories:  (a) that Cephalon "sponsored" third-party activities and publications that made purportedly false statements about opioid medicines in general ("Unbranded Promotion Theory"); and (b) that Cephalon "falsely

1

promoted" two opioid medicines, Actiq and Fentora, for off-label uses ("Branded Promotion Theory"). Both theories fail under *Iqbal*, *Twombly*, and Rule 9(b).

The City's Unbranded Promotion Theory again tries to hold Cephalon responsible for lawful activities, including sponsoring certain third-party publications and continuing medical education ("CME") programs and participating in third-party trade organizations. Ignoring the Court's prior ruling, the City fails to show that Cephalon controlled what any third party said or did, and identifies no communications between Cephalon and any third party concerning such activities. Nor does the City identify any specific third-party statements purportedly attributable to Cephalon that were false, that influenced a prescriber to write an opioid medicine for which the City paid, or that led to an opioid prescription that did not benefit a patient.

Likewise, Plaintiffs' Branded Promotion Theory continues to rest entirely upon allegations of off-label promotion. Off-label prescribing, however, is *lawful*, and although off-label promotion may raise FDA regulatory issues, statements about uses that have not been specifically approved by the FDA are not inherently false. Indeed, recognizing the difference between off-label promotion and fraud, multiple courts have dismissed substantially similar complaints against the Teva Defendants because the very types of allegations raised by the City here do not state a fraud-based claim.[1] As in *Travelers, Carpenters,* and *CREB,* the City fails to identify a ***single*** false statement or omission that Cephalon made to the City, to one of the City's pharmacy benefit managers, or to ***any*** physician who wrote an Actiq or Fentora prescription for which the City paid. For example, the City alleges that, at unidentified times, unidentified sales

---

[1]     *See Travelers Indemnity Company v. Cephalon, Inc.* ("*Travelers I*"), 32 F. Supp. 3d 538 (E.D. Pa. 2014), *aff'd* No. 14-4261, 2015 WL 4717929 (3d Cir. Aug. 10, 2015) (*Travelers II*"); *Indiana/Kentucky/Ohio/Regional Council of Carpenters Welfare Fund* v. *Cephalon, Inc.* ("*Carpenters*"), No. 09-3418, 2014 WL 2115498, at *6 (E.D. Pa. May 21, 2014); *Cen. Reg'l Empl. Benefit Fund v. Cephalon, Inc.* ("*CREB II*"), No. 13-7167, 2010 WL 1257790, at *4 (D.N.J. March 29, 2010); *Cen. Reg'l Empl. Benefit Fund v. Cephalon, Inc.* ("*CREB I*"), No. 09-3418, 2009 WL 3245485 (D.N.J. Oct. 7, 2009).

representatives did not raise the risk of addiction with unidentified Chicago prescribers who are obligated, by law, to know the labels for the Actiq and Fentora medicines they prescribed—labels which make clear that they are pain medicines with "abuse" potential and carry the "risk of addiction even under appropriate medical use." (Actiq Label, Ex. A, at page 1 & ¶ 9.2; Fentora Label, Ex. B, at page 1 & ¶ 9.2). This is not fraud.

Third, the City again has failed to plead causation, which is both a required element of its claims and necessary for Article III standing. Despite adding a few conclusory allegations about Chicago prescribers, the City still fails to identify a single false statement or omission that Cephalon made to a single Chicago prescriber who wrote an Actiq or Fentora prescription; the City still fails to plead facts showing that Cephalon *caused any* Chicago prescribing doctor to deviate from her medical judgment and write *any* of the prescriptions at issue; and the City still fails to link any statement or omission made by Cephalon to a single prescription that was inappropriate for and did not benefit the Chicago insured patient who received it.

Fourth, the City has not alleged that it has been injured by anything that Cephalon said or did, as a required element of certain claims and for Article III standing. Because off-label prescriptions often are beneficial to patients and thus are both common and legal, mere payment for off-label prescriptions, without more, is not a cognizable legal injury. Here, although the City alleges that it paid for off-label prescriptions of Actiq and Fentora, the City fails to allege that Actiq or Fentora was ineffective in treating the pain of any Chicago insured patient; that any Chicago insured patient suffered any harm from any Actiq or Fentora prescription for which the City paid; or that the City had to pay for any treatment or emergency-room costs associated with any Actiq or Fentora prescription. Because the City has not identified any injury that it or

anyone else in Chicago suffered from any Actiq or Fentora prescription, the SAC must be dismissed.

Fifth, while the City has dropped its claim that all defendants conspired together, it now contends that Cephalon has conspired with two third-party organizations to deceptively market opioids. These conspiracy assertions fail, too. The City has not alleged any facts showing that Cephalon reached an agreement with any third-party group to defraud the City, much less the details of any such purported agreement. Furthermore, because the City has not asserted any claim against any third-party organization, its conspiracy claim fails under Illinois law.

Lastly, all claims brought against Teva USA must be dismissed for the additional reason that the City fails to plead any independent acts of wrongdoing against it, which only became affiliated with Cephalon in October 2011.

## II.   <u>BACKGROUND</u>

Cephalon is a pharmaceutical company that manufactures and sells innovative prescription medicines, including Actiq and Fentora. (SAC ¶¶ 32, 34). The City contends that, since October 2011, Teva USA has sold Cephalon-branded products. (*Id.* at ¶ 34). The City also makes the conclusory statement that Teva USA sells generic opioids, but asserts no facts about Teva USA, including no allegations about its marketing of any opioid. (*Id.* at ¶ 37).

### A.   <u>Cephalon's Opioid Medicines.</u>

Actiq is a "powerful" rapid-onset opioid with "extreme potency." (*Id.* ¶¶ 303-304, 307). As its label makes clear, Actiq was approved by the FDA for the management of breakthrough cancer pain in patients with malignant cancer who are opioid-tolerant. (*Id.* ¶ 305). The active ingredient in Actiq is fentanyl, a Schedule II controlled substance, and Actiq's product label— which includes a "black box" warning, the "most serious medication warning required by the

FDA"—specifies the potential risks associated with its use. (*Id.* ¶¶ 303-305, 310). A true and correct copy of the Actiq label is attached hereto as Ex. A.[2]

In October 2006, following FDA approval, Cephalon started promoting Fentora. (*Id.* ¶ 309-311). Like Actiq, Fentora is a powerful prescription opioid approved for the "treatment of breakthrough cancer pain in patients with cancer who are already tolerant to around the clock opioid therapy for their underlying persistent cancer pain." (*Id.* ¶¶ 309-310). Fentora's label expressly states the conditions for which it is approved by the FDA and, like Actiq's label, includes a "strong" and "detailed" black box warning and lists the potential risks associated with its use. (*Id.* ¶ 310). A true and correct copy of the Fentora label is attached hereto as Ex. B.

