**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, | |
| Plaintiff, | |
| v. | Case No. 14-cv-04361 |
| PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC; f/k/a ACTAVIS PLC; ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., | Honorable Jorge L. Alonso |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' JOINT AND INDIVIDUAL MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 7

I.   The Court should reject Defendants' request to revisit primary jurisdiction .................... 7

    A.   The Court already has considered—and rejected—Defendants' primary
        jurisdiction arguments .......................................................................................... 7

    B.   Nothing has happened since the MTD Order that would require the Court
        to reverse its prior decision. ................................................................................. 8

        1.   The SAC's allegations do not make a stay or dismissal more
            appropriate. ........................................................................................... 9

        2.   The FDA has not taken any action that makes application of the
            primary jurisdiction doctrine more appropriate. ..................................... 11

            a)   The FDA's response to PROP does not merit a stay or
                dismissal. ................................................................................... 11

            b)   The FDA-mandated studies related to long-term opioid use
                 do not merit a stay or dismissal. ................................................. 12

        3.   The California state court decision, which did not analyze or
            depend upon primary jurisdiction, provides no basis for changing
            this Court's Order. ................................................................................. 12

    C.   This Court has already determined that the content of FDA-approved
        labeling does not require a stay or dismissal. ..................................................... 14

II.   The SAC states claims for relief on each cause of action. ............................................. 14

    A.   The SAC sufficiently alleges deceptive and unfair conduct (Counts I – III) ........ 15

        1.   Defendants' Rule 9(b) and other joint arguments are inconsistent
            with the case law and this Court's Orders. ............................................. 16

            a)   Rule 9(b) requires sufficient notice of claims. ............................ 16

            b)   Allegations are sufficiently individualized if they apprise
                 each Defendant of its role in the fraud ......................................... 18

            c)   Rule 9(b) applies only to the City's deceptive practices
                claims (Counts I and III), not its unfair practices claim
                (Count II). ................................................................................... 20

            d)   Determinations regarding whether particular statements are
                deceptive are inappropriate on a motion to dismiss ..................... 20

        2.   The SAC continues to state claims against Purdue ................................. 21

            a)   The City has met the Court's standard for pleading its
                deceptive and unfair practices claims. ......................................... 21

i

**TABLE OF CONTENTS**

Page

b) Purdue's arguments do not defeat the City's consumer fraud claims............................................................... 28

    i. The SAC's allegations against Purdue are sufficiently individualized. ............................ 29

    ii. The City's allegations against Purdue satisfy Rule 9(b)........................................................... 29

    iii. Omission of the risk of addiction is actionable................ 31

    iv. Conduct before November 19, 2008 is relevant to the City's claims. .......................................... 32

    v. The allegations support the City's unfair practices claim............................................................ 33

    vi. Purdue's arguments regarding deceptiveness are premature and fraught with mischaracterizations. ........... 36

3. The SAC states claims against Actavis.................................... 38

  a) The City has met the Court's standard for pleading its deceptive and unfair practices claims. .......................... 38

  b) Actavis's arguments do not defeat the City's consumer fraud claims............................................................ 41

4. The SAC states claims against Cephalon................................... 43

  a) The City has met the Court's standard for pleading its deceptive and unfair practices claims. .......................... 43

  b) Cephalon's arguments do not defeat the City's consumer fraud claims....................................................... 49

5. The SAC states claims against Endo. ...................................... 51

  a) The City has met the Court's standard for pleading its deceptive and unfair practices claims. .......................... 51

  b) Endo's arguments do not defeat the City's consumer fraud claims............................................................ 57

    i. The City has sufficiently alleged editorial control............ 58

    ii. The City has alleged Endo misrepresentations. ............... 59

6. The SAC states claims against Janssen.................................... 61

  a) The City has met the Court's standard for pleading its deceptive and unfair practices claims. .......................... 61

  b) Janssen's arguments do not defeat the City's consumer fraud claims............................................................ 66

    i. The City has sufficiently alleged deceptive Janssen speaker programs in Chicago.......................... 67

## TABLE OF CONTENTS

**Page**

    ii. Janssen's misrepresentations applied to all its drugs, including Nucynta IR. ....................................................... 67

    iii. The City has alleged actionable misrepresentations. ........ 68

B. The SAC sufficiently alleges false statements (Count IV), false claims (Counts V and VI), and insurance fraud (Count VIII). ......................................... 70

  1. The SAC asserts cognizable theories of false claims liability. ................. 70

    a) The City has sufficiently pleaded express and implied certification. ............................................................................. 71

    b) The City has sufficiently pleaded liability in the absence of any certifications. .................................................................... 75

  2. The SAC states a cognizable theory under the false statements ordinance. .................................................................................... 78

  3. Allegations that Defendants' marketing rendered their drugs "misbranded" are not preempted. .............................................. 78

  4. The SAC has sufficiently alleged presentment. ....................................... 80

C. The SAC sufficiently alleges conspiracy (Counts VI and IX). ........................... 82

  1. The SAC's detailed allegations satisfy the City's pleading burden. ......... 83

    a) Cephalon ...................................................................................... 84

    b) Endo ............................................................................................. 85

    c) Janssen ......................................................................................... 88

    d) Purdue .......................................................................................... 89

  2. Defendants' conspiracy case law and arguments are inapplicable. .......... 91

D. The SAC sufficiently alleges a claim for recovery of the cost of municipal services (Count VII). ...................................................................................... 93

E. The SAC sufficiently alleges unjust enrichment (Count X). ............................... 95

F. The City has sufficiently pleaded claims against Purdue, Cephalon, Endo, and Janssen for aiding and abetting third-party wrongdoing. ............................... 97

G. Where required, the SAC sufficiently pleads causation and injury. .................... 98

  1. The City need not allege causation, reliance, or injury to state claims for deceptive and unfair conduct under the consumer fraud ordinances. .................................................................................. 99

  2. The City has sufficiently alleged causation in support of its other claims. ..................................................................................... 101

  3. The SAC demonstrates that the City of Chicago and its residents suffered grave injuries due to the widespread use of opioids to treat chronic pain. .......................................................................... 114

## TABLE OF CONTENTS

**Page**

III. Defendants' challenges to parent liability lack merit. .................................................... 116

    A. No basis exists to revisit the decision that the Court has personal jurisdiction over the Allergan parent entities. ...................................................... 116

        1. The Court has already concluded that it may properly exercise personal jurisdiction over Allergan plc and Actavis, Inc. ....................... 116

        2. Nothing justifies a departure from the Court's previous conclusion. ..... 118

    B. The City has pleaded wrongdoing of Johnson & Johnson. ................................. 119

CONCLUSION ................................................................................................................ 120

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

**Cases**

*ABN AMRO, Inc. v. Capital Int'l, Ltd.*,
   595 F. Supp. 2d 805 (N.D. Ill. 2008) ................................................................................120

*Abt v. Mazda Am. Credit*,
   25 F. Supp. 2d 860 (N.D. Ill. 1998) ...................................................................................21

*Ackerman v. Coca-Cola Co.*,
   No. 09-0395, 2010 WL 2925955 (E.D.N.Y. July 21, 2010)...............................................32

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) .........................................................................................42

*Adcock ex rel. Adcock v. Brakegate, Ltd.*,
   645 N.E.2d 888 (Ill. 1994) .................................................................................................82

*Alumax Mill Prods., Inc. v. Krzysztofiak*,
   No. 96-5012, 1997 WL 201555 (N.D. Ill. Apr. 17, 1997)..........................................18, 29, 42

*Anthony v. Country Life Mfg., L.L.C.*,
   No. 02-1601, 2002 WL 31269621 (N.D. Ill. Oct. 9, 2002) ................................................79

*Aspacher v. Kretz*,
   No. 94-6741, 1997 WL 692943 (N.D. Ill. Aug. 13, 1997) ................................................119

*Astiana v. Hain Celestial Group, Inc.*,
   783 F.3d 753 (9th Cir. 2015) .............................................................................................13

*Bausch v. Stryker Corp.*,
   630 F.3d 546 (7th Cir. 2010) .............................................................................................79

*Beaman v. Souk*,
   No. 10-1019, 2011 WL 832506 (C.D. Ill. Mar. 3, 2011).....................................................19

*Belfiore v. Proctor & Gamble Co.*,
   311 F.R.D. 29 (E.D.N.Y. Oct. 5, 2015) .............................................................................13

*In re Bextra & Celebrex Mktg. Sales Prac. & Prod. Liab. Litig.*,
   No. 11-310, 2012 WL 3154957 (N.D. Cal. Aug. 2, 2012) ................................................112

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Bober v. Glaxo Wellcome PLC,*
   246 F.3d 934 (7th Cir. 2001) .........................................................................21

*Bober v. Glaxo Wellcome, PLC,*
   No. 99-3243, 1999 WL 759340 (N.D. Ill. Sept. 3, 1999) .......................................46

*Boyd v. U.S. Bank, N.A.,*
   787 F. Supp. 2d 747 (N.D. Ill. 2011) ...........................................................10, 11

*Brown v. SBC Commc'ns, Inc,*
   No. 05-777, 2007 WL 684133 (S.D. Ill. Mar. 1, 2007) .........................................98

*Bruaner v. MusclePharm Corp.,*
   No. 14-8869, 2015 WL 4747941 (C.D. Cal. Aug. 11, 2015) ...................................13

*Buckman Co. v. Plaintiffs' Legal Comm.,*
   531 U.S. 341 (2001)...............................................................................79

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985)..............................................................................118

*Camasta v. Jos. A. Bank Clothiers, Inc.,*
   761 F.3d 732 (7th Cir. 2014) ....................................................................20

*Caterpillar, Inc. v. Usinor Industeel,*
   393 F. Supp. 2d 659 (N.D. Ill. 2005) ...........................................................120

*Cebulske v. Johnson & Johnson,*
   No. 14-627, 2015 WL 1257778 (S.D. Ill. Mar. 17, 2015) .....................................92

*Cent. Reg'l Emps. Benefit Fund v. Cephalon, Inc.,*
   No. 09-3418, 2010 WL 1257790 (D.N.J. Mar. 29, 2010) ...................................116

*Chesbrough v. VPA, P.C.,*
   655 F.3d 461 (6th Cir. 2011) ....................................................................74

*City of Chicago v. Beretta U.S.A. Corp.,*
   821 N.E.2d 1099 (Ill. 2004).........................................................94, 95, 115

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.,*
   719 F.2d 322 (9th Cir. 1983) ....................................................................94

*Cohen v. Am. Sec. Ins. Co.,*
   735 F.3d 601 (7th Cir. 2013) ....................................................................98

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Colas v. Abbvie, Inc.*,
No. 14-1452, 2014 WL 2699756 (N.D. Ill. June 13, 2014) ................................................113

*Corley v. Rosewood Care Ctr., Inc. of Peoria*,
142 F.3d 1041 (7th Cir. 1998) ....................................................................................18, 30

*Cty. of Cook v. Philip Morris Inc.*,
817 N.E.2d 1039 (Ill. App. Ct. 1st Dist. 2004) ..........................................................94, 101

*Craftwork, Inc. v. Robinson*,
No. 10-3629, 2011 WL 6097725 (N.D. Ill. Dec. 6, 2011) ..................................................82

*Cunningham v. Waters Tan & Co.*,
65 F.3d 1351 (7th Cir. 1995) ............................................................................................119

*De Falco v. Vibram USA, Inc.*,
No. 12-7238, 2013 WL 1122825 (N.D. Ill. Mar. 18, 2013) ..........................................21, 96

*Del Valle v. PLIVA, Inc.*,
No. B:11-113, 2011 WL 7168620 (S.D. Tex. Dec. 21, 2011) ............................................46

*Desiano v. Warner-Lambert Co.*,
326 F.3d 339 (2d Cir. 2003) ......................................................................................112, 116

*Dexia Credit Local v. Rogan*,
604 F. Supp. 2d 1180 (N.D. Ill. 2009) ..............................................................................92

*Dexia Credit Local v. Rogan*,
No. 02-8288, 2003 WL 22349111 (N.D. Ill. Oct. 14, 2003) ..............................................17

*District 1199P Health & Welfare Plan v. Janssen LP*,
Nos. 06-3044, 07-2224, 07-2608, 07-2860, 2008 WL 5413105
(D.N.J. Dec. 23, 2008) ....................................................................................................116

*Ebeid ex rel. United States v. Lungwitz*,
616 F.3d 993 (9th Cir. 2010) ............................................................................................74

*Emery v. Am. Gen. Fin., Inc.*,
134 F.3d 1321 (7th Cir. 1998) ..........................................................................................30

*Empire Title Servs., Inc. v. Fifth Third Mortg. Co.*,
No. 10-2208, 2013 WL 1337629 (N.D. Ohio Mar. 29, 2013) ............................................19

## TABLE OF AUTHORITIES

**Page(s)**

*Everco Indus., Inc. v. O.E.M. Prods. Co.*,
    63 F.R.D. 662 (N.D. Ill. 1974) ........................................................................33

*Felland v. Clifton*,
    682 F.3d 665 (7th Cir. 2012) ........................................................................118

*Fields v. Alcon Labs., Inc.*,
    No. 13-00197, 2014 WL 1041191 (S.D. Ill. Mar. 18, 2014) ....................35, 95

*Franz v. Beiersdorf, Inc.*,
    No. 14-2241, 2015 WL 4659104 (S.D. Cal. Aug. 5, 2015) ...........................13

*In re Frito-Lay N. Am., Inc. All Nat. Litig.*,
    No. 12-2413, 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) ...........................8

*FTC v. Sperry & Hutchinson Co.*,
    405 U.S. 233 (1972) ........................................................................................34

*Garross v. Medtronic, Inc.*,
    77 F. Supp. 3d 809, 815 (E.D. Wis. 2015) ...............................................51, 67

*Gas Tech. Inst. v. Rehmat*,
    No. 05-2712, 2006 WL 3743576 (N.D. Ill. Dec. 15, 2006) ...........................83

*Gaudie v. Countrywide Home Loans, Inc.*,
    683 F. Supp. 2d 750 (N.D. Ill. 2010) ......................................................83, 120

*Hardeway v. City of Chi.*,
    No. 91-0041, 1991 WL 203857 (N.D. Ill. Oct. 4, 1991) ...............................82

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999) .........................................................................76

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) .........................................................................18

*Herazo v. Whole Foods Mktg., Inc.*,
    No. 14-61909, 2015 WL 4514510 (S.D. Fla. July 24, 2014) .........................13

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) ......................................................................................112

*In re Horizon Organic Milk Plus DHA Omega-3 Mktg. Litig.*,
    955 F. Supp. 2d 1311 (S.D. Fla. 2013) ...........................................................8

viii

# TABLE OF AUTHORITIES

**Page(s)**

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
545 N.E.2d 672 (Ill. 1989) ..................................................................................95

*Hunter v. Citibank, N.A.*,
No. 09-02079, 2011 WL 7462143 (N.D. Cal. May 5, 2011) ...................................86

*Ibarrola v. Kind, LLC*,
83 F. Supp. 3d 751 (N.D. Ill. 2015) ......................................................................21

*Jasper v. MusclePharm Corp.*,
No. 14-02881, 2015 WL 2375945 (D. Colo. May 15, 2015) ..................................13

*Jones v. City of Chi.*,
856 F.2d 985 (7th Cir. 1988) ...............................................................................82

*Judson Atkinson Candies, Inc. v Latini-Hohberger Dhimantec*,
237 F.R.D. 173 (N.D. Ill. 2006) ...........................................................................17

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) ............................................................................................13

*Lane v. Money Masters, Inc.*,
No. 14-1715, 2015 WL 225427 (N.D. Ill. Jan. 15, 2015) .....................................92

*LSREF3 Sapphire Trust 2014 v. Barkston Props., LLC*,
No. 14-7968, 2016 WL 302150 (N.D. Ill. Jan. 25, 2016) (Alonso, J) ...................34

*Lyttle v. Killackey*,
528 F. Supp. 2d 818 (N.D. Ill. 2007) ....................................................................91

*Marchetti v. Chicago Title Ins. Co.*,
No. 12-5985, 2013 WL 317014 (N.D. Ill. Jan. 28, 2013) ......................................20

*McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*,
423 F.3d 1256 (11th Cir. 2005) ...........................................................................74

*Merrilees v. Merrilees*,
998 N.E.2d 147 (Ill. Ct. App. 1st Dist. 2013) .......................................................92

*Midwest Grinding Co., Inc. v. Spitz*,
976 F.2d 1016 (7th Cir. 1992) .............................................................................17

*Mikes v. Straus*,
274 F.3d 687 (2d Cir. 2001) .................................................................................74

ix

**TABLE OF AUTHORITIES**

**Page(s)**

*Moore v. PaineWebber, Inc.*,
   189 F.3d 165 (2d Cir. 1999) (Calabresi, J. concurring)......................................112

*Morgan v. Kobrin Sec., Inc.*,
   649 F. Supp. 1023 (N.D. Ill. 1986) ..........................................................................13

*Morrison v. YTB Int'l, Inc.*,
   No. 08-565, 2010 WL 1558712 (S.D. Ill. Apr. 19, 2010)......................................88

*Muir v. Playtex Prods., LLC*,
   983 F. Supp. 2d 980 (N.D. Ill. 2013) .......................................................................32

*In re Mut. Life Ins. Co. of N.Y. Premium Litig.*,
   295 F. Supp. 2d 140 (D. Mass. 2003) .......................................................................21

*Nemitz v. Metro. Life Ins. Co.*,
   No. 12-8039, 2013 WL 3944292 (N.D. Ill. July 31, 2013) ..................................120

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 21 (1st Cir. 2013)................................................................107, 111, 113

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 51 (1st Cir. 2013)....................................................................................107

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 60 (1st Cir. 2013)....................................................111, 112, 113

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)......................................................................................42

*Oliveira v. Amoco Oil Co.*,
   776 N.E.2d 151 (Ill. 2002) ......................................................................................100

*Opp v. Wheaton Van Lines, Inc.*,
   231 F.3d 1060 (7th Cir. 2000) ................................................................................119

*People ex rel. Hartigan v. E & E Hauling, Inc.*,
   607 N.E.2d 165 (Ill. 1992)......................................................................................101

*People ex rel. Madigan v. United Constr. of Am., Inc.*,
   981 N.E. 2d 404 (Ill. App. Ct. 1st Dist. 2012)............................................99, 100

*People v. Purdue Pharma L.P.*,
   No. 14-725287, 2015 WL 5123273 (Cal. Super. Ct. Aug. 27, 2015).........12, 13, 89

# TABLE OF AUTHORITIES

**Page(s)**

*Petrovich v. Share Health Plan of Ill., Inc.*,
719 N.E.2d 756 (Ill. 1999) ........................................................................119

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreens Co.*,
631 F.3d 436 (7th Cir. 2011) ........................................................................20

*Proctor v. Upjohn Co.*,
682 N.E.2d 1203 (Ill. App. Ct. 1st Dist. 1997) ........................................113

*Prohias v. Pfizer, Inc.*,
490 F. Supp. 2d 1228 (S.D. Fla. 2007) .........................................................21

*Partipilo v. Hallman*,
510 N.E.2d 8 (Ill. App. Ct. 1st Dist. 1987) .................................................96

*Quinones v. Szorc*,
771 F.2d 289 (7th Cir. 1985) ........................................................................82

*Reid v. Unilever U.S., Inc.*,
964 F. Supp. 2d 893 (N.D. Ill. 2013) ...........................................................21

*Robinson v. Toyota Motor Credit Corp.*,
775 N.E.2d 951 (Ill. 2002) ................................................................. *passim*

*Roehl v. Merrilees*,
No. 11-4886, 2012 WL 1192093 (N.D. Ill. Apr. 10, 2012) ........................91

*Romo v. Fed. Nat'l Mortg. Ass'n*,
No. 14-1891, 2014 WL 5620157 (N.D. Ill. Nov. 4, 2014) .........................33

*S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*,
697 F.3d 544 (7th Cir. 2012) ........................................................................79

*In re Sanofi Sec. Litig.*,
No. 13-8806, 2015 WL 365702 (S.D.N.Y. Jan. 28, 2015) .......................100

*Saunders v. Mich. Ave. Nat'l Bank*,
662 N.E.2d 602 (Ill. App. Ct. 1st Dist. 1996) .............................................35

*Schuller v. Am.'s Wholesale Lender*,
No. 14-4097, 2015 WL 5316413 (N.D. Ill. Sept. 9, 2015) (Alonso, J.) ....17

*Scott v. Ass'n for Childbirth at Home, Int'l*,
430 N.E.2d 1012 (Ill. 1981) .........................................................................35

# **TABLE OF AUTHORITIES**

**Page(s)**

*Segreti v. Lome*,
    747 F. Supp. 484 (N.D. Ill. 1990) ...................................................................91

*Sellers v. Boehringer Ingelheim Pharm., Inc.*,
    881 F. Supp. 2d 992 (S.D. Ill. 2012) ............................................................113

*Shahin Edalatdju v. Guaranteed Rate, Inc.*,
    748 F. Supp. 2d 860 (N.D. Ill. 2010) .............................................................83

*Sobilo v. Seleman*,
    No. 06-0461, 2006 WL 1762353 (N.D. Ill. June 27, 2006).............................18

*State ex rel. Raymer v. Univ. of Chi. Hosps.*,
    No. 06-2742, 2006 WL 2987118 (Ill. Cir. Ct. Oct. 6, 2006) ....................70, 72

*Strom v. Scios, Inc.*,
    676 F. Supp. 2d 884 (N.D. Cal. 2009) .........................................................112

*Suburban Buick, Inc. v. Gargo*,
    No. 08-0370, 2009 WL 1543709 (N.D. Ill. May 29, 2009)............................19

*Sussex Fin. Enters., Inc. v. Bayerische Hypo-und Vereinsbank*,
    No. 08-4791, 2010 WL 94272 (N.D. Cal. Jan 6, 2010)..................................19

*Sweeney v. Bausman*,
    No. 87-5532, 1987 WL 45713 (N.D. Ill. Nov. 5, 1987) .................................92

*Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*,
    No. 02-3293, 2005 WL 2405797 (N.D. Ill. Sept. 28, 2005) ..........................96

*Thornwood Inc. v. Jenner & Block*,
    799 N.E.2d 756 (Ill. App. Ct. 1st Dist. 2003) ...........................................97, 98

*Triple Canopy, Inc. v. Moore*,
    No. 04-3265, 2005 WL 1629768 (N.D. Ill. July 1, 2005) ..............................96

*Triumph Packaging Grp. v. Ward*,
    No. 11-7927, 2012 WL 5342316 (N.D. Ill. Oct. 29, 2012) ............................96

*United States ex rel. Bergman v. Abbott Labs.*,
    995 F. Supp. 2d 357 (E.D. Pa. 2014) .............................................................75

*United States ex rel. Bidani v. Lewis*,
    264 F. Supp. 2d 612 (N.D. Ill. 2003) .............................................................72

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*United States ex rel. Blaum v. Triad Isotopes, Inc.*,
  104 F. Supp. 3d 901 (N.D. Ill. 2015) ....................................................................81

*United States ex rel. Bragg v. SCR Med. Transp., Inc.*,
  No. 07-2328, 2011 WL 1357490 (N.D. Ill. Apr. 8, 2011) ......................................17

*United States ex rel. Brown v. Celgene Corp.*,
  No. 10-3165, 2014 WL 3605896 (C.D. Cal. July 10, 2014) ...................75, 111, 114

*United States ex rel. Cieszyski v. LifeWatch Servs., Inc.*,
  No. 13-4052, 2015 WL 6153937 (N.D. Ill. Oct. 19, 2015) .............................74, 75

*United States ex rel. Colquitt v. Abbott Labs.*,
  864 F. Supp. 2d 499 (N.D. Tex. 2012) ..................................................................77

*United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*,
  460 F.3d 853 (7th Cir. 2006) ...........................................................................81, 107

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
  780 F.3d 504 (1st Cir. 2015) ...................................................................................74

*United States ex rel. Franklin v. Parke-Davis*,
  147 F. Supp. 2d 39 (D. Mass. 2001) ............................................................. *passim*

*United States ex rel. Galmines v. Novartis Pharm. Corp.*,
  No. 06-3213, 2013 WL 2649704 (E.D. Pa. June 13, 2013)...................................111

*United States ex rel. Garst v. Lockheed-Martin Corp.*,
  328 F.3d 374 (7th Cir. 2003) ............................................................................80, 81

*United States ex rel. Grandeau v. Cancer Treatment Ctr. of Am.*,
  No. 99-8287, 2003 WL 21504998 (N.D. Ill. June 30, 2003)..................................30

*United States ex rel. Grenadoyr v. Ukrainian Village Pharmacy, Inc.*,
  772 F.3d 1102 (7th Cir. 2014) ................................................................................81

*United States ex rel. Kennedy v. Aventis Pharm., Inc.*,
  512 F. Supp. 2d 1158 (N.D. Ill. 2007) ............................................................76, 110

*United States ex rel. Kennedy v. Aventis Pharm., Inc.*,
  610 F. Supp. 2d 938 (N.D. Ill. 2009) ...................................................................109

*United States ex rel. Kennedy v. Aventis Pharm., Inc.*,
  No. 03-2750, 2008 WL 5211021 (N.D. Ill. Dec. 10, 2008)..................................115

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*United States ex rel. Kroening v. Forest Pharm., Inc.*,
No. 12-366, 2016 WL 75066 (E.D. Wis. Jan. 6, 2016) ......................................75

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*,
614 F.3d 1163 (10th Cir. 2010) ......................................74

*United States ex rel. Main v. Oakland City Univ.*,
426 F.3d 914 (7th Cir. 2005) ......................................109

*United States ex rel. Martin v. Life Care Ctrs. of Am.*,
114 F. Supp. 3d 549 (E.D. Tenn. 2014) ......................................107, 114

*United States ex rel. McGee v. IBM Corp.*,
81 F. Supp. 3d 643 (N.D. Ill. 2015) ......................................91

*United States ex rel. Oughatiyan v. IPC The Hospitalist Co., Inc.*,
No. 09-5418, 2015 WL 718345 (N.D. Ill. Feb. 17, 2015) ......................................17, 30

*United States ex. rel. Ruhe v. Masimo Corp.*,
929 F. Supp. 2d 1033 (C.D. Cal. 2012) ......................................77

*United States ex rel. Schmidt v. Zimmer, Inc.*,
386 F.3d 235 (3d Cir. 2004) ......................................111

*United States ex rel. Steury v. Cardinal Health, Inc.*,
625 F.3d 262 (5th Cir. 2010) ......................................74, 75

*United States ex rel. West v. Ortho-McNeil Pharm., Inc.*,
No. 03-8239, 2007 WL 2091185 (N.D. Ill. July 20, 2007) ......................................80, 81

*United States ex rel. Westmoreland v. Amgen*,
738 F. Supp. 2d 267 (D. Mass. 2010) ......................................111

*United States ex rel. Wilkins v. United Health Group, Inc.*,
659 F.3d 295 (3d Cir. 2011) ......................................71, 72, 74

*United States ex rel. Yarberry v. Sears Holdings Corp.*,
No. 09-588, 2013 WL 1287058 (S.D. Ill. Mar. 28, 2013) ......................................72

*United States ex rel. Zemplenyi v. Group Health Cooperative*,
No. 09-603, 2011 WL 814261 (W.D. Wash. Mar. 3, 2011) ......................................115

*United States v. Cervantes*,
466 F.2d 736 (7th Cir. 1972) ......................................82

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*United States v. Dolphin Mortg. Corp.*,
No. 06-499, 2009 WL 153190 (N.D. Ill. Jan. 22, 2009)................................................109

*United States v. First Nat'l Bank of Cicero*,
957 F.2d 1362 (7th Cir. 1992) ....................................................................................109

*United States v. Harkonen*,
No. 08-00164, 2009 WL 1578712 (N.D. Cal. June 4, 2009)..........................................73

*United States v. Kellogg Brown & Root Servs., Inc.*,
No. 12-4110, 2014 WL 4948136 (C.D. Ill. Sept. 30, 2014) ..........................................19

*United States v. King-Vassel*,
728 F.3d 707 (7th Cir. 2013) ....................................................................................110

*United States v. Livdahl*,
459 F. Supp. 2d 1255 (S.D. Fla. 2005) ...............................................................46, 59

*United States v. Luce*,
No. 11-05158, 2015 WL 5768503 (N.D. Ill. Sept. 30, 2015)........................................109

*United States v. Neifert-White Co.*,
390 U.S. 228 (1968)..................................................................................................76

*United States v. Rogan*,
459 F. Supp. 2d 692 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) ...........75, 82, 84, 85

*United States v. Sanford-Brown*,
788 F.3d 696 (7th Cir. 2015) ...........................................................................19, 72, 74, 75

*United States v. Triple Canopy, Inc.*,
775 F.3d 628 (4th Cir. 2015) ....................................................................................74

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
20 F.3d 771 (7th Cir. 1994) ....................................................................................19

*Vodak v. City of Chi.*,
No. 03-2463, 2006 WL 2524141 (N.D. Ill. Aug. 30, 2006) ..........................................94

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000)..................................................................................................101

*Watt v. City of Highland Park*,
No. 98-8123, 2001 WL 1090152 (N.D. Ill. Sept. 13, 2001)..........................................19

xv

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Wayne v. Kirk*,
    No. 13-8540, 2015 WL 5950900 (N.D. Ill. Oct. 13, 2015) (Alonso, J.)................................82

*Whitley v. Taylor Bean & Whitacker Mortg. Corp.*,
    607 F. Supp. 2d 885 (N.D. Ill. 2009) ........................................................................ 119-120

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ............................................................................................99

*Williams v. Purdue Pharma Co.*,
    297 F. Supp. 2d 171 (D.D.C. 2003)................................................................................116

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*,
    536 F.3d 663 (7th Cir. 2008) ............................................................................................20

*Wolf v. Liberis*,
    505 N.E.2d 1202 (Ill. App. Ct. 1st Dist. 1987).................................................................98

*Wyeth v. Levine*,
    555 U.S. 555 (2009)...................................................................................................11, 79

*Zakaria v. Gerber Prods. Co.*,
    No. 15-00200, 2015 WL 3827654 (C.D. Cal. June 18, 2015) ..............................................13

*Zapka v. Coca-Cola Co.*,
    No. 99-8238, 2001 WL 1558276 (N.D. Ill. Dec. 5, 2001)....................................................8

*Zoglauer v. City of Wheaton*,
    No. 96-7533, 1997 WL 619833 (N.D. Ill. Sept. 29, 1997)..................................................92

**REGULATIONS**

21 C.F.R. § 202.1(e) (2008)..................................................................................................49

21 C.F.R. § 1308.12(b)(i)(c) (2015) ......................................................................................27

**RULES**

Fed. R. Civ. P. 8(a) .........................................................................................................14, 20

Fed. R. Civ. P. 8(d)(2).............................................................................................................96

Fed. R. Civ. P. 9(b) .......................................................................................................*passim*

Fed. R. Civ. P. 12(c) ...............................................................................................................79

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes and Ordinances**

720 ILCS 5/17-10.5 .................................................................................................101

745 ILCS 35/2.................................................................................................27, 34

815 ILCS 505 ...............................................................................................*passim*

815 ILCS 505/2 ......................................................................................................34

820 ILCS 305/8(a) .................................................................................................72

21 U.S.C. § 301 *et seq.*.........................................................................................79

21 U.S.C. § 321(m).........................................................................................46, 59

21 U.S.C. § 321(n) .................................................................................................73

21 U.S.C. § 352(a) .................................................................................................73

21 U.S.C. § 812(b)(2) ...........................................................................................34

MCC § 1-20-010 .....................................................................................................94

MCC § 1-20-020.....................................................................................93, 94, 101

MCC § 1-21-010.............................................................................................78, 101

MCC § 1-21-010(b) ...............................................................................................78

MCC § 1-21-010(c).................................................................................................78

MCC § 1-21-020 ...................................................................................................101

MCC § 1-22-020 ...........................................................................................*passim*

MCC § 1-22-020(1) ...............................................................................................97

MCC § 2-25-090 ...........................................................................................*passim*

MCC § 4-276-470...........................................................................................*passim*

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Other Authorities**

5 Charles Alan Wright & Arthur R. Miller,
 *Federal Practice & Procedure* (3d ed.)..................................................................83

11 Illinois Law & Prac. Conspiracy (1956 & Supp. 2009)..........................................88

Restatement (Third) of Agency § 1.01 (2006)..........................................................119

## INTRODUCTION

The City of Chicago's Second Amended Complaint , Docket No. 395 ("SAC"), robustly addresses the pleading concerns identified in the Court's May 8 Order dismissing the City's claims as to all Defendants except Purdue.  Nevertheless, Defendants have again moved to dismiss—individually and in two joint submissions—and the City submits this consolidated opposition to all seven motions.  Defendants' motions are meritless for three overriding reasons: Defendants (1) recycle arguments already made to, and rejected by, the Court; (2) ignore the City's new allegations remedying every defect identified by the Court in dismissing certain claims in the First Amended Complaint, ECF No. 186 ("FAC"); and (3) fail to dispel the sufficiency of a reformulated conspiracy claim and a new, separate unfair practices claim.

**Defendants recycle arguments previously made and rejected.**  For example, they rehash their primary jurisdiction arguments, contending that the Court is being asked to second-guess the judgment of the FDA and doctors by drawing scientific conclusions about when opioids should be prescribed.  But other than offering the unsupported conclusion that there have been "new developments" warranting a revised view, Defendants ignore this Court's ruling that "the issue [in this case] is not whether opioids are prescribed appropriately but whether they are marketed truthfully."  May 8, 2015 Order, ECF No. 288, at 8 ("MTD Order").  Defendants similarly repeat their arguments that the City has engaged in impermissible group pleading, that the Court can determine as a matter of law that the promotional materials are not deceptive or false, and that the Court lacks personal jurisdiction over Allergan plc and Actavis, Inc.  The Court has already explicitly or implicitly rejected these assertions, *see id.* at 11-15, 22-29, and nothing in Defendants' motions warrants reversing course.  This is particularly true given that the City's allegations in the SAC are even more robust than its initial allegations.

**The SAC remedies all defects with respect to each Defendant.**  When the Court

dismissed certain claims in the FAC, it specified the defects it found, giving the City a roadmap for correcting any pleading flaws.  Specifically, with respect to certain claims, the Court voiced a desire for specific allegations of editorial control over marketing materials, allegations showing a Chicago nexus, and/or allegations identifying prescribers who, as a result of Defendants' misrepresentations, wrote prescriptions for opioids that were paid for by the City.  The City took the Court's directives to heart, engaged in the extensive investigation necessary to satisfy them, and added scores of allegations remedying the identified deficiencies.  The SAC addresses and meets *every* concern the Court expressed with respect to *each* Defendant, and then some:

*Purdue entities*.  The Court upheld the deceptive conduct counts against Purdue based on allegations that "in 2005 and continuing to the present, the Purdue entities made misstatements about opioids on their own websites."  MTD Order at 29.  Later, denying Purdue's motion for reconsideration, the Court specified that these allegations "suggest[] both that it made them and that it intended for anyone with access to the sites, including Chicagoans, to rely on them."  Mem. Op. Order, ECF No. 318, at 3 ("Recons. Order").  However, the Court dismissed the false statement, false claims, municipal services, and insurance fraud claims (the "fraud claims") against Purdue for failing to allege "identities of doctors who, as a result of one or more of defendants' alleged misrepresentations, prescribed opioids for chronic pain to a City-insured patient or workers' compensation recipient whose claim . . . the City paid, or any other details about such claims."  MTD Order at 32.

