IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation,<br><br>      Plaintiff,<br><br>    v.<br><br>PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.,<br>      Defendants. | Case No. 14-cv-04361<br><br>Honorable Jorge L. Alonso |

**DEFENDANTS PURDUE PHARMA L.P., PURDUE PHARMA INC., AND THE PURDUE FREDERICK COMPANY INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS COUNTS II AND IV-X OF PLAINTIFF'S THIRD AMENDED COMPLAINT UNDER RULE 12(B)(6)**

Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company, Inc. (collectively, "Purdue") join in the Defendants' Joint Motion to Dismiss And/Or Strike Counts 2 and 4-10 of Plaintiff's Third Amended Complaint Under Rules 12(b)(6) and 12(f), and the Memorandum of Points and Authorities in support thereof ("Defendants' Joint Brief"), and write separately to address certain additional deficiencies in the specific allegations against Purdue in the Third Amended Complaint ("Complaint" or "TAC") (Dkt. No. 477).[1]

## I. INTRODUCTION

Although this Court held in its prior ruling that the City of Chicago (the "City") may proceed on Counts I and III because injury and causation "need not be alleged in public enforcement actions" under those Counts, 9/29/16 Order (Dkt. No. 471) at 17-18, 26, the Court made clear as to all remaining Counts that the City must allege injury and proximate causation with specificity in accordance with Federal Rule of Civil Procedure 9(b). *Id.* at 26, 32-33, 35, 37-40. Accordingly, this Court required the City to allege—by means of Exhibits tying particular prescribers to prescriptions for which the City provided reimbursement—that the "prescribers who prescribed defendants' drugs that the City reimbursed are the same prescribers who heard the misrepresentations about defendants' drugs" and "relied on defendants' misrepresentations when they prescribed defendants' drugs." *Id.* at 32-33, 37, 38, 40.

In response to this Court's Order, the City amended its Exhibits in an attempt to provide this "missing link," *id.* at 40, and to tie, with requisite specificity, the particular prescribers identified in the Complaint to specific Purdue opioid prescriptions reimbursed by the City that were written as a consequence of alleged misrepresentations made to that prescriber. Consistent with the underlying purpose of requiring such compliance with Federal Rule of Civil Procedure

---

[1] Plaintiff did not amend the previously dismissed Count II, and set forth the Count "solely for purposes of appellate review." TAC at 1 n.1. As addressed in Defendants' Joint Brief, Count II should therefore be dismissed and stricken. *See* Defendants' Joint Brief at 14.

1

9(b) at the pleading stage, this required exercise has now served to expose the fundamental disconnect between the sweeping, generalized allegations that permeate the Complaint and the *actual* prescriptions at issue. As to Purdue, the City does not allege with particularity *any* specific instance in which a Chicago prescriber wrote a prescription for a Purdue opioid reimbursed by the City that was written because the prescriber was misled by a misrepresentation alleged to have been made by Purdue.

## II. ARGUMENT

The cornerstone of Plaintiff's fraud claims is that "[b]ut for Defendants' fraudulent and deceptive marketing, prescribers would have accurately understood the risks and benefits of opioids and would not have prescribed opioids where not medically necessary or reasonably required to treat chronic pain." TAC ¶ 680. To this end, the Complaint identifies 17 prescribers who purportedly received misrepresentations from Purdue regarding Purdue opioids. *See id.* ¶ 630. In an attempt to meet its Rule 9(b) pleading obligations and this Court's 9/29/16 Order, the City has:

> (1) Alleged the particular misrepresentations purportedly made by Purdue to each of those 17 prescribers, *see id.* at ¶ 630(a)-(q); and

> (2) Identified in "Exhibits A.1-6 and B.1" the alleged claims "caused to be submitted to and paid by the City's health plans" for patients who "received prescriptions written by health care providers who were referenced in the Complaint as receiving Defendants' deceptive marketing," *id.* at ¶ 661 & n.133.

Now that the City has been required to tie *actual* prescriptions to the 17 prescribers, the failing of the City's allegations is manifest. The prescriptions identified in the Exhibits do not correspond to the misrepresentations alleged to have been made to the prescribers. Indeed, the City fails to allege with particularity *any* specific instance in which a Chicago prescriber wrote a prescription for a Purdue opioid reimbursed by the City that the prescriber would not have

deemed medically necessary but for a misrepresentation alleged to have been made to the prescriber by Purdue.

### A. The Prescriptions Identified In The Exhibits Do Not Correspond To The Misrepresentations Alleged To Have Been Made To The Prescriber.

