IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation,<br><br>Plaintiff,<br><br>v.<br><br>PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHOMCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.,<br><br>Defendants. | Case No. 14-cv-04361<br><br>Honorable Jorge L. Alonso<br><br>Magistrate Judge Young B. Kim |

**PLAINTIFF CITY OF CHICAGO'S LEGAL BRIEFING ON DISCOVERY ISSUES**[1]

Plaintiff City of Chicago ("City") provides this briefing to the Court in advance of the May 8th Status Conference.

**I. Defendants' Responses to the City's Interrogatories**

Pursuant to the Court's discovery order, the City propounded between 36 and 40 Requests for Production ("RFPs") and 14 Interrogatories (together, "Discovery Requests") on each of the Defendants; and Defendants collectively served 108 RFPs and 50 Interrogatories on the City. The City provided substantive responses to each of Defendants' Interrogatories, with

---

[1] Defendants' brief is accompanied by a supplemental brief, presented as an appendix.

the limited exception of Defendants' contention interrogatories for the reasons described in Section III. Actavis did not answer a single Interrogatory; Purdue provided an answer to one Interrogatory, but indicated it would subsequently produce documents; and the remaining Defendants answered some, but not all, of the City's Interrogatories.[2]

Over the last month, the City has conducted at least thirteen separate meet and confer discussions, during which time the City attempted to address each of the Defendants' objections, explain the City's positions, and encourage Defendants to respond more fully to the City's Interrogatories. The City also committed that, with the exception of contention interrogatories requiring expert testimony, and without waiver of its objections that contention interrogatories are premature, the City would respond to the contention interrogatories by June 7, 2017, subject to the entry of the ESI protocol. Even after all of these discussions, Defendants have not committed to a date by which they will fully respond to the City's Interrogatories, and the City requests that this Court direct Defendants to answer each Interrogatory propounded to it no later than June 7, 2017. Fed. R. Civ. P. 33(b)(1)(B)(3).

## II. Issues Raised by Defendants' Objections

In addition to Defendants' insufficient interrogatory responses, there are five issues raised by one or more of the Defendants' objections that require resolution by the Court.

---

[2] Interrogatory No. 1 asks each Defendant to identify (with title and contact information) current and former employees involved in marketing to Chicago prescribers, and to provide their salary and bonus information. Actavis and Purdue provided no information; the remaining Defendants identified some employees, but none provided contact or compensation information. Interrogatory No. 7, which requires each Defendant to disclose its spending, by year, in marketing to Chicago prescribers, or Interrogatory No. 14, regarding compliance violations identified to, or investigated or reported by, each Defendant relating to its marketing to Chicago prescribers. These are only a few of the examples of Interrogatories Defendants have not answered, or have not answered fully.

2

A.     Geographic Scope of Discovery

Some of the City's Discovery Requests seek information relating to Defendants' activities within "Chicago," defined to include the Census Bureau's Chicago Metropolitan Statistical Area ("MSA"), which includes some of the City's suburbs. Other Requests seek corporate documents on a national level, or without regard to geography. At least one Defendant has stated it is only willing to produce documents concerning activities within the City limits, although Janssen has stated that it no longer intends to withhold documents based on this objection and Teva has agreed to consider producing documents from the MSA. Endo and Teva have agreed to provide documents reflecting national policies and practices, so long as Chicago was not excluded from their reach (which the City accepts as sufficient).

The geographic scope of discovery should be driven by the relevance and proportionality considerations in Rule 26(b), which here mandates discovery of documents reflecting national policies and practices affecting the City. *See U.S. ex rel. Oughatiyan v. IPC The Hospitalist Co., Inc.*, No. 09 C 5418, 2015 WL 4249195, at *2 (N.D. Ill. July 14, 2015). Where a company's local or regional activities follow directives from central corporate sources—such as corporate headquarters—discovery should include at least those central corporate sources. *See id.* at *3 (even where court limits geographic scope for initial stage of discovery, such scope includes targeted jurisdictions *and* central corporate documents); *U.S. ex rel. Rost v. Pfizer, Inc.*, 253 F.R.D. 11, 17 (D. Mass. 2008) (stating that court will allow "nationwide" discovery if initial discovery shows that drug company's sales region was following a national directive to pay kickbacks to doctors). The City has alleged that Defendants' marketing in Chicago is carried out pursuant to national marketing plans and through trainings, scripts, and materials that were developed centrally but deployed in Chicago, as elsewhere. *See* Third Amended Complaint

