IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, | |
| Plaintiff, | |
| v. | Case No. 14-cv-04361 |
| PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICAL, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., | Honorable Jorge L. Alonso

Magistrate Judge Young B. Kim |
| Defendants. | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO
COMPEL REGARDING TEMPORAL SCOPE OF DISCOVERY**

# TABLE OF CONTENTS

Factual and Procedural Background ..................................................................................... 1

Legal Standard ...................................................................................................................... 9

Argument ............................................................................................................................. 11

   I.  The City's Proposed Scope of Discovery Is Contrary to Rule 26 and this Court's Guidance. ....................................................................................................................... 11

   II.  The City's Proposed Scope of Discovery Ignores the Statute of Limitations and Seeks Irrelevant Information. ...................................................................................................... 12

   III. The City's Proposed Scope of Discovery Is Not Proportional to the Needs of the Case. . 16

   IV. The City's Proposed Scope of Discovery Violates Rule 26(b)(1) With Respect To Each Defendant. ........................................................................................................................ 22

       A.  The City's Proposed Scope of Discovery Violates Rule 26(b)(1) With Respect to The Purdue  Defendants and Disregards Materials Already Produced To The City. ........ 22

       B.  The City's Proposed Scope of Discovery Is Inappropriate as to the Janssen Defendants. .................................................................................................................. 29

       C.  The City's Proposed Scope of Discovery Is Inappropriate as to the Teva Defendants. .................................................................................................................. 33

       D.  The City Has Not Satisfied the Basic Requirements of Relevance and Proportionality to Justify the Scope of Discovery It Seeks from the Actavis Defendants. ................. 37

Conclusion .......................................................................................................................... 38

# TABLE OF AUTHORITIES

## CASES

*Champaign County Forest Preserve District v. King*,
    683 N.E.2d 980 (Ill. App. Ct. 1997) ................................................................14

*City of Evanston v. Texaco, Inc.*,
    19 F. Supp. 3d 817 (N.D. Ill. 2014) ..........................................................13, 14

*City of Urbana v. Mallow*,
    356 N.E.2d 1327 (Ill. App. Ct. 1976) ..............................................................28

*County of Cook v. Philip Morris, Inc.*,
    817 N.E.2d 1039 (Ill. App. Ct. 2004) ........................................................23, 28

*In re Dockers Roundtrip Airfare Promotion Sales Practices Litigation*,
    2010 WL 11515318 (C.D. Cal. Aug. 1, 2010).................................................18

*Fassett v. Sears Holdings Corp.*,
    319 F.R.D. 143 (M.D. Pa. 2017)......................................................................18

*Gredell v. Wyeth Laboratories, Inc.*,
    803 N.E.2d 541 (Ill. App. Ct. 2004) ................................................................15

*Infowhyse GmbH v. Fleetwood Group*,
    2016 WL 4063168 (N.D. Ill. July 29, 2016).....................................................16

*Landis v. Marc Realty, L.L.C.*,
    919 N.E.2d 300 (Ill. 2009) ...............................................................................13

*N.U. v. Wal-Mart Stores, Inc.*,
    2016 WL 3654759 (D. Kan. July 8, 2016) .......................................................18

*Novak v. Pearlstein*,
    2016 WL 3586899 (N.D. Ill. June 24, 2016)....................................................29

*Oppenheimer Fund Inc. v. Sanders*,
    437 U.S. 340 (1978)..........................................................................................15

*People ex rel. Devine v. Time Consumer Marketing, Inc.*,
    782 N.E.2d 761 (Ill. App. Ct. 2002) ........................................................23, 28

*Rainey v. Metropolitan Water. Reclamation District*,
    2012 WL 2192241 (N.D. Ill. June 14, 2012)....................................................15

*Rennie v. Dalton*,
    3 F.3d 1100 (7th Cir. 1993) ..............................................................................15

*Sapia v. Board of Education of the City of Chicago*,
2017 WL 2060344 (N.D. Ill. May 15, 2017) ........................................................10, 13, 37

*Simon v. Northwestern University*,
2017 WL 467677 (N.D. Ill. Feb. 3, 2017) .........................................................................17

*In re Sulfuric Acid Antitrust Litigation*,
231 F.R.D. 351 (N.D. Ill. 2005)..........................................................................................14

*Surgery Center at 900 North Michigan Avenue, LLC v. American Physicians Assurance
Corporation, Inc.*,
317 F.R.D. 620 (N.D. Ill. 2016)..........................................................................................17

*Uppal v. Rosalind Franklin University of Medicine & Science*,
124 F. Supp. 3d 811 (N.D. Ill. 2015) .................................................................................15

*Village of DePue v. Viacom International Inc.*,
713 F. Supp. 2d 774 (C.D. Ill. 2010) .................................................................................14

*West Loop Chiropractic & Sports Injury Center, Ltd. v. North American Bancard, LLC*,
2017 WL 404896 (N.D. Ill. Jan. 30, 2017) ........................................................................17

*Ye v. Cliff Veissman, Inc.*,
2016 WL 950948 (N.D. Ill. Mar. 7, 2016).........................................................................30

*Zuni Solar, LLC v. Builders*,
2016 WL 4530896 (S.D.N.Y. Mar. 4, 2016) ......................................................................10

**STATUTES, REGULATIONS, RULES**

Ill. Const. 1970, art. V.........................................................................................................28

735 ILCS 5/13-202 ..........................................................................................................1, 13

735 ILCS 5/13-205 ..........................................................................................................1, 13

21 C.F.R. § 314 ......................................................................................................................4

21 C.F.R. § 314.81 ......................................................................................................3, 22, 24

MCC § 1-22-040 ..............................................................................................................1, 13

Federal Rule of Civil Procedure 26 .......................................................................... passim

**OTHER AUTHORITIES**

8 Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, Federal Practice &
Procedure § 2008.1 (3d ed. 2017) .....................................................................................16

Scott Gottlieb, FDA, Remarks Delivered Before FDA's Scientific Meeting on Opioids (July 10, 2017), available at https://www.fda.gov/NewsEvents/Speeches/ucm566189.htm ...........................................19

Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 New Eng. J. Med. 1480, 1480 (2016), *available at* http://www.nejm.org/doi/pdf/10.1056/NEJMsr1601307...................................................20

Press Release, FDA, *Califf, FDA top officials call for sweeping review of agency opioid policies* (Feb. 4, 2016), *available at* https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ ucm484765.htm ...............................................................................................................20

Theodore J. Cicero et al., *Determinants of Fentanyl and Other Potent M Opioid Agonist Misuse in Opioid-Dependent Individuals*, 19 Pharmacoepidemiology & Drug Safety 1057 (2010), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2948061/pdf/nihms-225001.pdf. .........30

Defendants[1] respectfully submit this Response to "Plaintiff City of Chicago's Motion to Compel – Temporal Scope of Discovery" (Dkt. No. 586).[2] Plaintiff's motion to compel the production of voluminous documents and data dating back up to 28 years is contrary to Federal Rule of Civil Procedure 26(b)(1), seeks irrelevant material, fails to acknowledge materials that already have been or will soon be produced to the City, and is grossly disproportionate to the needs of the case given the claims and defenses at issue. Accordingly, the motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The City's discovery requests initially sought data and documents dating back to January 1, 2004. Defendants advised the City that such a time frame was overbroad, not proportional to the needs of the case, and failed to reflect the temporal limits applicable to the claims at issue. The longest statute of limitations applicable to the City's claims is the six-year limitations period for the False Claims Act Counts—Counts Five and Six (which have twice been dismissed by Judge Alonso). *See* MCC § 1-22-040. All other Counts of the Complaint are subject to either the two-year statute of limitations applicable to claims "for a statutory penalty," *see* 735 ILCS 5/13-202, or the "catch-all" five-year limitations period applicable to civil actions, *see* 735 ILCS 5/13-205. The City filed its initial Complaint on June 2, 2014. As such, the two counts not

---

[1] "Defendants" refers to the parties against which the City's motion is directed: Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company Inc. (collectively the "Purdue Defendants"); Janssen Pharmaceuticals, Inc. and Johnson & Johnson (collectively the "Janssen Defendants"); Cephalon, Inc. and Teva Pharmaceuticals USA, Inc. (collectively the "Teva Defendants"); and Allergan plc, f/k/a Actavis plc, Actavis, Inc., n/k/a Allergan Finance, LLC, f/k/a Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., n/k/a Actavis Laboratories UT, Inc., Actavis LLC, and Actavis Pharma, Inc., f/k/a Watson Pharma, Inc. (collectively the "Actavis Defendants").

The City has withdrawn its Motion as to Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. *See* Amendment to Mot. (Dkt. No. 589).

[2] For the Court's convenience, Defendants combine these common points in a single brief. In total, the reply briefs on this motion will not exceed 15 pages per Defendant group.

previously dismissed by Judge Alonso—Counts I and III—run from 2009 and 2012, respectively. Moreover, the ordinance upon which Count I is based, MCC § 2-25-090, was not enacted until November 19, 2008. Each Defendant also addressed the City's discovery requests on a request-by-request basis, and in various instances provided materials predating the limitations periods applicable to the claims at issue when such productions were consistent with the relevance and proportionality requirements of Rule 26(b)(1).

Following this Court's May 8, 2017 status conference, the City sent a letter to Defendants in which the City *expanded* its requests by removing all date restrictions by "seek[ing] responsive documents, regardless of their dates." Exh. A to Mot., Letter of June 29, 2017 (Dkt. No. 586-1). The City also asserted that "the relevant time period begins a year before the launch of each product at issue." *Id.* Defendants objected to this proposal as both inconsistent with the City's previous position and Rule 26. After further discussions, the City announced its final position:

1. For the seven opioid products at issue in this litigation that were FDA-approved or acquired by a defendant after 1/1/2004, the time period for responding to the City's discovery requests shall start one year prior to the product's approval or acquisition date.

