# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *City of Chicago,* | Case No. 14-cv-04361 |
| *Plaintiff.* | Honorable Jorge L. Alonso |
| *v.* | **FIFTH AMENDED COMPLAINT** |
| *Purdue Pharma L.P. et al.,* | JURY TRIAL DEMANDED |
| *Defendants.* | |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................................ 10

II. PARTIES ......................................................................................................... 21
   A. Plaintiff ..................................................................................................... 21
   B. Defendants. .............................................................................................. 22

III. JURISDICTION AND VENUE .................................................................... 45

IV. JURY DEMAND ............................................................................................ 45

V. FACTUAL ALLEGATIONS ......................................................................... 45
   A. The Science behind Pain Medicine. ..................................................... 45
     1. Safe and Effective Treatment of Chronic Pain Hinges on Informed Risk Management. ................................................ 45
     2. The Use of Opioids Is Associated with Known and Substantial Risks. .......................................................................... 46
     3. The Benefits Offered by Long-Term Opioid Use Are Unproven and Contradicted. ........................................................ 51
     4. Defendants' Impact on the Perception and Prescribing of Opioids. ........... 54
   B. Defendants Promoted Their Branded Products Through Direct Marketing to Prescribers and Consumers. ......................................... 56
     1. Defendants Relied Upon Branded Advertisements. .................................... 56
     2. Defendants Relied Upon Their Sales Forces and Recruited Physician Speakers. ................................................................. 57
     3. Defendants Directed These Promotional Efforts Through Detailed Marketing Plans. .............................................. 61
       a. Targeting categories of prescribers ................................................... 62
       b. Increasing "direct to consumer" marketing ..................................... 63
       c. Differentiating each brand ................................................................. 63
       d. Moving beyond office visits ............................................................... 64
     4. Defendants Marketed Opioids in Chicago Using the Same Strategies and Messages They Employed Nationwide. ................ 65
   C. Defendants Used "Unbranded" Marketing to Evade Regulations and Consumer Protection Laws. ...................................... 68

1.  Regulations Governing Branded Promotion Require that it Be Truthful, Balanced, and Supported by Substantial Evidence. ................. 68

2.  Defendants Deployed Front Groups and Doctors to Disseminate Unbranded Information on Their Behalf. ................................. 71

    a.  Defendants' Use of KOLs ............................................ 74

        i.   Russell Portenoy ............................................. 77

        ii.  Lynn Webster ............................................... 78

    b.  "Research" That Lacked Supporting Evidence ............................ 79

    c.  Treatment Guidelines .............................................. 82

        i.    FSMB ..................................................... 83

        ii.   AAPM/APS Guidelines ...................................... 84

        iii.  American Geriatrics Society .............................. 86

        iv.   Guidelines That Did Not Receive Defendants' Support ............................................. 87

    d.  Continuing Medical Education ....................................... 89

    e.  Unbranded Patient Education ....................................... 91

    f.  Defendants' Use of Front Groups ................................... 91

        i.   American Pain Foundation ................................. 92

        ii.  The American Academy of Pain Medicine ..................... 95

3.  Defendants Acted In Concert with KOLs and Front Groups in the Creation, Promotion, and Control of Unbranded Marketing. ............ 96

4.  Defendants Targeted Vulnerable and Lucrative Populations. ................... 98

    a.  The Elderly ..................................................... 98

    b.  Veterans ....................................................... 99

D.  **Why Defendants' Marketing Messages Are Misleading and Unfair. .......... 101**

1.  Defendants and Their Third-Party Allies Misrepresented that Opioids Improve Function. ................................... 102

2.  Defendants and Their Third-Party Allies Concealed the Truth About the Risk of Addiction from Long-Term Opioid Use. ............ 108

3.  Defendants and Their Third-Party Allies Misrepresented that Addiction Risk Can Be Avoided or Managed. ...................... 119

4.  Defendants and their Third-Party Allies Created Confusion By Promoting the Misleading Term "Pseudoaddiction." ............. 121

5.  Defendants and their Third-Party Allies Claimed Withdrawal is Simply Managed. .................................... 124

6.     Defendants and Their Third-Party Allies Misrepresented that Increased Doses Pose No Significant Additional Risks. ........................ 126

7.     Defendants and Their Third-Party Allies Deceptively Omitted or Minimized Adverse Effects of Opioids and Overstated the Risks of Alternative Forms of Pain Treatment. .................................................... 129

8.     Purdue Misleadingly Promoted OxyContin as Providing 12 Hours of Pain Relief. ............................................................................................... 132

**E.     Each Defendant Engaged in Deceptive Marketing, Both Branded and Unbranded, that Targeted and Reached Chicago Prescribers. .................... 136**

1.     Actavis ................................................................................................. 138

    a.    Actavis's Deceptive Direct Marketing ............................................ 138

        i.    Actavis's Deceptive Sales Training ................................ 140

        ii.    Actavis's Deceptive Speakers Training .......................... 144

    b.    Actavis's Deceptive Statements to Chicago Prescribers and Patients ......................................................................................... 147

2.     Cephalon ............................................................................................. 151

    a.    Cephalon's Deceptive Direct Marketing ....................................... 152

        i.    Cephalon's Fraudulent Off-Label Marketing of Actiq and Fentora ................................................... 152

           (a)    Cephalon launched its fraudulent marketing scheme for Actiq .................................. 153

           (b)    October 1, 2006—Cephalon fraudulently marketed Actiq's successor drug, Fentora .......... 154

           (c)    September 2007—Reports of death and serious side effects led the FDA to issue a public health warning for Fentora ....................... 157

           (d)    May 6, 2008—The FDA rejected Cephalon's request for expanded approval of Fentora ............................................................ 158

           (e)    March 26, 2009—the FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") warned Cephalon about its misleading advertising of Fentora ............................................................ 159

           (f)    Cephalon continues to knowingly, deceptively, and illegally promote Fentora for off-label uses ................................. 160

|  |  | ii. | Cephalon's Misrepresentation of the Risks Associated with the Use of Opioids for the Long-Term Treatment of Chronic Pain | 165 |

|  | b. | Cephalon's Deceptive Third-Party Statements | | 168 |
|  |  | i. | FSMB – Responsible Opioid Prescribing | 169 |
|  |  | ii. | APF – Treatment Options:  A Guide for People Living with Pain | 170 |
|  |  | iii. | Key Opinion Leaders and Misleading Science | 172 |
|  |  | iv. | Misleading Continuing Medical Education | 174 |

|  | c. | Cephalons's Deceptive Statements to Chicago Prescribers and Patients | | 179 |

| 3. | Endo | | | 184 |

|  | a. | Endo's Deceptive Direct Marketing | | 185 |
|  |  | i. | Endo's Sales Force and Deceptive Sales Training | 186 |

(a) Endo's Sales Force Deceptively Minimized the Risks of Addiction Associated with Chronic Opioid Therapy. ... 188

(b) Endo's Sales Force Deceptively Implied that Chronic Opioid Therapy Would Improve Patients' Ability to Function. ... 191

(c) Endo's Sales Force Deceptively Presented the Risks and Benefits of Opioids To Make Them Appear Safer Than Other Analgesics ... 192

ii. Endo's Speakers Bureau Programs Deceptively Minimized the Risks of Addiction Associated with Chronic Opioid Therapy ... 193

iii. Endo's Misleading Journal Supplement ... 195

iv. Endo's Deceptive Unbranded Advertising ... 196

b. Endo's Deceptive Third-Party Statements ... 196

i. APF ... 198

(a) Misleading Medical Education ... 201

(b) Painknowledge.com ... 203

(c) *Exit Wounds* ... 204

ii. Other Front Groups:  FSMB, AAPM, and AGS ... 205

iii. Key Opinion Leaders and Misleading Science ... 207

|  |  | c. | Endo's Deceptive Statements to Chicago Prescribers and Patients | 211 |

| 4. | Janssen | | | 219 |
|  | a. | Janssen's Deceptive Direct Marketing | | 220 |
|  |  | i. | Janssen's Deceptive Sales Training | 220 |
|  |  | ii. | Janssen's Deceptive Speakers Bureau Programs | 225 |
|  |  | iii. | Janssen's Deceptive Unbranded Advertising | 226 |
|  | b. | Janssen's Deceptive Third-Party Statements | | 226 |
|  |  | i. | AAPM and AGS – Finding Relief: Pain Management for Older Adults | 226 |
|  |  | ii. | AGS – Misleading Medical Education | 230 |
|  |  | iii. | APF | 231 |
|  |  |  | (a) Let's Talk Pain | 231 |
|  |  |  | (b) Exit Wounds | 235 |
|  | c. | Janssen's Deceptive Statements to Chicago Prescribers and Patients | | 236 |
|  |  | i. | Janssen's Deceptive Medical Education Programs in Chicago | 236 |
|  |  | ii. | Janssen's Deceptive Detailing Practices in Chicago | 237 |

| 5. | Mallinckrodt | | | 243 |
|  | a. | Mallinckrodt's Deceptive Direct Marketing | | 243 |
|  | b. | Mallinckrodt's Deceptive Statements to Chicago Prescribers and Patients | | 245 |

| 6. | Purdue | | | 246 |
|  | a. | Purdue's Deceptive Direct Marketing | | 247 |
|  | b. | Purdue's Deceptive Third-Party Statements | | 252 |
|  |  | i. | APF | 253 |
|  |  |  | (a) Purdue's Control of APF | 253 |
|  |  |  | (b) *A Policymaker's Guide* | 258 |
|  |  |  | (c) *Treatment Options: A Guide for People Living with Pain* | 260 |
|  |  |  | (d) *Exit Wounds* | 261 |
|  |  | ii. | Purdue's Work with Other Third Party Front Groups and KOLs | 262 |
|  |  |  | (a) *FSMB – Responsible Opioid Prescribing* | 262 |

     (b)  *AGS – Pharmacological Management of Persistent Pain in Older Persons* .......................... 262

     (c)  *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes* ............................................. 263

     (d)  *Managing Patient's Opioid Use:  Balancing the Need and Risk* ................................................ 264

     (e)  *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse* ................. 264

     (f)  *Overview of Management Options* ...................... 265

    iii.  Purdue's Misleading Science ........................................... 265

   c.  Purdue's Deceptive Statements to Chicago Prescribers and Patients ........................................................................................ 266

**F.**  **Each Defendant Failed to Put in Place Proper Suspicious Order Monitoring Procedures ................................................................................ 274**

  1.  Defendants Were Aware of Their Obligations. ......................................... 278

  2.  Defendants Kept Careful Track of Prescribing Data and Knew About Suspicious Orders and Prescribers, But Used the Information for Marketing Instead of Legal Compliance ................................................. 279

  3.  Defendants Used Their Information to Increase Sales and Disincentivized their Employees From Reporting and Exercising Due Diligence to Halt Diversion ......................................................... 284

  4.  Defendants Failed to Monitor the Wholesalers They Used to Supply their Opioids ................................................................................... 287

  5.  Defendants Worked In Concert to Limit Enforcement ............................. 289

  6.  Opioids Sold by Defendants Migrated into Other Jurisdictions, Including Chicago ................................................................................... 290

  7.  Specific Defendants' Failures to Prevent Diversion ................................. 291

  (1)  Allergan ............................................................................................ 291

  (2)  Endo ................................................................................................. 299

  (3)  Janssen ............................................................................................. 301

  (4)  Mallinckrodt ..................................................................................... 304

  (5)  Teva .................................................................................................. 312

  8.  Defendants Misrepresented Their Efforts to Prevent Diversion ............... 315

  9.  Additional Examples of Failure to Report Suspicious Prescribing in the Chicago area ............................................................................... 316

G.    The Result of Defendants' Unlawful Scheme and Inadequate Controls............................................................................................ 318

    1.    Defendants' Fraudulent and Deceptive Marketing of Opioids and Failure to Maintain Effective Controls Against Diversion Imposed Costs on the City of Chicago. ................................................. 319

        a.    Increase in Opioid Prescribing Nationally...................................... 319

        b.    The City's Increased Opioid Prescribing and costs ....................... 330

        c.    Increased Opioid Use Has Led to an Increase in Opioid Abuse, Addiction, and Death ........................................................ 338

        d.    Increased Opioid Use Has Increased Costs Related to Addiction Treatment and other Services..................................... 344

        e.    Increased Opioid Use Has Fueled An Illegal Secondary Market for Narcotics and the Criminals Who Support It............ 347

    2.    Defendants' Unlawful Conduct Has Led to Record Profits....................... 348

    3.    Defendants Fraudulently Concealed their Violations of Law.................... 348

VI.    COUNT ONE  CONSUMER FRAUD—DECEPTIVE PRACTICES VIOLATIONS OF MCC § 2-25-090 AGAINST ALL DEFENDANTS................... 350

VII.    COUNT TWO  CONSUMER FRAUD—UNFAIR PRACTICES VIOLATIONS OF 815 ILCS 505/2 AND MCC § 2-25-090 AGAINST ALL DEFENDANTS ................................................................................. 354

        a.    Defendants' unfair acts or practices include, but are not limited to, failing to maintain effective controls to prevent opioid diversion, in violation of the CSA and Illinois Controlled Substances Act ("ICSA")"), by:Failing to create, maintain, and use a compliance program that maintains effective controls to prevent diversion of opioids;..... 356

        b.    Failing to create, maintain, and use a compliance program that detects suspicious orders of opioids, including through the use of rigid and inflated thresholds for orders; .................... 357

        c.    Failing to use available information, including data obtained from Data Vendors, chargeback data, or observations of their sales force to prevent diversion; ......................................... 357

        d.    Failing to monitor compliance by Defendants' wholesaler customers; and ......................................................................... 357

        e.    Failing to report and reject suspicious orders once identified. ...... 357

VIII.    COUNT THREE  MISREPRESENTATIONS IN CONNECTION WITH SALE OR ADVERTISEMENT OF MERCHANDISE  VIOLATIONS OF MCC § 4-276-470 AGAINST ALL DEFENDANTS.................................................. 362

IX.    **COUNT FOUR  RECOVERY OF CITY COSTS OF PROVIDING SERVICES  VIOLATIONS OF MCC § 1-20-020 AGAINST ALL DEFENDANTS .......................................................................................... 365**

Plaintiff City of Chicago ("the City"), by its attorney, Mark Flessner, Corporation

Counsel of the City, files this Fifth Amended Complaint[1] against Defendants Purdue Pharma

L.P.; Purdue Pharma Inc.; the Purdue Frederick Company, Inc.;[2] Teva Pharmaceuticals USA,

---

[1]   In its Third Amended Complaint, the City made changes only as directed by thisthis Court in its September 29, 2016 Memorandum Opinion and Order (N.D. Ill., No. 14-cv-4361, Dkt. 471). Specifically, the City (1) submitted revised versions of Exhibits A.1-A.7 and B.1-B.2 that link letter designations in the Complaint to prescriber names in the exhibits, as well as provided explanatory footnotes in the Complaint; and (2) added allegations in support of its false statements and false claims causes of action regarding the materiality of Defendants' misrepresentations in Section V.F.1.b.iii. The City did not implement other changes to address the voluntary dismissal of Depomed or the dismissal of the false claims express certification theory of liability, or the unfairness cause of action. These allegations remain in the Complaint but are pleaded solely for purposes of appellate review. Although motions to dismiss the Third Amended Complaint were fully briefed, thethe Court did not rule on those pending issues.

The Fourth Amended Complaint preserved those changes but also made the following discrete changes: (1) pleadingpleading allegations against an additional manufacturer, Mallinckrodt LLC; (2) addingadding a public nuisance claim; and (3) based on case law subsequent to the Third Amended Complaint, in Paragraphs 695-707 supplementing the City's allegations relating to the materiality of Defendants' fraudulent conduct, supplementing the City's allegations relating to the materiality of Defendants' fraudulent conduct.

This Fifth Amended Complaint: (1) pleads allegations against Mallinckrodt plc, SpecGx, LLC, an additional Mallinckrodt subsidiary named in other MDL bellwether actions, and Teva Pharmaceutical Industries, Ltd., 2) adds allegations pertaining to defendants' failures to monitor suspicious orders of controlled substances; (3) narrows the causes of action by removing the claims asserted as Counts Four-Six & Eight-Eleven of the Fourth Amended Complaint (claims for False Statements to the City in violation of MCC § 1-21-010 *et seq.*, False Claims in violation of MCC § 1-22-020, Conspiracy to Defraud by Getting False or Fraudulent Claims Paid or Approved by the City in violation of MCC § 1-22-020, Insurance Fraud in violation of 720 ILCL 5/17-10.5, Civil Conspiracy, Unjust Enrichment, and Public Nuisance). The City previously reserved its right to appeal this Court's September 29, 2016 Order dismissing its unfairness claim under MCC § 2-25-090, but, based on this Court's prior rulings, is asserting an unfairness claim related to Defendants' failure to prevent diversion of opioids, as required by state and federal law.

For the Court's convenience, the City has attached as Exhibit C a redline that compares the Fifth Amended Complaint to the Second Amended Complaint, on which this Court previously entered his Motion to Dismiss Order. To avoid confusion and because the sufficiency of other allegations already was decided by this Court, as with the Fourth Amended Complaint, the City, except to the extent additional detail is provided in connection with the allegations of failure to maintain effective controls against diversion, has not generally updated facts, such as the number of deaths, overdoses, prescriptions, or detailing visits, which are pleaded as of the date of the Third Amended Complaint.

[2] Purdue Pharma, L.P., Purdue Pharma, Inc., and The Purdue Frederick Company, Inc. (collectively, "Purdue") were named in the prior complaints. The City recognizes that these claims are stayed due to bankruptcy proceedings and is not attempting to take any further action concerning Purdue by virtue of filing this Fifth Amended Complaint. The City does not intend to serve Purdue with this Fifth Amended Complaint in light of the stay. To ensure that this clear, the City has not altered any of the allegations specific to Purdue and has not added new allegations or facts regarding Purdue. As a result, there remains a single reference to Exhibit A.5 in this Fifth Amended Complaint, even though that Exhibit is no longer attached. The City reserves the right to seek leave to amend allegations against Purdue at a later date if the bankruptcy stay is lifted.

Inc.; Teva Pharmaceutical Industries, Ltd.[3] Cephalon, Inc.; Johnson & Johnson; Janssen

Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Ortho-

McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Depomed, Inc.; Endo

Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Mallinckrodt plc; SpecGx, LLC; and

Mallinckrodt LLC (collectively, "Defendants").  The City alleges as follows:

## I.    INTRODUCTION

1.    A pharmaceutical manufacturer should never place its desire for profits above the

health and well-being of its customers.  Drug manufacturers have a legal duty to ensure their

products are accompanied by full and accurate instructions and warnings to guide prescribing

doctors and other health-care providers in making treatment decisions.  They must tell the truth

when marketing their drugs and ensure that their marketing claims are supported by science and

medical evidence.  Defendants broke these simple rules.

2.    By the 1990s, Defendants were confronting the limited market for opium-like

painkillers ("opioids").

3.    Defendants knew that opioids were effective treatments for short-term post-

surgical and trauma-related pain, and for palliative (end-of-life) care.  Yet they also knew—and

had known for years—that opioids were addictive and subject to abuse, particularly when used

long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred

to as "chronic pain"), and should not be used except as a last-resort.  Defendants further knew—

---

[3]    In in its Third and Fourth Amended Complaints, the City reserved its right to appeal this Court's May 8, 2015
Memorandum Opinion and Order dismissing this entity for lack of personal jurisdiction, and has included
allegations at this time in light of evidence revealed in the MDL proceedings and the MDL Court's Opinion and
Order, Doc. 2131, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Aug. 5, 2019).

and had known for years—that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.[4, 5]

4.      Defendants also knew that controlled studies of the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (*e.g.*, hospitals), where the risk of addiction and other adverse outcomes was much less significant. Indeed, the U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.[6]

5.      Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, and generics like oxycodone and hydrocodone, are narcotics. They are derived from or possess properties similar to opium and heroin, which is why they are regulated as controlled substances.[7] Like heroin, prescription opioids work by binding to receptors on the

---

[4]      *See, e.g.*, Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain:  Current Status*, 1 Progress in Pain Res. & Mgmt. 247 (1994).

[5]      The authoritative *Diagnostic and Statistical Manual of Mental Disorders*, (5th ed. 2013) ("DSM-V") classifies addiction as a spectrum of "substance use disorders" that ranges from misuse and abuse of drugs to addiction. Patients suffer negative consequences wherever they fall on the substance use disorder continuum.  Throughout this Complaint, "addiction" refers to this range of substance use disorders.

[6]      Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

[7]      Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances.  Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest.  The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety.  Opioids generally had been categorized as Schedule II or Schedule III drugs.  Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence.  21 U.S.C. § 812.  Schedule II drugs may not be dispensed without an original copy of a manually signed prescription, which may not be refilled, from a doctor and filled by a pharmacist who both must be licensed by their state and registered with the DEA.  21 U.S.C. § 829.  Opioids that have been categorized as Schedule II drugs include morphine (Avinza, Embeda, Kadian, MS Contin), fentanyl (Duragesic, Actiq, Fentora), methadone, oxycodone (OxyContin, Percocet, Percodan, Tylox), oxymorphone (Opana), and hydromorphone (Dilaudid, Palladone).

Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence.  21 U.S.C. § 812.  Schedule III drugs may not be dispensed without a written or oral prescription, which may not be filled or refilled more than six months after the date of the prescription or be refilled more than five times.  21 U.S.C. § 829.  Some opioids had been categorized as

spinal cord and in the brain, dampening the perception of pain.  Opioids also can create a

euphoric high, which can make them addictive.  At certain doses, opioids can slow the user's

breathing, causing respiratory depression and, ultimately, death.

6.      In order to expand the market for opioids and realize blockbuster profits,

Defendants needed to create a sea change in medical and public perception that would permit the

use of opioids not just for acute and palliative care, but also for long periods of time to treat more

common aches and pains, like lower back pain, arthritis, and headaches.

7.      Defendants, through a sophisticated and highly deceptive and unfair marketing

campaign that began in the late 1990s, deepened around 2006, and continues to the present, set

out to, and did, reverse the popular and medical understanding of opioids.  Chronic opioid

therapy—the prescribing of opioids to treat chronic pain long-term—is now commonplace.

8.      To accomplish this reversal, Defendants spent hundreds of millions of dollars:

(a) developing and disseminating seemingly truthful scientific and educational materials and

advertising that misrepresented the risks, benefits, and superiority of opioids used long-term to

treat chronic pain, as described in Sections V.B.1 and V.C.2; (b) deploying sales representatives

who visited doctors and other prescribers and delivered misleading messages about the use of

opioids, as described in Section V.B.2; (c) recruiting prescribing physicians as paid speakers, as

a means of both securing those physicians' future "brand loyalty" and extending their reach to

the physicians' peers, as described in Section V.B.2; (d) funding, assisting, encouraging, and

directing certain doctors, known as "key opinion leaders" ("KOLs"), not only to deliver scripted

talks, but also to draft misleading studies, present continuing medical education programs

---

Schedule III drugs, including forms of hydrocodone and codeine combined with other drugs, like acetaminophen. However, in October 2013, the FDA, following the recommendation of its advisory panel, reclassified all medications that contain hydrocodone from Schedule III to Schedule II.  *See* 21 C.F.R. § 1308.

("CMEs") that were deceptive and lacked balance, and serve on the boards and committees of professional societies and patient advocacy groups that delivered messages and developed guidelines supporting chronic opioid therapy, as described in Section V.C.2; and (e) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups") that developed educational materials and treatment guidelines that were then distributed by Defendants, which urged doctors to prescribe and patients to use opioids long-term to treat chronic pain, as described in Section V.C.2.

9.    These efforts, executed, developed, supported, and directed by Defendants, were designed not to present a fair view of how and when opioids could be safely and effectively used, but rather to convince doctors and patients that the benefits of using opioids to treat chronic pain outweighed the risks and that opioids could be used safely by most patients.  Defendants, and the ostensibly neutral third parties whom they recruited and supported, both profited handsomely through their dissemination of these deceptions.  KOLs and Front Groups saw their stature in the medical community elevated dramatically due to Defendants' funding, and Defendants saw an equally dramatic rise in their revenues.

10.    Working individually and with and through these Front Groups and KOLs, Defendants pioneered a new and far broader market for their potent and highly addictive drugs— the chronic pain market.  Defendants persuaded doctors and patients that what they had long understood—that opioids are addictive drugs, unsafe in most circumstances for long-term use— was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids. Ignoring the limitations and cautions in their own drugs' labels, Defendants:  (a) overstated the benefits of chronic opioid therapy, promised improvement in patients' function and quality of

life, and failed to disclose the lack of evidence supporting long-term use; (b) trivialized or obscured their serious risks and adverse outcomes, including the risk of addiction, overdose, and death; (c) overstated their superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives; and (d) mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms. There was, and is, no reliable scientific evidence to support Defendants' marketing claims, and there was, and is, a wealth of scientific evidence that these claims are false. Defendants also deceptively and unfairly marketed the drugs for indications and benefits that were outside of the drugs' labels and not supported by substantial evidence.

11. Even Defendants' KOLs initially were very cautious about whether opioids were appropriate to treat chronic pain. Some of these same KOLs have since recanted their pro-opioid marketing messages and acknowledged that Defendants' marketing went too far. Yet despite the voices of renowned pain specialists, researchers, and physicians who have sounded the alarm on the overprescribing of opioids to treat chronic pain, Defendants continue to disseminate their misleading and unfair marketing claims to this day.

12. Defendants' efforts were wildly successful. The United States is now awash in opioids. In 2012, health care providers wrote 259 million prescriptions for opioid painkillers— enough to medicate every adult in America around the clock for a month. Twenty percent of all doctors' visits in 2010 resulted in the prescription of an opioid, nearly double the rate in 2000. Opioids—once a niche drug—are now the most prescribed class of drugs—more than blood pressure, cholesterol, or anxiety drugs. While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global

hydrocodone supply. Together, opioids generated $8 billion in revenue for drug companies in 2012, a number that is projected to reach $15.3 billion by 2016.

13.    It was Defendants' marketing—and not any medical breakthrough—that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse.

14.    The result has been catastrophic. As one doctor told the City: "This was an experiment on the population of the United States. It wasn't randomized, it wasn't controlled, and no data was collected, until they started gathering death statistics."

15.    Compounding these failures, Defendants also failed to put in place adequate systems to guard against diversion of their opioids. As millions became addicted to opioids, "pill mills," often styled as "pain clinics," sprouted nationwide and rogue prescribers stepped in to supply prescriptions for non¬medical use. These pill mills, typically under the auspices of licensed medical professionals, issued high volumes of opioid prescriptions under the guise of medical treatment. Prescription opioid pill mills and rogue prescribers cannot channel opioids for illicit use without at least the tacit support and willful blindness of the Defendants, if not their knowing support.

16.    The federal Controlled Substances Act, U.S. Code 21 U.S.C. § 801 *et seq.* ("CSA"), and regulations thereunder charge opioid manufacturers, and other registrants, with implementing systems to identify and report suspicious orders of controlled substances to prevent the diversion of scheduled drugs into illicit channels. The Illinois Controlled Substances Act ("ICSA"), 720 ILCS 570/301, *et seq.*, imposes parallel requirements. Defendants had particularly detailed information about the distribution and sale of opioids in Chicago. This included information concerning prescriptions of their drugs such as "chargeback" data, which

provided essentially real time information about opioid prescriptions, as well as the observations of their on-the-ground sales force, which was well-positioned to identify suspicious activity. Each Defendant manufactured, marketed, and sold opioids without an adequate system in place to prevent diversion of its opioids or to investigate, report, and refuse to fill orders that it knew or should have known were suspicious.

17.     According to the U.S. Centers for Disease Control and Prevention ("CDC"), the nation has been swept up in an opioid-induced "public health epidemic."[8]  According to the CDC, prescription opioid use contributed to 16,651 overdose deaths nationally in 2010; 16,917 in 2011; and 16,007 in 2012.  One Defendant's own 2010 internal data shows it knew that the use of prescription opioids gave rise to 40% of drug-related emergency department visits in 2010 and 40% of drug poisoning deaths in 2008, and that the trend of opioid poisonings was increasing from 1999-2008.  For every death, more than 30 individuals are treated in emergency rooms.  The U.S. Department of Health and Human Services estimated that in 2009 in Chicago, there were 40.4 emergency department visits involving adverse reactions to opioids per 100,000 people, which, for Chicago's population, translates into 1,080 trips to the emergency room.  But even these alarming statistics do not fully communicate the toll of prescription opioid abuse on patients and their families.

18.     The dramatic increase in opioid prescriptions to treat common chronic pain conditions has resulted in a population of addicts who seek drugs from doctors.  When turned down by one physician, many of these addicts deploy increasingly desperate tactics—including doctor-shopping, use of aliases, and criminal means—to satisfy their cravings.

---

[8]     CDC, *Examining the Growing Problems of Prescription Drug and Heroin Abuse* (Apr. 29, 2014), http://www.cdc.gov/washington/testimony/2014/t20140429.htm.

19.     Efforts by doctors to reverse course for a chronic pain patient already on opioids long-term involve managing the physical suffering and psychological distress a patient endures while withdrawing from the drugs.  This process is often thwarted by a secondary criminal market well-stocked by a pipeline of drugs that is diverted to supply them.  Even though they never would have prescribed opioids in the first place, many doctors feel compelled to continue prescribing opioids to patients who have become dependent on them.

20.     According to the CDC, more than 12 million Americans age 12 or older have used prescription painkillers without a prescription in 2010, and adolescents are abusing opioids in alarming numbers.  The former president of the New Hope Recovery Center on Chicago's North Side stated:  "Five years ago, 70 percent of the people we saw here were heroin addicts.  Today, 70 percent of the people we see are prescription drug users."[9]

21.     Opioid abuse has not displaced heroin, but rather triggered a resurgence in its use, imposing additional burdens on the City and local agencies that address heroin use and addiction.  According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% in 2002-2004 to 45.2% in 2011-2013.  Chicago ranks first in the nation in emergency room visits for heroin overdoses.  Heroin produces a very similar high to prescription opioids, but is often cheaper.  While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price.  It is hard to imagine the powerful pull that would cause a law-abiding, middle-aged person who started on prescription opioids for a back injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

---

[9]     Monifa Thomas, Prescription Drug Abuse Is Fastest-Growing Drug Problem in Country, Chi. Sun-Times, Dec 25, 2010.

22.     Dr. Robert DuPont, former director of the National Institute on Drug Abuse and the former White House drug czar, opines that opioids are more destructive than crack cocaine:

> [Opioid abuse] is building more slowly, but it's much larger. And the potential[] for death, in particular, [is] way beyond anything we saw then. . . . [F]or pain medicine, a one-day dose can be sold on the black market for $100. And a single dose can [be] lethal to a non-patient. There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem.[10]

23.     Countless Chicagoans suffer from chronic pain, which takes an enormous toll on their health, their lives, and their families. These patients deserve both appropriate care and the ability to make decisions based on accurate, complete information about treatment risks and benefits. But Defendants' deceptive and unfair marketing campaign deprived Chicago patients and their doctors of the ability to make informed medical decisions and, instead, caused important, sometimes life-or-death decisions to be made based not on science, but on hype. Defendants deprived patients, their doctors, and health care payors of the chance to exercise informed judgment and subjected them to enormous costs and suffering.

24.     Defendants' actions are not permitted or excused by the fact that their labels (with the exception of Cephalon's labels for Fentora and Actiq) may have allowed or did not exclude the use of opioids for chronic non-cancer pain. The FDA's approval did not give Defendants license to misrepresent the risks, benefits, or superiority of opioids. Indeed, what makes Defendants' efforts particularly nefarious—and dangerous—is that, unlike other prescription drugs marketed unlawfully in the past, opioids are highly addictive controlled substances. Defendants deceptively and unfairly engaged a patient base that—physically and

---

[10]     Transcript, *Use and Abuse of Prescription Painkillers*, The Diane Rehm Show (Apr. 21, 2011), http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/transcript.

psychologically—could not turn away from their drugs, many of whom were not helped by the drugs or were profoundly damaged by them.

25.     Nor is Defendants' causal role broken by the involvement of doctors. Defendants' marketing efforts were both ubiquitous and highly persuasive; their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions.  Defendants targeted not only pain specialists, but also primary care physicians (PCPs), nurse practitioners, physician assistants, and other non-pain specialists who were even less likely to be able to assess the companies' misleading statements. Defendants also were able to callously manipulate what doctors wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

26.     Defendants' course of conduct, individually and/or in concert with the KOLs and Front Groups with which they allied, and/or in cooperation with each other, has violated and continues to violate local and state law, as laid out below.

- Municipal Code of Chicago ("MCC") § 2-25-090, in that Defendants engaged in fraudulent and deceptive acts and practices in their promotion of opioids to treat chronic pain, and/or engaged in conduct that violates the Illinois Consumer Fraud and Deceptive Business Practices Act and/or the Uniform Deceptive Trade Practices Act.

- MCC § 2-25-090, in that Defendants engaged in unfair acts or practices, including the oppressive and unscrupulous promotion of opioids to treat chronic pain, and in failing to maintain effective controls against opioid diversion and instead fueling black markets for diverted drugs, all while publically promoting themselves as legally compliant, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

- MCC § 4-276-470, in that Defendants employed deception, fraud, false pretense, false promise or misrepresentation, or concealed, suppressed or omitted material facts with intent that

others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise.

- MCC § 1-20-020, in that Defendants have caused and continue to cause the City and/or its agents to incur costs in order to provide services reasonably related to their violation of federal, state or local law and their failure to correct conditions that violate federal, state or local law.

27.    To redress and punish these violations, the City seeks a judgment requiring Defendants to pay (a) civil penalties and the costs of City services reasonably related to their violations of federal, state, and local law and failure to correct those violations, (b) attorneys' fees, costs, and expenses; and (c) any other relief to which the City may be entitled.  The City also requests that the Court enjoin Defendants' unlawful promotion and distribution of opioids in the City of Chicago and order them to correct their misrepresentations and to maintain adequate systems to prevent diversion.

28.    The opioid epidemic has been widely described as the deadliest drug crisis in American history.  Drug overdoses rose to become the leading cause of death for Americans under 50 years old, eclipsing guns or car accidents or accidents.  Overdoses have been killing people at a pace faster than the H.I.V. epidemic did at its peak.  This public health crisis has reached the point that, in 2016, the Centers for Disease Control ("CDC") reported that, in contrast to other developed countries, and despite having some of the world's highest spending on medical care, our nation saw life expectancy at birth decline for the second straight year, with the increasing number of people who died of overdoses representing the most significant factor in this alarming trend.  According to Robert Anderson, who oversees death statistics at the Centers for Disease Control and Prevention: "'I don't think we've ever seen anything like this. Certainly not in modern times.'"

29.     Like the nation, "Illinois is in the midst of an unprecedented opioid epidemic,"[11]
and Chicago is no exception.  Chicago suffered 741 opioid-related overdose deaths in 2016, a
roughly 75% increase from the year before.  In 2017, Illinois emergency rooms reported a 66%
jump in overdose visits, with the increase being highest in urban centers.

30.     The cost of this human tragedy cannot be calculated or ever adequately
compensated.  But the financial burden to the City is staggering.  In 2017, the Chicago
Department of Public Health ("CDPH") began investing an additional $700,000 a year in opioid
addiction treatment and supportive services, with a focus on medication-assisted treatment
("MAT").  In 2018, CDPH is increasing its investment again in opioid addiction treatment and
services, including funding for MAT and recovery homes to serve an estimated 500 more
residents annually.  These increases are on top of the $1.5 million the City was already investing
annually on substance use treatment overall, including on outpatient treatment, medical
detoxification services, residential treatment and recovery homes, as well as other costs attendant
to the epidemic of opioid use and abuse in the City.

## II.     PARTIES

### A.     Plaintiff.

31.     Plaintiff is the City of Chicago, a municipal corporation organized and existing
under the laws of the State of Illinois.  The Corporation Counsel has the authority to "[a]ppear
for and protect the rights and interests of the city in all actions, suits and proceedings brought by
or against it or any city officer, board or department."  MCC § 2-60-020.

32.     Pursuant to its authority under the Chicago false claims ordinance, MCC § 1-22-
050, the Corporation Counsel conducted a more than year-long investigation into the marketing

---

[11] Illinois Dept. of Public Health, State of Illinois Comprehensive Opioid Data Report, (Dec. 4, 2017).

of opioids for chronic pain by these Defendants and other entities and concluded that Defendants

engaged in a pattern and practice of conduct violating state and local law and that the impact of

their conduct on public health and law enforcement warranted immediate action. The

Commissioner of the Department of Business Affairs and Consumer Protection also requested

that the Corporation Counsel bring an action for injunctive and equitable relief, pursuant to the

Chicago consumer fraud ordinance, MCC § 2-25-090, *et seq*.

## B.     Defendants.

33.     PURDUE PHARMA L.P. is a limited partnership organized under the laws of

Delaware. Purdue Pharma Inc. is a Delaware corporation with its principal place of business in

Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY, INC. is a Delaware

corporation with its principal place of business in Stamford, Connecticut (collectively,

"Purdue").

34.     Purdue is primarily engaged in the manufacture, promotion, and distribution of

opioids nationally and in Chicago, including the following:

>      (a) OxyContin (oxycodone hydrochloride extended release) is a
>      Schedule II opioid agonist[12] tablet first approved in 1995 and
>      indicated for the "management of pain severe enough to require
>      daily, around-the-clock, long-term opioid treatment and for
>      which alternative treatment options are inadequate." Prior to
>      April 2014,[13] OxyContin was indicated for the "management of

---

[12]    An opioid agonist is a drug that activates certain opioid receptors in the brain. An antagonist, by contrast, blocks the receptor and can also be used in pain relief or to counter the effect of an opioid overdose.

[13]    The labels for OxyContin and other long-acting opioids were amended in response to a 2012 citizens' petition by doctors. The changes were intended to clarify the existing obligation to "make an individualized assessment of patient needs." The petitioners also successfully urged that the revised labels heighten the requirements for boxed label warnings related to addiction, abuse, and misuse by changing "Monitor for signs of misuse, abuse, and addiction" to "[Drug name] exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death." Letter from Bob Rappaport, Dir. Ctr. for Drug Evaluations & Res., *Labeling Supplement and PMR [Post-Marketing Research] Required* (Sept. 10, 2013), http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM367697.pdf.

moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."

(b) MS Contin (morphine sulfate extended release) is a Schedule II opioid agonist tablet first approved in 1987 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, MS Contin was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."

(c) Dilaudid (hydromorphone hydrochloride) is a Schedule II opioid agonist first approved in 1984 (injection) and 1992 (oral solution and tablet) and indicated for the "management of pain in patients where an opioid analgesic is appropriate."

(d) Dilaudid-HP (hydromorphone hydrochloride) is a Schedule II opioid agonist injection first approved in 1984 and indicated for the "relief of moderate-to-severe pain in opioid-tolerant patients who require larger than usual doses of opioids to provide adequate pain relief."

(e) Butrans (buprenorphine) is a Schedule III opioid partial agonist transdermal patch first approved in 2010 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Butrans was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."

(f) Hysingla ER (hydrocodone bitrate) is a Schedule II opioid agonist tablet first approved in 2014 and indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

(g) Targiniq ER (oxycodone hydrochloride and naloxone hydrochloride) is a Schedule II combination product of oxycodone, an opioid agonist, and naloxone, an opioid antagonist, first approved in 2014 and indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

35.     OxyContin is Purdue's largest-selling opioid, in both Chicago and the nation. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

36.     In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the United States $635 million—at the time, one of the largest settlements with a drug company for marketing misconduct. Pursuant to its settlement, Purdue operated under a Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services, which required the company, *inter alia*, to ensure that its marketing was fair and accurate, and to monitor and report on its compliance with the Agreement.

37.     TEVA PHARMACEUTICAL INDUSTRIES, LTD ("Teva Ltd.") is an Israeli corporation, with its principal place of business in Israel.

38.     CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired Cephalon, Inc.

39.     TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a wholly-owned subsidiary of Teva Ltd. Teva USA is a Delaware corporation with its principal place of business in Pennsylvania.

40.     In 2016, Teva Ltd. acquired from Allergan its Actavis/Watson generic business, and immediately began selling their generic opioid products.[14]

---

[14](Teva Opioids Over Time). Form 10-Q Filed by Teva Pharmaceutical Industries Ltd. For the quarterly period ended on March 31, 2019

41.     Teva USA and Cephalon, Inc. are affiliated corporations, while the
Actavis/Watson entities Teva Ltd. acquired are subsidiaries of Teva USA.

42.     Teva Ltd. and its subsidiaries are collectively referred to herein as "Cephalon."

43.     Teva Ltd. over the years has built a vast portfolio of opioid products through
various acquisitions of U.S. pharmaceutical drug companies.[15]  One of Cephalon's "core therapeutic
areas" is pain, including opioid products.[16]  Cephalon began selling its first opioid mediations in the
U.S. in July 1980, and started selling its first Schedule II opioids beginning in 1997.[17]  Before it
acquired Cephalon, Inc. and the Actavis/Watson entities, in 2006, Teva Ltd. acquired the Ivax
Corporation and related entities, and immediately began selling their generic opioid products.[18]  In
early 2007, Teva Ltd. announced in a press release that it would continue to sell generic oxycodone
in the U.S. after settling a patent dispute with Purdue.[19]  In 2008, Teva Ltd. acquired Barr
Corporation and related entities, and immediately began selling their generic opioid products.[20]
Teva Ltd. also acquired Anda, Inc. from Allergan, a U.S. based pharmaceutical drug distributor.[21]

44.     Teva Ltd. and its subsidiaries work together closely to market and sell Cephalon
products in the United States.  Teva USA conducts Teva Ltd.'s sales and marketing activities for
Cephalon in the United States and has done so since Teva Ltd.'s October 2011 acquisition of
Cephalon.  Teva USA holds out Actiq and Fentora as Teva products to the public.  Teva USA
sells all former Cephalon branded products through its "specialty medicines" division.  The FDA

---

[15] ("Our History" from Teva Ltd. website);

[16]

[17] (Teva Opioids Over Time)

[18] (Teva Opioids Over Time)

[19]

[20] (Teva Opioids Over Time)

[21]

approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in Chicago, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.

45.     The close connection between Teva Ltd. and its U.S. subsidiaries, as well as the blurred distinction between them, has been demonstrated in Teva's websites. For example, for some time Teva USA's website was a page entitled "Teva Pharmaceutical Industries Limited," on a page labeled "intended for US residents only," which included the following: "Teva improves health in the US every day, every minute, every second. One in every six prescriptions dispensed in the US is a Teva product. Approximately 22 prescriptions in the US are filled by Teva products every second. Teva is the world's largest maker of generic pharmaceutical products."[22]

46.     This portrayal is no accident. Upon information and belief, in 2016, Teva Ltd. implemented guidelines that governed visuals and logos on all its subsidiaries to convey a consistent message about Teva products.[23] Teva Ltd. also imposed a Global Publication Policy on its subsidiaries with directives they were expected to follow.[24] Teva Ltd. also prepared and maintained a single Teva website portal, which all subsidiaries were required to utilize.[25]

47.     This was not the only policy or set of guidelines Teva Ltd. expected its subsiaires to follow. Rather, Teva Ltd. has approximately 50 such corporate global policies and guidelines.[26] For example, a "Global Procurement Policy," signed by Teva's CEO and CFO and

---

[22] https://www.tevausa.com/Company.asp2x

[23] (Teva Visual Identity Guidelines).

[24]

[25]

[26] (listing Teva Ltd.'s "Global Policies")

applicable to "all Teva group companies," as well as all employees thereof, states that a violation could result in "disciplinary action in accordance with Teva's Code of Conduct" and other policies and procedures.[27]

48.     As another example, the "Teva Annual Bonus Policy" applied to Teva Ltd. and its subsidiaries alike.[28]  Teva Ltd.'s procedures also included "Guidelines for Composition of Governance of Subsidiary Boards," which required among other things, that nominations for members of the Board of Directors for "First Tier Subsidiaries" such as Teva USA and Cephalon, Inc. be approved by Teva Ltd.'s Company Secretary and that at least one board member be the member of the "Teva Executive Committee" or "TEC" that is "responsible for the main activity of the subsidiary."[29]  Board members of Teva subsidiaries were expected to be Teva employees, who received no additional compensation for this role and could be on up to ten "Second Tier Boards" at one time.[30]  Not surprisingly, in light of this policy, a declaration submitted on behalf of certain plaintiffs in the MDL, in which this case was consolidated until remand by the Judicial Panel on Multidistrict Litigation ("JPML"), identified a number of common officers of both Teva Ltd. and its subsidiaries.[31]

---

[27]

[28]

[29]

[30]

[31] Due to the timing of the declaration's disclosure, the MDL Court declined to consider the declaration itself or exhibits created by the declarant.  *See* MDL Doc. 2131 at 4.  It did, however, consider the numerous other exhibits thereto.  *See id.*  These exhibits alone were enough to support its conclusion.  Although the exhibit summarizing the common officers was created by the declarant, it states that it is based on the results of a "public records search" indicating that the information is available through alternate sources.  *See* MDL Doc. 1817 at Ex. 2.

49.    Teva Ltd. is managed by an Executive Committee, the "TEC" referenced above, which consists of Teva's CEO, and twelve high ranking Teva Ltd. corporate officers, six of whom live and work in the United States.[32]

50.    All Teva USA employees report up a chain through Teva Ltd.'s Executive Management and ultimately to Teva Ltd.'s CEO.[33]

51.    Teva Ltd.'s CEO is identified as the Chief Operating Decision Maker ("CODM"), and in a 2018 "Segment Memorandum" Teva stated that "the business will continue to be _**managed and orchestrated by Teva's CEO**_, who regularly reviews its results, is directly involved in assessing performance and making decisions on overall resource allocation, and ultimately responsible for the allocation of resources."[34]  The memorandum explained, for example, that the CODM / CEO "regularly reviewed" operating results and also reviewed "flash Reports" containing key financial data, using this information to make "decisions about Teva's overall resource allocation."[35]

52.    Also, in 2017, Teva's CEO "announced, with the support of the Board, a new organizational structure and leadership changes to enable strategic alignment across our portfolios, regions and functions ... _**under this new structure our business will be integrated into one commercial organization**_."[36]  This structure included U.S. business entities.[37]

---

[32]

[33]

[34] (Segment Reporting Memorandum Q1 2018) at 000841 (emphasis added).

[35] (Segment Reporting Memorandum Q1 2018) at 000841-000845.

[36] Teva Pharmaceutical Industries Ltd. 2018 Notice of Annual Meeting of Shareholders and Proxy Statement  p.28 (emphasis added).

[37] https://www.tevapharm.com/news/teva_announces_new_organization_structure_and_leadership_changes_11_17.aspx

53.    Teva's organizational structure was integrated even before 2018.  According to the December 2015 version of Teva's Guidelines for Composition and Governance of Subsidiary Boards, for example, the "Teva Group CEO" had to approve a variety of transactions and actions by subsidiaries, including, but not limited to, "[a]ny action proposed as an exception to the Teva Group corporate polices or guidelines," by which the subsidiaries were expected to abide.[38]  As another example, a 2016 filing with the U.S. Securities and Exchange Commission ("SEC") described Teva as "organized into two commercial business units," one for generic drugs and another for "specialty" drugs.[39]  It further describes the company's activities as "conducted by several global divisions."[40]  A "Global Generic Medicines group," for example, has responsibility for "all generic . . . commercial activities." [41]  As another example, the Global Research and Development (R&D) Division, "is responsible for research and development of specialty products and includes regulatory affairs and pharmacovigilance"[42] and is managed by Dr. Fridriksdottir, who is a member of Teva Ltd.'s Executive Management Team.[43]  The same SEC filing states that "Teva manages its assets on a company basis, not by segments, as many of its assets are shared or comingled."[44]

---

[38] MDL Doc. 1816 at Ex. 37, p. 14.

[39] Form F-20 Filed by Teva Pharmaceutical Industries Ltd. For the fiscal year ended December 31, 2016 p. 46

[40] Id.

[41] Id.

[42] Form F-20 Filed by Teva Pharmaceutical Industries Ltd. For the fiscal year ended December 31, 2016

[43]

[44] Id. "Teva" is defined in Teva Ltd.'s SEC Form10-K as "Teva Pharmaceutical Industries Limited and its subsidiaries."  The SEC filings consistently refer to "Teva," "We" and "Our."

54.     As a further example of Teva Ltd.'s control, Teva Ltd. has directed global pharmacovigilance and quality monitoring for its global subsidiaries, including for the U.S.[45]  Teva Ltd. provided global standard operating procedures ("SOPs") for pharmacovigilance and drug safety monitoring, and Teva USA was expected to comply with those SOPs.[46]  Teva Ltd. maintained the global adverse event database, including for opioids sold in the U.S.[47]

55.     Teva Ltd. handles insurance for all its subsidiaries.[48]  In addition, as part of its 2016 acquisition of the Actavis/Watson entities, Teva Ltd. agreed to be responsible for the defense of litigation arising out of generic opioids.[49]

56.     Consistent with the structure described above, certain employees have responsibilities that cut across corporate entities.  For example, a "Senior V.P., Head of Global Tax, Teva Pharmaceuticals" employed by Teva Ltd. is responsible for tax compliance and tax planning for Teva Ltd. and all its subsidiaries.[50]  Teva USA has a "Head of Tax," which reports directly to Head of Global Tax.[51]  As another example, a Teva USA employee who acted as Senior V.P., Global Government Affairs and Public Policy from 2006 to 2018 was in charge of coordinating and directing advocacy, lobbying and policy development across the entire Teva group of companies.[52]

---

[45]

[46]

[47]

[48]

[49]

[50]

[51]

[52]

57.     Teva Ltd. recently restructured the company to "unify and simplify its organization" including by reducing the global workforce by more than 25%.[53]  Thus, Teva Ltd.'s Board had ultimate control of the firing of thousands of employees, including in the United States.

58.     Teva Ltd. currently presents itself as "One global brand, One story, One Teva."[54] Consistent with this understanding, Teva Ltd. reports revenue by "segments."  Before 2018, segment revenue was reported by region (United States, Europe and the Rest of the world) and by product type (i.e. "Generics" and "Specialty") consolidated under "One Teva" as a single economic unit.[55]  In 2018, revenues were reported under three segments: North America (which includes the U.S. and Canada), Europe and International Markets.

59.     In addition, Teva Ltd. presents itself as a leading global pharmaceutical drug company and "one of the most competitive operational networks in the industry," with 57,000 employees worldwide, 87 production sites, manufacturing 120 billion pills annually, distributing pharmaceuticals in approximately 100 markets globally, and having revenues of $18.9 billion.[56]

60.     Teva Ltd. files its consolidated financial results with the SEC, offsetting its losses against its gains as "One Teva" with "functional units unified organization," "integrated into one commercial organization" as a single economic unit.[57]  Upon information and belief, Teva Ltd. received tax benefits in Israel from owning its U.S. and other foreign subsidiaries in the same

---

[53] Teva Pharmaceutical Industries Ltd. 2018 Notice of Annual Meeting of Shareholders and Proxy Statement  p.28

[54]

[55] Form 20-F filed by Teva Pharmaceutical Industries Ltd. for the fiscal year ended December 31, 2012 and Form 10-K filed by Teva Pharmaceutical Industries Ltd. for the fiscal year ended December 31, 2017.

[56]

[57] Form 20-F filed by Teva Pharmaceutical Industries Ltd. for the fiscal year ended December 31, 2012

line of business under "One Teva." Teva Ltd. also, upon information and belief, received tax benefits in the U.S. from the U.S. Tax Cuts and Jobs Act under "One Teva."

61.     Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales . . . ."[58] The United States is the largest of Teva Ltd.'s global markets, and it represents nearly half of its total revenue.[59]

62.     Teva Ltd., through its integrated management team, is involved in establishing its consolidated "Annual Operating Plan" ("AOP") from the early stages of the AOP plan through final approval. The "AOP, as well as forecasts and budgets," are consolidated and "are reviewed and approved by the CEO & BoD" and by Teva Ltd.'s outside auditors.[60] Teva Ltd., through its common officers, and through its Capital Expenditure (CAPEX) Corporate Policy, is also involved in the approval of its subsidiaries' capital expenditures and procurement of supplies and/or services.[61]

63.     Teva Ltd. also securitizes the trade receivables of its subsidiaries so that they are controlled by Teva Ltd., and not by its subsidiaries. To do this, Teva Ltd. "established a trade receivables securitization program" that took control of its subsidiaries' receivables and collections via a Special Purpose Entity ("SPE") that Teva Ltd. owns and of which Teva Ltd. is the "primary beneficiary."[62] This means, among other things, that the funds are protected from Teva's U.S. subsidiaries' creditors, including in bankruptcy.

---

[58] Teva Pharmaceutical Industries Ltd. Annual Report (Form 20-F) (Feb. 12, 2013) at 62.

[59] *Ibid*. at 62-64.

[60]

[61]

[62] Form 10-K filed by Teva Pharmaceutical Industries Ltd. for the fiscal year ended December 31, 2018

64.     Other publicly available information demonstrates Teva Ltd.'s control over
Cephalon's operations.  For example, immediately after acquiring Cephalon, Teva Ltd. caused
Cephalon to increase its product prices up to twenty-five percent.[63]  The two companies'
combined sales forces,[64] product pipelines, and research and development efforts.[65]

65.     Evidencing Teva Ltd.'s control of messaging about the opioid epidemic at the
highest levels of the company, on September 27, 2017, Teva Ltd.'s then-CEO, directed Teva's
"Government Affairs: Opioid Workgroup," "to review the U.S. opioid epidemic and consider Teva
response options."[66]

66.     In addition to implementing policies and procedures for itself and its subsidiaries,
as described above, Teva Ltd. through its global officers and its staff, oversees, monitors and
audits its subsidiaries', including its U.S. subsidiaries', compliance to make sure they are
adhering to Teva Ltd.'s policies and SOPs established by Teva Ltd.[67]  For example, Teva Ltd.
through its Global Drug Safety and Pharmacovigilance Department conducted an internal audit
of Teva USA's pharmacovigilance system.[68]  The audit states "the safety system in Teva U.S.
has multiple gaps and the reporting of safety matters to the FDA ... cannot be assured.[69]  It
further stated "The safety system in Teva U.S. is largely out of control and the reporting of safety

---

[63]     Tracy Staton, *Teva jacks up prices on Cephalon legacy brands* (Dec. 7, 2011),
http://www.fiercepharma.com/story/teva-jacks-prices-cephalon-legacy-brands/2011-12-07.
[64] *NASDAQ OMX 27th Investor Program Conference Call,* Teva Pharm. Indus. Ltd. (Dec. 6, 2011, 5:15 AM),
http://seekingalpha.com/article/315684-teva-pharmaceuticals-management-presents-at-nasdaq-omx-27th-investor-
program-transcript?page=4.
[65] *See generally, Teva Pharmaceuticals Industries' Management Presents at Citi Global Health Care Conference
(Transcript)* (Mar. 8, 2012), http://seekingalpha.com/article/419471-tevapharmaceutical-industries-management-
presents-at-citi-global-health-care-conferencetranscript?page=1.
[66]
[67]
[68]
[69]

matters to FDA (and by extension other regulatory agencies and business partners) cannot be assured."[70]  In 2015, Teva Ltd. audited Teva USA's DEA compliance department and SOM program, and prepared a report critical of the department and the suspicious order monitoring (SOM) program.

67.    Additional facts regarding Teva Ltd.'s interrelationship with and control over its subsidiaries are detailed in the materials attached to declarations filed in the MDL in connection with a challenge to personal jurisdiction over Teva Ltd. in the MDL "Track 1" bellwether cases. Teva disputed personal jurisdiction in the MDL and previously in this Action.  By contrast, it stipulated to the existence of personal jurisdiction in a different U.S. district court in connection with a settlement in which it admitted to failing to implement adequate internal accounting controls and to enforce the controls it did have.[71]  With the additional facts alleged in this Complaint developed through depositions and additional document discovery in the MDL, as well as more recent public sources, that were not available to the City when the earlier Motion to Dismiss was decided by this Court, the MDL Court found that Plaintiffs had demonstrated a prima facie case of personal jurisdiction as to Teva Ltd.  *See* MDL Doc. 2131.

68.    Cephalon has been in the business of manufacturing, selling, and distributing the following opioids, nationally and in Chicago:

(a) Actiq (fentanyl citrate) is a Schedule II opioid agonist lozenge (lollipop) first approved in 1998 and indicated for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."

(b) Fentora (fentanyl citrate) is a Schedule II opioid agonist buccal tablet (similar to plugs of smokeless tobacco) first approved in 2006 and indicated for the "management of breakthrough pain

---

[70].

[71] Form 20-F filed by Teva Pharmaceutical Industries Ltd. for the fiscal year ended December 31, 2016 p.44

in cancer patients 18 years of age and older who are already
receiving and who are tolerant to around-the-clock opioid
therapy for their underlying persistent cancer pain."

69.     In November 1998, the FDA granted restricted marketing approval for Actiq,
limiting its lawful promotion to cancer patients experiencing pain.  The FDA specified that Actiq
should not be marketed for off-label uses, stating that the drug must be prescribed solely to
cancer patients.  In 2008, Cephalon pleaded guilty to a criminal violation of the Federal Food,
Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to
pay $425 million in fines, damages, and penalties.

70.     Teva USA is also in the business of selling generic opioids, nationally and in
Chicago, including a generic form of OxyContin from 2005 through 2009.

71.     On September 29, 2008, Cephalon entered into a five-year Corporate Integrity
Agreement with the Office of Inspector General of the U.S. Department of Health and Human
Services.  The agreement, *inter alia*, required Cephalon to send doctors a letter advising them of
the settlement terms and giving them a means to report questionable conduct of its sales
representatives; disclose payments to doctors on its web site; and regularly certify that the
company has an effective compliance program.

72.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its
principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of
JOHNSON & JOHNSON, a New Jersey corporation with its principal place of business in New
Brunswick, New Jersey.  Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-
Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica Inc.
Defendant ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as Janssen
Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in

Titusville, New Jersey. JANSSEN PHARMACEUTICA, INC., now known as Janssen

Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in

Titusville, New Jersey. Johnson & Johnson is the only company that owns more than 10% of

Janssen Pharmaceuticals, Inc.'s stock, and it corresponds with the FDA regarding Janssen's

products. Upon information and belief, Johnson & Johnson controls the sale and development of

Janssen Pharmaceutical's drugs, and Janssen Pharmaceuticals, Inc.'s profits inure to Johnson &

Johnson's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc.,

Janssen Pharmaceutica, Inc., and Johnson & Johnson collectively are referred to herein as

"Janssen.")

73.     Janssen manufactures, sells, and distributes a range of medical devices and

pharmaceutical drugs in Chicago and the rest of the nation, including Duragesic (fentanyl),

which is a Schedule II opioid agonist transdermal patch first approved in 1990 and indicated for

the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-

clock, long-term opioid treatment and for which alternative treatment options are inadequate."

74.     Until January 2015, Janssen also developed, marketed, and sold Nucynta and

Nucynta ER:

> (a) Nucynta ER (tapentadol extended release) is a Schedule II
> opioid agonist tablet first approved in 2011 and indicated for the
> "management of pain severe enough to require daily, around-
> the-clock, long-term opioid treatment and for which alternative
> treatment options are inadequate." Prior to April 2014, Nucynta
> ER was indicated for the "management of moderate to severe
> chronic pain in adults [and] neuropathic pain associated with
> diabetic peripheral neuropathy (DPN) in adults." The DPN
> indication was added in August 2012.

> (b) Nucynta (tapentadol) is a Schedule II opioid agonist tablet and
> oral solution first approved in 2008 and indicated for the "relief
> of moderate to severe acute pain in patients 18 years of age or
> older."

75.     Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

76.     DEPOMED, INC. ("Depomed") is a California corporation with its principal place of business in Newark, California.  Depomed describes itself as a specialty pharmaceutical company focused on pain and other central nervous system (CNS) conditions.  Depomed develops, markets, and sells prescription drugs in Chicago and nationally.  Depomed acquired the rights to Nucynta and Nucynta ER for $1.05 billion from Janssen pursuant to a January 15, 2015 Asset Purchase Agreement.  This agreement closed on April 2, 2015.[72]

77.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  ENDO PHARMACEUTICALS, INC. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  (Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. collectively are referred to herein as "Endo.")

78.     Endo develops, markets, and sells prescription drugs, including the following opioids, in Chicago and nationally:

> (a) Opana ER (oxymorphone hydrochloride extended release) is a Schedule II opioid agonist tablet first approved in 2006 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."  Prior to April 2014, Opana ER was indicated for the "relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time."
>
> (b) Opana (oxymorphone hydrochloride) is a Schedule II opioid agonist tablet first approved in 2006 and indicated for the "relief of moderate to severe acute pain where the use of an opioid is appropriate."

---

[72]     The City has listed Depomed as a Defendant for the purpose of ensuring that the City can obtain appropriate injunctive relief as to Nucynta and Nucynta ER.

(c) Percodan (oxycodone hydrochloride and aspirin) is a Schedule II opioid agonist tablet first approved in 1950 and first marketed by Endo in 2004 and indicated for the "management of moderate to moderately severe pain."

(d) Percocet (oxycodone hydrochloride and acetaminophen) is a Schedule II opioid agonist tablet first approved in 1999 and first marketed by Endo in 2006 and indicated for the "relief of moderate to moderately severe pain." [73]

79.    Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded revenue of $1.15 billion from 2010 to 2013, and it alone accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids, nationally and in Chicago, both itself and through its subsidiary, Qualitest Pharmaceuticals, Inc., including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

80.    ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired ALLERGAN PLC in March 2015, and the combined company changed its name to ALLERGAN PLC in March 2015. Prior to that, WATSON PHARMACEUTICALS, INC. acquired Actavis, Inc. in October 2012; the combined company changed its name to Actavis, Inc. as of January 2013 and then to Actavis plc in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany,

---

[73]    In addition, Endo marketed Zydone (hydrocodone bitartrate and acetaminophen), a Schedule III opioid agonist tablet indicated for the "relief of moderate to moderately severe pain," from 1998 through 2013. The FDA's website indicates this product is currently discontinued, but it appears on Endo's own website. The City paid for 110 Endo Zydone prescriptions from July 18, 2005 through March 4, 2013.

New Jersey.  Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States.  Upon information and belief, Allergan plc exercises control over these marketing and sales efforts, and profits from the sale of Allergan/Actavis products ultimately inure to its benefit.  (Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. hereinafter collectively are referred to as "Actavis.")

81.     Actavis engages in the business of marketing and selling opioids in Chicago and across the country, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana.  Kadian (morphine sulfate extended release) is a Schedule II opioid agonist capsule first approved in 1996 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."  Prior to April 2014, Kadian was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."  Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc., on December 30, 2008 and began marketing Kadian in 2009.

82.     MALLINCKRODT PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. Mallinckrodt plc describes itself as "a global specialty pharmaceuticals company" that "develops, manufactures, markets and distributes both branded and generic specialty pharmaceutical products and medical imaging agents."  Mallinckrodt plc also operates under the registered business name Mallinckrodt Pharmaceuticals, with its U.S. headquarters in Hazelwood, Missouri.  Mallinckrodt Pharmaceuticals has responded to a letter from the FDA

concerning Xartemis XR, and the Mallinckrodt Pharmaceuticals logo appears on marketing and/or purportedly educational materials.

83.     Mallinckrodt plc's "Memorandum and Articles of Association," the foundational governing document establishing Mallinckrodt plc under the Irish Companies Act, states that "the objects for which the Company is established are:"

- "To carry on the business of a healthcare services development company operating in the healthcare field, and to design, manufacture, produce, supply and provide generic and branded pharmaceuticals, active pharmaceutical ingredients and dosage pharmaceuticals...necessary or suitable for the proper treatment of sick or injured persons or patients".

- "To co-ordinate the administration, finances and activities of any subsidiary companies...to carry on in all its branches the business of a management services company, to act as managers and to direct or co-ordinate the management of other companies or of the business...as may be deemed expedient by the Company's board of directors..."

84.     MALLINCKRODT LLC is a Delaware limited liability company with its principal place of business in Hazelwood, Missouri and is a wholly-owned subsidiary of Mallinckrodt plc. Mallinckrodt engages in the business of marketing and selling opioids in Chicago and across the country, including the branded drugs Exalgo (hydromorphone hydrochloride extended release), approved in 2010 for the "management of moderate to severe pain in opioid tolerant patients requiring continuous, around-the-clock opioid analgesia for an extended period of time" and, after 2014, for "opioid-tolerant patients for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatments are inadequate; and Xartemis XR (oxycodone hydrochloride and acetaminophen extended release), first approved in March, 2014 for the treatment of "actute pain severe enough to require opioid treatment and for which alternative treatment options are

inadequate." Exalgo was designed to include properties to make it harder to abuse, but has not been approved by the FDA to make abuse-deterrent claims.

85.     Defendant SpecGx LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri and is a wholly-owned subsidiary of Mallinckrodt plc. Mallinckrodt plc, Mallinckrodt LLC, and SpecGx LLC and their DEA registrant subsidiaries and affiliates (together, "Mallinckrodt") manufacture, market, sell and distribute pharmaceutical drugs throughout the United States. In addition to the branded opioids described above, Mallinckrodt also has a large generics drug business, including hydrocodone- and oxycodone-combination products, morphine, methadone, hydromorphone, and fentanyl products.

86.     In 2017, Mallinckrodt plc and Mallinckrodt LLC admitted as part of a settlement with the United States Drug Enforcement Administration ("DEA") that "Mallinckrodt knew about the diversion [of oxycodone] and sold excessive amounts of the most highly abused forms … placing them into a stream of commerce that would result in diversion." To settle these claims, Mallinckrodt paid a fine of $35 million. A Mallinckrodt officer, Michael-Bryant Hicks, held himself out as the Senior Vice President & General Counsel of both Mallinckrodt plc and Mallinckrodt LLC in signing the agreement, described further below, on behalf of both entities.

87.     Upon information and belief, Mallinckrodt plc and Mallinckrodt LLC also had other common officers and directors. Notably, John Einwalter acted as Director, Vice President, and Treasurer of both the plc and LLC.

88.     In addition, upon information and belief, Mallinckrodt plc's President and CEO served as "Chief Operating Decision Maker" ("CODM"), which makes resource allocation decisions and assesses the performance of the business.

89.     Mallinckrodt keeps consolidated financial statements for Mallinckrodt plc and Mallinckrodt LLC.  For example, Mallinckrodt plc's Form 10-K for the year ending September 30, 2016," defines excess cash flow "with respect to the Parent and the Subsidiaries," which becomes "Working Capital" available to Mallinckrodt plc.  The annual budget considers "projected consolidated balance sheet of the Parent and its Subsidiaries . . .  and the related consolidated statements of projected cash flow and projected income (collectively, the 'Budget')" and consolidated debt is "secured by liens 'on all or any portion of the assets of the Parent or its subsidiaries.'"  Its SEC filings also list shared services among the entities as including IT, finance, human resources, compliance, communications, and government affairs.

90.     The two entities also share office space at the same location that the predecessor entity, Mallinckrodt, Inc., occupied before the "inversion" — a corporate restructuring designed to take advantage of lower foreign taxes while Mallinckrodt maintained U.S.-centered operations — that created Mallinckrodt plc and LLC.  As described above, in answering a 2016 letter the FDA had addressed to Mallinckrodt, Inc., a Mallinckrodt plc employee used letterhead with the same "Mallinckrodt Pharmaceuticals" logo that Mallinckrodt plc uses as its own registered business name, and did so without advising that the entity to which the correspondence was addressed no longer existed.

91.     In deposition testimony in the MDL, a Mallinckrodt employee who had always worked in St. Louis could not testify as to which Mallinckrodt entity he worked for.  The same employee, who served as "Senior Director Finance, Specialty Generics," and who signed a Sarbanes-Oxley compliance form for Mallinckrodt plc in 2015, testified that he generally pays no attention to legal entities but rather focuses on the business of Mallinckrodt.[74]  Similarly, a

---

[74] Kilper Dep. Tr. 46:10-21; *see also* 8:13-23, 9:2-9, 12:19-23, 13:11-14.

Mallinckrodt executive vice president and chief commercial officer, despite being in the senior leadership of the company, did not know which entity paid his salary.  He was also unclear which entity the board of directors was nominally associated with.[75]

92.     In 2017, Mallinckrodt plc reported in an SEC filing "approximately 3,900 employees, approximately 3,400 of which are based in the U.S." In its Form 10-K for the fiscal year ending December 29, 2017, the Company describes itself as "a global business that develops, manufactures, markets and distributes specialty pharmaceutical products and therapies," lists analgesics among its "areas of focus," and further states that: "We manufacture controlled substances under DEA quota restrictions and in calendar 2017 we estimated that we received approximately 36% of the total DEA quota provided to the U.S. market for the controlled substances we manufacture."  In 2016, Mallinckrodt accounted for 43.8 million of the 236 million opioid prescriptions filled, according to IMS Health.

93.     Publicly, "Mallinckrodt plc" describes itself as "an industry leader in the effort to address prescription drug diversion and misuse in the United States," and claims that Mallinckrodt plc released a "prescription for America's Opioid Epidemic" – policy initiatives which purport to take aim prescription drug abuse.

94.     Nevertheless, Mallinckrodt plc opposed efforts to approve a shareholder resolution that would have required it to provide its shareholders a report related to measures it has taken since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis in the United States in ligation of Mallinckrodt's sale of opioid medications and "API" (shorthand for the "active pharmaceutical ingredients" used to make opioid painkillers).  In doing so, Mallinckrodt plc, through counsel, took the position that the

---

[75] O'Neill Dep. Tr. at 12:17-23; 17:22-18:16.

resolution relates to matters "at the heart of the Company's ordinary business," "critical day-to-day business" activities of its management, and subject to "direct oversight" by its board.

95.     In April 2019, Mallinckrodt plc opposed a shareholder proposal that "the Company should enhance oversight of risks related to opioids."[76]  The Mallinckrodt plc board of directors recommended voting against the proposal, claiming that it was already "actively engaged in risk oversight of our business, including with respect to opioid abuse and misuse," and that the company has "proactively taken a number of steps to address the opioid crisis under our Board's direction and supervision."[77]  At that time, Mallinckrodt plc further stated that "*[u]nder our Board's supervision*" the company had "devoted significant resources" to preventing opioid abuse and "demonstrated a record of meeting and exceeding the requirements of federal and state laws governing the manufacturing, sale, and distribution of controlled substances."[78]

96.     As with Teva Ltd., discovery conducted in the MDL has deepened the City's understanding of the role that Mallinckrodt plc has played in the operation of Mallinckrodt LLC and SpecGX LLC and their opioid business in the United States.  Based on those facts, the MDL Court found that Plaintiffs had made out a prima facie case of personal jurisdiction against Mallinckrodt plc, *see* MDL Doc. 2131, as have state courts in Kentucky and Rhode Island.  *See State of Rhode Island, by and through, Peter Neronha, Attorney General v. Purdue Pharma L.P.*, C.A. No. PC-2018-4555 (R.I. Super. Ct. Aug. 16, 2019); *Commonwealth of Kentucky v. Mallinckrodt plc*, No. 18-CI-381 (Ky. Cir Ct. Sept. 6, 2018).

---

[76] 2019 Notice of Annual General Meeting of Shareholder and Proxy Statement, at 71, https://mallinckrodt.gcs-web.com/static-files/4090b445-92ae-4da0-9e2f-362f0039f2a9

[77] *Id.* at 71.

[78] *Id.* (emphasis added).

### III.    JURISDICTION AND VENUE

97.    This civil action was originally filed in the Circuit Court of Cook County, Illinois. It was removed by Defendants to the United States District Court for the Northern District of Illinois and the City did not seek remand.  Jurisdiction is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1332.

98.    The Northern District of Illinois has personal jurisdiction over Defendants because they carry on a continuous and systematic part of their general businesses within Illinois, have transacted substantial business with Illinois entities and residents, and have caused grave harm in Illinois as a result.

99.    Venue as to each Defendant is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in the Eastern Division of the Northern District of Illinois.

100.    On December 14, 2017, the Judicial Panel on Multidistrict Litigation ("JPML") transferred this case to this Court for consolidated or coordinated pretrial proceedings.  On December 2, 2019, the JPML remanded this case to this Court.

### IV.    JURY DEMAND

101.    The City demands a jury trial pursuant to Federal Rule of Civil Procedure 38 for all claims triable by jury.

### V.    FACTUAL ALLEGATIONS

A.    The Science behind Pain Medicine.

    1.    Safe and Effective Treatment of Chronic Pain Hinges on Informed Risk Management.

102.    The practice of medicine hinges on informed risk management.  Prescribers must weigh the potential risks and benefits of each treatment option, as well as the risk of non-

treatment. Accordingly, the safe and effective treatment of chronic pain requires that a physician be able to weigh the relative risks of prescribing opioids against both (a) the relative benefits that may be expected during the course of opioid treatment and (b) the risks and benefits of alternatives.

103. This bedrock principle of full disclosure is particularly important in the context of chronic opioid therapy because of the risk that patients will become physically and psychologically dependent on the drugs and find it difficult to manage or terminate their use.

104. The FDA-approved drug labels on each of Defendants' opioids do not attempt to advise physicians how to maximize the benefit and minimize risk for patients on long-term chronic opioid therapy. The labels contain no dosing cap above which it would be unsafe for any doctor to prescribe to any patient. Nor do any of the labels provide a duration limit, after which the risks to a patient might increase. Thus, doctors and patients rely more heavily on educational materials, such as treatment guidelines, CMEs, scientific and patient education articles and websites, to inform their treatment decisions.

### 2. The Use of Opioids Is Associated with Known and Substantial Risks.

105. The pain-relieving properties of opium have been recognized for millennia. So has the magnitude of its potential for abuse and addiction. Opioids, after all, are closely related to illegal drugs like opium and heroin. During the Civil War, opioids, then known as "tinctures of laudanum," gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve pain—particularly on the battlefield—and were popularly used in a wide variety of commercial products ranging from pain elixirs to cough suppressants to beverages. By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to avoid patients' withdrawal. Both the numbers of opioid

addicts and the difficulty in weaning patients from opioids made clear their highly addictive nature.

106. Minimizing addiction has long been a policy objective of both the Illinois and federal governments. More than 25 years ago, the Illinois legislature announced that "drug addiction [is] among the most serious health problems facing the people of the State of Illinois" and, as a result, "[i]t is hereby declared to be the public policy of the State of Illinois to promote and encourage . . . [the] successful treatment of . . . drug addiction."[79] The City's workers' compensation program and health benefit plans have expended approximately $2.4 million on addiction treatment services from May 2013 to May 2015 alone, on top of the City's provision of grants to drug treatment centers for services including the treatment of opioid addiction.

107. Due to concerns about their addictive properties, opioids have been regulated at the federal level as controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," the result of an excessive dose.

108. Most patients with more than a few weeks of opioid therapy will experience withdrawal symptoms if opioids are discontinued (commonly referred to as "dependence"). Once dependent, a patient experiences deeply unpleasant symptoms when his or her current dose of opioids loses effect and is not promptly replaced with a new dose. Among the symptoms reported in connection with opioid withdrawal are: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which

---

[79]  745 ILCS 35/2.

may persist for months after a complete withdrawal from opioids, depending on how long opioids were used.

109.    Dr. Andrew Kolodny, Chief Medical Officer for Phoenix House, a national addiction treatment program, has explained the effect of opioids as akin to "hijack[ing] the brain's reward system," which in turn convinces a user that "the drug is needed to stay alive."[80] A patient's fear of the unpleasant effects of discontinuing opioids combined with the negative reinforcement during a period of actual withdrawal can drive a patient to seek further opioid treatment—even where ineffective or detrimental to quality of life—simply to avoid the deeply unpleasant effects of withdrawal.

110.    When under the continuous influence of opioids over a period of time, patients grow tolerant to their analgesic effects.  As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same levels of pain reduction he or she has become accustomed to—up to and including doses that are considered to be "frighteningly high."[81]  At higher doses, the effects of withdrawal are more substantial, thus leaving a patient at a much higher risk of addiction.  The FDA has acknowledged that available data suggest a relationship between increased doses and the risk of adverse effects.

111.    Patients receiving high doses of opioids as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses.  As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance

---

[80]    David Montero, *Actor's Death Sows Doubt Among O.C.'s Recovering Opioid Addicts*, The Orange Cnty. Reg. (Feb. 3, 2014), http://www.ocregister.com/articles/heroin-600148-shaffer-hoffman.html.

[81]    Mitchell H. Katz, Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith, 170(16) Archives of Internal Med. 1422 (2010).

to analgesic effects. Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended.

112. Further, "a potential side effect from chronic use [of opioids] can be abuse and addiction . . . . [i]n fact, correct use and abuse of these agents are not polar opposites—they are complex, inter-related phenomena."[82] It is very difficult to tell whether a patient is physically dependent, psychologically dependent, or addicted. Drug-seeking behaviors, which are signs of addiction, will exist and emerge when opioids are suddenly not available, the dose is no longer effective, or tapering of a dose is undertaken too quickly.

113. Studies have shown that between 30% and 40% of long-term users of opioids experience problems with opioid use disorders.[83]

114. Each of these risks and adverse effects—dependence, tolerance, and addiction—is fully disclosed in the labels for each of Defendants' opioids (though, as described below, not in Defendants' marketing).[84] Prior to Defendants' deceptive marketing scheme, each of these risks was well-recognized by doctors and seen as a reason to use opioids to treat chronic pain sparingly and only after other treatments had failed.

115. Opioids vary by duration. Long-acting opioids are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours. Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's

---

[82]   Wilson M. Compton & Nora D. Volkow, *Major Increases in Opioid Analgesic Abuse in the United States: Concerns and Strategies*, 81(2) Drug & Alcohol Dependence 103, 106 (2006).

[83]   Joseph A. Boscarino et al., Risk factors for drug dependence among out-patients on opioid therapy in a large US health-care system, 105(10) Addiction 1776 ( 2010); Joseph A. Boscarino et al., Prevalence of Prescription Opioid-Use Disorder Among Chronic Pain Patients: Comparison of the DSM-5 vs. DSM-4 Diagnostic Criteria, 30(3) Journal of Addictive Diseases 185 (2011).

[84]   For example, Purdue's OxyContin label (October 5, 2011) states: "Physical dependence and tolerance are not unusual during chronic opioid therapy."

Opana ER, Actavis's Kadian, and Mallinckrodt's Xartemis XR are all examples of long-acting opioids. In addition, opioids may be taken in short-acting formulations, which last for approximately 4-6 hours. Short-acting opioids may be taken in addition to long-acting opioids to address "episodic pain." Cephalon's Actiq and Fentora are particularly fast-acting drugs that are explicitly indicated only for use in conjunction with continuous opioid therapy. Defendants promoted the idea that pain should be treated first by taking long-acting opioids continuously and then by taking short-acting, rapid-onset opioids on top of that.

116. While it was once thought that long-acting opioids would not be as susceptible to abuse and addiction as short-acting ones, this view has been discredited. OxyContin's label now states, as do all labels of Schedule II long-acting opioids, that the drug "exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death." The FDA has required extended release and long-acting opioids to adopt "Risk Evaluation Mitigation Strateg[ies]" on the basis that they present "a serious public health crisis of addiction, overdose, and death."[85]

117. In 2013, in response to a petition to restrict the labels of long-acting opioid products, the FDA noted the "grave risks" of opioids, "the most well-known of which include addiction, overdose, and even death."[86] The FDA further warned that "[e]ven proper use of opioids under medical supervision can result in life-threatening respiratory depression, coma, and death."[87] The FDA required that—going forward—opioid makers of long-acting formulations clearly communicate these risks in their labels (defined, as noted in Section V.C.1, to include promotional materials disseminated by or on behalf of the manufacturer of the drug).

---

[85] FDA, *Risk Evaluation and Mitigation Strategy (REMS) for Extended-Release and Long-Acting Opioids* (last updated Oct. 9, 2014), http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm163647.htm.

[86] Letter from Janet Woodcock, M.D., *supra*, at 2.

[87] *Id*.

Thus, the FDA confirmed what had previously been accepted practice in the treatment of pain—that the adverse outcomes from opioid use include "addiction, unintentional overdose, and death" and that long-acting or extended release opioids "should be used ***only when alternative treatments are inadequate***."[88]

118.     Notably, in reaching its conclusion, the FDA did not rely on new or otherwise previously unavailable scientific studies regarding the properties or effects of opioids.

### 3.     The Benefits Offered by Long-Term Opioid Use Are Unproven and Contradicted.

119.     Despite the fact that opioids now are routinely prescribed, there never has been evidence of their safety and efficacy for long-term use.  Defendants always have been aware of these gaps in knowledge.  While promoting opioids to treat chronic pain, Defendants have failed to disclose the lack of evidence to support their use long-term and have failed to disclose the contradictory evidence that chronic opioid therapy actually makes patients sicker.

120.     There are no controlled studies of the use of opioids beyond 16 weeks, and no evidence that opioids improve patients' pain and function long-term.  The first random, placebo-controlled studies appeared in the 1990s, and revealed evidence only for short-term efficacy and only in a minority of patients.[89]  A 2004 report reviewed 213 randomized, controlled trials of treatments for cancer pain and found that, while opioids had short-term efficacy, the data was insufficient to establish long-term effectiveness.  Subsequent reviews of the use of opioids for cancer and non-cancer pain consistently note the lack of data to assess long-term outcomes.  For example, a 2007 systematic review of opioids for back pain concluded that opioids have limited,

---

[88]     *Id.* at 7 (emphasis in original).

[89]     Nathaniel Katz, Opioids: After Thousands of Years, Still Getting to Know You, 23(4) Clin J. Pain 303 (2007); Roger Chou et al., Research Gaps on Use of Opioids for Chronic Noncancer Pain, 10(2) J. Pain 147 (2009).

if any, efficacy for back pain and that evidence did not allow judgments regarding long-term use. Similarly, a 2011 systematic review of studies for non-cancer pain found that evidence of long-term efficacy is poor. One year later, a similar review reported poor evidence of long-term efficacy for morphine, tramadol, and oxycodone, and fair evidence for transdermal fentanyl (approved only for use for cancer pain).

121. On the contrary, evidence exists to show that opioid drugs are not effective to treat chronic pain, and may worsen patients' health. A 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. Most notably, it stated: "For functional outcomes, the other analgesics were significantly more effective than were opioids."[90] Another review of evidence relating to the use of opioids for chronic pain found that up to 22.9% of patients in opioid trials dropped out before the study began because of the intolerable effects of opioids and that the evidence of pain relief over time was weak.

122. Endo's own research shows that patients taking opioids, as opposed to other prescription pain medicines, report higher rates of obesity (30% to 39%); insomnia (9% to 22%); and self-described fair or poor health (24% to 34%).

123. Increasing duration of opioid use is strongly associated with an increasing prevalence of mental health conditions (depression, anxiety, post-traumatic stress disorder, or substance abuse), increased psychological distress, and greater health care utilization.

---

[90]   Andrea D. Furlan et al., *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Can. Med. Ass'n J. 1589 (2006). This same study revealed that efficacy studies do not typically include data on opioid addiction. In many cases, patients who may be more prone to addiction are pre-screened out of the study pool. This does not reflect how doctors actually prescribe the drugs, because even patients who have past or active substance use disorders tend to receive higher doses of opioids. Karen H. Seal, *Association of Mental Health Disorders With Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307(9) J. Am. Med. Ass'n 940 (2012).

124.    As a pain specialist noted in an article titled *Are We Making Pain Patients Worse?*, "[O]pioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning.  Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[91]

125.    This is true both generally and for specific pain-related conditions.  Studies of the use of opioids long-term for chronic lower back pain have been unable to demonstrate an improvement in patients' function.  Instead, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not cause patients to return to work or physical activity.  This is due partly to addiction and other side effects.

126.    As many as 30% of patients who suffer from migraines have been prescribed opioids to treat their headaches.  Users of opioids had the highest increase in the number of headache days per month, scored significantly higher on the Migraine Disability Assessment (MIDAS), and had higher rates of depression, compared to non-opioid users.  A survey by the National Headache Foundation found that migraine patients who used opioids were more likely to experience sleepiness, confusion, and rebound headaches, and reported a lower quality of life than patients taking other medications.

127.    The lack of evidence for the efficacy of opioid use long-term has been well-documented nationally in the context of workers' compensation claims, where some of the most detailed data exists.  Claims involving workers who take opioids are almost four times as likely to reach costs of over $100,000 than claims without opioids, as these patients suffer greater side effects and are slower to return to work.  Even adjusting for injury severity and self-reported pain

---

[91]    Andrea Rubenstein, *Are we making pain patients worse?*, Sonoma Medicine (Fall 2009).

score, receiving an opioid for more than seven days and receiving more than one opioid prescription increased the risk that the patient would be on work disability one year later. A prescription for opioids as the first treatment for a workplace injury doubled the average length of the claim.

### 4. Defendants' Impact on the Perception and Prescribing of Opioids.

128. Before Defendants began their marketing campaign, generally accepted standards of medical practice dictated that opioids should only be used short-term, for instance, for acute pain, pain relating to recovery from surgery, or for cancer or palliative care. In those instances, the risks of addiction are low or of little significance.

129. In 1986, the World Health Organization ("WHO") published an "analgesic ladder" for the treatment of cancer pain. The WHO recommended treatment with over-the-counter or prescription acetaminophen or non-steroidal anti-inflammatory drugs ("NSAIDs") first, and then use of unscheduled or combination opioids, and then stronger (Schedule II or III) opioids if pain persisted. The WHO ladder pertained only to the treatment of cancer pain, and did not contemplate the use of narcotic opioids for chronic pain—because the use of opioids for chronic pain was not considered appropriate medical practice at the time.

130. Studies and articles from the 1970s and 1980s made clear the reasons to avoid opioids. Scientists observed negative outcomes from long-term opioid therapy in pain management programs: opioids' mixed record in reducing pain long-term and failure to improve patients' function; greater pain complaints as most patients developed tolerance to opioids; opioid patients' diminished ability to perform basic tasks; their inability to make use of complementary treatments like physical therapy due to the side effects of opioids; and addiction. Leading authorities discouraged, or even prohibited, the use of opioid therapy for chronic pain.

131.     In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of

Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at the same

time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew

substantial gains in employment or social function could be attributed to the institution of opioid

therapy."[92]

132.     Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the

dangers of long-term use of opioids:

> The traditional approach to chronic nonmalignant pain does not
> accept the long-term administration of opioid drugs.     This
> perspective has been justified by the perceived likelihood of
> tolerance, which would attenuate any beneficial effects over time,
> and the potential for side effects, worsening disability, and
> addiction.  According to conventional thinking, the initial response
> to an opioid drug may appear favorable, with partial analgesia and
> salutary mood changes, but adverse effects inevitably occur
> thereafter.  It is assumed that the motivation to improve function will
> cease as mental clouding occurs and the belief takes hold that the
> drug can, by itself, return the patient to a normal life.  _Serious
> management problems are anticipated, including difficulty in
> discontinuing a problematic therapy and the development of drug
> seeking behavior induced by the desire to maintain analgesic effects,
> avoid withdrawal, and perpetuate reinforcing psychic effects.  There
> is an implicit assumption that little separates these outcomes from
> the highly aberrant behaviors associated with addiction._[93]

According to Portenoy, these problems could constitute "compelling reasons to reject long-term

opioid administration as a therapeutic strategy in all but the most desperate cases of chronic

nonmalignant pain."[94]

---

[92]     Russell K. Portenoy & Kathleen M. Foley, Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of
38 cases, 25(2) Pain 171 (1986).

[93]     Portenoy, Opioid Therapy for Chronic Nonmalignant Pain: Current Status, supra (emphasis added).

[94]     _Id._

133. For the reasons outlined by Dr. Portenoy, and in the words of one researcher from the Harvard Medical School, "it did not enter [doctors'] minds that there could be a significant number of chronic pain patients who were successfully managed with opioids."[95] Defendants changed that perception.

**B. Defendants Promoted Their Branded Products Through Direct Marketing to Prescribers and Consumers.**

134. Defendants' direct marketing proceeded on two tracks, serving two related purposes. First, Defendants worked through branded and unbranded marketing to build confidence in long-term opioid use by overstating its benefits and downplaying its risks, and thereby expand the chronic pain market. In addition, Defendants worked through their own staffs of sales representatives, physician speakers whom those representatives recruited, and advertising in medical journals to claim their share of that broader market. Defendants directed all of this activity through carefully designed marketing plans that were based on extensive research into prescriber habits and the efficacy of particular sales approaches and messages.

**1. Defendants Relied Upon Branded Advertisements.**

135. Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the *Journal of Pain* and *Clinical Journal of Pain*, to journals with wider medical audiences, such as the *Journal of the American Medical Association*. Defendants' advertising budgets peaked in 2011, when they collectively spent more than $14 million on medical journal advertising of opioids, nearly triple what they

---

[95] Igor Kissin, Long-term opioid treatment of chronic nonmalignant pain: unproven efficacy and neglected safety?, 6 J. Pain Research 513, 514 (2013) (quoting Loeser JD, Five crises in pain management, 20(1) Pain Clinical Updates 1-4 (2012).

spent in 2001.  The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.[96]

136.    As described in Sections V.D and V.E below, a number of these branded advertisements deceptively portrayed the benefits of opioid therapy for chronic pain.  As just one example, a 2005 Purdue advertisement for OxyContin that ran in the *Journal of Pain* touted the drug as an "around-the-clock analgesic . . . for an extended period of time."  The advertisement featured a man and boy fishing and proclaimed that "There Can Be Life With Relief."  This depiction falsely implied that OxyContin provides both effective long-term pain relief and functional improvement, claims that, as described below, are unsubstantiated and contradicted in the medical literature.

### 2.    Defendants Relied Upon Their Sales Forces and Recruited Physician Speakers.

137.    Each Defendant promoted the use of opioids for chronic pain through "detailers"— sales representatives who visited individual physicians and their staff in their offices—and small group speaker programs.  By establishing close relationships with doctors, Defendants' sales representatives were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to differentiate their opioids and to address individual prescribers' concerns about prescribing opioids for chronic pain.  Representatives were trained on techniques to build these relationships, with Actavis even rolling out an "Own the Nurse" kit as a "door opener" to time with doctors.

138.    Defendants developed sophisticated plans to select prescribers for sales visits based on their specialties and prescribing habits.  In accordance with common industry practice,

---

[96]    In 2011, Actavis spent less than $100,000 on such advertising, and Cephalon spent nothing.  These companies' medical journal advertising peaked earlier, with Actavis spending $11.7 million in 2005, and Cephalon spending about $2 million in each of 2007 and 2008.

Defendants purchase and closely analyze prescription sales data from IMS Health that allows them to track, precisely, the rates of initial prescribing and renewal by individual doctor, which in turn allows them to target, tailor, and monitor the impact of their appeals.

139. Defendants in particular relied upon "influence mapping," *i.e.*, using decile rankings or similar breakdowns to identify the high-volume prescribers as to whom detailing would have the greatest sales impact. Endo, for example, identified prescribers representing 30% of its nationwide sales volume (decile Nos. 8 through 10) and planned to visit these physicians three times per month. Defendants also closely monitored doctors' prescribing after a sales representative's visit to allow them to refine their planning and messaging and to evaluate and compensate their detailers.

140. Defendants' sales representatives have visited hundreds of thousands of doctors, including thousands of visits to Chicago prescribers, and as described herein, spread misinformation regarding the risks, benefits, and superiority of opioids for the treatment of chronic pain. This misinformation includes deceptive and unfair claims regarding the risks of opioids for chronic pain, particularly the risks of addiction, withdrawal, and high doses, as well as the benefits.

141. As described in more detail in Section V.E below, each Defendant carefully trained its sales representatives to deliver company-approved messages designed to generate prescriptions of that company's drugs in particular and opioids in general. Pharmaceutical companies exactingly direct and monitor their sales representatives—through detailed action plans, trainings, tests, scripts, role-plays, supervisor tag-alongs, and other means—to ensure that individual detailers actually deliver the desired messages and do not veer off-script. Pharmaceutical companies likewise require their detailers to deploy sales aids reviewed,

approved, and supplied by the company and forbid them to use, in industry parlance, "homemade bread"—*i.e.*, promotional materials not approved by the company's marketing and compliance departments. Sales representatives' adherence to their corporate training typically is included in their work agreements. Departing from their company's approved messaging can and does lead to severe consequences, including termination of employment.

142. Besides carefully training their sales representatives, Defendants also used surveys of physicians—conducted by third-party research firms—to assess how well their core messages came across to prescribers. These "verbatim" recollections of detailers' messages are an integral tool in ensuring consistent message delivery. They also help Defendants gauge physicians' perceptions of, and willingness to prescribe, a particular Defendant's drugs. As described below in Section V.B.4, data obtained by the City, reflecting Midwest prescribers' verbatim recollections of sales calls (as well as electronic, meeting, and event promotional activity), corroborate the types of deceptive and unfair detailing messages that Defendants purveyed nationally and in Chicago.

143. In addition to making sales calls, Defendants' detailers also identified doctors to serve, for payment, on Defendants' speakers' bureaus and to attend programs with speakers and meals paid for by Defendants. Defendants almost always select physicians who are "product loyalists," since one question they will be asked is whether they prescribe the drug themselves. Endo, for instance, sought to use specialists in pain medicine—including high prescribers of its drugs—as local thought leaders to market Opana ER to primary care doctors. Such invitations are lucrative to the physicians selected for these bureaus; honorarium rates range from $800 to $2,000 per program, depending on the type of event, and even speaker training typically is compensated at $500 per hour.

144. These speaker programs and associated speaker training serve three purposes: they provide an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; a forum in which to further market to the speaker him or herself; and an opportunity to market to the speaker's peers. Janssen thus described its speaker programs as a "key driver" of opioid business, and noted that they "often trigger first use." Defendants grade their speakers, and future opportunities are based on speaking performance, post-program sales, and product usage. Defendants also track the prescribing of event attendees, with Endo noting that "physicians who came into our speaker programs wrote more prescriptions for Opana ER after attending than before." In the same vein, Cephalon found that attending one speaker program "activate[d]" 43% of attendees as Fentora prescribers. It would make little sense for Defendants to devote significant resources to programs that did not increase their sales.

145. Like the sales representatives who select them, speakers are expected to stay "on message"—indeed, they agree in writing to follow the slide decks provided to them. Endo's speaker rules, for example, provide that "all slides must be presented in their entirety and without alterations . . . and in sequence." This is important because the FDA regards promotional talks as part of product labeling, and requires their submission for review. Speakers thus give the appearance of providing independent, unbiased presentations on opioids, when in fact they are presenting a script prepared by Defendants' marketing departments. Although these meal-based speaker events are more expensive to host and typically have lower attendance than CMEs, they are subject to less professional scrutiny and thus afford Defendants greater freedom in the messages they present.

146. Defendants devoted massive resources to these direct sales contacts with prescribers. In 2014, Defendants collectively spent $168 million on detailing branded opioids to

physicians nationwide. This figure includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Actavis. The total figure is more than double Defendants' collective spending on detailing in 2000. Detailers' role in Defendants' overall promotional efforts was also carefully calibrated; Endo, for example, found that devoting 61% of its marketing budget to sales representatives reflected an "[a]ppropriate combination of personal . . . and non-personal . . . selling initiatives."

147. Defendants have spent hundreds of millions of dollars promoting their opioids through their respective sales forces because they understand that detailers' sales pitches are effective. Numerous studies indicate that marketing can and does impact doctors' prescribing habits,[97] and face-to-face detailing has the highest influence on intent to prescribe. Defendants could see this phenomenon at work not only in the aggregate, as their sales climbed with their promotional spending, but also at the level of individual prescribers, whom they targeted for detailing and who responded by prescribing more of Defendants' drugs.

### 3. Defendants Directed These Promotional Efforts Through Detailed Marketing Plans.

148. Defendants guided their efforts to expand opioid prescribing through comprehensive marketing and business plans for each drug. These documents, based on the companies' extensive market research, laid out ambitious plans to bring in new prescribers and increase overall prescribing of Defendants' opioids.

---

[97] *See, e.g.,* Puneet Manchanda & Pradeep K. Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis*, 15 (2-3) Mktg. Letters 129 (2004) (detailing has a positive impact on prescriptions written); Ian Larkin, *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children*, 33(6) Health Affairs 1014 ( 2014) (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am J. Pub. Health 221 (2009) (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997 to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls).

a.     Targeting categories of prescribers

149.     Defendants targeted, by zip codes and other local boundaries, individual health care providers for detailing.  Defendants chose their targets based on the potential for persuading a provider to prescribe, ease of in-person access, and the likelihood of higher numbers of prescriptions at higher doses, with no correlation to demonstrated need or demand for opioid therapy, or to risk of abuse.

150.     Collectively, Defendants' marketing plans evince dual strategies, which often operated parallel to one another.  Defendants' sales representatives continued to focus their detailing efforts on pain specialists and anesthesiologists, who are the highest-volume prescribers of opioids but are also, as a group, more educated than other practitioners about opioids' risks and benefits.  Seeking to develop market share and expand sales, however, Defendants also targeted increasing numbers and types of prescribers for marketing.

151.     This expanded market of prescribers was, as a group, less informed about opioids and, market research concluded, more susceptible to Defendants' marketing messages.  These prescribers included nurse practitioners and physician assistants, who, a 2012 Endo business plan noted, were "share acquisition" opportunities because they were "3x times more responsive than MDs to details" and wrote "96% of [their] prescriptions . . . without physician consult."  Janssen similarly focused on non-physician prescribers, observing that they "[v]alue information from pharmaceutical companies, e.g., from reps and . . . KOLs."

152.     The expanded market also included internists and general practitioners who were low- to mid-volume prescribers.  Actavis, for example, rolled out a plan in 2008 to move beyond "Kadian loyalists" to an "expanded audience" of "low morphine writers."  Cephalon likewise perceived primary care physicians as the principal "drivers of opioid volume," even though its

opioids—Actiq and Fentora—are indicated only for cancer pain in opioid tolerant patients, which typically is not treated by general practitioners.

        b.     Increasing "direct to consumer" marketing

153.   Defendants knew that physicians were more likely to prescribe their branded medications when patients asked for those medications. Endo's research, for example, found that such communications resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. Defendants thus increasingly took their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials. These took the form of pamphlets, videos, or other publications that patients could view in their physician's office, as well as employer and workers' compensation plan initiatives to, as Endo put it, "[d]rive demand for access through the employer audience by highlighting cost of disease and productivity loss."

154.   Defendants also knew that one of the largest obstacles to patients starting and remaining on their branded opioids—including by switching from a competitor's drug—was out-of-pocket cost. They recognized they could overcome this obstacle by providing patients financial assistance with their insurance co-payments, and each of the Defendants did so through vouchers and coupons distributed during detailing visits with prescribers. A 2008 Actavis business review, for example, highlighted co-pay assistance, good for up to $600 per patient per year, as a way to drive conversions to Kadian from competitor drugs like Avinza and MS Contin. In 2012, Janssen planned to distribute 1.5 million savings cards worth $25 each.

        c.     Differentiating each brand

155.   Purdue's OxyContin was the clear market leader in prescription opioid therapy, with 30% of the market for analgesic drugs in 2012. Meanwhile, by 2010, Defendants faced increasing pushback from the medical community and regulators based on the growing problems

of opioid addiction and abuse.  Both market conditions prompted Defendants to pursue product differentiation strategies—and particularly an emphasis on their products being less subject to diversion, abuse, and addiction—as a means of grabbing market share from Purdue and other competitors.

156.    Endo, for example, tracked in detail prescriber "switching" from OxyContin to Opana ER, and Actavis and Janssen did the same for switches to Kadian and Nucynta ER, respectively.  Pressure to stand out among other drugs resulted in Defendants identifying marketing themes that thereafter were reflected in Defendants' deceptive and harmful messages to physicians and consumers, as described in greater detail in Sections V.D and V.E below.  A 2008 Janssen plan emphasized "value" messaging in support of Nucynta ER, including claims of less dose escalation, lower toxicity, fewer withdrawal symptoms, and less dependence, and a 2009 Opana ER market research report focused on greater potency and lower abuse potential of Opana ER vis-à-vis OxyContin.

### d.    Moving beyond office visits

157.    Defendants sought to reach additional prescribers by expanding beyond traditional sales calls and speaker events to new channels for their messages.  For their sales forces, these included marketing to prescribers through voice mail, postcards, and email—so-called "e-detailing."  Defendants also created new platforms for their speakers by implementing "peer to peer" programs such as teleconferences and webinars that were available to prescribers nationally.  These programs allowed Defendants to use this more seemingly credible vehicle to market to, among other hard-to-reach audiences, prescribers at hospitals, academic centers, and other locations that limit or prohibit in-person detailing.  Employing these new approaches, each Defendant relied heavily on speakers to promote its drugs.

### 4. Defendants Marketed Opioids in Chicago Using the Same Strategies and Messages They Employed Nationwide.

158.    As one of the United States' largest cities, and the regional hub of the Midwest, Chicago is a focus of Defendants' marketing efforts. Chicago and the Midwest are attractive targets to pharmaceutical companies based on population density, consequent sales efficiency, and demographics—with opportunities for growth among large elderly and labor populations. Defendants also perceived Chicago and Illinois as receptive to their marketing messages, with Janssen giving the state a "Launch Friendly and Market Opportunity" score, in connection with the 2011 launch of Nucynta ER launch, that ranked 11th out of 50 states.

159.    Defendants employed the same marketing plans and strategies and deployed the same messages in Chicago as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Defendants' messages are accurately and consistently delivered across marketing channels—including detailing visits, speaker events, and advertising—and in each sales territory. Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

160.    Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. As noted above in Section V.B.2, Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide desks, and supervisors rode along with them periodically to both check on their performance and compliance.

161.     As they did nationwide, Defendants extensively tracked the prescribing behavior of Chicago-area health care providers and used that data to target their detailing and speaker-recruiting efforts.  Top prescribers were profiled at the city, region, zip code, and sometimes facility levels, with information about their specialty, prescribing patterns (including product and dose), product loyalty and refill history.  Providers' prescribing volume was ranked and sorted into deciles.

162.     This information allowed Defendants to target, within each sales territory, prescribers who could have the biggest sales impact.  Indeed, one Chicago pain specialist, Prescriber NN, who estimates that he writes 600-700 opioid prescriptions each month for the treatment of long-term chronic pain, observed that detailers see him often because he is "big money for these people."  Tracking prescribing behavior also enabled Defendants to zero in on trends; Actavis, for example, identified on a monthly basis the prescribers with the greatest increases and decreases in prescriptions written.

163.     As described herein, misrepresentations and deceptions regarding the risks, benefits, and superiority of opioid use to treat chronic pain were part and parcel of Defendants' marketing campaigns in Chicago.

164.     These misrepresentations are reflected in the accounts of Chicago prescribers whom the City interviewed.  As set forth below in Sections V.E, these prescribers were on the receiving end of Defendants' misleading messaging via detailing visits; CMEs; small-group speaker programs; dinners, and other meals; branded advertisements; and unbranded promotional materials funneled through third parties.  These deceptive and unfair messages include the unfounded and untrue claims described in Section V.D about functional improvement; the risks

of abuse, addiction, withdrawal, and higher dosing; the duration of pain relief, and the superiority of opioids to other treatments.

165.    Such misrepresentations also are captured in the verbatim sales message recall data obtained by the City.  To gain insight into detailing messaging, the City obtained data from a market research and analytics company that performs promotional message tracking in the pharmaceutical industry.  The data consist of verbatim messages from detailing activity (as well as electronic, meeting, and event promotional activity) to a sample of panelists—office-based physicians, hospital-based physicians, nurse practitioners, and physician assistants—in the Midwest.  Each month, panelists report via online surveys on the promotional activity in which they participated that month.  The panelists' responses are based on the panelists' perception of the main message of the promotion.  The responses received by the research company are reported word-for-word as "verbatims."

166.    Surveyed Midwestern health care providers often reported that Defendants' representatives marketed their drugs as safe, with low risk of addiction or lower risk than competing opioids, and touted that their company's product was the drug of choice for chronic pain conditions such as low back pain and osteoarthritis.  As reported by these health care professionals, Defendants' representatives also repeatedly claimed or implied that their drugs had minimal or low abuse potential; were safer than other pain medications; and, in the case of Cephalon's Actiq and Fentora, were appropriate for off-label uses.  Individual Defendants' misrepresentations contained in that data are described below in Section V.E[98]

---

[98]    As also set forth in that section, many of the misrepresentations reported in the Midwestern verbatim data and in the City's interviews with Chicago-area prescribers can be traced back to sales training materials produced to the City by Defendants.  However, the City does not have access to all of the materials on which Defendants' sales representatives were trained.  Upon information and belief—based on the careful instruction and monitoring sales representatives receive to ensure that they deliver only company-approved messages—Defendants' sales representatives received corporate training on each of the deceptive statements reported by prescribers herein.

**C.    Defendants Used "Unbranded" Marketing to Evade Regulations and Consumer Protection Laws.**

167.    In addition to their direct marketing efforts, Defendants used unbranded, third-party marketing, which they deployed as part of their national marketing strategies for their branded drugs. Each Defendant executed these strategies through a network of third-party KOLs and Front Groups, with which it acted in concert by funding, assisting, encouraging, and directing their efforts, while at the same time exercising substantial control over the content of the messages these third parties generated and disseminated, and distributing certain of those materials themselves.  As with their other marketing strategies, Defendants' unbranded marketing created and relied upon an appearance of independence and credibility that was undeserved but central to its effectiveness.  Unlike their direct promotional activities, Defendants' unbranded marketing allowed them to evade the oversight of federal regulators and gave them greater freedom to expand their deceptive messages.

**1.    Regulations Governing Branded Promotion Require that it Be Truthful, Balanced, and Supported by Substantial Evidence.**

168.    Drug companies that make, market, and distribute opioids are subject to generally applicable rules requiring truthful marketing of prescription drugs.  A drug company's branded marketing, which identifies and promotes a specific drug, must:  (a) be consistent with its label and supported by substantial scientific evidence; (b) not include false or misleading statements or material omissions; and (c) fairly balance the drug's benefits and risks.[99]  The regulatory framework governing the marketing of specific drugs reflects a public policy designed to ensure that drug companies, which are best suited to understand the properties and effects of their drugs,

---

[99]    21 U.S.C. § 352(a); 21 C.F.R. §§ 1.21(a), 202.1(e)(3), 202.1(e)(6).

are responsible for providing prescribers with the information they need to accurately assess the risks and benefits of drugs for their patients.

169.    Further, the Federal Food, Drug, and Cosmetic Act ("FDCA") prohibits the sale in interstate commerce of drugs that are "misbranded." A drug is "misbranded" if it lacks "adequate directions for use" or if the label is false or misleading "in any particular."[100] "Adequate directions for use" are directions "under which the layman can use a drug safely and for the purposes for which it is intended."[101] Labeling" includes more than the drug's physical label; it also includes "all . . . other written, printed, or graphic matter . . . accompanying" the drug, including promotional material.[102] "The term "accompanying" is interpreted broadly to include promotional materials—posters, websites, brochures, books, and the like—disseminated by or on behalf of the manufacturer of the drug.[103] Thus, Defendants' promotional materials are part of their drugs' labels and required to be accurate, balanced, and not misleading.

170.    Labeling is misleading if it is not based on substantial evidence, if it materially misrepresents the benefits of the drug, or if it omits material information about or minimizes the frequency or severity of a product's risks. "The most serious risks set forth in a product's labeling are generally material to *any* presentation of efficacy." The FDA notes that "[b]ecause people expect to see risk information, there is no reason for them to imagine that the product has important risks that have been omitted . . . especially if some risks are included."[104] Promotion

---

[100]    21 U.S.C. §§ 352.

[101]    21 C.F.R. § 201.5.

[102]    21 U.S.C. § 321(m).

[103]    See id.

[104]    FDA, Draft Guidance for Industry, Presenting Risk Information in Prescription Drug and Medical Device Promotion, May 2009, at 14.

that fails to present the most important risks of the drug as prominently as its benefits lacks fair balance and is therefore deceptive.

171.     It is also illegal for drug companies to distribute materials that exclude contrary evidence or information about the drug's safety or efficacy or present conclusions that "clearly cannot be supported by the results of the study."[105]  Drug companies further must not make comparisons between their drugs and other drugs that represent or suggest that "a drug is safer or more effective than another drug in some particular when it has not been demonstrated to be safer or more effective in such particular by substantial evidence or substantial clinical experience."[106]

172.     While the FDA must approve a drug's label, it is the drug company's responsibility to ensure that the material in its label is accurate and complete and is updated to reflect any new information.[107]  Promotional materials also must be submitted to the FDA when they are first used or disseminated.  The FDA does not have to approve these materials in advance; if, upon review, the FDA determines that materials marketing a drug are misleading, it can issue an untitled letter or warning letter.  The FDA uses untitled letters for violations such as overstating the effectiveness of the drug or making claims without context or balanced information.  Warning letters address promotions involving safety or health risks and indicate the FDA may take further enforcement action.

---

[105]   21 C.F.R. § 99.101(a)(4).

[106]   21 C.F.R. § 202.1(e)(6)(ii).

[107]   *See* 21 C.F.R. § 201.56 (providing general requirements for prescription drug labeling); *see also Wyeth v. Levine*, 555 U.S. 555 (2009) (holding that a drug company bears responsibility for the content of its drug labels at all times); 21 C.F.R. § 314.70(c)(6) (iii)(A-C) (allowing manufacturers to make changes that "strengthen . . . a warning, precaution, or adverse reaction" or "strengthen a statement about drug abuse, dependence, psychological effect, or overdosage").

173. The Chicago Consumer Fraud and False Claim ordinances reflect the same judgment that drug companies, just like other businesses, have a duty to deal honestly with consumers, government, and other payors who purchase and use their products.

**2. Defendants Deployed Front Groups and Doctors to Disseminate Unbranded Information on Their Behalf.**

174. Drug companies market both directly and indirectly, using third party validators (such as scientists, physicians, or patient or professional organizations) that appear to be independent and therefore more credible. The FDA has made clear that its promotional requirements apply to both forms of marketing:

> FDA's regulation of prescription drug product promotion extends both to promotional activities that are carried out by the firm itself, and to promotion conducted on the firm's behalf.
>
> . . . .
>
> Therefore, a firm is responsible for the content generated by its employees or any agents acting on behalf of the firm who promote the firm's product. For example, if an employee or agent of a firm, such as a medical science liaison or paid speaker (e.g., a key opinion leader) acting on the firm's behalf, comments on a third-party site about the firm's product, the firm is responsible for the content its employee or agent provides. A firm is also responsible for the content on a blogger's site if the blogger is acting on behalf of the firm. [108]

175. In addition to being carried out directly or through third parties, drug companies' promotional activity can be branded or unbranded; unbranded marketing refers not to a specific drug, but more generally to a disease state or treatment. By using unbranded communications,

---

[108] FDA, Draft Guidance for Industry on Fulfilling Regulatory Requirements for Postmarketing Submissions of Interactive Promotional Media for Prescription Human and Animal Drugs and Biologics, January 2014, at 1, 4, http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/ guidances/ucm381352.pdf.

drug companies can sidestep the extensive regulatory framework, described in Section V.C.1, governing branded communications.

176.    Defendants disseminated many of their false, misleading, imbalanced, and unsupported statements indirectly, through KOLs and Front Groups, and in unbranded marketing materials.  These KOLs and Front Groups were important elements of Defendants' marketing plans, which specifically contemplated their use, because they seemed independent and therefore outside of FDA oversight.  Through unbranded materials, Defendants presented information and instructions concerning opioids generally that were contrary to, or at best, inconsistent with information and instructions listed on Defendants' branded marketing materials and drug labels and with Defendants' own knowledge of the risks, benefits and advantages of opioids. Defendants did so knowing that unbranded materials typically are not submitted to or reviewed by the FDA.

177.    Even where such unbranded messages were channeled through third-party vehicles, Defendants adopted these messages as their own when they cited to, edited, approved, and distributed such materials knowing they were false, misleading, unsubstantiated, unbalanced, and incomplete.  Unbranded brochures and other materials that are "disseminated by or on behalf of [the] manufacturer" constitute drug "labeling" that may not be false or misleading in any particular.  *See* 21. C.F.R. 202.1(e)(7)(l)(2).[109]  As described below and in Section V.E,

---

[109]    This regulation provides:  "Brochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug and the references published . . . containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling, as defined in section 201(m) of the act."  As labeling, such third party-created content distributed by a drug company may not be misleading and must meet the accuracy, substantiation, and fair balance requirements in the FDCA.

Defendants' sales representatives distributed third-party marketing material that was deceptive to Defendants' target audiences. Defendants are responsible for these materials.

178. Moreover, Defendants took an active role in guiding, reviewing, and approving many of the misleading statements issued by these third parties, ensuring that Defendants were consistently aware of their content. By funding, directing, editing, and distributing these materials, Defendants exercised control over their deceptive messages and acted in concert[110] with these third parties to fraudulently promote the use of opioids for the treatment of chronic pain.

179. For example, drug companies have been admonished for making functional claims in FDA-reviewed branded materials because there is no evidence for such claims. Thus, drug companies were put on notice that the FDA would not allow such claims in branded materials. Defendants instead created and disseminated these same unsupported claims—that opioids allow patients to sleep, return to work, or walk more easily—through *unbranded* marketing materials.

180. The third-party publications Defendants assisted in creating and distributing did not include the warnings and instructions mandated by their FDA-required drug labels and consistent with the risks and benefits known to Defendants. For example, these publications either did not disclose the risks of addiction, abuse, misuse, and overdose, or affirmatively denied that patients faced a serious risk of addiction.

181. By acting through third parties, Defendants were able to both avoid FDA scrutiny and give the false appearance that the messages reflected the views of independent third parties.

---

[110] As used in this Complaint, the allegation that Defendants "acted in concert" with third parties is intended to mean *both* that they conspired with these third parties to achieve some end and that they aided and abetted these third parties in the commission of acts necessary to achieve it.

Later, Defendants would cite to these sources as "independent" corroboration of their own statements.  As one physician adviser to Defendants noted, third-party documents not only had greater credibility, but broader distribution, as doctors did not "push back" at having materials from, for example, the non-profit American Pain Foundation ("APF") on display in their offices, as they might with first party, drug company pieces.  Nevertheless, the independence of these materials was a ruse—Defendants were in close contact with these third parties, paid for and were aware of the misleading information they were disseminating about the use of opioids to treat chronic pain, and regularly helped them to tailor and distribute their misleading, pro-opioid messaging.

182.    As part of a strategic marketing scheme, Defendants spread and validated their deceptive messages through the following vehicles:  (a) KOLs, who could be counted upon to write favorable journal articles and deliver supportive CMEs; (b) a body of biased and unsupported scientific literature; (c) treatment guidelines; (d)  CMEs; (e) unbranded patient education materials; and (f) Front Group patient-advocacy and professional organizations, which exercised their influence both directly and through Defendant-controlled KOLs who served in leadership roles in those organizations.

a.    Defendants' Use of KOLs

183.    Defendants cultivated a small circle of doctors who, upon information and belief, were selected and sponsored by Defendants solely because they favored the aggressive treatment of chronic pain with opioids.  Defendants' support helped these doctors become respected industry experts.  In return, these doctors repaid Defendants by touting the benefits of opioids to treat chronic pain.

184.    Pro-opioid doctors have been at the hub of Defendants' promotional efforts, presenting the appearance of unbiased and reliable medical research supporting the broad use of

opioid therapy for chronic pain. KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy. They have served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain (even while acknowledging the lack of evidence in support of that position) and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Defendants were able to exert control of each of these modalities through their KOLs.

185.    In return, the KOLs' association with Defendants provided not only money, but prestige, recognition, research funding, and avenues to publish. This positioned them to exert even more influence in the medical community.

186.    Although some KOLs initially may have advocated for more permissive opioid prescribing with honest intentions, Defendants cultivated and promoted only those KOLs who could be relied on to help broaden the chronic opioid therapy market. Defendants selected, funded, and elevated those doctors whose public positions were unequivocal and supportive of using opioids to treat chronic pain.[111] These doctors' professional reputations were then dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by the drug companies.

187.    Defendants cited and promoted favorable studies or articles by these KOLs. By contrast, Defendants did not support, acknowledge, or disseminate the publications of doctors critical of the use of chronic opioid therapy. Indeed, one prominent KOL sponsored by

---

[111]   Opioid-makers were not the first to mask their deceptive marketing efforts in purported science. The tobacco industry also used KOLs in its effort to persuade the public and regulators that tobacco was not addictive or dangerous. For example, the tobacco companies funded a research program at Harvard and chose as its chief researcher a doctor who had expressed views in line with industry's views. He was dropped when he criticized low-tar cigarettes as potentially more dangerous, and later described himself as a pawn in the industry's campaign.

Defendants, Russell Portenoy, stated that he was told by a drug company that research critical of opioids (and the doctors who published that research) would never obtain funding. Some KOLs have even gone on to become direct employees and executives of Defendants, like Dr. David Haddox, Purdue's Vice President of Risk Management, or Dr. Bradley Galer, Endo's former Chief Medical Officer.

188.     Defendants provided substantial opportunities for KOLs to participate in research studies on topics Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature. As described by Dr. Portenoy, drug companies would approach him with a study that was well underway and ask if he would serve as the study's author. Dr. Portenoy regularly agreed.

189.     Defendants also paid KOLs to serve as consultants or on their advisory boards and give talks or present CMEs, typically over meals or at conferences. From 2000 on, Cephalon, for instance, has paid doctors more than $4.5 million for programs relating to its opioids.

190.     These KOLs were carefully vetted to ensure that they were likely to remain on-message and supportive of a pharmaceutical industry agenda. One measure was a doctor's prior work for trusted Front Groups.

191.     Defendants kept close tabs on the content of the misleading materials published by these KOLs. In many instances, they also scripted what these KOLs said—as they did with all their recruited speakers, as discussed above in Section V.B.2. The KOLs knew or deliberately ignored the misleading way in which they portrayed the use of opioids to treat chronic pain to patients and prescribers, but they continued to publish those misstatements to

benefit themselves and Defendants, all the while causing harm to Chicago prescribers and patients.

i.      *Russell Portenoy*

192.    Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue.

193.    Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009. He was also a member of the board of APF, an advocacy organization almost entirely funded by Defendants.

194.    Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations. He appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely watched program, broadcast in Chicago and across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[112]

---

[112]    Good Morning America television broadcast, ABC News (Aug. 30, 2010).

195. To his credit, Dr. Portenoy has recently admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." These lectures falsely claimed that fewer than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[113] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[114]

ii.     *Lynn Webster*

196. Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a front group that ardently supports chronic opioid therapy.[115] He is a Senior Editor of *Pain Medicine*, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).

197. Dr. Webster had been under investigation for overprescribing by the DEA, which raided his clinic in 2010. More than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses. Ironically, Dr. Webster created and promoted the Opioid Risk

---

[113]   Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012.

[114]   *Id.*

[115]   Journal supplements are paid for by drug manufacturers and, although they may be designed to blend into the rest of the journal, are not peer-reviewed and constitute drug company advertising.

Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue. In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk*. Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach Chicago doctors.

198. Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to *increase* a patient's dose of opioids. As he and his co-author wrote in a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response." As noted below in Section V.E.3, Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, as described below in Section V.D.4, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[116]

      b.      <u>"Research" That Lacked Supporting Evidence</u>

199. Rather than find a way to actually test the safety and efficacy of opioids for long-term use, Defendants led everyone to believe that they already had. Defendants created a body

---

[116] John Fauber & Ellen Gabler, *Networking Fuels Painkiller Boom*, Milwaukee Wisc. J. Sentinel (Feb. 19, 2012).

of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was thus more likely to shape the perceptions of prescribers, patients and payors. This literature was, in fact, marketing material focused on persuading doctors and consumers that the benefits of long-term opioid use outweighed the risks.

200.    To accomplish this, Defendants—sometimes through third-party consultants and/or advocacy organizations—commissioned, edited, and arranged for the placement of favorable articles in academic journals. Defendants' internal documents reveal plans to submit research papers and "studies" to long lists of journals, including back-up options and last resort, "fast-track" application journals that they could use if the pending paper was rejected everywhere else.

201.    Defendants coordinated the timing and publication of manuscripts, abstracts, posters/oral presentations, and educational materials in peer-reviewed journals and other publications to support the launch and sales of their drugs. The plans for these materials did not originate in the departments within the Defendant organizations that were responsible for research, development or any other area that would have specialized knowledge about the drugs and their effects on patients, but in Defendants' marketing departments and with Defendants' marketing and public relations consultants. Defendants often relied on "data on file" or presented posters, neither of which are subject to peer review. They also published their articles not through a competitive process, but in paid journal supplements, which allowed Defendants to publish, in nationally circulated journals, studies supportive of their drugs.

202.    Defendants also made sure that favorable articles were disseminated and cited widely in the medical literature, even where references distorted the significance or meaning of

the underlying study. Most notably, Purdue promoted a 1980 reference in the well-respected *New England Journal of Medicine*: J. Porter & H. Jick, *Addiction Rare in Patients Treated with Narcotics*, 302(2) *New Eng. J. Med.* 123 (1980) ("Porter-Jick Letter"). It is cited 856 times in Google Scholar, and 86 times since 2010. It appears as a reference in two CME programs in 2012 sponsored by Purdue and Endo.[117] Defendants and those acting on their behalf fail to reveal that this "article" is actually a letter-to-the-editor, not a peer-reviewed study (or any kind of study at all). The Porter-Jick Letter, reproduced in full below, describes a review of the charts of hospitalized patients who had received opioids. (Because it was a 1980 study, standards of care almost certainly would have limited opioids to acute or end-of-life situations, not chronic pain.)



> ### ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS
>
> ***To the Editor:*** Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients¹ who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,² Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.
>
> JANE PORTER
> HERSHEL JICK, M.D.
> Boston Collaborative Drug
> Surveillance Program
> Waltham, MA 02154    Boston University Medical Center
>
> 1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
> 2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

203. The Porter-Jick Letter notes that, when these patients' records were reviewed, it found almost no references to signs of addiction, though there is no indication that caregivers were instructed to assess or document signs of addiction. None of these serious limitations is

---

[117] AAPM, Safe Opioid Prescribing Course, February 25-26, 2012, sponsored by Purdue and Endo; "Chronic Pain Management and Opioid Use," October 11, 2012, sponsored by Purdue. Each CME is available for online credit, including to prescribers in Chicago.

disclosed when Defendants or those acting on their behalf cite the Porter-Jick Letter, typically as the sole scientific support for the proposition that opioids are rarely addictive, even when taken long-term. In fact, Dr. Jick later complained that his letter had been distorted and misused.

204.    Defendants worked not only to create or elevate favorable studies in the literature, but to discredit or bury negative information. Defendants' studies and articles often targeted articles that contradicted Defendants' claims or raised concerns about chronic opioid therapy. In order to do so, Defendants—often with the help of third-party consultants—targeted a broad range of media to get their message out, including negative review articles, letters to the editor, commentaries, case-study reports, and newsletters.

205.    Defendants' strategies—first, to plant and promote supportive literature and then, to cite the pro-opioid evidence in their promotional materials, while failing to disclose evidence that contradicts those claims—are flatly inconsistent with their legal obligations, as laid out in Section V.C.1. The strategies were intended to, and did, knowingly and intentionally distort the truth regarding the risks, benefits and superiority of opioids for chronic pain relief and distorted prescribing patterns as a result.

        c.    Treatment Guidelines

206.    Treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy. They are relied upon by doctors, especially the general practitioners and family doctors targeted by Defendants, who are otherwise not experts, nor trained, in the treatment of chronic pain. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Furthermore, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

i.      *FSMB*

207.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States.  The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians.  The FSMB finances opioid- and pain-specific programs through grants from Defendants.

208.    In 1998, the FSMB developed *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain* ("FSMB Guidelines"), which FSMB admitted was produced "in collaboration with pharmaceutical companies."  The FSMB Guidelines taught not that opioids could be appropriate in limited cases or after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option. The FSMB Guidelines failed to mention risks relating to respiratory depression and overdose, and they discussed addiction only in the sense that "inadequate understandings" of addiction can lead to "inadequate pain control."

209.    A 2004 iteration of the FSMB Guidelines and the 2007 book adapted from the 2004 guidelines, *Responsible Opioid Prescribing*, also make these same claims.  These guidelines were posted online and were available to and intended to reach Chicago physicians.

210.    The publication of *Responsible Opioid Prescribing* was backed largely by drug manufacturers, including Cephalon, Endo, and Purdue.  The FSMB financed the distribution of *Responsible Opioid Prescribing* by its member boards by contracting with drug companies, including Endo and Cephalon, for bulk sales and distribution to sales representatives (for distribution to prescribing doctors).

211.    In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed to state medical boards (and through the boards, to practicing doctors), and the FSMB benefitted by

earning approximately $250,000 in revenue and commissions from their sale.[118]  The FSMB
website describes the book as the "leading continuing medication education (CME) activity for
prescribers of opioid medications."

212.     Drug companies relied on FSMB guidelines to convey the message that "under-
treatment of pain" would result in official discipline, but no discipline would result if opioids
were prescribed as part of an ongoing patient relationship and prescription decisions were
documented.  FSMB turned doctors' fear of discipline on its head—doctors, who used to believe
that they would be disciplined if their patients became addicted to opioids, were taught that they
would be punished instead if they failed to prescribe opioids to their patients with pain.

213.     FSMB, more recently, has moderated its stance.  Although the 2012 revision of
*Responsible Opioid Prescribing* continues to teach that pseudoaddiction is real and that opioid
addiction risk can be managed through risk screening, it no longer recommends chronic opioid
therapy as a first choice after the failure of over-the-counter medication and has heightened its
addiction and risk warnings.

ii.     *AAPM/APS Guidelines*

214.     AAPM and the APS are professional medical societies, each of which received
substantial funding from Defendants from 2009 to 2013 (with AAPM receiving over $2 million).
They issued a consensus statement in 1997, *The Use of Opioids for the Treatment of Chronic
Pain*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would
become addicted to opioids was low.[119]  The co-author of the statement, Dr. Haddox, was at the

---

[118]   According to the Federation of State Medical Boards, the Illinois Department of Financial and Professional
Regulators distributed 500 copies of *Responsible Opioid Prescribing* within Illinois.

[119]   Consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, APS & AAPM (1997), *available
at* http://opi.areastematicas.com/generalidades/OPIOIDES.DOLORCRONICO.pdf.

time a paid speaker for Purdue. Dr. Portenoy was the sole consultant. The consensus statement, which also formed the foundation of the FSMB Guidelines, remained on AAPM's website until 2011. The statement was taken down from AAPM's website only after a doctor complained, though it lingers on the internet elsewhere.[120]

215. AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.

216. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members.

217. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated in Chicago during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

218. Defendants widely referenced and promoted the 2009 Guidelines without disclosing the acknowledged lack of evidence to support them.

---

[120] *Id.*

iii.     *American Geriatrics Society*

219.    The American Geriatrics Society ("AGS"), a nonprofit organization serving

health care professionals who work with the elderly, disseminated guidelines regarding the use of

opioids for chronic pain in 2002 (*The Management of Persistent Pain in Older Persons*,

hereinafter "2002 AGS Guidelines") and 2009 (*Pharmacological Management of Persistent Pain*

*in Older Persons*, hereinafter "2009 AGS Guidelines").  The 2009 AGS Guidelines included the

following recommendations: "All patients with moderate to severe pain . . . should be considered

for opioid therapy (low quality of evidence, strong recommendation)," and "the risks [of

addiction] are exceedingly low in older patients with no current or past history of substance

abuse."[121]  These recommendations, which continue to appear on AGS's website, are not

supported by any study or other reliable scientific evidence.  Nevertheless, they have been cited

278 times in Google Scholar since their 2009 publication.

220.    AGS contracted with Defendants Endo, Purdue, and Janssen to disseminate the

2009 Guidelines, and to sponsor CMEs based on them.  These Defendants were aware of the

content of the 2009 Guidelines when they agreed to provide funding for these projects.  The

2009 Guidelines were released at the May 2009 AGS Annual Scientific Meeting in Chicago and

first published online on July 2, 2009.  AGS submitted grant requests to Defendants including

Endo and Purdue beginning July 15, 2009.  Internal AGS discussions in August 2009 reveal that

it did not want to receive up-front funding from drug companies, which would suggest drug

company influence, but would instead accept commercial support to disseminate the

publication.  However, by drafting the guidelines knowing that pharmaceutical company funding

---

[121]    Pharmacological Management of Persistent Pain in Older Persons, 57 J. Am. Geriatrics Soc'y 1331, 1339, 1342
( 2009), *available at*  http://www.americangeriatrics.org/files/documents/2009_Guideline.pdf.

would be needed, and allowing these companies to determine whether to provide support only after they have approved the message, AGS ceded significant control to these companies. Endo, Janssen, and Purdue all agreed to provide support to distribute the guidelines.

221. According to one news report, AGS has received $344,000 in funding from opioid makers since 2009.[122] Five of 10 of the experts on the guidelines panel disclosed financial ties to Defendants, including serving as paid speakers and consultants, presenting CMEs sponsored by Defendants, receiving grants from Defendants, and investing in Defendants' stock. The Institute of Medicine recommends that, to ensure an unbiased result, fewer than 50% of the members of a guidelines committee should have financial relationships with drug companies.

### iv.    *Guidelines That Did Not Receive Defendants' Support*

222. The extent of Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines—the authors of which did not accept drug company funding—reached very different conclusions. The 2012 *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain*, issued by the American Society of Interventional Pain Physicians ("ASIPP"), warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it." ASIPP's Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and

---

[122]   John Fauber & Ellen Gabler, *Narcotic Painkiller Use Booming Among Elderly*, Milwaukee J. Sentinel, May 30, 2012.

political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommends long-acting opioids in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence monitoring, in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvement in physical and functional status and minimal adverse effects."[123]

223. Similarly, the 2011 *Guidelines for the Chronic Use of Opioids*, issued by the American College of Occupational and Environmental Medicine, recommend against the "routine use of opioids in the management of patients with chronic pain," finding "at least moderate evidence that harms and costs exceed benefits based on limited evidence," while conceding there may be patients for whom opioid therapy is appropriate.[124]

224. The *Clinical Guidelines on Management of Opioid Therapy for Chronic Pain*, issued by the U.S. Department of Veterans Affairs ("VA") and Department of Defense ("DOD") in 2010, notes that their review:

> revealed the lack of solid evidence based research on the efficacy of long-term opioid therapy. Almost all of the randomized trials of opioids for chronic non-cancer pain were short-term efficacy studies. Critical research gaps . . . include: lack of effectiveness studies on long-term benefits and harms of opioids . . .; insufficient evidence to draw strong conclusions about optimal approaches to risk stratification . . .; lack of evidence on the utility of informed consent and opioid management plans . . .; and treatment of patients with chronic non-cancer pain at higher risk for drug abuse or misuse.[125]

---

[123] Laxmaiah Manchikanti, et al., American Society of Interventional Pain Physicians (ASIPP) *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part 1, Evidence Assessment*, 15 Pain Physician (Special Issue) S1-S66; *Part 2 – Guidance*, 15 Pain Physician (Special Issue) S67-S116 (2012).

[124] *American College of Occupational and Environmental Medicine's Guidelines for the Chronic Use of Opioids*, (2011), *available at*: http://beta.acoem.org/uploadedFiles/Knowledge_Centers/ Practice_Guidelines/Chronic%20Pain%20Opioid%202011.pdf.

[125] Management of Opioid Therapy for Chronic Pain Working Group, VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (May 2010), *available at* http://www.healthquality.va.gov/guidelines/Pain/cot/COT_312_Full-er.pdf.

d.     Continuing Medical Education

225.     CMEs are ongoing professional education programs provided to doctors.  Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of their licensure.  These programs are delivered in person, often in connection with professional organizations' conferences, and online, or through written publications.  Doctors rely on CMEs not only to satisfy licensing requirements, but to get information on new developments in medicine or to deepen their knowledge in specific areas of practice.  Because CMEs typically are delivered by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

226.     The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation.  As one target, Defendants aimed to reach general practitioners, whose broad area of focus and lack of specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to Defendants' deceptions.

227.     In all, Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint.  These CMEs, while often generically titled to relate to the treatment of chronic pain, focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects.

228.     The American Medical Association ("AMA") has recognized that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and

urges that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the educational subject matter."[126]

229.    Dozens of CMEs that were available to and attended or reviewed by Chicago doctors during the relevant time period did not live up to the AMA's standards.

230.    The influence of Defendants' funding on the content of these CMEs is clear.  One study by a Georgetown University Medical Center professor compared the messages retained by medical students who reviewed an industry-funded CME article on opioids versus another group who reviewed a non-industry-funded CME article.  The industry-funded CME did not mention opioid-related death once; the non-industry-funded CME mentioned opioid-related death 26 times.  Students who read the industry-funded article more frequently noted the impression that opioids were underused in treating chronic pain.  The "take-aways" of those reading the non-industry-funded CME mentioned the risks of death and addiction much more frequently than the other group.  Neither group could accurately identify whether the article they read was industry-funded, making clear the difficulty health care providers have in screening and accounting for source bias.[127]

231.    By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, Defendants could expect messages to be favorable to them, as these organizations were otherwise dependent on Defendants for other projects.  The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy, as described in Section V.C.2.a.  Defendant-driven content in these CMEs had a direct and

---

[126]    Opinion 9.0115, *Financial Relationships with Industry in CME*, Am. Med. Ass'n (Nov. 2011), *available at* http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion90115.page.

[127]    Adriane Fugh-Berman, *Marketing Messages in Industry-Funded CME*, PharmedOut (June 25, 2010), *available at* pharmedout.galacticrealms.com/Fugh-BermanPrescriptionforConflict6-25-10.pdf.

immediate effect on prescribers' views on opioids.  Producers of CMEs and Defendants

measured the effects of CMEs on prescribers' views on opioids and their absorption of specific

messages, confirming the strategic marketing purpose in supporting them.

> e.    Unbranded Patient Education

232.    Pharmaceutical industry marketing experts see patient-focused advertising,

including direct-to-consumer marketing, as particularly valuable in "increas[ing] market share

. . . by bringing awareness to a particular disease that the drug treats."[128]  Evidence also

demonstrates that physicians are willing to acquiesce to patient demands for a particular drug—

even for opioids and for conditions for which they are not generally recommended.[129]  An

Actavis marketing plan, for example, noted that "[d]irect-to-consumer marketing affects

prescribing decisions."  Recognizing this fact, Defendants put their relationships with Front

Groups to work to engage in largely unbranded patient education about opioid treatment for

chronic pain.

233.    The drug companies expect that they will recoup their investment in direct-to-

consumer advertisements because they will capture at least some of any additional prescriptions

that result from patients "asking their doctor" about drugs that can treat their pain.  Doctors also

may review direct-to-consumer materials sales representatives give them to distribute to patients.

> f.    Defendants' Use of Front Groups

234.    As noted above, Defendants Cephalon, Endo, Janssen, and Purdue entered into

arrangements with numerous organizations to promote opioids.  These organizations depend

---

[128]   Kanika Johar, An Insider's Perspective: Defense of the Pharmaceutical Industry's Marketing Practices, 76 Albany L. Rev. 299, 308 (2013).

[129]   Prescribers often accede to patient requests.  According to one study, nearly 20% of sciatica patients requesting oxycodone would receive a prescription for it, compared with 1% making no request.  More than half of patients requesting a strong opioid received one.  J.B. McKinlay et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52(2) Med. Care 294 (2014).

upon Defendants for significant funding and, in some cases, for their survival.  They were involved not only in generating materials and programs for doctors and patients that supported chronic opioid therapy, but also in assisting Defendants' marketing in other ways—for example, responding to negative articles and advocating against regulatory changes that would constrain opioid prescribing.  They developed and disseminated pro-opioid treatment guidelines; conducted outreach to groups targeted by Defendants, such as veterans and the elderly; and developed and sponsored CMEs that focused exclusively on use of opioids to treat chronic pain. Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages.

235.    Several representative examples of such Front Groups are highlighted below, but there are others, too, such as APS, AGS, FSMB, American Chronic Pain Association ("ACPA"), AAPM, American Society of Pain Educators ("ASPE"), NPF, and PPSG.  While many of these non-Chicago-based organizations refused to cooperate with the City's investigatory subpoenas, some of the available evidence demonstrating how Defendants controlled their allied Front Groups is laid out below.

> i.    *American Pain Foundation*

236.    The most prominent of Defendants' Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012.  Endo alone provided more than half that funding; Purdue was next, at $1.7 million.

237.    APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction.  APF also launched a campaign to promote opioids for returning veterans, as described in Section V.C.4.b, which has contributed to high rates of addiction and other adverse

outcomes—including death—among returning soldiers.  APF also engaged in a significant multimedia campaign—through radio, television and the internet—to educate patients about their "right" to pain treatment, namely opioids.  All of the programs and materials were available nationally and were intended to reach Chicagoans.

238.    In addition to Perry Fine, Russell Portenoy, and Scott Fishman, who served on APF's Board and reviewed its publications, another board member, Lisa Weiss, was an employee of a public relations firm that worked for both Purdue and APF.

239.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources.  Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million.  By 2011, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.  As one of its board members, Russell Portenoy, explained, the lack of funding diversity was one of the biggest problems at APF.

240.    APF held itself out as an independent patient advocacy organization.  It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors.  It was often called upon to provide "patient representatives" for Defendants' promotional activities, including for Purdue's *Partners Against Pain* and Janssen's *Let's Talk Pain*.  As laid out below, APF functioned largely as an advocate for the interests of Defendants, not patients.  Indeed, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

241.     In practice, APF operated in close collaboration with opioid makers.  On several occasions, representatives of the drug companies, often at informal meetings at Front Group conferences, suggested activities and publications for APF to pursue.  APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

242.     APF assisted in other marketing projects for drug companies.  One project funded by another drug company—*APF Reporter's Guide:  Covering Pain and Its Management* (2009)—recycled text that was originally created as part of the company's training document.

243.     The same drug company made general grants, but even then it directed how APF used them.  In response to a an APF request for funding to address a potentially damaging state Medicaid decision related to pain medications generally, the company representative responded, "I provided an advocacy grant to APF this year—this would be a very good issue on which to use some of that.  How does that work?"

244.     The close relationship between APF and the drug company was not unique, but mirrors relationships between APF and Defendants.  APF's clear lack of independence—in its finances, management, and mission—and its willingness to allow Defendants to control its activities and messages support an inference that each Defendant that worked with it was able to exercise editorial control over its publications.

245.     Indeed, the U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers.  The investigation caused considerable damage to APF's credibility as an objective and neutral third party and Defendants stopped funding it.  Within days of being

targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[130]

ii.    *The American Academy of Pain Medicine*

246.    The American Academy of Pain Medicine, with the assistance, prompting, involvement, and funding of Defendants, issued the treatment guidelines discussed in Section V.C.2.c.ii, and sponsored and hosted medical education programs essential to Defendants' deceptive marketing of chronic opioid therapy.

247.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event—its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, Cephalon and Actavis were members of the council and presented deceptive programs to doctors who attended this annual event. Indeed, before Cephalon's supplemental new drug application for the use of Fentora to treat chronic non-cancer pain was rejected by the FDA, as described in Section V.E.2.a.i(d), AAPM was one of the primary channels by which the company intended to promote its drugs for non-cancer use. This planned promotion included issuing a "media alert" at the 2008 AAPM annual meeting and delivering "expanded indication presentations" at AAPM events.

---

[130]    http://www.painfoundation.org (last visited Aug. 24, 2015).

248.    AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members.  Endo attended AAPM conferences, funded its CMEs, and distributed its publications.  The conferences sponsored by AAPM heavily emphasized sessions on opioids—37 out of roughly 40 at one conference alone.  AAPM's presidents have included top industry-supported KOLs Perry Fine, Russell Portenoy, and Lynn Webster.  Dr. Webster was even elected president of AAPM while under a DEA investigation.  Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[131]

249.    AAPM's staff understood they and their industry funders were engaged in a common task.  Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

### 3.    Defendants Acted In Concert with KOLs and Front Groups in the Creation, Promotion, and Control of Unbranded Marketing.

250.    Like cigarette makers, which engaged in an industry-wide effort to misrepresent the safety and risks of smoking, Defendants worked with each other and with the Front Groups and KOLs they funded and directed to carry out a common scheme to deceptively market the risks, benefits, and superiority of opioids to treat chronic pain.

251.    Defendants acted through and with the same network of Front Groups, funded the same KOLs, and often used the very same language and format to disseminate the same deceptive messages.  These KOLs have worked reciprocally with Defendants to promote misleading messaging regarding the appropriate use of opioids to treat chronic pain.  Although

---

[131]    Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), http://www.medscape.org/viewarticle/500829.

participants knew this information was false and misleading, these misstatements were nevertheless disseminated to Chicago prescribers and patients.

252.    One vehicle for their collective collaboration was Pain Care Forum ("PCF").  PCF began in 2004 as an APF project with the stated goals of offering "a setting where multiple organizations can share information" and "promote and support taking collaborative action regarding federal pain policy issues."  APF President Will Rowe described the Forum as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

253.    PCF is comprised of representatives from opioid manufacturers and distributors (including Cephalon, Endo, Janssen, and Purdue); doctors and nurses in the field of pain care; professional organizations (*e.g.*, American Academy of Pain Management, APS, and American Society of Pain Educators); patient advocacy groups (*e.g.*, APF and ACPA); and other like-minded organizations (*e.g.*, FSMB and Wisconsin Pain & Policy Studies Group), almost all of which received substantial funding from Defendants.

254.    PCF, for example, developed and disseminated "consensus recommendations" for a Risk Evaluation and Mitigation Strategy ("REMS") for long-acting opioids that the FDA mandated in 2009 to communicate the risks of opioids to prescribers and patients[132]  This was critical because a REMS that went too far in narrowing the uses or benefits or highlighting the risks of chronic opioid therapy would deflate Defendants' marketing efforts.  The recommendations—drafted by Will Rowe of APF—claimed that opioids were "essential" to the management of pain, and that the REMS "should acknowledge the importance of opioids in the

---

[132]   The FDA can require a drug maker to develop a REMS—which could entail (as in this case) an education requirement or distribution limitation—to manage serious risks associated with a drug.

management of pain and should not introduce new barriers."[133]  As laid out below in Section

V.E, Defendants worked with PCF members to limit the reach and manage the message of the

REMS, which enabled them to maintain, and not undermine, their deceptive marketing of

opioids for chronic pain.

> **4.    Defendants Targeted Vulnerable and Lucrative Populations.**
>
> a.    The Elderly

255.    Elderly patients taking opioids have been found to suffer elevated fracture risks, a

greater risk for hospitalizations, and increased vulnerability to adverse drug effects and

interactions, such as respiratory depression, which, as Defendants acknowledge in their labels

(but not in their marketing), occurs more frequently in elderly patients.  A 2010 paper in the

Archives of Internal Medicine reported that elderly patients who used opioids had a significantly

higher rate of death, heart attacks, and strokes than users of NSAIDs.  Defendants' targeted

marketing to the elderly and the absence of cautionary language in their promotional materials

flies in the face of scientific evidence and their own labels, and creates a heightened risk of

serious injury to elderly patients.

256.    Defendants also promoted the notion—also without adequate scientific

foundation—that the elderly are particularly unlikely to become addicted to opioids.  AGS's

2009 Guidelines, for example, which Purdue, Endo, and Janssen publicized, described the risk of

addiction as "exceedingly low in older patients with no current or past history of substance

abuse."  Yet, a 2010 study examining overdoses among long-term opioid users found that

patients 65 or older were among those with the largest number of serious overdoses.

---

[133]  Defendants also agreed that short-acting opioids should also be included in REMS as not to disadvantage the long-acting, branded drugs.

257. Defendants' efforts have paid off. Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59. In Chicago, use of chronic opioid therapy by elderly patients who are seen in one of the City's 17 senior wellness program sites, for example, is significant. According to a pharmacist associated with the program, many seniors start on opioids to treat chronic back pain or arthritis.

b. Veterans

258. Veterans, too, are suffering greatly from the effects of Defendants' targeted marketing. A 2008 survey showed prescription drug abuse among military personnel doubled from 2002 to 2005, and then nearly tripled again over the next three years. In 2009, military doctors wrote 3.8 million prescriptions for narcotic pain pills—four times as many as they did in 2001. Further, one-third of veterans prescribed opioids as of 2012 remained on take-home opioids for more than 90 days. Although many of these veterans are returning from service with traumatic injuries, the increase in opioid prescribing is disproportionate to the population and, in far too many cases, unsuited for their treatment. Among former service members receiving VA services nationally in a single year (2005), 1,013 had died of accidental drug overdoses—double the rate of the civilian population.

259. The City has a substantial population of veterans who must cope with the consequences of overprescribing opioids. The Jesse Brown Veterans Affairs Medical Center, which serves Chicago residents who are veterans, saw dramatic increases in their rates of prescribing opioids. In addition, at least one doctor interviewed by the City of Chicago described the pressure to prescribe opioids in the facility and the high rates of addiction.

260. Opioids are particularly dangerous to veterans. According to a study published last year in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes,

like overdoses and self-inflicted and accidental injuries; 40% of veterans with post-traumatic stress disorder received opioids and benzodiazepines (anti-anxiety drugs) that, when mixed with alcohol, can cause respiratory depression and death. Yet, according to a VA Office of Inspector General Report, 92.6% of veterans who were prescribed opioid drugs were also prescribed benzodiazepines. Again, as with elderly patients, Defendants both purposefully sought to increase opioid prescribing to this vulnerable group and omitted from their promotional materials the known, serious risks opioids posed to them.

261.    *Exit Wounds*, a 2009 publication sponsored by Purdue, distributed by APF with grants from Janssen and Endo, and written as a personal narrative of one veteran, describes opioids as "underused" and the "gold standard of pain medications" and fails to disclose the risk of addiction, overdose, or injury. It notes that opioid medications "increase a person's level of functioning" and that "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications." The book also asserts that "[d]enying a person opioid pain medication because he or she has a history of substance abuse or addiction is contrary to the model guidelines for prescribing opioids, published by the U.S. Federation of State Medical Boards." As laid out above, the FSMB itself received support from Defendants during the time it created and published its guidelines.

262.    *Exit Wounds* minimizes the risks from chronic opioid therapy and does not disclose the risk that opioids may cause fatal interactions with benzodiazepines, which were taken by a significant number of veterans.[134] It is not the unbiased narrative of a returning war veteran. It is pure marketing, sponsored by Purdue, Endo, and Janssen. Yet, Janssen, for

---

[134]   FDA guidance states that materials designed to target a particular audience should disclose risks particular to that audience. *See* FDA Notice, Guidance for Industry, "Brief Summary and Adequate Directions for Use: Disclosing Risk Information in Consumer-Directed Print Advertisements and Promotional Labeling for Prescription Drugs," August 6, 2015.

example, supported the marketing effort, and its insufficient disclosures, despite acknowledging on the label for its opioid Duragesic that its use with benzodiazepines "may cause respiratory depression, hypotension, and profound sedation or potentially result in coma."  A similar warning is found on the labels of other Defendants' opioids.

263.    The deceptive nature of *Exit Wounds* is obvious in comparing it to guidance on opioids published by the VA and DOD in 2010 and 2011.  The VA's *Taking Opioids Responsibly* describes opioids as "dangerous."  It cautions against taking extra doses and mentions the risk of overdose and the dangers of interactions with alcohol.  The list of side effects from opioids includes decreased hormones, sleep apnea, hyperalgesia, addiction, immune system changes, birth defects and death—none of which is disclosed in *Exit Wounds*.

**D.    Why Defendants' Marketing Messages Are Misleading and Unfair.**

264.    Defendants' marketing of opioids for long-term use to treat chronic pain, both directly and with and through third parties, included information that was false, misleading, contrary to credible scientific evidence and their own labels, and lacked balance and substantiation.  Their marketing materials omitted material information about the risks of opioids, and overstated their benefits.  Moreover, Defendants inaccurately suggested that chronic opioid therapy was supported by evidence, and failed to disclose the lack of evidence in support of treating chronic pain with opioids.

265.    As described in greater detail  below in Sections V.D.1-7, there are seven primary misleading and unfounded representations.  Defendants and the third parties with which they teamed:

- misrepresented that opioids improve function;

- concealed the link between long-term use of opioids and addiction;

- misrepresented that addiction risk can be managed;

- masked the signs of addiction by calling them "pseudoaddiction";

- falsely claimed withdrawal is easily managed;

- misrepresented or omitted the greater dangers from higher doses of opioids; and

- deceptively minimized the adverse effects of opioids and overstated the risks of NSAIDs.

266.     In addition to these misstatements, Purdue purveyed an eighth deception—laid out in detail below in Section V.D.8—that OxyContin provides a full 12 hours of pain relief.

267.     Exacerbating each of these misrepresentations and deceptions was the collective effort of Defendants and third parties to hide from the medical community the fact that the FDA "is not aware of adequate and well-controlled studies of opioid use longer than 12 weeks."[135]

### 1.     Defendants and Their Third-Party Allies Misrepresented that Opioids Improve Function.

268.     Each of the following materials was created with the expectation that, by instructing patients and prescribers that opioids would improve patients' function and quality of life, patients would demand opioids and doctors would prescribe them.  These claims also encouraged doctors to continue opioid therapy in the belief that failure to improve pain, function, or quality of life could be overcome by increasing doses or prescribing supplemental short-acting opioids to take on an as-needed basis for breakthrough pain.

269.     However, not only is there no evidence of improvement in long-term functioning, a 2006 study-of-studies found that "[f]or functional outcomes . . . other analgesics were

---

[135]   Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

significantly more effective than were opioids."[136] Studies of the use of opioids in chronic

conditions for which they are commonly prescribed, such as low back pain, corroborate this

conclusion and have failed to demonstrate an improvement in patients' function. Instead,

research consistently shows that long-term opioid therapy for patients who have lower back

injuries does not cause patients to return to work or physical activity.[137] Indeed, one Defendant's

own internal marketing plans characterized functional improvement claims as "aspirational."

Another acknowledged in 2012 that "[s]ignificant investment in clinical data [was] needed" to

establish opioids' effect on mitigating quality of life issues, like social isolation.

270. As laid out below in Section V.D.7, the long-term use of opioids carries a host of

serious side effects, including addiction, mental clouding and confusion, sleepiness,

hyperalgesia, immune-system and hormonal dysfunction, that degrade, rather than improve,

patients' ability to function. Defendants often omitted these adverse effects from their

publications, as well as omitting certain risks of drug interactions.

271. Yet each of the following statements by Defendants, which are further discussed,

by Defendant, in Section V.E, suggests that the long-term use of opioids improve patients'

function and quality of life, and that scientific evidence supports this claim.

---

[136]  Andrea D. Furlan et al., *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Can. Med. Ass'n J. 1589-1594 (2006). This study revealed that efficacy studies do not typically include data on opioid addiction, such that, if anything, the data overstate effectiveness.

[137]  Moreover, users of opioids had the highest increase in the number of headache days per month, scored significantly higher on the Migraine Disability Assessment (MIDAS), and had higher rates of depression, compared to non-opioid users. They also were more likely to experience sleepiness, confusion, and rebound headaches, and reported a lower quality of life than patients taking other medications.

| Actavis | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct prescribers that "*most* chronic benign pain patients do have **markedly improved ability to function** when maintained on chronic opioid therapy." (Emphasis added.) |
|---|---|---|
| | b. | Documents from a 2010 sales training indicate that Actavis trained its sales force that increasing and restoring function is an expected outcome of chronic Kadian therapy, including physical, social, vocational, and recreational function. |
| | c. | Actavis distributed a product advertisement that claimed that use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and cause patients to enjoy their lives." The FDA warned Actavis such claims were misleading, writing: "We are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[138] |
| | d. | Actavis sales representatives told Chicago prescribers that prescribing Actavis's opioids would improve their patients' ability to function and improve their quality of life. |

---

[138] Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18. 2010), *available at* http://www.fda.gov/ Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViola tionLetterstoPharmaceuticalCompanies/ucm259240.htm.

| Cephalon | e. | Cephalon sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed the book through its pain sales force to 10,000 prescribers and 5,000 pharmacists. |
|---|---|---|
| | f. | Cephalon sponsored the American Pain Foundation's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids when used properly "give [pain patients] a quality of life we deserve." The *Treatment Options* guide notes that non-steroidal anti-inflammatory drugs have greater risks with prolonged duration of use, but there was no similar warning for opioids. APF distributed 17,200 copies in one year alone, according to its 2007 annual report. The publication was available online until the APF shut its doors in 2012. |
| | g. | Cephalon sponsored a CME written by key opinion leader Dr. Lynn Webster, titled *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007, through December 15, 2008. The CME taught that Cephalon's Actiq and Fentora improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids. |
| | h. | Cephalon sales representatives told Chicago prescribers that opioids would increase patients' ability to function and improve their quality of life. |

| Endo | i. | Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it. |
| | j. | A CME sponsored by Endo, titled *Persistent Pain in the Older Patient*, taught that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." |
| | k. | Endo distributed handouts to prescribers that claimed that use of Opana ER to treat chronic pain would allow patients to perform work as a chef. This flyer also emphasized Opana ER's indication without including equally prominent disclosure of the "moderate to severe pain" qualification.[139] |
| | l. | Endo's sales force distributed FSMB's *Responsible Opioid Prescribing* (2007). This book taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." |
| | m. | Endo provided grants to APF to distribute *Exit Wounds* to veterans, which taught that opioid medications "*increase* your level of functioning" (emphasis in the original). *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder. |
| | n. | Endo sales representatives told Chicago prescribers that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work. |

---

[139] FDA regulations require that warnings or limitations be given equal prominence in disclosure, and failure to do so constitutes "misbranding" of the product. 21 C.F.R. § 202.1(e)(3); *see also* 21 U.S.C. § 331(a).

| Janssen | o. | Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. The guide states as a "fact" that "opioids may make it *easier* for people to live normally" (emphasis in the original). The myth/fact structure implies authoritative backing for the claim that does not exist. The targeting of older adults also ignored heightened opioid risks in this population. |
| | p. | Janssen sponsored, developed, and approved content of a website, *Let's Talk Pain* in 2009, acting in conjunction with the APF, AAPM, and ASPMN, whose participation in *Let's Talk Pain* Janssen financed and orchestrated. This website featured an interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," inaccurately implying her experience would be representative. This video is still available today on youtube.com. |
| | q. | Janssen provided grants to APF to distribute *Exit Wounds* to veterans, which taught that opioid medications "*increase* your level of functioning" (emphasis in the original). *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder. |
| | r. | Janssen sales representatives told Chicago prescribers that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work. |
| **Mallinckrodt** | s. | Defendant Mallinckrodt's website, in a section on "responsible use" of opioids, claims that "[t]he effective pain management offered by our medicines helps enable patients to stay in the workplace, enjoy interactions with family and friends, and remain an active member of society." |

| Purdue | t. | Purdue ran a series of advertisements for OxyContin in 2012 in medical journals titled "Pain vignettes," which were case studies featuring patients, each with pain conditions persisting over several months, recommending OxyContin for each. One such patient, "Paul," is described to be a "54-year-old writer with osteoarthritis of the hands," and the vignettes imply that an OxyContin prescription will help him work more effectively. |
| | u. | Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The sole reference for the functional improvement claim noted the absence of long-term studies and actually stated: "For functional outcomes, the other analgesics were significantly more effective than were opioids." |
| | v. | Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids, when used properly, "give [pain patients] a quality of life we deserve." APF distributed 17,200 copies in one year alone, according to its 2007 annual report. |
| | w. | Purdue sponsored APF's *Exit Wounds* (2009), which taught veterans that opioid medications "increase your level of functioning." *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder. |
| | x. | Purdue sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a "long-term therapeutic treatment course." Purdue also spent over $100,000 to support distribution of the book. |
| | y. | Purdue sales representatives told Chicago prescribers that opioids would increase patients' ability to function and improve their quality of life. |

## 2. Defendants and Their Third-Party Allies Concealed the Truth About the Risk of Addiction from Long-Term Opioid Use.

272. The fraudulent representation that opioids are rarely addictive is central to Defendants' scheme. To reach chronic pain patients, Defendants, and the Front Groups and KOLs that they directed, assisted, and collaborated with, had to overcome doctors' legitimate

fears that opioids would addict their patients.  The risk of addiction is an extremely weighty

risk—condemning patients to, among other things, dependence, compulsive use, haziness, a

lifetime of battling relapse, and a dramatically heightened risk of serious injury or death.  But for

Defendants' campaign to convince doctors otherwise, finding benefits from opioid use for

common chronic pain conditions sufficient to justify that risk would have, and previously had,

posed a nearly insurmountable challenge.

273.    Through their well-funded, comprehensive marketing efforts, Defendants and

their KOLs and Front Groups were able to change prescriber perceptions, despite the well-settled

historical understanding and clear evidence that opioids taken long-term are often addictive.

Defendants and their third-party partners:  (a) brazenly maintained that the risk of addiction for

patients who take opioids long-term was low; and (b) omitted the risk of addiction and abuse

from the list of adverse outcomes associated with chronic opioid use, even though the frequency

and magnitude of the risk—and Defendants' own labels—compelled disclosure.

274.    Further, in addition to falsely claiming opioids had low addiction risk or omitting

disclosure of the risk of addiction altogether, Defendants employed language that conveyed to

prescribers that the drugs had lower potential for abuse and addiction.  Further, in addition to

making outright misrepresentations about the risk of addiction, or failing to disclose that serious

risk at all, Defendants used code words that conveyed to prescribers that their opioid was less

prone to abuse and addiction.  For instance, sales representatives for Actavis, Endo, Janssen, and

Purdue promoted their drugs as having "steady-state" properties with the intent and expectation

that prescribers would understand this to mean that their drugs caused less of a rush or a feeling

of euphoria, which can trigger abuse and addiction.  Further, Endo actively promoted its

reformulated Opana ER on the basis that it was "designed to be crush-resistant," suggesting both

(a) that Endo had succeeded in making the drug harder to adulterate, and (b) that it was less addictive, in consequence. In fact, however, Endo knew that "the clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER" and that Opana ER could still be ground and cut into small pieces by those looking to abuse the drug. In the same vein, Janssen denied that Nucynta ER was an opioid and claimed that it was not addictive, and Purdue claimed that its opioids were not favored by addicts and did not produce a buzz, all of which falsely suggested that its opioids were less likely to be abused or addictive.

275. Each of the following was created with the expectation that, by instructing patients and prescribers that addiction rates are low and that addiction is unlikely when opioids are prescribed for pain, doctors would prescribe opioids to more patients. For example, one publication sponsored exclusively by Purdue—APF's 2011 *A Policymaker's Guide to Understanding Pain & Its Management*—claimed that opioids are not prescribed often enough because of "misconceptions about opioid addiction."

276. Acting directly or with and through third parties, each of the Defendants claimed that the potential for addiction from its drugs was relatively small, or non-existent, even though there was no scientific evidence to support those claims, and the available research contradicted them. A recent literature survey found that while ranges of "problematic use" of opioids ranged from <1% to 81%,[140] abuse averages between 21% and 29% and addiction between 8% and 12%.[141] These estimates are well in line with Purdue's own studies, showing that between 8% and 13% of OxyContin patients became addicted, but on which Purdue chose not to rely, citing instead the Porter-Jick letter.

---

[140] Cited for the low end of that range was the 1980 Porter-Jick letter in the *New England Journal of Medicine.*

[141] Kevin Vowels et al., Rates of opioid misuse, abuse, and addiction in chronic pain: a systematic review and data synthesis, 156 PAIN 569-76 (April 2015).

277.    The FDA has found as well that 20% of opioid patients use two or more

pharmacies, 26% obtain opioids from two or more prescribers, and 16.5% seek early refills—all

potential "red flags" for abuse or addiction.[142]  The FDA in fact has ordered manufacturers of

long-acting opioids to "[c]onduct one or more studies to provide <u>quantitative estimates</u> of <u>the</u>

<u>serious risks of misuse, abuse, addiction, overdose and death associated with long-term use of</u>

<u>opioid analgesics for management of chronic pain</u>," in recognition of the fact that it found "high

rates of addiction" in the medical literature.[143]

278.    Of course, the significant (and growing) incidence of abuse, misuse, and addiction

to opioids also is powerful evidence that Defendants' statements regarding the low risk of

addiction were and are untrue.  This was well-known to Defendants, who had access to sales data

and reports, adverse event reports, federal abuse and addiction-related surveillance data, and

other sources that demonstrated the widening epidemic of opioid abuse and addiction.

279.    Acting directly or through and with third parties, each of the Defendants claimed

that the potential for addiction even from long-term use of its drugs was relatively small, or non-

existent, even though that was false and there was no scientific evidence to support it.  Examples

of these misrepresentations are laid out below, and further discussed, by Defendant, in Section

V.E:

| Actavis | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force that long-acting opioids were less likely to produce addiction than short-acting opioids, although there is no evidence that either form |

---

[142]    Len Paulozzi, M.D., "Abuse of Marketed Analgesics and Its Contribution to the National Problem of Drug Abuse," *available at* http://www.fda.gov/downloads/AdvisoryCommittees/ CommitteesMeetingMaterials/Drugs/AnestheticAndLifeSupportDrugsAdvisoryCommittee/UCM233244.pdf.

[143]    September 10, 2013 letter from Bob Rappaport, M.D., to NDA applicants of ER/LA opioid analgesics, *available at* http://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/ UCM367697.pdf ; Letter from Janet Woodcock, M.D., *supra*.

|  | | of opioid is less addictive or that any opioids can be taken long-term without the risk of addiction. |
|  | b. | Actavis caused a patient education brochure to be distributed in 2007 that claimed addiction is possible, but it is "less likely if you have never had an addiction problem." Although the term "less likely" is not defined, the overall presentation suggests the risk is so low as not to be a worry. |
|  | c. | Kadian sales representatives told Chicago prescribers that Kadian was "steady state" and had extended release mechanisms, the implication of which was that it did not produce a rush or euphoric effect, and therefore was less addictive and less likely to be abused. |
|  | d. | Kadian sales representatives told Chicago prescribers that the contents of Kadian could not be dissolved in water if the capsule was opened, implying that Kadian was less likely to be abused—and thereby less addictive—than other opioids. |
|  | e. | In discussions with Chicago prescribers, Kadian sales representatives omitted any discussion of addiction risks related to Actavis's drugs. |
| **Cephalon** | f. | Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*, which claims, among other things, that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids." |
|  | g. | Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. |
|  | h. | In discussions with Chicago prescribers, Cephalon sales representatives omitted any discussion of addiction risks related to Cephalon's drugs. |
| **Endo** | i. | Endo trained its sales force in 2012 that use of long-acting opioids resulted in increased patient compliance, without any supporting evidence. |
|  | j. | Endo's advertisements for the 2012 reformulation of Opana ER claimed it was *designed to be crush resistant*, in a way that conveyed that it was less likely to be abused. This claim was false; the FDA warned in a May 10, 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse" and Endo's "post-marketing data submitted are insufficient to support any conclusion about the overall or route-specific rates of abuse." Further, Endo instructed its sales representatives to repeat this claim about |

"design," with the intention of conveying Opana ER was less subject to abuse.

k. Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that: "[p]eople who take opioids as prescribed usually do not become addicted." Although the term "usually" is not defined, the overall presentation suggests the risk is so low as not to be a worry. The language also implies that as long as a prescription is given, opioid use will not become problematic. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.

l. Endo sponsored a website, PainAction.com, which stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

m. Endo sponsored CMEs published by APF's NIPC, of which Endo was the sole funder, titled *Persistent Pain in the Older Adult* and *Persistent Pain in the Older Patient*. These CMEs claimed that opioids used by elderly patients present "possibly less potential for abuse than in younger patients[,]" which lacks evidentiary support and deceptively minimizes the risk of addiction for elderly patients.

n. Endo distributed an education pamphlet with the Endo logo titled *Living with Someone with Chronic Pain*, which inaccurately minimized the risk of addiction: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

o. Endo distributed a patient education pamphlet edited by key opinion leader Dr. Russell Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics*. It claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems." This implies that pain patients prescribed opioids will not become addicted, which is unsupported and untrue.

p. Endo contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids, and there is no such evidence. Endo was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion.

| | | |
|---|---|---|
| | q. | Endo sales representatives told Chicago prescribers that its drugs were "steady state," the implication of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. |
| | r. | Endo provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests that the risk is so low as not to be a worry. |
| | s. | In discussions with Chicago prescribers, Endo sales representatives omitted discussion of addiction risks related to Endo's drugs. |
| **Janssen** | t. | Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and which its sales force distributed. This guide described a "myth" that opioids are addictive, and asserts as fact that "[m]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain." Although the term "rarely" is not defined, the overall presentation suggests the risk is so low as not to be a worry. The language also implies that as long as a prescription is given, opioid use is not a problem. |
| | u. | Janssen contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." The study supporting this assertion does not analyze addiction rates by age and, as already noted, addiction remains a significant risk for elderly patients. Janssen was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
| | v. | Janssen provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught that [l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests the risk is so low as not to be a worry. |
| | w. | Janssen currently runs a website, *Prescriberesponsibly.com* (last modified July 2, 2015), which claims that concerns about opioid addiction are "overstated." |

| | | |
|---|---|---|
| | x. | A June 2009 Nucynta Training module warns Janssen's sales force that physicians are reluctant to prescribe controlled substances like Nucynta, but this reluctance is unfounded because "the risks . . . are much smaller than commonly believed." |
| | y. | Janssen sales representatives told Chicago prescribers that its drugs were "steady state," the implication of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. |
| | z. | Janssen sales representatives told Chicago prescribers that Nucynta and Nucynta ER were "not opioids," implying that the risks of addiction and other adverse outcomes associated with opioids were not applicable to Janssen's drugs. In truth, however, as set out in Nucynta's FDA-mandated label, Nucynta "contains tapentadol, an opioid agonist and Schedule II substance with abuse liability similar to other opioid agonists, legal or illicit." |
| | aa. | Janssen sales representatives falsely told a Midwestern orthopedic surgeon in 2013 that Duragesic had anti-abuse properties when it had none. |
| | bb. | Janssen's sales representatives told Chicago prescribers that Nucynta's unique properties eliminated the risk of addiction associated with the drug. |
| | cc. | In discussions with Chicago prescribers, Janssen sales representatives omitted discussion of addiction risks related to Janssen's drugs. |
| **Mallinckrodt** | dd. | In 2010, Mallinckrodt launched the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance, whose website promoted a book with addiction-related statements, quoted in more detail below, including that: "[o]nly rarely does opioid medication cause a true addiction" and that "[i]t is very uncommon for a person with chronic pain to become 'addicted' to narcotics IF (1) he doesn't have a prior history of any addiction and (2) he only takes the medication to treat pain." |
| | ee. | Mallinckrodt sales representatives promoted Exalgo in the Midwest on the basis of "safety," including claims that there was less potential for abuse or diversion, and also told prescribers in the Midwest that Exalgo was "steady state," the implication of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. |

| | | |
|---|---|---|
| **Purdue** | ff. | Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which under the heading, "Indications of Possible Drug Abuse," shows pictures of the stigmata of injecting or snorting opioids—skin popping, track marks, and perforated nasal septa.  In fact, opioid addicts who resort to these extremes are uncommon; the far more typical reality is patients who become dependent and addicted through oral use.[144]  Thus, these misrepresentations wrongly reassure doctors that as long as they do not observe those signs, they need not worry that their patients are abusing or addicted to opioids. |
| | gg. | Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that less than 1% of children prescribed opioids will become addicted.  This publication is still available online.  This publication also asserted that pain is undertreated due to "misconceptions about opioid addiction." |
| | hh. | Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which asserted that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. |
| | ii. | A Purdue-funded study with a Purdue co-author claimed that "evidence that the risk of psychological dependence or addiction is low in the absence of a history of substance abuse."[145]  The study relied only on the 1980 Porter-Jick letter to the editor concerning a chart review of hospitalized patients, not patients taking Purdue's long-acting, take-home opioid.  Although the term "low" is not defined, the overall presentation suggests the risk is so low as not to be a worry. |
| | jj. | Purdue contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*.  These guidelines falsely claim that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."  None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids and the claim is, in fact, untrue.  Purdue was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |

---

[144]  Purdue itself submitted briefing materials in October 2010 to a meeting of the FDA's Joint Meeting of the Anesthetic and Life Support Drugs Advisory Committee and the Drug Safety and Risk Management Advisory Committee in which it stated that OxyContin was used non-medically by injection 4-17% of the time.

[145]  Watson, Controlled-release oxycodone, *supra*.

| | kk. | Purdue sponsored APF's *Exit Wounds* (2009), which counseled veterans that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." Although the term "very unlikely" is not defined, the overall presentation suggests it is so low as not to be a worry. |
| | ll. | Purdue sales representatives told Chicago prescribers that its drugs were "steady state," the implication of which was that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. |
| | mm. | Purdue sales representatives told Chicago prescribers that Butrans has a lower abuse potential than other drugs because it was essentially tamper-proof and, after a certain point, patients no longer experience a "buzz" from increased dosage. |
| | nn. | Advertisements that Purdue sent to Chicago prescribers stated that OxyContin ER was less likely to be favored by addicts, and, therefore, less likely to be abused or diverted, or result in addiction. |
| | oo. | In discussions with Chicago prescribers, Purdue sales representatives omitted discussion of addiction risks related to Purdue's drugs. |

280.    In addition to denying or minimizing the risk of addiction and abuse generally, and as laid out in Section V.E, Defendants also falsely claimed that their particular drugs were safer, less addictive, and less likely to be abused or diverted than their competitors' or predecessor drugs. In making these claims, Defendants said or implied that because their drug had a "steady-state" and did not produce peaks and valleys, which cause drug-seeking behavior—either to obtain the high or avoid the low—it was less likely to be abused or addicting. Endo also asserted in particular that, because a reformulation of Opana ER was (or was designed to be) abuse-deterrent or tamper-resistant, patients were less likely to become addicted to them. Defendants had no evidence to support any of these claims, which, by FDA

regulation, must be based on head-to-head trials;[146] the claims also were false and misleading in that they misrepresented the risks of both the particular drug and opioids as a class.

281.     Further, rather than honestly disclose the risk of addiction, Defendants, and the third parties they directed and assisted and whose materials they distributed, attempted to portray those who were concerned about addiction as unfairly denying treatment to needy patients.  To increase pressure on doctors to prescribe chronic opioid therapy, Defendants turned the tables; it was doctors who fail to treat their patients' chronic pains with opioids—not doctors who cause their patients to become addicted to opioids—who are failing their patients (and subject to discipline).  Defendants and their third-party allies claimed that purportedly overblown worries about addiction cause pain to be under-treated and opioids to be over-regulated and under-prescribed.  This mantra of under-treated pain and under-used drugs reinforced Defendants' messages that the risks of addiction and abuse were not significant and were overblown.

282.     For example, Janssen's website, *Let's Talk Pain*, warns in a video posted online that "strict regulatory control has made many physicians reluctant to prescribe opioids.  The unfortunate casualty in all of this is the patient, who is often undertreated and forced to suffer in silence."  The program goes on to say:  "Because of the potential for abusive and/or addictive behavior, many healthcare professionals have been reluctant to prescribe opioids for their patients . . . .  This prescribing environment is one of many barriers that may contribute to the undertreatment of pain, a serious problem in the United States."

283.     In the same vein, a Purdue website called *In the Face of Pain* complains, under the heading of "Protecting Access," that, through at least mid-2013, policy governing the

---

[146]  *See Guidance for Industry*, "Abuse-Deterrent Opioids—Evaluation and Labeling," April 2015 (describing requirements for premarket and postmarket studies).

prescribing of opioids was "at odds with" best medical practices by "unduly restricting the amounts that can be prescribed and dispensed"; "restricting access to patients with pain who also have a history of substance abuse"; and "requiring special government-issued prescription forms only for the medications that are capable of relieving pain that is severe." This unsupported and untrue rhetoric aims to portray doctors who do not prescribe opioids as uncaring, converting their desire to relieve patients' suffering into a mandate to prescribe opioids.

### 3. Defendants and Their Third-Party Allies Misrepresented that Addiction Risk Can Be Avoided or Managed.

284. Defendants each continue to maintain to this day that most patients safely can take opioids long-term for chronic pain without becoming addicted. Presumably to explain why doctors encounter so many patients addicted to opioids, Defendants and their third-party allies have come to admit that some patients could become addicted, but that doctors can avoid or manage that risk by using screening tools or questionnaires. These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance abuse, mental illness, or abuse) so that doctors can more closely monitor patients at greater risk of addiction.

285. There are three fundamental flaws in these assurances that doctors can identify and manage the risk of addiction. First, there is no reliable scientific evidence that screening works to accurately predict risk or reduce rates of addiction. Second, there is no reliable scientific evidence that high-risk or addicted patients can take opioids long-term without triggering addiction, even with enhanced monitoring and precautions. Third, there is no reliable scientific evidence that patients without these red flags are necessarily free of addiction risk.

286. Addiction is difficult to predict on a patient-by-patient basis, and there are no reliable, validated tools to do so. A recent Evidence Report by the Agency for Healthcare

Research and Quality ("AHRQ"), which "systematically review[ed] the current evidence on long-term opioid therapy for chronic pain" identified "[n]o study" that had "evaluated the effectiveness of risk mitigation strategies, such as use of risk assessment instruments, opioid management plans, patient education, urine drug screening, prescription drug monitoring program data, monitoring instruments, more frequent monitoring intervals, pill counts, or abuse-deterrent formulations on outcomes related to overdose, addiction, abuse or misuse."[147] Furthermore, attempts to treat high-risk patients, such as those who have a documented predisposition to substance abuse, by resorting to patient contracts, more frequent refills, or urine drug screening are not proven to work in the real world, if busy doctors even in fact attempt them.

287.    Most disturbingly, despite the widespread use of screening tools, patients with past substance use disorders—which every tool rates as a risk factor—receive, on average, higher doses of opioids.

288.    As described below, and in Section V.E, each Defendant claimed that the risk of addiction could be avoided or managed, claims that are deceptive and without scientific support:

| Actavis | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force that prescribers can use risk screening tools to limit the development of addiction. |
|---|---|---|
| Cephalon | b. | Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that "opioid agreements" between doctors and patients can "ensure that you take the opioid as prescribed." |

---

[147]   The Effectiveness and Risks of Long-term Opioid Treatment of Chronic Pain, Agency for Healthcare Res. & Quality (September 19, 2014).

| Endo | c. | Endo paid for a 2007 supplement[148] available for continuing education credit in the *Journal of Family Practice* and written by a Chicago-based doctor who later became a member of Endo's speakers bureau. This publication, titled *Pain Management Dilemmas in Primary Care: Use of Opioids*, recommended screening patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain, and advised that patients at high risk of addiction could safely (*e.g.*, without becoming addicted) receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts. |
|---|---|---|
| Purdue | d. | Purdue's unbranded website, *In the Face of Pain* (inthefaceofpain.com) states that policies that "restrict[] access to patients with pain who also have a history of substance abuse" and "requiring special government-issued prescription forms for the only medications that are capable of relieving pain that is severe" are "at odds with" best medical practices.[149] |
| | e. | Purdue sponsored a 2012 CME program taught by a Chicago-based KOL titled *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*. This presentation recommended that use of screening tools, more frequent refills, and switching opioids could treat a high-risk patient showing signs of potentially addictive behavior. |
| | f. | Purdue sponsored a 2011 webinar taught by Dr. Lynn Webster, titled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This publication taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths." |
| | g. | Purdue sales representatives told Chicago prescribers that screening tools can be used to select patients appropriate for opioid therapy and to manage the risks of addiction. |

### 4. Defendants and their Third-Party Allies Created Confusion By Promoting the Misleading Term "Pseudoaddiction."

289. Defendants and their third-party allies developed and disseminated each of the

following misrepresentations with the intent and expectation that, by instructing patients and

---

[148] The Medical Journal, *The Lancet* found that all of the supplement papers it received failed peer-review. Editorial, "The Perils of Journal and Supplement Publishing," 375 *The Lancet* 9712 (347) 2010.

[149] *See In the Face of Pain Fact Sheet: Protecting Access to Pain Treatment*, Purdue Pharma L.P. (Resources verified Mar. 2012), www.inthefaceofpain.com/content/uploads/2011/12/factsheet_ProtectingAccess.pdf.

prescribers that signs of addiction are actually the product of untreated pain, doctors would prescribe opioids to more patients and would continue to prescribe, and patients to use, opioids despite signs that the patient was addicted. The concept of pseudoaddiction was coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, who consulted for Cephalon, Endo, Janssen, and Purdue. Much of the same language appears in other Defendants' treatment of this issue, highlighting the contrast between "undertreated pain" and "true addiction," as if patients could not experience both. As KOL Dr. Lynn Webster wrote: "[Pseudoaddiction] obviously became too much of an excuse to give patients more medication. . . . It led us down a path that caused harm. It is already something we are debunking as a concept."[150]

290.     Each of the publications and statements below, which are further discussed, by Defendant, in Section V.E, falsely states or suggests that the concept of "pseudoaddiction" is substantiated by scientific evidence and accurately describes the condition of patients who only need, and should be treated with, more opioids:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct physicians that aberrant behaviors like self-escalation of doses constituted "pseudoaddiction." |
|---|---|
| Cephalon | b. Cephalon sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding are all signs of pseudoaddiction. Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed it through its pain sales force to 10,000 prescribers and 5,000 pharmacists. |
| Endo | c. Endo distributed copies of a book by KOL Dr. Lynn Webster entitled *Avoiding Opioid Abuse While Managing Pain* (2007). Endo's internal planning documents describe the purpose of distributing this book as to |

---

[150]  John Fauber & Ellen Gabler, *Networking Fuels Painkiller Boom*, Milwaukee Wisc. J. Sentinel (Feb. 19, 2012).

| | |
|---|---|
| | "[i]ncrease the breadth and depth of the Opana ER prescriber base." The book claims that when faced with signs of aberrant behavior, the doctor should regard it as pseudoaddiction and thus, increasing the dose *in most cases . . . should be the clinician's first response.*" (emphasis added).<br><br>d. Endo spent $246,620 to buy copies of FSMB's *Responsible Opioid Prescribing* (2007), which was distributed by Endo's sales force. This book asserted that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of "pseudoaddiction." |
| **Janssen** | e. Janssen's website, *Let's Talk Pain*, stated from 2009 through 2011 that "pseudoaddiction . . . refers to patient behaviors that may occur when *pain is under-treated*" and "[p]seudoaddiction is *different from true addiction* because such behaviors can be resolved with effective pain management." (emphasis added). |
| **Mallinckrodt** | f. Mallinckrodt gave education grants to pain-topics.org, a website which included claims that pseudoaddiction occurred when patients with "unrelieved pain may become very focused on obtaining opioid medications and may be erroneously perceived as 'drug seeking.'" |
| **Purdue** | g. Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that "emerged in the literature to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."<br><br>h. Purdue distributed to physicians at least as of November 2006, and posted on its unbranded website, *Partners Against Pain*, a pamphlet copyrighted 2005 and titled *Clinical Issues in Opioid Prescribing*. This pamphlet included a list of conduct including "illicit drug use and deception" it defined as indicative of pseudoaddiction or untreated pain. It also states: "Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when *pain is undertreated. . . .* Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be *distinguished from true addiction* in that the behaviors resolve when the pain is effectively treated." (Emphasis added.)<br><br>i. Purdue sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name, "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction. Purdue also spent over $100,000 to support distribution of the book. |

| | j. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which states: "Pseudo-addiction describes patient behaviors that may occur when *pain is undertreated*. . . . Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated." (Emphasis added.) |
|---|---|

**5.      Defendants and their Third-Party Allies Claimed Withdrawal is Simply Managed.**

291.      Defendants and their third-party allies promoted the false and misleading messages below with the intent and expectation that, by misdescribing the difficulty of withdrawing from opioids, prescribers and patients would be more likely to start chronic opioid therapy and would fail to recognize the actual risk of addiction.

292.      In an effort to underplay the risk and impact of addiction, Defendants and their third-party allies frequently claim that while patients become "physically" dependent on opioids, physical dependence can be addressed by gradually tapering patients' doses to avoid the adverse effects of withdrawal.  They fail to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids—effects that also make it less likely that patients will be able to stop using the drugs.

293.      In reality, withdrawal is prevalent in patients after more than a few weeks of therapy, and common symptoms of withdrawal include:  severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, and pain.  Some symptoms may persist for months, or even years, after a complete withdrawal from opioids, depending on how long opioids were used.  Withdrawal symptoms trigger a feedback loop that drives patients to seek opioids, contributing to addiction.

294.    Each of the publications and statements below, which are further discussed, by Defendant, in Section V.E, falsely states or suggests that withdrawal from opioids was not a problem and they should not be hesitant about prescribing or using opioids:

| | |
|---|---|
| **Actavis** | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that discontinuing opioid therapy can be handled "simply" and that it can be done at home. Actavis's sales representative training claimed opioid withdrawal would take only a week, even in addicted patients. |
| **Endo** | b. A CME sponsored by Endo, titled *Persistent Pain in the Older Adult*, taught that withdrawal symptoms can be avoided entirely by tapering the dose by 10-20% per day for ten days. |
| **Janssen** | c. A Janssen PowerPoint presentation used for training its sales representatives titled "Selling Nucynta ER" indicates that the "low incidence of withdrawal symptoms" is a "core message" for its sales force. This message is repeated in numerous Janssen training materials between 2009 and 2011. The studies supporting this claim did not describe withdrawal symptoms in patients taking Nucynta ER beyond 90 days or at high doses and would therefore not be representative of withdrawal symptoms in the chronic pain population. Patients on opioid therapy long-term and at high doses will have a harder time discontinuing the drugs and are more likely to experience withdrawal symptoms. In addition, in claiming a low rate of withdrawal symptoms, Janssen relied upon a study that only began tracking withdrawal symptoms in patients two to four days after discontinuing opioid use, when Janssen knew or should have known that these symptoms peak earlier than that for most patients. Relying on data after that initial window painted a misleading picture of the likelihood and severity of withdrawal associated with chronic opioid therapy. Janssen also knew or should have known that the patients involved in the study were not on the drug long enough to develop rates of withdrawal symptoms comparable to rates of withdrawal suffered by patients who use opioids for chronic pain—the use for which Janssen promoted Nucynta ER.<br><br>d. Janssen sales representatives told Chicago prescribers that patients on Janssen's drugs were less susceptible to withdrawal than those on other opioids. |

| Purdue | e. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "Symptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but did not disclose the significant hardships that often accompany cessation of use. |
|---|---|
| | f. Purdue sales representatives told Chicago prescribers that the effects of withdrawal from opioid use can be successfully managed. |
| | g. Purdue sales representatives told Chicago prescribers that the potential for withdrawal on Butrans was low due to Butrans's low potency and its extended release mechanism. |

### 6. Defendants and Their Third-Party Allies Misrepresented that Increased Doses Pose No Significant Additional Risks.

295.    Each of the following misrepresentations was created with the intent and expectation that, by misrepresenting and failing to disclose the known risks from high dose opioids, prescribers and patients would be more likely to continue to prescribe and use opioids, even when they were not effective in reducing patients' pain, and not to discontinue opioids even when tolerance required them to reach even higher doses.

296.    Defendants and their third-party allies claimed that patients and prescribers could increase doses of opioids indefinitely without added risk, even when pain was not decreasing or when doses had reached levels that were "frighteningly high," suggesting that patients would eventually reach a stable, effective dose. Each of Defendants' claims also omitted warnings of increased adverse effects that occur at higher doses, and misleadingly suggested that there was no greater risk to higher dose opioid therapy.

297.    These claims are false. Patients receiving high doses of opioids as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower

rate than tolerance to analgesic effects. Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended. The FDA has itself acknowledged that available data suggest a relationship between increased doses and the risk of adverse effects. Moreover, it is harder for patients to terminate use of higher-dose opioids without severe withdrawal effects, which contributes to a cycle of continued use, even when the drugs provide no pain relief and are causing harm—the signs of addiction.

298. Each of the following claims, which are further discussed, by Defendant, in Section V.E, suggests that high-dose opioid therapy is safe:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that "individualization" of opioid therapy depended on increasing doses "until patient reports adequate analgesia" and to "set dose levels on [the] basis of patient need, not on [a] predetermined maximal dose." Actavis further counseled its sales representatives that the reasons some physicians had for not increasing doses indefinitely were simply a matter of physician "comfort level," which could be overcome or used as a tool to induce them to switch to Actavis's opioid, Kadian. |
|---|---|
| Cephalon | b. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of their opioid, regardless of the dose currently prescribed.<br><br>c. Cephalon sponsored a CME written by KOL Dr. Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids that include aspirin and acetaminophen are less effective to treat breakthrough pain because of dose limitations.<br><br>d. Cephalon sales representatives assured Chicago prescribers that opioids were safe, even at high doses. |
| Endo | e. Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that opioids may be increased until "you are on the right dose of medication for your pain," and once that occurs, further dose |

| | |
|---|---|
| | increases would not occur. Endo funded the site, which was a part of Endo's marketing plan, and tracked visitors to it. |
| | f. Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics*. In Q&A format, it asked: "If I take the opioid now, will it work later when I really need it?" The response was: "The dose can be increased . . . . You won't 'run out' of pain relief." |
| **Janssen** | g. Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. This guide listed dose limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased doses from opioids. The publication also falsely claimed that it is a "myth" that "opioid doses have to be bigger over time." |
| **Purdue** | h. Purdue's *In the Face of Pain* website, along with initiatives of APF, promoted the notion that if a patient's doctor does not prescribe them what—in their view—is a sufficient dose of opioids, they should find another doctor who will. In so doing, Purdue exerted undue, unfair, and improper influence over prescribers who face pressure to accede to the resulting demands. |
| | i. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dose escalations are "sometimes necessary," even indefinitely high ones, which suggested that high dose opioids are safe and appropriate and did not disclose the risks from high dose opioids. This publication is still available online. |
| | j. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The guide also claimed that some patients "need" a larger dose of the drug, regardless of the dose currently prescribed. This language fails to disclose heightened risks at elevated doses. |
| | k. Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013. The CME, *Overview of Management Options*, was edited by KOL Dr. Russell Portenoy, among others, and taught that other drugs, but not opioids, are unsafe at high doses. The 2013 version is still available for CME credit. |
| | l. Purdue sales representatives told Chicago prescribers that opioids were just as effective for treating patients long-term and omitted any discussion that increased tolerance would require increasing, and increasingly dangerous, doses. |

**7.     Defendants and Their Third-Party Allies Deceptively Omitted or Minimized Adverse Effects of Opioids and Overstated the Risks of Alternative Forms of Pain Treatment.**

299.    Each of the following misrepresentations was created with the intent and expectation that, by omitting the known, serious risks of chronic opioid therapy, including the risks of addiction, abuse, overdose, and death, and emphasizing or exaggerating risks of competing products, prescribers and patients would be more likely to choose opioids. Defendants and their third-party allies routinely ignored the risks of chronic opioid therapy. These include (beyond the risks associated with misuse, abuse, and addiction):  hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time;"[151] hormonal dysfunction; decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly; neonatal abstinence syndrome (when an infant exposed to opioids prenatally withdraws from the drugs after birth); and potentially fatal interactions with alcohol or benzodiazapines, which are used to treat post-traumatic stress disorder and anxiety (disorders frequently coexisting with chronic pain conditions).[152]

300.    Despite these serious risks, Defendants asserted or implied that opioids were appropriate first-line treatments and safer than alternative treatments, including NSAIDs such as ibuprofen (Advil, Motrin) or naproxen (Aleve).  While NSAIDs can pose significant gastrointestinal, renal, and cardiac risks, particularly for elderly patients, Defendants' exaggerated descriptions of those risks were deceptive in themselves, and also made their

---

[151]    *See* Letter from Janet Woodcock, M.D., *supra*, at 10 n.41.

[152]    Several of these risks do appear in the FDA-mandated warnings.  *See, e.g.,* the August 13, 2015 OxyContin Label, Section 6.2, identifying adverse reactions including:  "abuse, addiction … death, … hyperalgesia, hypogonadism . . . mood altered . . . overdose, palpitations (in the context of withdrawal), seizures, suicidal attempt, suicidal ideation, syndrome of inappropriate antidiuretic hormone secretion, and urticaria [hives]."

omissions regarding the risks of opioids all the more striking and misleading. Defendants and their third-party allies described over-the-counter NSAIDs as life-threatening and falsely asserted that they were responsible for 10,000-20,000 deaths annually (more than opioids), when the real number is closer to 3,200. This description of NSAIDs starkly contrasted with their representation of opioids, for which the listed risks were nausea, constipation, and sleepiness (but not addiction, overdose, or death). Compared with NSAIDs, opioids are responsible for roughly four times as many fatalities annually.

301. As with the preceding misrepresentations in Sections V.D.1-6, Defendants' false and misleading claims regarding the comparative risks of NSAIDs and opioids had the effect of shifting the balance of opioids' risks and purported benefits. While opioid prescriptions have exploded over the past two decades, the use of NSAIDs has declined during that same time.

302. Each of the following, which are further discussed, by Defendant, in Section V.E, reflects Defendants' deceptive claims and omissions about the risks of opioids, including in comparison to NSAIDs:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that the ability to escalate doses during long-term opioid therapy, without hitting a dose ceiling, made opioid use safer than other forms of therapy that had defined maximum doses, such as acetaminophen or NSAIDs.<br><br>b. Actavis also trained physician-speakers that "maintenance therapy with opioids can be safer than long-term use of other analgesics," including NSAIDs, in older persons.<br><br>c. Kadian sales representatives told Chicago prescribers that NSAIDs were more toxic than opioids. |
|---|---|
| Cephalon | d. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. The publication attributed 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of |

| | | |
|---|---|---|
| | | NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. |
| | e. | Cephalon sales representatives told Chicago prescribers that NSAIDs were more toxic than Cephalon's opioids |
| **Endo** | f. | Endo distributed a "case study" to prescribers titled *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*. The study cites an example, meant to be representative, of a patient "with a massive upper gastrointestinal bleed believed to be related to his protracted use of NSAIDs" (over eight years), and recommends treating with opioids instead. |
| | g. | Endo sponsored a website, painknowledge.com, through APF and NIPC, which contained a flyer called "Pain: Opioid Therapy." This publication included a list of adverse effects from opioids that omitted significant adverse effects like hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it. |
| | h. | Endo provided grants to APF to distribute *Exit Wounds* (2009), which omitted warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
| | i. | Endo sales representatives told Chicago prescribers that NSAIDs were more toxic than opioids. |
| **Janssen** | j. | Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. This publication described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "can increase the risk of heart attack and stroke." The only adverse effects of opioids listed are "upset stomach or sleepiness," which the brochure claims will go away, and constipation. |
| | k. | Janssen sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines. Janssen's label for Duragesic, however, states that use with benzoidazepines "may cause respiratory depression, [low blood pressure], and profound sedation or potentially result in coma. *Exit Wounds* also contained a lengthy discussion |

| | |
|---|---|
| | of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
| | l.  Janssen sales representatives told Chicago prescribers that Nucynta was not an opioid, making it a good choice for chronic pain patients who previously were unable to continue opioid therapy due to excessive side effects.  This statement was misleading because Nucynta is an opioid and has the same effects as other opioids. |
| **Purdue** | m.  Purdue sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk.  APF distributed copies of *Exit Wounds* to a non-profit in Chicago.  *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
| | n.  Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which advised patients that opioids differ from NSAIDs in that they have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.  The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose.  *Treatment Options* also warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. |
| | o.  Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013, and the 2013 version is still available for CME credit.  The CME, *Overview of Management Options*, was edited by KOL Dr. Russell Portenoy, among others, and taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses. |
| | p.  Purdue sales representatives told Chicago prescribers that NSAIDs were more toxic than opioids. |

### 8.  Purdue Misleadingly Promoted OxyContin as Providing 12 Hours of Pain Relief.

303.   In addition to making the deceptive statements above, Purdue also dangerously misled doctors and patients about OxyContin's duration and onset of action.

304.   Purdue promotes OxyContin as an extended-release opioid, but the oxycodone does not enter the body on a linear rate.  OxyContin works by releasing a greater proportion of oxycodone into the body upon administration, and the release gradually tapers, as illustrated in

the following chart, which was, upon information and belief, adapted from Purdue's own sales materials:[153]



Figure 1

The reduced release of the drug over time means that the oxycodone no longer provides the same level of pain relief; as a result, in many patients, OxyContin does not last for the 12 hours for which Purdue promotes it—a fact that Purdue has known at all times relevant to this action.

305. OxyContin tablets provide an initial absorption of approximately 40% of the active medicine. This has a two-fold effect. First, the initial rush of nearly half of the powerful opioid—OxyContin is roughly twice as powerful as morphine—triggers a powerful psychological response. OxyContin thus behaves more like an immediate release opioid, which

---

[153]  Jim Edwards, "*How Purdue Used Misleading Charts to Hide OxyContin's Addictive Power*," *CBSNews.com*, Sept. 28, 2011, http://www.cbsnews.com/news/how-purdue-used-misleading-charts-to-hide-oxycontins-addictive-power/.  The 160 mg dose is no longer marketed.  Purdue's promotional materials in the past displayed a logarithmic scale, which gave the misleading impression the concentration remained constant.

Purdue itself once claimed was more addicting in its original 1995 FDA-approved drug label.
Second, the initial burst of oxycodone means that there is less of the drug at the end of the dosing
period, which results in the drug not lasting for a full 12 hours and precipitates withdrawal
symptoms in patients, a phenomenon known as "end of dose" failure. (The FDA found in 2008
that a "substantial number" of chronic pain patients will experience "end-of-dose failure" with
OxyContin.) The combination of fast onset and end-of-dose failure makes OxyContin
particularly addictive, even compared with other opioids.

306. Purdue nevertheless has falsely promoted OxyContin as if it were effective for a
full 12 hours. Its advertising in 2000 included claims that OxyContin provides "Consistent
Plasma Levels Over 12 Hours." That claim was accompanied by a chart depicting plasma levels
on a logarithmic scale, which minimized the rate of end-of-dose failure by depicting 10 mg in a
way that it appeared to be half of 100 mg in the table's y-axis. That chart, shown below, depicts
the same information as the chart above but does so in a way that makes the absorption rate
appear more consistent:

**For moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time**

# Consistent Plasma Levels Over 12 Hours

**Plasma concentrations (ng/mL) over time of various dosage strengths**



• OxyContin® 80 and 160 mg Tablets FOR USE ONLY IN OPIOID-TOLERANT PATIENTS requiring minimum daily oxycodone equivalent dosages of 160 mg and 320 mg, respectively. These tablet strengths may cause fatal respiratory depression when administered to patients not previously exposed to opioids

Steady state achieved within 24 to 36 hours

307.     More recently, other Purdue advertisements also emphasized "Q12h" (meaning twice-daily) dosing, as discussed in Section V.E.5. These include an advertisement in the February 2005 *Journal of Pain* and 2006 *Clinical Journal of Pain* featuring an OxyContin logo with two pill cups, reinforcing the twice-a-day message. Other advertisements that ran in the 2005 and 2006 issues of the *Journal of Pain* depict a sample prescription for OxyContin, with "Q12h" handwritten for emphasis.

308.     The information that OxyContin did not provide pain relief for a full 12 hours was known to Purdue, and Purdue's competitors, but was not disclosed to general practitioners. Purdue's knowledge of some pain specialists' tendency to prescribe OxyContin three times per day instead of two (which would have compensated for end-of-dose failure) was set out in Purdue's internal documents as early as 1999 and is apparent from MEDWATCH Adverse Event

reports for OxyContin.[154]  Even Purdue's competitor, Endo, was aware of the problem; Endo attempted to position its Opana ER drug as offering "durable" pain relief, which Endo understood to suggest a contrast to OxyContin.  Opana ER advisory board meetings, including one in Chicago in November 2007, feature pain specialists citing lack of 12-hour dosing as a disadvantage of OxyContin.  Endo even ran advertisements for Opana ER referring to "real" 12-hour dosing.

309.    Purdue's failure to disclose the prevalence of end-of-dose failure meant that prescribers in Chicago were not informed of risks relating to addiction, and that they received the misleading message that OxyContin would be effective for treating chronic pain for the advertised duration.  Furthermore, doctors would compensate by increasing the dose or prescribing "rescue" opioids, which has the same effect as increasing the amount of opioids prescribed to a patient, as described above in Section V.D.6.[155, 156]

**E.    Each Defendant Engaged in Deceptive Marketing, Both Branded and Unbranded, that Targeted and Reached Chicago Prescribers.**

310.    Defendants—and the Front Groups and KOLs who depended on and worked alongside them—were able to effect a sea change in medical opinion in favor of accepting opioids as a medically necessary long-term treatment for chronic pain.  As set forth below, each

---

[154]   MEDWATCH refers to the FDA's voluntary adverse event reporting system.

[155]   Purdue's *Clinical Issues in Opioid Prescribing*, put out in 2005 under Purdue's unbranded *Partners Against Pain* banner, states that "it is recommended that a supplementary immediate-release medication be provided to treat exacerbations of pain that may occur with stable dosing."  References to "rescue" medication appear in publications Purdue sponsored such as APF's *A Policymaker's Guide* (2011) and the 2013 CME *Overview of Pain Management Options*.

[156]   The Connecticut Attorney General's office filed a citizens' petition with the FDA on January 27, 2004, requesting that the OxyContin label be amended with a warning not to prescribe the drug more than twice daily as a means of compensating for end-of-dose failure.  The FDA denied this request on September 11, 2008.  The FDA found that the state had failed to present sufficient evidence that more frequent dosing caused adverse outcomes, but the FDA did not challenge the Connecticut finding that end-of-dose failure of OxyContin was prevalent.  Indeed, the FDA found that end-of-dose failure affected a "substantial" number of chronic pain patients prescribed OxyContin.

Defendant contributed to that result through a combination of both direct marketing efforts and third-party marketing efforts over which that Defendant exercised editorial control. These deceptive and misleading statements were directed to and reached Chicago prescribers and patients, with the intent of distorting their views on the risks, benefits, and superiority of opioids for treatment of chronic pain.

311. Defendants engaged in their deceptive marketing campaign, both nationwide and in Chicago, using a number of strategies. Defendants trained their sales forces and recruited physician speakers to deliver these deceptive messages and omissions, and they in turn conveyed them to prescribers. Defendants also broadly disseminated promotional messages and materials, both by delivering them personally to doctors during detailing visits and by mailing deceptive advertisements directly to prescribers. Because they are disseminated by Defendant drug manufacturers and relate to Defendants' drugs, these materials are considered "labeling" within the meaning of 21 C.F.R. § 1.3(a), which means Defendants are liable for their content.

312. As described below, the City has located a number of Chicago-area prescribers who received Defendants' misrepresentations. Each of the misrepresentations received by these doctors—as well as other misrepresentations outlined above in Section V.D—constitutes an integral piece of a centrally directed marketing strategy to change medical perceptions regarding the use of opioids to treat chronic pain. Defendants were aware of each of these misrepresentations, and Defendants approved of them and oversaw their dissemination at the national, corporate level.[157]

---

nu

1.    **Actavis**

313.    As described below, Actavis promoted its branded opioid, Kadian, through a

highly deceptive marketing campaign that it carried out principally through its sales force and

recruited physician speakers.  As internal documents indicate, this campaign rested on a series of

misrepresentations and omissions regarding the risks, benefits, and superiority of opioids, and

indeed incorporated each of the types of deceptive messages described above in Section V.D.1-7.

Based on the highly coordinated and uniform nature of Actavis's marketing, and as confirmed by

both verbatim message data and prescriber interviews, Actavis conveyed these deceptive

messages to Chicago prescribers.  Actavis did so with the intent that Chicago prescribers and/or

consumers would rely on the messages in choosing to use opioids to treat chronic pain.[158]

a.    Actavis's Deceptive Direct Marketing

314.    To help devise its marketing strategy for Kadian, Actavis commissioned a report

from one of its consultants in January 2005 about barriers to market entry.  The report concluded

that two major challenges facing opioid manufacturers in 2005 were (i) overcoming "concerns

regarding the safety and tolerability" of opioids, and (ii) the fact that "physicians have been

trained to evaluate the supporting data before changing their respective practice behavior."  To

do that, the report advocated a "[p]ublication strategy based on placing in the literature key data

that influence members of the target audience" with an "emphasis . . . on ensuring that the

message is believable and relevant to the needs of the target audience."  This would entail the

creation of "effective copy points . . . backed by published references" and "developing and

placing publications that demonstrate [the] efficacy [of opioids] and [their] safety/positive side

effect profile."  According to the report, this would allow physicians to "reach[] a mental

---

[158]   Actavis also sold various generic opioids, including Norco, which were widely prescribed in Chicago and
benefited from Actavis's overall promotion of opioids, but were not directly marketed by sales representatives.

agreement" and change their "practice behavior" without having first evaluated supporting data—of which Actavis (and other Defendants) had none.

315.    The consulting firm predicted that this manufactured body of literature "w[ould], in turn, provide greater support for the promotional message and add credibility to the brand's advocates" based on "either actual or *perceived* 'scientific exchange'" in relevant medical literature. (emphasis added).  To this end, it planned for three manuscripts to be written during the first quarter of 2005.  Of these, "[t]he neuropathic pain manuscript will provide evidence demonstrating KADIAN is as effective in patients with presumptive neuropathic pain as it is in those with other pain types"; "[t]he elderly subanalysis . . . will provide clinicians with evidence that KADIAN is efficacious and well tolerated in appropriately selected elderly patients" and will "be targeted to readers in the geriatrics specialty"; and "[t]he QDF/BID manuscript will . . . . call attention to the fact that KADIAN is the only sustained-release opioid to be labeled for [once or twice daily] use."  In short, Actavis knew exactly what each study would show—and how that study would fit into its marketing plan—before it was published.  Articles matching Actavis's descriptions later appeared in the *Journal of Pain* and the *Journal of the American Geriatrics Society*.

316.    To ensure that messages based on this science reached individual physicians, Actavis deployed sales representatives, or detailers, to visit prescribers in Chicago and across the country.  At the peak of Actavis's promotional efforts in 2011, the company spent $6.7 million on detailing.

317.    To track its detailers' progress, Actavis's sales and marketing department actively monitored the prescribing behavior of physicians.  It tracked the Kadian prescribing activity of individual physicians, and assessed the success of its marketing efforts by tabulating how many

Kadian prescriptions a prescriber wrote after he or she had been detailed. As described below, Kadian monitored numerous Chicago physicians, one of whom was the top Kadian prescriber in a sales territory that extended from Grand Rapids, Michigan to Buffalo, New York.

318. Actavis also planned to promote Kadian by presenting at conferences of organizations where it believed it could reach a high concentration of pain specialists. Its choice of conferences also was influenced by the host's past support of opioids. For example, Actavis documents show that Actavis presented papers concerning Kadian at an annual meeting of AGS because AGS's guidelines "support the use of opioids."

319. Actavis targeted prescribers using both its sales force and recruited physician speakers, as described below.

i.   *Actavis's Deceptive Sales Training*

320. Actavis's sales representatives targeted physicians to deliver sales messages that were developed centrally and deployed uniformly across the country. These sales representatives were critical in delivering Actavis's marketing strategies and talking points to individual prescribers.

321. Actavis's strategy and pattern of deceptive marketing is evident in its internal training materials. A sales education module titled "Kadian Learning System" trained Actavis's sales representatives on the marketing messages—including deceptive claims about improved function, the risk of addiction, the false scientific concept of "pseudoaddiction," and opioid withdrawal—that sales representatives were directed and required, in turn, to pass on to prescribers, nationally and in Chicago.

322. The sales training module, dated July 1, 2010, includes the misrepresentations documented in this Complaint, starting with its promise of improved function. The sales training instructed Actavis sales representatives that "most chronic benign pain patients do have

markedly improved ability to function when maintained on chronic opioid therapy," when, in reality, as described above in Section V.D.1, available data demonstrate that patients on chronic opioid therapy are *less likely* to participate in daily activities like work. The sales training also misleadingly implied that the dose of prescription opioids could be escalated without consequence and omitted important facts about the increased risks of high dose opioids. First, Actavis taught its sales representatives, who would pass this message on to doctors, that pain patients would not develop tolerance to opioids, which would require them to receive increasing doses: "Although tolerance and dependence do occur with long-term use of opioids, many studies have shown that tolerance is limited in most patients with [Chronic pain]." Second, Actavis instructed its sales personnel that opioid "[d]oses are titrated to pain relief, and so no ceiling dose can be given as to the recommended maximal dose." Actavis failed to explain to its sales representatives and, through them, to doctors the greater risks associated with opioids at high doses, which are described in Section V.D.6 above.

323. Further, the 2010 sales training module highlighted the risks of alternate pain medications without providing a comparable discussion of the risks of opioids, painting the erroneous and misleading impression that opioids are safer. Specifically, the document claimed that "NSAIDs prolong the bleeding time by inhibiting blood platelets, which can contribute to bleeding complications" and "can have toxic effects on the kidney." Accordingly, Actavis coached its sales representatives that "[t]he potential toxicity of NSAIDs limits their dose and, to some extent, the duration of therapy" since "[t]hey should only be taken short term." By contrast, the corresponding section related to opioids neglects to include a *single* side effect or risk associated with the use of opioids, including from long-term use.

324. This sales training module also severely downplayed the main risk associated with Kadian and other opioids—addiction. It represented that "there is no evidence that simply taking opioids for a period of time will cause substance abuse or addiction" and, instead, "[i]t appears likely that most substance-abusing patients in pain management practices had an abuse problem before entering the practice." This falsely suggests that few patients will become addicted, that only those with a prior history of abuse are at risk of opioid addiction, and that doctors can screen for those patients and safely prescribe to others. To the contrary, as described above in Section V.D.2, opioid addiction will affect a significant population of patients; while patients with a history of abuse may be more prone to addiction, all patients are at risk, and doctors may not be able to identify, or safely prescribe to, patients at greater risk.

325. The sales training also noted that there were various "signs associated with substance abuse," including past history or family history of substance or alcohol abuse, frequent requests to change medication because of side effects or lack of efficacy, and a "social history of dysfunctional or high-risk behaviors including multiple arrests, multiple marriages, abusive relationships, etc." This is misleading, as noted above, because it implies that only patients with these kinds of behaviors and history become addicted to opioids.

326. Further, the sales training neglected to disclose that no risk-screening tools related to opioids have ever been scientifically validated. As noted in Section V.D.3, the AHRQ recently issued an Evidence Report that could identify "[n]o study" that had evaluated the effectiveness of various risk mitigation strategies—including the types of patient screening implied in Actavis's sales training—on outcomes related to overdose, addiction, abuse or misuse.

327. The sales training module also directed representatives to counsel doctors to be on the lookout for the signs of "[p]seudoaddiction," which were defined as "[b]ehaviors (that mimic

addictive behaviors) exhibited by patients with inadequately treated pain." However, as described above in Section V.D.4, the concept of "pseudoaddiction" is unsubstantiated and meant to mislead doctors and patients about the risks and signs of addiction.

328. Finally, the 2010 national training materials trivialized the harms associated with opioid withdrawal by explaining that "[p]hysical dependence simply requires a tapered withdrawal should the opioid medication no longer be needed." This, however, overlooks the fact, described in Section V.D.5, that the side effects associated with opiate withdrawal are severe and a serious concern for *any person* who wishes to discontinue long-term opioid therapy.

329. The Kadian Learning System module dates from July 2010, but Actavis sales representatives were passing deceptive messages on to prescribers even before then. A July 2010 "Dear Doctor" letter issued by the FDA indicated that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]." Certain risks that were misrepresented included the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid agonists have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion." The FDA also took issue with an advertisement for misrepresenting Kadian's ability to help patients "live with less pain and get adequate rest with less medication," when the supporting study did not represent "substantial evidence or substantial clinical experience."

330. Actavis's documents also indicate that the company continued to deceptively market its drugs after 2010. Specifically, a September 2012 Kadian Marketing Update, and the "HCP Detail" aid contained therein, noted that Kadian's "steady state plasma levels" ensured

that Kadian "produced higher trough concentrations and a smaller degree of peak-to-trough fluctuations" than other opioids.

331.    Actavis also commissioned surveys of prescribers to ensure Kadian sales representatives were promoting the "steady-state" message.  That same survey—paid for and reviewed by Actavis—found repeated instances of prescribers being told by sales representatives that Kadian had low potential of abuse or addiction.  This survey also found that prescribers were influenced by Actavis's messaging.  A number of Kadian prescribers stated that they prescribed Kadian because it was "without the addictive potential" and wouldn't "be posing high risk for addiction."  As a result, Actavis's marketing documents celebrated a "perception" among doctors that Kadian had "low abuse potential".

332.    Finally, the internal documents of another Defendant, Endo, indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines with doctors during detailing visits.  As discussed above in Section V.C.2.c.ii, these guidelines deceptively concluded that the risk of addiction is manageable for patients regardless of past abuse histories.

ii.    *Actavis's Deceptive Speakers Training*

333.    Actavis also increasingly relied on speakers—physicians whom Actavis recruited to market opioids to their peers—to convey similar marketing messages.  Actavis set a goal to train 100 new Kadian speakers in 2008 alone, with a plan to set up "power lunch teleconferences" connecting speakers to up to 500 participating sites nationwide.  Actavis sales representatives, who were required to make a certain number of sales visits each day and week, saw the definition of sales call expanded to accommodate these changes; such calls now included physicians' "breakfast & lunch meetings with Kadian advocate/speaker."

334. A training program for Actavis speakers included training on many of the same messages found in the Kadian Learning System, as described below. The deceptive messages in Actavis's speakers' training are concerning for two reasons: (a) the doctors who participated in the training were themselves prescribing doctors, and the training was meant to increase their prescriptions of Kadian; and (b) these doctors were trained, paid, and directed to deliver these messages to other doctors who would write prescriptions of Kadian.

335. Consistent with the training for sales representatives, Actavis's speakers' training falsely minimized the risk of addiction posed by long-term opioid use. Actavis claimed, without scientific foundation, that "[o]pioids can be used with minimal risk in chronic pain patients without a history of abuse or addiction." The training also deceptively touted the effectiveness of "Risk Tools," such as the Opioid Risk Tool, in determining the "risk for developing aberrant behaviors" in patients being considered for chronic opioid therapy. In recommending the use of these screening tools, the speakers' training neglected to disclose that none of them has been scientifically validated.

336. The speakers' training also made reference to "pseudoaddiction" as a "[c]ondition characterized by behaviors, such as drug hoarding, that outwardly mimic addiction but are in fact driven by a desire for pain relief and usually signal undertreated pain." It then purported to assist doctors in identifying those behaviors that *actually* indicated a risk of addiction from those that did not. Behaviors it identified as "[m]ore suggestive of addiction" included "[p]rescription forgery," "[i]njecting oral formulations," and "[m]ultiple dose escalations or other nonadherence with therapy despite warnings." Identified as "[l]ess suggestive of addiction" were "[a]ggressive complaining about the need for more drugs," "[r]equesting specific drugs," "[d]rug hoarding during periods of reduced symptoms," and "[u]napproved use of the drug to treat another

symptom." By portraying the risks in this manner, the speakers' training presentation deceptively gave doctors a false sense of security regarding the types of patients who can become addicted to opioids and the types of behaviors these patients exhibit.

337. The speakers' training downplayed the risks of opioids, while focusing on the risks of competing analgesics like NSAIDs. For example, it asserted that "Acetaminophen toxicity is a major health concern." The slide further warned that "Acetaminophen poisoning is the most common cause of acute liver failure in an evaluation of 662 US Subjects with acute liver failure between 1998-2003," and was titled "Opioids can be a safer option than other analgesics." However, in presenting the risks associated with opioids, the speakers' training focused on nausea, constipation, and sleepiness, and ignored the serious risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and dizziness; increased falls and fractures in the elderly, neonatal abstinence syndrome, and potentially fatal interactions with alcohol or benzodiazapines. As a result, the training exaggerated the risks of NSAIDs, both absolutely and relative to opioids, to make opioids appear to be a more attractive first-line treatment for chronic pain.

338. The speakers' training also misrepresented the risks associated with increased doses of opioids. For example, speakers were instructed to "[s]tart low and titrate until patient reports adequate analgesia" and to "[s]et dose levels on [the] basis of patient need, not on predetermined maximal dose." However, the speakers' training neglected to warn speakers (and speakers bureau attendees) that patients on high doses of opioids are more likely to suffer adverse events.

      b.     Actavis's Deceptive Statements to Chicago Prescribers and
               Patients

339.    The misleading messages and training materials Actavis provided to its sales
force and speakers were part of a broader strategy to convince prescribers to use opioids to treat
their patients' pain, without complete and accurate information about the risks, benefits, and
alternatives.  This deception was national in scope and included Chicago.  As described in
Section V.B.2 above, Actavis's nationwide messages reached Chicago prescribers in a number of
ways.  For example, they were carried into Chicago by Actavis's sales representatives during
detailing visits as well as made available to Chicago patients and prescribers through websites
and ads, including ads in prominent medical journals.  They have also been delivered to Chicago
prescribers by Actavis's paid speakers, who were required by Actavis policy and by FDA
regulations to stay true to Actavis's nationwide messaging.

340.    Once trained, Actavis's sales representatives and speakers were directed to, and
did, visit potential prescribers in Chicago, as elsewhere, to deliver their deceptive messages.
These contacts are demonstrated by Actavis's substantial effort in tracking the habits of
individual Chicago physicians in prescribing Kadian, and by the direct evidence of Actavis
detailing Chicago prescribers.

341.    According to Actavis documents, Chicago was its own sales territory, designated
A202.

342.    Actavis tracked, in substantial detail, the prescribing behavior of Chicago area
physicians.  For example, a spreadsheet dated August 8, 2012 and summarizing sales over the
2011 – 2012 period indicates that Chicago health care providers wrote 5,623 prescriptions for
Kadian, averaging 703 prescriptions per month and 161 per week.  The spreadsheet tracked 145
Chicago-area prescribers and measured their current prescribing habits against the volume of

Kadian prescriptions they had written in the past. The spreadsheet further analyzed the changes in prescribing behavior so that Actavis could select Chicago prescribers for detailing visits and other marketing and track the impact of its efforts.

343. Actavis also tracked the "Top 25 Target Prescribers per Region," and the highest prescriber of all was Chicago Prescriber A.[159] Another Chicago doctor also appeared on this list.

344. The experiences of specific prescribers confirm both that Actavis's national marketing campaign included the misrepresentations described above in Sections V.D and V.E.1, and that the company disseminated these same misrepresentations to Chicago prescribers and consumers. In particular, these prescriber accounts reflect that Actavis detailers omitted or minimized the risk of opioid addiction; claimed or implied that opioids were safer than NSAIDs; and overstated the benefits of opioids, including by making claims of improved function.

345. A survey of a sample of Midwestern physicians, who reported the "verbatim" messages that they retained from detailing visits and other promotional activity, documented that Kadian sales representatives promoted Kadian as being less addictive than other Schedule II opioids at least between 2006 and 2008. In specific instances in 2007 and 2008, these sales representatives also made these claims to nurse practitioners. Additionally, Kadian sales representatives told a Midwestern orthopedic surgeon in 2006 that Kadian improved patients' sleep (a promise of improved function) and told a Midwestern rheumatologist that Kadian was "safer than NSAIDs."

346. In addition, the City has interviewed a number of Chicago-area prescribers who reported that they were detailed by Actavis sales representatives and heard similar claims, as

---

[159] The region included parts of Illinois, Indiana, Kentucky, Maryland, Michigan, Missouri, New York, Ohio, Pennsylvania, and Wisconsin.

well as other messages described in Sections V.D. and V.E.1.[160]  In each instance, Actavis intended that the prescriber rely on these messages.  Most of these physicians did, in fact, prescribe Actavis's opioids.  Exhibit D to this Fifth Amended Complaint summarizes data showing the number of prescriptions, doses, and Morphine Milligram Equivalents ("MME") by Defendant family from IQVIA Xponent (data sold by "data vendor" IQVIA, formerly known as IMS Health, and used by Defendants to target and evaluate their marketing, as described in ¶ 715 below) for the year 1997-2017 for these prescribers.

   a.  Chicago Prescriber B, an anesthesiologist, sees opioid drug company representatives on a regular basis, and he has met with representatives from Actavis.  These representatives pushed the message that "steady-state" drugs have less potential for abuse. Opioid manufacturers, including Actavis, have told him that opioids improved patient function and quality of life.  Prescriber B relies on the information he receives from drug company representatives because his busy practice prevents him from having the time to conduct the research himself.  Prescriber B wrote prescriptions for opioids, including Defendants' drugs and Actavis' opioids in particular to local patients.  ██████████████ ████████████████████████████████████████████ ████████████

   b.  Chicago Prescriber D was visited by opioid sales representatives from Purdue, Endo, Janssen, and Actavis.  He relied on the representations made by these sales representatives and, in the past, had not comprehended the true addictive potential of opioids.   Representatives from each of these companies, including Kadian representatives, told Prescriber D that their drugs were "steady state," which he interpreted to mean that they were less addictive.   Prescriber D wrote prescriptions for opioids, including Defendants' drugs and Actavis' opioids in particular to local patients.  █████████████ ████████████████████████████████████████████

---

[160]   The City's interviews with prescribers, described here and elsewhere in the Complaint, focused on the period 2006 to the present.  Prescribers, however, cannot always recall with precision when particular detailing visits took place.  Defendants, on the other hand, closely track their sales representatives' detailing visits through call notes and other documentation, and are in a much better position to know these dates than the City.

████████████████████████████
████

c.  Chicago Prescriber E, an anesthesiologist and pain specialist, explained that he received visits from sales representatives from all Defendants, including Kadian representatives, until a few years ago.  Representatives from Actavis never discussed addiction with him other than to promote Kadian as tamper-proof and more difficult to abuse.  Prescriber E also attended a dinner at which a heavy Kadian prescriber talked about the benefits of using the drug.[161] ████████████████████
████████████████████████████
████████████████████████████
████

d.  Chicago Prescriber F, a headache specialist, recalls being detailed by Kadian representatives from 2005 to 2007.  Prescriber F explained that Kadian representatives told him that Kadian is less addicting than other opioids due to its extended release mechanism, a proposition he believes to be true.  Prescriber F wrote prescriptions for opioids, including Defendants' drugs and Actavis's opioids in particular to local patients. ████████████████████████
████████████████████████████
████████████████████

e.  Chicago Prescriber H, a Chicago physician, was detailed many times by Kadian sales representatives.  These representatives never discussed the risk of addiction with him.  Prescriber H attended a speaker event sponsored by Actavis.  Prescriber H wrote prescriptions for opioids, including Defendants' drugs to local patients, including at least one Actavis opioid prescription.
████████████████████████████
████████████████████████████
███████████████████

f.  Chicago Prescriber I recalled being detailed by Kadian representatives every few months.  Prescriber I recalls being told by his Kadian representative that, if the capsule was opened, its contents could not be dissolved in water, which he believes was intended to imply that Kadian was less likely to be abused—and thereby less likely to lead to addiction—than other opioids.  Sales representatives, including Kadian representatives, never

---

[161]  Prescriber C, as well as Prescriber H below, attended talks presented by Actavis speakers.  These talks would have followed the same deceptive talking points covered in Actavis's speaker training, as described above in Section V.E.1a.ii.

informed Prescriber I about the risk of addiction. Prescriber I wrote prescriptions for opioids, including Defendants' drugs and Actavis's drugs in particular to local patients. ██████████ ████████████████████████████ ███████████████████████████████

347. These accounts reflect specific examples of instances in which Actavis's sales representatives made the misrepresentations outlined above in Sections V.D and V.E.1 directly to Chicago prescribers. They are not an exhaustive list. Many physicians are difficult to reach given their patient schedules, and some are reluctant to be interviewed about their prescribing decisions. Nevertheless, based on the nationwide and uniform character of Actavis's marketing campaign, these examples support the inference that Actavis sales representatives made similar misstatements to the other Chicago-area prescribers they detailed.

**2. Cephalon**

348. At the heart of Cephalon's deceptive promotional efforts was a concerted and sustained effort to expand the market for its branded opioids, Actiq and Fentora, far beyond their FDA-approved use in opioid-tolerant cancer patients. Trading on their rapid-onset formulation, Cephalon touted its opioids as the answer to "breakthrough pain"—a term its own KOL allies planted in the medical literature—whether cancer pain or not. Cephalon promoted this message through its sales force, paid physician speakers, advertisements, and CMEs, even after the FDA issued the company warnings and rejected an expanded drug indication.

349. Even as it promoted Actiq and Fentora off-label, Cephalon also purveyed many of the deceptive messages described above in Section V.D. It did so both directly—through detailing visits and speaker programs—and through the publications and CMEs of its third-party partners. These messages included misleading claims about functional improvement, addiction risk, pseudoaddiction, and the safety of alternatives to opioids.

350.    Based on the highly coordinated and uniform nature of Cephalon's marketing, and as confirmed by both verbatim message data and prescriber interviews, Cephalon conveyed these deceptive messages to Chicago prescribers.  The materials that Cephalon generated in collaboration with third-parties also were distributed or made available in Chicago.  Cephalon distributed these messages, or facilitated their distribution, in Chicago with the intent that Chicago prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

> a.    Cephalon's Deceptive Direct Marketing

351.    Like the other Defendants, Cephalon directly engaged in misleading and deceptive marketing of its opioids through its sales force and branded advertisements.  These messages were centrally formulated and intended to reach prescribers nationwide, including those practicing in the Chicago area.  Cephalon also spent the money necessary to aggressively promote its opioid drugs, setting aside $20 million to market Fentora in 2009 alone.

> i.    *Cephalon's Fraudulent Off-Label Marketing of Actiq and Fentora*

352.    Chief among Cephalon's direct marketing efforts was its campaign to deceptively promote its opioids for off-label uses.  Cephalon reaps significant revenue from selling its opioids for treatment of chronic non-cancer pain.  However, neither of its two opioid drugs—Actiq or Fentora—is approved for this purpose.  Instead, both have indications that are very clearly and narrowly defined to limit their use to a particular form of cancer pain.  Despite this restriction and in order to claim its piece of the broader chronic non-cancer pain market, Cephalon deceptively and unlawfully marketed Actiq and then Fentora for patients and uses for which they were not safe, effective, or allowed, causing prescriptions to be written and paid and, grievously, patients to be injured and die.  As described below in Section V.E.2.c, Cephalon's

efforts to expand the market for its drugs beyond cancer pain extended to Chicago prescribers, few of whom were oncologists and at least one of whom was surprised to have received Cephalon's sales pitches because he ran a "headache clinic."

(a)    Cephalon launched its fraudulent marketing<br>scheme for Actiq

353.     Cephalon's Actiq is a powerful opioid narcotic that is delivered to the bloodstream by a lollipop lozenge that dissolves slowly in the mouth.  As described by one patient, Actiq "tastes like the most delicious candy you ever ate." [162]

354.     Actiq is appropriately used only to treat "breakthrough" cancer pain that cannot be controlled by other medications.  Breakthrough pain is a short-term flare of moderate-to-severe pain in patients with otherwise stable persistent pain.  Actiq is a rapid-onset drug that takes effect within 10-15 minutes but lasts only a short time.  It is also an extremely strong drug, considered to be at least 80 times more powerful than morphine.  Fentanyl, a key ingredient in Actiq, has been linked to fatal respiratory complications in patients.  Actiq is not safe in any dose for patients who are not opioid tolerant, that is, patients who have taken specific doses of opioids for a week or longer and whose systems have acclimated to the drugs.

355.     In 1998, the FDA approved Actiq "***ONLY*** for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[163] (Emphasis in FDA document). Because of Actiq's dangers, wider, off-label uses—as the FDA label makes clear—are not permitted:

---

[162]     See John Carreyrou, Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs, Wall St. J., Nov. 3, 2006.

[163]     FDA Approval Letter for NDA 20-747 (Nov. 4, 1998) at 5, http://www.accessdata.fda.gov/ drugsatfda_docs/appletter/1998/20747ltr.pdf.

> This product ***must not*** be used in opioid non-tolerant patients because life-threatening respiratory depression and death could occur at any dose in patients not on a chronic regimen of opioids. For this reason ACTIQ is contraindicated in the management of acute or postoperative pain.[164]

356.     Actiq and Fentora are thus intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain.  Unlike other drugs, as to which off-label uses are permitted but cannot be promoted by the drug maker, Actiq and Fentora are so potent that off-label use for opioid naïve patients is barred by the FDA, as their labels make clear.

357.     Notwithstanding the drug's extreme potency and related dangers and the FDA's explicit limitations, Cephalon actively promoted Actiq for chronic non-cancer pain—an unapproved, off-label use.  Cephalon marketed Actiq as appropriate for the treatment of various conditions including back pain, headaches, pain associated with sports-related injuries, and other conditions not associated with cancer for which it was not approved, appropriate, or safe.

358.     Actiq's initial sales counted in the tens of millions of dollars, corresponding to its limited patient population.  But by 2005, Actiq sales reached $412 million, making it Cephalon's second-highest selling drug.  As a result of Cephalon's deceptive, unlawful marketing, sales exceeded $500 million by 2006.

(b)     October 1, 2006—Cephalon fraudulently marketed Actiq's successor drug, Fentora

359.     Actiq was set to lose its patent protection in September 2006.  To replace the revenue stream that would be lost once generic competitors came to market, Cephalon purchased

---

[164]  Actiq Drug Label, July 2011.  The 1998 version does not substantively differ:  "Because life-threatening hypoventilation could occur at any dose in patients not taking chronic opiates, *Actiq* is contra-indicated in the management of acute or postoperative pain.  This product **must not** be used in opioid non-tolerant patients." (Emphasis in original).

a new opioid drug, Fentora, from Cima Labs and, in August 2005, submitted a New Drug Application ("NDA") to the FDA for approval. Like Actiq, Fentora is an extremely powerful and rapid-onset opioid. It is administered by placing a tablet in the mouth until it disintegrates and is absorbed by the mucous membrane that lines the inside of the mouth.

360. On September 25, 2006, the FDA approved Fentora, like Actiq, only for the treatment of breakthrough cancer pain in cancer patients who were already tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. Fentora's unusually strong and detailed black box warning label—the most serious medication warning required by the FDA—makes clear that, among other things:

> Fatal respiratory depression has occurred in patients treated with FENTORA, including following use in opioid non-tolerant patients and improper dosing. The substitution of FENTORA for any other fentanyl product may result in fatal overdose.

> Due to the risk of respiratory depression, FENTORA is contraindicated in the management of acute or postoperative pain including headache/migraine and in opioid non-tolerant patients.[165]

361. When Cephalon launched Fentora on October 1, 2006, it picked up the playbook it developed for Actiq and simply substituted in Fentora. Cephalon immediately shifted 100 general pain sales representatives from selling Actiq to selling Fentora to the very same physicians for uses that would necessarily and predictably be off-label. Cephalon's marketing of Actiq therefore "primed the market" for Fentora. Cephalon had trained numerous KOLs to lead promotional programs for Fentora, typically including off-label uses for the drug. Cephalon billed Fentora as a major advance that offered a significant upgrade in the treatment of breakthrough pain generally—not breakthrough cancer pain in particular—from Actiq.

---

[165] Fentora Drug Label, February 2013, http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/021947s008lbl.pdf

Cephalon also developed a plan in 2007 to target elderly chronic pain patients, via a multi-city tour with stops at AARP events, YMCAs, and senior living facilities.

362.    On February 12, 2007, only four months after the launch, Cephalon CEO Frank Baldino told investors:

> [W]e've been extremely pleased to retain a substantial portion, roughly 75% of the rapid onset opioid market. We executed our transition strategy and the results in our pain franchise have been better than we expected. With the successful launch of FENTORA and the progress in label expansion program, we are well positioned to grow our pain franchise for many years to come.[166]

363.    On May 1, 2007, just seven months after Fentora's launch, Cephalon's then-Executive Vice President for Worldwide Operations, Bob Roche, bragged to financial analysts that Fentora's reach would exceed even Actiq's. He described the company's successful and "aggressive" launch of Fentora that was persuading physicians to prescribe Fentora for ever broader uses. He identified two "major opportunities"—treating breakthrough cancer pain and:

> The other opportunity of course is the prospect for FENTORA outside of cancer pain, in indications such as breakthrough lower back pain and breakthrough neuropathic pain. . . .
>
> . . . .
>
> We believe that a huge opportunity still exists as physicians and patients recognize FENTORA as their first choice rapid onset opioid medication. . . . [opioids are] widely used in the treatment of . . . non-cancer patients . . . .
>
> . . . .
>
> Of all the patients taking chronic opioids, 32% of them take that medication to treat back pain, and 30% of them are taking their opioids to treat neuropathic pain. In contrast only 12% are taking them to treat cancer pain, 12%.

---

[166]    *See Cephalon Q4 2006 Earnings Call Transcript,* Seeking Alpha (February 12, 2007, 8:48 PM EST) at 5, http://seekingalpha.com/article/26813-cephalon-q4-2006-earnings-call-transcript.

We know from our own studies that breakthrough pain episodes experienced by these non-cancer sufferers respond very well to FENTORA. And for all these reasons, we are tremendously excited about the significant impact FENTORA can have on patient health and wellbeing and the exciting growth potential that it has for Cephalon.

In summary, we have had a strong launch of FENTORA and continue to grow the product aggressively. Today, that growth is coming from the physicians and patient types that we have identified through our efforts in the field over the last seven years. In the future, with new and broader indications and a much bigger field force presence, the opportunity that FENTORA represents is enormous.[167]

(c)     September 2007—Reports of death and serious side effects led the FDA to issue a public health warning for Fentora

364.    On September 10, 2007, Cephalon sent letters to doctors warning of deaths and other "serious adverse events" connected with the use of Fentora and indicating that "[t]hese deaths occurred as a result of improper patient selection (*e.g.*, use in opioid non-tolerant patients), improper dosing, and/or improper product substitution."[168] The warning did not mention Cephalon's deliberate role in the "improper patient selection."

365.    Two weeks later, the FDA issued its own Public Health Advisory. The FDA emphasized, once again, that Fentora should be prescribed only for approved conditions and that dose guidelines should be carefully followed. The FDA Advisory made clear that several Fentora-related deaths had occurred in patients who were prescribed the drug for off-label uses. The FDA Advisory warned that Fentora should not be used for any off-label conditions,

---

[167]   *See Cephalon Q1 2007 Earnings Call Transcript,* Seeking Alpha (May 1, 2007, 8:48 PM EST) at 23, http://seekingalpha.com/article/34163-cephalon-q1-2007-earnings-call-transcript?page=1.

[168]   Letter from Jeffrey M. Dayno, M.D., Vice President, Medical Services, Cephalon, Inc. to Healthcare Providers (Sept. 10, 2007), http://www.fda.gov/downloads/Safety/MedWatch/SafetyInformation/ SafetyAlertsforHumanMed icalProducts/UCM154439.pdf.

including migraines, post-operative pain, or pain due to injury, and that it should be given only to patients who have developed opioid tolerance. The Advisory reiterated that because Fentora contains a much greater amount of fentanyl than other opiate painkillers, it is not a suitable substitute for other painkillers.[169]

366. Cephalon's off-label marketing continued notwithstanding the regulatory scrutiny. Cephalon's 2008 internal audit of its Sales & Marketing Compliance Programs concluded that marketing and tactical documents, as written, may be construed to promote off-label uses. The same report acknowledged that Cephalon lacked a process to confirm that speakers' program participants were following Cephalon's written, formal policies prohibiting off-label promotion, and that "non-compliant [Cephalon Speaker Programs] may be taking place." Moreover, the report acknowledged that Cephalon's "call universe" may include "inappropriate prescribers"—prescribers who had nothing to do with cancer pain.

(d) May 6, 2008—The FDA rejected Cephalon's request for expanded approval of Fentora

367. Cephalon filed a supplemental new drug application, ("sNDA"), asking the FDA to approve Fentora for the treatment of non-cancer breakthrough pain. Cephalon admitted that Fentora already had been heavily prescribed for non-cancer pain, but argued that such widespread use demonstrated why Fentora should be approved for these wider uses.[170] Cephalon's application also conceded that "[t]o date, no medication has been systematically

---

[169] FDA Public Health Advisory, *Important Information for the Safe Use of Fentora (fentanyl buccal tablets)* (Sept. 26, 2007), http://www.fda.gov/Drugs/DrugSafety/ PostmarketDrugSafetyInformationforPatientsandProviders/ucm051273.htm.

[170] *See Fentora CII: Advisory Committee Briefing Document,* U.S. FDA Anesthetic & Life Support Drugs Advisory Comm. & Drug Safety & Risk Mgmt. Advisory Comm. (May 6, 2008), http://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4356b2-02-Cephalon.pdf.

evaluated in clinical studies or approved by the FDA for the management of [breakthrough pain] in patients with chronic persistent non-cancer-related pain." *Id.*

368.     In response to Cephalon's application, the FDA presented data showing that 95% of all Fentora use was for treatment of non-cancer pain.[171]  By a vote of 17-3, the relevant Advisory Committee—a panel of outside experts—voted against recommending approval of Cephalon's sNDA for Fentora, citing the potential harm from broader use.  On September 15, 2008, the FDA denied Cephalon's application and requested, in light of Fentora's already off-label use, that Cephalon implement and demonstrate the effectiveness of proposed enhancements to Fentora's Risk Management Program.  In December 2008, the FDA followed that up with a formal request directing Cephalon to submit a Risk Evaluation and Mitigation Strategy for Fentora.

> (e)     March 26, 2009—the FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") warned Cephalon about its misleading advertising of Fentora

369.     Undeterred by the rejection of its sNDA, Cephalon continued to use its general pain sales force to promote Fentora off-label to pain specialists as an upgrade over Actiq for the treatment of non-cancer breakthrough pain.  Deceptively and especially dangerously, Cephalon also continued to promote Fentora for use by all cancer patients suffering breakthrough cancer pain, and not simply those who were opioid tolerant.

370.     On March 26, 2009, DDMAC issued a Warning Letter to Cephalon, telling Cephalon that its promotional materials for Fentora amounted to deceptive, off-label promotion

---

[171]   *See* Yoo Jung Chang & Lauren Lee, *Review of Fentora and Actiq Adverse Events from the Adverse Event Reporting System ("AERS") Database*, U.S. FDA Anesthetic & Life Support Drugs Advisory Comm. & Drug Safety & Risk Mgmt. Advisory Comm. (May 6, 2008), http://www.fda.gov/ohrms/dockets/ac/08/slides/2008-4356s2-02-FDAcorepresentations.ppt#289,1 (last visited Aug. 17, 2010).

of the drug. [172]  Specifically, the Warning Letter asserted that a sponsored link on Google and other search engines for Fentora, which said "[l]earn about treating breakthrough pain in patients with cancer,"[173] was improper because it "misleadingly broaden[ed] the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora therapy . . . when this is not the case."

371.    DDMAC emphasized that Fentora's label was limited to cancer patients with breakthrough pain ***"who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."*** (Emphasis in original).  DDMAC explained that the advertisement was "especially concerning given that Fentora **must not** be used in opioid non-tolerant patients because life-threatening hypoventilation and death could occur at any dose in patients not on a chronic regimen of opioids." (Emphasis in original).  DDMAC also warned Cephalon that, based on a review of Cephalon-sponsored links for Fentora on internet search engines, the company's advertisements were "misleading because they make representations and/or suggestions about the efficacy of Fentora, but fail to communicate **any** risk information associated with the use" of the drug. (Emphasis in original).

(f)    Cephalon continues to knowingly, deceptively, and illegally promote Fentora for off-label uses

372.    Cephalon's own market research studies confirm that its Fentora promotions were not focused on the physicians who treat breakthrough cancer pain.  Cephalon commissioned

---

[172]    Letter from Michael Sauers, Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications, to Carole S. Marchione, Senior Director and Group Leader, Regulatory Affairs (March 26, 2009), http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/ EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM166238.pdf.

[173]    Screen shots of the sponsored link are available here:  http://www.fda.gov/downloads/Drugs/ GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM166240.pdf.

several market research studies to determine whether oncologists provided an "adequate" market potential for Fentora. These studies' central goal was to determine whether oncologists treat breakthrough cancer pain themselves, or whether they refer such patients to general pain specialists. The first study, completed in 2007, reported that 90% of oncologists diagnose and treat breakthrough cancer pain themselves, and do not refer their breakthrough cancer pain patients to pain specialists. The second study, completed in 2009, confirmed the results of the 2007 study, this time reporting that 88% of oncologists diagnose and treat breakthrough cancer pain themselves and rarely, if ever, refer those patients to general pain specialists. (One reason that general pain specialists typically do not treat oncological pain is that the presence of pain can, in itself, be an indicator of a change in the patient's underlying condition that should be monitored by the treating oncologist.)

373. Yet Cephalon continued to use its general pain sales force (which numbered over 110 representatives) to promote Fentora to general pain specialists, and, as described below in Section V.E.2.c, to Chicago-area anesthesiologists and physical medicine and rehabilitation specialists. And Cephalon did not stop there. It also targeted primary care physicians, which it viewed as principal "driver[s] of opioid volume." Of the 2007 recipients of Fentora vouchers nationwide, excluding those flagged for non-promotion, 24.96% of targeted doctors were identified as primary care physicians under the column of "Fentora Specialty Group." By comparison, 19.64% were anesthesiologists, 5.24% were neurologists, and a mere 9.87% were oncologists.

374. Cephalon-set sales quotas for its general pain sales force would be unattainable if they did not deceptively promote Fentora off-label. The general pain sales representatives have, from the outset, been required to adhere to call lists that include numerous pain doctors and other

physicians who do not, and would not, prescribe Fentora on-label. These same call lists contain few, if any, oncologists. Cephalon's internal "Fentora launch objectives," for example, included marketing to "core Actiq prescribers" in 2007 by "increasing call frequency." The core Actiq prescribers were the very same subset of physicians Cephalon admitted were the subject of improper marketing of Actiq. This plan was successful. By 2009, Cephalon could say: "[T]he majority of . . . Fentora prescriptions are generated primarily by Pain/Anesthesiology/Physical Medicine & Rehabilitation, followed by [primary care physicians]. This distribution is consistent with both personal and nonperson targeting."

375. Cephalon's sales force training further confirms the presence of a concerted scheme to market Fentora to doctors who did not treat cancer. Cephalon created a document for its sales force titled "Model Sales Call Behavior." While the document includes general disclaimers that "all discussions must tie back to breakthrough pain in opioid-tolerant patients with cancer," the "model call" involves sales representatives relaying information about chronic *non*-cancer pain. Specifically, it includes a "group 1" of leading questions relating to chronic pain, and uses the statistic "[a]pproximately 70% of patients with Chronic Pain suffer from [breakthrough pain]."[174] In "group 2," relating to breakthrough pain, the model call uses a different figure for breakthrough cancer pain (51-89%). The inclusion of the 70% figure can only mean the sales force is trained in the promotion of chronic non-cancer pain.

376. Cephalon was well aware that physicians were prescribing Fentora for off-label uses. A presentation titled "FENTORA Brand Pulse Research," submitted to Cephalon by Pinnacle Research Group, LLC in March of 2008 explained that "FENTORA usage patterns fall

---

[174] In fact, Cephalon's 2008 Brand Plan claims there is a 74% incidence of breakthrough pain in chronic non-cancer patients on baseline opioid therapy.

into one of three groups." The first was "Indicated Use," and consisted of prescribers who "are adamant that they won't use FENTORA except in the indicated area of cancer pain." The second was "Restricted Use," and consisted of prescribers who "will use FENTORA off-label" to treat non-cancer break through pain, "but . . . intentionally limit their use of this drug." The third was "Selective Use," and consisted of prescribers who will "reach for FENTORA more quickly than the first two user groups."

377.    These last two categories of doctors were expressly acknowledged to prescribe Fentora for off-label indications, and yet they remained principal targets of Cephalon's marketing. This same presentation also advanced the position that "Doctors would argue that they are protecting patients with their concerns about abuse and safety but we contend they are keeping FENTORA at arm's length for selfish reasons."

378.    Cephalon also was aware that its detailing had an impact on prescription rates. A PowerPoint presentation created for a 2010 Sales Managers Meeting held in Chicago contains a "Sales Force Effectiveness Summary," which states that "[r]ep driven detailing activities (Messaging, Vouchers, & Debit Cards) account for 25.3% of 2009 [s]ales" of Fentora. The Marketing Plan further analyzes the effectiveness of various tactics, including "Messaging," "Vouchers," "and "Journals," setting forth the total number of Fentora prescriptions attributable to each.

379.    A 2009 PowerPoint presentation by Kathy Roman, Cephalon's Associate Director of Oncology for Strategic Analysis & Planning, reported that only 4% of Fentora prescriptions were written by oncologists. A 2009 Brand Plan attributes an even lower 3% of Fentora prescriptions to oncologists. Even earlier, a presentation dated July 2007, "Examining the Utilization and Opioid Tolerance of Fentora Patients," noted that "a cancer diagnosis was found

for less than 20% of patients Cephalon monitored in the study." Lower back pain and other pain accounted for nearly half of all Fentora patients as of the first quarter 2007."

380. Further, by 2010—after Cephalon could have reasonably planned on receiving FDA approval for an expanded indication—Cephalon described an "increase in chronic pain patients" as a "driver of opioid prescriptions." Cephalon's own market share analysis showed that cancer pain patients represented a smaller population and one that was largely diagnosed and treated, thus would not present opportunities for growth. Cephalon's 2010 Fentora marketing plan also included facts that could be applicable only to non-cancer pain, such as the estimate that 50 million Americans experience chronic pain, defined to exclude cancer pain as "pain that persists beyond the normal healing time." Cephalon's marketing plans also described breakthrough pain as a component of both cancer and non-cancer pain. Inclusion of this information in a marketing plan strongly indicates an ongoing plan to continue to market Fentora for off-label chronic non-cancer pain.

381. In 2011, Cephalon wrote and copyrighted an article titled "2011 Special Report: An Integrated Risk Evaluation and Risk Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA®) and Oral Transmucosal Fentanyl Citrate (ACTIQ®)" that was published in *Pain Medicine News*. The article promoted Cephalon's drugs for off-label uses by stating that the "judicious use of opioids can facilitate effective and safe management of chronic pain" and noted that Fentora "has been shown to be effective in treatment of [break through pain] associated with multiple causes of pain," not just cancer.

ii.    *Cephalon's Misrepresentation of the Risks Associated with the Use of Opioids for the Long-Term Treatment of Chronic Pain*

382.    Cephalon's conduct in marketing Actiq and Fentora for chronic non-cancer pain, despite their clear (and deadly) risks and unproved benefits, was an extension, and reaped the benefits, of Cephalon's generally deceptive promotion of opioids for chronic pain.

383.    For example, in a May 24, 2006 "[Fentora] Launch Playbook," which laid out the sales plans and messages for marketing Fentora, in a section titled "Positioning and Messaging," Cephalon set out its "Position Statement" on Fentora: namely, that Fentora "is the first and only fentanyl buccal tablet which utilizes an effervescent reaction to provide the most rapid onset of analgesia of any oral opioid, ***resulting in improved patient functioning and activities of daily living***" (emphasis added).  As described above in Section V.D.1, there is no scientific evidence corroborating a link between chronic opioid therapy and increased functionality, and any suggestion of such a link is, in fact, false.

384.    A 2005 sales training document titled "Introduction to Actiq" instructed Cephalon sales representatives to talk to prescribers about pseudoaddiction.  The relevant slide advised that pseudoaddiction is a "behavior[] that may occur when pain is inadequately treated" and that the patients' "[b]ehavior mimics addiction."  Cephalon directed its sales representatives to promote more opioids as the solution to this problem, because these patients' "[f]ocus is relief of pain" and the drug-seeking and other addictive behaviors "resolve when pain is appropriately treated."  However, as described above in Section V.D.4, these veiled references to the concept of "pseudoaddiction" had no basis in science or in fact.

385.    Along with its deploying its sales representatives, Cephalon also used speakers bureaus to help reach prescribers.  The following chart, used by Cephalon in connection with developing a speakers bureau program in 2010, reflects how the company viewed each treating

physician as a vehicle to generate prescriptions—whether written by that physician directly or caused indirectly by his or her influence over other physicians:



386.    Having determined that speakers were an effective way to reach prescribers, Cephalon set to work ensuring that its speakers would disseminate its misleading messages. An April 29, 2006 "Cephalon Pain Franchise Speaker Training," which (as the name suggests) lays out what Cephalon speakers should and may say in their talks to other doctors, advocated the use of screening tools to minimize the risks associated with prescribing Cephalon's opioid drugs, including urine drug tests, psychological assessments, and treatment agreements. Cephalon did not disclose to speakers that, as described above in Section V.D.3, even when these tools are applied, they are unable to control for the risk of addiction.

387.    The same Franchise Speaker Training also minimized the risks of addiction inherent in chronic opioid therapy by encouraging speakers to label drug-seeking behavior as "pseudoaddiction" rather than true addiction. According to the training document,

pseudoaddiction "describes the patient who seeks additional medications, appropriately or inappropriately, secondary to undertreatment of the pain syndrome." Cephalon's training further claimed that "[w]hen the pain is treated in the proper manner, all inappropriate behavior ceases." As with the other Defendants, Cephalon deployed the made-up concept of pseudoaddiction to encourage prescribers to address addictive behavior in the worst way possible—with more opioids.

388.    Working with FSMB, Cephalon also trained its speakers to turn doctors' fear of discipline on its head—doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with pain. Through this messaging, Cephalon aimed to normalize the prescribing of opioids for chronic pain and failed to acknowledge the serious risks of long-term opioid use and its inappropriateness as a front-line treatment for pain. Cephalon included these claims in sales training for its speakers bureau members, including to a Chicago doctor who conducted programs on its behalf.

389.    Finally, Cephalon also developed a guidebook called *Opioid Medications and REMS: A Patient's Guide*, which deceptively minimized the risks of addiction from the long-term use of opioids. Specifically, the guidebook claimed that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids," which, as described in Section V.D.2, is dangerously false. Cephalon distributed the guidebook broadly, and it was available to and intended to reach prescribers in Chicago.

390.    The misleading messages and materials Cephalon provided to its sales force and its speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, without complete and accurate information about the risks, benefits, and

alternatives. This deception was national in scope and included Chicago. As described above in Section V.B, Cephalon's nationwide messages would have reached Chicago prescribers in a number of ways. For example, they were delivered in Chicago by Cephalon's sales representatives in detailing visits and made available to Chicago patients and prescribers through websites and ads, including ads in prominent medical journals. They have also been delivered to Chicago prescribers by Cephalon's paid speakers, who were required by Cephalon policy to stay true to the company's nationwide messaging.

> b.  Cephalon's Deceptive Third-Party Statements

391.   Like the other Defendants, Cephalon also relied on third parties to disseminate its messages through deceptive publications and presentations. By funding, developing and reviewing the content of, and distributing and facilitating the distribution of these messages, Cephalon exercised editorial control over them. Cephalon, in some instances, used its sales force to directly distribute certain publications by these Front Groups and KOLs, rendering those publications "labeling" within the meaning of § 21 C.F.R. § 1.3(a) and making Cephalon responsible for their contents. Cephalon also deployed its KOLs as speakers for talks and CMEs to selected groups of prescribers.

392.   In fact, Cephalon's 2007 Fentora Marketing Plan identified "Outreach to Third-Party and Professional Organizations," including APF, NPF, and ACPA, as a key marketing tactic. Cephalon planned to accomplish this outreach principally through "[c]orporate contributions and grants." Cephalon believed that these relationships would help establish it as a "leader" in the pain market.

393.   Cephalon's relationships with several such Front Groups and KOLs—and the misleading and deceptive publications and presentations those relationships generated—are described below.

i.     *FSMB – Responsible Opioid Prescribing*

394.    In 2007, for example, Cephalon sponsored and distributed through its sales representatives FSMB's *Responsible Opioid Prescribing*, which was drafted by "Medical Writer X," whose work for Janssen is described below in Section V.E.4.  Medical Writer X was frequently hired by a consulting Firm, Conrad & Associates LLC, to write pro-opioid marketing pieces disguised as science.  Medical Writer X's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

395.    *Responsible Opioid Prescribing* was a signature piece of Medical Writer X's work and contained a number of deceptive statements.  This publication claimed that because pain had a negative impact on a patient's ability to function, relieving pain—alone—would "reverse that effect and improve function."  However, as described in Section V.D.1 above, the truth is far more complicated; functional improvements made from increased pain relief can be offset by a number of problems, including addiction.

396.    *Responsible Opioid Prescribing* also misrepresented the likelihood of addiction by mischaracterizing drug-seeking behavior as "pseudoaddiction."  It explained that "requesting drugs by name," engaging in "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding were all signs of "pseudoaddiction" and are likely the effects of undertreated pain, rather than true addiction.  As described in Section V.D.4 above, there is no scientific evidence to support the concept of pseudoaddiction, and any suggestion that addictive behavior masquerades as "pseudoaddiction" is false.

397.    Cephalon spent $150,000 to purchase copies of *Responsible Opioid Prescribing* in bulk.  It then used its sales force to distribute these copies to 10,000 prescribers and 5,000

pharmacists nationwide.  These were available to and intended to reach prescribers and pharmacists in Chicago.

ii.     *APF – Treatment Options:  A Guide for People Living with Pain*

398.    Cephalon also exercised considerable control over the Front Group APF, which published and disseminated many of the most egregious falsehoods regarding chronic opioid therapy.  Their relationship, and several of the APF publications, are described in detail below.

399.    Documents indicate that Cephalon provided APF with substantial assistance in publishing deceptive information regarding the risks associated with the use of opioids for chronic pain.  An April 3, 2008 Fentora Assessment Strategy Tactics Team Meeting presentation outlines Cephalon's strategy to prepare for a meeting at which the FDA Advisory Committee would consider expanding the indication of Fentora to include chronic, non-cancer pain. Cephalon prepared by "reaching out to third-party organizations, KOLs, and patients to provide context and, where appropriate, encourage related activity."  First among the Front Groups listed was APF.

400.    Cephalon was among the drug companies that worked with APF to persuade the Institute of Medicine of the National Academies (IOM) on issues related to chronic opioid therapy.  APF President Will Rowe circulated a document to Cephalon and other drug company personnel that contained key message points and suggested that they "[c]onsider using this document in your communications with the members of the IOM Committee."  According to Rowe, recipients should "consider this a working document which you can add to or subtract from."  Rowe also advised that, if recipients "have an ally on that Committee," they should "consider sharing this document with that person."

401.     Cephalon personnel responded enthusiastically, with Cephalon's Associate Director for Alliance Development stating her belief that "the document does a good job of bringing together many important ideas."  Cephalon reviewed and directed changes to this document, with the Cephalon Associate Director thanking Rowe "for incorporating the points we had raised."  The close collaboration between Cephalon and APF on this project demonstrates their agreement to work collaboratively to promote the use of opioids as an appropriate treatment for chronic pain.

402.     Cephalon's influence over APF's activities was so pervasive that APF's President, Will Rowe, even reached out to Defendants—including Cephalon—rather than his own staff to identify potential authors to draft an answer to an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011.

403.     Cephalon also sponsored APF's *Treatment Options:  A Guide for People Living with Pain*, starting in 2007.  It is rife with misrepresentations regarding the risks, benefits, and superiority of opioids.

404.     For example, *Treatment Options* deceptively asserts that the long-term use of opioids to treat chronic pain could help patients function in their daily lives by stating that, when used properly, opioids "give [pain patients] a quality of life [they] deserve."  As described above in Section V.D.1, there is no scientific evidence corroborating that statement, and such statements are, in fact, false because available data demonstrate that patients on chronic opioid therapy are *less likely* to participate in life activities like work.

405.     *Treatment Options* also claims that addiction is rare and is evident from patients' conduct in self-escalating their doses, seeking opioids from multiple doctors, or stealing the drugs.  *Treatment Options* further minimizes the risk of addiction by claiming that it can be

avoided through the use of screening tools, like "opioid agreements," which can "ensure [that patients] take the opioid as prescribed." Nowhere does *Treatment Options* explain to patients and prescribers that neither "opioid agreements" nor any other screening tools have been scientifically validated to decrease the risks of addiction, and the publication's assurances to the contrary are false and deceptive as described above in Section V.D.2-3.

406. *Treatment Options* also promotes the use of opioids to treat chronic pain by painting a misleading picture of the risks of alternate treatments, most particularly NSAIDs. *Treatment Options* notes that NSAIDs can be dangerous at high doses, and attributes 10,000 to 20,000 deaths a year annually to NSAID overdose. According to *Treatment Options*, NSAIDs are different from opioids because opioids have "no ceiling dose," which is beneficial since some patients "need" larger doses of painkillers than they are currently prescribed. These claims misleadingly suggest that opioids are safe even at high doses and omit important information regarding the risks of high-dose opioids, as discussed above in Section V.D.6.

407. Additionally, *Treatment Options* warns that the risks associated with NSAID use increase if NSAIDs are "taken for more than a period of months," but deceptively omits any similar warning about the risks associated with the long-term use of opioids. As discussed above in Section V.D.7, this presentation paints a misleading picture of the risks and benefits of opioids compared with alternate treatments.

408. APF distributed 17,200 copies of *Treatment Options* in 2007 alone. It was also available online and was intended to reach Chicago prescribers and pharmacists. As described below in Section V.E.2.c, it was attended by at least one Chicago physician, Prescriber G.

   iii.  *Key Opinion Leaders and Misleading Science*

409. Cephalon also knew that its misleading messages would be more likely to be believed by prescribers if they were corroborated by seemingly neutral scientific support.

Cephalon developed a plan that "provide[d] procedures for the dissemination of certain peer-reviewed articles and reference textbooks that contain information about unapproved or off-label uses of Cephalon marketed products." These procedures dictate that "[a]ll peer-reviewed articles and reference textbooks" circulated to market Cephalon's products "must be reviewed and approved by [Cephalon's Product and Disease Review Committee]." The "Review and Approval Form" for these reprints required the signature of representatives from Cephalon's Legal, Marketing, Medical, and Regulatory Affairs departments. Once approved, these documents were to be "distributed and used by the Sales force." The document also expressly contemplates that Cephalon would provide funding for some of these studies.

410.    Cephalon's planning documents indicate that Cephalon exercised sufficient control over the process of creating these studies to know in advance the title and subject of various studies, which KOLs would conduct them, and which medical journals would eventually publish them. Employing these tactics, Cephalon caused the term "breakthrough pain"—a term it seeded in the medical literature—to be used in articles published by practitioners and clinicians it supported. With funding from Cephalon, for example, Dr. Portenoy wrote an article that purported to expand the definition of breakthrough cancer pain to non-cancer indications, vastly expanding the marketing potential of Cephalon's Fentora. The article was published in the nationally circulated *Journal of Pain* in 2006 and helped drive a surge in Fentora prescriptions.

411.    The concept of "breakthrough pain" ultimately formed the sole basis for the central theme of promotional messages Cephalon cited to support the approval and marketing of Actiq and Fentora, rapid-acting opioids which begin to work very quickly but last only briefly. Neither of these drugs had a natural place in the treatment of chronic pain before Cephalon's marketing campaign changed medical practice. A recent literature survey of articles describing

non-cancer breakthrough pain calls into question the validity of the concept, suggesting it was not a distinct pain condition but a hypothesis to justify greater dosing of opioids. In other words, Cephalon conjured the science of breakthrough pain in order to sell its drugs.

412. As one scholar has pointed out, references to breakthrough pain in articles published on the MEDLINE bibliographic database spiked in 1998 and again in 2006.[175] These spikes coincide with FDA's approval of Actiq and Fentora.

413. Cephalon also bolstered supportive studies with supportive key opinion leaders. For example, a 2008 Fentora Brand Plan contemplated creating a "PROTECT Committee," which would be "compris[ed of] five internationally renowned leaders in pain medicine" whose task would be to "educate clinicians on the rational prescribing of Fentora and other opioid medications"—*i.e.*, urging their peers to prescribe those drugs. The five doctors selected for service on the PROTECT Committee were Russell Portenoy, Steven D. Passik, Scott Fishman, Perry Fine, and Christine Miaskowski. Each of these doctors received some combination of research support, consulting fees, and honoraria from Cephalon, and Dr. Portenoy was a paid consultant for the company. All told, Cephalon has paid doctors more than $4.5 million for programs relating to its opioids since 2000.

### iv. *Misleading Continuing Medical Education*

414. Cephalon developed sophisticated plans for the deployment of its KOLs, broken down by sub-type and specialty, to reach targeted groups of prescribers through CMEs.

415. Distributing CMEs was one of the "SciCom CME & Education Activities" outlined in a May 18, 2006 presentation to Cephalon's Steering Committee about Fentora's

---

[175] Adriane Fugh-Berman, *Marketing Messages in Industry-Funded CME*, PharmedOut , Georgetown U. Med. Ctr. (June 25, 2010), *available at* pharmedout.galacticrealms.com/Fugh-BermanPrescription forConflict6-25-10.pdf.

launch.  The same presentation highlighted the importance of speakers in Cephalon's marketing strategy, which planned to target "KOLs" and "Opioid prescribers" with a "Field Driven Cephalon Speaker program," "National Speaker Training with online follow-up," and "Convention Round Tables."  Cephalon used the CME programs it sponsored to deceptively portray the risks related to the use of opioids to treat chronic non-cancer pain and promote the off-label use of Actiq and Fentora.

416.    In 2007 and 2008, Cephalon sponsored three CMEs that each positioned Actiq and Fentora, and only Actiq and Fentora, as "rapid onset opioids" that would provide effective analgesia within the time period during which "breakthrough pain" was at its peak intensity.  Although the CMEs used only the generic names of the drugs, the description of the active ingredient and means of administration means that a physician attending the CME knew it referred only to Actiq or Fentora.

417.    The CMEs each taught attendees that there was no sound basis for the distinction between cancer and non-cancer "breakthrough pain," and one instructed patients that Actiq and Fentora were commonly used in non-cancer patients, thus effectively endorsing this use. *Optimizing Opioid Treatment for Breakthrough Pain*, offered online by Medscape, LLC from September 28, 2007, through December 15, 2008, was prepared by KOL Dr. Lynn R. Webster and M. Beth Dove.  It recommends prescribing a "short-acting opioid" (e.g., morphine, hydromorphone, oxycodone) "when pain can be anticipated," or a rapid-onset opioid when it cannot.  The only examples of rapid-onset opioids then on the market were oral transmucosal fentanyl citrate (*i.e.*, Actiq) or fentanyl effervescent buccal tablet (*i.e.*, Fentora): "Both are indicated for treatment of [breakthrough pain] in opioid-tolerant cancer patients *and are*

*frequently prescribed to treat [breakthrough pain] in noncancer patients as well*." (Emphasis added).

418.   *Optimizing Opioid Treatment for Breakthrough Pain* not only deceptively promoted Cephalon's drugs for off-label use, but also misleadingly portrayed the risks, benefits, and superiority of opioids for the treatment of chronic pain.  For example, the CME misrepresented that Actiq and Fentora would help patients regain functionality by advising that they improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids.  The CME also minimized the risks associated with increased opioid doses by explaining that NSAIDs were less effective than opioids for the treatment of breakthrough pain because of their dose limitations, without disclosing the heightened risk of adverse events on high-dose opioids.

419.   *Optimizing Opioid Treatment for Breakthrough Pain* is described in a September 20, 2007 Fentora marketing document, suggesting both approval of the CME's content and awareness of it as a means to promote Fentora.  One week before it was ever presented, *Optimizing Opioid Treatment for Breakthrough Pain* appeared among the promotional activities Cephalon identified in a Fentora Assessment Strategy and Tactics presentation as "scientific communications."  A slide titled "Medscape" specifies that the CME will be taught by Lynn Webster, and states and that it will be posted online (and therefore available nationally) in September.  The Strategy and Tactics presentation makes clear that Cephalon was aware of the content of this CME before it debuted, and that Cephalon considered CMEs and other "scientific communications" as integral parts of its strategy to market Fentora.  Around the same time, Dr. Webster was receiving nearly $2 million in funding from Cephalon.

420. *Optimizing Opioid Treatment for Breakthrough Pain* was available online and was intended to reach Chicago prescribers. As described below in Section V.E.2.c, it was attended by at least three Chicago physicians, Prescriber G, Prescriber O, and Prescriber P.

421. Cephalon similarly used an educational grant to sponsor the CME *Breakthrough Pain: Improving Recognition and Management*, which was offered online between March 31, 2008, and March 31, 2009, by Medscape, LLC. The direct result of Cephalon's funding was a purportedly educational document that echoed Cephalon's marketing messages: the CME deceptively omitted Actiq's and Fentora's tolerance limitations, cited examples of patients who experienced pain from accidents, not from cancer, and, like Cephalon's *Optimizing Opioid Treatment* CME, taught that Actiq and Fentora were the only products on the market that would take effect before the breakthrough pain episode subsided. This CME was available online and was intended to reach Chicago prescribers.

422. Lastly, KOL Dr. Fine authored a CME, sponsored by Cephalon, titled *Opioid-Based Management of Persistent and Breakthrough Pain*, with KOLs Dr. Christine A. Miaskowski and Michael J. Brennan, M.D. Cephalon paid to have this CME published in a supplement of Pain Medicine News in 2009. It instructed prescribers that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility," and recommended dispensing "rapid onset opioids" for "episodes that occur spontaneously" or unpredictably, including "oral transmucosal fentanyl," *i.e.*, Actiq, and "fentanyl buccal tablet," *i.e.*, Fentora, including in patients with chronic non-cancer pain. Dr. Miaskowski disclosed in 2009, in connection with the APS/AAPM Opioid Treatment Guidelines, that she served on

Cephalon's speakers bureau.[176]  Dr. Fine also received funding from Cephalon for consulting services.

423.   *Opioid-Based Management of Persistent and Breakthrough Pain* was available to and was intended to reach Chicago prescribers.  As described below in Section V.E.2.c, it was attended by at least two Chicago physicians, Prescriber O and Prescriber P.

424.   Cephalon's control over the content of these CMEs is apparent based on its advance knowledge of their content.  A December 2005 Cephalon launch plan set forth key "supporting messages" to position Fentora for its product launch.  Among them was the proposition that "15-minute onset of action addresses the unpredictable urgency of BTP."  Years later, the same marketing messages reappeared in the Cephalon-sponsored CMEs described above.  Echoing the Cephalon launch plan, *Optimizing Opioid Treatment for Breakthrough Pain* stated that "[t]he unpredictability of BTP will strongly influence the choice of treatment" and that Fentora "delivers an onset of analgesia that is similar to [Actiq] at ≤ 15 minutes."  Similarly, *Opioid-Based Management of Persistent and Breakthrough Pain* defined "breakthrough pain" as "unpredictable," over a table describing both cancer and non-cancer "breakthrough pain."

425.   Cephalon tracked the effectiveness of its deceptive marketing through third parties, demonstrating that Cephalon not only planned for but depended upon their activities as a key element of its marketing strategy.  A December 5, 2007 Fentora Assessment Strategy Tactics presentation indicates that Cephalon had supported "145 independent education tactics" in 2007, including live national programs, live regional programs, websites, print media, journal supplements, and electronic media.  In total, Cephalon estimated that these 145 programs had led

---

[176]   As described in Section V.C.2.c.ii above, 14 of 21 panel members who drafted the AAPM/APS Guidelines received support from Janssen, Cephalon, Endo, and Purdue.

to 1,255,567 "exposures." These programs were available to prescribers in Chicago and, based on the uniform and nationwide character of Cephalon's marketing, featured the same deceptive messages described above.

           c.    <u>Cephalons's Deceptive Statements to Chicago Prescribers and Patients</u>

426.    Cephalon used various measures to disseminate its deceptive statements regarding the risks of off-label use of Actiq and Fentora and the risks, benefits, and superiority of opioids to Chicago patients and prescribers.

427.    Cephalon targeted Chicago prescribers by recruiting them for its speakers bureaus for Actiq and Fentora. These included Prescriber K, who was a paid Cephalon speaker from January 24, 2002 to May 10, 2013; Prescriber L, a paid Cephalon speaker from July 15, 2004 to August 19, 2012; Prescriber M, a paid Cephalon speaker from June 2003 to August 1, 2011; and Prescriber N, a paid Cephalon speaker from October 1, 2008 to at least January 14, 2014. Based on the uniform and nationwide character of Cephalon's marketing and Cephalon's own speaker training materials, each of these speakers attended Cephalon's speaker's training, was instructed to disseminate the misrepresentations outlined above, and did disseminate those misrepresentations in Chicago.

428.    Cephalon's speakers regularly held talks for Chicago prescribers—Cephalon sponsored more than 35 such events in Chicago and its surrounding areas between October and December 2006. These talks would have followed the same deceptive talking points covered in Cephalon's speakers' training.

429.    Cephalon also targeted Chicago prescribers through the use of its sales force. In planning for the launch of Fentora, two sales representatives scheduled 10 events at various Chicago offices and restaurants, meeting with 151 prescribers in Chicago through speakers

bureau programs and dinners during the fourth quarter of 2006. Cephalon spent over $200,000 on these meetings, many of which were with prescribers who did not specialize in treating cancer patients. Given Fentora's sole indication for treating cancer pain in opioid-tolerant patients, these physicians were unlikely to prescribe the product for its approved, on-label use.

430. On October 3, 2006, Cephalon sales representatives hosted 17 Chicago prescribers for dinner at a cost of over $4,000. The next day, Cephalon sales representatives hosted five prescribers at the office of a respected physician specializing in neurology and general pain medicine at a cost of $750. The following day, Cephalon representatives treated 19 Chicago prescribers to a $3,500 dinner at an upscale Chicago restaurant. Many of the prescribers with whom Cephalon met did not have cancer-related specialties.

431. Given that Cephalon's own studies demonstrated that the overwhelming majority of oncologists diagnose and treat breakthrough cancer pain themselves, Cephalon knew the only purpose in its representatives meeting with these prescribers was to promote off-label use. Based on the uniform and nationwide character of Cephalon's marketing, Cephalon's deceptive messages would have been disseminated to Chicago prescribers by Cephalon's sales representatives during these events.

432. At a meeting of Cephalon's sales force in Chicago on September 24, 2010, it was acknowledged that "[r]ep driven activities . . . account for 25.3%" of 2009 [Fentora] sales." Sales representatives, and the misrepresentations on which they were trained, drove significant Fentora sales.

433. One Fentora tracking sheet lists more than 50 Chicago area prescribers to whom Cephalon sent promotional vouchers covering patients' copayments, itemizes how many prescriptions of Fentora each of them wrote from January to June of 2007, and tracks whether

the vouchers sent to those physicians were redeemed. Cephalon's desire to promote off-label use of Fentora is evidenced by the fact that, of the 101 Chicago-area prescribers who received Fentora vouchers during this period, only 12 were oncologists.

434.    The experiences of specific prescribers confirm both that Cephalon's national marketing campaign included the misrepresentations described above in Sections V.D and V.E.2, and that the company disseminated these same misrepresentations to Chicago prescribers and consumers. In particular, these prescriber accounts reflect that Cephalon detailers omitted or minimized the risk of opioid addiction; overstated the benefits of opioids, including by making claims of improved function, and engaged in the off-label promotion of Cephalon's drugs for the treatment of chronic non-cancer pain.

435.    A survey of a sample of Midwestern physicians, who reported the messages that they retained from detailing visits detailing visits and other promotional activity, documented that Cephalon's sales force disseminated the misleading statements described above. In 2006, for example, Cephalon sales representatives told a Midwestern general practitioner that Actiq was effective in "rapid relief of acute exacerbations of chronic pain." They told anesthesiologists in 2008 and 2009 that Actiq can be used for chronic back pain, and in 2014, they told an ob/gyn that Actiq was appropriate for use treating chronic pain. All told, at least ten ob/gyn physicians responded to the survey indicating they were detailed by representatives promoting Actiq or Fentora from 2014 and 2015.

436.    In addition, the City has interviewed a number of Chicago-area prescribers who reported that they were detailed by Cephalon sales representatives and heard similar claims, as well as other messages described in Sections V.D. and V.E.2. In each instance, Cephalon intended that the prescriber rely on these messages. Certain of these physicians did, in fact,

prescribe Cephalon's or Teva's opioids. Exhibit D to this Fifth Amended Complaint summarizes data showing the number of prescriptions, doses, and MME by Defendant family from IQVIA Xponent for the year 1997-2017 for these prescribers.

a. Chicago Prescriber C, a pain specialist, is based in Wisconsin but treats Chicago residents. In their meetings with him, sales representatives from each Defendant, including Cephalon, routinely omitted any discussion about addiction and overdose death and frequently overstated the benefits of opioids. These representatives taught that opioids would increase his patients' ability to function and increase their quality of life. Prescriber C was detailed at two meals paid for by Cephalon to promote Fentora on May 23, 2014 and June 30, 2014.[177] ████████████
████████████████████████████████████████████

b. Chicago Prescriber F, a headache specialist, recalls being detailed heavily on Fentora and Actiq from 2010 to 2013. Prescriber FX believes that Cephalon sales personnel wanted him to prescribe for off-label use because they came to him many times to detail Actiq even though he runs a headache clinic and does not treat cancer patients. He has prescribed Actiq and Fentora. ██████████████████████
████████████████████████████████████████████
██████████████████████████

c. Chicago Prescriber G, a pain specialist, indicated that he was visited by sales representatives from all Defendants, including Cephalon. Cephalon's representatives stated that Cephalon's opioids might find a place in his practice, even though he was not an oncologist. Prescriber G remembers receiving *Treatment Options*: He recalled that he was never warned about the risk of addiction. *A Guide for People Living with Pain* and *Opioid Based Management of Persistent and Breakthrough Pain*, described above in Section V.E.2.b.ii. In addition, opioid sales representatives—including representatives from Cephalon— told Prescriber G that opioids would increase patients' ability to complete activities of daily living and that patients could be

---

[177] Under the Physician Payment Sunshine Act, passed as Section 6002 of the Affordable Care Act, pharmaceutical companies are required to disclose payments to prescribers and to teaching hospitals, as well as information about the nature, type, and purpose of the payments, for a period starting from August 2013. Data are available through December 2014 on the ProPublica.org website. *See* 42U.S.C. § 1320a-7g. Although Defendants also detailed nurse practitioners and physician assistants, the Act does not require the public disclosure of payments to these non-physician prescribers.

managed to avoid addiction. These representatives also told him that patients can be screened to mitigate addiction risks. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

d. Chicago Prescriber E, an anesthesiologist and pain specialist, explained that he received visits from sales representatives from all Defendants, including Cephalon, until a few years ago. Representatives from Cephalon never discussed addiction with him. ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

e. Chicago Prescriber O, a physiatrist (doctor who specializes in rehabilitation) recalls attending the Cephalon-sponsored CMEs *Opioid Based Management of Persistent and Breakthrough Pain* and *Optimizing Opioid Treatment for Breakthrough Pain,* described above in Section V.E.2.b.iv. He was contacted at least 24 times by Cephalon sales representatives from 2006 to 2007.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

f. Chicago Prescriber P, a physiatrist, also recalls attending, whether online or in person, *Opioid Based Management of Persistent and Breakthrough Pain*. He also recalled attending *Optimizing Opioid Treatment for Breakthrough Pain*, described above in Section V.E.2.b.iv. He has prescribed Actiq. ████████

████████████████████████████████████████████████████████

g. Chicago Prescriber Q recalls being visited by representatives from Cephalon. Prescriber Q indicated that none of the representatives discussed abuse, addiction, or overdoses, which were not part of the sales conversation. ████████████████

████████████████████████████████████████████████████████

████████████

h. Chicago Prescriber J, a nurse practitioner, indicated that she was visited (or sat in on visits) by sales representatives from Defendants Purdue, Cephalon, Janssen, and Actavis. Drug representatives from these Defendants, including Cephalon, never mentioned the risks of addiction associated with opioid use. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

437. These accounts reflect specific examples of instances in which Cephalon's sales representatives made the misrepresentations outlined above in Sections V.D and V.E.2 directly to Chicago prescribers. They are not an exhaustive list. Based on the nationwide and uniform character of Cephalon's marketing campaign, these examples support the inference that Cephalon sales representatives made similar misstatements to the other Chicago-area prescribers they detailed.

438. Cephalon knew that its Chicago sales force was effective in its work. A presentation delivered to the Cephalon Pharma Business Unit on October 13-15, 2008 in Phoenix, Arizona recognized high-performing sales personnel. Sales Representative A, who had responsibility for the "Chicago, IL South" region, was recognized as a "Top Performer" in generating Fentora sales in the second quarter of 2008. In 2007, Sales Representative B was Cephalon's sales manager responsible for the North Central Area, which included Chicago. Cephalon sales meeting presentations demonstrate that Sales Representative B was one of Cephalon's top sellers of Fentora. At a Pain Care Specialist Leadership Meeting held in September 2008, Cephalon noted that some of Sales Representative B's representatives were outpacing the national average in Fentora sales by 10% or more over a six month basis, and by 15% or more on a three month basis. During this period, the North Central Area had 142 "A" level "Target Prescribers." At a June 9-10, 2009 North Central Area Pain Care Division sales meeting held in San Diego, California, Sales Representative C—a sales representative with responsibility for Chicago—was the second highest-grossing Fentora representative.

### 3. Endo

439. Endo promoted its opioids through the full array of marketing channels. The company deployed its sales representatives, paid physician speakers, journal supplements, and advertising in support of its branded opioids, principally Opana and Opana ER. Misleading

claims about the purportedly lower abuse potential of Opana ER featured prominently in this campaign, but Endo also made many of the other deceptive statements and omissions described above in Section V.D.  These included deceptive messages about functional improvement, addiction risk, pseudoaddiction, addiction screening tools, and the safety of alternatives to opioids.

440.    At the same time, Endo also relied on a cast of third-party partners to promote the safety, efficacy, and superiority of opioids generally, through a combination of CMEs, websites, patient education pamphlets, and other publications.  These materials echoed the misrepresentations described above, and also made deceptive statements about withdrawal symptoms and the safety of opioids at higher doses.

441.    Based on the highly coordinated and uniform nature of Endo's marketing, and as confirmed by verbatim message data and interviews with a sales representative and prescribers, Endo conveyed these deceptive messages to Chicago prescribers.  The materials that Endo generated in collaboration with third-parties also were distributed or made available in Chicago. Endo distributed these messages, or facilitated their distribution, in Chicago with the intent that Chicago prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

a.    Endo's Deceptive Direct Marketing

442.    Like the other Defendants, Endo used deceptive direct marketing to increase the sales of its dangerous opioids.  As set forth below, Endo conveyed these deceptive messages in training of its sales force and recruited speakers, who in turn conveyed them to physicians; in a misleading journal supplement; and in unbranded advertising.

i.      *Endo's Sales Force and Deceptive Sales Training*

443.    Endo's promotion of Opana ER relied heavily on in-person marketing, including to Chicago prescribers.  Endo had an aggressive detailing program, with its sales representatives making nearly 72,000 visits to prescribers nationwide to detail Opana ER in the first quarter of 2010 alone.  Between 2007 and 2013, Endo spent between $3 million and $10 million each quarter to promote opioids through its sales force.

444.    Endo's sales representatives, like those of the other Defendants, targeted physicians to deliver sales messages that were developed centrally and deployed uniformly across the country.  These sales representatives were critical in transmitting Endo's marketing strategies and talking points to individual prescribers.

445.    Endo specifically directed its sales force to target physicians who would prescribe its drugs to treat chronic pain.  For example, an Opana Brand Tactical Plan dated August, 2007 aimed to increase "Opana ER business from [the Primary Care Physician] community" more than 45% by the end of that year.  Indeed, Endo sought to develop strategies that would be most persuasive to primary care doctors—strategies that sought to influence the prescribing behavior of primary care physicians through the use of subject matter experts.  A February 2011 Final Report on Opana ER Growth Trends, for example, predicted that Endo's planned "[u]se of Pain Specialists as local thought leaders should affect increased primary care adoption."

446.    Endo trained its sales force to make a number of misrepresentations to physicians nationwide, including to physicians in Chicago.  Endo's sales representatives were trained to represent to these prescribers that Opana ER would help patients regain function they had lost to chronic pain; that Endo opioids had a lower potential for abuse because they were "designed to be crush resistant," even though the "clinical significance of INTAC Technology or its impact on

abuse/misuse has not been established for Opana ER;" and that drug seeking behavior was a sign of undertreated pain rather than addiction.

447.    Endo knew that its marketing reached physicians —repeatedly—because it tracked their exposure.  Internal Endo documents dated August 23, 2006 demonstrate that the following percentages of physicians would view an Endo journal insert (or paid supplement) at least 3 times in an 8 month period:  86% of neurologists; 86% of rheumatologists; 85% of oncologists; 85% of anesthesiologists; 70% of targeted primary care physicians; and 76% of OB/Gyns.

448.    Endo was not only able to reach physicians through its marketing, but also successfully imparted its marketing messages.  The company found its promotional materials tripled prescribers' ability to recall the sales message and doubled their willingness to prescribe Opana ER in the future.  This was true of marketing that contained its deceptions.

449.    For example, according to internal Endo documents, up to 10% of physicians it detailed were able to recall without assistance the message that Opana ER had "Minimal/less abuse/misuse" potential than other drugs.  The Endo message that prescribers retained was a plain misrepresentation: that use of Opana ER was unlikely to lead to abuse and addiction.  Although Opana ER always has been classified under Schedule II as a drug with a "high potential for abuse" and consistent with the pattern of misrepresentations described in Section V.D.2, the largest single perceived advantage of Opana ER, according to a survey of 187 physicians who reported familiarity with the drug, was "perceived low abuse potential," cited by 15% of doctors as an advantage.  As described in Section V.E.3.c below, low abuse potential was among the deceptive messages that Chicago prescribers received, and retained, from Endo sales representatives.

450. Endo's own internal documents, however, acknowledged the misleading nature of these statements, conceding that "Opana ER has an abuse liability similar to other opioid analgesics as stated in the [FDA-mandated] box warning." A September 2012 Opana ER Business Plan similarly stated that Endo needed a significant investment in clinical data – to support comparative effectiveness, scientific exchange, benefits and unmet need, while citing lack of "head-to-head data" as a barrier to greater share acquisition.

451. Nevertheless, Endo knew that its marketing was extremely effective in turning physicians into prescribers. Nationally, the physicians Endo targeted for in-person marketing represented approximately 84% of all prescriptions for Opana ER in the first quarter of 2010. Endo also observed that the prescribers its sales representatives visited wrote nearly three times as many prescriptions per month for Opana ER as those physicians who were not targeted for Endo's marketing—7.4 prescriptions per month versus 2.5. The most heavily targeted prescribers wrote nearly 30 prescriptions per month. Internal Endo documents from May 2008 indicate that Endo expected that each of its sales representatives would generate 19.6 prescriptions per week by the end of 2008. As summarized by a February 2011 report on Opana ER growth trends, Endo's "[a]ggressive detailing [is] having an impact."

452. More broadly, Endo's sales trainings and marketing plans demonstrate that its sales force was trained to provide prescribers with misleading information regarding the risks of opioids when used to treat chronic pain. Foremost among these messages were misleading claims that the risks of addiction, diversion, and abuse associated with opioids—and Endo's products in particular—were low, and lower than other opioids.

(a)     Endo's Sales Force Deceptively Minimized
        the Risks of Addiction Associated with
        Chronic Opioid Therapy.

453.     By way of illustration, Endo's Opana ER INTAC Technology Extended-Release Sell Sheet Implementation Guide, which instructs Endo sales personnel how to effectively "support key messages" related to the marketing of Opana ER, states that it is an "approved message" for sales representatives to stress that Opana ER was "designed to be crush resistant," even though this internal document conceded that "the clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER."

454.     Other Endo documents acknowledged the limitations on Opana ER's INTAC technology, conceding that while Opana ER may be resistant to pulverization, it can still be "ground" and "cut into small pieces" by those looking to abuse the drug.

455.     Endo's claims about the crush-resistant design of Opana ER also made their way to the company's press releases.  A January 2013 article in *Pain Medicine News*, based in part on an Endo press release, described Opana ER as "crush-resistant."  This article was posted on the *Pain Medicine News* website, which was accessible to Chicago patients and prescribers.

456.     Endo could only have promoted the crush resistance of Opana ER in order to persuade doctors that there was less risk of abuse, misuse, and diversion of the drug.  As laid out below in Section V.E.3.c, that Endo was less addictive than other drugs was the precise message that Chicago prescribers took from Endo's marketing.

457.     On May 10, 2013, however, the FDA warned Endo that there was no evidence that Opana ER's design "would provide a reduction in oral, intranasal, or intravenous abuse" and that the post-marketing data Endo had submitted to the FDA "are insufficient to support any conclusion about the overall or route-specific rates of abuse."  Even though it was rebuked by the FDA, Endo continued to market Opana ER as having been ***designed*** to be crush resistant,

knowing that this would (falsely) imply that Opana actually *was* crush resistant and that this crush-resistant quality would make Opana ER less likely to be abused.

458.    Endo's sales training and the promotional materials distributed by its sales representatives also minimized the risk of addiction.  For example, Endo circulated an education pamphlet with the Endo logo titled *Living with Someone with Chronic Pain*, which implied to persons providing care to chronic pain patients that addiction was not a substantial concern by stating that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem."  This program was downloadable from Endo's website and accessible to Chicago area prescribers.

459.    Endo's sales training also misrepresented the risks of addiction associated with Endo's products by implying that Endo's prolonged absorption would make it less likely to lead to abuse.  For example, a presentation titled "Deliver the Difference for the Opana Brand in POA II" sets out that one of the "[k]ey [m]essages" for the Endo sales force was that Opana ER provides "[s]table, steady-state plasma levels for true 12-hour dosing that lasts."  As outlined in Section V.E.3.c below, Endo's sales representatives used this messaging to imply to Chicago prescribers that Opana ER provided "steady state" pain relief, making Opana less likely to incite euphoria in patients and less likely to lead to addiction.

460.    Endo further instructed its sales force to promote the misleading concept of "pseudoaddiction,"—*i.e.*, that drug-seeking behavior was not cause for alarm, but merely a manifestation of undertreated pain.  In a sales training document titled "Understanding the Primary Care MD and their use of Opioids," Endo noted that the "biggest concerns" among primary care physicians were "prescription drug abuse (84.2%), addiction (74.9%), adverse effects (68%), tolerance (60.7%), and medication interaction (32%)."  In response to these

concerns, Endo instructed its sales representatives to ask whether their customers are "confus[ing] 'pseudo-addiction' with 'drug-seekers'" and how confident they are that their health care providers "know these differences (Tolerance, Dependence, Addiction, Pseudo-Addiction . . .)."

(b)    Endo's Sales Force Deceptively Implied that Chronic Opioid Therapy Would Improve Patients' Ability to Function.

461.    In addition to their deceptive messages regarding addiction, Endo's promotional materials and sales trainings also misleadingly claimed that patients using opioids for the long-term treatment of chronic pain would experience improvements in their daily function. In reality, long-term opioid use has not been shown to and does not improve patients' function, and, in fact, often is accompanied by serious side effects that degrade function. Endo's own internal documents acknowledged that claims about improved quality of life were unsubstantiated "off label claims."

462.    Nevertheless, Endo distributed product advertisements that suggested that using Opana ER to treat chronic pain would allow patients to perform demanding tasks like work as a chef. One such advertisement states prominently on the front: "Janice is a 46-year-old chef with chronic low back pain. She needs a treatment option with true 12-hour dosing." The advertisement does not mention the "moderate to severe pain" qualification in Opana ER's indication, except in the fine print. These advertisements were mailed to prescribers and distributed by Endo's sales force in detailing visits, which would have included Endo representatives' visits to Chicago prescribers.

463.    In a 2007 Sales Tool that was intended to be shown by Endo sales personnel to physicians during their detailing visits, Endo highlighted a hypothetical patient named "Bill," a 40-year-old construction worker who was reported to suffer from chronic low back pain.

Page 191

According to the Sales Tool, Opana ER will make it more likely that Bill can return to work and support his family.

464.    Similarly, training materials for sales representatives from March 2009 ask whether it is true or false that "[t]he side effects of opioids prevent a person from functioning and can cause more suffering than the pain itself." The materials indicate that this is "[f]alse" because "[t]he overall effect of treatment with opioids is very favorable in most cases."

465.    A sales training video dated March 8, 2012 that Endo produced and used to train its sales force makes the same types of claims. A patient named Jeffery explains in the video that he suffers from chronic pain and that "chronic pain [ . . .] reduces your functional level." Jeffery claims that after taking Opana ER, he "can go out and do things" like attend his son's basketball game and "[t]here's no substitute for that." This video was shown to Endo's sales force, which adopted its misleading messaging in its nationwide sales approach, including the approach it used in Chicago.

466.    Claims of improved functionality were central to Endo's marketing efforts for years. A 2012 Endo Business Plan lists ways to position Opana ER, and among them is the claim that Opana ER will help patients "[m]aintain[] normal functionality, sleep, [and] work/life/performance productivity" and have a positive "[e]ffect on social relationships." Indeed, that business plan describes the "Opana ER Vision" as "[t]o make the Opana franchise (Opana ER, Opana, Opana Injection) the choice that maximizes improvement in functionality and freedom from the burden of moderate-to-severe pain."

(c)    Endo's Sales Force Deceptively Presented the
Risks and Benefits of Opioids To Make Them
Appear Safer Than Other Analgesics

467.    Endo further misled patients and prescribers by downplaying the risks of opioids in comparison to other pain relievers. For example, it distributed in Chicago and elsewhere a

presentation titled *Case Challenges in Pain Management*: *Opioid Therapy for Chronic Pain*. This study held out as a representative example one patient who had taken NSAIDs for more than eight years and, as a result, developed "a massive upper gastrointestinal bleed." The presentation recommended treating this patient with opioids instead. By focusing on the adverse side effects of NSAIDs, while omitting discussion of serious side effects associated with opioids, this presentation misleadingly portrayed the comparative risks and benefits of these drugs.

468. Endo distributed *Case Challenges in Pain Management*: *Opioid Therapy for Chronic Pain* to 116,000 prescribers in 2007, including primary care physicians.

> ii. *Endo's Speakers Bureau Programs Deceptively Minimized the Risks of Addiction Associated with Chronic Opioid Therapy*

469. In addition to its sales representatives' visits to doctors, Endo also used deceptive science and speaker programs to spread its deceptive messages.

470. Endo leaned heavily on its speakers' bureau programs. In 2008 alone, Endo spent nearly $4 million to promote up to 1,000 speakers programs around the country. In 2012, at least 13 speakers programs devoted to Opana ER took place in Illinois, up from 8 in 2011. Endo contracted with a medical communications firm to operate its speakers bureau program, planning to hold a total of 500 "fee-for-service . . . peer-to-peer promotional programs" for Opana ER in just the second half of 2011, including dinners, lunches and breakfasts. These programs were attended by sales representatives, which reveal their true purpose as marketing, rather than educational, events. As described below in Section V.E.3.c, among Endo's speakers were several Chicago physicians.

471. Endo's internal reporting stated that the "return on investment" turned positive 8-12 weeks after such programs. Endo measured that return on investment in numbers of prescriptions written by physicians who attended the events. One internal Endo document

concluded: "[w]e looked at the data for [the] 2011 program and the results were absolutely clear: physicians who came into our speaker programs wrote more prescriptions for Opana ER after attending than they had before they participated. You can't argue with results like that."

472. These speakers bureau presentations included the very same misrepresentations Endo disseminated through its sales representatives. A 2012 speaker slide deck for Opana ER— on which Endo's recruited speakers were trained and to which they were required to adhere to in their presentations—misrepresented that the drug had low abuse potential, in addition to suggesting that as many as one-quarter of the adult population could be candidates for opioid therapy.

473. In addition, a 2013 training module directed speakers to instruct prescribers that "OPANA ER with INTAC is the only oxymorphone designed to be crush resistant" and advised that "[t]he only way for your patients to receive oxymorphone ER in a formulation designed to be crush resistant is to prescribe OPANA ER with INTAC." This was a key point in distinguishing Opana ER from competitor drugs. Although Endo mentioned that generic versions of oxymorphone were available, it instructed speakers to stress that "[t]he generics are not designed to be crush resistant." This was particularly deceptive given that Opana ER was not actually crush-resistant.

474. In 2009, Endo wrote a talk titled *The Role of Opana ER in the Management of Chronic Pain*, which was delivered by Chicago Prescriber M.[178] The talk included a slide titled "Use of Opioids is Recommended for Moderate to Severe Chronic Noncancer Pain," which cited the AAPM/APS Guidelines—and, as described above in Section V.C.2.c.ii, their accompanying

---

[178] Prescriber M did not just work for Endo. He also gave paid promotional talks for opioid drugs manufactured by Janssen and Cephalon; appeared on a Purdue unbranded website; and taught at Purdue-funded CMEs, including several available in the Chicago area.

misstatements regarding the likelihood of addiction (by claiming that addiction risks were manageable regardless of patients' past abuse histories) while omitting their disclaimer regarding the lack of supporting evidence in favor of that position. This dangerously misrepresented to doctors the force and utility of the 2009 Guidelines.

475. The misleading messages and materials Endo provided to its sales force and its speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives. This deception was national in scope and included Chicago. As described above in Section V.B.2, Endo's nationwide messages would have reached Chicago prescribers in a number of ways. For example, they were carried into Chicago by Endo's sales representatives during detailing visits as well as made available to Chicago patients and prescribers through websites and ads. They also have been delivered to Chicago prescribers by Endo's paid speakers, who were required by Endo policy and by FDA regulations to stay true to Endo's nationwide messaging.

iii. *Endo's Misleading Journal Supplement*

476. In 2007, Endo enlisted Chicago Prescriber M to write a supplement available for CME credit in the *Journal of Family Practice* that Endo paid to have published. It was called *Pain Management Dilemmas in Primary Care: Use of Opioids*, and it deceptively minimized the risk of addiction by emphasizing the effectiveness of screening tools. Specifically, it recommended screening patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain. It also falsely claimed that, through the use of tools like toxicology screens, pill counts, and a "maximally structured approach," even patients at high risk of addiction could safely receive chronic opioid therapy. Endo distributed 96,000 copies of this CME nationwide, and it was available to and was intended to reach Chicago prescribers.

iv.        *Endo's Deceptive Unbranded Advertising*

477.    Endo also used unbranded advertisements to advance its goals.  By electing to

focus on unbranded marketing, Endo was able to make claims about the benefits of its opioids

that the FDA would never allow in its branded materials.  The chart below compares an Endo

unbranded statement with one of Endo's FDA-regulated, branded statements:

| **Living with Someone with Chronic Pain  (2009)** <br> **(Unbranded)** | **Opana ER Advertisement (2011/2012/2013)** <br><br> **(Branded)** |
|---|---|
| Patient education material created by Endo | Endo advertisement |
| "Most health care providers who treat people with pain agree that **most people do not develop an addiction problem**." | "[C]ontains oxymorphone, an opioid agonist and Schedule II controlled substance with an abuse liability similar to other opioid agonists, legal or illicit." <br><br> "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use**." |

b.      Endo's Deceptive Third-Party Statements

478.    Endo's efforts were not limited to directly making misrepresentations through its

marketing materials, its speakers, and its sales force.  Endo believed that support for patient

advocacy and professional organizations would reinforce Endo's position as "the pain

management company."

479.    Prior to, but in contemplation of, the 2006 launch of Opana ER, Endo developed a "Public Stakeholder Strategy."  Endo identified "tier one" advocates to assist in promoting the approval and acceptance of its new extended release opioid.  Endo also intended to enlist the support of organizations that engage or have the potential to advocate for public policy that would be "favorable" to Schedule II opioids from a sales perspective.  Endo sought to develop its relationships with these organizations through its funding.  In 2008, Endo spent $1 million per year to attend conventions of these pro-opioid medical societies, including meetings of AAPM, APS, and the American Society of Pain Management Nursing ("ASPMN").

480.    APF's ability to influence professional societies and other third parties is demonstrated by its approach in responding to a citizens' petition filed with the FDA by the Physicians for Responsible Opioid Prescribing (the "PROP Petition").  The PROP petition, filed by a group of prescribers who had become concerned with the rampant prescribing of opioids to treat chronic pain, asked the FDA to require dose and duration limitations on opioid use and to change the wording of the approved indication of various long-acting opioids to focus on the severity of the pain they are intended to treat.

481.    The PROP Petition set off a flurry of activity at Endo.  It was a given that Endo would respond to the petition; the only question among Endo personnel was "[s]hould we [ . . . ] consider filing a direct response to this [citizens' petition] or do you think we are better served by working through our professional society affiliations?"  One Endo employee responded: "My sense is the societies are better placed to make a medical case than Endo."  Endo's Director of Medical Science agreed that "a reply from an external source would be most impactful."  These communications reflected Endo's absolute confidence that the professional societies would support its position.

i.    *APF*

482.    One of the societies with which Endo worked most closely was APF.  Endo provided substantial assistance to, and exercised editorial control, over the deceptive and misleading messages that APF conveyed through its National Initiative on Pain Control ("NIPC").  Endo was one of the APF's biggest financial supporters, and Endo provided more than half of the $10 million APF received from opioid manufacturers during its lifespan.  Endo spent $1.1 million on the NIPC program in 2008 alone, funding earmarked, in part, for the creation of CME materials that were intended to be used over and over again.

483.    Endo's influence over APF's activities was so pervasive that APF President Will Rowe even reached out to Defendants—including Endo—rather than his own staff to identify potential authors to answer an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011.  Personnel from Defendants Purdue, Endo, Janssen, and Cephalon worked with Rowe to formulate APF's response.  The response suggested by Defendants was the one that APF ultimately published.

484.    Documents also indicate that Endo personnel were given advance notice of materials APF planned to publish on its website and provided an opportunity to comment on the content of those materials before they were published.  For example, in early July of 2009, APF's Director of Strategic Development wrote to Endo personnel to give them advance notice of content that APF planned to be "putting . . . up on the website but it's not up yet."  This Endo employee also reassured the sender that she "<u>will not forward it to anyone at all</u>" and promised that she would "'double delete it' from [her] inbox."  In response, APF's Director of Strategic Development replied internally with only four words:  "And where's the money?"

485.    Nowhere was Endo's relationship with APF closer than with its sponsorship of the NIPC.  Before being taken over by APF, the NIPC was sponsored by Professional

Postgraduate Services, but that company was determined to be a "commercial interest" by the ACCME and could no longer serve as a sponsor. In response, Endo reached out to APF. An August 2009 document titled "A Proposal for the American Pain Foundation to Assume Sponsorship of the National Initiative on Pain Control," pointed out that "[f]or the past 9 years, the NIPC has been supported by unrestricted annual grants from Endo Pharmaceuticals, Inc." According to this document, APF's sponsorship of the NIPC "[o]ffers the APF a likely opportunity to generate new revenue, as Endo has earmarked substantial funding: $1.2 million in net revenue for 2010 to continue the NIPC." Further, sponsorship of the APF would "[p]rovide[] numerous synergies to disseminate patient education materials," including "[h]andouts to attendees at all live events to encourage physicians to drive their patients to a trusted source for pain education—the APF website."

486. A September 14, 2009 presentation to APF's board contained a materially similar discussion of NIPC sponsorship, emphasizing the financial benefit to APF from assuming the role of administering NIPC. The proposal "offer[ed] a solution to continue the development and implementation of the NIPC initiative as non-certified . . . yet independent education to physicians and healthcare professionals in the primary care setting, while providing the APF with a dependable, ongoing source of grant revenue." A number of benefits related to NIPC sponsorship were listed, but chief among them was "a likely opportunity [for APF] to generate new revenue, as Endo has earmarked substantial funding: $1.2 million in net revenue for 2010 to continue the NIPC."

487. Internal Endo scheduling documents indicate that "NIPC module curriculum development, web posting, and live regional interactive workshops" were Endo promotional

tasks in 2010.  Endo emails indicate that Endo personnel reviewed the content created by NIPC and provided feedback.

488.    Behind the scenes, Endo exercised substantial control over NIPC's work.  Endo exerted its control over NIPC by funding NIPC and APF projects; developing, specifying, and reviewing content; and taking a substantial role in distribution of NIPC and APF materials, which in effect determined which messages were actually delivered to prescribers and consumers.  As described below, Endo projected that it would be able to reach tens of thousands of prescribers nationwide through the distribution of NIPC materials.

489.    From 2007 until at least 2011, Endo also meticulously tracked the distribution of NIPC materials, demonstrating Endo's commercial interest in and access to NIPC's reach.  Endo knew exactly how many participants viewed NIPC webinars and workshops and visited its website, *Painknowledge.com*.  Endo not only knew how many people viewed NIPC's content, but what their backgrounds were (*e.g.*, primary care physicians or neurologists).  Endo's access to and detailed understanding of the composition of the audience at these events demonstrates how deeply Endo was involved in NIPC's activities.  Moreover, Endo tracked the activities of NIPC—ostensibly a third party—just as it tracked its own commercial activity.

490.    Endo worked diligently to ensure that the NIPC materials it helped to develop would have the broadest possible distribution.  Endo's 2008 to 2012 Opana Brand Tactical Plan indicates that it sought to reach 1,000 prescribers in 2008 through live NIPC events, and also to "[l]everage live programs via enduring materials and web posting."  Endo also planned to disseminate NIPC's work by distributing two accredited newsletters to 60,000 doctors nationwide for continuing education credit and sponsoring a series of 18 NIPC regional case-

based interactive workshops. Endo had earmarked more than one million dollars for NIPC activities in 2008 alone.

491. In short, NIPC was a key piece of Endo's marketing strategy. Indeed, internal APF emails question whether it was worthwhile for APF to continue operating NIPC given that the NIPC's work was producing far more financial benefit for Endo than for APF. Specifically, after Endo approved a $244,337.40 grant request to APF to fund a series of NIPC eNewsletters, APF personnel viewed it as "[g]reat news," but cautioned that "the more I think about this whole thing, [Endo's] making a lot of money on this with still pretty slender margins on [APF's] end." APF's commitment to NIPC's "educational" mission did not figure at all in APF's consideration of the value of its work, nor was Endo's motive or benefit in doubt.

(a)     Misleading Medical Education

492. NIPC distributed a series of eNewsletter CMEs focused on "key topic[s] surrounding the use of opioid therapy" and sponsored by Endo. These newsletters were edited by KOL Dr. Perry Fine and also listed several industry-backed KOLs, including Dr. Webster, as individual authors. Endo estimated that roughly 60,000 prescribers viewed each one, which were available to and would have included Chicago prescribers. Before-and-after surveys, summarized in the chart below, showed that prescriber comfort with prescribing opioids ranged from 27% to 62% before exposure to the CME, and from 76% to 92% afterwards:

| Topic | Comfort level *prior to reading the article* | Comfort level *after reading the article* |
|---|---|---|
| Patient Selection and Initiation of Opioid Therapy as a Component of Pain Treatment | 47% | 87% |
| Informed Consent and Management Plans to Optimize Opioid Therapy for Chronic Pain | 48% | 81% |
| Risk Stratification and Evaluation of High-Risk Behaviors for Chronic Opioid Therapy | 28% | 76% |
| Integration of Nonpharmacologic and Multidisciplinary Therapies Into the Opioid Treatment Plan | 42% | 85% |
| Addressing Patients' Concerns Associated With Chronic Pain Treatment and Opioid Use | 62% | 92% |
| Opioid Therapy in Patients With a History of Substance Use Disorders | 35% | 85% |
| Urine Drug Testing: An Underused Tool | 54% | 86% |
| Appropriate Documentation of Opioid Therapy: The Emergence of the 4As and Trust and Verify as the Paradigm | 44% | 86% |
| Opioid Rotation | 27% | 92% |
| Discontinuing Opioid Therapy: Developing and Implementing an "Exit Strategy" | 37% | 90% |

493.    Endo documents made clear that the persuasive power of NIPC speakers was directly proportional to their perceived objectivity.  Accordingly, Endo personnel directed that, when giving Endo-sponsored talks, NIPC faculty would not appear to be "Endo Speakers." Nevertheless, the two parties understood that Endo and NIPC shared a common "mission to educate physicians" and working "through the APF . . . [wa]s a great way to work out . . . problems that could have been there without the APF's participation and support."

494.    The materials made available on and through NIPC included misrepresentations. For example, Endo worked with NIPC to sponsor a series of CMEs titled *Persistent Pain in the Older Patient* and *Persistent Pain in the Older Adult*.  These CMEs misrepresented the prevalence of addiction by stating that opioids have "possibly less potential for abuse" in elderly patients than in younger patients, even though there is no evidence to support such an assertion. Moreover, whereas withdrawal symptoms are always a factor in discontinuing long-term opioid therapy, *Persistent Pain in the Older Adult* also misleadingly indicated that such symptoms can

be avoided entirely by tapering the patient's does by 10-20% per day for ten days. *Persistent Pain in the Older Patient*, for its part, made misleading claims that opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." NIPC webcast these CMEs from its own website, where they were available to and were intended to reach Chicago prescribers.

(b)     Painknowledge.com

495.    Working with NIPC enabled Endo to make a number of misleading statements through the NIPC's website, *Painknowledge.com*. Endo tracked visitors to *PainKnowledge.com* and used *Painknowledge.com* to broadcast notifications about additional NIPC programming that Endo helped to create.

496.    APF made a grant request to Endo to create an online opioid "tool-kit" for NIPC and to promote NIPC's website, *Painknowledge.com*. In so doing, APF made clear that it planned to disseminate Defendants' misleading messaging. The grant request expressly indicated APF's intent to make misleading claims about functionality, noting: "Some of these people [in chronic pain] may be potential candidates for opioid analgesics, which can improve pain, function, and quality of life." Endo provided $747,517 to fund the project.

497.    True to APF's word, *Painknowledge.com* misrepresented that opioid therapy for chronic pain would lead to improvements in patients' ability to function. Specifically, in 2009 the website instructed patients and prescribers that, with opioids, a patient's "level of function should improve" and that patients "may find [they] are now able to participate in activities of daily living, such as work and hobbies, that [they] were not able to enjoy when [their] pain was worse."

498.    *Painknowledge.com* also deceptively minimized the risk of addiction by claiming that "[p]eople who take opioids as prescribed usually do not become addicted."

*Painknowledge.com* did not stop there. It deceptively portrayed opioids as safe at high doses and also misleadingly omitted serious risks, including the risks of addiction and death, from its description of the risks associated with the use of opioids to treat chronic pain.

499. Endo was the sole funder of *Painknowledge.com*, and it continued to provide that funding despite being aware of the website's misleading contents.

(c)  *Exit Wounds*

500. Finally, Endo also sponsored APF's publication and distribution of *Exit Wounds*, a publication aimed at veterans that also contained a number of misleading statements about the risks, benefits, and superiority of opioids to treat chronic pain. *Exit Wounds* was drafted by "Medical Writer X," whose extensive work for Janssen is described below in Section V.E.4. Medical Writer X was frequently hired by a consulting Firm, Conrad & Associates LLC, to write pro-opioid marketing pieces disguised as science. Medical Writer X's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

501. *Exit Wounds* is a textbook example of Medical Writer X's authorship on drug companies' behalf. The book misrepresented the functional benefits of opioids by stating that opioid medications "*increase* your level of functioning" (emphasis in original).

502. *Exit Wounds* also misrepresented that the risk of addiction associated with the use of opioids to treat chronic pain was low. It claimed that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications."

503. Finally, *Exit Wounds* misrepresented the safety profile of using opioids to treat chronic pain by omitting key risks associated with their use. Specifically, it omitted warnings of

the risk of interactions between opioids and benzodiazepines—a warning sufficiently important to be included on Endo's FDA-required labels. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids—a particular risk for veterans.

504.    As outlined above, Endo exercised dominance over APF and the projects it undertook in an effort to promote the use of opioids to treat chronic pain. In addition, as outlined above, Medical Writer X's work was being reviewed and approved by drug company representatives, motivating him to draft pro-opioid propaganda masquerading as science. Combined, these factors gave Endo considerable influence over the work of Medical Writer X and over APF. Further, by paying to distribute *Exit Wounds*, Endo endorsed and approved its contents.

ii.        *Other Front Groups:  FSMB, AAPM, and AGS*

505.    In addition to its involvement with APF, Endo worked closely with other third-party Front Groups and KOLs to disseminate deceptive messages regarding the risks, benefits, and superiority of opioids for the treatment of chronic pain. As with certain APF publications, Endo in some instances used its sales force to directly distribute certain publications by these Front Groups and KOLs, making those publications "labeling" within the meaning of 21 C.F.R. § 1.3(a).

506.    In 2007, Endo sponsored FSMB's *Responsible Opioid Prescribing*, which, as described in Section V.D, in various ways deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain. *Responsible Opioid Prescribing* was drafted by "Medical Writer X."

507.    Endo spent $246,620 to help FSMB distribute *Responsible Opioid Prescribing*. Endo approved this book for distribution by its sales force. Based on the uniform and

nationwide character of Endo's marketing campaign, and the fact that Endo purchased these copies specifically to distribute them, these copies were distributed to physicians nationwide, including physicians in Chicago.

508. In December 2009, Endo also contracted with AGS to create a CME to promote the 2009 guidelines titled the *Pharmacological Management of Persistent Pain in Older Persons* with a $44,850 donation. As described in Section V.C.2.c.iii above, these guidelines misleadingly claimed that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse," since the study supporting this assertion did not analyze addiction rates by age. They also stated, falsely, that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy (low quality of evidence, strong recommendation)" when in reality, opioid therapy was an appropriate treatment only for a subset of those patients, as Endo's FDA-mandated labels recognized.

509. AGS's grant request to Endo made explicit reference to the CME Endo was funding. Endo thus knew full well what content it was paying to distribute, and was in a position to evaluate that content to ensure it was accurate, substantiated, and balanced before deciding whether to invest in it. After having sponsored it, Endo's internal documents indicate that Endo's pharmaceutical sales representatives discussed the AGS guidelines with doctors during individual sales visits.

510. Endo also worked with AAPM, which it viewed internally as "Industry Friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications.

511.    A talk written by Endo in 2009, approved by Endo's Medical Affairs Review Committee,[179] and given by a Chicago-area KOL, titled *The Role of Opana ER in the Management of Chronic Pain,* includes a slide titled *Use of Opioids is Recommended for Moderate to Severe Chronic Noncancer Pain.*  That slide cites the AAPM/APS Guidelines, which contain a number of misstatements as outlined in Section V.C.2.c.ii above, while omitting their disclaimer regarding the lack of supporting evidence.  This dangerously misrepresented to doctors the force and utility of the 2009 Guidelines.  Furthermore, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

### iii.    *Key Opinion Leaders and Misleading Science*

512.    Endo also sought to promote opioids for the treatment of chronic pain through the use of key opinion leaders and biased, misleading science.

513.    Endo's 2010 publication plan for Opana ER identified a corporate goal of making Opana ER the second-leading branded product for the treatment of moderate-to-severe chronic pain (after OxyContin).  Endo sought to achieve that goal by providing "clinical evidence for the use of Opana ER in chronic low back pain and osteoarthritis," and succeeded in having articles on this topic published.[180]

---

[179]    Although they were given slightly different names by each Defendant, each Defendant employed a committee that would review and approve materials for distribution.  These committees included representatives from all relevant departments within Defendants' organizations, including the legal, compliance, medical affairs, and marketing departments.  The task of these review committees was to scrutinize the marketing materials Defendants planned to distribute and to ensure that those materials were scientifically accurate and legally sound.  Tellingly, these committees were called to review only materials that created a potential compliance issue for the company, an implicit recognition by Defendants that they ultimately would be responsible for the content under review.

[180]    These studies suffered from the limitations common to the opioid literature—and worse.  None of the comparison trials lasted longer than three weeks.  Endo also commissioned a six-month, open label trial during which a full quarter of the patients failed to find a stable dose, and 17% of patients discontinued, citing intolerable effects.  In open label trials, subjects know which drug they are taking; such trials are not as rigorous as double-blind, controlled studies in which neither the patients nor the examiners know which drugs the patients are taking.

514.     In the years that followed, Endo sponsored articles, authored by an Endo

consultant and Endo employees, which argued that the metabolic pathways utilized by Opana ER

made it less likely than other opioids to result in drug interactions in elderly low back and

osteoarthritis pain patients.  In 2010, Endo directed its publication manager to reach out to a list

of consultants conducting an ongoing Endo-funded study, to assess their willingness to respond

to an article[181] that Endo believed emphasized the risk of death from opioids, "without [] fair

balance."[182]

515.     Endo's reliance on flawed, biased research is also evident in its 2012 marketing

materials and strategic plans.  A 2012 Opana ER slide deck for Endo's speakers bureaus—on

which these recruited physician speakers were trained and to which they were required to

adhere—misrepresented that the drug had low abuse potential and suggested that as many as

one-quarter of the adult population could be candidates for opioid therapy.  Although the FDA

requires such speaker slide decks to reflect a "fair balance" of information on benefits and risks,

Endo's slides reflected one-sided and deeply biased information.  The presentation's 28 literature

citations were largely to "data on file" with the company, posters, and research funded by or

otherwise connected to Endo.  Endo's speakers carried the information in these slides to

audiences that were unaware of the skewed science on which the information rested.

516.     A 2012 Opana ER Strategic Platform Review suffered from similar defects.  Only

a small number of the endnote references in that document, which it cites to indicate "no gap" in

scientific evidence for particular claims, were to national-level journals.  Many were published in

lesser or dated journals, and written or directly financially supported by opioid manufacturers.

---

[181]   Susan Okie, *A Flood of Opioids, a Rising Tide of Deaths*, 363 New Engl. J. Med. 1981 (2010), finding that
opioid overdose deaths and opioid prescriptions both increased by roughly 10-fold from 1990 to 2007.

[182]   Endo did manage to get a letter written by three of those researchers, which was not published.

Where the strategy document did cite independent, peer-reviewed research, it did so out of context.  For example, it cited a 2008 review article on opioid efficacy for several claims, including that "treatment of chronic pain reduces pain and improves functionality," but it ignores that article's overall focus on "the lack of consistent effectiveness of opioids in reducing pain and improving functional status."[183]

517.    Notwithstanding Endo's reliance upon dubious or cherry-picked science, in an Opana ER brand strategy plan it internally acknowledged the continuing need for a significant investment in clinical data  to support comparative effectiveness.  Endo also cited a lack of "head-to-head data" as a barrier to greater share acquisition and the "lack of differentiation data" as a challenge to addressing the  "#1 Key Issue" of product differentiation.  Nor did this acknowledged lack of support stop Endo from directing its sales representatives to tell prescribers that its drugs were less likely to be abused or less addictive than other opioids.

518.    Endo also worked with various KOLs to disseminate various misleading statements about chronic opioid therapy.  For example, Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding your Pain: Taking Oral Opioid Analgesics*.  This pamphlet deceptively minimized the risks of addiction by stating that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems," implying that patients who are taking opioids for pain are not at risk of addiction.

519.    *Understanding your Pain:  Taking Oral Opioid Analgesics* also misleadingly omitted any description of the increased risks posed by higher doses of opioid medication.  Instead, in a Q&A format, the pamphlet asked "[i]f I take the opioid now, will it work later when

---

[183]   Andrea M. Trescot et al., Opioids in the management of non-cancer pain: an update of American Society of the Interventional Pain Physicians, Pain Physician 2008 Opioids Special Issue, S5-S2.

I really need it?" and responded that "[t]he dose can be increased . . . [y]ou won't 'run out' of pain relief."

520.  Dr. Portenoy received research support, consulting fees, and honoraria from Endo for editing *Understanding Your Pain* and other projects.

521.  *Understanding Your Pain* was available on Endo's website during the time period of this Complaint and was intended to reach Chicago prescribers.  As described below in Section V.E.3.c, at least one Chicago physician, Prescriber G, received this pamphlet from an Endo sales representative.

522.  Endo similarly distributed a book written by Dr. Lynn Webster titled *Avoiding Opioid Abuse While Managing Pain*, which stated that in the face of signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."

523.  A slide from an Opana ER business plan contemplated distribution of the book as part of Endo's efforts to "[i]ncrease the breadth and depth of the OPANA ER prescriber base via targeted promotion and educational programs."  The slide indicates that the book would be particularly effective "for [the] PCP audience" and instructed "[s]ales representatives [to] deliver[ the book] to participating health care professionals."  The slide, shown below, demonstrates Endo's express incorporation of this book by a KOL into its marketing strategy:



524.     Endo documents indicate that, around 2007, the company purchased at least 50,000 copies of the book for distribution.  Internal Endo documents demonstrate that the book had been approved for distribution by Endo's sales force, and Endo had fewer than 8,000 copies on hand in March of 2013.  Based on the nationwide and uniform character of Endo's marketing, and the book's approval for distribution, this book was available to and was intended to reach Chicago prescribers.

        c.    <u>Endo's Deceptive Statements to Chicago Prescribers and Patients</u>

525.     Endo also directed the dissemination of the misstatements described above to Chicago patients and prescribers, including through its sales force, speakers bureaus, CMEs, and the *Painknowledge.com* website.

526.     Consistent with their training, Endo's sales representatives delivered all of these deceptive messages to Chicago prescribers.  A former Endo sales representative, Sales Representative D, who marketed Opana and Opana ER for Endo in Chicago's southwest suburbs, including Joliet, Orland Park, and Tinley Park, spoke to the City about her training and sales practices.  This sales representative marketed principally to internists.  She never heard about the risks of long-term opioid use while working at Endo.  As she explained, the risks of

long-term opioid use were not a focus of her training. She was familiar with the term pseudoaddiction, which she defined as patients who thought they were addicted but really were not. In her sales visits, she would dodge any questions about addiction, telling doctors that she lacked a document or data to talk about it.

527. Sales Representative D reported that Endo specifically targeted physicians who prescribed Vicodin and NSAIDs. She was trained to persuade them to prescribe Endo's drugs by discussing milder side effects associated with the drugs, like constipation and itching skin. She also frequently told doctors that prescribing Opana ER to their patients would improve patients' ability to function. Finally, this former sales representative recalls leaving copies of *Understanding Your Pain: Taking Oral Opioid Analgesics* with the prescribers she detailed. As described above in Section V.E.3.b.iii, this publication misleadingly implied that pain patients prescribed opioids would not become addicted.

528. Given that this sales representative was in the same sales region as Chicago (and subject to the same regional management as Chicago sales representatives), that her detailing reached Chicago suburbs, and that her messaging tracked Endo's deceptive sales training, her account offers insight into the misleading messages conveyed to prescribers in the Chicago area.

529. The experiences of specific prescribers confirm both that Endo's national marketing campaign included the misrepresentations described above in Sections V.D and V.E.3, and that the company disseminated these same misrepresentations to Chicago prescribers and consumers. In particular, these prescriber accounts reflect that Endo detailers omitted or minimized the risk of opioid addiction; claimed that Endo's drugs would be less problematic for patients because they were tamper resistant and "steady state;" claimed or implied that opioids

were safer than NSAIDs; and overstated the benefits of opioids, including by making claims of improved function.

530. A survey of a sample of Midwestern physicians, who reported the messages that they retained from detailing visits detailing visits and other promotional activity, documented that Endo promoted Opana ER as less addictive than other opioids. For example, Endo sales representatives told a Midwestern internal medicine doctor in 2008 that Opana ER had a "minimal" abuse potential," and in 2008 and 2011 told physicians that it has a "lower" abuse potential, presumably as compared to other opioids. Further, beginning in 2012, the survey reported that Endo sales representatives promoted the "Intac" formulation as being affirmatively crush resistant, despite FDA findings to the contrary. For example, Endo representatives told a pain specialist in 2012 that Opana ER was "tamper proof"; they told internal medicine doctors in 2013 and 2014 that Opana ER was "difficult to abuse." Endo sales representatives also claimed that the fact that Opana ER was a long-acting formulation made it less addicting, despite its Schedule II classification. Finally, Opana ER sales representatives told a Midwestern internist that sustained release had the properties of "hopefully avoiding addiction" in 2013.

531. In addition, the City has interviewed a number of Chicago-area prescribers who reported that they were detailed by Endo sales representatives and heard similar claims, as well as other messages described in Sections V.D and V.E.3. In each instance, Endo intended that the prescriber rely on these messages. Most of these physicians did, in fact, prescribe Endo's opioids. Exhibit D to this Fifth Amended Complaint summarizes data showing the number of prescriptions, doses, and MME by Defendant family from IQVIA Xponent for the year 1997-2017 for these prescribers.

      a. Chicago Prescriber C, a pain specialist, is based in Wisconsin but treats Chicago residents. In their meetings with him, sales

representatives from each Defendant, including Endo, routinely omitted any discussion about addiction and overdose death and frequently overstated the benefits of opioids. These representatives taught that opioids would increase his patients' ability to function and increase their quality of life. Prescriber C was detailed at three meals paid for by Endo to promote Opana ER on April 14, 2014; May 27, 2014; and September 12, 2014. ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████

b.  Chicago Prescriber S, a nurse practitioner who is based in Indiana but writes opioid prescriptions to Chicago patients, recalls being visited frequently by drug representatives detailing Opana. According to Prescriber S, representatives from Defendants Janssen, Purdue, and Endo emphasized that opioids could help her patients regain function by becoming more physically active and returning to work. Prescriber S has prescribed opioids, including Defendants' drugs and Endo's opioids in particular, to local patients.

c.  Chicago Prescriber D was visited by opioid sales representatives from Purdue, Endo, Janssen, and Actavis. He relied on the representations made by these sales representatives and, in the past, had not comprehended the true addictive potential of opioids. Representatives from each of these companies told Prescriber D that their drugs were "steady state," which he interpreted to mean that they were less addictive. Prescriber D has prescribed opioids, including Defendants' drugs and Endo's opioids in particular, to local patients. ████████████████████ ████████████████████████████████████████ ████████████████████████████

d.  Chicago Prescriber G indicated that he was visited by sales representatives from all Defendants, including Endo. He recalls receiving some of the marketing materials described above, including a copy of *Understanding your Pain: Taking Oral Opioid Analgesics* that was given to him by an Endo sales representative. Prescriber G was never told about the risk of addiction. According to Prescriber G, opioid sales representatives—including Endo's—told him that opioids would increase patients' ability to complete activities of daily living and that patients could be managed to avoid addiction. These representatives also told him that patients can be screened to mitigate addiction risks. Prescriber G has prescribed opioids, including Defendants' drugs and Endo's opioids in particular, to local patients. ████████████████████

████████████████████████████████
████████████

e.  Chicago Prescriber E, an anesthesiologist and pain specialist, explained that he received visits from sales representatives from all Defendants, including Endo, until a few years ago. Representatives from Endo never discussed addiction with him. Prescriber E has prescribed opioids, including Defendants' drugs and Endo's opioids in particular, to local patients. ████
████████████████████████████████
████████████████████████████████
████████████

f.  Chicago Prescriber F, a headache specialist, recalls being detailed by Endo sales representatives. Prescriber F explained that these sales representatives told him that Opana was less addicting than other opioids. Prescriber F has prescribed opioids, including Defendants' drugs and Endo's opioids in particular, to local patients. ████████████████
████████████████████████████████

g.  Chicago Prescriber B, a Chicago anesthesiologist, sees opioid drug company representatives on a regular basis, and he has seen representatives from Endo. These representatives pushed the message that "steady-state" extended release drugs have less potential for abuse. Opioid manufacturers, including Endo, have told him that opioids improved patient function and quality of life. He relies on the information he receives from drug company representatives because he does not have the time to conduct his own research. Prescriber B has prescribed opioids, including Defendants' drugs and Endo's opioids in particular, to local patients. ████████████████
████████████████████████████████
██████████████████

h.  Chicago Prescriber Q recalls being visited by representatives from Purdue, Endo, and Cephalon. Prescriber Q indicated that none of the representatives discussed abuse, addiction, or overdose, which are simply not part of the sales conversation." Prescriber Q has prescribed opioids, including Defendants' drugs and Endo's opioids in particular, to local patients. ████
████████████████████████████████
████████████████████████████████
████

i. Chicago Prescriber T indicated that he was visited by sales representatives from Defendants Purdue, Endo, and Janssen. Endo's sales representatives told Prescriber T that Opana would improve his patients' ability to function and make it more likely that they could groom themselves, bathe, feed themselves, and conduct other daily activities. Endo representatives never mentioned the risks of addiction associated with Opana. Prescriber T has prescribed opioids, including Defendants' drugs and Endo's opioids in particular, to local patients. █████

j. Chicago Prescriber QQ, a Chicago-area anesthesiologist, has met with representatives from Endo within the last five years. Endo representatives told him that the delivery system of Opana ER made it tamper-resistant, which he interpreted to mean it is less likely to be diverted or misused. Prescriber QQ has prescribed opioids, including Defendants' drugs and Endo's opioids in particular, to local patients. █████

532. These accounts reflect specific examples of instances in which Endo's sales representatives made the misrepresentations outlined above in Sections V.D and V.E.3 directly to Chicago prescribers. They are not an exhaustive list. Based on the nationwide and uniform character of Endo's marketing campaign, these examples support the inference that Endo sales representatives made similar misstatements to the other Chicago-area prescribers they detailed.

533. Endo also entered into speaking engagements with Chicago-area prescribers, including Chicago Prescribers A and M. Chicago Prescriber A wrote more than 20,000 prescriptions for Endo drugs to to local patients, including Opana ER to Chicago area patients, totaling 2.995 million doses, from 1997-2017. Chicago Prescriber M likewise has prescribed more than 300,000 doses of Endo opioids to Chicago patients from 1997-2017.

534. The speaker agreements between Endo and these doctors demonstrate the complete control that Endo exerts over the content of their presentations. Endo requires that Prescriber M "will attend and participate in those speaker programs requested by Endo" and that

"Endo will select the topics for all presentations which will be based upon slides, outlines or materials provided and approved by Endo." Further, "[a]ll materials provided by Endo must be presented in their entirety or without alterations.

535. Prescribers A and M were not alone. Endo documents indicate that Endo hired additional Chicago prescribers to speak on its behalf to Chicago-area doctors. In 2010, for example, these included Prescriber U, who spoke at least six times for Endo and wrote numerous Opana ER prescriptions for local patients; and Prescriber V, who spoke three times for Endo and also prescribed Opana ER.

536. Based on their status as Endo speakers bureau members, both Prescriber U and Prescriber V would have attended speakers training at which training materials of the sort described above in Section V.E.3.a.ii were provided. Given that they practice in the Chicago area, it is highly likely that their audiences included other Chicago-area prescribers. Moreover, these paid speaking engagements incentivized these prescribers to write prescriptions for Endo's opioids, because only doctors who wrote Endo prescriptions were considered for the role. Prescribers U and V wrote at least hundreds of prescriptions of Opana ER to local patients.

537. The importance of Chicago prescribers to Endo is also demonstrated by its solicitation of marketing advice from Chicago health professionals. For example, Endo held an Opana ER Pain Management Regional Advisory Board meeting in Chicago on November 15, 2007. At this meeting, Endo explained the benefits of its drugs and solicited the views of Chicago attendees regarding its products and those of its competitors. The meeting was attended by a number of Chicago-area prescribers, including Prescriber W, Prescriber X , and Prescriber Y. These physicians also prescribed Opana ER to local patients.

538.   Endo also directed misleading marketing to Chicago prescribers and patients through the APF/NIPC materials it sponsored, reviewed, and approved.  For example, Endo hired a New York-based KOL to deliver the CME *Managing Persistent Pain in the Older Patient* on April 27, 2010 at the Westin Michigan Avenue in Chicago, with 54 attendees.  As described above in Section V.E.3.b.i (a) above, this CME misrepresented the prevalence of addiction in older patients and made misleading claims that chronic opioid therapy would improve patients' ability to function.  An email invitation to the event and other NIPC programs was sent to "all healthcare professionals" in APF's database.

539.   Another CME, *Persistent Pain in the Older Adult*, was presented in Chicago by a Philadelphia, Pennsylvania-based KOL on Wednesday, May 18, 2011.  This talk took place at the Marriott Chicago Downtown and was attended by 41 prescribers in Chicago.  Like *Managing Persistent Pain in the Older Patient*, *Persistent Pain in the Older Adult* understated the risks of addiction.  It also trivialized the risks associated with opioid withdrawal by stating that withdrawal symptoms can be eliminated entirely.

540.   The significant response to *Painknowledge.com* also indicates that those websites were viewed by Chicago prescribers, who were exposed to the site's misleading information regarding the effect of opioids on patients' ability to function and the deceptive portrayal of the risks of opioids.  As of September 14, 2010, *Painknowledge.com* had 10,426 registrants, 86,881 visits, 60,010 visitors, and 364,241 page views.  Upon information and belief, based on the site's nationwide availability, among the site's visitors were Chicago-area patients and prescribers who were exposed to the site's misleading information regarding the effect of opioids on patients' ability to function and the deceptive portrayal of the risks of opioids.

541.    Endo knew that the harms from its deceptive marketing would be felt in Chicago. It saw workers' compensation programs as a lucrative opportunity, and it promoted the use of opioids for chronic pain arising from work-related injuries, like chronic lower back pain. Endo developed plans to "[d]rive demand for access through the employer audience by highlighting cost of disease and productivity loss in those with pain; [with a] specific focus on high-risk employers and employees." In 2007, Endo planned to reach 5,000 workers' compensation carriers in order to ensure that Opana ER would be covered under disability insurance plans.

### 4.    Janssen

542.    Janssen promoted its branded opioids, including Duragesic, Nucynta, and Nucynta ER, through its sales representatives and a particularly active speakers program. Deceptive messages regarding low addiction risk and low prevalence of withdrawal symptoms were a foundation of this marketing campaign. Janssen also conveyed other misrepresentations as described in Section V.D, including that its opioids could safely be prescribed at higher doses and were safer than alternatives such as NSAIDs.

543.    Janssen supplemented these efforts with its own unbranded website, as well as third-party publications and a Front Group website, to promote opioids for the treatment of chronic pain. These materials likewise made deceptive claims about addiction risk, safety at higher doses, and the safety of alternative treatments. They also claimed that opioid treatment would result in functional improvement, and further masked the risk of addiction by promoting the concept of pseudoaddiction.

544.    Based on the highly coordinated and uniform nature of Janssen's marketing, and as confirmed by verbatim message data and interviews with prescribers, Janssen conveyed these deceptive messages to Chicago prescribers. The materials that Janssen generated in collaboration with third-parties also were distributed or made available in Chicago. Janssen

distributed these messages, or facilitated their distribution, in Chicago with the intent that Chicago prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

a.    Janssen's Deceptive Direct Marketing

545.    Janssen joined the other Defendants in propagating deceptive branded marketing that falsely minimized the risks and overstated the benefits associated with the long-term use of opioids to treat chronic pain.  Like the other Defendants, Janssen sales representatives visited targeted physicians to deliver sales messages that were developed centrally and deployed identically across the country.  These sales representatives were critical in transmitting Janssen's marketing strategies and talking points to individual prescribers.  In 2011, at the peak of its effort to promote Nucynta ER, Janssen spent more than $90 million on detailing.

546.    Janssen's designs to increase sales through deceptive marketing are apparent on the face of its marketing plans.  For example, although Janssen knew that there was no credible scientific evidence establishing that addiction rates were low among patients who used opioids to treat chronic pain, its Nucynta Business Plans indicated that one of the "drivers" to sell more Nucynta among primary care physicians was the "[l]ow perceived addiction and/or abuse potential" associated with the drug.  However, there is no evidence that Nucynta is any less addictive or prone to abuse than other opioids, or that the risk of addiction or abuse is low.  Similarly, Janssen knew that there were severe symptoms associated with opioid withdrawal including, severe anxiety, nausea, vomiting, hallucinations, and delirium, but Janssen touted the ease with which patients could come off opioids.

i.    *Janssen's Deceptive Sales Training*

547.    Janssen's sales force was compensated based on the number of Nucynta prescriptions written in each sales representative's territory.  Janssen encouraged these sales

representatives to maximize sales of Nucynta and meet their sales targets by relying on the false and misleading statements described above, including in Sections V.D.2 and V.D.5.

548.    For example, Janssen's sales force was trained to trivialize addiction risk.  A June 2009 Nucynta training module warns that physicians are reluctant to prescribe controlled substances like Nuycnta because of their fear of addicting patients, but this reluctance is unfounded because "the risks . . . are [actually] much smaller than commonly believed."  Janssen also encouraged its sales force to misrepresent the prevalence of withdrawal symptoms associated with Nucynta.  A Janssen sales training PowerPoint titled "Selling Nucynta ER and Nucynta" indicates that the "low incidence of opioid withdrawal symptoms" is a "core message" for its sales force.  The message was touted at Janssen's Pain District Hub Meetings, in which Janssen periodically gathered its sales force personnel to discuss sales strategy.

549.    This "core message" regarding a lack of withdrawal symptoms runs throughout Janssen's sales training materials.  For example, Janssen's "Licensed to Sell" Facilitator's Guide instructs those conducting Janssen sales trainings to evaluate trainees, in part, on whether they remembered that "[w]ithdrawal symptoms after abrupt cessation of treatment with NUCYNTA ER were mild or moderate in nature, occurring in 11.8% and 2% of patients, respectively" and whether they were able to "accurately convey" this "core message."  Janssen further claimed in 2008 that "low incidence of opioid withdrawal symptoms" was an advantage of the tapentadol molecule.

550.    Similarly, a Nucynta Clinical Studies Facilitator's Guide instructs individuals training Janssen's sales representatives to ask trainees to describe a "key point"—that "83% of patients reported no withdrawal symptoms after abruptly stopping treatment without initiating alternative therapy"—"as though he/she is discussing it with a physician."

551.    This misrepresentation regarding withdrawal was one of the key messages Janssen imparted to employees in the "Retail ST 101 Training" delivered to Nucynta sales representatives.  This training session was attended by more than 40 sales representatives from Janssen's Chicago sales district.

552.    Indeed, training modules between 2009 and 2011 instruct training attendees that "most patients [who discontinued taking Nucynta] experienced no withdrawal symptoms" and "[n]o patients experienced moderately severe or severe withdrawal symptoms."  As described below, the Retail ST 101 Training was attended by Janssen's Chicago sales representatives.

553.    During the very time Janssen was instructing its sales force to trivialize the risks of addiction and withdrawal associated with the use of Nucynta to treat chronic pain, it knew or should have known that, as laid out above in Section V.D.2, significant numbers of patients using opioids to treat chronic pain experienced issues with addiction.  As laid out in Section V.D.5, Janssen knew or should have known that its studies on withdrawal were flawed and created a misleading impression of the rate of withdrawal symptoms and, as a result, the risk of addiction.

554.    The deceptive messages described above and in Section V.D.1-7 are confirmed by Janssen sales representatives.  One former Janssen sales representative, Sales Representative E, who was interviewed by the City and worked in Janssen's Midwest Region (the Regional Manager had offices in Naperville, Illinois) recalls selling Nucynta and Nucynta ER.  Her compensation was directly tied to how many Nucynta and Nucynta ER prescriptions were written by the doctors who were listed on the quarterly call plan she received from her district manager and how many doctors or clinics in her assigned zip codes prescribed the drugs that she was asked to sell.  This former sales representative stated that family practices and internal

medicine doctors made up about 80% of the call plan targets for opioids; as noted above, these generalists are less knowledgeable about opioids and more likely to fall victim to sales representatives' misrepresentations.

555.   Sales Representative E was instructed to push the envelope when selling Nucynta ER and stress that Nucynta ER didn't hit receptors like other opioids so it was less addictive and had fewer withdrawal issues.  She also promoted Nucynta and Nucynta ER as a safer alternative to NSAIDs and, when discussing side effects related to Nucynta and Nucynta ER, she focused on nausea, itchy skin, and vomiting.  She told physicians that they could prescribe higher doses of Nucynta ER because its mechanism works differently than other opioids.  She also recalls telling prescribers that Janssen's opioids can improve their patients' ability to function in their lives, enabling them to get off workers' compensation or work pain-free.  She also recalls being provided various books, articles, and pamphlets to provide as handouts to physicians.

556.   This former sales representative also recalls that Janssen's Midwest region would hold regional "Plan of Action" meetings three times a year, usually at a hotel or conference facility in a northern suburb of Chicago.  These meetings would include various presentations regarding the marketing of Janssen's drugs, including Nucynta and Nucynta ER.  The Midwest region also held weekly Friday calls, which were used to make sure that everyone followed the same strategy and talking points.  Based on the uniform character of Janssen's marketing, Chicago sales representatives, who were in the same sales region, would have received the same sales training and made the same misrepresentations when detailing Chicago prescribers.

557.   Another former Janssen sales representative, Sales Representative F, who also worked in Janssen's Midwest region, recalls Janssen using a number of KOLs in support of its efforts to sell Nucynta and Nucynta ER.  Some of these KOLs were based in Chicago and

participated in Janssen's speakers bureau.  On information and belief, based on the uniform and nationwide character of Janssen's marketing,  these speakers were trained to deliver the misleading messages described above in Section V.E.4.a.ii to prescribers in Chicago.

558.    A third former Janssen sales representative, Representative G, whose territory included the suburbs northwest of Chicago, recalled selling Nucynta and Nucynta ER.  She promoted Nucynta and Nucynta ER as safe and effective for the long-term treatment of chronic pain and told physicians that drugs like Tylenol kill the liver and that Nucynta and Nucynta ER were cleaner by comparison and did not attack the organs.

559.    Finally, a fourth former Janssen sales representative, Sales Representative H, who also worked in Janssen's Midwest Region, recalls selling Nucynta and Nucynta ER.  She recalls being trained to say that Nucynta and Nucynta ER did not offer the same euphoric feeling as other opioids.  She also recalled referring prescribers to a Youtube video that asserted that Nucynta was more difficult to crush than other pills, making it less likely to be abused or diverted.  Representative H believed that it was common for Janssen sales representatives to downplay the addictive nature of Nucynta and Nucynta ER.

560.    The misleading messages and materials Janssen provided to its sales force were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives.  This deception was national in scope and included Chicago.  As described above in Section V.B.2, Janssen's nationwide messages reached Chicago prescribers in a number of ways, including through its sales force in detailing visits, as well as through websites and ads.  They also were delivered to Chicago prescribers by Janssen's paid speakers, who were required by Janssen policy and by FDA regulations to stay true to Janssen's nationwide messaging.

ii.      *Janssen's Deceptive Speakers Bureau Programs*

561.    Janssen did not stop at disseminating its misleading messages regarding chronic opioid therapy through its sales force.  It also hired speakers to promote its drugs and trained them to make the very same misrepresentations made by its sales representatives.

562.    Janssen's speakers worked from slide decks—which they were required to present—reflecting the deceptive information about the risks, benefits, and superiority of opioids outlined above.  For example, a March 2011 speaker's presentation titled *A New Perspective For Moderate to Severe Acute Pain Relief:  A Focus on the Balance of Efficacy and Tolerability* set out the following adverse events associated with use of Nucynta:  nausea, vomiting, constipation, diarrhea, dizziness, headache, anxiety, restlessness, insomnia, myalgia, and bone pain.  It completely omitted the risks of misuse, abuse, addiction, hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and other known, serious risks associated with chronic opioid therapy.  The presentation also minimized the risks of withdrawal by stating that "more than 82% of subjects treated with tapentadol IR reported no opioid withdrawal symptoms."

563.    An August 2011 speakers presentation titled *New Perspectives in the Management of Moderate to Severe Chronic Pain* contained the same misleading discussion of the risks associated with chronic opioid therapy.  It similarly minimized the risks of withdrawal by reporting that 86% of patients who stopped taking Nucynta ER "abruptly without initiating alternative opioid therapy" reported no withdrawal symptoms whatsoever.  The same deceptive claims regarding risks of adverse events and withdrawal appeared in a July 2012 speaker's presentation titled *Powerful Pain Management:  Proven Across Multiple Acute and Chronic Pain Models*.

564.    These speakers presentations were part of Janssen's nationwide marketing efforts. Indeed, Janssen planned to spend $8 million on its speakers training in 2012, which included plans for 3,000 speakers events.  Upon information and belief, a number of these events were available to and were intended to reach Chicago prescribers.

iii.    *Janssen's Deceptive Unbranded Advertising*

565.    Janssen was aware that its branded advertisements and speakers programs would face regulatory scrutiny that would not apply to its unbranded materials, so Janssen also engaged in direct, unbranded marketing.

566.    One such unbranded project was Janssen's creation and maintenance of *Prescriberesponsibly.com* (last updated July 2, 2015), a website aimed at prescribers and patients that claims that concerns about opioid addiction are "overstated."  A disclaimer at the bottom of the website states that the "site is published by Janssen Pharmaceuticals, Inc., which is solely responsible for its content."  This website was available to and intended to reach Chicago prescribers and patients.

b.    Janssen's Deceptive Third-Party Statements

567.    Janssen's efforts were not limited to directly making misrepresentations through its sales force, speakers bureau, and website.  To avoid regulatory constraints and give its efforts an appearance of independence and objectivity, Janssen obscured its involvement in certain of its marketing activities by "collaborat[ing] with key patient advocacy organizations" to release misleading information about opioids.

i.    *AAPM and AGS – Finding Relief:  Pain Management for Older Adults*

568.    Janssen worked with AAPM and AGS to create a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009).  In doing so, Janssen contracted with

a medical publishing firm, Conrad & Associates, LLC. The content was drafted by a writer ("Medical Writer X") hired by Conrad & Associates and funded by Janssen. These materials were reviewed, in detail, by Janssen's medical-legal review team, which conducted detailed reviews and gave him editorial feedback on his drafts, which was adopted in the published version.

569. Medical Writer X understood, without being explicitly told, that since his work was funded and reviewed by Janssen, the materials he was writing should aim to promote the sale of more drugs by overcoming the reluctance to prescribe or use opioids to treat chronic pain. He knew that the publication was undertaken in connection with the launch of a new drug and was part of its promotional effort. Medical Writer X knew of the drug company sponsoring the publication, and he would go to the company's website to learn about the drug being promoted. He also knew that his clients—including Janssen—would be most satisfied with his work if he emphasized that: (a) even when used long-term, opioids are safe and the risk of addiction is low; (b) opioids are effective for chronic pain; and (c) opioids are under-prescribed because doctors are hesitant, confused, or face other barriers.[184]

570. *Finding Relief* is rife with the deceptive content described above in Sections V.D.2, V.D.6, and V.D.7. *Finding Relief* misrepresents that opioids increase function by featuring a man playing golf on the cover and listing examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. The guide states as a "fact" that "opioids may make it *easier* for

---

[184] Medical Writer X now acknowledges that the lists of adverse effects from chronic opioid use in the publications he authored, which excluded respiratory depression, overdose, and death and minimized addiction, were, "ridiculous" and "prime examples" of leaving out facts that the pharmaceutical company sponsors and KOLs knew at the time were true. His writings repeatedly described the risk of addiction as low. Medical Writer X stated that he understood that the goal was to promote opioids and, as a result, discussing addiction would be "counterproductive."

people to live normally" (emphasis in the original).  The functional claims contained in *Finding Relief* are textbook examples of Defendants' use of third parties to disseminate messages the FDA would not allow them to say themselves.  Compare, e.g.:

| Branded Advertisement That Triggers an FDA Warning Letter (2008)[185] |
|---|
| Improvement in Daily Activities Includes:<br><br>• Walking on a flat surface<br><br>• Standing or sitting<br><br>• Climbing stairs<br><br>• Getting in and out of bed or bath<br><br>• Ability to perform domestic duties. |

with:

| Seemingly Independent Publication: "Finding Relief: Pain Management for Older Adults" (Final Authority, Janssen 2009): |
|---|
| Your recovery will be measured by how well you reach functional goals such as<br><br>• Sleeping without waking from pain<br><br>• Walking more, or with less pain<br><br>• Climbing stairs with less pain<br><br>• Returning to work<br><br>• Enjoying recreational activities<br><br>• Having sex |

---

[185]   This advertisement drew an FDA Warning Letter dated March 24, 2008.  Though the advertisement was by drug company King, it is used here to demonstrate the types of claims that the FDA regarded as unsupported.



571.    *Finding Relief* also trivialized the risks of addiction describing a "myth" that opioids are addictive, and asserting as fact that "[m]any studies show that opioids are *rarely* addictive when used properly for the management of chronic pain."

572.    *Finding Relief* further misrepresented that opioids were safe at high doses by listing dose limitations as "disadvantages" of other pain medicines but omitting any discussion of risks from increased doses of opioids.  The publication also falsely claimed that it is a "myth" that "opioid doses have to be bigger over time."

573.    Finally, *Finding Relief* deceptively overstated the risks associated with alternative forms of treatment.  It juxtaposes the advantages and disadvantages of NSAIDs on one page, with the "myths/facts" of opioids on the facing page.  The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "increase[d] . . . risk of heart attack and stroke."  Conversely, the only adverse effects of opioids listed by *Finding Relief* are "upset stomach or sleepiness," which the brochure claims will go away, and constipation. The guide never mentions addiction, overdose, abuse, or other serious side effects of opioids.

574.    Janssen was not merely a passive sponsor of *Finding Relief*.  Instead, Janssen

exercised control over its content and provided substantial assistance to AGS and AAPM to

distribute it.  A "Copy Review Approval Form" dated October 22, 2008 indicates that key

personnel from Janssen's Advertising & Promotion, Legal, Health Care Compliance, Medical

Affairs, Medical Communications, and Regulatory Departments reviewed and approved *Finding*

*Relief*.  All six Janssen personnel approving the publication checked the box on the approval

form indicating that *Finding Relief* was "Approved With Changes."  After the publication was

modified at the behest of Janssen personnel, Janssen paid to have its sales force distribute 50,000

copies of *Finding Relief* in Chicago and throughout the nation.  Thus, *Finding Relief* is

considered labeling for Janssen's opioids within the meaning of 21 C.F.R. § 1.3(a).

575.    AAPM, which is based in Chicago, purchased and distributed copies of *Finding*

*Relief* to all of its members, including those who reside in its home city.

576.    *Finding Relief's* author, Medical Writer X, later said it was clear, from his perch

at the intersection of science and marketing, that the money paid by drug companies to the KOLs

and professional and patient organizations with which he worked distorted the information

provided to doctors and patients regarding opioids.  The money behind these and many other

"educational" efforts also, he believes, led to a widespread lack of skepticism on the part of

leading physicians about the hazards of opioids.  It also led these physicians to accept without

adequate scrutiny published studies that, while being cited to support the safety of opioids, were,

in fact, of such poor methodological quality that they would not normally be accepted as

adequate scientific evidence.

ii.    *AGS – Misleading Medical Education*

577.    Janssen also worked with the AGS on another project—AGS's CME promoting

the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*.

As described above in Section V.C.2.c.iii, these guidelines falsely claimed that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse" when the study supporting this assertion did not analyze addiction rates by age. They also stated, falsely, that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy (low quality of evidence, strong recommendation)." Based on Janssen's control over AGS's *Finding Relief*, Janssen also would have exercised control over this project as well.

iii.      *APF*

578.    Janssen also worked with APF to carry out its deceptive marketing campaign. Documents obtained from one of Janssen's public relations firms, Ketchum, indicate that Janssen and the firm enlisted APF as part of an effort to "draft media materials and execute [a] launch plan" for Janssen's drugs at an upcoming meeting of the AAPM. Janssen also drew on APF publications to corroborate claims in its own marketing materials and its sales training. Janssen personnel participated in a March 2011 call with APF's "Corporate Roundtable," in which they worked with APF and drug company personnel to develop strategies to promote chronic opioid therapy. In particular, APF personnel spoke with Janssen employees, who "shar[ed] expertise from within their company for [a] public awareness campaign."

579.    Their joint work on the "Corporate Roundtable" demonstrates the close collaboration between Janssen and APF in promoting opioids for the treatment of chronic pain. APF President Will Rowe also reached out to Defendants—including Janssen—rather than his own staff to identify potential authors to draft an answer to an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011. Additional examples of APF's collaboration with Janssen are laid out below:

(a)      Let's Talk Pain

580.　Most prominent among these efforts was the *Let's Talk Pain* website. Janssen sponsored *Let's Talk Pain* in 2009, acting in conjunction with APF, American Academy of Pain Management, and American Society of Pain Management Nursing, whose participation in the website Janssen financed and orchestrated.

581.　Janssen exercised substantial control over the content of the *Let's Talk Pain* website. Janssen's internal communications always referred to *Let's Talk Pain* as promoting tapentadol, the molecule it sold as Nucynta and Nucynta ER. Janssen regarded *Let's Talk Pain* and another website—*Prescriberesponsibly.com*— as integral parts of Nucynta's launch:



Janssen documents also reveal that Janssen personnel viewed APF and AAPM as "coalition members" in the fight to increase market share.

582.　To this end, Janssen and APF entered into a partnership to "keep pain and the importance of responsible pain management top of mind" among prescribers and patients. They agreed to work to reach "target audiences" that included patients, pain management physicians, primary care physicians, and KOLs. One of the roles Janssen assumed in the process was to "[r]eview, provide counsel on, and approve materials." Janssen did in fact review and approve

material for the *Let's Talk Pain* website, as evidenced by the following edits by a Janssen

executive to the transcript of a video that was to appear on the site:



The final version of the video on *Let's Talk Pain* omitted the stricken language above.

583. This review and approval authority extended to the *Let's Talk Pain* website.

Emails between Janssen personnel and a consultant indicate that, even though the *Let's Talk

Pain* website was hosted by APF, Janssen had approval rights over its content. Moreover, emails

describing Janssen's review and approval rights related to *Let's Talk Pain* indicate that this right

extended to "major changes and video additions."

584. As a 2009 Janssen memo conceded, "[t]he *Let's Talk Pain Coalition* is sponsored

by PriCara, a Division of Ortho-McNeil-Janssen Pharmaceuticals, Inc." and "[t]he Coalition and

Pricara **maintain editorial control of all *Let's Talk Pain* materials and publications**"

(emphasis added).

585. A 2011 Consulting Agreement between Janssen and one of APF's employees,

relating to the dissemination of national survey data, demonstrates the near-total control Janssen

was empowered to exercise over APF in connection with the *Let's Talk Pain* website, including

in requiring APF to circulate and post Janssen's promotional content. The agreement required

APF to "participate in status calls between Janssen, APF, AAPM, ASPMN, and Ketchum as requested by Janssen" and required APF to "respond to requests to schedule status calls **within 48 hours** of the request" (emphasis in original). APF also was required to "[r]eview and provide feedback to media materials, including a press release, pitch email, a key messages document, and social media messages, **within one week** of receipt" (emphasis in original).

586. The agreement further required APF to provide a summary of the survey results in APF's PAIN MONITOR e-newsletter, post a link to the survey results on APF's Facebook page, send out tweets related to the survey, serve as a spokesperson available for media interviews, "[s]hare information with any media contacts with whom APF has existing relationships to promote the announcement of the national survey findings," identify at least two patient spokespersons to talk about the survey data, and include the survey results in "any future APF materials, as appropriate." Tellingly, "any ideas made or conceived by [APF] in connection with or during the performance" of the Agreement "shall be the property of, and belong to, [Janssen]."

587. Janssen also exercised its control over *Let's Talk Pain*. Janssen was able to update the *Let's Talk Pain* website to describe its corporate restructuring and Janssen personnel asserted their control over "video additions" by reviewing and editing the interview touting the functional benefits of opioids described above in Section V.D.1. Given its editorial control over the content of *Let's Talk Pain*, Janssen was at all times fully aware of—and fully involved in shaping—the website's content.[186]

588. *Let's Talk Pain* contained a number of the misrepresentations outlined above in Sections V.D.1 and V.D.4.

---

[186] It bears noting that Janssen does not publicly identify its role in creating *Let's Talk Pain*'s content. Instead, *Let's Talk Pain* represents that "coalition members" develop the content that appears on the website and lists Janssen as the only sponsor of that coalition.

589. For example, *Let's Talk Pain* misrepresented that the use of opioids for the treatment of chronic pain would lead patients to regain functionality. *Let's Talk Pain* featured an interview claiming that opioids were what allowed a patient to "continue to function." This video is still available today on YouTube.com and is accessible to Chicago prescribers and patients.

590. *Let's Talk Pain* in 2009 also promoted the concept of pseudoaddiction, which it described as patient behaviors that may occur when *pain is under-treated*" but differs "*from true addiction* because such behaviors can be resolved with effective pain management" (emphasis added). *Let's Talk Pain* was linked to by *the Chicago Tribune Blog* in 2008, where it was available to and was intended to reach Chicago patients and prescribers. The website was in fact viewed by a large number of Chicago readers; according to Internet analysis tools, the *Chicago Tribune* post was the second-leading driver of traffic to *Let's Talk Pain*.

(b)     Exit Wounds

591. Janssen also engaged in other promotional projects with and through APF. One such project was the publication and distribution of *Exit Wounds*, which, as described above in Section V.D, deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain. *Exit Wounds* was drafted by "Medical Writer X." It is fully representative of his work on behalf of drug companies.

592. Janssen gave APF substantial assistance in distributing *Exit Wounds* in Chicago and throughout the nation by providing grant money and other resources.

593. APF mailed copies of *Exit Wounds* to the "Wounded Heroes Foundation" in Chicago. The Wounded Heroes Foundation is an organization designed to support the injured men and women who have served the United States in Iraq, Afghanistan and around the world.

Unfortunately, by distributing *Exit Wounds* to its members, it distributed Defendants' deceptive statements about the appropriateness of opioid therapy to treat chronic pain.

        c.    <u>Janssen's Deceptive Statements to Chicago Prescribers and Patients</u>

594.    Janssen also directed the misstatements described above to Chicago patients and prescribers, including through CMEs, its sales force, and recruited physician speakers.

        i.    Janssen's Deceptive Medical Education Programs in Chicago

595.    Janssen sponsored CMEs and talks attended by Chicago prescribers. From 2009 to 2013, Janssen spent over $195,000 on 103 speakers bureau programs in Cook County, retaining 27 different physicians as speakers (including four of the top six Nucynta prescribers in Chicago) who gave talks with more than 1,000 attendees. Janssen also budgeted significant resources for live speaker programs around the national launch of Nucynta ER, with $1 million in training and $3.75 million for the events in 2012 alone. One such program, "New Perspectives in the Management of Moderate to Severe Chronic Pain," which was given 33 times to Chicago prescribers over 2011 and 2012, deceptively minimized the adverse events associated with chronic opioid therapy and concealed the risks of withdrawal by stating that 86% of "subjects taking Nucynta ER who stopped abruptly without initiating alternative opioid therapy experienced no withdrawal symptoms whatsoever.

596.    Speakers on Janssen's bureau were among the more prolific prescribers of Janssen's opioids. PRESCRIBER R received $36,845 in payments from Johnson & Johnson from 2011-2013, and wrote prescriptions for Janssen's opioids to Chicago-area patients. PRESCRIBER CC received $8,250 in speaking fees for 2010, and wrote prescriptions for Nucynta and Nucynta ER to Chicago-area patients. These doctors were trained by Janssen and thus were exposed to the same misrepresentations disseminated to other doctors. Further, the

benefits of speaking on behalf of Janssen gave them a powerful incentive to continue to prescribe Janssen's opioids.

597.    Documents also indicate that more than 200 people attended speaking engagements in Chicago put on by Janssen on or before March 1, 2012 through its "Meetings Direct" program.  These talks were billed as a "peer-to-peer" program aimed to influence physicians and "[e]stablish . . . Nucynta ER as [the] new standard  . . . in moderate-to-severe . . . pain management."  Based on the uniform and nationwide character of Janssen's marketing campaign, the speakers at these events would have delivered talks from slide decks provided by Janssen, consistent with the key deceptive messages described above in Section V.E.4.a.ii.

ii.        Janssen's Deceptive Detailing Practices in Chicago

598.    Janssen documents indicate that the company specifically tested the impact of its marketing messages in Chicago.  Internal Janssen "Target Lists" identify hundreds of doctors in the Chicago area and track their Nucynta prescribing habits.  By way of one example, a spreadsheet titled "HCP's TARGETED BY PAIN CSO SALES FORCE IN 2013" lists 205 doctors targeted in Chicago and assigns a specific sales representative to cover each one of them.  Janssen's documents tracked specific prescribers by decile of prescribing volume.  According to one document, 37 doctors were targeted to be visited a total of 185 times in 2013.

599.    The experiences of specific prescribers confirm both that Janssen's national marketing campaign included the misrepresentations described above in Sections V.D and V.E.4, and that the company disseminated these same misrepresentations to Chicago prescribers and consumers.  In particular, these prescriber accounts reflect that Janssen detailers claimed that

Nucynta was "not an opioid" because it worked on an "alternate receptor";[187] claimed that Janssen's drugs would be less problematic for patients because they had anti-abuse properties and were "steady state"; claimed that patients on Janssen's drugs were less susceptible to withdrawal; omitted or minimized the risk of opioid addiction; claimed or implied that opioids were safer than NSAIDs; and overstated the benefits of opioids, including by making claims of improved function.

600.    A survey of a sample of Midwestern physicians, who reported the messages that they retained from detailing visits detailing visits and other promotional activity, documented that Janssen sales representatives promoting Duragesic made claims to Midwestern prescribers that Duragesic improves physical function, at least from 2006 to 2010. They also misrepresented the likelihood of abuse associated with Janssen's drugs. For example, they falsely told a Midwestern orthopedic surgeon in 2013 that Duragesic had anti-abuse properties. The same survey indicates that, between 2009 and 2012, Nucynta and Nucynta ER sales representatives repeatedly promoted these drugs as less addictive than other opioids. For example, Janssen sales representatives described Nucynta as "not an opioid" to one Midwestern internist at least twice in 2010. Similarly, a sales representative told a Midwestern physician that Nucynta was "non-opioid yet opioid like" in 2011.

601.    In addition, the City has interviewed a number of Chicago-area prescribers who reported that they were detailed by Janssen sales representatives and heard similar claims, as well as other messages described in Sections V.D and V.E.4. In each instance, Janssen intended that the prescriber rely on these messages. Most of these physicians did, in fact, prescribe

---

[187]   The FDA-approved labels for both Nucynta and Nucynta ER describe the tapentadol molecule as an "opioid agonist and a Schedule II controlled substance that can be abused in a manner similar to other opioid agonists, legal or illicit."

Janssen's opioids. Exhibit D to this Fifth Amended Complaint summarizes data showing the

number of prescriptions, doses, and MME by Defendant family from IQVIA Xponent for the

year 1997-2017 for these prescribers:

    a.  Chicago Prescriber C, a pain specialist, is based in Wisconsin but treats Chicago residents. In their meetings with him, sales representatives from each Defendant, including Janssen, routinely omitted any discussion about addiction and overdose death and frequently overstated the benefits of opioids. These representatives taught that opioids would increase his patients' ability to function and increase their quality of life. Janssen's sales representatives also falsely stated that Nucynta was not being abused. Prescriber C was detailed at four meals paid for by Janssen on August 5, 2013; August 13, 2013; May 9, 2014; and July 21, 2014.[188] ███████████████████████
███████████████████████████████████████
███████████████████████

    b.  Chicago Prescriber S, a nurse practitioner who is based in Indiana but wrote opioid prescriptions to a number of City employees, was visited frequently by Janssen representatives and was told by opioid sales representatives, including representatives from Janssen, that opioids would improve her patients' function, and allow them to be increasingly physically active and return to work. Prescriber S prescribed opioids, including Defendants' drugs and Janssen's opioids in particular, to local patients.

    c.  Chicago Prescriber D was visited by opioid sales representatives from Purdue, Endo, Janssen, and Actavis. He relied on the representations made by these sales representatives and, in the past, had not comprehended the true addictive potential of opioids. Representatives from each of these companies told Prescriber X that their drugs were "steady state," which he interpreted to mean that they were less addictive. Prescriber D prescribed opioids, including Defendants' drugs. ███████████████
███████████████████████████████████████

    d.  Chicago Prescriber G, who served on Janssen's speakers bureau from 2009 to 2012, indicated that he was visited by sales

---

[188] Pursuant to a 2010 Corporate Integrity Agreement with the Office of the Inspector General of the U.S. Department of Justice, the yearly value of payments by Johnson & Johnson to prescribers is made public, but without information about which particular drug was being promoted.

representatives from all Defendants, including Janssen. He recalled that he was never warned about the risk of addiction. According to Prescriber G, opioid sales representatives—including those employed by Defendant Janssen—represented that opioids would increase patients' ability to complete activities of daily living and that patients could be managed to avoid addiction. These representatives also told him that patients can be screened to mitigate addiction risks. Prescriber G prescribed opioids, including Defendants', to local patients This prescriber met with Janssen sales representatives over meals on five separate occasions from October 2013 through August 2014. Prescriber G also received $1,085 in unspecified speaking fees and for meals in 2011 from Johnson & Johnson, and $10,232 in speaking fees, meals, and travel in 2012.

e.  Chicago Prescriber B, an anesthesiologist, sees opioid drug company representatives on a regular basis, and he has seen representatives from Janssen. These representatives pushed the message that "steady-state" drugs have less potential for abuse. Representatives from opioid manufacturers, including Janssen, have told him that opioids improved patient function and quality of life. He relies on the representations made by drug company representatives because he does not have the time to conduct his own research. Prescriber B prescribed opioids, including Defendants' drugs and Janssen's opioids in particular, to local patients. █████████████████████████████ ███████████████████████████████████ ████████████████████████

f.  Chicago Prescriber H, a podiatrist, was aggressively detailed by Janssen sales representatives, who called on him once or twice a month. These representatives told Prescriber H that Janssen's drugs were less susceptible to withdrawal then their competitors and never discussed the risk of addiction. Janssen documents indicate that Prescriber H was detailed 57 times between March 2010 and December 2012. According to Janssen "call notes"—written notes by detailers reflecting their discussions with individual prescribers during sales visits—Prescriber H told a detailer that "if he doesn't have to worry about withdrawal problems . . . he would like to start a patient as soon as possible" on Nucynta. Prescriber H prescribed opioids to local patients.

g.  Chicago Prescriber J, a nurse practitioner, indicated that she was visited (or sat in on visits) by sales representatives from Defendants Purdue, Cephalon, Janssen, and Actavis. Drug representatives from these Defendants, including Defendant Janssen, never mentioned the risks of addiction from opioid use.

Janssen sales representatives also told Prescriber J that their drugs were "steady state." Prescriber J prescribed opioids, including Defendants' to local patients, including at least one Janssen opioid prescription.

h. Chicago Prescriber Z, a pain specialist, indicated that he was visited by sales representatives from Defendants Purdue and Janssen. These sales representatives never discussed the risks of addiction associated with their opioids, and they frequently referenced studies their company had sponsored. Prescriber Z prescribed opioids, including Defendants' drugs to local patients, including at least one Janssen opioid prescription. ████
████████████████████████████████████████
████████████████████████████████████

i. Chicago Prescriber AA indicated that she was visited by sales representatives from Defendant Janssen. She was detailed by this sales representative once a month for 6 months to a year. This sales representative marketed Nucynta to Prescriber AA, but not as an opioid. Instead, Prescriber AA was told that Nucynta was an alternative to opioid therapy and that it worked on an alternate receptor. This sales representative explained that Nucynta would be appropriate for chronic pain patients who were unable to continue opioid therapy due to excessive side effects. This sales representative also stated that Nucynta didn't have a risk of addiction, unlike opioids, and that it would improve her patients' function. Prescriber AA prescribed opioids, including Defendants' drugs to local patients. ████
████████████████████████████████████████
████████████████████████████████████

j. Chicago Prescriber T indicated that he was visited by sales representatives from Defendants Purdue, Endo, and Janssen. Janssen sales representatives told him that Nucynta would improve his patients' ability to function. Janssen sales representatives never mentioned the risks of addiction associated with Janssen's drugs. Prescriber T prescribed opioids to local patients.

k. Chicago Prescriber PP indicated that he was visited by sales representatives from Janssen. Janssen sales representatives told him that Nucynta would improve his patients' ability to function because once pain is under control, the patient can "get out and be more active." Janssen sales representatives also warned Prescriber PP about the risks of NSAIDs, which included gastrointestinal bleeding, and suggested that Nucynta could be an appropriate option if NSAIDs did not work. Prescriber H

prescribed opioids, including Defendants' drugs and Janssen's
opioids in particular, to local patients. ███████████████
███████████████

602.    These accounts reflect specific examples of instances in which Janssen's sales
representatives made the misrepresentations outlined above in Sections V.D and V.E.4 directly
to Chicago prescribers.  They are not an exhaustive list.  Based on the nationwide and uniform
character of Janssen's marketing campaign, these examples support the inference that Janssen
sales representatives made similar misstatements to the other Chicago-area prescribers they
detailed.

603.    The Chicago prescriber most commonly visited by Janssen was Chicago
Prescriber R, whom Janssen visited 231 times between August 2009 and May 2013.  Prescriber
R has written at least hundreds of opioid prescriptions to local patients, and likely more.  These
prescriptions include prescriptions for Janssen's opioids.  Prescriber R's opioid prescribing
steadily increased over time. Documents of another Defendant, Actavis, place Prescriber R in the
ninth decile of Nucnyta/Nucynta ER prescriber volume.

604.    Prescriber R received significant funding from Janssen to promote Nucynta and
Nucynta ER.  Between 2011 and 2012, Prescriber R gave 11 talks in Chicago, reaching 142
prescribers and for which he received $13.626.17.  His total funding from Janssen was $13,422
in 2011, $17,423 in 2012, $15,000 in 2013, and $8,777 in 2014.

605.    Janssen also detailed a number of other prescribers who wrote prescriptions paid
for by the City.  Chicago Prescriber BB received 3 meals from Janssen on August 14, October 1,
and November 4. 2013, which would have included talks by Janssen sales representatives.

606.    While these individual doctors allow the City to describe, in retrospect, the link
between Janssen's deceptive marketing and claims paid by the City, Janssen tracked this

information on a real-time basis. Janssen monitored the impact of its details, and knew that they made a difference. A "Pain Briefing Marketing Plan" that breaks down the total volume of Nucynta prescriptions by region indicates that prescriptions written in Chicago had increased by nearly 25% in the eight weeks preceding July 20, 2012.

### 5. Mallinckrodt

607. As described below, Mallinckrodt promoted its branded opioids Exalgo and Xartemis XR, and opioids generally, in a campaign that consistently mischaracterized the risk of addiction and made deceptive claims about functional improvement. Mallinckrodt did so through a broad array of marketing channels, including its website, sales force, and unbranded communications, such as those distributed through the "C.A.R.E.S. Alliance" it created and led.

608. Based on the highly coordinated and uniform nature of Mallinckrodt's marketing, and as confirmed by verbatim message data and interviews with prescribers, Mallinckrodt conveyed these deceptive messages to Chicago prescribers. The materials that Mallinckrodt generated were distributed or made available in Chicago. Mallinckrodt distributed these messages, or facilitated their distribution, in Chicago with the intent that Chicago prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

a. Mallinckrodt's Deceptive Direct Marketing

609. Mallinckrodt disseminated the misstatements described above through its sales representatives and unbranded marketing.

610. Mallinckrodt in 2010 created the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance, which it describes as "a coalition of national patient safety, provider and drug diversion organizations that are focused on reducing opioid pain medication abuse and increasing responsible prescribing habits." Mallinckrodt describes C.A.R.E.S as its own advocacy program, and promised "[t]hrough the C.A.R.E.S. Alliance

website, prescribers and pharmacists can access tools and resources to assist them in managing the risks of opioid pain medications, and patients can find information designed to help them better manage their pain and understand the responsible use of the medications they take."

611.    The C.A.R.E.S. Alliance publicly describes itself as "[c]reated with leading pain experts through a scientific process" and offering "free resources" to "promote safe prescribing, dispensing, use, storage, and disposal" of opioid pain medications.  It further described the "safe-use programs and voluntary tools" it developed as "grounded in science and research."  The "C.A.R.E.S. Alliance" itself is a service mark of Mallinckrodt LLC (and was previously a service mark of Mallinckrodt, Inc.) copyrighted and registered as a trademark by Covidien, its former parent company.  Materials distributed by the C.A.R.E.S. Alliance, however, include unbranded publications that do not disclose a link to Mallinckrodt.

612.    By 2012, Mallinckrodt, through the C.A.R.E.S. Alliance, was promoting a book titled *Defeat Chronic Pain Now!*.  This book is still available online in Chicago and elsewhere.  The false claims and misrepresentations in this book include the following statements:

- "Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

- "[O]pioid medication may also significantly relieve many patients' chronic pain.  Over the past decade, lots of good scientific studies have shown that long-acting opioids can reduce the pain in some patients with low back pain, neuropathic pain, and arthritis pain."

- "It is currently recommended that every chronic pain patient suffering from moderate to severe pain be viewed as a potential candidate for opioid therapy."

- "[P]hysical dependence . . . is a normal bodily reaction that happens with lots of different types of medications, including medications not used for pain, and is easily remedied."

- "When chronic pain patients take opioids to treat their pain, they rarely develop a true addiction and drug craving."

- "[I]n our experience, the issue of tolerance is overblown."

- "Only a minority of chronic pain patients who are taking long-term opioids develop tolerance."

- "**The bottom line:** Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

- "Here are the facts. It is very uncommon for a person with chronic pain to become 'addicted' to narcotics IF (1) he doesn't have a prior history of any addiction and (2) he only takes the medication to treat pain."

- "Studies have shown that many chronic pain patients can experience significant pain relief with tolerable side effects from opioid narcotic medication when taken daily and no addiction."

613. Mallinckrodt's former parent Company, Covidien, published a patient resource, "Opioid Safe Use and Handling Guide," which stated that: "Addiction does not often develop when taking opioid pain medicine as prescribed under the guidance of a healthcare provider, but it can occur;" and "Taking more than your prescribed amount of medication to treat your pain is not the same as addiction, but it can be very dangerous."

b. Mallinckrodt's Deceptive Statements to Chicago Prescribers and Patients

614. A survey of a sample of Midwestern physicians, who reported the "verbatim" messages that they retained from detailing visits and other promotional activity, documented that Mallinckrodt sales representatives promoted Exalgo because of its "safety" in 2012. In 2011, a sales representative marketed Exalgo to a Midwestern physicians' assistant on the basis that Exalgo had less potential for abuse or diversion. Further, one Midwestern physicians' assistant in 2013 reported being told that Exalgo had steady-state properties, the implication of which was

that the drug did not produce a rush or euphoric effect, and therefore was less addictive and less likely to be abused.

615.    In addition, the City has interviewed a number of Chicago-area prescribers who reported that they were detailed by Mallinckrodt sales representatives and heard similar claims, as well as other messages described in Sections V.D and V.E.5.a.  In each instance, Mallinckrodt intended that the prescriber rely on these messages.  Most of these physicians did, in fact, prescribe Mallinckrodt's opioids.  Exhibit D to this Fifth Amended Complaint summarizes data showing the number of prescriptions, doses, and MME by Defendant family from IQVIA Xponent for the year 1997-2017 for these prescribers.

- Chicago Prescriber E was detailed by sales representatives for Exalgo, and Mallinckrodt's primary message was that its drugs were effective for long-term use.  No representatives from Mallinckrodt ever discussed the risks of addiction. ██████████████████████████████ ██████████████████████████████████████ ████████████████

- Chicago Prescriber Z was detailed by sales representatives for Exalgo, and they falsely told him it was abuse-deterrent, when Exalgo has not received approval to be marketed as abuse-deterrent. ██████████████ ████████████████████████████████████████ ████████████████████████████

616.    These accounts reflect specific examples of instances in which Mallinckrodt's sales representatives made the misrepresentations outlined above in Sections V.D and V.E.5.a directly to Chicago prescribers.  They are not an exhaustive list.  Based on the nationwide and uniform character of Mallinckrodt's marketing campaign, these examples support the inference that Mallinckrodt sales representatives made similar misstatements to the other Chicago-area prescribers they detailed.

**6.    Purdue**

617.    Purdue promoted its branded opioids—principally, Oxycontin, Butrans, and Hysingla—and opioids generally in a campaign that consistently mischaracterized the risk of addiction and made deceptive claims about functional improvement.  Purdue did so through its sales force, branded advertisements, promotional materials, and speakers, as well as a host of materials produced by its third-party partners, most prominently APF.  Purdue's sales representatives and advertising also misleadingly implied that OxyContin provides a full 12 hours of pain relief, and its allied Front Groups and KOLs conveyed the additional deceptive messages about opioids' safety at higher doses, the safety of alternative therapies, and the effectiveness of addiction screening tools.

618.    Based on the highly coordinated and uniform nature of Purdue's marketing, and as confirmed by verbatim message data and interviews with prescribers, Purdue conveyed these deceptive messages to Chicago prescribers.  The materials that Purdue generated in collaboration with third parties also were distributed or made available in Chicago.  Purdue distributed these messages, or facilitated their distribution, in Chicago with the intent that Chicago prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

            a.    Purdue's Deceptive Direct Marketing

619.    Like the other Defendants, Purdue directly disseminated deceptive branded and unbranded marketing focused on minimizing the risks associated with the long-term use of opioids to treat chronic pain.  Purdue directed these messages to prescribers and consumers through its sales force and branded advertisements.

620.    Purdue engaged in in-person marketing to doctors in Chicago and operated speakers bureau programs that included and targeted Chicago prescribers.  Purdue had 250 sales representatives in 2007, of whom 150 were devoted to promoting sales of OxyContin full time. Like the other Defendants' detailers, Purdue sales representatives visited targeted physicians to

deliver sales messages that were developed centrally and deployed, identically, across the country. These sales representatives were critical in delivering Purdue's marketing strategies and talking points to individual prescribers. [189] Indeed, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines, which as discussed above in Section V.C.2.C.ii deceptively concluded that the risk of addiction is manageable for patients regardless of past abuse histories, with doctors during individual sales visits.

621. Purdue's spending on detailing reached its nadir in 2006 and 2007, as the company faced civil and criminal charges for misbranding OxyContin. Since settling those charges in 2007, however, Purdue has sharply increased its quarterly spending on promotion through its sales force, from under $5 million in 2007 to more than $30 million by the end of 2014.

622. Purdue also marketed its drugs through branded advertisements, which relied on, among other deceptive tactics, misleading statements about the efficacy and onset of OxyContin. As described above in Section V.D.8, Purdue has marketed its drug as effective for 12 hours. Purdue knew, however, that these claims were misleading because, for many patients, the pain relief lasted for as little as eight hours, which led to end-of-dose failure and withdrawal symptoms and prompted doctors to prescribe or patients to take higher or more frequent doses of opioids, all of which increased the risk of abuse and addiction.

623. For example, a "Conversion and Titration Guide" submitted to the FDA and distributed to physicians by Purdue, prominently referred to "Q12h OxyContin Tablets,"

---

[189] But Purdue did not stop there. It also tracked around 1,800 doctors whose prescribing patterns demonstrated a probability that they were writing opioid prescriptions for addicts and drug dealers. Purdue kept the program secret for nine years and, when it finally did report information about these suspicious doctors to law enforcement authorities, it only did so with respect to 8% of them.

meaning that each tablet is intended to "offer your patient every-twelve-hour dosing." Other marketing materials directed at physicians and disseminated across the country in 2006 touted that OxyContin's "12-hour AcroContin Delivery System" is "designed to deliver oxycodone over 12 hours," which offered patients "life with Q12H relief." Those same marketing materials included a timeline graphic with little white paper pill cups only at "8AM" and, further down the line, at "8PM." They also proclaimed that OxyContin provides "Consistent Plasma Levels Over 12 Hours" and set forth charts demonstrating absorption measured on a logarithmic scale, which fraudulently made it appear levels of oxycodone in the bloodstream slowly taper over a 12 hour time period.

624. Purdue advertisements that ran in 2005 and 2006 issues of the *Journal of Pain* depict a sample prescription for OxyContin with "Q12h" handwritten. Another advertisement Purdue ran in 2005 in the *Journal of Pain* touted OxyContin's "Q12h dosing convenience" and displayed two paper dosing cups, one labeled "8 am" and one labeled "8 pm," implying that OxyContin is effective for the 12 hour period between 8 a.m. and 8 p.m. Similar ads appeared in the March 2005 *Clinical Journal of Pain*.

625. Further, to this day, Purdue includes prominent 12-hour dosing instructions in its branded advertising, such as in a 2012 Conversion and Titration Guide, which states: "Because each patient's treatment is personal / Individualize the dose / Q12h OxyContin Tablets."

626. As outlined above in Section V.D.8, however, these statements are misleading because they fail to make clear that a 12 hour dose does not equate to 12 hours of pain relief. Nevertheless, Purdue's direct marketing materials have misleadingly claimed OxyContin offers 12 hour "dosing convenience."

627.     As described below, these deceptive statements regarding the efficacy of OxyContin were also carried into Chicago by Purdue's detailers.

628.     Purdue's direct marketing materials also misrepresented that opioids would help patients regain functionality and make it easier for them to conduct everyday tasks like walking, working, and exercising.

629.     For example, in 2012, Purdue disseminated a mailer to doctors titled "Pain vignettes." These "vignettes" consisted of case studies describing patients with pain conditions that persisted over a span of several months. One such patient, "Paul," is described to be a "54-year-old writer with osteoarthritis of the hands," and the vignettes imply that an OxyContin prescription will help him work. None of these ads, however, disclosed the truth—that there is no evidence that opioids improve patients' lives and ability to function (and there was substantial evidence to the contrary).

630.     Some of the greatest weapons in Purdue's arsenal, however, were unbranded materials it directly funded and authored. These were in addition to the unbranded materials, described below, that Purdue channeled through third parties.

631.     In 2011, Purdue published a prescriber and law enforcement education pamphlet titled *Providing Relief, Preventing Abuse*, which deceptively portrayed the signs—and therefore the prevalence—of addiction. However, Purdue knew, as described above in Section V.D.2, that OxyContin was used non-medically by injection less than less than 17% of the time. Yet, *Providing Relief, Preventing Abuse* prominently listed side effects of injection like skin popping and track marks as "Indications of Possible Drug Abuse"—downplaying much more prevalent signs of addiction associated with OxyContin use, such as asking for early refills, and making it seem that addiction only occurs when opioids are taken illicitly.

632. *Providing Relief, Preventing Abuse* also deceptively camouflaged the risk of addiction by falsely supporting the idea that drug-seeking behavior could, in fact, be a sign of "pseudoaddiction" rather than addiction itself. Specifically, it noted that the concept of pseudoaddiction had "emerged in the literature" to describe "[drug-seeking behaviors] in patients who have pain that has not been effectively treated." Nowhere in *Providing Relief, Preventing Abuse* did Purdue disclose the lack of scientific evidence justifying the concept of pseudoaddiction, nor that it was coined by a Purdue vice president.

633. *Providing Relief, Preventing Abuse* was available nationally and was intended to reach Chicago prescribers. As described below, the deceptive statements in *Providing Relief, Preventing Abuse* regarding addiction were the very same messages Purdue directed at Chicago prescribers through its sales force.

634. Purdue also disseminated misrepresentations through two of its unbranded websites, *In the Face of Pain* and *Partners Against Pain*.

635. Consistent with Purdue's efforts to portray opioid treatment as "essential" for the proper treatment of chronic pain and label skepticism related to chronic opioid therapy as an "inadequate understanding" that leads to "inadequate pain control," *In the Face of Pain* criticized policies that limited access to opioids as being "at odds with best medical practices" and encouraged patients to be "persistent" in finding doctors who will treat their pain. This was meant to imply that patients should keep looking until they find a doctor willing to prescribe opioids.

636. *In the Face of Pain* was available nationally and was intended to reach Chicago prescribers.

637.     Purdue also used its unbranded website *Partners Against Pain* to promote the same deceptive messages regarding risk of addiction that are described in Section V.D.2 and delivered by its sales representatives.  On this website, Purdue posted *Clinical Issues in Opioid Prescribing*, a pamphlet that was copyrighted in 2005.  Purdue distributed a hard-copy version of this pamphlet at least as of November 2006.  *Clinical Issues in Opioid Prescribing* claimed that "illicit drug use and deception" were not indicia of addiction, but rather indications that a patient's pain was undertreated.  The publication indicated that "[p]seudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated."  In other words, Purdue suggested that when faced with drug-seeking behavior from their patients, doctors should prescribe more opioids—turning evidence of addiction into an excuse to sell and prescribe even more drugs.

638.     Purdue's misleading messages and materials were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives.  This deception was national in scope and included Chicago.  As described in Section V.B.2 above, Purdue's nationwide messages would have reached Chicago prescribers in a number of ways.  For example, they were carried into Chicago by Purdue's sales representatives during detailing visits as well as made available to Chicago patients and prescribers through websites and ads, including ads in prominent medical journals.  They would have also been delivered to Chicago prescribers by Purdue's paid speakers, who were required by Purdue policy and by FDA regulations to stay true to Purdue's nationwide messaging.

          b.     Purdue's Deceptive Third-Party Statements

639.     Purdue's efforts were not limited to making misrepresentations through its own sales force and its own branded and unbranded marketing materials.  As described above, Purdue knew that regulatory constraints restricted what it was able to say about its drugs through direct

marketing.  For this reason, like the other Defendants, Purdue enlisted the help of third parties to release misleading information about opioids.  The most prominent of these was APF.

> i.    *APF*

> (a)    Purdue's Control of APF

640.    Purdue exercised considerable control over APF, which published and disseminated in many of the most blatant falsehoods regarding chronic opioid therapy.  Their relationship, and several of the APF publications, is described in detail below.

641.    Purdue exercised its dominance over APF over many projects and years.  Purdue was APF's second-biggest donor, with donations totaling $1.7 million.  Purdue informed APF that the grant money reflected Purdue's effort to "strategically align its investments in nonprofit organizations that share [its] business interests," making clear that Purdue's funding depended upon APF continuing to support Purdue's business interests.  Indeed, Purdue personnel participated in a March 2011 call with APF's "Corporate Roundtable," where they suggested that APF "[s]end ambassadors to talk about pain within companies and hospitals."  Thus, Purdue suggested what role APF could play that would complement its own marketing efforts.  On that call, Purdue personnel also committed to provide APF with a list of "industry state advocates" who could help promote chronic opioid therapy, individuals and groups that, upon information and belief, APF reached out to.  Purdue personnel remained in constant contact with their counterparts at APF.

642.    This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives.  Purdue and APF entered into a "Master Consulting Services" Agreement on September 14, 2011.  That agreement gave Purdue substantial rights to control APF's work related to a specific promotional project.  Moreover, based on the assignment of particular Purdue "contacts" for each project and APF's

periodic reporting on their progress, the agreement enabled Purdue to be regularly aware of the misrepresentations APF was disseminating regarding the use of opioids to treat chronic pain in connection with that project. The agreement gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason. Even for projects not produced during the terms of this Agreement, the Agreement demonstrates APF's lack of independence and willingness to harness itself to Purdue's control and commercial interests, which would have carried across all of APF's work.

643. Purdue used this agreement to conduct work with APF on the *Partners Against Pain* website. *Partners Against Pain* is a Purdue-branded site, and Purdue holds the copyright. However, its ability to deploy APF on this project illustrates the degree of control Purdue exercised over APF. In 2011, it hired an APF employee to consult on the *Partners Against Pain* rollout, to orchestrate the media campaign associated with the launch of certain content on the website, and to make public appearances promoting the website along with a celebrity spokesperson. Purdue contemplated paying this consultant $7,500 in fees and expenses for 26 hours of work. Purdue would require this consultant to "to discuss and rehearse the delivery of [Purdue's] campaign messages" and Purdue committed that "[m]essage points will be provided to [the] Consultant in advance and discussed on [a planned] call." At all times, decisions regarding the final content on the *Partners Against Pain* website were "at the sole discretion of Purdue."

644. APF also volunteered to supply one of its staff (a medical doctor or a nurse practitioner) to assist Purdue as a consultant and spokesperson in connection with the launch of one of Purdue's opioid-related projects, *Understanding & Coping with Lower Back Pain*, which appeared on *Partners Against Pain*. One of the consultants was APF's paid employee, Mickie

Brown.  The consultant's services would be provided in return for a $10,000 in consulting fees for APF and $1,500 in honoraria for the spokesperson.  All documents used by the consultant in her media appearances would be reviewed and approved by individuals working for Purdue. Purdue initiated this project, and it was not until later that APF worried about "how Purdue sees this program fitting in with our [existing] grant request."

645.    Given the financial and reputational incentives associated with assisting Purdue in this project and the direct contractual relationship and editorial oversight, APF personnel were acting under Purdue's control at all relevant times with respect to *Partners Against Pain*.

646.    Purdue often asked APF to provide "patient representatives" for *Partners against Pain*, and APF fulfilled these requests.  Moreover, APF staff and board members and Front Groups ACPA and AAPM, among others (such as Dr. Webster), appear on *Inthefaceofpain.com* as "Voices of Hope"—"champions passionate about making a difference in the lives of people who live with pain" and providing "inspiration and encouragement" to pain patients.  APF also contracted with Purdue for a project on back pain where, among other things, it provided a patient representative who agreed to attend a Purdue-run "media training session."

647.    According to an Assurance of Voluntary Compliance ("AVC") entered into between the New York Attorney General and Purdue Pharma on August 19, 2015, *Inthefaceofpain.com* received 251,648 page views between March 2014 and March 2015. Except in one document linked to the website, *Inthefaceofpain.com* makes no mention of opioid abuse or addiction.  Purdue's copyright appears at the bottom of each page of the website, indicating its ownership and control of its content.  There is no other indication that 11 of the individuals who provided testimonials on *Inthefaceofpain.com* received payments, according to the AVC, of $231,000 for their participation in speakers programs, advisory meetings and travel

costs between 2008 and 2013.  Therefore, the New York Attorney General found Purdue's failure to disclose its financial connections with these individuals had the potential to mislead consumers by failing to disclose the potential bias of these individuals.

648.    Nowhere was Purdue's influence over APF so pronounced as it was with the APF's "Pain Care Forum" ("PCF").  Based on interviews conducted and documents reviewed by the City, PCF was and continues to be run not by APF, but by Defendant Purdue's in-house lobbyist, Burt Rosen.  As described by a former drug company employee , Burt Rosen was able to tell PCF "what to do and how to do it," and also asserted that this allowed him to run APF.  According to this employee, to Rosen's thinking, "PCF was APF, which was Purdue."  The group meets regularly in-person and via teleconference and shares information through an email listserv.

649.    In 2011, APF and another third-party advocacy group, the Center for Practical Bioethics, were contemplating working together on a project.  Having reviewed a draft document provided by the Center for Practical Bioethics, the APF employee cautioned that "this effort will be in cooperation with the efforts of the PCF" and acknowledged that "I know you have reservations about the PCF and pharma involvement, but I do believe working with them and keeping the lines of communications open is important."  The Center for Practical Bioethics CEO responded by indicating some confusion about whom to speak with, asking  "[i]s Burt Rosen the official leader" and reflecting what other sources have confirmed.

650.    In 2007, the PCF Education Subgroup, consisting of drug companies Purdue and Alpharma, and Front Groups APF and ACPA (self-described as "industry-funded" groups), developed a plan to address a perceived "lack of coordination" among the industry and pro-opioid professional and patient organizations.  PCF members agreed to develop simplified "key"

messages" to use for public education purposes. Their messages were reflected in programs like NIPC's *Let's Talk Pain* (put together by Endo and APF), and Purdue's *In the Face of Pain*.

651. When the FDA required drug companies to fund CMEs related to opioid risks in connection with its 2009 REMS, Purdue, along with these Front Groups, worked through the PCF to ensure that, although it was mandatory for drug companies to fund these CMEs, it would not be mandatory for prescribers to attend them. A survey was circulated among Defendants Endo, Janssen, and Purdue, which predicted that the rates of doctors who would prescribe opioids for chronic pain would fall by 13% if more than four hours of mandatory patient education were required in connection with the REMS. With a push from PCF, acting under Purdue's direction, they were not.

652. APF showed its indebtedness to Purdue and its willingness to serve its corporate agenda by testifying on the company's behalf at a July 2007 hearing before the Senate Judiciary Committee "evaluating the propriety and adequacy of the OxyContin criminal settlement."[190] Despite its ostensible role as a patient advocacy organization, APF was willing to overlook substantial evidence—resulting in the jailing of Purdue executives—that Purdue blatantly, and despite its clear knowledge to the contrary, told physicians and patients that OxyContin was "rarely" addictive and less addictive than other opioids. Like Purdue and despite the leadership of numerous medical doctors and researchers on its board, APF ignored the truth about opioids and parroted Purdue's deceptive messaging. Purdue testified on Purdue's behalf that addiction

---

[190] *Evaluating the Propriety and Adequacy of the Oxycontin Criminal Settlement: Before the S. Comm. On the Judiciary*, 110th Cong. 46-50, 110-116 (2007) (statements of Dr. James Campbell, Chairman, APF). Purdue also was able to exert control over APF through its relationships with APF's leadership. Purdue-sponsored KOLs Russell Portenoy and Scott Fishman chaired APF's board. Another APF board member, Perry Fine, also received consulting fees from Purdue. APF board member Lisa Weiss was an employee of a public relations firm that worked for both Purdue and APF. Weiss, in her dual capacity, helped vet the content of the Purdue-sponsored *Policymaker's Guide*, which is described below.

was a "rare problem" for chronic pain patients and asserted: "[T]he scientific evidence suggests that addiction to opioids prescribed by legitimate chronic non-cancer pain patients without prior histories of substance abuse using the medication as directed is rare. Furthermore, no causal effect has been demonstrated between the marketing of OxyContin and the abuse and diversion of the drug." There was, and is, no scientific support for those statements.

653. APF President Will Rowe reached out to Defendants—including Purdue—rather than his own staff to identify potential authors to draft an answer to an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011.

654. Purdue's control over APF shaped and was demonstrated by specific APF, pro-opioid publications. These publications had no basis in science and were driven (and can only be explained) by the commercial interest of pharmaceutical companies—Purdue chief among them.

(b) *A Policymaker's Guide*

655. Purdue provided significant funding to and was involved with APF in creating and disseminating *A Policymaker's Guide to Understanding Pain & Its Management*, which was originally published in 2011. *A Policymaker's Guide to Understanding Pain & Its Management* misrepresented that that there were studies showing that the use of opioids for the long-term treatment of chronic pain could improve patients' ability to function.

656. Specifically, *A Policymaker's Guide to Understanding Pain & Its Management* claimed that "multiple clinical studies" demonstrated that "opioids . . . are effective in improving [d]aily function, [p]sychological health [and] [o]verall health-related quality of life for people with chronic pain" and implied that these studies established that the use of opioids long-term led to functional improvement. The study cited in support of this claim specifically noted that there

were no studies demonstrating the safety of opioids long-term and noted that "[f]or functional outcomes, the other [studied] analgesics were significantly more effective than were opioids."[191]

657.     The *Policymaker's Guide* also misrepresented the risk of addiction.  It claimed that pain generally had been "undertreated" due to "[m]isconceptions about opioid addiction" and that "less than 1% of children treated with opioids become addicted."

658.     Moreover, the *Policymaker's Guide* attempted to distract doctors from their patients' drug-seeking behavior by labeling it as pseudoaddiction, which, according to the guide, "describes patient behaviors that may occur when pain is undertreated."  Like *Partners Against Pain*, *A Policymaker's Guide* noted that "[p]seudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated."  The similarity between these messages regarding pseudo-addiction highlights the common, concerted effort behind Purdue's deceptive statements.

659.     The *Policymaker's Guide* further misrepresented the safety of increasing doses of opioids and deceptively minimized the risk of withdrawal.  For example, the *Policymaker's Guide* claimed that "[s]ymptoms of physical dependence" on opioids in long-term patients "can often be ameliorated by gradually decreasing the dose of medication during discontinuation" while omitting the significant hardship that often accompanies cessation of use.  Similarly, the *Policymaker's Guide* taught that even indefinite dose escalations are "sometimes necessary" to reach adequate levels of pain relief, but it completely omitted the safety risks associated with increased doses.

---

[191]    Andrea D. Furlan et al., Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects, 174(11) Can. Med. Ass'n J. 1589 (2006).

660.    Purdue provided substantial assistance toward the creation and dissemination of the *Policymaker's Guide*, which APF ultimately disseminated on behalf of Defendants, including Purdue.  Purdue provided $26,000 in grant money to fund the development and dissemination of its content.  Purdue kept abreast of the content of the guide as it was being developed, and, based on the periodic reports APF provided to Purdue regarding its progress on the *Policymaker's Guide*, had editorial input into its contents.

661.    The *Policymaker's Guide* was posted online, and was available to and intended to reach Chicago prescribers and consumers.  As described below, the deceptive statements in *Policymaker's Guide* regarding addiction and functionality were the very same messages Purdue directed at Chicago through its own sales force.

(c)    *Treatment Options:  A Guide for People Living with Pain*

662.    Purdue's partnership with APF did not end with the *Policymaker's Guide*.  Purdue also substantially assisted APF by sponsoring *Treatment Options:  A Guide for People Living with Pain*, starting in 2007.  Based on Purdue's control of other APF projects, Purdue also would have exercised control over *Treatment Options*.

663.    *Treatment Options* is rife with misrepresentations regarding the safety and efficacy of opioids.  For example, *Treatment Options* misrepresented that the long-term use of opioids to treat chronic pain could help patients function in their daily lives by stating that, when used properly, opioids "give [pain patients] a quality of life [they] deserve."

664.    Further, as outlined above in Section V.D.2, *Treatment Options* claimed that addiction is rare and, when it does occur, involves unauthorized dose escalations, patients who receive opioids from multiple doctors, or theft, which paints a narrow and misleading portrait of opioid addiction.

665.    *Treatment Options* also promoted the use of opioids to treat long-term chronic pain by denigrating alternate treatments, most particularly NSAIDs.  *Treatment Options* noted that NSAIDs can be dangerous at high doses and inflated the number of deaths associated with NSAID use, and distinguished opioids as having less risk.  According to *Treatment Options*, NSAIDs were different from opioids because opioids had "no ceiling dose," which was beneficial since some patients "need" larger doses of painkillers than they are currently prescribed.  *Treatment Options* warned that the risks associated with NSAID use increased if NSAIDs were "taken for more than a period of months," but deceptively omitted any similar warning about the risks associated with the long-term use of opioids.

666.    *Treatment Options* was posted online.  It was available to and intended to reach Chicago prescribers and patients.  As described below, the deceptive statements in *Treatment Options* regarding addiction and functionality echo the messages Purdue directed at Chicago through its own sales force.

(d)    *Exit Wounds*

667.    Purdue also engaged in other promotional projects with and through APF.  One such project was the publication and distribution of *Exit Wounds*, which, as described above in Section V.D, deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain.

668.    Purdue provided APF with substantial assistance in distributing *Exit Wounds* in Chicago and throughout the nation by providing grant money and other resources.

669.    APF mailed copies of *Exit Wounds* to the "Wounded Heroes Foundation" in Chicago.

ii.    *Purdue's Work with Other Third Party Front Groups and KOLs*

670.    Purdue also provided other third-party Front Groups with substantial assistance in issuing misleading statements regarding the risks, benefits, and superiority of opioids for the long-term treatment of chronic pain.

(a)    *FSMB – Responsible Opioid Prescribing*

671.    In 2007, Purdue sponsored FSMB's *Responsible Opioid Prescribing*, which, as described above in Section V.D, deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain. *Responsible Opioid Prescribing* also was drafted by "Medical Writer X."

672.    Purdue spent $150,000 to help FSMB distribute *Responsible Opioid Prescribing*. The book was distributed nationally, and was available to and intended to reach prescribers in Chicago.

(b)    *AGS – Pharmacological Management of
Persistent Pain in Older Persons*

673.    Along with Janssen, Purdue worked with the AGS on a CME to promote the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*.  As discussed above in Section V.C.2.c.iii, these guidelines falsely claimed that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse" when the study supporting this assertion did not analyze addiction rates by age.  They also stated, falsely, that "[a]ll patients with moderate to severe pain should be considered for opioid therapy (low quality of evidence, strong recommendation)."

674.    Controversy surrounding earlier versions of AGS guidelines had taught AGS that accepting money directly from drug companies to fund the guidelines' development could lead to allegations of bias and "the appearance of conflict."  Accordingly, AGS endeavored to

eliminate "the root cause of that flack" by turning down commercial support to produce the 2009

Guidelines. Having determined that its veneer of independence would be tarnished if it accepted

drug company money to create the content, AGS decided to develop the guidelines itself and turn

to the drug companies instead for funding to *distribute* the pro-drug company content once it had

been created. As explained by AGS personnel, it was AGS's "strategy that we will take

commercial support to disseminate [the 2009 Guidelines] if such support is forthcoming." AGS

knew that it would be difficult to find such support unless the report was viewed favorably by

opioid makers.

675. AGS sought and obtained grants from Endo and Purdue to distribute

*Pharmacological Management of Persistent Pain in Older Persons*. As a result, the publication

was distributed nationally, and was available to and was intended to reach Chicago prescribers.

Indeed, internal documents of another Defendant, Endo, indicate that pharmaceutical sales

representatives employed by Purdue discussed treatment guidelines that minimized the risk of

addiction to opioids with doctors during individual sales visits.[192]

(c)     *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*

676. Purdue sponsored a 2012 CME program taught by Steven Stanos, a Chicago-

based KOL, called *Chronic Pain Management and Opioid Use:  Easing Fears, Managing Risks,*

*and Improving Outcomes*. The presentation deceptively instructed doctors that, through the use

of screening tools, more frequent refills, and other techniques, high-risk patients showing signs

of addictive behavior could be treated with opioids. This CME was presented at various

---

[192]   As described above in Section V.C.2.c.ii, Purdue also provided substantial support for the AAPM/APS
guidelines. The 1997 AAPM and APS consensus statement *The Use of Opioids for the Treatment of Chronic Pain*
was authored by one of its paid speakers, and 14 out of 21 panel members who drafted the AAPM/APS Guidelines
received support from Defendants Janssen, Cephalon, Endo, and Purdue.

locations in the United States and, as described below in Section V.E.5.c, attended by at least one Chicago physician, Prescriber P.

(d) *Managing Patient's Opioid Use: Balancing the Need and Risk*

677.   Purdue also sponsored a 2011 CME taught by KOL Lynn Webster via webinar titled *Managing Patient's Opioid Use: Balancing the Need and Risk.* This presentation likewise deceptively instructed prescribers that screening tools, patient agreements, and urine tests prevented "overuse of prescriptions" and "overdose deaths." At the time, Dr. Webster was receiving significant funding from Purdue. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Purdue (and other Defendants). The webinar was available to and was intended to reach Chicago prescribers and, as described below in Section V.E.5.c, was attended by at least one Chicago physician, Prescriber P.

(e) *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*

678.   Purdue also sponsored a CME program entitled *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse. Path of the Patient* is devoted entirely to treating chronic pain with opioids. Although the program purports to instruct a treating physician how to manage chronic pain in younger adults at risk for abuse, it does no such thing. This "educational" program, addressing treatment of a population known to be particularly susceptible to opioid addiction, presents none of the alternative treatment options available, but only discusses treatment of chronic pain with opioids.

679.   In a role-play in *Path of the Patient*, a patient who suffers from back pain tells his doctor that he is taking twice as many hydrocodone pills as directed. The doctor reports that the pharmacy called him because of the patient's early refills. The patient has a history of drug and alcohol abuse. Despite these facts, the narrator notes that, because of a condition known as

Page 264

"pseudoaddiction," the doctor should not assume his patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor in the role play treats this patient by prescribing a high-dose, long-acting opioid. This CME was available online and was intended to reach Chicago prescribers.

(f) <em>Overview of Management Options</em>

680. Purdue also sponsored a CME titled *Overview of Management Options* and issued by the American Medical Association in 2003, 2007, and 2013 (the latter of which is still available for CME credit). The CME was edited by KOL Russel Portenoy, among others. It deceptively instructed physicians that NSAIDs and other drugs, but not opioids, are unsafe at high doses. In fact, the data indicates that patients on high doses of opioids are more likely to experience adverse outcomes than patients on lower doses of the drugs. Dr. Portenoy received research support, consulting fees, and honoraria from Purdue (among others), and was a paid Purdue consultant. This CME was presented online in the United States and was available to Chicago prescribers.

iii. <em>Purdue's Misleading Science</em>

681. Purdue also misrepresented the risks associated with long-term opioid use by promoting scientific studies in a deceptive way. In 1998, Purdue funded two articles by Dr. Lawrence Robbins in Chicago, which showed that between 8% and 13% of the patients he studied became addicted to opioids—a troubling statistic for Purdue, whose market, and marketing, depended upon the claim that opioids were rarely addictive.[193] Purdue had these articles placed in headache-specific journals, where they would be less likely to be encountered

---

[193] Lawrence Robbins, Long-Acting Opioids for Severe Chronic Daily Headache, 10(2) Headache Q. 135 (1999); Lawrence Robbins, Works in Progress: Oxycodone CR, a Long-Acting Opioid, for Severe Chronic Daily Headache, 19 Headache Q. 305 (1999).

by pain specialists or general practitioners. The first of these articles has been cited a mere 16 times; the second does not even appear on Google scholar. Five years later, Purdue also funded a study of OxyContin in diabetic neuropathy patients, which was published in 2003. Notwithstanding that Purdue-funded studies, testing Purdue's own drugs, had previously indicated that addiction rates were between 8% and 13%, Purdue's 2003 article reached back to the 1980 Porter-Jick Letter to support its claim that OxyContin was not commonly addictive. This article was placed in a prominent pain journal and has been cited 487 times.[194] While this article was drafted over a decade ago, it continues to be relied upon to further the misrepresentations that opioids are not addictive.

          c.    <u>Purdue's Deceptive Statements to Chicago Prescribers and Patients</u>

682. Purdue directed the dissemination of the misstatements described above to Chicago patients and prescribers through the Front Groups, KOLs, and publications described above, as well as through its substantial sales force in Chicago and through advertisements in prominent medical journals. The deceptive statements distributed through each of these channels reflect a common theme of misrepresenting the benefits of Purdue's opioids, unfairly portraying the risks of addiction associated with their use, and deceptively implying that they would improve patients' ability to function.

683. The deceptive message that OxyContin provided 12 hours of pain relief not only was available to and intended to reach Chicago prescribers through nationally circulated advertising, but also was carried directly into the offices of Chicago doctors by Purdue's sales

---

[194]   C. Peter N. Watson et al., Controlled-release oxycodone relieves neuropathic pain: a randomized controlled trial I painful diabetic neuropathy, 105 Pain 71 (2003).

representatives. For example, Chicago Prescriber DD reported being told by a Purdue sales representative that OxyContin would provide his patients with 12 hours of pain relief.

684. Likewise, the deceptive messages minimizing addiction were not only directed at Chicago patients and prescribers through the publications circulated above, but also were disseminated directly by Purdue's sales force. For example, Chicago Prescribers B, EE, F, D, E, and Q all received messages and/or omissions regarding addiction and potential for abuse from Purdue sales representatives that were deceptive.

685. Purdue also used its sales force to disseminate misleading statements about the ability of opioids to improve functionality. Chicago Prescribers B, C, and S all reported being told by Purdue sales representatives that opioids improve function.

686. The experiences of specific prescribers confirm both that Purdue's national marketing campaign included the misrepresentations described above in Sections V.D and V.E.6, and that the company disseminated these same misrepresentations to Chicago prescribers and consumers. In particular, these prescriber accounts reflect that Purdue detailers omitted or minimized the risk of opioid addiction; claimed that Purdue's drugs would be less problematic for patients because they had extended release mechanisms, were tamper proof, and were "steady state"; claimed that OxyContin would provide 12 hours of pain relief; represented that screening tools could help manage the risk of addiction; minimized the symptoms of withdrawal; claimed or implied that opioids were safer than NSAIDs; and overstated the benefits of opioids, including by making claims of improved function.

687. A survey of a sample of Midwestern physicians, who reported the messages that they retained from detailing visits and other promotional activity, documented that Purdue sales representatives promoted OxyContin as being effective for a full 12 hours at least between 2008

and 2012. Purdue sales representatives also promoted OxyContin as improving patients' sleep (an unsubstantiated functional improvement) to a Midwestern orthopedic surgeon in 2006 and to a physicians' assistant in 2013. Purdue sales representatives also told Midwestern internists that the reformulation of OxyContin prevented illegal drug use and that the formulation was 'less addicting," rather than being harder to adulterate. Purdue sales representatives also claimed in 2011 that the sustained-release property of OxyContin reduced patient "buzz," which is neither based on scientific evidence nor true.

688. The same survey indicated that Purdue sales representatives promoted its Schedule III opioid Butrans as having low or little abuse potential. Other misrepresentations regarding Butrans include telling a Midwestern ear-nose-throat doctor in 2012 that Butrans had a "ceiling effect," reducing its abuse potential and telling a general practitioner that Butrans was "essentially tamperproof," even though there is nothing in the label to support such claims.

689. In addition, the City has interviewed a number of Chicago-area prescribers who reported that they were detailed by Purdue sales representatives and heard similar claims, as well as other messages described in Sections V.D and V.E.6. In each instance, Purdue intended that the prescriber rely on these messages. Most of these physicians did, in fact, prescribe Purdue's opioids. As specified below and in Exhibit A.5, most of them wrote prescriptions for Purdue opioids that were paid for by the City's health plans:

> a. Chicago Prescriber B, an anesthesiologist, sees opioid drug company representatives on a regular basis. Purdue representatives have detailed him on OxyContin, Hysingla, and Butrans. About a year ago, these representatives pushed the message that "steady-state" extended release drugs have less potential for abuse. Opioid manufacturers, including Purdue, told him that opioids improve patient function and quality of life. Prescriber B relies on the information he receives from drug company representatives because he does not have time to conduct the research himself. For the period June 3, 2005 –

June 29, 2015, the City health plans paid $176,510.98 in claims for opioids prescribed by Prescriber B, including $34,029.61 in Defendants' drugs (368 prescriptions) and $2,605.89 for Purdue's opioids in particular (14 prescriptions).

b. Chicago Prescriber P recalled attending *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes* and *Managing Patient's Opioid Use: Balancing the Need and Risk*, Purdue-sponsored CMEs that are described above in Section V.D.2. For the period January 6, 2006 – June 17, 2015, the City health plans paid $19,415.52 in claims for opioids prescribed by Prescriber P, including $6,279.26 in Defendants' drugs (219 prescriptions) and $145.08 for Purdue's opioids in particular (2 prescriptions).

c. Chicago Prescriber C, a pain specialist, is based in Wisconsin but treats Chicago residents. In their meetings with him, sales representatives from each Defendant, including Purdue, routinely omitted any discussion about addiction and overdose death and frequently overstated the benefits of opioids. These representatives taught that opioids would increase his patients' ability to function and increase their quality of life. He has prescribed OxyContin.

d. Chicago Prescriber S, a nurse practitioner who is based in Indiana but prescribed opioids to a number of employees covered by the City's health plans, recalls being visited by drug representatives detailing OxyContin and Burtrans. These representatives emphasized that opioids could help her patients regain function by becoming more physically active and returning to work. For the period July 20, 2005 – May 15, 2015, the City health plans paid $9,460.86 in claims for opioids prescribed by Prescriber S, including $5,990.96 in Defendants' drugs (43 prescriptions) and $385.31 for Purdue's opioids in particular (2 prescriptions).

e. Chicago Prescriber F, a headache specialist, reported being detailed by Purdue representatives on OxyContin—primarily between 1997 and 2002, but also since then. He recalls being told that OxyContin was less addicting than other opioids. Prescriber F explained that Purdue representatives now mislead doctors by active omission rather than through aggressive misrepresentations made previously. For the period December 8, 2006 – June 4, 2015, the City health plans paid $3,737.07 in claims for opioids prescribed by Prescriber F, including $1,503.41 in Defendants' drugs (71 prescriptions) and $72.54 for Purdue's opioids in particular (1 prescription).

f.  Chicago Prescriber D was visited by opioid sales representatives from Purdue, Endo, Janssen, and Actavis. He relied on the representations made by these sales representatives and, in the past, had not comprehended the true addictive potential of opioids. Representatives from each of these companies told Prescriber X that their drugs were "steady state," which he interpreted to mean that they were less addictive. For the period June 6, 2005 – August 11, 2012, the City health plans paid $61,651.12 in claims for opioids prescribed by Prescriber D, including $59,566.89 in Defendants' drugs (624 prescriptions) and $39,256.33 for Purdue's opioids in particular (95 prescriptions).

g.  Chicago Prescriber G indicated that he was visited by sales representatives from all Defendants, including Purdue. He recalls that he was never told about the risk of addiction. According to Prescriber G, opioid sales representatives—including those employed by Purdue—told him that opioids would increase patients' ability to complete activities of daily living and that patients could be managed to avoid addiction. Purdue's sales representative told him that patients can be screened to address addiction risks, and provided him with a "pain questionnaire" from *Partners Against Pain* for use in screening potential opioid patients. Purdue sales representatives also told Prescriber G that OxyContin provided patients with 12 hours of pain relief. For the period August 21, 2007 – June 18, 2015, the City health plans paid $23,759.89 in claims for opioids prescribed by Prescriber G, including $23,299.81 in Defendants' drugs (84 prescriptions).

h.  Chicago Prescriber E, an anesthesiologist and pain specialist, explained that he received visits from sales representatives from all Defendants, including Defendant Purdue, until a few years ago. Other than to promote long-acting, "steady-state" opioids as having less potential for abuse, representatives from Purdue did not discuss addiction with him. For the period October 23, 2006 – May 12, 2014, the City health plans paid $23,114.17 in claims for opioids prescribed by Prescriber E, including $15,638.46 in Defendants' drugs (107 prescriptions) and $11,601.26 for Purdue's opioids in particular (30 prescriptions).

i.  Chicago Prescriber DD was visited by sales representatives from Purdue, who informed him that OxyContin would provide his patients with 12 hours of pain relief. Prescriber DD provided the City with a 2014 document a sales representative gave him, labeled "Retained visual aid – not for distribution." This visual aid prominently describes the product as "Every-12-hour

OxyContin Tablets." Prescriber DD has written opioid prescriptions paid by the City in 2013 and 2014. For the period September 9, 2005 – June 27, 2015, the City health plans paid $10,975.67 in claims for opioids prescribed by Prescriber DD, including $10,636.52 in Defendants' drugs (154 prescriptions) and $8,079.65 for Purdue's opioids in particular (53 prescriptions).

j.  Chicago Prescriber O recalled attending a CME "similar" to *Chronic Pain Management and Opioid Use*, which was held on or around October 11, 2012 and attended *Managing Patient's Opioid Use: Balancing the Need and Risk*, which was held on or around September 22, 2011, both of which are described above in Section V.D.2. For the period June 16, 2005 – June 11, 2015, the City health plans paid $24,385.60 in claims for opioids prescribed by Prescriber O, including $22,029.24 in Defendants' drugs (81 prescriptions) and $8,894.58 for Purdue's opioids in particular (32 prescriptions).

k.  Chicago Prescriber GG indicated that he was visited by sales representatives from Purdue. These sales representatives told Prescriber GG that Butrans would improve his patients' ability to function. They also explained that screening tools can be used select patients appropriate for opioid therapy and manage addiction. For the period August 19, 2005 – February 13, 2015, the City health plans paid $42.14 in claims for opioids prescribed by Prescriber GG, including $8.70 in Defendants' drugs (2 prescriptions).

l.  Chicago Prescriber J, a nurse practitioner, indicated that she was visited (or sat in on visits) by sales representatives from Defendants Purdue, Cephalon, Janssen, and Actavis. Drug representatives from these Defendants, including Defendant Purdue, never mentioned the risks of addiction associated with opioid use. Prescriber J also recalls sales representatives from Defendant Purdue explaining that Butrans has less abuse potential than other drugs because, after a certain point, the patient no longer experiences a better "buzz" from increased doses and that OxyContin was less likely to be abused because it could not be liquefied or injected when crushed. Purdue sales representatives also told Prescriber J that their drugs were "steady state." For the period February 22, 2012 – May 25, 2015, the City health plans paid $5,253.22 in claims for opioids prescribed by Prescriber J, including $2,706.06 in Defendants' drugs (39 prescriptions) and $1,033.42 for Purdue's opioids in particular (5 prescriptions).

m. Chicago Prescriber Z, a pain specialist, indicated that he was visited by sales representatives from Defendants Purdue and Janssen. These sales representatives never discussed the risks of addiction associated with their opioids, and they frequently referenced studies their company had sponsored. For the period September 3, 2008 – April 13, 2015, the City health plans paid $369.08 in claims for opioids prescribed by Prescriber Z, including $279.62 in Defendants' drugs (10 prescriptions).

n. Chicago Prescriber HH indicated that he was visited by sales representatives from Purdue. Prescriber HH explained that the sales representatives never discussed the side effects or adverse effects of their opioids. He has also been told by drug representatives, including Purdue's, that the effects of withdrawal from opioid use can be successfully managed. Purdue's sales representatives also told Prescriber HH that Purdue's reformulated oxycodone—Hysingla—is long acting, has fewer "peaks and troughs," and is less likely to lead to euphoria than other opioids. Prescriber HH also was familiar with Purdue's claims that OxyContin has "true 12 hour dosing," and noted that short acting opioids are often prescribed to handle patients' pain once the 12 hour dose prematurely wears off. For the period July 28, 2005 – June 13, 2015, the City health plans paid $2,689.04 in claims for opioids prescribed by Prescriber HH, including $2,689.04 in Defendants' drugs (117 prescriptions) and $956.27 for Purdue's opioids in particular (5 prescriptions).

o. Chicago Prescriber T indicated that he was visited by sales representatives from Purdue, Endo, and Janssen. Purdue's sales representatives told Prescriber T that Butrans was a weak opioid with lower risks of withdrawal and pseudoaddiction. These sales representatives also told him that the potential for withdrawal on Butrans was very low due to its low potency and extended release mechanism. Purdue took Prescriber T's entire class out to dinner when they finished their fellowships, and, during this dinner, a speaker recommended Butrans as a "reasonable drug." For the period October 31, 2013 – October 3, 2014, the City health plans paid $3,238.31 in claims for opioids prescribed by Prescriber T, including $501.83 in Defendants' drugs (16 prescriptions) and $233.43 for Purdue's opioids in particular (1 prescription).

p. Chicago Prescriber QQ, a Chicago-area anesthesiologist, has met with representatives from Defendant Purdue within the last five years. He recalls having numerous discussions with Purdue representatives in which he was told that OxyContin provides 12

hours of pain relief. For the period December 21, 2007 to June 26, 2015, the City health plans paid $50,044.34 in claims for opioids prescribed by Prescriber QQ, including $42,170.47 in Defendants' drugs (340 prescriptions) and $13,402 for Purdue's opioids in particular (28 prescriptions).

q. Chicago Prescriber Q recalls being visited by representatives from Purdue, Endo, and Cephalon. Prescriber Q indicated that none of the representatives discussed abuse, addiction, or overdose, which are not part of the sales conversation. For the period March 25, 2011 – May 27, 2014, the City health plans paid $889.53 in claims for opioids prescribed by Prescriber Q, including $165.94 in Defendants' drugs (12 prescriptions). Prescriber Q has prescribed OxyContin.

690. These accounts reflect specific examples of instances in which Purdue's sales representatives made the misrepresentations outlined above in Sections V.D and V.E.6 directly to Chicago prescribers. They are not an exhaustive list. Based on the nationwide and uniform character of Purdue's marketing campaign, these examples support the inference that Purdue sales representatives made similar misstatements to the other Chicago-area prescribers they detailed.

691. Like the other Defendants, Purdue also promoted its opioids through a network of recruited, paid speakers. Prescriber G above was not only a prescriber of Purdue's opioids, he was also a paid speaker for Purdue. He attended Purdue's speaker training in Florida, and he received visits from a Purdue regional supervisor, who came to his office and asked him to do a practice run through the Purdue-approved slide deck. According to Chicago Prescriber G, he was required to stick to the company-approved messaging during his speaking engagements. Chicago Prescriber G characterized this district manager as a mercenary who would do whatever it took to sell Purdue's drug and told Chicago Prescriber G that Purdue would spare no expense in furtherance of that goal.

**F.  Each Defendant Failed to Put in Place Proper Suspicious Order Monitoring Procedures**

692.    As explained above, Defendants created a vastly and dangerously larger market for opioids.  Defendants compounded this harm by facilitating the supply of far more opioids than could have been justified by a legitimate market. Their failure to maintain effective controls to prevent diversion, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious, breached their statutory duties and imposed significant costs upon the City to address and prevent the worsening opioid epidemic they caused.

693.    Multiple sources impose duties on the Defendants to endeavor to prevent diversion and to report suspicious orders and to not ship those orders unless due diligence disproves those suspicions.

694.    First, Defendants are prohibited under both the Chicago Municipal Code and Illinois law from engaging in unfair acts and practices in trade and commerce.  *See* MCC § 2-25-090.  Defendants must not engage in conduct which offends public policy, or is immoral, unethical, oppressive, or unscrupulous.  *See, e.g.*, *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417, 775 N.E.2d 951, 961 (2002).  To that end, their conduct in flooding the market with opioids, failing to maintain effective controls against diversion, and fueling an illicit black market injures consumers, offends specific public policy, and is immoral, unethical, and oppressive.

695.    At the same time, Defendants made statements to the media, regulators, and the public at large claiming to take all reasonable precautions to prevent drug diversion.  For

example, Allergan,[195] Endo,[196] and Mallinckrodt[197] publicly touted their purportedly state-of-the-art Suspicious Order Monitoring ("SOM") systems and processes, and professed their commitment to legal compliance and combatting diversion as evidence of their corporate responsibility.  This deceptive conduct too, violates MCC § 2-25-090.

696.    Second, each of the Defendants was required to register with the DEA to manufacture and/or distribute Schedule II controlled substances. *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100. As registrants, Defendants were required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. Defendants were further required to take steps to halt suspicious orders. Thus, Defendants' conduct also violated their obligations under federal law.

697.    Third, Defendants also had duties under applicable state laws.  Like the federal CSA, Illinois' ICSA, requires that registration, or licensure, be consistent with the public interest, which, in turn, requires "maintenance of effective controls against diversion of controlled substances into other than lawful medical, scientific, or industrial channels."  720 ILCS 570/303(a)(1).  Illinois registrants must also comply with federal record keeping obligations. *Id.* at Sec. 306.

698.    The CSA and its implementing regulations, and ICSA created a "closed system" of distribution; every entity that handles controlled substances is required to meet specific record-keeping and distribution standards.  As the Congressional Record reflects, "Such a closed

---

[195]  https://www.allergan.com/-/media/allergan/documents/us/Investors/Report-to-the-Stockholders-of-Allergan-Form-the-Board-of-Directors-Board-Report.pdf

[196]  http://www.endo.com/our-responsibility/our-commitment/endos-open-letter-on-the-opioid-abuse-crisis

[197]  http://www.mallinckrodt.com/corporate-responsibility/responsible-use/programs/

system should significantly reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control." 970 U.S.C.C.A.N. 4566. In enacting the CSA, "Congress was particularly concerned with the diversion of drugs from legitimate channels. It was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic." *United States v. Moore*, 423 U.S. 122, 135 (1975).

699. The CSA requires manufacturers of Schedule II substances including opioids to: (a) register; (b) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (c) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

700. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. 21 C.F.R. § 1301.74(b). These criteria are not exclusive; any one of them can trigger the duty to report and stop shipment, and other factors not listed in the regulations also may point to suspicious orders. A volume of orders of a controlled substance disproportionate to the population or historic use in an area, for example, may provide reason for suspicion. In addition, orders skewed toward high-dose pills or drugs valued for abuse should alert manufacturers to potential diversion.

701. A manufacturer can only fill, and avoid reporting, suspicious orders of opioids after a diligent investigation has allayed the reason for its suspicion. Of course, due diligence efforts must be thorough: "the investigation must dispel all red flags indicative that a customer is engaged in diversion to render the order non-suspicious and exempt it from the requirement that the distributor 'inform' the [DEA] about the order. Put another way, if, even after investigating

the order, there is any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the Agency must be informed."[198] This due diligence requirement extends, in the case of manufacturers, to an obligation to "know your customers' customer." [199] It is not enough to ship opioids to wholesalers and distributors and trust them to do the right thing.

702.   The DEA testified in the MDL that:

    a.   DEA registrants are required to block all suspicious orders prescription opioids.[200]

    b.   Shipping a suspicious order is a per se violation of federal law.[201]

    c.   After-the-fact reporting of suspicious orders has never been in compliance with federal law.[202]

703.   In sum, the law imposes on Defendants, due to the position of special trust and responsibility afforded by their license to manufacture and profit from prescription opioids, a duty to help prevent diversion.[203]   Defendants may not ignore red flags of illegal conduct and must use the information available to them to identify and report potential diversion.  That would include reviewing their own data, relying on their observations of prescribers, pharmacies, and customers, and following up on reports or concerns of potential diversion.

---

[198] *Masters Pharmaceuticals, Inc.*, Decision and Order, 80 Fed. Reg. 55418-01 at *55477 (DEA Sept. 15, 2015).
[199] Defendants Endo, Janssen, Mallinckrodt, all used this phrase in internal discussions. Moreover, the

[200] *See* Prevoznik Dep. Vol II, 770:6 to 771:20, April 18, 2019 (DEA 30(b)(6) designee).

[201] *Id.* at 632:7 to 633:2.
[202] *Id.* at 673:7 to 674:13 , 679:20 to 680:8.

[203] The existence of this duty at all relevant times is confirmed by the MDL's grant of partial summary judgment to the "Track One" bellwether plaintiffs.  There, the MDL Court held, that defendants, had, and have, an obligation under the federal Controlled Substances Act ("CSA") to identify and report suspicious orders, and not to ship suspicious orders unless due diligence reasonably dispels the suspicion.  Grounding its holding in uniform precedent, as well as the plain language of the statute and its implementing regulations, the Court described itself as "hard-pressed to think of a more basic requirement than not to ship a dubious order bearing indicia that the drugs could be diverted to illegal channels."  *See In re: National Prescription Opiate Litig.*, Case No. 1:17-MD-2804 Doc. 2483 (N.D. Ohio Aug. 19, 2019).  That was the only summary judgment motion granted by the MDL Court, which declined both defendants' and plaintiffs' motions for summary judgment on issues of fact related to their compliance (among others filed by defendants).

704.     As laid out below, Defendants' systemically failed to comply with the law. Their shipments of orders destined for unlawful channels, and their failure to report and halt potential diversion, perpetuated the opioid epidemic in Chicago and imposed, and continue to impose, substantial costs upon the City.  Defendants have a duty, and are expected, to be vigilant in deciding whether a prospective customer can be trusted to deliver opioids only for lawful purposes.  Defendants breached these duties by failing to: (a) maintain effective controls to prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of an oversupply of opioids.

### 1.     Defendants Were Aware of Their Obligations.

705.     The DEA sent a letter to Defendants on December 27, 2007, reminding them that, as registered manufacturers and distributors of controlled substances, they share, and must each abide by, statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances." The DEA's December 27, 2007 letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (e.g., by specifically identifying an order as suspicious, not merely transmitting data to the DEA). The letter referenced the Revocation of Registration issued in Southwood Pharmaceuticals, Inc., 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and to have "some criteria to use when determining whether an order is suspicious."

706.     In addition, the letter made clear that "rely[ing] on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders.  The letter noted:

For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributors.  Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially.  Nevertheless, ordering one highly abused controlled substance and little or nothing else deviated from the normal pattern of what pharmacies generally order.

707.     In 2017, Mallinckrodt admitted in a settlement with DEA that "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to DEA." Mallinckrodt further stated that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and agreed that it would "design and operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product." Mallinckrodt specifically agreed "to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."

708.     Other Defendants were likewise aware of their obligations to maintain effective controls to prevent diversion and to identify, report, and reject, suspicious orders.

> ### 2.     Defendants Kept Careful Track of Prescribing Data and Knew About Suspicious Orders and Prescribers, But Used the Information for Marketing Instead of Legal Compliance.

709.     Defendants funneled far more opioids into communities across the United States, including Chicago, than could have been expected to serve legitimate medical use, and ignored other red flags of suspicious orders.[204]

---

[204] ████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████

710. This information, along with the information known only to Defendants, would have alerted them to potentially suspicious orders of opioids.

711. This information includes the following facts:

   a. Manufacturers have access to detailed data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy and includes the volume of opioids and dose;

   b. Defendants make use of that data to target their marketing and, for that purpose, regularly monitor the activity of doctors and pharmacies;

   c. Defendants regularly visit pharmacies and doctors to promote their products, which allows them to observe red flags of diversion; and

   d. Defendants purchased chargeback data (in return for discounts) that allowed them to monitor the combined flow of opioids into a pharmacy or geographic area.

712. Specifically, at all relevant times, Defendants were in possession of national, regional, state, and local prescriber- and patient-level data that allowed them to track prescribing patterns over time.

713. Manufacturers of opioids have detailed information, including in the form of chargeback data, that showed where their opioids were going and permitted—and obligated—them to identify and prevent diversion. The DEA has confirmed that manufacturers have an obligation to use available chargeback and prescribing data for suspicious order monitoring and as part of effective controls to prevent diversion. In a Rule 30(b)(6) deposition, the DEA testified that chargeback data allows opioid manufacturers, such as Mallinckrodt, to review if their customer or customer's customer is over-prescribing, over-dispensing, or over-distributing opioids, and, if they have it, must use this information to prevent diversion.

---

714.    As Mallinckrodt's Director of Compliance, Karen Harper also testified in the MDL, chargeback data "tells Mallinckrodt exactly which pharmacy to which the drugs were sold, what the DEA registration number is, the pharmacy address, the quantity, and which drugs they have sold to that pharmacy."  Using this chargeback data, for example, would have enabled Mallinckrodt's compliance department to see that many pharmacies and pain clinics were purchasing opioid from multiple distributors, a red flag for diversion since it may indicate an intent to avoid detection or limits placed by individual distributors.  Upon information and belief, Allergan, Endo, Teva and Janssen also possessed chargeback data and could have used it to do the same.

715.    In addition to chargeback data, Defendants, upon information and belief, also had detailed information from data vendors or other sources.  Pharmaceutical companies are the primary customers for the prescribing data sold by these vendors.  And, as a routine practice, "[p]harmaceutical companies monitor the return on investment of detailing - and all promotional efforts - by prescription tracking."

716.    They obtained this information from data companies, including but not limited to: IMS Health, QuintileslMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").  One product sold by IQVIA (formerly IMS) called "Xponent," provided Defendants with information on every opioid prescription filled, tracking the doctor who wrote the prescription and the drug prescribed. Manufacturers such as Defendants purchased this information from IQVIA in order to assess their own sales efforts. They could track precisely which doctors were prescribing their drugs and tailor their marketing efforts accordingly. IQVIA

data was the lynchpin of the Defendants' marketing efforts and, in particular, of the compensation scheme for their sales representatives. Without the detail in the IQVIA data, the Defendants would not have been able to tell which sales representatives were most effective at their jobs, because they would not have known which doctors were writing the prescriptions reflected in their sales.

717.    Defendants purchased data from the Data Vendors that would have allowed them to track prescribing trends, identify suspicious orders, and identify pill mills, for example. This information allowed Defendants them to view, analyze, compute, and track their competitors' sales, and to compare and analyze market share information.  IQVIA/IMS Health, provided Defendants with reports detailing prescriber behavior and the number of prescriptions written between competing products.[205]

718.    This information allowed the Defendants to track and identify instances of overprescribing. In fact, one of the Data Vendors' experts testified that the Data Vendors' information could be used to track, identify, report and halt suspicious orders of controlled substances.[206]

719.    Defendants also have specialized and detailed knowledge of the potential suspicious prescribing and dispensing of opioids through their regular visits to doctors' offices and pharmacies.   Their extensive boots-on-the-ground presence through their sales forces allows Defendants to observe the signs of suspicious prescribing and dispensing discussed elsewhere in

---

[205] Paul Kallukaran & Jerry Kagan, *Data Mining at IMS HEALTH: How We Turned a Mountain of Data into a Few Information-Rich Molehills,* (accessed on February 15, 2018), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.198.349&rep=repl&type=pdf, Figure 2 at p.3.

[206] In *Sorrell,* expert Eugene "Mick" Kolassa testified, on behalf of the Data Vendor, that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product." *Id.; see also* Joint Appendix in *Sorrell v. IMS Health,* No. 10-779, 2011 WL 687134, at *204 (Feb. 22, 2011).

the Complaint—lines of seemingly healthy patients, out-of-state license plates, and cash transactions, to name only a few.

720.    Instead of encouraging them to report potential diversion, however, Defendants' sales incentives rewarded sales representatives who had pill mills within their territories, enticing those representatives to look the other way even when their in-person visits to such clinics should have raised red flags.  Defendants' obligation to report suspicious prescribing ran head on into their marketing strategy. Defendants routinely identified doctors who were their most prolific prescribers, not to report them, but to market to them. It would make little sense to focus on marketing to doctors who may be engaged in improper prescribing only to report them to law enforcement, just as made little sense to Defendants to report those doctors who drove their sales.

721.    Defendants necessarily expected a return on the enormous investment they made in their deceptive marketing scheme, and worked to measure and expand their success.  Their own documents show that they knew they were influencing prescribers and increasing prescriptions.  Studies also show that in doing so, they fueled an epidemic of addiction and abuse.

722.    Endo, for example directed the majority of its marketing budget to sales representatives—with good results: 84% of its prescriptions were from the doctors they detailed. Moreover, as of 2008, cancer and post-operative pain accounted for only 10% of Opana ER's uses; virtually all of Endo's opioid sales—and profits—were from a market that did not exist ten years earlier.  Internal emails from Endo staff attributed increases in Opana ER sales to the aggressiveness and persistence of sales representatives.  Similarly, according to an internal

Janssen training document, sales representatives were told that sales calls and call intensity have high correlation to sales.

723.     Cephalon also recognized the return of its efforts to market Actiq and Fentora off-label for chronic pain. In 2000, Actiq generated $15 million in sales.  By 2002, Actiq sales had increased by 92%, which Cephalon attributed to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists."[207]  Actiq became Cephalon's second best-selling drug. By the end of 2006, Actiq's sales had exceeded $500 million.  Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists.  One measure suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[208]

724.     Upon information and belief, each of the Defendants tracked the impact of their marketing efforts to measure their impact in changing doctors' perceptions and prescribing of their drugs.  They purchased prescribing and survey data that allowed them to closely monitor these trends, and they did actively monitor them.  They monitored doctors' prescribing before and after detailing visits, and at various levels of detailing intensity, and before and after speaker programs, for instance.  Examples from their own internal documents are described in Section G.1 below.

**3.     Defendants Used Their Information to Increase Sales and Disincentivized their Employees From Reporting and Exercising Due Diligence to Halt Diversion.**

---

[207] Cephalon, Inc., Annual Report (Form 10-K) at 28 (Mar. 31, 2003), https://www.sec.gov/Archives/edgar/data/873364/000104746903011137/a2105971z10-k.htm.

[208] John Carreyrou, *Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs*, Wall St. J., https://www.wsj.com/articles.SB116252463810112292 (last updated Nov. 3, 2016, 12:01 AM).

725.    Marketing visits were focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers, particularly through aggressive, high frequency detailing visits. ██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

726.    "On May 19, 2014, several months after the launch of Xartemis, Hugh M. O'Neill, Mallinckrodt's President of Specialty Pharmaceuticals, stated in an email to Stacy A. Chick, Mallinckrodt's Vice President of Specialty Sales, 'I would also like to take our highest performing 10% of reps and bring them together on a weekend to turn them loose on the organization and the non-prescribing physicians . . . The bottom line is [] one common goal— GENERATE Prescriptions.  Everything else that is not generating prescriptions should become a secondary priority.'"[209]  Employees got the message, and a Kansas City Senior District Manager counseled other sales representatives for Xartemis XR, for example, that "You only have 1 responsibility, SELL BABY SELL!"  Thus, Mallinckrodt sent the message that reporting potential diversion was not an important responsibility and successfully incentivized its employees to focus only on increasing sales.

---

[209] Kessler MDL Expert Report

727.     Former Teva sales representatives also described pressure to meet the sales numbers the company set for them (including through the annual bonus policy set by Teva Ltd.), explaining that the pressure to meet their sales numbers effectively required them to promote off-label use.  One former sales representative explained: "Even though Actiq and Fentora were only indicated for cancer pain, Cephalon and Teva's sales goals and intense sales culture perpetuated the astonishing amount of off-label prescriptions for Actiq and Fentora. As a sales representative, if you weren't in line with your peers, you were not going to get a bonus or keep your job."  Another put it this way: "Despite its limited indication, the sales goals dictated by Cephalon management required the sales representative to call on more than just oncologists or pain specialists treating cancer patients.  If a representative stayed within the indicated patient population, there was no way he could meet his sales numbers."  Former sales representatives for Mallinckrodt also explained that, for a time, prescription dosage was calculated into representatives' bonuses as well, meaning that higher dose prescriptions would count "extra" towards the representatives' bonus.  For all Defendants the pressure to increase sales necessarily provided a disincentive to report suspicious activity or take steps to halt the supply of opioids to suspicious prescribers.

728.     Further, Endo knew that Opana ER was being widely abused. Yet the New York Attorney General found in its investigation of Endo that the company's sales representatives were not aware that they had a duty to report suspicious activity, were not trained on the company's policies or duties to report suspicious activity, and were paid bonuses for detailing prescribers who were subsequently arrested for illegal prescribing.

729.     Teva directed its sales representatives to make a "minimum of seven Fentora calls per day" and focus "on high prescribers to maintain and grow their contribution." Another chart

showed Cephalon ensured that the majority highest-volume or "core prescribers," were detailed at least five times in ten months

730. ███████████████████████████████████████████

███████████████████████████████████

731.    This focus on marketing to the highest prescribers demonstrates that Defendants were keenly aware of the doctors who were writing large quantities of opioids, including those that could not be justified by medical practice. But instead of investigating or reporting those doctors, Defendants were singularly focused on maintaining, capturing, or increasing their sales.

732.    As one former Teva sales representative has explained: "In general, sales representatives did not want to report suspicious prescribers because they were the money-makers. We did not want to shoot the golden goose."

733.    Disincentives for Mallinckrodt's sales representatives to report diversion are also discussed further in Section 6(4) below.

### 4.    Defendants Failed to Monitor the Wholesalers They Used to Supply their Opioids.

734.    Defendants ignored not only their own systemic failures and the suspicious orders into Chicago that they were legally obligated to report and halt, but that they were relying on large distributors which had systemic failings of their own, and lacked the systems to properly guard against diversion.

735.    As explained above, *see* ¶ 701, Defendants had a duty to know their direct customers, including the distributors that bought and shipped their drugs in Chicago and across the country.  This included an obligation to assess their distributors to ensure they were compliant with applicable law.  Any reasonable diligence would have revealed not only glaring,

facial deficiencies in distributors' compliance systems, but DEA enforcement actions against these distributors for their noncompliance with the CSA.

736.    In May 2014, the United States Department of Justice, reported that the DEA had issued final decisions in 178 registrant actions between 2008 and 2012.  These included a number of actions against large wholesalers such as AmerisourceBergen, Cardinal, and McKesson, which Defendants relied on as their distributors.  Certain of these actions evidenced systemic failures that would have impacted Defendants' sales of opioids into Chicago.

737.    For example, pursuant to an Administrative Memorandum of Agreement entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[210]  McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 *et seq.*," at multiple McKesson distribution centers.  As additional examples:

- On May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement after the DEA alleged that McKesson failed to maintain effective controls and failed to report suspicious orders or thefts.  To resolve these allegations, McKesson paid a $13.25 million civil penalty. The MOU provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious

---

[210] Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter "2017 Settlement Agreement and Release"] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), available at https://www.justice.gov/opa/press-release/file/928471/download.

orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program."

- On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration.

- Reflecting systemic failures across Cardinal's distribution system, on September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its Auburn, Lakeland, Florida, Swedesboro, New Jersey, and Stafford, Texas distribution centers. The DEA alleged that Cardinal failed to maintain effective controls, and Cardinal paid $34 million to resolve these charges.

- On February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against Cardinal Health's Lakeland, Florida, facility for failure to maintain effective controls against diversion of oxycodone; and

- On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland facility.

738. Chain pharmacies which bought and dispensed prescription opioids from Defendants have likewise faced enforcement actions. ██████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ CVS faced similar enforcement actions, as well; the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ").

### 5. Defendants Worked In Concert to Limit Enforcement

739. Defendants worked together to achieve their common purpose through trade or other organizations, such as the PCF, described above, and the Healthcare Distribution Alliance

("HDA"). Through these organizations, Defendants lobbied for higher quotas and to weaken DEA enforcement. Although the HDA membership directory is private, the HDA website confirms that each of the Allergan, Endo, Mallinckrodt, and Teva were members of the HDA.[211]

740. While Defendants have consistently blamed the DEA for their failure to follow the law and their oversupply of opioids, Defendants worked together in and through PCF and HDA to limit the authority of law enforcement to rein in illicit or inappropriate distribution. For example, Defendants, acting through the HDA, lobbied for and drafted portions of the Ensuring Patient Access and Effective Drug Enforcement Act of 2016, which raised the standard for the DEA to suspend a registrant.

741. Defendants also worked to ensure that quotas for opioids allowed by the DEA remained artificially high.

### 6. Opioids Sold by Defendants Migrated into Other Jurisdictions, Including Chicago

742. As the demand for prescription opioids grew, interstate commerce flourished: opioids moved from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

743. First, prescriptions written in one state would, under some circumstances, be filled in a different state. Individuals transported opioids from one jurisdiction specifically to sell them in another.

744. Chicago serves as a primary distribution hub for opioids and other illegal drugs in the region, with the West Side of Chicago being the region's most significant opioid

---

[211] Manufacturer Membership , Healthcare Distribution Alliance https://www.hda.org/about/membership/manufacturer. (last accessed Nov. 26, 2019).

market. This market is easily accessible using Interstate 290, a route that has been dubbed "the heroin highway." [212]

745. When authorities cracked down on opioid suppliers, out-of-state suppliers filled the gaps. Florida, in particular, assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills. Residents of Illinois and other states would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists." As a result, prescription data from Chicago does not capture the full scope of the misuse, oversupply and diversion problem in the city. If prescription opioid pills were hard to get in one area, they migrated from another. Defendants were fully aware of this phenomenon and profited from it, and the City of Chicago bore the costs of addressing this trafficking of prescription opioids, as well.

### 7. Specific Defendants' Failures to Prevent Diversion

#### (1) Allergan

746. Allergan's SOM system included separate systems operated by Watson Pharmaceuticals, Inc. ("Watson") and Actavis, Inc. ("Actavis"), which Watson bought in 2012-2013, and by Allergan, which the merged companies then bought in 2015. Neither of the two prior companies, nor the merged group, maintained effective controls against diversion.

747. Before the year-end 2012 merger, Actavis produced twelve different generic opioids including some of the most abused and diverted opioids such as generic OxyContin (Oxycodone I hydrochloride tablet), generic Opana ER (Oxymorphone tablet) and a generic version of Janssen's Duragesic. Meanwhile, from November 2000 through October 2012, the

---

[212] DEA Intelligence Report, The Opioid Threat in the Chicago Field Division, June 2017.

company maintained the same rudimentary threshold-based SOM system. Under that system, a Customer Service group printed a report "several times a day" showing any controlled substance order that was "25% over the customer's rolling average" of orders placed over the prior six months. Then: "Customer Service [would] review[] (eyeball[]) the suspicious order report throughout the day (when a new report is created)" and "any order that look[ed] unusual [was] investigated and any unusual items [we]re cleared before the order [wa]s released."

748. This 2000-2012 system only flagged orders unusual in size; it did not flag orders unusual in frequency or pattern in real time, as the law required. It did not utilize any downstream customer information available to Actavis, did not differentiate among National Drug Codes ("NDC"s) for drugs with a higher risk of diversion, nor did it automatically stop orders from shipping. And, although Actavis mailed reports to the DEA of orders that were identified in the system from 2009-2012, the lack of any analysis of such data, and the fact that Actavis shipped the orders notwithstanding its suspicion, made the reports meaningless.

749. Further, although Actavis's marketing group designed a separate program starting in January 2011, that program tracked only "oxycodone IR suspicious orders." The marketing program compared monthly order rates and noted "any individual customer locations that have ordered 50% or greater than their established six month order average." It was not designed to track DEA regulations, and appears to have been abandoned after only three months of trials.

750. Internal documents reflect that in September 2012, Actavis was implementing a statistics-based, more modern SOM system designed by outside consultants from the Buzzeo/Cegedim group to detect "orders of interest" in "[d]irect Customer sales." On October 1, 2012, that system began working alongside Actavis's prior system.

751.    Similarly, the core of the pre-merger Watson SOM system, like the early pre-merger Actavis system, dated to the early 2000's.  This system, however, was even more rudimentary. According to a 2001 memo, Watson's inventory system automatically compiled a "12-month average" of customers' various orders, and reported violations of it Customer Service personnel (also known as the "Call Center" group).  A May 2004 Operational Procedure added a "SOMS multiplier table" to the system, which increased the level at which the inventory system would alert a potentially suspicious order.  The multiplier placed a different value for various "classes of trade."  Orders from wholesalers, distributors and chain pharmacies were regularly allowed at triple the historical average, or more.

752.    The program was also understaffed.  Between 2009 and 2012, the Watson Call Center/Customer Relations Operation added no new staff to handle the SOMs "validations," even though the number of validations increased substantially.   Between 2009 and 2010 alone, the number of "SOMs validations" handled by each "administrator" jumped from 62 "SOMs validations" per month to an average of 180.  In 2011, the number reached 280.

753.    The Watson system was flawed, as well, in that it affirmatively allowed customers to get around violations by canceling the order or cutting its quantity.  Shipping less of an order, however, does not make it less suspicious, it means only that fewer suspicious drugs are shipped.  Through 2102, Watson's consistent policy was not to file a report, but to simply cut or cancel the order instead.  Beginning in 2012, Watson added to its requirements, but merely that "[i]f the customer decides to cancel or reduce the quantity, they will need to provide a reason for the reduction or cancellation."  Before the merger with Watson, Actavis's internal documents reflect an understanding that "cutting" an order to a volume that places it beneath the threshold is unacceptable.  According to its then-CEO, however, Actavis Group allowed customers to

resubmit unjustifiable suspicious orders in smaller amounts so as to fall below their arithmetic suspicious order monitoring threshold, thereby avoiding reporting.

754. After the merger, the combined company reverted to the existing Watson SOM system, and cutting or cancelling suspicious orders without reporting them was not generally prohibited. Watson also allowed orders to be shipped based on an e-mail justification from an employee (including salespeople with a financial incentive to complete the sale).

755. As described above, like the pre-merger Actavis system, the automated portion of Watson's system only looked for orders of unusual size and not for frequency and/or pattern. The rigid formula used did not satisfy DEA requirements to detect and investigate suspicious orders. The automated portion of the system did not utilize any downstream customer information and did not differentiate among NDCs for drugs with a higher risk of diversion. The SOM was not an effective control and, as described below, Watson and Actavis employees recognized as much. Yet the system remained in place until 2016, and was not replaced.

756. In 2015, the company, now known as Allergan, announced it was selling all of its generic drugs and various corporate subsidiaries to Teva. It ceased operating even the deficient Watson SOMS program at that time. Now, Allergan outsources its manufacturing, transport and delivery systems, and is no longer a DEA registrant with regard to Kadian and Norco. It appears Allergan takes the view that it is a "virtual manufacturer" and need not have a suspicious order monitoring system at all. DEA regulations recognize no category of "virtual" manufacturers, and Allergan cannot delegate its duties to prevent diversion.

757. Even before 2015, internal documents show that both Watson and Actavis employees recognized that the suspicious order monitoring systems described above were not an effective control against diversion.

758.  In February 2009, the Senior Manager of Actavis's Customer Service Department, Nancy Baran told her boss that the existing Actavis process was inadequate to "prevent shipping excess product" because it was not cumulative and because there were too many orders over the 25% threshold.  Baran would later testify in the MDL that she remembered only one order between 2008 and 2017 that was ever deemed to be suspicious and reported to the DEA.  All other orders flagged by the system were shipped.

759.  In a 2011 Project status review, Baran would also make clear that "'Cutting' orders to a volume that puts the order under a threshold is not acceptable." The same presentation explains that the "DEA has stated on this topic, 'That is like saying a little bit of diversion is okay'").

760.  On September 12, 2012, at the same time Actavis was preparing to implement the Buzzeo/Cegedim SOM system, Actavis had an approximately three-hour meeting with sDEA personnel at the DEA's Arlington, Virginia office to discuss opioid diversion.  At the meeting Barbara J. Boockholdt, Chief of the DEA's Regulatory Section, told Actavis that its products were being distributed in Florida in quantities and under circumstances highly suggestive of diversion.  Leonard Levin, Staff Coordinator of the DEA Regulatory Section told Baran that it should have a member of its compliance team visit certain pharmacies in south Florida, "get to know their customers, visit distribution sites, visit customers of those distributors, check on customers' suspicious order monitoring systems, review due diligence files, and obtain printouts of pharmacies or practitioners who are receiving Actavis products," among other steps.   Upon information and belief based on industry practices, however, Actavis already had detailed information about its customers, prescribing doctors, and pharmacies.  It simply used this information to advance their sales, rather than prevent diversion.

761.    Actavis's Ethics & Compliance Officer, Michael R. Clarke, testified in the MDL that "the tone and the tenor of the meeting" was such that it seemed the DEA was viewing and speaking with the Actavis representatives "as street dealers" rather than "as professionals." "[T]hey described it," Clarke said, "without using these specific words, but in a way that we would just manufacture, put the product out on the street, and not have a care as to where it went" and "described finding or seeing or obtaining product, you know, opioid products that seemed to be diverted relatively easily."

762.    In late October 2012, Actavis had a follow-up meeting with two field representatives from the DEA's Newark, New Jersey office where, according to Clarke, DEA requested a reduction of approximately 30%-40% in Actavis's manufacturing quota for oxycodone. According to Clarke, Actavis's then CEO, Doug Boothe, rejected the DEA's request.

763.    Further, like Nancy Baran at Actavis, Thomas Napoli at Watson made clear – internally— that the system did not comply with the DEA laws and regulations. In November 2008 Napoli wrote a memo stating that:

> It is highly recommended that industry utilize a 'total SOM model.' This model favors a more statistically-based model that dynamically evaluates a variety of order characteristics to determine whether an order should be pending. Characteristics include order size, ordering frequency, ordering patterns and percentage of CS ordered.

His memo continued "[t]his approach is viewed to be more effective and defensible than the traditional approach of just setting a threshold."

764.    A 2012 PowerPoint from Napoli's files also describes feedback from Buzzeo/ Cegedim as critical. Specifically, the presentation states that the consultant had "produced a written report" and under "Findings" notes that the multiplier threshold was "not consistent with specific requirements noted within regulations and guidance," that Watson's system "evaluates at

SKU level," left open the "possibility of distributing orders across multiple SKU's without detection," and that Watson's system did not "evaluate listed chemicals." The PowerPoint made "Recommendations" including developing an SOM system to "Fully address specific regulatory requirements," effectively acknowledging that the existing Watson system, which continued to be used, did not do so. In 2014, a memo also described a "very labor intensive" "manual effort" and stated that "the current system is not configured with any analytical tools to support timely and accurate decision making."

765. ███████████████████████████████████████████
█████████████████████████████████████

█████████████████████████████████████████████
████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████ In another internal document, Allergan similarly acknowledged its program as "not consistent with specific requirements within the regulations and guidance."

766. As explained above, Allergan was, and should have been, well aware of its obligations. █████████████████████████████████████
███████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

767.   Tellingly, however, former CEO Boothe testified in the MDL that he believed Actavis's responsibility was only to making certain that orders were received from licensed pharmacies and were within numerical thresholds, and that Actavis had no responsibility (or accountability) for preventing diversion:

> Again, I don't think we had responsibility for, accountability for preventing diversion. We had responsibility and accountability for making certain that the orders that we received were valid from licensed pharmacies and were within our suspicious order monitoring thresholds as it was described earlier then with the Buzzeo model or the more statistical model. So we -- that was our responsibility. Once it goes outside of our chain of custody, we have no capability or responsibility or accountability to -- or at least my understanding, I'm not a lawyer, as it relates to diversion. So, once we ship a valid order to a wholesaler or ship a valid order to a distributor or another smaller wholesaler, our chain of custody is finished at that point.

768.   ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

████████████

769.   Allergan's failure to monitor suspicious orders and maintain effective controls to prevent diversion contributed to the spread of illicit opioids in Chicago, causing the City to incur costs to address opioid diversion, misuse, addiction, and overdose, among other consequences.

(2)     **Endo**

770.    Endo and certain of its subsidiaries, including Qualitiest Pharmaceuticals, Par

Pharmaceutical Companies, Inc. f/ik/a Par Pharmaceutical Holdings, Inc. and its wholly-owned

subisiary, Par Pharmaceutical, Inc., failed to maintain effective controls against diversion.

During this time, Qualitiest's biggest product was generic Vicodin (hydrocodone/ APAP), and

Par sold generic Percocet (oxycodone/APAP).

771.    Endo employed a rigid "excessive orders" system operated by sales and customer

service personnel, rather than dedicated compliance staff.  Endo never looked at data on its

customers' customers, and failed to conduct any meaningful due diligence.  This rudimentary

system never determined any order to be suspicious, and Endo never reported any orders, from

Chicago or anywhere else, to the DEA.

772.    Prior to 2014, Endo never examined volume, frequency, or pattern for

identification of a suspicious order.  In 2014, it amended its systems to review order quantity,

size, and frequency, but it never developed any suspicious order practices or use chargeback or

IQVIA data to identify qualitative signs of abuse.  Endo further never conducted due diligence

site visits on its customers.

773.    Endo's apparent justification for what the company itself described as a "limited"

SOM Program was that UPS, the DEA registrant Endo used to process and ship orders, had its

own SOM program.  Yet Endo and its subsidiary Qualitest conducted an audit of UPS's SOM

system in 2013 and found that UPS had not reported any Endo/Qualitest product orders as

"suspicious orders" to any agency, did not visit customers ███████████████████

███████████████████████, lacked the functionality to visit or know customers' customers,

and did not utilize chargeback data, trending analyses, or modify its program based on current

diversion trends.

774.    Endo sales representatives who detailed New York health care providers testified that they did not know about any policy or duty to report problematic conduct.  The New York Attorney General determined that Endo detailed health care providers who were subsequently arrested or convicted for illegal prescribing of opioids a total of 326 times, and these prescribers collectively wrote 1,370 prescriptions for Opana ER (although the subsequent criminal charges at issue did not involve Opana ER).  Upon information and belief, and based on the nationwide and uniform training provided to sales representatives, Endo sales representatives also failed to report suspicious prescribing in Chicago.

775.    Endo's generic subsidiaries also had deficiencies in their compliance. A former DEA official found in 2008 and again in 2013 that Endo's suspicious order monitoring systems were deficient.  Qualitiest personnel were not even aware of the company's reporting obligation as of 2008.  Nor did Qualitiest, even after 2013, examine the size, pattern, or frequency of opioid orders as required by CSA regulations.  Instead, the sales department, rather than compliance, set thresholds for detecting suspicious orders and had the authorization to increase the thresholds upon request.  Orders could also be broken down into several smaller orders to make sure each order fell under the triggering thresholds.  Qualitiest also continued to ship opioids even where it knew a customer had been declined or limited in quantity by other suppliers.

776.    Furthermore, Qualitest allowed sales personnel to conduct due diligence visits, a recognized conflict of interest.  Even after Qualitest supposedly revamped its programs in 2013, large customers could only be reported or terminated by the Chief Operating Officer.

777.    Par did not have an SOM program prior to 2012, and even its post-2012 program did not define a suspicious order or mandate reporting of suspicious orders.  An outside audit found that Par's Standard Operating Procedures "may be difficult to explain and defend," did not

use dedicated employees, were limited to a manual review by sales personnel, and did not contain instructions for reporting suspicious orders. ████████████████████

████████████████████████████████

███████████████████████████

████████████████████████████

778.   Although Par's system did flag a number of orders, all were cleared to ship.

779.   Endo would have had additional information about suspicious orders and prescribers in Chicago, as described above. ████████████████████

██████████████████████████

████████████████████████████

███████████████████████████

████████████████████████████

████████████

780.   Endo's failure to monitor suspicious orders and maintain effective controls to prevent diversion contributed to the spread of illicit opioids in Chicago, causing the City to incur costs to address opioid diversion, misuse, addiction, and overdose, among other consequences.

### (3)   Janssen

781.   Janssen first implemented its suspicious order monitoring program through a SOM Standard Operating Procedure in 2005. It has not made any meaningful change since. More specifically, although Janssen revised its procedures in 2013, its SOM program has used the same algorithm and the same definition of a suspicious order since their development in 2005.   Janssen defines a "potentially suspicious or excessive controlled substance order. . . as an

order that exceeds the minimum order quantity requirements, and is above 3xs (300%) of the calculated, 12 month, per weekly order average."

782.    Thus, contrary to the requirements of federal law, Janssen's SOM program only monitored for orders of unusual size for customers with a prior order history; it failed to ever monitor for unusual frequency and/or pattern in real time. Accordingly, as Janssen has acknowledged in internal documents and conceded in a MDL deposition of its Director of Controlled Substance Compliance, its SOM program would not detect: (i) multiple customer orders during a given month; (ii) orders which consisted of gradual quantity increases of a controlled substance over time; and (iii) a new customer's orders for controlled substances which initially commence with larger than normal quantities and remain constant. Moreover, its rigid and inflated threshold was insufficient to identify suspicious orders, as noted above.

783.    Janssen's SOM program was also materially deficient in other ways. Importantly, it was narrowly designed such that an order of a Schedule II opioid would only be compared to previous orders of products with an identical SKU (i.e., the same product at the same strength) placed in the prior 52 weeks. In other words, if a customer ordered 1,000 Nucynta 100 mg tablets, the SOM system would only compare that order to the customer's other orders of Nucynta 100 mg tablets placed within the past year. In addition, as an internal document explained in 2017, Janssen's "report does not compare customers against similar wholesalers and their ordering patters [sic]. The team aligned [sic] that in the future, our software should differentiate by customer type (large, medium, small wholesaler)."

784.    Another shortcoming of Janssen's SOM program was that the algorithm stopped automatically flagging suspicious orders at 3:45 p.m. every day, even though orders could be placed at any time. This meant that any Schedule II order placed after 3:45 p.m. would have to

be manually checked by someone the next morning to determine whether it was of unusual size. Janssen internally recognized that "there is the potential that an order can be released the next morning without being monitored in the program."

785. As explained above, Janssen had access to transactional sales data that could have allowed it to identify suspicious orders based on unusual size, pattern, and frequency (as required under the CSA), including, but not limited to, chargeback data, wholesalers' inventory and sales data, and third-party data from its vendors Integrichain and ValueTrak. Among other things, this data allowed Janssen to track the purchasing behavior of its customers and its customers' customers, down to the retail level (e.g., individual pharmacy locations), as well as the prescribing behavior of individual physicians. Janssen's sales and marketing teams, along with its trade group, extensively utilized this data to increase sales, but it did not incorporate this information into its compliance program until as late as 2017.

786. Since at least 2011, Janssen had access to 852 data (wholesalers' inventory and total sales out to their customers) and 867 data (wholesalers' total sales out to their customers broken out by outlet, i.e., Retail Pharmacies, Hospitals, Long Term Care, and Clinics.Yet, Janssen also chose not to incorporate this data, which it used for marketing purposes, into its SOM program.

787. Despite the many deficiencies in its SOM program, Janssen did not conduct an internal or external review of its SOM program until around December 2017. At that time, both its internal workshop and its outside consultant's report acknowledged these deficiencies and recommended significant modifications to its SOM program.

788. The review confirmed that Janssen not only failed to implement a SOM system that identified all suspicious orders, but failed to report the orders that were actually flagged by

its system.  Specifically, in January 2018, Janssen's outside consultant concluded: "It appears that the JOM SOM has not reported an order for controlled substances as suspicious during its time in operation.

789.  As described above and further below, Janssen had information to alert it to red flags of diversion in Chicago, yet failed to act.

790.  Jannsen's failure to monitor suspicious orders and maintain effective controls to prevent diversion contributed to the spread of illicit opioids in Chicago, causing the City to incur costs to address opioid diversion, misuse, addiction, and overdose, among other consequences.

### (4)  Mallinckrodt

791.  Mallinckrodt claims on its website to be "committed both to helping health care providers treat patients in pain and to fighting opioid misuse and abuse," and further asserts that: "In key areas, our initiatives go beyond what is required by law.  We address diversion and abuse through a multidimensional approach that includes educational efforts, monitoring for suspicious orders of controlled substances . . . ."[213]  However, the design of Mallinckrodt's order monitoring programs contradict its claims.

792.  Since its creation, Mallinckrodt's Suspicious Order Monitoring ("SOM") Program was based on a threshold formula, which reviewed the size of orders from distributors and compared them against the average size of the former distributors' orders for either 12 or 18 months.  According to the first of Mallinckrodt's written policies—which were only drafted in 2008—Mallinckrodt initially used a two-times multiplier, meaning that orders that more than two times the size of a customer's prior 12 month average were flagged as "peculiar" (the term

---

[213] Mallinckrodt website, Our Programs,
http://www2.mallinckrodt.com/Responsibility/Responsible_Use/Our_Programs/

Mallinckrodt used for suspicious orders). Mallinckrodt later increased this formula to a three-time multiplier in order to reduce the number of suspicious orders it had to review, and thus its "administrative burden." In other words, Mallinckrodt changed its formula not because it believed that the orders the formula identified were *not suspicious*, but because the formula identified *too many* suspicious orders. If an order failed to surpass the threshold set by Mallinckrodt's numeric formula, it was not flagged as suspicious and therefore not investigated or halted. At either level, the reliance on a numeric formula to identify suspicious orders failed to maintain effective controls against diversion.

793. Moreover, even the numeric formula used by Mallinckrodt was fundamentally flawed. According to a former employee, Mallinckrodt's algorithm had gaps that made it possible for problematic orders to get through. Additionally, according to an internal email, Mallinckrodt itself recognized that customers could defeat detection by "gradually increasing their order quantities to not get caught by the 2x formula threshold." Howard Davis, a former DEA Diversion Program Manager hired as a consultant by Mallinckrodt to assess its SOM program, was severely critical of Mallinckrodt's reliance on a formula, and warned that by doing so, Mallinckrodt "would be unnecessarily exposing itself to potential liability." Despite knowing from multiple sources that a strict formula was insufficient, Mallinckrodt continued to rely exclusively on a formula to identify suspicious orders.

794. Mallinckrodt's system also failed to identify orders of unusual size, frequency, or that deviate substantially from normal patterns. During the 2008-2009 time period, Mallinckrodt discontinued use of its threshold formula and completely failed to evaluate its orders on any metric. It relied only on whether customers had adequate registration forms.

795.    Additionally, Mallinckrodt shipped and failed to report to the DEA suspicious orders it did identify.  Between 2003 and 2011, Mallinckrodt shipped more than 53 million orders of opioid products across the U.S.  During this time period, Mallinckrodt's SOM formula—such as it was—identified 37,817 orders as potentially suspicious.  But, during this time frame, Mallinckrodt appears to have stopped and reported at most 33 orders out of 53 million.

796.    Mallinckrodt's compliance programs had deficiencies beyond its use of a formula, as Mallinckrodt systemically failed to stop shipment of suspicious orders.  ██████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████ Shipping orders without due diligence in and of itself indicates a failure to maintain effective controls against diversion, and is in direct violation of DEA guidance.

797.    ███████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

798.    In addition, documents demonstrate that Mallinckrodt cleared suspicious orders not because it had determined that they would not be diverted, but to keep the "momentum rolling" with a customer or allow the customer to secure favorable pricing.

799.    One of Mallinckrodt's highest paid National Account Managers ("NAMs"), Victor Borelli cavalierly joked about addiction and diversion with one his distributor customers at Key Source Medical, Steve Cochrane, after Key Source ordered an additional 1200 bottles of oxycodone from Mallinckrodt.  Mr. Cochrane wrote: "Keep 'em comin'! Flyin' out of here.  It's like people are addicted to these things or something.  Oh, wait, people are…"  Mr. Borelli responded: "Just like Doritos keep eating.  We'll make more."

800.    Like other Defendants, Mallinckrodt had detailed information, in the form of chargeback data, which showed where its opioids were going and would have permitted the company to identify and prevent diversion.  Using this chargeback data would have enabled Mallinckrodt's compliance department to see that many pharmacies and pain clinics were purchasing opioid from multiple distributors, for example, as noted above, a red flag for diversion since it indicates an intent to avoid detection or limits placed by individual distributors.

801.    Further, as described above, Mallinckrodt sales representatives responsible for selling generic opioids were given key roles in investigating suspicious orders and had authority to clear them.  But, this assignment of roles and responsibilities overlooked the fact that the compensation scheme for NAMs favored sales over compliance.  ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  To the contrary, NAMs were recognized to be "advocates" for their distributor customers, as opposed to "boots on the ground" with a responsibility for stopping diversion.

802.    Mallinckrodt was warned against using sales representatives to carry out its compliance functions.  According to Mallinckrodt meeting notes from a DEA pharmaceutical

conference, the "general consensus is that sales reps are not considered a good option for on—site investigations and initial review prior to accepting new customers due to their perceived bias in getting the customer approved for sales revenue purposes."

803.    In 2011, the DEA began to investigate Mallinckrodt after DEA investigators noted large amounts of Mallinckrodt's oxycodone being sent to Florida (and then diverted across the country). ███████████████████████████████████

████████████████████████████████████████

████████████████████████████ the DEA had described Mallinckrodt as "the kingpin within the drug cartel." ███████████████████████

████████████████████████

804.    Mallinckrodt executives also were summoned to an August 23, 2011 meeting at DEA headquarters.  Barbara J. Boockholdt, the the chief of the regulatory section for DEA's Office of Diversion Control at the time, would later tell the *Washington Post* that Mallinckrodt briefly reduced shipments after that meeting, and also notified more than 40 of its distributors that it would no longer provide them rebates if they continued to supply specific pharmacies whose orders were deemed suspicious.  She further explained, however, than after making these promises, "Mallinckrodt's output of opioid pills soon ramped back up."

805.    The DEA investigation of Mallinckrodt resulted in a fine of $35 million for Mallinckrodt's failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.  The DOJ and DEA determined that Mallinckrodt ignored its responsibility to report suspicious orders of as many as 500 million of its pills that were sent to Florida from 2008 to 2012, which was 66% of all oxycodone sold in the state. According to the *Washington Post*, an internal summary of the federal case against Mallinckrodt

found that "Mallinckrodt's response was that 'everyone knew what was going on in Florida but they had no duty to report it.'"

806.     In the press release accompanying the settlement, the DOJ stated that Mallinckrodt "did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic.  These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone . . . . Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . . . 'Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands' . . ."

807.     Among the allegations resolved by the settlement was that "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances—orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."

808.     Additionally, the DEA claimed that Mallinckrodt "sold excessive amounts of the most highly abused forms of oxycodone, 30 mg and 15 mg tablets, placing them into a stream of commerce that would result in diversion…even though Mallinckrodt knew of the pattern of excessive sales of its oxycodone feeding massive diversion, it continued to incentivize and supply these suspicious sales," and that Mallinckrodt "never notified the DEA of suspicious orders in violation of the CSA."

809. The 2017 Mallinckrodt MOA further details the DEA's allegations regarding

Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer.

a. With respect to its distribution of oxycodone and hydrocodone products, Mallinckrodt's alleged failure to distribute these controlled substances in a manner authorized by its registration and Mallinckrodt's alleged failure to operate an effective suspicious order monitoring system and to report suspicious orders to the DEA when discovered as required by and in violation of 21 C.F.R. § 1301.74(b). The above includes, but is not limited to Mallinckrodt's alleged failure to:

  i. conduct adequate due diligence of its customers;

  ii. detect and report to the DEA orders of unusual size and frequency;

  iii. detect and report to the DEA orders deviating substantially from normal patterns including, but not limited to, those identified in letters from the DEA Deputy Assistant Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007:

    1. orders that resulted in a disproportionate amount of a substance which is most often abused going to a particular geographic region where there was known diversion,

    2. orders that purchased a disproportionate amount of a substance which is most often abused compared to other products, and

    3. orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;

  iv. use "chargeback" information from its distributors to evaluate suspicious orders. Chargebacks include downstream purchasing information tied to certain discounts, providing Mallinckrodt with data on buying patterns for Mallinckrodt products; and

  v. take sufficient action to prevent recurrence of diversion by downstream customers after receiving concrete information of

diversion of Mallinckrodt product by those downstream customers.[214]

Mallinckrodt also acknowledged that at certain times prior to January 1, 2012, certain aspects of its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."

810.    Mallinckrodt knew or should have known that some of the millions of pills it ignored its responsibility to report were being used to fill suspicious orders in Florida, and knew or should have known that those opioids were being diverted into other states. In fact, one well-traveled route became known as the "Blue Highway," a reference to the color of Mallinckrodt's 30mg Roxicodone pills.

811.    While the 2017 settlement arose out of Mallinckrodt's failure to report suspicious orders in Florida, upon information and belief, it is indicative of a systemic failure that continues to this day.

812.    In the Chicago area, for example, ████████████████████████████
████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████ Upon information and belief, Mallinckrodt did not report this prescriber. ██████████████████████████████

████████████████████████████████████

---

[214] Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC (July 10, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download. ("2017 Mallinckrodt MOA"), at 2-3.



813.    Mallinckrodt's failure to monitor suspicious orders and maintain effective controls to prevent diversion contributed to the spread of illicit opioids in Chicago, causing the City to incur costs to address opioid diversion, misuse, addiction, and overdose, among other consequences.

### (5)    Teva

814.    Teva's internal documents show that, as of September, 2012, Teva had no written suspicious order monitoring system in place, and, until that time, had never had one.   In 2012, Teva hired Ronald Buzzeo and Cegedim to perform a review of Teva's SOM system. The review resulted in a starkly critical September 2012 report which noted the absence of written procedures, Teva's failure to report a single suspicious order, ever, and the "rudimentary" nature of Teva's program, such as it was.  In that regard, the audit also revealed that Teva's customer due diligence process was limited to checking customers' registration and DEA credit-worthiness.  And, the audit explained, Teva's order monitoring system was "not sufficiently sensitive to customer ordering practices to result in any meaningful analysis of customer order practices."

815. Teva ultimately decided not to hire Buzzeo to implement a compliance program, a decision that appears to have been based on its assessment of the costs involved.

816. Ultimately, in January 2014, Teva hired Joe Tomkiewicz, who had recently received two visits at his home by DEA agents who advised him to get a lawyer, to design and operate the suspicious order monitoring program for this multi-national corporation.

817. Tomkiewicz later coined the program he designed "DefOps," short for "Defensible Operations," a name he admitted in an MDL deposition was chosen because it "sounded good" and was intended to keep Teva out of trouble with the DEA. In August 2014, nearly two years after the Buzzeo report stated Teva needed to have written procedures in place, the written Standard Operating Procedures ("SOPS") for Teva's system finally were approved.

818. The system developed was fundamentally flawed. Most glaringly, the SOPS maintained the key investigatory role in the hands of Teva's sales department. The sales department would then direct customer service to contact the customer for initial investigation and to gather information, and to send a sales representative to the customer if the response was not satisfactory. The conflicts of interest inherent in this system are obvious, and parallel those discussed with respect to other Defendants.

819. Teva recognized these conflicts internally. Notably, Tomkiewicz developed a 2017 PowerPoint on Teva's suspicious monitoring system which references the sales department under the slide titled "Managing Conflicts."

820. The program also suffered from other glaring deficiencies. In fact, Teva Ltd. audited Cephalon's DEA compliance department in 2015 and prepared a report critical of the department and the SOM program. The report stated that Teva Ltd. investigated 10,000 line orders per month of Schedule II products, 95% of which were automatically released. It found

that the company's DEA Department was in "non‑compliance with DEA requirements" and was at "High Risk" of DEA regulatory action, and that the SOM program was at "Moderate Risk" for such action.  For the SOMs program, the report focused primarily on the fact that suspicious orders were cleared through the decisions of a single person (Tomkiewicz), which exposed the system to the risk of mistaken releases.  It also recognized that the program must clear 5,000 pending potentially suspicious line orders per month under pressure from the sales department to clear those orders quickly so as not to delay their customers' opioid orders. That number likely more than doubled after the 2016 acquisition of generic business from Allergan.

821.    Internally, Cephalon also acknowledged that it was not scrutinizing the distributors it used (or chain pharmacies for that matter) as closely as it would other customers.

822.    The inadequacy of Cephalon's system is confirmed by the fact that even after implemented a written SOMs policy, it reported and stopped very few suspicious orders. Teva reported its first ever suspicious order to the DEA on February 13, 2013.  In total, from 2013 through 2016, nationally, Cephalon reported only 6 suspicious orders out of 600,000 total line orders (and not all were opioid products).

823.    ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████.

824.    Cephalon's failure to monitor suspicious orders and maintain effective controls to prevent diversion contributed to the spread of illicit opioids in Chicago, causing the City to incur costs to address opioid diversion, misuse, addiction, and overdose, among other consequences.

### 8.    Defendants Misrepresented Their Efforts to Prevent Diversion

825.    By publicly stating that they had systems in place to prevent diversion, Defendants sought to assuage concerns about the opioid epidemic by presenting a false front that the crisis was not the responsibility of manufacturers.  For instance, Allergan's Board publicly claimed in 2019 that it "employed a number of controls," including holding and flagging suspicious orders, monitoring large shipments, and evaluation of customer data.[215]  Endo published an open letter touting its "anti-diversion measures" and claiming that it is "proud of Endo's actions."[216]  Janssen launched a website in 2011 called *prescriberesponsibly.com*, discussed above.  In the launch announcement, Janssen stated that it "is dedicated to taking ongoing steps to ensure its products are used correctly and responsibly."  Mallinckrodt similarly claims to be "committed . . . to fighting opioid misuse and abuse,"[217] and further asserts that: "In key areas, our initiatives go beyond what is required by law."[218]…We address diversion and abuse through a multidimensional approach that includes educational efforts, monitoring for suspicious orders of controlled substances[.]"[219] As demonstrated below, all of these statements were false, and designed to conceal their contribution to the opioid epidemic and create a false sense of security that opioids remained in proper channels.

---

[215]  https://www.allergan.com/-/media/allergan/documents/us/Investors/Report-to-the-Stockholders-of-Allergan-Form-the-Board-of-Directors-Board-Report.pdf

[216]  http://www.endo.com/our-responsibility/our-commitment/endos-open-letter-on-the-opioid-abuse-crisis

[217]  http://www.mallinckrodt.com/corporate-responsibility/responsible-use/programs/

[218]  Id.

[219]  http://www.mallinckrodt.com/about/news-and-media/news-detail/?id=7176

9.    **Additional Examples of Failure to Report Suspicious Prescribing in the Chicago area.**

826.    According to the DEA Chicago Field Division, improper prescribing, "doctor shoping," theft, and forgery of prescription opioids are a "significant problem" in the greater Chicago area.[220]  Chicago Field Division arrests reached a high of 245 in 2014, owing in part to increased Chicago Police Department activity.

827.    In 2016, state regulators identified and closed a cash-only pill mill in the Chicago suburbs operated by Drs. Paul Madison, William McMahaon, and Joseph Giacchino.  This clinic, Melrose Park Clinic, operated in Riverside from 2013-2017, and in Melrose Park from 1985-2011. The clinic moved after Dr. Giacchino lost his medical license, but he continued to provide administrative services.  Dr. Madison was found to have prescribed 1.6 million doses of controlled substances, including nearly 1 million doses of hydrocodone alone, in over two years, and at his peak, Dr. Giacchino was responsible for over 1 million pills in a one year period, often prescribed to groups of young men, and many of the pills were later sold on the street. Melrose Park Clinic was found to have distributed prescriptions to patients from 11 states, a red flag that it operated as a pill mill, though, on information and belief, most of the harm was felt locally. Investigators found that individuals seeking drugs from Dr. McMahon could receive prescriptions for cash without any medical examination.

828.    ████████████████████████████████

████████████████████████████████████

████████████████████████████████  ██ █

---

[220] https://www.dea.gov/sites/default/files/2018-07/DEA-CHI-DIR-023-17%20The%20Opioid%20Threat%20in%20the%20Chicago%20FD.pdf

[221] Dosage units refers to the unit of dose delivery (e.g., tablet or capsule at a defined dose).

███████████████████████████████████████████████████

████████████████████████████

829.    As another example, ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████

830.    Another Chicago prescriber who lost his license for controlled substances

violations sharply escalated the volume of opioids he prescribed between 2000 and the time he

lost his license in 2009.  By that time, he was prescribing as much as 1.2 million more dosage

units than the average doctor (family medicine / general physicianpractice).  His clinic was co-

located with a Chicago pharmacy and he received direct shipments of opioids, including

hydrocodone and morphine, at that location from distributors, another red flag of diversion.

831.    ████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

832.    ██████████████████████████████████████████████

███████████████████████████████████████████████



833.    Defendants' failure to maintain effective controls against diversion contributed to, maintained, and extended the secondary market for opioids—producing both the inventory of narcotics to sell and the demanded for users addicted to them.

**G.    The Result of Defendants' Unlawful Scheme and Inadequate Controls.**

834.    Through their direct promotional efforts, along with those of the third-party Front Groups and KOLs they assisted and controlled, and whose seemingly objective materials they distributed, Defendants accomplished exactly what they set out to do:  change the institutional and public perception of the risk-benefit assessments and standard of care for treating patients with chronic pain.  As a result, Chicago doctors began prescribing opioids long-term to treat chronic pain—something most would never have considered prior to Defendants' campaign.

835.    But for the misleading information disseminated by Defendants, doctors would not, in most instances, have prescribed opioids in the volumes, doses, and durations they did.  As outlined below, the impact of Defendants' deceptive marketing on doctors' prescribing and patients' use of opioids is evidenced by: (a) the increase in opioid prescribing nationally in concert with Defendants' marketing; (b) the City's own increased spending on opioids resulting from Defendants' promotional spending; (c) interviews with Chicago prescribers, including those who prescribed opioids paid for by the City, who confirmed that they prescribed opioids based on deceptive marketing, patients' demand, and/or to continue opioids therapy begun by

other doctors; and (d) the consequences of opioid overprescription—including addiction, overdose, and death—that have been visited on Chicago and its residents, as confirmed by interviews with victims and addiction treatment programs.

836.    Additionally, with more widespread opioid prescribing, there was both greater demand for, and supply of, illicit opioids, and pill mills and rogue pharmacies continued to operate, in Chicago and in other areas from which prescription opioids migrated to Chicago. Defendants profited from the prescriptions by these unlawful prescribers, and breached their obligations to stop suspicious shipments and to report them.

837.    But for Defendants' unlawful marketing and distribution of opioids, the use, overuse, misuse, addiction, trafficking and related harms, overdose and death would not have been nearly as widespread or prolonged.  As a result of Defendants' violations of law, the City of Chicago has incurred, and will continue to incur, costs to respond to overdoses; address drug diversion, trafficking, and related crimes; provide addiction treatment and prevention, and treat other adverse effects of opioids, such as Hepatitis C, among others. The City does not seek to recover costs of prescriptions for opioid painkillers themselves incurred due to deceptive marketing.  Rather, it seeks to recover costs of providing public services needed due to Defendants' legal violations, as well as civil penalties and other relief available to remedy and deter the violations of MCC set forth in Counts One through Three.

> **1.    Defendants' Fraudulent and Deceptive Marketing of Opioids and Failure to Maintain Effective Controls Against Diversion Imposed Costs on the City of Chicago.**

> a.    Increase in Opioid Prescribing Nationally

838.    Defendants' scheme to change the medical consensus regarding opioid therapy for chronic pain worked.  During the year 2000, outpatient retail pharmacies filled 174 million prescriptions for opioids nationwide.  During 2009, they provided 83 million more.

839. Opioid prescriptions increased even as the percentage of patients visiting the doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.[222]

840. Approximately 20% of the population between the ages of 30 and 44 and nearly 30% of the population over 45 have used opioids. Indeed, "[o]pioids are the most common means of treatment for chronic pain."[223] From 1980 to 2000, opioid prescriptions for chronic pain visits doubled. This is the result not of an epidemic of pain, but an epidemic of prescribing. A study of 7.8 million doctor visits found that prescribing for pain increased by 73% between 2000 and 2010—even though the number of office visits in which patients complained of pain did not change and prescribing of non-opioid pain medications **decreased**. For back pain alone—one of the most common chronic pain conditions—the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined and referrals to physical therapy remained steady—and climbing.

841. This increase corresponds with, and was caused by, Defendants' massive marketing push. As reflected in the chart below, according to data obtained from a marketing research company, Defendants'[224] spending nationwide on marketing of opioids—including all of the drugs at issue here—stood at more than $20 million per quarter and $91 million annually in 2000. By 2011, that figure hit its peak of more than $70 million per quarter and $288 million

---

[222]  Matthew Daubresse et al., Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010, 51(10) Med. Care 870 (2013).

[223]  Deborah Grady et al., *Opioids for Chronic Pain,* 171(16) Arch. Intern. Med. 1426 ( 2011).

[224] These figures do not yet include data for Defendant Mallinckrodt.

annually, a more than three-fold increase.  By 2014, the figures dropped to roughly $45 million

per quarter and $182 million annually, as Defendants confronted increased concern regarding

opioid addiction, abuse, and diversion, and as Janssen, which accounted for most of the spending

reduction, prepared to sell its U.S. rights to Nucynta and Nucynta ER.  Even so, Defendants still

spend double what they spent in 2000 on opioid marketing.



842.    By far the largest component of this spending was opioid drugmakers' detailing

visits to individual doctors, with total detailing expenditures more than doubling between 2000

and 2014 and now standing at $168 million annually.

843.    Each Defendant's promotional spending reflects its participation in this marketing

blitz.[225]  Between 2000 and 2011:

- Actavis's promotional spending, which was virtually non-
  existent in the 2004-2008 period, sharply rose beginning in 2009
  to a quarterly peak of nearly $3 million at one point in 2011 (and
  nearly $7 million for the year), as shown below:



---

[225] Chicago does not have information concerning Mallinckrodt's expenditures, but upon information and belief, and based on its spending on meal reimbursements in data collected by the Center for Medicare and Medicaid Financing, it also spent heavily to promote its branded opioids.

- Cephalon's quarterly spending steadily climbed from below $1 million in 2000 to more than $3 million in 2014 (and more than $13 million for the year), with a peak, coinciding with the launch of Fentora, of nearly $9 million for one quarter of 2007 (and more than $27 million for the year), as shown below:



- Endo's quarterly spending went from the $2 million to $4 million range in 2000-2004 to more than $10 million following the launch of Opana ER in mid-2006 (and more than $38 million for the year in 2007) and more than $8 million coinciding with the launch of a reformulated version in 2012 (and nearly $34 million for the year):



- Janssen's quarterly spending dramatically rose from less than $5 million in 2000 to more than $30 million in 2011, coinciding with the launch of Nucynta ER (with yearly spending at $142 million for 2011), as shown below:



2

- Purdue's quarterly spending notably decreased from 2000 to 2007, as Purdue came under investigation by the Department of Justice, but then spiked to above $25 million in 2011 (for a total of $110 million that year), and continues to rise, as shown below:



844. In addition, Defendants' own documents show their deceptive marketing was having an impact, of which they were well aware. Defendants' promotional strategy documents showed expected returns on investment (or "ROI")—*through increased sales*—of up to 500% for detailing visits to promote prescription opioids and comparable or greater returns for other opioid promotion practices.[226] "Promotional strategy documents often feature estimates of the return on investment (ROI) for individual tactics or messages. The ROI, expressed as a multiple or percentage, provides an indication of the dollars of profit earned per dollar of marketing

---

[226] *See* Rosenthal Expert Rep., MDL Dkt. # 3007-22-23 at 29-33.

expenditure."[227] 

Documents disclosed in the MDL describe consistently high ROI for detailing visis for Defendants' promotion of their branded drugs. Janssen's analysis of its detailing for Duragesic "showed that detailing not only resulted in new prescriptions in the current period but also in future time periods upwards of 11 months after the detail."[228] Mallinckrodt documents show that with respect to Exalgo, it "fine-tuned detailing contacts based on profitability calculations."[229] Meanwhile, their unbranded promotion can also affect sales, "often with classwide effects."[230]

845. Defendants calculated the return on investment for not only detailing, but other promotional activities as well. By way of example: a Teva document describes a "[l]inear relationship exists between promotional spend ($) and FENTORA sales."

Endo described speaker programs as associated with an increase in new patient starts by prescribers who attended programs. Likewise, it knew its efforts to promote higher doses worked, congratulating itself that: "The sales message is having a positive impact on physicians, 'approximately 90% indicate that they have prescribed the new strengths recently.'" Mallinckrodt documents reveal similar results, citing, for example, "significant difference in prescribing trends post webcast."

---

[227] *Id.* at 31.

[228] Rosenthal Expert Rep., MDL Dkt. # 3007-22-23 (citing "Strike Force Sales Rep Alignment: Feasibility Analysis from ROI Perspective" (2003), JAN-MS-00309600 at slide 8).

[229] *Id.* (citing Exalgo Detail ROI Analysis" (2013), MNK-T1_0000947739 at 742-743).

[230] *See* Rosenthal Expert Rep., MDL Dkt. # 2000-23 at 30.

846.  Other examples from Defendants' own documents likewise illustrate the impact of

their deceptive marketing tactics. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

847.  Internal documents also illustrate, for example, the expected impact of KOLS.

*See* Blueprint to a Billion: 7 Essentials: The Endo Pharmaceuticals Story, *available at*

https://www.youtube.com/watch?v=6fqFOy-bZ1k&t=258s (Endo co-founder and former CEO

Carol Ammon explaining that, "thought leaders" "would not only talk about [a company's]

products but would really start to move the whole market towards a change in pain

management").

848.  ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

849.  At the time they engaged in the misconduct described in this complaint, the

addictive potential of prescription opioids and the need for restraint in their use was widely

understood, as was the likelihood of large-scale opioid addiction, abuse, overdoses, illness, and

early death resulting from sharply increased use.  In fact, the Supreme Court has observed the

obvious potential for marketing campaigns for controlled substances to foster black markets. *See also Direct Sales Co*., 319 U.S. 703, 712 (1943) ("Mass advertising and bargain counter discounts are not appropriate to commodities so surrounded with restrictions. They do not create new legal demand and new classes of legitimate patrons, as they do for sugar, tobacco and other free commodities. Beyond narrow limits, the normal legal market for opiates is not capable of being extended by such methods. The primary effect is rather to create black markets for dope and to increase illegal demand and consumption.").

850. More recently, a former KOL for Defendants, Dr. Portenoy, described in a declaration in the MDL how Defendants' conduct led to the opioid crisis. In deposition testimony, Dr. Portenoy also acknowledged that "risk-related concepts . . . tended to be neglected in the marketing materials, and could have had an impact in the way doctors perceived these drugs and led to more prescribing." With respect to Defendants, Dr. Portenoy concluded that, "I've come to conclude that their conduct in marketing without context and without education about risk produced an increase of inappropriate and unsafe prescribing that contributed to the public health problem."

851. There is also substantial literature that pharmaceutical marketing increases drug utilization and that detailing is particularly effective. For example, a 2017 study that found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers. The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures. Another study examined four practices, including visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on drug utilization. An

additional study found that doctor meetings with sales representatives are related to changes in both prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

852. The U.S. Senate Homeland Security & Governmental Affairs Committee recently issued a Staff Report which noted the link between drug maker payments to prescribers and physician prescribing practices. It found that "a clear link exists between even minimal manufacturer payments and physician prescribing practices."[231] The Report quotes ProPublica findings that "doctors who received industry payments were two to three times as likely to prescribe brand-name drugs at exceptionally high rates as others in their specialty."

853. Further, it is common sense that sophisticated drug companies do not invest huge amounts of resources, in both time and money, without expecting a return on their investment.

      b.    The City's Increased Opioid Prescribing and costs

854. Increased opioid prescriptions—and the attendant and consequential costs—for opioids prescribed for chronic pain, as opposed to acute and cancer or end-of-life pain, were the result of Defendants' deceptive and unfair conduct. National data indicate that 87% of all opioids dispensed were to chronic pain patients using opioids long-term, whereas only 13% were for acute or cancer pain.

855. The connection between Defendants' marketing and opioid prescribing is confirmed both by documents provided by Defendants, which begin to describe their efforts to train, target, market to, and track Chicago prescribers, and by the City's interviews with many of these doctors.

---

[231] Staff Report, Fueling an Epidemic, Insys Therapeutics and the Systemic Manipulation of Prior Authorization at 7.

856.     As described above, Defendants' marketing in Chicago took varied forms.
Defendants heavily relied on speakers bureau programs, in which Chicago-area physicians
received very prescriptive training—including slide decks and scripts to which they were
expected to adhere—and then were paid to speak to other Chicago physicians at Defendant-
funded events.  Documents produced by Cephalon, Endo, and Janssen identify at least 36
Chicago physicians who were trained in their speakers bureaus from 2002 to 2013.

857.     These speakers themselves responded to Defendants' marketing by prescribing
opioids.

858.     But the true value of these speakers was as a force multiplier, generating
prescriptions by passing on Defendants' biased messages supporting opioid treatment for chronic
pain, with the misrepresentations contained in their scripts, to the speakers' peers.

859.     Defendants also targeted Chicago-area prescribers and potential prescribers for
visits by the companies' sales representatives.  As described above in Section V.E, Defendants
carefully tracked the prescribing behavior of Chicago prescribers, targeting them by specialty,
prescribing volume, and other criteria.  Documents produced by Defendants Cephalon, Endo,
and Janssen specifically identify at least 84 Chicago-area prescribers who were described as
"targets" for detailing from 2006-2012, and based on Defendants' actual detailing practices, they
targeted many more.  Defendant Janssen met with at least 125 different Chicago-area prescribers
at least once between August 2009 and May 2013 to promote Nucynta alone.  These physicians,
many of whom were visited numerous times in that period, responded to the marketing pitches
by prescribing Defendants' opioids.

860.     The City interviewed numerous Chicago doctors who prescribed opioids for
chronic pain to Chicago consumers and City employees, and these interviews confirmed the

influence of Defendants' deceptive marketing. These doctors relied on treatment guidelines or scientific articles, attended CMEs, were visited by drug representatives, and were trained by doctors who provided Defendants' deceptive messages. These doctors explained that: (a) many of their chronic pain patients became addicted to opioids; (b) they frequently had to prescribe opioids for months—or longer—solely to taper addicted chronic pain patients from the drugs; (c) few of their patients were advised or aware of the risks of addiction from long-term use of opioids; and (d) based on their own experience, they now regard opioids as inappropriate for chronic pain, largely because of the incidence of addiction, the lack of efficacy of opioids over time and without escalating doses, and other adverse effects, like hyperalgesia. The following are examples of Chicago-area physicians' experience with the consequences of Defendants' deceptive opioid marketing. Each of these Chicago-area prescribers prescribed opioids manufactured by Defendants. They are included in this Fifth Amendment Complaint to demonstrate the links between Defendants' marketing and increased prescribing activities, not to identify claims for which the City seeks recovery. To be clear, the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans:

861.    Chicago Prescriber B, an anesthesiologist, has used many of the major brands and types of opioids, including those marketed by Actavis, Endo, Janssen, and Purdue. As noted above in Section V.E, Prescriber B reported that he talked with opioid manufacturers' sales representatives on a regular basis and that he has met with detailers from Actavis, Endo, Janssen, and Purdue.

862.    Prescriber B also has attended, and continues to attend, drug company-sponsored CMEs on the use of opioids. He knows that the programs may be biased, but he relies on the

information because he has no time to research the issue on his own. Prescriber B indicated he was most likely to trust information presented in CMEs by other physicians, even where he knew those CMEs were sponsored by drug companies.

863.     Prescriber B has reigned in his opioid prescribing in recent years because of the problems he has seen related to abuse and addiction. Knowing what he knows now, he would have prescribed fewer opioids in the past. He feels he did not previously have complete information about the risks and benefits of opioids.

864.     Chicago Prescriber D is a family care physician in Melrose Park, Illinois. He has met with sales representatives from Actavis, Endo, and Purdue. Representatives from all of these companies said that their products were "steady state" drugs without peaks and troughs, which he interpreted to mean that the drugs were less likely to be addictive. The sales representatives did not typically bring up addiction other than to represent that there is a lower addiction risk with long-acting opioids.

865.     Prescriber D indicated he has relied on sales representatives and the information they provide. In the past, his understanding was that long-acting opioids were less addictive. He did not comprehend how addictive opioids could be, but he came to that knowledge over time as he experienced it in his practice. He believes sales representatives should be more up front about opioid addiction.

866.     Chicago Prescriber RR specializes in internal medicine at the University of Illinois Hospital and Health Sciences System (located in Chicago) and regularly treats pain patients. He explained that most of the patients for whom he prescribed opioids complained of chronic pain in their lower back or, less frequently, osteoarthritis. He noted that many patients seeking treatment for pain were already prescribed opioids prescribed by another doctor,

typically their primary care physician. He noted, further, that many of the patients he followed had taken opioids for more than a year.

867.   Though Prescriber RR observed that most patients eventually begin to self-escalate their dose, and then seek early refills—a sign of addiction—he explained that he learned through medical school and in his early residency that opioids were safer than NSAIDs and more effective. Prescriber RR described this view as engrained in the curriculum.

868.   Based on his own clinical experience and research, Prescriber RR does not now believe that opioids are medically appropriate for chronic pain as a first-line treatment, but reluctantly prescribes opioids to patients to try to taper them off the drugs. Prescriber RR described opioids as almost always requiring escalating doses. He further noted that it is very hard to end opioid therapy. Even successful weaning takes six months to a year, depending on how long the patient was on the drugs.

869.   Prescriber RR noted further that one of the dangers of opioids, beyond the risk of addiction, is that they distract from other, more successful treatments, such as physical therapy, weight loss, or treatment for mental health issues.

870.   Chicago Prescriber SS, a physician who has worked with veterans seeking treatment for pain, indicated that he unfortunately prescribes opioids for chronic pain. He explained, based on his clinical experience and observations, that opioids are taken for much longer than is safe or necessary. Prescriber SS based his opinion on the fact that patients—even if they had no intention to abuse the drug—often become so tolerant and dependent that it is difficult to stop using the drugs. Prescriber SS has prescribed opioids that he would not have prescribed but for the fact that patients become addicted through chronic opioid therapy and thus need to be tapered off the drug.

871.     As a result of Defendants' conduct, Prescriber SS previously learned that opioids are the most appropriate treatment for chronic pain.  He also observed other providers using opioids for chronic pain and found support for their opioid use in medical literature he had read. He also specifically pointed to the AAPM/APS Guidelines as one source of his support for his opinions about opioids.  These guidelines, Prescriber SS explained, made him more willing to prescribe opioids for chronic pain; as he explained, doctors want to know what others are doing and that there is science behind the practice.  He also noted, generally, that professional organizations promoted opioids to treat chronic pain.

872.     More recently, the prevalence of opioid abuse and addiction changed Prescriber SS's views on the use of opioids.  He explained that the institution at which he works has similarly experienced a change in practice as to the proper way to treat chronic pain.  He also observed that doctors often feel their hands are tied because their patients come to them already on opioids for chronic pain.

873.     The influence of Defendants' deceptive marketing in Chicago extends far beyond the physicians who were detailed by Defendants' sales representatives or attended their talks or CMEs, however.  Defendants' campaign to change the medical and public perception of opioids resulted in health care providers writing opioid prescriptions to treat chronic pain even though they never were direct targets of Defendants' deceptive marketing.  They prescribed these drugs because it was the new normal—their patients demanded them, and their colleagues prescribed them, and the medical profession more generally had adopted Defendants' message that the appropriate treatment of pain required such drugs.  Even some who were more circumspect about prescribing opioids for chronic pain ended up doing so because they had patients who were addicted or they wished to avoid conflict with patients who requested them.

874.     The following are examples of Chicago physicians who do not recall being exposed to Defendants' marketing but nevertheless prescribe opioids, albeit with reservations about their consequences:

875.     Chicago Prescriber JJ, a family practice physician, does not recall being exposed to opioid marketing but does prescribe the drugs.  In the past, she prescribed opioids primarily to treat acute pain.  More and more, however, she uses opioids—generally hydrocodone with Tylenol, and also OxyContin—for the treatment of chronic pain associated with non-terminal illnesses.  Recently, she has been uncomfortable with the amount of opioid prescriptions she writes.  Prescriber JJ has become aware of heightened concerns about opioid addiction and the risk of overdose.  She believes there is an epidemic of pain medication, and is worried she may be contributing to this epidemic.

876.     Chicago Prescriber KK, who practices internal and geriatric medicine, "unfortunately" prescribes opioids.  He has not attended a pain CME, unless it was part of a larger internal medicine or primary care presentation, and sales representatives are not permitted in his building.  However, he has patients who became addicted to opioids, and he does prescribe opioids to this population.  He has patients who have been on OxyContin for more than a year and are "going nowhere but up"; some of his patients take opioids "like candy."  He believes doctors in general, responding to a message that patients should experience no pain, have gone overboard in using opioids.

877.     Chicago Prescriber LL, an internist, does not attend drug company CMEs and does not receive any sales representatives at his office.  Nevertheless, his practice has been "inundated" with patients who started elsewhere on prescription opioids to treat chronic pain and are now addicted.  Patients "just come in asking for opioids."  He has seen in his health center

that it is very difficult to break these patients' habits, an effort that is the source of arguments between patients and physicians. Two years ago he instituted a "chronic pain contract," requiring patients to do more than take opioids if they wanted refills, including, for example, doing physical therapy, losing weight, or tapering off the drugs over time.

878.    Further, the massive increase of opioids shipped purportedly for medical uses caused increased nonmedical use (diversion and abuse). *See* Atluri et al., *Assessment of the Trends in Medical Use and Misuse of Opioid Analgesics from 2004 to 2011*. Pain Physician, 2014;17:E119-E128.

879.    An internal presentation from Endo describes the causal chain:

"1' Opioid access & use has 1' availability of opioids for misuse" "Rx opioid-related deaths, addiction, abuse & misuse are on the rise" "Increase has paralleled increase in Rx opioid sales" "Teens & young adults are fastest growing groups"

880.    Endo knew its opioid, Opana, was being sold as a street drug and was being widely misused.

881.    One opioid manufacturer's senior employees also found in 2006 that "the extent of abuse expected under the established system of diversion control is a predictable function of the drug's availability, potency, and diversion profit potential (acquisition cost for medicinal use compared to sale price in the illicit market)."[232]

882.    As described above, diversion is also a significant problem in Chicago. As illustrated in ¶ 827, a single rogue prescriber can write as many as a half million or million prescriptions per year. Instead of reporting and declining to supply pill mills and rogue prescribers in the City, however, Defendants' detailed them to promote even more sales, and

---

[232] Wright IV, Curtis, et al. "Risk identification, risk assessment, and risk management of abusable drug formulations." Drug and alcohol dependence 83 (2006): S68-S76

profited the increased prescriptions and black market for diverted opioids that arose alongside their deceptive marketing campaign.

> c.  Increased Opioid Use Has Led to an Increase in Opioid Abuse, Addiction, and Death

883. Nationally, the sharp increase in opioid use has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death.  Scientific evidence demonstrates a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and opioid abuse.  "Deaths from opioid overdose have risen steadily since 1990 in parallel with increasing prescription of these drugs."[233]  Prescription opioid use contributed to 16,917 overdose deaths nationally in 2011—more than twice as many deaths as heroin and cocaine combined; drug poisonings now exceed motor vehicle accidents as a cause of death.  More Americans have died from opioid overdoses than from participation in the Vietnam War.

884. Contrary to Defendants' misrepresentations, most of the illicit use stems from *prescribed* opioids; in 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from drug dealers or the internet.  According to the CDC, the 80% of opioid patients who take low-dose opioids from a single prescriber (in other words, who are not illicit users or "doctor-shoppers") account for 20% of all prescription drug overdoses.

885. Failure to guard against diversion also plays a significant role in the opioid epidemic.

886. DEA's Joe Rannazzisi has testified:

[Diversion] causes death. That is why our police officer had to start carrying Naloxone because there were overdoses. Some communities were overrun with overdoses. We were losing people left and right. In '15 or '14, we lost over

---

[233]  Grady, *supra*, at 1426.

16,000 people just to the pharmaceuticals . . . .[T]hat's what I meant by people die. Diversion causes death.[234]

887.    The Defendants' failure to properly monitor and stop suspicious orders contributed substantially to the diversion.

888.    Death statistics represent only the tip of the iceberg.  According to 2009 data, for every overdose death that year there were nine abuse treatment admissions, 30 emergency department visits for opioid abuse or misuse, 118 people with abuse or addiction problems, and 795 non-medical users.  Nationally, there were more than 488,000 emergency room admissions for opioids other than heroin in 2008 (up from almost 173,000 in 2004).

889.    Emergency room visits tied to opioid use likewise have sharply increased in Chicago.  The U.S. Department of Health and Human Services estimated that in 2009 in Chicago, there were 40.4 emergency department visits involving adverse reactions to opioids per 100,000 people, which, for Chicago's population, translates into 1,080 trips to the emergency room.  Emergency department visits due to opioids increased 153 percent between 2004 and 2011.  In 2009, over 1,200 emergency department visits involved patients who were illicitly using opioids.

890.    Widespread opioid use and abuse in Chicago are problems even where they do not result in injury or death.  According to addiction treatment programs interviewed by the City, opioid addiction is affecting residents of all ages, ethnicities, and socio-economic backgrounds in Chicago.  Many addicts start with a legal opioid prescription—chronic back pain, fibromyalgia, or even dental pain—and do not realize they are addicted until they cannot stop taking the drugs.

---

[234] Rannazzisi Dep., Dkt. # 1969-20 at 426:18-427:2.

891.    These treatment programs told the City that many of their patients reported never being told by their doctor of the risk of addiction from opioids.  The founder and director of one resource center explained that prescription pills are the primary gateway to heroin and that very few of the center's clients were addicted to heroin before they were addicted to pills.  The center's clients have included individuals who became addicted to opioids by first using the drugs at issue here, including OxyContin, MS Contin, Dilaudid, Dilaudid-HP, Butrans, Opana, Opana ER, Percodan, and Percocet.  More than 75% of the center's clients crossed over from opioids to heroin.  Individuals typically increase their opioid doses as their tolerance builds, and then cross into snorting and/or shooting drugs.  The center's clients who first received opioids through prescriptions were initially prescribed opioids by a broad range of prescribers for a variety of ailments, including chronic pain.  The prescribing doctors rarely discussed the risk of addiction with them.

892.    The medical director of another treatment center also said many addicts in his program received no education from their prescribing physicians on addiction risk and consequently had "no clue" of the danger posed; they simply followed doctors' instructions.  A counselor at another treatment center echoed that view, saying that many of the facility's patients did not know when they started on pharmaceutical opioids of the risk they might become addicted.  A Chicago physician specializing in addiction treatment said a "minority" of his patients were warned of the risk of addiction by their prescribing physicians.  Other physicians treating opioid addiction spoke of their patients feeling misled because they were not told of the risk they could become addicted to their prescription opioids.   These patients note that they would have never started on opioids had they known what might follow.

893. A founder of another resource center, who estimates that the center sends 200 individuals per month to local in-patient treatment centers and supports over 200 individuals a week in recovery and support groups, similarly noted prescribers' failure to educate patients regarding the risks of addiction. The center's clients have included individuals who became addicted to opioids by first using lawfully obtained prescriptions for drugs at issue here, including OxyContin, MS Contin, Dilaudid, Fentora, Duragesic, Percocet, and Percodan. 80% of the center's clients cross over from opioids to heroin. And the rate of relapse for those individuals in recovery is high—an estimated 90 to 95%.

894. Those Chicago patients who spoke to the City echoed themes of not being warned and not being aware when they started that they could become addicted to opioids prescribed to them by their doctors.

895. In 2015, the top prescriber of opioids in the City, Prescriber A, transmitted Defendants' misrepresentations to a former runner and athletic trainer seeking treatment for pain. He told the patient that opioids would improve the quality of her life and that, by taking opioids, including Nucynta and Nucynta ER, she would be able to return to running and cycling. The doctor told this patient that she might be on opioids for the rest of her life but that they were necessary for her to lead the active life she had before the onset of her pain. When the patient asked the doctor about addiction, he brushed off her concerns.

896. One Chicago addiction treatment patient is a waitress who suffered a back injury on the job and saw a physician for the pain. The doctor prescribed 5 mg Norco, which worked for about a month. She told the doctor she needed more, and he increased the dose to 10 mg. He never warned her about the risk of addiction. She was taking two pills a day, but soon started taking four pills to get the same pain relief, and within a few months she was up to 10 pills per

day. After about 5-6 months, the doctor cut her off – a story repeated by many patients whose addiction eventually became evident to their doctors. She turned to the street for more opioids, obtaining them through doctor-shopping, using aliases, going to an emergency room, or working through "someone who knew someone" who could get them. She has suffered severe withdrawal symptoms when she has attempted to kick the habit. She is now treated with daily methadone.

897.    Another recovering addict in Chicago was prescribed opioids in 2012 after he slipped and hurt his back. He saw a pain specialist in Chicago, who prescribed Tramadol. His primary care physician also prescribed opioids for his pain, including Norco and fentanyl. A nurse, he had some knowledge of addiction, but understood he would not get addicted if he took the medications as directed. While the opioids worked for a while, the pain returned, and he ended up increasing his dose, taking the drugs more often, or combining drugs. He was fired for appearing drunk on the job, which he attributed to all the medications he was taking. He did not realize he was addicted until he went through withdrawal. He has been in rehab since late 2013 and still craves opioids for his pain.

898.    These glaring omissions, described consistently by counselors and patients, mirror and confirm Defendants' drug representatives' own widespread practice, as described above, of omitting any discussion of addiction from their sales presentations to physicians or in their "educational" materials.

899.    Defendants' failures to maintain effective controls against diversion also compounded this harm. When Congress enacted the CSA, and when DEA adopted its implementing regulations, they did so out of a recognition that a lack of controls against diversion of controlled substances would lead to real harm in communities across America. That is precisely

what has happened. Expert analysis in the MDL, for example, demonstrated that increases in shipments of prescription opioids was a direct and substantial cause of the rapid growth in mortality from both licit and illicit opioid-related mortality in the past 20 years. The same report described a link between shipments of prescription opioids and higher crime.[235]

900. This harm was all too foreseeable to the Defendants. As, the DEA recognized in *Southwood*, the legal controls imposed by the CSA are "of critical importance in protecting the American people from this extraordinary threat to public health and safety." *Id.* at 36504; *see also Masters Pharm., Inc.*, 80 Fed. Reg. 55418, 55475 (Drug Enf't Admin. Sept. 15, 2015), *affirmed, Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017) (CSA's "core purposes" is to "prevent prescription drug abuse and the diversion of drugs to persons who seek to abuse them."). In *In the Matter of Southwood Pharmaceuticals Inc.*, the failure to maintain suspicious order controls caused diversion of opioids. 72 FR 36487, 26500 (2007) ("In short, the direct and foreseeable consequence of the manner in which Respondent conducted its due diligence program was the likely diversion of millions of dosage units of hydrocodone.").

901. Defendants' failures to control the supply chain are not merely technical violations without consequence, but rather a substantial and foreseeable contributing factor in causing the opioid epidemic. And as Joe Rannazzisi, former head of DEA's Office of Diversion Control testified, the pill mill pharmacies and doctors – while perhaps small in volume as an overall percentage – "that small percentage is doing a huge amount of harm."[236]

---

[235]

[236]

902.    Indeed, it is surely the case that diverted opioids are disproportionately linked with abuse and addiction.  Every diverted pill is headed for non-medical use, which Defendants, in the MDL, have not disputed is linked to abuse and addiction.

        d.      <u>Increased Opioid Use Has Increased Costs Related to Addiction Treatment and other Services.</u>

903.    By May 2014, Illinois had seventy-one Certified Opioid Treatment Programs, thirty-one of which are in the City of Chicago.  By way of contrast, Tennessee, whose opioid epidemic is among the worst in the nation, has only twelve.  These treatment programs, by all reports, do not even begin to meet the need for services.

904.    In addition to intense counseling, many treatment programs prescribe additional drugs to treat opioid addiction.  Nationally, in 2012, nearly 8 billion prescriptions of the two drugs commonly used to treat opioid addiction—buprenorphine/naloxone and naltrexone—were written and paid for.  Studies estimate the total medical and prescription costs of opioid addiction and diversion to public and private healthcare payors at $72.5 billion.

905.    The City's workers' compensation program and health benefit plans have expended approximately $2.4 million on addiction treatment services from May 2013 to May 2015.  Additionally, claims data indicate that non-retirees covered by the City's health plans had 835 days of inpatient therapy between May 2013 and May 2015, causing these employees to miss work.

906.    As one expert in the MDL explained, misconceptions promoted by Defendants about the risks and benefits of opioids "were the single most significant factor giving rise to the

massive increase in the sale of opioids and the resulting epidemic of dependence and addiction . . .."[237]

907.    Defendants' conduct in fueling, instead of maintaining effective controls to guard against, diversion of their opioids likewise caused the City to incur costs to provide addiction treatment and respond to the opioid epidemic.  Indeed, the Supreme Court has long recognized the inherent causal relationship between diversion of opioids and harm to the public. *Direct Sales Co.*, 319 U.S. at 710-11 ("The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, aris[es] from the latters' inherent capacity for harm and from the very fact they are restricted . . . .").

908.    Independent research demonstrates a close link between opioid prescriptions and opioid abuse.  For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[238]  It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

909.    There is a parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes.  The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[239]

---

[237]

[238] Theodore J. Cicero *et al.*, *Relationship Between Therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban* Locations in the United States, 16(8) Pharmacoepidemiology and Drug Safety, 827-40 (2007).

[239] Robert M. Califf, M.D., *et al.*, *A Proactive Response to Prescription Opioid Abuse*, New Eng. J. Med., 1480-85 (2016), http://www.nejm.org/doi/full/10.1056/NEJMsr1601307.

910.    Notably, Endo representatives admitted responsibility for increases in abuse due to increased supply. Speaking at a 2012 Pain Management Summit, Neil Shusterman, an Endo V.P., stated: "Everybody's seen this slide [below]. I don't see how any of these talks can start without showing the magnitude of the problem. And we felt that being responsible to what we knew to be our specific contribution to the problem was the right thing to do." He then displayed the following slide:



911.    At that time, Mr. Shusterman thus recognized that aggregate data from the National Vital Statistics System and ARCOS was enough to show what he termed "our specific contribution to the problem."

912.    Janssen also admits the connection between market saturation and the terrible harms as the "data show that as the number of prescriptions for opioid drugs increases, so does the frequency of misuse, abuse, overdose and drug-related fatalities."

    e.  <u>Increased Opioid Use Has Fueled An Illegal Secondary Market for</u>
       <u>Narcotics and the Criminals Who Support It</u>

913. Defendants' misconduct dramatically expanded the market for both licit and illicit prescription opioid use. By supplying opioids into the City that they knew, or should have known, would be diverted, Defendants fostered a black market for diverted opioids.

914. In addition, because heroin is cheaper than prescription painkillers, many prescription opioid addicts migrate to heroin. Self-reported heroin use nearly doubled between 2007 and 2012, from 373,000 to 669,000 individuals and, in 2010, more than 3,000 people in the U.S. died from heroin overdoses, also nearly double the rate in 2006; nearly 80% of those who used heroin in the past year previously abused prescription opioids. Patients become addicted to opioids and then move on to heroin because these prescription drugs are roughly four times more expensive than heroin on the street. In the words of one federal DEA official, "Who would have ever thought in this country it would be cheaper to buy heroin than pills . . . [t]hat is the reality we're facing."[240]

915. That reality holds in Chicago. According to addiction programs in Chicago, a typical course is addicts requesting more and more opioids from their doctors, who eventually cut them off. Many then doctor-shop for additional prescriptions. Defendants, as noted above, continued to detail, supply, and failed to report pill mills and prescribers engaged in diversion, including in Chicago. When these sources run out, individuals who have developed addiction turn to the streets to buy opioids illicitly. A significant number become heroin addicts. Addiction treatment programs, whose patient populations vary, reported rates of patients who had switched from prescription opioids to heroin ranging from half to 95%. Those

---

[240] Matt Pearce & Tina Susman, *Philip Seymour Hoffman's death calls attention to rise in heroin use*, L.A. Times, Feb. 3, 2014, http://articles.latimes.com/2014/feb/03/nation/la-na-heroin-surge-20140204.

addicts who do reach treatment centers often do so when their health, jobs, families and relationships reach the breaking point or after turning to criminal activity such as prostitution and theft to sustain their addiction. Unfortunately, few are successful in getting and staying clean. Addiction treatment centers told the City that repeated relapse is common; one Chicago addiction center estimated that only 5-10% of its patients reach abstinence on a long-term basis.

### 2. Defendants' Unlawful Conduct Has Led to Record Profits.

916. While the use of opioids has taken an enormous toll on the City of Chicago and its residents, Defendants have realized blockbuster profits. In 2012, health care providers wrote 259 million prescriptions for painkillers—roughly one prescription per American adult. Opioids generated $8 billion in revenue for drug companies just in 2010.

917. Financial information—where available—indicates that Defendants each experienced a material increase in sales, revenue, and profits from the fraudulent, misleading, and unfair market activities laid out above. Purdue's OxyContin sales alone increased from $45 million in 1996 to $3.1 billion in 2010. In 2010, Research Firm Frost & Sullivan projected an increase to $15.3 billion in overall revenue from opioid sales by 2016.

### 3. Defendants Fraudulently Concealed their Violations of Law.

918. At all times relevant to this Fifth Amended Complaint, Defendants took steps to avoid detection of and fraudulently conceal their deceptive marketing and conspiratorial behavior.

919. First, and most prominently, Defendants disguised their own roles in the deceptive marketing of chronic opioid therapy by funding and working through patient advocacy and professional front organizations and KOLs. Defendants purposefully hid behind these individuals and organizations to avoid regulatory scrutiny and to prevent doctors and the public from discounting their messages.

920.    While Defendants were listed as sponsors of many of the publications described in this Complaint, they never disclosed their role in shaping, editing, and exerting final approval over their content.  Defendants exerted their considerable influence on these promotional and "educational" materials.

921.    In addition to hiding their own role in generating the deceptive content, Defendants manipulated their promotional materials and the scientific literature to make it appear that they were accurate, truthful, and supported by substantial scientific evidence.  Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.  The true lack of support for Defendants' deceptive messages was not apparent to the medical professionals who relied upon them in making treatment decisions, nor could they have been detected by the City.

922.    Defendants additionally fraudulently concealed their failure to maintain effective controls to prevent diversion and their failure to identify, report, and exercise due diligence to stop shipment of suspicious orders of opioids.  Instead, Defendants publicly extolled their efforts to comply with the law and their compliance programs.

923.    Defendants were also uniquely positioned to identify prescribers engaged in diversion and suspicious orders, through their sales visits and access to third-party vendor and chargeback data.  The City, conversely, could not have identified suspicious prescribing or orders to the same degree.

924.    These public statements created the false and misleading impression that the Defendants rigorously carried out their duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and as a matter of corporate responsibility to the communities their business practices would necessarily impact.

925.    Thus, while the opioid epidemic was evident, Defendants, in furtherance of their respective marketing strategies, intentionally concealed their own role in causing it.  Defendants successfully concealed from the medical community, patients, and health care payers, facts sufficient to arouse suspicion of the existence of claims that the City now asserts.  The City was not alerted to the existence and scope of Defendants industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

926.    Through their public statements, marketing, and advertising, Defendants' deceptions deprived the City of actual or presumptive knowledge of facts sufficient to put them on notice of potential claims.

## VI.    COUNT ONE

## CONSUMER FRAUD—DECEPTIVE PRACTICES

### VIOLATIONS OF MCC § 2-25-090
### AGAINST ALL DEFENDANTS

927.    The City realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Count.

928.    MCC § 2-25-090 makes it unlawful for a business to "engage in any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city" including "[a]ny conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act."  The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, makes unlawful, among other things, "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'"

929.    Defendants have engaged in unlawful and deceptive business practices in violation of the Municipal Code as set forth above.

930. Defendants' practices as described in the Complaint are deceptive business practices that violate MCC § 2-25-090 because the practices were and are intended to deceive consumers and occurred and continue to occur in the course of conduct involving trade and commerce in the City.

931. At all times relevant to this Complaint, Defendants, directly, through their control of third parties, and/or by aiding and abetting third parties,[241] violated MCC § 2-25-090 by making and disseminating untrue, false, and misleading statements to Chicago prescribers and consumers to promote the sale and use of opioids to treat chronic pain, or by causing untrue, false, and misleading statements about opioids to be made or disseminated to Chicago prescribers and consumers in order to promote the sale and use of opioids to treat chronic pain. These untrue, false, and misleading statements included, but were not limited to:

   a. Claiming or implying that opioids would improve patients' function and quality of life;

   b. Mischaracterizing the risk of opioid addiction and abuse, including by stating or implying that opioids were rarely addictive, that "steady state" and abuse-resistant properties meant the drugs were less likely to be addictive or abused, and that specific opioid drugs were less addictive or less likely to be abused than other opioids;

   c. Claiming or implying that addiction can be avoided or successfully managed through the use of screening and other tools;

   d. Promoting the misleading concept of pseudoaddiction, thus concealing the true risk of addiction;

   e. Mischaracterizing the difficulty of discontinuing opioid therapy, including by mischaracterizing the prevalence and severity of withdrawal symptoms;

---

[241] Here and in the subsequent counts of the Complaint, the allegations that Defendants acted with and through third parties pertain to Defendants Cephalon, Endo, Janssen, and Purdue. The City does not allege that Actavis acted with or through third parties.

    f.   Claiming or implying that increased doses of opioids pose no significant additional risk;

    g.   Misleadingly depicting the safety profile of opioids prescribed by minimizing their risks and adverse effects while emphasizing or exaggerating the risks of competing products, including NSAIDs;

    h.   In the case of Purdue, mischaracterizing OxyContin's onset of action and duration of efficacy to imply that the drug provided a full 12 hours of pain relief; and

    i.   Publicly promoting themselves as legally compliant and committed to combatting the opioid epidemic, while failing to maintain effective controls to prevent diversion and to monitor for, report, and stop shipment of suspicious orders of opioids.

932.  At all times relevant to this Complaint, Defendants, directly, through their control of third parties, and by aiding and abetting third parties, also violated MCC § 2-25-090 by making statements that omitted or concealed material facts to promote the sale and use of opioids to treat chronic pain.  Defendants and their third-party allies repeatedly failed to disclose or minimized material facts about the risks of opioids, including the risk of addiction, significant risks of side effects, and their risks compared to alternative treatments, including NSAIDs.  Such material omissions were deceptive and misleading in their own right, and further rendered even otherwise truthful statements about opioids untrue, false, and misleading, creating a misleading impression of the risks, benefits, and superiority of opioids for treatment of chronic pain.

933.  At all times relevant to this Complaint, Defendants, directly, through their control of third parties, and by aiding and abetting third parties, made and disseminated the foregoing untrue, false and misleading statements, and material omissions, through an array of marketing channels, including but not limited to: in-person and other forms of detailing; speaker events, including meals, conferences, and teleconferences; CMEs; studies, and journal articles and supplements; advertisements; and brochures and other patient education materials.

934. Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public. In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority of opioids.

935. The third-party KOLs and Front Groups which Defendants aided and abetted likewise knew at the time of making or disseminating these misstatements and material omissions that such statements were untrue, false, or misleading and therefore likely to deceive the public. Defendants were aware of the misleading nature of the misstatements and material omissions made by KOLs and Front Groups, and yet Defendants provided them substantial assistance and encouragement by helping them develop, refine and promote these misstatements and material omissions and distributing them to a broader audience. Defendants also substantially encouraged the dissemination of these misstatements and material omissions by providing the Front Groups and KOLs with funding and technical assistance for the shared purpose of issuing misleading, pro-opioid messaging.

936. Defendants additionally affirmatively misrepresented their compliance with obligations to prevent the diversion of opioids into illicit channels. Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public. In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false,

and misleading impression regarding the existence and sources of diversion and their own corporate conduct.

937.    In sum, Defendants:  (a) directly engaged in untrue, false and misleading marketing; (b) exercised editorial control over and disseminated the untrue, false, and misleading marketing of KOLs and Front Groups; and (c) aided and abetted the untrue, false, and misleading marketing of KOLs and Front Groups.  Thus, while Defendants made, controlled, and disseminated deceptive marketing themselves, Defendants also are independently liable for the deceptive activity of third parties.

938.    All of this conduct, separately and collectively, was intended to deceive Chicago consumers who used or paid for opioids for chronic pain; Chicago physicians who prescribed opioids to consumers to treat chronic pain; and Chicago payors, including the City, who purchased, or covered the purchase of, opioids for chronic pain.

WHEREFORE, PLAINTIFF, CITY OF CHICAGO, respectfully requests that this Court enter an order (a) awarding judgment in its favor and against Defendants on Count One of the Complaint; (b) enjoining Defendants from performing or proposing to perform any acts in violation of the MCC § 2-25-090; (c) compelling Defendants to pay civil penalties up to $10,000 per violation pursuant to § 2-25-090 for each day the violations occurred; (d) compelling Defendants to pay the cost of the suit, including attorneys' fees; and (e) awarding the City such other, further, and different relief as this Honorable Court may deem just.

## VII.    COUNT TWO

## CONSUMER FRAUD—UNFAIR PRACTICES

## VIOLATIONS OF 815 ILCS 505/2 AND MCC § 2-25-090
## AGAINST ALL DEFENDANTS

939.    The City realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Count.

940. The MCC § 2-25-090 makes it unlawful for a business to "engage in any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city," including "any conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act." The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, makes unlawful, among other things, "[u]nfair . . . acts or practices."

941. At all times relevant to this Complaint, Defendants, directly, through their control of third parties, and/or by aiding and abetting third parties, violated the Illinois Consumer Fraud and Deceptive Business Practices Act—and therefore MCC § 2-25-090—by engaging in unfair acts or practices to promote the sale and use of opioids to treat chronic pain. These acts or practices are unfair in that they offend public policy; are immoral, unethical, oppressive, or unscrupulous; and have resulted in substantial injury to Chicago consumers that is not outweighed by any countervailing benefits to consumers or competition.

942. Defendants' unfair acts or practices include, but are not limited to:

    a. Targeting a vulnerable population—the elderly—for promotion of opioids to treat chronic pain in the face of the known, heightened risks of opioid use to that population, including risks of addiction, adverse effects, hospitalization, and death;

    b. Targeting a vulnerable population—veterans—for promotion of opioids to treat chronic pain in the face of the known, heightened risks of opioid use to that population, including risks of addiction, overdose, and self-inflicted or accidental injury;

    c. Engaging in untrue, false, unsubstantiated, and misleading marketing, directly and with and through third parties in violation of 21 C.F.R. § 202.1(e), thereby causing their drugs to be misbranded;

    d. Promoting other purported advantages of their opioid products, including but not limited to decreased risk of

abuse, addiction, or withdrawal symptoms or their superiority to NSAIDs, without substantial scientific evidence to support their claims, in violation of FDA regulations, including 21 C.F.R. § 202.1(e);

e.  Failing, despite the known, serious risks of addiction and adverse effects posed by opioids, to present a fair balance of benefit and risk information in their promotion of opioids, in violation of FDA regulations, including 21 C.F.R. § 202.1(e);

f.  Deliberately using unbranded marketing to evade FDA oversight and rules prohibiting deceptive marketing;

g.  Promoting their opioids for off-label uses in the case of Cephalon, by marketing Actiq and Fentora for treatment of non-cancer pain and/or for use in non-opioid-tolerant patients; and

h.  Failing to maintain effective controls to prevent diversion and to monitor for, report, and halt suspicious orders of opioids.

943.    Defendants engaged in these practices both directly and through the KOLs and Front Groups that they controlled and/or which they aided and abetted.  Defendants were aware of the unfair conduct of the KOLs and Front Groups, and yet Defendants provided them substantial assistance and encouragement by helping them engage in the unfair practices. Defendants also substantially encouraged the unfair practices by providing the Front Groups and KOLs with funding and technical support for the shared purpose of issuing unfair, pro-opioid messaging.

a.  Defendants' unfair acts or practices include, but are not limited to, failing to maintain effective controls to prevent opioid diversion, in violation of the CSA and Illinois Controlled Substances Act ("ICSA")"), by:Failing to create, maintain, and use a compliance

program that maintains effective controls to prevent diversion of opioids;

b.      Failing to create, maintain, and use a compliance program that detects suspicious orders of opioids, including through the use of rigid and inflated thresholds for orders;

c.      Failing to use available information, including data obtained from Data Vendors, chargeback data, or observations of their sales force to prevent diversion;

d.      Failing to monitor compliance by Defendants' wholesaler customers; and

e.      Failing to report and reject suspicious orders once identified.

944.    Defendants' promotional practices and failure to employ effective controls against diversion of their drugs as described above offend deep-seated public policies. As the Illinois legislature has decreed, "drug addiction [is] among the most serious health problem[] facing the people of the State of Illinois."[242] Further, as the Illinois legislature recognized in enacting the ICSA, "the rising incidence in the abuse of drugs and other dangerous substances and its resultant damage to the peace, health, and welfare of the citizens of Illinois" requires a "system of control over the distribution and use of controlled substances."[243] It is also the public policy of the state of Illinois to "shift, to the extent possible, the cost of the damage caused by the existence of the illegal drug market in a community to those who illegally profit from that market."[244]

945.    Defendants' conduct in failing to maintain effective controls against diversion and instead fueling an illicit market in opioids also violates longstanding federal policy, including the policy set forth in the CSA, its implementing regulations, and many years of DEA guidance. As

---

[242]  745 ILCS 35/2.

[243] 720 Ill. Comp. Stat. 570/100 (West 2012).

[244] 740 Ill. Comp. Stat. 57/5 (West 1996).

described above, the CSA (and ICSA) were intended to create a "closed system" for opioids and other addictive drugs. As the Congressional Record reflects, "Such a closed system should significantly reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control." 970 U.S.C.C.A.N. 4566. In enacting the CSA, "Congress was particularly concerned with the diversion of drugs from legitimate channels. It was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic." *United States v. Moore*, 423 U.S. 122, 135 (1975).

946. The CSA, its implementing regulations, and DEA guidance all recognize that when registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse. To that end, federal regulations issued under the CSA mandate that all registrants, including manufacturers, "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market. Congress was concerned with the diversion of drugs out of legitimate channels of distribution. In mandating a closed system of distribution, Congress acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[245] Having been placed in a position of special trust and responsibility, rregistrants, including Defendants, are not entitled to be passive (but profitable) observers, but rather "shall inform the Field

---

[245] Statement of Joseph T. Rannazzisi, U.S. House Committee on Energy and Commerce Subcommittee on Health, Improving Predictability and Transparency in DEA and FDA Regulation (April 7, 2014) (quoting H.R. Rep. No. 91-1444, 1979 U.S.C.C.A.N. at 4572), https://www.dea.gov/pr/speeches-testimony/2014t/04072014t.pdf

Division Office of the Administration in his area of suspicious orders when discovered by the registrant." 21 C.F.R. § 1301.74(b).

947.    Nevertheless, by engaging in the conduct alleged above, Defendants actively worked to conceal the risk of addiction related to opioids from Illinois patients and prescribers in the hopes of selling greater quantities of their dangerous drugs. Defendants also worked to undermine public policy, enshrined by regulations contained in state and federal law, that is aimed at ensuring honest marketing and safe and appropriate use of pharmaceutical drugs.  In addition, Defendants profited from the opioid epidemic in the City, turning a blind eye to orders of opioids that Defendants knew or should have known were likely to be diverted and concealing their failure implement effective suspicious order monitoring systems and comply with their legal obligations.

948.    Defendants' conduct also was oppressive to both patients and prescribers. Patients are laypersons who put their trust in physicians to appropriately convey and balance the risks and benefits of various treatment options.  Physicians, in turn, are inclined to trust the advice of KOLs, Front Groups, and other seemingly independent sources of objective medical information.  By engaging in the conduct described above, Defendants co-opted the sources reasonable physicians relied upon to convince those physicians that the risks related to opioids were minimal, that the benefits were substantial, and—as a result—that opioids were medically necessary to treat their patients' chronic pain.  Defendants deliberately targeted non-specialist physicians and non-physician prescribers, who lacked the time and expertise to evaluate their deceptive claims.  This is even more true of the patients who were both the subject and object of Defendants' marketing; patients have little ability to independently evaluate the medical

necessity of the treatments they are prescribed and rely on the judgment of their physicians instead—the same judgment that was compromised by Defendants' unlawful conduct.

949. Defendants conduct was also oppressive in fueling addication and diversion of drugs specifically known to Defendants to be dangerous because, *inter alia*, these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction. As described above, those who seek treatment for addiction to prescription opioids and heroin or other illicit opioids to which they often transition often struggle with relapse, criminal justice involvement, and other consequences of their addiction.

950. Finally, Defendants' conduct has caused substantial, indeed grievous, injury to Chicago consumers. The staggering rates of opioid use, abuse, and addiction resulting from Defendants' marketing efforts and unfair acts and practices in profiting from illicit opioid use have caused substantial injury to Chicago residents, including, but not limited to:

    a. Upwards of 30% of all adults have used opioids, with the vast majority of the use stemming from prescribing for chronic pain conditions.

    b. A substantial number of Chicago residents prescribed opioids long-term for chronic pain have experienced the life-upending effects of addiction, abuse, misuse, overdose and death. For those who can stop taking narcotic opioids, there are years of struggling with the pull of the drugs and the fear of relapse (and often relapse itself), counseling sessions, or lining up each morning for daily maintenance drugs. And those who cannot overcome the need for opioids must deal with the compulsive use of and need for opioids, the haziness when they are on the drugs, and the nearly constant struggle to maintain their supplies of the drugs, whatever the cost. Both groups face a dramatically heightened risk of serious injury or death and sometimes an unrecoverable toll on their health, work, and family.

    c. Elderly Chicagoans and Chicago veterans are particularly vulnerable to serious adverse outcomes, including overdose, injury, and death;

d.   Chicagoans who have never taken opioids also have also been injured.  Many have endured both the emotional and financial costs of carin2g for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids. Infants born to mothers who abuse opioids have suffered neonatal abstinence syndrome.

e.   Chicago consumers have incurred health care costs due to the prescription of opioids for chronic pain and the treatment of opioids' adverse effects, including addiction and overdose.

f.   Defendants' success in extending the market for opioids to new patients and chronic conditions has also created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.  Defendants' scheme created both ends of a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them.  Defendants compounded these harms and contributed to this illicit market by failing to monitor suspicious orders or to report potential diversion to relevant state or federal authorities, and by failing to exercise due diligence to halt the supply of their opioids entering the illicit marketsmarket.

g.   This demand and the failure to maintain effective controls against diversion of prescription opioids also has created additional illicit markets in other opiates, particularly heroin. Patients addicted to opioids frequently migrate to lower-cost heroin, with the serious personal costs that accompany their use of unlawful drugs.

h.   All of this has caused substantial injuries to consumers—in lives lost; addictions endured; the creation of an illicit drug market and all its concomitant crime and costs; unrealized economic productivity; and broken lives, families, and homes.

951.   The profound injuries to Chicago consumers are not outweighed by any countervailing benefits to consumers or competition since there is no benefit from the deceptive marketing of these narcotic drugs or the failure to maintain effective controls against diversion. Moreover, no public policy justifies Defendants' conduct in overstating the benefits, denying or

downplaying the risks, and misrepresenting the superiority of opioids for chronic pain, which deprived Chicago patients and doctors of the honest and complete information they need to make informed choices about their treatment. Likewise, no public policy justifies Defendants' conduct in fueling and profiting from an illicit market and in failing to maintain effective suspicious order monitoring systems or their concealmentopioids and deception concerning concealing their non-compliance with their statutory obligations to prevent diversion. In light of this campaign of misinformation (and especially given the addictive nature of these drugs), Chicago consumers could not reasonably have avoided their injuries.

WHEREFORE, PLAINTIFF, CITY OF CHICAGO, respectfully requests that this Court enter an order (a) awarding judgment in its favor and against Defendants on Count Two of the Complaint; (b) enjoining Defendants from performing or proposing to perform any acts in violation of the MCC § 2-25-090; (c) compelling Defendants to pay civil penalties up to $10,000 per violation pursuant to § 2-25-g090 for each day the violations occurred; (d) compelling Defendants to pay the cost of the suit, including attorneys' fees; and (e) awarding the City such other, further, and different relief as this Honorable Court may deem just.

## VIII.  COUNT THREE

### MISREPRESENTATIONS IN CONNECTION WITH SALE
### OR ADVERTISEMENT OF MERCHANDISE

### VIOLATIONS OF MCC § 4-276-470
### AGAINST ALL DEFENDANTS

952.    The City realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Count.

953.    Section 4–276–470(1) of the MCC states:

> It shall be [unlawful] for any person to act, use or employ any
> deception, fraud, false pretense, false promise or misrepresentation,

> or to conceal, suppress or omit any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . or advertisement of any merchandise . . . .

954.    Defendants' practices, as described in the Complaint, violate MCC § 4-276-470(1) because the practices were intended to deceive doctors, consumers, and other health care payors and occurred in connection with the sale or advertisement of any merchandise.

955.    At all times relevant to this Complaint, Defendants, directly, through their control of third parties, and by aiding and abetting third parties, violated MCC § 4-276-470(1) by making and disseminating deceptions and misrepresentations to promote the sale and use of opioids to treat chronic pain, or by causing untrue, false, and misleading statements about opioids to be made or disseminated in order to promote the sale and use of opioids to treat chronic pain.

956.    Defendants knew at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were untrue, false, or misleading and failed to disclose material risks and were therefore likely to deceive prescribers, consumers, and other health care payors.  In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority of opioids.

957.    Defendants repeatedly failed to disclose material facts about the risks of opioids. Such material omissions, which are deceptive and misleading in their own right, render even Defendants' seemingly truthful statements about opioids untrue, false, and misleading. In omitting and concealing these material facts, Defendants intended to cause Chicago prescribers, consumers, and other payors of opioid prescriptions to rely on those omissions and concealments.

958.    Defendants also engaged in the fraudulent conduct described above by acting in concert with third party Front Groups and KOLs to make false statements about Defendants' drugs' suitability for the treatment of chronic pain.  Defendants were aware of the misleading nature of the statements and material omissions made by KOLs and Front Groups, and yet Defendants provided them substantial assistance and encouragement by helping them develop, refine and promote these misstatements and material omissions and distributing them to a broader audience.  Defendants also substantially encouraged the dissemination of these misstatements and material omissions by providing the Front Groups and KOLs with funding and technical support for the shared purpose of issuing misleading, pro-opioid messaging.

959.    Defendants additionally affirmatively misrepresented their compliance with obligations to prevent the diversion of opioids into illicit channels.  Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public.  In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression regarding the existence and sources of diversion and their own corporate conduct.

All of this conduct, separately and collectively, was intended to deceive Chicago consumers who used or paid for opioids for chronic pain; Chicago prescribers who prescribed opioids for chronic pain; and other payors that purchased, or covered the purchase of, opioids for chronic pain.

WHEREFORE, PLAINTIFF, CITY OF CHICAGO, respectfully requests that this Court enter an order (a) awarding judgment in its favor and against Defendants on Count Three of the Complaint; (b) compelling Defendants to pay civil penalties up to $2,000 per violation pursuant

to § 4-276-480 for each day the violations occurred; and (c) awarding the City such other, further, and different relief as this Honorable Court may deem just.

## IX. COUNT FOUR

### RECOVERY OF CITY COSTS OF PROVIDING SERVICES

### VIOLATIONS OF MCC § 1-20-020
### AGAINST ALL DEFENDANTS

960. The City realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Count.

961. Section 1-20-020 of the MCC provides, in pertinent part:

> Any person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law, or such person's failure to correct conditions which violate any federal, state or local law when such person was under a legal duty to do so, shall be liable to the city for those costs. This liability shall be collectible in the same manner as any other personal liability.

962. At all times relevant to this Complaint, Defendants, directly, through their control of third parties, and/or by acting in concert with third parties, participated in unlawful acts or lawful acts in an unlawful manner by, among other unlawful conduct:

    a. Violating, or aiding and abetting in the violation of, MCC § 2-25-090 by making and disseminating untrue, false, or misleading statements to promote the sale and use of opioids to treat chronic pain, or by causing untrue, false, and misleading statements about opioids to be made or disseminated in order to promote the sale and use of opioids to treat chronic pain;

    b. Violating, or aiding and abetting in the violation of, MCC § 2-25-090 by engaging in unfair acts or practices, including the deceptive, oppressive, and unscrupulous promotion of opioids to treat chronic pain, in violation of the Illinois Consumer Fraud and Deceptive Business Act;

    c. Violating, or aiding and abetting in the violation of, MCC § 2-25-090 by engaging in unfair acts or practices, including the failure to implement systems to prevent diversion of opioids into

illicit channels, in order to profit from the sale of those opioids for diversion;

d. Violating, or aiding and abetting in the violation of, MCC § 4-276-470 by making and disseminating deceptions and misrepresentations to promote the sale and use of opioids to treat chronic pain, or by causing untrue, false, or misleading statements about opioids to be made or disseminated in order to promote the sale and use of opioids to treat chronic pain;

e. Violating, MCC § 4-276-470 and MCC § 2-25-090 by publicly promoting themselves as legally compliant and committed to combatting the opioid epidemic, while failing to maintain effective controls to prevent diversion and to monitor for, report, and stop shipment of suspicious orders of opioids; and

f. Violating 21 U.S.C. § 331(a) and 21 U.S.C. § 352 by making and disseminating false and misleading statements about the risks, benefits, and superiority of opioids for chronic pain in labels and other written, printed, or graphic matter accompanying their drugs, or causing such statements to be made.

963. Defendants have known at all times relevant to this Fifth Amended Complaint that their statements (and those statements made by the KOLs and third-party Front Groups they directed and assisted) were false and misleading. Defendants also knew, and intended, that their misrepresentations would cause an increase in the use, abuse, and diversion of opioids and their attendant consequences.

964. Moreover, Defendants knew that their drugs were much more harmful then they, or the third parties they acted in concert with, represented and that their conduct would cause substantial harm to the City and its residents. Accordingly, Defendants created conditions that violate the legal provisions outlined above and were under a legal duty to correct those conditions, but failed to do so.

965. Defendants also knew that failure to maintain effective controls against the diversion of opioids would cause increased opioid misuse, addiction, and other harms and

impose costs on governments, including the City. They knew that their efforts to prevent diversion were essential, as Defendants were uniquely positioned to identify pill mills and suspicious orders, through their visits to prescribers and pharmacies and access to third-party vendor and chargeback data. They likewise knew of the consequences of illicit opioids in terms of increased addiction and overdose.

966. The City, through its remedial expenditures, has incurred costs reasonably related to Defendants' violations of federal, state, or local laws, and/or failure to correct conditions that violate those laws. These include costs of providing emergency services in response to opioid-related deaths, overdoses, addiction, and other injury; costs of funding addiction treatment, such as the prescription of additional drugs like buprenorphine/naloxone and naltrexone; the costs related to the diversion and trafficking of opioids and other opioid-related crimes, and other costs attendant to the epidemic of opioid use and abuse in the City.

WHEREFORE, PLAINTIFF, CITY OF CHICAGO, respectfully requests that this Court enter an order (a) awarding judgment in its favor and against Defendants on Count Four of the Complaint; (b) compelling Defendants to pay the costs the City incurred and will incur that are reasonably related to Defendants' violations of federal, state, or local law; (c) compelling Defendants to pay the cost of the suit, including attorneys' fees; and (d) awarding the City such other, further, and different relief as this Honorable Court may deem just.

DATED: December 26, 2019.

Respectfully submitted,

MARK FLESSNER
**Corporation Counsel, City of Chicago**

BY: /s/ *Linda J. Singer*

Thomas P. McNulty
Fiona A. Burke
City of Chicago, Department of Law
30 N. LaSalle St., Suite 1240
Chicago, IL 60602
thomas.mcnulty@cityofchicago.org
fiona.burke@cityofchicago.org
Phone: (312) 744-6929
Fax:    (312) 742-3832

Linda Singer
Elizabeth Smith
David I. Ackerman
MOTLEY RICE LLC
lsinger@motleyrice.com
esmith@motleyrice.com
dackerman@motleyrice.com

401 9th Street NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
Fax:    (202) 386-9622

Kenneth A. Wexler
Bethany R. Turke
Kara A. Elgersma

WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
kaw@wexlerwallace.com
brt@wexlerwallace.com
tad@wexlerwallace.com
Phone: (312) 346-2222
Fax:    (312) 346-0022

*Attorneys for Plaintiff City of Chicago*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26 day of December 2019, I electronically filed the foregoing Document with the Clerk of Court by using the CM/ECF System.  The foregoing will be served on counsel of record subject to the applicable Protective and Confidentiality Orders. A redacted version of the foregoing will be filed in the CM/ECF system and will be served upon counsel of record.

<i>/s/ Linda Singer</i>   <br><u>Linda Singer</u>