**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CITY OF CHICAGO, a municipal corporation,

*Plaintiff*,

v.

PURDUE PHARMA L.P.; et al.,

*Defendants.*

Case No. 14-cv-04361

Honorable Jorge L. Alonso

Magistrate Judge Young B. Kim

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION CONCERNING
PRODUCTION OF MEDICAL AND PHARMACEUTICAL CLAIMS DATA**

## TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ............................................................................................... II

**INTRODUCTION**.............................................................................................................. 1

**BACKGROUND** ............................................................................................................... 2

**ARGUMENT** .................................................................................................................... 5

I. The City's motion should be rejected because the discovery at issue is not only
relevant but critical. .................................................................................................5

    A. The discovery at issue remains relevant to all of the City's claims....................... 5

    B. The discovery at issue is independently relevant to Defendants' defenses. ........... 8

    C. The discovery at issue is proportional to the needs of this case. ......................... 10

II. The City cannot meet the stringent motion for reconsideration standard; nor
should it be permitted to renege on its agreement to produce the broader set of
claims data. ............................................................................................................13

**CONCLUSION** ............................................................................................................... 14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*City of Chicago v. Purdue Pharma L.P.*,
  211 F. Supp. 3d 1058 (N.D. Ill. 2016) ..................................................................5

*E.Z. by Braun v. U.S.*,
  2020 WL 757890 (N.D. Ill. Feb. 14, 2020) ..........................................................13

*In re Neurontin*,
  712 F.3d 21 (1st Cir. 2013).................................................................................9, 10

*People v. ConAgra Grocery Prod. Co.*,
  17 Cal. App. 5th 51 (Cal. Ct. App. 2017) ............................................................10

*Safrithis v. Wilkie*,
  2020 WL 606787 (N.D. Ill. Feb. 7, 2020) ............................................................13

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  2009 WL 2043604 (D.N.J. July 10, 2009), *aff'd* 678 F.3d 235 (3d Cir. 2012) .......................9

*Sergeants Benevolent Ass'n Health & Welfare Fund v. State of Louisiana*,
  806 F.3d 71 (2d Cir. 2015)......................................................................................9

*Sidney Hillman Health Ctr. of Rochester v. Abbott Laboratories*,
  873 F.3d 574 (7th Cir. 2017) ...................................................................................9

*UFC Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010).....................................................................................9

*United States v. Life Care Centers of America, Inc.*,
  2015 WL 10987029 (E.D. Tenn. Feb. 18, 2015) ..................................................10

**Rules**

8 Fed. Prac. & Proc. Civ. § 2011 (3d ed.).......................................................................8

Fed. R. Civ. P. 26 .............................................................................................................8

Fed. R. Civ. P. 26(b)(1)..............................................................................................2, 8

## INTRODUCTION

The City moves the Court for reconsideration of its August 2017 Order requiring Plaintiff to produce some of the most critical discovery in this case: identification of the prescriptions that Plaintiff claims were written in reliance on each Defendant's alleged misrepresentations and that Plaintiff claims led to the harms for which the City seeks to recover. In addition, the City seeks to renege on the City's agreement to produce claims data reflecting a larger set of prescriptions it reimbursed as well as the medical history of the individuals who received them.

The City's motion thus aims to deprive Defendants of highly relevant discovery into whether prescribing decisions were the result of any alleged unlawful conduct by Defendants—as opposed to the result of numerous other factors, such as those inherent to the patient or the doctor's exercise of his/her independent medical judgment based on his/her medical education and experience. For example, Defendants need to know what prescriptions were allegedly written as a result of their conduct so that they can test that contention by examining the City's claims data to see what conditions led to each prescription and whether the prescriber who wrote that prescription had ever received each Defendant's marketing. This is a matter of basic due process.

