**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, | |
| Plaintiff, | |
| v. | Case No. 14-cv-04361 |
| PURDUE PHARMA L.P., et al., | Honorable Jorge L. Alonso |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' JOINT PARTIAL MOTION TO DISMISS PLAINTIFF'S CORRECTED FIFTH AMENDED COMPLAINT UNDER RULE 12(b)(6)

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................ 1

II.     BACKGROUND AND SUMMARY OF ALLEGATIONS ............................ 3

     A.    The City's Prior Complaints ........................................................ 3

     B.    The City's Fifth Amended Complaint .................................... 5

III.    ARGUMENT ................................................................................... 6

     A.    The Unfair Practices Claim Fails in Its Entirety (Count 2). ................. 7

          1.    The SOMS Theory Is Preempted by Federal Law. ................... 8

               a.    The City's Claims Premised on Defendants' Purported Failures to Comply with the CSA and Its Implementing Regulations Are Preempted Under *Buckman*. ............. 8

               b.    The City's Claims Premised on an Alleged Duty to Halt Suspicious Orders Are Also Preempted. ................... 11

          2.    The City Fails To Adequately Plead an Unfair Practices Claim Based on Its SOMS Theory. ........................................ 13

               a.    The City Does Not Plausibly Plead that Defendants' Practices Offended Public Policy. ............................ 13

               b.    The City Does Not Allege Acts that Are Immoral, Unethical, Oppressive, or Unscrupulous. ................... 14

               c.    The City Does Not Allege Acts that Caused Substantial Injury to Consumers ................................................ 15

     B.    The Cost Recovery Claim Fails in Its Entirety (Count 4). ................. 16

          1.    The City Fails to Plead Causation-in-Fact. ........................... 16

          2.    The City Fails to Plead Proximate Causation. ...................... 19

     C.    The Deceptive Practices and Misrepresentations Claims Fail to the Extent They Rely on the SOMS Marketing Theory (Counts 1 and 3). ........................ 24

     D.    Counts 1-4 Also Should Be Dismissed as Improper Efforts to Circumvent the Lack of a Civil Right of Action Under the CSA. ........................... 28

IV.    CONCLUSION ................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amgen Inc. v. Sandoz Inc.*,
877 F.3d 1315 (Fed. Cir. 2017) ............................................................... 10

*Arizona v. United States*,
567 U.S. 387 (2012).................................................................................. 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................... 6

*Astra USA, Inc. v. Santa Clara County, Cal.*,
563 U.S. 110 (2011).................................................................................. 29

*Bank of Am. Corp. v. City of Miami*,
137 S. Ct. 1296 (2017).............................................................................. 20

*Bastian v. Petren Res. Corp.*,
892 F.2d 680 (7th Cir. 1990) ...................................................................... 7

*Batson v. Live Nation Entm't, Inc.*,
2013 WL 992641, at *3 (N.D. Ill. Mar. 13, 2013).................................... 14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................... 6

*Bober v. Glaxo Wellcome PLC*,
246 F.3d 934 (7th Cir. 2001) .................................................................... 25

*Borsellino v. Goldman Sachs Grp., Inc.*,
477 F.3d 502 (7th Cir. 2007) ...................................................................... 6

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) .................................................................... 27

*Buckman Co. v. Plaintiffs' Legal Committee*,
531 U.S. 341 (2001)............................................................................ 8, 9, 10

*City of Chi. v. Beretta U.S.A. Corp.*,
821 N.E.2d 1099 (Ill. 2004)................................................................. 20, 24

*City of Chicago v. Purdue Pharma L.P.*,
2015 WL 2208423 (N.D. Ill. May 8, 2015)..................................... 3, 4, 25, 27

*City of Chicago v. Purdue Pharma L.P.*,
211 F. Supp. 3d 1058 (N.D. Ill. 2016) .............................................. passim

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*City of New Haven v. Purdue Pharma, L.P.*,
    2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019) ................................................. 23

*Coleman v. E. Joliet Fire Prot. Dist.*,
    46 N.E. 3d 741 (Ill. 2016) ............................................................................ 14

*Connick v. Suzuki Motor Co.*,
    675 N.E.2d 584 (Ill. 1986) ........................................................................... 17

*Cty. of Cook v. Bank of Am. Corp.*,
    2018 WL 1561725 (N.D. Ill. Mar. 30, 2018)............................................ 21, 22, 23

*Cty. of Cook v. Philip Morris*,
    817 N.E.2d 1039 (Ill. App. 2004) ................................................................... 20

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ...................................................................... 2, 6

*Durr v. Strickland*,
    602 F.3d 788 (6th Cir. 2010) ......................................................................... 28

*Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v.*
    *Bristol Myers Squibb Co.*,
    969 F. Supp. 2d 463 (S.D. W. Va. 2013)............................................................ 21

*Fuchs v. Menard, Inc.*,
    2017 WL 4339821 (N.D. Ill. Sept. 29, 2017) .................................................. 26, 27

*Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*
    *(A.F.L.)*,
    346 U.S. 485 (1953)................................................................................... 12

*Garrett v. Rentgrow, Inc.*,
    2005 WL 1563162 (N.D. Ill. July 1, 2005)..................................................... 13, 14

*Geier v. American Honda Motor Co.*,
    529 U.S. 861 (2000)................................................................................... 12

*Gonzalez v. Raich*,
    545 U.S. 1 (2005)..................................................................................... 10

*Gravitt v. Mentor Worldwide, LLC*,
    2018 WL 2933609 (N.D. Ill. June 12, 2018)......................................................... 9

*Hemi Group LLC v. City of New York, NY*,
    559 U.S. 1 (2010)..................................................................................... 21

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
  2012 WL 3154957 (N.D. Cal. Aug. 2, 2012) ........................................................... 17

*In re Innovation IP Ventures, LLC Patent Litig.*,
  921 F. Supp. 2d 903 (N.D. Ill. 2013) .......................................................... 16, 24, 28

*In re Nat'l Prescription Opiate Litig.*,
  2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ...................................................... 22

*In re Nat'l Prescription Opiate Litig.*,
  2020 WL 1875174 (6th Cir. Apr. 15, 2020) ........................................................... 8

*In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated
  Pretrial Proceedings*,
  2017 WL 1836443 (N.D. Ill. May 8, 2017) ........................................................... 9

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods.
  Liability Litig.*,
  310 F. Supp. 3d 1030 (N.D. Cal. 2018) ............................................................... 10

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab.
  Litig.*,
  2010 WL 3119499 (S.D. Ill. Aug. 5, 2010) ........................................................... 21

*Int'l Bhd. of Teamsters Local 734 Health & Welfare Trust Fund v. Philip
  Morris, Inc.*,
  34 F. Supp. 2d 656 (N.D. Ill. 1998) ...................................................................... 24

*Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*,
  585 F. Supp. 2d 1339 (M.D. Fla. 2008) ................................................................ 21

*Kemper v. Deutsche Bank AG*,
  911 F.3d 383 (7th Cir. 2018) .................................................................. 20, 22, 23

*Kirk v. Michael Reese Hosp. & Med. Ctr.*,
  513 N.E.2d 387 (Ill. 1987) ................................................................................... 18

*Lake v. Unilever U.S., Inc.*,
  964 F. Supp. 2d 893 (N.D. Ill. 2013) .......................................................... 16, 24, 28

*Lamie v. U.S. Trustee*,
  540 U.S. 526 (2004) ............................................................................................. 12

*Lantz v. Am. Honda Motor Co.*,
  2008 WL 162759 (N.D. Ill. Jan. 17, 2008) ............................................................. 7

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Massey v. Helman*,
  196 F.3d 727 (7th Cir. 1999) ................................................................ 17

*McCauley v. City of Chi.*,
  671 F.3d 611 (7th Cir. 2011) .................................................................. 6

*Nathan Kimmel, Inc. v. DowElanco*,
  275 F.3d 1199 (9th Cir. 2002) ........................................................... 9, 10

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011) ............................................................................... 2

*Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*,
  2014 WL 2115498 (E.D. Pa. May 21, 2014) ....................................... 19

*Rhode Island v Purdue Pharma L.P.*,
  2020 WL 2315956 (R.I. Super. Ct. May 5, 2020) ............................... 11

*Robinson v. Toyota Motor Credit Corp.*,
  775 N.E.2d 951 (Ill. 2002) ............................................................... 2, 15

*Safe Sts. Alliance v. Alternative Holistic Healing, LLC*, 2016 WL 223815
  (D. Colo. Jan. 19, 2016) ..................................................................... 28

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S.
  LLP*,
  20 F. Supp. 3d 305 (E.D.N.Y. 2014) ................................................... 21

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs*.,
  873 F.3d 574 (7th Cir. 2017) .......................................................... 20, 21

*Smith v. Eli Lilly & Co.*,
  560 N.E.2d 324 (Ill. 1990) ................................................................... 22

*Sonrai Sys., LLC v. AMCS Grp. Inc.*,
  2017 WL 4281122 (N.D. Ill. Sept. 27, 2017) ...................................... 27

*State ex rel. Stenehjem v. Purdue Pharma L.P.*,
  2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019) ............................... 22

*Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*,
  902 F.3d 735 (7th Cir. 2018) ...................................................... 20, 22, 23

*Travelers Indem. Co. v. Cephalon*,
  620 F. App'x 82 (3rd Cir. 2015) ..................................................... 17, 19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*U.S. v. Sanford-Brown, Ltd.*,
   788 F.3d 696 (7th Cir. 2015) .................................................................... 25

*United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare
   Fund v. Amgen, Inc.*,
   400 F. App'x 255 (9th Cir. 2010) .............................................................. 21

*United States v. Tex-Tow, Inc.*,
   589 F.2d 1310 (7th Cir. 1978) .................................................................. 12

**STATUTES**

21 U.S.C. § 801 ........................................................................................... 14

21 U.S.C. § 801(1) ...................................................................................... 10

21 U.S.C. § 801(2) ...................................................................................... 10

**OTHER AUTHORITIES**

Dispensing Controlled Substances for the Treatment of Pain, 71 Fed. Reg.
   52,716, 52,719–20 (DEA Sept. 6, 2006) ................................................. 12

**RULES**

21 C.F.R. § 1301.74(b) ............................................................................... 11

## I.    INTRODUCTION

Although the City's Fifth Amended Complaint ("5AC") adds 150 paragraphs of allegations, the numerous deficiencies that marked its previous five complaints over the past six years remain uncured. Instead, in an effort to plead around the many defects the Court identified in the City's false marketing theory, the City once again changes the cast of Defendants[1] and asserts two entirely new purported liability theories: (1) that Defendants allegedly failed to "monitor for, report, and halt suspicious orders" of their prescription opioid medications sold to licensed distributors that were later allegedly diverted and abused; and (2) that Defendants purportedly marketed themselves as having adequate suspicious order monitoring systems ("SOMS") in place. *E.g.*, 5AC ¶¶ 15, 802, 908(i). Because neither these new theories nor anything else in the 5AC cures the shortcomings of the earlier complaints, Defendants respectfully request that the Court dismiss with prejudice Counts 2 and 4 in their entirety and dismiss Counts 1 and 3 to the extent they rely on the City's new SOMS marketing theory.[2]

The Court should once again dismiss Counts 2 and 4 in their entirety, as nothing in the 5AC remedies earlier pleading deficiencies. As for the Unfair Practices claim (Count 2), the City concedes that it cannot state a claim under its false marketing theory, 5AC ¶ 1 n.1, and instead alleges that Defendants are liable for failing to adequately guard against diversion of opioid

---

[1] The Defendants include Teva Pharmaceuticals USA, Inc. ("Teva"); Cephalon Inc. ("Cephalon"); Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc. ("Janssen"); Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. ("Endo"); Allergan plc f/k/a Actavis plc and Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. ("Allergan"); Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc., f/k/a Watson Pharma, Inc. ("Actavis"); and Mallinckrodt LLC and SpecGx LLC ("Mallinckrodt"). Unless otherwise noted, emphasis in quotations is added and internal citations and quotation marks are omitted.
[2] This motion addresses deficiencies in the 5AC that are common to all Defendants. Certain Defendants have filed separate motions to dismiss addressing additional, defendant-specific issues.

medications by third party criminals. This theory, however, is both preempted by the federal Controlled Substances Act ("CSA") and inadequately pleaded—the City fails to allege that Defendants' conduct "offends public policy," "is immoral, unethical, oppressive, or unscrupulous," or "causes substantial injury to consumers." *See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002). Likewise, the City Costs claim (Count 4) fails because the 5AC still falls far short of pleading actual or proximate causation.

Counts 1 and 3 should be dismissed in part. The Court previously held that the City stated a claim for Counts 1 (Deceptive Practices) and 3 (Misrepresentations) based on its theory that Defendants deceptively promoted the risks and benefits of prescription opioid medications. *Infra* at § III.C. Defendants do not challenge that ruling in this motion.[3] The City now alleges, however, that Defendants are also liable for marketing themselves as legally compliant with their SOMS obligations. But the threadbare allegations in support of this theory fall short of plausibly stating a claim, and come nowhere close to alleging the requisite "who, what, when, where, and how" of the alleged fraud. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Counts 1 and 3 should therefore be dismissed to the extent they rely on that deficient theory.

Finally, all of the City's SOMS-based claims improperly seek to assert a right of action under the CSA by attempting to import alleged CSA requirements into state law. The Supreme Court has been forbidden such attempts to circumvent the CSA's lack of a private right of action.

---

[3] Generic manufacturers Watson Laboratories, Inc. ("Watson"), Actavis LLC ("Actavis LLC"), or Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. ("Actavis Pharma") separately move to dismiss Counts 1 and 3 based upon an argument that was not previously addressed by the Court—namely, that they do not promote generic medicines (and there are no allegations showing that they did so) and any claims against them based upon a failure to disclose theory are preempted under *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011).

## II.    BACKGROUND AND SUMMARY OF ALLEGATIONS

### A.    The City's Prior Complaints

The City filed its original complaint in June 2014, Dkt. 4-1, and then a First Amended Complaint ("1AC") in November 2014, Dkt. 186. The 1AC asserted 11 counts: (1) Consumer Fraud under Municipal Code of Chicago ("MCC") § 2-25-090 and the Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA");[4] (2) Misrepresentations under MCC § 4-276-470; (3) False Statements under MCC § 1-21-010 *et seq.*; (4) False Claims under MCC § 1-22-020; (5) Conspiracy to Defraud under MFCA § 1-22-030; (6) City Costs under MCC § 1-22-020; (7) Insurance Fraud; (8) Civil Conspiracy; (9) Fraud; (10) Unjust Enrichment; and (11) Subrogation. Dkt. 186. All claims were premised on the theory that Defendants falsely represented the risks and benefits of opioid medications for the long-term treatment of chronic non-cancer pain (the "Opioids Marketing Theory").

This Court dismissed all claims under Rule 12(b)(6) (except for two asserted against Purdue Pharma L.P., Purdue Inc., and the Purdue Frederick Company, Inc. ("Purdue")),[5] holding that the City failed to adequately allege that Defendants: (a) made specific representations to Chicago prescribers; (b) were responsible for allegedly false statements made by third parties; and (c) caused the City's alleged losses. *City of Chicago v. Purdue Pharma L.P.*, 2015 WL 2208423, at *10-11 (N.D. Ill. May 8, 2015) ("*Purdue I*"). Specifically, the City failed to allege the "identities of doctors who, as a result of one or more of defendants' alleged

---

[4] The consumer fraud claim alleged a violation of both the "Deceptive Practices" and "Unfair Practices" prongs of MCC § 2-25-090 and the ICFA.

[5] As to Purdue, the Court held that the City adequately pleaded Count 1 (consumer fraud under MCC § 2-25-090) and Count 2 (misrepresentations in connection with sale under MCC § 4-276-470). *See Purdue I*, 2015 WL 2208423 at 12. The Court also dismissed the 1AC as to Teva Pharmaceuticals, Ltd. under Rule 12(b)(2). *See id.* at *6. Purdue has since filed for bankruptcy protection and is not a party to this motion.

misrepresentations, prescribed opioids for chronic pain to a City-insured patient or worker's compensation recipient whose claim for that prescription the City paid, or any other details about such claims." *Id.*

The City then filed a Second Amended Complaint ("2AC") that (i) added a separate Unfair Practices claim under MCC § 2-25-090 and the ICFA[6], (ii) dropped the City's subrogation and common law fraud claims, and (iii) reasserted all other claims from the 1AC. Dkt. 328. Defendants again moved to dismiss, Dkts. 401–25, and the Court again granted the motion in substantial part. *See City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058 (N.D. Ill. 2016) ("*Purdue II*"). The Court held that the City adequately pleaded Count 1 (Deceptive Practices) and Count 3 (Misrepresentations), which the Court concluded do not require a showing of "causation or injury." *Id.* at 1074-76. But the Court dismissed all other claims, which the Court held do require causation and injury, because the City failed to plead facts establishing a causal link between any alleged misrepresentations and any allegedly improper or harmful opioid medication prescription. *Id.* at 1076-84. The Court also dismissed Count 2 (Unfair Practices) for failure to plead that Defendants' conduct "(1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers." *Id.* at 1074. The Court gave the City "a final opportunity" to replead its dismissed claims. *Id.* at 1085.

The City then filed a Third Amended Complaint ("3AC"), which asserted the same claims as the 2AC. Dkt. 478. Defendants again moved to dismiss and/or strike all claims other than Counts 1 and 3. Dkts. 491-518. The Court took the motion under submission but did not

---

[6] Count 1 of the SAC, the City's consumer fraud claim, was brought only under the "Deceptive Practices" prong of MCC §§ 2-25-090 and the ICFA.

rule on it before the action's transfer to the MDL.

While the case was in the MDL, the City sought and obtained leave to file a Fourth Amended Complaint ("4AC"). *See* MDL Dkt. 304. The 4AC repleaded all claims from the 2AC and 3AC, and also added a new defendant (Mallinckrodt LLC), 4AC ¶¶ 52, 71, 227, 235, 247, 564-73, 678, a new cause of action (common law public nuisance), *id.* ¶¶ 881-908, and a handful of allegations about claims processing for the City's health plan and workers' compensation program, *id.* ¶¶ 703-706; *see also id.* at 1, n.1. Defendants moved to dismiss the 4AC, MDL Dkt. 500, but the MDL Court remanded the matter to this Court without ruling on that motion.

