**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CITY OF CHICAGO,** | ) | |
| | ) | **No. 14 CV 4361** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **PURDUE PHARMA, L.P.,** *et al.*, | ) | |
| | ) | **July 1, 2020** |
| **Defendants.** | ) | |

**MEMORANDUM OPINION and ORDER**

In this diversity suit, Plaintiff City of Chicago ("the City") alleges that Defendants violated state law and municipal code in their marketing and distribution of opioid medications. Before the court is the City's motion for protective order concerning production of medical and pharmaceutical claims data. (R. 721.) In this motion the City seeks to be relieved from its obligation under a previous court order to identify opioid prescriptions that it considers to be medically unnecessary and to turn over data to Defendants regarding opioids prescribed to individuals covered by the City's insurance plans. For the following reasons, the motion is granted:

**Background**

In October 2016 the City filed its Third Amended Complaint, which included counts alleging false claims under the City's municipal code ("MCC") and insurance fraud under Illinois law. (R. 478, 3d Am. Compl. at 309-18, 322-26.) With respect to those counts, the City alleged that Defendants engaged in deceptive marketing

practices that caused doctors to write medically unnecessary opioid prescriptions that were presented to the City's health and workers' compensation plans for reimbursement. (Id. at 310.) The City further alleged that if it had known that Defendants' marketing representations were false it would not have reimbursed those claims. (Id. at 310-11.) The City sought damages in the amount of the costs it incurred to reimburse what it alleged were medically unnecessary opioid prescriptions. (Id. at 311, 325.)

As discovery unfolded Defendants moved in July 2017 to compel the City to provide a phased identification of the allegedly medically unnecessary prescriptions at issue in their claims, along with insurance claims data regarding reimbursement for those prescriptions. (R. 588.) This court granted the motion in part in August 2017 and ordered the City to identify: "(1) the prescription claims submitted to and paid for by [the City] that it asserts were medically unnecessary and to whom they were written; (2) the physicians or health care providers who wrote the prescriptions [the City] alleges to have been medically unnecessary; and (3) [the City's] basis for identifying the prescription claims to be 'medically unnecessary.'" (R. 604.) In December 2017, before the City complied with this order, this case was transferred to the United States District Court for the Northern District of Ohio as part of the Judicial Panel on Multidistrict Litigation ("MDL") for consolidated pretrial proceedings. (R. 662.)

Two years later, in December 2019, this case was remanded back to this court and the City was granted leave to file its Fifth Amended Complaint. (R. 676, 713.)

In the current iteration of its complaint, the City has dropped it false claims and insurance fraud claims entirely.  (R. 715, 5th Am. Compl.)  It is currently pursuing only the following four claims: (1) consumer fraud and deceptive practices under MCC § 2-25-090; (2) consumer fraud and unfair practices under Illinois law and MCC § 2-25-090; (3) misrepresentations in connection with sales or advertisement of merchandise under MCC § 4-276-470; and (4) recovery of City's costs for providing services under MCC § 01-20-020.  (Id. ¶¶ 904-43.)  The City is no longer seeking damages in the form of reimbursement for medically unnecessary prescriptions.  Instead it is pursuing civil penalties and damages in the form of the costs it incurred for services rendered in response to opioid-related addiction and deaths.  (Id. ¶ 943.)  After amending its complaint in this way, the City filed the current motion seeking relief from the court's August 2017 order requiring it to identify medically unnecessary prescriptions and prescription claims data.

## Analysis

In moving for a protective order relieving it of the obligations established under the court's August 2017 discovery order, the City argues that the court-ordered claims data discovery is no longer relevant now that it has dropped the insurance fraud and false claims counts and is not seeking reimbursement for amounts it paid to cover what it had alleged were medically unnecessary prescriptions.  (R. 723, Pl.'s Mem. at 1-2.)  Federal Rule of Civil Procedure 26(b)(1) allows "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  In support of its motion

3

the City invokes Federal Rule of Civil Procedure 26(b)(2), which requires the court to limit discovery that falls outside the scope of Rule 26(b)(1) or "is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C); *see also Charvat v. Travel Servs.*, 110 F. Supp. 3d 894, 897 (N.D. Ill. 2015) (noting that the court is required, not merely permitted, to limit discovery of the type described in Rule 26(b)(2)(C)). The City argues that under the current version of its complaint, individual prescription and claims data are no longer relevant and impose an unnecessary burden, because it now intends to prove its claims without that information, relying solely on data showing that Defendants' alleged marketing misrepresentations and diversion of opioids are responsible for increased opioid addiction among Chicago residents. (R. 723, Pl.'s Mem. at 1-3.)

