**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, | |
| Plaintiff, | |
| v. | Case No. 14-cv-04361 |
| PURDUE PHARMA L.P., et al., | Honorable Jorge L. Alonso |
| Defendants. | Magistrate Judge Young B. Kim |

**<u>JOINT STATUS REPORT</u>**

Pursuant to this Court's Order dated October 11, 2020 (Dkt. No. 852), Plaintiff City of Chicago ("the City") and Defendants[1] (collectively, the "Parties") hereby file this Joint Status Report (i) identifying their unresolved document production disputes that remain after the Court-ordered meet and confer; (ii) attaching the relevant discovery requests and responses as exhibits hereto; and (iii) identifying the names of those attorneys who will be addressing the Court during the status hearing on December 14, 2020. The Parties agree that negotiations and discussions regarding the parties' productions are ongoing and will be raised with the Court as appropriate.

---

[1] For purposes of this Joint Status Report, the "Defendants" include Teva Pharmaceuticals USA, Inc. ("Teva"); Cephalon Inc. ("Cephalon"); Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc. ("Janssen"); Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. ("Endo"); Allergan plc f/k/a Actavis plc and Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. ("Allergan"); and Watson Laboratories, Inc., n/k/a Actavis Laboratories UT, Inc., Actavis LLC, and Actavis Pharma, Inc., f/k/a Watson Pharma, Inc. ("Actavis").

## I.  CITY OF CHICAGO'S DOCUMENT REQUESTS TO DEFENDANTS

### A.  Janssen Defendants' Responses and Production

#### 1.  Janssen's Failure to Produce Documents from Key Custodians

On October 9, 2020, after the parties had conferred regarding Janssen's deficient interrogatory responses, Janssen served its Amended Responses and Objections to Plaintiff's Third Set of Interrogatories.[2] Among other changes, Janssen's "Amended Response to Interrogatory No. 4" identified five individuals with knowledge of Janssen's lobbying efforts. Three of the five individuals worked in Janssen's "State Government Affairs" department and possessed state-specific responsibilities, and Janssen has agreed to collect, review and produce their documents.[3] The remaining two individuals—Carla Cartwright and Bruce Colligen—are purported "national-level" employees who possess relevant, discoverable information concerning lobbying and other efforts on the national level, yet Janssen refuses to produce their documents.

Although scant, the information in Janssen's interrogatory response confirms that Ms. Cartwright and Mr. Colligen are custodians relevant to this action. Janssen's response confirms that Carla Cartwright is the "Former Director, Federal Affairs," who "may have knowledge related to Defendants' federal advocacy efforts."[4] Similarly, Bruce Colligen is the "Executive Director, Health Policy, Government Affairs & Policy" and Janssen confirms that he "may have knowledge relating to Defendants' Government Affairs department."[5]

---

[2] Copy attached as Exhibit 1.
[3] That production was described in the parties' Agreed Motion for Extension of Time to Complete Production of Certain Documents (Dkt. 876), and has not yet been completed.
[4] Exh. 1 at 20.
[5] *Id.* at 21.

2

Defendants, including Janssen, intend to cast blame on the Federal Government for the opioid crisis. Janssen's Sixteenth Affirmative Defense, for example, asserts that the "acts or omissions of parties or third parties" including "governmental entities" absolve it from liability.[6] Janssen cannot simultaneously claim that the federal or state governments' actions or inactions caused the opioid epidemic while denying the City discovery from the very individuals whose responsibilities involved influencing the federal or state governments' efforts. Just as Defendants have sought (and continue to seek) expansive discovery from City custodians, Janssen should be required to produce the files of every employee whose documents are relevant to defenses they have asserted in this case.

These two individuals are in a unique position in this litigation. Janssen did not produce either employee's files during the "Track 1" proceedings in Cleveland. Yet Janssen designated both employees as testimonial designees pursuant to Rule 30(b)(6) during those prior proceedings. That testimony reveals their connection to this litigation.

Ms. Cartwright testified during her 30(b)(6) deposition that she "did lobbying on issues related to opioids generally" and that she was a registered lobbyist for Defendant Johnson & Johnson.[7] Mr. Colligen's resume was marked as an exhibit to his 30(b)(6) deposition transcript and confirms that his relevant responsibilities included:

- "Develop[ing] policy positions for" numerous topics, including "marketing practices;"
- "Evaluat[ing] legislative/regulatory initiatives and recommend[ing] strategic direction to State Government Affairs field directors;" and

---

[6] Dkt. 776 at p. 554.
[7] Exh. 2 (Cartwright Tr.) at 18-20.

3

- "Develop[ing] talking points, prepar[ing] comments policy for state government affairs lobbyists."[8]

"[T]he selection of custodians is more than a mathematical count. The selection of custodians must be designed to respond fully to document requests and to produce responsive, nonduplicative documents during the relevant period." *Kleen Prods. LLC v. Packaging Corp. of Am.*, 2012 WL 4498465, at *15 (N.D. Ill. Sep. 28, 2012). Janssen identified both of these individuals in its interrogatory response as possessing relevant knowledge. Yet Janssen refuses to produce the files of these two employees (and potentially more) with responsibilities that bear directly on their affirmative defenses. There is no rule limiting discovery in this proceeding to city- or even state-level activities. Regardless, Janssen has not identified another custodian who engaged in federal-level lobbying; certainly there is not another individual listed in Janssen's interrogatory response. The City is entitled to discovery relevant to its claims.

***Janssen's Response:***

There is no basis for the City to seek additional Janssen lobbying custodians. As the party requesting additional discovery, the City bears the burden of demonstrating the relevance of these custodians' documents. *See Lightsquared Inc. v. Deere & Co.*, 2015 WL 8675377, at *5 (S.D.N.Y. Dec. 10, 2015) ("[A] party seeking to compel another party to search the files of additional custodians bears the burden of establishing the relevance of the documents it seeks from those custodians."). Here, the crux of the City's claims against Janssen rely on allegations regarding Janssen's marketing practices and its suspicious order monitoring ("SOM") program. *See e.g.*, 5AC ¶¶ 15, 227. The only references to lobbying in the Fifth Amended Complaint pertain to a Purdue lobbyist's involvement with the American Pain Foundation ("AFP") (*id.* ¶

---

[8] Exh. 3 (Colligen Ex. 4).

4

625); vague references to APF's "grassroots lobbying" against unspecified "legislative initiatives" (*id.* ¶ 217); and alleged lobbying of the DEA by other pharmaceutical manufacturers as part of the Healthcare Distribution Alliance (*id.* ¶ 716). There are no allegations relating to *Janssen's* lobbying of federal or state governments and agencies.

To the extent Janssen's lobbying efforts have any relevance to this case—which relates to marketing and SOM practices in the City of Chicago—it would only be with respect to Janssen's lobbying of government officials in the State of Illinois. To that end, Janssen has agreed to produce the files of three custodians who were directly responsible for overseeing Janssen's lobbying efforts in Illinois, specifically: two Directors of State Government Affairs, Greg Aronin and Tricia Kinley, and a Senior Director of State Government Affairs, Dennis Majeskie. The two additional custodians the City requests, Bruce Colligen and Carla Cartwright, have both served in national roles with limited, if any, direct involvement in state lobbying in Illinois. As the City acknowledges, the City also has access to the transcripts of both Mr. Colligen's and Ms. Cartwright's depositions in the MDL.

Recognizing that its own allegations provide no basis to seek these custodians' files, the City instead argues that these custodians' documents may be relevant to Janssen's defenses. Specifically, the City refers to Janssen's Sixteenth Affirmative Defense, which asserts that the City's claims against J&J and Janssen are barred to the extent they rely on or implicate unlawful acts or omissions of various third parties, including, among others, "government entities." Dkt. 776, at 549 (Janssen's Answer to Fifth Amended Complaint). The City claims that Janssen must produce documents from individuals whose responsibilities included "influencing" these "government entities." However, Ms. Cartwright has had almost no involvement lobbying government entities regarding opioids and, to the extent Mr. Colligen has had any involvement in

5

opioids-related lobbying, his documents will be largely redundant of the lobbying custodians Janssen has already agreed to produce.

Carla Cartwright has been an employee of Janssen from 2012 to the present. Exh. 2, Tr. of Jan. 17, 2019 Deposition of C. Cartwright in *In re: Nat'l Prescription Opiate Litig.* (MDL No. 2804), at 13:5. For the vast majority of her tenure, Ms. Cartwright has served as Director of Global Regulatory Policy, a position that does not involve lobbying state governments. In this capacity, Ms. Cartwright has "primarily focused on . . . [Janssen's] oncology business and . . . matters relating to USFDA regulatory issues." *Id.* at 16:23-17:4. From 2016 to 2018, Ms. Cartwright served as Director of Federal Affairs. In this capacity, she lobbied the federal government on issues related to Janssen's "immunology and oncology business and on matters relating to FDA." *Id.* at 18:9-17. At no point did Ms. Cartwright have any responsibilities related to any Janssen opioid medication, nor did she ever lobby state governments on any issue or the federal government on issues related specifically to Janssen opioid medications. *Id.* 17:5-15. Rather, the only opioid-related legislation Ms. Cartwright lobbied on behalf of was the federal Maternal Opioid Treatment, Health, Education, and Recovery Act, which provided care for mothers and infants suffering from neonatal abstinence syndrome. *Id.* at 19:8-18. The City has made no allegations related to this act. As such, it is highly unlikely that Ms. Cartwright possesses any documents relevant to this litigation—let alone documents of sufficient utility to justify the burden of collecting and reviewing Ms. Cartwright's custodial file. *See U.S. ex rel. McBride v. Halliburton Co.*, 272 F.R.D. 235, 240-41 (D.D.C. 2011) ("All discovery, even if otherwise permitted by the Federal Rules of Civil Procedure because it is likely to yield relevant evidence, is subject to the court's obligation to balance its utility against its cost.").

6

Similarly, Bruce Colligen has served as Executive Director of State and Health Policy for Janssen since 2001. *See* Exh. 3, Ex. 4 to Jan. 22, 2019 Deposition of B. Colligen in *In re: Nat'l Prescription Opiate Litig.* (MDL No. 2804). In this capacity, Mr. Colligen is responsible for developing policy positions on medical research, marketing practices, and health information technology, among other topics, for Janssen and identifying legislative and regulatory healthcare initiatives to further those positions. *Id.* Mr. Colligen is not directly involved in Janssen's federal or state lobbying efforts. *Id.* Instead, he consults with Janssen's lobbyists regarding health care policy and provides high-level strategic insight. *See* Exh. 3, Tr. of Jan. 22, 2019 Deposition of B. Colligen in *In re: Nat'l Prescription Opiate Litig.* (MDL No. 2804), at 74:21-24 ("I typically allow [lobbyists] to contact me if they have questions related to policy."). As such, Mr. Colligen did not lobby state government officials in Illinois. And, to the extent Janssen's Illinois lobbying team consulted with Mr. Colligen, those communications will be largely, if not entirely, redundant of documents in the three custodial files Janssen is already producing from Illinois-focused lobbyists in its State Government Affairs department.

Under similar circumstances, the City has argued that the Court should not require parties to produce additional custodians where they have "already agreed to produce documents from others covering the same subject area, and those individuals would be cumulative." Dkt. 832 (Pl.'s Opp. to Defs.' Mot. to Compel Further Custodians, Search Terms, and Non-Custodial Sources), at 5. And the Court declined to compel production of additional City custodians under those circumstances because they were "cumulative" of other custodial files the City would produce. *See also* Dkt. 841 (Order Granting in Part and Denying in Part Defs.' Mot. to Compel Further Custodians, Search Terms, and Non-Custodial Sources), at 3. Yet, the City makes no showing that Ms. Cartwright or Mr. Colligen possess any non-cumulative, relevant documents.

7

Instead, notwithstanding that the files of **any** Janssen lobbying custodians have marginal relevance at best, the City demands that Janssen produce **additional** lobbying custodian files before it has even assessed the sufficiency of the files Janssen has already agreed to produce. As the City's own authority recognizes, determining the "utility of the proposed [additional custodians]" is difficult where, as here, the moving party has not completed a "review [of] the huge quantity of information … from the existing custodians." *Kleen Products LLC v. Packaging Corp. of Am.*, 2012 WL 4498465, at *14 (N.D. Ill. Sept. 28, 2012).[9] Indeed, the City has not even commenced that review—pursuant to the Parties' agreement (*see* Dkt. 877), Janssen will produce the custodial files of its 3 Illinois-focused lobbying custodians on or before December 11, 2020.

Given Ms. Cartwright's and Mr. Colligen's limited involvement with lobbying efforts in Illinois, it would be unduly burdensome for the Court to require Janssen to produce these additional custodial files. That is particularly so given the burden Janssen has already incurred in producing over 750,000 documents from the custodial files of 64 national-level custodians in the MDL and 11 Chicago-specific sales force members in this case, and in preparing its forthcoming production of 3 Illinois-focused lobbying custodians. The Court should deny the City's request that Janssen produce Ms. Cartwright's and Mr. Colligen's custodial files.

---

[9] *See also, e.g.*, *Nevro Corp. v. Boston Sci. Corp.*, 2017 U.S. Dist. LEXIS 96727, at *9-10 (N.D. Cal. June 22, 2017) (declining to compel additional custodians because moving party did "not explain how information from additional custodians would not be duplicative, and more importantly, how it would be proportionate to the needs of the case"; explaining that "[i]f, after reviewing emails produced by these seven custodians Nevro believes it still lacks relevant information …, the parties may meet and confer to discuss increasing the number of custodians" and other issues); *Hannah v. Wal-Mart Stores, Inc.*, 2014 U.S. Dist. LEXIS 2971, at *18-19 (D. Conn. Jan. 10, 2014) ("[T]he information sought by plaintiffs may in fact be produced by the searches ordered for the other custodians' ESI. Nevertheless, plaintiffs may make an application to the Court for a search of Mr. Golembewski's ESI if after a review of the documents produced and the depositions of the custodians, the plaintiffs can make a showing that other relevant and responsive documents exist.").

8

**2.  Janssen's Marketing to Formularies (Request for Production No. 5)**

The City's Request No. 5 requires Janssen to produce "Documents and Communications concerning Marketing conducted by You or on Your behalf to Formularies, including placement of Your Opioids on Formularies covering Chicago, and all Documents and Communications conveying any changes to formulary status to Chicago Healthcare Providers …"[10] The term "Formularies" includes entities, such as Prescription Benefit Managers, who maintain lists of prescription medications that will and will not be covered by insurance. Janssen's response to Request No. 5 does not include an agreement to produce responsive materials, but rather an offer to meet-and-confer.

Defendants have sought expansive discovery concerning the City's reimbursement of opioids. This Court has decided that "how the City treats and how it views opioid prescriptions issued to its own employees after it filed its complaint in June 2014 may be relevant to its current claims against Defendants" and ordered discovery from certain custodians on that basis.[11] As noted in previous motions, the City largely delegates the selection of appropriate drugs to its third party insurance vendors. The extent to which Janssen marketed its opioids to those vendors is just as relevant as any inquiry into the City's practices.

During a discussion on November 30, 2020, Janssen's counsel agreed to confirm whether its existing custodians covered this information. The City has not received any response, and Janssen has not amended its response to this document request to confirm that it is producing such information.

---

[10] Ex. 4 at 17.
[11] Dkt. 841 at 2.

US 168971952

*Janssen's Response:*

The City's request that Janssen designate additional custodians with documents and communications regarding Janssen's marketing to formularies is both untimely and outside the scope of this litigation.  Janssen provided the City with an initial list of Chicago-specific custodians nearly nine months ago, on March 30, 2020 (*see* Exh. 5, Mar. 30, 2020 Ltr. from S. Baglin), and the parties met and conferred extensively regarding those custodians earlier this year (*see, e.g.*, Exh. 6, Apr. 10, 2020 Email from D. Ackerman).  At no point did the City request additional custodians with documents related to Janssen's marketing to formularies.  Likewise, the City has had access to Janssen's entire production in the Federal MDL for years, and yet the first time that the City raised its request for these additional documents was in a letter on November 20, 2020—after the November 12, 2020 deadline for completion of document productions.[12]  Exh. 7, Nov. 20, 2020 Ltr. from D. Ackerman.  The City has thus had ample time to request documents regarding marketing to formularies, but has waited until document productions are nearly complete to make its belated request for these documents.

Moreover, the City's claims do not turn on Defendants' marketing to formularies.  To the contrary, the City "expressly disclaims" recovery for the costs of prescription opioids paid for by the City's health and workers' compensation plans in its complaint.  *See* Fifth Am. Compl. ¶ 837.  The Fifth Amended Complaint also contains no references to prescription benefits managers and just a single reference to formularies—and that reference relates to how doctors, not pharmaceutical manufacturers, communicate with formularies.  *See id.* ¶ 828 (alleging that a

---

[12] The Court granted the parties a brief extension of the November 12, 2020 deadline for completion of document productions, to December 11, 2020, for a limited set of documents that are not at issue here. *See* Dkt. 877.

US 168971952

"study found that doctor meetings with sales representatives are related to changes in both prescribing practices and requests by physicians to add the drugs to hospitals' formularies"). The documents the City requests are thus not relevant to its claims.

Nevertheless, Janssen has already produced documents responsive to the City's Request for Production No. 5. Specifically, during a meet and confer call on November 30, 2020, Janssen informed the City that it has already produced documents and communications "conveying any changes to formulary status to Chicago Healthcare Providers" in the files of the Chicago-area sales force members Janssen designated as custodians. And Janssen is continuing to investigate whether documents concerning marketing to formularies have similarly been produced in the files of its sales force members. Accordingly, the parties are continuing to meet and confer regarding this request and may be able to reach a resolution.

### 3. Janssen's Refusal to Produce Information Regarding Diversion of Its Tramadol Products (RFP No. 7 & 8)

The City's Request for Production No. 7 requires Janssen to produce "[a]ll Documents referencing, relating, or concerning Diversion of Opioids into or out of Chicago, or affecting Chicago, including records of all calls to security hotlines or intranet reports and all completed reports of concern or suspected Diversion reporting forms and reviews of Chicago Health Care Providers' or pharmacies' data."[13] Request No. 8 requires the production of "Documents concerning each Order in Chicago that You investigated, flagged, blocked, held or reported for suspicious actual or potential Diversion."[14] Janssen has agreed to produce responsive documents concerning some, but not all, of its opioid products in response to these requests. In particular,

---

[13] Ex. 4 at 19.
[14] Ex. 4 at 20.

11

Janssen limits its response only to "Duragesic, Nucynta, or Nucynta ER," excluding its Schedule IV tramadol products, Ultram, Ultram ER and Ultracet.

The DEA classified Janssen's tramadol products as Schedule IV narcotics effective August 2014. Although "[t]ramadol was approved for marketing in the United States as a non-controlled analgesic . . . soon after its approval there have been reports of diversion and abuse of tramadol."[15] Because Janssen's tramadol products are Schedule IV narcotics, Janssen is required to maintain effective controls against diversion of those products, as with its Schedule II opioids.

The City seeks discovery into potential diversion of Janssen's tramadol drugs in Chicago and Janssen's monitoring and reporting of suspicious orders. That discovery may very well reveal that Janssen failed to report suspicious orders or otherwise failed to prevent diversion of its products. This request is not unique. In January 2020, the court overseeing the consolidated Texas opioid litigation ordered Janssen to produce materials concerning the same tramadol products.[16]

Janssen's claim that tramadol products are outside the scope of this litigation is misplaced. The portions of the complaint addressing Defendants' failure to maintain effective controls against diversion do not discuss specific drugs but rather refer only generally to "opioids." For example, the City alleges that the harm caused by Defendants' marketing misconduct was "compounded" by Defendants "facilitating the supply of far more *opioids* than could have been justified by a legitimate market."[17] Similarly, the City alleges that "Defendants

---

[15] "Tramadol," Drug Enforcement Administration, Diversion Control Division, Drug & Chemical Evaluation Section (March 2020), available at:
https://www.deadiversion.usdoj.gov/drug_chem_info/tramadol.pdf.
[16] Ex. 8 (Texas Order).
[17] Dkt. 727 at ¶ 669 (emphasis added).

US 168971952

have a duty, and are expected, to be vigilant in deciding whether a prospective customer can be trusted to deliver *opioids* only for lawful purposes."[18] These allegations are not limited to Schedule II narcotics, and Janssen should be required to produce information concerning all of its opioid products.

**Janssen's Response:**

The City requests that the Court order Janssen to produce discovery regarding diversion of its tramadol opioid products, namely, Ultram, Ultram ER, and Ultracet. Yet the City provided no notice to Janssen that it intended to raise this issue in this report, let alone that it would seek a ruling from Your Honor ordering production of this discovery. To the contrary, the parties have met and conferred on this issue only once, on November 30, 2020, and the City represented then that it would consider Janssen's position and follow-up at a later date. The City never followed up. Instead, two days after the December 2, 2020 deadline to meet and confer expired, the City provided Janssen with its position statement demanding discovery regarding tramadol products. As such, the City's demand is both unripe and improperly raised for resolution before Your Honor and should be denied on that basis alone.

To the extent the Court considers the substance of the City's demand, the Court should still reject the demand for several reasons.

**First**, Janssen's tramadol products are not at issue in this case and have not been for over six years. The City's original complaint, filed in 2014, expressly named five Janssen-manufactured opioid products: Duragesic, Nucynta, Nucynta ER, Ultracet, and Ultram. Dkt. 4, Compl. ¶ 27.[19] In August 2014, Janssen moved to dismiss the City's complaint arguing, among

---

[18] Dkt. 727 at ¶ 681 (emphasis added).
[19] None of the six complaints the City has filed has contained any allegations regarding Ultram ER.

13

other things, that the City failed to adequately allege any claims based on Janssen's marketing of

Ultram and Ultracet.  Dkt. 124, Def.'s J&J and Janssen's Mot. to Dismiss Pl's Compl. at 6-9.

Rather than oppose Janssen's motion, the City amended its complaint and removed all references

to Ultram and Ultracet.  *See* Dkt. 164, First Am. Compl.  Since then, the City has amended its

complaint four more times, most recently on February 19, 2020, at no point reintroducing

allegations regarding Ultram or Ultracet.  *See* Dkt. 715, Fifth Am. Compl.  Nor does the

operative complaint (or any of the previous four complaints) contain more than passing

references to tramadol.  In fact, the City's nearly 1,000-paragraph operative complaint makes just

*two* references to tramadol—and neither reference relates to diversion of Janssen opioid

products.[20]  Having specifically forgone claims based on Ultram and Ultracet, and having

removed all references to these products and nearly all references to tramadol from its complaint,

the City cannot now six years later attempt to reintroduce these products into the litigation.

Moreover, Janssen's tramadol products are fundamentally different than the opioid

products at issue in this litigation.  The City's complaint focuses almost exclusively on Schedule

II opioids,[21] classified by the DEA as "drugs with a high potential for abuse, with use potentially

leading to severe psychological or physical dependence,"[22] such as OxyContin, that have

spawned nationwide litigation over the opioid abuse crisis.  By contrast, Janssen's tramadol

---

[20] *See* Fifth Am. Compl. ¶ 97 (referencing a "systematic review" of medical studies that found "poor evidence of long-term efficacy for morphine, tramadol, and oxycodone" for treatment of non-cancer pain); *id.* ¶ 874 (allegations regarding a "recovering addict in Chicago" who was prescribed tramadol by a pain specialist).

[21] The Fifth Amended Complaint references just one Schedule III opioid, Butrans, manufactured by Purdue.  *See* Fifth Am. Compl. ¶ 34.  With respect to the Defendants who remain in this case, the Fifth Amended Complaint refers exclusively to Schedule II opioids.  *See id.* ¶¶ 37-73.

[22] *See* 21 U.S.C. § 812(b)(2).

14

products are low-potency opioid medications that were not scheduled by the DEA until 2014,

and even then were scheduled as Schedule IV substances.  Such substances have a "low potential

for abuse relative to the drugs or other substances in schedule III" and "may lead to limited

physical dependence or psychological dependence relative to the drugs or other substances in

schedule III."[23]  As unscheduled medications through 2014, Janssen's tramadol medications

were subject to different marketing standards, prescribing regulations, monitoring standards, and

record-keeping requirements.[24]

      As the Special Master presiding over discovery in the Federal MDL recognized, "low-

potency products" like Janssen's tramadol medications "are at best barely relevant to plaintiffs'

claims and the burden of production exceeds its likely benefit."[25]  Exh. 9, MDL Discovery

Ruling No. 2 at 3.  Because "substances in Schedule II (such as hydromorphone, oxycodone,

fentanyl, and morphine) . . . are at the alleged root of the 'opioid crisis,'" the Special Master

denied discovery into a Schedule III medication—Tylenol with Codeine—finding it "clearly

peripheral to plaintiffs' claims."  *Id.*  Janssen's Schedule IV tramadol medications are even less

---

[23] *See id.* § 812(b)(5).

[24] *See, e.g.*, 21 C.F.R. § 1306.03 (requiring that prescriptions for controlled substances "may be issued only by an individual practitioner" who is registered with the DEA or exempt from such registration); *id.* § 1311.100 (imposing conditions on the use of electronic prescriptions for controlled substances); *id.* § 1301.74 (requiring registrants to "design and operate a system to disclose to the registrant suspicious orders of controlled substances"); *id.* § 1310.03 (requiring that "[e]ach regulated person who engages in a regulated transaction involving [controlled substances or tableting machines] shall keep a record of the transaction as specified by § 1310.04 and file reports as specified by § 1310.05").

[25] The MDL Track One Plaintiff's claims, like the City's, were also premised on both a marketing theory and suspicious order monitoring theory.  *See, e.g.*, *City of Cleveland v. Purdue Pharma*, No. 18-OP-45132, Second Am. Compl. (Dkt. No. 508), ¶ 1 ("Plaintiff asserts two categories of claims: (1) claims against the pharmaceutical manufacturers of prescription opioid drugs that engaged in a massive false marketing campaign . . . and (2) claims against manufacturer and distributor entities in the supply chain that . . . refus[ed] to monitor and restrict the improper distribution of those drugs.").

US 168971952

prone to abuse and addiction, and the Special Master accordingly denied discovery into them as well. *Id.* This Court should do the same.

The City ignores the Special Master's ruling in the MDL and instead refers to a Texas state court decision ordering Janssen to produce discovery regarding tramadol products. That order has no bearing on this litigation. In particular, unlike the City, the plaintiff in the Texas litigation specifically raised allegations in its complaint regarding Janssen's tramadol products— a fact on which the Texas court based its ruling. *See* Exh. 10, Jan. 10, 2020 Tr. of Hearing, *Master Case Texas Opioid Litig.* at 68:20-23 ("The Court: If [plaintiffs] say [this case is] about Tramadol, how is it that [defendants] can say it is not?") (referring to the fact that plaintiffs in the Texas litigation specifically raised allegations regarding Janssen's tramadol products); *see also id.* at 76:15-18 ("The Court: What caused the Federal MDL to not expand their scope in the Schedule 4 drugs? [Counsel for plaintiffs]: They didn't mention Ultram and Ultracet in that. We did. That's it."). By contrast, here, the City deliberately chose not to pursue claims regarding Ultram and Ultracet and has purged its complaint of all references to those products.

***Second***, the City's request for tramadol discovery is beyond untimely. For years, Janssen has made clear to the City that it does not intend to produce discovery regarding tramadol products. In responding to the City's First Set of Requests for Production, on March 24, 2017, Janssen specifically objected to the City's definition of "opioids," noting that "the Complaint references only three Janssen-manufactured opioids: Duragesic, Nucynta, and Nucynta ER" and that "Defendants will limit any productions to documents relating to those three referenced opioid drugs." Janssen's Responses to Pl.'s First Set of Requests for Production, at 6-7. Janssen included identical objections in its responses to the City's Second and Third Sets of Requests for Production on June 23, 2017 and November 2, 2020, respectively. *See* Responses to Pl.'s

16

Second Set of Requests for Production, at 6; Responses to Pl.'s Third Set of Requests for Production, at 10. And Janssen has included nearly identical objections in each of its responses to the City's Interrogatories, dating from March 24, 2017, June 7, 2017, June 23, 2017, July 31, 2020, and October 9, 2020. *See* Janssen's Responses to Pl.'s First Set of Special Interrogatories; Janssen's Am. Responses to Pl.'s First Set of Special Interrogatories; Janssen's Responses to Pl.'s Second Set of Special Interrogatories; Janssen's Responses to Pl.'s Third Set of Special Interrogatories; Janssen's Am. Responses to Pl.'s Third Set of Special Interrogatories. Yet the City waited until November 20, 2020 to demand for the very first time that Janssen produce discovery regarding tramadol products. Exh. 7, Nov. 20, 2020 Ltr. from D. Ackerman. If the City believed that it was entitled to discovery regarding Janssen's tramadol products, it had ample opportunity to request that discovery but failed to timely do so.

***Third***, expanding the scope of discovery at this late stage to include an entirely separate line of medications would be severely burdensome and not proportional to the needs of the case. Discovery to date, which commenced in December 2016, has centered on Schedule II opioids, and there will be little overlap between the City's request and the discovery efforts Janssen has already undertaken. Further, the J&J subsidiary that marketed and sold Ultram and Ultracet— Ortho-McNeil—was separate and distinct from the subsidiaries that marketed and sold the Schedule II medications on which all prior discovery has focused. To fulfill the City's demand, Defendants would have to negotiate new search terms, potentially identify additional custodians, and collect, process, and review documents spanning more than 15 years. With the deadline for completion of document productions having passed nearly a month ago, the process of identifying and producing these documents would undoubtedly cause substantial delay to the completion of discovery.

17

Accordingly, the Court should deny the City's improper request for discovery regarding tramadol products.

### 4. Janssen's Refusal to Produce Sales Representative Personnel Files (RFP No. 10)

The City's Request No. 10 requires Janssen to produce "[t]he complete human resources files, employment files, custodial files, and any other individual files of each of Your sales representatives, district, area, regional and national managers, and compliance personnel who worked in, had contact with or had responsibilities related to Chicago."[26] Janssen interposes a litany of objections and offered to meet-and-confer regarding this request. However, during the meet and confer, Janssen refused to search its own files for responsive documents.

There can be no question that the human resources files of Janssen's sales personnel contain relevant information. Those files likely contain evidence of performance reviews, disciplinary actions, and sales and compensation information. Janssen cannot contend that this information is not relevant to the City's claims. Indeed, Janssen was ordered to produce this same information for one of its employees – David Lin – during the prior "Track 1" proceedings.

Yet Janssen refuses to even search for this information because it believes that similar information may be included in the files of supervisors or managers who oversaw Janssen's sales force. Janssen cannot state with 100% certainty that each personnel file or performance review for its sales representatives is contained in that employee's files. Nor has it directed the City to any specific documents in its collection representing these documents. Indeed, prior to MDL transfer, Janssen refused to even provide a roster of its Chicago-based sales personnel to permit the City to perform this analysis.

---

[26] Ex. 4 at 22.

US 168971952

Janssen is a sophisticated company and no doubt has readily available human resources files that it may query for responsive documents. While those files may contain sensitive information, the parties have negotiated a protective order sufficient to address those concerns and that precludes public dissemination of personal information. The Court should require Janssen to search its central files and produce this relevant information.

**_Janssen's Response:_**

The City requests that Janssen produce the complete "personnel files" of every Janssen sales representative, district, area, regional, and national manager, and compliance personnel with responsibilities related to Chicago. As with the City's request for tramadol-related documents, the City provided no notice to Janssen that it intended to raise this issue in this report or that it would seek a ruling ordering this discovery. Moreover, the City substantially misrepresents the parties' discussions. On November 30, 2020, the parties met and conferred regarding the City's Request No. 10. Far from refusing to search for responsive documents, Janssen explained to the City that it had already produced documents responsive to this request in the custodial files of the Chicago-area sales force members Janssen designated as custodians, and that the City's request for "personnel files" was both ambiguous and overbroad. Janssen requested that the City narrow its request to a specific subset of documents from these files, but the City refused. Then, on December 4, 2020, after receiving the City's portion of this report, counsel for Janssen contacted counsel for the City to inquire again whether the City would accept a subset of personnel files from Janssen's Chicago-area sales force custodians. The City again refused to narrow its request, insisting that Janssen produce the personnel files of every single Janssen employee involved in sales, marketing, or compliance in the Chicago-area.

US 168971952

The City's request is incredibly overbroad. To date, Janssen has identified more than 100 individuals who may have been engaged in or supervised Janssen's marketing of Duragesic, Nucynta, or Nucynta ER in Chicago. *See* Janssen's Responses to Pl.'s First Set of Special Interrogatories, Response to Interrogatory No. 1. The City's request, if granted, would require Janssen to collect, review, and produce the personnel files of each of these individuals. These files may be spread across multiple company divisions depending on the particular portfolio of products a given employee has worked on, and the files may contain highly sensitive personal information that will need to be reviewed and potentially redacted. Based on counsel for Janssen's experience collecting and producing personnel files for certain Janssen employees, this process can easily take several months, if not longer. In short, responding to the City's request would impose an enormous burden on Janssen and significantly expand the scope of Janssen's document production nearly a month after the November 12, 2020 deadline for completion of document productions.

The only support the City identifies for this request is a ruling by the Special Master in the Federal MDL requiring Janssen to produce the personnel file of *one* of its employees, David Lin. The scope of the discovery ordered in that ruling is significantly narrower than the discovery the City seeks here. Specifically, the Special Master ruled that "[w]ith respect to *deponents whose depositions have not yet occurred* . . . Defendants will search for personnel files for the employees or former employees whose primary responsibility involves sales, marketing, and/or compliance . . . ." Exh. 11, Discovery Ruling Regarding Personnel Files, *In re: Nat'l Prescription Opiate Litig.* (MDL No. 2804), at 1-2 (emphasis added). Here, the City seeks the personnel files of over 100 Janssen employees involved in sales, marketing, or compliance in the Chicago-area, regardless of whether the City plans to depose them.

20

Finally, as the City's portion of this report makes plain, the City has made no effort to review the documents Janssen has already produced before making this incredibly expansive request. The City suggests that Janssen has not produced "performance reviews, disciplinary actions, and sales and compensation information" for its Chicago-area sales force. But Janssen has produced hundreds of these documents. They include, among others:

- Performance-related documents for Chicago sales force members, including performance reviews,[27] coaching reports,[28] career and performance development plans,[29] and notes from training sessions.[30]

- Performance improvement plans that set goals for sales force members when their performance has not met expectations.[31]

- Incentive compensation scorecards that describe sales and compensation information, including bonuses, for sales force members.[32]

Notably, these documents are not limited to the 11 Chicago sales force members that Janssen has designated as custodians in this action, who include 3 Regional Business Directors ("RBDs"), 3

---

[27] See, e.g., JAN-CHI-00226463; JAN-CHI-00226906; JAN-CHI-00227038; JAN-CHI-00227052; JAN-CHI-00227264; JAN-CHI-00227290; JAN-CHI-00227310; JAN-CHI-00227575; JAN-CHI-00227816; JAN-CHI-00227825; JAN-CHI-00227827; JAN-CHI-00232187; JAN-CHI-00232639; JAN-CHI-00232643; JAN-CHI-00232647; JAN-CHI-00232651; JAN-CHI-00232941; JAN-CHI-00233043; JAN-CHI-00233056; JAN-CHI-00233058; JAN-CHI-00233064; JAN-CHI-00233067; JAN-CHI-00233069; JAN-CHI-00233071.
[28] See, e.g., JAN-CHI-00222542; JAN-CHI-00228026; JAN-CHI-00232635; JAN-CHI-00233011; JAN-CHI-00233114; JAN-CHI-00233143; JAN-CHI-00233152; JAN-CHI-00233157; JAN-CHI-00233163; JAN-CHI-00233169; JAN-CHI-00233190; JAN-CHI-00233220; JAN-CHI-00233264; JAN-CHI-00233280; JAN-CHI-00233283; JAN-CHI-00233287; JAN-CHI-00233295; JAN-CHI-00233304; JAN-CHI-00233309; JAN-CHI-00233329; JAN-CHI-00233333; JAN-CHI-00233346; JAN-CHI-00222549; JAN-CHI-00222554; JAN-CHI-00222557.
[29] See, e.g., JAN-CHI-00222500; JAN-CHI-00226457; JAN-CHI-00227606; JAN-CHI-00232868; JAN-CHI-00232256; JAN-CHI-00232257; JAN-CHI-00232258; JAN-CHI-00232259.
[30] See, e.g., JAN-CHI-00222506; JAN-CHI-00222509; JAN-CHI-00222513; JAN-CHI-00222517; JAN-CHI-00222525; JAN-CHI-00222532; JAN-CHI-00222539.
[31] JAN-CHI-00251122; JAN-CHI-00253029; JAN-CHI-00253362; JAN-CHI-00253409; JAN-CHI-00253419;
[32] JAN-CHI-00238326; JAN-CHI-00238327; JAN-CHI-00238328; JAN-CHI-00238329; JAN-CHI-00238330; JAN-CHI-00246091.

