**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF CHICAGO, a municipal corporation, | ) ) | |
| Plaintiff, | ) ) | Case No. 14 CV 4361 |
| v. | ) ) | Judge Jorge L. Alonso |
| PURDUE PHARMA L.P., PURDUE PHARMA INC., THE PURDUE FREDERICK COMPANY INC., TEVA PHARMACEUTICALS USA INC., CEPHALON, INC., JOHNSON & JOHNSON, JANSSEN PHARMA-CEUTICALS, INC., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., n/k/a JANSSEN PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICA, INC., n/k/a JANSSEN PHARMA-CEUTICALS, INC., DEPOMED, INC., ENDO HEALTH SOLUTIONS INC., ENDO PHARMACEUTICALS, INC., ALLERGAN PLC,f/k/a ACTAVIS PLC, ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC.,ACTAVIS LLC, ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., MALLINCKRODT PLC, MALLINCKRODT LLC, SPECGX LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on defendants' latest round of motions to dismiss, the third time this Court has been called upon to resolve such motions. Since the last occasion, the Judicial Panel on Multidistrict Litigation ("JPML") ordered this case—along with numerous similar cases—to be transferred to the Northern District of Ohio for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Following remand two years later, plaintiff, the City

of Chicago ("the City"), has filed a Fifth Amended Complaint, incorporating new allegations to support its claims that defendants, various opioid manufacturers, bear responsibility for the nation's ongoing opioid crisis. Defendants move to dismiss for failure to state a claim pursuant to Rule 12(b)(6). For the following reasons, defendants' motions are denied.

## BACKGROUND

This case is one of many nationwide in which governmental entities claim that pharmaceutical manufacturers, including the above-captioned defendants, caused the nation's opioid crisis by way of unfair and deceptive misconduct in marketing, commercializing, and promoting their opioid products. The Court has already described the background of this dispute in some detail in other opinions. *See City of Chicago v. Purdue Pharma L.P.*, No. 14 C 4361, 2015 WL 2208423, at *1-4 (N.D. Ill. May 8, 2015) ("*Chicago I*"); *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1062-63 (N.D. Ill. 2016) ("*Chicago II*"). Since then, the core of plaintiff's complaint has not changed, but plaintiff has narrowed the scope of the case in some respects, including by dropping numerous claims, while expanding it in others. What follows is a short summary of the most pertinent allegations in plaintiff's sprawling Fifth Amended Complaint, which spans nine hundred forty-three paragraphs in three hundred fifty-nine pages.

According to plaintiff, defendants knew long ago that opioids are an effective treatment for acute short-term pain, such as post-surgical or trauma-related pain, and for palliative care. They also knew that long-term opioid use comes with serious, frequently prohibitive risks. This is because opioids are highly addictive, and patients develop a tolerance for them over time, which lessens their effectiveness and increases the risk of harmful side effects, as larger doses become necessary to achieve the same effects. Nevertheless, plaintiff alleges, over a period of time beginning approximately fifteen years ago, defendants marketed and promoted opioids for long-

term, chronic, non-cancer pain by disseminating misleading information that deceptively minimized the risks the drugs presented.

Defendants' misleading marketing practices generally fell into one of the following five categories. (*See* 5th Am. Compl. ¶ 8, ECF No. 715 (redacted), ECF No. 727 (sealed).) First, defendants developed and disseminated seemingly truthful scientific and educational materials that misrepresented the relative risks and benefits of opioid use. Second, they deployed sales representatives who visited doctors and other prescribers to supply misleading information about the risks and benefits of opioid use. Third, they recruited prescribing physicians as paid speakers who would publicly extol the virtues of opioids, without fairly representing the counterbalancing risks. This practice both secured the ongoing support of these physicians as prescribers and helped to convince their peers to prescribe opioids for chronic pain. Fourth, defendants allegedly funded, facilitated, and directed certain doctors known as "key opinion leaders" ("KOLs") in delivering scripted talks and disseminating information, including studies and continuing medical education materials, that supported the increased use of opioids, but without accounting for their serious risks. These KOLs also served on boards and committees of professional societies and patient advocacy groups that supported opioid use for chronic pain. Fifth, defendants allegedly funded, facilitated, and directed certain seemingly neutral and credible professional societies and patient advocacy groups, known as "front groups," in developing educational materials and guidelines for prescribing opioids, which defendants distributed as apparently neutral support for their position that it was safe to prescribe opioids for chronic use. By way of all of these deceptive marketing practices, the number of opioid prescriptions in the United States exploded, as more and more physicians prescribed opioids for chronic pain.

Additionally, plaintiff alleges that, as the market for opioids boomed due to the change in prescribing practices that defendants fomented and the increasing numbers of opioid-addicted users, defendants failed to put in place adequate systems to guard against diversion of their opioids from legitimate channels into illicit ones. According to plaintiff, defendants had a legal duty under the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq*, and the Illinois Controlled Substances Act, 720 ILCS 570/301 *et seq*., to maintain adequate systems to monitor for suspicious orders. Plaintiff alleges that not only did defendants fail to comply with this duty to maintain suspicious-order-monitoring systems ("SOMS"), but they concealed their failure from the public, misrepresenting that they were in compliance with their obligations under the law. As a result of defendants' failures in this regard, pain clinics or "pill mills" arose, and rogue prescribers met the rising demand for opioids by prescribing high volumes of defendants' products—but instead of serving any genuine clinical purpose, these prescriptions merely fed the addiction of opioid users. According to plaintiff, defendants kept detailed data on the prescription, distribution, and sale of their products in Chicago, but still they never designed any system to reliably monitor for suspicious orders likely to be diverted into illicit channels. The resulting oversupply of opioids in Chicago and other communities throughout the United States has allegedly had significant knock-on effects, including an increasing number of deaths and hospitalizations due to opioid addiction and abuse and increased use of illicit substitutes for opioids such as heroin.

## PROCEDURAL HISTORY

Following the Court's September 2016 ruling, *see Chicago II*, 211 F. Supp. 3d at 1084, the parties conducted discovery and briefed another round of motions to dismiss. Meanwhile, in the fall of 2017, the parties in certain similar opioid cases around the country commenced proceedings before the JPML, seeking to consolidate all such cases for pretrial proceedings before a single

judge. Soon after, the JPML ordered dozens of cases, including this one, transferred to the Northern District of Ohio as part of MDL No. 2804 (hereafter, "the opioids MDL").

The MDL court identified certain bellwether cases, which proceeded through discovery and, in the case of the "Track One" cases brought by Summit and Cuyahoga Counties in northern Ohio, to the brink of trial, before settling only hours before opening statements were set to begin. In the course of presiding over these pretrial proceedings, the MDL court made numerous rulings[1] on discovery issues as well as, in some cases, dispositive motions, including dispositive motions filed by and against the present defendants. (*See* Suggestions of Remand at 4, ECF No. 676.) Following the parties' settlement of the Track One cases, the MDL judge concluded that, at the current rate, it would take an inordinate amount of time to reach each of the different categories of cases before him, let alone the merits of each individual case. He therefore suggested certain strategic remands to permit parallel processing of the many opioid cases awaiting rulings. (*Id.*) On December 2, 2019, the JPML ordered this case remanded to this Court. Plaintiff sought and was granted leave to file an amended complaint to drop certain claims while also incorporating new allegations based on facts that had surfaced during discovery before the MDL court.