### B. Off-Label Prescribing Is Entirely Legal And Off-Label Promotion Is Not The Same As Fraud.

"Off-label" prescribing refers to the well-established and entirely proper practice of medical professionals prescribing a medicine for a purpose different than that specifically approved by the FDA. *See, e.g., Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 n.5 (2001) (recognizing that off-label prescribing and use "often is essential to giving patients optimal medical care"); *Use of Approved Drugs for Unlabeled Indications*, FDA Drug Bulletin, Vol. 12, No. 1, at 4-5 (Apr. 1982) ("accepted medical practice often includes drug use that is not reflected in approved drug labeling"). Thus, in exercising their independent medical judgment, doctors are free to prescribe a medicine—including Actiq or Fentora—to treat *any* condition or symptom, regardless of whether the condition or symptom is covered by the FDA-approved labeling. *See Carpenters*, 2014 WL 2115498, at *7 ("it is not illegal for physicians, exercising their independent medical judgment, to prescribe Fentora for off-label use").

---

[2] Because the product labels are quoted by the City and are central to its claims (*see id.* ¶¶ 305, 310), they may properly be considered by the Court in ruling on the motion to dismiss. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

Off-label promotion is different from off-label prescribing, and refers to the promotion of a drug by a pharmaceutical company for a use not approved by the FDA. Off-label promotion may be subject to federal regulatory action by the FDA and has been the subject of enforcement by the U.S. Department of Justice, but there is nothing intrinsically untruthful or misleading about off-label promotion. *See, e.g.*, *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *10 (D. N.J. July 10, 2009) ("off-label promotion of a pharmaceutical product in violation of the FDCA simply does not give rise to fraud-based rights of action"); *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1051 n.6 (N.D. Cal. 2009) ("off-label marketing of an approved drug is itself not inherently fraudulent").

### C. The Court Previously Dismissed All Of The City's Claims.

In its comprehensive 34-page opinion dismissing the City's last complaint, the Court held that the City failed to plead a plausible claim against any of the Teva Defendants. First, the Court reasoned that the City failed to identify any specific misrepresentations made by Cephalon, much less "when, how, and to whom in Chicago the Cephalon entities made any alleged misrepresentations or distributed the contested materials." (Op., at 23). Second, the Court reasoned that the City failed to "connect the alleged misrepresentations specifically to Chicago doctors or consumers." (*Id.* at 24). Indeed, the City failed to allege the "identities of doctors who, *as a result of one or more of defendants' alleged misrepresentations*, prescribed opioids for chronic pain to a City-insured patient or worker's compensation recipient whose claim for that prescription the City paid." (*Id.* at 32 (emphasis added)). Lastly, the City failed to allege any "details" about any Cephalon prescriptions for which the City paid and, thus, the City failed to allege "with particularity that it was harmed by defendants' actions." (*Id.* at 32-33).

6

### D.    The City Has Failed To Cure The Defects That The Court Identified.

The SAC now spans 325 pages and more than 850 paragraphs.  But again, most of the City's allegations against Cephalon, despite sounding in fraud, are focused on alleged off-label promotion.  (SAC ¶¶ 298-389).  The City also alleges that Cephalon worked with third-party groups to misrepresent the efficacy and safety of opioids in general.  (*Id.* ¶ 838).  While adding a few new allegations about anonymous Chicago doctors and nurses who allegedly had contact with Cephalon sales representatives (*id.* ¶¶ 386-388), the City still does not identify anything false or misleading that Cephalon said to any Chicago prescriber; still does not allege facts showing that any statements by Cephalon caused a Chicago prescriber to write a prescription; and still does not identify any prescriptions written by such prescribers for which the City paid.

### III.    LEGAL ARGUMENT

### A.    The City's Complaint Should Be Dismissed Because It Is Improperly Prolix And Confusing.

Under Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Under well-settled Seventh Circuit law, a "prolix and confusing complaint" fails to satisfy Rule 8(a) and "should be dismissed because it makes it difficult for the defendant to file a responsive pleading and for the court to conduct orderly litigation." *Flayter v. Wisconsin Dep't of Corr.*, 16 F. App'x 507, 508-509 (7th Cir. 2001) (holding that 116-page complaint, with 242 separate paragraphs and "tedious and difficult to follow detail," violated Rule 8(a)(2)); *see also Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 776 (7th Cir. 1994) (119-page, 385-paragraph RICO complaint was "confusing, redundant, and seemingly interminable" and "violated" Rule 8(a)).

Consistent with this principle, the Seventh Circuit and federal courts in this Circuit have repeatedly held that complaints lumping multiple defendants together without differentiation

should be dismissed because a complaint must allege sufficient facts about ***each*** defendant to state a plausible claim, especially if the claim sounds in fraud. *See, e.g.*, *Vicom*, 20 F.3d at 778 ("We previously have rejected complaints that have 'lumped together' multiple defendants"); *Beaman v. Souk*, No. 10-cv-1019, 2011 WL 832506, at *5, *15 (C.D. Ill. Mar. 3, 2011) (group pleading violates Rule 8); *Watt v. City of Highland Park*, No. 98-c-8123, 2001 WL 1090152, at *2-3 (N.D. Ill. Sept. 13, 2001) (same); *Design Time, Inc. v. Synthetic Diamond Tech., Inc.*, 674 F. Supp. 1564, 1569 (N.D. Ind. 1987) ("A complaint that attributes misrepresentations to all defendants, 'lumped' together for pleading purposes, generally is insufficient.").

Here, the SAC violates Rule 8 for multiple reasons. The SAC spans 325 pages and 850 paragraphs; its length alone renders it needlessly prolix. Moreover, Defendants are 16 companies in five unrelated corporate structures—each manufacturing and selling opioid drugs in competition with one another for treatment of various conditions under different FDA-approved product labels. The City has dropped its "inter-defendant" conspiracy claim, yet the SAC persists in including hundreds of paragraphs that improperly lump the Teva Defendants with each other and every other Defendant, without specifying what each did or differentiating between companies, drugs, labels, or relevant time period, (SAC ¶¶ 85-262, 633-850).