In the SAC, the City expanded the allegations regarding Purdue's websites that this Court found stated consumer fraud claims.  The SAC also identifies Chicago prescribers to whom Purdue made misrepresentations, as well as when and how the misrepresentations were made. The SAC identifies numerous Chicago-area prescribers who confirmed that, during the relevant

period, they received one or more marketing messages from Purdue sales representatives that the City alleges are deceptive and misleading and which the City alleges are false. The SAC further specifies, by claim dollar amount and number of prescriptions, the opioid prescriptions written by each interviewed prescriber that were paid for by the City. Other new allegations regarding Purdue's national marketing campaign enable the Court to reasonably infer that such marketing efforts were available to reach, and in fact did reach, Chicago prescribers.

*Actavis entities*. The Court dismissed the City's consumer fraud counts against Actavis for failure to allege "the name of any Chicago doctor or consumer to whom any Actavis entity made an alleged misrepresentation, when the misrepresentation was made, or how." MTD Order at 22. The Court similarly dismissed the City's fraud claims for failure to identify prescribers who, as a result of Actavis's alleged misrepresentations, wrote prescriptions for opioids that were paid for by the City, or any other details about those claims. *Id.* at 32.

The SAC eliminates these defects. Specifically, the SAC identifies Chicago-area prescribers who confirmed that they received one or more false and misleading marketing messages regarding Actavis's branded opioid, Kadian. The SAC further specifies the opioid prescriptions written by each interviewed prescriber that were paid for by the City. The City alleges, moreover, that the promotional materials used by Actavis's sales representatives, and the training Actavis gave those sales representatives, reflected the very misrepresentations that were conveyed to Chicago prescribers; these allegations support the inference of a widespread scheme of deceptive promotion, which is further established by other allegations in the SAC.

*Cephalon entities*. The Court dismissed the consumer fraud claims against Cephalon because the FAC (1) failed to "explain what editorial control, if any, is entailed in 'sponsoring' or 'facilitating' materials or events," and (2) did not "allege when, how, and to whom in Chicago

3

the Cephalon entities made any alleged misrepresentations or distributed the contested materials." MTD Order at 23. It dismissed the fraud claims against Cephalon for the same prescriber-related issues it cited in dismissing the claims against Purdue and Actavis. *Id.* at 32.

These issues are, once again, remedied in the SAC. First, the SAC contains allegations that tie Cephalon misrepresentations to specific Chicago-area prescribers, some of whom were also paid speakers for Cephalon. The SAC further identifies opioid prescriptions that each of these prescribers wrote that were paid for by the City. Second, the SAC alleges facts from which the Court can infer Cephalon's editorial control over deceptive and misleading materials authored by third parties, including new allegations regarding Cephalon's knowledge and approval of the contents of the third-party materials and allegations that Cephalon's own sales representatives distributed the materials to Chicago-area prescribers.

***Endo entities.*** The Court dismissed the City's consumer fraud claims against Endo for reasons similar to the other Defendants. *See* MTD Order at 26, 32. The SAC eliminates the identified deficiencies. It includes allegations regarding Chicago prescribers who confirmed that Endo sales representatives disseminated misleading marketing messages, prescribers who were exposed to deceptive marketing in their training as paid Endo speakers, and a sales representative who worked in the Chicago sales region and reported conveying certain of the messages that the City alleges were deceptive. The SAC once again specifies the City-reimbursed prescriptions written by each of these prescribers. The SAC also includes new allegations as to the reach into Chicago of specific materials, including the date on which a continuing medical education program ("CME") was presented in Chicago and the widespread viewing of a specific website.

Endo's editorial control over the third-party materials distributed to Chicago prescribers is likewise alleged in greater detail in the SAC, including through allegations that Endo reviewed

4

and edited third-party content, made statements available on its own website, and used its sales force to disseminate the messages. The SAC also incorporates allegations that Endo tracked the distribution of the third-party materials just as it tracked its own commercial activity, demonstrating the degree to which Endo was involved with the third-party messaging.

*Janssen entities.* The Court dismissed the City's consumer fraud claims against Janssen for lack of allegations about the Janssen entities' "editorial control over materials they allegedly sponsored or funded or about where or when the Janssen entities made these alleged misrepresentations to Chicago doctors or consumers," and it dismissed the City's fraud claims against Janssen for the same prescriber-related issues highlighted in connection with the fraud claims against the other Defendants. *See* MTD Order at 27, 32.

The SAC solves these problems. It identifies specific Chicago-area prescribers who received one or more deceptive marketing messages from Janssen sales representatives. The SAC further identifies additional Chicago-area prescribers who were exposed to deceptive marketing through their training as Janssen-paid speakers; each of these prescribers not only received the messages but also, it can be reasonably inferred, conveyed these misrepresentations to Chicago prescribers in their audiences. The SAC further specifies, by number of prescriptions and claim dollar amount, the opioid prescriptions written by these prescribers that were paid for by the City. Finally, the SAC identifies Janssen CMEs given to Chicago prescribers, a Janssen website that was available to and intended to reach Chicago prescribers, and two Janssen-controlled publications that conveyed misrepresentations to Chicago prescribers and consumers.

**The City's reformulated conspiracy and new unfair practices claims withstand scrutiny.** The City omitted from the SAC its previously dismissed allegations concerning an inter-Defendant conspiracy. Heeding the additional factual investigation undertaken in response

to the MTD Order, the City now alleges independent conspiracies between individual Defendant groups and Front Groups to publish and disseminate misleading messages regarding the use of opioids for chronic pain. Following the guidance this Court provided in its MTD Order, each cause of action underlying those conspiracy claims is well-pleaded. The SAC's revised conspiracy allegations further establish, both directly and circumstantially, the requisite conspiratorial agreements and the overt acts committed in furtherance of those agreements.

The SAC also includes a new, separate unfair practices claim, in which the City alleges that Defendants engaged in conduct that offended clear public policies, was immoral, unethical, oppressive, and unscrupulous, and which caused substantial injury to consumers. This claim does not have to meet Rule 9(b) requirements, but is sufficient under any pleading standard.

*          *          *

In the face of these meticulously detailed allegations addressing the Court's MTD Order, Defendants' motions pretend that this Court was not clear about what allegations are necessary. They misstate the elements the City must plead, suggesting causation and reliance requirements for the deceptive and unfair practices claims and a RICO causation standard inapplicable to false claims, and failing to recognize the distinct requirements of the City's municipal services claims. Their briefing focuses on picking apart isolated allegations while ignoring many others, failing to credit how the allegations mutually reinforce one another, and dismissing the reasonable inferences that arise from the allegations' collective weight. Defendants seek to impose pleading standards found neither in the MTD Order nor in any applicable law, and to impose evidentiary hurdles appropriate at summary judgment—after discovery—and not with respect to notice pleading. Their motions to dismiss should, accordingly, be denied in their entirety.

<u>ARGUMENT</u>

I. **THE COURT SHOULD REJECT DEFENDANTS' REQUEST TO REVISIT PRIMARY JURISDICTION.**

As the Court has already recognized, this is not a case about which medical conditions opioids should be used to treat, or how long the drugs may be used safely. The City does not ask the Court to step into the shoes of the FDA and determine whether opioids are an appropriate treatment for chronic, non-cancer pain. Rather, this is a case about what Defendants knew about their drugs and whether what they told prescribers and consumers about those drugs was truthful in light of that knowledge. It is a pharmaceutical marketing case.

Defendants seek to obscure that fact by arguing—again—that adjudicating the SAC will require the Court to second-guess the FDA and doctors by drawing scientific conclusions about the circumstances in which opioids should be prescribed. The Court has already rejected this argument. Its MTD Order correctly concluded that the City's claims can be decided without scientific judgments about opioids. Defendants' citation to "interim developments"—new allegations in the SAC, the FDA's response to various citizens' petitions, and a non-final, non-binding decision by a California court based on a different legal doctrine—does not undermine the Court's prior analysis. Defendants also re-hash previously rejected arguments about the FDA-approved labels for their drugs. There is no reason for the Court to revisit its MTD Order.

A. **The Court already has considered—and rejected—Defendants' primary jurisdiction arguments.**

Defendants extensively briefed primary jurisdiction in their motions to dismiss the FAC, where they advanced the same arguments they make now, including that the case should be stayed pending the resolution of studies ordered in connection with the petition of Physicians for Responsible Opioid Prescribing in 2012, ECF No. 419-4 ("PROP Petition"). *Compare* Mem.

7

Supp. Jt. Mot. to Dismiss SAC Under Prim. Jurisd. Doctrine, ECF No. 417, at 3 ("Prim. Jurisd. Mem.") *with* Mem. Supp. Jt. Mot. to Dismiss FAC, ECF No. 229, at 5-8 ("Original Mem.").

The Court considered those arguments and refused to stay or dismiss the case on primary jurisdiction grounds. MTD Order at 7-10. In fact, the Court rejected the precise argument Defendants repackage in their current briefing—that "the central issue to be decided [in this case] is whether opioids should be prescribed to treat chronic, non-cancer pain" and that this was "a determination best left to the FDA." *Id.* at 8. The Court explained that "[i]n reality . . . the issue is not whether opioids are prescribed appropriately but whether they are marketed truthfully; specifically, whether defendants misrepresented the risks, benefits, and superiority of opioids to treat long-term, chronic pain" and that "[c]ourts are equipped to adjudicate such claims." *Id.* at 8-9.[1] Defendants offer no compelling reason to revisit the Court's decision, which is in harmony with decisions in the Seventh Circuit and elsewhere.[2]

**B.    Nothing has happened since the MTD Order that would require the Court to reverse its prior decision.**

Defendants argue that their primary jurisdiction arguments have greater force because of

---

[1] Defendants also suggest that this is a case about the use of opioids, rather than their marketing, because "the only basis for identifying the improper claims" in the City's exhibits is that "the prescriptions exceeded 90 days." Prim. Jurisd. Mem. at 3 n.3. However, the City alleges these claims were false because they resulted from Defendants' misrepresentations. The 90-day cutoff is merely a way to identify which claims resulting from the deception were for chronic pain, which was the focus of Defendants' marketing—and, in fact, the SAC identifies claims tied specifically to misrepresentations to specific providers and chronic pain conditions. *See* SAC ¶¶ 85-213; 296, 377, 482, 552, 630, Exs. A.1 – A.7.

[2] *See, e.g.*, *Zapka v. Coca-Cola Co.*, No. 99-8238, 2001 WL 1558276, at *6 (N.D. Ill. Dec. 5, 2001) (rejecting a referral to the FDA, which "does not have specialized expertise in the marketing or advertising of food and drinks"); *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. Litig.*, 955 F. Supp. 2d 1311, 1349 (S.D. Fla. 2013) ("[T]he determination of whether . . . representations on its products' labeling, in its advertisements, and on its website are false and/or misleading and whether customers purchased [Defendant]'s products in reliance on these representations . . . . is not a technical area in which the FDA has greater technical expertise than the courts—[as] every day courts decide whether conduct is misleading."); *In re Frito-Lay N. Am., Inc. All Natural Litig.*, No. 12-2413, 2013 WL 4647512, at *8 (E.D.N.Y. Aug. 29, 2013) ("'This case is far less about science than it is about whether a label is misleading,' and the reasonable-consumer inquiry upon which . . . the claims in this case depend[] is one to which courts are eminently well suited, even well versed.") (citation omitted).

three "interim developments": new allegations in the SAC, new details about FDA studies responding to the PROP Petition, and a California state court stay of a similar case. Prim. Jurisd. Mem. at 2-5. These change neither the core allegations in the case nor the key questions the Court must decide, and none of them justifies abandoning the Court's prior ruling.

1. *The SAC's allegations do not make a stay or dismissal more appropriate.*

While the SAC added detail about how Defendants' misrepresentations were made and how they reached Chicago prescribers, it did not alter the nature of the City's claims. Defendants spend the bulk of their motion attempting to show how either (a) the FDA is currently considering the truth of each of the misrepresentations described in the SAC, or (b) their falsity has already been "rejected" by the FDA. Prim. Jurisd. Mem. at 5-11. However, seven of the SAC's eight types of misstatements are the same as in the FAC—misstatements the Court has already held can be adjudicated without deference to the FDA. *See* MTD Order at 10.[3]

Defendants identify two sets of allegations that are new, but these do not change the analysis. First, the SAC alleges that Purdue misleadingly promoted OxyContin as effective for 12 hours of pain relief. Prim. Jurisd. Mem. at 10. The label states that "OXYCONTIN is designed to provide delivery of oxycodone over 12 hours," but Purdue represented that the drug would alleviate pain for 12 hours when it knew that many patients would experience end-of-dose failure and the duration of their relief would be much shorter. *See* SAC ¶¶ 253-59.

Because there is no conflict between the City's allegations and the FDA-approved label, Defendants turn to the FDA's response to a 2004 petition by the Connecticut Attorney General

---

[3] *Compare* FAC ¶¶ 246-47 *with* SAC ¶¶ 218-21 (misrepresentations re improvement of function); FAC ¶¶ 248-55 *with* SAC ¶¶ 222-33 (misrepresentations re addiction risk); FAC ¶¶ 256-60 *with* SAC ¶¶ 234-38 (claims re addiction management); FAC ¶¶ 261-62 *with* SAC ¶¶ 239-40 (misrepresentations re pseudoaddiction); FAC ¶¶ 263-64 *with* SAC ¶¶ 241-44 (claims re management of withdrawal); FAC ¶¶ 265-67 *with* SAC ¶¶ 245-48 (misrepresentations re safety of high doses); and FAC ¶¶ 268-72 *with* SAC ¶¶ 249-52 (claims re risks and benefits of opioids versus alternative treatments).

as evidence the FDA has rejected the City's position. However, that petition sought, because of greater risks of adverse events, diversion, and abuse, to direct Purdue to warn against dosing more often than every 12 hours to address end-of-dose failure. *See* Letter from FDA to Conn. Att'y Gen. Blumenthal, ECF No. 419-8, at 3 ("FDA Letter"). In fact, the FDA Letter *supports* the City's position, as the FDA acknowledged that, despite Purdue's marketing, "a substantial proportion of chronic pain patients will experience inadequate analgesia toward the end of the dosing interval." *Id.* at 5. Further, the City's claim will not turn on whether it is safe to prescribe OxyContin more often than every 12 hours or whether there is increased risk to taking more OxyContin, but whether the marketing claim of 12-hour *efficacy* was deliberately deceptive.

Second, Defendants cite the SAC's unfair practices claim and argue that it increases the risk that the Court will issue a ruling inconsistent with those of the FDA. Specifically, the SAC alleges that one of the reasons Defendants' marketing constitutes an unfair trade practice under MCC § 2-25-090 is that the marketing violated FDA regulations. Prim. Jurisd. Mem. at 5 (citing SAC ¶ 755(c) – (e)). Violations of FDA regulations are, however, only a few of the grounds the City put forward to establish that Defendants' conduct constitutes unfair practices under MCC § 2-25-090. *See* SAC ¶¶ 755(a) – (g). Moreover, the City does not cite the FDA regulations to have the Court enforce them—it cites them to show that Defendants' conduct is contrary to public policy and therefore unfair. *See Boyd v. U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011) ("A plaintiff may prove an . . . unfairness claim by showing that the challenged practice offends public policy . . . . [a]nd a practice can offend public policy if it violates a standard of conduct contained in an existing statute . . . that typically applies to such a situation.") (internal quotation omitted). Many state or local unfair trade practice laws use noncompliance with federal laws or regulations as an objective indicator that conduct is "unfair;"

10

as a result, plaintiffs can point to violations of those laws and regulations as predicates for unfair

trade practice claims. *See*, *e.g.*, *Boyd*, 787 F. Supp. 2d at 753 ("Violations of [federal] agency

directives like these can be a hallmark of unfairness under the [Illinois Consumer Fraud Act]").[4]

> 2. *The FDA has not taken any action that makes application of the primary jurisdiction doctrine more appropriate.*

> a) <u>The FDA's response to PROP does not merit a stay or dismissal.</u>

Defendants first argue that the FDA rejected the City's claims in partially granting the

PROP Petition. *See* Prim. Jurisd. Mem. at 5-11. But the FDA's response to the PROP Petition

was discussed in Defendants' prior motion and is not an "interim development." *See* Original

Mem. at 6-8; Letter from Janet Woodcock, FDA, to PROP Pres. Andrew Kolodny (Sept. 10,

2013), ECF 419-5 ("PROP Response"). The PROP Response neither opined upon nor confirmed

the truthfulness of the marketing the SAC alleges is false. *See* Prim. Jurisd. Mem. at 5-11.

Far from repudiating the PROP Petition, the FDA took the opportunity, based on *existing*

science, to highlight the risks of opioids and make clear the drugs are appropriate only as a last

resort. PROP Response at 6. Defendants claim the FDA "considered and rejected" an argument

that patients could not increase doses of opioids indefinitely without added risk, Prim Jurisd.

Mem. at 9, but the FDA "acknowledge[d] that the available data demonstrate an association . . .

between opioid dose and certain serious risks of opioid use," including "misuse, abuse,

hyperalgesia, addiction, overdose, and death," PROP Response at 10.[5] Further, FDA's inability

to identify any "adequate and well-controlled studies of opioid use longer than 12 weeks," and its

---

[4] Further, the FDA is focused, with the PROP-precipitated studies, on whether to change opioid labels going forward, not whether Defendants' past conduct complied with FDA labeling rules; there is thus no potential inconsistency. Though they deny it, Defendants' argument essentially is a plea that, to ensure uniformity, federal law should preempt the City's claims. The Supreme Court has rejected this position in pharmaceutical cases. *Wyeth v. Levine*, 555 U.S. 555, 573 (2009) (finding "no merit" to argument that state-law tort claims are preempted by the purposes and objectives of federal drug labeling regulation).
[5] Defendants argue the FDA rejected studies cited in the SAC, Prim. Jurisd. Mem. at 6 n.10, but the Court has found that the FDA addressed different questions than those present here. MTD Order at 8, 10 n.2.

directive that Defendants do studies to assess the impact of increased dosage and duration, show the lack of evidence supporting the safety and efficacy of long-term use of opioids—contra Defendant's conduct implying such support existed. *Id.* at 10; *see also, e.g.*, SAC ¶¶ 221, 240.

> b) The FDA-mandated studies related to long-term opioid use do not merit a stay or dismissal.

Second, Defendants contend that "recently finalized protocols [for the PROP studies] now provide details demonstrating that these studies will assess the precise scientific issues underlying the SAC's claims." Prim. Jurisd. Mem. at 3. However, there is nothing revolutionary about these studies, which were ordered by the FDA to "assess certain *known serious* risks of ER/LA opioid use" including "misuse, abuse, hyperalgesia, addiction, overdose, and death" (emphasis added), PROP Response at 10, and also were discussed extensively in the last round of briefing. Far from constituting a new development, the FDA's final study protocols merely reflect that it is moving forward with the course of action that it had already ordered by the time the Court considered Defendants' prior motion. Indeed, the Court's Order addressed these studies. MTD Order at 10 n.2. The Court reasoned that what was before the FDA "*would not be a basis for applying the primary jurisdiction doctrine because . . . that issue will not be determined in this case.*" *Id*. (emphasis added). What is at issue in this case is "whether [opioids] are marketed truthfully" and "specifically, whether defendants misrepresented the risks, benefits, and superiority of opioids to treat long-term, chronic pain." MTD Order at 8.

> 3. *The California state court decision, which did not analyze or depend upon primary jurisdiction, provides no basis for changing this Court's Order.*

Defendants further argue that a ruling by a California state court, in a case brought under California law, should swing the Court's decision. *See* Prim. Jurisd. Mem. at 4-5; *People v. Purdue Pharma L.P.*, No. 14-725287, 2015 WL 5123273, at *1-2 (Cal. Super. Ct. Aug. 27, 2015). There, the court stayed a similar lawsuit because it concluded that the case "entail[ed]

much more than determining issues of false and misleading marketing" and would "require the court to become an expert in a field in which it has no expertise." *Id*. at *1. However, the California court did not invoke the doctrine of primary jurisdiction. It stayed the case "pursuant to the court's inherent authority to manage its own cases," and its one-paragraph decision reflects only passing analysis, briefly mentioning one case. *Id*. at *1-2. More fundamentally, the court erred in deciding that the case required it to go beyond issues of deceptive marketing and decide "what the public and doctors needs [sic] to be told about opioids." *Id*. at *1. The decision is not a basis for this Court to reconsider its prior ruling.[6]

Defendants alternatively argue that the Court should follow the California court's lead and stay this case based on its inherent authority to manage its docket. Prim. Jurisd. Mem. at 12. They make no showing in support of that unusual request. "[A] stay should be granted only under exceptional circumstances," *Morgan v. Kobrin Sec., Inc.*, 649 F. Supp. 1023, 1032 (N.D. Ill. 1986), and "the burden of making out the justice and wisdom of a departure from the beaten track lay[s] heavily" on the party seeking the stay, *Landis v. N. Am. Co.*, 299 U.S. 248, 256

---

[6] Defendants also cite cases to suggest there has been a sea change in the law since the MTD Order. *See* Prim. Jurisd. Mem. at 5 n.8. Not one of them bears on the facts of this case, however. For example, in *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 761 (9th Cir. 2015), and *Belfiore v. Proctor & Gamble Co.*, 311 F.R.D. 29, at *50-52 (E.D.N.Y. Oct. 5, 2015), plaintiffs challenged the meaning of *specific words* in product labeling. In *Franz v. Beiersdorf, Inc.*, No. 14-2241, 2015 WL 4659104, at *4-5 (S.D. Cal. Aug. 5, 2015), plaintiffs argued that a drug needed FDA approval before being sold—a question only the FDA could address. And in *Herazo v. Whole Foods Marketing, Inc.*, No. 14-61909, 2015 WL 4514510, at *4-5 (S.D. Fla. July 24, 2014), the plaintiffs challenged a product's FDA-regulated indications. To the contrary, numerous decisions since the MTD Order have confirmed courts' ability to adjudicate deceptive marketing claims, even when they involve products regulated by the FDA. *See, e.g.*, *Bruaner v. MusclePharm Corp.*, No. 14-8869, 2015 WL 4747941, at *4-5 (C.D. Cal. Aug. 11, 2015) (declining to apply primary jurisdiction doctrine in dietary supplement case because "Plaintiff is not asking the court to impose standards that the FDA does not impose, nor do his claims require [defendant] to label protein content according to tests using non-FDA approved methods." (internal quotation omitted)); *Zakaria v. Gerber Prods. Co.*, No. 15-00200, 2015 WL 3827654, at *6-7 (C.D. Cal. June 18, 2015) (declining to apply doctrine to health claims pertaining to baby formula despite possibility that court may be required to consider evidence about clinical studies, including those evaluated by the FDA); *Jasper v. MusclePharm Corp.*, No. 14-02881, 2015 WL 2375945, at *3-5 (D. Colo. May 15, 2015) (declining to apply doctrine to challenge to a dietary supplement manufacturer's fat-burning claims).

(1936).  Lacking any reason to invoke the primary jurisdiction doctrine, the Court likewise should decline to stay the case pursuant to its inherent authority.

### C.     This Court has already determined that the content of FDA-approved labeling does not require a stay or dismissal.

Defendants also argue—again—that language contained in their FDA-mandated labels forecloses the City's claims that Defendants made misrepresentations about pseudoaddiction and withdrawal.  *See* Prim. Jurisd. Mem. at 8.  These are merely recycled, and rejected, arguments from Defendants' first motion.  *Compare* Original Mem. at 23-24 *with* Prim. Jurisd. Mem. at 5-11.  As the Court previously recognized, "drug labels do not preclude fraud claims based on misrepresentations of the label information, which is what the City alleges."  MTD Order at 21.

## II.     THE SAC STATES CLAIMS FOR RELIEF ON EACH CAUSE OF ACTION.

The City has pleaded claims that both fully address the pleading deficiencies identified in the MTD Order and otherwise satisfy Rules 8(a) and Rule 9(b), as applicable.  Section II.A lays out, in detail and by Defendant, the factual basis for the City's deceptive conduct claims under its consumer fraud ordinances—including allegations that each Defendant misrepresented the risks, benefits, and superiority of opioids to specific Chicago prescribers and otherwise directed misrepresentations into Chicago with the intent that Chicagoans rely on them.  As discussed therein, even if the Court somehow found this detail lacking, such allegations support the City's new claim for unfair conduct, to which Rule 9(b) does not apply.

Sections II.B – E show how Defendants' misrepresentations also support the City's false statements and claims, conspiracy, municipal services, and unjust enrichment claims.  Section II.F establishes that four Defendants (all but Actavis) may be held liable for third-party conduct under an aiding-and-abetting theory, even if the Court deems the City's conspiracy allegations lacking.  Finally, Section II.G shows how the SAC meets the pleading burden the Court set on

14

causation. The City need not show causation to state claims for deceptive and unfair practices, but it has sufficiently alleged this element in its other claims through allegations showing that specific Chicago prescribers wrote opioid prescriptions as a result of Defendants' deceptive schemes. However, even if the Court found the prescriber-level causation allegations insufficient, the City should be permitted to proceed on its municipal services claim, since it is expressly authorized by ordinance to recover these costs and may prove them in the aggregate.

**A.      The SAC sufficiently alleges deceptive and unfair conduct (Counts I – III).**

The City has pleaded three causes of action under its consumer fraud ordinances: a claim for deceptive conduct in violation of MCC § 2-25-090 (Count I); a claim—new to the SAC—for unfair practices in violation of MCC § 2-25-090 (Count II); and a claim for deceptive conduct in the sale or advertisement of merchandise, in violation of MCC § 4-276-470 (Count III). In its MTD Order, the Court sustained the two deceptive conduct claims against Purdue but dismissed them as to the other Defendants, finding that the City had insufficiently alleged those Defendants' control over third-party misrepresentations and failed to tie those misrepresentations to Chicago. The SAC addresses these concerns as to all Defendants and builds on the case against Purdue with expanded allegations that: (a) identify specific Chicago prescribers who received Defendants' deceptive messages; (b) show Defendants' control over misleading third-party materials that reached Chicagoans; and (c) identify deceptive materials that Defendants themselves directed into Chicago. The same allegations—which establish that Defendants engaged in immoral, unethical, oppressive, and unscrupulous conduct that violates public policy and caused substantial injury to consumers—also support the City's unfair practices claims.

Below, the City first addresses the standards by which the Court should judge the City's deceptive and unfair practices claims, in the process explaining how Defendants' arguments regarding Rule 9(b), group pleading, and deceptiveness are inconsistent with this Court's MTD

and Reconsideration Orders and other case law.  The City next demonstrates, beginning with Purdue and proceeding to the other Defendants, both (a) how the SAC's expanded allegations satisfy the pleading burden the Court established in its Orders, and (b) why Defendants' arguments do not overcome this pleading.  In doing so, the City has not attempted to show that each Defendant exercised editorial control over *every* third-party misrepresentation with which it was involved, or that *every* deceptive publication referenced in the SAC reached or was available to Chicago prescribers.  That is not what the Court asked for or even intimated was required.  As to each Defendant, the City has highlighted more than enough examples of misrepresentations directed into Chicago—by Defendants themselves, or with the requisite editorial control—to meet the Court's standard and proceed to discovery on its claims as a whole.  Defendants' strategy of picking apart isolated allegations ignores the overall weight of these well-pleaded examples and how the City's allegations fit together to describe and confirm, in great detail and in conformity with the MTD Order, Defendants' deceptive and misleading marketing campaigns.

> 1.  *Defendants' Rule 9(b) and other joint arguments are inconsistent with the case law and this Court's Orders.*

>> a)  Rule 9(b) requires sufficient notice of claims.

Defendants' response to the high degree of particularity in the SAC is to demand even more.  Per Defendants, the City must plead that each Defendant, through a *specific employee or publication*, made a *specific misrepresentation* to a *particular prescriber* in a *particular location* on a *particular dat*e, who in reliance thereon prescribed a *specific opioid* to a *particular patient*, which *was* shown to be *"ineffective or caused harm"* and that *the City paid for that prescription* as a result of an *independent misrepresentation* to the *particular administrator* who decided the claim.  *See* Defs.' Mem. Supp. Jt. Mot. to Dismiss SAC, ECF No. 424, at 18-19 ("Jt. Mem."); Purdue Mem. Supp. Mot. to Dismiss SAC, ECF No. 412, at 6-8 ("Purdue Mem.").  This

16

hypertechnical standard goes far beyond what the law requires and would pose a virtually insurmountable obstacle to any plaintiff asserting a large-scale fraud. The Court recognized this in upholding the claims against Purdue because the City had alleged that "the Purdue entities made misstatements about opioids on their own websites with the intention that Chicago doctors and consumers rely on those misrepresentations." MTD Order at 29.

The Court's Orders are consistent with the flexibility reflected in other Rule 9(b) case law of this Circuit. "[A] plaintiff who provides a 'general outline of the fraud scheme' sufficient to 'reasonably notify the defendants of their purported role' in the fraud satisfies Rule 9(b)." *Judson Atkinson Candies, Inc. v Latini-Hohberger Dhimantec*, 237 F.R.D. 173, 175 (N.D. Ill. 2006) (quoting *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)). Rule 9(b) can be met through "a brief sketch of the 'who, what, when, where, and how' of the fraudulent scheme." *Dexia Credit Local v. Rogan*, No. 02-8288, 2003 WL 22349111, at *9 (N.D. Ill. Oct. 14, 2003). However, these "are examples of th[e] detail" that may satisfy Rule 9(b); "they are not . . . essential elements." *United States ex rel. Oughatiyan v. IPC The Hospitalist Co., Inc.*, No. 09-5418, 2015 WL 718345, at *5 (N.D. Ill. Feb. 17, 2015) (eschewing dismissal simply because suit "fails to allege the exact time or specific location . . . of a fraudulent claim"). As the Court has recognized, the "exact level of particularity that is required will necessarily differ based on the facts of the case." *Schuller v. Am.'s Wholesale Lender*, No. 14-4097, 2015 WL 5316413, at *2 (N.D. Ill. Sept. 9, 2015) (Alonso, J.).

In keeping with this case-by-case approach, courts have recognized that the rule should be relaxed in some circumstances. In particular, "[c]ourts . . . that have relaxed Rule 9(b)'s pleading standard typically do so when the plaintiff is alleging a wider fraudulent scheme." *United States ex rel. Bragg v. SCR Med. Transp., Inc.*, No. 07-2328, 2011 WL 1357490, at *4

17

(N.D. Ill. Apr. 8, 2011).  The Seventh Circuit has also held that "the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to be the case where . . . plaintiff alleges a fraud against one or more third parties."  *Corley v. Rosewood Care Center, Inc. of Peoria*, 142 F.3d 1041, 1051 (7th Cir. 1998).  Further, Rule 9(b) does not displace the requirement that courts make all reasonable inferences, "in the light most favorable to the plaintiff," from the well-pleaded facts in the complaint.  *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009).  Because Defendants, but not the City, have the information on whom they detailed, what was said or handed out, which Chicago prescribers attended their events, and how they adjusted their prescribing in response, and because the City, based on its extensive investigation, has provided highly detailed direct evidence and facts creating an inference of fraudulent conduct, the SAC satisfies Rule 9(b).

> b) <u>Allegations are sufficiently individualized if they apprise each Defendant of its role in the fraud.</u>

Defendants further contend that the SAC runs afoul of Rule 9(b), as well as *Iqbal* and *Twombly*, by engaging in improper "group pleading."  Jt. Mem. at 4-5.  They accuse the City of both lumping all five corporate families into collective allegations against "Defendants" and failing to differentiate among related entities in the same corporate family.  These arguments, which Defendants previously raised, misconstrue the concept of group pleading.

A complaint is not deficient simply because it employs common allegations to allege common conduct; a complaint engages in group pleading when it fails to detail the role of each defendant in their collective fraud.  *See Sobilo v. Seleman*, No. 06-0461, 2006 WL 1762353, at *3 (N.D. Ill. June 27, 2006) (holding that use of the term "defendants" did not render plaintiff's allegations insufficient when it was used to more simply plead common conduct, and "individual roles within the scheme" were also described); *Alumax Mill Prods., Inc. v. Krzysztofiak*, No. 96-

5012, 1997 WL 201555, at *3 (N.D. Ill. Apr. 17, 1997) ("Plaintiff is not merely lumping defendants together and generally complaining of their actions. Plaintiff has adequately apprised each defendant of their respective roles in the alleged scheme."). While the SAC pleads certain common conduct, its Defendant-specific sections—which Defendants entirely ignore—amply apprise each Defendant of the specific conduct with which it is charged.[7]

Further, defendants that are related corporate entities are "in a position to determine their roles in the alleged fraud without significant difficulty." *United States v. Kellogg Brown & Root Servs., Inc.*, No. 12-4110, 2014 WL 4948136, at *11 (C.D. Ill. Sept. 30, 2014); *accord Empire Title Servs., Inc. v. Fifth Third Mortg. Co.*, No. 10-2208, 2013 WL 1337629, at *17 (N.D. Ohio Mar. 29, 2013) (finding that related corporations could "sort out themselves who made the alleged misstatements"). In these circumstances, allegations directed at the larger organization are "less likely to frustrate notice of the claims" as to any individual defendant. *Sussex Fin. Enters., Inc. v. Bayerische Hypo-und Vereinsbank*, No. 08-4791, 2010 WL 94272, at *3 (N.D. Cal. Jan 6, 2010). The SAC apprises each entity of the role the City alleges it played in the marketing and distribution of opioids. Further, no Defendant actually contends—nor could any credibly—that it cannot identify its involvement in the fraudulent scheme in which its larger corporate family is alleged to have engaged. This is not a basis for dismissal.

---

[7] In contrast to the circumstances presented here, the cases on which Defendants rely, Jt. Mem. at 4-5, involved claims that were generalized in the extreme. *See, e.g., United States v. Sanford-Brown*, 788 F.3d 696, 705-06 (7th Cir. 2015) (finding that "not once" did the complaint distinguish conduct of each defendant); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777-78 (7th Cir. 1994) (finding complaint deficient where many allegations stated only that "the misrepresentations were made 'at the direction, under the supervision, or with the knowledge and consent' of all defendants"); *Beaman v. Souk*, No. 10-1019, 2011 WL 832506, at *7 (C.D. Ill. Mar. 3, 2011) (finding plaintiff made only "general" and "scant" allegations against certain defendants and did not put them on notice of the claims); *Suburban Buick, Inc. v. Gargo*, No. 08-0370, 2009 WL 1543709, at *5 (N.D. Ill. May 29, 2009) (observing that complaint in "kitchen-sink style" failed to identity to which defendants the various counts applied); *Watt v. City of Highland Park*, No. 98-8123, 2001 WL 1090152, at *2 (N.D. Ill. Sept. 13, 2001) (dismissing complaint where "plaintiffs provide[d] no indication of what they . . . alleg[ed] that each defendant did").

        c)      <u>Rule 9(b) applies only to the City's deceptive practices claims<br>(Counts I and III), not its unfair practices claim (Count II).</u>

Despite Defendants' assertions to the contrary, Jt. Mem. at 25 n.34, the heightened

pleading standard of Rule 9(b) is inapplicable to the City's unfair practices claims. As the

Seventh Circuit held in *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology*

*Financing Services*, 536 F.3d 663, 670 (7th Cir. 2008): "Because neither fraud nor mistake is an

element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair

practices . . . need only meet the notice pleading standard of Rule 8(a), not the particularity

requirement in Rule 9(b)." *See also Marchetti v. Chicago Title Ins. Co.*, No. 12-5985, 2013 WL

317014 (N.D. Ill. Jan. 28, 2013) (applying Rule 8(a) to unfair practices claim, and Rule 9(b) to

deceptive practices claim, where plaintiff alleged that conduct was both unfair and deceptive).