As set forth below and summarized in the chart attached hereto as Appendix 1, the City's attempts to provide the "missing link" and to tie particular prescribers identified in the Complaint to specific Purdue opioid prescriptions that were written as a consequence of an alleged misrepresentation made to the prescriber fail on multiple bases. *See* Appendix 1.

#### 1. As to six of the prescribers, the City fails to identify any Purdue opioid prescription at issue.

With respect to Prescribers C, G, Q, S, Z, and GG, the City sets forth in the narrative portion of its Complaint various purported misrepresentations alleged to have been made by Purdue. *See* TAC ¶¶ 630 (c), (d), (g), (k), (m), (q). Yet, now that it has been required to identify the actual prescriptions at issue written by these prescribers, the City is unable to identify *any* Purdue opioid prescription for which the City provided reimbursement. Thus, the allegations relating to these prescribers fail to state a claim against Purdue.

#### 2. As to four of the prescribers, the City alleges misrepresentations regarding a Purdue opioid medication for which no prescription is identified.

With respect to Prescribers T, QQ, J, and HH, the allegations regarding the misrepresentations purportedly made to each prescriber do not relate to the specific Purdue opioid medications identified in the Exhibits:

- Prescriber T is alleged to have been told "that Butrans was a weak opioid with lower risks of withdrawal and pseudoaddiction." TAC ¶ 630(o). "These sales representative also told him that the potential for withdrawal on Butrans was very low due to its low potency and extended release mechanism . . . a speaker recommended Butrans as a 'reasonable drug.'" *Id*. Yet, despite the purported misrepresentations concerning Butrans, the City has not identified a single Butrans prescription written by Prescriber T. Instead, only a single prescription for OxyContin has been identified as having been written by Prescriber T.

3

- Prescriber QQ is alleged to have been "told that OxyContin provides 12 hours of pain relief." *Id.* ¶ 630(p). Yet, the City has not identified a single OxyContin prescription written by Prescriber QQ. The only two prescriptions identified in the Exhibits with respect to Prescriber QQ are for Butrans.

- Prescriber J, a nurse practitioner, is alleged to have been told, *inter alia*, "that Butrans has less abuse potential than other drugs because, after a certain point, the patient no longer experiences a better 'buzz' from increased doses." TAC ¶ 630(l).[2] Yet, the City has failed to identify any prescription written by Prescriber J for Butrans.

- Prescriber HH is alleged to have been told, *inter alia*, that "Purdue's reformulated oxycodone—Hysingla—is long acting, has fewer 'peaks and troughs,' and is less likely to lead to euphoria than other opioids." TAC ¶ 630(n).[3] Yet, the City has not identified a single Hysingla prescription written by Prescriber HH.

Thus, these allegations fail to state a claim against Purdue.

        3.     <u>As to two of the prescribers, the timing of the identified prescriptions at issue is inconsistent with the alleged misrepresentations.</u>

With respect to nearly all of the prescribers, the City fails to allege, in any regard, "when" the purported misrepresentations were made to the prescriber. Thus, not only does the City fail to allege that an identified prescription was written by the prescriber *because* of the purported misrepresentation, but there is no basis to even determine the relative timing of the purported misrepresentation and the identified prescriptions. As to two prescribers—Prescribers B and P—for whom the allegations provide some basis to determine the general timing of the alleged misrepresentations, the timing of the prescriptions identified in the Exhibits as having been written by these prescribers demonstrates that the prescriptions could not have been the result of the alleged misrepresentations set forth in the Complaint:

- Prescriber B is alleged to have been told "about a year ago" that "'steady-state' extended release drugs have less potential for abuse." TAC ¶ 630(a). Yet, the City identifies 11

---

[2] The City also makes allegations relating to OxyContin with respect to Prescriber J, which are addressed *infra*.

[3] The City also makes allegations relating to OxyContin with respect to Prescriber HH, which are addressed *infra*.

4

prescriptions written well before "a year ago." None of those prescriptions has any causal connection to the alleged representation. The other three prescriptions identified as having been written by Prescriber B were written and reimbursed by the City *after* the City brought this lawsuit, and thus cannot provide a basis for a fraud claim by the City. *See* 9/29/16 Order at 31.

- Prescriber P is alleged to have been misled by two "Purdue-sponsored CMEs" presented in 2011 and 2012. TAC ¶¶ 617, 618, 630(b). Yet, the City has identified only two Purdue opioid prescriptions by Prescriber P, both of which were written in 2009 – *two years prior to the CMEs.*

Accordingly, the allegations regarding these prescribers cannot state a claim against Purdue.