3

("TAC" or "Complaint") ¶¶ 99-103, 110-12, 182, 311, 401, 497. Thus, discovery of these national marketing documents is not only essential to proving Defendants' overall deceptive marketing campaign, but are directly relevant to proving their activities *in Chicago*.3 *See Mackey v. IBP, Inc.*, 167 F.R.D. 186, 196 (D. Kan. 1996) (finding that the inclusion of corporate documents does not expand the geographic scope of discovery beyond the subject facility).

Certain Discovery Requests also seek information for the Chicago MSA. Defendants' sales representatives visited prescribers in the communities bordering Chicago, many of whom treat City beneficiaries and have prescribed opioids paid for by the City. When such a claim is presented for payment within the City, it violates the City's False Claims Ordinance, and artificially constraining discovery to the City limits therefore would limit discovery of actionable misconduct. Even though City-covered retirees live throughout the nation, the City reasonably limited its Discovery Requests to the MSA, which captures 84.8% of the City's health care spending on opioids (as opposed to only 51.9 % in the City of Chicago alone) and 77.7% of the City's workers' compensation spending (as opposed to only 55.7% in the City alone). Therefore, this Court should order that Defendants answer the City's Discovery Requests with national and MSA-level information where requested.

B.    Product Scope of Discovery

Although the TAC's allegations cover opioids as a class of drugs, Actavis, Purdue and Teva have refused to produce documents covering all opioids they manufactured during the relevant time period and have indicated that they will limit their responses to documents

---

3 In addition to national marketing plans and materials, communications about publications distributed or available in Chicago would almost certainly have occurred among executives outside of the Chicago area. Also, research and studies used to justify, or that fail to validate, Defendants' claims, would have been conducted by scientists across the country, whose work was published and cited in national journals distributed within Chicago or handed out by Defendants' employees to Chicago prescribers.

4

concerning opioid products specifically mentioned in the TAC, and, in some cases, unbranded (or non-product specific) marketing activity.

This very issue was confronted and decided by another judge in this District, who held that where a complaint contains allegations pertaining to a category of drugs, the scope of discovery properly covers the whole category. *In re Brand Name Prescription Drugs Antitrust Litig.*, Nos. 94 C 897, MDL 997, 1995 WL 234521, at *1 (N.D. Ill. Apr. 18, 1995) ("The fact that the complaint enumerates some examples of brand name drugs manufactured by each defendant does not . . . place any unenumerated drugs beyond the scope of the lawsuit."). As in *In re Brand Name Prescription Drugs*, all references in the TAC to any particular brand are mere examples of the activities at issue. The TAC alleges that Defendants misrepresented the risks, benefits, and superiority of opioids generally, *as a class of drugs*. Nowhere does the TAC limit its allegations to a particular opioid product; the publications, websites, studies, treatment guidelines, and detailing visits described for each Defendant typically discuss opioids, not a specific product, and the Counts refer generally to opioids. [4]

This is a lawsuit about the marketing of opioids for chronic pain, not about particular brands, and Defendants' opioids were subject, object, and beneficiary of their deceptive campaign. Therefore, Defendants should answer the Discovery Requests with information pertaining to all opioid products they manufactured or marketed during the time period.

---

[4] *See, e.g.*, TAC ¶¶ 127 ("Through unbranded materials, Defendants presented information and instructions concerning opioids generally that were contrary to . . . Defendants' branded marketing materials"); 230 ("[T]he claims also were false and misleading in that they misrepresented the risks of both the particular drug and opioids as a class."); 752 (Defendants deceptively promoted "the sale and use of opioids to treat chronic pain . . . in order to promote the sale and use of opioids to treat chronic pain" (footnote omitted)); 775 (same); 786 ("Through their scheme to illegally and deceptively promote opioids in an effort to further opioid sales," Defendants caused false claims to be submitted stating that "opioids to treat chronic pain were medically necessary and reasonably required"); 796 (same); 810 (same).