2. For the three products at issue in this litigation approved prior to 1/1/2004, the time period for responding to the City's discovery requests shall start on 1/1/2004, plus the following:

   a. The product's launch plan and communications relating to the product's launch plan; and

   b. All marketing plan documents, communications related to marketing plans, and marketing materials, regardless of the date, reflecting or relating to marketing of the product after 1/1/2004.

Exh. B to Mot., Letter of July 12, 2017 (Dkt. No. 586-2) at 1. Three products mentioned in the City's Third Amended Complaint ("Complaint" or "TAC," Dkt. No. 478) were approved before 2004: Janssen's Duragesic (1990), Purdue's OxyContin (1995), and Teva's ACTIQ® (1998).

2

Defendants individually met and conferred on the City's proposal as addressed below.

***Purdue Defendants' Negotiations With The City***.  The City identifies three opioid products for Purdue—OxyContin, Butrans, and Hysingla ER.  Mot. at 4.  The parties are in agreement as to temporal scope as to Butrans and Hysingla ER, for which the City proposes discovery start dates of June 30, 2009, and November 20, 2013, respectively.  *Id.*  As to OxyContin, which was approved in 1995, there is a dispute but that dispute has been misstated by the City.  The City claims that Purdue has stated that it would only produce materials dating back to November 1, 2008.  While Purdue has consistently maintained that general discovery should not predate 2008, Purdue has addressed production matters on a request-by-request basis considering the claims and defenses at issue in the litigation, the periods involved for the claims at issue, and proportionality.

To this end, Purdue has already produced to the City, among other things, the complete New Drug Application ("NDA") files for all three drugs, including those pertaining to both the initial approval of OxyContin in 1995 and approval of the abuse deterrent reformulation of OxyContin in 2010.  The materials in the NDA file are extensive and include, by law, the marketing materials used in connection with the medication.  *See* 21 C.F.R. § 314.81(b)(3)(i).  Those files contain all documents submitted to the Food and Drug Administration ("FDA") in connection with OxyContin's approval in 1995 as well as all submissions and correspondence with FDA thereafter, including all labeling or advertising devised for OxyContin's promotion over time and any comments received from FDA relating to such materials.[3]  Accordingly, the

---

[3] The NDA includes, *inter alia*:

- Submissions seeking initial marketing approval of the drug (including numerous clinical studies demonstrating safety and efficacy of drug, summaries of safety and efficacy, which summarize these studies, proposed labeling, etc.);
- Documents reflecting interactions/communications with FDA during review;

City already has the marketing materials used in connection with the original "launch" of OxyContin, as well as the marketing materials thereafter. The NDA contains more than 10,000 pages of marketing materials, including comprehensive submissions in 1995 containing "Initial Promotional Campaign: Marketing Advertising and Communications," and "Proposed launch materials submitted to DDMAC for review." *See* Declaration of Robert Hoff ("Hoff Dec.") ¶ 4. As stated in the cover letters to FDA, those submissions contain the proposed marketing "launch materials":

> In accordance with the Section IV (Launch Campaigns) of the FDA July 1993 guidance entitled, "Current Issues and Procedures, Division of Drug Marketing, Advertising and Communications," and the FDA March 1994 Guidance entitled, "Guidance to Expedite the Review of Launch Campaign Submissions," we are hereby submitting the proposed launch materials for review.

*Id.*

As to the City's sweeping requests for further materials and communications, Purdue advised the City, consistent with its approach throughout, that November 2008 was an appropriate temporal limit, taking into account the relevant statutes of limitations and the claims at issue. After receiving the City's June 29, 2017 letter seeking for the first time to extend the

---

- Documents reflecting FDA review of marketing approval submissions;
- Letters approving the drug for marketing;
- Communications with/submissions to FDA regarding drug labeling (both initial labeling and all subsequent label changes);
- Adverse event reports, including 15-day alert reports, reports filed quarterly for first 3 years after approval, and reports filed annually thereafter;
- Annual reports that include data regarding distribution of the drug, current labeling, changes to manufacturing, copies of unpublished and summaries of published non-clinical studies conducted by or obtained by the sponsor, published clinical trials conducted by or obtained by the sponsor, summaries of unpublished clinical data or prepublication manuscripts for studies conducted by or obtained by the sponsor, a status report on any pending postmarketing research commitments and any other postmarketing research being performed by or on behalf of the sponsor;
- Post-marketing commitments (i.e., studies required by FDA), protocols and communications with FDA; and
- All other post-approval communications with FDA.

*See* 21 C.F.R. § 314, Subpart B.

discovery period by almost a decade back to 1994, Purdue advised the City that its request was unfounded, disregarded the limitations on the claims at issue, and was in no way proportional to the needs of the case. *See* Hoff Dec. ¶ 11.[4]

*Janssen Defendants' Negotiations with the City*. The City identifies three opioid products Janssen once marketed: Nucynta, Nucynta ER, and Duragesic. The Janssen Defendants agreed to the City's proposed start dates for Nucynta (November 20, 2007) and Nucynta ER (August 25, 2010), so the only Janssen product implicated by this motion is Duragesic. Duragesic is a branded opioid product that FDA approved in 1990 to treat chronic pain for certain patients. TAC ¶ 40. Unlike many of the opioid products the City has identified, Duragesic is not a pill or otherwise consumed orally. Nor is it injected. Rather, it is a transdermal patch, meaning it is applied to the skin where its active ingredient (fentanyl) is absorbed over the course of several days. Its patent exclusivity ended in 2005, at which point generic versions of the product entered the market. Shortly after its patent expired, Janssen ceased actively marketing Duragesic, meaning that it no longer had sales representatives call on or "detail" health care providers regarding the drug or speakers' bureau programs promoting it. *See* Defendants' Supplemental Status Report, Appendix A at 10 (Dkt No. 557-1). Duragesic is not and never was a first-line opioid product. The first page of its initial FDA-approved label specified that it is "FOR USE ONLY IN OPIOID TOLERANT PATIENTS," and later labels have contained similar warnings. Exh. A, Duragesic Label (August 1990) at 1.

---

[4] While the City claims that "Defendants did not assert, and therefore waived, a statute of limitations defense" (Mot. at 9), that statement is not true. Defendants' answers all assert the statute of limitations. Purdue Defs.' Answer (Dkt. No. 491) at 497-98; Janssen Defs.' Answer (Dkt. No. 518) at 486-87; Teva Defs.' Answer (Dkt. No. 515) at 406-07; Actavis Defs.' Answer (Dkt. No. 498) at 444-45. Defendants have consistently raised the statute of limitations in addressing the City's overbroad discovery requests.

The Janssen Defendants explained to the City why its expanded time period was not appropriate for Duragesic. *See* Exh. B, Letter of July 11, 2017 from D. Roberts. For one thing, the proposed discovery was irrelevant: Duragesic was approved in 1990, "has been a legacy product since approximately 2005 when it went off patent" and "Janssen stops marketing a product once it enters the legacy portfolio," and "the complaint lacks allegations of Duragesic marketing activity except for a single alleged statement by a lone sales representative in 2013." *Id.* at 2. For another, the discovery was overly burdensome and not proportional to the needs of the case, especially given "employee recollection and turnover and the accessibility of documents and data from this time period." *Id.* Janssen offered to "produc[e] available call-note data dating to 2004" to show Duragesic is indeed a legacy product and proposed request-specific negotiations to identify further "appropriate targeted searches for responsive information." *Id.* at 2-3.

The City did not address the Janssen Defendants' arguments or their proposed compromise, which it also omits from its motion. Instead, the City announced its final position, recited above. The Janssen Defendants declined for the reasons they previously stated, reiterated their plan to "conduct[] a full custodian- and keyword-based search concerning Duragesic beginning November 20, 2007," and renewed their proposal to conduct appropriate targeted searches following request-specific negotiations. Exh. C, Email of July 18, 2017 from D. Roberts. Again, the City did not respond to the Janssen Defendants' position and proceeded to file this motion.

### *Teva Defendants' Negotiations with the City*.

The City identifies two opioid products marketed by Teva Pharmaceuticals USA, Inc. and Cephalon Inc. (the "Teva Defendants"): ACTIQ® and FENTORA®. The Teva Defendants

have agreed to produce documents for FENTORA® and ACTIQ® dating back to January 2006. However, the City contends that the Teva Defendants must produce documents for FENTORA® dating back to September 2005 and for ACTIQ® dating back to October 1999—years before any possible claim the City may have under the applicable statutes of limitations and years before any supposedly improper prescription for one of the Teva Defendants' drugs was written because of any statement attributable to the Teva Defendants. In short, as the Teva Defendants have repeatedly explained to the City, this proposed time period disregards the limitations on the claims at issue and is in no way proportional to the needs of the case.

ACTIQ® was approved by the FDA in November 1998, launched by Abbott Laboratories in March 1999, and was not acquired by Cephalon until October 2000. Declaration of Matthew Day ("Day Dec."), at ¶ 3. Cephalon ceased promotion of ACTIQ® when it lost its patent exclusivity in September 2006—two years before the passage of the City's Consumer Fraud Ordinance in 2008. *Id.* FENTORA® was approved by the FDA in September 2006 and launched by Cephalon in October 2006. *Id.* ACTIQ® and FENTORA® are unique, immediate-release, short-acting opioids indicated to treat spikes of pain, commonly known as "breakthrough pain," experienced by a patient who is already receiving and who is tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. *See* Teva Defendants' Ans. and Affirm. Defenses, ECF No. 515 (Dec. 15, 2016) at ¶ 66. Thus, neither of the Teva Defendants' products at issue is a front-line therapy; nor are either widely prescribed.