The operative, as-amended Complaint confirms that this discovery remains highly relevant to the City's claims. For example, as the City's brief acknowledges,[1] Count IV (Cost Recovery under MCC § 1-20-020) requires proof of causation. The City's central causation theory is that Defendants' marketing caused prescribers to write opioid prescriptions that should not have been written, which later led to the City's incurring costs. *E.g.*, Dkt. 727, Corrected Fifth Am. Compl. ("5AC") at ¶¶ 12, 18. For example, the City alleges that Defendants' conduct "change[d] the institutional and public perception" of opioids, and that "[a]s a result, Chicago doctors began

---

[1] *E.g.*, Dkt. No. 723, Pl.'s Memo. in Support of Motion for Protective Order ("Mot.") at 2, 8, 11, 15.

prescribing opioids long-term to treat chronic pain." *Id.* at ¶ 811. "But for the misleading information disseminated by Defendants," the City alleges, "doctors would not, in most instances, have prescribed opioids in the volumes, doses, and durations they did." *Id.* at ¶ 812. Putting aside for now whether those allegations suffice to plead causation, the particular prescriptions those doctors wrote, why they wrote them, and whether and how those prescriptions caused harm to the City is not only relevant but essential.

The discovery at issue is likewise relevant to Defendants' defenses. This independently sufficient basis to deny the City's motion is confirmed by Rule 26(b)(1), which permits discovery into matters relevant to "any party's claims *or defense*." (emphasis added) No matter how the City tries to meet its burden to prove causation—whether by "aggregate proof" or otherwise—Defendants are entitled to the discovery they need to disprove the City's theories. The information this Court previously ordered the City to provide will allow Defendants to examine, for example, whether a doctor ever received any marketing from any Defendant, whether any marketing by any Defendant changed a doctor's prescribing, whether the City continues to reimburse opioid prescriptions for diagnoses it claims are medically unnecessary, and whether prescriptions of Defendant's medications resulted in harm to the City. The information is thus highly relevant.

Defendants therefore respectfully request that the Court (i) deny the motion for reconsideration of the August 2017 Order; and (ii) order the City to promptly produce all claims data in its possession, custody or control, as previously agreed.

## **BACKGROUND**

On July 19, 2017, Defendants moved to compel the City to answer interrogatories and requests for production seeking identification of allegedly wrongful prescriptions, along with other related information. *See* Dkt. 588. The Court granted Defendants' motion on August 21, 2017. *See* Dkt. 604. Specifically, the August 2017 Order required the City to respond to Defendants'

2

interrogatories and RFPs "seeking identification of the following after the close of party written discovery and third-party (except health care providers and patients) written discovery":

(1) "the prescription claims submitted to and paid for by Plaintiff that it asserts were medically unnecessary and to whom they were written";

(2) "the physicians or health care providers who wrote the prescriptions Plaintiff alleges to have been 'medically unnecessary'"; and

(3) "Plaintiff's basis for identifying the prescription claims to be 'medically unnecessary.'"[2]

Separately, the City agreed to provide *all* of its claims data in its possession, custody or control—not just the prescriptions that were allegedly medically unnecessary. *E.g.*, Dkt. 723-4, 9/13/2017 E. Smith Letter to Defendants at 1 (representing that the City would "collect claims data from its workers' compensation division and PPO prescription drug data from its employee benefits division"); Dkt. 723-5, 9/26/2017 M. Bailey Letter at 1 (noting that Defendants "understand that the City is planning to produce data relating to medical or prescription opioid claims submitted under the City's health plans," a statement the City never challenged). The City's lawyers made this representation to the Court at hearings in May 2017[3] and August 2017.[4] Indeed, the City's brief here acknowledges this agreement, stating that "[t]he City ***agreed*** to produce all

---

[2] *Id.*

[3] *E.g.*, Ex. 1, Dkt. 588-2, 5/8/2017 Hearing Tr. at 25:19-25 (the City's lawyer stating that she "would also remind defendants that here the City has agreed to provide all of its claims data"); *id.* at 26:23-24 ("We're providing all of the City's claims for opioids.").