## B.    The City's Fifth Amended Complaint

Since remand, the City filed the 5AC in February 2020. Dkt. 715. The 5AC adds two new Defendants, Mallinckrodt plc and SpecGx, LLC, and asserts four causes of action: (1) Deceptive Practices under MCC § 2-25-090 and the ICFA (Count 1); (2) Unfair Practices under MCC § 2-25-090 and the ICFA (Count 2); (3) Misrepresentations under MCC § 4-276-470(1) (Count 3); and (4) City Costs under MCC § 1-22-020 (Count 4). The 5AC dropped all other causes of action. *See* 5AC, Ex. C (redline comparison of 4AC and 5AC).[7]

The 5AC adds over 150 paragraphs of allegations, principally to advance two new liability theories. *See*, *e.g.*, *id.* ¶¶ 669–814. In addition to the Opioids Marketing Theory asserted in prior complaints, the 5AC alleges that Defendants: (i) "failed to put in place adequate systems to guard against diversion of their opioids," including systems to "monitor for, report, and halt suspicious orders of opioids" (the "SOMS Theory"), *id.* ¶¶ 15, 919(h), *see also id.* ¶¶ 864, 927(f), 939(e), and (ii) "publicly stat[ed] that they had systems in place to prevent diversion" in

---

[7] The dropped causes of action include claims for False Statements, False Claims, Conspiracy to Defraud, Insurance Fraud, Civil Conspiracy, Unjust Enrichment, and Public Nuisance. 5AC at 1 n.1.

an effort to "assuage concerns about the opioid epidemic by presenting a false front that the crisis was not the responsibility of manufacturers" (the "SOMS Marketing Theory"), *id.* ¶ 802. Counts 1 and 3 (Deceptive Practices and Misrepresentations) rely on the Opioids Marketing Theory and SOMS Marketing Theory, *see id.* ¶¶ 908, 932, 936; Count 2 (Unfair Practices) relies on the Opioids Marketing Theory and SOMS Theory, *see id.* ¶¶ 941-43; and Count 4 (City Costs) relies on all three, *see id.* ¶ 939.

## III. ARGUMENT

All of the City's claims sound in fraud. *See, e.g.*, *Purdue II*, 211 F. Supp. 3d at 1064, 1071, 1074-76, 1083.[8] They must therefore meet both the particularity standard of Rule 9(b), *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007), and the plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). To satisfy *Twombly*, the allegations must transcend the "speculative" and "conceivable," and "state a claim to relief that is plausible on its face." 550 U.S. at 555, 570. Well-pleaded factual allegations must be more than "'merely consistent with' a defendant's liability," and mere "legal conclusions" and "conclusory statements" must be disregarded. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009) (quoting *Twombly*, 550 U.S. at 557); *see also McCauley v. City of Chi.*, 671 F.3d 611, 617 (7th Cir. 2011). To satisfy Rule 9(b), the 5AC must further detail the "who, what, when, where, and how" of the alleged fraud. *DiLeo*, 901 F.2d at 627. The 5AC does not overcome the pleading standards of *Twombly* and Rule 9(b).

---

[8] The newly pleaded SOMS Marketing Theory and SOMS Theory are also "premised upon a course of fraudulent conduct," implicating Rule 9(b). *Purdue*, 211 F. Supp. 3d at 1064. *See, e.g.*, 5AC ¶¶ 672, 802, 899, 901 (alleging that Defendants made false statements regarding their efforts to "prevent diversion" in order to "present[] a false front" that was "designed to conceal their contribution[] to the opioid epidemic"); *id.* ¶¶ 697, 899 (alleging that Defendants "fraudulently concealed" violations of their SOMS obligations).

A.    **The Unfair Practices Claim Fails in Its Entirety (Count 2).**

The City alleges that Defendants violated MCC § 2-25-090 by engaging in unfair practices under the Opioids Marketing Theory and the SOMS Theory. 5AC ¶¶ 941-43; *see also id.* ¶ 1 n.1. The claim fails under both theories.

*First*, the City concedes that its Unfair Practices claim based on the Opioids Marketing Theory fails, and purports to assert the claim only for appellate preservation purposes. The Court should thus, once again, dismiss this claim with prejudice. Specifically, the Court previously did so because the 2AC failed to adequately plead that Defendants' conduct "(1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers." *Purdue II*, 211 F. Supp. 3d at 1074. The City does not seek to revisit that ruling, but alleges that it has repleaded the claim under an Opioids Marketing Theory, unamended, "for purposes of appellate review." 5AC ¶ 1 n.1. But "the Seventh Circuit has made clear, time and again, that a litigant need not replead dismissed claims to preserve them for appeal." *Lantz v. Am. Honda Motor Co.*, 2008 WL 162759, at *3 (N.D. Ill. Jan. 17, 2008). There being no reason to revisit its earlier ruling, the Court should again dismiss Count 2 to the extent it is premised on the Opioids Marketing Theory. *See id.*; *cf. Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683 (7th Cir. 1990) ("Had the plaintiffs repleaded their [dismissed claim], the judge would have dismissed the charge, not only with prejudice, but with annoyance.").

*Second*, to the extent the Unfair Practices claim is premised on the SOMS Theory, it fails because (1) the SOMS Theory is preempted by federal law[9] and (2) it is inadequately pleaded.

---

[9] In a recent status report, the City incorrectly suggested that the MDL court's rulings on preemption, Defendants' alleged duties under the CSA, and causation—made in different cases—are binding in this case. Dkt. 701 at 7-8. This is wrong for at least two reasons. First, the MDL court never addressed these or any other issues *under Seventh Circuit or Illinois law*; thus, its rulings have no application here. Second, the MDL court's rulings are only law of the case in

### 1. The SOMS Theory Is Preempted by Federal Law.

#### a. The City's Claims Premised on Defendants' Purported Failures to Comply with the CSA and Its Implementing Regulations Are Preempted Under *Buckman*.

Count 2 is predicated on the City's claim that Defendants violated purported federal "duties" under the CSA and its implementing regulations to report and refuse to ship "suspicious orders" of opioid medications. 5AC ¶ 677. This claim is preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).

In *Buckman*, the plaintiffs alleged personal injuries from a medical device for which the defendant, a consulting company, had helped the manufacturer obtain FDA approval. *Id*. at 343. Plaintiffs asserted state-law claims based on the company's failure to report information to the FDA during the approval process. *Id*. But the Supreme Court held that federal law preempted such claims because they "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Id.* at 350.

The Supreme Court explained that in this reporting context, there is no presumption against preemption: "Policing fraud against federal agencies is hardly a field which the States have traditionally occupied." *Id*. at 347. "To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* The *Buckman* plaintiffs' state-law claims conflicted with federal law because "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and … this authority is used by the Administration to achieve a somewhat delicate balance of statutory

---

the case where those rulings were made. Like the decision of any other district court, an MDL court's decision in a different case is entitled to whatever weight its reasoning, treatment of precedent, and application of law to similar facts may command. But this Court can and must independently assess the sufficiency of the allegations in *this* case under the laws applicable to *this* case. As the Sixth Circuit recently explained when granting a mandamus petition in the MDL, "an MDL court's determination of the parties' rights in an individual case must be based on the same legal rules that apply in other cases, as applied to the record in that case alone." *In re Nat'l Prescription Opiate Litig*., 2020 WL 1875174, at *1 (6th Cir. Apr. 15, 2020).

objectives. The balance sought by the Administration can be skewed by allowing fraud-on-the-FDA claims under state tort law." *Id.* at 348. Because "[t]he FDA … ha[d] at its disposal a variety of enforcement options" and "[t]his flexibility [wa]s a critical component of the statutory and regulatory framework under which the FDA pursue[d] difficult (and often competing) objectives," the Supreme Court concluded that the plaintiffs' state-law claims were preempted. *Id.* at 350, 352.

Applying *Buckman*, courts within this Circuit recognize that state-law claims that are "unconnected to any traditional state tort duty" and "that seek only to enforce [federal] regulations are impliedly preempted." *Gravitt v. Mentor Worldwide, LLC*, 2018 WL 2933609, at *7 (N.D. Ill. June 12, 2018); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 2017 WL 1836443, at *7 (N.D. Ill. May 8, 2017) (addressing FDA regulations).[10]

Under these precedents, the City's claims are preempted to the extent they are premised on alleged failures to comply with the CSA and its implementing regulations. The City seeks to hold defendants liable for their alleged failure to "maintain … effective controls against diversion" as required by the CSA. 5AC ¶ 673. But Congress created a comprehensive statutory scheme that vested the Drug Enforcement Administration ("DEA") with exclusive authority to enforce the CSA—including the regulatory provisions relating to identifying and informing DEA about "suspicious orders." *Id.* Congress granted DEA discretion in exercising this enforcement authority because that federal agency has the expertise to balance the CSA's competing aims of "foster[ing] the beneficial use of those medications" and "prevent[ing] their misuse." *Gonzalez v.*

---

[10] The same is true in other Circuits. *See, e.g.*, *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1206 (9th Cir. 2002) (noting "the potential problems inherent in allowing a state court (or a federal court interpreting state law) to ascertain the propriety of disclosures made by an applicant to a federal agency in response to the mandates of federal legislation" and finding it "troubl[ing] that an applicant's disclosures under [federal law], although not challenged by … the very agency empowered by Congress to enforce [the federal law at issue], may be judged illegal under state law").