As an initial matter, Defendants attempt to knock out the City's motion by arguing that it should be treated as a motion to reconsider the court's August 2017 discovery order. Defendants argue that the motion should be denied because from their perspective the City has failed to show that there is newly discovered evidence or a manifest error of law to justify reconsidering the court's prior order. (R. 751, Defs.' Mem. at 13.) The court disagrees with this attempted characterization of the City's motion. The court has "extremely broad discretion" in managing discovery, *Jones v. City of Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013), and that discretion necessarily includes the ability to revisit discovery orders as the needs and demands of the litigation change. The City seeks a protective order with respect to an

4

interlocutory discovery order, and under Rule 54(b) the court may revise an interlocutory order at any time before the entry of judgment. Even if the court were to construe the City's motion as one for reconsideration, the court applies the Rule 54(b) standard and reconsiders the prior order "where there has been a controlling or significant change in the facts of the case." *Caine v. Burge*, 897 F. Supp. 2d 714, 716 (N.D. Ill. 2012). The City's decision to drop the claims underlying the court's August 2017 order represents such a change. *See Best v. Ind.*, No: 1:16-cv-02549-TWP-MJD, 2019 WL 699138, at *4 (S.D. Ind. Feb. 20, 2019) (finding new allegations in amended complaint to be a significant change in facts for purpose of Rule 54(b)). Accordingly, the court may consider whether to revisit the August 2017 discovery order without holding the City to the high bar that applies when a party seeks reconsideration of a final judgment.

Turning to the motion's merit, the court agrees with the City that under the current version of its complaint, the relevance and proportionality analyses with respect to medically unnecessary prescriptions and individual claims data have shifted substantially. At the time the court issued the August 2017 discovery order granting Defendants' motion to compel, the City alleged that it was damaged by the costs it incurred in reimbursing insurance claims for what it alleged were medically unnecessary opioid prescriptions written by doctors targeted by Defendants' marketing. In considering the motion, the court explicitly noted that Defendants were entitled to "have the set of claims that the City is relying on in order to prove this case." (R. 723, Pl.'s Mem. Ex. 1, May 8, 2017 Hearing Tr. at 41-42.) But now

5

that the City has amended its complaint by dropping the insurance fraud and false claims counts, and the City is no longer seeking to recover the amounts it paid for the allegedly medically unnecessary prescriptions, the need to identify individual prescriptions or insurance claims is far less clear.   That is because the City is no longer relying on individual prescriptions or insurance claims data to prove its case, but rather has shifted the focus to what it alleges are Defendants' illegal marketing and diversion tactics.   Moreover, the City currently is seeking only civil penalties and, by way of damages, the cost of responding to the impact of the allegedly fraudulent marketing and diversionary tactics.   The City asserts that it will prove its amended claims by showing a link between the nature and volume of Defendants' marketing and increased addiction among its residents.   In short, the City represents that it will not rely on any information regarding individual prescriptions or insurance claims data in proving the four counts in the current complaint, and argues that accordingly, discovery related to that information is no longer relevant.   (R. 723, Pl.'s Mem. at 10-11.)

Although the court accepts the City's representation that it will not rely on the information targeted in the court's August 2017 discovery order to prove its claims, that still leaves open the question whether Defendants nonetheless are entitled to this discovery to support their defenses.   Defendants insist that even with the changes in the City's claims, they need the City to identify medically unnecessary prescriptions and provide insurance claims data in order to defend against the City's theory of causation.   Specifically, Defendants assert that they

6

need the targeted discovery to understand why doctors wrote allegedly medically unnecessary prescriptions, whether the prescribing doctors were exposed to and relied on Defendants' marketing, and whether their reliance led to the alleged harms. (R. 751, Defs.' Resp. at 1-2.)