District Managers ("DMs"), and 5 sales representatives. Indeed, as supervisors of Janssen's Chicago sales force, RBDs and DMs maintained performance-related documents, disciplinary-related documents, and incentive compensation information for *all* sales representatives they supervised.

Because Janssen's production is replete with the types of documents the City seeks, the Court should deny the City's overbroad and burdensome request that Janssen produce personnel files from over 100 employees.

### B.    Teva Defendants' Response and Production

#### 1.    Production of Robert Roche's Custodial File

Robert Roche is a key employee who worked for Cephalon from 1994 to 2010, and was Cephalon's Senior Vice President of Pharmaceutical Operations and a member of Cephalon's Executive Committee. Not only was Mr. Roche in the chain of command over Chicago-area sales managers and representatives, he also was directly involved in some of Cephalon's most egregious misconduct. Consequently, the City requested his custodial file and intends to take his deposition. Teva refuses to produce his file, and so the City seeks the Court's intervention to compel its production.

Mr. Roche was a key senior manager with responsibilities relating to the marketing and promotion of Actiq and Fentora, which are high-risk fentanyl-based opioids approved for limited use for "breakthrough" pain in cancer patients. Despite Actiq's cancer-only indication, Cephalon illegally promoted Actiq and later Fentora for non-cancer uses such as back pain and migraines. Consequently, prescriptions skyrocketed for these drugs and, according to Cephalon's market research, over 90% of Actiq was prescribed for non-cancer uses. Mr. Roche was involved in the illegal promotion of Actiq and Fentora, as well as an investigation by the Department of Justice

22

and a corresponding internal investigation into Cephalon's illegal promotional practices that culminated Cephalon's 2008 guilty plea and payment of $425 million in fines. Mr. Roche even gave a major speech to sales representatives at Cephalon's November 2007 national sales meeting admitting that he and the other Cephalon executives bore responsibility for the wrongful conduct.

Teva refuses to produce Mr. Roche's custodial file claiming the plaintiffs should have sought his file during the expedited discovery period in the "Track 1" MDL case. Teva, however, never identified Mr. Roche in response to the plaintiffs' initial interrogatory that Teva "identify individuals with knowledge concerning the subject matter of the allegations in the Complaint." And after Special Master Cohen ordered Teva and the other defendants to "certify" a list of custodians "most likely to have non-cumulative discoverable information related both to the bellwether jurisdictions and (as to defendants) their national conduct," Teva again failed to identify Mr. Roche in its certified response. It was only after the expedited discovery phase in the CT-1 case had concluded that the plaintiffs were able to ascertain his degree of importance to the case.

Teva next claims Mr. Roche's files are duplicative of other custodial files produced in the case. Key documents appear to be missing from the production on the audit, the Department of Justice investigation and guilty plea, and on Mr. Roche's involvement, handling and decision-making with regard to those matters. And the City found nothing in the files about Mr. Roche's preparation of his 2007 speech other than a transmittal email he sent to Cephalon's compliance officer after he made the speech. As the Cephalon executive involved in some of the most critical wrongdoing in the case, the City should be allowed to review his custodial file before taking his deposition.

23

Finally, Teva claims that the City is too late to request his custodial file in this case. During meet and confer the City reduced its custodial file requests from ten to five including Mr. Roche's file. While Teva produced four of those files (including two local Chicago files and two national witness files), the City has always made clear Mr. Roche's file remained in dispute, and the City is aware of no deadline or reason the City cannot compel production of his file at this time. With regard to Teva's response below, Teva's complaint that Mr. Roche's relevance should have been discovered by the City earlier is belied by Teva's own inability to identify Mr. Roche as a witness with relevant knowledge in its sworn interrogatory responses or in its court-ordered certification listing relevant witnesses. With regard Teva's reference to Judge Polster's comment in the Track 2 distributor-only case, that comment was not a broad brush statement that discovery was completed in Track 1, but was made narrowly with regard to additional discovery defendants were seeking from the DEA (a third party) and in recognition that "[a]ny further resolution of discovery disputes is within the purview of the transferor court." (*In re National Prescription Opiate Litigation*, No. 17-md-02804, Dkt. No. 3263 at 3 (N.D. Ohio April 17, 2020). Also, when partially denying the plaintiffs' motion seeking further custodial files from Teva, Special Master Cohen indicated that given the constraints of Track 1's expedited discovery track, the plaintiffs would have to seek those files for the next bellwether case. *Id*. at Dkt. No. 1059 at 52 and 58-59 (recognizing "With each [successive] trial, there's more discovery and there's additional discovery done.") With regard to the number of custodial files Teva asserts it produced overall in the litigation, the City notes that Teva produced only 48 custodial files in the Track 1 litigation and most of the additional files it refers to are local sales representative and manager files it produced in other litigations (of no import to this case) or for primarily Allergan employees who came to Teva in 2016 after its purchase of Allergan's generic drug business.

24

In short, Teva presents no credible argument why production of this one additional custodial file presents an undue burden especially given the importance of this witness and in light of the fact it only produced 4 custodial files in this case (a local sales representative, 2 local sales managers, and one "national" witness), while the City has produced custodial files for 76 witnesses.

For these reasons, the City respectfully requests that Teva be ordered to produce Mr. Roche's custodial file in this case.

***Teva Defendant's Response:*** Plaintiff's request for Mr. Roche's custodial file comes six and one-half years after commencing this action, two and one-half years after the Teva Defendants produced documents demonstrating his role in Cephalon, and five months after abandoning their initial request for his documents. Plaintiff's extreme delay and historical nonchalance about Mr. Roche betrays its assertion that it is entitled to his custodial file because of his centrality to the case.

Plaintiff knew of Mr. Roche's role at Cephalon even before it initiated this action, because his role was described in Cephalon's annual public filings. In their first MDL production of documents on May 25, 2018, the Teva Defendants produced organizational charts to Plaintiff reflecting Mr. Roche's position at Cephalon.[33] During the course of MDL discovery, the Teva Defendants produced more than 25,000 documents and emails including and referencing Mr. Roche. Despite those productions and the intentionally extreme breadth of MDL

---

[33] Plaintiff has suggested that discovery of the Teva Defendants in the MDL should in some way be discounted when considering whether Plaintiff is entitled to additional discovery now, because this case was remanded. But, discovery in the MDL was conducted by Plaintiff's counsel on a national scale, in a case to which Plaintiff was a party, regarding the same allegations and legal theories at issue in this case, with no limitation on the provision or use of that discovery by Plaintiff here.

US 168971952

discovery, to facilitate national discovery of defendants that would not need to be repeated in future cases, Plaintiffs in the MDL never requested his documents or deposition.

With Plaintiff's counsel at the helm, Plaintiffs in the MDL instead requested scores of other custodial files, from the CEO of Cephalon to individual sales representatives who called on doctors more than 15 years ago.[34] They included Mr. Roche's direct superior (Cephalon CEO Frank Baldino) and many of Mr. Roche's subordinates who actually managed the day-to-day business of marketing and selling opioids products.[35] Those productions included the files of 25 custodians with responsibility for sales and marketing, all but three of whom had national responsibilities relevant to Chicago. A list of those custodians is included as Teva Defendants' Attachment A. As Judge Polster explained in a case involving certain MDL defendants that was remanded to federal court in West Virginia, the "extensive global discovery" was so fulsome that "the only remaining fact discovery the parties in the West Virginia cases would need after remand [from the MDL] was limited to localized evidence pertaining to the specific jurisdiction." *In re National Prescription Opiate Litigation*, No. 17-md-02804, Dkt. No. 3263 at 2 (N.D. Ohio April 17, 2020). The same is true here. As such, there is no need to add yet another custodian with no specific ties to Chicago, particularly one in which Plaintiff has shown no prior interest.

---

[34] Plaintiff's counsel also did not request Mr. Roche's custodial file in state litigation in California, despite moving there to compel the production of nine sales-and-marketing-related custodians. Mr. Roche cannot be essential in only this case when the relevant facts and allegations are the same in both cases.

[35] Opioid products comprised only one portion of Mr. Roche's responsibilities, and opioid product sales and marketing comprised even less. As Senior Vice President of Pharmaceutical Operations, Mr. Roche oversaw wide-ranging activities relating to all of Cephalon's pharmaceutical products. Thus, Plaintiff's claim that Mr. Roche was in the "chain of command" for sales and marketing is technically correct but does not accurately describe his role at Cephalon.

26

The number of sales and marketing custodians in Plaintiff's possession has only increased since Judge Polster made that observation. By MDL court order, the Teva Defendants have produced to Plaintiff's counsel every document produced in any opioid litigation throughout the country, resulting in the production of 33 more custodial files, including 29 custodians who were involved in the sale and marketing of opioid products.[36]

The Teva Defendants also have produced additional custodians directly in this case. By agreement with Plaintiff, the Teva Defendants have produced the custodial files of the longest-serving sales representative in Chicago, the longest-serving Area Manager responsible for Chicago, and the Regional Director responsible for Chicago. These productions supplemented three other Area Managers and Regional Directors responsible for Chicago whose custodial files already were produced to Plaintiff through the MDL. The Teva Defendants also produced the custodial file of one national custodian who was responsible for risk evaluation and management programs, which was not covered as extensively as sales and marketing in the MDL. All told, Plaintiff is now in possession of the files of **104 custodians**, **58 of which were involved in the sale and marketing of opioid products**.

Plaintiff first requested Mr. Roche's file and other custodial files in April. The Teva Defendants agreed to produce the four additional custodians described above, but did not agree to produce Mr. Roche's custodial file for the reasons stated here.[37] Plaintiff declared an impasse on June 26, 2020 and informed the Teva Defendants that they would move to compel production

---

[36] That Mr. Roche's custodial file was produced in neither the MDL nor any other opioid litigation is indicative of its significance in this litigation.

[37] Two other custodians requested by Plaintiffs had already been produced by the Teva Defendants.

US 168971952

on June 30, 2020, but did not. The decision not to do so was a conscious one. On June 26, Plaintiff's counsel stated that it would "hold off filing until the Tuesday [June 30] MTC deadline if you wish to consider further production[.]" The Teva Defendants understood this to be a reference to the deadline that Plaintiff requested during a June 12 conference with the Court. Plaintiff believed it was required to move to compel Mr. Roche's file by June 30 and did not. On July 17, 2020, the Teva Defendants sent a letter memorializing the results of negotiations, identifying the agreed custodial files for production, and expressing their understanding that the City's failure to follow through with its motion to compel constituted an abandonment of the issue. That letter went unanswered. The City did not re-raise the issue of Mr. Roche's file until nearly six months later, on December 1, 2020.

As purported support for its demand, Plaintiff offers only vague assertions that Mr. Roche was at Cephalon during the relevant time, oversaw sales and marketing personnel, and gave a speech at a national sales conference. Plaintiff's inaction, delay and ultimate abandonment of its earlier request speaks only to how unnecessary his custodial file is.

## 2. Production of Up-To-Date SOM Documents

The parties have met and conferred on the City's requests for production of documents, and there remains a dispute as to Teva's refusal to update its productions regarding its suspicious order monitoring ("SOM") system. Teva last produced documents for this system in 2018 and early 2019 for the CT-1 case. Specifically, the City seeks updated SOM productions in response to Request for Production Nos. 1, 6 and 8. Request No. 1 seeks Teva's transactional data, including its chargeback data which it uses as a tool to identify suspicious downstream activity with regard to its opioid orders; Request No. 6 seeks audit/investigative/due diligence files with

regard to Teva's SOM investigations; and Request No. 8 seeks documents concerning each order that Teva investigated, held or reported for suspicious diversion.[38]

Teva refused to update its SOM productions claiming that it stopped promoting opioid products prior to its last production of these documents, and that the City's complaint makes no allegations about Teva's conduct since that date. Though the City disputes Teva's assertion that it is no longer promoting its opioid products, the City is not asking Teva here to update its production relating to such promotion. Rather, the City is asking Teva to update its production concerning its SOM system. The City's complaint makes numerous allegations about the inadequacy of Teva's SOM system (see Fifth Amended Complaint, pp. 274-349), and since Teva is the largest manufacturer of opioids in the United States, the adequacy of its SOM system certainly is in dispute with regard to the City's statutory claims. Production of these updated SOM-related files presents no undue burden on Teva.

For these reasons, the City requests that Teva be ordered to update its production of documents concerning its SOM system in response to Request Nos. 1, 6 and 8.

*Teva Defendant's Response*: The Teva Defendants have produced responsive information regarding their SOM system through the time period at issue in the Fifth Amended Complaint, and postdating the initiation of litigation by five years. The Fifth Amended

---

[38] The full requests are as follow:

- No. 1: "All Transactional Data, including but not limited to Chargeback data and inventory reports, related to Opioids in Chicago."
- No. 6: "All audit, investigatory, or due diligence files for each of Your Direct Customers and Downstream Customers in Chicago and Your Direct Customers that shipped Your Opioid Products to Downstream Customers in Chicago. Please Identify the Documents that correspond to each due diligence file and indicate which due diligence file correlates to which customer."
- No. 8: "Documents concerning each Order in Chicago that You investigated, flagged, blocked, held or reported for suspicious of actual or potential Diversion."

29

Complaint contains no allegations regarding the Teva Defendants after 2018.  Information

regarding the Teva Defendants SOM system since 2018 has no relevance to Plaintiff's claims.

Furthermore, as provided in the Teva Defendant's responses to the Plaintiff's Requests

for Admission, the June 18, 2018 Standard Operating Procedures for Suspicious Order

Monitoring, which have already been produced, remain in effect to present date.  Additional

supplementation through the present date is not necessary, appropriate, or required, and would

increase the already substantial burden on the Teva Defendants without yielding additional

relevant documents.

### 3.  Depositions of Teva Witnesses

Plaintiffs are seeking the depositions of four current and former Teva employees, namely,

a Chicago Area Sales Manager (Michael Hemenway), a Chicago sales representative (Gregory

Garner), Teva's Senior Medical Director (Arvind Narayana), and Teva's Director of Medical

Education (Paula Williams). Plaintiffs asked Teva's counsel if they represented the witnesses,

and if so to provide proposed deposition dates.

Teva, however, has taken the position that depositions are not yet permitted in the case,

despite the fact that the Court has ordered that the parties may take 60 hours of depositions per

defendant family. The City seeks the Court's affirmation or permission that it can proceed with

these depositions. The parties have already negotiated and agreed to remote deposition protocols

in other opioid cases throughout the country, and there is no reason these protocols cannot be

adopted in this case with little or no modification.

Teva also takes the position the City cannot take the depositions of Mr. Narayana and

Ms. Williams, claiming those witnesses are "national in scope." While those witnesses had

national responsibilities, there is no real dispute that those responsibilities are relevant to the

claims here and Plaintiffs are aware of no prohibition on depositions of relevant witnesses depending on a supposed distinction between local and national responsibilities. Mr. Narayana's conduct as Medical Director and his involvement in the marketing of Actiq and Fentora had a direct nationwide including in Chicago, and Ms. Williams was involved in unbranded promotion, medical education, and training activities that impacted Chicago physicians and sales personnel. The City should be allowed to choose how it uses its 60 allotted hours of deposition time for these defendants.

With regard to Teva's response below, due to the Court's expedited discovery schedule and limitations on depositions in Track 1 the plaintiffs took just 26 Teva depositions covering a wide range of areas and over 20 years of sales and marketing of opioids, including brand and generic opioid sales and marketing, local Ohio sales employees, regulatory issues, personal jurisdiction issues and Rule 30(b)(6) depositions. Many of the other depositions referenced by Teva for non-MDL litigations were of local sales officials of no relevance to Chicago, and Teva makes no argument that the depositions of the "national" witnesses requested here are duplicative of depositions taken in these other cases. And as referenced above, Special Master Cohen indicated that further "national" discovery should be expected for subsequent bellwether cases such as this one, and Judge Polster's comments were in the context of a motion for further production by the DEA in its third-party capacity. In short, the depositions of the two "national" witnesses requested here in addition to the two local sales depositions fall far short of any credible undue burden argument by Teva.

For these reasons, the City respectfully requests that the City be allowed to commence depositions starting in January after negotiation and entry of a deposition protocol.

31

*Teva Defendant's Response*: The Teva Defendants do not object to the depositions of custodians with Chicago-specific knowledge. However, Plaintiff's request for the depositions of Teva Defendant witnesses was premature, given the sequential discovery practice that has occurred in this case, and because the parties have not yet entered into a remote deposition protocol. Plaintiff is correct that parties in this litigation have negotiated and agreed to remote deposition protocols in other opioids cases throughout the country, but neglects to mention that these protocols are not uniform, and have been separately negotiated in each case. The Teva Defendants cannot unilaterally agree to any such protocol without agreement from all parties, and Plaintiff has made no attempt to seek such agreement prior to this status report.

The Teva Defendants object to the deposition of any custodians whose knowledge is national in scope. Plaintiff had ample opportunity to obtain such discovery in the MDL. The Teva Defendants' corporate designee and current and former employees sat for scores of depositions in the MDL and state litigations, generating 66 deposition transcripts. Plaintiff is a party to the MDL and is in possession of each of these transcripts. Judge Polster made clear before, during and after MDL discovery that "the extensive global discovery" produced by defendants in Track 1 in the MDL is so comprehensive that discovery in cases remanded from the MDL to local federal courts should be "limited to localized evidence pertaining to the specific jurisdiction." MDL Dkt. No. 3263 at 2. Plaintiff has not and cannot provide any justification for the depositions of Mr. Narayana and Ms. Williams for the purpose of localized evidence pertaining to the specific jurisdiction. Moreover, the Teva Defendants attempted to contact Mr. Narayana, a former employee, earlier this year, and have been unable to do so. This issue is therefore moot as to Mr. Narayana.

32

## II.   THE PARTIES' PRIVILEGE LOGS

The parties' discussions regarding privilege objections are ongoing and any disputes related to these issues will be raised as appropriate at a later date.

## III.   DOCUMENTS CONCERNING NON-OPIOID PRESCRIPTION MEDICATIONS AND ILLICIT DRUGS (REQUESTS FOR PRODUCTION 11 AND 14)

*Defendants' Position:*  Requests for Production Nos. 11 and 14 seek documents related to non-opioid prescription medications and/or non-opioid illicit drugs.  Specifically, Request 11 seeks documents from or related to the Chicago Department of Public Health or other agencies related to non-opioid controlled substances or illicit drugs, including treatment data, overdose data, grant information, and other reports. Request 14 seeks documents related to unintentional medication or drug overdose deaths in Chicago resulting from both opioid and non-opioid substances.

The City has refused to produce documents related to non-opioid prescription medications and/or non-opioid illicit drugs, and instead is limiting productions to documents referencing opioids, documents that pertain to substance abuse generally, or generally applicable materials (*e.g.*, budgets).  The City has no justifiable basis to refuse production of documents related to non-opioid prescription medications and illicit drugs.  As stated in its response to Defendants' Joint Interrogatory No. 13, the City intends to seek recovery for, inter alia, costs associated with drug treatment programs, public health programs, mental health services, law enforcement and public safety expenditures, public safety and health initiatives, and clean-up of public parks, spaces, and facilities. *See* Response to Defendants' Interrogatory No. 13.  As the City confirmed during the parties' meet and confer call on December 2, 2020, these costs are not limited solely to the abuse of opioids, but rather "substance abuse generally." Similarly, the City

33

attached as an exhibit to it supplemental response to Interrogatory No. 13 a table of specific costs the City seeks to recover. Most of the expenditures the City identifies refer to programs to treat substance abuse generally. For example, the City identifies the costs of hiring a Supervising Substance Abuse Counselor within the Chicago Police Department. *See* Supplemental Response to Defendants' Interrogatory No. 13. And the City identifies the costs associated with more than thirty Department of Public Health programs and services that are simply identified as "relating to substance abuse." *Id.* Defendants are entitled to discovery to determine the extent to which these relate to the abuse of opioids as opposed to other substances. The documents sought by Request Nos. 11 and 14 are therefore squarely relevant to the City's claims and are critical for Defendants to measure the extent to which the costs the City seeks to recover are attributable to the abuse of non-opioids rather than the abuse of opioids.

Additionally, information related to the abuse, misuse, addiction to, or diversion of non-opioid prescription medications and illicit drugs is relevant to Defendant's arguments that the alleged opioid abuse crisis is attributable to a broad array of causes of substance abuse separate from any action of the Defendants. Documents concerning the abuse, harms, and costs of non-opioid substances are thus relevant both to (1) the City's claims that it incurred costs specifically attributable to abuse of opioids, and (2) Defendant's defenses regarding their alleged role in the opioid abuse epidemic. Defendants therefore request that the City supplement its productions with documents concerning non-opioid prescription and non-opioid illicit substances that are responsive to Requests 11 and 14.

### City's Position:

Defendants misrepresent the City's interrogatory response in order to justify this expansive and burdensome request seeking irrelevant information. This case concerns

34

Defendants' marketing and distribution of their *prescription opioid* medications, and the City seeks to redress the impact that Defendants' misconduct has had on the City. The City's claims do not grant Defendants license to require the City to produce voluminous information regarding non-opioid prescription and illicit drugs.

Indeed, Defendants' requests for "[a]ll Documents from . . . any . . . public agency related to controlled substances (including but not limited to Prescription Opioids) or any Illicit Drug" seemingly have no discernible boundaries. The Request potentially includes data or incident reports related to a person's use of anabolic steroids (a Schedule III Controlled Substance), amphetamines (Schedule II), marijuana (Schedule I), or even the prescription drug Xanax (Schedule IV), and would require production of such documents even where there were no prescription or illicit opioids involved. "Merely because a request is made in discovery does not mean it is automatically proper. Relevance and proportionality are critical components of every request, and 'fishing expeditions' are still prohibited here and throughout the country." *Williams v. Estates of Hyde Park, LLC*, 2020 WL 5702297, at *1 (N.D. Ill. Sep. 24, 2020); *see also Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, 2020 WL 6896090, at *3 (N.D. Ill. Nov. 24, 2020).

To be clear, the City has employed broad filters when evaluating responsiveness of documents reviewed for production in this case. The City has agreed to produce documents and information concerning non-opioid drugs in three circumstances: (i) where such information is contained "within documents pertaining to opioid medications or drugs;" (ii) where such information is contained "within documents pertaining to substance abuse generally;" and (iii) where such information is contained "within generally applicable material, including

35

medical/prescription plan documents, budgets and other databases."[39] The City advised

Defendants during the meet-and-confer that these standards were applied with respect to the

Requests at issue here.

Consistent with that response, the City has produced 230,297 documents totaling

1,271,034 pages from the Department of Public Health alone. The City also has produced

generally applicable material, including:

- Staffing and salary information for Police, Public Health, Fire and OEMC: CHI_003063108 - CHI_003063111 (2011-2020).

- Substance abuse treatment vendor contracts, CHI_003064579-CHI_003068519

- Pharmaceutical Representative Licensing database and contracts CHI_003064477-CHI_003064521

- Express Script Drug Trend Report, CHI_002433987 (2010)

- Substance Use Disorder Services Monthly Data Reports, CHI_003284708, CHI_002981259, CHI_002983370, CHI_002880196, CHI_002880269

- Guide to: Principles of drug addiction treatment, CHI_002522707 (2012)

- Emails re Petition to FDA on Benzodiazepine and Opioid Labeling, CHI_002522939 (2016)

- City of Chicago Department of Public Health Request for Proposal for Substance Abuse Lead Agency, CHI_002827747 (2015)

- Substance Abuse Roundtable Meeting Summary, "What are the big trends in abuse and recovery? What are the opportunities that are being missed? What policy efforts can be targeted", CHI_002828729 (2014)

But the City cannot produce and should not be ordered to produce material with no

connection whatsoever to opioids. Such requests are irrelevant, burdensome and not proportional

to the needs of the case.

---

[39] *See* City's Response to Defendants' Request for Production No. 3, Ex. 12 at 10-11.

US 168971952

Defendants' justifications for these requests do not withstand scrutiny. The City's response to Interrogatory No. 13 *does not* seek costs for programs unrelated to opioids. Defendants do not quote the actual language of the City's response, because each of the 10 categories identified in the City's initial answer expressly ties the City's recovery to costs attributable to opioid addiction and abuse. For example, although Defendants describe the response above as seeking "costs associated with drug treatment programs," the actual text of the City's interrogatory response states: "[c]osts associated with drug treatment programs *associated with opioid addiction, including City grants to private programs and medication-assisted treatment.*" Defendants omit the emphasized text because it defeats their argument. Similarly, Defendants above only include the phrase "public health programs," but the City's interrogatory response is not so broad. The City seeks "[c]osts associated with public health programs *to address opioid overdose and addiction* . . ." Moreover, the City's supplemental response provided tables of calculations and specific costs that the City seeks to recover. The costs and programs on that table all relate to the City's efforts to address and remediate the effects of opioid misuse and abuse.

Indeed, the only quote that Defendants use is the term "substance abuse generally." But that quoted phrase *does not appear* in the City's response to Interrogatory No. 13. Rather, that quote is taken from the City's description of the types of documents it is producing in response to Defendants' requests (as noted above). There is no support for the claim that the City seeks recovery of costs concerning "substance abuse generally."

Notably, the City's production of materials is consistent with the way Defendants have treated their own documents. The Case Management Order permits Defendants to redact information from documents related to non-opioid products, and Defendants have routinely

redacted such information from their own productions.[40] Defendants seek to hold the City to a different standard.

Finally, Defendants contend that non-opioid information is relevant to their defenses, but provide no detail other than a single sentence. Defendants' conclusory statement does not justify such broad and expansive discovery of the City's files. Even if such information is somehow relevant to their defenses (and it is not), Defendants have made no showing that their expansive request for "[a]ll Documents from . . . any . . . public agency related to controlled substances (including but not limited to Prescription Opioids) or any Illicit Drug" is proportional to the needs of the case. Nor have they offered to narrow or modify this request to alleviate the burden on the City.

For all these reasons, the Court should deny Defendants' request.

## IV. DEFENDANTS' JOINT REQUESTS FOR PRODUCTION TO THE CITY

### The City's Preamble:

The City has produced 1,142,587 documents in this litigation, totaling 4,618,517 pages, over the course of 27 productions. Defendants imply that the bulk of the City's production has been only recent, but of the over 1,000,000 total documents produced to date, the City has produced only 152,911 documents (roughly 10%) of the City's total document productions since October 1, 2020.

---

[40] *See, e.g.,* Ex. 13, JAN-MS-05488277, at 279-83 (redacted as "Non-Responsive J&J Product"); Ex. 14, Acquired_Actavis_02347327 (information redacted as "Other Teva Product" throughout); Ex. 15, TEVA_CHI_00045355 (all substantive information redacted as "Other Product").

38

As noted in multiple instances below, the City has committed to investigate Defendants' concerns and produce any documents that may have been missed. But the City's investigation is ongoing, and none of the issues below are ripe for the Court's consideration at this time.

A.   **Request for Production No. 2:**

***Defendants' Position:***   Request for Production No. 2 calls for the production of certain financial-related documents and databases from the City and each of its departments, agencies, or other constituent entities which the City contends has incurred or will incur costs for which the City will seek damages, reimbursement, or other relief.  Among other categories of documents, this Request seeks budget-related documents, transactional data, and databases used by the City or its constituent entities to track, record, or otherwise account for revenues and expenditures, and other financial documents such as employee data, grant documents, audit reports, and analyses of the costs and financial impact of the opioid crisis on the City.

In response, the City referred Defendants to publicly available financial documents and agreed to produce "non-privileged documents related to the City's budget."  *See* The City's Response to Defendants' Joint Request for Production No. 2.  The City has since clarified that its use of the phrase "budget" in its response was simply shorthand and was not intended to narrow the boundaries of what the City is producing in response to this Request.  Rather, to the extent documents responsive to this Request, including but not limited to the categories of documents described above, are identified in the City's agreed-upon custodial and non-custodial files, the City intends to produce them.

Defendants reserve all rights to raise any deficiencies related to this Request once the City completes its production.

39

*City's Position:*

As noted, there is no dispute requiring the Court's attention at this time. The City has produced 13,855 documents totaling 176,750 pages for the Office of Budget and Management and has produced 12,820 documents totaling 138,788 pages for the Committee on Finance. The City is confirming that no documents were missed during its collection, but the City has located at least the following responsive documents:

- Staffing and salary information for Police, Public Health, Fire and OEMC: CHI_003063108 - CHI_003063111 (2011-2020).

- Grants and contracts, CHI_003064579-CHI_003068519, CHI_003064481-CHI_003064521, CHI_004202261, CHI_004202909, CHI_004575594

- Comprehensive Annual Financial Reports: CHI_004564249. CHI_004564477, CHI_004564705

- Statistical Reports: CHI_002713795, CHI_003634958, CHI_003634981

- Budget Documents: CHI_002891215- CHI_002895672, CHI_004565572-CHI_004565577, CHI_003706497

- Budget Documents – Revenue: CHI_004078086, CHI_004078087, CHI_004565556

### B.     Request for Production No. 4:

*Defendants' Position:* This Request seeks documents relating to "the purchase, prescribing, distribution, and dispensing of Prescription Opioids, including (a) instructions, directives, recommendations, procedures, policies, or guidelines relating to the distribution, prescribing, or use of Prescription Opioids; (b) Documents that relate to the legitimate need for and/or use of Prescription Opioids; (c) Documents that relate to the volumes of Prescription Opioids prescribed, dispensed, sold, distributed, diverted, and/or used in the City; and (d) Documents that relate to the maximum number of pills or other dosage units of Prescription Opioids that You believe, suspect, or contend could or should properly have distributed,

40

prescribed, or dispensed for legitimate medical purposes in the City."  In response, the City agreed only to produce documents concerning City-sponsored medical plans and reimbursement policies.  Because the Request is broader, Defendants sought to clarify in their November 19, 2020 letter that the City would produce a broader array of documents, including:

- Instructions, directives, recommendations, procedures, policies, or guidelines relating to the distribution, prescribing, or use of prescription opioids;

- Documents that relate to the legitimate need for and/or use of prescription opioids;

- Documents that relate to the volumes of prescription opioids prescribed, dispensed, sold, distributed, diverted, and/or used in the City; and

- Documents that relate to the maximum number of pills or other dosage units of prescription opioids the City contends are appropriate for legitimate medical purposes.

During the parties' November 25, 2020 meet and confer, the City stated that, while it had initially interpreted this Request to seek only information concerning City-sponsored medical plans and policies, upon further review, the City intended to produce all of the categories of documents identified in the bulleted list above.  By email of December 3, 2020, the City appears to confirm that it is producing all documents within the requested categories, to the extent not privileged or otherwise protected (which such documents Defendants expect the City to log). Accordingly, Defendants reserve all rights to raise with the Court any issues regarding the production of these documents, if necessary.

### City's Position:

As noted, there is no dispute requiring the Court's attention at this time. The City is confirming that all responsive documents were produced, and has agreed to produce responsive documents the City identifies.

US 168971952

C.      **Request for Production No. 8:**

**Law Enforcement Databases:**

*Defendants' Position:*  Request for Production No. 8 seeks "[a] copy of the content of all law enforcement databases, drug seizure databases, crime lab databases, encounters databases, healthcare or public health databases, correctional health databases, dispensing databases, toxicology databases, emergency services databases, and any other database that contains data related to Prescription Opioids, Illicit Opioids, or any cost You seek to recover." In its response to this Request, the City did not agree to produce documents from several responsive categories of databases, including drug seizure databases, crime lab databases, healthcare or public health databases, encounters databases, and dispensing databases.  *See* The City's Response to Defendants' Joint Request for Production No. 8.  The City has represented that it does not maintain any dispensing or encounters databases and it has represented that it has already identified and produced documents from all responsive public health databases.

In addition, the City has recently discovered that it may maintain an inventory system called eTrack tracking drugs seized by the City. The City is investigating whether that system was used, during which time period, and the extent to which information from that system may be extracted for production.

Defendants reserve all rights to raise any deficiencies related to this Request once the City completes its production and in the event Defendants learn of any additional databases responsive to this Request.

*City's Position:*

As noted, there is no dispute requiring the Court's attention at this time. The City is investigating the extent to which the "eTrack" inventory system was used for opioids, and, if so,

42

in what time periods and to what extent information from that system may be extracted for production.

The City's July 1, 2020 production cover letter contained extensive information concerning production of material from law enforcement databases. A copy of that letter is attached as Ex. 16. Defendants did not raise any questions regarding the information contained in that letter and the City referred Defendants to its contents during the parties meet-and-confer.

### **Public Health Databases:**

***Defendants' Position:*** Defendants' investigation continues as to whether the City has complied with its production obligations in response to Request No. 8, which seeks "a copy of the content of all . . . public health databases . . . that contain[] data related to Prescription Opioids, Illicit Opioids, or any cost You seek to recover." Defendants' position regarding the City's production relating to public health databases is set out below in Section V.A.

*City's Position:*

As noted, there is no dispute requiring the Court's attention at this time. The City has produced 230,297 documents totaling 1,271,034 pages for Public Health. The Department of Public Health has no databases to produce. The epidemiology office collects data from Cook County Medical Examiner, Hospital Emergency Departments, and the Fire Department. Responsive, non-privileged data was produced. Examples of such documents include: CHI_004057562, CHI_002445605, CHI_002445606, CHI_002604368, CHI_002446072, CHI_003437865, CHI_004056185.

43

**Emergency Services:**

*Defendants' Position:* This Request also calls for a copy of all "emergency services databases." Defendants' position regarding the City's production relating to emergency medical services is set out below in Section V.C.

*City's Position:*

There is no dispute requiring the Court's attention at this time. The City has produced 409 documents totaling 2,293 pages for Office of Emergency Management and Communication. That office manages "911" call-takers and does not possess any reports or policies related to opioids or administration of naloxone/narcan. The City produced all relevant incidents from the Fire Department Database, examples: CHI_003506137, CHI_003506138, CHI_003506139. The OEMC database collects only 911 operator calls. The Fire Department responds to these 911 calls and data for these incidents is available in the Fire database, which the City has produced.