In the present Fifth Amended Complaint, plaintiff asserts its claims in four counts, all brought pursuant to the provisions of the Municipal Code of Chicago ("MCC"): Count I, for engaging in deceptive business practices in violation of MCC § 2-25-090; Count II, for engaging in unfair business practices in violation of MCC § 2-25-090; Count III, for making misrepresentations in connection with the sale or advertisement of goods in violation of MCC § 4-

---

[1] For purposes of convenience, clarity, and simplicity, the Court will refer to these rulings as rulings of "the MDL judge" or "the MDL court," although on some occasions the relevant reasoning is contained in a magistrate judge's report and recommendation, subsequently adopted by the district judge presiding over the MDL, rather than the ruling of the district judge himself. For purposes of this Opinion, it will not be necessary to distinguish between them.

276-470(1); and Count IV, seeking recovery of costs the City of Chicago incurred "in order to provide services reasonably related" to defendants' violations of "federal, state, or local law," including the MCC, pursuant to MCC § 1-20-020. Plaintiff seeks civil penalties, an injunction against further acts in violation of MCC § 2-25-090, costs of the suit, including attorneys' fees, and the costs of City services reasonably related to defendants' violations of the law.

## LEGAL STANDARDS

"A motion under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what . . . the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded

facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Some of plaintiff's claims involve or include acts of fraud, and such claims must comply with Federal Rule of Civil Procedure 9(b), which requires the pleading party to "state with particularity the circumstances constituting fraud," apart from "[m]alice, intent, knowledge, and other conditions of a person's mind," which "may be alleged generally." The requirement that circumstances of fraud be pleaded with particularity "ensures that plaintiffs do their homework before filing suit and protects defendants from baseless suits that tarnish reputations." *Pirelli Armstrong Tire Corp. Retiree Med. Ben. Trust v. Walgreen Co.*, 631 F.3d 436, 439 (7th Cir. 2011). Ordinarily, a fraud plaintiff's complaint must include such information as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated," *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008), or, as the Seventh Circuit has "often incanted," the "'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Pirelli*, 631 F.3d at 441-42 (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)). However, the "exact level of particularity that is required will necessarily differ based on the facts of the case," *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011), and courts must not "take an overly rigid view of the formulation." *Pirelli*, 631 F.3d at 442. Notably, although defendants argue to the contrary, plaintiff's claims premised on "unfair" practices, as opposed to deceptive practices, need not meet the Rule 9(b) standard for particularity. *See Totty v. Anderson Funeral Home, Ltd.*, 448 F. Supp.

3d 928, 936-37 (N.D. Ill. 2020) ("'A claim under the Consumer Fraud Act may be premised on either [unfair or deceptive conduct] (or both), but the two categories have different pleading standards.'") (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

In Counts I and II, plaintiff seeks relief under section 2-25-090 of the Municipal Code of Chicago. Section 2-25-090 provides as follows:

> No person shall engage in any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city. Any conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act . . . or any section of this Code relating to business operations or consumer protection, shall be a violation of this section. In construing this section, consideration shall be given to court interpretations relating to the Illinois Consumer Fraud and Deceptive Business Practices Act, as amended. In construing this section, consideration shall also be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act, 15 U.S.C.A., Section 45. . . .

The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" . . . in the conduct of any trade or commerce . . . . In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2. "The elements of a claim under the ICFA are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556-57 (7th Cir. 2012); *see Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002); *see also People ex rel. Madigan v. United Constr. of Am., Inc.*, 981 N.E.2d 404, 411 (Ill. App. Ct. 2012) (stating that "the Attorney General may litigate a violation [of ICFA] and seek injunctive and other relief" without

showing actual damages). In Count I, plaintiff claims that defendants violated MCC § 2-25-090 by engaging in deceptive business practices. In Count II, plaintiff claims that defendants violated MCC § 2-25-090 by engaging in unfair business practices.

In Count III, the City alleges that defendants violated § 4-276-470 of the Code, which prohibits any person from:

> [A]ct[ing], us[ing] or employ[ing] any deception, fraud, false pretense, false promise or misrepresentation, or . . . conceal[ing], suppress[ing] or omit[ting] any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, for cash or on credit, or advertisement of any merchandise, whether or not any person has in fact been misled.

In Count IV, plaintiff alleges that defendants violated § 1-20-20 of the Code, which states that:

> Any person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law, or such person's failure to correct conditions which violate any federal, state or local law when such person was under a legal duty to do so, shall be liable to the city for those costs. This liability shall be collectible in the same manner as any other personal liability.

## DISCUSSION

Defendants jointly move to dismiss Counts I and III to the extent that they are based on plaintiff's allegations that defendants misrepresented or concealed their failure to maintain SOMS. They move to dismiss Count II in its entirety, arguing that (a) plaintiff fails to state a claim under the "unfair" practices prong of MCC § 2-25-090 and the ICFA, and (b) even if plaintiff does state a claim, any claim that defendants violated MCC § 2-25-090 by failing to maintain SOMS is preempted by federal law. Further, they move to dismiss Count IV, arguing that plaintiff has failed to plead sufficient factual allegations to establish that defendants' business practices actually or proximately caused the city to incur costs.

Additionally, defendants Teva Pharmaceuticals USA, Inc. and Cephalon, Inc. (collectively, "Teva") and certain defendants referring to themselves as the "Actavis Generic Entities," namely,

Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc., f/k/a/ Watson Pharma, Inc., separately move to dismiss, arguing that the Fifth Amended Complaint fails to make sufficiently specific allegations against them.[2]

## I.  Counts I and III – Deceptive Practices, Misrepresentation and SOMS

The Court has already ruled that the City has adequately pleaded its claims that defendants engaged in deceptive business practices in violation of MCC § 2-25-090 and made misrepresentations in connection with the sale or advertisement of merchandise in violation of MCC § 4-276-470. *See Chicago I*, 2015 WL 2208423, at *8-10; *Chicago II*, 211 F. Supp. 3d at 1070-74. However, the Court's prior rulings did not address the allegations concerning defendant's failure to maintain SOMS or its concealment of its failure to maintain SOMS, which were not included in the versions of the complaint then before the Court. Defendants argue that plaintiff does not state a claim of deceptive practices or misrepresentation based on the SOMS allegations, which, according to defendants, are not sufficiently detailed to meet the plausibility and particularity standards of Rule 8 and Rule 9(b).