The SAC is also redundant and confusing. Multiple sections are devoted to the same issues—which are scattered throughout the SAC and its exhibits, rather than being presented succinctly as to each Defendant. It is filled with legal conclusions. To the extent it even purports to allege facts, the SAC frequently fails to specify exactly what the Teva Defendants are supposed to have done or differentiate between them and the many other unrelated Defendants. In short, the SAC is an improper "puzzle pleading" that requires Defendants and the Court to sift through hundreds of pages to try to piece together how the City contends it supposedly was

harmed because of some statement or omission by the Teva Defendants. It should be dismissed. *See, e.g.*, *Conlee v. WMS Indus., Inc.*, No. 11-c-3503, 2012 WL 3042498, at *4 (N.D. Ill. July 25, 2012) (dismissing "puzzle pleading" complaint because it fails to concisely identify statements by each defendant and explain facts that make them false).

### B. All Claims Fail Because The City Has Not Pled Any Misrepresentation Or Omission By Any Teva Defendant, Much Less Any That Satisfy Rule 9(b).

All ten of the claims against the Teva Defendants rest upon the premise that Cephalon made fraudulent misrepresentations and omissions regarding the safety and efficacy of: (a) opioids in general; and (b) Actiq and Fentora in particular. (SAC ¶¶ 742-747, 755, 765-69; 776-77, 786-87, 800-802, 820, 829-31, 838). As the Court recognized before, it is not enough to allege misrepresentations and omissions in general; the City must connect particular alleged misrepresentations to the particular prescribers who wrote the prescriptions at issue. (Op., at 24).

Moreover, all of the City's claims are predicated on fraud, which Plaintiffs repeatedly refer to as the "Fraudulent Scheme." (SAC ¶¶ 678, page 247; *see also id.* at page 248, 279 (referring to Defendants' conduct as "Fraudulent and Deceptive Marketing of Opioids"); *id.* ¶¶ 129, 222, 708, 731, 736 (referring to conduct as "fraudulent")). Thus, all of the City's claims are subject to Rule 9(b)'s heightened pleading standards. *See, e.g.*, *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736-37 (7th Cir. 2014); *Borsellino v Goldman Sachs Grp. Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Yet, the City has failed to satisfy *Iqbal*, *Twombly*, or Rule 9(b).

### 1. The City's Unbranded Promotion Theory Fails As A Matter Of Law.

The City's Unbranded Promotion Theory continues to rest entirely upon lawful conduct that is not alleged to have any connection to the prescriptions paid for by the City. In section D, labeled "Why Defendant's Marketing Messages Are Misleading And Unfair" (SAC ¶¶ 214-259), the City continues to rely upon the ***very same*** Cephalon statements that the Court previously

9

found insufficient as a matter of law to state a claim. The City lists allegedly false statements by each Defendant in chart form, but, as shown in Appendix A (attached hereto), those charts contain **no new** statements and one chart does not allege anything about Cephalon at all.

For example, although these charts again allege that Cephalon supposedly "sponsored" and "facilitated" three independent third-party publications about opioids and one CME where a doctor purportedly stated that opioids can improve quality of life and are more effective in treating breakthrough pain than aspirin (SAC ¶¶ 221(e)-(h), 229(f)-(g), 238(b), 240(b), 248(b), 252(d)),[3] there is nothing unlawful or fraudulent about Cephalon's activities. The City yet again fails to allege any facts to show how Cephalon supposedly "controlled" or can be held responsible for these independent publications and activities; how anything said in or during them was false; or how any allegedly false statement supposedly influenced any Chicago doctor who wrote any of the opioid prescriptions for which the City seeks recovery.

In a failed attempt to address the Court's motion to dismiss ruling, the City has added a **single** vague and conclusory reference in several charts that purports to summarize what sales representatives from Cephalon purportedly told Chicago prescribers. The City asserts in sweeping fashion that **unidentified** "Cephalon sales representatives" at **unidentified** times and **unidentified** places told **unidentified** Chicago prescribers that "opioids would increase patients' ability to function and improve their quality of life," that "opioids were safe, even at high doses," and that "NSAIDs were more toxic than Cephalon's opioids," and failed to discuss "addiction risks related to Cephalon's drugs." (SAC, at ¶¶ 221(h), 229(h), 248(d), 252(e)). But the City does not identify any facts to support these conclusions. The City does not identify what

---

[3]     The three third-party publications are entitled *Opioid Medications and REMS: A Patient's Guide*, for which no publisher is identified; *Treatment Options: A Guide For People Living With Pain*, which was sponsored by the American Pain Foundation ("APF"); and *Responsible Opioid Prescribing*, which was sponsored by the Federation of State Medical Boards ("FSMB"). (SAC ¶¶ 344-358).

specifically was said, when, or by whom. Nor does the City identify a single prescriber to whom any such statements or omissions purportedly were said, much less why they are false, particularly when each doctor was obligated to be aware of the risks—clearly stated in the product label—associated with prescribing an opioid. *See, e.g., Carpenters,* 2014 WL 2115498, at *6 ("physician-prescribers are presumed to have knowledge of a drug label's contents"). The City's conclusory allegations simply do not state a claim under *Iqbal*, *Twombly*, or Rule 9(b).

The City also makes additional allegations about two third-party opioid publications "sponsored" by Cephalon (SAC ¶¶ 344-358), but the Court previously dismissed claims based upon these publications because the City failed to allege facts showing that Cephalon had "editorial control" over them. (Op., at 23). Rather than try to cure this fatal flaw, the City resorts to naked conclusions that merely parrot the Court's ruling and are insufficient under *Iqbal* and *Twombly*. (SAC ¶ 341 (now alleging that Cephalon "exercised editorial control")). The City still does not allege a single ***fact*** to support this conclusory assertion, or even identify a single communication between Cephalon and any third-party organization regarding these publications.