Defendants attempt to bootstrap Rule 9(b) pleading requirements by relying on *Camasta*

*v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732 (7th Cir. 2014), and *Pirelli Armstrong Tire Corp.*

*Retiree Medical Benefits Trust v. Walgreens Co.*, 631 F.3d 436 (7th Cir. 2011), and arguing that

the City's unfair practices claim is purportedly "based entirely on allegedly deceptive advertising

practices." Jt. Mem. at 3 n.5. In fact, the City has alleged in detail that Defendants engaged in

immoral, unethical, oppressive, and unscrupulous conduct that violates public policy and caused

substantial injury to consumers. *See*, *e.g.*, SAC ¶¶ 205-13, 710-29, 752-63; Sections II.A.2 –

II.A.6, *infra*. Such conduct is not dependent on deception and is an independent basis for a valid

unfair practices claim. In any case, as outlined below in Sections II.A.2 – II.A.6, the City's

unfairness allegations also comport with Rule 9(b) as to each Defendant.

        d)      <u>Determinations regarding whether particular statements are deceptive<br>are inappropriate on a motion to dismiss.</u>

Lastly, Purdue, Endo, and Janssen argue that various materials and statements discussed

in the SAC are not false or misleading as a matter of law. These arguments mischaracterize both

the materials and the SAC's allegations concerning their falsity, as discussed in Sections

II.A.2.b.vi, II.A.5.b.ii, and II.A.6.b.iii, *infra*.  As a threshold matter, whether Defendants'

conduct creates a likelihood of deception "is a factual question that is best left for the jury."  *In*

*re Mut. Life Ins. Co. of N.Y. Premium Litig.*, 295 F. Supp. 2d 140, 147 (D. Mass. 2003).  Rule

9(b) "does not require a plaintiff to plead facts that if true would show that the defendant's

alleged misrepresentations were indeed false."  *De Falco v. Vibram USA, Inc.*, No. 12-7238,

2013 WL 1122825, at *3 (N.D. Ill. Mar. 18, 2013); *see also Abt v. Mazda Am. Credit*, 25 F.

Supp. 2d 860, 865 (N.D. Ill. 1998) ("For the purpose of a motion to dismiss, it cannot be decided

as a matter of law that the defendant's action was or was not misleading . . . .").[8]

### 2. *The SAC continues to state claims against Purdue.*

Applying the foregoing standards, the City has stated claims for deceptive and unfair

conduct against each Defendant, starting with Purdue.  Below, the City first describes how the

allegations of the SAC meet the pleading burden set by the Court, then addresses both

Defendants' joint arguments—as applied to the claims against Purdue—and Purdue's individual

arguments.  Sections II.A.3 – II.A.6 follow the same pattern for the other four Defendants.

### a) The City has met the Court's standard for pleading its deceptive and unfair practices claims.

The Court's MTD Order held that the City had stated consumer fraud claims against

---

[8] The cases on which Defendants rely involved claims with no plausible possibility that the statements were deceptive.  *See Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938-43 (7th Cir. 2001) (finding that analysis of statements themselves, and the clear information attached to the complaint, "eliminate[d] any possibility of deception"); *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 906-09, 914-15 (N.D. Ill. 2013) (dismissing claim where allegedly deceptive representation was contradicted by the ingredient list on the product packaging, but refusing to resolve similar questions of fact in other claims); *Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 756-59 (N.D. Ill. 2015) (holding that plaintiff failed to plausibly allege that food manufacturer's "no-refined sugars" claim was deceptive given that the label listed "evaporated cane juice" as an ingredient); *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1235 (S.D. Fla. 2007) (finding certain advertisements comported with the approved label but noting that, for others, "[w]hether or not the plaintiffs can show any inconsistencies between [the drug's] approved label and [the manufacturer's] advertisements, and whether such inconsistencies are in fact misleading, are questions of fact").

Purdue.  MTD Order at 29.  The Court found that although most of the City's allegations against Purdue "suffer[ed] from the same flaws as those leveled against the other entities," the City's allegations "that, starting in 2005 and continuing to the present, the Purdue entities made misstatements about opioids on their own websites with the intention that Chicago doctors and consumers rely on those misrepresentations are sufficient to state claims against the Purdue entities."  *Id.*  Thereafter, in denying Purdue's motion for reconsideration, the Court rejected Purdue's claim that it had been treated differently than the dismissed Defendants, explaining:

> These entities, unlike Purdue, are not alleged to have made misrepresentations on their own websites but to have "sponsor[ed]" websites containing misrepresentations. . . . Absent a control allegation or an allegation that suggests Chicagoans were the intended recipients of the misrepresentation, *e.g.*, that "Chicago doctors or consumers visited the websites" . . . , there is no basis for inferring . . . intent.  However the situation is different for Purdue, which is alleged to have made misrepresentations on its own websites, which suggests both that it made them and that it intended for anyone with access to the sites, including Chicagoans, to rely on them.

Recons. Order at 2.

In the SAC, the City continues to rely upon its allegations regarding Purdue's direct marketing to support the deceptive practices claims (Counts I and III).  As before, the City alleges that Purdue used its website *Partners Against Pain* to purvey deceptive messages about addiction—and, in particular, that a pamphlet Purdue posted on that site, and distributed in hard copy, claimed "illicit drug use and deception" were indicia not of addiction but undertreated pain.  SAC ¶ 578.[9]  The City again alleges that Purdue's *In the Face of Pain* website deceptively implied that patients should keep looking until they find a doctor willing to prescribe opioids.  *Id.* ¶ 576.  New to the SAC is the allegation that this website was deceptive because it omitted the significant risks of opioid abuse and addiction and because testimonials on the site created a

---

[9] The SAC further clarifies that this pamphlet, *Clinical Issues in Opioids Prescribing*, is copyrighted 2005 and was distributed in hard copy through at least November 2006.  *Id.* ¶ 578.

misleading impression by failing to disclose that the doctors were paid by Purdue. *Id.* ¶ 588.

The SAC also supports its claims against Purdue with facts showing that Purdue directed misrepresentations to Chicago prescribers. The SAC identifies, as examples, 15 Chicago-area prescribers who, in interviews with the City, confirmed that they received one or more marketing messages from Purdue sales representatives regarding OxyContin and other Purdue opioids, and opioids generally, that the City alleges are deceptive. Purdue also deceptively promoted its drugs through national advertising, its own publications, and those of third parties it controlled.

The allegations regarding the prescriber interviews, at SAC ¶ 630 (a) – (q):

- identify the prescribers who received misrepresentations or omissions (Prescribers B-G, J, Q, S, T, Z, DD, GG, HH, and QQ), each of whom has been assigned a letter designation in the SAC but whose name will be disclosed in discovery;

- identify the specific misrepresentations or omissions made by Purdue sales representatives to each prescriber—*e.g.*, that opioids would increase patients' ability to function, that OxyContin would give patients 12 hours of pain relief, and that OxyContin was less likely to be abused or lead to addiction;

- specify (at SAC ¶ 296 n.94) that the misrepresentations occurred during a time period—2006 to the present—that is relevant to the City's claims;

- where possible, supply additional specificity regarding the time frame of the misrepresentations—*e.g.*, that Purdue sales representatives pushed their "steady state" message with Prescriber B about a year ago; that Purdue representatives informed Prescriber DD in 2014 that OxyContin provides 12 hours of pain relief; and that Prescriber QQ has been detailed by Purdue in the last five years; and

- indicate how the misrepresentation was made—*i.e.*, by a Purdue sales representative in detailing visits to the prescriber.[10]

In addition, SAC § V.D explains why each of the statements is false. *See, e.g., id.* ¶ 224 (claims about "steady state" properties falsely implied that risk of addiction and abuse was low); *id.* ¶¶

---

[10] In each Defendant-specific section, the SAC further specifies, by claim dollar amount and number of prescriptions, the opioid prescriptions written by each interviewed prescriber that were paid for by City health plans. Although not required to state claims for consumer fraud, *see* Section II.G.1, *infra*, this information supports the City's false claims and other causes of action, *see* Section II.G.2, *infra*.

218-20 (claims of functional improvement lack scientific basis and ignore significant side effects); *id.* ¶¶ 253-59 (implication that OxyContin provides 12 hours of pain relief is misleading in light of "end of dose failure"); *id.* ¶¶ 222-29 (claims of reduced risk of abuse and addiction are misleading in light of available scientific evidence).

The allegations regarding Chicago Prescriber HH are illustrative. Prescriber HH recalled:

[H]e was visited by sales representatives from Purdue. . . . [They] never discussed the side effects or adverse effects of their opioids. He has also been told by drug representatives, including Purdue's, that the effects of withdrawal can be successfully managed. Purdue's sales representatives also told Prescriber HH that Purdue's reformulated oxycodone—Hysingla—is long acting, has fewer "peaks and troughs," and is less likely to lead to euphoria than other opioids. He was also familiar with Purdue's claims that OxyContin has "true 12 hour dosing," and noted that short acting opioids are often prescribed to handle patients' pain once the 12 hour dose prematurely wears off.

SAC ¶ 630(o).

Purdue also deceptively promoted opioids through nationally distributed publications. For example, Purdue ran ads in the *Journal of Pain* in 2005 and 2006 and in the *Clinical Journal of Pain* in 2005 that misleadingly implied that OxyContin's 12-hour dosing provided a full 12 hours of pain relief. *See id.* ¶¶ 257, 565. And in 2011, Purdue published and made available nationally to prescribers and law enforcement the pamphlet *Providing Relief, Preventing Abuse*, which promoted the false concept of "pseudoaddiction" and otherwise downplayed the risk of addiction to opioids. *See id.* ¶¶ 572-74.[11] As with Purdue's websites, the Court may reasonably infer that they were available to, intended to reach, and did reach, Chicago prescribers.

Finally, Purdue conveyed misrepresentations through third parties, most notably the American Pain Foundation ("APF").[12] In 2011, for instance, APF published *A Policymaker's*

---

[11] The SAC clarifies the allegations as to *Providing Relief* by pointing out that Purdue published the pamphlet online, *see id.* ¶¶ 572-74, evincing intent that it reach and be relied upon by Chicago prescribers.

[12] The City has identified various third-party projects that Purdue and other Defendants sponsored, as part of its allegations regarding Defendants' widespread and systematic marketing schemes. However, in

24

*Guide to Pain and Its Management*, which falsely asserted that "opioids . . . are effective in improving [d]aily function," deceptively minimized the risks of addiction and withdrawal, and misrepresented the safety of increasing doses of opioids. *See* SAC ¶¶ 596-600. The guide was posted online, where it was and remains available to Chicago prescribers. *See* id. ¶ 596. And in 2007, APF published *Treatment Options: A Guide for People Living with Pain*, which deceptively implied that opioids could improve patients' function by promising them "a quality of life [they] deserve," minimized the risk of addiction, and touted the safety of opioids while exaggerating risks of alternative forms of treatment. *See id.* ¶¶ 603-07. *Treatment Options* was posted online, where it was available to and intended to reach Chicago prescribers. *Id.* ¶ 607.

Purdue not only sponsored these APF publications, but demonstrated its control over their messages.[13] APF heavily relied on Purdue's funding, and Purdue made clear to APF that continued funding was contingent on APF's support of Purdue's interests. *See id.* ¶ 582. In addition, evidence of Purdue's overt control over particular APF projects—Purdue's hiring of APF as a consultant, and its domination of APF's Pain Care Forum—supports the inference that Purdue also exercised control over these two publications. *See id.* ¶¶ 583-84, 589-90.[14]

---

opposing Defendants' motions to dismiss, the City has taken care to direct the Court to those specific allegations that go beyond sponsorship or funding of third parties. Further, the exercise of control over these third party statements is not the only way Defendants can be liable for them. The SAC alternately alleges that Defendants are liable for conspiring with the third parties to disseminate deceptive messages, *see* Section II.C, *infra*, and for aiding and abetting such third-party statements, *see* Section II.F, *infra*.

[13] *Treatment Options* also was sponsored by Cephalon, *see id.* ¶¶ 353-57, but this does not preclude a finding that Purdue, as well as Cephalon, exercised control over the publication's message. The City has alleged that APF served multiple corporate masters. *See id.* ¶¶ 186-95, 348-58, 433-55, 529-44, 581-610.

[14] The Court's MTD Order deemed insufficient the City's allegations regarding Purdue's editorial control over *A Policymaker's Guide* and *Treatment Options*. New to the SAC are allegations detailing Purdue's tight-knit relationship with APF, including allegations a "Master Consulting Services" agreement between the two organizations related to *Partners Against Pain*, SAC ¶¶ 583-87, details regarding their work to promote opioids through the Pain Care Forum, *see id.* ¶¶ 589-92, and an explanation of how the APF's corporate round table—of which Purdue was a member—worked to "[s]end ambassadors to talk about pain within . . . hospitals," *id.* ¶ 582. Also new are the SAC's allegations that Purdue's continued funding of APF was dependent on APF's support of Purdue's business interests. *See id.*

Collectively, the foregoing allegations amply satisfy Rule 9(b) and the Court's requirement that the City identify Chicago prescribers to whom Purdue made misrepresentations, as well as when and how the misrepresentations were made. That is so whether or not the Court credits the City's allegations supporting editorial control, as the City has sufficiently alleged direct misrepresentations by Purdue.

While these allegations provide the specificity the Court required, they also are merely examples of Purdue's widespread, deceptive promotion of opioids, which originated nationally and reached into Chicago. *See id.* ¶¶ 558-632. This widespread scheme is further established by other sources alleged in the SAC, including: (a) other deceptive advertising and promotional materials, *see id.* ¶¶ 564, 569-74; (b) paid speakers, who were required to stay true to Purdue's nationwide messaging, *see id.* ¶ 579; (c) Purdue's collaboration with third parties, including APF, FSMB, and AGS, *see id.* ¶¶ 580-621; (d) promotion and funding of misleading science, *id.* ¶ 622; and (e) the verbatim sales message recall data obtained by the City, which also documented Purdue sales representatives making misleading claims to Midwestern prescribers regarding improved patient function, 12-hour efficacy of OxyContin, and risk of addiction, *see id.* ¶¶ 628-29.[15] The City has pleaded sufficient facts to go forward to discovery and summary judgment on the full scope of its deceptive practices claims against Purdue.

Moreover, much of this same conduct also establishes the City's claim against Purdue for unfair practices—which, as set forth in Section II.A.1.c, *supra*, the City does not need to plead with particularity. Independent of whether Purdue's statements were consumer fraud by

---

[15] Purdue and the other Defendants dismiss as speculative the City's allegations regarding conduct nationwide and in the Midwest. Jt. Mem. at 8 n.13. The City has pleaded in detail the nationwide and uniform character of Defendants' marketing, which was centrally orchestrated and consistent across sales regions. *See* SAC ¶¶ 85-117. These allegations, and the City's allegations of specific deceptive and unfair conduct in Chicago, mutually reinforce one another. Together, they amply support the inferences that (a) Defendants engaged in the same conduct in Chicago as they did nationwide, and (b) such conduct extended beyond the specific prescribers described in the SAC to other prescribers in Chicago.

26

deception, they were unfair in that—contra state and federal policy[16]—they failed to accurately and fully disclose the risk of opioid addiction. *See, e.g.*, SAC ¶¶ 628-30 (Purdue representatives omitted and minimized risk of addiction and suggested it could be managed); *id.* ¶¶ 572-621 (Purdue and Purdue-controlled materials distributed or available in Chicago, including *Providing Relief* and the APF publications, minimized risk of addiction).   The City has sufficiently alleged that Purdue's conduct was unscrupulous, immoral, unethical, and oppressive, contrary to numerous public policies, and substantially injured Chicagoans.   Purdue's dishonest marketing of addictive drugs—which patients could not just stop taking, *see id.* ¶¶ 692-98—goes to the core of the unfairness doctrine.   The doctrine considers the injury to consumers, the impact of the conduct on vulnerable populations, and consumers' ability to avoid the injury.   *See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002); FTC, *Policy Statement on Unfairness* (Dec. 17, 1980) ("FTC Policy Statement").[17]

Each of these factors is present in the City's claims against Purdue and the other Defendants.   The Complaint describes the grievous injury to Chicagoans as a result of "the life-upending effects of addiction, abuse, misuse, overdose and death," including not only "the compulsive use of and need for opioids, the haziness when . . . on the drugs, and the nearly constant struggle to maintain their supplies," but also a "dramatically heightened risk of serious injury or death and sometimes an unrecoverable toll on their health, work, and family."   SAC ¶ 759(b).   And, as the SAC lays out, Purdue and other Defendants targeted vulnerable populations—veterans and the elderly—that were particularly susceptible to the deceptive marketing, both because they are more likely to face chronic pain conditions and are more likely

---

[16] *See, e.g.*, 745 ILCS 35/2 ("[D]rug addiction [is] among the most serious health problems facing the people of the State of Illinois"); 21 C.F.R. § 1308.12(b)(i)(c) (2015) (which has the effect of classifying Defendants' opioids as Schedule II controlled substances based on high potential for abuse that may lead to severe psychological or physical dependence).

[17] *Available at* https://www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness.

to suffer serious injuries through interaction with other drugs, falls, suicides, and other adverse events. *See, e.g.*, *id.* ¶¶ 211-13, 608-10 (*Exit Wounds*, which Purdue sponsored and APF distributed to veterans in Chicago, described opioids as "underused" and the "gold standard of pain medications" while omitting discussion of addiction and overdose risk); ¶¶ 614-16 (documenting Purdue's work with American Geriatrics Society ("AGS") to promote pro-opioid guidelines for management of pain in the elderly). Finally, because of the very nature of prescription opioids, which closely resemble heroin, consumers are unable to avoid injury. The SAC describes prescribers and addiction counselors who laid out for the City the need to prescribe opioids to maintain patients' addiction, the severe symptoms from opioid withdrawal, the conversion of many patients from prescription opioids to heroin, and, even for recovering addicts, the lifelong challenge to avoid relapse. *See id.* ¶¶ 18-20, 60, 83, 682-706, 714-22, 729. On these facts, the City has also stated a claim for unfair practices against Purdue.

> b) <u>Purdue's arguments do not defeat the City's consumer fraud claims.</u>

Although the SAC squarely addresses the deficiencies identified by the Court, Purdue asserts a scattershot of other arguments that the City's consumer fraud claims must be dismissed. These include Defendants' common arguments that (a) the SAC impermissibly lumps together individual Defendants, notwithstanding the detailed, Defendant-specific allegations of SAC § V.E; (b) however particularly the City has pleaded, it has not pleaded particularly enough; (c) their drugs' labeling immunizes them from any claim that they omitted discussion of the risks of opioids; (d) only conduct from November 2008 forward is actionable; and (e) the City's allegations do not support the unfair practices claim. The City addresses these contentions in full below with respect to Purdue, and responds to them briefly hereafter with respect to the other Defendants. Beyond these joint arguments, Purdue also asserts that various materials referenced

28

in the SAC are not deceptive as a matter of law—fact-based arguments that the Court should dismiss out of hand as premature, but which the City also addresses briefly below.

        i.      The SAC's allegations against Purdue are sufficiently individualized.

Purdue already unsuccessfully argued that the City improperly grouped Purdue entities as the "Purdue Defendants" and impermissibly lumped Purdue into collective allegations against "Defendants." This argument fares no better now. First, Purdue does not—and could not— claim any actual difficulty in determining which of its entities played which role in the fraudulent scheme alleged in the SAC. Second, although the SAC employs collective allegations to describe certain common conduct of Defendants, it devotes an entire section—Section V.E.5—to laying out the specific conduct of which Purdue is accused, including the specific misrepresentations and the manner in which it made them. This is enough to "apprise [the] defendant[s] of their respective roles in the alleged scheme." *Alumax*, 1997 WL 201555, at *3.

        ii.      The City's allegations against Purdue satisfy Rule 9(b).

As noted in Section II.A.1.a, *supra*, Purdue and the other Defendants have demanded an unrealistic and unfounded degree of particularity—tying misrepresentations about specific drugs to specific Purdue employees who delivered them to named prescribers on particular dates in particular places to specific prescriptions written in reliance on those misrepresentations and resulting harm to specific patients. The MTD Order already rejected this outlandish approach, and the City has pleaded all that Rule 9(b) requires.

Defendants' primary Rule 9(b) argument is that the City failed to plead with particularity *when* they—in this case, Purdue—made the misrepresentations documented in the Complaint. But the City has identified the particular years in which Purdue's advertisements and other publications appeared. *See, e.g.*, SAC ¶¶ 564-79. As to the interviewed prescribers, the City has

alleged that the misrepresentations took place in the period 2006 to the present. *Id.* ¶ 296 n.94.

Combined with other details in the SAC (including the nature of the statement, how it was made,

and the prescriber to whom it was made), the time frame is sufficient to give Purdue notice of the

City's claims against it. "[A] complaint that fails to allege the exact time or specific location of

the transmission of a fraudulent claim will not be dismissed under Rule 9(b)." *Oughatiyan*, 2015

WL 718345, at *5; *see also United States ex rel. Grandeau v. Cancer Treatment Ctr. of Am.*, No.

99-8287, 2003 WL 21504998, at *1 (N.D. Ill. June 30, 2003) ("While [relator] does not give

specific names or dates under each heading, there is enough information in the complaint to

allow defendants to respond and prepare a defense."). The Court has recognized this, deeming

sufficient the FAC's allegations that Purdue made misstatements on its websites "starting in

2005 and continuing to the present." MTD Order at 29; *see also* Recons. Order at 2-3.

Defendants would require the City to plead specific dates of misrepresentations, even

though sales visits and other marketing exposure are recurrent, and doctors would not know—or

recall years later—the date on which a sales representative made a particular misrepresentation.

Defendants are the ones with records of whom their sales representatives met with when and

what was said. Particularly because specific dates of detailing visits are in Purdue's hands—not

those of the City or prescribers—the Court should find that the City's allegations as to the

"when" of the misrepresentations are sufficient.[18]

Defendants further complain that in some instances, the allegations are not particular

enough because prescribers recalled that they were visited by representatives from several or all

---

[18] The City's pleading satisfies Rule 9(b) for the reasons above. However, to the extent the Court believes
Rule 9(b) requires more specificity, this is precisely the type of case that warrants a relaxed application of
the Rule. *See Corley*, 142 F.3d at 1051. In recognition of certain case law requiring a "showing" in
support of relaxing Rule 9(b), *see Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998), the
City submits herewith the Declaration of Fiona A. Burke. That declaration documents the City's largely
unsuccessful efforts to obtain from Defendants the "call notes" and other records that are the only source
of information about precisely when their representatives visited prescribers.

Defendants, and that each made the same type of misrepresentation. Purdue Mem. at 6-8. But this is a complaint about the credit to be given witnesses' recollections, not the sufficiency of the City's pleading. It is consistent with the City's theory of the case that multiple Defendants made similar misrepresentations. *See* SAC ¶¶ 214-52. The same is true of Defendants' complaint that the SAC sometimes alleges deceptive messages about Purdue's drugs or opioids generally, as opposed to deceptions about a specific Purdue opioid. The City has alleged that all Defendants, including Purdue, both engaged in and benefitted from not only specific misrepresentations about their own drugs, but also about opioids as a class. *See id.* ¶¶ 133, 516-44, 636-37.

Defendants' other Rule 9(b) arguments likewise are unavailing as to Purdue. Defendants assert a host of causation-related pleading defects—*e.g.*, that the City fails to allege *why* particular doctors prescribed opioids, and that the SAC does not connect particular misrepresentations to particular misrepresentations to doctors. As discussed in Section II.G.1, *infra*, and as the Court recognized in its MTD Order, causation and injury are not elements of the City's consumer fraud claims. Purdue also complains that the SAC does not allege, by name, *which specific employees* made misrepresentations to the doctors cited in the SAC. But Purdue—alone—knows which of its employees detailed Chicago prescribers and does not identify a single case in which consumer fraud allegations were dismissed for failure to name the sales representatives who made the fraudulent statements. For good reason: requiring the names of specific employees would serve only to screen out meritorious claims, since prescribers, who see many sales representatives, would not be expected to remember the name of the employee who conveyed a particular message, even though the message itself stuck with them.

> iii.    Omission of the risk of addiction is actionable.

All Defendants, including Purdue, assert that they cannot be liable for omitting the risk of addiction in discussions with prescribers, because that information is disclosed in their drugs'

labeling. This ignores FDA guidance that it is "critically important to disclose risk information in prescription drug and medical device promotion appropriately and effectively to healthcare professionals and consumers." FDA, *Draft Guidance for Industry Presenting Risk Information in Prescription Drug and Medical Device Promotion* (May 2009).[19] It is reasonable to expect that the risks of abuse, overdose, and addiction—important enough to merit boxed warnings— would be included when Defendants promoted their drugs in sales visits to prescribers.

The argument also misstates the law. "The allegedly deceptive act must be looked upon in light of the totality of information made available to the plaintiff." *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 987-88 (N.D. Ill. 2013) (finding that small-print disclaimers on back of package "could have the capacity to deceive consumers" given more prominent claims on package front); *see also Ackerman v. Coca-Cola Co.*, No. 09-0395, 2010 WL 2925955, at *6, 16 (E.D.N.Y. July 21, 2010) (rejecting dismissal because "[t]he fact that the actual sugar content of vitaminwater was accurately stated in an FDA-mandated label on the product does not eliminate the possibility that reasonable consumers may be misled" by other statements touting product's health benefits). The City has pleaded various examples of Defendants omitting or minimizing the risk of opioid addiction in their promotional materials and in sales representatives' detailing visits—including, as to Purdue, in marketing messages delivered to Prescribers C, E–G, J, Q, Z, and HH. SAC ¶ 630. Whether these reflect actionable consumer fraud, based on the totality of the information provided, is a question of fact that cannot be resolved on a motion to dismiss.

    iv. Conduct before November 19, 2008 is relevant to the City's claims.

Defendants challenge Count I to the extent it seeks relief under MCC § 2-25-090 for conduct that occurred before the ordinance's November 19, 2008 enactment. Jt. Mem. at 24-25.

---

[19] *Available at* http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/ guidances/ucm155480.pdf.

The City, however, does not seek a retroactive application of the ordinance and has pleaded actionable conduct occurring on or after November 19, 2008. Conduct preceding that date is relevant in considering Defendants' later actions and pattern of conduct. Regardless, Defendants' argument relates only to *how much of* their conduct took place in the operative time period, not *whether* they engaged in actionable fraud; thus, it would affect only the quantification of penalties and other relief under MCC § 2-25-090 and is not properly addressed at this stage of the case. *See Everco Indus., Inc. v. O.E.M. Prods. Co.*, 63 F.R.D. 662, 665-66 (N.D. Ill. 1974).[20]

v.     The allegations support the City's unfair practices claim.

Defendants argue that the City's unfair practices claim fails as a matter of law, Jt. Mem. at 25-26, but the City has alleged in detail, as set forth *supra*, marketing by Purdue and the other Defendants that failed to fully and accurately disclose the risk of addiction—leading not only to addiction, but also injury, death, increased crime, broken families, and rising health care costs. This conduct states a claim for unfair practices because it is immoral, unethical, oppressive, and unscrupulous conduct, offensive to numerous public policies, that has resulted in substantial injury to consumers. *See Romo v. Fed. Nat'l Mortg. Ass'n*, No. 14-1891, 2014 WL 5620157, at *4 (N.D. Ill. Nov. 4, 2014); *Robinson*, 775 N.E.2d at 960-61. Indeed, even if the City had completely failed to satisfy one or two of the factors used in assessing unfairness, the sheer magnitude and scope of Defendants' misconduct under any *one* of the factors would be enough to sustain an unfair practices claim. *Robinson*, 775 N.E.2d at 961.

Purdue and the other Defendants sidestep these allegations with a cramped definition of "public policy." Because the Illinois legislature's statement that "drug addiction [is] among the

---

[20] Moreover, Defendants do not raise the same challenge to the City's claims under MCC § 4-276-470 for misrepresentations in connection with the sale or advertisement of merchandise (Count III). The City's claims under MCC § 4-276-470 have the same elements and rely on the same allegations as its claims under MCC § 2-25-090, but MCC § 4-276-470 was enacted in 1992.

[state's] most serious health problems," 745 ILCS 35/2, is found in a statute facilitating addiction treatment, Defendants argue, that expression of public policy lacks a sufficient nexus to the City's claims. Jt. Mem. at 25. However, in the context of an unfair practices claim under the Illinois Consumer Fraud and Business Practices Act, 815 ILCS 505 ("ICFA"),[21] "public policy" broadly refers to policy "as established by statutes, the common law or otherwise, or, in other words, whether it is within the penumbra of some established concept of unfairness." *LSREF3 Sapphire Trust 2014 v. Barkston Props., LLC*, No. 14-7968, 2016 WL 302150, at *7 (N.D. Ill. Jan. 25, 2016) (Alonso, J). In assessing unfair practices under the Federal Trade Commission Act—which the ICFA mirrors—the Supreme Court explained that the FTC, "like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of" the law. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).

Here, Defendants' practices offend at least three clear public policies: (a) the policy of discouraging drug addiction, as reflected in the Illinois legislature's statement, SAC ¶ 757, and federal law sharply limiting the distribution of Schedule II drugs, 21 U.S.C. § 812(b)(2); (b) the public policy, enshrined in state and federal law, seeking to ensure that pharmaceuticals are marketed and utilized appropriately, SAC ¶ 757; and (3) the public policy against intentional victimization, for profit, of vulnerable populations such as veterans and the elderly, *id.* ¶¶ 184, 205-13, 755, 757-58, 759(c). Even if the City had failed to identify a statute offended by Defendants' misconduct, courts look to "public values" and the broader purposes of the law, not the letter of specific provisions. Defendants' arguments that the City may not rely on state and federal policies recognizing the scourge of addiction and encouraging treatment misses the mark.

Defendants' remaining arguments—that the SAC fails to allege that their misconduct

---

[21] The City's consumer fraud ordinance expressly incorporates ICFA and thus its unfair practices provision. MCC § 2-25-090; 815 ILCS 505/2.

caused "substantial injury to consumers" or that such conduct was "immoral, unethical, oppressive, or unscrupulous," Jt. Mem. at 25-26—fare no better. The City has described above, and further in Sections II.G.2 (causation) and II.G.3 (injury), *infra*, the scope of the injury sustained by Chicagoans as a result of Defendants' conduct. Further, the City alleges at length how Purdue and the other Defendants, through sophisticated marketing campaigns, "set out to, and did, reverse the popular and medical understanding of opioids," such that Defendants effected—to their own commercial benefit—a change in the standard of care for chronic pain. SAC ¶ 7; *see also id.* § V.E.5 (Purdue's execution of scheme).

Defendants do not dispute that the allegations reflect immoral, unethical, or unscrupulous conduct. Instead, they focus solely on the term "oppressive" and mis-cite the *Robinson* standard to suggest that the City must allege conduct "'so *oppressive* as to leave the consumer with little alternative except to submit to it.'" Jt. Mem. at 26 (quoting *Robinson*, 775 N.E.2d at 961) (emphasis added). This language quotes from an Illinois appellate decision, *Saunders v. Mich. Ave. Nat'l Bank*, 662 N.E.2d 602 (Ill. App. Ct. 1st Dist. 1996), that the *Robinson* court proceeded to *correct—rejecting* the notion that any one of the three elements is dispositive. *See Robinson*, 775 N.E.2d at 961. Effective enforcement of the ICFA—and, by extension, MCC § 2-25-090—requires that the term "unfair practice" remain flexible and be defined case-by-case, *Scott v. Ass'n for Childbirth at Home, Int'l*, 430 N.E.2d 1012 (Ill. 1981), and an unfair practices claim may survive, even without "oppressive conduct leaving no alternatives," if the misconduct is immoral, unethical, or unscrupulous (or one of the other factors is satisfied), *see Fields v. Alcon Labs., Inc.*, No. 13-00197, 2014 WL 1041191, at *3-4 (S.D. Ill. Mar. 18, 2014) (denying motion to dismiss even where plaintiff eye drop purchasers had numerous other treatment options).

Even if it were binding law that the City must allege "oppressive" misconduct that left

consumers with limited alternatives, the City has done so. The SAC alleges that Defendants co-opted prescribers through the pervasive manipulation of information on opioids' risks and benefits, leaving both consumers and prescribers with a misunderstanding of opioid risks and benefits and little ability to choose alternative appropriate treatment. SAC ¶ 758. Defendants' conduct effected a comprehensive shift in prescribing behavior by convincing prescribers that compassionate treatment of pain required the use of narcotic opioids. *See, e.g., id.* ¶¶ 658, 758. And, in contrast with use of non-narcotics—which can be discontinued easily—patients who take opioids can quickly become addicted or dependent, such that neither the patient nor the prescriber can simply stop or choose alternate treatment. *See generally id.* ¶¶ 56-64, 758-59. In fact, it is hard to imagine what qualifies as oppressive conduct if not deceptive marketing of prescription drugs with so powerful a pull that many users will turn to heroin to satisfy the compulsions of addiction when their doctors cut off their prescriptions or they become too expensive to maintain. *See id.* ¶¶ 19, 715, 726-29. These allegations meet and exceed the City's pleading burden, and the Court should sustain the City's unfair practices claim.[22]

> vi. Purdue's arguments regarding deceptiveness are premature and fraught with mischaracterizations.

Beyond Defendants' joint arguments, Purdue further asserts that the misrepresentations alleged in the SAC are not false or deceptive as a matter of law. As discussed in Section II.A.1.d, *supra*, such arguments are not appropriately raised in a motion to dismiss, and the Court previously rejected the invitation to opine, at this stage, on the actual falsity of Defendants' representations.[23] Further, Purdue focuses on published materials and ignores statements by its

---

[22] Defendants also mistakenly analogize this case to *Robinson,* in which the court noted that the defendant had complied with the requirements of the Truth in Lending Act ("TILA") and that compliance was a complete defense to the consumer fraud claim. 775 N.E.2d at 962-63. No such safe harbor applies here.

[23] The City also objects to the supporting exhibits Purdue has submitted, which are documentary evidence possibly appropriate for summary judgment, not a motion to dismiss. *See* ECF Nos. 413-9 – 413-15.

sales representatives that are key elements of the City's claims. Given the already unwieldy length of the briefing, the City does not fully respond to the 14 pages Purdue devotes to these fact issues, and instead merely highlights several ways in which Purdue mischaracterizes them:

- Purdue contends that its advertising statements regarding 12-hour dosing cannot be misleading as a matter of law because the FDA label states that OxyContin should be administered only every 12 hours. Purdue Mem. at 8-9. This ignores the basis for the City's claim, which is that Purdue implied that OxyContin provides 12 hours of pain relief—when it knew that this was often not true, and failed to disclose that pain relief often wears off in less than 12 hours. SAC ¶¶ 256-59. In other words, the dosing instructions do not speak to efficacy, but Purdue's marketing suggested that they do.

- Purdue continues to misstate the basis for the City's allegations regarding the *In the Face of Pain* website, Purdue Mem. at 21-22, even though the City exhaustively explained it in its opposition to Purdue's motion for reconsideration. ECF No. 307 at 8-10. The source of the City's allegation that the site promoted doctor-shopping is not the "Protecting Access to Treatment" article on *In the Face of Pain*; it is a separate article titled "Advocacy 101." *Id.* Purdue's various arguments that the misstatements the City cites are not misleading in context, are supported, or were subject to a blanket disclaimer of responsibility present fact questions.

- Purdue contends that the City has materially changed its claims regarding *Partners Against Pain*, Purdue Mem. at 20, by alleging that the *Clinical Issues in Opioid Prescribing* pamphlet from the website was distributed "at least as of November 2006" instead of "circulated after 2007." *Compare* SAC ¶ 578 *with* FAC ¶ 262(g). Purdue suggests this difference is important because "the City makes no allegation that the pamphlet circulated [after] the November 2008 enactment of § 2-25-090." Purdue Mem. at 20. However, having alleged that the pamphlet circulated before the relevant period, and that the campaign of which it was a part continued into that period, the City is entitled to the inference that Purdue continued to distribute it. In any case, *Clinical Issues in Opioid Prescribing* still supports the City's claim based on MCC § 4-276-470 (Count III). *See* Section II.A.2.b.iv, *supra*.