    4.    <u>As to the remaining prescribers for whom a Purdue opioid prescription has been identified in the Exhibits, there is no allegation that the prescriber was misled by a Purdue representation, let alone allegations of a causal nexus between the representation and the identified prescriptions.</u>

Throughout the Complaint, the City generically alleges that a particular topic was either discussed, or was not discussed, by a Purdue representative who met with a prescriber. Absent from the allegations as to the prescribers for whom a Purdue opioid has been identified in the Exhibits, however, is any allegation that (i) the prescriber was actually misled by the representation at issue; (ii) that any prescription identified in the Exhibits was written by the prescriber as a result of the representation; or (iii) that the prescriber would not have deemed the prescription to have been medically necessary but for the representation.

    (a)    <u>12-hour dosing</u>

The City alleges that three prescribers were informed by Purdue representatives that OxyContin would provide "patients with 12 hours of pain relief" or that OxyContin has "true 12 hour dosing." *See* TAC ¶ 630(i) (Prescriber DD); *id.* ¶ 630(n) (Prescriber HH); *id.* ¶ 630(p) (Prescriber QQ). Entirely absent from the allegations pertaining to these prescribers, however, is any allegation that (i) the prescriber was misled by any representation regarding 12-hour dosing; (ii) that any prescription identified in the Exhibits written by the prescriber did not provide 12

5

hours of pain relief to the identified patient; or (iii) that the prescriber would not have deemed the prescription to have been medically necessary but for the representation regarding 12-hour dosing.

The allegations as to Prescriber DD are representative, stating only that Prescriber DD was informed "that OxyContin would provide his patients with 12 hours of pain relief" and that he received a "visual aid" that "prominently describes the product as 'Every-12-hour OxyContin Tablets." *Id.* ¶ 630(i). Nowhere does the City allege that Prescriber DD was somehow misled with respect to statements made to him regarding 12-hour dosing, nor are there any allegations tying the prescriptions written by Prescriber DD that are set forth in the Exhibits to any problems or concerns relating to 12-hour dosing.

The absence of any such allegations is unsurprising, as the City could not plausibly allege causation or injury arising from any references to 12-hour dosing made by Purdue representatives for two independent reasons.[4] ***First***, under Seventh Circuit authority, representations regarding dosing that are in accordance with the FDA-mandated label cannot be misleading as a matter of law. *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 941-42 (7th Cir. 2001); *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 914-15 (N.D. Ill. 2013). The FDA-approved label for OxyContin instructs users to dose every 12 hours. *See* Ex. 1 (OxyContin label)[5], at 39 (Medication Guide instructing patients to: "Take your prescribed dose **every 12**

---

[4] This Court did not previously reach Purdue's arguments that, with respect to certain FDA-mandated aspects of the warning labels, the City could not allege a plausible basis for causation. *See* 9/29/16 Order at 22.

[5] Exhibits 1 and 2 are attached to the Declaration of R. Ryan Stoll, filed concurrently herewith. Purdue's OxyContin label, and the City's health plan, which are referred to in the TAC, *see, e.g.*, TAC ¶¶ 29(a), 65 n.18, 67, 249 n.87, 645-46, 649, 651, and 654, and are central to the City's claims, may be considered by the Court in resolving this motion to dismiss. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) ("document[s] merely … referred to in [a] complaint" can be considered for purposes of resolving a motion to dismiss where their authenticity is not disputed and they are central to the claims).

6

**hours** at the same time every day. Do not take more than your prescribed dose in 12 hours. If you miss a dose, take your next dose at your usual time.") (emphasis added).

*Second*, representations regarding 12-hour dosing in accordance with the FDA-mandated label could also not have been a plausible cause of harm to the City since the benefit decision-makers could *not* approve reimbursement for any prescriptions issued other than in accordance with the FDA-directed dosing. The City's own Plans disallow pharmacy prescriptions to be dispensed for non-FDA approved purposes or "in amounts in excess of the manufacturer's recommended dosage limits." *See* Ex. 2 (City of Chicago Health Plan), at 68, 73.