C. <u>Other Consumer Complaints, Government Investigations, and Lawsuits</u>

The City asked each Defendant to produce documents relating to other complaints and proceedings dealing with the safety and marketing of their opioids, covering government investigations, civil litigation, regulatory actions, attorney general investigations, law enforcement proceedings, and private party complaints and lawsuits. *See, e.g.*, City's RFPs 17, 21, 23, 33 to Actavis. During the parties' meet and confers, the City asked Defendants to provide, as an initial step, a list of all of the matters that would be covered by these Requests. To date, Purdue, Endo, Janssen and Actavis have agreed to provide a list of at least some of the matters the City requested, while Teva is currently considering the City's proposal.

Producing a list of the matters would permit the City to determine whether it might narrow these Discovery Requests, and it is a sensible way to proceed. Discovery already taken in other cases could be relevant to the facts here and would help the parties streamline discovery in this case. For that reason, the Seventh Circuit has recognized that "when litigants seek to use discovery in aid of collateral litigation on similar issues, . . . access in such cases materially eases the tasks of courts and litigants and speeds up what may otherwise be a lengthy process." *Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854, 860-61 (7th Cir. 1994) (quoting *Wilk v. Am. Med. Ass'n*, 635 F.2d 1295, 1299 (7th Cir. 1980); *see also AT&T v. Grady*, 594 F.2d 594, 595 (7th Cir. 1978) (affirming district court modification of protective order to allow discovery materials to be accessed by outside litigants).[5] Testimony of a witness in another matter could

---

[5] In other contexts, courts in this District have held that files from past proceedings involving similar facts are relevant and subject to discovery. *Sauer v. Exelon Generation Co., LLC*, No. 10 C 3258, 2011 WL 3584780, at *3-5 (N.D. Ill. Aug. 15, 2011) (ordering production of documents from lawsuits regarding contamination from the same facility); *Lepianka v. Vill. of Franklin Park*, No. 03 C 2991, 2004 WL 626830, at *2 (N.D. Ill. Mar. 26, 2004) ("Plaintiffs are entitled to discover defendant officers' disciplinary

help include or exclude that person as a witness for this case; by the same token, evidence that Defendants made the same statements in other jurisdictions would tend to confirm that the conduct occurred in Chicago and was part of a pattern and practice of deceptive marketing.

Because the other discovery has already occurred, the burden on Defendants is minimal, and after discovery, the Court can deal with any evidentiary issues regarding using the information at trial. But the process would properly and efficiently begin with the City reviewing a list of the other matters to determine which involve facts similar to the conduct at issue in this case. Therefore, the City requests that this Court direct Defendants to promptly provide the City with a list of consumer complaints, government investigations, and lawsuits relating to opioid marketing or safety so that the City may focus its Requests.

D.  Temporal Scope of Discovery – Beginning Date

The parties do not agree on the relevant start date for discovery. The City's Discovery Requests seek documents and answers from January 1, 2004—one year before the first alleged violations took place[6]—because marketing activities may have been in development during the preceding year. Some Defendants have taken the position that a six-year statute of limitations limits the proper scope of violations, and thus discovery, to a time period beginning in 2008.

The City's claims arise under ordinances based on Illinois statutes and, under Illinois law, fraudulent concealment tolls the statute of limitations. 735 ILCS 5/13-215; *see also Henderson Square Condo. Ass'n v. Lab Townhomes, LLC*, 46 N.E.3d 706, 716 (Ill. 2015) ("Under the fraudulent concealment doctrine, the statute of limitations will be tolled if the plaintiff pleads

---

records, and the trial judge will determine before or at the trial whether 'other acts' are similar enough and close enough in time to be relevant to the matter in issue and thus, admissible."); *Schaap v. Executive Indus., Inc.*, 130 F.R.D. 384, 387 (N.D. Ill. 1990) (plaintiff is entitled to prior consumer complaints and lawsuits regarding subject vehicles and similar models).

[6] The City's False Claims Ordinance, which went into effect in January 2005, provides the earliest date for statutory violations.

7

and proves that fraud prevented discovery of the cause of action."); *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (reversing district court's dismissal based on statute of limitations where plaintiff had no opportunity for discovery into when it should have known about its injuries from off-label marketing); *In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-cv-10739-PBS, 2011 WL 3852254, at *49 (D. Mass. Aug. 31, 2011) (tolling state consumer protection claims based on drug company's misleading conduct). Because the Complaint alleges Defendants fraudulently concealed their violations, TAC ¶¶ 743-47, the statute of limitations cannot shield them from discovery dating back to January 1, 2004.