Remarkably, despite years of investigation, multiple complaints, and accusations of a sweeping fraudulent marketing campaign, the City has alleged only four total prescriptions of ACTIQ® and FENTORA® written before 2011 that it claims were the result of some unspecified misrepresentation by the Teva Defendants; and the City does not allege that any of

7

these four prescriptions were written for chronic pain. *See* Exhibit A.2 to TAC. In fact, in the City's chart labeled "Prescribers Receiving Cephalon Misrepresentations" (Exhibit A.2), there is only one ACTIQ® prescription listed and ***no prescription*** of either ACTIQ® or FENTORA® that predates May 31, 2006. *Id.* Nor has the City's discovery responses identified any other prescription written before January 1, 2006 that supposedly was caused by any alleged misrepresentations by either Teva Defendant.

Ignoring these fundamental issues, the City seeks improperly expansive discovery from the Teva Defendants dating back to 1999 for ACTIQ® and dating back to September 2005 for FENTORA®. As the Teva Defendants have explained, they do not object to producing documents relating to the launch of FENTORA® and have no objection to producing documents relating to ACTIQ® consistent with the claims that have been pled. *See* Exh. D, Letter of July 8, 2017 from T. Diamantatos. Indeed, as a compromise, the Teva Defendants have offered to produce documents dating back to January 1, 2006—a full nine months before the approval of FENTORA®, well before any of the alleged prescriptions listed on Exhibit A.2 of the City's TAC was written, and years prior to even the longest applicable statute of limitations in this case. *Id.* However, as explained to the City, having to collect and produce documents prior to January 1, 2006 will impose significant additional burden, expense, and business disruption on the Teva Defendants. *See* Day Dec. ¶¶ 4-6. Rather than accept this compromise or address the substantive problems identified by the Teva Defendants, the City simply announced its final position and moved to compel.

***Actavis Defendants' Negotiations with the City***. The TAC identifies marketing activity by the Actavis Defendants for only one opioid medication, Kadian®. The FDA first approved Kadian® for treatment of moderate to severe chronic pain on July 3, 1996 and, until December

30, 2008, the right to market and sell Kadian® belonged exclusively to pharmaceutical companies unrelated to any of the Actavis Defendants. TAC ¶ 48. None of this is controverted. Indeed, the City acknowledges that the Actavis Defendants did not acquire Kadian® until December 30, 2008, and that they did not market the product until sometime after the acquisition. *Id.* Furthermore, the City does not allege that the Actavis Defendants played any role in the development or launch of Kadian®. *See id.*

The Actavis Defendants have already provided voluminous discovery to the City, including over one million pages of documents produced in response to the City's pre-suit investigative subpoena. *See* Defendants' Supplemental Status Report, Appendix A at 2 (Dkt. No. 557-1). In the course of this case, the Actavis Defendants have agreed to produce additional non-privileged documents concerning their post-acquisition marketing of Kadian®. Throughout the meet and confer process, the Actavis Defendants pointed out that the City had not made a threshold showing of relevance for its broad discovery requests for time periods predating acquisition of Kadian®. *See, e.g.*, Exh. E, Letter of July 11, 2017 from A. Francisco. The City never addressed this flaw, and continued to press for pre-acquisition discovery, most recently, delimiting the temporal scope of its requests to the period commencing December 30, 2007, a full year before Kadian® was acquired and even longer before the Actavis Defendants began to market the medication. Mot. at 4. Because no liability can attach to the Actavis Defendants for anything that may have occurred prior to the acquisition of Kadian®, they stand on their objections to expanding the start date for the temporal scope of discovery beyond January 1, 2009.

## LEGAL STANDARD

"Unless otherwise limited by court order," the revised Rule 26 of the Federal Rules of Civil Procedure allows for "discovery regarding any nonprivileged matter that is *relevant* to any

party's claim or defense *and proportional* to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). In assessing relevance, the revised rules intentionally struck the phrase "reasonably calculated" from the prior rule, explaining that this phrase "has continued to create problems" and lead to overbroad discovery. Fed. R. Civ. P. 26, Adv. Comm. Notes 2015 Amendment. As courts have recognized, the "amended Federal Rules of Civil Procedure" were designed to address "the 'information explosion' of the electronic age by providing that discovery must be 'proportional to the needs of the case' *rather than* 'reasonably calculated to lead to the discovery of admissible evidence.'" *Zuni Solar, LLC v. Builders*, 2016 WL 4530896 (S.D.N.Y. Mar. 4, 2016) (emphasis added) (citation omitted). Thus, discovery requests must be "*significantly* narrowed in scope and time" where the requests are disproportionate to the needs of the case. *Id.* (emphasis in original).

The factors bearing on whether discovery is proportional are "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "[T]he discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *Sapia v. Bd. of Educ. of the City of Chi.*, 2017 WL 2060344, at *2 (N.D. Ill. May 15, 2017). In order to control "needless and enormous costs to the litigants," "the Supreme Court ha[s] cautioned that the requirement of Rule 26 that the material sought in discovery be 'relevant' should be firmly applied." *Id*.

## ARGUMENT

**I.      The City's Proposed Scope of Discovery Is Contrary to Rule 26 and this Court's Guidance.**

At the May 8, 2017 status conference, the Court offered the parties guidance on the temporal scope of discovery and other issues.  The Court identified a potential general approach suited to drugs that, like Janssen's Nucynta, received FDA approval long after the 2004 start date the City initially proposed.  The Court pointed to the Janssen Defendants' proposed approach, under which "the beginning date for discovery as to Janssen [would] be 2008, . . . the year preceding Nucynta IR's mid-2009 launch."  App'x A to Defs.' Supp. Status Report (Dkt. No. 557-1) at 10.  The Court observed that "[t]he best answer perhaps lies in that particular launch plan that the companies came up with before a product is introduced to the market," adding that this is "why I like Janssen's proposal." May 8, 2017 Tr. at 86:14-17.

The Court, however, emphasized that this approach was simply general guidance that appeared workable for some products and expressly recognized that it may well not work for others, particularly those launched before Nucynta.  When Teva raised the need to tailor the Court's general guidance for older products like ACTIQ®, a drug that "was launched . . . in the early 2000s," well prior to the passage of the City's Consumer Fraud Ordinance, and that it "no longer marketed . . . in 2008 and beyond," the Court indicated it agreed.  *Id.* at 87:12-88:5.  The Court explained:  "So now we're looking at specific disputes for specific defendants.  That's something that we probably have to take up . . . in a different way."  *Id.* at 88:3-5.

Remarkably, the City now points to this general guidance and support for the Janssen Defendants' position to *justify* vastly expanding its discovery requests by removing all date restrictions.  Mot. at 3.  In reality, the Court's guidance shows the City's overreach.  Though the City says its current proposal reflects a "narrowed timeframe" as compared to what it proposed

11

during meet and confers, *id.* at 2, the timeframe is not narrower at all: the City continues to seek documents that precede any potential claim by many years and are untethered to the claims at issue. This includes documents predating the 1990 approval of Janssen's Duragesic, the 1995 approval of Purdue's OxyContin, and the 1998 approval of Teva's ACTIQ®. Contrary to the City's assertion, the Court's guidance from the status conference suggested that even the 2004 start date the City initially proposed may reach too far back for the *most recently* approved of these three drugs. The much earlier dates the City now proposes—nearly 30 years for Duragesic—are not consistent with the Court's guidance, but directly contrary to it.

## II. The City's Proposed Scope of Discovery Ignores the Statute of Limitations and Seeks Irrelevant Information.

The City asserts that the Court should essentially ignore the pertinent statutes of limitation that apply to its claims in assessing the scope of discovery, basing its argument on this Court's observation that "[s]ometimes you have to go back beyond the statute of limitations to get the information that's pertinent." May 8, 2017 Tr. at 87:3-5. The Court's uncontroversial observation, however, does not alleviate the City's burden to show that the discovery that it seeks *in this case* is both (1) relevant to its claims and (2) proportional to the needs of the case. *See* Fed. R. Civ. Pr. 26 (b)(1), Adv. Comm. Notes 2015 Amendment.

The City asserts, in conclusory fashion, that it has satisfied its burden on these two points. It has never explained, however, how discovery dating back decades is relevant to claims regarding prescriptions written years later. The provisions allowing for discovery "of any matter relevant to the subject matter involved in the action" or "reasonably calculated to lead to the discovery of admissible evidence" have been deleted from amended Rule 26(b). *Id.* The party seeking discovery must show that its requests are demonstrably "relevant to any party's claim or defense." *Id.* Thus, in order to control "needless and enormous costs to the litigants," "the

Supreme Court ha[s] cautioned that the requirement of Rule 26 that the material sought in discovery be 'relevant' should be firmly applied." *Sapia*, 2017 WL 2060344, at *2 (citations omitted).

The City did not and cannot demonstrate that the broad discovery it seeks is relevant or proportional to the issues in this case. As noted above, the longest statute of limitations potentially applicable to the City's claims is the six-year limitations period for the False Claims Act Counts—Counts Five and Six (which have twice been dismissed by Judge Alonso). *See* MCC § 1-22-040. All other Counts of the Complaint are subject to either the two-year statute of limitations applicable to claims "for a statutory penalty," *see* 735 ILCS 5/13-202, or the "catch-all" five-year limitations period applicable to civil actions, *see* 735 ILCS 5/13-205.[5] Because the City filed its initial Complaint on June 2, 2014, the two counts not previously dismissed by Judge Alonso—Counts I and III—run from 2009 and 2012 respectively. The City's multiple requests for discovery dating back to 1990 are even more strained because MCC § 2-25-090 was not enacted until November 19, 2008. As the City has previously acknowledged, its claims under Count One date back only to the November 19, 2008 enactment of the statute. To this end, the City has repeatedly stated that it "does not seek a retroactive application" of the City's Consumer Fraud Ordinance, enacted November 19, 2008, *see, e.g.*, Mem. of Law in Opp. to Defs.' Joint

---

[5] Where, as here, a municipal ordinance lacks a specified limitations periods it is subject to the general limitations periods specified under the Illinois Code of Civil Procedure. *See, e.g.*, *Landis v. Marc Realty, L.L.C.*, 919 N.E.2d 300, 303-07 (Ill. 2009); *City of Evanston v. Texaco, Inc.*, 19 F. Supp. 3d 817, 827 (N.D. Ill. 2014) (Feinerman, J.). A claim seeking fees or penalties for a municipal ordinance violation is a "statutory penalty" under 735 ILCS 5/13-202, and thus "is subject to the two-year limitations period." *Landis*, 919 N.E.2d at 308. All other civil claims advanced by the City are subject to the general five-year limitations period of 735 ILCS 5/13-205. *See, e.g.*, *City of Evanston*, 19 F. Supp. 3d at 827.