[4] *E.g.*, Ex. 2, 8/21/2017 Hearing Tr. at 49:11-19 (referring to the "claims database that we will be providing to defendants, which will have medical diagnoses" and that would "have all of the coding that will let defendants do their own analysis"); *id.* at 75:23-25 ("So defendants, in the meantime, can have the entire database to do all of the testing and investigating with doctors and others that they wish to do."); *id.* at 59:24-60:8 (the City's lawyer's "hope" was that the City was "weeks away from pulling the trigger" on producing this data).

claims submitted under its medical plans from January 1, 2005, and all claims submitted under its workers' compensation plans from January 1, 2008." Mot. at 5 (emphasis added).

But before the City complied with the August 2017 Order or honored its agreement to produce the full set of claims data, the Court stayed this case pending decision on transfer by the Judicial Panel on Multidistrict Litigation. *See* Dkt. 659, 11/16/2017 Order. In December 2017, the case was transferred into the MDL. Dkt. 664. The City produced no discovery between then and when the case was remanded to this Court in December 2019.

Once remanded, the City moved to amend its Complaint for a fifth time (Dkt. 670), which the Court granted in part and denied in part on February 18, 2020 (Dkt. 713). The result was the Corrected Fifth Amended Complaint, filed on February 19, 2020. The Corrected Fifth Amended Complaint drops several claims. Dkt. 717-3 (redline showing changes). Critically, however, it continues to press claims that require proof of causation, as explained below. *See* 5AC at ¶¶ 904-943. The City's Fifth Amended Complaint also continues to put its claims data squarely at issue. For example, the City still alleges that its "workers' compensation program and health benefit plans have expended approximately $2.4 million on addiction treatment services from May 2013 to May 2015" and that "***claims data indicate*** that non-retirees covered by the City's health plans had 835 days of inpatient therapy between May 2013 and May 2015." 5AC at ¶ 882 (emphasis added).

Despite relying on this data in its own Fifth Amended Complaint and asserting claims that require proof of causation, and despite failing to mention (much less meet) the motion for reconsideration standard, the City filed this motion on February 26, 2020.

## ARGUMENT

I.  **The City's motion should be rejected because the discovery at issue is not only relevant but critical.**

A.  **The discovery at issue remains relevant to all of the City's claims.**

The City attempts to justify its refusal to comply with the ordered identification of allegedly "medically unnecessary" prescriptions and the agreed production of the broader set of claims data by arguing that they are "irrelevant to the City's streamlined claims" in its Fifth Amended Complaint. *E.g.*, Mot. at 10-12. But, while Defendants dispute that the City can plead (much less prove) causation, this discovery remains highly relevant to the claims asserted. Causation is an element of several of the City's causes of action and is central to Plaintiff's allegations. For example, Count Four under MCC § 1-20-020 expressly requires plaintiffs to prove causation, cabining liability to those "who ***cause[]*** the city or its agents to incur costs." MCC § 1-20-020 (emphasis added); *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1076-1081 (N.D. Ill. 2016) (dismissing this count without prejudice for failure to adequately allege causation). And the City's motion repeatedly acknowledges that causation is an essential element of this claim.[5] Causation is also pertinent to Count Two, under MCC § 2-25-090, because the Court already has held that "[i]n order to state a claim for unfair practices, plaintiff must allege that the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) ***causes*** substantial injury to consumers." *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d at 1074 (emphasis added). The operative Complaint continues to rely on this third prong, alleging

---

[5] *E.g.*, Mot. at 2 (acknowledging that Count IV contends that Defendants' conduct "***resulted in*** the City expending significant costs") (emphasis added); *id.* at 8 ("Count IV of the Fifth Amended Complaint requires only that the City demonstrate that Defendants' unlawful conduct ***caused*** the City to incur expenses 'reasonably related' to their conduct.") (emphasis added); *id.* at 11 (same); *id.* at 15 (same).

that Defendants violated this statute by "engaging in unfair acts or practices" that "have resulted in substantial injury to Chicago consumers." 5AC at ¶ 918.