*Raich*, 545 U.S. 1, 24 (2005).[11]

The City's claims parallel those that were preempted in *Buckman*. In *Buckman*, plaintiffs alleged that, had the defendant fully reported testing data to FDA, the agency would not have approved the device and users would not have been injured. Here, the City claims that, had Defendants reported suspicious orders to DEA, DEA would have investigated and shut down pharmacies and doctors improperly dispensing and prescribing opioid medications. As in *Buckman*, the City's claim of non-reporting would require a court to assess whether Defendants complied with federal regulations—and such an assessment would interfere with the "delicate balance of statutory objectives" that guides DEA in enforcing regulations. *See* 531 U.S. at 348.

Recognizing the disruption such lawsuits would cause, courts have rightly concluded that state-law claims are impliedly preempted when they seek to usurp a federal agency's regulatory authority and impose additional penalties under state law. That is particularly true where, as here, numerous government entities around the country have brought parallel state-law claims based on the same conduct. *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liability Litig.*, 310 F. Supp. 3d 1030, 1044–45 (N.D. Cal. 2018) (holding that plaintiff's claims were impliedly preempted and holding that when a plaintiff "seek[s] to impose additional, significant sanctions for the same conduct" that Congress has provided penalties for, and especially when "other counties and states bring similar claims," "the potential penalties could dwarf those [under the federal scheme], which would seriously undermine the congressional calibration of force"); *see also Amgen Inc. v. Sandoz Inc.*, 877 F.3d 1315, 1329 (Fed. Cir. 2017) (concluding conflict preemption barred plaintiff's claim because "compliance with the [federal

_____

[11] Congress enacted the CSA "to control the supply and demand of controlled substances," *id.* at 19, which requires a regulatory balance. If the distribution of medications is too restricted, the American people will be deprived of essential medicines "necessary to maintain [their] health and general welfare." 21 U.S.C. § 801(1). If the distribution of medications is too free, their improper use will have a "detrimental effect on the health and general welfare." 21 U.S.C. § 801(2). Congress gave DEA authority to promulgate regulations (through notice-and-comment rulemaking) and enforce the statute with *both* those competing considerations in mind.

statute's] detailed regulatory scheme in the shadow of 50 States' tort regimes … could dramatically increase the burdens on [regulated parties] beyond those contemplated by Congress in enacting the [statute]").[12]

DEA is far better positioned than local government entities to enforce the CSA. There is no private cause of action under the CSA, *infra* at III.D, and permitting private plaintiffs to seek substantial recovery based on purported violations of the CSA would undermine the delicate balance that Congress struck in enacting the statute. Accordingly, the City's claims are preempted under *Buckman*.

> **b.** **The City's Claims Premised on an Alleged Duty to Halt Suspicious Orders Are Also Preempted.**

The City's claims also fail to the extent they are premised on its erroneous assertion that the CSA requires registrants to refuse to ship certain orders placed by licensed pharmacies and other DEA registrants. *See, e.g.*, 5AC ¶¶ 16, 669-71, 679-81. Indeed, there is *no* obligation under the federal CSA or its implementing regulations to refuse to ship a "suspicious order." DEA regulations require only that Defendants "design and operate a system" for the "*disclos[ure]*" of suspicious orders and to "*inform*" DEA of those orders. 21 C.F.R. § 1301.74(b). Contrary to the City's claim, 5AC ¶ 677, nothing in the CSA or DEA regulations imposes any "stop-shipment" requirement for suspicious orders. *See Rhode Island v Purdue Pharma L.P.*, 2020 WL 2315956, at *3 (R.I. Super. Ct. May 5, 2020) ("The State claims that the federal and state CSAs create an explicit duty for the Defendants to refrain from shipping suspicious orders until due diligence ensures that they will not be diverted to illegal channels. *This requirement does not appear in the text of the CSAs or the associated regulations*."). Under well-settled precedent, this Court cannot

---

[12] Insofar as the MDL plaintiffs sought to enforce the federal CSA, the MDL court never substantively engaged with the argument that plaintiffs' claims were preempted. For example, in denying a motion for summary judgment, the MDL court summarily cited the "reasons previously articulated" for its rejection of a different *Buckman* argument on inapposite grounds. *See* MDL Dkts. 2565 at 9, 22. Accordingly, the MDL court's summary rejection of the argument that *Buckman* preempts state-law claims to enforce the CSA's suspicious order reporting provisions is not entitled to any deference.

"read" textually absent duties "into the statute." *See Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004); *see also United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1313 (7th Cir. 1978) (rejecting attempt to read additional requirements into statute).

Regardless, a state-law claim premised on the purported duty to halt shipment of "suspicious orders" of prescription opioid medications is preempted by federal law. State law is preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Because the City's claims disrupt the delicate regulatory balance Congress intended DEA to achieve in enforcing the CSA, they stand as such an obstacle.

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), is instructive. There, plaintiffs attempted to impose liability on a car manufacturer for failing to include airbags. In plaintiffs' view, there was no middle ground—"the more airbags, and the sooner, the better." *Id.* at 874. But this approach differed from that of the Department of Transportation, which preferred "a mix of different devices introduced gradually over time" that would "lower costs, overcome technical safety problems, encourage technological development, and win widespread consumer acceptance." *Id.* at 874-75. Accordingly, the Supreme Court concluded that the plaintiffs' claims conflicted with the objectives of the regulatory scheme and were preempted by federal law. The City's liability theory is likewise inconsistent with DEA's obligation under the CSA "to ensure that there is no interference with the dispensing of controlled substances to the American public in accordance with the sound medical judgment of their physicians." *See* Dispensing Controlled Substances for the Treatment of Pain, 71 Fed. Reg. 52,716, 52,719–20 (DEA Sept. 6, 2006).

The City may argue that it turns to state law to impose penalties only for actions that it claims are prohibited by federal regulation. In that scenario, imposing a greater remedy than DEA imposes would still create a conflict: "[I]t does not follow that the state and federal authorities may supplement each other," because "when two separate remedies are brought to bear on the same activity, a conflict is imminent." *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776 (A.F.L.)*, 346 U.S. 485, 498–99 (1953). When (as here) a state-law claim

seeks to impose additional liability on defendants for their alleged non-compliance with federal regulations, the claim is preempted.

In short, imposing state tort liability would prevent DEA from fulfilling its mandate to strike the balance between policing diversion and ensuring that Americans have access to necessary medicines. Because the City's claims would interfere with accomplishment of the purposes and objectives of Congress in enacting the CSA, the claims are preempted.

### 2. The City Fails To Adequately Plead an Unfair Practices Claim Based on Its SOMS Theory.

The City's Unfair Practices claim also remains inadequately pleaded. For this claim to survive, the City must adequately allege that Defendants' practices "(1) offend[] public policy; (2) [are] immoral, unethical, oppressive, or unscrupulous; or (3) cause[] substantial injury to consumers." *Purdue II*, 211 F. Supp. 3d at 1074. The 5AC does not allege facts plausibly pleading that Defendants' SOMS procedures are "unfair" under any of those three prongs.

### a. The City Does Not Plausibly Plead that Defendants' Practices Offended Public Policy.

Citing the CSA and its implementing regulations, DEA guidance, and three Illinois statutes (745 ILCS 35/2, 720 ILCS 570/100, and 740 ILCS 57/5), 5AC ¶¶ 919-23, the City alleges that Defendants undermined public policy by "turning a blind eye to orders of opioids that Defendants knew or should have known were likely to be diverted and concealing their failure [to] implement effective suspicious order monitoring systems," *id.* ¶ 924. But to state an unfairness claim, a plaintiff must "point to an[] established statute or common law doctrine" defining an offended public policy. *Garrett v. Rentgrow, Inc.*, 2005 WL 1563162, at *3 (N.D. Ill. July 1, 2005). A court cannot simply "infer" the policy. *Purdue II*, 211 F. Supp. 3d at 1074 ("A practice offends public policy when it violates a standard of conduct contained in an existing statute or common-law doctrine that typically applies to such a situation."); *see also Coleman v.*

13

*E. Joliet Fire Prot. Dist.*, 46 N.E. 3d 741, 756 (Ill. 2016) ("[T]he determination of public policy is primarily a legislative function[.]").

The CSA and federal regulations cited by the City do not set forth or establish any public policy regarding SOMS. Indeed, Congress' findings in enacting the CSA, 21 U.S.C. § 801, say nothing about SOMS, and this Court should not "infer" any public policy in the face of this Congressional silence. *Purdue II*, 211 F. Supp. 3d at 1074. And the DEA guidance cited by the City is neither a statute nor common law doctrine capable of establishing a public policy for purposes of an unfairness claim. *See Batson v. Live Nation Entm't, Inc.*, 2013 WL 992641, at *3 (N.D. Ill. Mar. 13, 2013).