Likely because the court determined in a prior ruling that the City is not required to demonstrate causation to prove counts one and three, *see City of Chicago v. Purdue Pharma L.P.* ("*Chicago II*"), 211 F. Supp. 3d 1058, 1073, 1076 (N.D. Ill. 2016), Defendants focus entirely on counts two and four in explaining their relevance argument, (see R. 751, Defs.' Resp. at 5-6). In count two the City alleges consumer fraud and unfair practices under 815 ILCS 505/2 and MCC § 2-25-090. (R. 715, 5th Am. Compl. ¶¶ 916-28.) The cited municipal code section makes it a code violation to engage in unfair practices while conducting business in the City, *see* MCC § 2-25-090, while the state statute prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact," *see* 815 ILCS 505/2. This section of the statute does not include an explicit causation requirement. *See id.* As the court already concluded, the City can demonstrate unfairness through evidence that Defendants' alleged practices are unscrupulous, immoral, or offensive to public policy, without showing consumer injury. *See Chicago II*, 211 F. Supp. 3d at 1074. Because consumer injury is not a required factor under count two and the City seeks only civil penalties with respect

7

to this claim, Defendants have not shown that the targeted discovery is relevant to their defense of that count.

The parties' relevance dispute then boils down to count four, which is the only remaining count that includes an express causation element. Under MCC § 1-20-020, the City can recover the costs of providing services that are reasonably related to an entity's violation of state law. At the June 12, 2020 hearing on the current motion, the City represented to the court that it will rely on aggregate data to prove causation under this count, using expert opinion evidence to establish that Defendants' marketing practices and their failure to police the distribution of their opioids led to an increase in the number of prescriptions which in turn caused an epidemic of addiction. (R. 812, Hearing Tr. at 8-9.) The City reiterates that it intends to prove causation without any evidence regarding medically unnecessary prescriptions. (Id. at 9-10.)

It is important to clearly frame the Defendants' argument in response with respect to the two forms of disputed discovery: medically unnecessary prescriptions and insurance claims data. With respect to the former category, Defendants argue that to establish that their marketing led to increased costs related to addiction, the City must show that doctors relied on their marketing materials in deciding to write unnecessary prescriptions. But at the June 12, 2020 hearing on this motion, the City asserted that it does not have to establish reliance in order to prevail on count four, and that it expects to prove count four based on aggregate proof, meaning without establishing that specific doctors relied on specific misrepresentations in

8

writing prescriptions for Defendants' opioids. (Id. at 9:1-9:24, 16:20-17:2.) If Defendants believe that the City cannot prove its claim under count four without evidence that doctors wrote medically unnecessary prescriptions in reliance on their marketing materials, then their insufficient evidence argument is best left to play out on the merits at the summary judgment phase. In other words, Defendants cannot demand discovery based on a proof element the opposing party does not accept as a required element.

Defendants also argue that the City must be required to identify medically unnecessary prescriptions because they need this information to fully defend against count four. According to Defendants, even if the City relies only on aggregate data to prove this claim, they are entitled to have the City identify which prescriptions it considers medically unnecessary so they can challenge that data by showing that there is no link between their marketing materials and the identified prescriptions. (R. 751, Defs.' Mem. at 2.) In other words, Defendants seek granular data regarding individual prescriptions to undermine the City's aggregate data linking Defendants' actions to a surge in opioid addiction. But as the City points out, in the MDL the presiding judge gave the plaintiffs in four bellwether cases the option of declining to identify which prescriptions they considered medically unnecessary if they committed to proceeding solely by presenting aggregate data. (R. 723, Pl.'s Mem. Ex. 2.) As set forth in its brief, "[h]ere, the City is prepared to commit to proceed solely by aggregate proof on its existing claims." (Id. Pl.'s Mem. at 3.) One purpose of the conditional transfer of this case to the MDL was to

9

conserve judicial resources, *see Tench v. Jackson Nat'l Life Ins. Co.*, No. 99 CV 5182, 1999 WL 1044923, at *1 (N.D. Ill. Nov. 12, 1999), and given the ruling with respect to aggregate data in the MDL and the City's commitment to relying on aggregate data here, it would be inconsistent for this court to hold the City to the obligation to identify medically unnecessary prescriptions, s*ee Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 (7th Cir. 1996) (noting that one purpose of MDL proceedings is to "avoid duplicative rulings").  In short, now that the City has made clear that it does not intend to point to or rely on a single example of medically unnecessary prescriptions, and without the false claims and insurance fraud counts that supported a relevance finding under the August 2017 discovery order, the court agrees with the City that requiring it to identify for Defendants which prescriptions it considers medically unnecessary falls outside the scope of Rule 26(b)(1).