D.    **Request for Production No. 16:**
       **Law Enforcement Databases:**

*Defendants' Position:* Request for Production No. 16 seeks documents relating to the administration of naloxone or similar treatments to individuals to treat apparent respiratory failure as a result of or related to a known or suspected medication or drug overdose. In its response to this Request, the City did not specify whether it planned to produce certain documents responsive to this Request, including (1) documents related to the number of naloxone or similar treatments provided by the City and (2) documents related to the costs and sources of funding for these treatments, including any grant applications and decisions thereon. *See* The City's Response to Defendants' Joint Request for Production No. 16. During a meet and

44

confer call on November 25, 2020, the City confirmed that it searched for responsive documents in both of these categories and has produced them to the extent they are contained in the City's agreed-upon custodial files and non-custodial sources.

Defendants reserve all rights to raise any deficiencies related to this Request once the City completes its production.

**City's Position:**

There is no dispute requiring the Court's attention at this time. The City has produced 45,244 documents totaling 403,806 pages from Police sources. The City produced relevant records from the Criminal History Records Information System (CHRIS) database on July 1, 2020, and the production letter extensively described the criteria the City used in connection with that production. (Ex. 16.) Defendants have had five months to raise any questions regarding that production, and have not done so.

**<u>Emergency Services Databases:</u>**

***Defendants' Position:***  This Request also calls for a copy of all "emergency services databases."  Defendants' position regarding the City's production relating to emergency medical services is set out below in Section V.C.

**City's Position:**

There is no dispute requiring the Court's attention at this time. The City has produced 409 documents totaling 2,293 pages for Office of Emergency Management and Communication. That office manages "911" call-takers and does not possess any reports or policies related to opioids or administration of naloxone/narcan. The City produced all relevant incidents from the Fire Department Database, examples: CHI_003506137, CHI_003506138, CHI_003506139.  The

45

OEMC database collects only 911 operator calls. The Fire Department responds to these 911 calls and data for these incidents is available in the Fire database, which the City has produced.

**E.** **Request for Production No. 25:**

**Emergency Services:**

*Defendants' Position:*  This Request seeks "[a]ll documents reflecting all purchases of Prescription Opioids made by You, including the brand, units purchased, date, and seller." During the parties' November 25, 2020 meet and confer, the City's counsel stated that their understanding is that the City does not purchase prescription opioids and that therefore the City has no documents responsive to this Request.  Defendants suggested that the City may purchase opioids for use by the Fire and Emergency Management and Communication ("OEMC") departments.  In its email of December 3, 2020, the City confirmed that "City EMS or Fire Personnel did administer low levels of opioids" and that it is now "locating and producing documents related to those programs, including documents related to the acquisition of those opioids."  Accordingly, Defendants reserve all rights to raise with the Court any issues with this production, if necessary.

*City's Position:*

There is no dispute requiring the Court's attention at this time. The City has produced documents concerning administration of low-levels of opioids by Fire/EMS personnel. Examples:  CHI_003415620, CHI_003415705, CHI_003513637, CHI_003513647, CHI_003512512, CHI_003512730. The City is investigating whether additional documents exist, and has agreed to produce additional responsive documents if they exist.

46

## V.    <u>CITY'S PRODUCTIONS FROM NON-CUSTODIAL SOURCES</u>

***Defendants' Preamble:*** Defendants' review of the City's document production is ongoing.  Although the City has produced roughly 1.1 million documents throughout this litigation, at least 800,000 of these documents were produced into the MDL and consist mainly of documents produced by third parties rather than responsive documents that are contained in the City's agreed-upon custodial files and non-custodial sources. Of the roughly 330,000 documents produced since this action was remanded, the City produced roughly half of those documents in October and November of 2020.  Pursuant to the City's representations, this production is ongoing and Defendants reserve all rights to raise any deficiencies related to this Request once the City completes its production.

***The City's Preamble:*** Defendants have misstated the timing and extent of the City's document production. The City produced 1,142,587 documents in this litigation, totaling 4,618,517 pages, over the course of 27 productions. Since October 1, 2020, the City produced 152,911 documents, roughly 10% of the City's total document productions—far less than Defendants' assertion of "roughly half" of the City's production occurring in that time frame.

Defendants did not raise the issues below until a letter sent on November 27, 2020—the Friday after Thanksgiving. The parties conferred regarding those issues on December 2, 2020, only three business days later. The City has committed to investigate the complaints below and determine whether responsive documents were not produced. But the City contends that the issues below are not ripe for consideration at this time. The City should be afforded more than three business days to respond to a letter sent during a holiday weekend.

The City's responses below set forth its current position, based upon the limited time the City has had to investigate these concerns. The City takes it document production obligations

seriously, as demonstrated by the fact that the City has produced more than 1 million documents totaling more than 4.6 million pages in this litigation. But the Court should not address any of the below issues at this time because the City has not had sufficient opportunity to assess Defendants' complaints and to determine whether additional documents were inadvertently missed during the production process.

**A.** **Public Health:**

***Defendants' Position:*** Defendants' investigation continues as to whether the City has complied with its production obligations regarding public health information from non-custodial sources. To date, Defendants have identified the following potential deficiencies:

Pre-2014 documents. The City has produced roughly 16,000 scanned hard copy documents from the Public Health Department. While these documents do not have a date associated with them in their metadata, Defendants' preliminary review indicates that the City has produced few hard copy documents from the Public Health Document pre-dating 2014. During the parties' meet and confer call on December 2, 2020, the City stated that it had produced all available responsive hard copy documents that it has been able to locate from the Public Health Department, including documents pre-dating 2014, except that it is checking to see whether it has produced all pre-2014 invoices and reports relating to substance use disorder facilities. The City further stated that it is not aware of any pre-2007 hard copy documents from the Public Health Department that it has in its possession.

Aggregate data on individuals receiving substance abuse treatment and naloxone. The City has produced multiple reports entitled "Substance Use Disorder Services Monthly Data Report" that indicate, among other information, the number of individuals receiving services for

48

particular months by substance and the number of naloxone kits distributed. The City did not produce any such reports pre-dating 2017 or any database with the information contained within these reports. During the parties' meet and confer call on December 2, 2020, the City stated that it is checking to see whether it has any such reports or databases to produce.

### *City's Position:*

The Department of Public Health's hard copy documents date back to 2007. The City is investigating whether additional documents exist in offsite storage facilities, and assessing whether those documents may be reasonably produced. The City notes that Defendants have more than 11 years of hard copy documents.

The City has confirmed that it has produced all copies of the "Substance Use Disorder Services Monthly Data Report" it located during the collection of materials for production in this litigation. The City is investigating whether additional documents exist.

### B. <u>Law Enforcement:</u>

*Defendants' Position:* The City has agreed to produce a number of documents related to the City's law enforcement departments. In responding to these requests, the City has produced documents from the Chicago Police Department ("CPD"). However, based on Defendants' review of the City's productions, the following categories of documents responsive to Defendants' requests are either missing or incomplete.

### CHRIS extract.

*Defendants' Position:* The City has produced an extract from the Criminal History Records Information System ("CHRIS") that purportedly includes all "closed" or "cleared" cases that involved opioids by selecting certain opioid-related offense, property, and crime codes.

49

While the City provided a complete list of offense codes, Defendants requested that the City also provide a complete list of narcotics-related property and crime types so that Defendants can assess whether the extract the City has provided is sufficient. In its position statement below, the City confirmed for the first time that the July 1, 2020 cover letter it provided contains all the narcotics-related property and crime types for narcotics codes. Defendants are currently reviewing these lists and may request that City produce additional CHRIS extracts to the extent the City has excluded relevant information.

*City's Position:*  There is no dispute requiring the Court's attention. The City produced the extraction from the CHRIS database on July 1, 2020, along with an explanatory cover letter. The City has confirmed that the July 1 cover letter identifies all property and crime types in the database and whether they were included in the City's search.

**Summary statistics provided to FBI.**

*Defendants' Position:*  The City has produced a 2016 Information Services Division Annual Report, which states the CPD uses "summary based reporting to the Illinois Uniform Crime Reports (IUCR) and the Federal Uniform Crime Reports (UCR)," and that "[s]ummary Uniform Crime Reports (UCR) has been a national method of collecting crime statistics for the FBI since the 1930s." Defendants requested the City provide reports of these summary statistics submitted by the CPD, which are responsive to Defendants' Joint Request No. 7. During the parties' meet and confer call on December 2, 2020, the City represented that it is investigating whether and to what extent CPD is in possession of such documents that have not already been produced.

50

*City's Response:* There is no dispute requiring the Court's attention at this time. The City is confirming whether the summary statistics exist and will produce any responsive documents that were not included in the original production.

**Annual reports.**

*Defendants' Position:* The City has produced several documents that appear to be regularly- issued annual reports, but the City's production of each these reports is limited to a single year. For example, the City produced an End-of-Year Crime Statistics Report for 2018 and an Information Services Division Annual Report for 2016, but has not produced similar reports for any other years. During the parties' meet and confer call on December 2, 2020, the City represented that it is investigating whether and to what extent CPD is in possession of such documents that have not already been produced.

Similarly, the City produced the Annual Report, Year-End Review for 2016, but initially did not produce similar reports for any other years. During the parties' meet and confer call on December 2, 2020, the City indicated that these reports are publicly available. Nevertheless, the City informed Defendants that it had produced additional reports dating back to 1996 in its most recent production, which was served on November 30, 2020. Defendants have since reviewed the City's production and several reports still appear to be missing for the years 2011 to 2015. Although the City has since confirmed that these reports are not publicly available online, it is obligated to undertake a good faith search for these reports in non-public files. Indeed, even though the City states that the 2016 report is not publicly available, the City produced a copy of it at CHI_004419887. Thus, the City should be ordered to investigate whether any similar reports exist for the missing years, and, if so, produce them.

51

*City's Response:* Defendants are mistaken and there is no need for a Court order. The annual reports are available online back to 1965, at https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/. The City produced the annual reports for 1996 to 2019, including the following bates numbers: CHI_004617017 (2002), CHI_004617017 (2003), CHI_004617069 (2004), CHI_004617177 and CHI_004617121 (2005), CHI_004617303 (2006), CHI_004617373 (2007), CHI_004617529 (2008), CHI_004617609 (2009). As reflected at the link above, there were no annual reports for 2011 to 2016.

**Training programs.**

*Defendants' Position:* The City has produced some documents related to law enforcement education and training programs for the years 2009, 2010, and 2016, which are responsive to Defendants' Joint Request No. 16. During the parties' meet and confer call on December 2, 2020, the City represented that it is investigating whether and to what extent CPD is in possession of such documents that have not already been produced.

*City's Response:* There is no dispute requiring the Court's attention at this time. The City is investigating whether additional documents exist and will produce any responsive documents that were not included in the original production.

**Documents related to CPD costs.**

*Defendants' Position:* The City has produced a limited number of invoices for costs related to personal protective equipment, Narcan, opioid overdose kit bags, and specimen bags for the CPD. It appears that the City has only produced such invoices for the years 2016, 2018, 2019, and 2020. To the extent the City is seeking recovery for these type of costs incurred by the CPD, Defendants are entitled to all documentation related to these costs during the relevant time period (as defined in Defendants' Requests). During the parties' meet and confer call on

52

December 2, 2020, the City responded that the CPD did not begin carrying Narcan until July 2018, which may explain the lack of invoices. Regardless, the City represented that it is investigating whether and to what extent CPD is in possession of such documents that have not already been produced.

Similarly, the City has produced only a select number of documents related to police overtime, including payroll reports for overtime dated January 1, 2013 to December 12, 2013, January 3, 2014 to September 25, 2020, and May 1, 2019 to June 30, 2019. To the extent the City is seeking costs related to police overtime, Defendants are entitled to any and all records in the City's possession documenting those costs during the relevant time period. During the parties' meet and confer call on December 2, 2020, the City represented that it is investigating whether and to what extent CPD is in possession of such documents that have not already been produced.

*City's Response:* There is no dispute requiring the Court's attention at this time. The City has produced cost information that it has located using searches, including documents at CHI_003546562; CHI_003546573; CHI_003546577; CHI_003546570, and CHI_003063108. The Narcan initiative was introduced in July 2017, and the City believes it has produced all responsive documents. The City has produced staffing and salary information for the time period from 2011 to 2020 for Police, Public Health, Fire and OEMC at CHI_003063108 - CHI_003063111. The City is investigating whether additional documents exist and will produce any responsive documents that were not included in the original production.

**Narcan administration reports and training.**

*Defendants' Position:* The City has produced some Narcan administration reports and training documents, which are responsive to Defendants' Joint Request No. 16. However, the

US 168971952

City has only produced Narcan administration reports for June 20, 2018 to October 19, 2018, January 1, 2019 to June 30, 2019, and January 1, 2020 to May 31, 2020. Additionally, the Narcan administration report that the City produced for the first half of 2019 is only for Police District 11 and does not cover other Police Districts. During the parties' meet and confer call on December 2, 2020, Defendants also requested that the City identify and agree to the produce the underlying data or documents from which the City pulled the data to create the Narcan administration reports. In response, the City agreed to investigate these potential deficiencies.

*City's Response:*  There is no dispute requiring the Court's attention at this time. The City is investigating whether additional documents exist and will produce any responsive documents that were not included in the original production.

**Incident/arrest reports and investigatory/arrest files.**

*Defendants' Position:*  The City agreed to produce documents responsive to Defendants' Joint Request No. 7, including arrest reports for opioid-related incidents and investigatory and/or arrest files for any physicians, dentists, or other entities or persons investigated, charged, or arrested for any reasons related to prescription or illicit opioids. *See* The City's Response to Defendants' Joint Request for Production No. 7. However, these documents appear to be missing from the City's production from CPD. During the parties' meet and confer call on December 2, 2020, the City represented that it had produced responsive information through the CHRIS database and that CPD officers enter all information directly into that database rather the completing separate forms. Defendants offered to identify specific cases for which they seek production of investigative files, and the parties agreed to revisit this Request in the future.

54

*City's Response:*  There is no dispute requiring the Court's attention. The City produced the CHRIS database on July 1, 2020, which reflected over 7 million reports of law enforcement incidents occurring in the City of Chicago.

**Other law enforcement documents.**

*Defendants' Position:*  Several other categories of documents responsive to Defendants' requests appear to be missing from the City's non-custodial production. These include opioid or drug-related grants and applications for law enforcement departments (*see* Defs.' Joint RFP Nos. 2, 3); contracts related to substance use disorder treatment and Narcan/naloxone (Defs.' Joint RFP Nos. 2, 3, 16); and law enforcement policies concerning prescription and illicit opioids, including but not limited to policies related to investigations or arrests for opioid-related incidents, drug seizures, administration of Narcan, and evaluation and treatment of opioid withdrawal or opioid use disorder for individuals in CPD's custody (*see* Defs.' Joint RFP No. 20). During the parties' meet and confer call on December 2, 2020, the City represented that it has produced all contracts related to substance use disorder treatment and Narcan/naloxone within its possession from the Public Health Department and that no such contracts exist that are related to the Police Department. Additionally, the City represented that it is investigating whether and to what extent CPD is in possession of law enforcement policies that have not already been produced.

*City's Response:*  There is no dispute requiring the Court's attention at this time. The City has produced 45,224 documents totaling 403,806 pages for Police and its custodians, including the CHRIS database with over 7,000,000 entries. That production includes a chart of pending grants at CHI_004420398 and at least one grant application at CHI_004202261. The

City is investigating whether additional documents exist and will produce any responsive documents that were not included in the original production.

**C.** **Emergency Medical Services:**

*Defendants' Position:* Defendants have identified several issues with the City's document production relating to emergency medical services. *First*, the City has produced an output from the Office of Emergency Management and Communications ("OEMC") incident database. But the output is limited by time (including only incidents from 2013 to 2015) and has limited fields, among other issues. When Defendants raised these concerns, the City stated on a December 2, 2020 meet and confer that it had produced only a sample, as it believes the Fire Department's incident database is more appropriate for production. Defendants asked the City to confirm that the Fire Department incident database contains all data about each incident reflected in this OEMC database, and the City stated that it would investigate to be sure. Unless the City confirms that there are no incidents (or substantive information related to each incident) reflected in the OEMC database that are not reflected in the Fire Department database, Defendants request that the City be ordered to produce a full output from the OEMC database.

*Second*, as for data from the incident database maintained by the Fire Department, during the parties' December 2, 2020 meet and confer, Defendants raised questions about the fields provided and what parameters the City used to search the database. In response, the City provided Defendants with information on both issues. Defendants are reviewing the information provided and reserve all rights to raise any issues should that become necessary.

*Third*, the Fire Department incident database only goes back to 2006. Pre-2006 incidents, per the City, are stored only in microfiche, and the City appears to be taking the position that pre-2006 incidents are not reasonably accessible such that they will not produce them. Defendants

56

request that the City either confirm without ambiguity that it is not seeking emergency medical services-related costs prior to 2006, or to produce the pre-2006 incident files.

*Fourth*, Defendants have requested that the City confirm that it has produced: (i) all policies and procedures relating to the Fire Department's provision of emergency care, such as those on the treatment of pain in the field using opioids and on the administration of naloxone, and (ii) all contracts, invoices and grants from the Fire Department or OEMC. The City has offered to so confirm, but it has not yet done so. Defendants request that the City either confirm on both counts or produce the requested documents.

*Finally*, on the parties' December 2, 2020 meet and confer, the City's counsel disclosed that they had recently discovered a program whereby the Fire Department administers a dose of fentanyl in the field. The City has committed to produce documents relating to this program, but it has yet not done so. Accordingly, Defendants reserve all rights to raise with the Court any issues with this production, if necessary.

***City's Position:*** There are no disputes requiring the Court's attention at this time. With respect to the OEMC database, the City confirms that the Fire database contains all relevant entries that appear in the OEMC database. As the City explained during the meet-and-confer, the databases are duplicative, and the OEMC database contains only notes concerning information relayed to the 911 call-taker, whereas the Fire database details what actually occurred at the scene. The City reasonably concluded that the information in the Fire database was more relevant. The narratives in the OEMC database would require significant review and redaction prior to production, and Defendants have not explained why information relayed by a third party who called 911 is relevant to their claims or why production of this information is proportional to the needs of the case.

57

With respect to the Fire Department database, there is no dispute requiring the Court's attention, as Defendants acknowledge.

With respect to pre-2006 Fire Department records, the City advised the following in an email sent December 3, 2020:

> After checking with our client, we determined that there are paper records for some pre-2006 fire incidents, but those files do not contain any database or index that would permit the City to search them. The paper records cover approximately 8 months in 1997, five months of 2000, and all of 1998, 1999, 2003 and 2005. We conservatively estimate that the Fire Department averages more than 300,000 incidents per year. We thus estimate that there are well more than 1 million paper records in these files. Searching those pre-2006 materials to locate only those runs related to drug/alcohol cases would not be proportional to the needs of the case.

Defendants' submission does not address the supposed need for these files.

With respect to policies, procedures, contracts, invoices and grants, the City is confirming that its production is complete and will produce any responsive documents that were not included in the City's original production.

Finally, as stated above, the City has produced documents concerning administration of low-levels of opioids by Fire/EMS personnel. Examples:  CHI_003415620, CHI_003415705, CHI_003513637, CHI_003513647, CHI_003512512, CHI_003512730. The City is investigating whether additional documents exist, and has agreed to produce additional responsive documents if they exist.

### D.    <u>Health Plans, Payors, and Claims Data:</u>

***Defendants' Position:***  On the parties' December 2, 2020 meet and confer, counsel for the City confirmed that the City has produced the specific categories of requested materials, namely formulary lists, drug utilization reviews and reports generated concerning opioids, and that the City has no documents reflecting denials or disputes of payment or reimbursement of

58

opioids as medically unnecessary. Defendants reserve all rights to seek additional production in these categories should they learn of unproduced documents via depositions or otherwise.

*City's Position:* Defendants acknowledge there is no issue requiring the Court's attention. The City has produced over 10,000 documents and 160,000 pages for the City's Department of Finance Employee Benefits division which oversees the administration of the City employees' health care plans. That production includes formularies (for example, CHI_002336485 to CHI_002337316 (25 docs), CHI_002584983, CHI_002585004, CHI_002352577) and drug utilization reviews (for example, CHI_002344349 - CHI_002344991, CHI_002351936, CHI_004168929 to CHI_004169029, CHI_003544679).

### E. <u>Budget & Finance:</u>

*Defendants' Position:* The City has agreed to produce a number of documents related to the budget and finances of the City and its constituent departments and agencies. In responding to these requests, the City has produced documents from its Office of Management and Budget ("OBM") and Department of Finance ("DOF"), among other departments. Based on Defendants' review, several categories of documents responsive to Defendants' requests appear to be missing from the City's OBM and DOF productions. These include expenditure reports (Defs.' Joint RFP No. 2); audit records (*id.*); and opioid or drug-related grant applications (*id.*; Janssen RFP No. 31). During a meet and confer call on December 2, 2020, the City represented that it is investigating whether and to what extent OBM and/or DOF are in possession of such documents that have not already been produced.

*City's Position:* There is no dispute requiring the Court's attention at this time. The City has produced 13,855 documents totaling 176,750 pages for the Office of Budget and

US 168971952

Management. The City has also produced 12,820 documents totaling 138,788 pages for the Committee on Finance. The City is investigating whether additional documents exist, and has agreed to produce additional responsive documents if they exist.

**F.**    **City Executives:**

*Defendants' Position:* The City previously agreed to produce documents from the shared drive used by the Chicago City Council. However, the City's productions to date do not contain any documents from this shared drive. Additionally, the City has failed to produce any materials related to City Council meetings, including meeting minutes, agendas, notes, recordings, or presentations. These types of documents are responsive to the Defendant's Joint Request for Production Nos. 6 and 13. During the parties' meet and confer call on December 2, 2020, the City indicated that it will produce additional documents responsive to these Requests, including the agreed-upon shared drive. Defendants reserve the right to revisit this issue following the City's supplemental productions.

*City's Position:* There is no dispute requiring the Court's attention at this time. The City has produced 11,237 documents totaling 105,981 pages for the Chicago City Council custodians. The City believes its production is complete based upon information received from those individuals. However, the City is investigating whether additional documents exist, and will produce any additional responsive documents that were not included in the City's production.

**G.**    **Consumer Protection and Affairs:**

*Defendants' Position:* The City's production does not include any complaints received by the Department of Business Affairs and Consumer Protection regarding pharmaceutical companies' marketing of opioid products, which are requested by Janssen Request for

Production No. 7. The City represented during the December 2, 2020 meet and confer that it produced all responsive complaints, and that an absence of produced documents indicates that no responsive complaints could be located. Defendants reserve the right to revisit this issue if evidence of non-produced responsive documents arises.

*City's Position:* There is no dispute requiring the Court's attention at this time, as the City believes it has produced all responsive documents.

## VI.   <u>CUSTODIAL PRODUCTIONS</u>

*Defendants' Position:* The City has designated, by agreement or order of the Court, 76 custodians. Defendants have identified significant issues with the City's production of nearly half of these custodians. As discussed further in Attachment B to this report, these issues include:

- The City has produced no documents for one custodian: John F. Harris.

- Numerous custodial files contain virtually no emails sent by the custodian. For example, the custodial files of Ed Burke, Jorge Cardenas, Patricia Dowell, Thomas Lemmer, Samantha Fields, Hootan Bahmadeji, Elise Horton-Newkirk, Isaac Morcos, Hugh Russell, Mark Edinburg, Greta Ivers, Mary Daly, and Ariel Reboyras each appear to contain fewer than 100 emails sent by those custodians.

- Numerous custodial files are missing documents from key periods in the custodians' tenure. For example, Leslie Stein-Spencer was an employee of the Fire Department from 2006 through 2017 and yet her custodial file only contains emails from January 2014 through June 2017. Likewise, Cassandra Judon was an employee with the CPD from 1986 to 2016, but her custodial file only contains documents dated after 2016. And Claudia Chavez was an employee in the Chicago Mayor's office from 2014 to 2015, but her custodial file does not contain a single email from those years.[41]

---

[41] The tenure dates referenced in this report and in Appendix A were determined from Defendants' investigation of publicly available information regarding these custodians and information provided by the City during meet and confers regarding custodians.

US 168971952

- Twenty-one custodial files contain less than 1,000 documents.

The significant number of deficiencies with the City's custodial file productions raises serious concerns about the City's process for collecting and reviewing custodial files. During the parties' meet and confer call on December 2, 2020, the City represented that it is investigating the Defendants' concerns. Accordingly, Defendants reserve all rights to raise with the Court any issues with Plaintiff's custodial productions, if necessary.

### City's Position:

Defendants first presented their list to the City on November 27, 2020—the Friday after the Thanksgiving holiday. The City is researching each and every custodial file identified in this list to determine that collections were complete and that all responsive documents were produced. The City will produce any additional responsive documents it identifies that were not included in the City's initial production. Although the City's investigation is ongoing, it has made some preliminary findings.

Certain of these custodians simply had no responsive documents. For example, John F. Harris was a Budget Director from February 2004 through August 2005. The City does not have responsive emails for periods prior to October 2004. There were no responsive documents found in Mr. Harris' emails for the remainder of his tenure as Budget Director.

Defendants also complain about "low number of emails" sent from the Alderman custodians, but the City does not believe that represents an error in collection or production. Rather, our investigation suggests that City Aldermen, including Edward Burke, simply do not send voluminous emails from their email accounts related to opioids. To the extent the City identified responsive documents, it has produced them.

US 168971952

Additionally, numerous documents from medical directors or nurse practitioners have not been produced because they were identified as subject to possible privilege, including privileges related to individual medical treatment. The City is evaluating those documents to determine whether the privilege applies, and, if it does, whether the documents may be redacted to obscure privileged information.

The City is researching the circumstances concerning each custodian that Defendants identified, and will provide responses when its investigation is complete. But the Court need not and should not address this "dispute" until the City has had an adequate opportunity to evaluate Defendants' complaints.

## VII.    NAMES OF ATTORNEYS WHO WILL BE ADDRESSING THE COURT DURING THE STATUS HEARING

The following are the attorneys who may address the Court for each of the Parties at the December 14, 2020 telephonic status hearing:

- **The City:** Thomas McNulty, Kenneth Wexler, David Ackerman

- **Teva:** Rebecca Hillyer, Tinos Diamantatos, Zachary Lazar

- **Janssen:** Esteban Rodriguez

- **Endo:** Melissa Bertke

- **Allergan:** Donna M. Welch and Karl Stampfl

US 168971952

Dated:    December 7, 2020

/s/ Kenneth A. Wexler
Kenneth A. Wexler
Bethany R. Turke
Kara A. Elgersma
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
kaw@wexlerwallace.com
brt@wexlerwallace.com
kae@wexlerwallace.com
Phone: (312) 346-2222
Fax: (312) 346-0022

Thomas P. McNulty
Fiona A. Burke
City of Chicago, Department of Law
30 N. LaSalle St., Suite 1240
Chicago, IL 60602
thomas.mcnulty@cityofchicago.org
fiona.burke@cityofchicago.org
Phone: (312) 744-6929
Fax: (312) 742-3832

Linda Singer
Elizabeth Smith
David I. Ackerman
MOTLEY RICE LLC
lsinger@motleyrice.com
esmith@motleyrice.com
dackerman@motleyrice.com
401 9th Street NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
Fax: (202) 386-9622

*Attorneys for Plaintiff City of Chicago*

Respectfully submitted,

/s/ Tinos Diamantos
Tinos Diamantatos
Zachary R. Lazar
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601
(312)-324-1000
Firm Id # 40417
tinos.diamantatos@morganlewis.com
zacharly.lazar@morganlewis.com

Eric W. Sitarchuk
Rebecca J. Hillyer
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103-2921
T: 215.963.5840
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com

*Attorneys for Teva Pharmaceuticals, U.S.A., Inc., Cephalon, Inc., Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc.*

/s/ Jonathan L. Stern
Jonathan L. Stern
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Phone: 202-942-5000
jonathan.stern@arnoldporter.com

Sean O. Morris
Arnold & Porter Kaye Scholer LLP
777 S. Figueroa St., Suite 4400
Los Angeles, CA 90017
Phone: 213-243-4000
sean.morris@arnoldporter.com

Douglas F. Curtis [IL 6329143]
Caitlin Martini Mika (IL 6316776)
Arnold & Porter Kaye Scholer LLP

64

70 W. Madison St., Suite 4200
Chicago, IL 60602
Phone: (312) 583-2300
doug.curtis@arnoldporter.com
caitlin.mika@arnoldporter.com

Carole S. Rendon (IL 6200217)
Melissa D. Bertke (*admitted pro hac vice*)
BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
127 Public Square, Suite 2000
Cleveland OH 44114-1214
Phone: 216.861.7420
crendon@bakerlaw.com
mbertke@bakerlaw.com

Justin R. Donoho (IL 6299667)
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 4500
Chicago IL 60606-2841
Telephone: 312.416.8198
jdonoho@bakerlaw.com

*Attorneys for Endo Health Solutions Inc. and
Endo Pharmaceuticals Inc.*

*/s/ Charles C. Lifland*
Charles C. Lifland (*admitted pro hac vice*)
Sabrina H. Strong (*admitted pro hac vice*)
Esteban Rodriguez (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
clifland@omm.com
sstrong@omm.com
esrodriguez@omm.com

Amy R. Lucas (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
1999 Avenue Of The Stars
Los Angeles, CA 90067
Telephone: (310) 246-6784

65

Facsimile: (310) 246-6779
alucas@omm.com
Sherry A. Knutson (#6276306)
TUCKER ELLIS LLP
233 South Wacker Drive, Suite 6950
Chicago, Illinois 60606
Telephone: (312) 624-6300
Facsimile: (312) 624-6309
sherry.knutson@tuckerellis.com

*Attorneys for Defendants Janssen*
*Pharmaceuticals, Inc., Johnson &*
*Johnson, Janssen Pharmaceutica, Inc.*
*n/k/a Janssen Pharmaceuticals, Inc., and*
*Ortho-McNeil-Janssen Pharmaceuticals, Inc.*
*n/k/a Janssen Pharmaceuticals, Inc.*

*/s/ Donna Welch*
Donna Welch, P.C.
Timothy W. Knapp
Karl Stampfl
KIRKLAND & ELLIS LLP
300 North LaSalle, Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
donna.welch@kirkland.com
tknapp@kirkland.com
karl.stampfl@kirkland.com

Jennifer G. Levy, P.C. (admitted pro hac vice)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jlevy@kirkland.com

*Attorneys for Allergan plc (f/k/a Actavis plc)*
*and Allergan Finance, LLC (Actavis, Inc.*
*f/k/a Watson Pharmaceuticals, Inc.)*

66

## **TEVA ATTACHMENT A**

## **MDL CUSTODIANS**

| Custodian | Title |
|---|---|
| Aprahamian, Ara | Former Actavis Director, Pricing & Contracts |
| Baldassano, Valli | Former Cephalon Executive Vice President & Chief Compliance Officer |
| Baldino, Frank | Former Cephalon Chief Executive Officer |
| Baran, Nancy | Former Actavis/Teva Executive Director, Customer Relations Operations |
| Barrett, Jeannette | Former Allergan/Actaivs Senior Medical Director |
| Bart, Bryan | Teva Senior Director, New Product Launch, formerly Senior Director of Product Operations at Teva |
| Bearer, Deborah | Teva Pharmaceuticals Director, Health Systems Marketing |
| Boothe, Doug | Former Actavis CEO |
| Boyer, Andy | Former Teva President and CEO of North American Generics, 2016-2018 |
| DaCunha, Lynn | Allergan Principal Global Trade Compliance Specialist, formerly Actavis Senior DEA Affairs Compliance Analyst |
| Caminiti, Joseph | Former Cephalon Inc., Vice President, Sales and Marketing Operations and Effectiveness |
| Clarke, Michael | Former VP of Ethics and Compliance at Actavis |
| Condodina, Cynthia | Teva Pharmaceuticals Director, Commercial Training & Development |
| Day, Matthew | Teva Pharmaceuticals Director, Marketing, CNS & Pain Care Franchises |
| Delgauclio, Joyce | Former Teva Senior Director of Regulatory Affairs |
| DeWildt, Charles | Former Teva Pharmaceuticals Vice President, Regional Payers |
| Diaz, Simon | Teva Pharmaceuticals Director, Regulatory Affairs |
| Doerr, Chris | Teva Pharmaceuticals Vice President, Trade Relations & Distribution Strategy |
| Dorsey, Michael | Teva Director of National Accounts |

67

US 168971952

| | |
|---|---|
| Galant, Rachelle | Former Actavis Senior Product Manager formerly Actavis Product Manager. |
| Geiger, Marianne | Teva Associate Director Trade Customer Service |
| Giella, Angie | Former Actavis Senior Manager, Regulatory Affairs, Labeling |
| Gillenkirk, Corrine | Teva Executive Sales Specialist; formerly Cephalon and then Teva Sales Representative in southern Ohio and northern Kentucky |
| Kaisen, Valerie | Former Teva Sales Representative in northern Ohio and Pennsylvania |
| King, James | Teva Pharmaceuticals Director, US Medical Information |
| Kosich, Richard | Former Cephalon Senior Safety Associate, Pharmacovigilance |
| Kozloski, Gary | Former Actavis Medical Officer |
| Larijani, Susan | Teva Pharmaceuticals Senior Director, Medical Information |
| Leitch, Nathalie | Former Teva Senior Vice President of Portfolio Management |
| Lowney, Karen | Former Teva Pharmaceuticals Senior Director, Global Compliance |
| Marchione, Carol | Former Teva Pharmaceuticals Senior Director and Group Leader for Oncology Regulatory Affairs |
| Martin, Greg | Teva Pharmaceuticals Director, Scientific Information |
| Mathias, Sheila | Teva Pharmaceuticals Director, Regulatory Affairs |
| McCormick, Jinping | Former Actavis Director of Product Marketing |
| McGinn, Colleen | Teva Pharmaceuticals Senior Director, DEA Compliance |
| Megaffin, Scott | Former Cephalon Vice President, Pain Franchise |
| Meyer, Chris | Teva Pharmaceuticals Director, Sales Force Planning & Operations |
| Miley, Dennis | Former Teva Director of North America Drug Safety and Pharmacovigilance |
| Miller, Brandon | Former inVentiv Health Director of Trade Sales and Former Actavis Director, Trade Relations |
| Miller, Scott | Former inVentive Compliance |

US 168971952

| | |
|---|---|
| Miller, Wendy | Former Teva Pharmaceuticals Director, Marketing Insights & Analytics |
| Moore, Tamala Mallett | Former Cephalon Director Risk Management, Regulatory Affairs |
| Morreale, Michael | Cephalon and then Teva Regional Sales Manager; former Cephalon Sales Representative |
| Myers, David | Teva Associate Director of Marketing; former Teva Senior Product Manager |
| Napoli, Tom | Former Associate Director of Controlled Substance Compliance, Actavis, Inc. |
| Narayana, Arvind | Former Teva Pharmaceuticals Senior Global Medical Director |
| Nataline, Terri | Former VP Regulatory and Medical Affairs, Actavis |
| Perfetto, Michael | Former VP Sales and Marketing, Actavis |
| Pientka, Janet | Former Actavis Risk Manager |
| Pyfer, Andrew | Former Cephalon National Sales Director, Pain Care Division |
| Reilly, Jim | Former Teva Pharmaceuticals Vice President, Sales |
| Richardson, Michael | Former Cephalon Senior Director of Product Planning for Pain Franchise |
| Sippial, Laura | Former Cephalon Pain and Care Specialist |
| Spokane, Randy | Former Teva Pharmaceuticals National Sales Director, Pain Care |
| Terifay, Terrance | Former Cephalon Product Director, FENTORA® |
| Thapar, Sarita | Former Actavis Director of Pharmacovigilance Operations |
| Thatcher, Jerri Ann | Former Cephalon Senior Director, Pain Franchise Marketing |
| Tomkiewicz, Joseph | Teva Pharmaceuticals Manager, DEA Compliance |
| Viscosi, Joe | Former Actavis Director and Head of Patient Safety Operations-Global Drug Safety |
| Viscomi, Marcello | Former Actavis Employee, Labeling |
| Walters, Nicola | Former Actavis Director, Regulatory Affairs |
| Warner, Jamie | Teva Pharmaceuticals Vice President, Global Labeling and Brand Management |

US 168971952

| | |
|---|---|
| Wilhelm, Amanda | Teva Pharmaceuticals Associate Director, NeuroPsych and Pain Medical Science Liaison Team |
| Williams, Paula | Teva Pharmaceuticals Director, Medical Education |
| Winkelman, Dan | Former Cephalon Product Manager and Research Manager for ACTIQ® and FENTORA® |
| Woods, Mary | Allergan (formerly Actavis) Executive Director, Customer Relations |

**CUSTODIANS PRODUCED BY THE TEVA DEFENDANTS BY AGREEMENT WITH PLAINTIFFS**[42]

| Custodian | Title |
|---|---|
| Garner, Gregory | Former Sales Representative with Responsibility for Chicago |
| Gopu, Kishore | Teva Pharmaceuticals Director of REMS |
| Hemenway, Michael | Former Area Manager with Responsibility for Chicago |
| Tatum, Chandler | Former Regional Director with Responsibility for Chicago |

**CUSTODIANS PRODUCED BY THE TEVA DEFENDANTS FROM OTHER OPIOID LITIGATIONS**

| Custodian | Title |
|---|---|
| Cunningham, Bill | Former Regional Director with Responsibility for Chicago |
| Glover, Tricia | Former VP and NA Compliance Officer |
| Pansch, Jennifer | Senior Director, Regulatory Affairs |
| Schultewolter, Dieter | Senior Director, Global Medical Lead for CNS |
| Cavanaugh, Maureen | Former Chief Commercial Officer, North America |
| Merris, Geoffrey | Area Manager |

---

[42] Plaintiffs also sought the custodial file of Bill Cunningham, Former Regional Director, and Tricia Glover, Former Vice President and NA Compliance Officer, but those custodians' files had already been produced. The custodial file of Randy Spokane, former Regional Director and Michael Morreale, Former Area Manager, both of whom had responsibility for Chicago, were also produced in MDL Track 1.