Plaintiff responds that defendants' motion should be denied because plaintiff has not even attempted to state a separate claim based on the SOMS allegations. Instead, plaintiff argues, it has folded its allegations regarding defendants' concealing their failure to maintain adequate SOMS

---

[2] Defendants Mallinckrodt plc, Mallinckrodt LLC, and SpecGx LLC have also filed a separate motion to dismiss based on personal jurisdiction. However, these defendants subsequently declared bankruptcy, so the claims against them are automatically stayed under 11 U.S.C. 362. Pursuant to the automatic stay, the Court denies the Mallinckrodt entities' motion to dismiss without prejudice. Parenthetically, the Court also notes that the claims against the Purdue defendants—Purdue Pharma L.P., Purdue Pharma Inc., and the Purdue Frederick Company, Inc.— are stayed following the initiation of bankruptcy proceedings in September 2019. (*See* Pl.'s Mot. for Leave to File an Am. Compl. at 8 n. 6, ECF No. 670 (recognizing that the claims against the Purdue entities are stayed due to bankruptcy); *see also* Pl.'s Feb. 19, 2021 Opp'n to Mot. to Quash at 6, ECF No. 956 (same).)

into its broader claims that defendants engaged in deceptive practices and made misrepresentations in marketing their products, which encompass allegations of a larger pattern of deceptive marketing. (*See* 5th Am. Compl. ¶¶ 913, 936.) The Court agrees with plaintiff. Read naturally, the Fifth Amended Complaint does not purport to assert a separate claim for deceptive practices or misrepresentation based only on the SOMS allegations, and the Court need not determine now whether a claim based only on those allegations would survive, given that the claim will proceed beyond the pleading stage, regardless. The Seventh Circuit has explained that "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324-25 (7th Cir. 2015). In this regard, Rule 12 is unlike Rule 56, which expressly permits courts to award "[p]artial [s]ummary [j]udgment" to litigants who "identif[y] each claim or defense—or the part of each claim or defense" on which there is no genuine dispute of material fact. *See BBL*, 809 F.3d at 325 (internal quotation marks omitted). The Court has already ruled that plaintiff has stated a claim for deceptive practices and misrepresentation in its marketing, and it makes no difference at this stage whether the SOMS allegations could support such claims by themselves.

Defendant argues that the above-quoted language from *BBL* is dicta, and it cites prior district court cases that have ruled at the pleading stage on whether a particular factual theory was viable. No doubt there are many cases in which district courts have pushed the limits of the Rule 12(b)(6) inquiry in an attempt to focus the parties' efforts in discovery by offering an early ruling on the viability of a particular theory. But that does not change the fact that, as *BBL* explained, the critical question at the pleading stage is simply whether the plaintiff has stated a plausible claim under some theory, regardless of whether the plaintiff might later choose to focus on certain facts

rather than others. Subsequent district court decisions have followed *BBL*'s reasoning. *See Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 618 (N.D. Ill. 2020); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proc.*, 159 F. Supp. 3d 898, 923-24 (N.D. Ill. 2016); *see also Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 978 (W.D. Wis. 2003) (citing *Reich v. Continental Casualty Co.*, 33 F.3d 754, 757 (7th Cir.1994)) ("As a general rule, district courts should be guided by the views of the court of appeals or the Supreme Court, even when those views are expressed in dicta."); *Kenall Mfg. Co. v. Cooper Lighting, LLC*, 354 F. Supp. 3d 877, 898 (N.D. Ill. 2018) (explaining why the *dicta* in *BBL* are correct based on the structure of the Federal Rules of Civil Procedure, without regard for what level of deference they are owed). The Court is persuaded to follow *BBL* here, particularly given that a dismissal would likely only invite another amended complaint in this nearly seven-year-old case. Defendants' motions are denied as to this ground.

## II.  Count II – Unfair Practices

MCC § 2-25-090 expressly incorporates the standards of the ICFA. The Seventh Circuit has explained the unfairness prong of the ICFA as follows:

> In interpreting unfair conduct under the Consumer Fraud Act, Illinois courts look to the federal interpretations of unfair conduct under section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45. *Robinson,* 775 N.E.2d at 960; 815 ILCS 505/2. Thus, three considerations guide an Illinois court's determination of whether conduct is unfair under the Consumer Fraud Act: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Robinson,* 75 N.E.2d at 961. A court may find unfairness even if the claim does not satisfy all three criteria. *Id.* For example, a "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.*

*Windy City*, 536 F.3d at 669 (internal parallel citations omitted). Plaintiff contends that defendants' marketing practices are not only immoral, unethical, oppressive, or unscrupulous, but also contrary to public policy as expressed in the CSA, its implementing regulations, and the Illinois CSA.

Defendants argue that the Court should dismiss the unfair practices claim in Count II for two reasons. First, they argue that plaintiff fails to state a claim because it does not plausibly allege that defendants have engaged in any practice that offends public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers. *See Robinson,* 775 N.E.2d at 961. Second, they argue that, even if plaintiff does state a claim, the claim is preempted by the CSA under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), and *Geier v. American Honda Motor Co.*, 529 U.S. 861, 874-75 (2000).

As a threshold matter, the MDL court made numerous rulings bearing on issues defendants raise here, and plaintiff argues that the Court should follow the MDL court's rulings as law of the case, given that this case was one of those consolidated before the MDL court at the time.

Although the MDL court's rulings are instructive, the Court is not persuaded to follow them as law of the case. Plaintiff concedes that the law of the case doctrine is discretionary, not mandatory. The Sixth Circuit has recently warned, in the context of an appeal from another ruling of the MDL court, that cases within an MDL "'retain their separate identities,'" so a district court's decision "in an individual case depends on the record in that case and not others." *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 844-45 (6th Cir. 2020). The Court is not convinced that it should uncritically adopt the MDL court's rulings and reject defendants' arguments out of hand. Instead, as another district court has done in a similar case remanded from the opioids MDL, it will review defendants' arguments independently, but it will use the MDL court's rulings as a "springboard." *City & Cty. of San Francisco v. Purdue Pharma L.P.*, No. 3:18-CV-07591-CRB, 2020 WL 5816488, at *2 (N.D. Cal. Sept. 30, 2020). The Court regards the MDL judge's rulings as "highly persuasive," given his expertise and the stark similarities between this case and the cases before him in those rulings, but it will give due consideration to defendants' arguments that it

should depart from them, particularly if and to the extent that defendants suggest that the MDL court's rulings are inconsistent with Illinois or Seventh Circuit precedent. *See id.*

### A. Failure to State a Claim

With respect to defendants' argument that plaintiff fails to state a claim, both sides focus most heavily on the public policy element of MCC § 2-25-090's unfairness prong. Plaintiff argues that it states a claim because defendants violated their duties to monitor and prevent diversion under the CSA. According to defendants, neither the CSA nor its implementing regulations impose any duties owed to consumers that might reveal a relevant public policy; at most, they argue, the regulations describe a "requirement imposed on [Drug Enforcement Administration ("DEA")]-registrants to maintain their DEA registration," without imposing any specific "standard of conduct" for compliance. (Defs.' Joint Reply Br. at 9 (internal quotation marks omitted).)