Moreover, the City continues to fail to link these publications (or any other publications "sponsored" by Cephalon) to any prescriptions for which it paid. For instance, the City contends that Cephalon committed fraud because *Treatment Options: A Guide for People Living with Pain* (2007) purportedly "taught patients that 'opioid agreements' between doctors and patients can ensure that you take the opioid as prescribed." (SAC ¶ 238(b)). But the City does not identify why this statement is false. It does not identify whether any Chicago prescriber ever saw this particular statement in this document. It does not identify whether any opioid prescription was ever written because of this statement. It does not identify whether any such prescription was paid for by the City or caused any harm to any patient. Because the City has not pled—and

11

clearly cannot plead—these fundamental facts or that Cephalon somehow controlled the content of publications that were written and distributed by third parties, all claims based upon the City's Unbranded Promotion Theory should be dismissed.

### 2. The City's Branded Promotion Theory Fails As A Matter Of Law.

The City also alleges that Cephalon engaged in off-label promotion regarding Actiq and Fentora. (SAC ¶¶ 301-338). But it is well-settled that off-label promotion of pharmaceutical medicines cannot form the basis for fraud-based claims absent well-pled allegations that the statements that allegedly caused the plaintiff's injury were actually false or misleading.[4]

Applying this rule, numerous courts have dismissed complaints based upon nearly identical allegations against Cephalon for failing to plead any misrepresentation, omission, or other fraudulent conduct. For instance, in *Carpenters*, a third-party payor asserted fraud-based claims against Cephalon to recover payments for supposedly fraudulently-marketed prescriptions of Fentora. 2014 WL 2115498, at *1, 3. The Court dismissed the "voluminous" complaint, which included many of the same allegations here. The Court reasoned that although plaintiff "allege[d] a sweeping" campaign of "off-label marketing" regarding the use of Fentora for non-cancer pain, plaintiff failed to allege anything fraudulent that Cephalon did or said. *Id.* at *5. The Court stressed that statements that Fentora "'has been shown to be effective' for non-cancer breakthrough pain" were not false because they "neither contradict[] nor conceal[] the limits of the FDA's approval of the drug" and because "physician-prescribers are presumed to have knowledge of a drug label's contents [which state the FDA-approved indications and FDA-required risks]." *Id.* at *6. The Court further reasoned that the plaintiff failed to identify when any specific statements were made, to whom they were made, and how they were linked to any

---

[4]      *See, e.g., United Food & Commercial Workers Cent. Pa. & Reg. Health & Welfare Fund v. Amgen, Inc.*, 400 Fed. Appx. 255, 257 (9th Cir. 2010); *In re Schering-Plough Corp.*, 2009 WL 2043604, at *10.

of the prescriptions at issue. *Id*. at *6-7 & n.3; *see also CREB I*, 2009 WL 3245485, at *4 (dismissing fraud-based claims brought against Cephalon because "[m]erely alleging that Cephalon marketed the drugs at issue for off-label purposes does not state a claim for fraud").

Similarly, in *Travelers,* the Third Circuit Court of Appeals recently affirmed the dismissal of fraud-based claims against Cephalon by several insurance companies seeking to recover payments for off-label prescriptions of Actiq and Fentora. *Travelers II,* 2015 WL 4717929 (3d Cir. Aug. 10, 2015). The insurance companies based their claims on many of the same statements and materials that the City does here. *Travelers I,* 32 F. Supp. at 551-552 (description of allegations). The Third Circuit reasoned that "Plaintiffs' argument" boiled down to the flawed "assertion that Cephalon's off-label promotion of Actiq and Fentora was inherently fraudulent and created a private cause of action." *Travelers II*, 2015 WL 4717929, at *2. The Third Circuit further reasoned that the plaintiffs failed to "identify any specific fraudulent statements, omissions, or misrepresentations that were made to doctors who prescribed Actiq and Fentora" or the "particular facts surrounding the alleged fraud." *Id.* Nor could the plaintiffs plead such fraud because, as the district court recognized, doctors are "sophisticated consumers who themselves have an affirmative duty to be familiar" with the labels of the medicines they prescribe. *Travelers I*, 32 F. Supp. 3d at 553.

Like its prior complaint and like the failed complaints in *Carpenters*, *Travelers*, and *CREB,* the City's SAC again ignores the distinction between off-label promotion and fraud. In the section directed to Cephalon under the heading "Cephalon's Deceptive Direct Marketing" (SAC ¶¶ 301-339), the City again relies upon nothing more than conclusory allegations of wrongdoing and allegations of off-label promotion:

- "Chief among Cephalon's direct marketing efforts was its campaign to deceptively promote its opioids for off-label uses." (*Id.* ¶ 302).

13

- Cephalon "actively promoted Actiq for chronic non-cancer pain—an unapproved, off-label use." (*Id.* ¶ 307).

- "Cephalon's off-label marketing continued notwithstanding the regulatory scrutiny." (*Id.* ¶ 316); and

- "Cephalon continued to use its general pain sales force to promote Fentora off-label to pain specialists as an upgrade over Actiq for the treatment of non-cancer breakthrough pain." (*Id.* ¶ 319).

(*See also e.g.,* SAC ¶ 36, 117, 298-301, 322-327, 330, 332, 340-341, 348, 376). These

allegations do not state a fraud-based claim under *Iqbal*, *Twombly*, or Rule 9(b).

In fact, the City continues to rely upon many of the same allegations of non-fraudulent

promotional conduct that this Court rejected in its prior opinion—including that Cephalon used

speaker programs to promote Actiq and Fentora at scheduled events with prescribers (*id.* ¶¶ 379-

380); that Cephalon sponsored CMEs (more than five years ago) where speakers talked about the

use of "rapid onset opioids" for breakthrough pain (*id.* ¶¶ 366-372); that Cephalon sought to

expand the label for Fentora (*id.* ¶¶ 317-318); that Cephalon's sales representatives detailed pain

specialists (*id.* ¶¶ 322-327); and that Cephalon analyzed the market share of Fentora among

certain patients (*id.* ¶¶ 329-330). Just as these allegations were insufficient to state a claim in the

FAC, they are insufficient here, too.

Once again, the City fails to allege a ***single relevant*** supposedly-false statement or

omission by Cephalon—that is, one made to the City, its pharmacy benefit managers, or any

Actiq or Fentora prescriber that is somehow linked to any prescription for which the City paid

and that caused any harm. Although the City contends that unidentified sales representatives did

not discuss "addiction" and other adverse side effects with a few unidentified Chicago

prescribers at unidentified times (SAC ¶¶ 386(a), (c), (d), (g), (h)), this purportedly omitted

information—that Schedule II opioids can be addictive—was clearly stated in the labels for

14

Actiq and Fentora. (SAC ¶¶ 305, 310). The City also acknowledges that Cephalon itself sent letters to doctors explaining the "serious adverse events" that can accompany such prescriptions. (*Id.* ¶ 314). Moreover, the City does not even attempt to identify any details about any alleged omissions—such as what specifically was omitted, when, where, by whom, whether any doctor wrote a prescription based upon that omission, or whether the City paid for the prescription.