- Purdue argues that *A Policymaker's Guide* is not misleading when viewed in context. Purdue Mem. at 15-16. In so doing, however, Purdue asks this Court to determine what a scientific study concluded, whether statements on certain pages of the guide modify statements on other pages, and whether extraneous "medical literature and FDA-approved materials" demonstrate that the guide is not misleading. *Id.* These are issues of fact. Furthermore, Purdue's arguments ignore the City's allegation that *A Policymaker's Guide* deceptively claimed that less than 1% of children prescribed opioids will become addicted. *See* SAC ¶¶ 229(ee); Purdue Mem. at 15-16.

- So, too, with *Providing Relief, Preventing Abuse*. Although the City alleged that this publication misleadingly downplayed addiction risk by focusing on the signs of abuse

by injection and labeling drug-seeking behavior a sign of undertreated pain, SAC ¶¶ 572-73, Purdue argues that these statements are not misleading because the pamphlet has "an entire section" addressing additional signs of addiction, Purdue Mem. at 10. Simply because *Providing Relief, Preventing Abuse* has accurately characterized *some* warning signs related to addiction, however, does not make the entire pamphlet non-deceptive as a matter of law.

*     *     *

Because the SAC maintains the website allegations that the Court credited in its MTD Order, and expands the case against Purdue by identifying specific prescribers to whom its representatives made misrepresentations and specific publications that it directed into Chicago, the City has stated claims against Purdue for deceptive practices. Independent of whether it is consumer fraud by deception, Purdue's failure to fully disclose the risk of addiction—and its targeting of veterans and the elderly—also establishes the City's claim for unfair practices.

### 3. *The SAC states claims against Actavis.*

#### a) The City has met the Court's standard for pleading its deceptive and unfair practices claims.

In its MTD Order, the Court dismissed the City's consumer fraud claims against Actavis because "the City [did] not allege . . . the name of any Chicago doctor or consumer to whom any Actavis entity made an alleged misrepresentation, when the misrepresentation was made, or how." MTD Order at 22. The SAC amply satisfies that pleading burden for the City's deceptive practices claims: it identifies, as examples, seven Chicago-area prescribers who, in interviews with the City, confirmed that they received one or more marketing messages regarding Actavis's opioid Kadian, and opioids generally, that the City alleges are deceptive.

The allegations regarding the prescriber interviews, at SAC ¶ 296 (a) – (h):

- identify, again by letter designation, the prescribers who received the misrepresentations (Prescribers B, D, E, and G – J);

- identify the specific misrepresentations made to each prescriber—*e.g.*, that opioids were "steady state" drugs with less potential for abuse, that Kadian was less addictive than other opioids, or that opioids improve patients' daily function;

38

- specify (at SAC ¶ 296 n.94) that the misrepresentations occurred during a time period—2006 to the present—that is relevant to the City's claims; and

- indicate how the misrepresentation was made, *i.e.*, by a Kadian sales representative in detailing visits to the prescriber.[24]

The allegations regarding Chicago Prescriber G are illustrative. Prescriber G, who was visited by sales representatives from all Defendants recalled as follows:

> [H]e was never warned about the risk of addiction. . . . [O]pioid sales representatives—including Kadian representatives—told him that opioids would increase patients' ability to complete activities of daily living and that patients could be managed to avoid addiction. These representatives also told him that patients can be screened to mitigate addiction risks.

*Id.* ¶ 296(e). Each of the seven other listed physicians likewise recalled receiving messages from Kadian sales staff that the SAC alleges lack scientific support or are otherwise misleading.

Actavis argues that because it purchased the rights to Kadian at the end of 2008, the City has not shown the conduct was theirs. Actavis Mem. at 17. As noted in the SAC, prescribers often cannot recall when particular detailing visits took place, whereas Defendants—including Actavis—closely track details of sales representatives' visits through call notes and other documentation. SAC ¶ 296 n.94. However, the City has alleged that Actavis's promotional materials used by its sales representatives, and the training it gave those representatives, reflected the very misrepresentations that were conveyed to Chicago prescribers, suggesting that it was Actavis's marketing activity. *See id.* ¶ 279 (FDA found in 2009 that Actavis representatives were distributing materials that omitted serious risks); ¶¶ 271-78 (2010 sales representative training promised improved function, minimized risk of addiction, and suggested addiction risk could be managed); ¶ 280 (2012 detailing aid emphasized "steady state plasma levels"). The

---

[24] The City does not allege, as it does with respect to the other four Defendant groups, that Actavis engaged in deceptive, unbranded marketing through third parties.

City also has alleged that Actavis implemented its marketing on a uniform and nationwide basis, such that its Chicago sales representatives were trained in the same way and would use the same materials. *See id.* ¶¶ 289, 297. Drawing all reasonable inferences in favor of the City, the City has sufficiently alleged that the misrepresentations to Prescribers B and D – J were continued— or made in the first instance—by Actavis's representatives in promoting Kadian.[25]

Moreover, two of the seven prescribers—Prescriber E and Prescriber H—also recalled attending speaker events sponsored by Actavis itself. *See* SAC ¶¶ 296(c) & n.96, 298(f).[26] Actavis's nationwide speaker training program falsely minimized the risk of addiction, implied that opioids were safer than competing analgesics, and suggested that high doses of opioids could be used safely. *Id.* ¶¶ 285-88. The City has alleged that Actavis's speakers were paid to deliver the messages they received in training to other physicians. *Id.* ¶ 284. The City also has alleged that these speakers were required by both Actavis policy and FDA regulations to stay true to Actavis's nationwide messaging. *Id.* ¶¶ 96, 289. Drawing reasonable inferences in favor of the City, the City has sufficiently alleged that prescribers (including Prescribers E and H) received these misrepresentations when they attended Actavis events in Chicago.[27]

These interview allegations alone identify specific prescribers to whom Actavis made misrepresentations, as well as when and how Actavis made the misrepresentations. They fully satisfy Rule 9(b)'s purpose to ensure Defendants are given fair notice of the claims against them.

---

[25] The SAC identifies an eighth prescriber, Prescriber F, who reported that he was detailed on Kadian between 2005 and 2007. *See id.* ¶ 296(d). Because he did not recall receiving sales visits on Kadian after 2007, the City has not included Prescriber F in the discussion above.

[26] SAC note 96 contains a scrivener's error. It should refer to Prescriber E, not C, as is clear in the text.

[27] Actavis misconstrues the purpose of the allegations regarding its sales force and speaker training. *See* Actavis Mem. Supp. Mot. to Dismiss SAC, ECF No. 405, at 14-15 ("Actavis Mem."). The point is not that these training materials actually were distributed to prescribers. Rather, the materials corroborate the misrepresentations that prescribers reported were made directly by sales representatives and speakers, and support the inference of a widespread scheme of deceptive promotion. Actavis would have the Court believe its speakers and sales representatives ignored instructions and *did not* convey the same messages to prescribers. However implausible that position is, it is an issue of fact that may not be resolved now.

Further, while these accounts provide the specificity the Court required, they are merely examples of what the City has alleged to be Actavis's widespread, deceptive promotion of the risks, benefits, and superiority of opioids. *See* SAC ¶¶ 263, 289-97. This widespread scheme, both nationally and in Chicago, is established in conjunction with other sources alleged in the Complaint, including: (a) the deceptive speaker and sales training, *id.* ¶¶ 270-79, 283-88; (b) the 2010 warning from the FDA that Actavis promotional materials misrepresented risks of opioids and made unsubstantiated claims about functional improvement, *id.* ¶ 279; and (c) the verbatim sales messages recall data obtained by the City, which documented Kadian sales representatives making misleading claims to Midwestern prescribers concerning addiction risk and functional improvement, *id.* ¶ 295. The City has pleaded sufficient facts to go forward to discovery and summary judgment on the full scope of its deceptive practices claims against Actavis.

Moreover, much of this same conduct also establishes the City's claim against Actavis for unfair practices. Independent of whether Actavis's statements constitute consumer fraud by deception, they were unfair in that they failed to accurately and fully disclose the risk of addiction to opioids. *See, e.g.*, *id.* ¶¶ 271-79, 296 (Actavis sales representatives were trained to, and did, minimize the risk of addiction and suggest that addiction risk could be managed, including to Chicago prescribers); ¶¶ 285-86 (Actavis speaker training minimized risk of addiction). As discussed in Section II.A.2.b.v, *supra*, the City has sufficiently alleged that the conduct of Defendants—in this case, Actavis—was unscrupulous, unethical, immoral, and oppressive, contrary to numerous public policies, and substantially injured Chicagoans. On these facts, the City has also stated a claim for unfair practices against Actavis.

      b)    <u>Actavis's arguments do not defeat the City's consumer fraud claims.</u>

Defendants' common arguments as to group pleading, Rule 9(b) particularity, omission of the risk of addiction, and the City's unfair practices claim—presented in their joint brief and

supplemented in Actavis's submission—also fail as applied to the claims against Actavis.

First, the SAC alleges that each Actavis entity "is owned by Allergan plc, which uses them to market and sell its drugs in the United States . . . [and] exercises control over these marketing and sales efforts." SAC ¶ 47. SAC § V.E.1 lays out the specific conduct underlying the City's claims against Actavis. These allegations "apprise each defendant of their respective roles in the alleged scheme." *Alumax*, 1997 WL 201555, at *3; *see* Section II.A.2.b.i, *supra*.

Second, with respect to Rule 9(b), Actavis's demand for specific dates, employee names, and other details is inconsistent with this Court's Orders. *See* Section II.A.2.b.ii, *supra*. Nor, in light of the elements of its consumer fraud claims, does the City need to plead that any physician wrote a prescription in reliance on Actavis's misrepresentations. *See* Section II.G.1, *infra*. Actavis also contends, incredibly, that the City has not explained *why* the misrepresentations are false, ignoring the City's detailed explanations in SAC § V.D. Just as mystifyingly, Actavis finds it "particularly galling" that the City refers to particular prescribers by letter designations rather than their actual names. Actavis Mem. at 15 n.13. The City will provide Actavis and the other Defendants that information in discovery, but it is not needed for pleading purposes.[28]

Third, Actavis may be held liable for omitting discussion of the risk of addiction, notwithstanding its drug labels. *See* Section II.A.2.b.iii, *supra*. The City has pleaded several examples of Actavis omitting or minimizing the risk of opioid addiction—in sales representatives' detailing visits to Prescribers D, E, G, H, and J, for example. SAC ¶ 296. The

---

[28] Although the City is not aware of any published consumer fraud cases on this issue, in securities cases—which have a pleading standard similar to Rule 9(b)—courts have permitted plaintiffs to preserve the confidentiality of witness names in pleadings. *See, e.g.*, *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) ("Judicial gloss requiring the allegation of the sources, either documentary or personal, of all facts alleged is in our view too restrictive a response to the requirement of pleading facts with particularity."); *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (holding that purpose of affording defendant fair notice of plaintiffs' claims "can be served without requiring plaintiffs to name their confidential sources as long as they supply sufficient specific facts to support their allegations").

deceptiveness of such omissions is a question of fact, based on the circumstances.

Finally, contrary to Defendants' arguments, the City has sufficiently alleged Actavis's liability for unfair practices. *See* Section II.A.2.b.v, *supra*.

*     *     *

Because the SAC remedies the defects the Court identified by identifying specific prescribers to whom Actavis's representatives made misrepresentations, the City has stated claims against Actavis for deceptive practices. Independent of whether it is consumer fraud by deception, Actavis's failure to fully disclose the risk of addiction also establishes the City's claim for unfair practices.

### 4. *The SAC states claims against Cephalon.*

#### a) The City has met the Court's standard for pleading its deceptive and unfair practices claims.

The Court dismissed the FAC's consumer fraud claims against Cephalon for two reasons. First, the Court found that the City did not "allege when, how, and to whom in Chicago the Cephalon entities made any alleged misrepresentations or distributed the contested materials." MTD Order at 23. Second, insofar as the City alleged that Cephalon sponsored and facilitated misrepresentations by third parties, the Court found that the City had "not . . . explain[ed] what editorial control, if any, is entailed in 'sponsoring' or 'facilitating' materials or events." *Id.*

The SAC fully satisfies this pleading standard for the City's deceptive practices claims. As discussed below, it identifies, as examples, eight Chicago-area prescribers who confirmed they received one or more marketing messages from Cephalon regarding Actiq and Fentora, and opioids generally, that the City alleges are deceptive. Most were conveyed by Cephalon sales representatives. Two prescribers also attended a deceptive CME over which Cephalon exercised control, and one received a deceptive third-party publication from Cephalon. The SAC also

identifies four other Chicago prescribers who were exposed to, and would have disseminated, deceptive marketing through their training as paid Cephalon speakers.  All of this took place against the backdrop of Cephalon's campaign to promote its opioids beyond their indication for treatment of cancer pain.  *See* SAC ¶¶ 302-31.  That campaign was deceptive of itself, since it falsely implied that the drugs were FDA-approved as safe and effective for chronic pain.  *See id.* ¶ 302.  However, the City rests its claims not only on Cephalon's off-label marketing, but also on its deceptive messages to prescribers regarding the use of opioids to treat chronic pain.

The allegations regarding the prescriber interviews, at SAC ¶ 386 (a) – (h):

- identify, again by letter designation, the prescribers who received the misrepresentations or omissions (Prescribers C, E, G, J, and O – Q);

- identify (as to Prescribers C, F, G, J, O, and Q) the specific misrepresentations or omissions made by Cephalon sales representatives to each prescriber—*e.g.*, that opioids would increase patients' ability to function, and that patients could be managed to avoid addiction, as well as the marketing of opioids to prescribers who did not treat cancer pain (*e.g.* Prescriber F);

- identify (as to Prescribers G, O, and P) the particular deceptive publication or CME that each prescriber received;

- specify (at SAC ¶ 296 n.94) that the misrepresentations occurred during a time period—2006 to the present—that is relevant to the City's claims;

- where possible, supply additional specificity regarding the time frame of the misrepresentations—*e.g.*, Prescriber C was detailed at two meals on specific dates in 2014, and Prescriber E was detailed by Cephalon until a few years ago;[29] and

- specify how the misrepresentation was made—*i.e.*, by a Cephalon sales representative in visits to the prescriber or through a deceptive publication or CME.

The allegations regarding Prescribers C and O are illustrative.  Prescriber C recalled:

---

[29] As noted in Section II.A.2, *supra*, prescribers often cannot recall specific dates on which they were visited or received misrepresentations, and Rule 9(b) does not require such detail.  In certain instances, relying on public data or information from Defendants' documents, the City has specified date ranges or dates on which prescribers were visited by representatives of a Defendant.  The Court may infer from the SAC's allegations of deceptive marketing by Defendants' sales representatives that the prescribers received misrepresentations on those dates.  However, the City has pleaded its claims with sufficient particularity even absent such detail, which often is not available from a source other than Defendants.

> [S]ales representatives from each Defendant, including Cephalon, routinely omitted any discussion about addiction and overdose and frequently overstated the benefits of opioids. These representatives taught that opioids would increase his patients' ability to function and increase their quality of life.

*Id.* ¶ 386(a). The seven other prescribers described in the SAC likewise recalled receiving messages from Cephalon sales representatives that, as alleged in the SAC, lack scientific support, go beyond the FDA-approved indications for Actiq and Fentora, or are otherwise misleading.

Two of those interviewed, Prescribers O and P, also attended deceptive Cephalon-sponsored CMEs. These were *Optimizing Opioid Treatment for Breakthrough Pain*, which endorsed off-label use of Actiq and Fentora for non-cancer pain, claimed functional benefits, and minimized the risks from increased doses of opioids, *see id.* ¶¶ 367-68, 386(e); and *Opioid-Based Management of Persistent and Breakthrough Pain*, which also promoted Cephalon's drugs for off-label use, *see id.* ¶¶ 372-73, 386(e). The City has alleged a sufficient basis to infer Cephalon's control over both of these CMEs. *Optimizing Opioid Treatment* was not merely sponsored by Cephalon ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████ *See id.* ¶ 369. By doing so, Cephalon effectively endorsed its messages.[30] The same is true of *Opioid-Based Management*, which Cephalon paid to have published and whose author was a Cephalon consultant and speaker. *See id.* ¶ 372.

A third prescriber, Prescriber G, received the APF-produced *Treatment Options: A Guide for People Living with Pain*, directly from a Cephalon sales representative. *See id.* ¶¶ 353,

---

[30] The MTD Order deemed insufficient the FAC's allegations as to Cephalon's control over *Optimizing Opioid Treatment*, and the CME's connection to Chicago. New to the SAC are more detailed allegations regarding Cephalon's knowledge and approval of the contents of the CME, *see id.* ¶¶ 369, 374; the allegation that it was available online and intended to reach Chicago prescribers, *see id.* ¶¶ 367, 370; and the allegation that it reached two specific Chicago providers, *see id.* ¶ 386(e), (f).

386(c). It deceptively presented the risks of opioids, including as compared with alternate treatments, and claimed opioids would improve patients' function. *See id.* ¶¶ 353-57. Cephalon sponsored *Treatment Options*, but also engaged in direct conduct by having its sales force distribute the publication. *Id.* ¶ 386(c).[31] In so doing, Cephalon adopted *Treatment Options*' messages as its own—and effectively incorporated those messages into its drugs' labeling. *See* 21 U.S.C. § 321(m) (providing that labeling includes "all . . . written, printed, or graphic matter . . . accompanying" the drug); *United States v. Livdahl*, 459 F. Supp. 2d 1255, 1266 (S.D. Fla. 2005) (recognizing that labeling has . . . been construed to include nearly every form of drug company promotional activity, including booklets, pamphlets, mailing pieces, bulletins, and all literature that supplements, explains, or is otherwise textually related to the product"); *see also* Recons. Order at 3 (recognizing that disseminating materials "suggests both that [the defendant] made [the misrepresentations] and . . . intended for anyone with access . . . to rely on them").[32]

In addition to the prescribers identified in the interview allegations, the SAC identifies four other Chicago prescribers (Prescribers K, L, M, and N) who were paid speakers for Cephalon. *See id.* ¶ 377 (specifying date ranges of each prescriber's service as a speaker).

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████     *Id.* ¶¶ 336-37. The Court may reasonably infer both that

---

[31] The Court's MTD Order deemed insufficient the City's allegations regarding Cephalon's control over *Treatment Options*, and the publication's connection to Chicago. MTD Order at 24. New to the SAC are allegations that it was available online and intended to reach Chicago prescribers, *see* SAC ¶ 358, and that Cephalon's sales force distributed it to at least one Chicago physician, Prescriber G, *see id.* ¶ 386(c).

[32] Janssen argues—as also applicable here—that unbranded, third-party materials cannot be "labeling" because this term is limited to product-specific prescribing information and promotional communications. Janssen Mem. at 16 n.14. However, the cases Janssen cites at most demonstrate that product-specific labels can be misleading. *See, e.g.*, *Bober v. Glaxo Wellcome, PLC*, No. 99-3243, 1999 WL 759364, at *2 (N.D. Ill. Sept. 3, 1999). Courts have been clear that labeling "is so broadly defined that it encompasses nearly *every conceivable form of communication* with medical professionals." *Del Valle v. PLIVA, Inc.*, No. B:11-113, 2011 WL 7168620, at *4, 6 (S.D. Tex. Dec. 21, 2011) (emphasis added).

the four identified prescribers received these deceptive messages, *see id.* ¶¶ 94-95 (alleging that

Defendants used speaker programs as an opportunity to market to the speakers themselves), and

that they disseminated these misrepresentations to other Chicago prescribers, *see id.* ¶ 340.

Beyond these allegations of misrepresentations to identified, individual prescribers, the

SAC also notes instances of Cephalon's broad campaign of off-label marketing in Chicago.  On

October 5, 2006, Cephalon representatives provided a $3,500 dinner to 19 Chicago physicians—

many of whom did not have cancer-related specialties.  *See id.* ¶ 380.  ████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████  *See id.* ¶ 383.  These efforts, exemplified by Cephalon's

promotion to Prescriber F, a headache specialist, reflected Cephalon's identification of marketing

"outside of cancer pain" as a "major opportunity" for Fentora.  *See id.* ¶¶ 309-13, 386(b).

Collectively, these allegations satisfy the Court's requirement that the City identify

Chicago physicians to whom Cephalon made misrepresentations and when and how they were

made.  That is so whether or not the Court credits the City's allegations supporting editorial

control; though the City offered additional facts to tie these deceptive third-party materials to

Cephalon, the City has alleged that Cephalon made direct misrepresentations.  On their own and

together with the additional allegations that Cephalon controlled, adopted, and distributed third-

party misrepresentations, these allegations of direct fraud more than meet Rule 9(b)'s purpose.

While the specific prescriber examples provide the specificity the Court required, they

also are merely examples of what the City has alleged to be Cephalon's widespread, deceptive

promotion of Actiq and Fentora.  *See id.* ¶¶ 332-89.  This widespread scheme, which originated

nationally and reached into Chicago, is further established by other sources alleged in the SAC,

including: (a) Cephalon's training of speakers and its sales force, which was implemented

nationally and included misrepresentations consistent with what specific Chicago prescribers

were told, *see id.* ¶¶ 332-38; (b) Cephalon's effort to seed the science of opioids with deceptive

research and medical education, *see id.* ¶¶ 359-72; and (c) additional, specific publications,

including the Cephalon guidebook *Opioid Medications and REMS: A Patient's Guide*, which

deceptively minimized the risk of addiction from long-term use of opioids, and *Responsible*

*Opioid Prescribing*, which Cephalon distributed nationally and, by inference, in Chicago. *See id.*

¶¶ 339, 344-47.[33]  The City has pleaded sufficient facts to go forward to discovery and summary

judgment on the full scope of its deceptive practices claims against Cephalon.

Much of this same conduct also establishes the City's claim against Cephalon for unfair

practices.  Independent of whether Cephalon's statements constitute consumer fraud by

deception, they were unfair in that they promoted off-label, non-FDA-approved use of

Cephalon's drugs and failed to accurately and fully disclose the risk of addiction to opioids.  *See,*

*e.g.*, *id.* ¶¶ 334-37, 384-86 (Cephalon sales representatives and speakers omitted and minimized

risk of addiction); ¶¶ 298-331, 379-86, 389 (Cephalon marketed for non-cancer uses and to

prescribers who likely did not treat cancer pain); ¶¶ 331, 339, 344-58, 364-75 (various Cephalon

and Cephalon-controlled materials distributed or available in Chicago, including *Optimizing*

---

[33] The Court's MTD Order deemed insufficient the City's allegations regarding Cephalon's editorial
control over *Opioid Medications and REMS* and *Responsible Opioid Prescribing*, as well as those
publications' connection to Chicago.  The SAC makes clear that Cephalon itself developed and
distributed *Opioid Medications and REMS*.  *See* SAC ¶ 339.  Although *Responsible Opioid Prescribing*
was officially the work of the Federation of State Medical Boards, Cephalon distributed the book through
its sales force and thus adopted and disseminated its misleading messages, knowing them were false.  *See*
*id.* ¶ 347.  The book was drafted by "Medical Writer X," who admits that his writing distorted the risks
and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.  *See*
*id.* ¶ 344.  The SAC alleges that both publications were distributed nationally and available to prescribers
in Chicago.  *See id.* ¶¶ 339, 347.  Thus, these further examples support the City's claims against Cephalon
in the same way as the Purdue website allegations.  Nevertheless, in light of the examples of direct
misrepresentations, the City has met the standard set forth in the MTD Order without these allegations.

*Opioid Treatment for Breakthrough Pain* and *Treatment Options*, minimized risk of addiction or

suggested Cephalon's suitability for non-cancer pain).  As discussed in Section II.A.2.b.v, *supra*,

the City has sufficiently alleged that Cephalon's conduct was unscrupulous, immoral, unethical,

and oppressive, contrary to numerous public policies—including FDA policy against off-label

marketing, *see, e.g.*, 21 C.F.R. § 202.1(e) (2008)—and substantially injured Chicagoans.  On

these facts, the City has also stated a claim for unfair practices against Cephalon.

> b)   Cephalon's arguments do not defeat the City's consumer fraud
> claims.

Cephalon joins in Defendants' common arguments regarding group pleading, Rule 9(b),

omission of the risk of addiction, the relevant time period, and the City's unfair practices

claim—and they lack merit for the same reasons.

First, Cephalon complains that the City failed to differentiate among Cephalon entities

and Defendant groups.  Yet, the City has specified how the different Cephalon units worked

together to market opioids, *see* SAC ¶¶ 33-38, and apprised Cephalon of the nature of its

fraudulent scheme and activities in Chicago, SAC ¶¶ 298-389.  These allegations are sufficient to

apprise the Cephalon Defendants of their roles in the alleged fraud.  *See* Section II.A.2.b.i, *supra*.

Second, Cephalon's demands for more specific time frames, identities of specific

Cephalon sales representatives, and other details are not what the law requires.  *See* Section

II.A.2.b.ii, *supra*.  The City provided the date range within which Cephalon representatives

visited the identified prescribers, and additional specificity as available—including dates of

detailing visits to Prescriber C, date ranges of four prescribers' service as Cephalon speakers, and

the 2007 distribution of *Responsible Opioid Prescribing*.  *See* SAC ¶¶ 344-47, 376-89.  Further,

it is immaterial whether the misrepresentations identified in the SAC relate to opioids generally

or Actiq and Fentora specifically—in fact, there are some of each—because the City's theory is

that Cephalon engaged in and benefitted from both types of promotion. *See id.* ¶¶ 133, 516-44, 636-37. Cephalon all but ignores the particularity provided in SAC § V.E.2—even claiming, incredibly, that the City has not pointed to *any* false statements to prescribers—other than to erroneously claim that the drug labeling excuses its sales representatives' omission of the risk of addiction. Cephalon sales representatives minimized or omitted the risk of opioid addiction in detailing visits to Prescribers C, E, G, J, and Q, *see id.*¶ 386, and whether this conduct was deceptive is a question of fact, *see* Section II.A.2.b.iii, *supra*. Cephalon further asserts a host of causation and injury arguments, relying on the incorrect premise that causation and injury are required elements of the City's consumer fraud claims. *See* Section II.G.1, *infra*.

Third, the argument that only conduct after November 19, 2008, is relevant to the City's claims ignores the fact that Cephalon's earlier acts—particularly its pervasive off-label marketing—helps prove a pattern of conduct extending into the period covered by MCC § 2-25-090. Moreover, the earlier conduct in any case supports the City's deceptive practices claim under MCC § 4-276-470 (Count III). *See* Section II.A.2.b.iv, *supra*.

Fourth, contrary to Defendants' arguments, the City has sufficiently alleged Cephalon's liability for unfair practices. *See* Section II.A.2.b.v, *supra*. The SAC describes in detail how Cephalon's marketing in Chicago promoted its drugs for the off-label use of treating non-cancer pain, and failed to fully disclose the risk of addiction.

Separately, Cephalon contends that the City has insufficiently alleged Cephalon's control over certain third-party misrepresentations. The City explained *supra* exactly how Cephalon's involvement with these third-party publications amounts to control. Even if the Court were to deem those allegations lacking, the City sufficiently pleaded direct misstatements by Cephalon and has cleared the bar set by the Court.

50

Finally, Cephalon argues that off-label promotion is not actionable fraud unless it is also deceptive. But its marketing of Actiq and Fentora for non-cancer pain *was* deceptive because it falsely implied FDA approval of the drugs—and, thus, their safety and effectiveness—for that indication. *See* SAC ¶ 302. Off-label marketing can be the basis for a misrepresentation claim. *See, e.g.*, *Garross v. Medtronic, Inc.*, 77 F. Supp. 3d 809, 815 (E.D. Wis. 2015) (permitting misrepresentation claim to go forward, based in part on allegations of off-label marketing). Further, the SAC's allegations that Cephalon misrepresented the risk of addiction from chronic and high-dose opioid use, and falsely portrayed opioids as safer than NSAIDs and as improving patients' function, make Cephalon's off-label marketing especially misleading. Such conduct also violates FDA policy and, as discussed *supra*, supports the City's unfair practices claim. Finally, the City has sufficiently alleged misrepresentations by Cephalon regarding the risks and benefits of opioids for the treatment of chronic pain, independent of its off-label marketing.

*　　　　*　　　　*

Because the SAC remedies the deficiencies found by the Court by identifying specific prescribers to whom Cephalon representatives made misrepresentations and specific publications Cephalon directed into Chicago, the SAC states claims against Cephalon for deceptive practices. Independent of whether they are consumer fraud by deception, Cephalon's off-label marketing and failure to fully disclose the risk of addiction also establish the claim for unfair practices.

> 5. *The SAC states claims against Endo.*
>
>> a) <u>The City has met the Court's standard for pleading its deceptive and unfair practices claims.</u>

The Court dismissed the FAC's consumer fraud claims against Endo because the City did "not allege that the Endo entities distributed the educational materials or advertisements to Chicago doctors or consumers, that Chicago doctors attended the continuing medical education

51

programs, that Chicago doctors or consumers visited the websites or otherwise indicate when, how, and to whom the alleged misrepresentations were made." MTD Order at 26. Insofar as the City alleged that Endo sponsored or funded deceptive third-party materials, the Court found that the City had "not . . . explain[ed] what editorial control, if any, the Endo entities had over materials they allegedly sponsored or funded." *Id.*

The SAC satisfies this pleading burden for the City's deceptive practices claims. It identifies, as examples, 10 Chicago-area prescribers who confirmed they received one or more messages from Endo sales representatives regarding Opana and Opana ER, and opioids generally, that the City alleges are deceptive. One of the prescribers also received a deceptive third-party pamphlet from Endo sales representatives. In addition, the SAC identifies four more prescribers who were exposed to, and would have disseminated, deceptive marketing as a result of their training as Endo speakers. One such speaker wrote a deceptive journal supplement for Endo that was available in Chicago. Endo also distributed its own publications. Finally, the SAC identifies two CMEs and a website, over which Endo exercised control through its close relationship with APF, that conveyed misrepresentations to Chicago prescribers and consumers.

The allegations regarding the prescriber interviews, at SAC ¶ 482 (a) – (j):

- identify, again by letter designation, the prescribers who received the misrepresentations or omissions (Prescribers B – G, Q, S, T, and QQ);

- identify the specific misrepresentations or omissions made by Endo sales representatives to each prescriber—*e.g.*, that opioids would improve patient function, that Opana was less addictive than other opioids, and that "steady state" drugs have less potential for addiction and abuse;

- identify (as to Prescriber G) the particular deceptive publication the physician received, *i.e.*, *Understanding Your Pain: Taking Oral Opioid Analgesics*;

- specify (at SAC ¶ 296 n.94) that the misrepresentations occurred during a time period—2006 to the present—that is relevant to the City's claims;

52

- where possible, supply additional specificity regarding the time frame of the misrepresentations—*e.g.*, that Prescriber C was detailed at three meals on specific dates in 2014, that Prescriber E was detailed by Endo until a few years ago, and that Prescriber QQ was detailed by Endo representatives within the last five years; and

- specify how the misrepresentation was made—*i.e.*, by an Endo sales representative in detailing visits to the prescriber, or through a specific deceptive publication.

The allegations regarding Chicago Prescriber T are illustrative. Prescriber T recalled:

Endo's sales representatives told Prescriber T that Opana would improve his patients' ability to function and make it more likely that they could groom themselves, bathe, feed themselves, and conduct other daily activities. Endo representatives never mentioned the risks of addiction associated with Opana.

*Id.* ¶ 482(i).

That Endo representatives conveyed deceptive messages to Chicago prescribers, such as those reported by Prescribers B – G, Q, S, T, and QQ, is further established by the City's interview with Sales Representative D. *See id.* ¶¶ 477-79. A former Endo detailer in Chicago's southwest suburbs (part of the same sales region as Chicago) recalled that she was not trained about risks of long-term opioid use; would dodge questions about addiction in sales calls; and told prescribers that Opana ER would improve patients' ability to function. *See id.*

With respect to the deceptive third-party publication *Understanding Your* Pain, the SAC now also alleges a sufficient basis for the Court to determine that Endo adopted and conveyed its message, knowing it was false. Endo distributed this pamphlet in the Chicago area through its sales force, as confirmed by Prescriber G and Sales Representative D, and made it available in Chicago on its own website. *See id.* ¶¶ 472, 478, 482(d). *Understanding Your Pain* minimized the risks of opioids by implying that patients who take opioids for pain will not get addicted and by omitting any description of increased risks posed by higher doses. *See id.* ¶¶ 469-70, 482(d). The pamphlet was edited by Dr. Russell Portenoy, a prominent collaborator with opioid

manufacturers and pain advocacy groups. *See id.*; *see generally id.* § V.C.2.a.i, ¶¶ 143-46. By distributing the pamphlet, Endo adopted and disseminated the pamphlet's deceptive messages.[34]

The SAC also identifies four other Chicago physicians (Prescribers A, M, U, and V) who were paid speakers for Endo. *See id.* ¶ 484 (Prescribers A and M); *id.* ¶ 486 (specifying that Prescriber U gave six talks for Endo in 2010, and Prescriber V gave three talks that year). Endo speaker presentations included the misleading claim that Opana ER has low potential for abuse and is crush-resistant. *See id.* ¶¶ 423-24. Since Endo speakers were required to adhere to company-provided slide decks and other materials, *see id.* ¶ 485, the Court may reasonably infer not only that these four Chicago prescribers received Endo's deceptive messages about abuse potential, but that they conveyed these messages to other Chicago prescribers.

One of these speakers, Prescriber M, also was paid by Endo to write a 2007 CME supplement that misleadingly claimed that patients at high risk of addiction could safely use opioids. *See id.* ¶ 427. Endo paid to have the CME published in the *Journal of Family Practice* and distributed 96,000 copies nationwide. *Id.* Through these actions, Endo adopted the CME's messages as its own and made it available to, and intended that it reach, Chicago prescribers.[35]

Endo also directly disseminated publications, including *Living with Someone with Chronic Pain* and *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain.* *Living with Someone with Chronic Pain* was an Endo-logoed pamphlet that falsely implied that addiction was not a substantial concern. *See id.* ¶ 409. By posting the pamphlet on its website

---

[34] The Court's MTD Order deemed lacking the FAC's allegations regarding Endo's editorial control over *Understanding Your Pain*, and that publication's connection to Chicago. New to the SAC are allegations that the pamphlet was available on Endo's website and was intended to reach Chicago prescribers, *see id.* ¶ 472, and that Endo's sales force distributed the pamphlet in the Chicago area, *see id.* ¶¶ 477-78, 482(d).
[35] The FAC contained these same allegations regarding control and availability of the CME, titled *Pain Management Dilemmas in Primary Care: Use of Opioids*, but the Court's MTD Order deemed the City's allegations insufficient. The City directs the Court's attention to them again, because Endo's direct distribution of the CME and its publication of the CME in a leading journal support the inference that Endo intended Chicago prescribers to rely on the CME.

and making it available nationwide, including in Chicago, *see id.*, Endo intended that Chicago prescribers and consumers rely on it.[36] *Case Challenges in Pain Management* deceptively depicted the relative risks and benefits of NSAIDs and opioids. *See id.* ¶ 418. In 2007, Endo distributed more than 100,000 copies to prescribers in Chicago and elsewhere. *See id.* ¶ 419.