(b) Addiction Risk or Abuse Potential

The City makes allegations as to five prescribers regarding alleged statements or omissions by Purdue representatives regarding addiction risk or abuse potential. *See* TAC ¶ 630(a) (Prescriber B) ("pushed the message that 'steady state' extended release drugs have less potential for abuse"); *id.* ¶ 630(e) (Prescriber F) ("recalls being told that OxyContin was less addicting that other opioids"); *id.* ¶ 630(f) (Prescriber D) ("which he interpreted to mean that they were less addictive"); *id.* ¶ 630(*l*) (Prescriber J) ("never mentioned the risks of addiction . . . and that OxyContin was less likely to be abused because it could not be liquefied or injected when crushed"); *id.* ¶ 630(n) (Prescriber HH) ("the effects of withdrawal from opioid use can be successfully managed"). Absent from the allegations pertaining to these prescribers, however, is any allegation that (i) the prescriber was misled regarding the risk of addiction or abuse potential relating to OxyContin; (ii) that the OxyContin prescriptions identified in the Exhibits as written by the prescriber had any association with addiction or concerns of addiction with respect to the patient at issue; or (iii) that the prescriber would not have deemed the prescription to have been medically necessary given the medical conditions of the patient.

7

The allegations as to Prescriber J are representative, alleging that sales representatives "never mentioned the risk of addiction associated with opioid use . . . that OxyContin was less likely to be abused because it could not be liquefied or injected when crushed . . . [and the] drugs were 'steady state.'" ¶ 630(*l*). Nowhere is it alleged that Prescriber J did not understand the risks of addiction or abuse associated with OxyContin, that any problems arose with respect to the patients for whom Prescriber J wrote prescriptions, or that Prescriber J would now view those prescriptions as not medically necessary to treat the medical conditions of the patients.

The absence of allegations that a prescriber was actually misled regarding addiction risks or abuse potential of OxyContin is also unsurprising. The FDA-approved label for OxyContin, with respect to which physicians are required to be knowledgeable, provides a black-box, bolded warning stating that "**OXYCONTIN exposes users to risks of addictions, abuse and misuse, which can lead to overdose and death. Assess each patient's risk before prescribing and monitor regularly for development of these behaviors and conditions.**" Ex. 1, at 1. *See Bober*, 246 F.3d at 938.

The closest the City comes to alleging that a Prescriber was misled with respect to addiction is the following generalized allegations as to Prescriber D:

> Chicago Prescriber D was visited by opioid sales representatives from Purdue, Endo, Janssen and Actavis. He relied on the representations made by these sales representatives and, in the past, had not comprehended the true addictive potential of opioids. Representatives from each of these companies told Prescriber X that their drugs were "steady state," which he interpreted to mean that they were less addictive.

¶ 630(f). Yet, even assuming such references to Prescriber D's "comprehen[sion]" or "interpret[ation]" are construed to mean that he was somehow misled, there remain multiple additional deficiencies with respect to the allegations of causation and injury relating to Prescriber D. First, there is no actual misrepresentation identified to have been made by a

8

Purdue representative, let alone an identification of who made the representation, when it was made, what was stated, and how it was misleading. Rather, the allegation is an impermissible generic, group reference to "representatives from Purdue, Endo, Janssen and Actavis." *See, e.g.*, *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328-29 (7th Cir. 1994). Moreover, even assuming the "Prescriber X" identified in the paragraph is meant to be "Prescriber D," nothing is set forth regarding what was actually stated by a Purdue representative regarding "steady state," whether any such statement was inaccurate in any respect, or why Purdue should be accountable for Prescriber D's "interpret[ation]" of the unidentified statement. Indeed, the FDA-approved label for OxyContin expressly provides that "steady-state plasma concentrations of oxycodone are achieved within 24-36 hours of initiation of dosing with OXYCONTIN." Ex. 1, at 31. *See Bober*, 246 F.3d at 938.

Second, and more fundamentally, there is no causal nexus of any kind alleged as between these unidentified, amorphous "representations" and the Purdue opioid prescriptions identified in the Exhibits to have been written by Prescriber D. The City does not allege that the representations caused Prescriber D to write any of the prescriptions at issue, that any of the patients for whom a Purdue prescription was reimbursed by the City became addicted, or that Prescriber D would not have deemed the prescriptions to have been medically necessary given the medical conditions of those patients. Indeed, no information of any kind is provided regarding the patients for whom Prescriber D prescribed Purdue opioids, the conditions for which they were receiving treatment, or whether the patient had any negative effects from the opioid treatment prescribed.