      E.    <u>Temporal Scope of Discovery – Ending Date</u>

The City's Discovery Requests seek documents and information up until the date the Requests were served on each Defendant—January 30, 2017. Actavis has taken the position that it will not produce documents generated after the date the City filed its first complaint in this litigation—June 2, 2014—on the theory that the City was then aware of its conduct.[7]

Nothing in Rule 26 excludes post-complaint evidence. *See* FED. R. CIV. P. 26. Moreover, "[i]t is commonsense that information and documents created after filing the Complaint can be relevant and must be produced." *Charvat v. Valente*, 82 F. Supp. 3d 713, 717 (N.D. Ill. 2015) (citations omitted). Post-complaint documents not only have a bearing on Defendants' ongoing liability, but could reflect on their pre-complaint conduct. *See United States v. City of Torrance*, 164 F.R.D. 493, 495 (C.D. Cal. 1995) ("Documents which bear a date after the filing of a complaint may relate to events occurring prior to the filing of the complaint." (citation omitted)).

---

[7] For reasons laid out in the City's Opposition to Defendants' Third Motion to Dismiss, which is currently pending, the City's knowledge of Defendants' fraudulent marketing does not cut-off ongoing liability under the False Claims Ordinance. Plaintiff's Mem. Of Law in Opp'n to Defs.' Joint and Indiv. Mot. to Dismiss at 12-17 (Jan. 27, 2017). Even so, the filing of the City's Complaint would have no impact on its consumer fraud claims.

8

"[I]t is simply a fact of life that in major adjudications much discovery will be post-complaint discovery." *Standard Oil Co. v. F.T.C.*, 475 F. Supp. 1261, 1270 (N.D. Ind. 1979).

Moreover, courts have held that post-complaint discovery is particularly appropriate and important where, as here, TAC ¶¶ 751, 780, the plaintiff alleges continuing violations. *See, e.g.*, *Charvat*, 82 F. Supp. 3d at 717. In such a case, "prohibit[ing] discovery after the filing of the [complaint] would arbitrarily limit plaintiff's claims and preclude material evidence at trial." *City of Torrance*, 164 F.R.D. at 495; *see also United States v. Int'l Bus. Machs. Corp.*, 66 F.R.D. 180, 185 (S.D.N.Y. 1974) (holding that discovery of "post-complaint activities of defendant presents no problem. As stated earlier the complaint charges a continuing violation."). Evidence of a "continuation of a course of conduct, involving false representations or other culpable wrongdoing after a complaint, may have evidentiary significance as to malice or reckless or wanton conduct." *In re Jemsek Clinic, P.A.*, Nos. 06-31766, 06-31986, 07-3006, 2013 WL 3994666, at *5 (Bankr. W.D.N.C. Aug. 2, 2013) (quoting *King v. E.F. Hutton & Co.*, 117 F.R.D. 2, 7 (D.D.C. 1987)). Since the TAC seeks civil penalties and alleges continuing violations, such post-complaint conduct is relevant here.

The TAC also seeks injunctive relief, which necessarily puts post-complaint evidence at issue. In fact, the Court "must" be informed of such evidence to address this request for relief. *See* 10 Fed. Proc., L. Ed. § 26:104 ("In an action for injunctive relief, discovery of documents relating to matters occurring after the filing of the action is permitted, since the court must be informed of the current activities of the defendant in order to determine the need for, or the propriety of, injunctive relief.") (footnote omitted). If filing a complaint negates any ongoing violation, there would have been no reason to provide an injunctive remedy in the Consumer Fraud Ordinance, and this aspect of the statute would be meaningless. *Cf. United States v.*

9

*Franz*, 886 F.2d 973, 978 (7th Cir. 1989) ("as a general rule, a court should not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous") (internal quotation marks and citation omitted).

The Court should reject Actavis' request to impose an inappropriate cut-off on discovery.