Mot. to Dismiss Pl.'s First Am. Compl. (Dkt. No. 252) at 50 n.53; *accord* Pl.'s Mem. of Law in Opp. to Defs.' Joint and Individual Mots. To Dismiss (Dkt. No. 433) at 33.[6]

Of course, the City's actionable claims can only be predicated upon misrepresentations made within the operative statute of limitations period or post-statutory enactment. Against this legal backdrop, the City does not meaningfully dispute that statutes of limitations circumscribe its claims, instead asserting only that the Court should disregard the applicable limitations because "the statute of limitations period does not define the time period for discovery." Mot. at 9.[7] But the case that the City relies on—a 2005 case interpreting the now-abrogated discovery rules—does not support such a bright line rule. *See* Mot. at 10 (citing *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 357 n.5 (N.D. Ill. 2005)). To the contrary, and to the extent that this pre-Rule 26 amendment case retains any vitality, it expressly acknowledged that "in certain instances it might be proper to deny discovery of documents on the ground that they would only be relevant to events occurring before an applicable limitations period." 231 F.R.D. at 357 n.5.

---

[6] The City now suggests that it was mistaken and references a prior ordinance, MCC § 16-6(a). The belated assertion is unavailing. No claim has been, or could be, advanced under MCC § 16-6(a). Notably, the City's affirmative declarations that it was not seeking to apply Count I to conduct prior to November 19, 2008 were made in the context of responding to a motion to dismiss, thereby mooting the Court's consideration of the issue.

[7] To the extent the City attempts to suggest that it is not bound by the governing statutes of limitation, any such assertion is misplaced. Illinois law limits principles of sovereign immunity as to the application of the statute of limitations to only those matters in which a municipality advances an action on behalf of the general public, rather than on behalf of the municipality itself or the inhabitants of the local municipality. *See, e.g.*, *Vill. of DePue v. Viacom Int'l Inc.*, 713 F. Supp. 2d 774, 781 (C.D. Ill. 2010). "The fact that the residents of a particular municipality would benefit from the action is not alone sufficient to render it 'public' in nature; the right must belong 'to the general public,' rather than 'only to the government, or some small, distinct subsection of the public at large." *Id.* (quoting *Champaign Cty. Forest Pres. Dist. v. King*, 683 N.E.2d 980, 982 (Ill. App. Ct. 1997)). Here, the gravamen of the City's claims is its effort to recover its own proprietary payments made for allegedly "medically unnecessary" opioid prescriptions under the City's self-insured health care plans and workers' compensation program. *See, e.g.*, TAC ¶ 635. Such efforts by the City to recover its own costs expended on its health plans and workers' compensation programs are business costs of the City, not matters on behalf of the general public. Each of the factors considered in addressing whether a municipal action is "public" confirm that the statutes of limitations apply to the City's claims. *Vill. of DePue v. Viacom Int'l Inc.*, 713 F. Supp. 2d at 783-84.

14

The decision permitted discovery of "handful of pre-1988 documents" because it was "otherwise relevant." *Id.* at 360 & n.5. It cited *Oppenheimer Fund Inc. v. Sanders*, 437 U.S. 340 (1978), in which the United States Supreme Court recognized that "it is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken, *or to events that occurred before an applicable limitations period*, unless the information sought is otherwise relevant to issues in the case." 437 U.S. at 352 (emphasis added). And even before Rule 26's relevance requirement was heightened in 2015, this Court has regularly denied discovery pertaining to matters that fall outside the scope of the relevant time frame. *See, e.g.*, *Uppal v. Rosalind Franklin Univ. of Med. & Sci.*, 124 F. Supp. 3d 811, 815 (N.D. Ill. 2015); *Rainey v. Metro. Water. Reclamation Dist.*, 2012 WL 2192241, at *2 (N.D. Ill. June 14, 2012). As the Seventh Circuit has admonished, it is for the Court "to draw the line as to what [is] and [is] not relevant to [Plaintiff]'s claim[s]" and a "request exceed[s] the bounds of relevance [where] the documents involve[] . . . an entirely different setting." *Rennie v. Dalton*, 3 F.3d 1100, 1110 (7th Cir. 1993).

Here, the City makes no valid showing as to how decades old marketing "plans" or communications, falling more than 10 years outside of any claim at issue, have meaningful relevance to the *actual* marketing communications occurring in 2008 and later.[8] "Without any such explanation or connection" showing the relevance of this information, there is no justification for the "additional burden and expense on Defendant[s]." *Rainey*, 2012 WL 2192241, at *2.

---

[8] The City's fraudulent concealment argument is also without merit because the City has failed to allege that Defendants engaged in "affirmative acts or representations . . . which were designed to prevent and, in fact, did prevent, [the City] from discovering [its] claim[s]." *Gredell v. Wyeth Labs., Inc.*, 803 N.E.2d 541, 548 (Ill. App. Ct. 2004). Instead, the City merely "reiterate[es] . . . [its] assertions that defendants fraudulently misrepresented" the safety and efficacy of opioids. *Id.* This is insufficient to allege fraudulent concealment.

### III. The City's Proposed Scope of Discovery Is Not Proportional to the Needs of the Case.

Even if the City could show that decades old, dated marketing communications had some marginal relevance, the Court should not adopt the City's expansive timeframe because the City does not—and cannot—demonstrate that compelling Defendants to produce such materials long pre-dating the claims at issue is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Proportionality weighs the relative burden on the producing party against "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Proportionality is "a significant factor controlling the scope of discovery." *Infowhyse GmbH v. Fleetwood Grp.*, 2016 WL 4063168, at *4 (N.D. Ill. July 29, 2016). Indeed, the 2015 amendments to Rule 26 were made to "emphasize proportionality" and reaffirm the goals of the 1983 amendments "to encourage judges to be more aggressive in identifying and discouraging discovery overuse." 8 Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, Federal Practice and Procedure § 2008.1 (3d ed. 2017).

The City suggests that its "product-specific approach is narrowly tailored to focus upon the most important materials and to avoid undue burden." Mot. at 6. The City makes this unsupported claim without regard to relevance or the enormous costs and burdens placed on Defendants when asking them to search for and produce such documents. As noted above, these decades old materials have no meaningful relevance to the matter at issue—the *actual* marketing communications made in the Chicago area occurring during any actionable time period. As to those salient materials, there is no dispute as to temporal scope.

The burdens associated with collecting, reviewing and producing such outdated materials are substantial. In many cases, the requested documents are stored in electronic databases that have been taken offline and, therefore, any effort to try to identify, collect, and export requested documents from those defunct databases will require massive business disruption. Moreover, even if this were possible, the sheer volume of documents that would need to be collected, reviewed, and analyzed as a result of the City's expansive timeframe would impose wholly disproportionate monetary and operational burdens on the defendants.

Courts in the Northern District of Illinois interpreting the proportionality rule in evaluating discovery requests have routinely limited the temporal scope of those requests on the basis of proportionality. For instance, in *Surgery Center at 900 North Michigan Avenue, LLC v. American Physicians Assurance Corporation, Inc.*, the court narrowed discovery requests seeking information for eight years to four years, reasoning that "[i]f there is nothing found within this period, it seems doubtful that there will be information before then or at least not information that may not be episodic and thus irrelevant to the theory on which the interrogatories are (or can be) based." 317 F.R.D. 620, 631 (N.D. Ill. 2016). In *West Loop Chiropractic & Sports Injury Center, Ltd. v. North American Bancard, LLC*, the plaintiff's revised discovery request sought information related to over 7,000 entities to information related to 10 entities with specific content in a four-year timeframe, the court found revised request to be "proportional to the needs of the case considering the potential relevance of the information requested in the context of a class certification decision." 2017 WL 404896, at *2 (N.D. Ill. Jan. 30, 2017). And in *Simon v. Northwestern University*, the court limited certain discovery requests from 17 years to 10 years, explaining that "proportionality factors of Rule 26 counsel against ordering production through 2012 in light of the diminishing relevance of after-the-fact

17

evidence" because events in 2012 would not be relevant in showing knowledge, intent, or motivation in 1999. 2017 WL 467677, at *5-6 (N.D. Ill. Feb. 3, 2017).

Tellingly, in arguing that the burden of its proposed time period for discovery does not outweigh any benefit, the City does not cite a single case from within the Seventh Circuit where a court has allowed such an expansive time period for discovery as the City seeks here. Instead, the City cites a few cases from outside the Seventh Circuit for the notion that a discovery time period may be "longer than the claims at issue in the litigation." Mot. at 10. Critically, the courts in those cases permitted discovery to proceed on a significantly shorter or narrower time frame than what the City is seeking. *See N.U. v. Wal-Mart Stores, Inc.*, 2016 WL 3654759, at *4 (D. Kan. July 8, 2016) (limiting temporal scope to 2008, the year affirmatively offered by non-moving party); *In re Dockers Roundtrip Airfare Promotion Sales Practices Litig.*, 2010 WL 11515318, at *5 (C.D. Cal. Aug. 1, 2010) (finding five-year temporal scope of discovery requests to be reasonable based on pre-2015 standard and case law); *Fassett v. Sears Holdings Corp.*, 319 F.R.D. 143, 156-57 (M.D. Pa. 2017) (extending the discovery period in a products liability case slightly but denying plaintiffs' requested temporal scope of discovery as it was excessive in comparisons to the needs of the case, noting that the lack of reasonable temporal bounds in a discovery request may render it "abusive" and "facially objectionable").