Any conceivable causal chain between each Defendant's alleged misconduct and the City's alleged harms would include—among several other links—precisely what Defendants seek: medically unnecessary prescriptions written by a doctor in reliance on alleged wrongdoing. As the Court put it and as the City's lawyer acknowledged during the August 2017 hearing, the City's fundamental allegation is that Defendants "misrepresented their drugs to the medical providers, medical providers relied on those misrepresentations and then caused the prescription drugs to be provided to the patients and then billed ultimately to the City of Chicago." Ex. 2, 8/21/2017 Hearing Tr. at 38:1-11. That remains true in the Fifth Amended Complaint: While the City no longer seeks to recover for specific prescriptions it reimbursed but rather for various "costs attendant to the epidemic of opioid use and abuse in the City"—such as the provision of addiction and emergency services (5AC at ¶ 943) —the core of the City's purported causal chain remains: alleged misrepresentations to prescribers, reliance on those alleged misrepresentations, medically unnecessary prescriptions resulting from that reliance, and then harm to the City resulting from those prescriptions. Depriving Defendants of the discovery necessary to examine and challenge the steps in that chain involving prescriptions would be unjust and violate principles of due process.

Beyond causation, this discovery is relevant to other elements of the City's claims. Most notably, all four of Plaintiff's claims rely on alleged misrepresentations. *See* MCC § 2-25-090 (Consumer Fraud, Unfair Competition or Deceptive Practices); MCC § 4-276-470 (Misrepresentations in Connection with Sale or Advertisement of Merchandise); MCC § 1-20-020 (Recovery of Costs). Chief among those alleged misrepresentations is the conclusory assertion that Defendants promoted opioid pain medications for uses of which the City now purports to

6

disapprove—most notably, chronic non-cancer pain. *E.g.*, 5AC at ¶ 10. That the City continues to permit the reimbursement as medically necessary of prescriptions for the very types of diagnoses it claims for litigation purposes are inappropriate is powerful evidence that Defendants' alleged representations were *not* false. Similarly, whether opioid medications are appropriate for these uses can be explored by examining individual prescriptions to see why doctors prescribe opioids in exactly those circumstances.

Other courts in ongoing opioid litigation have recognized the relevance and import of this discovery—even where the claims at issue did not involve a request for reimbursement of specific prescriptions. For example, in a case brought by Motley Rice lawyers on behalf of "the People of the State of California," the plaintiff refused to identify inappropriate prescriptions. The California court rejected the plaintiff' argument and ordered the identification of and information about allegedly inappropriate prescriptions:

> Plaintiff alleges that Defendants misrepresent their opiate products, with at least one effect of causing treating physicians to prescribe, and patients to desire, opiate-based pain medication. Plaintiff further alleges that this is but one route by which Defendants have created an overall public health emergency that has ripened into an actionable public nuisance. Without passing any kind of factual judgment on the merits of Plaintiff's case—indeed, taking that case as alleged quite seriously and at face value—*it seems undeniable that Defendants should be able to test the premise at a key hinge point: The circumstances under which individuals are actually prescribed, received, and begin to take opiates.*

Ex. 3, *People of the State of California v. Purdue Pharma L.P. et al.*, No. 30-2014-00725287, Report and Recommendation No. 1 at 7 (emphasis added). Further, in adopting the discovery referee's Report and Recommendation, the California trial court judge held that "Plaintiff's assertion that *it* intends to use aggregate-level data to show causation does not foreclose each Defendant's right to discovery on causation." Ex. 4, 4/11/2019 Minute Order at 2.