The Illinois statutes cited by the City are similarly insufficient here. This Court has already determined that 745 ILCS 35/2—which is directed at "promot[ing] and encourag[ing] use of the intervention process to help initiate successful treatment of alcoholism and drug addiction"—has "no bearing" here, where drug intervention is not at issue. *Purdue II*, 211 F. Supp. 3d at 1074; *see also Garrett*, 2005 WL 156162, at *3. Similarly, 720 ILCS 570/100 sets out the Illinois General Assembly's recognition of the dangers of drug abuse and the need to limit access to controlled substances, but it falls short of "establish[ing]" any clear public policy on SOMS. *Purdue II*, 211 F. Supp. 3d at 1074. And 740 ILCS 57/5 is designed to "provide a civil remedy for damages" to those individuals harmed "as a result of illegal drug use"—it does not address SOMS issues at all. 740 ILCS 75/5.

### b. The City Does Not Allege Acts that Are Immoral, Unethical, Oppressive, or Unscrupulous.

The 5AC also fails to allege facts showing that Defendants' SOMS procedures were "immoral, unethical, oppressive, or unscrupulous." *Purdue II*, 211 F. Supp. 3d at 1075. The City alleges that Defendants' SOMS procedures purportedly "fuel[ed] addiction [to] and diversion" of

prescription opioid medications and illicit opioids such as heroin. 5AC ¶ 926; *see also id.* ¶ 26. This does not state an unfairness claim, since to do so the alleged conduct must be "so oppressive as to leave the consumer with little alternative except to submit to it." *Robinson*, 775 N.E.2d at 961; *see Purdue II*, 211 F. Supp. 3d at 1075. The City does not and cannot allege that "[D]efendants' [SOMS-related] conduct left prescribers and consumers no choice but to use [D]efendants' opioids." *Purdue II*, 211 F. Supp. 3d at 1075. Even if there were purported failures with SOMS procedures, this does not "oppress" consumers. Prescribers are under no obligation to write opioid medication prescriptions. Nor are patients under any obligation to fill or take those prescriptions. And, as the Court recognized in the context of the Opioids Marketing Theory, both prescribers and patients "had [alternative] long-term pain management treatment options besides opioids" before and after Defendants' alleged conduct. *Id*. Given the availability of other treatment options and the 5AC's concession that opioid medication risks are disclosed in product labeling, 5AC ¶¶ 10, 84, 277, the City again fails to plausibly allege that anything Defendants said or did with respect to their SOMS practices left prescribers and patients with "little alternative" but to "submit" to opioid medications—let alone to diverted medications or to illicit opioids. *See Robinson*, 775 N.E.2d at 961.

### c. The City Does Not Allege Acts that Caused Substantial Injury to Consumers.

The 5AC likewise fails to plead facts establishing a "substantial injury to consumers" caused by Defendants' conduct. *Purdue II*, 211 F. Supp. 3d at 1075. The City claims that the Defendants caused substantial injury to consumers by failing to report suspicious orders of opioid medications and to halt shipment of those orders under the CSA. 5AC ¶ 927. That claim fails for the reasons described below at Section III.B:  The City fails to allege that Defendants' SOMS procedures actually or proximately caused the City's alleged harms. Indeed, the City fails

to identify a single suspicious order placed with any Defendant that was shipped into Chicago and that caused harm to any Chicago patient or resident.

For these reasons, the Court should dismiss the City's Unfair Practices claim with prejudice.

### B.     The Cost Recovery Claim Fails in Its Entirety (Count 4).

#### 1.     The City Fails to Plead Causation-in-Fact.

MCC § 1-20-020 authorizes actions against persons who cause the City "to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law." The City attempts to plead a claim under this statute based on all three of its liability theories, *see* 5AC ¶ 938, but like the claims this Court already dismissed for lack of causation, the City again fails to adequately plead but-for causation in support of the claim. This dooms Count 4 in its entirety.[13]

In twice dismissing the City's cost recovery claim based on the Opioids Marketing Theory, the Court held that the City had failed to provide the "missing [causal] link" between alleged false statements and the City's alleged injuries. *Purdue II*, 211 F. Supp. 3d at 1084. To provide the "missing link," the City was required to "clearly identif[y]" the "prescribers who heard the misrepresentations" and allege facts showing both that "the same prescribers . . . *subsequently* prescribed defendants' drugs," *id.* at 1080, and "*relied* on defendants'

---

[13] For the reasons discussed *supra* at § III.A.1. and *infra* at § III.C., Count 4 also fails and must be dismissed to the extent it relies on the City's preempted SOMS Theory and inadequately pleaded SOMS Marketing Theory. *See Lake v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 913-14 (N.D. Ill. 2013) (dismissing ICFA claim in part "to the extent" it was predicated on unsupported factual theory); *In re Innovation IP Ventures, LLC Patent Litig.*, 921 F. Supp. 903, 924 (N.D. Ill. 2013) (dismissing breach of contract claim to the extent it relied on theory that was not properly pleaded).

misrepresentations *when* they prescribed defendants' drugs," *id*; *accord id.* at 1079-84.[14] The City's amendments—namely, the addition of Exhibit D, which purports to "summarize[] data showing the number of prescriptions, doses, and MME by Defendant family," 5AC ¶¶ 323, 413, 508, 578, 592—fail to provide the requisite causal link.[15]

Indeed, the City did not even attempt to include *any* exhibit—or any verified allegations—specifying any prescribers who purportedly prescribed Mallinckrodt medications in reliance on alleged misrepresentations by Mallinckrodt. As to the remaining Defendants, the 5AC fails to allege that most of the prescribers even heard a misrepresentation *before* writing a listed prescription. If an alleged misrepresentation did not precede a prescription, it cannot have caused it. *See Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 594 (Ill. 1986).[16] Further, for prescribers the City claims to have received an alleged misrepresentation, the 5AC does not allege facts linking each prescriber to specific misrepresentations or omissions, or otherwise supporting an inference that the prescriber relied on those misrepresentations or omissions when prescribing that Defendant's opioid medications. For example:

- ***Allergan***. None of the prescribers the City interviewed could identify who from Allergan made a false statement, when or where such statements were made, or that they would not have prescribed Kadian but for those statements. *See* 5AC ¶ 323.

---

[14] Even if the City got the sequence correct in some instances, the fact that one event followed the other is not enough to establish causation (the well-established logical fallacy "post hoc ergo propter hoc"). *See Travelers Indem. Co. v. Cephalon*, 620 F. App'x 82, 87 (3rd Cir. 2015).

[15] Prior versions of the City's complaint relied on and attached two other exhibits (A and B) that purportedly identified prescribers who received alleged misrepresentations from Defendants. The 5AC does neither; instead, it relies on and attaches Exhibit D only. *See* 5AC at 1 n.1, ¶¶ 323, 413, 508, 578, 592. "[W]hen a plaintiff files an amended complaint, the new complaint supersedes all previous complaints and controls the case from that point forward." *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999). Thus, Exhibits A and B to the Third and Fourth Amended Complaints no longer form part of the City's claims.

[16] *See also In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 2012 WL 3154957, at *8-9 (N.D. Cal. Aug. 2, 2012) (dismissing fraud and unjust enrichment claims for failure to allege facts showing that "particular doctors with a 'demonstrated connection' to the plaintiff were actually deceived by the defendant's statements").

- **Cephalon**. Exhibit D lists prescribers who allegedly prescribed a Cephalon opioid medicine, but the 5AC alleges no facts showing that Cephalon made a false statement or omission to any of them, that they wrote prescriptions *after* receiving alleged misrepresentations, or that any misrepresentations *caused* them to write a prescription for opioid medicines that they otherwise would not have written. *See id.* ¶ 413.

- **Endo**. The City allegedly interviewed ten prescribers who were detailed by Endo and several others who allegedly spoke on Endo's behalf at events, but the City either identifies no specific Endo misrepresentation that the prescribers allegedly heard, or fails to allege when and by whom the statement was made or whether the prescriber relied on the statement when writing a specific prescription. By way of example only, while the City asserts that Prescriber V was misled by Endo, *id.* ¶ 513, the City does not allege the time, place, or substance of any statement by Endo to Prescriber V. Rather, the City merely speculates, because he allegedly spoke three times for Endo in 2010, that he "would have attended speakers training" at which misleading training materials may have been provided. *Id.* ¶¶ 512-13. Such speculation is insufficient to state a claim.

- **Janssen**. The City identified 11 prescribers that it interviewed who may have been exposed to Janssen misrepresentations. *Id.* ¶ 578. None, however, is alleged to have relied on any such misrepresentation in prescribing a Janssen opioid. For example, three prescribers (G, H, and T) did not even prescribe any Janssen opioid. *See* 5AC, Ex. D. For the remaining prescribers, the 5AC fails to allege *when* they were exposed to the alleged Janssen misrepresentation, *what* the content was of any such misrepresentation, or *why* any such misrepresentation (e.g., a sales representative's purported failure to "warn about the risk of addiction") would mislead reasonable prescribers when viewed in context.

Compounding the deficiencies, the City does not specifically allege that *any* of these prescribers' prescriptions were medically unnecessary, harmful, or even ineffective.