With respect to the second category of discovery, information regarding insurance claims for opioid prescriptions the City reimbursed under its insurance plans, it is important to note as an initial matter that the only insurance claims information the court ordered the City to provide in its August 2017 order was "the prescription claims submitted to and paid for by Plaintiff that it asserts were medically unnecessary and to whom they were written."  (R. 604.)  Subsequently, however, the City agreed to provide all insurance claims made under its medical plans from January 1, 2005, and all claims made under its workers compensation plans from January 1, 2008.  (See R. 723, Pl.'s Mem. at 5.)  Defendants argue that despite the changes in the Fifth Amended Complaint, it is still entitled to the claims

10

information covered by both the court's August 2017 order and the City's agreement.

With respect to the medical insurance and workers compensation data, the relevance analysis has shifted here as well. Because the City is no longer seeking to recover the costs it paid to reimburse its insureds' prescription claims, that information is no longer relevant to the question of damages. And although Defendants assert that they need insurance claims information to investigate which doctors prescribed their medications and why, (R. 751, Defs.' Mem. at 11), for the same reasons the City's decision to rely on aggregate proof undermines the relevance of the prescription information, it also undermines the need for insurance claims data.

Defendants' only relevance argument that is unique to the insurance claims data stems from its assertion that it can use this data to show that the City still reimburses claims for opioid prescriptions in a way that undermines the City's allegations that Defendants' marketing representations are false. (Id. at 7.) But again, the City is no longer proceeding on a theory that a sub-set of prescriptions were medically unnecessary but plans to base its case on Defendants' conduct in marketing and distributing opioid medications and the alleged connection between that conduct and an increase in opioid addiction. The focus of the case has shifted substantially, and information that was clearly relevant when the City was seeking reimbursement for costs it incurred in covering its insureds' prescriptions is no longer relevant.

11

Even if the claims data were still relevant to Defendants' defense strategy under the current iteration of the complaint, that evidence must meet Rule 26(b)(1)'s proportionality standard, and the court is required to exclude discovery that "is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). Now that the City has dropped its false claims and insurance fraud counts, the damages it seeks are based on the costs of services it has expended in relation to the increase in opioid addiction among all City residents, rather than the costs of the individual insurance claims it paid on behalf of its insured employees. Defendants acknowledge that the City has access to insurance claims data only for its insured employees, who, according to the City, make up about 1% of its total population. (R. 723, Pl.'s Mem. at 13.) However, Defendants' experts can access information with respect to the vast majority of City residents through third-party insurers. That means that to the extent Defendants believe that the information they can glean from insurance claims data is relevant to their defense, a large universe of that data is available to them regardless of the City's production. The City asserts that compiling information about its insureds who received opioid prescriptions would require it to identify about 250,000 unique claims across several databases, and that this endeavor is likely to involve significant expense that is out of proportion to Defendants' needs, given the availability of this information from other sources. (Id.) The court agrees that requiring the City to engage in a costly and time-consuming production process to glean data that

12

represent only a sliver of the claims data Defendants intend to access presents a burden that outweighs the benefit of the proposed discovery. *See* Fed. R. Civ. P. 26(b)(1).

Moreover, Defendants' acknowledgment that they intend to collect a "larger set of claims data" from third-party insurers, (R. 751, Defs.' Mem. at 13), means that the data the City would produce is likely to be cumulative or meaningless. The City submitted correspondence demonstrating the parties' understanding under the prior agreement that the City's insurance claims data would be sourced from the third-party insurance companies that provided its plans. (R. 723, Pl.'s Mem. Ex. 5.) There is likely to be substantial overlap between claims data Defendants obtain from third-party insurers and claims data the City would produce. Accordingly, as the City suggests in its reply, (R. 757, Pl.'s Reply at 12), it makes sense to require Defendants to seek this information from third-party insurers first, and then ascertain the extent to which that compiled data is sufficient from their experts' perspective. But ordering the City to produce the requested insurance claims data at this point is likely to be both cumulative and involve costs that are disproportionate to Defendants' need for the information in light of the amended claims, the availability of data from other sources, and the usefulness of such data. Accordingly, the court is obligated to curtail that discovery. *See* Fed. R. Civ. P. 26(b)(2)(C).

## Conclusion

For the foregoing reasons, the City's motion for protective order concerning production of medical and pharmaceutical claims data is granted.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**

14