70

| | |
|---|---|
| Nikolaus, Matt | Sales Representative |
| Ciampi, Louis | Sales Representative |
| Mara, James | Sales Representative |
| Mears, Denise | Sales Representative |
| Walker, Michael | Sales Representative |
| Grillone, Meghan | Sales Representative |
| Lazarus, Megan | Sales Representative |
| Estrella-Cordova, Illena | Sales Representative |
| Roseman, Scott | Sales Representative |
| Lane, Gregory | Sales Representative |
| Tocco, Phil | Area Manager |
| McMahon, Tim | Sales Representative |
| Sweeney, Tim | Area Manager |
| Collins, Michael | Sales Representative |
| Webster, Leslie | Sales Representative |
| Kramin, Matthew | Area Manager |
| Stuart, David | Area Manager |
| Lally, Shawn | Area Manager |
| Athey, Kelly | Sales Representative |
| Fisher, Tim | Sales Representative |
| Suggs, Muriel | Sales Representative |
| Griggs, Cornelius | Area Manager |
| Rocco, Phil | Area Manager |
| Helak, Gary | Sales Representative |
| Jacobo, Ana | Sales Representative |
| Munafo, Alissa | Sales Representative |
| Oseroff, Marc | Sales Representative |

71

| Robb, Thomas | Sales Representative |
|---|---|

US 168971952

**ATTACHMENT B**

| Custodian | Department | Title | Issue |
|---|---|---|---|
| Ed Burke | City Council / Chicago-Cook Task Force on Heroin | Alderman / Task Force Member | - Temporal scope: Served in his position since 1983, but less than 100 documents per year prior to 2012 produced and no documents dated earlier than 2006 produced<br><br>- Low number of emails sent from custodian |
| Jorge Cardenas | City Council / Chicago-Cook Task Force on Heroin | Alderman / Task Force Member | - Low number of emails sent from custodian |
| Patricia Dowell | City Council / Chicago-Cook Task Force on Heroin | Alderman / Task Force Member | - Low number of emails sent from custodian |
| Ariel Reboyras | City Council / Chicago-Cook Task Force on Heroin | Alderman / Task Force Member | - Low number of emails sent from custodian |
| Mary Daly | Fire | Nurse Practitioner | - Low document count<br><br>- Low number of emails sent from custodian |
| Mark Edinburg | Fire | Commander, Medical Section | - Low document count<br><br>- Low number of emails sent from custodian |
| Roula Johnson | Fire | Case Manager, Medical Section | - Low document count<br><br>- Temporal scope: employee with the City from 2006 to the present, but his custodial file contains less than 100 documents per year from 2011 to 2012 and no documents dated earlier than 2011 |

73

| Hugh Russell | Fire | Medical Director, Emeritus | - Low document count<br><br>- Low number of emails sent from custodian |
| Leslie Stein-Spencer | Fire | Director of EMS Compliance | - Temporal scope: employee of the Chicago Fire Department from 2006 through 2017, but her custodial file only contains emails from January 2014 through June 2017 |
| Elise Horton-Newkirk | Fire | Occupational Health Nurse | - Low document count<br><br>- Low number of emails sent from custodian |
| Isaac Morcos | Fire | Medical Director | - Low document count<br><br>- Low number of emails sent from custodian |
| Daisy Jones | Fire | Nurse Practitioner | - No documents produced |
| Claudia Chavez | Mayor's Office | Deputy Director for Legislative Council and Government Affairs | - Temporal scope: employee in the Chicago Mayor's office from 2014 to 2015, but her custodial file does not contain a single email from those years |
| John F Harris | Office of Budget Management | Budget Director | - No documents produced |
| Bennett Johnson III | Office of Budget Management | Budget Director | - Low document count |
| Eugene Munin | Office of Budget Management | Budget Director | - Low document count |
| Paul Volpe | Office of Budget Management | Budget Director | - Low document count |
| Samantha Fields | Office of Budget Management | Budget Director | - Low number of emails sent from custodian |
| Hootan Bahmandeji | Police | Captain | - Temporal scope: employee with the City from 1999 to 2019, but his custodial file contains less than 100 documents per year from 2008 to |

74

| | | | |
|---|---|---|---|
| | | | 2011 and no documents dated earlier than 2008<br><br>- Low number of emails sent from custodian |
| Matthew Cline | Police | Lieutenant, Narcotics Unit | - Temporal scope: employee with the City from 1992 to the present, but no documents in his custodial file dated earlier than 2008 |
| Paul Gregoire | Police | Sergeant | - Low document count<br><br>- Temporal scope: employee with the City from 1986 to the present, but less than 100 documents produced for each year from 2009 to 2013 and no documents produced dated earlier than 2009 |
| Eileen Guest | Police | Sergeant | - Low document count<br><br>- Temporal scope: employee with the City from 1982 to 2012, but almost no documents produced for each year of her tenure and no documents produced dated earlier than 2007 |
| Cassandra Judon | Police | Lieutenant | - Low document count<br><br>- Temporal scope: employee with the City from 1986 to 2016, but her custodial file only contains documents dated after 2016 |
| Janet Kemper | Police | Sergeant | - Temporal scope: employee with the City from 1990 to the present, but less than 100 documents produced for |

US 168971952

| | | | |
|---|---|---|---|
| | | | each year from 2009 to 2013 and no documents produced dated earlier than 2009 |
| Thomas Lemmer | Police | Commander | - Temporal scope: employee with the City from 1986 to the present, but less than 100 documents produced for each year from 2008 to 2012 and no documents produced dated earlier than 2008<br><br>- Low number of emails sent from custodian |
| Tony Liace | Police | Lieutenant | - Low document count<br><br>- Temporal scope: employee with the City from 1977 to 2010, but his custodial file contains less than 100 documents per year from 2007 to 2010 and no documents dated earlier than 2007 |
| William Looney | Police | Captain | - Temporal scope: employee with the City from 1988 to the present, but less than 100 documents produced for each year from 2009 to 2011 and no documents produced dated earlier than 2009 |
| Steve Pietrzak | Police | Sergeant | - Temporal scope: employee with the City from 1996 to the present, but less than 100 documents produced for each year from 2008 to 2013 and no documents produced dated earlier than 2008 |

US 168971952

| Thomas Risley | Police | Sergeant | - Temporal scope: employee with the City from 1989 to the present, but less than 100 documents produced for each year from 2010 to 2015 and no documents produced dated earlier than 2010 |
| John Thornton | Police | Officer, Narcotics Unit, DEA Task Force | - Temporal scope: employee with the City from 2003 to the present, but less than 100 documents produced for each year from 2012 to 2013 and no documents produced dated earlier than 2012 |
| Greta Ivers | Public Health | Director Substance Abuse Programs | - Low document count<br><br>- Low number of emails sent from custodian |
| Sandra Thomas | Public Health | Director of Epidemiology | - Low document count<br><br>- Low number of emails sent from custodian |

US 168971952

# **EXHIBIT 1**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, | |
| Plaintiff, | |
| v. | Case No. 14-cv-04361 |
| PURDUE PHARMA L.P., et al., | Honorable Jorge L. Alonso |
| Defendants. | Magistrate Judge Young B. Kim |

**DEFENDANTS JANSSEN'S AND J&J'S AMENDED RESPONSES AND OBJECTIONS
TO PLAINTIFF'S THIRD SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Janssen

Pharmaceuticals, Inc., its predecessor companies Ortho-McNeil-Janssen Pharmaceuticals, Inc.

and Janssen Pharmaceutica, Inc. (jointly, "Janssen"), and its parent company Johnson & Johnson

("J&J," and together with Janssen, "Defendants") hereby amend their responses and objections

to Plaintiff City of Chicago's ("Plaintiff" or the "City") Third Set of Interrogatories (the

"Interrogatories") as follows:

**PRELIMINARY STATEMENT**

Defendants make these amended responses and objections in good faith, based on

presently available information and documentation and following a reasonably diligent search

and investigation. The City should not construe these responses and objections to prejudice

Defendants' right to conduct further investigation or to limit their right to utilize any additional

evidence that may be developed. Defendants' discovery, investigation, and preparation for trial is

not yet completed and is continuing as of the date of these objections and responses. Defendants

do not waive any right to modify or supplement their responses and objections to any

Interrogatory, and expressly reserve all such rights. Because discovery is ongoing, Defendants

1

reasonably diligent search using predetermined keyword searches and reviewing the results, and subject to a determination that producing such records would not be unduly burdensome.

**INTERROGATORY NO. 4:**

Identify all Persons with knowledge of Your attempts to influence bills, legislation, regulations or rules regarding the treatment of pain, Formulary coverage of Opioids or access to Health Care Providers or pharmacy stocking, including, but not limited to, lobbying efforts performed by You at the local, state-wide, or nationwide level.

**AMENDED RESPONSE TO INTERROGATORY NO. 4:**

Defendants incorporate their Preliminary Statement and General Objections set forth above. Defendants object to this Interrogatory as vague and ambiguous in its use of the phrase "attempts to influence." Defendants further object to this Interrogatory on the ground that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks information unrelated to Duragesic, Nucynta, or Nucynta ER. Defendants further object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case as it is not limited to Chicago or Illinois but rather uses terms like "local" and "state-wide." Defendants further object to this Interrogatory as vague and ambiguous in its use of the phrase "all Persons with knowledge" and calls for information not necessarily within Defendants' possession, custody, or control. Defendants further object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine, joint defense privilege, or other applicable privileges.

Subject to and without waiving the foregoing, Defendants respond as follows: The following individuals may have knowledge regarding the subject matter of this Interrogatory:

1. **Greg Aronin**. Director, State Government Affairs. This individual may have knowledge relating to Defendants' lobbying activities in the state of Illinois.

2. **Carla Cartwright**. Former Director, Federal Affairs. This individual may have knowledge related to Defendants' federal advocacy efforts.

20

3. **Bruce Colligen**. Executive Director, Health Policy, Government Affairs & Policy. This individual may have knowledge relating to Defendants' Government Affairs department.

4. **Tricia Kinley**. Director, State Government Affairs. This individual may have knowledge relating to Defendants' lobbying activities in the state of Illinois.

5. **Dennis Majeskie**. Senior Director, State Government Affairs. This individual may have knowledge relating to Defendants' lobbying activities in the state of Illinois.

Janssen has utilized the following third parties in connection with lobbying potentially related to opioids:

1. **Alston & Bird LLP**, 950 F Street, NW, Washington, DC 20004

2. **Brownstein Hyatt Farber Schreck, LLP**, 130 I Street, NW, Suite 510, Washington DC 20005

3. **Foley Hoag LLP**, 1717 K Street, NW, Washington, DC 20036

4. **Health Policy Alternatives Inc.**, 400 North Capitol Street NW, Suite 799, Washington, DC 20001

5. **Navigators Global LLC**, 901, 7th Street, NW, Suite 200, Washington DC 20001

6. **Nusgart Consulting LLC**, 5225 Pooks Hill Road, Suite 1626N, Bethusda, MD 20814

7. **Sidley Austin LLP**, 1501 K Street, Washington, DC 20004

8. **The Waldman Group**, 2245 12th Place, NW, Washington, DC 20009

9. **Washington Council, Ernst & Young**, 1150 17th Street, NW, Suite 601, Washington DC 20036

Dated:   October 9, 2020                    Respectfully submitted,

/s/ *Charles C. Lifland*
Charles C. Lifland (*admitted pro hac vice*)
Sabrina H. Strong (*admitted pro hac vice*)
Esteban Rodriguez (*admitted pro hac vice*)
O'MELVENY & MYERS LLP

21

# **EXHIBIT 2**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4    - - - - - - - - - - - - - - - x

 5    IN RE:  NATIONAL              :  HON. DAN A.

      PRESCRIPTION OPIATE              POLSTER

 6    LITIGATION                   :  MDL NO. 2804

 7    APPLIES TO ALL CASES         :  NO. 1:17-MD-2804

 8    - - - - - - - - - - - - - - - x

 9

10                  HIGHLY CONFIDENTIAL

11         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

13                      -   -   -

14                 January, 17, 2019

15                      -   -   -

16

17          Videotaped deposition of CARLA CARTWRIGHT,

18     taken pursuant to notice, held at the law offices of

19     O'Melveny & Myers, LLP, 1625 Eye Street, N.W.,

20     Washington, D.C., beginning at 9:14 a.m., before

21     Misty Klapper, Registered Merit Reporter, Certified

22     Realtime Reporter and Notary Public in and for the

23     District of Columbia.

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. ZIELINSKI:  Can we go off

 2         the record really quick?  I'm having a very

 3         difficult time hearing the witness.  Is it

 4         possible to move the phone closer?

 5                    MR. ACKERMAN:  Yeah.  Let's go

 6         off the record for a minute and we'll try to

 7         fix that.

 8                    VIDEO OPERATOR:  The time is now

 9         9:18 a.m.  We're going off the record.

10                    (Thereupon, a brief recess was

11             taken.)

12                    VIDEO OPERATOR:  The time is now

13         9:20 a.m.  We're back on the record.

14                    BY MR. ACKERMAN:

15             Q.    Okay.  We'll do our best to

16         speak up so that everyone on the phone can

17         hear as well.

18                    Before the break you mentioned

19         that your current position is director of

20         global regulatory affairs; is that correct?

21             A.    I misspoke.  It's director,

22         global regulatory policy.

23             Q.    Got it, regulatory policy.

24                    And how long have you held that
```

```
 1          position?
 2               A.    Since October of 2018.
 3               Q.    When did you join
 4          Johnson & Johnson?
 5               A.    The fall of 2012.
 6               Q.    Okay.  So what positions have
 7          you -- did you hold -- what position did you
 8          hold at Johnson & Johnson prior to being
 9          director of global regulatory policy?
10               A.    Immediately prior I was a
11          director in federal affairs within the
12          government affairs and policy group.
13               Q.    And for how long did you hold
14          that position?
15               A.    Approximately two years.
16               Q.    And prior to being director of
17          federal affairs, what position did you hold?
18               A.    I was a director of global
19          regulatory policy and intelligence within our
20          pharmaceutical sector.
21               Q.    Okay.  And for how long did you
22          hold that position?
23               A.    Approximately four years.
24               Q.    Was that the position you began
```

Highly Confidential - Subject to Further Confidentiality Review

1        in when you joined Johnson & Johnson?

2                A.      It was.

3                Q.      Prior to joining

4        Johnson & Johnson, were you employed somewhere

5        else?

6                A.      I was.

7                Q.      Where?

8                A.      The Food and Drug

9        Administration.

10               Q.      For how long were you at the

11       Food and Drug Administration?

12               A.      Five years.

13               Q.      And what job titles did you hold

14       there?

15               A.      I was an attorney in the office

16       of chief counsel the entire time --

17               Q.      Okay.

18               A.      -- I was there.

19               Q.      At the Food and Drug

20       Administration, did you have any particular

21       specialty or responsibilities?

22               A.      I did.  I was a regulatory

23       counsel focused on drug issues.  So we had

24       what was called a drugs team and I was on that

Highly Confidential - Subject to Further Confidentiality Review

```
 1          team.

 2                  Q.     And when you say drug issues,

 3          are you referring to prescription drugs?

 4                  A.     Matters relating to the Center

 5          for Drug Evaluation and Research.  So CDER was

 6          essentially my client --

 7                  Q.     Okay.

 8                  A.     -- within FDA.

 9                  Q.     And what is CDER?

10                  A.     CDER is the center that reviews

11          applications for drugs, mostly prescription

12          drugs, but they also oversee the

13          over-the-counter monograph and work on, you

14          know, ongoing regulatory issues related to

15          drugs and some biologics.

16                  Q.     Okay.  You mentioned when you

17          joined Johnson & Johnson you were director,

18          global regulatory policy and intelligence in

19          the pharmaceutical sector.

20                         Did -- did I write that down

21          correctly?

22                  A.     Yes.

23                  Q.     Okay.  What is the

24          pharmaceutical sector of Johnson & Johnson?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    A.    Well, Johnson & Johnson is

 2          comprised of three primary sectors.  There's

 3          the consumer group, medical devices, and then

 4          pharmaceuticals.

 5                    Q.    Okay.

 6                    A.    And I was -- I sat within the

 7          pharmaceutical sector.

 8                    Q.    Are you familiar with an entity

 9          called Janssen?

10                    A.    Yes.

11                    Q.    Okay.  And is Janssen a part of

12          Johnson & Johnson?

13                    A.    It is.  It is the pharmaceutical

14          part of Johnson & Johnson.

15                    Q.    Okay.  So Janssen would be

16          included within the pharmaceutical sector --

17                    A.    Yes.

18                    Q.    -- is that correct?

19                    A.    Yes.

20                    Q.    What were your job

21          responsibilities as director of global

22          regulatory policy and intelligence?

23                    A.    I primarily focused on our -- on

24          our oncology business and worked on matters
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              relating to USFDA regulatory issues, did a lot

 2              of work around combination products,

 3              accelerated approvals, expedited pathways,

 4              that kind of thing.

 5                   Q.    Did you have any

 6              responsibilities relative to Duragesic?

 7                   A.    I did not.

 8                   Q.    Okay.  Did you have any

 9              responsibilities relative to Nucynta or

10         Nucynta ER?

11                   A.    I did not.

12                   Q.    Did you have any

13              responsibilities relative to any opioid

14              product manufactured or sold by Janssen?

15                   A.    I did not.

16                   Q.    In that first position, global

17              regulatory policy and intelligence, who did --

18              did you -- did you have a supervisor?

19                   A.    I did.

20                   Q.    And who was that?

21                   A.    David Dorsey.

22                   Q.    And what was Mr. Dorsey's title?

23                   A.    He was a senior director, head

24              of the Americas for the global regulatory
```

```
  1          policy and intelligence group.

  2               Q.     And did you have any direct

  3          reports?

  4               A.     I did not.

  5               Q.     All right.  The next position

  6          you said you held was director of federal

  7          affairs?

  8               A.     Yes.

  9               Q.     And what were your job

 10          responsibilities as director of federal

 11          affairs?

 12               A.     I was, again, on a sort of

 13          pharmaceutical sector team, so I was a

 14          registered lobbyist working on pharmaceutical

 15          issues.  I was primarily focused on our

 16          immunology and oncology businesses and on

 17          matters relating to FDA.

 18               Q.     Okay.  Did you -- as director of

 19          federal affairs, did you have -- or did -- did

 20          you have any responsibilities related to

 21          Duragesic?

 22               A.     I did not.

 23               Q.     And did you, as a registered

 24          lobbyist, do any lobbying on issues related to
```

1    Duragesic?

2            A.    I did lobbying on issues related

3    to opioids generally.

4            Q.    Okay.  And did you do any

5    lobbying on issues related to specifically

6    Nucynta or was it just on issues related to

7    opioids generally?

8            A.    I only lobbied on issues related

9    to opioids generally.

10            Q.    Got it.  And what were those

11    issues?

12            A.    I lobbied on a bill that was

13    called the MOTHER Act -- Maternal Opioid

14    Treatment, Health, Education, and Recovery, I

15    believe -- and I also, you know, monitored and

16    tracked what ultimately became H.R. 6 and the

17    omnibus opioid bill that was passed and signed

18    into law last fall.

19            Q.    Okay.  When was the MOTHER Act

20    introduced?

21            A.    I believe it was first

22    introduced on the House side in -- I don't

23    recall the exact month, but I think in 2017.

24            Q.    Okay.  Can you just describe

1          generally the -- what the MOTHER Act provided

2          for?

3                    A.    Yes.  It was focused on

4          providing a continuum of care for mothers and

5          infants who were exposed to opioids or

6          suffering from neonatal abstinence syndrome.

7                    So it called for implementation

8          of existing SAMHSA guidelines for the

9          treatment of infants who had been exposed to

10         opioids.  It called for better alignment of

11         how expectant women are -- manage pain.  It

12         called for SAMHSA to work with public/private

13         partnerships to address education and stigma

14         issues related to the use of opioids and just

15         generally sort of better coordination and

16         better dissemination of existing guidelines

17         around the use of opioids for pregnant and --

18         and women who might become pregnant.

19                   Q.    Okay.  You said you were a

20         registered lobbyist.  For whom were you

21         registered?

22                   A.    For Johnson & Johnson.

23                   Q.    That's -- and what was

24         Johnson & Johnson's position with respect to

Highly Confidential - Subject to Further Confidentiality Review

```
 1                CERTIFICATE OF NOTARY

 2                   I, MISTY KLAPPER, the officer

 3           before whom the foregoing deposition was

 4           taken, do hereby certify that the witness

 5           whose testimony appears in the foregoing

 6           deposition was duly sworn by me; that the

 7           testimony of said witness was taken by me in

 8           shorthand and thereafter reduced to

 9           typewriting by me; that said deposition is a

10           true record of the testimony given by said

11           witness; that I am neither counsel for,

12           related to, nor employed by any of the parties

13           to the action in which this deposition was

14           taken; and, further, that I am not a relative

15           or employee of any attorney or counsel

16           employed by the parties hereto, nor

17           financially or otherwise interested in the

18           outcome of this action.