The defendants made a similar argument in the MDL, contending that monitoring for suspicious orders is merely a factor the DEA considers as part of the DEA registration process, and that nothing in the text of the CSA goes so far as to impose an ongoing duty on them to do so, let alone to halt shipments of suspicious orders. *See* 21 U.S.C. §§ 822-24, 21 C.F.R. § 1301.71-77. But the MDL court granted summary judgment for the Track One plaintiffs on these issues, ruling that the CSA and its implementing regulations impose an ongoing duty on DEA registrants, including defendants, to "(1) design and operate a system to disclose to the registrant suspicious orders; and (2) inform the DEA of suspicious orders when discovered by the registrant." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3917575, at *7 (N.D. Ohio Aug. 19, 2019) (hereafter, "8/19/19 Track One CSA Ruling") (citing *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 221 (D.C. Cir. 2017)); *see* 21 C.F.R. § 1301.71(a) ("All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled

14

substances."), 21 C.F.R. § 1301.74(b) ("The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the [DEA] of suspicious orders when discovered by the registrant."). Additionally, the court ruled that "the CSA statutory and regulatory duties to maintain effective controls against diversion includes a duty not to ship suspicious orders . . . unless due diligence reasonably dispels the suspicion." 8/19/19 Track One CSA Ruling, 2019 WL 3917575, at *9; *see Masters*, 861 F.3d at 212-13, 222; 21 C.F.R. § 1301.71(a). In *City & County of San Francisco v. Purdue Pharma L.P.*, 2020 WL 5816488, at *3-4, the court agreed with the MDL judge's CSA ruling, explaining in detail why his reasoning was correct. Defendants do not engage with these decisions in their briefs, and it would only belabor the point to retrace their steps any further. This Court agrees with their reasoning.[3]

Conduct violates the public policy prong of the ICFA's test for unfairness if it "offends public policy as established by statutes, the common law or otherwise, or, in other words, whether it is at least within the penumbra of some established concept of unfairness." *Ekl v. Knecht*, 585 N.E.2d 156, 163 (Ill. App. Ct. 1991); *see FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n. 5 (1972). Given that, as the Court has explained, defendants were under legal duties, imposed under the CSA, to monitor for suspicious orders and halt shipments of them, the Court has little doubt that their alleged failure to do so offends public policy, particularly under circumstances in

---

[3] Defendants have noted in a notice of supplemental authority that the DEA has recently published a notice of proposed rulemaking that seeks to amend the CSA to add an explicit "no shipping" duty. Defendants argue that this shows that there is no such duty in the present version of the CSA or its implementing regulations. Plaintiff responds that the proposed amendment is entirely consistent with its proposed construction of the relevant regulations and the amendment merely adds "clarity and consistency" to them. (Pl.'s Resp. at 3, ECF No. 900-1.) The Court agrees with plaintiff. *See Middleton v. City of Chicago*, 578 F.3d 655, 663 (7th Cir. 2009) (explaining that an amendment may clarify, rather than alter, existing law).

which consumers of their products and the consumers' communities were likely to be injured by addiction and its consequences.

Ultimately, however, whether plaintiff states a claim in Count II does not depend on the public policy element because plaintiff's allegations of immoral, unethical, oppressive, or unscrupulous conduct causing substantial injury to consumers are sufficient to state a claim on their own. *See In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 780-81 (N.D. Ohio 2020) (hereafter, "West Boca MDL Ruling") ("Whether violations of the CSA serve as an appropriate predicate is not dispositive of West Boca's [Florida Deceptive and Unfair Trade Practices Act] claim. The Court finds that West Boca has plausibly alleged 'unconscionable, deceptive, or unfair acts or practices' by Distributor Defendants other than those acts that allegedly violate the CSA."). What plaintiff alleges defendants to have done wrong is (a) promote addictive drugs suitable for coping with short-term pain as if they were suitable for coping with long-term, chronic pain; (b) see their promotional efforts pay off with explosive sales growth; but (c) fail to take due care to ensure that the massive quantities of drugs they were shipping were not being abused or misused by people who needed them not for a therapeutic purpose but only to feed their addictions. That is, defendants are accused of selling a product that was highly addictive and ignoring signs that their customers were abusing the product, causing it to be diverted into illicit channels, to the detriment of the end-users' health and the stability of the communities they live in, and in violation of defendants' legal duties. These allegations, if proven, describe conduct that is "immoral, unethical, oppressive or unscrupulous." *See Demitro v. General Motors Acceptance Corp.*, 902 N.E.2d 1163, 1169-70 (Ill. App. Ct. 2009).

In particular, courts have characterized "oppressive" conduct as that which "leaves the consumer with little alternative except to submit to it." *See Robinson*, 775 N.E.2d at 961;

16

*Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 631 (N.D. Ill. 2019) ("For purposes of ICFA, a practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer.") (internal quotation marks omitted). By promoting the use of their products for chronic or long-term pain while concealing the risks, including the risk of addiction, they not only caused consumers with chronic pain to use their product, but also, a reasonable factfinder could conclude, they put these consumers in a position in which they were compelled by their addiction to continue buying defendants' product, whether via legal or illicit channels. In other words, the consumers, having been tricked into buying defendants' products, had little alternative but to submit to defendants' alleged misconduct and continue to buy the products, even in illicit channels, if necessary. This is enough to state a claim by itself. *See* West Boca MDL Ruling, 452 F. Supp. 3d at 780-81; *see also In re Nat'l Prescription Opiate Litig.*, No. 18-OP-45332, 2020 WL 1986589, at *8-9 (N.D. Ohio Apr. 27, 2020) (same). Because defendants' alleged misconduct is immoral, unethical, oppressive or unscrupulous, in addition to being contrary to public policy, plaintiff states a claim under the ICFA.

### B. Preemption

"The preemption doctrine is grounded in the Constitution's Supremacy Clause." *Wis. Cent., Ltd. V. Shannon*, 539 F.3d 751, 762 (7th Cir. 2008). The Supremacy Clause declares that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Law of any State to the Contrary notwithstanding." U.S. Const. Art. VI., cl. 2. "Where state and federal law directly conflict, state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (internal quotation marks omitted). Conflict preemption occurs when it is impossible to comply with a state-law duty without violating federal law, or when, under the circumstances of a

particular case, state law stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wyeth v. Levine*, 555 U.S. 555, 563-64 (2009) (internal quotation marks omitted); *see id.* at 588-89 (Thomas, J., concurring).

According to defendants, plaintiff's claims are preempted to the extent that they depend on establishing that defendants failed to comply with the CSA and its implementing regulations by failing to prevent diversion or implement SOMS. Defendants argue that any such claims are preempted because Congress entrusted enforcement of the CSA to the DEA, just as, in *Buckman*, the plaintiff's claims that the defendant failed to comply with the disclosure requirements of the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, in seeking regulatory approval were preempted because Congress had entrusted enforcement of such requirements to the FDA. *See Buckman*, 531 U.S. at 348, 350, 352. Further, to the extent that plaintiff's claim is that defendants should not only have identified and reported suspicious orders, but also that they should not have shipped them, defendants argue that the CSA imposes no such duty on them, and that recognizing any such duty under state tort law would violate preemption principles that prohibit courts from applying state tort law in a fashion that interferes with a federal regulatory scheme. *See Geier*, 529 U.S. at 874-75.