The City also makes new contentions about sales training documents (*id.* ¶¶ 333-334), speaker training documents (*id.* ¶¶ 336-338), one guidebook (*id.* ¶ 339), and three CMEs regarding "breakthrough pain" that did not mention Actiq of Fentora by name (*id.* ¶¶ 367-375). But as in *Carpenters*, *Travelers*, and *CREB*, the City does not identify a single false statement or omission that Cephalon made in connection with any of those activities. It does not connect any statement or activity to any prescription for which the City paid. And while the City contends that two Chicago prescribers attended two Cephalon-sponsored CMEs (¶¶ 386(e)-(f)), it does not identify when they did so, what they heard, whether any statement made was false, or whether any such statement impacted their decision to write any prescription.

Because the City has failed to plead any allegedly false statements or omissions connected to its reimbursement of prescriptions, much less with the particularity required by Rule 9(b), all claims against the Teva Defendants should be dismissed.

### C.     All Claims Fail Because The City Has Not Pled Any Facts To Show That Any Teva Defendant Caused The City Any Harm.

As the SAC concedes, the City must plead facts showing that an alleged misrepresentation made by one of the Teva Defendants caused a Chicago physician to write an opioid prescription for which the City reimbursed. (SAC ¶¶ 749-751 (Count I); 759-761 (Count II); ¶¶ 769-771 (Count III); ¶¶ 776, 778 (Count IV); *id.* ¶¶ 788, 797 (Count V); *id.* ¶¶ 807, 814 (Count VI); *id.* ¶¶ 822, 825 (Count VII); *id.* ¶¶ 829, 834 (Count VIII); *id.* ¶¶ 837, 845-46 (Count

15

IX), *id.* ¶ 849 (Count X)). This causal nexus is also required by Article III and is an element of the City's claims.[5] (Op., at 32 (dismissing claims under Code §§ 1-20-20, 1-21-010, 1-21-020, 1-22-020, and 720 ILCS 5/17-10.5 for lack of causation)). Indeed, both the Supreme Court and Illinois appellate courts have made clear that causation and injury are necessary elements in every tort or statutory claim. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014) ("we generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute"); *County of Cook v. Philip Morris, Inc.*, 353 Ill. App. 3d 55, 60, 817 N.E. 2d 1039, 1043 (1st Dist. 2006) ("[p]roof of a causal relationship between a defendant's action and a plaintiff's injury is essential in every tort" and statutory claim).

Notwithstanding that the Court dismissed the FAC in part for failure to plead causation (Op., at 32); the SAC remains devoid of any factual allegations to establish this element:

- It does not allege that Cephalon had any communications with the City or that the City directly relied on any statements by Cephalon;

- It does not allege that Cephalon had any communications with any pharmacy benefit managers for the City's health care plans or that those managers relied on any statements by Cephalon in deciding whether to pay for opioid prescriptions;

- It does not describe with particularity a single interaction between Cephalon and a Chicago doctor who wrote an Actiq or Fentora prescription—much less describe with particularity even a single false statement or omission that Cephalon made to a prescribing doctor who wrote a prescription for which the City paid; and

- It does not allege any facts to show that even a single doctor abandoned his or her medical obligation and relied upon something false that Cephalon supposedly said in connection with a single prescription for which the City paid.

---

[5]     *See, e.g.*, *In re Schering Plough Corp.*, 678 F.3d 235, 247 (3d Cir. 2012) (dismissing claim brought by third-party payor under Article III for lack of causal nexus); *Hess v. Kanoski & Associates*, 668 F.3d 446, 456 (7th Cir. 2012) (causation is element of civil conspiracy claim); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, MDL No. 1703, 2007 WL 4287511, at *7 (N.D. Ill. Dec. 4, 2007) (requiring causation for unjust enrichment claim); *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 492 (1992) (requiring Attorney General to demonstrate "some connection" between alleged misrepresentation and injury under ICFA); Chicago Municipal Code ("Code") § 2-25-090 (deferring to interpretation of ICFA, which requires causation); Code § 1-20-020 (requiring person to "cause[] the City or its agents to incur costs . . . related to such person's violation" of law).

16

As a matter of law, because the City continues to fail to allege facts showing that it, its agents, or any of the doctors who prescribed Actiq or Fentora relied upon any false statements by Cephalon, all claims should be dismissed for lack of causation.

In the SAC, the City alleges that it conducted interviews with eight unidentified medical providers that purportedly prescribed Cephalon's opioids (SAC ¶ 386), but the City does not contend that any of these doctors actually wrote the Actiq or Fentora prescriptions for which the City paid.[6]  Notably, the City does not list **any** of the prescribers who purportedly received supposedly false statements from Cephalon as doctors who wrote the Actiq and Fentora prescriptions for which the City paid.  (*Compare* SAC ¶ 386 *with* SAC ¶ 388).

More fundamentally, the City does not identify any facts to show that these providers abandoned their independent medical judgment and wrote an Actiq or Fentora prescription **because of** any allegedly false statement or omission.  Such causal statements are conspicuously absent from the City's summary of the prescriber interviews.  This is fatal to the City's claims because, as the Third Circuit has made clear, "[a]llegations that physicians attended presentations and interacted with Cephalon sales representatives do not sufficiently demonstrate that these interactions **caused the physicians to write the prescriptions at issue**."  *Travelers,* 2015 WL 4717929, at *3 (emphasis added); *see also CREB II*, 2010 WL 1257790, at *4 (dismissing claims against Cephalon because plaintiffs did "not plead a single instance in which they, themselves, or any of their prescribing doctors received a misrepresentation of fact from Defendants and relied upon that misrepresentation in deciding to prescribe one of the Subject Drugs to Plaintiffs")).[7]

---

[6]     The City identifies one prescriber who was visited by sales representatives from all Defendants and purportedly wrote 39 opioid prescriptions (SAC ¶ 386(h)), but the City does not allege that any of those prescriptions was for Actiq or Fentora, much less that Cephalon caused any of those prescriptions to be written.