Finally, the SAC alleges that Endo conveyed misrepresentations to Chicago prescribers through three publications of APF's National Initiative on Pain Control ("NIPC"). *See id.* ¶¶ 436-50, 489-91. Two of these were CMEs presented to prescribers in Chicago on specific dates in 2010 and 2011. *Id.* ¶¶ 489-90. These CMEs (*Managing Persistent Pain in the Older Patient* and *Persistent Pain in the Older Adult*) misrepresented the prevalence of addiction in older patients, and where one (*Persistent Pain in the Older Patient*) misleadingly claimed that opioid therapy would improve patient function, the other (*Persistent Pain in the Older Adult*) deceptively claimed that withdrawal symptoms could be eliminated entirely. *Id.* The third publication was NIPC's website, *Painknowledge.com*, which in 2009 misrepresented that opioid therapy would lead to improvements in patients' ability to function, minimized the risk of addiction, and deceptively portrayed opioids as safe at high doses. *Id.* ¶¶ 448-50. This website was both available to and intended to reach Chicagoans, as evidenced by the more than 60,000 visitors and 360,000 page views the site had accumulated by September 2010. *See id.* ¶ 491.[37]

Endo not only sponsored these three publications, but fully incorporated the NIPC's efforts into its own marketing. Internal Endo documents include "NIPC curriculum

---

[36] The Court did not credit the FAC's allegations regarding *Living with Someone with Chronic Pain*. MTD Order at 25. The SAC makes clear that Endo itself published this pamphlet on its own website, *see* SAC ¶ 409, thus evincing the intent that it reach and be relied upon by Chicago prescribers.

[37] The Court deemed insufficient the FAC's allegations as to Endo's control over *Painknowledge.com* and the CME *Persistent Pain in the Older Adult* and their connection to Chicago. New to the SAC are the allegations regarding widespread viewing of the website and its connection to Chicago, *see* SAC ¶ 491, and the allegation that the CME was given to 41 prescribers in Chicago on May 18, 2011, *see id.* ¶ 490. The City's new control allegations are common to all three NIPC projects, and are discussed below.

development" among the company's promotional activities in 2010, and indicate that Endo personnel specified, reviewed, and provided feedback on NIPC content. *Id.* ¶¶ 438-39. Endo was aware of the content of NIPC websites and materials and continued to approve funding for them. From 2007 to at least 2011, Endo meticulously tracked the distribution of NIPC material, reflecting its deep immersion in the activities of an organization it viewed as an integral part of its marketing, and planned to reach out to prescribers regarding Opana through live NIPC events. *See id.* ¶¶ 440-41. Indeed, Endo itself hired a physician to deliver the *Managing Persistent Pain* CME in Chicago. *Id.* ¶ 489. These allegations are sufficient at this stage to support an inference that Endo adopted the NIPC's deceptive messages or exercised editorial control over them.

Collectively, the foregoing allegations amply satisfy the Court's requirement that the City identify Chicago prescribers to whom Endo made misrepresentations, as well as when and how the misrepresentations were made. That is so whether or not the Court credits the City's allegations supporting editorial control; although the deceptive third-party materials support the City's claims, the City has sufficiently alleged direct misrepresentations. These allegations more than meet Rule 9(b)'s requirements.

While these allegations provide the specificity the Court required, they also are merely examples of what the City has alleged to be Endo's widespread, deceptive promotion of opioids nationwide and in Chicago. *See id.* ¶¶ 390-492. This widespread scheme is further established by other sources alleged in the SAC, including: (a) training of both speakers and sales representatives that was implemented on a nationwide basis and contained misrepresentations consistent with what the representative Chicago prescribers were told, *see id.* ¶¶ 394-426; (b) Endo's use of unbranded advertising that minimized the risk of addiction, *see id.* ¶ 428; (c) its extensive collaboration with APF more generally, as well as with other pain advocacy groups,

*see id.* ¶¶ 429-62; (d) Endo's use of key opinion leaders and misleading science to advance its products, *see id.* ¶¶ 463-75; (e) the accounts of former Endo sales representatives who worked in the same sales region in Chicago, *see id.* ¶¶ 477-79; and (f) the verbatim sales messages recall data obtained by the City, which also corroborate Endo sales representatives' misleading claims to Midwestern prescribers concerning Opana ER's purportedly lower potential for abuse and addiction, *see id.* ¶ 481. The City has pleaded sufficient facts to go forward to discovery and summary judgment on the full scope of its deceptive practices claims against Endo.

Moreover, much of this same conduct also establishes the City's claim against Endo for unfair practices. Independent of whether Endo's statements are consumer fraud by deception, they were unfair in that they failed to accurately and fully disclose the risk of addiction. *See, e.g.*, *id.* ¶¶ 477-79, 481-82 (Endo representatives omitted, minimized, and avoided questions about risk of addiction and suggested risk could be managed); ¶¶ 409, 436-50, 482, 489-91 (Endo and Endo-controlled materials distributed or available in Chicago, such as *Understanding Your Pain*, *Living with Someone with Chronic Pain*, and the NIPC publications, minimized risk). Endo also targeted vulnerable populations—veterans and the elderly—that were susceptible to its deceptive marketing. *See, e.g.*, *id.* ¶¶ 451-55 (Endo sponsored and APF distributed *Exit Wounds* to veterans); ¶¶ 459-60 (Endo worked with AGS to promote pro-opioid guidelines for pain management in the elderly). As discussed in Section II.A.2.b.v, *supra*, the City has sufficiently alleged that Endo's conduct was unscrupulous, immoral, unethical, and oppressive, contrary to numerous public policies, and substantially injured Chicagoans. On these facts, the City has also stated a claim for unfair practices against Endo.

        b)    <u>Endo's arguments do not defeat the City's consumer fraud claims.</u>

Defendants' common challenges do not defeat the City's consumer fraud claims against Endo. The SAC gives Endo extensive notice of the nature of its own fraudulent scheme and its

specific misrepresentations to Chicago prescribers. *See* SAC § V.E.3, ¶¶ 390-492; Section II.A.2.b.1, *supra*. The City has provided the specificity that Rule 9(b) requires, including the timeframe of the misrepresentations. *See* Section II.A.2.b.2, *supra*. In addition to alleging that Endo sales representatives conveyed deceptive messages to the interviewed prescribers during the relevant time period, the SAC also specifies, by year, when Prescribers U and V spoke for Endo, when Endo's CME supplement was published, when Endo distributed *Case Challenges in Pain Management*, and when the misrepresentations appeared on *Painknowledge.com*. *See* SAC ¶¶ 418-19, 427, 440, 446-50, 486-87, 491. And the SAC provides specific dates for the presentation of the deceptive *Persistent Pain* CMEs in Chicago. *See id.* ¶¶ 489-90. Endo also joins in various causation-related Rule 9(b) challenges, but the City does not need to demonstrate causation. *See* Section II.G.1, *infra*. Endo, too, can be liable for misrepresentations or omissions regarding the risk of addiction in detailing visits to prescribers, including to Prescribers C, E, F, G, Q, and T, *see id.* ¶ 482, and whether that conduct was deceptive is a question of fact. *See* Section II.A.2.b.iii, *supra*. Evidence of Endo's conduct before November 19, 2008, is relevant for the reasons set forth in Section II.A.2.b.iv, *supra*.

In addition, contrary to Defendants' arguments, the City has sufficiently alleged Endo's liability for unfair practices. *See* Section II.A.2.b.v, *supra*.

Beyond these arguments, Endo principally asserts two others—that the City's allegations of editorial control are insufficient, and that the City has not pleaded any actionable misrepresentations. Neither argument has merit.

i. The City has sufficiently alleged editorial control.

Endo contends that the City insufficiently alleged Endo's editorial control over certain third-party misrepresentations. Even if that were so, the City has sufficiently pleaded direct misrepresentations by Endo. But the City has explained *supra* exactly how Endo's involvement

with these third-party publications amounts to control. Endo argues that funding, working collaboratively, approving content or offering comments, are all—by themselves—insufficient to establish control. Whether or not that is true, in no instance does the City rely solely on any one of these factors; the combination of Endo's recurrent funding of NIPC projects, its close collaboration with that organization, *and* editorial review gives rise to the inference that Endo could and did dictate the terms of that relationship. Indeed, it is difficult to imagine otherwise. After all, Endo viewed "NIPC module curriculum development, web posting, and live regional interactive workshops" as its own promotional tasks, SAC ¶ 438, and tracked NIPC activities in the same way it tracked its own commercial activity, *id.* ¶ 440. Further, by disseminating the messages, Endo adopted them as its own and, in effect, incorporated them into the drug labeling. *See* 21 U.S.C. § 321(m); *Livdahl*, 459 F. Supp. 2d at 1266. In any case, however, the City's allegations of Endo's direct conduct clear the Court's pleading bar.

ii.   The City has alleged Endo misrepresentations.

Endo further asserts that its alleged misrepresentations are not false or deceptive as a matter of law. As discussed in Section II.A.1.d, *supra*, these arguments are not appropriately raised in a motion to dismiss. Further, Endo raises challenges to the falsity of certain statements in certain publications, but fails to address the totality of its deceptive statements. In particular, Endo largely ignores the misrepresentations made by its sales representatives, as reported by interviewed prescribers referenced in the SAC. Given space constraints, the City herein does not fully respond to Endo's lengthy discussion of these issues of fact, and instead merely highlights several ways in which Endo has mischaracterized the publications and the SAC's allegations:

- Endo asserts that the City does not allege that statements of functional improvement are false, suggesting that, at most, "the City's allegations reflect only that the functional benefits of using an opioid analgesic for pain relief may be *less* as compared to other prescription pain medications or over other non-addicting treatments." Endo Mem. Supp. Mot. to Dismiss SAC, ECF No. 408, at 5 ("Endo

59

Mem.") (citing SAC ¶¶ 72-73).  This ignores the City's allegations that, with long-term use, various aspects of patient function generally *decline*.  *See* SAC ¶¶ 74-78.

- Endo posits that claims about opioids' relative risks vis-à-vis NSAIDs, including in *Case Challenges in Pain Management*, are not false because the City has not alleged, for example, that no patients developed gastrointestinal bleeding from prolonged NSAID use.  Endo Mem. at 6.  However, the heart of the misrepresentation is not that NSAIDs carry no risks, but that Endo emphasized NSAIDs' most serious risks while downplaying those associated with opioids.  *See* SAC ¶¶ 249-52.

- Endo contends that the City failed to show why claims about withdrawal risk are misleading—and specifically, why the claim in *Persistent Pain in the Older Adult* that "withdrawal symptoms can be avoided entirely by tapering the dose for 10 days" is not true.  The City specifically alleged, however, that Endo deceptively minimized the likelihood and severity of withdrawal.  *See id.* ¶¶ 241-43.

- Endo claims that statements that opioid doses can be increased indefinitely are not alleged to be false, but the deception is one of omission:  it is deceptive to claim that dose may be escalated to achieve analgesic effect without noting the correspondingly escalating risks.  *See id.* ¶¶ 246-48.

- Endo contends that the City failed to allege that Endo deceptively concealed the risks of addiction, describing as true its statements in Endo and Endo-controlled documents that "people . . . usually" do not become addicted to opioids.  That type of statement, however, deceptively suggests that the risk is so low as to not be a concern.  *See id.* ¶ 229(k).  Endo also concealed or minimized the risk of addiction in other ways—including by claiming that Opana ER was "designed to be crush resistant," deceptively implying that the drug was actually less likely to be abused, *id.* ¶ 229(j), and emphasizing that its opioids were "steady state," which falsely suggested that they were less likely to produce a euphoric effect and be addictive, *id.* ¶ 226(q).

*            *            *

Because the SAC remedies the deficiencies found by the Court by identifying specific prescribers to whom Endo representatives made misrepresentations and publications that it directed into Chicago, the City has stated claims against Endo for deceptive practices. Independent of whether it is consumer fraud by deception, Endo's failure to fully disclose the risk of addiction, and its targeting of veterans and the elderly, also establishes the City's claim for unfair practices.

6.    *The SAC states claims against Janssen.*

a)    <u>The City has met the Court's standard for pleading its deceptive and unfair practices claims.</u>

In its MTD Order, the Court dismissed the City's consumer fraud claims against Janssen because "there are no allegations about [the Janssen] entities' editorial control over materials they allegedly sponsored or funded or about where or when the Janssen entities made these alleged misrepresentations to Chicago doctors or consumers." MTD Order at 27. The SAC fully satisfies this pleading burden for the City's deceptive practices claims. It identifies, as examples, 11 Chicago-area prescribers who confirmed they received one or more marketing messages from Janssen sales representatives regarding Nucynta, Nucynta ER, and Duragesic, and opioids generally, that the City alleges are deceptive. The SAC identifies two other prescribers who were exposed to deceptive marketing through their training as paid Janssen speakers. Finally, the SAC identifies Janssen CMEs, a Janssen website, and two Janssen-controlled publications that conveyed misrepresentations to Chicago prescribers and consumers.

The allegations regarding the prescriber interviews, at SAC ¶ 552 (a) – (k):

- identify, again by letter designation, the prescribers who received the misrepresentations or omissions (Prescribers B-D, G, H, J, S, T, Z, AA, and PP);

- identify the specific misrepresentations or omissions made by Janssen sales representatives to each prescriber—*e.g.*, that opioids would increase patients' ability to function, that Nucynta was not addictive or had a lower potential for addiction, and that withdrawal symptoms were not a problem;

- specify (at SAC ¶ 296 n.94) that the misrepresentations occurred during a time period—2006 to the present—that is relevant to the City's claims;

- where possible, supply additional specificity regarding the time frame of the misrepresentations—*i.e.*, that Prescriber C was detailed at four meals on specific dates in 2013 and 2014; that Prescriber G was detailed at five meals between October 2013 and August 2014; and that Prescriber H was detailed 57 times between March 2010 and December 2012; and

- indicate how the misrepresentation was made—*i.e.*, by a Janssen sales representative in detailing visits to the prescriber.

The allegations regarding Chicago Prescriber AA are illustrative. Prescriber AA recalled:

She was detailed by [a Janssen] sales representative once a month for six months to a year. This sales representative marketed Nucynta to Prescriber AA, but not as an opioid. Instead, Prescriber AA was told that Nucynta was an alternative to opioid therapy and that it worked on an alternate receptor. This sales representative explained that Nucynta would be appropriate for chronic pain patients who were unable to continue opioid therapy due to excessive side effects. This sales representative also stated that Nucynta didn't have a risk of addiction, unlike opioids, and that it would improve her patients' function.

*Id.* ¶ 552(i).

In addition to the prescribers detailed by Janssen's sales force, the SAC identifies two other Chicago prescribers (R and CC) who were paid speakers for Janssen. *Id.* ¶ 547 (detailing fees paid to Prescriber R for 2011-13 and Prescriber CC for 2010). Prescriber R, in particular, gave 11 talks in Chicago in 2011-12 that reached 142 prescribers. *Id.* ¶ 555. Janssen's speakers were required to use slide decks that deceptively minimized risks of using Nucynta for chronic pain, including the risk of addiction and withdrawal symptoms. *Id.* ¶¶ 513-14. From these allegations, the Court may reasonably infer that Prescribers R and CC not only received Janssen's deceptive messages, but also conveyed them to Chicago prescribers in their audiences. Indeed, more than 200 people attended "peer-to-peer" talks on Nucynta ER that Janssen put on in Chicago between the product's launch in 2011 and March 2012. *See id.* ¶¶ 41(a), 548.

Other Chicago prescribers were exposed to Janssen misrepresentations through CME programs in Chicago and a Janssen website. *See id.* ¶¶ 517, 546. One such CME, given 33 times to Chicago prescribers in 2011-2012, deceptively minimized the adverse effects associated with opioids and concealed the effects of withdrawal from Nucynta ER. *See id.* ¶ 546. These programs were not merely sponsored by Janssen; they were Janssen programs in which Janssen-

62

paid speakers delivered Janssen-approved messages. *See id.* ¶¶ 512-15 (describing Janssen speakers bureaus). Janssen's website, *Prescriberesponsibly.com*, misleadingly claimed—at least as recently as July 2, 2015—that concerns about opioid addiction (which now contributes to almost as many deaths as the HIV/AIDS epidemic at its peak) were overstated. *Id.* ¶ 517. Like the websites that the Court found sufficient to support claims against Purdue, this Janssen website was available to and intended to reach Chicago prescribers. *See id.*[38]

Finally, the SAC alleges that Janssen conveyed misrepresentations to Chicago prescribers through two third-party publications whose messages Janssen controlled. First, Janssen worked with the American Academy of Pain Medicine ("AAPM") and the American Geriatrics Society to create the 2009 patient education guide *Finding Relief: Pain Management for Older Adults*. *Id.* ¶ 519. This guide misrepresented that opioids improve patient function, trivialized the risk of addiction, misrepresented that opioids were safe at high doses, and overstated the risks of alternative therapies in comparison with opioids. *Id.* ¶¶ 521-24. Janssen exercised editorial control over *Finding Relief*, as evidenced by a form indicating that six Janssen departments— including "Advertising & Promotion"—had "approved [the document] with changes." *Id.* ¶ 525. After the publication was modified at Janssen's behest, Janssen had its sales force distribute 50,000 copies of *Finding Relief* nationwide, including in Chicago—adopting and disseminating *Finding Relief*'s messages, knowing they were false. *See id.* ¶¶ 521-25. AAPM, which is based in Chicago, distributed the Janssen-edited and approved copies to all its members. *Id.* ¶ 526.[39]

---

[38] The FAC alleged the misrepresentation on *Painknowledge.com*, but the Court's MTD Order deemed the City's allegations regarding a Chicago connection insufficient. In the SAC, the City has clarified that the website was available to and intended to reach Chicago prescribers. *See id.*

[39] The Court's MTD Order deemed insufficient the City's allegations regarding Janssen's editorial control over *Finding Relief* and that publication's connection to Chicago. New to the SAC are the substantial indicia of control identified above, *see id.* ¶ 525, and Janssen's distribution of the publication, *see id.* ¶ 526. The allegations that *Finding Relief* was widely distributed nationally, *see id.* ¶¶ 525-26, support the inference that the publication was directed to Chicago prescribers.

Second, Janssen worked directly with APF and other groups to create the *Let's Talk Pain* website. *See id.* ¶ 531. Beginning in at least 2009, *Let's Talk Pain*, which Janssen described as integral to the launch of Nucynta ER, misrepresented that opioids would improve patient function and promoted the false scientific concept of pseudoaddiction. *See id.* ¶¶ 531-32, 540-41. Janssen's partnership with APF allowed Janssen to "[r]eview, provide counsel on, and approve materials," and a Janssen memorandum internally acknowledged that Janssen "maintain[ed] editorial control of all *Let's Talk Pain* materials." *Id.* ¶¶ 533-38. Janssen exercised that editorial control, making at least two changes to *Let's Talk Pain* content— including striking language from the script for a video that referenced "concern about the risk" of opioids. *Id.* ¶¶ 533, 538. *Let's Talk Pain* was available nationally and certainly reached Chicago readers after a *Chicago Tribune* blog post linked to the website. *See id.* ¶ 541.[40]

Collectively, the foregoing allegations fully satisfy the Court's requirement that the City identify Chicago physicians to whom Janssen made misrepresentations, as well as when and how the misrepresentations were made. That is so whether or not the Court credits the City's allegations supporting editorial control; though the deceptive third-party materials support the City's claims, the City has sufficiently alleged direct misrepresentations by Janssen. These allegations more than meet Rule 9(b)'s purpose.

While these allegations provide the specificity the Court required, they also are merely examples of what the City has alleged to be Janssen's widespread, deceptive promotion of its opioids nationally and in Chicago. *See id.* ¶¶ 493-557. This widespread scheme is further established by other sources alleged in the Complaint, including: (a) training of Janssen's sales

---

[40] The Court's MTD Order deemed insufficient the City's allegations regarding Janssen's control over *Let's Talk Pain* and that website's connection to Chicago. New to the SAC are the substantial indicia of control identified above and the allegation that the website reached Chicagoans through the *Chicago Tribune*, as well as through national distribution. *See id.* ¶¶ 533-38, 541.

force and paid speakers that was implemented nationwide and contained misrepresentations consistent with what representative Chicago prescribers were told, *see id.* ¶¶ 498-504, 512-15; (b) accounts of four former Janssen sales representatives from nearby areas confirming many of the deceptive practices alleged in the SAC, *see id.* ¶¶ 505-10; (c) Janssen's broader collaboration with third-party front groups, including AGS and APF, *see id.* ¶¶ 518-44; and (d) the verbatim sales message recall data obtained by the City, which documented Janssen representatives making misleading claims to Midwestern prescribers regarding improved patient function and addiction risk, *see id.* ¶ 551. The City has pleaded sufficient facts to go forward to discovery and summary judgment on the full scope of its deceptive practices claims against Janssen.

Moreover, much of this same conduct also establishes the City's claim against Janssen for unfair practices. Independent of whether Janssen's statements constitute consumer fraud by deception, they were unfair in that they failed to accurately and fully disclose the risk of addiction to opioids. *See, e.g.*, *id.* ¶¶ 499, 505-10, 550-52 (Janssen sales representatives omitted and minimized risk of addiction and suggested risk could be managed); ¶¶ 516-48 (various Janssen and Janssen-controlled publications, including *Prescriberesponsibly.com*, *Finding Relief*, and *Let's Talk Pain*, minimized risk of addiction). Janssen also targeted vulnerable populations—veterans and the elderly—that were susceptible to its deceptive marketing. *See, e.g., id.* ¶¶ 542-44 (Janssen sponsored APF's publication and distribution to veterans of *Exit Wounds*, which omitted discussion of addiction and overdose risk); ¶¶ 519-528 (Janssen worked with AAPM and AGS to create *Finding Relief* and a CME, both of which trivialized addiction in the elderly). As discussed in Section II.A.2.b.v, *supra*, the City has sufficiently alleged that Janssen's conduct was unscrupulous, immoral, unethical, and oppressive, contrary to numerous

public policies, and substantially injured Chicagoans. On these facts, the City has also stated a claim for unfair practices against Janssen.

b) <u>Janssen's arguments do not defeat the City's consumer fraud claims.</u>

Defendants' common arguments do not defeat the City's claims against Janssen. While the City includes Janssen in certain collective allegations, as befitting the parallel schemes implemented by each Defendant, the City extensively set forth the specific basis for its claims against Janssen in SAC § V.E.4. *See* Section II.A.2.b.i, *supra*. With respect to Rule 9(b), the City has pleaded with the requisite particularity. *See* Section II.A.2.b.ii, *supra*. In addition to alleging that Janssen sales representatives conveyed deceptive messages to specific prescribers during the relevant time period, the SAC also provides specific dates for detailing visits to Prescribers C, G, and H; specific years for the service of Prescribers R and CC as Janssen speakers; the date range in which a deceptive Janssen CME was offered in Chicago; a specific date of the misrepresentation on *Prescriberesponsibly.com*; and the specific years of the misrepresentations in *Finding Relief* and *Let's Talk Pain*. Various other Rule 9(b) arguments joined in by Janssen operate from the faulty premise that the City must demonstrate reliance or causation to state claims for deceptive or unfair conduct. *See* Section II.G.1, *infra*. Janssen may be held liable for omitting discussion of the risk of addiction—as reflected by Prescribers C, G, H, J, T, Z, and AA—for the reasons discussed in Section II.A.2.b.iii, *supra*. And evidence of Janssen's conduct before November 19, 2008, is relevant, as noted in Section II.A.2.b.iv, *supra*. Finally, contrary to Defendants' arguments, the City has sufficiently alleged Janssen's liability for unfair practices. *See* Section II.A.2.b.v, *supra*.

Beyond Defendants' common arguments, Janssen principally asserts three others, each of which lacks merit for the reasons described below.

i. The City has sufficiently alleged deceptive Janssen speaker programs in Chicago.

Janssen labels as "unadulterated speculation" the City's allegation, on information and belief, that a number of Janssen's speaker programs were available to and intended to reach Chicago prescribers, as well as its allegation that these programs were based on deceptive slide decks provided by Janssen. Janssen Mem. Supp. Mot. to Dismiss SAC, ECF No. 418, at 7-8 ("Janssen Mem.") (citing SAC ¶¶ 515, 548). The Court need not credit either allegation to find that the City has stated consumer fraud claims against Janssen. But the City has explained the basis for both allegations, and only Janssen would know in precise detail where these speaker programs took place, who attended, and what slide deck was used. *See Medscript Pharmacy, LLC v. MyScript, LLC*, 77 F. Supp. 3d 788, 794 (N.D. Ill. 2015) (holding that a plaintiff may plead fraud on information and belief, so long as (1) the facts constituting fraud are not accessible to the plaintiff and (2) the plaintiff provides the "grounds for his suspicions"). The SAC alleges, in detail, how Janssen executed a uniform and nationwide marketing scheme, *see* SAC ¶¶ 94-98, 110-11, 493-557, and in light of those well-pleaded allegations, the Court may reasonably infer that Janssen provided the same training to Chicago speakers. *See id.* ¶¶ 94-98, 512-15, 546-48. Moreover, the City has provided specific examples of deceptive speaker programs that it knows *were* given in Chicago, *see id.* ¶¶ 546, 548, 555.

ii. Janssen's misrepresentations applied to all its drugs, including Nucynta IR.

Janssen next alleges that the SAC does not state a claim with respect to Nucynta (also referred to as Nucynta IR) because it is approved for "moderate to severe acute pain," *i.e.*, short-term, not chronic, pain. Janssen Mem. at 4. The SAC plainly alleges that Janssen promoted Nucynta IR for off-label chronic conditions. *See, e.g.*, SAC ¶¶ 252(l), 504, 509, 552(i)). The SAC further alleges deceptive statements in marketing Nucynta IR. *See id.* ¶¶ 229(x), 229(z),

229(bb), 252(l), 497, 499, 506, 509, 510, 550, 551, 552(a), 552(i), 552(j).  Moreover, the

representative false claims in Exhibit A.4 list Nucynta prescriptions, and all claims for opioids

prescribed to patients within three months of a joint pain or back pain diagnostic code and with

no history of cancer—*i.e.*, they are Nucynta prescriptions for chronic pain.  That Nucynta had a

limited indication does not mean that Janssen limited its marketing.  The fact that Janssen *did*

market Nucynta for chronic pain, *see, e.g.*, *id.* ¶¶ 504, 509, 552(i),  is an additional basis for

concluding that Janssen's marketing was both deceptive and unfair.  *See* Section II.A.4, *supra*.

Because the City does assert and plead claims with respect to Nucynta, Janssen's

additional argument—that the SAC impermissibly deploys the term "Janssen's drugs" to refer

both to drugs as to which the City makes claims (Nucynta ER and Duragesic) and a drug as to

which it does not—also fails.  Contrary to Janssen's contention, the City does identify

misrepresentations specific to Nucynta ER, *see* SAC ¶¶ 224, 229(z), 244(c), 499, 500, 506, 509,

510, 514, 546, 551, as well as to Duragesic, *see id.* ¶¶ 229aa, 551, and Janssen's deceptive

statements regarding Nucynta IR constitute consumer fraud even if no claims were made to the

City for the drug.  However, the City's various allegations that Janssen deceptively promoted its

opioids or opioids generally are appropriate and consistent with the City's theory of the case,

which is that Janssen (and the other Defendants) both engaged in and benefitted from promotion

of opioids as a class.  *See id.* ¶¶ 133, 516-44, 636-37.

iii.      The City has alleged actionable misrepresentations.

Finally, Janssen, like Endo and Purdue, argues that various publications cited in the SAC

are not misleading as a matter of law.  As discussed *supra*, however, Janssen's arguments are

premature.[41]  Further, even if the Court were to engage in the inquiry, and then accept Janssen's

---

[41] The City similarly objects to the supporting exhibits Janssen has submitted, which are evidence
appropriate for a summary judgment motion, not a motion to dismiss.  *See* Docket Nos. 421-15 – 421-27.

contested arguments, the City's other allegations of misrepresentations by Janssen to Chicago prescribers are sufficient for the City's claims to advance. Given space constraints, the City herein does not fully respond to the 10 pages of briefing Janssen has devoted to these issues of fact, and instead merely highlights several ways in which Janssen has mischaracterized the publications and the SAC's allegations:

- Janssen contends *Finding Relief: Pain Management in Older Adults* is not misleading because research supports its claims that opioids are rarely addictive and that NSAIDs carry risks, and that the guide does not actually promise functional improvement. The City alleged, however, that claims about rarity of addiction misleadingly put prescribers and physicians at ease when addiction is a catastrophic problem and the risk is far from trivial. *See* SAC ¶¶ 222-29. The claim about NSAIDs is misleading not because NSAIDs carry no risks, but because *Finding Relief* emphasized the risks of NSAIDs and downplayed those associated with opioids. *See id.* ¶¶ 252(j), 524. The SAC also asserts that by claiming "opioids may make it easier for people to live normally" and providing examples of expected functional improvement, *Finding Relief* deceptively suggests a likelihood of improvement—whether or not it is stated as a guarantee—that is not supported by the evidence. *See id.* ¶¶ 221, 221(o), 521.

- Janssen characterizes the *Let's Talk Pain* website as merely providing "general information," but this is irrelevant. The City spelled out in detail how the website falsely implies that opioids allow patients to "continue to function," *id.* ¶¶ 240(e), 541; *Let's Talk Pain* emphasizes NSAID risks while downplaying those of opioids, *id.* ¶ 232, and deploys the misleading term "pseudoaddiction" to suggest that signs of addiction actually reflect "untreated pain" and require more opioids, *id.* ¶ 239.

- Janssen claims *Prescriberesponsibly.com's* statement that concerns about addiction are "overstated" has been taken out of context by the City. But Janssen's reliance on context illustrates that this is an issue of fact that may not be addressed now.

*　　　*　　　*

Because the SAC remedies the deficiencies found by the Court by identifying specific prescribers to whom Janssen representatives made misrepresentations and specific publications that it directed into Chicago, the City has stated claims against Janssen for deceptive practices. Independent of whether it is consumer fraud by deception, Janssen's misrepresentations regarding the risk of addiction —buttressed by its off-label marketing and targeting of veterans and the elderly—also establish the City's claim for unfair practices.

**B.    The SAC sufficiently alleges false statements (Count IV), false claims (Counts V and VI), and insurance fraud (Count VIII).**

The Court's MTD Order held that the City's false statements, false claims, and fraud counts failed because the FAC did not allege "the identities of doctors who, as a result of one or more of defendants' alleged misrepresentations, prescribed opioids for chronic pain to a City-insured patient or worker's compensation recipient whose claim for that prescription the City paid, or any other details about such claims." MTD Order at 32. As demonstrated in Section II.G.1, *infra*, the SAC remedies these deficiencies and sufficiently alleges the requisite causation for each of these counts. The City's allegations that Defendants' false marketing was intended to, and did in fact, cause prescribers to write opioids prescriptions for the treatment of chronic pain and subsequently seek payment from the City's health plans and workers' compensation program similarly satisfy all other elements of the City's fraud claims.

Defendants additionally assert that these counts must be dismissed because (a) the SAC does not adequately allege that any claims for reimbursement of opioids for chronic pain were false or fraudulent; (b) the City's argument that Defendants' marketing rendered their drugs misbranded, such that claims for those drugs were false, is preempted; and (c) the City has failed to plead presentment of individual false claims.[42] Each of these arguments fails.

*1.    The SAC asserts cognizable theories of false claims liability.*

The SAC alleges the type of fraudulent conduct that the City's false claims ordinance ("FCO") is intended to police.[43] Each Defendant purposely misrepresented the risks, benefits, and superiority of opioids to treat chronic pain to expand the market for opioids and realize

---

[42] Defendants' related conspiracy arguments, Jt. Mem. at 29-30, are addressed in Section II.C, *infra*.

[43] The City's false claims counts are brought under its municipal FCO, MCC § 1-22-020, which is patterned after the state and federal false claims statutes, and "FCA case law is generally held to be applicable" to state-law false claims cases. *State ex rel. Raymer v. Univ. of Chi. Hosps.*, No. 06-2742, 2006 WL 2987118, at *4 (Ill. Cir. Ct. Oct. 6, 2006). Accordingly, and given the dearth of case law interpreting the FCO, the City cites cases interpreting the FCA.

profits from increased sales. *See, e.g.*, SAC ¶¶ 6-9, 214-59, 636, 730-31. Cephalon and Janssen also promoted their opioids for off-label uses disallowed by the City's health plans. *See, e.g.*, *id.* ¶¶ 252(l), 302-31, 380-81, 386(b), 504, 509, 552(i), 647-57. Defendants intended that their conduct reach Chicago prescribers, that prescribers submit claims to the City, and that the City pay the resulting claims. *Id.* ¶¶ 109-17, 289-97, 376-89, 476-92, 545-57, 623-32, 635-37. This was the overarching purpose and foreseeable result of their marketing. And Defendants' plans succeeded—the City paid the claims made as a result of Defendants' fraud, as illustrated by the examples in the SAC and attached to it as exhibits. *See id.* ¶¶ 296, 386, 482, 552, 630, 661, 676, 708-09, Exs. A.1 – A.7, Exs. B.1 – B.2. Consistent with Supreme Court precedent and case law in this Circuit and elsewhere, Defendants can, and should, be held liable for their conduct.

       a)     <u>The City has sufficiently pleaded express and implied certification.</u>

The City alleges that Defendants caused providers to expressly certify—falsely—that chronic opioid therapy was medically necessary. SAC ¶¶ 648-61. CMS Form 1500, which is submitted, for example, for reimbursement of prescription drugs in certain circumstances and for office visits at which opioids are prescribed (including monthly refill visits) and urine tests conducted, requires doctors to certify that "services [on this form] were medically indicated and necessary."[44] Defendants' misrepresentations regarding opioids caused doctors to expressly certify that opioids were medically necessary and rendered those certifications false. Therefore, Defendants are liable for causing false claims under an express certification theory. *See United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) ("Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites" to government payment); *see also*

---

[44] *Available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/ CMS1500.pdf.

*State ex rel. Raymer*, 2006 WL 2987118, at *9-10 (finding claims sufficiently stated under express certification theory for false certifications on Forms 1500).

Alternatively, Defendants caused prescribers and pharmacies to impliedly certify—falsely— that opioid prescriptions for chronic pain were medically necessary and for an FDA-approved use.  Implied false certification "treats a bill submitted to the government as an implicit assurance that the bill is a lawful claim for payment, an assurance that's false if the firm submitting the bill knows that it's not entitled to payment."  *Sanford-Brown, Ltd.*, 788 F.3d at 711 n.7.[45]  As a prerequisite to payment, the City's health and workers' compensation plans *require* that treatments be medically necessary.  *See* SAC ¶¶ 651-52, 668-69, 671, 788, 807.  The Illinois Workers' Compensation Act requires employers like the City to pay for medical services that are "reasonably required."  *Id.* ¶ 668 (quoting 820 ILCS 305/8(a)).  Further, the City's health plans exclude from coverage drugs dispensed for a non-FDA approved purpose, such as off-label uses.  SAC ¶ 651.  Accordingly, the SAC pleads two forms of implied certification .  First, Defendants' deceptive and unfair marketing was designed to, and did, cause providers to submit claims to the City for opioids prescribed for chronic pain—impliedly certifying the prescriptions were medically necessary, reasonably required, and thus eligible for coverage.  Second, Defendants' conduct was designed to cause, and did cause, providers to submit claims to the City for opioids that were misbranded or had been prescribed for off-label uses—impliedly certifying that the drugs were FDA-approved within the meaning of the City's health plans.