The City apparently premises its theory of injury on the sweeping, universal assertion that ***any*** prescription written to treat long-term, chronic non-cancer pain was not "medically

9

necessary"—regardless of the *actual* condition of the patient receiving treatment, whether that opioid treatment was effective for the patient, or whether the patient had any negative effects from the opioid treatment prescribed. As this Court has already recognized, that sweeping theory of injury and causation must be rejected. The FDA-approved label expressly states that OxyContin is "indicated for the management of pain severe enough to require daily, around-the-clock, *long-term* opioid treatment and for which alternative treatment options are inadequate." Ex. 1, at 4 (emphasis added); *see, e.g.*, *In re Plavix Mktg. Sales Practices and Prods. Liab. Litig.*, 123 F. Supp. 3d 584, 605 (D.N.J. 2015) ("[A] FDA approved drug that is prescribed for its on-label use is 'reasonable and necessary.'"). This Court predicated its prior rulings on the assertion that "the Court is not being asked to adjudicate whether opioids are appropriate for the treatment of chronic, non-cancer pain or whether defendants' drugs' labels are accurate." 9/29/16 Order at 7; *see also* 5/8/15 Order at 10 n.2 ("As discussed *supra*, that issue will not be determined in this case."). Yet, by continuing to attempt to advance a theory of injury and causation that is wholly untethered from the specific alleged representation, treatment decision, patient condition, and patient outcome at issue, the City asks the Court to do just that.

This same fundamental failing to allege a causal nexus between the generic representations alleged and the Purdue opioid prescriptions identified in the Exhibits applies to all five of the prescribers.

(c) <u>CMEs</u>

The City alleges that two Prescribers attended CMEs. *See* TAC ¶ 630(b) (Prescriber P); *id.* ¶ 630(j) (Prescriber O). As noted above, the prescriptions identified as having been written by Prescriber P were written two years *before* those CMEs took place. As to Prescriber O, the City alleges only that he "recalled attending a CME *'similar'* to *Chronic Pain and Opioid Use*,"

as well as "*Managing Patient's Opioid Use: Balancing the Need and Risk*." *Id.* ¶ 630(j) (emphasis added). The City does not allege that anything said in those CMEs misled Prescriber O in any respect, or that any representation at those CMEs had any relation to the OxyContin and Butrans prescriptions identified in the Exhibits.

The CME allegations are further deficient because the City has failed to adequately allege that Purdue exercised "editorial control" over the alleged misrepresentations in the CMEs as required by the Court's prior Order. *See* 5/8/15 Order at 27-29.[6] The City merely alleges that Purdue "sponsored" the CMEs, which, as this Court previously held, is not sufficient to state a claim against Purdue. *See id*. Thus, even if the City had alleged that Prescriber P or Prescriber O relied on the alleged misrepresentations in the CMEs when prescribing the Purdue opioids identified in the Exhibits—which it did not—the CME allegations would still fail.

\* \* \* \* \*

In sum, the City falls well-short of alleging with requisite specificity that the "prescribers who prescribed defendants' drugs that the City reimbursed are the same prescribers who heard the misrepresentations about defendants' drugs" and "that those prescribers relied on defendants' misrepresentations when they prescribed defendants' drugs." 9/29/16 Order at 32-33, 37, 38, 40. To the contrary, the Exhibits now linking specific prescriptions of Purdue opioids to particular prescribers reveals the lack of any plausible connection between the purported "misrepresentations" that have been generically asserted as to each prescriber and the actual Purdue opioid prescriptions at issue. 5/8/15 Order (Dkt. No. 288) at 32 ("What the City does not allege, however, is the identities of doctors who, as a result of one or more of defendants' alleged misrepresentations, prescribed opioids for chronic pain to a City-insured patient or worker's

---

[6] The Court did not reach this issue in its 9/29/16 Order.

compensation recipient whose claim for that prescription the City paid or any other details about such claims.").

## III. CONCLUSION

For the foregoing reasons, and for the reasons reflected in the Defendants' Joint Brief, Purdue respectfully requests the Court dismiss counts II and IV-X as to Purdue.

Dated: December 15, 2016

By: /s/ R. Ryan Stoll
Patrick Joseph Fitzgerald
R. Ryan Stoll

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
155 N. Wacker Drive
Suite 2700
Chicago, IL 60606
(312) 407-0508
patrick.fitzgerald@skadden.com
ryan.stoll@skadden.com

*Attorneys for Defendants Purdue Pharma L.P., The Purdue Frederick Company, Inc., and Purdue Pharma Inc.*

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 15, 2016, I caused to be electronically filed the foregoing Defendants Purdue Pharma L.P., Purdue Pharma Inc., And The Purdue Frederick Company Inc.'s Memorandum Of Law In Support Of Their Motion To Dismiss Counts II And IV-X Of Plaintiff's Third Amended Complaint Under Rule 12(B)(6) with the clerk of the court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the electronic Mail Notice List.

      Executed on December 15, 2016, at Chicago, Illinois.

      /s/ R. Ryan Stoll
      R. Ryan Stoll