### III. Issue Raised by City's Objections: Contention Interrogatories Seeking Classification of Medically Unnecessary Prescriptions

The City has agreed to produce the City's claims data. Defendants have insisted that the City—today, without the benefit of discovery or expert analysis—should identify from such claims data every medically unnecessary claim. According to Defendants, they do not know all the prescribers to depose on the issue of medical necessity and, without such knowledge, they are hamstrung in defending against the City's claims. However, the City already disclosed in the TAC and Initial Disclosures more than two dozen prescribers who received Defendants' deceptive marketing, along with examples of medically unnecessary claims that resulted. Defendants also have their own records of which prescribers they marketed to and what they told them. Nothing is preventing Defendants from deposing any of these prescribers on why they prescribed opioids, whether they followed accepted and appropriate medical practice, whether they were influenced by Defendants' marketing--or any other factors Defendants believe is relevant to determining whether a claim was medically unnecessary. While the City sufficiently identified and demonstrated medically unnecessary claims for purposes of pleading its case, it has the right to fill out the contours of its proof through discovery.[8] As it advised Defendants, the City intends to obtain expert review of its data and the information produced by Defendants.

---

[8] Defendants claim that this case is different than off-label marketing cases, where improper claims can be identified as relating to particular conditions. However, only claims caused by off-label *promotion* are impermissible, raising the same types of factual issues—whether any prescriber received or relied upon specific marketing—that Defendants claim are unique to this case.

Consistent with the Court's schedule for expert disclosures and discovery, the City will further identify or otherwise quantify its spending on claims it asserts were medically unnecessary as a result of Defendants' fraud. In the meantime, Defendants will be in possession of the same claims data as the City, and they hold the very discovery that will be provided to the City.

Defendants attempt to disguise their requests as requests for production of documents under Rule 34 rather than contention interrogatories under Rule 33. However, the City plans to produce to Defendants *all* of its claims data; all of the subject documents are being produced. The only dispute is whether the City must now, at the beginning of discovery, commit itself to a position regarding which of those claims reflect medically unnecessary prescriptions. Plainly, these discovery requests, which ask for the City's position regarding whether each claim was medically necessary, are contention interrogatories: no documents exist that the City can produce to answer this question and they seek the City's legal conclusions regarding the claims it paid.

"'The general policy is to defer contention interrogatories until discovery is near an end, in order to promote efficiency and fairness.'" *In re Peregrine Fin. Grp. Customer Litig.*, No. 12 C 5546, 2015 WL 1344466, at *4 (N.D. Ill. Mar. 20, 2015) (quoting *Ziemack v. Centel Corp.*, No. 92 C 3551, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995)). Although a court may compel answers to early contention interrogatories "when answering them could contribute to clarifying the issues," *Peregrine*, 2015 WL 1344466, at *4, this analysis is based on the circumstances of the case and even sometimes the specifics of each interrogatory at issue. S*ee, e.g.*, *In re Arlington Heights Funds Consol. Pretrial*, No. 89 C 701, 1989 WL 81965, at *1 (N.D. Ill. July 11, 1989). "The critical questions are whether compelling an answer would require multiple supplemental answers, or if it would prematurely commit a party to a position." *Peregrine*, 2015 WL 1344466, at *4. Defendants bear the burden of coming forward with a specific basis for

11

finding these concerns do not apply here, and that answering their interrogatories "could contribute to clarifying the issues." *Id.* (citation omitted).

Defendants cannot meet their burden in justifying early contention interrogatories.[9] The City would be required to supplement its response (and re-conduct its expert analysis) as Defendants produce the information the City has requested regarding their marketing plans and activities. Some of the most relevant factual information—Defendants' sales volume and revenue in the Chicago area, Defendants' marketing spending and activity and prescribing in Chicago, the identity of Chicago prescribers to whom Defendants marketed, the statements Defendants made to those prescribers, and the number of prescriptions each prescriber wrote—is within Defendants' possession, often exclusively so. And Defendants' interrogatories would prematurely commit the City to a position with respect to whether individual prescriptions were fraudulently induced without the benefit of discovery that would influence its views.