Other factors considered in assessing proportionality do not support the City's sweeping and burdensome requests for documents having no relevance to the actual marketing activities, and the prescriptions written by Chicago physicians, within the time period applicable to the claims at issue. For instance, the City contends that its proposed temporal scope is appropriate given the importance of the issues at stake—namely, the present "opioid addiction epidemic." Mot. at 7. To this end, the City cites various materials unrelated to Defendants' products,

including materials focusing on heroin and illicit street drugs. But as this Court properly observed the last time the City raised the same issues, "I'm not sure that social cost has any bearing on the consideration that the Court must make in deciding the scope of proper discovery . . . that shouldn't be part of the analysis, right?" May 8, 2017 Tr. at 75:4-12. Rather, the Court explained, the proper analysis is directed to proportionality with respect to the claims and defenses at issue. *Id.* Viewed through this proper lens, it is clear that this factor does not support the City's position.

In addition, the social costs of opioid addiction in general have little to do with the opioid medications at issue here—many of which are Extended Release/Long Acting (ER/LA) formulations, are not first-line opioids, or are not for treating chronic, non-cancer pain—and even less to do with the claims at issue in this litigation. As for ER/LA opioids,[9] the FDA has emphasized the vital and important role such medications play in treatment for chronic pain. Indeed, the FDA rejected a Citizens' Petition that mirrored the allegations in the City's Complaint seeking to prohibit the use of ER/LA opioids for the treatment of chronic, non-cancer pain.[10] In doing so, the FDA noted the importance of such medications to address public health needs: "When prescribed and used properly, opioids can effectively manage pain and alleviate suffering—clearly a public health priority. Chronic pain is a serious and growing health problem: it 'affects millions of Americans; contributes greatly to national rates of morbidity, mortality, and disability; and is rising in prevalence.'"[11] To this end, the FDA has continued to

---

[9] Just three weeks ago, the Food and Drug Administration ("FDA") Commissioner noted that "about 90 percent of all opioid prescriptions in the U.S. are written for *immediate release* formulations of these drugs." *See* Scott Gottlieb, FDA, Remarks Delivered Before FDA's Scientific Meeting on Opioids (July 10, 2017), *available at* https://www.fda.gov/NewsEvents/Speeches/ucm566189.htm (emphasis added).

[10] *See* Exh. F, Letter of Sept. 9, 2013 from FDA to PROP.

[11] *Id.* at 2 & nn.4-6.

19

engage in a number of actions to address opioid addiction while at the same time "protect[ing] the well-being of people experiencing the devastating effects of acute or chronic pain."[12] Last year, FDA committed to "help defeat [the opioid abuse] epidemic through a science-based and continuously evolving approach."[13]

The opioid medications at issue are rigorously regulated by FDA—the agency vested with authority to determine the safety and efficacy of the opioid medications at issue—as well as the Drug Enforcement Administration. Indeed, the opioid medications are subject to various FDA-mandated Risk Evaluation and Mitigation Strategy ("REMS") programs that, among other things, require patients and healthcare professionals to be informed about the risks of opioid medicines and help ensure that they are appropriately prescribed to avoid adverse outcomes. And, of course, such medications can only be obtained lawfully by prescription from an authorized health care provider obligated by law to act in his or her patient's best interest. As this Court recognized, it is not the Court's role to weigh the "social costs" associated with balancing the importance of prescription opioid medications for the treatment of pain and current issues surrounding increased opioid addiction involving the illicit use of heroin, illicitly made fentanyl, and other products having nothing to do with Defendants. Rather, the role of the Court is to assess proportionality with respect to the claims at issue.

Similarly, Plaintiff's assertion that Defendants have ready access to the requested information and "sufficient resources" to meet its sweeping discovery requests runs afoul of the intent of the Federal Rules, which instruct that "consideration of the parties' resources does not

---

[12] Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 New Eng. J. Med. 1480, 1480 (2016), *available at* http://www.nejm.org/doi/pdf/10.1056/NEJMsr1601307.

[13] Press Release, FDA, *Califf, FDA top officials call for sweeping review of agency opioid policies* (Feb. 4, 2016), *available at* https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm484765.htm.

. . . justify unlimited discovery requests addressed to a wealthy party" and that the "court must apply the standards in an even-handed manner that will prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak or affluent." Fed. R. Civ. P. 26, Adv. Comm. Notes 2015 Amendment. Likewise, Plaintiff's boilerplate recitation that Defendants have "full access to their own information," Mot. at 8, ignores that the documents the City seeks are up to 30 years old and that many were created long before modern computers, file formats, and storage media were in use. No amount of "top-tier" legal representation or access to the "latest electronic searching and coding tools," *id.*, changes that or lessens the burden of finding and producing these documents. And while the City insists that Defendants "should be readily able to identify" responsive custodians and documents, *id.*, departments have reorganized and potentially knowledgeable employees have left for other companies, retired, and perhaps even died, as individual Defendants explain further below.

Put simply, the City's broad, expansive temporal scope for discovery will require the Defendants to expend significant time, money, and resources to search for documents—many of which may be contained in archived or legacy systems—going back nearly thirty years in some instances, and, in certain circumstances, created by different companies not part of this litigation. Even were such materials marginally relevant, which they are not, the City's request is simply not proportional to the needs of this case or the City's own allegations because the burden of such a massive undertaking will outweigh any possible benefit. The Court should not adopt the City's proposal and instead consider the individual Defendants' suggestions below, which address the unique issues with each product.

21

IV.     **The City's Proposed Scope of Discovery Violates Rule 26(b)(1) With Respect To Each Defendant.**

A.     **The City's Proposed Scope of Discovery Violates Rule 26(b)(1) With Respect to The Purdue Defendants and Disregards Materials Already Produced To The City.**

As set forth above, the City has no claim predating 2008 given the operative statutes of limitation and the enactment date of MCC § 2-25-090. *See supra* pp 12-13. Accordingly, although Purdue has addressed the City's production requests on a request-by-request basis, with respect to certain of the sweeping requests, Purdue has appropriately limited the temporal scope of aspects of discovery to November 2008. As the City acknowledges in its Motion, two of the three Purdue opioid medications at issue—Butrans and Hysingla ER—were approved in 2010 and 2014 respectively, and thus no discovery is sought with respect to those products prior to June 30, 2009. *See* Mot. at 4. The remaining Purdue medication, OxyContin, was approved in 1995. *Id.* In 2010, FDA approved a new abuse deterrent formulation of OxyContin ("AD Formulation"), which has been marketed and sold thereafter. The City seeks outdated communications and materials that predate any claim at issue in this litigation by more than a *decade*.

The City claims that it needs marketing materials relating to the "launch" of Purdue's medication. But Purdue has already produced to the City the NDA associated with OxyContin, Butrans and Hysingla ER, which, by law, contains the marketing materials used in connection with those medications. *See* 21 C.F.R. § 314.81(b)(3)(i). In fact, as set forth above, the NDA file provided to the City contains the "proposed launch materials" submitted to FDA in 1995, including comprehensive submissions containing "Initial Promotional Campaign: Marketing Advertising and Communications," and "Proposed launch materials submitted to DDMAC for review." *See* Hoff Dec. ¶ 4. Accordingly, the City already has marketing materials used in

connection with the original "launch" of OxyContin, as well as marketing materials used thereafter. The burdens associated with any further productions regarding long past, outdated materials are wholly disproportionate to the claims at issue in this litigation—namely, Purdue's *actual* representations, marketing activities and conduct in Chicago from 2009 to the present.

Additionally, Purdue's proposed temporal limit of November 2008 is reasonable given that there is no basis in law for the City to claim any "public" interest, or viable theory of recovery, as against Purdue for ***any*** conduct predating May 8, 2007. This is because on May 8, 2007, the Attorney General of Illinois, after fully addressing the promotional and marketing activities of Purdue in Illinois, entered into a Consent Judgment with Purdue, on behalf of the People of Illinois (including the People of Chicago), regarding Purdue's promotional and marketing practices for OxyContin. *See* Hoff Dec., Exh. 6, *The People of the State of Illinois v. Purdue Pharma, L.P., et al.*, No. 07-CH-356 (Cir. Ct. Sangamon Cty. 2007) ("Consent Judgment"). That Consent Judgment forecloses the City from pursuing fines, penalties, or any claims purportedly exercising "public" authority with respect to Purdue's promotional and marketing practices prior to May 8, 2007. Where, as here, the Illinois Attorney General has entered into a Consent Judgment on behalf of the "People of the State of Illinois," the public authority rights of the State and its government subdivisions are bound by the judgment. The "Illinois Attorney General is 'the chief legal officer of the state'" and that "'the common law gave to [the] Attorney General the competence to control all litigation on behalf of the State.'" *People ex rel. Devine v. Time Consumer Mktg., Inc.*, 782 N.E.2d 761, 765-68 (Ill. App. Ct. 2002). Thus, in *County of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1041-42 (Ill. App. Ct. 2004), the court noted the dismissal of actions brought on behalf of "the People of the State of

Illinois" and the "People of Cook County" in the wake of settlement agreement entered by the Illinois Attorney General.

Here, the City has not shown how any of the additional discovery sought from more than 14 years before any claim at issue is relevant to the current dispute. It is not. The claims at issue concern that *actual* representations made within the Chicago area in 2009 and later. Regardless, by virtue of the production of the complete NDA files, the City already has marketing materials used for the original "launch" of OxyContin, as well as marketing materials used thereafter. Federal regulations require that the NDA file to contain, *inter alia*, "any . . . advertising devised for promotion of the drug product . . . at the time of initial publication of the advertisement for a prescription drug product." 21 C.F.R. § 314.81(b)(3)(i). Such materials are contained in the NDA file produced for the pre-AD Formulation OxyContin medication approved in 1995. *See* Hoff Dec. ¶ 4.