Ignoring that decision, the City relies heavily on the option the MDL court afforded the plaintiffs in the Track One Cases to elect to proceed solely on an aggregate proof theory instead of identifying allegedly inappropriate prescriptions and allegedly harmed individuals. *E.g.*, Mot. at 3, 5-6. As an initial matter, Plaintiff ignores the critical point that the MDL court ordered the Track One Plaintiffs to produce all claims data in their possession, custody or control—regardless of whether plaintiffs there disavowed aggregate proof. Mot. at 6-7; *e.g.*, *e.g.*, Ex. 5, Dkt. No. 1147, *Order*, No. 1:17-MD-2804, at ¶ 2 ("[T]he Track one plaintiffs will produce all opioid-related claims data *not* implicated by [a particular privacy statute] with individual-identifying information" and "all claims data that *is* implicated by [that statute] de-identified as to individual information.").

It is not enough for the City to "commit to proceed solely by aggregate proof on its existing claims." Mot. at 3. No matter how Plaintiff attempts to prove its claims, Defendants are entitled to the discovery necessary to rebut them, as explained below. If anything, the City's representation that it will rely solely on aggregate proof makes this discovery *more* relevant. The City's proffered experts' "aggregate proof" model is likely to be engineered such that it says there were *numerous* prescriptions written as a result of Defendants' conduct. Whether the City can identify even *one* medically unnecessary prescription that can be linked to each Defendant's alleged misconduct is highly relevant to the reliability of such a model. If there are such prescriptions, the City must identify them, and the Defendants must have the opportunity to examine them in discovery.

**B.     The discovery at issue is independently relevant to Defendants' defenses.**

Under Rule 26, Defendants are entitled to discovery relevant to either a party's affirmative claim or any party's "defense." Fed. R. Civ. P. 26(b)(1); *see also* 8 Fed. Prac. & Proc. Civ. § 2011 (3d ed.) ("[A] party is entitled to seek discovery on its theory of the facts and the law, and is not limited in discovery by the opponent's theory."). No matter how the City chooses to attempt to

prove its claims, discovery rebutting those claims is discoverable. While a lack of any evidence sustaining the causal chain is fatal to the City's case, the corollary is equally true: The requested discovery, and other evidence to which it may lead, can disprove causation and the other elements of the City's claims. Indeed, in the California case described above where the plaintiff is not seeking reimbursement for specific medically unnecessary prescriptions, the court has repeatedly recognized this too in ordering prescription-level discovery. *E.g.*, Ex. 6, *People of the State of California v. Purdue Pharma L.P. et al.*, No. 30-2014-00725287, Report & Recommendation No. 12 at 9 (holding from discovery referee adopted by trial court judge) ("Indeed, for purposes of discovery, it is of no matter how Plaintiff intends to prove its case at trial. Defendant is entitled to discover facts relevant to its defense.").

None of the City's cited cases holds otherwise. *In re Neurontin* proves Defendants' point. While the *Neurontin* plaintiffs relied on aggregate proof, the defendants in that case had access to individualized discovery and presented it to the jury as part of their defense. *See, e.g.*, 712 F.3d 21, 45 (1st Cir. 2013). Although the First Circuit considered aggregate proof to be sufficient under certain circumstances to establish causation (which is at odds with Seventh Circuit case law), it did so only where the jury heard and rejected precisely the type of discovery Defendants in this case have requested. *Id.* at 45–47. Although most courts have ruled that aggregate proof is not sufficient even under the narrow circumstances permitted by *In re Neurontin*,[6] this Court need not decide that larger issue at this juncture. It is sufficient for now to recognize that Defendants are entitled to individualized discovery necessary to rebut any aggregate proof analyses as well as to

---

[6] *E.g.*, *Sidney Hillman Health Ctr. of Rochester v. Abbott Laboratories*, 873 F.3d 574 (7th Cir. 2017); *UFC Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010); *Sergeants Benevolent Ass'n Health & Welfare Fund v. State of Louisiana*, 806 F.3d 71 (2d Cir. 2015); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604 (D.N.J. July 10, 2009), *aff'd* 678 F.3d 235 (3d Cir. 2012).

test whether aggregate proof is sufficient here at all. Even if aggregate proof were ultimately found to be admissible, the jury and this Court will then be responsible for "weighing the individual testimony . . . against the aggregate evidence" *after* it has been received and presented. *Id.* at 45–46. Simply put, on this discovery issue, *In re Neurontin* weighs in favor of Defendants.