In short, despite an extensive pre-suit investigation, six years of litigation, interviews with numerous prescribers, and six complaints, the City still cannot allege facts sufficient to show that any Chicago doctor wrote a medically inappropriate opioid prescription **because of** any Defendant's alleged misrepresentation. Under Illinois law, doctors are obliged to know the risks of medicines they prescribe—which, as the City concedes, were all clearly disclosed for Defendants' opioid medications through "black box warnings," *id.* ¶ 84—and then to decide what medicine "best fits the patient's needs." *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 392-93 (Ill. 1987). Yet, apart from allegations that doctors were detailed, *e.g.*, *id.* ¶¶

114-19, the 5AC has no factual allegations that any specific doctor who wrote an opioid

medication prescription in Chicago wrote the prescription because of an allegedly false statement

by any Defendant. The continued absence of such facts is fatal to Count 4 insofar as it is based

on the Opioids Marketing Theory. *See Travelers*, 620 F. App'x at 87 ("[a]llegations that

physicians attended presentations and interacted with Cephalon sales representatives do not

sufficiently demonstrate that these interactions caused the physicians to write the prescriptions at

issue"); *Reg'l Council of Carpenters Welfare Fund* v. *Cephalon, Inc.*, 2014 WL 2115498, at *7

(E.D. Pa. May 21, 2014) (dismissing false marketing claims regarding opioid medicine because

prescribers are presumed to have knowledge of a medication label's contents).

The SOMS Marketing Theory is similarly flawed. The City does not plead facts that any

City employee or any of the prescribers referenced in the 5AC were exposed to Defendants'

alleged marketing regarding their SOMS compliance, much less that any employees or

prescribers relied on that marketing and caused the City to incur costs. *See* 5AC ¶ 802. As a

result, this theory fails, too, for lack of but-for causation.

Finally, the 5AC fails to plead but-for causation as to the SOMS Theory. The 5AC does

not "clearly identif[y]" (or identify at all) a single suspicious order from Chicago that any

Defendant should have reported or stopped. *See Purdue II*, 211 F. Supp. 3d at 1080. Nor does the

5AC suggest that had Defendants reported these unidentified orders to the DEA then the DEA

would have taken action to avert diversion and related societal harms in Chicago. In short, the

City pleads no facts to support its vague, conclusory, and speculative allegation that Defendants'

failure to report or stop shipment of suspicious orders led to the "oversupply of opioids" in

Chicago, which in turn caused the City's alleged harms. 5AC ¶ 681.

### 2. The City Fails to Plead Proximate Causation.

In its last dismissal order, the Court ruled that the City had sufficiently alleged proximate

causation for its claims. *See Purdue II*, 211 F. Supp. 3d at 1081. In doing so, the Court applied a foreseeability test and declined to apply the "direct relationship" test articulated in RICO and other case law. *See Purdue II*, 211 F. Supp. 3d at 1080. Since that ruling, however, the United States Supreme Court has clarified that foreseeability alone is not sufficient to satisfy common-law or statutory proximate causation requirements; instead, relying upon the RICO case law that the Court declined to apply, the Supreme Court held that in the tort context proximate cause also "requires '*some direct relation between the injury and the injurious conduct alleged.*'" *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305-06 (2017).[17] And the Seventh Circuit has made clear that false marketing claims brought by downstream payors of prescription medicines are too attenuated to satisfy this standard of proximate causation, given that there "are so many layers, and so many independent decisions, between promotion and payment," including the independent decision-making of doctors. *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 578 (7th Cir. 2017).

Under the "direct relation" proximate cause standard, a cause of action must be dismissed when, as here, the complaint alleges a theory of liability that is "too attenuated." *Kemper*, 911 F.3d at 392 (affirming dismissal for failure to allege causation); *Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018) (affirming dismissal of state-law

---

[17] While *City of Miami* addressed a claim under the federal Fair Housing Act ("FHA"), the Supreme Court expressly noted that its decision was rooted in common law proximate cause principles. 137 S. Ct. at 1305-06; *cf. Kemper v. Deutsche Bank AG*, 911 F.3d 383, 391-392 (7th Cir. 2018) (applying *City of Miami* outside the FHA context). And Illinois law has long recognized the common law principles discussed in *City of Miami* that impose a "direct relation" proximate cause standard. *See City of Chi. v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004) (proximate cause exists "only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it"); *Cty. of Cook v. Philip Morris*, 817 N.E.2d 1039, 1043 (Ill. App. 2004) (proximate cause "operates … through the remoteness doctrine, . . . sometimes called the 'direct-injury' test").

20

claims and holding that "[p]roximate cause is an essential element that plaintiffs must prove" and is intended "to avoid speculative recovery by requiring a direct relationship between the plaintiff's injury and the defendant's behavior"); *see also Cty. of Cook v. Bank of Am. Corp.*, 2018 WL 1561725, at *6 (N.D. Ill. Mar. 30, 2018) ("increased costs arising out of the provision of downstream social services such as policing and home-loss counseling, are too remote in time and too contingent on later events, to satisfy the 'first step' directness requirement that the Court now applies"); *Sidney Hillman Health Ctr.*, 873 F.3d at 578. Courts across the country have likewise dismissed actions because there were too many "significant independent intervening events" between the alleged misconduct (false marketing) and the alleged harm. *See Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 467 (S.D. W. Va. 2013).[18] Indeed, the "[g]eneral tendency of the law, in regards to damages at least, is not to go beyond the first step." *Hemi Group LLC v. City of New York, NY*, 559 U.S. 1, 15 (2010).

Here, the City's causal chain goes far beyond "the first step." *Id.* The 5AC attempts to hold Defendants liable for the recovery of a wide array of alleged City-incurred costs, ranging from "[i] costs of providing emergency services in response to opioid-related deaths, overdoses, addiction, and other injury; [ii] costs of funding addiction treatment . . . ; [and] [iii] the costs related to the diversion and trafficking of opioids and other opioid-related crimes," as well as other unspecified "costs attendant to the epidemic of opioid use and abuse in the City." 5AC

---

[18] *See also United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 20 F. Supp. 3d 305, 323 (E.D.N.Y. 2014); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2010 WL 3119499, at *6-9 (S.D. Ill. Aug. 5, 2010); *Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1345 (M.D. Fla. 2008).

¶ 943. But Defendants cannot be liable for these purported harms given the many significant and independent intervening events and actors that render any such harms "too remote in time, and too contingent on later events[]." *Cty. of Cook*, 2018 WL 1561725, at *6.

      With respect to the City's marketing-related theories, the City's causal chain encompasses the following speculative series of events, at the very least:

    (a) a Defendant misrepresented a prescription opioid medication's safety or efficacy;

    (b) a prescriber in Chicago actually was exposed to that misrepresentation;

    (c) instead of exercising independent medical judgment, that prescriber prescribed that Defendant's opioid medication[19] to a Chicago resident based on that misrepresentation rather than medical training, knowledge, and experience regarding the risks of opioid medications;

    (d) the prescription was medically unnecessary and harmful;

    (e) the patient chose to fill that prescription without knowledge of the risks of opioid medications;

    (f) the patient became addicted to opioid medications as a result of that fraudulently-induced and medically inappropriate prescription, as opposed to other factors;

    (g) the patient chose to move from prescription opioids to illegal non-prescription drugs or the medically inappropriate prescription was illegally diverted for illicit use; and

    (h) the City incurred public costs to address the misuse, abuse, or addiction of opioids that would not have occurred but for the Defendant's misrepresentation.[20]

      These intervening and speculative events break the causal chain as a matter of law. *See Kemper*, 911 F.3d at 392; *Supreme Auto*, 902 F.3d at 743; *Cty. of Cook*, 2018 WL 1561725, at *6. Indeed, courts facing analogous false marketing theories in opioid-related actions have dismissed them on the pleadings for want of proximate causation. *See State ex rel. Stenehjem v. Purdue Pharma L.P.*, 2019 WL 2245743, at *10 (N.D. Dist. Ct. May 10, 2019) ("The State's

---

[19] As a matter of law, Defendants cannot be responsible for the costs and claims associated with other manufacturers' opioid medications. *See, e.g.*, *Eli Lilly & Co. v. Smith*, 560 N.E.2d 324, 329, 337 (Ill. 1990) (rejecting market share liability and requiring plaintiffs to identify the product causing their injuries).

[20] The MDL court looked past this attenuated chain by artificially collapsing it to three links that ignore necessary actors in the chain like prescribers, opioid abusers, and criminal actors. *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *5 (N.D. Ohio Dec. 19, 2018).

theory in this case depends on an extremely attenuated, multi-step, and remote causal chain.");

*City of New Haven v. Purdue Pharma, L.P.*, 2019 WL 423990, at *4 (Conn. Super. Ct. Jan. 8,

2019) (holding that the "links" in the alleged chain of causation were "too attenuated to support a

claim.").