19                   _____

                     Misty Klapper

20                   Notary Public in and for

                     the District of Columbia

21

22

23

24
```

# **EXHIBIT 3**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4                        -   -   -
 5    IN RE:  NATIONAL    :  MDL NO. 2804
      PRESCRIPTION OPIATE :
 6    LITIGATION          :
      ----------------------------------------
 7                        :  CASE NO.
      THIS DOCUMENT        :  1:17-MD-2804
 8    RELATES TO ALL CASES:
                           :  Hon. Dan A.
 9                        :  Polster
10                        -   -   -
             Tuesday, January 22, 2019
11                        -   -   -
12    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                          -   -   -
14
                   Videotaped deposition of
15    BRUCE COLLIGEN, taken pursuant to notice,
      was held at law offices Drinker Biddle
16    and Reath, LLP, 105 College Road, East
      Suite 300, Princeton, New Jersey 08542,
17    beginning at 10:05 a.m., on the above
      date, before Amanda Dee Maslynsky-Miller,
18    a Certified Realtime Reporter.
19                        -   -   -
20
21
22
              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

1  force?

2          A.    Yes, there is.

3          Q.    And does the Ohio state task

4  force cover simply Ohio, or does it cover

5  a region?

6          A.    It would cover Ohio

7  activities.

8          Q.    Did you speak with any

9  members of the Ohio state task force

10  before coming to this deposition today?

11          A.    Related to the deposition?

12          Q.    Sure.

13          A.    No.

14          Q.    Do you speak with members of

15  the Ohio state task force?

16          A.    I speak to our lobbyist who

17  covers Ohio, and other states.  I talk to

18  all our lobbyists.

19          Q.    And is that a large part of

20  your job?

21          A.    It's a -- it's a part of my

22  job.  I typically allow them to contact

23  me if they have questions related to

24  policy.

Highly Confidential - Subject to Further Confidentiality Review

1                    CERTIFICATE

2

3

4              I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the

7    testimony given by the witness.

8

9

10

        Amanda Maslynsky-Miller

11      Certified Realtime Reporter

        Dated:  January 23, 2019

12

13

14

15

16

17             (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24

# Bruce H. Colligen

**1206 Glen Ridge Drive**
**Glassboro, NJ 08028**
**908-581-9536**

## Professional

Johnson & Johnson    1996 - present
New Brunswick, NJ

Executive Director, Health Policy (2001 – 2006, 2008 – 2012)
Health Policy, Government Affairs and Policy

- Created and co-chaired J&J State Policy Council, a cross company forum for policy issue review to evaluate policy impact on business
- Manage health care compliance for GA&P which includes oversight of internal audit, management action plan (MAP), policy development, education and training
- Develop policy positions for comparative effectiveness research, evidence based medicine (EBM), marketing practices, health information technology and mental health parity
- Co-leader on Medicaid rebate negotiations (1999 - 2003) with state third party administrators for J&J enterprise.
- Facilitated a global monthly EBM call to discuss government policy initiatives to leverage corporate best practices

Executive Director, State Policy (2006 – 2007, 2012 - present)
State Government Affairs, Government Affairs and Policy

- Evaluate legislative/regulatory initiatives and recommend strategic direction to State Government Affairs field directors
- Develop talking points, prepare comments  policy counsel for state government affairs lobbyists
- Designed a new policy model to address the gaps in field policy support

Director, State Government and Issue Management (1996 – 2001)
State Government Affairs, Government Affairs and Policy

- Managed four professionals in support of State Government Affairs organization
- Designed, implemented and managed issue management department
- Created the state mental health issues forum consisting of state mental health officials to facilitate the discussion of key policy issues
- Lobbied state legislatures and regulatory agencies as needed

Exhibit    004

JANSSEN

WITNESS: **COLLIGEN**

DATE: **1/22/19**

REPORTER: Amanda Miller CRr

- Standards of Leadership award for successfully leading Medicaid rebate activities with Michigan Medicaid resulting in over $5 million in savings
- Promoted to Executive Director in 2000

National Pharmaceutical Council
Reston, Virginia

Vice President, Health Programs (1991- 1996)

- Editor, *Pharmaceutical Benefits Under State Medical Assistance Programs,* annual reference compilation of state Medicaid programs
- Chairman of NPC Health Programs Committee which is comprised of government affairs directors for 20 research based pharmaceutical companies
- Project leader on various research projects related to access to medicines

State and Federal Associates (1989 – 1991)
Alexandria, Virginia

Project Director

- Designed programs to improve pharmacy reimbursement for branded products
- Consulted with state Medicaid programs on behalf of clients to provide product access
- Managed Patient Assistance programs for clients
- Managed client projects for Abbott Laboratories, Pfizer, Serono, Allergan

National Association of Chain Drug Stores, Inc. (1981 – 1989)
Alexandria, VA

Director of Special Projects, (1981 – 1984), Director of Health Programs (1984 – 1989)

- Conducted economic analysis on implications of managed care on drug store sales
- Chaired Accounting Practices committee
- Managed pharmaceutical marketing trade show exhibits
- Created and composed association newsletters
- Conducted studies as requested

**<u>Education</u>**
Masters of Business Administration, 1981
The George Washington University
Washington, D.C.

Bachelor of Arts, Government with Business minor, 1979
Lehigh University
Bethlehem, Pennsylvania


Executive Certificate of Management, 1985
Cornell University
Ithaca, NY

Health Care Compliance Certification, 2011
Seton Hall School of Law
Newark, NJ

**References:** furnished upon request

# **EXHIBIT 4**

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| City of Chicago | |
| *Plaintiff*, | Case No. 14-cv-04361 |
| v. | Honorable Jorge L. Alonso |
| Purdue Pharma L.P. et al., | |
| *Defendants*. | |

**RESPONSES AND OBJECTIONS OF DEFENDANTS**
**TEVA PHARMACEUTICALS USA, INC., CEPHALON, INC., WATSON**
**LABORATORIES, INC., ACTAVIS LLC, AND ACTAVIS PHARMA, INC. TO**
**PLAINTIFF'S THIRD SET OF REQUESTS FOR PRODUCTION TO THE TEVA**
**DEFENDANTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants Cephalon, Inc.
and Teva Pharmaceuticals USA, Inc. (collectively, "Teva") and Watson Laboratories, Inc.,
Actavis LLC, and Actavis Pharma, Inc. (collectively, the "Teva-Acquired Actavis Entities")
(Teva and the Teva-Acquired Actavis entities are referred to collectively as the "Teva
Defendants"), by and through their undersigned counsel, hereby provide the following
Responses and Objections ("Responses") to Plaintiff's Third Set of Requests For Production to
the Allergan, Endo, Janssen, and Teva Defendants, served by Plaintiff City of Chicago
("Plaintiff" or "City"), and state as follows:

**PRELIMINARY STATEMENT**

1.      The Responses are made solely for the purpose of the above-captioned action and
are not to be used in connection with any other action.

2.      The Responses are based on documents and information available to the Teva
Defendants at this time, and reflect the Teva Defendants' knowledge, information, and belief as

of the date of the Responses. The Responses are true and correct to the Teva Defendants' best knowledge as of this date.

3.　　The Teva Defendants may engage in further investigation, discovery, and analysis, which may lead to changes in the Teva Defendants' Responses herein. Such investigation and discovery are continuing, and the Responses are given without prejudice to the Teva Defendants' right to produce evidence of any subsequently-discovered facts, documents, or interpretations thereof, or to supplement, modify, change, or amend the Responses, and to correct for errors, mistakes, or omissions. Reference in the Responses to a preceding or subsequent response incorporates both the information and the objections set forth in the referred-to response.

4.　　The Teva Defendants will make reasonable efforts to respond to every Request, to the extent the Request has not been objected to, as the Teva Defendants understand and interpret the Request. In the event that Plaintiff subsequently asserts an interpretation of an Request that differs from that of the Teva Defendants, the Teva Defendants reserve the right to amend and/or supplement their Response, but undertake no obligation to do so.

5.　　In responding to the Requests, the Teva Defendants do not waive, and hereby expressly reserve: (a) their right to assert any objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence, for any purpose, of any information produced in response to the Requests; (b) their right to object on any ground to the use of the information produced in response to the Requests at any hearing, trial, or other point during the litigation; and (c) their right to object on any ground at any time to a demand for further responses to the Requests.

6.      No incidental or implied admissions are intended in these Responses. That the Teva Defendants have responded to all or any part of a Request should not be taken as, and indeed does not constitute, an admission that the Teva Defendants accept or admit the existence of any fact set forth or assumed by the Request or that the Teva Defendants' Responses constitute admissible evidence. That the Teva Defendants have responded to all or any part of a Request also is not intended to be, and indeed does not constitute, a waiver by the Teva Defendants of all or any part of its objection(s) to the Request.

7.      References herein to documents previously produced in *In Re: National Prescription Opiate Litigation* (MDL No. 1:17-md-02804, N.D. Ohio) ("MDL 2804") or any other litigation shall not be construed as an admission by the Teva Defendants that all such previously produced documents are, or any individual previously produced document is, responsive to these Requests, relevant to any claims in this litigation, or likely to lead to the discovery of relevant or admissible evidence.

8.      The following Objections to Definitions and Instructions apply to each and every one of the Requests, and should be considered part of the Teva Defendants' response to each and every one of the Requests. Any specific objections provided below are made in addition to these Objections to Definitions and Instructions, and failure to reiterate an Objection to Definitions and Instructions below does not constitute a waiver or limitation of that or any other objection.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      The Teva Defendants hereby assert the following Objections to Definitions and Instructions, which are hereby incorporated into each of the specific responses and objections to the Requests set forth below.

3

2.     The Teva Defendants object to the definition of "Chargeback" due to its incorporation of the defined terms "Direct Customer," "Opioid Product," and "Downstream Customer."

3.     The Teva Defendants object to Plaintiff's definition of "Chicago" on the grounds that it is overbroad and unduly burdensome, seeks information that is not relevant to the claims or defenses of any party, and is not proportional to the needs of the case because it purports to include "the Chicago Metropolitan Statistical Area, as defined by the United States Census Bureau" ("Chicago MSA"), which currently includes fourteen counties spanning three states and over 500 zip codes. The Teva Defendants further object to the definition of "Chicago" as vague and ambiguous because the boundaries of the Chicago MSA have changed multiple times between January 1, 2004 and the present.

4.     The Teva Defendants object to the definitions of "Communication"  and "Communicated" as calling for the search and collection of sources like "MySpace," "Twitter," and "shared applications from cell phones" that would be unduly burdensome, overbroad, and not proportional to the needs of the case.

5.     The Teva Defendants object to the Plaintiff's definition of "Concerning" on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome because it is not limited by time, scope, or subject matter.

6.     The Teva Defendants object to Plaintiff's definition of "Describe" to the extent that it purports to require information not reasonably calculated to lead to the discovery of admissible evidence and to the extent it purports to impose upon the Teva Defendants any obligation inconsistent with the Federal Rules of Civil Procedure.

7.      The Teva Defendants object to the definition of "Direct Customer" to the extent it means "other customer" as vague, ambiguous, and overbroad. The Teva Defendants object to the definition of "Direct Customer" due to its incorporation of the defined term "Opioid."

8.      The Teva Defendants object to the definition of "Diversion" on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome.  The Teva Defendants also object on the ground that the definition assumes that the Teva Defendants can or do control or know how any opioid product is channeled or used and the purpose for any "unlawful channeling" or "use" of controlled substances.  The Teva Defendants further object to the definition of "Diversion" to the extent that it includes information about controlled substances that are not opioids or opioid products.

9.      The Teva Defendants object to the definition of "Document" on the grounds that it is overbroad and unduly burdensome to the extent it purports to impose upon the Teva Defendants any obligation inconsistent with the Federal Rules of Civil Procedure.

10.     The Teva Defendants object to the definition of "Downstream Customer" to the extent it means "customer of the Direct Customer that purchased Opioids from the Direct Customer" on the grounds that it is vague, ambiguous, and overbroad.  The Teva Defendants further object on the ground that this definition purports to require the Teva Defendants to produce information outside the knowledge, possession, custody, or control of the Teva Defendants. The Teva Defendants object to the definition of "Downstream Customer" due to its incorporation of the defined terms "Opioid" and "Direct Customer."

11.     The Teva Defendants object to the definition of "Employee" on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome, in part because it purports to

encompass "former salaried employees" and "independent contractors" outside of the Teva Defendants' direction or control.

12.     The Teva Defendants object to the definition of "Identify" when used with respect to corporate entities on the grounds that it seeks irrelevant information, is overbroad and unduly burdensome and purports to require the Teva Defendants to produce information outside the possession, custody, or control of the Teva Defendants and to the extent it purports to impose upon the Teva Defendants any other obligation inconsistent with the Federal Rules of Civil Procedure..

13.     The Teva Defendants object to the definition of "Identify" when used with respect to documents on the grounds that it seeks irrelevant information, is overbroad and unduly burdensome and purports to require the Teva Defendants to produce information outside the possession, custody, or control of the Teva Defendants and to the extent it purports to impose upon the Teva Defendants any other obligation inconsistent with the Federal Rules of Civil Procedure.

14.     The Teva Defendants object to the definition of "Identify" when used with respect to communications on the ground that it seeks irrelevant information, is overbroad and unduly burdensome, and purports to require the Teva Defendants to produce information outside the possession, custody, or control of the Teva Defendants.

15.     The Teva Defendants object to the definition of "Identify" when used with respect to an order on the ground that it seeks irrelevant information, is overbroad and unduly burdensome, and purports to require the Teva Defendants to produce information outside the possession, custody, or control of the Teva Defendants.

16.     The Teva Defendants object to the definition of "Identify" when used with respect to persons on the grounds that it seeks irrelevant information, is overbroad and unduly burdensome, and purports to require the Teva Defendants to produce information outside the possession, custody, or control of the Teva Defendants. In particular, the Teva Defendants object to the definition of "Identify" to the extent it purports to require the Teva Defendants to provide any person's present or last known address and present or last known place of employment.

17.     The Teva Defendants object to the definition of the term "Lobbying" on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome, particularly to the extent that it refers to the unidentified terms "special interest groups," "consultants," "advertising agencies," and "politically affiliated organizations," "influence," and "combat."

18.     The Teva Defendants object to Plaintiff's definition of "Marketing" and "Marketing Activity" to the extent that it means efforts "any effort undertaken with the goal, at least in part, of influencing Opioid prescriptions" as vague, ambiguous, and overbroad. The Teva Defendants further object to this definition as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it includes marketing of generic opioid products.  The Teva Defendants did not promote or market generic opioid products other than to announce their pricing and availability.  The Teva-Acquired-Actavis entities did not promote, market, or sell any branded opioid product. The Teva Defendants will provide information relating to Schedule II opioids that they sold, including ACTIQ® and FENTORA®. Any information provided by the Teva Defendants relating to those products in response to requests for information about "Marketing" and "Marketing Activity" does not mean that these products were promoted for or used for the treatment of Chronic, non-cancer pain or any other use beyond that which has expressly been approved by the FDA. The Teva Defendants further object to

Plaintiff's definition of "Marketing" and "Marketing Activity" to the extent that it includes "CME."

19.     The Teva Defendants object to Plaintiff's definition of "Marketing Material" as vague, ambiguous, and overbroad because it includes without limitation "a Document intended to be presented or disseminated for Marketing purposes." The Teva Defendants further object to this definition on the grounds that it is vague and ambiguous because it inaccurately characterizes documents related to CMEs as marketing materials. The Teva Defendants further object to Plaintiff's definition of "Marketing Material" due to its incorporation of the defined terms "Documents" and "Marketing." The Teva Defendants will provide documents related to the marketing of Schedule II opioids sold by the Teva Defendants, including ACTIQ® and FENTORA®.

20.     The Teva Defendants object to the definition of "Opioids" on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous. The Teva Defendants will provide information relating to their Schedule II opioid products, including ACTIQ® (fentanyl citrate) oral transmucosal lozenge CII and FENTORA® (fentanyl buccal tablet) CII. ACTIQ® and FENTORA® are each FDA-approved opioid agonists indicated for the management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. Patients considered opioid tolerant are those who are taking, for one week or longer, around-the-clock medicine consisting of at least 60 mg of oral morphine per day, at least 25 mcg of transdermal fentanyl per hour, at least 30 mg of oral oxycodone per day, at least 8 mg of oral hydromorphone per day, at least 25 mg of oral oxymorphone per day, at least 60 mg of oral hydrocodone per day, or an equianalgesic dose of another opioid daily for a week or longer. Patients must remain on

8

around-the-clock opioids while taking ACTIQ® or FENTORA®. The generic opioid products sold by the Teva Defendants are each FDA-approved generic versions of branded opioid products that were also approved by the FDA, and the indication for each generic opioid product speaks for itself.

21.　　Any information provided by the Teva Defendants in response to any Request about "Opioids" does not mean that their products were inappropriately marketed or that ACTIQ® or FENTORA® were promoted for any other use beyond that which has expressly been approved by the FDA, nor does it suggest that the Teva Defendants ever promoted, marketed, or sold any Opioids in Chicago. The Teva Defendants also object to any implication or presupposition that they can or do control or know how any Opioid product is used once prescribed.

22.　　The Teva Defendants object to the definition of "Order" due to its incorporation of the defined terms "Opioid" and "Opioid Products."

23.　　The Teva Defendants object to the definition of "Person" to the extent it purports to impose obligations to produce information outside of the Teva Defendants' knowledge, possession, custody, and control

24.　　The Teva Defendants object to the definition of the term "Prescribers" on the grounds that it is overbroad and unduly burdensome, particularly to the extent that it refers to the unidentified term "authority" and the undefined phrase "the authority to direct or advise others to write prescriptions." The Teva Defendants further object to this Request to the extent that it purports to suggest that persons within this definition have "the authority to direct or advise others to write prescriptions."

25.     The Teva Defendants object to the definition of "Prescribers" on the grounds that it is overbroad and unduly burdensome to the extent it purports to impose upon the Teva Defendants any obligation inconsistent with the Federal Rules of Civil Procedure.

26.     The Teva Defendants object to the definition of "Procedures" on the grounds that it is overbroad and unduly burdensome to the extent it purports to impose upon the Teva Defendants any obligation inconsistent with the Federal Rules of Civil Procedure.

27.     The Teva Defendants object to the definition of "Suspicious Order" to the extent it purports to be "defined by DEA." DEA has not defined the term "suspicious order" and Plaintiff does not identify one. The Teva Defendants further object to the definition of "Suspicious Order" due to its incorporation of the defined terms "Opioid" and "Opioid Products."

28.     The Teva Defendants object to the definition of "Transactional Data" to the extent it "means data concerning to the sale or distribution of Opioids" as vague, ambiguous, and overbroad. The Teva Defendants further object on the ground that this definition purports to require the Teva Defendants to produce information outside the knowledge, possession, custody, or control of the Teva Defendants. The Teva Defendants further object to the definition of "Transactional Data" due to its incorporation of the defined term "Opioid."

29.     The Teva Defendants object to Plaintiff's definition of "You" and "Your" on the grounds that it is vague and/or ambiguous, overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence, and thus outside the scope of permissible discovery because it purports to encompass, without limitation, "all affiliated entities, including any predecessor, successor, domestic or foreign parent, wholly or partially owned subsidiary, division, d/b/a, partnership, and joint venture." The Teva Defendants further object to Plaintiff's

10

definition of "You" and "Your" as vague and/or ambiguous, overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence, and thus outside the scope of permissible discovery because it purports to encompass, without limitation, "all owners, officers, agents, and employees of such entities, and other persons acting or authorized to act on their behalf." The Teva Defendants interpret the terms "You" and "Your" as used in these Requests to refer only to the Teva Defendants. The Teva Defendants will only produce documents in the possession, custody, or control of the Teva Defendants.

30.     The Teva Defendants object to the time period of "1995 to the present" on the grounds that it is overbroad and unduly burdensome because it requires them to produce documents that are outside the relevant statute(s) of limitations, not relevant to the claims in the Complaint, and are not likely to lead to the discovery of relevant evidence. Unless otherwise stated, the Teva Defendants will respond to the Requests for the time period of January 1, 2006 until August 31, 2016. Moreover, the Teva Defendants expressly state that the re-production of documents from MDL 2804 or any other litigation does not in any way limit, waive, or modify this objection.

31.     The Teva Defendants further object to the Requests to the extent they seek documents or information the disclosure of which is governed by a protective order entered into by the court. The Teva Defendants will produce such documents and information only after complying with, and in compliance with, the terms of such a protective order.

32.     The Teva Defendants object to the Requests to the extent that they are duplicative.

## REQUESTS FOR PRODUCTION

**Request No. 1:**

All Transactional Data, including but not limited to Chargeback data and inventory reports, related to Opioids in Chicago.

**Response to Request No. 1:**

The Teva Defendants incorporate their Preliminary Statement and Objections to Definitions and Instructions.  The Teva Defendants further object to this Request on the grounds that the Request is overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence because it seeks "all" transactional data related to opioids in Chicago, no matter how tangential the relation to the claims and defenses raised in the case.  The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks any document that does not reflect actual sales of opioid products by the Teva Defendants in Chicago. The Teva Defendants further object to this Request on the grounds that the undefined terms "data" and "inventory reports" are vague and ambiguous and do not have readily ascertainable meanings. The Teva Defendants further object to this Request on the grounds that it is not reasonably limited as to time.

Subject to and without waiver of the foregoing objections the Teva Defendants refer Plaintiff to documents previously produced by the Teva Defendants to Plaintiff in this litigation and MDL 2804.

**Request No. 2:**

To the extent You limited Your Document production in CT1 to Documents referring to, relating to, or concerning the geographic boundaries of CT1, all responsive Documents to those Requests that refer to, relate to, or concern Chicago.

**Response to Request No. 2:**

The Teva Defendants incorporate their Preliminary Statement and Objections to Definitions and Instructions.  The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of

admissible evidence because it seeks information regarding "all" responsive documents to the

CT1 requests that refer to, relate to, or concern Chicago, no matter how tangential the relation to

the claims and defenses at issue in the case.  The Teva Defendants further object to this Request

as vague and ambiguous because it fails to describe the documents sought with reasonable

particularity as required Federal Rule of Civil Procedure 34(b).  The Teva Defendants further

object to this Request as overbroad and unduly burdensome to the extent that it purports to

incorporate all document or other discovery requests from MDL 2804.  To the extent that

Plaintiff purports to incorporate all such requests from MDL 2804 in this Request, the Teva

Defendants incorporate each and every objection in their responses to those requests as if stated

here.  The Teva Defendants further object to this Request on the grounds that the undefined

terms "referring to," "related to," and "boundaries" are vague and ambiguous and do not have

readily ascertainable meanings. The Teva Defendants further object to this Request on the

grounds that it is not reasonably limited as to time.

Subject to and without waiver of the foregoing objections, the Teva Defendants state that

they did not limit their document production in CT1 based on geographic boundaries.

**Request No. 3:**

All Documents that reflect or related to Marketing Materials disseminated or presented
by You in the City of Chicago that concern Opioids or pain, as well as all databases,
spreadsheets, or other tracking systems identifying and tracking the Orders for and dissemination
and presentation of Marketing Materials, including all systems tracking page views of electronic
marketing.

**Response to Request No. 3:**

The Teva Defendants incorporate their Preliminary Statement and Objections to

Definitions and Instructions.  The Teva Defendants further object to this Request on the grounds

that it is overbroad, unduly burdensome, and not likely to lead to the discovery of relevant

evidence because it seeks descriptions of "all" documents that reflect or related to marketing materials disseminated or presented by the Teva Defendants in the City of Chicago that concern opioids or pain, as well as all databases, spreadsheets, or other tracking systems identifying and tracking the orders for and dissemination and presentation of marketing materials, no matter how tangential the relation to the claims and defenses raised in the case. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks documents related to the marketing of generic opioid products, about which Plaintiff has not made allegations against the Teva Defendants. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "databases" or other document sources that house documents disseminated or presented by the Teva Defendants, rather than or in addition to the documents that were disseminated or presented themselves. The Teva Defendants further object to this Request on the grounds that the undefined terms "presented," "disseminated," "databases," "tracking systems," "page views," and "electronic marketing" are vague and ambiguous and do not have readily ascertainable meanings. The Teva Defendants further object to this Request on the grounds that it is not reasonably limited as to time.

Subject to and without waiver of the foregoing objections the Teva Defendants state that they have not promoted or otherwise marketed generic opioid products other than to announce their pricing and availability and that the Teva-Acquired Actavis Entities have not promoted, marketed, or sold any branded opioid product.  The Teva Defendants further refer Plaintiff to documents previously produced by the Teva Defendants to Plaintiff in this litigation and MDL 2804.

14

**Request No. 4:**

All Documents that reflect or relate to Marketing Activities by You in the City of Chicago that concern Opioids or pain, as well as all databases, spreadsheets, or other tracking systems identifying those activities. For speaker programs, CMEs, conventions and other presentations and activities, this request includes but is not limited to Identifying speakers and participants, date and location, materials presented or disseminated, participant impressions, and Documents concerning discussions of off-label uses of products. All Documents concerning speaker programs in Chicago, including but not limited to Documents concerning and identifying all speakers or key opinion leaders, standards for selection and retention, attendee impressions, and Documents concerning off-label discussions before and after the programs.

**Response to Request No. 4:**

The Teva Defendants incorporate their Preliminary Statement and Objections to Definitions and Instructions. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence because it seeks "all" documents that reflect or relate to marketing activities by the Teva Defendants in the City of Chicago that concern opioids or pain, as well as "all" databases, spreadsheets, or other tracking systems identifying those activities, no matter how tangential the relation to the claims and defenses raised in the case. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks documents related to the marketing of generic opioid products, about which Plaintiff has not made allegations against the Teva Defendants. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "databases" or other document sources that house documents related to marketing activities, rather than or in addition to the documents that relating to marketing activities themselves. The Teva Defendants further object to this Request on the grounds that the undefined terms "databases," "tracking systems," "presentations," "participants," "dissemination," "impressions," "discussions,"

"standards for selection and retention," and "Formulary Coverage" are vague and ambiguous and do not have readily ascertainable meanings. The Teva defendants understand "Formulary coverage" to mean eligibility for reimbursement by a federal, state, or local government. The Teva Defendants further object to this Request on the grounds that it is not reasonably limited as to time or scope.

Subject to and without waiver of the foregoing objections the Teva Defendants state that they have not promoted or otherwise marketed generic opioid products other than to announce their pricing and availability and that the Teva-Acquired Actavis Entities have not promoted, marketed, or sold any branded opioid product. The Teva Defendants further refer Plaintiff to documents previously produced by the Teva Defendants to Plaintiff in this litigation and MDL 2804.

**Request No. 5:**

Documents and Communications concerning Marketing conducted by You or on Your behalf to Formularies, including placement of Your Opioids on Formularies covering Chicago, and all Documents and Communications conveying any changes to Formulary status to Chicago Healthcare Providers, including but not limited to, promotional pieces, videos, voucher and co-payment cards, refill and adherence or compliance programs, telephone call scripts, sales scripts, sales training materials and quizzes, videos, and presentations used on sales calls.

**Response to Request No. 5:**

The Teva Defendants incorporate their Preliminary Statement and Objections to Definitions and Instructions. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence because it seeks without limitation documents and communications concerning Marketing conducted by the Teva Defendants or on the Teva Defendants' behalf to formularies, no matter how tangential the relation to the claims and defenses raised in the case. The Teva Defendants further object to this Request to the extent that it characterizes the activities

16

described in this Request as "marketing." The Teva Defendants further object to this Request on the grounds that the undefined terms "covering," "promotional pieces," "voucher," "co-payment cards," "adherence or compliance programs," "call scripts," "sales scripts," "quizzes," and "presentations" are vague and ambiguous and do not have readily ascertainable meanings. The Teva Defendants further object to this Request on the grounds that it is not reasonably limited as to time.

Subject to and without waiver of the foregoing objections the Teva Defendants state that they have not promoted or otherwise marketed generic opioid products other than to announce their pricing and availability and that the Teva-Acquired Actavis Entities have not promoted, marketed, or sold any branded opioid product. The Teva Defendants further refer Plaintiff to documents previously produced by the Teva Defendants to Plaintiff in this litigation and MDL 2804.

**Request No. 6:**

All audit, investigatory, or due diligence files for each of Your Direct Customers and Downstream Customers in Chicago and Your Direct Customers that shipped Your Opioid Products to Downstream Customers in Chicago. Please Identify the Documents that correspond to each due diligence file and indicate which due diligence file correlates to which customer.

**Response to Request No. 6:**

The Teva Defendants incorporate their Preliminary Statement and Objections to Definitions and Instructions. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence because it seeks "all" audit, investigatory, or due diligence files for each of the Teva Defendants' direct customers and downstream customers in Chicago and the Teva Defendants' direct customers that shipped the Teva Defendants' opioid products to downstream customers in Chicago, no matter how tangential the relation to the claims and defenses raised in the case. The

Teva Defendants further object to this Request to the extent it incorrectly ascribes or purports to apply any duty on the Teva Defendants with respect to "Downstream Customers." The Teva Defendants further object to this Request on the grounds that it purports to impose a requirement to identify documents for Plaintiff that is inconsistent with Federal Rule of Civil Procedure 34(b). The Teva Defendants further object to this Request on the grounds that the undefined terms "audit," "investigatory," "due diligence files," and "shipped" are vague and ambiguous and do not have readily ascertainable meanings. The Teva Defendants further object to this Request on the grounds that it is not reasonably limited as to time.

Subject to and without waiver of the foregoing objections the Teva Defendants refer Plaintiff to documents previously produced by the Teva Defendants to Plaintiff in this litigation and MDL 2804.

**Request No. 7:**

All Documents referencing, relating, or concerning Diversion of Opioids into or out of Chicago, or affecting Chicago, including records of all calls to security hotlines or intranet reports and all completed reports of concern or suspected Diversion reporting forms and reviews of Chicago Health Care Providers' or pharmacies' data.

**Response to Request No. 7:**

The Teva Defendants incorporate their Preliminary Statement and Objections to Definitions and Instructions. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence because it seeks "all" documents referencing, relating, or concerning diversion of opioids into or out of Chicago, or affecting Chicago, no matter how tangential the relation to the claims and defenses raised in the case. The Teva Defendants further objet to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks any document related to any diversion of opioids that did not result in illicit

18

use of opioids in Chicago. The Teva Defendants further object to this Request on the grounds that the undefined terms "into or out of," "security hotlines," "intranet reports," "completed reports," "reporting forms," and "reviews" are vague and ambiguous and do not have readily ascertainable meanings. The Teva Defendants further object to this Request on the grounds that it is not reasonably limited as to time.

Subject to and without waiver of the foregoing objections the Teva Defendants refer Plaintiff to documents previously produced by the Teva Defendants to Plaintiff in this litigation and MDL 2804.

**Request No. 8:**

Documents concerning each Order in Chicago that You investigated, flagged, blocked, held or reported for suspicious of actual or potential Diversion.

**Response to Request No. 8:**

The Teva Defendants incorporate their Preliminary Statement and Objections to Definitions and Instructions.  The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence because it seeks documents concerning "each" order in Chicago that the Teva Defendants investigated, flagged, blocked, held or reported for suspicious of actual or potential diversion, no matter how tangential the relation to the claims and defenses raised in the case. The Teva Defendants further object to this Request to the extent that it incorrectly ascribes or purports to apply any obligation on the Teva Defendants that is inconsistent with federal or state laws or regulations regarding the diversion of controlled substances. The Teva Defendants further object to this Request on the grounds that the undefined terms "investigated," "flagged," "blocked," "held," "reported," "suspicious of actual or potential Diversion," and "potential Diversion" are vague and ambiguous and do not have readily ascertainable meanings. The Teva

19

Defendants further object to this Request on the grounds that it is not reasonably limited as to time.

Subject to and without waiver of the foregoing objections the Teva Defendants refer Plaintiff to documents previously produced by the Teva Defendants to Plaintiff in this litigation and MDL 2804.

**Request No. 9:**

All Documents and Communications related to any attempt to effect or influence bills, legislation, regulations, or rules regarding the treatment of pain, Formulary coverage of Opioids or Your access to Health Care Providers or pharmacy stocking, including, but not limited to, lobbying efforts performed by You at the local, state-wide, or nationwide level.

**Response to Request No. 9:**

The Teva Defendants incorporate their Preliminary Statement and Objections to Definitions and Instructions. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence because it seeks "all" documents and communications related to any attempt to effect or influence bills, legislation, regulations, or rules regarding the treatment of pain, formulary coverage of opioids or the Teva Defendants' access to health care providers or pharmacy stocking, no matter how tangential the relation to the claims and defenses raised in the case. The Teva Defendants further object to this Request on the grounds that the undefined terms "attempt," "effect," "rules," "Formulary coverage," "access," "pharmacy stocking," and "lobbying efforts" are vague and ambiguous and do not have readily ascertainable meanings. The Teva Defendants further object to this Request on the grounds that it is not reasonably limited as to time or geographic scope.

20

Subject to and without waiver of the foregoing objections the Teva Defendants refer Plaintiff to documents previously produced by the Teva Defendants to Plaintiff in this litigation and MDL 2804.

**Request No. 10:**

The complete human resources files, employment files, custodial files, and any other individual files of each of Your sales representatives, district, area, regional and national managers, and compliance personnel who worked in, had contact with, or had responsibilities related to Chicago. This request includes but is not limited to all performance reviews, bonus and salary information and payments, targeting reports, field activity or contact reports, sales call notes and reports, training materials and guidances, disciplinary records, exit interviews, and Marketing Materials ordered and received by each sales representative.

**Response to Request No. 10:**

The Teva Defendants incorporate their Preliminary Statement and Objections to Definitions and Instructions. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not likely to lead to the discovery of relevant evidence because it seeks "all" persons with knowledge of the claims in Plaintiff's complaint or the Teva Defendants' defenses, no matter how tangential the relation to the claims and defenses raised in the case. The Teva Defendants further object to this Request on the grounds that it is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks various types of documents that are irrelevant to Plaintiff's claims. The Teva Defendants further object to this Request on the grounds that the undefined terms "human resources files," "employment files," "custodial files," "individual files," "worked in," "had contact with," "responsibilities," "performance reviews," "salary information," "targeting reports," "field activity," "contact reports," "guidances," and "ordered" are vague and ambiguous and do not have readily ascertainable meanings. The Teva Defendants further object to this Request on the grounds that it is not reasonably limited as to time.

21

Subject to and without waiver of the foregoing objections, the Teva Defendants state that they will produce documents in accordance with the agreement that the parties have reached regarding the Teva Defendants' obligations to produce such files, namely:

- The custodial files of Gregory Garner, Michael Hemenway, Kishore Gopu, and Chandler Tatum, with the search terms that the Teva Defendants negotiated with Plaintiff in MDL 2804 applied to each;

- The personnel file of Gregory Garner; and