As the Court explained above in Part II.A. of this Opinion, the CSA does impose duties to prevent diversion by monitoring for and halting shipment of suspicious orders. The main problem with defendants' argument is that plaintiff's unfair practices claim does not depend for its existence on whether defendants violated these duties, so there is no conflict with federal law or interference with a federal regulatory scheme.

As plaintiff points out, defendants raised these same arguments in the opioids MDL, and the MDL court rejected them. The MDL court considered whether the CSA preempted state-law

18

claims based on both a false marketing and a failure-to-monitor-for-diversion theory, and it concluded that such claims are not preempted. In its first ruling touching on the issue, the MDL court explained that state-law claims based on fraudulent marketing in the promotion and sale of prescription opioids are not preempted because they do not usurp the FDA's role by asserting a bare violation of the FDCA, nor do they assert a *Buckman*-style claim for fraud on a federal agency. This is because the opioids claims center on the defendants' marketing practices, not their conduct in obtaining regulatory approval for their opioid products. The defendants could have marketed their products truthfully, without concealing the products' true risks, while staying within the bounds of applicable federal law and regulations, and the state-law duties requiring them to market their products truthfully existed independently of federal law, so the claims were not preempted. *In re Nat'l Prescription Opiate Litig.*, No. 1:18-OP-45090, 2018 WL 4895856, at \*23-24 (N.D. Ohio Oct. 5, 2018) (hereafter, "10/5/18 Summit County MDL Ruling"), *report and recommendation adopted in relevant part*, No. 1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018). Next, the MDL court explained that the plaintiff's claims based on a diversion monitoring theory do not "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," because nothing in alleged state-law duties to, "for example, monitor the sale of drugs with due care," is inconsistent with a federal regulatory scheme intended to ensure that those drugs are safe and effective for their intended use. *Id.* (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000)).

While the MDL judge addressed this issue in the context of an argument about duties under the FDCA and enforcement by the FDA, rather than the CSA and the DEA, he appeared to recognize the distinction in subsequent rulings, and to conclude—albeit somewhat conclusorily— that it made no difference. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-02804, 2019

WL 2468267, at *22 (N.D. Ohio Apr. 1, 2019) (hereafter, "4/1/19 Muscogee Creek MDL Ruling")

(adopting the reasoning of the 10/5/18 Summit County MDL Ruling to reject a "fraud on the DEA"

theory under *Buckman*), *report and recommendation adopted in relevant part*, No. 1:17-MD-

2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019); *see also In re Nat'l Prescription Opiate*

*Litig.*, No. 1:17 MD 2804, 2019 WL 4178591, at *5 (N.D. Ohio Sept. 3, 2019) (hereafter, "9/3/19

Track One MDL Ruling") (rejecting *Buckman*-based argument raised by manufacturer

defendants); *id.* at *12 ("Defendants contend imposition of state tort liability would stand as

an obstacle to DEA's ability to regulate and enforce the [CSA]. Congress struck a balance between

the risk of diversion and the risk of access to important medications and vested DEA with the

authority to implement that framework. The Court has previously rejected this obstacle preemption

argument, albeit with respect to the FDA, and now does so with respect to the DEA.").

Similarly, in *City & County of San Francisco*, 2020 WL 5816488, at *28-30, the court

rejected a preemption argument rooted in the CSA and DEA, framed in terms similar to those

defendants use here. The court reasoned that the plaintiff's state-law claims were not preempted

by the CSA under *Geier* because "there is no DEA policy, statement, or CSA regulation . . . that

conflicts with the City's tort claims." *Id.* at * 28. In *Geier*, as a subsequent decision explained, the

Supreme Court held:

> that state tort claims premised on Honda's failure to install airbags conflicted with
> a federal regulation that did not require airbags for all cars. The Department of
> Transportation (DOT) had promulgated a rule that provided car manufacturers with
> a range of choices among passive restraint devices. Rejecting an "'all airbag'"
> standard, the agency had called for a gradual phase-in of a mix of passive restraints
> in order to spur technological development and win consumer acceptance. Because
> the plaintiff's claim was that car manufacturers had a duty to install airbags, it
> presented an obstacle to achieving "the variety and mix of devices that the federal
> regulation sought." . . . [T]he DOT conducted a formal rulemaking and then
> adopted a plan to phase in a mix of passive restraint devices. Examining the rule
> itself and the DOT's contemporaneous record, which revealed the factors the

agency had weighed and the balance it had struck, [the Supreme Court] determined that state tort suits presented an obstacle to the federal scheme.

*Wyeth v. Levine*, 555 U.S. 555, 579-81 (2009) (citing *Geier*, 529 U.S. at 875) (internal citations omitted). The plaintiff's opioid-related state-law claims, the *San Francisco* court reasoned, were not analogous because they "are entirely consistent with the CSA's goals of 'foster[ing] the beneficial use of those medications,' and ensuring 'no interference with the dispensing' of lawfully prescribed opioids." *San Francisco*, 2020 WL 5816488, at *29 (quoting *Gonzalez v. Raich*, 545 U.S. 1, 4 (2005) (interpreting the CSA)).

Additionally, the *San Francisco* court followed the 9/3/19 Track One MDL Ruling in rejecting a *Buckman*-based "fraud on the DEA" preemption argument. The Court explained that *Buckman* was distinguishable because, there, the "claims were premised on the defendant's duty to accurately represent their device to the FDA: but-for the FDA's approval of the screws, the plaintiffs would not have been injured." *San Francisco*, 2020 WL 5816488, at *29. The claims therefore existed "'*solely* by virtue of the FDCA disclosure requirements.'" *Id.* (quoting *Buckman*, 531 U.S. at 353) (emphasis added in *San Francisco*). To the extent that "federal requirements are the 'critical element' of the state claim[s]," *Buckman* held, the state claims are preempted. *San Francisco*, 2020 WL 5816488, at *29 (quoting *Buckman*, 531 U.S. at 353). But the CSA and its implementing regulations are not critical elements of state-law claims of "public nuisance, unfair competition, and false advertising" because they are not "essential to [their] existence." *San Francisco*, 2020 WL 5816488, at *30. Rather, such claims sound in state-law duties to "exercise reasonable care in delivering dangerous narcotic substances." *Id.* Because the state-law claims were "premised on independent duties that [merely] overlap with duties imposed by the CSA and its implementing regulations," they were not preempted under *Buckman*. *Id.* Notably, these claims included a claim under the "unfair prong" of California's Unfair Competition Law, which prohibits

21

unfair business practices, including those that "'offend[] an established public policy'" or that are "'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,'" *id.* at *54 (quoting *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1268, 39 Cal. Rptr. 3d 634 (2006)).

The Court agrees with the reasoning of these decisions, and it finds them to be applicable here. While the duties imposed under the CSA may overlap with certain state-law duties underlying plaintiff's unfair practices claim, as the Court explained above in Part II.A., the latter are independent of the former. Because plaintiff states a claim independently of the duties imposed on defendants under the CSA, its claim is not preempted. The Court need not reach the question of whether the claim would be preempted if defendants' alleged violation of duties imposed under the CSA were the only basis for liability under the ICFA and, by extension, MCC § 2-25-090. Because defendants' alleged misconduct is immoral, unethical, oppressive or unscrupulous under Illinois law, independently of whether it is contrary to public policy expressed in the CSA, plaintiff states a claim under the ICFA, and the claim is not preempted by the CSA.