[7]     *See also In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab.*, MDL No. 01699, 2012 WL 3154957, at *8-9 (N.D. Cal. Aug. 2, 2012) (applying rule); *In re Yasmin & Yaz Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, 2010 WL 3119499, at *7-9 (S.D. Ill. Aug. 5, 2010) (applying rule).

As it did before, the City makes a few cursory assertions to try to link Cephalon to Chicago prescribers, but still fails to connect anything false that Cephalon supposedly said to any Chicago physician who wrote any of the prescriptions at issue:

- The City again alleges that Cephalon used Chicago prescribers as speakers (SAC ¶¶ 377-379), but does not identify any false statement that Cephalon made to one of those speakers, does not identify any specific false statement made by one of those speakers, and does not identify any Actiq or Fentora prescription connected to any such false statement.

- The City continues to allege that unidentified Cephalon sales representatives met with unidentified Chicago prescribers more than nine years ago (in 2006) during a dinner, an office meeting, and other unidentified events (SAC ¶¶ 379-380), but the City fails to allege what was said during any event, whether any statement was false, or whether any prescriber wrote any prescription because of such a statement.

- The City relies upon a survey of ten unidentified Midwestern physicians that were detailed by unidentified sales representatives (SAC ¶ 385), but these physicians have no apparent connection to Chicago and the City does link anything said to these physicians to any prescriptions written in Chicago or for which the City paid.

- The City alleges that Cephalon sponsored three independent CME programs that were supposedly "available" to "and intended to reach Chicago physicians" (SAC ¶¶ 370-371, 373; *id.* at ¶¶ 366-375), but fails to identify a single Chicago attendee who wrote a prescription that the City paid for.  And for those two Chicago attendees that the City does identify, the City does not allege that they prescribed Actiq or Fentora ***after*** they attended the CME, much less ***as a result*** of something said at the CME, as opposed to other factors, such as the physicians' experience or independent judgment.

Because the City still fails to connect anything that Cephalon allegedly said or did with the prescriptions for which it reimbursed, all claims fail as a matter of law.

Even more telling, the City acknowledges that it is still paying for fraudulently-induced prescriptions of Actiq or Fentora today, rather than refusing to reimburse them.  (SAC ¶ 794, 813 (alleging that the City has "paid and continues to pay" claims for medically inappropriate prescriptions of Actiq)).  As a matter of law, the Teva Defendants could not have defrauded the City when, with full knowledge of that alleged fraud, the City continues to reimburse for off-label

prescriptions.  *See, e.g., Ironworkers Local Union No. 68 and Participating Emp' Health & Welfare Funds, et al. v. Astrazeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1345 (M.D. Fla. 2008).

### D.    All Claims Against The Teva Defendants Fail for Lack of Injury.

As alleged and as an element of many of its claims, the City also must assert facts to show that it suffered some form of harm.  (SAC ¶ 751 (Count I), ¶ 761 (Count II), ¶ 771 (Count III), ¶¶ 781-82 (Count IV), ¶¶ 795, 797 (Count V), ¶¶ 814, 816 (Count VI), ¶ 825 (Count VII), ¶ 834 (Count VIII), ¶ 845 (Count IX), ¶ 850 (Count X)).[8]  Moreover, to have Article III standing, the City must show that it suffered an "injury-in-fact." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992); *see also Travelers I,* 32 F. Supp. 3d at 546-547.

Courts have repeatedly recognized that merely reimbursing for off-label prescriptions is not a cognizable injury, in the absence of facts showing that the prescriptions were ineffective for or caused harm to the patients who received them.[9]  For this reason, courts have dismissed fraud-based claims against Cephalon for failure to plead facts showing that the patients who received the Actiq or Fentora prescriptions at issue somehow did not benefit from them or were harmed. *See, e.g.*, *Travelers I*, 32 F. Supp. 3d at 546-547; *CREB II*, 2010 WL 1257790 at *3.

Here, in the section entitled "Examples of Opioid-Related Claims Paid by the City's Health Plans and Workers' Compensation Program" (SAC ¶¶ 707-709), the City identifies approximately eight patients who were prescribed opioids for off-label conditions.  But only two

---

[8]     *See, e.g., In re Towers*, 162 F.3d 952, 955 (7th Cir. 1998) ("[R]estitution is 'compensation for actual pecuniary loss' from the perspective of the victim . . . "); *TRW Title Ins. Co. v. Sec. Union Title Ins. Co*., 153 F.3d 822, 828 (7th Cir. 1998) (defendant must be enriched at plaintiff's expense to support unjust enrichment claim); *Vodak v. City of Chicago*, 2006 WL 2524141, at *3 (N.D. Ill. Aug. 20, 2006) (injury is element of claim under Code § 8-20-020); *Steadfast Ins. Co. v. Auto Mktg. Network, Inc*., No. 97-C-5696, 1997 WL 1106276, at *16 (N.D. Ill. Aug. 12, 1997) (injury is an element of a claim under 720 ILCS 5/17-10.5); *Reuter v. MasterCard Int'l, Inc*., 397 Ill. App. 3d 915, 927 (5th Dist. 2010) (injury is element of civil conspiracy claim); Code § 1-21-010(a) (authorizing "up to three times the amount of damages which the city sustains because of the person's violation of this section").

[9]     *See, e.g., Ironworkers Local Union 68 And Participating Emp' Health And Welfare Funds v. AstraZeneca Pharm. LP*, 634 F.3d 1352, 1360 (11th Cir. 2011); *Travelers I*, 32 F. Supp. 3d at 546-547 ; *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2010 WL 2346624, *7-8 (D.N.J. June 9, 2010); *CREB II*., 2010 WL 1257790, at *3; *District 1199P Health & Welfare Plan v. Janssen, L.P*, No. 06-3044, 2008 WL 5413105, at *11-13 (D.N.J. Dec. 23, 2008).

of these patients were prescribed Actiq or Fentora (*id.* ¶¶ 708(b), 709(h)), and there are no allegations to suggest that Actiq or Fentora was not effective in alleviating their pain. Nor are there any allegations that the medicines caused them harm. In fact, there are virtually no facts about any of these Actiq or Fentora prescriptions—including why Actiq or Fentora was prescribed, whether it helped or harmed the unidentified patient, whether it was effective in treating his or her pain, or whether the City authorized the prescription even though it was to treat some off-label condition.