The use of opioids for chronic pain, as opposed to acute pain or palliative or cancer care, was the focus of Defendants' marketing scheme.  *See, e.g.*, *id.* ¶¶ 6-7.  By systematically

---

[45] *Accord, e.g.*, *Wilkins*, 659 F.3d at 305 ("[T]he act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 614, 616 (N.D. Ill. 2003); *see also United States ex rel. Yarberry v. Sears Holdings Corp.*, No. 09-588, 2013 WL 1287058, at *3-4 (S.D. Ill. Mar. 28, 2013).

overstating the benefits and minimizing the risks of long-term opioid use, as described in the SAC, Defendants prevented doctors and patients from making informed decisions regarding the use of opioids for chronic pain, and caused prescribers to write prescriptions for opioids that were not medically necessary or reasonably required.  *See id.* ¶¶ 788, 807; *see also id.* ¶¶ 679-81 (documenting direct correlation between Defendants' promotion and increases in City-reimbursed prescriptions).  In seeking payment from the City, prescribers, or the pharmacies that filled the prescriptions, subsequently certified—impliedly—that the opioids were medically necessary and reasonably required when they were not.  *See, e.g., id.* ¶¶ 652, 655, 672, 788, 807. The SAC alleges that "to the extent that chronic opioid therapy is considered customary or consistent with generally accepted medical standards, it is only because standards of practice have been tainted by Defendants' deceptive marketing."  *Id.* ¶ 658; *see also id.* ¶¶ 793, 812.

The SAC further alleges that Defendants' deceptive printed materials rendered their opioids misbranded as prescribed for chronic pain, and thus not FDA-approved within the meaning of the City's health plans.  *See id.* ¶ 656.  A drug is misbranded if its labeling or promotional materials are "false or misleading in any particular."  21 U.S.C. §§ 321(n), 352(a); *see also, e.g., United States v. Harkonen*, No. 08-00164, 2009 WL 1578712, at *1, 10-11 (N.D. Cal. June 4, 2009).  It also alleges that Cephalon and Janssen marketed Actiq, Fentora, and Nucynta (and that those drugs then were prescribed) for off-label, non-FDA-approved ineligible for payment under the City's health plans.  *See, e.g., id.* ¶¶ 252(l), 302-31, 380-81, 386(b), 504, 509, 552(i), 647-57.[46]  Thus, Defendants' deceptive and unfair marketing caused prescribers and pharmacies to impliedly certify to the City that opioids prescribed for chronic pain and off-label uses met the City's coverage conditions when they did not.

---

[46] The SAC alleges, moreover, that the off-label uses pushed by Cephalon were particularly inappropriate and dangerous.  *See, e.g.,* SAC ¶¶ 302, 304-307, 310, 315.  Thus, such off-label uses also failed to meet the "medically necessary" and "reasonably required" conditions of payment.

Although implied certification is widely employed and accepted in FCA cases,[47] Defendants assert that in *Sanford-Brown* the Seventh Circuit categorically excluded implied certification as a basis for false claims liability. Jt. Mem. at 27. Defendants take an overly broad view of the case's holding. In *Sanford-Brown*, the relator alleged that a for-profit education company requested and received federal subsidies notwithstanding its violation of regulations regarding incentive compensation, student admissions, and accreditation. 788 F.3d at 700-02. The court refused to apply implied certification because the certifications involved only compliance with the ream of federal rules, which, under a "Program Participation Agreement" ("PPA") with the Department of Education, was a condition of the defendant's participation in the program. *See id.* at 701, 711-12. A "condition of participation" is distinct from a "condition of payment," which more narrowly establishes the circumstances in which government will remit payment. *See id.* at 709-10. The court found it unreasonable that "continued compliance with the thousands of pages of federal statutes and regulations incorporated by reference into the PPA" was required for Sanford-Brown to be entitled to payment. *Id.* at 711. As a district court subsequently observed, "[t]he distinction is important; indeed, the Seventh Circuit specifically noted that '"PPA" is an abbreviation for Program *Participation* Agreement—not Program *Payment* Agreement.'" *United States ex rel. Cieszyski v. LifeWatch Servs., Inc.*, No. 13-4052, 2015 WL 6153937, at *10 (N.D. Ill. Oct. 19, 2015) (quoting *Sanford-Brown*, 788 F.3d at 712).[48]

---

[47] *See, e.g.*, *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 780 F.3d 504, 512-13 (1st Cir. 2015); *Mikes v. Straus*, 274 F.3d 687, 699-700 (2d Cir. 2001); *Wilkins*, 659 F.3d at 313-14; *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 635-37 (4th Cir. 2015); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467-68 (6th Cir. 2011); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 996-98 (9th Cir. 2010); *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168-70 (10th Cir. 2010); *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259-60 (11th Cir. 2005). In December 2015, the Supreme Court granted certiorari to address questions of whether and under what circumstances the implied certification theory is available. *Escobar*, 136 S. Ct. 582 (Dec. 4, 2015).

[48] That *Sanford-Brown* did not reject implied certification entirely is underscored by its citation to *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262 (5th Cir. 2010), in which the Fifth Circuit held

District courts within the Circuit have recognized implied false certification in connection with conditions of payment both before and after *Sanford-Brown*. In *Cieszyski*, the court found that *Sanford-Brown* related only to conditions of participation and held that implied certification permitted recovery for individual claims for payment in violation of the condition of payment that services be provided by U.S.-based technicians. 2015 WL 6153937, at *10. These allegations distinguished the case from *Sanford-Brown*, which involved a "single, general, *good faith* promise to comply with various . . . regulations." *Id.* at *11 (emphasis in original); *see also United States ex rel. Kroening v. Forest Pharm., Inc.*, No. 12-366, 2016 WL 75066, at *5 (E.D. Wis. Jan. 6, 2016) (distinguishing *Sanford-Brown* on ground that its certification concerned a condition of participation, not payment); *United States v. Rogan*, 459 F. Supp. 2d 692, 717-18, 721-24 (N.D. Ill. 2006) ("Even in the absence of an express certification of compliance, the knowing submission of claims by a person who has violated a statute or regulation [with] a direct nexus to the government's payment decision is also actionable under the FCA."), *aff'd*, 517 F.3d 449 (7th Cir. 2008). Courts have, moreover, applied implied certification to cases involving pharmaceutical marketing and the medical necessity of prescriptions. *See, e.g.*, *United States ex rel. Brown v. Celgene Corp.*, No. 10-3165, 2014 WL 3605896, at *3 (C.D. Cal. July 10, 2014); *United States ex rel. Bergman v. Abbott Labs.*, 995 F. Supp. 2d 357, 366-70 (E.D. Pa. 2014).

> b) <u>The City has sufficiently pleaded liability in the absence of any certifications.</u>

Additionally, the City has sufficiently stated its fraud claims by alleging that Defendants' deceptive marketing caused prescribers and pharmacies to submit claims that were false because the prescriptions were, in fact, not medically necessary, reasonably required, or for an FDA-approved purpose and therefore ineligible for reimbursement—apart from any certifications.

---

that "a false certification of compliance, without more, does not give rise to a false claim for payment unless payment is conditioned on compliance." *Steury*, 625 F.3d. at 269.

The FCA—and by extension, the FCO—cannot be given a "rigid, restrictive reading" and must be construed broadly "to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).  The "touchstone for the Court's analysis" is not whether the facts fit a well-charted theory of liability; it is the statutory language itself.  *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 52-53 (D. Mass. 2001).  "The test for False Claims Act liability . . . is (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money . . . ."  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999).

The SAC alleges each of these elements:  Defendants' fraudulent marketing schemes, knowingly executed in Chicago, resulted in Chicago prescribers writing, and the City paying for, opioid prescriptions that would not have been written but for campaigns of deception that altered the medical standard of care.  *See, e.g.*, SAC ¶¶ 6-10, 109-17, 289-97, 376-89, 476-92, 545-57, 623-32, 635-37, 650, 658, 661, 676, 708-09; *id.* Exs. A.1 – A.7, B.1 – B.2.  Defendants thus caused the submission of false claims, as prescriptions written as a result of Defendants' conduct would not otherwise have qualified for payment because they were not medically necessary, were not reasonably required, or (in the case of prescriptions induced by Cephalon and Janssen's off-label marketing) dispensed for an FDA-approved use.  *See, e.g.*, *id.* ¶¶ 647-63, 665-78.

Courts around the country have denied motions to dismiss false claims cases involving similar fact patterns, and their reasoning applies equally here.  *See, e.g.*, *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1163, 1167 (N.D. Ill. 2007) (refusing to dismiss case since "[m]any doctors would not have prescribed . . . but for defendants' fraudulent statements. . . . each claim for reimbursement for an off-label use of [the drug] submitted to the

government by a healthcare provider" was false); *Franklin*, 147 F. Supp. 2d at 50-53 (refusing to dismiss FCA claim where drugmaker "engaged in an unlawful course of fraudulent conduct including knowingly making false statements to doctors that caused them to submit claims that were not eligible for payment by the government under Medicaid"); *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 530-33 (N.D. Tex. 2012) (sustaining "off-label promotion theory" because Medicare claims for stents "that [were] not covered and [were] not eligible for payment are false claims"). None of these cases employs a certification framework.

Perhaps the fullest explanation of this basis for liability is in *United States ex. rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1036-37 (C.D. Cal. 2012). The relators in *Ruhe* alleged that the defendant had misrepresented to physicians that its hemoglobin testing was effective and accurate, resulting in the submission of false claims to the government. *Id.* at 1036. The court rejected the argument that viable FCA claims "must fall into the narrow categories of 'false certification,'" and found that the "allegations fit within the language and purpose" of the FCA. *Id.* This was because the false statements were material to both "the use of the defective device by physicians, and the submission of claims for payment . . . for a medical procedure that the physicians believed was reasonable and necessary." *Id.* at 1036-37. As alleged, however, the tests were inaccurate and not "reasonable and necessary," such that deceptions that induced their use also "caused physicians to submit false claims for payment to the government." *Id.* at 1037.

These cases dovetail with the City's allegations. Prescriptions of Actiq, Fentora, and Nucynta IR for chronic pain, written as a result of Cephalon and Janssen's off-label marketing, were covered by the City's health plans, and claims for those prescriptions thus were false. As in *Ruhe*, prescriptions for opioids written as a result of Defendants' deceptive messages were not medically reasonable or necessary. Further, as discussed above, Defendants' use of deceptive

printed materials to market their opioids rendered their drugs misbranded—an additional reason the drugs were not reimbursable and claims for such prescriptions were false.

### 2. The SAC states a cognizable theory under the false statements ordinance.

Even if the Court deems the City's claims under its false claims ordinance lacking, the City has identified actionable false statements under MCC § 1-21-010. This ordinance broadly defines false statements to include false "assurances to the city . . . that a statement of material fact made in connection with any application, report, affidavit, oath, attestation or other document submitted to the city is accurate, true or complete," and requires "reasonable investigation to determine the accuracy, truthfulness or completeness" of such statements made to the City. MCC § 1-21-010(b). The broad formulation of any "assurance[] . . . in connection with . . . any . . . document" avoids any argument that the false statement liability requires an express or implied certification in a claim for payment. Instead, the ordinance extends to misrepresentations by Defendants regarding the risks and benefits of opioids that prompted them to write prescriptions for chronic pain—prescriptions that, when submitted to the City for payment, themselves constituted false assurances that they were medically necessary, reasonably required, and for an FDA-approved use, since prescribers understand that only such claims will be covered. *See* SAC ¶¶ 651-53. The ordinance also holds Defendants liable for failing to investigate—or substantiate—claims that opioids improved patients' function, carried a minimal risk of addiction, or could be used safely long-term, among their other deceptions.[49]

### 3. Allegations that Defendants' marketing rendered their drugs "misbranded" are not preempted.

Defendants' deceptive marketing of opioids rendered the drugs prescribed as a result of that marketing misbranded and, therefore, ineligible for reimbursement under the City's health

---

[49] The ordinance creates a rebuttable presumption that inaccurate or incomplete statements were not reasonably investigated. MCC § 1-21-010(c).

plans. *See, e.g.*, SAC ¶¶ 651, 656. Defendants, however, claim that the "City's attempt to declare Defendants' drugs misbranded is . . . preempted under the Supremacy Clause" because the federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "FDCA"), "vests exclusive enforcement authority for [the misbranding] provisions in the federal government." Jt. Mem. at 27. This argument lacks merit, as the City does not bring a cause of action under the FDCA.[50] The City does not seek to enforce the FDCA, and its claims arise not from the misbranding itself but from the *submission of claims* for uncovered drugs induced by Defendants' deceptive conduct. Such causes of action are not preempted. *See Bausch v. Stryker Corp.*, 630 F.3d 546, 549-53, 557 (7th Cir. 2010) ("Nothing in [the FDCA's preemption provision for medical devices] denies [a state] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements."); *Franklin*, 147 F. Supp. 2d at 51-52 ("[T]he failure of Congress to provide a cause action for money damages against a pharmaceutical manufacturer for marketing off-label drugs does not preclude an FCA claim where the manufacturer has knowingly caused a false statement to be made to get a false claim paid or approved by the government.").[51]

---

[50] In addition, as Defendants acknowledge elsewhere in their briefing, "federal preemption is properly raised in a motion under Rule 12(c) rather than 12(b)(6)." Prim. Jurisd. Mem. at 11 n.15 (citing *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 547 (7th Cir. 2012)).

[51] Defendants cite *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 349-50 (2001), to support their argument, Jt. Mem. at 27-28, but the preemption analysis in that case was driven by the nature of the specific state law claims at issue. *See* 531 U.S. at 347-53 (finding plaintiffs' state-law fraud-on-the-FDA claims preempted because the claims overlapped completely with the federal scheme empowering the FDA to punish and deter fraud against the Agency); *see also Bausch*, 630 F.3d at 557 ("[T]he *Buckman* court specifically distinguished such 'fraud-on-the-agency' claims, *i.e.*, claims not related to a field of law that states had traditionally occupied, from claims based on state law tort principles [in certain identified cases]."). More recently and more directly on point, the Supreme Court found that state-law failure-to-warn claims were not preempted by the FDA's drug labeling judgments. *Wyeth*, 555 U.S. at 563, 578, 581. *Anthony v. Country Life Manufacturing, L.L.C.*, No. 02-1601, 2002 WL 31269621 (N.D. Ill. Oct. 9, 2002), also is inapposite because, absent an allegation of injury, the action—unlike here—was one for direct enforcement of the FDCA. *See id.*

4. *The SAC has sufficiently alleged presentment.*

Defendants argue that the SAC fails to allege that any specific false claim was presented to the City for payment. Jt. Mem. at 28-29. To the contrary, the SAC provides detailed information for eight patients who were prescribed opioids to treat chronic pain and whose prescriptions were paid by the City as a result of Defendants' fraudulent conduct. SAC ¶¶ 707-08; Exs. B.1-B.2. For each of these patients, the City alleges the chronic pain indication (*e.g.*, back pain or joint pain); the exact number of opioid prescriptions received; the amount of the claim; the date range of the prescriptions; the opioid(s) prescribed; and the prescriber, along with the prescriber's connection to specific Defendants and their misrepresentations. SAC ¶¶ 707-08. The accompanying exhibits include even more detailed information for each of the patients, setting forth specific fill dates for each prescription and the amounts billed to the City. *See* Exs. B.1-B.2. The SAC sets forth elsewhere more than two thousand additional examples of opioid prescriptions written under circumstances compelling the inference that they were the result of Defendants' conduct and demonstrate that they were presented to, and paid for by, the City.[52] *See* Section II.G.2, *infra*. Defendants' claim that the City has not sufficiently alleged presentment of specific false claims is demonstrably false.

Defendants' reliance on *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374 (7th Cir. 2003), and *United States ex rel. West v. Ortho-McNeil Pharmaceutical, Inc.*, No. 03-8239, 2007 WL 2091185 (N.D. Ill. July 20, 2007), is misplaced. In *Garst*, the Seventh

---

[52] The City also provided specific claims for prescriptions written by prescribers who received misrepresentations from Defendants. *See* Section II.G., *infra*; SAC ¶¶ 296, 386, 482, 552, 630, 661, 676, 708-09, Exs. A.1 – A.7 (opioid claims paid by the City and prescribed by providers who reported being detailed by Defendants' sales representatives and hearing the messages described in the SAC), Exs. B.1 – B.2 (opioid claims paid by the City and prescribed to patients discussed in the SAC). To the extent Defendants contend that the City must supply such details as the location of the pharmacy and the identity of the pharmacy employee who transmitted the claim to the City, *see* Jt. Mem. at 28-29, that is pleading far beyond what the MTD Order required.

80

Circuit affirmed dismissal of a complaint where the relator "filed documents so long, so disorganized, so laden with cross-references and baffling acronyms, that they could not alert either the district judge or the defendants to the principal contested matters." 328 F.3d at 378. In *West*, the court dismissed the plaintiff's FCA claims because "[a]t best," the plaintiff described only "the general subject of the alleged misrepresentations" and "the general category of individuals (sales representatives) who made them." 2007 WL 2091185 at *4. These cases stand in marked contrast to the SAC, which details of particular misrepresentations and prescriptions, including the prescriber's name, patient's unique individual identification, date of prescription, and payment amount for the City. These allegations far exceed what is required at this stage. *See, e.g.*, *United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 918-19 (N.D. Ill. 2015) (denying motion to dismiss where relator's particularized allegations of misconduct gave rise to an inference of false claim presentment).[53]

In short, the SAC alleges both misrepresentations to specific prescribers and specific opioid prescriptions written by those prescribers, alongside other facts—including Defendants' successful effort to alter the standard of care for chronic pain, and the concomitant, skyrocketing increase in opioid prescriptions written—that, collectively, compel the inference that Defendants' deceptive messages caused claims to be presented to, and paid by, the City.

---

[53] The cases Defendants cite to establish that the City must plead details about each individual false claim, Jt. Mem. at 26, stand for the unremarkable proposition that a plaintiff must show at least some false claims were submitted. *See United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (on motion for summary judgment, plaintiff failed to meet her "'burden to establish, *in at least one instance*, that a given pharmaceutical had been paid for by Medicaid . . . and then redispensed and rebilled to Medicaid'" (emphasis added)); *United States ex rel. Grenadoyr v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102, 1106-08 (7th Cir. 2014) ("To comply with Rule 9(b) [the relator] would have had to allege either that the pharmacy submitted a claim to Medicare (or Medicaid) on behalf of a specific patient who had received a kickback, or at least name a Medicare patient who had received a kickback."). Here, the SAC details a scheme that lasted many years and provides exemplar claims and prescriptions that were medically unnecessary and ineligible for payment under the City's health plans and worker compensation program. *See* SAC ¶¶ 661, 676, 708-09; Exs. A.1 – A.7, B.1 – B.2.

### C.    The SAC sufficiently alleges conspiracy (Counts VI and IX).

To establish a civil conspiracy, "[a]ll that must be shown is that there [is] a single plan [to act unlawfully], that the alleged co-conspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *United States v. Rogan*, 459 F. Supp. 2d 692, 719 (N.D. Ill. 2006); *accord Adcock ex rel. Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 893-94 (Ill. 1994).[54]  A conspirator need not "have agreed on the details of the conspiratorial scheme or even know who the other conspirators are[;] [i]t is enough if [the conspirator] understand[s] the general objectives of the scheme, accept[s] them, and agree[s], either explicitly or implicitly, to do [his or her] part to further them." *Wayne v. Kirk*, No. 13-8540, 2015 WL 5950900, at *3 (N.D. Ill. Oct. 13, 2015) (Alonso, J.) (quoting *Jones v. City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1988)).  Moreover, "that a conspiracy's various members play different roles in executing it and may have dissimilar motives for participating in it, does not mean that a . . . conspiracy does not exist." *United States v. Cervantes*, 466 F.2d 736, 738 (7th Cir. 1972).

Defendants concede in their joint motion that a conspiracy can be inferred from circumstantial evidence.  *See*  Jt. Mem. at 32.  This is because "[t]he very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement; circumstantial evidence of the conspiracy, particularly regarding the overt acts performed in furtherance of the conspiracy, is all that is ordinarily obtainable before discovery and trial." *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985).[55]  Thus, even under Rule 9(b), a complaint will survive dismissal

---

[54] Because they are reciprocally informative, the City relies on federal and state law conspiracy analyses. *See Rogan*, 459 F. Supp. 2d at 719 (general civil conspiracy principles apply to FCA conspiracy claims); *Hardeway v. City of Chi.*, No. 91-0041, 1991 WL 203857, at *6 (N.D. Ill. Oct. 4, 1991) ("Illinois requirements for pleading a conspiracy are similar to Federal requirements.").

[55] *See also Craftwork, Inc. v. Robinson*, No. 10-3629, 2011 WL 6097725, at *7 (N.D. Ill. Dec. 6, 2011) ("[C]onspiracies, 'by their very nature, do not permit the plaintiff to allege, with complete particularity,

if its conspiracy allegations provide a general outline of the fraudulent scheme sufficient to reasonably notify defendants of their purported role in it. *See Shahin Edalatdju v. Guaranteed Rate, Inc.*, 748 F. Supp. 2d 860, 866-68 (N.D. Ill. 2010).[56] The SAC meets that burden.

### 1. The SAC's detailed allegations satisfy the City's pleading burden.

The City has adequately stated conspiracy claims against each Defendant. Based on its additional investigation, the City reframed the conspiracy allegations in the SAC. Whereas the FAC alleged that Defendants conspired with one another and sought to infer an agreement from Defendants' common conduct, the SAC alleges in far greater detail that Cephalon, Janssen, Endo, and Purdue engaged in parallel but separate conspiracies with key front groups to deceptively promote opioids for the broader chronic pain market. The Defendants and front groups may have had different motives—Defendants pursued profits while the front groups sought funding, enhanced reach and reputation, and access to opioids for patients, *see, e.g.,* SAC ¶¶ 6-9, 184-204—but they agreed to further their overlapping goals by working together. They did so by promoting the use of opioids to treat chronic pain through a series of specific, overt acts—creating and disseminating false, unsubstantiated, and misleading statements to prescribers and consumers and carrying out a marketing campaign that was unfair. *See, e.g.,* SAC ¶¶ 6-13, 184-204, 341-75, 429-75, 518-44, 580-622, 738-51, 753-61, 800-16, 837-46. The seemingly independent information disseminated through front groups was important to these Defendants

---

all of the details of the conspiracy or the exact role of the defendants in the conspiracy.'"); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1233 (3d ed.) ("[T]he nature of conspiracies often makes it impossible for the plaintiff to provide details at the pleading stage and . . . the pleader should be allowed to resort to the discovery process and not be subjected to a dismissal of his complaint.").
[56] *See also, e.g.*, *Gaudie v. Countrywide Home Loans, Inc.*, 683 F. Supp. 2d 750, 760 (N.D. Ill. 2010); *Gas Tech. Inst. v. Rehmat*, No. 05-2712, 2006 WL 3743576, at *35-36 (N.D. Ill. Dec. 15, 2006). Moreover, for the reasons laid out in Section II.A, *infra*, Rule 9(b) does not apply to a conspiracy to commit consumer fraud under the City's unfairness claim, since the underlying violation is not predicated on fraud. *Cf. Gaudie*, 683 F. Supp. 2d at 760 ("Because the underlying tort of the conspiracy is fraud, Rule 9(b)'s heightened pleading requirements apply to this claim.").

because it had greater credibility, *id.* ¶¶ 127, 132, 135, 184, 359, 518, and the front groups continued to publish messages promoting opioids in order to secure funding from Defendants and amplify their messages, *id.* ¶¶ 134-40, 143-49, 161, 165-71, 177-81, 186-87, 189-90, 197-98, even though they knew or should have known that these messages were deceptive, *id.* ¶¶ 142, 746, 842. Defendants did not need to exercise control over the front groups to be liable as conspirators; it is enough that they worked together with them, agreeing with the front groups to engage in deceptive and unfair practices and actively participating in that joint conduct (*e.g.,* by, editing, guiding, reviewing, approving, and funding the front groups' deceptive messaging). *See Rogan*, 459 F. Supp. 2d at 719 (setting forth the elements of civil conspiracy).[57]

The SAC particularizes the conspiracy allegations as to Cephalon, Endo, Janssen, and Purdue and the specific Front Groups with which each of them allied. Although the SAC alleges conspiracies between these Defendants and a number of organizations, namely AFP, FSMB, AAMP, and AGS, in the interest of economy, this memorandum focuses on the conspiracy between each Defendant and APF. Because the City has—at a minimum—sufficiently alleged a claim for conspiracy between each Defendant and APF, its conspiracy claims must survive.

        a)    <u>Cephalon</u>

The SAC's allegations detailing Cephalon's conspiracy with APF are sufficient to state a claim. *See, e.g.*, SAC ¶¶ 189, 341-43, 348-58.[58] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 342  A 2007 Fentora Marketing Plan identified outreach to APF as a key marketing tactic in Cephalon's mission to become a "leader"

---

[57] Because the City need not demonstrate control to make out a conspiracy, the conspiracy claims rely on conduct demonstrating that these Defendants and front groups *collaborated*.

[58] Although the City herein focuses on the conspiracy with APF, the SAC also alleges a conspiracy between Cephalon and FSMB in that they worked together to publish *Responsible Opioid Prescribing*, and Cephalon furthered the conspiracy by spending $150,000 to purchase copies of the deceptive publication and distributing it to 10,000 prescribers and 5,000 pharmacists. *See* SAC ¶¶ 161, 344-47; Section II.A.4, *supra*.

in the pain market. *See id.* Indeed, shortly thereafter, Cephalon listed APF first among third-party organizations that could be ""encourage[d]"to conduct activities" to help Cephalon persuade the FDA to expand Fentora's indication to include chronic, non-cancer pain. *Id.* ¶ 349.

APF accepted this role and worked to help Cephalon expand the market for its drugs. APF's president circulated a set of key message points to Cephalon in hopes of helping Cephalon influence the Institute of Medicine in favor of chronic opioid therapy. *Id.* ¶ 350. These points "incorporate[ed] points [Cephalon personnel] had raised" in earlier discussions. *See id.* ¶ 351. APF and Cephalon strategized about how to influence committee members, and APF's president suggested sharing the document with any "ally" Cephalon had on the committee. *Id.* ¶ 350. APF's president even reached out to Cephalon—rather than his own staff—to formulate a pro-opioid response to a 2011 *Archives of Internal Medicine* article that questioned the use of opioid therapy. *Id.* ¶ 352. Cephalon's funding of APF gave the Front Group an incentive to work with Cephalon towards a shared goal of promoting opioids for pain patients. *See, e.g.*, *id.* ¶¶ 189-91.

The SAC also demonstrates that Cephalon and APF committed overt acts in furtherance of their conspiracy by creating and disseminating deceptive materials to promote the use of opioids to treat chronic pain. APF published—with Cephalon's sponsorship—*Treatment Options: A Guide for People Living with Pain*. *See id.* ¶¶ 353-58; Section IIA.4, *supra*. This widely distributed publication misrepresented that opioids could increase patients' function and deceptively downplayed the risk of addiction, while exaggerating the risks of alternative painkillers like NSAIDs. SAC ¶¶ 354-58. It is available online and intended to reach Chicagoans, and was distributed to Chicago Prescriber G. *See id.* ¶¶ 357-58, 386(c).

        b)     <u>Endo</u>

The SAC's allegations detailing Endo's conspiracy with APF are sufficient to state a

claim. *See, e.g.*, SAC ¶¶ 186, 189, 433-55.[59] The SAC alleges facts supporting an inference of

an agreement between APF and Endo to promote chronic opioid therapy. Documents show that

the two organizations shared a "common mission," and Endo believed that "working through the

APF was a great way to work out problems that could have been there without the APF's

participation and support." *Id*. ¶ 444. APF provided Endo personnel with advance notice of

content it planned to publish and sought their editorial input. *Id.* ¶ 435. Endo provided APF

with the funds necessary to accomplish their shared pro-opioid agenda—providing more than

half of the $10 million that APF received from opioid manufacturers. *Id*. ¶ 433.[60] And APF's

president reached out to Endo—rather than his own staff—to formulate a pro-opioid response to

a 2011 *Archives of Internal Medicine* article that questioned the use of opioid therapy. *Id*. ¶ 434.

The two organizations also promoted chronic opioid therapy through APF's National

Initiative on Pain Control. *See also* Section II.A.5, *supra*. Although it was ostensibly run by

APF, Endo provided substantial input into the NIPC's activities; "NIPC module curriculum

development, web posting, and . . . workshops" were listed among Endo's own promotional

tasks. SAC ¶ 438. Reflecting its sense of joint ownership of NIPC's activities, Endo tracked the

distribution of NIPC materials, views of NIPC webinars, and its website (down to the medical

specialty of those visitors). *Id*. ¶ 440. Endo believed its partnership with NIPC would allow it to

distribute materials to tens of thousands of prescribers. *Id*. ¶ 439. Endo's Opana tactical brand

---

[59] Although the City herein focuses on Endo's conspiracy with APF. The SAC alleges other conspiracies. The SAC shows a conspiracy between Endo and FSMB in that the two groups worked together to publish *Responsible Opioid Prescribing*, and Endo furthered the conspiracy by spending $246,620 to distribute the deceptive publication. *See* SAC ¶¶ 161, 457-58. Similarly, it shows a conspiracy between Endo and AGS in that the two groups worked together to create the CME *Pharmacological Management of Persistent Pain in Older Persons*, and Endo furthered the conspiracy by reviewing the deceptive publication's content, spending $44,850 to fund it, and having its sales representatives discuss it with doctors during sales visits. *Id*. ¶¶ 459-60.

[60] Although funding alone may not be sufficient to establish editorial control, it can serve as the "overt act" in furtherance of an agreement necessary to establish conspiracy. *See Hunter v. Citibank, N.A.*, No. 09-02079, 2011 WL 7462143, *6 (N.D. Cal. May 5, 2011).

plan showed it planned to reach 1,000 prescribers in 2008 through live NIPC events,[61] and Endo planned to disseminate NIPC's work through two newsletters to 60,000 prescribers. *Id.* ¶ 441.

The SAC also shows the *quid pro quo* in the Endo-APF relationship. APF's strategic director emailed Endo with advance notice of content APF planned to publish, then sent a four-word email to colleagues at APF: "And where's the money?" *Id.* ¶ 435. After Endo approved a $244,337 grant request to fund a series of NIPC eNewsletters, APF personnel reflected on the benefits of the arrangement, noting that "Endo is making a lot of money on this with still pretty slender margins on APF's end." *Id.* ¶ 442. In any case, Endo provided millions of dollars in grants to APF. *Id.* ¶¶ 186, 433, 437. The SAC alleges that APF viewed NIPC both as a vehicle to promote chronic opioid therapy and to expand its reach and funding—$1.2 million from Endo in 2010 alone. *See id.* ¶ 436 (noting that, by sponsoring the NIPC, APF could "encourage physicians to drive their patients to a trusted source for pain education—the APF website").

Publishing NIPC's website *Painknowledge.com* was an overt act by Endo and APF in furtherance of their common goal to promote opioids. Available online—including to Chicago prescribers—it deceptively touted functional improvements associated with chronic opioid therapy and minimized the risk of addiction. *Id.* ¶¶ 447-50. The conspiracy between APF and Endo resulted in the creation and dissemination of other deceptive materials on opioids, too. For example, Endo and the NIPC worked together to create *Persistent Pain in the Older Patient* and *Persistent Pain in the Older Adult*, both of which misrepresented the risks, benefits, and superiority of chronic opioid therapy. *Id.* ¶ 445.[62] These CMEs were webcast from the NIPC website, where they were available to and intended to reach Chicago prescribers. *Id.*

---

[61] To capitalize on the perceived objectivity of the NIPC, Endo instructed NIPC faculty at Endo-sponsored talks to take care not to appear to be "Endo Speakers." *Id.* ¶ 444.

[62] These detailed allegations belie Endo's professed ignorance as to what it "individually did to join the supposed conspiracy or to learn of its aims and scope." Endo Mem. at 21. The SAC contains more than

c)      Janssen

The SAC's allegations detailing Janssen's conspiracy with APF are sufficient to state a

claim.  *See, e.g.*, SAC ¶¶ 529-44, 837, 840; *see also* Section II.A.6, *supra*.[63]  Janssen first

enlisted APF to help it "draft media materials and execute a launch plan" to promote its drugs.

*Id.* ¶ 529.  The agreement between the two organizations can be inferred from the closeness of

their relationship.  Janssen personnel participated in APF's "Corporate Roundtable," where they

worked together to develop strategies to promote chronic opioid therapy.  *Id.* ¶ 529.  In March

2011, for example, Janssen employees "shared expertise from within their company" with APF

personnel "for a public awareness campaign."  *Id.*  APF's president reached out to Janssen—

rather than his own staff—to formulate a pro-opioid response to a 2011 *Archives of Internal*

*Medicine* article that questioned the use of opioid therapy.  *Id.* ¶ 530.

In particular, the two organizations had a formal, written agreement to promote the

deceptive *Let's Talk Pain* website, which Janssen viewed as a promotional tool for Nucynta and

Nucynta ER and an integral part of Nucynta's launch.  *See id.* ¶¶ 531-33, 540-41.  Janssen and

APF agreed to keep pain management "top of mind" among prescribers and patients by reaching

out to "target audiences," including patients, prescribers, and key opinion leaders ("KOLs").  *Id.*

¶ 533.  Janssen and APF also collaborated on the creation and revision of *Let's Talk Pain*

---

10 pages of allegations discussing the relationship between Endo and front groups and their joint
activities.  *See* SAC ¶¶ 429-62.  Further, it is neither true nor relevant that the activities themselves were
lawful.  Producing and distributing deceptive and misleading pharmaceutical promotion is unlawful under
local, state, and federal law.  Additionally, "[w]here the conspiracy itself has an unlawful purpose, the
means employed, whether themselves criminally or civilly actionable, are immaterial."  *Morrison v. YTB*
*Int'l, Inc.*, No. 08-565, 2010 WL 1558712, at *9 (S.D. Ill. Apr. 19, 2010) (quoting 11 Illinois Law & Prac.
Conspiracy § 4 (1956 & Supp. 2009)).

[63] Although the City focuses herein on Janssen's conspiracy with APF, the SAC also shows a conspiracy
among Janssen, AAPM, and AGS in that the three groups worked together to publish *Finding Relief:*
*Pain Management for Older Adults*, and Janssen furthered the conspiracy by reviewing, editing, and
approving the deceptive publication and then distributing 50,000 copies in Chicago and nationwide.  *See*
SAC ¶¶ 521-26; Section II.A.6, *supra*.

content. *See id.* ¶¶ 533-35. *Let's Talk Pain* was linked to by the *Chicago Tribune Blog* in 2008, and it was available to and intended to reach Chicago prescribers. *Id.* ¶ 541.

The APF and Janssen partnership to promote opioids for chronic pain was further memorialized in a 2011 consulting agreement between Janssen and one of APF's employees *Id.* ¶¶ 536-538. The agreement required APF to participate in status calls at Janssen's request and provide feedback on Janssen's promotional messaging. *Id.* ¶ 536. Finally, the agreement required APF to help Janssen publicize national survey results that Janssen viewed as favorable to its drugs by disseminating them on social media, provide spokespersons to talk about them in public fora, and include the results in future APF materials. *See id.* ¶ 537.[64]

d)    <u>Purdue</u>

The SAC's allegations detailing Purdue's conspiracy with APF are sufficient to state a claim. *See, e.g.*, SAC ¶¶ 186, 189-90, 580-613, 837, 841; *see also* Section II.A.1, *supra*.[65] The two were longstanding partners in the promotion of opioid therapy, and Purdue told APF in 2001 it was funding APF due to its "desire to strategically align its investments in nonprofit organizations that share [its] business interests." *Id.* ¶ 190. The two organizations' agreement to promote opioids is most clearly demonstrated by their collaboration on Purdue's *Partners Against Pain* website, which deceptively minimized the risk of opioid addiction. *See id.* ¶¶ 578,

---

[64] Janssen argues that the 2011 consulting agreement and its actions with APF are not connected to the agreement involving *Let's Talk Pain*. Janssen Mem. at 23 nn.17-18. That is an issue of fact. Moreover, the allegations regarding the scope of work to be performed, SAC ¶¶ 536-37, and the misleading nature of the resulting publication, *id.* ¶¶ 539-41, support the inference of a conspiracy.