Furthermore, the interrogatories could require the City to perform a litigation function the City may never undertake—reviewing each claim individually to make a determination of medical necessity. "[W]here, in advance of expert discovery, a [party] seeks to inquire about a damage theory that may never come into being, and that is to be used essentially for rebuttal," a "contention interrogatory would seem premature and outside the ambit of what a contention interrogatory is designed to do." *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 230 F.R.D. 538, 544–45 (N.D. Ill. 2005). The City has multiple avenues for proving which prescriptions constitute false claims—including whether they were the product of misrepresentations to a

---

[9] The City's well-pleaded Complaint already provides Defendants with significant detail on the nature of its claims, and therefore is a far cry from *In re Ocwen Loan Servicing, LLC Mortgage Servicing Litigation*, 491 F.3d 638 (7th Cir. 2007), where the Court itself "found it difficult and in many instances impossible to ascertain the nature of the charges" and ordered responses to contention interrogatories in order to illuminate the core allegations in the complaint. *Id.* at 641.

specific prescriber, whether they were prescribed for conditions, at dosages, for periods of time, or in the absence of earlier interventions in a manner inconsistent with scientific evidence or customary practice, whether Defendants' misrepresentations impacted the City's coverage for such claims, etc. The City may also choose to use statistical sampling and extrapolation to establish damages, which courts have permitted as an appropriate (and sometimes the only) measure of damages in cases involving large-scale frauds such as this. *See e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (rejecting, in the context of damages in an FCA case, the "argument that the district judge had to address each of the 1,812 claim forms" as "a formula for paralysis" and stating that "[s]tatistical analysis should suffice"); *Ill. Physicians Union v. Miller*, 675 F.2d 151, 155 (7th Cir. 1982) (noting that the use of "statistical samples has been recognized as a valid basis for findings of fact in the context of Medicaid reimbursement" and that its use was reasonable given the impossibility of reviewing each of the doctor's 1,302 claims).[10]

In *United States ex rel. Martin v. Life Care Centers of America, Inc.*, No. 1:08-cv-251, 1:12-cv-64, 2015 WL 10987029 (E.D. Tenn. Feb. 18, 2015), the Court denied the defendant's motion for summary judgment, concluding that the use of statistical sampling is a legally viable mechanism which the Government may employ in attempting to prove the FCA claims. *Id.* at *1. Even so, the defendant filed a motion to compel, asking the court to order the Government to

---

[10] *See also* Public Brief for the United States as Intervenor-Appellee, *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, Nos. 15-2145(L), 15-2147, 2016 WL 1084783, at *18-19, 37-42 (4th Cir. Mar. 17, 2016) (arguing that "statistically-valid random sampling is a well-accepted method of establishing liability and damages in a variety of contexts" and "[p]roperly-validated statistical sampling is an especially effective and indispensable tool in False Claims Act cases where the scope of the defendant's fraud makes claim-by-claim review impracticable"); United States' Statement of Interest Pursuant to 28 U.S.C. § 517 and/or Amicus Brief in Response to Defendants' Opposition to Relator/Plaintiff's Discovery, *U.S. ex rel. Michaels v. Agape Senior Cmty., Inc.*, No. 0:12-cv-03466, Rec. Doc. 167 (D.S.C. Aug. 22, 2014).

identify, among other things, each of the alleged claims, records, or statements on which the Government intended to rely to establish liability and damages. *Id.* The Government argued that it had already provided the defendant with the relevant claims data and thus the defendant could do the analysis itself. *Id.* The court denied the motion to compel, finding that the "Defendant is not simply requesting that the Government disclose discovery, they are essentially requesting that the Court impose an affirmative burden on the Government to identify each claim in the total universe of claims which could be categorized as false." *Id.* at *3. Because "the Government will not be required to engage in a claim-by-claim review of the entire universe of claims[,]" the court found that the defendant was "attempting to have the discovery tail wag the substantive dog of rulings the Court has previously made on statistical sampling and extrapolation." *Id.*

If the City decides to proceed in a similar fashion, claim-by-claim identification would never be necessary, and it is well-established that it is *plaintiff's* prerogative, not defendant's, to establish a measure for damages. *City of Chicago v. Mich. Beach Hous. Coop.*, 297 Ill. App. 3d 317, 324 (1st Dist. 1998). The City should be entitled to develop its own models and use experts to analyze, characterize, and quantify which claims are medically unnecessary and the result of Defendants' fraud.[11] Defendants will have the opportunity to depose the City's experts and attack their model or the basis for their conclusions, but the City should not be required to develop a theory of damages Defendants might prefer.[12] "Simply because the Defendant may

---

[11] *See also Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2004 WL 2108410, at *2 (N.D. Ill. Sept. 21, 2004) ("Defendants argue . . . that defendants are entitled to know plaintiffs' specific methodology for computing damages. . . . Defendants' position is overreaching. It is unreasonable for defendants to expect the exact damages formula from initial disclosures in a securities fraud action where expert analysis is undoubtedly necessary.").