Further, the burden associated with the further production of outdated marketing materials preceding the claims at issue in this litigation by more than a decade is immense. The City's Requests for Production seek broad categories of documents, communications, and information relating to the marketing and sale of opioids. For example, not only does the City request all marketing and promotional materials Purdue "created, prepared, used or disseminated" in promoting its opioid products, but the City also seeks "all drafts of such materials and Documents and Communications concerning the review or approval of such materials." Hoff Dec., Exh. 1 at RFP 2. Without burdening the Court with a comprehensive list of every request the City makes for marketing materials, the fact is the City seeks virtually every document and communication concerning Purdue's marketing and advertising of opioids,

including all drafts of, and all communications regarding, marketing materials.[14]  *See* Hoff Dec. ¶ 2.

Given the breadth of the City's requests, there are likely few documents concerning opioids within the halls of Purdue, in its archives, or on Purdue's computer and software systems that the City has not requested in one form or another.  The City essentially seeks documents and communications from almost every area of the company, *see id.* at ¶ 6, without any indication of how these archaic documents have any bearing on their current claims.

The production of documents responsive to the City's broad requests beginning on November 1, 2008, is already tremendously burdensome given the scope of the City's requests and the number of areas of the company covered by them.  *Id.*  Purdue has reasonably objected to the overbreadth and undue burden of the City's requests, but has still agreed to produce documents that require it to scour the company for responsive documents covering an eight-year period.  *Id.* at ¶  3.

The burden on Purdue of responding to the City's requests is thus already great.  For the most part, Purdue's documents are not neatly stored in one central location.  *Id.* at ¶¶ 6-8.  Responsive documents do not reside with only a handful of custodians.  *Id.*  Purdue does not have, and never had, a discrete group that worked on opioid products from which Purdue could easily gather responsive material.  *Id.* at ¶ 6.  Rather, to respond to the City's requests, Purdue is

---

[14] Further demonstrating the breadth of the City's requests—and only by way of additional examples—the City also seeks:  all documents and communications reflecting interactions with Chicago-area health care professionals concerning opioids (RFP 1); information about every continuing medical education and other speaker program concerning opioids that Chicago-area health care professionals attended, including all draft and final program materials, and information about everyone who attended such programs (RFP 6); documents and communications concerning patient and doctor perceptions of opioids (RFP 14); every contract and statement of work with third-parties who worked with Purdue on marketing or promoting opioids (RFP 15); and every "public statement" by Purdue or any entity whose statements Purdue review or approved concerning opioids, including all drafts or mark-ups of such statements (RFP 20). *See* Hoff Dec., Exhs. 1-3.

required to collect hard copy and electronic documents from dozens of individuals; review dozens of non-custodial hard-copy and electronic sources; search for and retrieve documents from a massive archive, which contains approximately 45,000 boxes of older information; and re-create or obtain information from outdated software or database systems. *Id.* at ¶¶ 6-8. On top of that, Purdue will be collecting, reviewing, and producing hundreds of thousands (if not millions) of emails from dozens of individual custodians, many of whom no longer work at the company. *Id.* at 6.

In short, collecting, reviewing and producing further responsive materials dated on or after November 1, 2008, has already been, and continues to be, enormously burdensome.[15] The City's request that Purdue expand its collection efforts to January 1, 2004, let alone to 1994, makes Purdue's burden vastly disproportional to the needs of the litigation and the claims at issue. *See id.* at ¶¶ 6-10. The time and money that Purdue is already spending on discovery from November 1, 2008 forward is significant. *Id.* at ¶ 9. Costs include electronic discovery tools and vendors for collecting, hosting, and producing data; a small army of contract attorneys reviewing documents; and of course a significant spend on outside law firms to oversee, supervise, and review all of the discovery work. *Id.* Adding another 5 to 16 years to the discovery period compounds these costs to the point where they are far from reasonable.

Under the temporal scope set forth by Purdue, the City will have *all* promotional, marketing, and educational communications made within the Chicago area during the time period relevant to their claims. *Id.* at ¶ 4. Purdue has already produced over 3,000,000 pages of

---

[15] Compounding the complexity of this broad collection, many of the custodians whose documents may be relevant are no longer with the company, as the company has faced significant turnover over the years. *Id.* at ¶ 6. Current custodians do not have access to historical data and documents, so even collecting documents from November 1, 2008 forward is challenging. *Id.*

documents to the City (even prior to ESI searches),[16] and will be collecting, reviewing, and producing millions more. *Id.* at ¶ 10. Within the NDA files already produced, the City has been provided with marketing materials associated with the launch of OxyContin and used thereafter. *Id.* at ¶ 4. There is no proportional justification to require the production of additional materials long pre-dating the claims at issue.

Moreover, under any scenario, the City has no basis in law for discovery of materials pre-dating May 8, 2007, the effective date of the Consent Judgment between the State of Illinois and Purdue. The terms of the Consent Judgment were broad and encompassing—on behalf of the People of the State of Illinois, the Attorney General addressed Purdue's "promotional and marketing practices regarding OxyContin" within the State and under the Consumer Protection laws of the State. Hoff Dec., Exh. 6 at ¶ 34. The Consent Judgment further set forth a series of compliance provisions directing Purdue's future conduct with respect to "the promotion and marketing of OxyContin." *Id.* at ¶¶ 2-24. The Release contained in Consent Judgment "releases and forever discharges, to the fullest extent permitted by law, Purdue . . . from any and all civil causes of action, claims, damages, costs, attorney's fees, or penalties that the Attorney General could have asserted . . . under the State Consumer Protection Law by reason of any conduct that has occurred at any time up to and including the Effective Date of [the] Judgment relating to or based upon" Purdue's promotional or marketing practices regarding OxyContin. *Id.* at ¶ 35. The Consent Judgment expressly specified the claims excluded from the release, which included "private rights of action by consumers," but ***did not*** make any exclusion for the claims of governmental subdivisions of the State, such as municipalities or counties. *Id.* at ¶ 36. Use of the funds paid in settlement also expressly contemplated, *inter alia*, contributions to "local

---

[16] These productions have included call notes from all of Purdue's Chicago-area sales representative and all marketing and promotional materials contained within Purdue's NDA files.

consumer aid fund[s]" as well as "funding programs directed at combating prescription drug abuse, addiction and/or diversion." *Id.* at ¶ 25.

Section 15 of article V of the Illinois Constitution of 1970 provides that "[t]he Attorney General shall be the legal officer of the State, and shall have the duties and powers that may be prescribed by law." Ill. Const. 1970, art. V, § 15. A Consent Judgment entered by the Illinois Attorney General on behalf of the "People of the State of Illinois," encompasses the "People of Chicago," and thereby divests counsel for governmental subdivisions from pursuing further "public" claims on behalf of the people in their subdivision. *See People ex rel. Devine*, 782 N.E.2d at 765-68; *Cty. of Cook*, 817 N.E.2d at 1041-42. Thus, for instance, the City cannot seek to impose civil penalties under Count III (a Count as to which the City has previously asserted, incorrectly, that no statute of limitations applies), for purported fraudulent promotion and marketing by Purdue prior to May 8, 2007. All such fines or penalties for alleged fraudulent promotion and marketing of OxyContin in the State of Illinois have been addressed and released pursuant to the express terms of the Consent Judgment.[17] And, as addressed at length above, the "private," proprietary claims advanced by the City seeking to recover its own business expenses, are necessarily subject to the two-year and five-year limitations periods imposed by Illinois law. *See supra* pp. 12-14.

In sum, the City has already received marketing materials associated with OxyContin as a result of Purdue's production of the complete NDA files. The City has no claim predating 2008 given the operative statutes of limitation and the enactment date of MCC § 2-25-090. Accordingly, the temporal limit Purdue has placed on various discovery requests of November

---

[17] To the extent the City believes that it did not receive an appropriate amount in connection with Consent Judgment, then the recourse is against the State with respect to the disbursement of the amounts collected. *See, e.g.*, *City of Urbana v. Mallow*, 356 N.E.2d 1327 (Ill. App. Ct. 1976).

28

2008 is appropriate and proportional to the needs of this case. Regardless, in no event should a temporal limit preceding May 8, 2007 be applied given the Consent Judgment entered by the State of Illinois, on behalf of the People of Illinois, addressing, resolving, and releasing all claims relating to the alleged improper promotion and marketing of OxyContin prior to that date.

**B.      The City's Proposed Scope of Discovery Is Inappropriate as to the Janssen Defendants.**

The City's proposal seeks information of no relevance to its claims or the Janssen Defendants' defenses. The City asserts that "Defendants have not seriously contended that the documents the City seeks are irrelevant to the City's claims." Mot. at 7. That is false. As explained above, in both oral meet and confers and written correspondence, the Janssen Defendants have reiterated that the City's proposed discovery regarding Duragesic is not relevant because the City has not alleged any improper marketing of Duragesic while it was on patent and the only specific misstatement the City alleges occurred some eight years later in an isolated conversation not associated with Janssen's long-concluded marketing activities. Because the Complaint does not allege that Janssen did anything improper in marketing Duragesic for the entire time it was on patent, there is no basis to seek discovery of its "launch plan" or the numerous "communications relating to [its] launch plan," nor of marketing-related materials and communications "reflecting or relating to marketing of the product after 1/1/2004."

Illinois federal courts interpreting Rule 26(b)(1)'s relevance requirement have limited the temporal scope of requests for discovery to the time period relevant to the matters at issue in the case. *See Novak v. Pearlstein*, 2016 WL 3586899, at *3 (N.D. Ill. June 24, 2016) (recognizing "Rule 26(b)(1) generally limits discovery to materials that are relevant to the claims or defenses in this case," and that "the earliest allegations in Plaintiffs' complaint relate to events that occurred in December 2006. Therefore, the Court finds that, as a general matter, that marks the

relevant starting point for discovery in this case."); *Ye v. Cliff Veissman, Inc.*, 2016 WL 950948, at *3 (N.D. Ill. Mar. 7, 2016) (holding "Defendants . . . ha[d] not limited the scope of their request to a relevant time period or to content that is relevant to a claim or defense in this case"). This Court should follow these decisions.