Similarly misplaced is the City's reliance on *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51 (Cal. Ct. App. 2017). Mot. at 9, 14. *ConAgra* also makes Defendants' point. There, defendants were provided individualized discovery, including a database that "collect[ed] all of the data from children who happen to be tested for lead in California" (17 Cal.App.5th at 152) and lead poisoning "case files" (*id.* at 157).

Finally, the circumstances in *United States v. Life Care Centers of America, Inc.* were markedly different than those here. Mot. at 9, 14 (citing 2015 WL 10987029 (E.D. Tenn. Feb. 18, 2015)). Most critically, the plaintiff in *Life Care* had "already provided" the defendant with underlying claims data (*see* 2015 WL 10987029 at *3)—unlike here, where not only has the City failed to provide this discovery but as part of this same motion is seeking the Court's permission to break its promise to do so. Indeed, the Court already considered this case in rendering the August 2017 Order, as Plaintiff's lawyers repeatedly brought it to the Court's attention. *E.g.*, Ex. 1, 5/8/2017 Hearing Tr. at 9:20-10:24, 27:17-28:1 ("And, again, I would return the Court to *Life Care*."). The City fails to explain why the Court should now credit an unpublished 2015 decision from the Eastern District of Tennessee over this Court's own August 2017 Order.

## C. The discovery at issue is proportional to the needs of this case.

The City's argument that this discovery is not proportional (*see* Mot. at 12-13) is also belied by its own allegations. The Fifth Amended Complaint relies upon conclusory group-pled allegations that Defendants caused the "deadliest drug crisis in American history" and that "[b]ut for the misleading information disseminated by Defendants, doctors would not, in most instances,

have prescribed opioids in the volumes, doses, and durations they did." 5AC at ¶¶ 28, 812. This, in turn, allegedly caused the City to incur what the City will likely claim is hundreds of millions, if not billions, of dollars in costs in a wide variety of areas. *Id.* at ¶ 943. To be clear, these conclusory assertions and this extenuated, tortured causal chain are fictions. But now that the City has made them, this Court should not credit the City's argument that the very discovery needed to rebut them is somehow too burdensome.

This is among the most fundamental discovery from Defendants' perspective. It is necessary for Defendants to test the City's sweeping allegations by examining the actual prescriptions in the City's attenuated causal chain and assessing the City's allegations that those prescriptions (i) should not have been written and (ii) were written because doctors were deceived by Defendants. Claims data includes information about the doctors who wrote the prescriptions and the medical diagnoses (in the form of codes) that the doctors considered in writing the prescriptions. For any given prescription, claims data can be used to assess, among other important issues, whether the doctor who wrote the prescription actually received marketing materials from a given Defendant, whether he or she did so before writing a given prescription, and even whether the diagnosis that prompted the prescription was a type that even Plaintiff admits is appropriate, such as cancer pain, or that the City continues to reimburse as medically necessary.

In addition, the claims data the City previously agreed to provide can be used to analyze other relevant issues about opioid prescribing in Chicago, including:

- Whether prescribing patterns by the subset of physicians who were detailed by Defendants were affected by the detailing. For example, did those prescribers increase their opioid prescribing *after* being detailed? Did the *types* of opioid prescriptions they wrote change (*i.e.*, did they suddenly start prescribing opioids for chronic non-cancer pain)? Or did, at most, they simply *substitute* a prescription for a Defendant opioid for a prescription of a non-Defendant's opioid they would have written otherwise?

11

- Whether the types of opioid prescriptions written in Chicago *changed* from those for situations in which the City and their experts must admit were not problematic (*e.g.*, prescriptions for end-of-life or cancer pain) to those that they claim for litigation purposes were inappropriate (*e.g.*, prescriptions for chronic non-cancer pain or at higher dosages).