The City's SOMS Theory is similarly flawed. At the heart of this theory is the City's

claim that Defendants' purported failure to monitor and report suspicious orders or prescription

opioid medications to the DEA and to hold those shipments caused public expenditures

associated with prescription opioid misuse, abuse, and addiction. 5AC ¶¶ 939-43; *see supra* §

III.A. But the City's chain of causation assumes (but does not plead facts showing) that:

(a) the Defendants shipped orders to distributors in violation of their duties to monitor, report, and stop shipment of "suspicious orders";

(b) those distributors violated their own obligations and instead distributed the orders to pharmacies in Chicago;

(c) those pharmacies likewise ignored their legal obligations and disbursed those suspicious orders to patients;

(d) those patients misused or abused those prescription opioid medications, moved from those medications to illicit drugs, and/or diverted those medications to other Chicago residents for illicit use;

(e) those patients or other Chicago residents were physically harmed as a result of those prescription opioid medications or that diversion; and

(f) the City incurred public costs as a result.

Here, too, the City's alleged harms are too remote from Defendants' SOMS procedures.

*See Kemper*, 911 F.3d at 392; *see also Supreme Auto*, 902 F.3d at 743; *Cty. of Cook*, 2018 WL

1561725, at *6.

As a matter of Illinois law, liability is foreclosed for alleged downstream societal harms

involving third-party criminal actors. The 5AC asserts that Defendants created "a new secondary

market for opioids . . . [and] additional illicit markets in other opiates, particularly heroin,"

resulting in "concomitant crime and costs; unrealized economic productivity; and broken

families and homes" and increased costs for municipal services related to addiction and

treatment. 5AC ¶ 927. But under Illinois law, proximate cause "will not be found where the criminal acts of third parties have broken the causal connection." *Beretta*, 821 N.E.2d at 1134; *see also Int'l Bhd. of Teamsters Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*, 34 F. Supp. 2d 656, 662 (N.D. Ill. 1998). Defendants sell highly regulated, FDA-approved medications that patients can lawfully obtain only by prescription. Defendants are "several times removed" from any criminal market, increase in illegal heroin usage, or any other costs associated with the misuse of opioid medicines. *Beretta*, 821 N.E.2d at 1137. Those social ills are "the aggregate result of numerous unforeseeable intervening criminal acts by third parties not under defendants' control." *Id.* at 1148. As a result, any claim seeking relief for such harms fails for lack of proximate cause.

### C. The Deceptive Practices and Misrepresentations Claims Fail to the Extent They Rely on the SOMS Marketing Theory (Counts 1 and 3).

The City's Deceptive Practices claim under MCC § 2-25-090 (Count 1) and Misrepresentations claim under MCC § 4-276-470(1) (Count 3) are premised on the Opioids Marketing Theory and SOMS Marketing Theory. 5AC ¶¶ 908, 913, 932-36; *supra* at § II.B. The Court already held that the City adequately pleaded both claims as to the Opioids Marketing Theory, *see Purdue II*, 211 F. Supp. 3d at 1058—a ruling that Defendants do not challenge here. The City's allegations based on the SOMS Marketing Theory, however, fail to state a claim under either statute, requiring dismissal of both Counts 1 and 3 to the extent they are based on this theory. *See Lake*, 964 F. Supp. 2d at 913-14; *In re Innovation IP Ventures,* 921 F. Supp. 2d at 924.

The City's claim under MCC § 2-25-090 is predicated on alleged violations of the ICFA. *See* 5AC ¶¶ 904-05. To state an ICFA claim, the City must allege facts showing "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception;

and (3) the occurrence of the deception during a course of conduct involving trade or commerce." *Purdue II*, 211 F. Supp. 3d at 1070. A statement is deceptive only if it "creates a likelihood of deception or has the capacity to deceive," such that it may mislead a "reasonable consumer." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001). Likewise, the City's claim under MCC § 4-276-470(1) requires it to plead facts showing that Defendants "[1] use[d] deception, fraud, false pretense, or misrepresentation [2] with the intent that others rely on such concealment, [3] in connection with the sale or advertisement of any merchandise." *Id.* at 1076. And because both these fraud-based claims are subject to Rule 9(b), the City must plead these facts with particularity. As the Court has recognized, Rule 9(b) imposes a substantial pleading obligation: The City must provide "the *name* of [a] Chicago doctor or consumer to whom" Defendants "made an alleged misrepresentation" about SOMS compliance, as well as details regarding "*when* the misrepresentation was made, or *how*." *Purdue I*, 2015 WL 2208423, at *10[21]; *see U.S. v. Sanford-Brown, Ltd.*, 788 F.3d 696, 705 (7th Cir. 2015) (Rule 9(b) "requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff"). Count 1 falls far short of these pleading requirements for the SOMS Marketing Theory.

    *First*, the 5AC does not identify any actionable misrepresentations for the SOMS Marketing Theory. *See* 5AC ¶ 802. Although the 5AC claims that Defendants' statements "were false, and designed to conceal their contribution to the opioid epidemic and create a false sense

---

[21] *See also Purdue I*, 2015 WL 2208423, at *11 (the City must "allege[] … facts that connect the alleged misrepresentations *specifically* to Chicago doctors or consumers"); *id.* (the City must allege "that Chicago doctors or consumers visited [Defendants'] websites or otherwise indicate when, how, and to whom the alleged misrepresentations were made").

of security that opioids remained in proper channels," *id.*, it alleges no *facts* to support these

conclusory statements. Indeed, it identifies no statements at all as to Cephalon, Teva, or any

affiliated company for the SOMS Marketing Theory. As to the remaining Defendants, the

alleged statements either have no plausible connection to the SOMS Marketing Theory or are not

deceptive as a matter of law. *See Fuchs v. Menard, Inc.*, 2017 WL 4339821, at *3 (N.D. Ill. Sept.

29, 2017) ("A court may dismiss an ICFA claim at the pleading stage if the statement is not

misleading as a matter of law."). For example:

- *Allergan*. The only Allergan statement the 5AC identifies in support of its SOMS Marketing Theory is a 2019 statement stating simply that it "employed a number of controls." 5AC ¶ 802 (paraphrasing such controls). The 5AC nowhere alleges any facts suggesting that this straightforward statement was untrue or deceptive in any way. This statement provides no support for the City's SOMS Marketing Theory.

- *Endo*. As to Endo, the 5AC's SOMS Marketing Theory is based on a single Endo document, Endo's Open Letter on the Opioid Abuse Crisis available on the Company's website. *Id.* ¶ 802. That letter describes Endo's concern regarding the "opioid abuse crisis" and lists certain Endo efforts to "balance access to pain care medications for appropriate patients while aggressively mitigating the risks of opioid abuse."[22] While the letter does state that Endo engaged in "product serialization aimed at thwarting counterfeiting and theft to protect patient safety" as part of its "anti-diversion measures," it does not contain *any* reference to Endo's SOMS program. *Id.*

- *Janssen*. The 5AC identifies only one Janssen statement for the SOMS Marketing Theory: a snippet of a "launch announcement" for the 2011 launch of Janssen's unbranded educational website *Prescriberesponsibly.com*, in which "Janssen stated that it 'is dedicated to taking ongoing steps to ensure its products are used correctly and responsibly.'" *Id.* ¶ 802. That statement, which addresses the *use* of pain medications, says *nothing* about Janssen's SOMS procedures. The alleged launch announcement itself further confirms this: the statement was expressly tied to the "the appropriate and responsible *management of pain*" and "educational programs about safe and responsible

---

[22] Specifically, the Open Letter states that, "in September 2016, Endo voluntarily stopped promoting opioid products to healthcare professionals and eliminated the Company's entire pain product salesforce. Endo also voluntarily withdrew Opana® ER from the market, discontinued the research and development of new opioid products and implemented additional anti-diversion measures, including product serialization aimed at thwarting counterfeiting and theft to protect patient safety."

*use of pain medicines.*" *Id.*[23]

- ***Mallinckrodt****.* The 5AC identifies just one alleged statement by Mallinckrodt in connection with the SOMS Marketing theory: "We address diversion and abuse through a multidimensional approach that includes educational efforts, *monitoring for suspicious orders of controlled substances*[.]" *Id.* ¶¶ 768, 802.[24] That statement is indisputably true and the City pleads no facts suggesting otherwise. Mallinckrodt did, in fact, monitor for suspicious orders; the City simply contends that Mallinckrodt should have done so differently. Contrary to the City's pleading, the separate statements quoted in the complaint that in "key areas, our initiatives go beyond what is required by law," while taken from the same webpage, do not purport to describe Mallinckrodt's SOMS procedures at all. In context, the SOMS-related statement is nothing more than a passing reference in a list of initiatives included in the Responsible Pain Medication Use Programming. These are non-misleading as a matter of law. *See Fuchs*, 2017 WL 4339821, at *4 (true statements with no factual allegations of falsity are not misleading as a matter of law).

*Second*, the 5AC fails to plead the basic who, what, when, where, and how of the SOMS Marketing Theory. Despite spanning nearly 1000 paragraphs and more than 360 pages, the 5AC contains *one paragraph* of factual allegations to support this theory. 5AC ¶ 802. And that paragraph fails to identify any "specific[]" Chicago doctors or consumers to whom Defendants made alleged misrepresentations about SOMS compliance. *Purdue I*, 2015 WL 2208423, at *11.