- The personnel file of any sales representative who is deposed in this action.

The Teva Defendants further refer Plaintiff to documents previously produced by the Teva Defendants to Plaintiff in this litigation and MDL 2804.

Dated: July 30, 2020                         Respectfully submitted,


                                             */s/ Tinos Diamantatos*
                                             Tinos Diamantatos
                                             MORGAN, LEWIS & BOCKIUS LLP
                                             77 West Wacker Drive
                                             Chicago, IL 60601
                                             Email: tinos.diamantatos@morganlewis.com

                                             Eric W. Sitarchuk
                                             Rebecca J. Hillyer
                                             MORGAN, LEWIS & BOCKIUS LLP
                                             1701 Market Street
                                             Philadelphia, PA 19103-2921
                                             eric.sitarchuk@morganlewis.com
                                             rebecca.hillyer@morganlewis.com

                                             *Counsel for Teva Pharmaceuticals USA, Inc.,
                                             Cephalon, Inc., Watson Laboratories, Inc.,
                                             Actavis LLC, and Actavis Pharma, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of July 2020, the foregoing has been served via email to counsel listed below.

**Corporation Counsel, City of Chicago**
Fiona A. Burke
Thomas P. McNulty
City of Chicago, Department of Law
30 N. LaSalle Street, Suite 1240
Chicago, IL 60602
fiona.burke@cityofchicago.org
thomas.mcnulty@cityofchicago.org
Telephone: (312) 744-6929
Facsimile: (312) 742-3832

Linda Singer
Elizabeth Smith
David I. Ackerman
**MOTLEY RICE LLC**
401 9th St. NW, Suite 1001
Washington, DC 20004
lsinger@motleyrice.com
esmith@ motleyrice.com
dackerman@motleyrice.com
Telephone: 202.386.9606
Facsimile: 202.386.9622

Kenneth A. Wexler
Bethany R. Turke
Kara A. Elgersma
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
kaw@wexlerwallace.com
brt@wexlerwallace.com
kae@wexlerwallace.com
Phone: (312) 346-2222
Fax: (312) 346-0022

*Attorneys for Plaintiff City of Chicago*

/s/ *Tinos Diamantatos*
Tinos Diamantatos

23

# EXHIBIT 5



O'Melveny & Myers LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071-2899

T: +1 213 430 6000
F: +1 213 430 6407
omm.com

File Number:

March 30, 2020

**Seth Baglin**
D: +1 213 430 7553
sbaglin@omm.com

**VIA EMAIL**

David Ackerman
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, D.C. 20004
dackerman@motleyrice.com

Re:     _City of Chicago v. Purdue Pharma, L.P. et al._

Counsel:

On behalf of Johnson & Johnson and Janssen Pharmaceuticals, Inc. ("Janssen"), I write
regarding the individuals that Janssen plans to designate as custodians in the above-referenced
action.

After a reasonably diligent search, Janssen has identified the below individuals as potentially
possessing information responsive to Plaintiff's discovery requests because their roles as
district managers or regional business directors included territorial responsibility for the City of
Chicago. Accordingly, Janssen intends to designate each of these individuals as a custodian for
this action.

| Name | Title | Region |
|---|---|---|
| Derby, Gail | District Manager | North Chicago |
| Gaulding, Michelle | Regional Business Director | Chicago |
| Nowling, Richard | District Manager | Central Chicago |
| Duncan, Paul | Regional Business Director | Midwest |
| Griesser, Jeffry | Regional Business Director | North Central |
| Paradiso, Glenn | District Manager | Chicago/Geneva |

Should you have any questions or concerns, we are available to discuss.

O'Melveny

Sincerely,

*/s/ Seth Baglin*

Seth Baglin
Counsel
for O'MELVENY & MYERS LLP

# **EXHIBIT 6**

**Subject:**                                 RE: EXTERNAL-RE: City of Chicago Opioids Litigation -- City's Document Custodians and Search Terms

**From:** Ackerman, David
**Sent:** Friday, April 10, 2020 1:54 PM
**To:** Baglin, Seth ; Diamantatos, Tinos ; donna.welch@kirkland.com; Knapp, Timothy ; jonathan.stern@arnoldporter.com; Davis, Joshua M. ; O'Connor, Andrew ; Pantina, Jennifer ; Lifland, Charles ; Strong, Sabrina H. ; Rodriguez, Esteban
**Cc:** Chicago, Opioids ; xChicagoOpioidManufacturers ; Evan .Janush
**Subject:** RE: EXTERNAL-RE: City of Chicago Opioids Litigation -- City's Document Custodians and Search Terms

<span style="color:red">[EXTERNAL MESSAGE]</span>

Seth,

I hope you and your family are doing well. On behalf of the City of Chicago, we request that Janssen also search and produce files from the custodial files of the following Chicago-area sales reps:

Lora Banks
Wilma Bityou
Ross Bobenmoyer
Jamie Dunham
August Eckland
David Garofalo
Scott Gumz
Janice Holcomb
Bernard Kendrick
Rito Ochoa
Josie Sirovica
Sue Ellen Speaker

Would you please let us know whether Janssen agrees to search these files, and, if not, let us know when you are available to meet and confer regarding this list? Thanks – have a good weekend and stay safe.

David

**David I. Ackerman** | Attorney at Law | Motley Rice LLC
401 9th St. NW, Suite 1001 | Washington, DC 20004 | dackerman@motleyrice.com
o. 202.849.4962 x5962 | c. 202.997.1217 | f. 202.386.9622

**From:** Baglin, Seth
**Sent:** Monday, March 30, 2020 9:16 PM
**To:** Ackerman, David ; Diamantatos, Tinos ; donna.welch@kirkland.com; Knapp, Timothy ; jonathan.stern@arnoldporter.com; Davis, Joshua M. ; O'Connor, Andrew ; Pantina, Jennifer ; Lifland, Charles ; Strong, Sabrina H. ; Rodriguez, Esteban
**Cc:** Chicago, Opioids ; xChicagoOpioidManufacturers
**Subject:** EXTERNAL-RE: City of Chicago Opioids Litigation -- City's Document Custodians and Search Terms

Hi David,

I've attached a letter providing Janssen's Chicago-specific custodians.

Best,
Seth

Seth Baglin
O: +1-213-430-7553
sbaglin@omm.com

**From:** Ackerman, David <dackerman@motleyrice.com>
**Sent:** Monday, March 30, 2020 2:16 PM
**To:** Diamantatos, Tinos <tinos.diamantatos@morganlewis.com>; donna.welch@kirkland.com; Knapp, Timothy <tknapp@kirkland.com>; jonathan.stern@arnoldporter.com; Davis, Joshua M. <Joshua.Davis@arnoldporter.com>; O'Connor, Andrew <andrew.oconnor@ropesgray.com>; Pantina, Jennifer <Jennifer.Pantina@ropesgray.com>; Lifland, Charles <clifland@omm.com>; Strong, Sabrina H. <sstrong@omm.com>; Rodriguez, Esteban <erodriguez2@omm.com>
**Cc:** Chicago, Opioids <OpioidsChicago@motleyrice.com>; xChicagoOpioidManufacturers <xChicagoOpioidManufacturers@arnoldporter.com>
**Subject:** City of Chicago Opioids Litigation -- City's Document Custodians and Search Terms

[EXTERNAL MESSAGE]

External E-mail

All,

Per our agreement, please find attached a letter listing the City's custodians, search terms and non-custodial sources.

David

**David I. Ackerman** | Attorney at Law | Motley Rice LLC
401 9th St. NW, Suite 1001 | Washington, DC 20004 | dackerman@motleyrice.com
o. 202.849.4962 x5962 | c. 202.997.1217 | f. 202.386.9622

Confidential & Privileged

Unless otherwise indicated or obvious from its nature, the information contained in this communication is attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies--electronic, paper or otherwise--which you may have of this communication.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

Confidential & Privileged

Unless otherwise indicated or obvious from its nature, the information contained in this communication is attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies--electronic, paper or otherwise--which you may have of this communication.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# **EXHIBIT 7**



401 9th St. NW, Suite 1001
Washington, DC 20004
**o.** 202.232.5504  **f.** 202.232.5513

**David I. Ackerman**
*Licensed in DC, NJ, NY*
direct: 202.849.4962
dackerman@motleyrice.com

November 20, 2020

**BY EMAIL**

Amy R. Lucas
O'Melveny & Myers LLP
1999 Avenue of the Starts, 8th Floor
Los Angeles, CA 90067

> Re:  *City of Chicago v. Purdue Pharma L.P., et al.*, No. 1:14-cv-04361 (N.D. Ill.)
>       Janssen Defendants' Responses and Objections to Plaintiff's Third Set of
>       <u>Interrogatories and Third Set of Requests for Production</u>

Dear Amy:

I am writing concerning the Janssen Defendants[1]' Amended Responses to the City of Chicago's (the "City's") Third Set of Interrogatories (the "Interrogatories") and Third Set of Requests for Production of Documents (the "Requests for Production").

*Requests for Production*

Request No. 1 requires Janssen to produce "[a]ll Transactional Data, including but not limited to Chargeback data and inventory reports, related to Opioids in Chicago." Janssen's response refers generally to "document productions in MDL 2804, which contain documents responsive to this Request." Janssen does not, however, represent that all transactional data or chargeback data concerning its opioids in Chicago, specifically, have been produced in response. Accordingly, please identify or produce by November 30, all documents reflecting transactions or chargebacks relating to Chicago.

Request No. 5 requires Janssen to produce "Documents and Communications concerning Marketing conducted by You or on Your behalf to Formularies, including placement of Your Opioids on Formularies covering Chicago, and all Documents and Communications conveying any changes to Formulary status to Chicago Healthcare Providers …" Janssen objects to this request as "vague," and proposes a meet and confer. Janssen, however, is obligated to make a good faith effort to identify and produce responsive Documents, including for its efforts both toobtain favorable formulary coverage for its drugs (such as inclusion on preferred drug lists),

---

[1] Johnson & Johnson, Janssen Pharamceuticals, Inc., Ortho-McNeil-Janssen Pharmaceutials, Inc., and Janssen Pharmaceutica, Inc.



Amy Lucas
Re: Janssen Defendants' Responses and Objections to Plaintiff's Third Set of Interrogatories and Third Set of Requests for Production
November 20, 2020
Page 2

and to provide information relating to formulary coverage to Chicago area prescribers. The City requests that by November 30, Janssen identify all custodians who would possess information relating to marketing to third party payors, pharmacy benefits managers, or those responsible for setting formularies; and to the extent not already identified, identify and produce formulary and coverage-related promotional materials.

Request for Production No. 7 requires Janssen to produce "[a]ll Documents referencing, relating, or concerning Diversion of Opioids into or out of Chicago, or affecting Chicago, including records of all calls to security hotlines or intranet reports and all completed reports of concern or suspected Diversion reporting forms and reviews of Chicago Health Care Providers' or pharmacies' data." Janssen states that it has produced documents in MDL 2804, which "contain documents responsive to this Request." The City requests that you confirm by November 30 that Janssen has produced all responsive documents pertaining to Diversion into or out of Chicago, or that the custodians previously identified possess between them all responsive data.

Janssen further objects to this Request on the grounds that it "seeks information unrelated to Duragesic, Nucynta, or Nucynta ER." However, to the extent that Janssen identifies actual or suspected diversions relating to its Schedule IV tramadol products, Ultram, Ultram ER and Ultracet, that information is directly relevant to Janssen's obligations as a DEA registrant. Please confirm that You are not withholding the identities of any individuals on the basis you learned of unlawful activity with respect to tramadol. *See In re: Texas Opioid Litig.*, Master File No. 2018-63587, Order Granting Plaintiff's Motion to Compel Production, (152nd Jud. District. Harris Cty. Jan. 10, 2020).

Request No. 8 requires the production of "Documents concerning each Order in Chicago that You investigated, flagged, blocked, held or reported for suspicious actual or potential Diversion." As with Request No. 7, Janssen refers the City to documents produced in MDL 2804. Please confirm by November 30, that Janssen's response includes all documents concerning Orders in Chicago; or that there are no other custodians who have such documents other than those Janssen has previously identified.

Request No. 10 requires Janssen to produce "[t]he complete human resources files, employment files, custodial files, and any other individual files for each of Your sales representatives, district, area, regional and national managers, and compliance personnel who worked in, had contact with or had responsibilities related to Chicago." Request No. 10 specifically requires Janssen to produce "performance reviews, bonus and salary information and payments, targeting reports, field activity or contact reports, sales call notes and reports, training materials and guidance, disciplinary record, exit interviews, and Marketing Materials ordered and received by each sales representatives." While the parties have previously discussed the identity of these custodians,



Amy Lucas
Re: Janssen Defendants' Responses and Objections to Plaintiff's Third Set of Interrogatories and Third Set of Requests for Production
November 20, 2020
Page 3

please confirm by November 30 that Janssen will produce all of the material identified in this request for the agreed-upon custodians.

*Interrogatories*

Interrogatory No. 3 requires Janssen to identify "all actual or potential compliance violations that You learned of, identified, investigated or reported … that relate to Marketing, prescribing, distribution, or dispensing of Opioids in Chicago[.]" Janssen's Amended Response states that Janssen will "produce responsive documents, if any, from centrally located databases or from the files of designated custodians after conducting a reasonably diligent search using predetermined keyword searches and reviewing the results, and subject to a determination that producing such records would not be unduly burdensome." Janssen's response does not set forth a time-table for identifying these custodians or databases, or for producing documents, or for setting forth criteria as to which burden of production may be determined. To the extent that Janssen is limiting its searches to previously identified custodians, including the compliance custodians previously identified, please so state.

Secondly, Janssen objects to this Interrogatory on the grounds that it "seeks information unrelated to Duragesic, Nucynta, or Nucynta ER." However, to the extent that Janssen identifies actual or suspected diversions relating to its Schedule IV tramadol products, Ultram, Ultram ER and Ultracet, that information is directly relevant to Janssen's obligations as a DEA registrant. Please confirm that You are not withholding the identities of any individuals on the basis you learned of unlawful activity with respect to tramadol. *See In re: Texas Opioid Litig.*, Master File No. 2018-63587, Order Granting Plaintiff's Motion to Compel Production, (152nd Jud. District. Harris Cty. Jan. 10, 2020).

\*          \*          \*

Please contact me with any questions regarding this response.

Sincerely,

*/s/ David I. Ackerman*

David I. Ackerman

cc: All counsel of record (via Plaintiff's and Defendants' email distribution lists)

# **EXHIBIT 8**

12/11/2019 3:36:00 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 39175395
By: WILLIAMS, KATINA L
Filed: 12/11/2019 3:36:00 PM

### MDL PRETRIAL CAUSE NO. 2018-77098

| | | |
|---|---|---|
| **COUNTY OF DALLAS,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | **116TH JUDICIAL DISTRICT** |
| | § | |
| **PURDUE PHARMA, L.P.**, et al., | § | |
| | § | |
| *Defendants.* | § | **DALLAS COUNTY, TEXAS** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| | § | |
| **IN RE:  TEXAS OPIOID LITIGATION** | § | **152ND JUDICIAL DISTRICT** |
| | § | |
| | § | |
| | § | |
| | § | **HARRIS COUNTY, TEXAS** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL PRODUCTION

Before the Court is Plaintiff's Motion to Compel Production. The Court, having considered the Motion, any timely responses and replies thereto, the arguments of counsel, if any, the pleadings on file, the applicable law, and all other matters properly before the Court, determines that the Motion is meritorious and should be GRANTED.

It is, therefore, ORDERED that Plaintiff's Motion to Compel is GRANTED. Defendants Janssen Pharmaceuticals, Inc., its predecessor companies Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc., and its parent company, Johnson & Johnson (hereinafter referred to collectively as "Defendants) are instructed to produce all responsive materials related to all drugs at issue in this case, including Ultram, Ultracet and other tramadol-related drugs.

SIGNED on _____

Signed:
1/10/2020

The Honorable Robert Schaffer
Presiding Judge, 152nd District Court

# **EXHIBIT 9**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION | ) | CASE NO. 1:17-MD-2804 |
| OPIATE LITIGATION | ) | |
| | ) | SPECIAL MASTER COHEN |
| THIS DOCUMENT RELATES TO: | ) | |
| *"Track One Cases"* | ) | |
| | ) | |
| | ) | DISCOVERY RULING NO. 2 |
| | ) | |

The undersigned has received numerous emails and letters from plaintiffs and defendants raising various discovery issues. Having reviewed carefully the parties' positions, the Special Master now enters the following discovery rulings.

**Scope of Products Subject to Discovery**

Plaintiffs have requested discovery related to a wide array of opioids that are manufactured, sold, or distributed by the defendants, including branded products, generic products, and lower-strength products that have been sold "without problem" for decades. The *distributor* defendants have not objected to these requests – the distributors have agreed to produce discovery for all opioid products requested by plaintiffs. To various degrees, however, the *manufacturer* defendants do object to the breadth of the plaintiffs' requests. For example:

- Teva has no objection to plaintiffs' requests based on identity of the opioid product; thus, Teva is producing discovery related to all opioids, including unbranded and generic products.

- Purdue is willing to produce documents related to three of its branded opioid products (Oxycontin, Butrans, and Hyslinga ER), but objects to discovery of documents related to (a) any other branded opioid product (e.g. Targiniq ER), and (b) any unbranded or generic opioid product.

- Janssen is willing to produce documents related to three of its newer branded opioid products (Duragesic, Nucynta, and Nucynta ER), but objects to discovery of documents related to, among others, two branded, decades-old, combination opioid products (41-year-old Tylenol [acetaminophen] with codeine; and discontinued-in-2014, 32-year-old Tylox [acetaminophen with oxycodone]).

At this juncture, plaintiffs are in dispute on this issue with Endo, Mallinckrodt, Allergan, Janssen, and Purdue.

The main reason offered by defendants to support their objections is that plaintiffs' complaints do not sufficiently allege theories of liability based on the manufacture, sale, or distribution of *generic* drugs. This is simply untenable. Plaintiffs' complaints certainly focus upon branded drugs, such as Oxycontin; but the allegations clearly also support claims premised on the manufacture, sale, and distribution of generic drugs. *See, e.g., City of Cleveland v. Purdue Pharma*, case no. 18-OP-45132, second amended complaint ¶5 (docket no. 508) ("*Cleveland Complaint*") (attributing the huge number of deaths caused by opioid overdose to drugs including "brand-name prescription medications such as OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, as well as generics like oxycodone, hydrocodone, and fentanyl"); *id.* at ¶¶45, 49, 65, 78, 87, 824 (referring to individual generic drugs produced by each manufacturer defendant).

A second reason defendants offer to support their objections is that some of the drugs at issue

are low-potency products that were launched decades before there was any "opioid crisis" (which plaintiffs allege began in the "late 1990s);"[1] therefore, these drugs are at best barely relevant to plaintiffs' claims and the burden of production exceeds its likely benefit. The Special Master concludes this argument is well-taken. Tylenol with codeine has been available in the United States since the 1970s, and is listed by the FDA as a Schedule III drug – meaning it has a lower potential for abuse than substances in Schedule II (such as hydromorphone, oxycodone, fentanyl, and morphine), which are at the alleged root of the "opioid crisis." Tylenol with codeine is clearly peripheral to plaintiffs' claims.

Accordingly, the Special Master **RULES** as follows. Defendants shall produce discovery related to all opioid products that are or ever were classified as Schedule II under the Controlled Substances Act. This includes branded, unbranded, and generic drugs. If a branded drug was launched before 1995, then defendants need to produce documents related to that drug, and its non-branded and generic equivalents, only if the documents were created on or after January 1, 1995.

**Geographic Scope of Discovery**

The plaintiffs in the Track One cases are all located in the Northern District of Ohio, but Plaintiffs' discovery requests are largely national in scope. With regard to certain categories of documents, most defendants do not lodge objections based on geographic scope. Thus, for example, most of the manufacturer defendants have agreed to produce nationwide information on their marketing, advocacy, and regulatory activities. But several defendants object to production of other types of information outside of Ohio – for example, sales information for each customer pharmacy,

---

[1] *See, e.g., Cleveland Complaint* ¶¶4-7, 690-91, & 789.

notes on sales calls, compensation of sales representatives, and so on.  Other defendants have taken

a more surgical approach: manufacturer Mallinckrodt, for example, has agreed to provide

"documents relating to diversion" on a national basis, but "documents that pertain to marketing"

only in sales districts encompassing Ohio and its border states of Michigan, Indiana, Kentucky, West

Virginia, and Pennsylvania.  The bases for defendants' geographic scope objections are burden and

relevance.

The Special Master now **RULES** as follows.  Defendants must produce on a national basis

documents related to marketing and promotion, brand planning and strategy, sales training and sales

bulletins, prescriber educational materials, distribution monitoring, advocacy groups, speakers

bureau programs, continuing medical education, diversion, suspicious order reports, adverse event

reports, and regulatory activity.[2]  The defendants' policies and actions regarding all of these subjects

are (and were) primarily centralized and over-arching, applying broadly to their opioid products.

This discovery is referred to below as Category One Discovery.

The ruling above is relatively easy; the harder question is the extent to which defendants

must produce documents related to decentralized, customer-specific materials, such as sales call

notes and transactional data.  (This discovery is referred to below as Category Two Discovery.)  As

noted earlier, most defendants seek to limit geographic production of these materials to Ohio, where

plaintiffs in the Track One cases are located.  In response, plaintiffs argue this information should

be produced more broadly – at least regionally, if not nationally – as materials connected to

locations outside of Ohio are likely to reveal information relevant to the Ohio plaintiffs' claims.  For

---

[2]  This list is illustrative, not exhaustive.  The Special Master has carefully considered
whether each of the topics in this list should be included.

example, plaintiffs allege there is "abundant evidence . . . establish[ing] that prescription opioids migrated between cities, counties, and states, including into Ohio from West Virginia, Kentucky, Illinois, Georgia, and Florida." *Cleveland Complaint* ¶633. The Special Master agrees that tracing opioid migration to Ohio from other locations, especially high-supply areas, is relevant to plaintiffs' claims.

The Special Master concludes it is appropriate to enter a compromise ruling: defendants shall produce customer-specific information for the States of Ohio, Pennsylvania, West Virginia, Kentucky, Illinois, Georgia, and Florida. This restriction will provide plaintiffs with sufficient discovery to test their "migration" theory and pursue their claims, while limiting the burden on defendants. To the extent defendants must produce this discovery in stages, production of Ohio information shall occur first.

**Scope of Prior Productions**

Numerous defendants have produced documents in connection with other, earlier litigation matters or governmental investigations. In regard to these "prior productions," the Court ordered as follows in CMO-1:

> all Defendants shall review documents previously produced pursuant to any civil investigation, litigation, and/or administrative action by federal (including Congressional), state, or local government entities involving the marketing or distribution of opioids and shall produce to the PEC non-privileged documents relevant to the claims in this MDL proceeding.

Docket no. 232 at 15, ¶9.k.ii. Initially, some defendants agreed to produce only those prior productions that had occurred after a date-certain, such as January 1, 2006. Those defendants have correctly abandoned that position. But some defendants now assert they do not have to produce

certain prior productions for other reasons – for example, because a prior production in patent litigation did not "involv[e] the marketing or distribution of opioids," or because the prior production was made in *private* civil litigation as opposed to litigation with a governmental entity.

The Special Master now **RULES** as follows. The above-quoted language in CMO-1 was meant to be comprehensive. Defendants' objection that they are not obligated to produce in the MDL prior productions made in private ("non-governmental") litigation is not well-taken. If a defendant produced discovery in *any* prior litigation that involved the marketing or distribution of opioids, that discovery must be produced in the MDL.[3] That said, the Special Master agrees that defendants need not produce discovery of prior productions made in cases, such as patent litigation, that only tangentially addressed marketing and distribution of opioids.

The Special Master adds that defendants must produce prior productions made in personal injury cases, because those productions are highly likely to include materials relevant to distribution and marketing of opioids. More specifically, the Special Master notes that MDL lead plaintiff counsel Paul Hanly has engaged in prior litigation against manufacturer Purdue involving claims that Purdue's sale and marketing of Oxycontin led to personal injuries to hundreds of plaintiffs.

---

[3] Defendants apparently read the language in CMO-1 to mean they are only required to produce in the MDL prior productions made in "litigation . . . by federal (including Congressional), state, or local government entities," and not by private entities. The underlined clause, however, was meant to make fully *expansive* the requirement relative to administrative actions, not to *restrict* the requirement relative to litigation or investigations.

Purdue's prior discovery productions in those cases is relevant and discoverable in the MDL.[4]  To

lower Purdue's discovery burden, rather than requiring Purdue to re-produce its prior productions

made to Hanly's firm, these prior productions "shall be deemed produced to all Plaintiffs in MDL

2804 and shall be made immediately available to the PEC by any parties or counsel in possession

of same, at no cost to the party or counsel in possession."  *See* docket no. 232 at 15, ¶9.k.i (CMO-1)

(taking this approach with prior productions made in *City of Chicago v. Purdue Pharma L.P.*, case

no. 17-OP-45169).


**List of Prior Productions**

        The Special Master earlier directed each defendant to produce to plaintiffs a "list of all prior

productions in any civil investigation, litigation, and/or administrative action involving the

marketing or distribution of opioids," so that the parties and the Court could "understand precisely

what is the universe of prior productions at issue."  Email to counsel, June 13, 2018. 6:06 pm.

However, many of those defendants that responded – some still have not – did not include in their

lists prior productions made in private, non-governmental civil litigations.  The Special Master now

**ORDERS** *every* defendant to produce to plaintiffs, on or before July 10, 2018, a list of *every* prior

production in *any* earlier litigation, investigation, or administrative action that touches upon the

marketing or distribution of opioids, *without exception*.  This separate requirement is meant only to

---

        [4] Mr. Hanly has stated repeatedly that Purdue's earlier discovery in his personal injury cases
is clearly relevant to the claims in the MDL, and Purdue has not contested that assertion – although
it has withheld permission for Mr. Hanly to share his discovery in the MDL.  This is unacceptable.
It would be very odd and unsound for two different MDL lead plaintiffs' counsel – say, Mr. Hanly
and Mr. Farrell – to attend a deposition of Purdue where Mr. Hanly is aware of relevant documents
(but cannot use them), and Mr. Farrell is not.

obligate each defendant to produce a *list*, not to produce each and every single one of those prior productions.  Among other reasons, this list is necessary for the plaintiffs and the Court to engage in the mechanism set out at CMO-1, ¶9.k.iii ("to the extent the PEC believes there are other documents that were produced by a Defendant in another proceeding that are discoverable in this proceeding, the PEC shall notify the Defendant and identify the specific document(s) and basis for requesting production, and the parties shall meet and confer to attempt to resolve the issue").

**Temporal Scope of Discovery**

Plaintiffs' discovery requests are made without any time limit, and plaintiffs generally seek documents dating back to 1995 or even earlier.  Defendants object and seek to limit their responses to various other, later dates.  For example, distributors McKesson, Amerisource, and Cardinal have each agreed to provide documents from January 1, 2013 forward, but not earlier; manufacturer defendant Teva has agreed to provide documents from January 1, 2006 forward, as well as certain categories of documents that pre-date 2006; and manufacturer defendant Endo has agreed to provide documents with a begin-date of two years prior to the launch of its opioid product Opana ER.  The reasons distributors offer for limiting the begin-dates of their discovery production include: (a) statutes of limitations, (b) when their opioid products were launched, and (c) general relevance and burden.

The question of temporal scope is the most difficult of the issues addressed in this *Discovery Ruling*.  Obviously, the earlier the cut-off date for document production, the more burdensome is the discovery request on defendants, and potentially the less relevant.  Still, the Special Master rejects the defendants' contentions that the cut-off date should be set by strict reference to statutes

of limitations. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978) ("it is proper to deny discovery of . . . events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to issues in the case"); *Ray v. Waste Mgmt. of Kentucky, LLC*, 2010 WL 11545747 at *1 (W.D. Ky. Dec. 15, 2010) (denying a motion to limit discovery to the limitations period, because discovery into earlier events could lead to relevant and admissible evidence). Moreover, it appears the statute of limitations for plaintiffs' claims of public nuisance may be equitably tolled. *See The Little Miami RR Co. v. Comm'rs of Greene Cty.*, 1877 WL 31 at *6 (Ohio Dec. 1, 1877) ("no length of time can legalize a public nuisance"); *cf. State v. Swartz*, 88 Ohio St. 3d 131, 134 (2000) (in the case of criminal nuisance, "a continuing nuisance can constitute a continuing course of conduct, thus tolling the limitations period").

With regard to relevance, plaintiffs argue convincingly that "baseline evidence" of what the opioid marketplace looked like before defendants undertook their allegedly fraudulent marketing activities, and before defendants allegedly purposely failed to report Suspicious Orders, is highly relevant. The amount and degree of "unnecessary prescriptions" and the extent of the "inappropriate increase" of opioid distribution must be measured against a time before the allegedly wrongful activity began; that is, the scope of the "opioid crisis" can only be assessed against pre-crisis conditions. Indeed, the U.S. Drug Enforcement Agency describes Suspicious Orders as "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b). This language necessitates comparisons with "normal" and "usual" circumstances. Plaintiffs provide data showing opioid prescriptions and distributions began to increase dramatically in 1995, which is when Purdue launched Oxycontin. In sum, the baseline level of opioid prescriptions and distributions, which existed at that juncture, is highly relevant.

9

Ultimately, the dispute over the temporal scope of discovery requires a balancing of burden, relevance, and need. The Special Master has undertaken that calculation with an eye toward providing plaintiffs with evidence they need but no more than that, and with as little burden on defendants as this measure allows. This requires imposition of different, tailored cut-off dates for discovery of different categories of information from different defendants. A single cut-off date for all discovery would be both over- and under-inclusive. Accordingly, the Special Master now **RULES** as follows.

### Manufacturer Defendants

Except as stated in the next paragraph, the manufacturer defendants shall produce Category One Discovery and Category Two Discovery with a cut-off date of one year prior to the launch date of the opioid product in question. Thus, for example, Purdue must produce Categories One and Two Discovery related to Oxycontin going back to the date one year before it began selling Oxycontin; Purdue must produce Categories One and Two Discovery related to Hyslinga ER going back to the date one year before it began selling Hyslinga ER; and Mallinckrodt must produce Categories One and Two discovery related to Xartemis XR going back to the date one year before it began selling Xartemis XR. These dates are very different, as they are individualized to each drug.[5] Further, each manufacturer defendant must produce Categories One and Two discovery for generic opioids with a cut-off date of one year before it first sold that generic product.

Further, the manufacturer defendants shall produce transactional data (which is otherwise

---

[5] Purdue's Oxycontin was approved by the FDA in December of 1995, while Purdue's Hyslinga ER and Mallinckrodt's Xartemis XR were approved in 2014. The Special Master adds here that this "one year" requirement applies regardless of when the defendant acquired rights to the drug.

in Category Two) and Suspicious Order Reports (which is otherwise in Category One) with a cut-off date of January 1, 1996.

### Distributor Defendants

The distributor defendants shall produce transactional data and Suspicious Order Reports with a cut-off date of January 1, 1996. The discovery cut-off for all other discovery is January 1, 2006.


## Discovery of Prior Transcripts

Although this topic was disputed, the parties' most recent reports to the Special Master reveal there are no remaining disagreements regarding production of transcripts of testimony taken in prior opioid-related litigation or investigations.


## Definition of "Marketing Activities"

Earlier, some of the defendants objected to the definition of "marketing activities" that plaintiffs included in their discovery requests. It appears most of the defendants have resolved their disputes with plaintiffs regarding this issue, but some defendants (e.g. Mallinckrodt) have lingering disagreements. The specific language at issue is as follows:

> "Marketing" refers to the action or business of promoting, selling, or providing information about Opioids or Opioid Products. "Marketing" includes both branded and unbranded Communications; branded and unbranded informational or educational programs; detailing by sales representatives (including electronic detailing); continuing medical education; publication of scientific medical or marketing articles, Scientific Research, studies or reports; websites (whether branded or unbranded); video or other visual media; sales blasts, messages, or other means used to sell or promote Opioids or Opioid Products for sale or distribution.

Requests for Production at 3.

The Special Master simply observes that this definition in the abstract does not appear to be over-broad or to require production by defendants of irrelevant information. The Special Master directs those parties who continue to have disagreements over the definition of marketing to meet and confer again while taking this observation into account.

**Different Agreements**

The Special Master is aware that certain defendants may have reached agreements with plaintiffs on certain issues that are different from the requirements stated above. For example, this *Discovery Ruling* directs the manufacturer defendants to produce relevant documents with a cut-off date of one year prior to the launch date of their opioid products, but Janssen earlier agreed to produce documents going back two-and-a-half years before its launch of Nucynta. The parties are free, but not required, to honor these prior agreements, and are free to negotiate different agreements going forward from the requirements set out herein. But the Special Master hereby imposes consistent standardized rulings for all parties, so that there will be clarity going forward.

**Pharmacies**

The discussion above addresses discovery disputes plaintiffs have had with the manufacturer and distributor defendants. The Special Master has not received position papers on these topics from the retail pharmacy defendants, as their meet-and-confers with plaintiffs are ongoing. Nonetheless, the Special Master expects the pharmacy defendants will adhere to the rulings set out above and will not bring a similar dispute to the undersigned unless there is very good cause for a different

outcome.

## Other Issues

The Special Master is aware there are other discovery disputes brewing, including a complete absence of scheduling of 30(b)(6) depositions.  The parties are **ORDERED** to: (1) submit on or before July 6, 2018 an agreed schedule for at least some 30(b)(6) depositions, or risk sanctions; and (2) continue to meet and confer on all other outstanding disputes.

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**Dated: June 30, 2018**

13

# **EXHIBIT 10**

STATUS CONFERENCE HEARING
JANUARY 10 2020

1

2                          REPORTER'S RECORD
3                    REVISED VOLUME 1 OF 1 VOLUMES
                     TRIAL COURT CAUSE NO. 2018-63587

4

5                                          ) IN THE  DISTRICT  COURT
   MASTER CASE                             )
6                                          )
   TEXAS OPIOID LITIGATION                 ) HARRIS   COUNTY,  TEXAS
7                                          )
                                           ) 152ND JUDICIAL DISTRICT
8

9

10        _____

11               **STATUS CONFERENCE HEARING**
          _____
12

13

14       On the 10th day of January, 2020, the following proceedings came

15   on to be held in the above-titled and numbered cause before the

16   Honorable ROBERT K. SCHAFFER, Judge Presiding, held in Houston, Harris

17   County, Texas.

18       Proceedings reported by computerized stenotype machine.

19

20

21

22

23

24

25

                         Cynthia Martinez, CSR
                       152nd Civil District Court
                           (832) 927-2427
                        cynthiam@justex.net

STATUS CONFERENCE HEARING
JANUARY 10 2020

1        THE COURT:  And, again, I'm not ruling on anything here.  So,
2  just be aware.
3        MR. SIMON:  Yes, your Honor.
4        THE COURT:  That's all I'm saying.
5        MR. SMYSER:  That's all I am asking, your Honor.  And I've got
6  numerous examples of -- you know, written --
7        THE COURT:  Mr. Smyser, you are now beating a dead horse
8  there.
9        MR. SMYSER:  Okay.  I got it.
10        THE COURT:  We are going to move on.
11        MR. SIMON:  So, your Honor, I've got a four-slide PowerPoint
12  that I could do.  Although, I think this is so straightforward that we
13  will see if you care about my PowerPoint.
14        THE COURT:  Is this the Tramadol, Ultram?
15        MR. SIMON:  Sure.
16        We sued Janssen for Opioid Drugs they sold in Dallas County.
17  We've explicitly referenced in the first Petition and every one that
18  followed their Tramadol Drugs, Ultracet.
19        THE COURT:  Tramadol has a special meaning in this
20  particular --
21        MR. SIMON:  It certainly does, your Honor.
22        THE COURT:  It took out one Judge already?
23        MR. SIMON:  That's right.
24        And when they answered Discovery, they specifically excluded
25  the Tramadol Drugs from their Discovery Responses.  And when we

STATUS CONFERENCE HEARING
JANUARY 10 2020

1  reached out to them and said, "What about those Tramadol Drug," they

2  were like, "Well, they're different."

3          And my answer to that -- and I don't mean this flippantly --

4  is who cares?  We sued you for them.  You took 91(a) Motions on every

5  stated claim you could think of.  They were all denied.  Right.  It is

6  over being the analysis of whether we stated a claim.  Of course, you

7  have to answer Discovery about Opioid Drugs for which you have been

8  expressly been sued.

9          And the position they've taken is we're not going to do it, I

10 guess, unless you order it.  So, whereas, it is not 51/49 who has got

11 one.  This is 100 to nothing.  Right.  They've been sued for

12 particular Opioid Drugs they are refusing to answer Discovery about.

13         And, so, we're here asking you to compel them to do so.

14         THE COURT:  Whose got it?

15         MS. STRONG:  Your Honor, Sabrina Strong with O'Melveny on

16 behalf of the Janssen Defendants.

17         Your Honor, this case is not about the Tramadol Product.

18 These are Scheduled 4 products today; but, prior to 2014, they were

19 not even Scheduled Drugs.

20         THE COURT:  Let me ask you a question.  I don't like to

21 interrupt, but I'm going to in this case.

22         If they say it's about Tramadol, how is it that you can say it

23 is not?

24         MS. STRONG:  There is one reference to Tramadol in a

25 laundry-list paragraph in the Complaint.  Every substantive

STATUS CONFERENCE HEARING
JANUARY 10 2020

1  allegation in the Complaint, 387 paragraphs worth of the rest of the

2  Complaint, to the extent there's a specific reference to an Opioid

3  Product, it's to a Scheduled 2 Opioid.  Not a Schedule 3 Opioid.  Not

4  a Schedule 4 Opioid.  Not an Unscheduled Drug.

5       387 of the 388 paragraphs of this Complaint do not even

6  reference Tramadol.  The only reference is in a laundry list.  There

7  is not one specific allegation tied to Tramadol.  All of the efforts

8  to make specific allegations in the Complaint are all limited to

9  Schedule 2.

10       I have a board, your Honor, that I would like to show to you,

11  if I may, and I have a print out of it.

12       MR. GRIFFIN:  Your Honor, may I approach?

13       THE COURT:  You can either approach, or put it on the

14  monitor -- on the projector.

15       MS. STRONG:  So, what we've got here on this document, your

16  Honor -- on this graphic is just a high-level overview of the

17  Schedules because we don't know how much you've been exposed to this,

18  your Honor.

19       But there's a Schedule 1, Schedule 2, Schedule 3, Schedule 4

20  and Schedule 5.  These are scheduled by DEA based on the scientific

21  recommendations of the FDA.

22       And I would like to walk through each of these so you have an

23  understanding at a high level as to what these schedules mean.

24       Schedule 1:  There is no legitimate use for that drug and a

25  high potential for abuse.  And we have some examples on this chart to