## III.    Count IV – Cost Recovery

Defendants argue that plaintiff cannot recover costs for city services under MCC § 1-20-020 because plaintiff has not sufficiently demonstrated that defendants' misrepresentations or deceptive and unfair practices caused plaintiff, either proximately or in fact, to incur any such costs. They argue that plaintiff has not alleged that defendants' conduct caused any Chicago prescribers to write any bogus prescriptions or place any suspicious orders, or that defendants actually shipped any suspicious orders. Without such allegations, defendants submit, plaintiff does not allege a sufficiently direct relationship between the injury and the injurious conduct. *See Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1305-06 (2017).

22

Again, however, this is ground that the MDL court has already covered. In denying the defendants' motion to dismiss on proximate cause grounds in *Summit County*, one of the Track One cases, the MDL court explained that the defendants' characterization of the alleged causal chain was overly long and convoluted. In fact, the court explained, the causal chain could be summarized much more concisely:

> Plaintiffs have alleged sufficient facts to support a far more direct chain of causation: (i) . . . Defendants made deceptive claims in promoting their opioids in order to sell more opioids than the legitimate medical market could support (***the conduct***); (ii) the excess opioids marketed by the [defendants] . . . were then diverted into an illicit, black market; (iii) Plaintiffs were forced to expend resources beyond what they had budgeted to attempt to stop the flow of the excess opioids into local communities and to bear the costs associated with cleaning them up. Under this potential chain of causation, the relationship between Plaintiffs' injury and Defendants' alleged conduct is less remote than prior Sixth Circuit precedent finding proximate cause, and is not too remote to support a finding of proximate cause here.

*In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 WL 6628898, at *5 (N.D. Ohio Dec. 19, 2018) (citing *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 619 (6th Cir. 2004)); *see also* 10/5/18 Summit County MDL Ruling, 2018 WL 4895856, at *38-39; *City of Everett v. Purdue Pharma L.P.*, No. C17-209RSM, 2017 WL 4236062, at *6 (W.D. Wash. Sept. 25, 2017) ("Although not as direct as a car accident or slip-and-fall case, this causal chain is still a 'direct sequence,' and it is facially plausible that the involvement of third parties, even criminals, was reasonably foreseeable given the extensive facts of Purdue's knowledge in the pleadings.").

Subsequently, in the Track One cases, the MDL court denied defendants' motion for summary judgment on causation, rejecting arguments similar to the ones that defendants make here. The MDL court explained that the plaintiffs had alleged—and proposed to prove by way of expert testimony—that the defendants' marketing practices had dramatically increased the supply of opioids in the plaintiff-municipalities and that such increases in supply entail an increase in

23

opioid-related harms in those municipalities. *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4178617, at *1-2 (N.D. Ohio Sept. 3, 2019). Further, the MDL court explained that the plaintiffs adduced expert testimony that the defendants had failed to maintain effective controls against diversion. *Id.* at *3. Given this evidence, the MDL court reasoned, a reasonable jury could infer from the increased supply of opioids and the defendants' failure to maintain effective controls against diversion that defendants had caused the opioid-related harms in the plaintiffs' communities. *Id.* It made no difference, the MDL court explained, that the plaintiffs offered not granular proof but only "aggregate proof," without identifying particular orders that the defendants should not have shipped. *Id.* Because a reasonable jury could conclude that the plaintiffs "suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct," the plaintiffs' claims survived summary judgment on causation grounds. *Id.* (citing *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 756–57 (7th Cir. 2011)).

Despite these rulings, the defendants contested causation again before the *San Francisco* court, but that court agreed with the MDL court. The *San Francisco* court concluded that the plaintiff, proceeding under the theory that opioid manufacturers' unlawful and deceptive business practices, including their failure to monitor and halt suspicious orders, resulted in "increased opioid addiction, abuse, overdose death, and diversion," *San Francisco*, 2020 WL 5816488, at *43, had "plausibly alleged both factual and legal causation" of the harm underlying its public nuisance claim, *San Francisco*, 2020 WL 5816488, at *40.

Regarding factual causation, the court explained that the city had alleged that the manufacturer defendants had deceptively marketed opioids in such a way as to increase prescribers' willingness to prescribe opioids, without accurately conveying the risks of addiction, of diminishing efficacy over time, and of harmful side effects. *Id.* at *41. As a result, opioid

prescriptions skyrocketed, and as a "direct and foreseeable result," the city allegedly experienced "skyrocketing addiction, overdose, and death; black markets for diverted prescription opioids; and a concomitant rise in heroin and fentanyl abuse." *Id.* The court found that, by way of these allegations, the city had plausibly alleged that its harm would not have occurred absent the manufacturer defendants' conduct. *Id.*

Regarding proximate cause, the court explained that the "very existence of the duties to maintain effective controls supports the notion that opioid misuse is foreseeable." *Id.* at *40 (citing *Dent v. National Football League*, 902 F.3d 1109, 1119 (9th Cir. 2018) ("A lack of reasonable care in the handling, distribution, and administration of controlled substances can foreseeably harm the individuals who take them. That's why they're 'controlled' in the first place—overuse or misuse can lead to addictions and long-term health problems.")). Any intervening acts, the court explained, "including decisions by prescribers, patients, distributors, pharmacies, and third-party criminals," were "reasonably foreseeable, and thus not superseding acts" that broke the chain of proximate causation. *San Francisco*, 2020 WL 5816488, at *43. The manufacturers' argument that the harms the city had identified were remote and "attenuated," the court explained, "ignore[d] the nature of opioid addiction," as "[t]he opioid industry is heavily regulated because it is *not unforeseeable* . . . that opioid-addicted individuals would resort to illicit forms of opioids"; indeed, "opioid regulations are intended to prevent the precise harms that comprise the City's injuries." *Id.* at *44. In short, the plaintiff had "sufficiently pled proximate causation because its alleged harms—costs associated with addressing increased rates of opioid use, addiction, and overdoses . . . —are the foreseeable result of Manufacturers' conduct." *Id.*

Defendants argue that the analysis of causation-in-fact exemplified by these decisions is flawed because they did not require the plaintiffs to allege that particular misrepresentations caused

particular prescribers in the plaintiff jurisdictions to write medically inappropriate prescriptions. In making this argument, defendants rely heavily on this Court's decision in *Chicago II*. But that decision addressed a different version of the complaint that included claims under the City's false claims ordinance, an analog of the federal False Claims Act, 31 U.S.C. § 3730. *See Chicago II*, 211 F. Supp. 3d at 1083; *see also id.* at 1076-81; *cf. City of Chicago v. Smollett*, 421 F. Supp. 3d 565, 574 (N.D. Ill. 2019) (distinguishing *Chicago II* because, in *Smollett*, the city plausibly alleged that it incurred costs that were "reasonably related" to the defendant's false statements, reasoning that the city "is not required to catalog its damages in detail at the pleading phase"). The present complaint not only does contain significant prescriber-based allegations, but also it adverts to expert testimony that was offered in the MDL, which, the City alleges, will establish that defendants' marketing and sales activities caused an increase in opioid use, which caused an increase in opioid-related harm in Chicago and other communities. (*See* 5th Am. Compl. ¶¶ 703, 821, 860-89.) Under the allegations of the present complaint, and given the expert testimony that plaintiff has incorporated into the complaint, this Court finds the decisions of the MDL court and the *San Francisco* court highly persuasive. The Court agrees with plaintiff that, given the totality of the allegations in the Fifth Amended Complaint, plaintiff need not make specific allegations connecting each Chicago prescriber to specific misrepresentations and omissions. The present version of the complaint has been significantly altered since this case was last before this Court, and it sufficiently alleges causation-in-fact without the granular allegations the Court previously required.