Instead, the City's theory of harm as to Cephalon's medicines relies entirely on the same conclusory assertions from the previously-dismissed FAC—that Actiq and Fentora were "not safe, effective or allowed" to treat chronic non-cancer pain because they were not approved by the FDA for such uses. (SAC ¶ 302). But "off-label" use often forms the appropriate standard of care, and just because a medicine has not been FDA approved to treat a particular condition does not make it "ineffective" or "unsafe" for a patient with that condition. *Travelers I*, 32 F. Supp. 3d at 546-547 (rejecting allegations that Actiq and Fentora are "unsafe" or "ineffective" for off-label use because "absence of data or evidence affirmatively proving that a drug is safe and effective in treating a particular condition, without more, does not support the conclusion that the drug is actually ineffective or unsafe for that use"). Indeed, the City's conclusory label that Actiq and Fentora were "ineffective" for treating such pain is contradicted by the FDA warnings regarding their potency and the City's description of these medicines as "powerful," "strong," and "potent." (SAC ¶¶ 303-304, 306, 309); *see also Travelers I*, 32 F. Supp. 3d at 548.

Yet again, the City has not shown injury because it has not alleged facts about ***any*** of the prescriptions at issue. (Op., at 33). The City alleges that the less than 300 Actiq and Fentora prescriptions for which it paid over a 10-year period purportedly were written for patients "who

did not have a documented cancer diagnosis." (SAC ¶ 388). But the City does not connect any of those prescriptions to any allegedly false statement by Cephalon. Nor does the City allege any facts to show that any patients who received those prescriptions either did not experience effective pain relief or suffered some harm. This is fatal to the City's claims.

As it did before, the City also complains about alleged payments that it made for treatment for opioid addiction and opioid-related emergency room visits (SAC ¶¶ 713-714, 723-725), but does nothing to link any such payments or other harm to Actiq or Fentora prescriptions. Indeed, the City identifies two opioid addicts with whom it allegedly spoke (*id.* ¶¶ 720-721), but neither of those patients was prescribed Actiq or Fentora and the City does not link their circumstances to any false statement by Cephalon. The City's claims fail for lack of injury.

### E.  The Conspiracy Claims Against Cephalon Are Devoid of Facts.

The City has changed its conspiracy theory and now contends that Cephalon conspired not with other Defendants, but with APF and FSMB to fraudulently "promote the risks, benefits, and superiority of opioid therapy." (SAC ¶ 838). This new theory fails, too.

As the Court previously recognized, a claim for civil conspiracy "is not an independent tort." (Op., at 33 (quoting *Indeck N. Am. Power Fund, L.P. v. Norweb, PLC*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000)). To plead this claim under Illinois law, the City must allege facts showing "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff." *Borsellino*, 477 F.3d at 509. Because the claim sounds in fraud, the City also must satisfy Rule 9(b). *Borsellino*, 477 F.3d at 509. The City fails to plead any of these elements.

The City fails to plead a single fact to show any agreement between Cephalon and the FSMB or the APF to defraud the City. Indeed, with one exception (SAC ¶ 350), the City fails to

allege *any* communications between Cephalon and the FSMB or the APF; it fails to identify when the agreement allegedly took place, which individuals arranged the conspiracy, or any alleged meetings in support thereof; and it certainly fails to allege that Cephalon had knowledge of and participated in any type of plan to harm the City. This is the very pleading flaw that *Twombly* addressed and that is fatal to the City's claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) ("a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *see also Wright v. Carter*, No. 14 C 9109, 2015 WL 4978688, at *5 (N.D. Ill. Aug. 20, 2015) (Alonso, J.) (same). These conclusory allegations certainly fail to satisfy Rule 9(b). *See, e.g., Borsellino*, 477 F.3d. at 509 (dismissing conspiracy claim for failure to allege details about "purported agreement to defraud the plaintiffs, such as when it was made or which individuals . . . arranged the conspiracy").

In addition, the City fails to plead an independent cause of action underlying its conspiracy allegations. The City asserts no claims against FSMB or APF. Nor does it allege any false statements by the FSMB or APF that caused any allegedly inappropriate prescriptions for which the City paid. Because the conspiracy claim is based upon the allegedly fraudulent actions of the FSMB and APF and because no such claims have been brought against them, this claim necessarily fails. (Op., at 33); *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶¶ 51-52, 998 N.E.2d 147, 163 (2013) (conspiracy claim must be dismissed when based on wrongdoing of co-conspirator and plaintiff fails to allege underlying tortious behavior); *Suburban 1, Inc. v. GHS Mortg.*, LLC, 358 IL. App. 3d 769, 772-773, 833 N.E.2d 18, 22 (2005) (applying rule).

## F. The SAC Fails To Allege Any Misconduct By Teva USA.

The allegations relating to Teva USA are confined to six conclusory paragraphs in the Second Amended Complaint—none of which plead any facts concerning any wrongdoing. (SAC ¶¶ 33, 34, 37, 324, 662, 676). Thus, all claims against Teva USA should be dismissed.

The City appears to rely almost entirely upon the naked assertion that, after October 2011, Teva USA sold "former Cephalon branded products." (SAC ¶ 34). But the City fails to allege any statements or actions by Teva USA. At most, the City purports to quote from a 2007 "Teva" document that discusses marketing Fentora to Actiq prescribers (SAC ¶ 324), but the City does not identify any allegedly false statements from this document that were made by Teva USA to any Chicago prescriber. Nor does the City explain how this could be a "Teva" document when Teva USA did not become affiliated with Cephalon until October 2011. (SAC ¶ 34).

To mask the absence of any facts against Teva USA, the City purports to define "Cephalon" as Teva USA and Cephalon. (SAC ¶ 34). But such group pleading is improper and does not relieve the City from pleading specific facts related to Teva USA. Moreover, the City's SAC does not identify *any* particular conduct by Cephalon *after October 2011*—when Teva USA allegedly became affiliated with Cephalon. For this reason alone, all claims against Teva USA should be dismissed. *See, e.g.*, *Travelers I*, 32 F. Supp. 3d at 551-553 (dismissing claims against Teva USA due to lack of allegations of misconduct).[10]

## IV.  CONCLUSION

The City has had multiple opportunities to plead a viable claim. It has not done so—and clearly cannot do so. For the reasons stated herein, the Teva Defendants respectfully request that the Court enter an Order dismissing all claims against them with prejudice.