[65] Although the City herein focuses on Purdue's conspiracy with APF, the SAC alleges other conspiracies. The SAC shows a conspiracy between Purdue and FSMB in that the two groups worked together to publish *Responsible Opioid Prescribing*, and Purdue furthered the conspiracy by spending $150,000 to distribute the deceptive publication. *See* SAC ¶¶ 612-613; Section II.A.1, *supra*. The SAC also shows a conspiracy between Purdue and AGS in that the two groups worked together to create a CME promoting *Pharmacological Management of Persistent Pain in Older Persons*, and Purdue furthered the conspiracy by contributing funds to distribute the deceptive publication and instructing its sales representatives to discuss it with doctors during sales visits. *Id.* ¶¶ 614-17.

583-86. APF personnel consulted on the website's rollout and coordinated the media campaign associated with its content. *Id.* ¶ 584. Purdue provided the consultant with message points to use, and APF and Purdue worked together to "rehearse delivery of Purdue's campaign messages" related to the website. *Id.* APF also provided "patient representatives" to appear on *Partners Against Pain.* *Id.* ¶ 587. *Partners Against Pain* was available online, including to Chicago prescribers. *See id.* ¶¶ 578-79. In addition, APF volunteered to supply one of its own staff to assist as a consultant on another opioid-related Purdue project, and the two organizations signed a "Master Consulting Services" Agreement related to the promotion of opioids on September 14, 2011. *Id.* ¶¶ 583, 585. Purdue participated in APF's "Corporate Roundtable," where Purdue personnel discussed what role APF could play that would complement its own marketing efforts and remained in close contact with their counterparts at APF. *Id.* ¶ 582. Purdue provided APF with nearly $2 million in funding from 2007 to 2012, *id.* ¶ 186, and APF's president even reached out to Purdue—rather than his own staff—to formulate a pro-opioid response to a 2011 *Archives of Internal Medicine* article that questioned the use of opioid therapy, *id.* ¶ 594.

Purdue and APF also worked together to promote opioids through APF's Pain Care Forum ("PCF"). *See id.* ¶ 589. APF and Purdue used the PCF to address a perceived "lack of coordination" between various groups in promoting opioids. *See id.* ¶ 591. They developed "key messages" promoting opioids for use with the public—messages that ended up in a number of the deceptive publications identified by the SAC. *See id.* ¶ 591. They also worked together to successfully prevent the FDA from making prescriber education on opioids mandatory, which would have discouraged prescribing. *Id.* ¶ 592. Although this was ostensibly an APF project, it was run by a Purdue employee. *Id.* at ¶¶ 589-90. Indeed, other third parties like the Center for Practical Bioethics had "reservations" about PCF due to its involvement with drug companies

and believed that a Purdue employee was PCF's official leader.  *Id.* ¶ 590.

The two organizations also worked together to create *A Policymaker's Guide to Understanding Pain & Its Management*, which contained deceptive statements regarding functionality, the risk of addiction, and the ease of withdrawal.  *Id*. ¶¶ 596-601.  Purdue provided grant money to fund *A Policymaker's Guide*, kept abreast of the content while it was being developed, and provided editorial input into its contents.  *Id*. ¶ 601.

### 2. Defendants' conspiracy case law and arguments are inapplicable.

The City's allegations, which detail agreements between individual Defendants and third-party front groups and how those agreements led to the dissemination of deceptive messages that injured the City, sufficiently state claims for conspiracy.  Nevertheless, Defendants argue that the City has failed to allege a conspiracy to submit false claims because it has not alleged an agreement between any Defendant and third party to defraud the City by getting a false or fraudulent claim paid.  *See* Jt. Mem. at 29-30, Endo Mem. at 21-22.  However, the SAC specifically alleges that "Defendants set out to change the . . . consensus supporting chronic opioid therapy *so that* doctors would prescribe and government payors, such as the City of Chicago, would pay for long-term prescriptions of opioids," SAC ¶ 637.[66]  Moreover, none of the cases cited by Defendants involved the type of detailed allegations at issue here.[67]

---

[66] As discussed in Section II.B, *supra*, the SAC also remedies the prescriber-related deficiencies that the Court identified in its previous analysis of the City's FCO conspiracy claims.  *See* MTD Order at 32.

[67] Defendants' cases are inapposite because the rejected conspiracy claims involved razor-thin supporting allegations.  *See, e.g.*, *United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 666, 669 (N.D. Ill. 2015) (noting that the relator "fail[ed] to allege *anything* that would allow the Court to reasonably infer . . . an agreement, let alone what the terms of that agreement were," and upholding the conspiracy claim against a different defendant (emphasis added)); *Roehl v. Merrilees*, No. 11-4886, 2012 WL 1192093, at *8 (N.D. Ill. Apr. 10, 2012) (alleging no facts allowing an inference "'above the speculative level'"); *Lyttle v. Killackey*, 528 F. Supp. 2d 818, 831-32 (N.D. Ill. 2007) (finding a mere "blanket assertion" that a conspiracy occurred); *Segreti v. Lome*, 747 F. Supp. 484, 487 n.1 (N.D. Ill. 1990) (noting "skeletal pleadings").  Indeed, a court in the Southern District of Illinois recently refused to dismiss a civil conspiracy claim against Johnson & Johnson—even under Rule 9(b)—based on allegations that through their roles in an association and task force, the defendants caused to be released misleading information

Contra Defendants' arguments, Jt. Mem. at 32-33, the City also provides far more than an "averment" of overt acts committed in furtherance of the agreements. Defendants' respective conspiracies included myriad overt acts, including collaborative phone calls and meetings, formal agreements related to the promotion of opioid therapy, joint lobbying efforts, and the creation and distribution of publications that misrepresented the risks, benefits, and superiority of opioids. The SAC describes these acts in detail. *See, e.g.*, SAC ¶¶ 341-75, 429-75, 518-44, 580-622.[68] Defendants further argue that the common law conspiracy claim is "unintelligible," but the SAC's detailed allegations about each Defendant and how it worked with third parties in a common mission to promote opioids for chronic pain contradict this argument as well. *See, e.g.*, SAC ¶¶ 341-75, 429-75, 518-44, 580-622; *cf. Lane v. Money Masters, Inc.*, No. 14-1715, 2015 WL 225427, at *3 (N.D. Ill. Jan. 15, 2015) (stating that in civil cases alleging conspiracy, "[t]he Court reads the complaint and assesses its plausibility as a whole.").[69]

---

regarding the risks of talc, hired scientists to perform biased research, and pooled resources to "'collectively defend talc use at all costs.'" *See Cebulske v. Johnson & Johnson*, No. 14-627, 2015 WL 1257778, at *2-3 (S.D. Ill. Mar. 17, 2015). The SAC's allegations similarly establish conspiracies to promote chronic opioid therapy at all costs.

[68] Defendants rely on *Sweeney v. Bausman*, No. 87-5532, 1987 WL 45713, at *2 (N.D. Ill. Nov. 5, 1987), but in that case the plaintiffs had "not pleaded, generally or otherwise, facts sufficient to show a conspiratorial agreement," and the decision was based on the facts' similarity to a previously decided employment termination case that is inapposite here. In *Zoglauer v. City of Wheaton*, No. 96-7533, 1997 WL 619833, at *4 (N.D. Ill. Sept. 29, 1997), the court cited the same "averment" language that Defendants rely upon here but found that the factual allegations at issue "while admittedly quite sparse, [were] not mere averments" and instead created an inference that one defendant acted in collaboration with the other defendants.

[69] Defendants also argue that the City's conspiracy claim should be dismissed because it fails to allege an underlying tort. However, the City has sufficiently stated underlying claims, as demonstrated in Sections II.A – B, *supra*, and Sections II.D – G, *infra*. The fact that the City has not sued these Defendants' co-conspirators is immaterial because there is "no requirement that a plaintiff sue every member of an alleged conspiracy; the plaintiff can choose which members to bring to court." *Dexia Credit Local v. Rogan*, 604 F. Supp. 2d 1180, 1185-86 (N.D. Ill. 2009). Although Cephalon argues that the City's conspiracy claim fails because no claims have been brought against the front groups, the authorities it cites on this point add nothing to the basic proposition that a civil conspiracy claim is not an independent tort. *See, e.g.*, *Merrilees v. Merrilees*, 998 N.E.2d 147, 163 (Ill. Ct. App. 1st Dist. 2013).

**D.    The SAC sufficiently alleges a claim for recovery of the cost of municipal services (Count VII).**

Under MCC § 1-20-020, the City is entitled to recover the costs that it incurred "in order to provide services reasonably related to [Defendants'] violation of any federal, state or local law" and Defendants' "failure to correct conditions which violate any federal, state or local law when [they were] under a legal duty to do so."  Discussing this claim in conjunction with the City's false claims and insurance fraud cause of action, the MTD Order faulted the FAC for failing to allege "the identities of doctors who, as a result of one or more of defendants' alleged misrepresentations, prescribed opioids for chronic pain to a City-insured patient or worker's compensation recipient whose claim for that prescription the City paid, or any other details about such claims."  MTD Order at 32.  First, the municipal services claim does not require the City to prove that Defendants violated the false claims ordinance or committed insurance fraud.  The claim can be predicated upon a violation of the City's consumer fraud ordinance (minus a showing of causation and reliance), and damages are the City costs "reasonably related" to that violation—not just prescription costs.  Second, the City has addressed the deficiency cited by the Court by identifying specific prescribers who wrote City-reimbursed prescriptions as a result of Defendants' deceptive conduct, as discussed in Sections II.A, *supra*, and II.G.2, *infra*.

The City's municipal services claim is sufficiently pleaded in all other respects.  The SAC alleges that Defendants violated various federal, state, and municipal laws—including the consumer fraud provisions at MCC § 2-25-090 and § 4-276-470—and failed to correct conditions violating those laws when legally obligated to do so.  *See* SAC ¶¶ 817-21.  The SAC also outlines the costs the City incurred—including costs of prescriptions and associated doctor visits, but also costs of addiction treatment services, hospitalizations, and emergency services, and details how such costs are reasonably related to the violations.  *Id.* ¶¶ 633-709, 822-25.

Defendants contend that the free public services and "remoteness" doctrines bar the City from recovering the costs attributable to their actions, but neither doctrine has any bearing here. It is well-established that a municipality may recover costs of services where, as under MCC § 1-20-020, it is authorized by statute or regulation. *See City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983); *see also Vodak v. City of Chi.*, No. 03-2463, 2006 WL 2524141, at *1 (N.D. Ill. Aug. 30, 2006) (refusing to dismiss municipal services claim based on allegations that "[a]s a result of []Defendants' conduct, the City of Chicago incurred extensive costs to provide necessary services, including the extra police forces . . . and costs related to transporting, processing and housing []Defendants who were arrested").[70]

The remoteness doctrine is inapplicable, moreover, because the municipal services ordinance expressly sets the standard for any requisite directness, noting that the costs incurred by the City must be "reasonably related" to the challenged conduct. MCC § 1-20-020. The ordinance defines "costs" to include "all costs of the city incurred in relation to the provision of services," even if the City would have otherwise incurred them: personnel, equipment, materials "or any other costs allocable to the provision of services." MCC § 1-20-010. This broad language illustrates a clear legislative intent to permit recovery in instances such as this, where the City has incurred significant costs in providing services reasonably related to Defendants' deceptive and unfair campaign to increase prescriptions for dangerous, addictive drugs.[71]

---

[70] Defendants' reliance on *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1144 (Ill. 2004), in support of the application of the free public services doctrine does not advance their argument. *Beretta*, which concerned an action for public nuisance and cites *Flagstaff*, simply reaffirms the proposition that "public expenditures made in the performance of governmental functions are not recoverable" where "no Illinois statute authorizes the recovery sought by plaintiffs." *Id.* 1144-47. That proposition is inapplicable here, where recovery is expressly authorized by MCC § 1-20-020.

[71] The case on which Defendants rely does not analyze the municipal services ordinance and is thus inapposite. *See Cty. of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1043-48 (Ill. App. Ct. 1st Dist. 2004) (discussing the remoteness doctrine in context of ICFA and Illinois Antitrust Act).

Moreover, the City's municipal services claim survives even applying the remoteness doctrine. Legal causation turns on the question of foreseeability. *Beretta*, 821 N.E.2d at 1132-38. As laid out in Section II.G.2, *supra*, Defendants *knew* that their conduct would result in and be "reasonably related to" the City's injuries; the City was, in fact, an intended victim of Defendants' conduct. *See, e.g.*, SAC ¶ 637.

### E. The SAC sufficiently alleges unjust enrichment (Count X).

A plaintiff may recover on a theory of unjust enrichment if "the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989); *see also Alcon Labs., Inc.*, 2014 WL 1041191, at *1, 3-4, 10-12 (plaintiff sufficiently alleged unjust enrichment based on unfair payments made for larger quantities of medication than would have been purchased absent defendants' challenged conduct). In dismissing the unjust enrichment claim in the FAC, the Court found that the City had not "alleged with particularity that it was harmed by defendants' actions because it [did] not identify the opioid prescriptions for which it paid that were written by doctors influenced by defendants' alleged misrepresentations." MTD Order at 33. The SAC remedies this deficiency by providing detailed sample claims paid by the City and drawn from patients who were prescribed Defendants' opioids by providers who confirmed they had received Defendants' misleading and deceptive marketing messages, SAC ¶¶ 707-09, as well as identifying numerous other examples of City-paid prescriptions written by those providers.[72]

The SAC further alleges that Defendants were enriched by the City's payment for opioid

---

[72] *See id.* ¶¶ 296, 386, 482, 552, 630, 661, 676, 708-09, Exs. A.1 – A.7 (opioid claims paid by the City and prescribed by providers who reported being detailed by Defendants' sales representatives and hearing claims like the ones at issue in this litigation), Exs. B.1 – B.2 (opioid claims paid by the City and prescribed to patients referenced in the SAC).

prescriptions because of their deceptive and unfair promotion of opioids to treat chronic pain. *See id.* ¶¶ 6-13, 638-43, 848-49; *see also id.* § V.E.1 – 5. Chicago was a focus of Defendants' marketing efforts, and Chicago providers prescribed opioids as a result of those efforts. *See, e.g., id.* ¶¶ 109-17, 289-97, 376-89, 476-92, 545-57, 623-34, 662, 676, 682-709. Commensurate with Defendants' unlawful promotion, the City's spending on opioids increased dramatically. *Id.* ¶¶ 635-37, 644-81. The SAC further alleges that Defendants' efforts were wildly successful and led to record profits. *Id.* ¶¶ 12, 638-43, 679-81, 730-31. Combined with specific examples of harm to the City, these allegations establish a valid unjust enrichment claim, and belie Defendants' argument that the City has not put forward facts to support its claim. *See* Jt. Mem. at 34.

Defendants also argue that the unjust enrichment claim fails because the City does not allege it lacks adequate remedies at law. But that is an equitable defense, and unjust enrichment is an action at law where, as here, a plaintiff seeks disgorgement. *See Partipilo v. Hallman*, 510 N.E.2d 8, 10-11 (Ill. App. Ct. 1st Dist. 1987); *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02-3293, 2005 WL 2405797, at *3-4 (N.D. Ill. Sept. 28, 2005). In any case, the City may plead claims in the alternative. Fed. R. Civ. P. 8(d)(2); *see also Triple Canopy, Inc. v. Moore*, No. 04-3265, 2005 WL 1629768, at *14 (N.D. Ill. July 1, 2005).

Defendants' argument that the City's allegation of unjust enrichment is derivative of its other claims and fails for the same reasons also lacks merit because, as discussed above, the City has adequately pleaded each of its claims. *See De Falco*, 2013 WL 1122825, at *8 (finding unjust enrichment claim sufficient based on a determination that plaintiff adequately pleaded an ICFA claim). And even if those claims were to fail, the improper conduct underlying those claims would still support an unjust enrichment cause of action. *See Triumph Packaging Grp. v. Ward*, No. 11-7927, 2012 WL 5342316, at *7 (N.D. Ill. Oct. 29, 2012).

96

**F.    The City has sufficiently pleaded claims against Purdue, Cephalon, Endo,
and Janssen for aiding and abetting third-party wrongdoing.**

The City has stated claims for conspiracy based on each Defendant's agreements with its

third-party partners to deceptively promote opioids for chronic pain, as set forth in Section II.C,

*supra*.  However, even if the Court finds those allegations insufficient, Defendants' collaboration

with third parties still supports the City's consumer fraud (Counts I, II, and III), false statements

(Count IV), and municipal services (Count VII) claims under an aiding-and-abetting theory.[73]

An aiding-and-abetting claim includes these elements:  (1) the party whom the defendant

aids must perform a wrongful act that causes an injury; (2) the defendant must be regularly aware

of its role in the tortious activity at the time assistance is provided; and (3) the defendant must

knowingly and substantially assist the principal violation.  *Thornwood Inc. v. Jenner & Block*,

799 N.E.2d 756, 767-69 (Ill. App. Ct. 1st Dist. 2003).  The SAC alleges all three.

As detailed in Sections II.A (consumer fraud) and II.C (conspiracy), *supra*, the City has

amply pleaded wrongful conduct by the APF and others through the knowing development and

dissemination in Chicago of deceptive messages regarding opioids.  *See* SAC ¶¶ 158-71, 184-

204, 341-75, 429-75, 518-44, 580-622, 745-47.  These allegations belie Defendants' argument

that the "SAC nowhere alleges that third parties committed the underlying 'principal violation'

on which an aiding and abetting claim must be predicated."  Jt. Mem. at 31 n.39.  Further, the

SAC alleges, or alleges facts giving rise to the inference, that each of these Defendants was both

regularly aware of and knowingly and substantially lent aid to these activities.  *See id.* ¶¶ 127-33,

161-63, 166, 170-71, 184-204, 341-75, 429-75, 518-44, 580-618, 738-51, 752-61,772-82, 817-

25.  On these allegations, the City is entitled to go forward on its aiding-and-abetting theory.

---

[73] The City does not assert Defendants' aiding-and-abetting liability for its false claims cause of action
(Count V), since the FCO already imposes liability on any person who "knowingly . . . causes" false
claims to be presented for payment.  MCC § 1-22-020(1).

None of the cases Defendants rely upon to attack the City's aiding-and-abetting theory avails them. In *Cohen v. American Security Insurance Co.*, 735 F.3d 601, 612 (7th Cir. 2013), the court dismissed the aiding and abetting claims because they were derivative of a failed ICFA claim. Here, the City sufficiently alleges consumer fraud and municipal services claims. *See* §§ II.A and II.D, *supra*. In *Wolf v. Liberis*, 505 N.E.2d 1202, 1208 (Ill. App. Ct. 1st Dist. 1987), the plaintiff—unlike the City—did not allege the defendant's assistance or encouragement of the unlawful conduct at issue. Indeed, the SAC alleges that Defendants devised the misleading marketing campaigns, purposefully allied with the front groups and KOLs to give the false impression that their messages reflected independent, third-party views, and, among other things, helped the third parties develop, refine, and distribute the misleading messages. *See, e.g.*, SAC ¶¶ 6-10, 127-42, 341-75, 429-75, 518-44, 580-622. *Thornwood*, 799 N.E. 2d at 767-69, a case cited by Endo, actually *reversed* dismissal of an aiding and abetting claim. As in *Thornwood*, the SAC here reveals Defendants' myriad actions knowingly taken to aid and abet.[74]

### G. Where required, the SAC sufficiently pleads causation and injury.

The City has made the requisite showing of causation and injury. First, the City is not required to allege causation or injury at all to state claims under MCC § 2-25-090 or MCC § 4-276-470. Second, the City has demonstrated causation as to its other causes of action by connecting Defendants' deceptive and unfair marketing to specific prescriptions paid by the City—with the caveat that the City may recover certain "reasonably related" costs of municipal without proving them prescription by prescription. Finally, the SAC describes in detail the substantial injuries the City has suffered as a result of Defendant's deception.

---

[74] Defendants' argument notwithstanding, Jt. Mem. at 31 n.39, Illinois law recognizes aiding-and-abetting liability under Section 2 of the ICFA—and, by extension, the City's consumer fraud ordinances. *Brown v. SBC Communications, Inc.*, cited by Defendants, recognized as much by upholding a Section 2 claim where the allegations established more than "passive" or "peripheral" involvement in the misconduct. No. 05-777, 2007 WL 684133, at *3-4 (S.D. Ill. Mar. 1, 2007)

1. *The City need not allege causation, reliance, or injury to state claims for deceptive and unfair conduct under the consumer fraud ordinances.*

The Court's Orders make clear that the City need not link Defendants' misrepresentations to the writing of prescriptions to state claims for deceptive or unfair practices in violation of MCC § 2-25-090 (Counts I and II) and MCC § 4-276-470 (Count III). Noting that § 2-25-090 looks to ICFA for its construction, the Court explained in its MTD Order that the elements of a deceptive practices claim under § 2-25-090 are: "(1) a deceptive act or practice by the defendant[s]; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during the course of conduct involving trade or commerce." MTD Order at 17 (quoting *Robinson*, 775 N.E.2d at 960).[75] The Court then upheld the consumer fraud claims against Purdue, even though the Court found that the City had not specifically identified prescriptions caused by Purdue's deceptive marketing. It did so because the City sufficiently alleged misrepresentations that Purdue "intended for anyone with access to the sites, including Chicagoans, to rely on." Recons. Order at 3. Nothing more is required for the City to state claims for relief under its consumer fraud ordinances—though, as detailed in Sections II.G.2 and II.G.3, *infra*, the City has sufficiently allegedly causation and injury.

The Court's Orders comport with case law confirming that enforcement authorities need not allege injury (and causation) to establish a claim under ICFA—and, by extension, the City's consumer fraud ordinances. In *People ex rel. Madigan v. United Construction of America, Inc.*, the trial court dismissed an Illinois Attorney General action for deceptive mortgage and home

---

[75] The elements of misrepresentation under MCC § 4-276-470 mirror those for deceptive conduct under MCC § 2-25-090. *See* MCC § 4-276-470 (making it unlawful "to act, use or employ any deception . . . with [the] intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . or advertisement of any merchandise, *whether or not any person has in fact been misled*" (emphasis added)). An unfair conduct claim under MCC § 2-25-090 similarly requires a showing of "(1) a[n] . . . unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the . . . unfair practice; and (3) [that] the unfair . . . practice occurred during a course of conduct involving trade or commerce." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012).

repair sales tactics because the state "fail[ed] to plead . . . that any allegedly unlawful act had proximately harmed homeowners." 981 N.E. 2d 404, 406-07 (Ill. App. Ct. 1st Dist. 2012). The Appellate Court reversed, explaining that "[t]he Attorney General may litigate a violation [of ICFA] and seek injunctive and other relief without [showing actual damages]." *Id.* at 411.[76] *Madigan* comports with the holding of the Illinois Supreme Court that enforcement authorities need not plead that "any person has in fact been misled, deceived, or damaged" to establish an ICFA violation. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002).

Because the consumer fraud ordinances do not require allegations of injury and causation, neither does Rule 9(b). That rule merely requires that the circumstances of fraud be pleaded with particularity; it "does not add substantive elements . . . to any claim." *In re Sanofi Sec. Litig.*, No. 13-8806, 2015 WL 365702, at *13 n.8 (S.D.N.Y. Jan. 28, 2015). Accordingly, to satisfy Rule 9(b) and state a claim under MCC §§ 2-25-090 and 4-276-470, the City must only allege Defendants' deceptive and unfair practices with particularity. It need not allege that those practices resulted in any prescriptions at all, much less provide the sort of granular, doctor-by-doctor and prescription-by-prescription detail Defendants demand.[77]

Defendants also claim allegations of injury are necessary because they are "essential in every tort." Jt. Mem at 9. This is not a tort, but an enforcement action, the elements of which are defined by statute. The cases on which Defendants rely are inapposite. The court dismissed

---

[76] Defendants claim *Madigan* draws a distinction between whether an enforcement entity has *standing* to bring a claim and whether that entity has *stated a claim* under ICFA. *See* Jt. Mem. at 9 n.16. This is a distinction without a difference. The court was asked to determine "[w]hether the Attorney General must plead that the defendant's unlawful act proximately caused harm *to state a claim* for injunctive and other relief under section 7 [of the ICFA]." *Madigan*, 981 N.E.2d at 409 (emphasis added). That is the question the court answered in its ruling on what is required in a public enforcement action. *See id.* at 411. Whether the issue is framed as standing or sufficiency of pleading, *Madigan* establishes that causation is unnecessary in a public enforcement action. *See also* MTD Order at 17 (quoting *Madigan*).

[77] Whether and to what extent the City is entitled to restitution for damages are damages questions for a later stage of the case, not a pleading issue for resolution on a motion to dismiss. The City fully states claims for violations of MCC § 2-25-090 by establishing the elements the Court recited in its MTD Order.

the claims in *People ex rel. Hartigan v. E & E Hauling, Inc*., because the alleged misstatements were unrelated to defendants' fraudulent scheme—they were not deceptive because they were not material. 607 N.E.2d 165, 174-75 (Ill. 1992). In *Philip Morris Inc.*, the county had no statutory right to enforce state consumer laws and was like a private plaintiff, obligated to prove causation of damages. 817 N.E.2d at 1041. Here, the City is properly exercising its right to enforce its ordinances; the degree of the City's harm is a damages issue for later in the case.[78]

> ### 2. *The City has sufficiently alleged causation in support of its other claims.*

The MTD Order sets out what the City must under MCC §§ 1-21-010 (Count IV), 1-21-020 (Count V), 1-22-020 (Count VI), 1-20-020 (Count VII), and 720 ILCS 5/17-10.5 (Count VIII): "the identities of doctors who, as a result of one or more of defendants' alleged misrepresentations, prescribed opioids for chronic pain to a City-insured patient or workers' compensation recipient whose claim for that prescription the City paid." MTD Order at 32.

As a threshold matter, although the Court's analysis grouped municipal services with the City's other claims, the causation standard for that claim is distinct and set forth in the municipal services ordinance itself. MCC § 1-20-020 merely requires that the City's costs be "reasonably related" to the underlying violation of law. Causation thus requires allegations that the City incurred costs reasonably related to the predicate offense, and can be based on the consumer fraud violations alone. Thus, even absent a sufficient showing of false claims causation, the municipal services ordinance permits the City to recover the costs of hospitalization, emergency services, addiction treatment, and other costs alleged in the SAC, which the City has alleged resulted from Defendants' fraud. *See* SAC ¶¶ 824-25.

---

[78] Cephalon also argues that causation is necessary to show Article III standing. Mem. Supp. Cephalon & Teva MTD, ECF No. 402, at 16 ("Cephalon Mem."). But the Supreme Court has held that governments like the City have a sovereign interest in enforcing their civil and criminal codes, the violation of which is an injury conferring standing. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).

Nevertheless, the City has met the standard the Court articulated for its false claims counts with a depth of detail that warrants permitting this case to go forward. The SAC identifies, as representative examples, 20 prescribers who received one or more deceptions from Defendants Actavis, Cephalon, Endo, Janssen, and Purdue, and who wrote prescriptions for chronic pain that were reimbursed by the City. *See* SAC ¶¶ 296, 386, 482, 552, 630.

The SAC further describes representative examples of false claims submitted to the City—*i.e.*, claims for patients whose prescriptions were paid by the City and who were treated under circumstances supporting the inference the opioids were prescribed to treat chronic pain. *See id.* ¶¶ 707-09. For each such patient and set of prescriptions, there is a direct connection to a Defendant's marketing to a prescriber—as illustrated by Patient C. From June 11, 2005 to June 27, 2015, Patient C received 105 prescriptions for Endo's Opana ER, 92 of which were written by Chicago Prescriber A. *Id.* ¶ 708(c). Prescriber A was trained as an Endo speaker, and that training both misrepresented the abuse potential of Endo's drugs and downplayed the risk of addiction to opioids. *Id.* ¶¶ 708(c), 420-26. Other examples similarly tie deceptive marketing by Actavis, Cephalon, Endo, Janssen, and Purdue to the submission of false claims. *See, e.g., id.* ¶ 708(a) (identifying 47 opioid prescriptions paid for by the City and written by Prescribers O and R, who received misrepresentations from Cephalon, Janssen, and Purdue); ¶¶ 708(b) – (c) (identifying 366 prescriptions paid for by the City and written by Prescribers A and Y, who received misrepresentations from Endo); ¶ 709(e) (identifying 3 prescriptions paid for by the City and written by Prescriber E, who received misrepresentations from all Defendants).[79]

---

[79] Each Defendant argues that this case must be limited to misrepresentations that caused specific prescriptions for *that Defendant's* opioids. This misapprehends the City's claims and the nature of Defendants' marketing. The SAC alleges that Defendants' deceptive campaigns altered prescribers' perceptions of the suitability of opioids for treating chronic pain. *See id.* ¶¶ 79-84, 633-731. One Defendant's misrepresentations regarding the risk of addiction, for example, necessarily influenced

In addition to identifying prescribers who both received Defendants' deceptive and unfair marketing and prescribed opioids paid for by the City, the SAC pleads facts giving rise to the inference that these prescribers, and others, prescribed opioids for chronic pain to Chicagoans "as a result of" Defendants' deceptive marketing.  MTD Order at 32.  The misrepresentations referenced above were part of Defendants' systemic efforts to expand the market for opioids by reversing the medical understanding that opioids should be used only short-term or for cancer or palliative care.  *See* SAC ¶¶ 7, 79, 85.  Working individually and through others, Defendants "persuaded doctors and patients that what they had long understood—that opioids are addictive drugs, unsafe in most circumstances for long term use—was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids." *Id*. ¶ 10 (emphasis in original). Defendants' plans paid off.  From 1980 to 2000, opioid prescriptions for chronic pain visits doubled, and opioids are now the most common means of treatment for chronic pain." *Id*. ¶ 640.

It was these parallel promotional campaigns, suffused with the misrepresentations set forth in the SAC, that caused a sea change in medical practice—not merely a series of one-off transactions in which a particular doctor prescribed a particular drug based on a particular misrepresentation in a particular detailing visit.  Simply put, widespread prescribing of opioids for chronic pain *would not have occurred* in Chicago *but for* Defendants' pervasive efforts.  *See id*. ¶ 13 ("It was Defendants' marketing—and not any medical breakthrough—that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse.").  These well-pleaded facts, on their own, support the inference that Defendants' conduct caused Chicago prescribers, including those described in the SAC, to prescribe opioids for chronic pain.

Nevertheless, the City has provided specific examples of how Defendants' marketing

---

prescribers' thinking as to opioids generally. The City has sufficiently alleged that each Defendant's deceptive marketing resulted in prescribing of that Defendant's opioids, as well as others' opioids.

changed Chicago providers' prescribing behavior. Although some prescribers are reluctant to talk about the basis for their prescribing decisions, *id.* ¶ 297, the SAC describes two physicians—Prescribers B and D—who not only were exposed to Defendants' deceptive marketing but also acknowledge how pharmaceutical marketing has influenced their prescribing, including to individuals covered by the City's health and workers' compensation plans.

For example, the SAC alleges that Prescriber B spoke with opioid sales representatives "on a regular basis," and met with detailers from Actavis, Endo, Janssen, and Purdue. *Id.* ¶ 688. Prescriber B attended drug company-sponsored CMEs and "relie[d] on the information" they contained, even knowing they may be biased, "because he ha[d] no time to research the issue on his own." *Id.* ¶ 689. Sales representatives made deceptive statements to Prescriber B regarding the safety, efficacy, and superiority of opioids, including that their company's opioids had a low potential for abuse and could increase his patients' functionality and quality of life. *Id.* ¶¶ 296(a), 482(g), 552(e), 630(a).[80] Prescriber B "feels he did not previously have complete information about the risks and benefits of opioids" and "[k]nowing what he knows now, he would have prescribed fewer opioids in the past." *Id.* ¶ 690. In the meantime, however, Prescriber B wrote opioid prescriptions for specific patients that were reimbursed by the City.[81]

Prescriber D gives a similar account. Prescriber D met with sales representatives from Actavis, Endo, and Purdue, who misrepresented the risks of opioid addiction in their communications with him. *Id.* ¶ 692. Prescriber D came to believe that "long-acting opioids

---

[80] Defendants argue that the City has not alleged what misrepresentations these prescribers received from which Defendants. *See* Jt. Mem. at 11. This ignores the descriptions of Prescribers B and D in SAC § V.E, which provide precisely that information. *See id.* ¶¶ 296(a), 482(g), 552(e), 630(a) (Prescriber B); *id.* ¶¶ 296(b); 482(c); ¶ 552(c); ¶ 630(f) (Prescriber D).

[81] Specifically, the SAC alleges that the City reimbursed the following prescriptions by Prescriber B: (a) 252 prescriptions for Actavis's opioids at a cost of $26,979.75, SAC ¶ 296(a); (b) 81 prescriptions for Endo's opioids at a cost of $2,679.90, *id.* ¶ 482(g); (c) 12 prescriptions for Janssen's opioids at a cost of $1,471.40, *id.* ¶ 552(e); and (d) 14 prescriptions for Purdue's opioids at a cost of $ 2,605.89, *id.* ¶ 630(a).

were less addictive" and only came to understand the true risks of addiction over time as he saw what they did to his patients.  *Id*. ¶ 693.  Like Prescriber B, the SAC alleges that Prescriber D wrote opioid prescriptions for specific patients that were reimbursed by the City.[82]

Through these accounts and those of other Chicago-area prescribers described in SAC § V.E, the SAC explains, in detail, how Defendants' marketing caused false claims to be made.  *See* SAC ¶¶ 296, 386, 482, 552, 630, 686-702.  The SAC ties misrepresentations by each Defendant to particular prescribers who in turn wrote prescriptions for those Defendants' (and others') opioids that were submitted as claims to, and paid for by, the City's health plans.  The representative examples of Prescribers B and D further bolster the inference that the prescribers described in the SAC, and other Chicago providers, wrote opioid prescriptions—including prescriptions ultimately paid for by the City—as a result of Defendants' deceptive marketing.  So do the accounts of Prescribers B, D, E, F, G, H, J, O, P, Q, S, T, Z, AA, DD, GG, HH, PP, and QQ, all of whom reported receiving misrepresentations from Defendants and wrote prescriptions for opioids paid by the City.  *See id.* ¶¶ 296, 386, 482, 552, 630.  And likewise do the accounts of "verbatim" messages in which prescribers identified deceptive and misleading marketing they heard from Defendants' sales representatives.  *See id.* ¶¶ 295, 385, 481, 551, 628.

Moreover, having described the misrepresentations made to a representative sample of prescribers and the deceptive materials Defendants created or caused to be disseminated, the SAC also identifies specific prescriptions written as a result of the Defendant-impelled change in the standard of care for chronic pain.  Exhibits A.1, A.2, A.3, A.4, and A.5 to the SAC identify specific prescriptions for a given Defendant's opioids written by Chicago-area prescribers who

---

[82] Specifically, the SAC alleges that the City reimbursed the following prescriptions by Prescriber D:  (a) 425 prescriptions for Actavis's opioids at a cost of $11,297.89, SAC ¶ 296(b); (b) 20 prescriptions for Endo's opioids at a cost of $5,707.28, *id*. ¶ 482(c); (c) 1 prescription for Janssen's opioids at a cost of $215.49, *id*. ¶ 552(c); and (d) 95 prescriptions for Purdue's opioids at a cost of $39,256.33, *id*. ¶ 630(f).

were exposed to that Defendant's deceptive marketing, written under circumstances that indicate a diagnosis for chronic pain (*e.g.*, prescriptions written for patients within three months of a joint or back pain diagnosis and no reported cancer history).[83]  For each such prescription, the SAC provides a unique patient identifier, identifies the prescribing physician, specifies the date the prescription was filled, indicates the specific opioid that was prescribed, and indicates the amount paid by the City.  Exhibit A.6 contains sample claims for opioids paid for by the City's health plans and written by Chicago physicians who received misrepresentations from one or more Defendants; Exhibit A.7 contains claims from the workers' compensation plan written by prescribers who received misrepresentations from Defendants.  All told, Exhibits A.1-6 identify 2,856 different health plan claims for Defendants' drugs, written by 33 different prescribers for 147 chronic pain patients.  Exhibit A.7 identifies 249 worker compensation claims, written by 16 prescribers for 35 different chronic pain patients.  These are illustrative examples of claims paid by the City's health and workers' compensation plans as a result of Defendants' marketing.