[12] In prior exchanges, Defendants cited to a single, inapposite case, which in no way requires an individualized, claim-by-claim analysis as a categorical rule. That case, *Cleary v. Philip Morris USA, Inc.*, No. 09 C 1596, 2010 WL 431670 (N.D. Ill. Feb. 1, 2010) stands for the unremarkable proposition that a plaintiff may not "sue on behalf of a class if she herself was not injured." *Id.* at *3. Establishing

14

choose, among [its] options, to pursue a litigation strategy that relies on a claim-by-claim review does not justify placing the burden on the Government to be the party that performs that review." *Life Care*, 2015 WL 10987029, at *3.

The Court will establish an orderly process for the City to disclose its experts, methodologies, and models. Defendants are not entitled to circumvent that process, and doing so would not increase efficiency in this case. If Defendants wish to have a reasonable period of time for further fact discovery, after expert disclosures, the City would not object to a schedule with reasonably drawn parameters. The City repeatedly has asked Defendants to offer a proposal that would address this prospect, but has received none.

## CONCLUSION

The City looks forward to discussing these issues at the May 8th Status Conference.

May 3, 2017

Respectfully Submitted by:     /s/ Linda Singer

Linda Singer (pro hac vice)
Jeffrey Nelson (pro hac vice)
Elizabeth Smith (pro hac vice)
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
Telephone: (202) 386-9626
lsinger@motleyrice.com
jnelson@motleyrice.com
esmith@motleyrice.com

---

some injury or damage as a threshold requirement is fundamentally different than determining the scope of damages, and does not require the City to identify, from the start of discovery, *all* false claims. While the City must show that "in at least one instance," each Defendant made a false claim, *U.S. ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006), it has greater flexibility to prove damages. *See, e.g.*, *Ho Chunk Nation v. Southland Sports & Expo Ctr., LLC*, 2015 IL App (1st) 142966-U, ¶ 43, *app. den.*, 48 N.E.3d 672 (Ill. 2016) ( "once the existence of damage has been established, evidence tending to reasonably approximate the extent of damage is admissible.").

15

                                                Fiona A. Burke
Thomas P. McNulty
CITY OF CHICAGO,
DEPARTMENT OF LAW
30 N. LaSalle Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 744-6929
fiona.burke@cityofchicago.org
thomas.mcnulty@cityofchicago.org

Kenneth A. Wexler
Thomas A. Doyle
Bethany R. Turke
Justin N. Boley
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
tad@wexlerwallace.com
brt@wexlerwallace.com
jnb@wexlerwallace.com

**Local Rule 37.2 Certificate**

  Pursuant to Local Rule 37.2, Counsel for the City of Chicago states that after consultation by telephone and good-faith efforts to resolve differences, the parties have been unable to reach an accord on these discovery disputes. Linda Singer conducted a telephone conference with all of the Defendants on April 24, 2017, and Kenneth Wexler conducted a telephone conference with all of the Defendants on April 27, 2017. In addition, Thomas Doyle had several telephone calls with Counsel for Endo (Jonathan Stern and Joshua Davis) and with Counsel for Actavis (Jason Drori), and Jeffrey Nelson had several telephone calls with Counsel for Janssen (Charles Lifland and David Roberts), Counsel for Teva (Tinos Diamantatos and Jeremy Menkowitz) and Counsel for Purdue (Ryan Stoll and Gretchen Wolf).

May 3, 2017              _____/s/_____

                  Linda Singer, Counsel for the City of Chicago

## **CERTIFICATE OF SERVICE**

       I hereby certify that on May 3, 2017, I caused the foregoing document to be filed and served via the Court's CM/ECF system.

May 3, 2017                                                            By:_____/s/_____

                                                                                              Jeffrey Nelson