Even putting aside this dispositive failure, the City's proposed scope as to the Janssen Defendants fails the Rule 26(b)(1) factors. As to the *importance of the issues*, Duragesic has only a limited connection to the issues at stake in this litigation. It is not a pill-form opioid. Nor is it a first-line opioid; its label has always specified that it is only for opioid-tolerant patients. And while its active ingredient, fentanyl, is indeed potent, reports of fentanyl-related overdoses often involve "illicitly manufactured fentanyl" from other countries that was never part of any FDA-approved product, much less Duragesic. *E.g.*, Exh. D to Mot. (Dkt. No. 586-4) at 1. Moreover, research surveying opioid-dependent individuals suggests that they do not seek out fentanyl precisely because of its potency.[18]

The City's reliance on the *amount in controversy* is similarly generic and untethered to Duragesic or even the Janssen Defendants. This failure is particularly important because the relief the City mentions—damages, disgorgement resulting from fraudulent or deceptive practices, and civil penalties—has little to do with Duragesic, a drug Janssen has not marketed for a decade or more and that the City does not make substantive allegations about during the time it was marketed. For the same reason, injunctive relief is altogether inapplicable. Regardless, this factor deserves limited attention. As the advisory committee notes explain,

---

[18] *See* Theodore J. Cicero et al., *Determinants of Fentanyl and Other Potent M Opioid Agonist Misuse in Opioid-Dependent Individuals*, 19 Pharmacoepidemiology & Drug Safety 1057 (2010) ("The reason most commonly given for the failure to endorse fentanyl, . . . as an actual or preferred drug, was fear of toxicity and overdose"; "[w]e postulate that one of the more important facts was that [fentanyl and other] drugs were perceived to be much too potent to be safe with a poor 'therapeutic' index, that is, the threshold to get high is too close to a toxic dose."), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2948061/pdf/nihms-225001.pdf.

"monetary stakes are only one factor, to be balanced against other factors." Fed. R. Civ. P. 26, Adv. Comm. Notes 2015 Amendment.

The *party resources* and *access* factors cut against the City's proposed scope, as explained above. That is especially the case as to the Janssen Defendants, from whom the City seeks documents dating back almost 30 years. As further explained below, the Janssen Defendants do not have ready access to many of these documents and are willing to produce the ones to which they do.

The *importance of the discovery* likewise points decisively against the City's proposed scope. "A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." Fed. R. Civ. P. 26, Adv. Comm. Notes 2015 Amendment. The City fails to offer any such explanation, instead asserting in conclusory fashion that its proposed time period is "carefully tailored" and that the proposed discovery "is essential," and briefly addressing the statute of limitations. Mot. at 9-10. But for the same reasons that the City's proposed discovery *as to Duragesic* dating to *before 1990* is irrelevant, it has no "importance . . . in resolving the issues" this case presents. And as mentioned, Duragesic is not a pill-form opioid, is not a first-line opioid, and is not highly sought out among opioid-dependent individuals.

Finally, the *burden and expense* of the City's proposed scope as to the Janssen Defendants by far outweigh any benefit likely to come of it. It is not clear that there is any benefit at all given not just the City's lack of allegations of improper Duragesic marketing while it was on patent but also the extensive discovery Defendants have agreed to provide the City regarding Duragesic. Documents that could be responsive to Plaintiff's discovery requests are not stored in a centralized location or with only a select few custodians. The Janssen Defendants

31

have identified 12 current and former relevant employees and at least 10 non-custodial databases with information that may be relevant to this litigation.  From these sources, the Janssen Defendants have already collected over three million documents.  The time and money needed for reviewing and producing these documents is substantial.

Even as the benefit of the City's timeframe is slim to none, the serious burden and expense is a certainty given the nearly thirty-year period at issue and the turnover of employees in that time.  Expanding discovery, whether by 3 years or 17 years, compounds the time and money required for document collection and review significantly.  While the Janssen Defendants are still assessing the entirety of the burden associated with the City's expanded time period, they have already determined that it could easily double the size of their originally planned collection and review.

Despite the dearth of allegations regarding Duragesic marketing in the City's Complaint, the Janssen Defendants have offered the City extensive Duragesic-related information in their proposed compromise.  Specifically, they agreed to:

- produce available call-note data concerning Duragesic going back to January 2004, which contains contemporaneous records of Janssen sales representatives' calls and detailing on health care providers in the Chicago area;

- conduct "a full custodian- and keyword-based search concerning Duragesic beginning November 20, 2007"; and

- perform agreed-upon supplemental "targeted searches for Duragesic, including promotional, marketing, and sales-training materials."

Exhs. B & C.  This offer is on top of the Janssen Defendants' agreement to the City's proposed discovery start dates for both Nucynta and Nucynta ER.

The Janssen Defendants' compromise provides the City more information than it is fairly entitled to given its lack of allegations that Janssen improperly marketed Duragesic while it was on patent.  It also provides the information the City has sought that is reasonably available to the

Janssen Defendants. In particular, the call-note data provide real-time accounts summarizing the content and other aspects of sales representatives' interactions with health care providers, which is the main way that the City alleges that Defendants improperly marketed opioids. The call-note data also reflect the marketing plans in use at the time the calls were made.

In sum, the Janssen Defendants have already agreed to the City's proposal as to two of three drugs at issue and volunteered to provide a wide variety of documents and data the City has sought concerning the third, Duragesic, even absent any allegations of improper Duragesic marketing while the drug was on patent. The Court should not compel the Janssen Defendants to provide more than they have already offered.

### C. The City's Proposed Scope of Discovery Is Inappropriate as to the Teva Defendants.

The Teva Defendants have asked the City to reconsider its overly burdensome time frame for its discovery requests that relate to the Teva Defendants' two legacy products at issue: ACTIQ® and FENTORA®. As a compromise, the Teva Defendants have offered to produce documents dating back to January 1, 2006—nine months before the approval of FENTORA® and years prior to the longest applicable statute of limitations in this case and the passage of the Chicago Consumer Fraud Ordinance. Unfortunately, without providing any basis for doing so, the City has declined this and other offers to compromise and continues to seek documents without any particularized basis and, with respect to ACTIQ®, dating back more than 18 years. All of the relevant Rule 26(b) factors militate in favor of denying the City's motion to compel.

The expansive temporal scope requested for the discovery sought by the City from the Teva Defendants is completely *untethered* to the specific allegations pertaining to the Teva Defendants. Indeed, according to the Exhibit A.2 to the TAC, only three prescribers who allegedly received misrepresentations from the Teva Defendants wrote prescriptions at issue for

the Teva Defendants' products, and those prescriptions were written for only three patients.  *See* Exhibit A.2 to TAC.[19]  *None* of those prescriptions were written before May 31, 2006.  *Id.*  Nor does the City identify any specific misrepresentations by the Teva Defendants made to these three prescribers.  Worse, after years of investigation, neither the City's TAC nor its discovery responses have identified a single prescriber who was contacted by either of the Teva Defendants prior to 2006 and wrote a supposedly inappropriate opioid prescription because of that interaction.  Simply put, the City has not explained and cannot explain why any discovery regarding ACTIQ® or FENTORA® that predates January 1, 2006 is necessary for the City to establish its claims.

The City's proposed temporal scope for discovery not only is unsupported by its allegations against the Teva Defendants, but also would impose disproportionate *burden and expense* on them.  ACTIQ® and FENTORA® are both legacy products, and ACTIQ® has not been marketed since 2006.  *See* Day Dec. ¶¶ 3-4.  Data and other information maintained by various departments throughout Cephalon and Teva USA have been moved to different data systems over time (for example, from MFG/PRO to SAP and now to Oracle), with old data being saved but no longer readily accessible.  *Id.* ¶ 4.  As a result, trying to identify documents potentially responsive to the City's requests will require the Teva Defendants to reactivate various archive databases—at significant cost.  *Id.*  In addition, many of these databases may require the Teva Defendants to repurchase licenses from vendors to even access the data.  *Id.*  Similarly, having to search for historical hard copy materials prior to January 1, 2006 would be particularly burdensome because such materials are voluminous, not necessarily organized by

---

[19] One prescriber wrote a single prescription of ACTIQ® for one patient; a second prescriber wrote just two prescriptions for FENTORA® for one patient; and a third prescriber wrote 41 prescriptions for FENTORA® for one patient (and all of those prescriptions except for one were written between 2011 and 2014).  *See* Exhibit A.2 to TAC.

product, and in different locations.  *Id.*  And, because historical data is stored on a calendar basis, each year back that the Teva Defendants are required to collect and search creates additional expense and burden.  *Id.* at ¶ 5.  Thus, for example, having to produce documents dating back to October 2005 regarding FENTORA® rather than January 1, 2006, as the Teva Defendants have offered, will impose a great additional burden unjustified by the City's allegations here.  *See* Fed. R. Civ. P. 26(b)(2)(B) (parties "need not provide discovery of electronically stored information from sources that" are "not reasonably accessible because of undue burden or cost").

The City's excessive discovery period also will create significant business disruption.  If the Teva Defendants are forced to respond to the expensive discovery fishing expedition demanded by the City, their employees will have to divert significant time and attention from conducting normal business tasks and operations to assist counsel in trying to identify, locate, and collect documents pertaining to ACTIQ® and FENTORA® that predate January 1, 2006. Day Dec. ¶ 6.  This lost employee time and cost will grow exponentially with each additional year of discovery.  *Id.*  Put simply, the burdens associated with the City's start date for discovery grossly outweigh any purported benefit.