- Whether the City continues to reimburse opioid prescriptions for diagnoses that it claims in this litigation are inappropriate.

- Whether there were any patients who were prescribed Defendant's opioids and who later received diagnoses for opioid use disorder, and if so what the data shows about other prescriptions received by those patients and possible alternative reasons for the opioid use disorder diagnosis.

- Whether the rate of opioid use disorder diagnoses is disproportionately higher for patients who were prescribed certain opioid medications as opposed to others.

The City's argument that "[o]nly one of the Defendants' experts even cited the claims data produced by the MDL Plaintiffs" omits material facts. *See* Mot. at 7. The MDL Track One Plaintiffs did not produce claims data in a final, usable format until three months *after* the close of fact discovery. While certain experts, including one of Allergan's, used that claims data in their initial reports, many others reserved rights to supplement once the full scope of data had been produced and the lengthy, complicated process of analyzing it was complete. Before they could complete the process, several Defendants settled the Track One cases. The issue the City identifies—that Defendants' experts were unable to make full use of this critical data because of Plaintiffs' delay in producing it—can be remedied here by requiring the City to promptly produce all of this data now. Moreover, Plaintiff ignores that the court presiding over the New York opioid litigation nearing trial ordered the production of claims data, and several Defendants relied on plaintiff-produced claims data in their expert reports.

Equally unavailing is the City's contention that Defendants should obtain prescription claims data only from third parties. *E.g.*, Mot. at 8. First, only the City can disclose which prescriptions the City alleges were medically inappropriate, and thus the August 2017 Order

12

cannot be fulfilled by third parties.  As for the larger set of claims data, Defendants intend to ***also*** seek such data from third-party insurers.  But, in light of the City's broad allegations positing that Defendants are at the root of a public health crisis, Defendants are entitled to this type of discovery from ***the City as well.***  The City has made no showing that its data would fully overlap with data available from these third parties; indeed, this is unlikely given the complicated nature of this data.

## II.  The City cannot meet the stringent motion for reconsideration standard; nor should it be permitted to renege on its agreement to produce the broader set of claims data.

Although styled as a "motion for protective order," the City's motion seeks reconsideration of a prior Order of the Court.  *E.g.*, Mot. at 3 (requesting that the Court "reform its August 21, 2017 order").  To succeed, the City therefore has the burden to present either "newly discovered evidence" or "raise[] a manifest error of law."  *E.Z. by Braun v. U.S.*, 2020 WL 757890, at *1, *3 (N.D. Ill. Feb. 14, 2020) (denying motion for reconsideration and noting that such motions "serve a limited function" in the Seventh Circuit) (internal quotations omitted).  As demonstrated above, the City has failed to identify, much less satisfy, either of those potential bases for reconsideration. *See generally* Mot.; *see also Safrithis v. Wilkie*, 2020 WL 606787, at *2 (N.D. Ill. Feb. 7, 2020) ("Motions for reconsideration are disfavored, and rightly so.")

Nor should the City be permitted to renege on its agreement to produce the larger set of claims data.  As set out above, the City unequivocally agreed to produce this data independent of the August 2017 Order.  *See supra* at Background.  Indeed, the City has already begun the process of gathering this data.  *See, e.g.*, Mot. at 2 n.3.  Further, nowhere in the City's brief does it explain

why, whether or not the August 2017 Order stands, it should not be held to this agreement.[7]  The City should honor its commitment without delay.

## **CONCLUSION**

For those reasons, Defendants respectfully request that this Court (i) deny the motion for reconsideration of the August 2017 Order; and (ii) order the City to immediately produce all claims data in its possession, custody or control, as it had previously agreed.

---

[7] Defendants suggest that the Court order the parties to immediately recommence negotiations over the scope and form of this production.  Defendants reserve all rights to seek additional relief, as necessary, if the City does not produce all such data in its possession, custody or control in an appropriate form.