---

[23] The 5AC does not cite the source of the alleged launch announcement statement, but it appears to be quoting a "fact sheet" related to the *Prescriberesponsibly.com* website and other Janssen unbranded educational programs. *See* https://www.multivu.com/assets/51908/documents/51164-Janssen-Responsibility-Fact-Sheet-original.pdf (attached as Ex. 1 to the Declaration of Charles C. Lifland). Under the incorporation-by-reference doctrine, the Court can and should review this document in ruling on this motion. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("It is well settled that in deciding a Rule 12(b)(6) motion, a court may consider 'documents attached to a motion to dismiss ... if they are referred to in the plaintiff's complaint and are central to his claim.'"); *Sonrai Sys., LLC v. AMCS Grp. Inc.*, 2017 WL 4281122, at *8 (N.D. Ill. Sept. 27, 2017) ("[C]ourts of this district have applied the incorpora-tion-by-reference doctrine to websites relied upon by plaintiffs in their complaints.").

[24] The statement is part of a longer list of Mallinckrodt's initiatives in connection with its Re-sponsible Pain Medication *Use* Programs. The quoted language in Paragraphs 768 and 802 are excerpts from the 2014-2015 version of Mallinckrodt's website. *See* https://web.ar-chive.org/web/20140701095355/http://www2.mallinckrodt.com/Responsibility/Responsi-ble_Use/Our_Programs/ (attached as Ex. A to the Declaration of Sarah M. Kimmer). Under the incorporation by reference doctrine, this Court can and should review the entire cited webpage to understand the context of these statements. *See supra* n.23.

Nor does the paragraph allege *how* the alleged misrepresentations were made "with the intent that" Chicago physicians or consumers rely on them, *what* proposition they would even be relied on for, or *how* Defendants' SOMS compliance would be in any way relevant to Chicago doctors' prescribing decisions. *See Purdue II*, 211 F. Supp. 3d at 1070. By contrast, when the Court found that the City stated a claim for Counts 1 and 3 under the Opioids Marketing Theory, it noted that the City had "identified to which Chicago area prescribers defendants' representatives made alleged misstatements, what those alleged misstatements were, and generally when and where those alleged misrepresentations were made." *Id.* at 1071. The City's minimal allegations in support of the SOMS Marketing Theory offer none of these required details.

Because the City does not and cannot allege sufficient facts to support its SOMS Marketing Theory, Counts 1 and 3 should be dismissed with prejudice to the extent they are predicated on that theory. *See Lake*, 964 F. Supp. 2d at 913-14; *In re Innovation IP Ventures,* 921 F. Supp. 2d at 924.

### D. Counts 1-4 Also Should Be Dismissed as Improper Efforts to Circumvent the Lack of a Civil Right of Action Under the CSA.

Finally, the City's new SOMS Theory and SOMS Marketing Theory are both predicated on the supposition that Defendants should be held liable for violating requirements of the federal CSA. But Congress did not provide the City or any plaintiffs asserting civil claims a right of action under the statute. To the contrary, "no private right of action exists under" the CSA. *Durr v. Strickland*, 602 F.3d 788, 789 (6th Cir. 2010); *accord Safe Sts. Alliance v. Alternative Holistic Healing, LLC*, 2016 WL 223815, at *3 (D. Colo. Jan. 19, 2016) ("federal courts uniformly have held that there are no private rights of action under the CSA.").

The City's claims attempt to smuggle in a right of action under the CSA through purported violations of state law. But, as the Supreme Court has warned, "[t]he absence of a

private right to enforce the [statute] would be rendered meaningless if [parties] could overcome that obstacle by" simply recasting the violations as state-law claims. *Astra USA, Inc. v. Santa Clara County, Cal.*, 563 U.S. 110, 118 (2011). This too provides an independent basis to dismiss all of the City's new SOMS-based claims.

## IV.   CONCLUSION

For the foregoing reasons, the Court should dismiss with prejudice Counts 2 and 4 in their entirety and Counts 1 and 3 to the extent they are premised on the City's SOMS Marketing Theory.

Dated:   May 22, 2020                              Respectfully submitted,

                                                   /s/ Charles C. Lifland
                                                   Charles C. Lifland (*admitted pro hac vice*)
                                                   Sabrina H. Strong (*admitted pro hac vice*)
                                                   Esteban Rodriguez (*admitted pro hac vice*)
                                                   O'MELVENY & MYERS LLP
                                                   400 S. Hope Street
                                                   Los Angeles, CA 90071
                                                   Telephone: (213) 430-6000
                                                   Facsimile: (213) 430-6407
                                                   clifland@omm.com
                                                   sstrong@omm.com
                                                   esrodriguez@omm.com

                                                   Sherry A. Knutson (#6276306)
                                                   TUCKER ELLIS LLP
                                                   233 South Wacker Drive, Suite 6950
                                                   Chicago, Illinois 60606
                                                   Telephone: (312) 624-6300
                                                   Facsimile: (312) 624-6309
                                                   sherry.knutson@tuckerellis.com

                                                   *Attorney for Defendants Janssen
                                                   Pharmaceuticals, Inc., Johnson &
                                                   Johnson, Janssen Pharmaceutica, Inc.
                                                   n/k/a Janssen Pharmaceuticals, Inc., and
                                                   Ortho-McNeil-Janssen Pharmaceuticals,
                                                   Inc. n/k/a Janssen Pharmaceuticals, Inc.*

                                                   /s/ Tinos Diamantatos
                                                   Tinos Diamantatos
                                                   MORGAN, LEWIS & BOCKIUS LLP
                                                   77 West Wacker Drive
                                                   Chicago, IL 60601
                                                   Tel: (312) 324-1000
                                                   tinos.diamantatos@morganlewis.com

                                                   Eric W. Sitarchuk (*pro hac vice forthcoming*)
                                                   Rebecca J. Hillyer (*pro hac vice forthcoming*)
                                                   MORGAN, LEWIS & BOCKIUS LLP
                                                   1701 Market St.
                                                   Philadelphia, PA 19103-2921
                                                   Tel: (215) 963-5840
                                                   eric.sitarchuk@morganlewis.com
                                                   rebecca.hillyer@morganlewis.com

Brian M. Ercole (*admitted pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
200 South Biscayne Boulevard
Miami, FL 33133-2339
Tel: (305) 415-3416
brian.ercole@morganlewis.com

*Attorneys for Teva Pharmaceuticals, U.S.A.,
Inc., Cephalon, Inc., Watson Laboratories,
Inc., Actavis LLC, and Actavis Pharma, Inc.*

/s/ Jonathan L. Stern (consent)
Jonathan L. Stern
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Phone: 202-942-5000
Email: jonathan.stern@arnoldporter.com

Sean O. Morris
Arnold & Porter Kaye Scholer LLP
777 S. Figueroa St., Suite 4400
Los Angeles, CA 90017
Phone: 213-243-4000
Email: sean.morris@arnoldporter.com

Carole S. Rendon (IL  6200217)
Email: crendon@bakerlaw.com
BAKER & HOSTETER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland  OH  44114-1214
Telephone:  216.861.7420
Facsimile:    216.696.0740

Justin R. Donoho (IL  6299667)
Email: jdonoho@bakerlaw.com
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 4500
Chicago  IL  60606-2841
Telephone:  312.416.8198
Facsimile:    312.416.6201

*Attorneys for Endo Health Solutions Inc. and
Endo Pharmaceuticals Inc.*

/s/ Karl Stampfl (consent)
Donna Welch, P.C.
Timothy W. Knapp, P.C.
Karl Stampfl
KIRKLAND & ELLIS LLP
300 North LaSalle, Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
donna.welch@kirkland.com
tknapp@kirkland.com
karl.stampfl@kirkland.com

Jennifer G. Levy, P.C. (admitted pro hac vice)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jlevy@kirkland.com

*Attorneys for Allergan plc (f/k/a Actavis plc)
and Allergan Finance, LLC (Actavis, Inc.
f/k/a Watson Pharmaceuticals, Inc.)*

/s/ Andrew J. O'Connor (consent)
Andrew J. O'Connor (*admitted pro hac vice*)
Jennifer S. Pantina (*pro hac vice application
pending*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston St.
Boston, MA 02199-3600
(617) 235-4650
Andrew.O'Connor@ropesgray.com
Jennifer.Pantina@ropesgray.com

Sarah M Kimmer
ROPES & GRAY LLP
191 North Wacker Drive
Chicago, IL 60606
Telephone: (312) 845-1244
Sarah.Kimmer@ropesgray.com

*Attorneys for Defendants Mallinckrodt LLC
and SpecGx LLC*

32

## SIGNATURE ATTESTATION

Pursuant to the Northern District of Illinois' General Order on Electronic Case Filing, General Order 14-0009(IX)(C)(2), I hereby certify that authorization for the filing of this document has been obtained from each of the other signatories shown above and that all signatories concur in the filing's content.

/s/ Charles C. Lifland
Charles C. Lifland

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2020, I electronically filed the foregoing with the clerk of

the court using the CM/ECF system, which will send notification of such filing to the e-mail

addresses denoted on the electronic Mail Notice List.


Executed on May 22, 2020, at Los Angeles, California.


/s/ Charles C. Lifland
Charles C. Lifland