STATUS CONFERENCE HEARING
JANUARY 10 2020

1  Duragesic in with their Ultracet sales force in Dallas.

2        Now, one of the things that we allege is that these Opioid

3  Drugs, all of them, are the subject of criminal diversion in Dallas

4  County.

5        When you sell an addictive drug, people who got addicted to

6  them are going to do things against the law and order to obtain them.

7  We've provided evidence of exactly that.

8        Ultram -- this is a 2016 police report that Ultram is the

9  subject of criminal diversion in Dallas County and contrary to the

10  assertions put forward by Janssen's lawyer, it's described as

11  highly-addictive drug over prolonged use.

12        We've a got a Tramadol problem, specifically, an Ultram

13  problem, for example, in Dallas County.  Now, they can decide that

14  it's less addictive than other drugs and that's how they are going to

15  defend the case, which I would find to be an usual approach.  Don't

16  look at these Opioid Drugs.  Just focus on those.

17        But, nonetheless, they have that option.  It's not a basis to

18  not answer Discovery.  I don't think it's meaningful to talk about,

19  well, how many times did we mention it in the Petition.  But I do want

20  to make the point that what we talk about in the Petition a lot, with

21  respect to the Manufacturers, is that they engaged in product

22  detailing with Prescribers.  Where they come and they say, "Use our

23  products.  Here's why our products are safer than other products."

24  Even though that wasn't true.

25        And they try to trivialize the dangers of these addictive,

Cynthia Martinez, CSR
152nd Civil District Court
(832) 927-2427
cynthiam@justex.net

STATUS CONFERENCE HEARING
JANUARY 10 2020

1  often-lethal drugs with whimsical toys like you might get in a Happy

2  Meal.

3        Ultram and Ultracet, their sales people were among the most

4  egregious, and we make reference in the Petition to the stuffed dolls.

5  Here's the Ultracet doll.  It's a policeman carrying a tennis racquet.

6  Presumably with the help of Tramadol, he can accomplish both.  Now,

7  here's the sippy cup to wash the Opioid down with.  We make specific

8  references to that.  Reflex hammers and all.

9        My point is I get that they disagree with the merits of the

10 case, and that's fine.  That is not a legal basis to not answer

11 Discovery.  And if it creates delays, well, then you will have to deal

12 with how and why that happened.

13       But, nonetheless, they don't actually have a legal objection.

14 They just don't want to do it.

15       THE COURT:  What caused the Federal MDL to not expand their

16 scope into the Schedule 4 Drugs?

17       MR. SIMON:  They didn't mention Ultram and Ultracet in that.

18 We did.  That's it.

19       MS. STRONG:  And the Plaintiffs there, your Honor, argued that

20 the Complaint was broad enough to encompass it.  And, ultimately, the

21 Special Master ruled that these were peripheral drugs and he's not

22 going to open up the class of drugs beyond Schedule 2.

23       So, the Federal Court went beyond the question of what it

24 identified in the Complaint and answered the substantive question of

25 was it really significant to the case or not and found that it was

STATUS CONFERENCE HEARING
JANUARY 10 2020

1    not.

2         At issue, there was Tylenol with Codeine, your Honor, which is

3    a Schedule 3 Drug.  The Court said, "Schedule 3 is peripheral.  We're

4    not going to open the door to Schedule 3 here."

5         And, here, what we're talking about is a Schedule 4 as to

6    2014.  And, really, what I think they're interested in is information

7    about the drug when it was not scheduled at all in the 1990's and the

8    2000, et cetera, your Honor, which is very, very far away from what

9    the Federal MDL decided was too peripheral, which is a Schedule 3.

10        I would like to address a few of the points he made, your

11   Honor, which is in terms of timing.  He made a reference to

12   January 2018, there was a single reference to have Tramadol in the

13   Complaint.

14        I would like to walk through some timing issues because I

15   think there is a question as to why this is being raised now.

16        The decision in the MDL that was Discovery Ruling No. 2, you

17   Honor, that was made in June of 2018.  So, at that time the Plaintiffs

18   there overlapped the law firms.  The Lanier Law Firm is very much

19   involved here, your Honor, and was very much involved in these

20   discussions in the MDL.

21        They knew that Janssen made the argument and that the

22   Defendants' position broadly was that Schedule 2 was the proper scope

23   of Discovery; and that, beyond that, would be peripheral.

24        They have known that since June of 2018.  We were here back

25   before you in the context of this case, your Honor, in January of

STATUS CONFERENCE
*JANUARY 10, 2020*

1  STATE OF TEXAS

2  COUNTY OF HARRIS

3

4      I, Cynthia Martinez, Official Court Reporter in and for the 152nd

5  Civil District Court of Harris, State of Texas, do hereby certify that

6  the above and foregoing contains a true and correct transcription of

7  all portions of evidence and other proceedings requested in writing by

8  counsel for the parties to be included in this volume of the

9  Reporter's Record in the above-styled and numbered cause, all of which

10 occurred in open court or in chambers and were reported by me.

11     I further certify that this Reporter's Record of the proceedings

12 truly and correctly reflects the exhibits, if any, offered by the

13 respective parties.

14     I further certify that the total cost for the preparation of this

15 Reporter's Record is $_____ and was paid by SCOTT, DOUGLAS &

16 MCCONNICO, LLP.

17

18                    /s/Cynthia Martinez

19                    Cynthia Martinez, CSR
                      Texas CSR No. 6863
                      Official Court Reporter
20                    152nd Civil District Court
                      Harris County, Texas
21                    201 Caroline, 11th Floor
                      Houston, Texas 77002
22                    Telephone:  832-927-2427
                      Expiration:  04/30/2019

23

24

25

Cynthia Martinez, CSR
152nd Civil District Court
(832) 927-2427
cynthiam@justex.net

# **EXHIBIT 11**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION | ) | CASE NO. 1:17-MD-2804 |
| OPIATE LITIGATION | ) | |
| | ) | SPECIAL MASTER COHEN |
| THIS DOCUMENT RELATES TO: | ) | |
| *"Track One Cases"* | ) | |
| | ) | |
| | ) | DISCOVERY RULING |
| | ) | REGARDING PERSONNEL FILES |

Earlier, the parties raised with the Special Master a dispute regarding the extent to which personnel files of deponents would be produced, and the timing of those productions. After the undersigned provided suggestions and directed the parties to continue the meet-and-confer process, the parties came to agreement. Only defendant Discount Drug Mart ("DDM") objected to the agreement; the Special Master has reviewed that objection and overrules it, especially in light of the fact that all other pharmacy defendants support the agreement. Accordingly, the parties shall adhere to the following agreed-upon protocol, the language of which was supplied by the parties.

---

**Deponent Personnel Files Protocol**

With respect to deponents whose depositions have not yet occurred:

1. Defendants will search for personnel files for the employees or former employees whose primary responsibility involved sales, marketing, and/or compliance, including (i) application of FDA regulations and guidance concerning the marketing and promotion of prescription drugs, (ii) Suspicious Order Monitoring, and/or (iii) Anti-Diversion efforts, to the extent reasonably available and to the extent such materials are in it or its affiliates' possession or custody and can be located after a reasonable search. Defendants agree to provide from such files, to the extent the personnel files contain such materials, documents sufficient to show:

a. Compensation, except personal tax or banking information;
b. Opioid-related bonus or Opioid-related incentive compensation information (and the basis for the award or calculation of the bonus/IC), except personal tax or banking information;
c. Opioid-related performance reviews (including self- or peer- reviews) or awards related to opioid sales, Opioid marketing, or legal and regulatory compliance with Opioids-related laws or rules; and
d. Discipline records concerning Opioids or compliance with federal or state laws or regulations governing the sale, marketing, or distribution of Opioids.

2. All CT1 Plaintiffs will search for personnel files for the employees or former employees whose primary responsibilities involved Medical Examination, Law Enforcement, or Public Health to the extent reasonably available. All CT1 Plaintiffs agree to provide from such files, to the extent reasonably available and to the extent they can be located after a reasonable search, the following to the extent material contained in the personnel files relates to:

a. Bonus and compensation information (and the basis for the award or calculation) relating to responsibilities involving drug abuse, addiction, overdose, diversion, or drug related criminal activity, except personal tax or banking information;
b. Performance or discipline records relating to responsibilities involving drug abuse, addiction, overdose, diversion, or drug related criminal activity; and
c. Records concerning satisfaction of any drug-related arrest quotas.

"Drug-related" and "drug abuse" will not include items specifically relating only to non-Opioid drugs (e.g., cocaine abuse).

Defendants and CT1 Plaintiffs will make all best efforts to complete production at least 72 hours prior to the scheduled start of the deposition.

---

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen

**David R. Cohen**
**Special Master**

**Dated: November 30, 2018**

2

# **EXHIBIT 12**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, Plaintiff, <br> v. <br> PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., MALLINCKRODT PLC; MALLINCKRODT LLC; and SPECGX LLC, Defendants. | Case No. 14-cv-04361 <br><br> Honorable Jorge L. Alonso <br><br> Magistrate Judge Young B. Kim |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' FIRST SET OF JOINT REQUESTS
FOR PRODUCTION TO PLAINTIFF**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Magistrate

Judge Kim's June 12, 2020 Order, Plaintiff City of Chicago ("the City") responds to Defendants'

First Set of Joint Requests for Production to Plaintiff (the "Requests") as follows.

**PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

1.      No response by the City is, nor shall be deemed, an admission of any factual or

legal contention contained in any Request or that the response is relevant to the claims of any party.

The City reserves all rights to object to the competency, relevance, materiality, and admissibility

of the information disclosed pursuant to these Requests.

1

2.     The City objects to each Request to the extent they are overly broad, vague, unduly burdensome, seeks information that is not relevant to any party's claim or defense, or seeks to impose obligations or require actions beyond those required by the Federal Rules of Evidence or Civil Procedure or the Local Rules of the United States District Court of the Northern District of Illinois.

3.     These responses are made solely for the purpose of and in relation to this action. Each answer is given subject to all appropriate objections, which would require the exclusion at trial of any statement contained or document provided herein. All such objections and the grounds therefore are hereby reserved.  The City expressly reserves the right to object to further discovery concerning the subject matter of any of Defendants' discovery requests as well as the introduction into evidence of any document or information produced pursuant hereto.

4.     The City responds and objects to each Request based on the best of its present knowledge, information, and belief.  The City's responses and objections are at all times subject to such additional or different information that discovery or further investigation may disclose.

5.     The City reserves the right to amend, modify, supplement, or withdraw any response or objection set forth herein, but disclaims any agreement or obligation to do so.

6.     The City is conducting a reasonable search for responsive documents that are within the City's possession, custody, or control.  Any response stating that the City will produce documents shall be deemed followed by the phrase "as are within the City's possession, custody, or control."  The City will produce copies of responsive, non-privileged documents that it identifies through its reasonable search, as limited by the City's objections, on a rolling basis.  The City's production will be in accordance with the Stipulated Order Regarding Discovery of Electronically Stored Information, Dkt. No. 562.

7.      The City objects to each Request to the extent they purport to require Plaintiff to produce documents that are in the public domain or otherwise available to Defendants as easily from other sources as from Plaintiff.

8.      The City objects to any the use of the term "Medically Necessary" as not relevant to the needs of the litigation as the reference to Section 1862(a)(1)(A) of the Social Security Act relates to the use of "Medically Necessary" for purposes of submitting claims for payment, recovery for which the City, by its Fifth Amended Complaint (the "FAC") expressly disclaims. (See FAC ¶ 837).

9.      The City objects to each Request to the extent they purport to state facts, assumptions, or characterizations that are disputed.  The City intends to complete its production by the time agreed upon by the parties for the completion of discovery, or by the date ordered by the Court.  Upon request by the requesting party, the City is willing to meet and confer regarding its responses to the Requests.

## SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

The City specifically objects to the definitions and instructions accompanying the Interrogatories on the following grounds, each of which is incorporated by reference in the responses and objections to the individual Interrogatories below.

1.      The City objects to the definition of "Communication" as overly broad and unduly burdensome to the extent it seeks to impose duties and responsibilities beyond those required by the Federal Rules of Civil Procedure, Local Rules, and/or any order regarding the discovery of electronically stored information entered in this action.

2.      The City objects to the definition of "Describe" as overly broad and unduly burdensome to the extent it seeks to impose duties and responsibilities beyond those required by

3

the Federal Rules of Civil Procedure, Local Rules, and/or any order regarding the discovery of electronically stored information entered in this action.

3.     The City objects to the definition of "Document" as overly broad and unduly burdensome to the extent it seeks to impose duties and responsibilities beyond those required by the Federal Rules of Civil Procedure, Local Rules, and/or any order regarding the discovery of electronically stored information entered in this action.

4.     The City objects to the definition of "identify" as overly broad and unduly burdensome to the extent it seeks to impose duties and responsibilities beyond those required by the Federal Rules of Civil Procedure, Local Rules, and/or any order regarding the discovery of electronically stored information entered in this action.

5.     The City objects to the definition of "Plaintiff," "You," "Your," "City," and "Chicago" as overly broad, unduly burdensome, and requesting types of information not in the City's possession, custody, or control.  To the extent the City has obtained responsive information from former employees, the City will provide that information, but in answering these Interrogatories the City has not made inquiry to all "former employees, boards, instrumentalities, vendors, administrators, and other persons or entities acting on the City's behalf or controlled by the City.

## SPECIFIC RESPONSES AND OBJECTIONS

### REQUEST NO. 1:

All Documents relating to or contradicting the allegations in the Complaint, including (a) Documents and Communications referenced in, cited in, referred to, or relied upon by Plaintiff in drafting the original and all amended Complaint(s); (b) Documents obtained by Plaintiff as a result of any investigation, settlement or other negotiation, or any agreement between Plaintiff and any Person prior to the filing of the original complaint or since (including but not limited to

4

any non-party manufacturer of Prescription Opioids, any distributor of Prescription Opioids or

pharmacy that dispenses Prescription Opioids, and any doctors or other HCPs, addiction

treatment specialists, law enforcement officials, public health officials, patients, and other

residents of Chicago interviewed by Plaintiff) regarding Prescription Opioids or the allegations

in or similar to those in the Complaint; (c) Documents and Communications that Plaintiff

received from or exchanged with any non-party pursuant to a request made or subpoena issued in

connection with the pending litigation or in the course of preparing for the litigation, including

but not limited to Documents and Communications with experts or parties in other opioid-related

litigations, former employees or representatives of any Defendant, and HCPs; and (d) any

Documents or Communications sent to or received from any former employees or

representatives of any Defendant or any HCP, including any notes memorializing interviews

with such individuals.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations

beyond what is required under the Federal Rules of Civil Procedure, the Northern District of

Illinois Local Rules of Civil Procedure, or applicable case law.  The City objects to this Request

to the extent it seeks information and materials protected from disclosure in discovery pursuant

to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine,

the law enforcement privilege, and/or any other applicable privilege that makes such information

non-discoverable.  The City objects to the extent that this Request seeks information protected

by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested

information, or by a Confidentiality Agreement, the terms of which allow the City to produce the

information only upon a court order or by consent of the affected party.  The City objects to this

Request on the grounds that it seeks the disclosure of preliminary expert analysis. The City

objects to this Request to the extent it constitutes multiple document requests in violation of the Federal Rules and Judge Kim's Orders.

Notwithstanding the City's objections, the City has produced and will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

**REQUEST NO. 2:**

For You and each of Your departments, agencies, and other constituent entities that You contend has incurred or will incur costs for which You seek damages, reimbursement, or other relief, all databases and Documents relating to such costs, including all databases and Documents relating to Your annual and periodic budgets, budget reconciliations, reports of spending, and financial statements, both past and prospective, as well as all transactional data and databases You or any such departments, agencies, or other constituent entities have ever used or generated to track, record, or otherwise account for revenue and expenditures that relate to or include the abuse, use, misuse, prescribing, dispensing, sale, distribution, addiction to, and/or diversion of Prescription Opioids, or the possession, abuse, sale, distribution, or addiction to Illicit Opioids or Illicit Drugs. Documents covered by this request include, without limitation: annual budgets; budget reports and reconciliations; annual financial and statistical reports; accounting detail and underlying database entries for revenues and expenditures; Documents relating to headcounts, salaries, benefits, and overtime for employees; Documents relating to revenues and revenue sources; grant documents (including grant applications, reports, and tracking documents); budget requests and worksheets from Your departments, agencies, and other constituent entities; contracts and agreements for the provision of products or services for which the expenditures described above were or will be incurred; audit reports and associated work papers and drafts;

6

Documents relating to any activities, programs, initiatives, or efforts by You or anyone with whom You collaborated to address, remedy, solve, or otherwise attend to the opioid crisis alleged in the Complaint; and all Documents relating to any evaluation, assessment, analysis, modeling, or review of any cost or financial or economic impact associated with the alleged improper prescribing of Prescription Opioids or the abuse, misuse, and/or distribution of these medications, Illicit Opioids, or Illicit Drugs. Plaintiff's production should include all data and databases used to track, record, or otherwise account for Your revenue and expenses and data dictionaries for any produced structured data.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law.  The City objects to this request as overbroad and unduly burdensome to the extent it seeks production of "all databases and Documents relating to such costs, including all databases and Documents relating to Your annual and periodic budgets, budget reconciliations, reports of spending, and financial statements, both past and prospective, as well as all transactional data and databases You or any such departments, agencies, or other constituent entities have ever used or generated to track, record, or otherwise account for revenue and expenditures that relate to or include the abuse, use, misuse, prescribing, dispensing, sale, distribution, addiction to, and/or diversion of Prescription Opioids, or the possession, abuse, sale, distribution, or addiction to Illicit Opioids or Illicit Drugs." The City objects to this Request as vague and ambiguous to the extent the phrase "constituent entities" is vague and capable of differing interpretations.  The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest

7

doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

Notwithstanding the City's objections, the City identifies the documents identified in response to Defendants' Joint Interrogatory No. 13. Further answering, the City will produce non-privileged Documents related to its budgets to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

**REQUEST NO. 3:**

All Documents relating to Plaintiff's actual, anticipated, or proposed expenditures relating to abuse, use, misuse, prescribing, dispensing, sale, distribution, addiction to, and/or diversion of non-opioid prescription drugs (including but not limited to benzodiazepines, gabapentin, muscle relaxants, and antipsychotics), or abuse and/or addiction to alcohol, including without limitation Documents relating to emergency assistance, treatment, or health care costs paid by You or by fully or partially-funded medical insurance plans and workers' compensation programs, and all Documents relating to any evaluation, assessment, analysis, modeling, or

8

review of any cost or financial or economic impact associated with the alleged improper

prescribing of non-opioid prescription drugs or the abuse or misuse of these medications or

alcohol.

**RESPONSE:**

      The City objects to this Request to the extent it seeks to impose on the City obligations

beyond what is required under the Federal Rules of Civil Procedure, the Northern District of

Illinois Local Rules of Civil Procedure, or applicable case law.  The City objects to this Request

to the extent it seeks information and materials protected from disclosure in discovery under the

attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the

law enforcement privilege, and/or any other applicable privilege that makes such information

non-discoverable.  If any privileged information is inadvertently produced, the City does not

waive, or intend to waive, the privilege pertaining to such information.  The City objects to the

extent that this Request seeks information protected or by statute(s) or by ordinance(s) that

restrict the City's ability to disclose the requested information, or by a Confidentiality

Agreement, the terms of which allow the City to produce the information only upon a court order

or by consent of the affected party.  The City objects that this Request is not proportional to the

needs of the case considering (1) the marginal importance of the materials to the claims and

defenses in this litigation and (2) the substantial cost to identify additional responsive materials

balanced against the amount in controversy.  The City objects to this Request on the grounds that

it seeks the disclosure of expert analysis.

      The City objects to producing documents concerning specific prescriptions or patients

because such information is not relevant to the claims and defenses asserted in this lawsuit and is

not proportional to the needs of the case because the City does not seek, and expressly disclaims,

recovery for any of the costs of prescription opioids paid for by the City's health plans or

workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See, e.g.,* 42 U.S.C. § 290dd-2; 42 C.F.R. § 2.12(a)(1); 410 ILCS § 50/3; 735 ILCS § 5/8-802; *Kunkel v. Walton*, 689 N.E.2d 1047, 1055, 179 Ill.2d 519, 537 (1997).

The City objects to this Request as overbroad and unduly burdensome to the extent it seeks "[a]ll Documents relating to Plaintiff's actual, anticipated, or proposed expenditures relating to abuse, use, misuse, prescribing, dispensing, sale, distribution, addiction to, and/or diversion of non-opioid prescription drugs (including but not limited to benzodiazepines, gabapentin, muscle relaxants, and antipsychotics), or abuse and/or addiction to alcohol." Such material is not relevant to the claims and defenses in this case, nor is it proportional to the needs of the case.

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request from agreed custodial or non-custodial sources that can be identified using a reasonable set of search terms, only to the extent: (i) that information concerning non-opioid medications or drugs (including information concerning abuse of non-opioid medications or drugs) is contained within documents pertaining to opioid medications or drugs; (ii) that information concerning non-opioid medications or drugs (including information concerning abuse of non-opioid medications or drugs) is contained within documents pertaining to substance abuse generally; or (iii) that information concerning non-opioid medications or drugs (including

information concerning abuse of non-opioid medications or drugs) is contained within generally applicable material, including medical/prescription plan documents, budgets and other databases.

**REQUEST NO. 4:**

All Documents relating to the purchase, prescribing, distribution, and dispensing of Prescription Opioids, including (a) instructions, directives, recommendations, procedures, policies, or guidelines relating to the distribution, prescribing, or use of Prescription Opioids; (b) Documents that relate to the legitimate need for and/or use of Prescription Opioids; (c) Documents that relate to the volumes of Prescription Opioids prescribed, dispensed, sold, distributed, diverted, and/or used in the City; and (d) Documents that relate to the maximum number of pills or other dosage units of Prescription Opioids that You believe, suspect, or contend could or should properly have been distributed, prescribed, or dispensed for legitimate medical purposes in the City.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law.  The City objects to this request as overbroad, unduly burdensome and not proportional to the needs of the case to the extent it seeks production of "[a]ll Documents relating to the purchase, prescribing, distribution, and dispensing of Prescription Opioids."  The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery under the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable.  If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information.  The City objects to the extent that this

11

Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See, e.g.,* 42 U.S.C. § 290dd-2; 42 C.F.R. § 2.12(a)(1); 410 ILCS § 50/3; 735 ILCS § 5/8-802; *Kunkel v. Walton*, 689 N.E.2d 1047, 1055, 179 Ill.2d 519, 537 (1997).

Notwithstanding the City's objections, the City will produce non-privileged Documents concerning City-sponsored medical plans and reimbursement policies and changes to those plans and policies, to the extent such documents are located within agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

12

**REQUEST NO. 5:**

All Documents and Communications relating to any system or service used by You or anyone acting on Your behalf to monitor, evaluate, assess, or otherwise examine potentially suspicious, improper, or unlawful prescribing of Prescription Opioids or the use, abuse, or diversion of Prescription Opioids, including but not limited to all Documents relating to Plaintiff's use of the Illinois Prescription Monitoring Program, the Illinois Prescription Information Library, or ARCOS Data, or information derived therefrom during the Relevant Time Period. Documents covered by this request include, without limitation: (a) Documents relating to information or material obtained from the PMP, PIL, or ARCOS, including but not limited to PMP, PIL, or ARCOS reports; (b) Documents relating to actions You took, or considered taking, based on information you received from the PMP, PIL, or ARCOS; (c) Documents relating to your policies and procedures relating to the PMP, PIL, or ARCOS; and (d) Documents related to the frequency and City department or agency affiliation of user logins or access to the PMP, PIL, or ARCOS.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery under the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that

13

restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See, e.g.,* 42 U.S.C. § 290dd-2; 42 C.F.R. § 2.12(a)(1); 410 ILCS § 50/3; 735 ILCS § 5/8-802; *Kunkel v. Walton*, 689 N.E.2d 1047, 1055, 179 Ill.2d 519, 537 (1997).

Notwithstanding the City's objections, the City agrees to produce non-privileged Documents responsive to this Request to the extent such documents are located within agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

**REQUEST NO. 6:**

All Documents relating to any activity or effort by You to address, remedy, solve, or otherwise attend to the alleged opioid crisis asserted in the Complaint, including but not limited to: (a) all efforts by You to treat, reduce, or prevent Prescription Opioid abuse, other prescription drug abuse, illicit prescribing and dispensing of Prescription Opioids, and the manufacturing, trafficking, distribution, sale, and use of Illicit Opioids; and (b) any public information campaign relating to Prescription Opioids or Illicit Opioids, including but not limited to, for each such

14

campaign, any meeting minutes, agendas, presentations, white paper or other memoranda, press releases, advertisements, advertising contracts, requests for proposals or bids, organizational charts, and Documents from all task force or campaign members or relating to budgeting and financing.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery under the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party.

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using reasonable search terms.

**REQUEST NO. 7:**

All Documents related to law enforcement or other investigatory efforts related to prescription drugs, including but not limited to Prescription Opioids, or any Illicit Opioid or Illicit Drug, including but not limited to: (a) Communications between Plaintiff and any Federal

Agency, Illinois Agency, federal, state, or local official or board, insurer, third-party payer, or pharmacy benefit manager that relate to actual or suspected Suspicious Orders, diversion, improper or excessive dispensing, improper prescribing, unlawful sale, or other suspected wrongdoing related to Prescription Opioids, or the possession, misuse, abuse, illegal sale, or addiction to other opioids; (b) Documents relating to any request or receipt of information from Plaintiff to any Federal Agency, Illinois Agency, federal, state, or local official or board, insurer, third-party payer, or pharmacy benefit manager that relate to any alleged failure by any Defendant or other pharmaceutical manufacturer, distributor, or pharmacy to report Suspicious Orders; (c) Documents relating to investigations of actual or suspected diversion or unlawful or improper prescribing or dispensing of Prescription Opioids or Illicit Opioids; (d) incident reports and/or arrest reports, drug seizure reports, drug threat assessments and/or drug market assessments, High Intensity Drug Trafficking Area reports, and Documents related thereto; (e) Documents relating to criminal diversion programs; and (f) all "heat maps" generated of violent crime and overdoses in the City, and Documents related thereto or otherwise tying violent crime to overdoses.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents related to law enforcement or other investigatory efforts related to prescription drugs, including but not limited to Prescription Opioids." The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If

16

any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using reasonable search terms.

**REQUEST NO. 8:**

A copy of the content of all law enforcement databases, drug seizure databases, crime lab databases, encounters databases, healthcare or public health databases, correctional health databases, dispensing databases, toxicology databases, emergency services databases, and any other database that contains data related to Prescription Opioids, Illicit Opioids, or any cost You seek to recover.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "the content of all law enforcement databases, drug seizure databases, crime lab databases, encounters databases, healthcare or public health databases, correctional health databases, dispensing databases, toxicology databases,

17

emergency services databases, and any other database that contains data related to Prescription

Opioids, Illicit Opioids, or any cost You seek to recover." The City objects to this Request to the

extent it seeks information and materials protected from disclosure in discovery under the

attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the

law enforcement privilege, and/or any other applicable privilege that makes such information

non-discoverable. If any privileged information is inadvertently produced, the City does not

waive, or intend to waive, the privilege pertaining to such information. The City objects to the

extent that this Request seeks information protected or by statute(s) or by ordinance(s) that

restrict the City's ability to disclose the requested information, or by a Confidentiality

Agreement, the terms of which allow the City to produce the information only upon a court order

or by consent of the affected party. The City objects that this Request is not proportional to the

needs of the case considering (1) the marginal importance of the materials to the claims and

defenses in this litigation and (2) the substantial cost to identify additional responsive materials

balanced against the amount in controversy.

The City objects to producing documents concerning specific prescriptions or patients

because such information is not relevant to the claims and defenses asserted in this lawsuit and is

not proportional to the needs of the case because the City does not seek, and expressly disclaims,

recovery for any of the costs of prescription opioids paid for by the City's health plans or

workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide

information from its claims data in response to Defendants' discovery requests. *See City of

Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824

(July 1, 2020) (granting motion for protective order). Additionally, such material is subject to

federal and state restrictions on disclosure. *See, e.g.,* 42 U.S.C. § 290dd-2; 42 C.F.R.§ 2.12(a)(1);

18

410 ILCS § 50/3; 735 ILCS § 5/8-802; *Kunkel v. Walton*, 689 N.E.2d 1047, 1055, 179 Ill.2d 519, 537 (1997).

Notwithstanding the City's objections, the City will produce non-privileged Documents from the databases identified in the City's response to Defendants' Joint Interrogatory No. 6.

**REQUEST NO. 9:**

All Documents that relate to any alleged Suspicious Orders placed by or shipped to any Person, and/or any prescriptions of Prescription Opioids, to which you attribute any injury that the City has suffered or costs for which You seek damages or other relief.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents that relate to any alleged Suspicious Orders placed by or shipped to any Person, and/or any prescriptions of Prescription Opioids, to which you attribute any injury that the City has suffered or costs for which You seek damages or other relief." The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the

19

affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy. The City objects to this Request on the grounds that it seeks the disclosure of expert analysis.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See, e.g.,* 42 U.S.C. § 290dd-2; 42 C.F.R. § 2.12(a)(1); 410 ILCS § 50/3; 735 ILCS § 5/8-802; *Kunkel v. Walton*, 689 N.E.2d 1047, 1055, 179 Ill.2d 519, 537 (1997).

Notwithstanding the City's objections, the City will produce non-privileged Documents concerning Suspicious Orders to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a set of reasonable search terms.

**REQUEST NO. 10:**

All Documents relating to any HCP that You, any Federal Agency, or any Illinois Agency suspected, determined, or contended prescribed or dispensed excessive amounts of Prescription Opioids within or to any patient in Chicago or otherwise failed to meet their regulatory obligations, including, without limitation, under 21 C.F.R. § 1306.04, 720 ILCS 570/312, 720 ILCS 570/314.5,

720 ILCS 570/316, and 720 ILCS 570/318. Documents covered by this request include, without limitation, the complete investigation and prosecution files for such HCPs and any PMP or PIL reports contained therein.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents relating to any HCP that You, any Federal Agency, or any Illinois Agency suspected, determined, or contended prescribed or dispensed excessive amounts of Prescription Opioids within or to any patient in Chicago or otherwise failed to meet their regulatory obligations." The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery under the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects to this Request on the grounds that it seeks the disclosure of preliminary expert analysis.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims,

recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See, e.g.,* 42 U.S.C. § 290dd-2; 42 C.F.R.§ 2.12(a)(1); 410 ILCS § 50/3; 735 ILCS § 5/8-802; *Kunkel v. Walton*, 689 N.E.2d 1047, 1055, 179 Ill.2d 519, 537 (1997).

Notwithstanding the City's objections, the City will produce non-privileged Documents concerning investigations or prosecutions of healthcare providers for overprescribing opioid medications to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a set of reasonable search terms.

**REQUEST NO. 11:**

All Documents from or related to the Chicago Department of Public Health or any other public agency related to controlled substances (including but not limited to Prescription Opioids) or any Illicit Drug. Documents covered by this Request include, without limitation: reports relating to drug overdose data; naloxone and other medication assisted treatment reports; substance use disorder treatment data and/or reports (sorted by primary medication or drug of choice and year); opioid use disorder treatment data and/or reports (sorted by primary drug of choice and year); records of grants available, sought, or received from any source; reports generated from the Illinois Prescription Monitoring Program or Illinois Prescription Information Library, and all Documents otherwise relating to such reports; and all underlying relevant datasets mined or otherwise used by public health epidemiologists.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request as overbroad, unduly burdensome and not proportional to the needs of the case to the extent it seeks production of "[a]ll Documents from or related to the Chicago Department of Public Health or any other public agency related to controlled substances (including but not limited to Prescription Opioids) or any Illicit Drug," and seeks documents relating to controlled substances other than opioids. The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or

23

workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See, e.g.,* 42 U.S.C. § 290dd-2; 42 C.F.R. § 2.12(a)(1); 410 ILCS § 50/3; 735 ILCS § 5/8-802; *Kunkel v. Walton*, 689 N.E.2d 1047, 1055, 179 Ill.2d 519, 537 (1997).

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request concerning prescriptions and illicit opioids to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a set of reasonable search terms.

**REQUEST NO. 12:**

All Documents relating to any evaluation, assessment, analysis, modeling, or review of (a) the prevalence or incidence of substance abuse and the types of substance abuse in Chicago, including without limitation those organized by particular substance abused (e.g., alcohol, amphetamine/methamphetamine, barbiturate, buprenorphine, codeine, fentanyl, heroin, hydrocodone, hydromorphone, methadone, morphine, opium, oxycodone, oxymorphone, etc.), or class of substance abused (e.g., Prescription Opioids, benzodiazepines, other prescription medications, cocaine, etc.); (b) the manner by which individuals addicted to, misusing, or abusing Prescription Opioids first obtained possession of, and began taking, Prescription Opioids (e.g., through a legitimate prescription, illegitimate prescription, or other illegitimate or unlawful means); (c) the substance(s) first abused by individuals addicted to, misusing, or abusing Prescription Opioids or Illicit Opioids; (d) any other substance(s) previously or currently abused by individuals addicted to, misusing, or abusing Prescription Opioids or Illicit Opioids; and (e)

24

the underlying health conditions for each individual addicted to, misusing, or abusing Prescription Opioids or Illicit Opioids.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this request as overbroad, unduly burdensome and not proportional to the needs of the case to the extent the Request seeks production of "All Documents relating to any evaluation, assessment, analysis, modeling, or review of "[a]ll Documents relating to any evaluation, assessment, analysis, modeling, or review of" the listed topics. The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery under the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy. The City objects to this Request on the grounds that it seeks the disclosure of expert analysis.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See* 42 C.F.R. § 2.12; *Kunkel v. Walton*, 689 N.E. 2d 1047, 1055, 179 Ill.2d 519, 537 (1997); Article I, § 6 of the Illinois Constitution; and 410 ILCS § 50/3 (establishing "[t]he right of each patient to privacy and confidentiality in health care"); 735 ILCS § 5/8-802 (establishing the physician-patient privilege).

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a set of reasonable search terms.

**REQUEST NO. 13:**

All minutes, agendas, notes, audio and/or visual recordings, and other Communications from any public health, safety, law enforcement, or budgetary meeting relating to Prescription Opioids and/or Illicit Opioids, including but not limited to all Documents relating to any opioid-related task forces and any drug utilization reviews or reviews of any HCPs conducted by Medicaid or any Program.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of

26

Illinois Local Rules of Civil Procedure, or applicable case law.  The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery under the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable.  If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information.  The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party.