As for proximate cause, defendants argue that the court should not take an approach similar to the *San Francisco* court's because it emphasizes foreseeability without sufficiently attending to the requirement that there must be "'some direct relation between the injury asserted and the

26

injurious conduct alleged.'" *Bank of Am.*, 137 S. Ct. at 1306 (quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992)). Plaintiff responds that defendants are relying on the wrong case law, and the Court agrees. Whatever federal courts have said about proximate cause in the context of federal statutes such as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), *see Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys*, 873 F.3d 574, 578 (7th Cir. 2017), and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, *see Bank of Am.*, 127 S. Ct. at 1306, plaintiff's claims in this case are governed by Illinois law. Under Illinois law, as the Seventh Circuit has explained, "[f]oreseeability is the touchstone of [the] legal-cause analysis." *In re: Emerald Casino, Inc.*, 867 F.3d 743, 756 (7th Cir. 2017). "A defendant's conduct is a legal cause of damages if the damages were a likely and thus a foreseeable result of the defendant's conduct." *Id.* (citing *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124-25 (Ill. 2015)); *see Kramer v. Szczepaniak*, 123 N.E.3d 431, 440 (Ill. App. Ct. 2018) ("The touchstone of legal causation is foreseeability.") (citing *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004)); *Kramer*, 123 N.E.3d at 442 ("The context matters. The facts matter . . . . [T]aking the allegations here as true and drawing all reasonable inferences in favor of plaintiffs, we cannot say that the risk . . . was so clearly unforeseeable as to be something we can decide at the pleading stage."); *Inman v. Howe Freightways, Inc.*, 130 N.E.3d 458, 479 (Ill. App. Ct. 2019) ("[W]hat is reasonably foreseeable is a context-dependent inquiry. The context in this case was an extremely dangerous scenario.") (internal citation omitted); *see also Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392 (7th Cir. 2018) ("[Plaintiff] directs us to the foreseeability of an outcome, while [defendant] implores us to focus on the number of steps that occur between an action and its consequence. This is, to a degree, a pointless debate: directness and foreseeability are logically

linked.") (internal citations omitted). Given these governing principles of Illinois law, the *San Francisco* court's approach is apt and persuasive.

Defendants' best case is *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d at 1136, in which the Illinois Supreme Court considered whether firearm "dealer defendants, given the nature of the product they sell . . . could reasonably foresee that the guns they lawfully sell would be illegally taken into the city in such numbers and used in such a manner that they create a public nuisance." The court concluded that the firearms dealers' "lawful commercial activity" was not the proximate cause of the harms that arose from their use by Chicago residents; instead, the intervening criminal acts of third parties were a superseding cause. *Id.* (internal quotation marks omitted). But the *San Francisco* court distinguished similar firearms cases because, unlike the firearms dealers in those cases, whose conduct "did not violate any law," opioid manufacturers stand accused of "<u>unlawfully</u> market[ing] prescription opioids and violat[ing] their duties to maintain effective controls against diversion." *Id.* at *42-43 (citing *In re Firearm Cases*, 24 Cal. Rptr. 3d 659, 681 (Cal. App. Ct. 2005)). The very fact that the CSA imposed duties to maintain controls against diversion—controls designed to protect against "overuse or misuse," which leads to addiction—was what demonstrated that the harms the city suffered were foreseeable. *Id.* at *43. Thus, while, in *Beretta* and like cases, the "criminal acts of third parties" may not have been sufficiently foreseeable for purposes of proximate cause, the *San Francisco* court concluded that the defendants' *unlawfully* deceptive and unfair marketing of opioids required a different result.

This Court agrees with the reasoning of the *San Francisco* court and concludes that this case is distinguishable from *Beretta*. The opioid-related harms that the City experienced were a foreseeable result of defendants' allegedly deceptive and unfair marketing practices—indeed, they are practically the reason those practices are unlawful—and therefore plaintiff has sufficiently

28

alleged proximate cause.[4] *Id.* at *43-44; *see also City of Everett*, 2017 WL 4236062, at *6. Plaintiff has sufficiently alleged that defendants caused the opioid-related harm it experienced, both proximately and in fact, so defendants' motion to dismiss the City's cost recovery claim is denied.

## IV. Teva and Actavis Generic Entities' Motion to Dismiss

Teva and the Actavis Generic Entities have filed two separate motions to dismiss based on individualized issues particular to them. These entities are now commonly owned. Teva Pharmaceutical Industries, Ltd., owns defendant Teva Pharmaceuticals USA, Inc.; it acquired defendant Cephalon, Inc., in 2011; and it acquired the Actavis Generic Entities from defendant Allergan plc in 2016. (5th Am. Compl. ¶¶ 37-39.) In support of one of the individualized motions to dismiss, the Actavis Generic Entities argue that (a) the City makes no plausible allegations that they engaged in any deceptive or unfair marketing, given that generic manufacturers do not promote their products; (b) any false marketing claims against them are preempted under *Mensing*, 564 U.S. at 604, and *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013), because, as generic manufacturers, unlike brand-name manufacturers, federal law gives them no control over their products' labeling, and (c) the City does not plausibly allege that they caused its injuries. In support of the remaining motion, Teva argues that the City's claims in Counts II and IV fail for lack of causation. The Court takes these issues in reverse order.

---

[4] In a notice of supplemental authority, defendants cite a recent decision of the Circuit Court of Cook County in *People v. Johnson & Johnson, et al.*, No. 19 CH 10481 (Cir. Ct. Cook Cty. Jan. 8, 2021), in which the Court granted a motion to dismiss the State of Illinois's public nuisance claim against certain opioid manufacturers. The court reasoned, in pertinent part, relying on *Beretta*, that the State could not establish proximate cause. However, the court's analysis on that point was sparse, and the decision does not change this Court's conclusion that, just as the *San Francisco* court concluded, *Beretta* and like cases are distinguishable.

### A. Causation

The causation arguments are unavailing for the reasons already described above in Part III of this Opinion. Teva and the Actavis Generic Entities rely on *Chicago II* to argue that plaintiff has not sufficiently alleged that their deceptive activity caused particular prescribers to write medically inappropriate prescriptions or that there were any particular orders they should not have shipped to prevent diversion. But, as the Court has explained, the claims of the Fifth Amended Complaint need not include those details to meet the *Twombly/Iqbal* plausibility standard.