---

[10]  Although the City alleges that Teva USA also has sold generic opioids in the past (SAC ¶ 37), the City does not allege a single statement made by Teva USA in connection with the sale of any generic opioids, much less a false one; does not allege that Teva USA had any communications with any Chicago prescribers in connection with the sale of generic opioids; and does not allege facts showing that it paid for a generic opioid sold by Teva USA or that any such opioid caused harm to a single patient.

Dated:  November 20, 2015          Respectfully submitted,


/s/ Tinos Diamantatos
Tinos Diamantatos
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
Email: tdiamantatos@morganlewis.com

Gordon Cooney, Jr. (admitted *pro hac vice*)
Steven A. Reed (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
Email:  jgcooney@morganlewis.com
Email:  sreed@morganlewis.com

*Attorneys for Defendants Cephalon, Inc.* and *Teva Pharmaceuticals USA, Inc*

<u>**APPENDIX A**</u>

<u>**COMPARISON OF CHARTS IDENTIFYING ALLEGED MISREPRESENTATIONS BY CEPHALON IN CITY'S FIRST AMENDED COMPLAINT ("FAC") AND SECOND AMENDED COMPLAINT ("SAC")[1]**</u>

- Defendants [And Their Third-Party Allies] Misrepresented that Opioids Improve Function (FAC ¶ 247; SAC ¶ 221)

| Cephalon | |
|---|---|
| Cephalon | d. Cephalon sponsored the Federation of State Medical Boards' *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. ("While significant pain worsens function, relieving pain should reverse that effect and improve function," p.33). *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." Cephalon also purchased $150,000 in bulk copies of the book and distributed it by its pain sales force to 10,000 prescribers and 5,000 pharmacists.<br><br>e. Cephalon sponsored the American Pain Foundation's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that opioids when used properly "give [pain patients] a quality of life we deserve." The *Treatment Options* guide notes that non-steroidal anti-inflammatory drugs have greater risks with prolonged duration of use, but there was no similar warning for opioids. The American Pain Foundation distributed 17,200 copies in one year alone, according to its 2007 annual report, and it is currently available online.<br><br>f. Cephalon sponsored a CME written by key opinion leader Dr. Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC from September 28, 2007, through December 15, 2008. The CME taught that Cephalon's Actiq and Fentora drugs improve patients quality of life and allow for more activities when taken in conjunction with long-acting opioids. |

| Cephalon | |
|---|---|
| Cephalon | e. Cephalon sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed the book through its pain sales force to 10,000 prescribers and 5,000 pharmacists.<br><br>f. Cephalon sponsored the American Pain Foundation's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that opioids when used properly "give [pain patients] a quality of life we deserve." The *Treatment Options* guide notes that non-steroidal anti-inflammatory drugs have greater risks with prolonged duration of use, but there was no similar warning for opioids. APF distributed 17,200 copies in one year alone, according to its 2007 annual report, and the publication is currently available online.<br><br>g. Cephalon sponsored a CME written by key opinion leader Dr. Lynn Webster, titled *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007, through December 15, 2008. The CME taught that Cephalon's Actiq and Fentora improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids.<br><br>h. ==Cephalon sales representatives told Chicago prescribers that opioids would increase patients' ability to function and improve their quality of life.== |

---

[1]      All changes are highlighted between the FAC and the SAC are highlighted in yellow.

- Defendants [And Their Third-Party Allies] Concealed the Truth About How Opioids Lead to Addiction (FAC ¶ 252; SAC ¶ 229)

| Cephalon | c. Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*, which claims, among other things, that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids."<br><br>d. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. |
|---|---|

| Cephalon | f. Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*, which claims, among other things, that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids."<br><br>g. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.<br><br>h. In discussions with Chicago prescribers, Cephalon sales representatives omitted any discussion of addiction risks related to Cephalon's drugs. |
|---|---|

- Defendants [And Their Third-Party Allies] Misrepresent that Addiction Can Be Managed (FAC ¶ 260; SAC ¶ 238)

| Cephalon | b. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that "opioid agreements" between doctors and patients can "ensure that you take the opioid as prescribed." |
|---|---|

| Cephalon | b. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that "opioid agreements" between doctors and patients can "ensure that you take the opioid as prescribed." |
|---|---|

2

- Defendants [And Their Third-Party Allies] Created Confusion By Promoting the Misleading Term "Pseudoaddiction"[2] (FAC ¶ 262; SAC ¶240)



- Defendants And Their Third-Party Allies Claimed Withdrawal Is Simply Managed (FAC ¶ 264; SAC ¶ 241)

NOTHING ALLEGED ABOUT CEPHALON

---

[2] The title of this section in the FAC is "Defendants Create Confusion Through the Use of Misleading Terms Like 'Pseudoaddiction'."

- Defendants [And Their Third-Party Allies] Misrepresented that Increased Doses Pose No Significant Additional Risks (FAC ¶ 267; SAC ¶ 248)

| Cephalon | c. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of their opioid, regardless of the dose currently prescribed.<br><br>d. Cephalon sponsored a CME written by KOL Dr. Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC from September 28, 2007, through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids that include aspirin and acetaminophen are less effective to treat breakthrough pain because of dose limitations. |
|---|---|

| Cephalon | b. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of their opioid, regardless of the dose currently prescribed.<br><br>c. Cephalon sponsored a CME written by KOL Dr. Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids that include aspirin and acetaminophen are less effective to treat breakthrough pain because of dose limitations.<br><br>d. Cephalon sales representatives assured Chicago prescribers that opioids were safe, even at high doses. |
|---|---|

- Defendants [And Their Third-Party Allies] Deceptively Omit[ted] or Minimize[d] Adverse Effects of Opioids and Overstate[d] the Risks of Alternative Forms of Pain Treatment  (FAC ¶ 271; SAC ¶ 252)

| Cephalon | c. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose when the figure is closer to 3,200.[132] *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. |
|---|---|

| Cephalon | d. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributed 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids.<br><br>e. Cephalon sales representatives told Chicago prescribers that NSAIDs were more toxic than Cephalon's opioids. |
|---|---|

4

## **CERTIFICATE OF SERVICE**

I, Tinos Diamantatos, hereby certify that on November 20, 2015, I caused a true and correct copy of the foregoing document to be served using the electronic case filing system, which will send electronic notification of such filing to all parties that have appeared in this action.

/s/ Tinos Diamantatos
Tinos Diamantatos