Finally, the SAC buttresses these doctor- and claim-specific allegations by linking Defendants' deceptive promotion of opioids to a dramatic increase in the volume of prescriptions written to treat chronic pain.  Each Defendant increased its promotional spending on opioids in the years relevant to the SAC, resulting—in the aggregate—in promotional spending more than tripling between 2000 and 2011.  *See* SAC ¶¶ 638-43.  Expert analysis conducted for the City demonstrates that Defendants' promotional spending "*had a direct impact* on opioid use . . . in Chicago," which increased in direct proportion to Defendants' promotional spending.  *Id*. ¶ 680

---

[83] Defendants argue that the City fails to connect prescribers in the exhibits with those it interviewed  *See* Jt. Mem. at 6.  Not so.  The SAC specifies that these prescribers are those who appear in the exhibits.  *See* SAC ¶ 296 (identifying prescribers receiving Actavis misrepresentations as prescribers in Exhibit A.1); ¶ 482 (prescribers receiving Endo misrepresentations are in Exhibit A.3); ¶ 552 (prescribers receiving Janssen misrepresentations are in Exhibit A.4); ¶ 630 (prescribers receiving Purdue misrepresentations are in Exhibit A.5); *see also* Exhibit A.2 (prescribers receiving Cephalon misrepresentations).  The City will in any event link letter designations to specific names in discovery, or at the direction of the Court.

(emphasis added). Specifically, for every 10% increase in Defendants' national promotional spending, the City saw a 4.8% increase in the volume of opioid prescriptions covered by its health benefits and workers' compensation programs. *Id*. This analysis further strengthens the inference that Chicago prescribers—including those who, as set forth in the SAC, wrote prescriptions paid by the City—prescribed opioids as a result of Defendants' marketing. Indeed, any other conclusion is implausible: ████████████████████████████████

████████████████████████████████████████████████████████ *see, e.g., id.* ¶¶ 292-93 (Actavis); ¶¶ 382-83 (Cephalon); ¶ 549 (Janssen), and they were willing to spend millions of dollars marketing their opioids because they knew that marketing worked, *see id.* ¶¶ 98, 181.[84]

In sum, the SAC has sufficiently pleaded that each Defendant's deceptive marketing caused harm to the City. The SAC traces these deceptions from Defendants' nationwide marketing plans to actual prescriptions written by Chicago prescribers for Chicago patients and paid for by the City. Janssen's deception regarding the likelihood of withdrawal symptoms is illustrative. Janssen's sales training, attended by more than 40 representatives from Janssen's Chicago district, stressed that "the low incidence of opioid withdrawal symptoms" was a "core message." *Id.* ¶¶ 499-502. Indeed, a "key point" to stress to physicians was that "83% of patients reported no withdrawal symptoms after abruptly stopping treatment without initiating

---

[84] Defendants attack the City's statistical analysis, arguing "correlation and association are not causation." Jt. Mem. at 11. But statistical evidence is just one element of the City's causation allegations and is, in any event, supported by a litany of cases in which courts have allowed statistical methods to prove causation. *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 29 (1st Cir. 2013) ("*Kaiser Neurontin*") (permitting plaintiffs' claims to proceed where "[t]he primary evidence" was "aggregate data and statistical approaches to link patterns in promotional spending to patterns in prescribing the drug"); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51, 56 (1st Cir. 2013) ("*Aetna Neurontin*") (allowing statistical evidence to "demonstrate[] that defendants' marketing of *Neurontin* for . . . off-label indications . . . caused 43 million off-label prescriptions . . . between 1995 and 2004"); *United States ex rel. Martin v. Life Care Ctrs. of Am.*, 114 F. Supp. 3d 549, 566 (E.D. Tenn. 2014) (allowing statistical sampling to establish liability and explaining that "the plaintiff must establish that, 'in at least one instance,' the defendant has submitted a false claim" (quoting *NCS Healthcare of Ill.*, 460 F.3d at 856)).

alternative therapy." *Id.* ¶ 501. This claim was based on faulty studies and therefore misleading. *See id.* ¶ 244(c). Janssen representatives visited Chicago Prescriber H and assured him that Janssen's drugs were less susceptible to withdrawal than their competitors; he told them that "if he [did not] have to worry about withdrawal problems . . . he would like to start a patient [on Nucynta] as soon as possible." *Id.* ¶ 552(f). And he prescribed Nucynta—the City paid $380.29 in claims for Janssen's opioids prescribed by Prescriber H from July 11, 2008 to June 5, 2012. *Id.* The SAC pleads similar examples for the other Defendants.[85] In addition, attached as an Appendix to this brief are graphical representation of how Defendants' deceptive marketing led to the submission of false claims paid by the City, using exemplar allegations to depict each causal chain.

The foregoing allegations meet the burden set by the Court, but Defendants nevertheless argue that the City's pleading of causation is insufficient. Specifically, Defendants contend that a number of factors can play into the decision to prescribe a drug for a patient and, as a result, "a physician's prescribing decision is a crucial, independent step between Defendants' representations and a patient's use of Defendants' opioids." Jt. Mem. at 20. In Defendants' view, the City must therefore allege what misrepresentation a particular doctor relied upon when writing a particular prescription for a particular patient, which sales representative communicated

---

[85] *See* SAC ¶¶ 222-28, 229(a) – (e), 230-31, 272-75, 296(b), Ex.A.1 (Actavis sales training misrepresented risk of addiction and abuse, Prescriber E was visited by Actavis sales representatives who told him Kadian was less likely to be abused, and the City paid $3,954.62 for prescriptions of Actavis opioids by Prescriber E); ¶¶ 222-28, 229(f) – (h), 230-31, 239-40, 334, 386(h), Exs. A.4 – A.7, Ex. B.2 (Cephalon sales training misrepresented risk of addiction, Prescriber J was visited by Cephalon representatives who never discussed the risk, and the City paid $5,253.22 for opioid prescriptions by Prescriber J); ¶¶ 218-220, 221(i) – (n), 412-416, 482(g). Ex. A.3 (Endo sales training misrepresented the functional benefits of opioids, Prescriber B was visited by Endo representatives who said opioids would help patients regain function, and the City paid $2,679.90 for prescriptions of Endo opioids written by Prescriber B); ¶¶ 253-259, 563-68, 630(i), Ex. A.5 (Purdue marketing and detailers deceptively promoted OxyContin as effective for 12 hours, Prescriber DD was visited by Purdue representatives who told him OxyContin would provide 12 hours of pain relief and gave him a visual aid promoting that message, and the City paid $8,079.65 for prescriptions of Purdue opioids written by Prescriber DD).

that misrepresentation, which opioid the doctor prescribed for the patient in reliance on the

misrepresentation, what date the prescription was filled, what date the prescription was

reimbursed, and whether the patient was harmed by the prescription.

This is not the level of specificity required to plead false claims causation. The City's

FCO, like the federal FCA, to which it is identical in relevant part, allows the City to recover for

damages sustained "because of" a false claim. *See* MCC § 1-22-020 (imposing liability for

damages which the city sustains "because of" the false claim). In the Seventh Circuit, this

requires the plaintiff to allege that the claim would not have been paid "but for" the defendant's

fraudulent conduct. *See, e.g.*, *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374

(7th Cir. 1992); *United States v. Dolphin Mortg. Corp.*, No. 06-499, 2009 WL 153190, at *12

(N.D. Ill. Jan. 22, 2009); *United States v. Luce*, No. 11-05158, 2015 WL 5768503, at *10 (N.D.

Ill. Sept. 30, 2015) ("[A] demonstration that the government would not have guaranteed the loan

'but for' the false statement is sufficient to . . . permit recovery under the False Claims Act");

*United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) ("The statute

requires a causal rather than a temporal connection between fraud and payment" and false

statements are actionable "[i]f a false statement is integral to a causal chain leading to payment").

To establish but-for causation, the City need not exclude all intermediate causal factors; it must

only demonstrate that the false claims were the foreseeable consequence of Defendants'

deceptive marketing.

Foreseeability demands that "a defendant [be] answerable for the 'natural, ordinary, and

reasonable consequences of his conduct.'" *United States ex rel. Kennedy v. Aventis Pharm., Inc.*,

610 F. Supp. 2d 938, 943 (N.D. Ill. 2009). In *Kennedy*, the plaintiffs brought suit against a drug

manufacturer, alleging that its off-label promotion led to the submission of false claims that were

not reimbursable under Medicare.  *Id.* at 940-41.  The defendant argued that the case should be dismissed for lack of causation, but the court found that although "[i]t is certainly true that someone other than [Defendant]—specifically the hospitals—had to take its own action to include non-reimbursable charges for off-label Lovenox . . . these later intervening factors do not break the chain of causation."  *Id.* at 944.  The plaintiffs had sufficiently alleged causation because "when all reasonable inferences are drawn in favor of the [plaintiffs], the participation of doctors and pharmacists in the submission of false Medicaid claims was not only foreseeable, it was an intended consequence of [the defendant's] alleged scheme of fraud."  *Id.*  Thus, "reasonably foreseeable intervening forces will not break the chain of proximate causation" in false claims cases.  *United States v. King-Vassel*, 728 F.3d 707, 714 (7th Cir. 2013).

Courts have recognized that deceptive promotion of drugs for a particular purpose foreseeably leads physicians to write more prescriptions for that purpose.  In *Franklin*, the relator alleged that the defendant drug company had hired him to deceive prescribers about the safety and efficacy of a drug for off-label uses and that his work resulted in false claims being submitted and paid by the federal government.  147 F. Supp. 2d at 45.  The defendant countered that the complaint did not "account[] for the independent actions of the physicians who wrote the off-label prescriptions and the pharmacists who accepted and filled the off-label prescriptions." *Id.* at 52.  But the court allowed the claims to proceed, noting that "such an intervening force only breaks the causal connection when it is unforeseeable" and that "when all reasonable inferences are drawn in favor of the Relator, the participation of doctors and pharmacists in the submission of false . . . claims was not only foreseeable, *it was an intended consequence of the alleged scheme of fraud*."  *Id.* at 52-53 (emphasis added).  Numerous courts have adopted the *Franklin* reasoning to hold that drug manufacturers may be liable for false claims arising from

110

their deceptive marketing of pharmaceuticals.[86]

As in these FCA cases, the City's injury—unnecessary, City-reimbursed opioid prescriptions for the treatment of chronic pain and other consequential costs—was not only a foreseeable consequence of Defendants' actions, it was the *reason* Defendants engaged in such conduct. Defendants "set out to, and did, reverse the popular and medical understanding of opioids"; they undertook this course of action "*so that* doctors would prescribe and government payors, such as the City of Chicago, would pay" for chronic opioid therapy despite the absence of genuine evidence supporting such therapy and the contrary evidence regarding the significant risks and limited benefits from long-term use of opioids. SAC ¶¶ 7, 637. This approach was described in Defendants' internal documents, which "laid out ambitious plans to bring in new prescribers and increase overall prescribing of Defendants' opioids." *Id*. ¶ 99.[87]

Rather than false claims' but-for causation, Defendants' cases apply the stringent, RICO-specific "direct relation" standard, under which intermediate causes break the causal chain, such that a plaintiff must allege a "direct relation between the injury asserted and the injurious

---

[86] *See, e.g.*, *United States ex rel. Galmines v. Novartis Pharm. Corp.*, No. 06-3213, 2013 WL 2649704, at *11 (E.D. Pa. June 13, 2013) (refusing to dismiss case where "complaint plausibly suggest[ed] that doctors wrote off-label Elidel prescriptions because of Novartis's marketing, and that Novartis's actions thus played a substantial and foreseeable role in the submission of false claims"); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004) (refusing to dismiss FCA complaint because a jury could find that the submission of false claims by healthcare providers was a "normal consequence" of defendant's kick-back payments); *United States ex rel. Westmoreland v. Amgen*, 738 F. Supp. 2d 267, 277-78 (D. Mass. 2010) (refusing to dismiss case because false claims were an "intended and foreseeable" consequence of defendants' marketing conduct); *Celgene Corp.*, 2014 WL 3605896, at *8 (stating that a "drug manufacturer [can] reasonably foresee that a comprehensive marketing scheme involving a large number of salespeople furnishing large numbers of physicians with information about . . . use of a drug in a [particular] manner . . . could cause providers to prescribe the drug" under those conditions); *Kaiser Neurontin*, 712 F.3d at 38-39 (reversing grant of summary judgment where drug company "fraudulently marketed to physicians with the intent that those physicians would write prescriptions paid for by" a third-party plaintiff); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60, 67 (1st Cir. 2013) ("*Harden Neurontin*") (allowing claims to proceed where "plaintiffs' evidence [of causation] showed that [drug company's] marketing strategy specifically aimed to increase . . . market share in prescriptions for bipolar disorder").

[87] Each Defendant's execution of its plan is described in SAC § V.E.

conduct alleged." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268-9 (1992). RICO's strict

causation standard stems from its statute and is aimed at preserving a recovery for direct victims

of fraud. *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 178-79 (2d Cir. 1999) (Calabresi, J.

concurring) ("RICO is a statute aimed at remedying a particular class of harms[] and suits under

RICO are cognizable only if they fit within [the statute's] remedial scheme.") . Indeed, courts

have explained that establishing causation in RICO cases places a greater burden on plaintiffs

than most state-law causes of action. *See id.* at 179 (noting that "[i]n practice our cases have

held RICO plaintiffs to a more stringent showing of proximate cause than would be required at

common law," since the latter focuses on foreseeability).[88]

     Defendants' argument that doctors are "learned intermediar[ies]" whose prescribing

decisions break the chain of causation as a matter of law, Jt. Mem. at 19-20,[89] is not only driven

by a RICO analysis, but inconsistent with Defendants' own conduct. As courts have explained,

if Defendants' marketing "could not be expected to affect a single doctor's decision-making, the

---

[88] *See also In re Bextra & Celebrex Mktg. Sales Prac. & Prod. Liab. Litig.*, No. 11-310, 2012 WL 3154957, at *4 (N.D. Cal. Aug. 2, 2012) (noting that "different standards" apply to RICO claims and causation for state law claims); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 348 (2d Cir. 2003) ("The proximate cause requirements of RICO [are] more stringent than those of most states.").

[89] Defendants further argue the City does not adequately allege causation because claims administrators or made the decisions to pay for Defendants' drugs, and the City alleges no misrepresentations to these individuals. Jt. Mem. at 17 n.22; Purdue Mem. at 4-5. However, this does not disrupt causation: "[T]he structure of the American health care system mean[s] that almost all . . . prescriptions written by physicians would be paid for by [institutional payors.]" *Harden Neurontin*, 712 F.3d at 67. Defendants' deceptive marketing was the but-for cause of the claims being paid, even though the deceptions were directed to prescribers, not claims administrators. In any case, this is a fact issue for discovery.

    Cephalon's related argument that the City has not pleaded causation because the City is "still paying for fraudulently-induced prescriptions of Actiq or Fentora today, rather than refusing to reimburse them," Cephalon Mem. at 18-19, not only is a non sequitur, but ignores the fact that the City's health and workers' compensation plans are obligated to pay for treatments that are represented to be medically necessary. *See* SAC ¶¶ 652-53, 670-71. These plans cannot substitute their own judgment for that of medical professionals treating individual patients—the very judgment Defendants sought to co-opt through their deceptive marketing scheme. Moreover, Defendants cannot "un-ring the bell" of their deception and would remain liable for the effects of their deception even if the City were to stop paying for chronic opioid therapy completely. *See Strom v. Scios, Inc.*, 676 F. Supp. 2d 884, 894-95 (N.D. Cal. 2009). Finally, Cephalon's factual argument is not appropriately resolved at this stage of the litigation.

. . . choice to undertake [a] marketing campaign" directed at doctors "would be inexplicable." *Kaiser Neurontin*, 712 F.3d at 46. Moreover, it is axiomatic that, in order for the learned intermediary doctrine to apply, the intermediary must be *learned*, which means fully and adequately informed of the risks associated with a product or therapy. Where drug manufacturers misrepresent or omit the risks associated with the product, physicians cannot "be deemed 'learned intermediaries' who were aware of [the] dangers" associated with the drug. *Proctor v. Upjohn Co.*, 682 N.E.2d 1203, 1212 (Ill. App. Ct. 1st Dist. 1997). Thus, courts have allowed fraud claims to proceed where the plaintiffs allege that doctors' judgment was compromised by defendants' misrepresentations. *See Colas v. Abbvie, Inc.*, No. 14-1452, 2014 WL 2699756, at *3 (N.D. Ill. June 13, 2014); *accord Sellers v. Boehringer Ingelheim Pharm.*, *Inc.*, 881 F. Supp. 2d 992, 1008-09 (S.D. Ill. 2012). The SAC alleges precisely such conduct. *See* SAC ¶ 21 (alleging that Defendants' deceptive marketing "deprived patients, their doctors, and health care payors of the chance to exercise informed judgment"); *see also id.* ¶¶ 79-84.

Defendants' proposed approach—requiring the City to link every claim to a particular deception—mistakes what they may seek to prove at trial, to limit damages, with what the City must plead as a basis for liability (for those claims that require a showing of causation). As with their approach to Rule 9(b), Defendants ask the City to show causation by alleging the specifics of each prescription the City paid for, including (a) the identity of the patient; (b) the drug prescribed; (c) the prescribing physician; (d) the specific misrepresentation; (e) how it led to the prescription; (f) the name of the sales representative who made the misrepresentation or the publication that contained it; (g) the time the misrepresentation was heard or the publication was read; (h) the date the prescription was filled; (i) factors leading the patient to fill the prescription; and (j) the precise manner in which the prescription harmed the patient. *See* Jt. Mem. at 18-20.

113

Such a standard would present an impossibly high bar, essentially immunizing from liability any misconduct—such as that alleged here—that occurs on a massive enough scale. *Cf. Life Care Ctrs. of Am.*, 114 F. Supp. 3d at 571 ("If the Court were to reach the conclusion urged by the Defendant—that a claim-by-claim review is required in every FCA action . . . potential perpetrators of fraud would be emboldened by the fact that a claim-by-claim review is often impractical" and "large-scale perpetrators of fraud would reap the benefits of such a system.").

The burden Defendants seek to impose would require detailed information on specific marketing activities that only they possess, sets a hurdle that is inappropriate at this stage, and is inconsistent with this Court's Orders, other case law, and common sense. As one court noted:

> To suggest that [the defendant's] expansive, multi-faceted efforts to create an off-label market for [its drugs] did not cause physicians to prescribe [those drugs] for non-reimbursable uses strains credulity. It is implausible that a fraudulent scheme on the scope of that alleged . . . would be entirely feckless. Accordingly, rather than showing a lack of proximate causation, [defendant's] argument presents a question regarding the total number of prescriptions that were attributable to [defendant's] actions. Such an argument about the potential scope of . . . liability is premature at this stage.

*Celgene Corp.*, 2014 WL 3605896, at *8 (internal citations and quotation marks omitted).

> 3. *The SAC demonstrates that the City of Chicago and its residents suffered grave injuries due to the widespread use of opioids to treat chronic pain.*

In addition to sufficiently alleging causation, the SAC details the injuries suffered by the City as a result of Defendants' fraudulent scheme. First are the direct costs incurred by the City for unnecessary opioid prescriptions, which total at least $13.9 million. SAC ¶¶ 662, 644-78. These direct costs are magnified by the City's consequential damages, which include spending on drug testing, emergency room visits, and addiction treatment programs. *See id.* ¶¶ 710-29.

Nevertheless, Defendants argue that the SAC fails to allege that the City has suffered any injury as a result of their fraudulent marketing, contending that "[t]he SAC fails to allege that Defendants' allegedly improper conduct caused any doctor to write *any* ineffective opioid

prescriptions, much less that *every* opioid prescription in Chicago was ineffective or harmful."
*See* Jt. Mem. 23. Defendants' arguments fail for two reasons. First, the City has sufficiently
pleaded injury insofar as its claims require that element.[90] Under the FCO, the City's injury is its
payment of claims for drugs and other services that it would not have made but for Defendants'
fraud—not injuries to individual patients.[91] And the City is not required to allege injury to state
claims for violation of its consumer fraud ordinances, which bar deceptive and unfair practices
irrespective of any injury. *See* Section II.A, *supra*. Defendants claim the City has failed to
adequately allege injury because the use of opioids to treat chronic pain is FDA-approved, *see* Jt.
Mem. at 22, but that argument misstates the City's theory of recovery. The City's injury results
not from marketing opioids for FDA-approved uses, but from Defendants' deceptive statements
regarding the risks, benefits, and superiority of chronic opioid therapy. *See, e.g.*, SAC ¶¶ 635-
37. By Defendants' argument, statements by drugmakers that a drug was more effective or less
risky than it actually was would be shielded from liability so long as the false statements related
to a permitted use for the drug—a conclusion unsupported by the case law or common sense.

Defendants further argue that the City has failed to point to a single "ineffective" opioid

---

[90] Defendants cite *United States ex rel. Zemplenyi v. Group Health Cooperative*, No. 09-603, 2011 WL
814261, at *2 (W.D. Wash. Mar. 3, 2011), and *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, No.
03-2750, 2008 WL 5211021, at *2-3 (N.D. Ill. Dec. 10, 2008), to argue that the City did not incur an
injury because it was insured. In these cases, however, the plaintiff's expenses had no nexus to the
number of procedures or prescriptions. *See e.g.*, *Grp. Health Coop.*, 2011 WL 814261, at *2 (finding no
FCA violation given "the capitated payment system, in which a health care provider is paid a contracted
or fixed rate per patient regardless of the number or type of services provided to the enrolled member").
Here, the City directly paid for prescription costs throughout most of the relevant time period. *See* SAC ¶
647. Even when the City paid premiums to an HMO, those premiums were not priced at a "fixed rate,"
but reflected the rising cost of prescriptions for Defendants' drugs. *Id.* ¶ 647.

[91] Defendants cite a handful of cases to contend that injuries like heroin addiction and lost productivity are
"too remote" from the deceptive conduct to be actionable. Jt. Mem. at 20-21. However, these cases
involve situations in which the offensive conduct was truly unforeseeable, like the criminal conduct of
third parties. *See, e.g.*, *Beretta U.S.A. Corp.*, 821 N.E.2d at 1134 (criminal acts by third parties break the
causal chain between gun makers and gun violence). In contrast, the SAC alleges a spate of addiction and
accompanying harms that was eminently foreseeable to (and known by) Defendants. Here, doctors did
exactly what the drug companies expected them to do.

prescription, but the City is seeking to recover for unnecessary opioid prescriptions it reimbursed as a result of Defendants' fraudulent schemes, not the personal, physical injuries Defendants caused to individual opioid users in the City's employ. *See Desiano*, 326 F.3d at 349-50 (explaining that insurer's injuries due to costs of medication are distinct from the injuries patients incurred in taking the drugs). The cases cited by Defendants therefore are easily distinguished.[92]

## III. DEFENDANTS' CHALLENGES TO PARENT LIABILITY LACK MERIT.

### A. No basis exists to revisit the decision that the Court has personal jurisdiction over the Allergan parent entities.

Actavis also seeks dismissal of Allergan plc and Actavis, Inc. based on the Court's alleged lack of personal jurisdiction over those entities. *See* Actavis Mem. at 18-23.[93] This request is another glaring example of Defendants' attempts to re-litigate issues that have been argued and decided. The Court has concluded that it may exercise personal jurisdiction over these entities, and Actavis presents nothing new to warrant reconsideration of that ruling.

> #### 1. *The Court has already concluded that it may properly exercise personal jurisdiction over Allergan plc and Actavis, Inc.*

Actavis argues that the exercise of personal jurisdiction was improper because "[b]oth Actavis plc and Actavis, Inc. are holding companies" and neither had any contacts with Illinois. Actavis Mem. at 20. The MTD Order, however, recognized this, stating that "both [of these Defendants] are holding companies and neither has offices or employees in Illinois." MTD

---

[92] *District 1199P Health & Welfare Plan v. Janssen LP*, Nos. 06-3044, 07-2224, 07-2608, 07-2860, 2008 WL 5413105 (D.N.J. Dec. 23, 2008), and *Central Regional Employees Benefit Fund v. Cephalon, Inc.*, No. 09-3418, 2010 WL 1257790, at *3 (D.N.J. Mar. 29, 2010), are RICO cases, and apply a "concrete financial loss" injury requirement that does not exist in false claims or consumer fraud cases. *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003), likewise is inapposite. The private plaintiffs in *Williams* lacked standing because they failed to allege they were exposed to the defendants' fraudulent marketing or that that they had suffered any "particularized and specific injury-in-fact" as a result of their misstatements. *Id.* None of these cases limits a government's recovery in a false claims case.

[93] The Actavis MTD uses "Actavis plc" and "Allergan plc" interchangeably, *see*, *e.g.*, Actavis Mem. at 22, and the City will, too.

Order at 11.  Nevertheless, the Court concluded that "[al]though Actavis, Inc. avers that it does not direct advertising for opioids to or solicit sales of opioids from Illinois . . . its documents belie that contention."  *Id.* at 12.  The Court cited documents, produced by Actavis, indicating that Actavis, Inc. was involved in marketing opioids in Illinois.  *Id.*  It concluded that "[b]ecause the claims in this suit arise from Actavis, Inc.'s marketing efforts, these contacts are sufficient to give the Court specific jurisdiction over Actavis, Inc."  *Id.*  The Court also held it could exercise personal jurisdiction over Allergan plc based on successor liability, citing evidence—shared ownership, office space, and websites, and public filings that failed to distinguish among Actavis entities—that Allergan plc "simply continued the business of Actavis, Inc."  *Id.* at 14-15.

The MTD Order was supported by evidence the City submitted that demonstrates that Actavis, Inc. tracked the prescribing habits of Chicago doctors, hosted promotional talks in Chicago, and offered promotional programs to Chicago doctors to encourage them to prescribe Actavis's drugs.  *See* Mem. in Opp'n to Actavis Mot. to Dismiss for Lack of Personal Jursid., ECF No. 253 ("Personal Jurisd. Opp'n") & Exs. 1 – 12, ECF Nos. 254-2 to 254-13.[94]  The City described the relationship between Actavis, Inc. and Allergan plc and explained how Actavis, Inc.'s jurisdictional contacts inure to Allergan plc through successor liability.  *See* Personal Jurisd. Opp'n at 9-12.  Actavis fails to challenge a single fact about that relationship.

The SAC's new allegations about Actavis's conduct in Illinois only strengthen the case for personal jurisdiction over Actavis, Inc.  The SAC describes how Actavis had a dedicated sales territory for Chicago and tracked 5,623 Kadian prescriptions written by Chicago prescribers.  *See* SAC ¶¶ 291-93.  It alleges that Actavis tracked the prescribing habits of 145 Chicago-area prescribers so it could target prescribers for marketing.  *Id.* ¶ 292.  It details the

---

[94] The City incorporates its initial opposition and supporting exhibits herein by reference.

accounts of Chicago-area prescribers who reported receiving marketing messages from Actavis representatives that the City alleges are deceptive. *Id.* ¶ 296. The City's claims arise directly from such statements, and the exercise of specific personal jurisdiction over Actavis, Inc. is proper as a result. *See* MTD Order at 12 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012)).

2.     *Nothing justifies a departure from the Court's previous conclusion.*

Actavis nonetheless asks this Court to revisit the MTD Order, arguing—without citation to legal authority—that the Order is "not dispositive or controlling here" because it "is based on erroneous inferences that the evidence before this Court does not support." Actavis Mem. at 21. Actavis points specifically to the Court's finding that "Actavis, Inc.'s predecessor, *Actavis Group*, tracked the number of prescriptions for Kadian . . . written by Illinois doctors." *Id.* at 21 (quoting MTD Order at 12). Actavis claims the Court's ruling was in error because "there is no evidence before this Court that suggests that any entity known as the 'Actavis Group' has ever existed as a distinct legal entity." *Id.* at 22. However, the declaration Actavis submitted in support of this motion *contains precisely such evidence*, stating that "[o]n October 31, 2012, Watson Pharmaceuticals, Inc. completed its acquisition of the Actavis Group" and then "changed its corporate name to Actavis, Inc." Second Decl. of Sheldon V. Hirt, ECF No. 405-2 at 1.[95]

Actavis also argues that the Court drew an "erroneous inference" in its MTD Order because Actavis, Inc. and Allergan plc are legally separate entities.[96] Once again, this issue as

---

[95] Having referenced the "Actavis Group" in its own public filings and in the Second Hirt Declaration, Actavis argues in its brief that this "phrase is used solely as a term of convenience to describe a group of separate and distinct corporations"—the "Legacy Actavis Corporations"—that are affiliated with Allergan plc. Actavis Mem. at 22 n.27. This unsupported argument finds no basis in any allegation or record evidence before the Court. Actavis bears the burden to demonstrate why the Court should overturn a settled issue in the case, and an unsupported footnote does not suffice.

[96] Even though documents produced to the City demonstrate that Actavis personnel communicate with third parties simply on behalf of "Actavis," *see* Personal Jurisd. Opp'n, the web of legal entities operating

118

briefed, Personal Jurisd. Opp'n at 9-12, and the Court concluded that "the record suggests that [Allergan] plc simply continued the business of Actavis, Inc.," MTD Order at 14. The Court acknowledged that "this evidence does not definitively establish that [Allergan] plc is Actavis, Inc.'s successor" but was "sufficient to make a prima facie case of jurisdiction, which defeats [Allergan] plc's motion." *Id*. at 15. Actavis provides no reason to revisit that decision now.

### B. The City has pleaded wrongdoing of Johnson & Johnson.

The City sufficiently pleaded J&J's liability as a principal for the acts of its agent, Janssen. The argument that the City has failed to allege an alter ego theory thus is inapplicable.

An agency relationship arises "when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act." Restatement (Third) of Agency § 1.01 (2006).[97] A "cardinal consideration" for deciding whether there is an agency relationship is the principal's "right to control the manner of doing the work." *Petrovich v. Share Health Plan of Ill., Inc.*, 719 N.E.2d 756, 770 (Ill. 1999); *accord Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 895 (N.D. Ill. 2009).

J&J's argument fails because whether J&J controlled Janssen is "a question of fact and depends on the totality of the circumstances." *Aspacher v. Kretz*, No. 94-6741, 1997 WL 692943, at *7 (N.D. Ill. Aug. 13, 1997) (citing *Cunningham v. Waters Tan & Co.*, 65 F.3d 1351, 1357 (7th Cir. 1995)). Because "the existence of agency is a question of fact, . . . it would be improper for a court to dismiss a claim on the basis of an insufficient factual allegation of

---

under the "Actavis" umbrella is extraordinarily complex and opaque. This is by design, as evidenced by Actavis's effort to use that complexity as a shield to liability. *See* Reply Mem. Supp. Actavis Mot. to Dismiss FAC, ECF No. 259, at 2-5 (drawing a distinction between "Actavis, Inc." and "Actavis Inc. (no comma)"). The Court should not give Actavis the benefit of the confusion it has purposefully created.
[97] Both "the Illinois law of agency, as well as the federal common law of agency, accord with the Restatement." *Opp v. Wheaton Van Lines, Inc*., 231 F.3d 1060, 1064 (7th Cir. 2000).

agency, without giving the plaintiff a chance to prove the existence of the agency relationship."
*Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 671 (N.D. Ill. 2005).

Further, the City need only allege facts supporting an inference of an agency relationship, *see Nemitz v. Metro. Life Ins. Co.*, No. 12-8039, 2013 WL 3944292, at *5-6 (N.D. Ill. July 31, 2013), and it has done so, *see Gaudie*, 683 F. Supp. 2d at 757-58 (finding that plaintiff alleged sufficient facts, including on information and belief, to put defendant on notice of her agency theory).[98] The SAC alleges that J&J controlled the development and sale of Janssen's drugs— even corresponding with the FDA about them and issuing payments to opioid prescribers who were part of Janssen's speaker bureau—and that J&J benefited from the profits derived from Janssen's activities. SAC ¶¶ 39, 547, 552(g).[99] Even if Janssen acted outside the scope of its authority, J&J ratified Janssen's actions by retaining its profits, and is thus bound to such actions as if they had been authorized. *See ABN AMRO, Inc. v. Capital Int'l, Ltd.*, 595 F. Supp. 2d 805, 821-23 (N.D. Ill. 2008) (noting that ratification can "be inferred from surrounding circumstances, 'including long-term acquiescence, after notice, to the benefits of an unauthorized transaction'").

## CONCLUSION

The City has met the standard set by the MTD Order, for the reasons above. Indeed, if the SAC does not satisfy a plaintiff's initial pleading burden, it is difficult to imagine what complaint detailing a large-scale fraud could survive. The Court should deny Defendants' motions to dismiss.

---

[98] Rule 9(b) does not apply to the City's agency allegations because they are independent of the allegations regarding Defendants' marketing fraud. *Whitley*, 607 F. Supp. 2d at 898.

[99] Janssen and J&J contend that "[t]he SAC alleges no facts supporting any implication that J&J's payments to . . . physicians were related to Janssen's opioids," Janssen Mem. at 8 n.9, but that is not the case. The SAC alleges, for example, that J&J paid $36,845 to a provider who was both "among the more prolific prescribers of Janssen's opioids" and a member of Janssen's speakers bureau—which the SAC alleges Janssen used to market opioids—and that the provider's prescriptions "resulted in $8,546.37 in payments from the City between 2011 and 2015 for Janssen's opioids." SAC ¶¶ 512-15, 547.

Dated:  February 18, 2016         Respectfully submitted,

STEPHEN R. PATTON
Corporation Counsel for the City of Chicago

/s/ Brian Bowcut
Fiona A. Burke
Thomas P. McNulty
Mary Eileen Cunniff Wells
City of Chicago, Department of Law
30 N. LaSalle St., Suite 1240
Chicago, IL 60602
fiona.burke@cityofchicago.org
thomas.mcnulty@cityofchicago.org
maryeileencunniff.wells@cityofchicago.org
Phone: (312) 744-6929
Fax:    (312) 742-3832

COHEN MILSTEIN SELLERS & TOLL PLLC
Linda Singer
Admitted pro hac vice
Brian Bowcut
Admitted pro hac vice
Anthony R. Juzaitis
Admitted pro hac vice
1100 New York Ave NW, Suite 500 East
Washington, DC 20005
lsinger@cohenmilstein.com
bbowcut@cohenmilstein.com
ajuzaitis@cohenmilstein.com
Phone: (202) 408-4600
Fax:    (202) 408-4699

WEXLER WALLACE LLP
Kenneth A. Wexler
Bethany R. Turke
Justin N. Boley
Adam M. Prom
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
kaw@wexlerwallace.com
brt@wexlerwallace.com
jnb@wexlerwallace.com
ap@wexlerwallace.com
Phone: (312) 346-2222
Fax:    (312) 346-0022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of **Plaintiff's Memorandum Of Law in Opposition to Defendants' Joint and Individual Motions to Dismiss** was filed electronically with the Clerk of the Court using the CM/ECF system, which will automatically provide notice upon all counsel of record on this 18th day of February, 2016.

/s/ Brian Bowcut
Brian Bowcut