Rather than address these real and significant issues, the City merely assumes that, because the Defendants are "global pharmaceutical companies," they should be able to readily identify and produce documents sought by the City and that any cost or burden associated with such work is necessarily part of litigation.  Mot. at 8 & 10.  As described above, this position is factually untrue and is flawed as a matter of law.  The City also cannot rely upon the public attention surrounding opioid addiction to escape the proportionality rules set forth by Rule 26(b).

In addition, the City's reliance on the *amount in controversy* in seeking to expand the temporal scope for the Teva Defendants is untethered to ACTIQ®, FENTORA®, or the Teva

Defendants. Even if ACTIQ® had been promoted in the last decade (and it has not been), the City has not identified any prescriptions of the Teva Defendants' opioid products written before January 1, 2006 by a prescriber who allegedly received some unspecified misrepresentation from Cephalon prior to writing that prescription. These four prescriptions in no way justify the scope of the City's massive discovery expedition.

Lastly, regarding the *importance of discovery*, the central tenant of the City's TAC is that Defendants disseminated scientific and educational materials and advertising that misrepresented the risks, benefits, and superiority of opioids used long-term to treat "chronic pain." TAC ¶ 8. As noted above, "[a] party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." Fed. R. Civ. P. 26 note (2015). Here, ACTIQ® and FENTORA® are short-acting opioids meant to control flare-ups in cancer-related pain for patients who are already receiving opioid therapy. They are not front-line opioid treatments or prescribed to treat long-term chronic pain. It is therefore unsurprising that the City cannot explain why discovery from 1999, or at any time before 2006, is relevant the claims at issue, particularly where it has not alleged or identified a single prescription of one of the Teva Defendants' drugs written before May 31, 2006 as a result of any statement attributable to the Teva Defendants.

In short, the Court should not permit the City to seek costly, irrelevant, and burdensome discovery from the Teva Defendants dating back nearly twenty years, particularly when there are no allegations pled to support such broad discovery against them and the longest applicable statute of limitations period only reaches back to 2008. As a more than reasonable compromise, the Teva Defendants have offered to produce documents dating back to January 1, 2006. Because the City is not entitled to anything more, its motion to compel should be denied.

**D.    The City Has Not Satisfied the Basic Requirements of Relevance and Proportionality to Justify the Scope of Discovery It Seeks from the Actavis Defendants.**

The City's insistence that the Actavis Defendants provide discovery for the period pre-dating acquisition of Kadian® is at odds with Rule 26(b)(1)'s threshold requirement of relevance, and the Court's guidance concerning the Actavis Defendants at the May 8, 2017 status conference.  The City's requests for sweeping discovery from the Actavis Defendants for the year prior to the acquisition is also disproportionate to the needs of this case.

As the City acknowledges, "Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008 and began marketing Kadian in 2009."  TAC ¶ 48. Anything that may have occurred prior to the acquisition date is not relevant to the matters in dispute.  As to the Actavis Defendants, the Kadian® acquisition date provides a bright line defining the relevant temporal scope of discovery for the simple reason that the Actavis Defendants cannot be held liable for any conduct prior to January 1, 2009.  In fact, the City does not allege any Kadian® related activity prior to that date.  Given these facts, the City has failed to establish how pre-acquisition discovery is relevant to any claim or defense in this suit. Federal Rule of Civil Procedure 26(b)(1)'s relevance requirement is fundamental and "should be firmly applied."  *Sapia*, 2017 WL 2060344, at *2.

The City's position also disregards the guidance the Court provided at the May 8, 2017 status conference.  For more recently approved medications such as Janssen's Nucynta, the Court endorsed permitting discovery for the year preceding product launch.  May 8, 2017 Tr. at 86:4-19.  The Court noted that the period made sense because it would allow discovery of the "launch plan that the companies came up with before a product is introduced to the market."  *Id.*  The Court did not endorse a one-size-fits-all approach, however.  Rather, the Court observed that, "[a]s to the start date [of discovery], it really depends on each defendant, on the product that they

37

actually marketed." *Id.* at 89:17-19. Elaborating on this point, the Court highlighted the unique position of the Actavis Defendants. Specifically, the Court distinguished product launch, which necessarily involves pre-launch activities such as developing a launch plan, from the situation of the Actavis Defendants, noting that the Actavis Defendants were not involved in the creation of the product. *Id.* at 89:19-22 ("Actavis kind of took over—bought a product, I think, and wasn't even involved with the actual creation or manufacturing of that product."). The Court's reasoning leaves no doubt that discovery involving Kadian® should begin in 2009, when the Actavis Defendants "took over" the marketing of Kadian®, and not before. Nothing in the City's Motion justifies deviating from the Court's May 8, 2017 guidance.

Additionally, expanding discovery to encompass periods before 2009 would not be proportionate to the needs of the case. Pre-2009 conduct involving Kadian® has no bearing on the Actavis Defendants claimed liability. Thus, discovery into such conduct lacks any "importance [to] the issues at stake in the action" and would do nothing to "resolv[e] the issues," making "the burden or expense of the proposed discovery outweigh[] its likely benefit." Fed. R. Civ. P. 26(b)(1). Illinois federal courts interpreting Rule 26(b)(1)'s relevance requirement have limited the temporal scope of requests for discovery to the time period relevant to the matters at issue in the case. *See supra* pp. 25-29.

Because discovery for the period prior to acquisition of Kadian® is neither relevant to any claim or defense in this suit, nor proportionate to the needs of the case, the City's motion to compel the Actavis Defendants should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the City's motion and limit the time period of discovery as to Defendants to the scope they have already proposed.

Dated:    August 2, 2017                    Respectfully submitted,


                                            By: /s/ Charles C. Lifland
                                                Charles C. Lifland (*pro hac vice*)
                                                O'MELVENY & MYERS LLP
                                                400 S. Hope Street
                                                Los Angeles, CA 90071
                                                Telephone:  (213) 430-6000
                                                Facsimile:   (213) 430-6407
                                                clifland@omm.com

                                                *Attorneys for Defendants Janssen*
                                                *Pharmaceuticals, Inc., Johnson &*
                                                *Johnson, Janssen Pharmaceutica, Inc.*
                                                *n/k/a Janssen Pharmaceuticals, Inc., and*
                                                *Ortho-McNeil-Janssen Pharmaceuticals,*
                                                *Inc. n/k/a Janssen Pharmaceuticals, Inc.,*
                                                *Appearing Pro Hac Vice*

                                            By: /s/ Michael P. Doss
                                                Michael P. Doss
                                                Scott D. Stein
                                                SIDLEY AUSTIN LLP
                                                One South Dearborn
                                                Chicago, IL 60603
                                                Telephone:   (312) 853-7520
                                                Facsimile:    (312) 853-7036
                                                mdoss@sidley.com
                                                sstein@sidley.com

                                                *Attorneys for Defendants Janssen*
                                                *Pharmaceuticals, Inc., Johnson &*
                                                *Johnson, Janssen Pharmaceutica, Inc.*
                                                *n/k/a Janssen Pharmaceuticals, Inc., and*
                                                *Ortho-McNeil-Janssen Pharmaceuticals,*
                                                *Inc. n/k/a Janssen Pharmaceuticals, Inc.*

By: /s/ R. Ryan Stoll
    R. Ryan Stoll
    Patrick Joseph Fitzgerald
    Gretchen M. Wolf
    SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
    155 N. Wacker Drive
    Suite 2700
    Chicago, IL 60606
    Telephone: (312) 407-0508
    ryan.stoll@skadden.com
    patrick.fitzgerald@skadden.com
    gretchen.wolf@skadden.com

    *Attorneys for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company Inc.*

By: /s/ Tinos Diamantatos
    Tinos Diamantatos
    MORGAN, LEWIS & BOCKIUS LLP
    77 West Wacker Drive, 5th Floor
    Chicago, IL 60601
    Telephone: (312) 324-1145
    Fax: (312) 353-2067
    tdiamantatos@morganlewis.com

    Gordon Cooney, Jr. (*pro hac vice*)
    Steven A. Reed (*pro hac vice*)
    MORGAN, LEWIS & BOCKIUS LLP
    1701 Market Street
    Philadelphia, PA 19103-2921
    Telephone: (215) 963-5000
    jgcooney@morganlewis.com
    sreed@morganlewis.com

    *Attorneys for Defendants Cephalon, Inc. and Teva Pharmaceuticals USA, Inc.*

By: /s/ James W. Matthews

    James W. Matthews (*pro hac vice*)
    Katy E. Koski (*pro hac vice*)
    Jason L. Drori (*pro hac vice*)
    FOLEY & LARDNER LLP
    111 Huntington Avenue, Suite 2500
    Boston, MA 02199
    (617) 342-4000
    jmatthews@foley.com
    kkoski@foley.com
    jdrori@foley.com

    Jonathan W. Garlough
    FOLEY & LARDNER LLP
    321 North Clark Street, Suite 2800
    Chicago, IL 60654
    (312) 832-4500
    jgarlough@foley.com

    *Attorneys for Defendants Allergan plc, f/k/a Actavis plc, Actavis, Inc., n/k/a Allergan Finance, LLC, f/k/a Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., n/k/a Actavis Laboratories UT, Inc., Actavis LLC, and Actavis Pharma, Inc., f/k/a Watson Pharma, Inc.*

## SIGNATURE ATTESTATION

Pursuant to the Northern District of Illinois' General Order on Electronic Case Filing,

General Order 14-0009(IX)(C)(2), I hereby certify that authorization for the filing of this

document has been obtained from each of the other signatories shown above and that all

signatories concur in the filing's content.

/s/ Tinos Diamantatos
Tinos Diamantatos

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2017, I caused to be electronically filed the foregoing

Defendants' Response in Opposition to Plaintiff's Motion to Compel Regarding Temporal Scope

of Discovery to be filed with the clerk of the court using the CM/ECF system, which will send

notification of such filing to the e-mail addresses denoted on the electronic Mail Notice List.

/s/ Tinos Diamantatos
Tinos Diamantatos