Dated:    April 17, 2020                    Respectfully submitted,


                                           /s/ Karl Stampfl
                                           Donna Welch, P.C.
                                           Timothy W. Knapp
                                           Karl Stampfl
                                           KIRKLAND & ELLIS LLP
                                           300 North LaSalle, Chicago, IL 60654
                                           Telephone: (312) 862-2000
                                           Facsimile: (312) 862-2200
                                           donna.welch@kirkland.com
                                           tknapp@kirkland.com
                                           karl.stampfl@kirkland.com

                                           Jennifer G. Levy, P.C. (*admitted pro hac vice*)
                                           KIRKLAND & ELLIS LLP
                                           1301 Pennsylvania Ave., N.W.
                                           Washington, D.C. 20004
                                           Telephone: (202) 879-5000
                                           Facsimile: (202) 879-5200
                                           jlevy@kirkland.com

                                           *Attorneys for Allergan plc (f/k/a Actavis plc)*
                                           *and Allergan Finance, LLC (Actavis, Inc.*
                                           *f/k/a Watson Pharmaceuticals, Inc.)*

                                           /s/ Andrew J. O'Connor
                                           Andrew J. O'Connor (*admitted pro hac vice*)
                                           ROPES & GRAY LLP
                                           Prudential Tower
                                           800 Boylston St.
                                           Boston, MA 02199-3600
                                           (617) 235-4650
                                           andrew.oconnor@ropesgray.com

                                           Sarah M Kimmer
                                           ROPES & GRAY LLP
                                           191 North Wacker Drive
                                           Chicago, IL 60606
                                           Telephone: (312) 845-1244
                                           sarah.kimmer@ropesgray.com

                                           *Attorneys for Mallinckrodt LLC and SpecGx*
                                           *LLC*

/s/ Charles C. Lifland

Charles C. Lifland (*admitted pro hac vice*)
Sabrina H. Strong (*pro hac vice forthcoming*)
Esteban Rodriguez (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
clifland@omm.com
sstrong@omm.com
esrodriguez@omm.com

Amy R. Lucas (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
1999 Avenue Of The Stars
Los Angeles, CA 90067
Telephone: (310) 246-6784
Facsimile: (310) 246-6779
alucas@omm.com

Sherry A. Knutson (#6276306)
TUCKER ELLIS LLP
233 South Wacker Drive, Suite 6950
Chicago, Illinois 60606
Telephone: (312) 624-6300
Facsimile: (312) 624-6309
sherry.knutson@tuckerellis.com

*Attorneys for Defendants Janssen
Pharmaceuticals, Inc., Johnson &
Johnson, Janssen Pharmaceutica, Inc.
n/k/a Janssen Pharmaceuticals, Inc., and
Ortho-McNeil-Janssen Pharmaceuticals,
Inc. n/k/a Janssen Pharmaceuticals, Inc.*

/s/ Tinos Diamantatos

Tinos Diamantatos
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601
(312)-324-1000
Firm Id # 40417
tinos.diamantatos@morganlewis.com

Eric W. Sitarchuk
Rebecca J. Hillyer
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103-2921
T: 215.963.5840
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com

*Attorneys for Teva Pharmaceuticals, U.S.A.,
Inc., Cephalon, Inc., Watson Laboratories,
Inc., Actavis LLC, and Actavis Pharma, Inc.*

/s/ Jonathan L. Stern
Jonathan L. Stern
Joshua M. Davis
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Phone: 202-942-5000
jonathan.stern@arnoldporter.com
joshua.davis@arnoldporter.com

Sean O. Morris
Arnold & Porter Kaye Scholer LLP
777 S. Figueroa St., Suite 4400
Los Angeles, CA 90017
Phone: 213-243-4000
sean.morris@arnoldporter.com

*Attorneys for Endo Health Solutions Inc. and
Endo Pharmaceuticals Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of April, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF Systems.

*/s/ Karl Stampfl*

Karl Stampfl