The City objects to this request to the extent the request for production of any "drug utilization reviews" would disclose information concerning specific patients or prescriptions. The City objects to producing documents concerning specific patients or prescriptions because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837).  Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order).  Additionally, such material is subject to federal and state restrictions on disclosure. *See, e.g.,* 42 U.S.C. § 290dd-2; 42 C.F.R. § 2.12(a)(1); 410 ILCS § 50/3; 735 ILCS § 5/8-802; *Kunkel v. Walton*, 689 N.E.2d 1047, 1055, 179 Ill.2d 519, 537 (1997).

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a set of reasonable search terms.

**REQUEST NO. 14:**

All Documents relating to unintentional medication or drug overdose deaths in Chicago, including but not limited to all data You obtained from or provided for database(s) of the Cook County Office of the Chief Medical Examiner for all unintentional medication or drug overdose deaths (including but not limited to names, zip code fields, demographic fields, and fields related to cause and manner of death), data about drug overdose deaths entered into the National Violent Death Reporting System, death certificate data You obtained from or provided to the Cook County Clerk's Office or any other Cook County department, Documents relating to medication or drug overdose deaths, coroner's reports, autopsy reports, toxicology reports, medical examiners' verdicts, death certificates, and PMP or PIL reports used as part of autopsies and/or medical examiner investigations.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents relating to unintentional medication or drug overdose deaths in Chicago" and thus seeks information concerning non-opioid drugs. The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If

28

any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See* 42 C.F.R. § 2.12; *Kunkel v. Walton*, 689 N.E. 2d 1047, 1055, 179 Ill.2d 519, 537 (1997); Article I, § 6 of the Illinois Constitution; and 410 ILCS § 50/3 (establishing "[t]he right of each patient to privacy and confidentiality in health care"); 735 ILCS § 5/8-802 (establishing the physician-patient privilege).

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents relate to prescription and illicit opioids and are located within agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

**REQUEST NO. 15:**

Documents sufficient to Identify every Person whom Plaintiff contends, believes, suspects, or is aware was harmed in connection with any Prescription Opioid or for which Plaintiff seeks to recover costs and all Documents relating to each such Person's medical history, medical treatment, medical examinations, medical tests, prescriptions, therapy, injuries, diagnoses, medical condition, and/or death records, including any HCP's reports, records, summaries, test results, medical records, insurance records, pharmacy records, medical examiner records, and any other records relating to the use of any prescription or over-the-counter medications or Illicit Drugs.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials

balanced against the amount in controversy. The City objects to this Request on the grounds that it seeks the disclosure of expert analysis.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See* 42 C.F.R. § 2.12; *Kunkel v. Walton*, 689 N.E. 2d 1047, 1055, 179 Ill.2d 519, 537 (1997); Article I, § 6 of the Illinois Constitution; and 410 ILCS § 50/3 (establishing "[t]he right of each patient to privacy and confidentiality in health care"); 735 ILCS § 5/8-802 (establishing the physician-patient privilege).

Notwithstanding the City's objections, the City will produce non-privileged Documents concerning costs incurred for services rendered in response to opioid-related addiction and deaths to the extent such documents are located within agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms. The City will also produce non-privileged Documents from Fire and Police databases and custodians which may identify individuals harmed by Opioids.

**REQUEST NO. 16:**

All Documents relating to the administration of naloxone or similar treatments to individuals to treat apparent respiratory failure as a result of or related to a known or suspected medication or drug overdose, including but not limited to all Documents relating to the number of such treatments

provided and all Documents relating to the costs and the source of funds (including any grant applications and decisions thereon) used to cover the costs associated with such treatments.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents relating to the administration of naloxone or similar treatments to individuals to treat apparent respiratory failure as a result of or related to a known or suspected medication or drug overdose." The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy. The City objects to this Request on the grounds that it seeks the disclosure of expert analysis.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is

not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See* 42 C.F.R. § 2.12; *Kunkel v. Walton*, 689 N.E. 2d 1047, 1055, 179 Ill.2d 519, 537 (1997); Article I, § 6 of the Illinois Constitution; and 410 ILCS § 50/3 (establishing "[t]he right of each patient to privacy and confidentiality in health care"); 735 ILCS § 5/8-802 (establishing the physician-patient privilege).

Notwithstanding the City's objections, the City will produce non-privileged Documents concerning costs incurred for services rendered in response to opioid-related addiction and deaths to the extent such documents are located within agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms. The City will also produce non-privileged Documents from Fire and Police databases and custodians which may identify individuals receiving naloxone or similar treatments.

**REQUEST NO. 17:**

All Documents relating to the Chicago-Cook Task Force on Heroin and any other task forces or working groups involved in analyzing, addressing, remedying, solving, or otherwise attending to the abuse, misuse, addiction to, and/or diversion of Prescription Opioids, and/or possession, abuse, sale, distribution, or addiction to Illicit Opioids or other Illicit Drugs in Chicago.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of

33

Illinois Local Rules of Civil Procedure, or applicable case law.  The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents relating to the Chicago-Cook Task Force on Heroin and any other task forces or working groups involved in analyzing, addressing, remedying, solving, or otherwise attending to the abuse, misuse, addiction to, and/or diversion of Prescription Opioids, and/or possession, abuse, sale, distribution, or addiction to Illicit Opioids or other Illicit Drugs in Chicago."  The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable.  If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information.  The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party.  The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

**REQUEST NO. 18:**

All prescription- and individual-level data relating to Prescription Opioids, including (a) the full Medicaid or other Program claims history for prescriptions and other health care services

34

submitted to Medicaid or any other Program, whether reimbursed or not, for all patients who received a prescription for any Prescription Opioid; and (b) pharmacy and medical Claims Data, encounters or treatment data, and/or prescription dispensing data related to any Prescription Opioid prescribed to any patient, or substance abuse treatment provided to any patient, from hospitals, pharmacies, and/or any other treatment providers operated by or affiliated with (by contract or otherwise) Plaintiff.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation; (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy; and (3) the availability of data from other less burdensome sources, including the recipients of Defendants' subpoenas.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of*

35

*Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See* 42 C.F.R. § 2.12; *Kunkel v. Walton*, 689 N.E. 2d 1047, 1055, 179 Ill.2d 519, 537 (1997); Article I, § 6 of the Illinois Constitution; and 410 ILCS § 50/3 (establishing "[t]he right of each patient to privacy and confidentiality in health care"); 735 ILCS § 5/8-802 (establishing the physician-patient privilege).

**REQUEST NO. 19:**

All Documents and Communications reflecting or relating to public statements by You or anyone acting on Your behalf relating to Prescription Opioids, Illicit Opioids, the treatment of chronic pain, Defendants, the messages or materials You claim were false, or this litigation.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents and Communications reflecting or relating to public statements by You or anyone acting on Your behalf relating to Prescription Opioids, Illicit Opioids, the treatment of chronic pain, Defendants, the messages or materials You claim were false, or this litigation." The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's

36

ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party.  The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located within agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

**REQUEST NO. 20:**

All Documents concerning Your law enforcement and prosecutorial policies concerning Prescription Opioids and Illicit Opioids, including but not limited to all studies and evaluations of the effect or effectiveness of those policies and any actual, proposed, or contemplated changes to those policies.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law.  The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents concerning Your law enforcement and prosecutorial policies concerning Prescription Opioids and Illicit Opioids."  The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable.  If any

37

privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information.  The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party.  The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

**REQUEST NO. 21:**

All Documents and Communications maintained, or obtained by You or any of Your divisions, subdivisions, or agencies relating to thefts or diversion of Prescription Opioids from pharmacies, hospitals, HCPs, or any other location within the City of Chicago.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law.  The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents and Communications maintained, or obtained by You or any of Your divisions, subdivisions, or agencies relating to thefts or diversion of Prescription Opioids from pharmacies, hospitals, HCPs, or any other location within the City of Chicago."  The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the

attorney-client privilege, the attorney work product doctrine, the common interest doctrine, the law enforcement privilege, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

**REQUEST NO. 22:**

All Documents and Communications relating to the creation, implementation, or modification of any therapeutic intervention, switching programs, or any other program intended to allow or encourage patients or HCPs to use or switch to medications or treatments other than Prescription Opioids, including with respect to Medicaid or other program beneficiaries.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents and

Communications relating to the creation, implementation, or modification of any therapeutic intervention, switching programs, or any other program intended to allow or encourage patients or HCPs to use or switch to medications or treatments other than Prescription Opioids, including with respect to Medicaid or other program beneficiaries."  The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, and/or any other applicable privilege that makes such information non-discoverable.  If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information.  The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party.  The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

The City objects to this request to the extent documents concerning the "the creation, implementation, or modification of any therapeutic intervention, switching programs, or any other program" would require disclosure of material concerning specific patients or prescriptions.  The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not

obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See* 42 C.F.R. § 2.12; *Kunkel v. Walton*, 689 N.E. 2d 1047, 1055, 179 Ill.2d 519, 537 (1997); Article I, § 6 of the Illinois Constitution; and 410 ILCS § 50/3 (establishing "[t]he right of each patient to privacy and confidentiality in health care"); 735 ILCS § 5/8-802 (establishing the physician-patient privilege).

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

**REQUEST NO. 23:**

All Documents relating to evaluations of HCPs, including without limitation evaluation guidelines, oversight protocol, and any quality of care assessments by third parties, including patients.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents relating to evaluations of HCPs." The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, and/or any other applicable privilege that makes such information non-discoverable. If any privileged

41

information is inadvertently produced, the City does not waive, or intend to waive, the privilege pertaining to such information. The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party. The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order). Additionally, such material is subject to federal and state restrictions on disclosure. *See* 42 C.F.R. § 2.12; *Kunkel v. Walton*, 689 N.E. 2d 1047, 1055, 179 Ill.2d 519, 537 (1997); Article I, § 6 of the Illinois Constitution; and 410 ILCS § 50/3 (establishing "[t]he right of each patient to privacy and confidentiality in health care"); 735 ILCS § 5/8-802 (establishing the physician-patient privilege).

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

42

**REQUEST NO. 24:**

All Documents You relied upon in responding to Defendants' First Set of Joint Interrogatories.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege or the attorney work product doctrine.

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request.

**REQUEST NO. 25:**

All Documents reflecting all purchases of Prescription Opioids made by You, including the brand, units purchased, date, and seller.

**RESPONSE:**

The City objects to this Request to the extent it seeks to impose on the City obligations beyond what is required under the Federal Rules of Civil Procedure, the Northern District of Illinois Local Rules of Civil Procedure, or applicable case law. The City objects to this Request as overbroad and unduly burdensome to the extent it seeks production of "[a]ll Documents reflecting all purchases of Prescription Opioids made by You." The City objects to this Request to the extent it seeks information and materials protected from disclosure in discovery pursuant to the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, and/or any other applicable privilege that makes such information non-discoverable. If any privileged information is inadvertently produced, the City does not waive, or intend to waive, the

privilege pertaining to such information.  The City objects to the extent that this Request seeks information protected or by statute(s) or by ordinance(s) that restrict the City's ability to disclose the requested information, or by a Confidentiality Agreement, the terms of which allow the City to produce the information only upon a court order or by consent of the affected party.  The City objects that this Request is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this litigation and (2) the substantial cost to identify additional responsive materials balanced against the amount in controversy.

The City objects to producing documents concerning specific prescriptions or patients because such information is not relevant to the claims and defenses asserted in this lawsuit and is not proportional to the needs of the case because the City does not seek, and expressly disclaims, recovery for any of the costs of prescription opioids paid for by the City's health plans or workers compensation plans. (See FAC ¶ 837). Furthermore, the City is not obligated to provide information from its claims data in response to Defendants' discovery requests. *See City of Chicago v. Purdue Pharma, L.P.*, et al., No. 14-CV-4361, Mem. Op. and Order, Dkt No. 824 (July 1, 2020) (granting motion for protective order).  Additionally, such material is subject to federal and state restrictions on disclosure. *See* 42 C.F.R. § 2.12; *Kunkel v. Walton*, 689 N.E. 2d 1047, 1055, 179 Ill.2d 519, 537 (1997); Article I, § 6 of the Illinois Constitution; and 410 ILCS § 50/3 (establishing "[t]he right of each patient to privacy and confidentiality in health care"); 735 ILCS § 5/8-802 (establishing the physician-patient privilege).

Notwithstanding the City's objections, the City will produce non-privileged Documents responsive to this Request reflecting purchases of Prescription Opioids, if any, in the aggregate, to the extent such documents are located in agreed custodial or non-custodial sources and can be identified using a reasonable set of search terms.

44

Dated November 2, 2020

Respectfully submitted,

MARK FLESSNER
**Corporation Counsel, City of Chicago**

BY: /s/ *Linda J. Singer*
Thomas P. McNulty
Fiona A. Burke
City of Chicago, Department of Law
30 N. LaSalle St., Suite 1240
Chicago, IL 60602
thomas.mcnulty@cityofchicago.org
fiona.burke@cityofchicago.org
Phone: (312) 744-6929
Fax: (312) 742-3832

Linda Singer (admitted *pro hac vice*)
Elizabeth Smith (admitted *pro hac vice*)
David I. Ackerman (admitted *pro hac vice*)
MOTLEY RICE LLC
lsinger@motleyrice.com
esmith@motleyrice.com
dackerman@motleyrice.com
401 9th Street NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
Fax: (202) 386-9622

Kenneth A. Wexler
Bethany R. Turke
Kara A. Elgersma
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
kaw@wexlerwallace.com
brt@wexlerwallace.com
tad@wexlerwallace.com
Phone: (312) 346-2222
Fax: (312) 346-0022
*Attorneys for Plaintiff City of Chicago*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 2nd Day of November, 2020, I caused a true and correct copy of the foregoing: <u>**PLAINTIFF'S RESPONSE TO DEFENDANTS' FIRST SET OF JOINT REQUESTS FOR PRODUCTION TO PLAINTIFF**</u> to be served by electronic means upon the following counsel of record:

| | |
|---|---|
| Donna Welch, P.C.<br>Timothy Knapp, P.C.<br>Karl Stampfl<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>donna.welch@kirkland.com<br>timothy.knapp@kirkland.com<br>karl.stampfl@kirkland.com<br><br>Jennifer G. Levy, P.C.(admitted pro hac vice)<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Avenue,NW<br>Washington, DC 20004<br>Telephone: (202) 389-5000<br>Facsimile: (202) 389-5200<br>jennifer.levy@kirkland.com<br><br>*Counsel for Defendant Allergan Finance,*<br>*LLC f/k/a Actavis, Inc. f/k/a Watson*<br>*Pharmaceuticals, Inc. and Allergan plc*<br><br>Charles C. Lifland<br>Sabrina H. Strong<br>Esteban Rodriguez<br>O'MELVENY & MYERS LLP<br>400 S. Hope Street<br>Los Angeles, CA 90071<br>Telephone: (213) 430-6000<br>Facsimile: (213) 430-6407<br>clifland@omm.com<br>sstrong@omm.com<br>esrodriguez@omm.com<br><br>Amy R. Lucas<br>O'MELVENY & MYERS LLP<br>1999 Avenue Of The Stars | Carole S. Rendon<br>BAKER HOSTETLER<br>Key Tower  127 Public Square, Suite 200<br>Cleveland, Ohio 44114-1214<br>Telephone: (216) 861-7240<br>crendon@bakerlaw.com<br><br>Joshua M. Davis<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Ave, NW<br>Washington, DC 20001<br>(202) 942-5000<br>joshua.davis@arnoldporter.com<br><br>*Attorneys for Defendants Endo Health*<br>*Solutions Inc. and Endo Pharmaceuticals Inc.*<br><br>Tinos Diamantatos<br>Morgan, Lewis & Bockius LLP<br>77 West Wacker Drive<br>Chicago, Illinois 60601<br>Telephone: (312) 324-1000<br>Fax: (312) 324-1001<br>Firm ID #40417<br>tinos.diamantatos@morganlewis.com<br><br>Eric Sitarchuk<br>Rebecca Hillyer<br>MORGAN, LEWIS & BOCKIUS LLP<br>1701 Market St.<br>Philadelphia, PA 19103-2921<br>Tel: (215) 963-5000<br>eric.sitarchuk@morganlewis.com<br>rebecca.hillyer@morganlewis.com<br><br>Brian M. Ercole (admitted pro hac vice)<br>MORGAN, LEWIS & BOCKIUS LLP<br>200 South Biscayne Boulevard |

| | |
|---|---|
| Los Angeles, CA 90067<br>Telephone: (310) 246-6784<br>Facsimile: (310) 246-6779<br>alucas@omm.com<br><br>Sherry A. Knutson (#6276306)<br>TUCKER ELLIS LLP<br>233 South Wacker Drive, Suite 6950<br>Chicago, Illinois 60606<br>Telephone: (312) 624-6300<br>Facsimile: (312) 624-6309<br>sherry.knutson@tuckerellis.com<br>*Attorneys for Defendants Janssen*<br>*Pharmaceuticals, Inc., Johnson & Johnson,*<br>*Janssen Pharmaceutica, Inc. n/k/a Janssen*<br>*Pharmaceuticals, Inc., and Ortho-McNeil-*<br>*Janssen Pharmaceuticals, Inc. n/k/a Janssen*<br>*Pharmaceuticals, Inc* | Miami, FL 33133-2339<br>Tel: (305) 415-3416<br>brian.ercole@morganlewis.com<br><br>*Counsel for Defendant Teva Pharmaceutical*<br>*Industries Ltd. Cephalon, Inc. and Teva*<br>*Pharmaceuticals USA, Inc* |

Executed on November 2, 2020

By: */s/ David I. Ackerman*
MOTLEY RICE LLC
401 9th Street NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
Fax: (202) 386-9622

# **EXHIBIT 13**



1

JAN-MS-05488277



Highly Confidential - Attorneys' Eyes Only

JAN-MS-05488278

## EPG Historical Sales Performance

| | 2014 NTS | 2013 NTS | 2012 NTS | '14 vs '13 | '13 vs 12 |
|---|---|---|---|---|---|
| OTC LO | | | | | |
| ELMIRON | REDACTED: Non-Responsive J&J Product | | | | |
| TOPAMAX | | | | | |
| CONCERTA AG | | | | | |
| DURAGESIC | 90 | 85 | 105 | 6% | -19% |
| Other EPG | REDACTED: Non-Responsive J&J Product | | | | |
| TOTAL EPG | | | | | |

*NOTE:  PROCRIT transitioned into EPG following JU submission; NTS= [ _____ ]

DOXIL also transitioning into EPG following BP submission; NTS = [ _____ ]

janssen J   PHARMACEUTICAL COMPANIES
           of Johnson & Johnson

3

Highly Confidential - Attorneys' Eyes Only

JAN-MS-05488279

## EPG 2015 Executive Summary

**Financial Highlights**

- **2015 JU** expected to deliver $[____] ($[____] excluding CA MMA) with GP of [__]% and Contribution of [__]% across EPG portfolio of 30 Branded Products and 9 3rd Party Authorized Generics

- **2015 JU vs. 2015 FBP NTS** increase of [_____] ([__]%)

  - Approximately [__]% due to the CA Managed Medicaid Adjustment [_____] and the Bioequivalence Reclassification of generic Methylphenidate competition [_____])

  - ORTHO TRI-CYCLEN LO [REDACTED: Non-Responsive J&J Product]    **REDACTED: Non-Responsive J&J Product**

**Key Brand Highlights**

1. Execute effective and time appropriate strategies to maximize value of key EPG assets pre/post LOE:

   - Optimize Concerta AG [REDACTED: Non-Responsive J&J Product]

   - Increase engagement with ELMIRON [REDACTED: Non-Responsive J&J Product]

2. ORTHO TRI-CYCLEN LO [**REDACTED: Non-Responsive J&J Product**]

3. BME Investment of $[____] flat to 2015 FBP

Janssen PHARMACEUTICAL COMPANIES of Johnson & Johnson

4

Highly Confidential - Attorneys' Eyes Only



OTC Lo GTN: REDACTED: Non-Responsive J&J Product

REDACTED: Non-Responsive J&J Product

OTC Lo Share: REDACTED: Non-Responsive J&J Product

OTC Lo RR: REDACTED: Non-Responsive J&J Product

REDACTED: Non-Responsive J&J Product

Concerta GTN: REDACTED: Non-Responsive J&J Product

Duragesic GTN: AMP Ruling timing pushed to 4Q

Other Branded Ocs GTN: REDACTED: Non-Responsive J&J Product

5

Highly Confidential - Attorneys' Eyes Only



6

JAN-MS-05488282



Highly Confidential - Attorneys' Eyes Only

JAN-MS-05488283



**Current Strategies/ Best Practices**

8

Highly Confidential - Attorneys' Eyes Only

JAN-MS-05488284



Highly Confidential - Attorneys' Eyes Only

JAN-MS-05488285

**ELMIRON®: 2015 FBP NTS $** REDACTED: Non-Responsive J&J Product

**REDACTED: Non-Responsive J&J Product**

Janssen | PHARMACEUTICAL COMPANIES of Johnson & Johnson

10

JAN-MS-05488286

**ELMIRON® 2015 Final Business Plan**

**REDACTED: Non-Responsive J&J Product**

11

JAN-MS-05488287



Highly Confidential - Attorneys' Eyes Only

JAN-MS-05488288

Concerta AG – 2015 JU

**REDACTED: Non-Responsive J&J Product**

Janssen | PHARMACEUTICAL COMPANIES of Johnson-Johnson

13

Highly Confidential - Attorneys' Eyes Only

# EXHIBIT 14

**Confidential: Privileged Information**

| Meeting Title: | Generic Operations Meeting | Start Time: | 1:30 PM (EDT)/10:30 AM (PDT) |
|---|---|---|---|
| Meeting Date: | June 24, 2011 | End | 2:00 PM (EDT)/11:00 AM (PDT) |

### *ATTENDEES*

<u>*Committee Members*</u>

| | |
|---|---|
| Paul Bisaro* | Francois Menard |
| Andy Boyer* | Diane Miranda* |
| Beth Brannan | Jeff Morrod |
| Patrick Brunner | Daniel Motto* |
| David Buchen | Gordon Munro |
| Joyce Delgaudio* | Sigurdur Olafsson |
| Shahin Fesharaki | Jeff Regan* |
| Miguel Gomez | Eric Schumacher* |
| Janie Gwinn* | Bob Stewart* |
| Amy Hulina* | Atul Tandon* |
| Todd Joyce* | Janet Vaughn* |
| Jerry Loomstein* | Fred Weihmuller* |
| Marcelo Omelczuk* | Jim Williamson |

*\* In attendance*

**Agenda Updates:**
- Key Product Review (R: R&D updates; C: Commercial updates)
  - EE/Levonorgestrel (Seasonique / Amethia)
    - R: No Updates. 6/17/11: Received FA on 5/31/11.
    - C: 6/17/11: Launch ready.

  - Levonorgestrel/ EE Tablets and EE Tablets (Lo Seasonique / Lo Amethia) – Redacted - Other Teva Product

# Redacted - Other Teva Product

  - Vancomycin (Vancocin) – Redacted - Other Teva Product

# Redacted - Other Teva Product

**Highly Confidential**

**Acquired_Actavis_02347327**

Confidential: Privileged Information

**Redacted - Other Teva Product**

- Calcitonin Salmon Nasal (Miacalcin): **Redacted - Other Teva Product**

**Redacted - Other Teva Product**

- Clonidine TD (Catapres TTS): **Redacted - Other Teva Product**

**Redacted - Other Teva Product**

- Testosterone Gel (Androgel): **Redacted - Other Teva Product**

**Redacted - Other Teva Product**

- Fentanyl TD – Best Case: Apr 2012 / Most Probable: Jul 2012.
  - R: No updates. 11/18/10: The adhesion study failed, SLC is evaluating impact and next steps.
  - R: 12/3/10: New batch to be made (larger size matching brand); adhesion study to start

Highly Confidential

Acquired_Actavis_02347328

**Confidential: Privileged Information**

*Generic Operations Committee Meeting*

1/22; team recommends waiting for preliminary adhesion results and possibly PK results, before starting the I/S study. This gives a range of mid Jun to end of Jul for submitting the ANDA for the RLD strength. Additional strengths will be made after preliminary study results are available.

- R: 2/8/11: Received a call from FDA Drug Shortages, one of our competitors will not be able to provide product to the market for all the strengths. FDA wanted to make sure if this did occur Watson is prepared. Per marketing, the issue is with J&J (Brand) and Sandoz AG.
- R: 3/15/11: FDA Drug Shortages requested an update and inquired if Watson has seen a percentage increase. FDA is going to help us in obtaining more quota.
- R: 5/20/11: Adhesion and PK studies pass, the I/S study is due late Jul; filing is planned for early Oct 2011 based on the stability data reports for the waiver strengths.
- C: 6/17/11: No updates.

- Drospirenone/EE (Yaz): Redacted - Other Teva Product

# Redacted - Other Teva Product

- Norethindrone and Ethinyl Estradiol Tablets, Chewable, 0.4 mg/0.035 mg and Ferrous Fumarate

# Redacted - Other Teva Product

- Ropinirole Hydrochloride Extended-Release Tablets, 2 mg, 4 mg, 6 mg, 8 mg and 12 mg (REQUIP® XL): Redacted - Other Teva Product

# Redacted - Other Teva Product

- Bupropion Hydrobromide ER (Aplenzin): Redacted - Other Teva Product

# Redacted - Other Teva Product

- Morphine ER (Kadian): Redacted - Other Teva Product

# Redacted - Other Teva Product

**Highly Confidential**

**Acquired_Actavis_02347329**

Confidential: Privileged Information

Generic Operations Committee Meeting

**Redacted - Other Teva Product**

▪ Risperidone ODT (Risperdal) Redacted - Other Teva Product

**Redacted - Other Teva Product**

▪ Isradapine ER (Dynacirc CR) Redacted - Other Teva Product

**Redacted - Other Teva Product**

▪ Leviteracetam XR (Keppra XR) Redacted - Other Teva Product

**Redacted - Other Teva Product**

▪ Trospium XR (Sanctura XR) Redacted - Other Teva Product

**Redacted - Other Teva Product**

▪ Nabumetone (Relafen) Redacted - Other Teva Product

Redacted - Other Teva Product

▪ Nitrofurantoin Macrocrystals (Macrodantin) Redacted - Other Teva Product

**Redacted - Other Teva Product**

▪ Guaifenesin ER (Mucinex) Redacted - Other Teva Product

**Redacted - Other Teva Product**

Highly Confidential

Acquired_Actavis_02347330

**Confidential:  Privileged Information**

*Generic Operations Committee Meeting*

**Redacted - Other Teva Product**

▪ Guaifenesin / Dextromethorphan (Mucinex DM): Redacted - Other Teva Product

**Redacted - Other Teva Product**

▪ Guaifenesin / Pseudoephedrine (Mucinex D): **Redacted - Other Teva Product**

**Redacted - Other Teva Product**

▪ Clopidogrel (Plavix): Redacted - Other Teva Product

**Redacted - Other Teva Product**

▪ Ursodiol (Urso Forte)" Best Case / Most Probable: Redacted - Other Teva Product

**Redacted - Other Teva Product**

▪ Azelastine Nasal (Astelin): Redacted - Other Teva Product

**Redacted - Other Teva Product**

▪ Budesonide Susp. Inh. (Pulmicort): Redacted - Other Teva Product

**Redacted - Other Teva Product**

Acquired_Actavis_02347331

Confidential:  Privileged Information

Generic Operations Committee Meeting

**Redacted - Other Teva Product**

- Ibandronate (Boniva): Redacted - Other Teva Product

**Redacted - Other Teva Product**

- Rosuvastatin Zinc: Redacted - Other Teva Product

**Redacted - Other Teva Product**

- Amlodipine/Benazepril Tablets 10/40 mg and 5/40 mg: Redacted - Other Teva Product

**Redacted - Other Teva Product**

- Latanoprost Ophthalmic Solution: Redacted - Other Teva Product

**Redacted - Other Teva Product**

- Folic Acid: 2/10/09: Redacted - Other Teva Product

**Redacted - Other Teva Product**

New Approvals:  N/A

Highly Confidential

Acquired_Actavis_02347332

# **EXHIBIT 15**

07/20/2011 12:50 FAX &#8230; 002/004



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
Silver Spring, MD 20993

**TRANSMITTED BY FACSIMILE**

Franklin Vairinhos, Ph.D.
Director, Regulatory Affairs
Cephalon, Inc.
41 Moores Road
Frazer, PA 19355 USA

**RECEIVED**

JUL 2 0 2011

REGULATORY AFFAIRS

RE:
> ## Redacted - Other Product

Dear Dr. Vairinhos:

# Redacted - Other Product

Referenc  ID: 2976312

Confidential

TEVA_CHI_00045355

07/20/2011 12:50 FAX                                                    ✍003/004

# Redacted - Other Product

Sincerely,

{See appended electronic signature page}

Karen Rulli, Ph.D.
Group Leader
Division of Drug Marketing,
  Advertising, and Communications

Reference ID: 2976312

Confidential                                        TEVA_CHI_00045356

07/20/2011 12:50 FAX          ☐004/004

---------------------------------------------------------------------------------

**This is a r pr   entation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---------------------------------------------------------------------------------

/s/
----------------------------------------------

KAREN R RULLI
07/20/2011

Reference ID: 2976312

Confidential

TEVA_CHI_00045357

# EXHIBIT 16



**MotleyRice**®
LLC
ATTORNEYS AT LAW
www.motleyrice.com

401 9th St. NW, Suite 1001
Washington, DC 20004
**o.** 202.232.5504  **f.** 202.232.5513

**David I. Ackerman**
*Licensed in DC, NJ, NY*
direct: 202.849.4962
dackerman@motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

July 1, 2020

**BY EMAIL**

**SEE ATTACHED LIST OF DEFENSE COUNSEL**

Re:     *City of Chicago v. Purdue Pharma L.P., et al.*, No. 1:14-cv-04361 (N.D. Ill.)
        Chicago Production Volume CHI_011

Dear Counsel:

The City of Chicago is sending a production of documents to you today via Ricoh's sftp link, volume CHI_011. The bates range for this production is CHI_002668022 - CHI_002924651. The password to access this production is $xP=F5.

This production consists of 28,375 documents; 256,630 pages; and 3,183 native files. This production contains documents from the following custodial files:

1. City of Chicago Police Department
2. Department of Public Health
3. Office of Budget and Management
4. Department of Finance
5. Office of the Mayor
6. Daniel Ashley
7. Arneda Hamilton
8. Chris Wheat
9. Erica Salem
10. Jamie Dircksen
11. Jesse Lava
12. Kelvy Brown
13. Kendall Stagg
14. Leslie Stein Spencer
15. Matt Fischler
16. Matthew Link
17. Nik Prachand
18. Will Wong
19. Bechara Choucair
20. Roderick Jones
21. Marlita White

The City's production contains material that has been designated confidential and/or highly confidential – attorneys' eyes only pursuant to the confidentiality order entered in this case. The City's production of documents should not be seen as a waiver of any objection the City has previously raised in connection with Defendants' document requests.



Defendants' Counsel
Re: Chicago Production CHI_011
July 1, 2020
Page 2

This production contains documents from the Chicago police database known as CHRIS (Criminal History Records Information System) which contains information on police incidents and arrests. The CHRIS application began in 1999 and initially included information entered from paper police reports. Electronic information became more accurate and available at various times as incident reporting and arrest reports was updated throughout the years. By 2009, all Districts were reliably collecting electronic information. Case data in CHRIS is never deleted.

The database is relational and consists of over 40 tables. There is a main case table that has basic, single level incident information (report number, date/time of occurrence, primary type of incident, current status, etc.). There are also tables related to arrests, suspects, evidence, etc. The City makes their crime reports and data publicly available. See https://data.cityofchicago.org/Public-Safety/Crimes-2001-to-present/ijzp-q8t2. Reports from this site are produced at CHI_002919968 and CHI_002919969. This dataset of over 7 million reports reflects incidents of crime (with few exceptions) that occurred in the City of Chicago from 2001 to present.

Since late 1999, police officers have entered at least one Illinois Uniform Crime Reporting (IUCR) code on their case reports. The City produced all IUCR Codes at CHI_002919930. Given that IUCR codes were used consistently back to 1999, these codes provide a way to reliably search reports back in time.

The City searched CHRIS for all closed/cleared cases that involve opioids. The search includes the following:

- any report with an opioid related offense code (see all codes in the IUCR table below); or

- any report that involve an opioid property type, (using the Narcotics Property table below, for all indicated with a 'Y'); or

- any reports that involve an opioid crime (using the Crime Types table below, for any indicated with a 'Y').

This searches yielded 262,629 reports, which the City produced at CHI_002919929. The field "RD" is the report ID number and can be used to track incidents over the following tables: Notes, Incidents, Narcotics, Arrests, which are included in CHI_002919929.

If you would like to discuss crafting the search using any additional codes, or have any questions on this, please let us know.



Defendants' Counsel
Re: Chicago Production CHI_011
July 1, 2020
Page 3

## IUCR TABLE

| CD | PRIMARY CLASS | SECONDARY CLASS |
|----|---------------|-----------------|
| 1900 | OTHER NARCOTIC VIOLATION | INTOXICATING COMPOUNDS |
| 2013 | NARCOTICS | MANUFACTURE / DELIVER - HEROIN (TAN / BROWN TAR) |
| 2014 | NARCOTICS | MANUFACTURE / DELIVER - HEROIN (WHITE) |
| 2018 | NARCOTICS | MANUFACTURE / DELIVER - SYNTHETIC DRUGS |
| 2019 | NARCOTICS | MANUFACTURE / DELIVER - HEROIN (BLACK TAR) |
| 2023 | NARCOTICS | POSSESS - HEROIN (TAN / BROWN TAR) |
| 2024 | NARCOTICS | POSSESS - HEROIN (WHITE) |
| 2029 | NARCOTICS | POSSESS - HEROIN (BLACK TAR) |
| 2030 | NARCOTICS | MANUFACTURE / DELIVER - LOOK-ALIKE DRUG |
| 2040 | NARCOTICS | POSSESS - LOOK-ALIKE DRUGS |
| 2050 | NARCOTICS | CRIMINAL DRUG CONSPIRACY |
| 2060 | NARCOTICS | FAILURE TO REGISTER LICENSE - CONTROLLED SUBSTANCES |
| 2070 | NARCOTICS | DELIVER CONTROLLED SUBSTANCES TO PERSON UNDER 18 |
| 2080 | NARCOTICS | FAILURE TO MAINTAIN RECORDS - CONTROLLED SUBSTANCES |
| 2090 | NARCOTICS | ALTER / FORGE PRESCRIPTION |
| 2092 | NARCOTICS | SOLICIT NARCOTICS ON PUBLIC WAY |
| 2093 | NARCOTICS | FOUND SUSPECT NARCOTICS |
| 2095 | NARCOTICS | ATTEMPT POSSESSION NARCOTICS |
| 5105 | NON-CRIMINAL | NALOXONE USE BY DEPARTMENT MEMBER |

## NARCOTICS PROPERTY

| CD | DESCR | Opioid |
|----|-------|--------|
| 1 | COCAINE – CRACK | |
| 2 | COCAINE - POWDERED | |
| 3 | METHAMPHETAMINE (ICE) | |
| 4 | HEROIN – WHITE | Y |
| 5 | HEROIN - TAN BROWN | Y |
| 6 | HEROIN - BLACK TAR | Y |
| 7 | PCP – LIQUID | |
| 8 | PCP – POWDERED | |
| 9 | PCP - LACED MATERIAL | |
| 10 | CANNABIS – GENERIC | |
| 11 | CANNIBIS - SINSEMILLA | |
| 12 | HASHISH | |



Defendants' Counsel
Re: Chicago Production CHI_011
July 1, 2020
Page 4

| 13 | HASH OIL | |
| 14 | LSD | |
| 15 | ECSTACY / MDMA | |
| 16 | PSILOCYBIN | |
| 17 | TRANQUILIZER | |
| 18 | PILLS – DILAUDED | Y |
| 19 | PILLS – OXYCODONE | Y |
| 20 | PILLS – QUAALUDE | |
| 21 | PILLS – RITALIN | |
| 22 | PILLS – ROHYPNOL | |
| 23 | PILLS – TALWIN | |
| 24 | PILLS - TRIPELENNAMINE | |
| 25 | PILLS – VALIUM | |
| 26 | STEROID – LIQUID | |
| 27 | STEROID – PILLS | |
| 28 | CODEINE – LIQUID | Y |
| 29 | CODEINE – PILLS | Y |
| 30 | GHB – LIQUID | |
| 31 | METHADONE | Y |
| 32 | COCAINE – LIQUID | |
| 33 | CANNABIS - MEXICAN | |
| 34 | OPIUM | Y |
| 35 | BARBITUATES | |



Defendants' Counsel
Re: Chicago Production CHI_011
July 1, 2020
Page 5

## CRIME TYPES FOR NARCOTICS

| CD | PRIMARY_CLASS | SECONDARY_CLASS | Opioid |
|---|---|---|---|
| 2013 | NARCOTICS | MANUFACTURE / DELIVER - HEROIN (TAN / BROWN TAR) | Y |
| 2014 | NARCOTICS | MANUFACTURE / DELIVER - HEROIN (WHITE) | Y |
| 2019 | NARCOTICS | MANUFACTURE / DELIVER - HEROIN (BLACK TAR) | Y |
| 2023 | NARCOTICS | POSSESS - HEROIN (TAN / BROWN TAR) | Y |
| 2024 | NARCOTICS | POSSESS - HEROIN (WHITE) | Y |
| 2029 | NARCOTICS | POSSESS - HEROIN (BLACK TAR) | Y |
| 1821 | NARCOTICS | MANUFACTURE / DELIVER - CANNABIS 10 GRAMS OR LESS | |
| 1822 | NARCOTICS | MANUFACTURE / DELIVER - CANNABIS OVER 10 GRAMS | |
| 1840 | NARCOTICS | DELIVER CANNABIS TO PERSON UNDER 18 | |
| 1850 | NARCOTICS | CANNABIS PLANT | |
| 1811 | NARCOTICS | POSSESS - CANNABIS 30 GRAMS OR LESS | |
| 1812 | NARCOTICS | POSSESS - CANNABIS MORE THAN 30 GRAMS | |
| 2018 | NARCOTICS | MANUFACTURE / DELIVER - SYNTHETIC DRUGS | Y |
| 2026 | NARCOTICS | POSSESS - PCP | |
| 2028 | NARCOTICS | POSSESS - SYNTHETIC DRUGS | Y |
| 1860 | NARCOTICS | CALCULATED CANNABIS CONSPIRACY | |
| 1900 | OTHER NARCOTIC VIOLATION | INTOXICATING COMPOUNDS | Y |
| 2010 | NARCOTICS | MANUFACTURE / DELIVER - AMPHETAMINES | |
| 2011 | NARCOTICS | MANUFACTURE / DELIVER - BARBITURATES | |
| 2015 | NARCOTICS | MANUFACTURE / DELIVER - HALLUCINOGEN | |
| 2016 | NARCOTICS | MANUFACTURE / DELIVER - PCP | |
| 2030 | NARCOTICS | MANUFACTURE / DELIVER - LOOK-ALIKE DRUG | Y |
| 2040 | NARCOTICS | POSSESS - LOOK-ALIKE DRUGS | Y |
| 2050 | NARCOTICS | CRIMINAL DRUG CONSPIRACY | Y |
| 2080 | NARCOTICS | FAILURE TO MAINTAIN RECORDS - CONTROLLED SUBSTANCES | Y |
| 2020 | NARCOTICS | POSSESS - AMPHETAMINES | |
| 2021 | NARCOTICS | POSSESS - BARBITURATES | |



Defendants' Counsel
Re: Chicago Production CHI_011
July 1, 2020
Page 6

| 2025 | NARCOTICS | POSSESS - HALLUCINOGENS | |
| 2060 | NARCOTICS | FAILURE TO REGISTER LICENSE - CONTROLLED SUBSTANCES | Y |
| 2070 | NARCOTICS | DELIVER CONTROLLED SUBSTANCES TO PERSON UNDER 18 | Y |
| 2110 | NARCOTICS | POSSESS - HYPODERMIC NEEDLE | |
| 2012 | NARCOTICS | MANUFACTURE / DELIVER - COCAINE | |
| 2017 | NARCOTICS | MANUFACTURE / DELIVER - CRACK | |
| 2022 | NARCOTICS | POSSESS - COCAINE | |
| 2027 | NARCOTICS | POSSESS - CRACK | |
| 2091 | NARCOTICS | FORFEIT PROPERTY | |
| 2111 | NARCOTICS | SALE / DELIVER - HYPODERMIC NEEDLE | |
| 2120 | NARCOTICS | FAILURE TO KEEP HYPODERMIC RECORDS | |
| 2092 | NARCOTICS | SOLICIT NARCOTICS ON PUBLIC WAY | Y |
| 2093 | NARCOTICS | FOUND SUSPECT NARCOTICS | Y |
| 2094 | NARCOTICS | ATTEMPT POSSESSION CANNABIS | |
| 2095 | NARCOTICS | ATTEMPT POSSESSION NARCOTICS | Y |
| 2090 | NARCOTICS | ALTER / FORGE PRESCRIPTION | Y |
| 2031 | NARCOTICS | POSSESS - METHAMPHETAMINE | |
| 2032 | NARCOTICS | MANUFACTURE / DELIVER - METHAMPHETAMINE | |
| 2160 | NARCOTICS | SALE / DELIVER - DRUG PARAPHERNALIA | |
| 2170 | NARCOTICS | POSSESSION OF DRUG EQUIPMENT | |
| 2033 | NARCOTICS | MANUFACTURE / DELIVER - SYNTHETIC MARIJUANA | |
| 2034 | NARCOTICS | POSSESSION - SYNTHETIC MARIJUANA | |

Additionally, this production contains the database dictionary for the Computer Aided Dispatch (CAD) database from Office of Emergency Management Communications, CHI_002919928. Production from this database was previously made at CHI_002428937. Lastly, this production contains the layout for the Pharmaceutical Representative License database hosted by Department of Business Affairs and Consumer Protection, CHI_002735720. We propose searching the field, "Please provide the business name of your employer," with the names of Defendants in this case. If you would like to discuss crafting the search using any additional information, or have any questions on this, please let us know.

Please let me know if you have any questions or if you experience any difficulties accessing these documents.

Sincerely,



Defendants' Counsel
Re: Chicago Production CHI_011
July 1, 2020
Page 7

/s/

David I. Ackerman

cc: All counsel of record (via Plaintiff's and Defendants' email distribution lists)



Defendants' Counsel
Re: Chicago Production CHI_011
July 1, 2020
Page 8

DEFENSE COUNSEL

Tinos Diamantatos
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601
(312)-324-1000
Firm Id # 40417
tinos.diamantatos@morganlewis.com

Eric W. Sitarchuk
Rebecca J. Hillyer
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103-2921
T: 215.963.5840
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com

*Attorneys for Teva Pharmaceuticals, U.S.A.,
Inc., Cephalon, Inc., Watson Laboratories, Inc., Actavis
LLC, and Actavis Pharma, Inc.*

Jonathan L. Stern
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Phone: 202-942-5000
Email: Joshua.davis@arnoldporter.com

Donna Welch, P.C.
Timothy W. Knapp, P.C.
Karl Stampfl
KIRKLAND & ELLIS LLP
300 North LaSalle, Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
donna.welch@kirkland.com
tknapp@kirkland.com
karl.stampfl@kirkland.com

Jennifer G. Levy, P.C. (admitted pro hac vice)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jlevy@kirkland.com

*Attorneys for Allergan plc (f/k/a Actavis plc) and Allergan
Finance, LLC (Actavis, Inc. f/k/a Watson
Pharmaceuticals, Inc.)*

Carole S. Rendon (IL 6200217)
BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland OH 44114-1214
Telephone: 216.861.7420
Facsimile: 216.696.0740
Email: crendon@bakerlaw.com

Justin R. Donoho (IL 6299667)
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 4500
Chicago IL 60606-2841

Charles C. Lifland (*admitted pro hac vice*)
Sabrina H. Strong (*admitted pro hac vice*)
Esteban Rodriguez (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
clifland@omm.com
sstrong@omm.com
esrodriguez@omm.com

Amy R. Lucas (*admitted pro hac vice*)



Defendants' Counsel
Re: Chicago Production CHI_011
July 1, 2020
Page 9

Telephone: 312.416.8198
Fax: 312.416.6201
Email: jdonoho@bakerlaw.com

*Attorneys for Endo Health Solutions Inc.*
*and Endo Pharmaceuticals Inc.*

Andrew J. O'Connor (*admitted pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston St.
Boston, MA 02199-3600
(617) 235-4650
Andrew.O'Connor@ropesgray.com

Sarah M Kimmer
ROPES & GRAY LLP
191 North Wacker Drive
Chicago, IL 60606
Telephone: (312) 845-1244
Sarah.Kimmer@ropesgray.com

*Attorneys for Defendant Mallinckrodt LLC and SpecGx*
*LLC*

O'MELVENY & MYERS LLP
1999 Avenue Of The Stars
Los Angeles, CA 90067
Telephone: (310) 246-6784
Facsimile: (310) 246-6779
alucas@omm.com

Sherry A. Knutson (#6276306)
TUCKER ELLIS LLP
233 South Wacker Drive, Suite 6950
Chicago, Illinois 60606
Telephone: (312) 624-6300
Facsimile: (312) 624-6309
sherry.knutson@tuckerellis.com

*Attorneys for Defendants Janssen*
*Pharmaceuticals, Inc., Johnson &*
*Johnson, Janssen Pharmaceutica, Inc.*
*n/k/a Janssen Pharmaceuticals, Inc., and*
*Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen*
*Pharmaceuticals, Inc.*

## **CERTIFICATE OF SERVICE**

On December 7, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Illinois, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Caitlin Martini Mika*
Caitlin Martini Mika