### B. Preemption

Regarding preemption under *Mensing* and *Bartlett*, this is yet another issue that the MDL court has addressed. As the MDL court explained, generic drugs must be identical "to their branded equivalent in every clinically significant way, including with respect to labeling." 4/1/19 Muscogee Creek MDL Ruling, 2019 WL 2468267, at *18. Further, "[u]nder the FDCA and its regulations, the term 'labeling' refers" not only to the product's packaging but also certain "advertising or [other] descriptive matter" that "accompan[ies]" the product. *Id.* at *19 (citing *Strayhorn v. Wyeth Pharmaceuticals*, 737 F.3d 378, 394 (6th Cir. 2013)) (internal quotation marks omitted). Thus, state-law claims against generic drug manufacturers for their failure to warn consumers of certain risks may be preempted, to the extent that warning of the risks would have required the drug manufacturers to change the products' "labeling," which federal law does not permit them to do. *See Greager v. McNeil-PPC, Inc.*, 414 F. Supp. 3d 1137, 1142 (N.D. Ill. 2019). In response to a motion to dismiss, the MDL court explained that the plaintiff's claims were preempted only to the extent that they sought to "impose upon the Generic Manufacturers liability for not sending warnings that the Brand-Name Manufacturers had not sent," not "to the extent that they are founded upon allegations that the Generic Manufacturers engaged in aggressive and

misleading marketing and inadequate anti-diversion activities." 4/1/19 Muscogee Creek MDL Ruling, 2019 WL 2468267, at *22.

At summary judgment in the Track One cases, when the defendants construed the plaintiffs' claims "as effectively demanding nothing more than label changes," the MDL court rejected their "narrow construction," explaining that the allegations against the manufacturers went far beyond labeling:

> Plaintiffs allege that Manufacturers, despite knowing the highly addictive properties of opioids, initiated a massive marketing campaign based on false and misleading information, causing a dramatic increase in opioid prescriptions, creation of a black market for opioids, enormous profits for Manufacturers, and the public health crisis we find ourselves in today. Plaintiffs allege Manufacturers engaged in a series of marketing strategies – funding pain advocacy groups, key opinion leaders, and continuing medical education courses – all to spread messages that the risk of addiction is manageable even for patients with a history of drug abuse, signs of opioid addiction are actually attributable to untreated pain (requiring more opioids), withdrawal can be easily managed, and the risk of addiction from chronic opioid therapy is rare.

9/3/19 Track One MDL Ruling, 2019 WL 4178591, at *4. The MDL court ruled that "the term 'labeling'" was not broad enough to cover the "massive marketing campaign" the plaintiffs described in their allegations, so it rejected the generic manufacturers' preemption argument.

The MDL court's reasoning is persuasive, and the Court follows its lead here. The City's claims against the Actavis Generic Entities do not concern mere labeling, particularly to the extent they concern marketing strategies such as "funding pain advocacy groups, key opinion leaders, and continuing education courses – all to spread messages that the risk of addiction is manageable." *Id.* To the extent plaintiff's claims concern marketing practices that go beyond "labeling," they are not preempted. Because plaintiff describes at least some such practices, its claims against the Actavis Generic Entities survive their motion to dismiss.

31

### C. Sufficiency of Factual Allegations

In response to the Actavis Generic Entities' arguments about whether plaintiff has pleaded sufficient factual matter against them, plaintiff argues that these arguments are out of place at the pleading stage because they are premised on what is essentially a denial of plaintiff's factual allegations. The Actavis Generic Entities assert that, as generic manufacturers who do not promote their products, they cannot have engaged in the deceptive and unfair marketing practices the Fifth Amended Complaint describes, nor has the City described any specific misrepresentations they disseminated. These arguments are unavailing. While the complaint may leave something to be desired in terms of connecting the Actavis Generic Entities to specific conduct, the Fifth Amended Complaint provides fair notice because it tells "a story that holds together," *see Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010), which is all Rule 8 requires.

The Fifth Amended Complaint includes specific allegations against "Actavis." While the Court takes the point that the use of the term "Actavis" may lump the Actavis Generic Entities together with entities in the same corporate family who sold and promoted branded products such as Kadian and Norco, without specifying how the Actavis Generic Entities are meant to have participated in the promotional activity, it does not follow that the claims against the Actavis Generic Entities are not plausible. The Court is in no position at the pleading stage to say that the Actavis Generic Entities could not possibly have engaged in certain marketing behavior, which would have benefited them, because those marketing tasks must have fallen to other entities within the same corporate family. The pleading stage is not the appropriate time to sort out such issues. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-CV-02804, 2019 WL 2477416, at *8 (N.D. Ohio Apr. 1, 2019) ("Plaintiff's [complaint] contains plausible allegations against all manufacturers, which includes the Generic Manufacturers; and merely denying those allegations

32

creates material issues of fact not suitable for resolution on a motion to dismiss."), *report and recommendation adopted in relevant part*, No. 1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019); *see also id.* at *17 ("That level of specificity is not required at the pleading stage where the complaint provides sufficient factual content for the court to reasonably infer that the Manufacturer Defendants, including those that produce generic prescription opioids, are liable for the [injurious] conduct."); 4/1/19 Muscogee Creek MDL Ruling, 2019 WL 2468267, at *18 n.29 ("The Generic Manufacturers will have the opportunity to individuate and clarify their status as discovery progresses. At this phase of the litigation, however, the court accepts Plaintiff's allegations as true."). It is at least plausible that the Actavis Generic Entities engaged in some of the deceptive and unfair marketing that the City describes, particularly providing funding and support for KOLs and front groups, as well as failing in their duty to prevent diversion. *See* 4/1/19 Muscogee Creek MDL Ruling, 2019 WL 2468267, at *13-14. Indeed, the MDL court found that there was sufficient evidence against the generic manufacturers to survive summary judgment, let alone allegations to survive a motion to dismiss. 9/3/19 Track One MDL Ruling, 2019 WL 4178591, at *9-10 (summary judgment inappropriate because a "reasonable finder of fact could conclude . . . that Allergan/Actavis marketed both brand name and generic Kadian"). The allegations of the Fifth Amended Complaint state a plausible claim against the Actavis Generic Entities.

## CONCLUSION

For the reasons set forth above, defendants' joint motion to dismiss [769], Teva's motion to dismiss [764], and the Actavis Generic Entities' motion to dismiss [766] are denied. The Mallinckrodt entities' motion to dismiss [777] is denied, without prejudice to renewal following the resolution of bankruptcy proceedings. Plaintiff's motion for leave to file opposition briefing

under seal [817] is granted, as plaintiff has filed public versions of these documents with reasonably limited redactions. Plaintiff's motion for leave to file a response to defendants' notice of supplemental authority [900] is granted. Defendants' motion for leave to file notice of supplemental authority [925] is granted. The motions for leave to appear *pro hac vice* [951, 958, 960, 961, 966, 971, 972, 973, 974, 975, 977, 978, 996, 998] are granted.

**SO ORDERED.**                    **ENTERED: March 31, 2021**

_____
**JORGE L. ALONSO**
**United States District Judge**